**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>AMYRIS, INC., *et al.*,<br><br>                Debtors. [1] | Chapter 11<br><br>Case No. 23-11131 (___)<br><br>(Joint Administration Requested) |

**MOTION FOR ENTRY OF**
**INTERIM AND FINAL ORDERS (I) AUTHORIZING**
**THE DEBTORS TO PAY PREPETITION CLAIMS OF CRITICAL VENDORS,**
**FOREIGN VENDORS, 503(b)(9) CLAIMANTS, AND LIEN CLAIMANTS;**
**(II) AUTHORIZING ALL FINANCIAL INSTITUTIONS TO HONOR ALL RELATED**
**PAYMENT REQUESTS; AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors-in-possession (the "Debtors" or the "Amyris") file this motion (the "Motion") for the entry of an interim order on an expedited basis, substantially in the form attached hereto as **Exhibit A** (the "Proposed Interim Order") and, following a final hearing to be set by the Court (the "Final Hearing"), entry of a final order, substantially in the form attached hereto as **Exhibit B** (the "Proposed Final Order"): (a) authorizing, but not directing, the Debtors to pay (i) certain prepetition claims (each a "Critical Vendor Claim" and, collectively, the "Critical Vendor Claims") of certain essential vendors and service providers (each, a "Critical Vendor" and, collectively, the "Critical Vendors") on an interim basis not to exceed $6.5 million (the "Interim Critical Vendor Cap"), representing the critical expenditures the Debtors will need to make to Critical Vendors during the first five weeks of these Chapter 11 Cases (as defined below), and, on a final basis, not to exceed $10 million (the "Final Critical Vendor Cap"); (ii) certain prepetition claims of Foreign Vendors (as defined below) on an interim basis not to

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

exceed $1.2 million (the "Interim Foreign Vendor Cap"), representing the critical expenditures the Debtors will need to make to Foreign Vendors during the first five weeks of these Chapter 11 Cases, and, on a final basis, not to exceed $2 million (the "Final Foreign Vendor Cap"); (iii) 503(b)(9) Claimants (as defined below); and (iv) certain prepetition claims of Lien Claimants (as defined below), including expediters, shippers, and warehouses, on an interim basis not to exceed $2 million (the "Interim Lien Claimant Cap"), representing the critical expenditures the Debtors will need to make to Lien Claimants during the first five weeks of these Chapter 11 Cases, and, on a final basis, not to exceed $3 million (the "Final Lien Claimant Cap"); (b) authorizing applicable banks and other financial institutions to honor and process related checks and transfers; (c) approving the form of agreement that may be used by the Debtors, substantially in the form attached to the Proposed Interim Order as Exhibit 1 (the "Vendor Agreement"); and (d) granting related relief.   In support of this Motion, the Debtors rely upon and refer this Court to the *Declaration of Han Kieftenbeld in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), incorporated herein by reference.[2]   In further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.        The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. The Debtors confirm their consent, pursuant to Rule 9013-1(f) of the Local Rules, to the entry of

---

[2]    A capitalized term used but not defined herein shall have the meaning ascribed to it in the First Day Declaration.

a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105(a) and 363 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND

### A.      The Chapter 11 Cases

4.      On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated.

5.      Amyris was founded in 2003 to create a more stable supply of a key anti-malarial treatment.  Through Amyris' cutting-edge science, artemisinin—the most effective anti-malarial drug in the world—is now consistently available to treat the deadly disease.  Using the same technological innovations that produced artemisinin, Amyris has become the world's leading manufacturer of ingredients made with synthetic biology.  Amyris provides sustainable

ingredients that are eco-friendly alternatives to raw material sourced for flavors and fragrances, sweeteners, cosmetics, pharmaceuticals, and other consumer products.

6.     In addition, Amyris operates a family of consumer brands that utilize the Company's ingredients to meet the growing demand for sustainable, effective, and accessible products, including Biossance® (clean beauty skincare), JVN™ (haircare), Rose Inc.™ (clean color cosmetics), Pipette® (clean baby skincare), OLIKA™ (clean wellness), MenoLabs™ (healthy living and menopause wellness), Stripes™ (menopausal wellness), and 4U by Tia™ (a new clean haircare line).

7.     A more detailed description of the Debtors' business and facts precipitating the filing of the Debtors' chapter 11 proceedings are set forth in the First Day Declaration.

**B.     The Critical Vendors**

8.     The Debtors' business relies on continuing access to and relationships with various vendors and service providers.  Any disruption in the Debtors' access to the provision of critical raw materials, goods, and services to the Debtors would have a far-reaching and adverse economic and operational impact on their business.

9.     The bulk of the goods and services that the Debtors depend on are provided by a critical network of vendors and service providers that, for the most part, conduct business with the Debtors on an invoice-by-invoice or purchase order-by-purchase order basis, and not pursuant to long-term contracts.  These vendors typically supply their customers with services and products on trade terms based on their experience with and perceived risk of conducting business with such customers.  The Debtors believe that it would be extremely difficult, if not impossible, to replace the Critical Vendors within a reasonable time without severe disruption to the Debtors' businesses.  Such harm would likely far outweigh the cost of payment of the Critical Vendor Claims.  As a

4

result, it is essential to the success of the Debtors' goals in the Chapter 11 Cases that they be able to maintain the flow of goods and services to their business.

10.     The Debtors undertook a process to identify the Critical Vendors using the following criteria: (i) whether certain specifications prevent the Debtors from obtaining a vendor's goods or services from alternative sources within a reasonable timeframe; (ii) if a vendor is not a sole-source or primary provider of services or products, whether the Debtors can continue to operate in the ordinary course while a replacement vendor is secured; and (iii) whether the Debtors can compel performance from a vendor pursuant to an applicable contract.  As a result of their critical review and evaluation, the Debtors have identified a narrow subset of vendors as Critical Vendors.

11.     The Debtors routinely purchase (a) laboratory equipment and related repair services and (b) unique materials and goods from the Critical Vendors that are necessary to the Company's research and development and production of finished products.  Replacing the Critical Vendors would not be possible without expending additional resources or interrupting the Debtors' research and manufacturing processes.  The Debtors maintain, for the most part, a limited production schedule for their products that avoids a build-up of finished products awaiting transport.  While this production schedule limits waste and reduces inventory, it makes the manufacturing system more susceptible to shortage if production is interrupted, even if for a short time.

12.     As of the Petition Date, the Debtors will owe amounts to certain Critical Vendors (a) that have been billed and invoiced or (b) that have accrued immediately prior to the Petition Date for which they have not yet been invoiced or payment is not yet due.  The Debtors anticipate the total amount of Critical Vendor Claims will not exceed $10 million, of which $6.5 million is being requested on an interim basis.

DOCS_DE:243859.7

13.      Given the importance of the goods and services provided by the Critical Vendors, it is imperative that the Debtors be granted, on an emergency basis, the flexibility and authority to satisfy the prepetition claims of the Critical Vendors up to the Interim Critical Vendor Cap and, if approved on a final basis, the Final Critical Vendor Cap.

## C.      The Foreign Vendors

14.      A critical component of the Debtors' business involves transactions with foreign vendors (collectively, "Foreign Vendors").  In the ordinary course of business, the Debtors incur obligations to numerous suppliers of goods and services whose assets are located exclusively outside of the United States.

15.      Maintaining existing relationships with the Foreign Vendors is critical to continuing the Debtors' business.  Replacing these Foreign Vendors would be time-consuming, impracticable (and in many local jurisdictions, impossible), and cost-prohibitive.

16.      Foreign Vendors often have skeptical reactions to United States bankruptcy proceedings because many of them are unfamiliar with the chapter 11 process.  Short of severing their contractual relations with the Debtors, nonpayment of prepetition claims may cause the Foreign Vendors to take other precipitous actions, including delaying shipments or the provision of services, or initiating a lawsuit in a foreign court to obtain a judgment against the Debtors to collect prepetition amounts owed to them.  Although the automatic stay applies to protect the Debtors' assets wherever they are located in the world, the Foreign Vendors may erroneously believe that they are not subject to the automatic stay of section 362 of the Bankruptcy Code.  Moreover, attempting to enforce the Bankruptcy Code in foreign countries may be uneconomical.

17.      As of the Petition Date, the Debtors will owe amounts to certain Foreign Vendors (a) that have been billed and invoiced or (b) that have accrued immediately prior to the Petition

Date for which they have not yet been invoiced or payment is not yet due (the "<u>Foreign Vendor</u> <u>Claims</u>").  The Debtors anticipate the total amount of Foreign Vendor Claims will not exceed $2 million, of which $1.2 million is being requested on an interim basis.

18.     Given the importance of the goods and services provided by the Foreign Vendors, it is imperative that the Debtors be granted, on an emergency basis, the flexibility and authority to satisfy the prepetition claims of the Foreign Vendors up to the Interim Foreign Vendor Cap and, if approved on a final basis, the Final Foreign Vendor Cap.

**D.     <u>The 503(b)(9) Claims</u>**

19.     Certain vendors (the "<u>503(b)(9) Claimants</u>"), including potential Critical Vendors, may have delivered goods to the Debtors within 20 days prior to the Petition Date.[3]

20.     Section 503(b)(9) of the Bankruptcy Code provides that such claims (the "<u>503(b)(9)</u> <u>Claims</u>") hold administrative expense priority against the applicable Debtor's estate.  Therefore, such 503(b)(9) Claims must be paid in full to confirm a plan of reorganization.  *See* 11 U.S.C. § 1129(a)(9)(A) (requiring payment in full of claims entitled to priority).  Consequently, payment of such claims now only provides such parties with what they would be entitled to receive under a confirmed plan.  Moreover, the Bankruptcy Code does not prohibit a debtor from paying administrative claims prior to confirmation.  The Debtors believe that this relief is in the best interest of the Debtors' estates and will prevent detrimental changes to trade terms or a refusal to do business together, thereby preserving the Debtors' liquidity and businesses.

21.     The Debtors' ongoing ability to obtain materials and products as provided herein is necessary to preserve the value of their estates.  Absent the payment of the 503(b)(9) Claims at the outset of the Chapter 11 Cases—which may merely accelerate the timing of payment and not the

---

[3]     The 503(b)(9) Claims are also Critical Vendor Claims, Lien Claims, Foreign Vendor Claims, and amounts owed on account of such claims are captured in the other categories of claims in this Motion.

ultimate treatment of such claims—the Debtors could be denied access to materials and products necessary to maintain the Debtors' businesses and maximize the value of the Debtors' estates.

22.    Instead of satisfying the 503(b)(9) Claims after confirmation of a plan of reorganization (at which time such payments may be too late to benefit the Debtors' estates), the Debtors seek authority to pay these claims in the ordinary course of business, while such payments can still induce 503(b)(9) Claimants to adhere to favorable trade terms and do business with the Debtors on a go-forward basis.  Failure to honor these claims in the ordinary course of business may also cause the Debtors' vendor base to withhold support for the Debtors during the chapter 11 process.  Such vendors could accelerate or eliminate favorable trade terms.  The payment of 503(b)(9) Claims is in the best interests of the Debtors' estates because favorable trade terms will prevent material disruptions to the Debtors' businesses, and failure to make such payment could impair the Debtors' ability to stabilize their businesses at this critical juncture to the detriment of all stakeholders.

**E.    The Lien Claims**

23.    The Debtors transact business with third parties who may assert various common law and statutory liens (the "Lien Claimants") against the Debtors and their property if the Debtors fail to pay for the services rendered (the "Lien Claims" and, together with the Critical Vendor Claims, the Foreign Vendor Claims, and the 503(b)(9) Claims, the "Trade Claims," and the holders of Trade Claims, collectively, the "Vendors").

24.    The Lien Claimants include expediters, shippers, and warehousemen.  The Debtors use networks of such Lien Claimants to move both ingredients and finished products through the supply chain and ultimately into the hands of customers.  Attached hereto as **Exhibit C** is a flow chart describing the Debtors' supply chain for the consumer products business.  Attached hereto

as **Exhibit D** is a flow chart describing the Debtors' manufacturing supply chain, which includes the movement of raw materials necessary for its manufacturing business.

25.     As shown in **Exhibits C** and **D**, the Debtors rely on a variety of warehousemen, service providers, common carriers, contract carriers, freight brokers, shippers, and truckers to transport and deliver the goods shipped by the Debtors during the manufacturing process and ultimately to their customers.

26.     Under some non-bankruptcy laws, expediters, shippers, or warehousemen may have a lien on goods in their possession or under their control to secure the charges or expenses incurred in connection with the transportation or storage of the Debtors' goods.  In addition, certain of the expediters and shippers remit import duties and customs duties (the "Import and Customs Duties") on the Debtors' behalf in the ordinary course.[4]

27.     The Debtors expect that, as of the Petition Date, certain expediters, shippers, and warehousemen may hold claims against the Debtors.

28.     The Debtors' distribution system is an integrated network that is dependent upon the continued use of their existing logistics supply chain.  Because the Debtors' business depends on the constant supply of goods to the Debtors' customers, even minor disruptions to the supply of goods could be disastrous for the going concern value of the Debtors' business.

29.     To the extent that any Lien Claimant has perfected a lien on any of the Debtors' property or, in the Debtors' estimation, could assert and perfect a lien on any such property, it is imperative that the Debtors be authorized to pay such Lien Claimants, regardless of whether their claims arose before or after the Petition Date.  Such payment will secure the release of any such lien and the Debtors' continued uninterrupted access to the goods and services provided by the

---

[4] For the avoidance of doubt, the Debtors seek authority to pay any Import and Customs Duties to any Lien Claimants or, if necessary, to the proper governmental authorities, subject to the caps set forth herein.

Lien Claimants.  Further, if amounts owed to the Lien Claimants are not paid, certain of the Lien

Claimants may be able to assert and perfect liens against certain of the Debtors' goods or property,

notwithstanding the automatic stay imposed by section 362 of the Bankruptcy Code.  Accordingly,

the Debtors respectfully request the authority to pay Lien Claims (including Import and Customs

Duties) in their discretion.

30.    As of the Petition Date, the Debtors will owe amounts to certain Lien Claimants

(a) that have been billed and invoiced or (b) that have accrued immediately prior to the Petition

Date for which they have not yet been invoiced or payment is not yet due.  The Debtors anticipate

the total amount of Lien Claims will not exceed $3 million, of which $2 million is being requested

on an interim basis.

**F.    The Proposed Conditions to Payment of Trade Claims**

31.    Subject to the Court's approval, the Debtors intend to pay the Trade Claims only to

the extent necessary to preserve their business as a going concern.  To that end, in return for paying

the Trade Claims, the Debtors propose that they be authorized to require that Vendors provide

favorable terms for the postpetition delivery of goods and services.  Specifically, the Debtors may

choose to condition the payment of the Trade Claims upon the Vendors' agreement to continue

supplying goods and services to the Debtors in accordance with terms at least as favorable as those

practices and programs (including credit limits, pricing, timing of payments, availability, and other

terms) in place twelve months prior to the Petition Date, or such other trade terms that are

acceptable to the Debtors in their discretion (the "Customary Trade Terms").

32.    In addition, the Debtors request that, regardless of whether a Vendor enters into a

Vendor Agreement (as defined below), if a Vendor accepts payment pursuant to the relief

requested by this Motion and thereafter does not continue to provide goods or services on

Customary Trade Terms, then:  (a) the Debtors may take any and all appropriate steps to cause such Vendor to repay payments made to it on account of its prepetition claims to the extent that such payments exceed the postpetition amounts then owing to such Vendor; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to re-characterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance, and such Vendor will be required to repay to the Debtors such paid amounts that exceed the postpetition obligations then outstanding, without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

## **RELIEF REQUESTED**

33.     By this Motion, the Debtors seek entry of the Proposed Interim Order and Proposed Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively: (a) authorizing, but not directing, the Debtors to pay (i) Critical Vendor Claims in the ordinary course of business up to the Interim Critical Vendor Cap and, if approved on a final basis, the Final Critical Vendor Cap; (ii) claims of Foreign Vendors in the ordinary course of business up to the Interim Foreign Vendor Cap and, if approved on a final basis, the Final Foreign Vendor Cap; (iii) 503(b)(9) Claimants; and (iv) Lien Claimants; (b) authorizing applicable banks and other financial institutions to honor and process related checks and transfers; (c) approving the form of the Vendor Agreement; and (d) granting related relief.  In addition, the Debtors request that the Court schedule a final hearing within approximately thirty-five (35) calendar days of the commencement of the Chapter 11 Cases to consider approval of this Motion on a final basis.

11

## BASIS FOR RELIEF

### A. The Vendor Payments Are Necessary to Preserve the Debtors' Estates

34. Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) ("The ability of a Bankruptcy Court to authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept."); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims as provided herein.

35. Pursuant to section 363(b) of the Bankruptcy Code, payment of prepetition obligations may be authorized where a sound business purpose exists for doing so. *See Ionosphere Clubs*, 98 B.R. at 175 (noting that section 363(b) provides "broad flexibility" to authorize a debtor to honor prepetition claims where supported by an appropriate business justification). Indeed, courts have recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *CoServ*, 273 B.R. at 497.

36. In addition, the Court may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code, which codifies the Court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate

12

to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business. *See Just for Feet*, 242 B.R. at 825. Specifically, the Court may use its power under section 105(a) to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *Ionosphere Clubs*, 98 B.R. at 176.

37.    Indeed, the United States Court of Appeals for the Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981). The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor. *See id.* (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Penn Cent. Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding that the necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims have been paid"); *Just for Feet*, 242 B.R. at 824–25 (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of their business); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (same).

38.    This flexible approach is particularly critical where, as here, prepetition creditors are crucial to the preservation of the Debtors' going concern value. In *In re Structurlite Plastics Corp.*, the bankruptcy court recognized that "a bankruptcy court may exercise its equity powers under section 105(a) of the Bankruptcy Code to authorize payment of prepetition claims where such payment is necessary 'to permit the greatest likelihood of survival of the debtor and payment

of creditors in full or at least proportionately.'"  86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) (citations omitted).  The court explained that "a *per se* rule proscribing the payment of prepetition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the [Bankruptcy] Code."  *Id.* at 932.

39.     Allowing the Debtors to pay the Trade Claims, pursuant to some or all of the above-referenced provisions, is especially appropriate where, as here, doing so is consistent with the "two recognized policies" of chapter 11 of the Bankruptcy Code—preserving going concern value and maximizing the value of property available to satisfy creditors.  *See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. LaSalle St. P'Ship*, 526 U.S. 434, 453 (1999).

40.     Indeed, reflecting the recognition that payment of prepetition claims of certain essential suppliers and vendors is, in fact, both critical to a debtor's ability to preserve going concern value and maximize creditor recovery—thereby increasing prospects for a successful reorganization—courts in this district regularly grant relief consistent with what the Debtors seek in this Motion.  *See, e.g.*, *In re Mallinckrodt PLC*, No. 20-12522 (JTD) (Nov. 14, 2020) [Docket No. 465] (authorizing payments to critical vendors and foreign vendors); *In re Akorn, Inc.*, No. 20-11177 (KBO) (June 11, 2020) [Docket No. 161] (authorizing payments to critical vendors, foreign vendors, 503(b)(9) claimants, and lien claimants); *In re Bluestem Brands, Inc.*, No. 20-10566 (MFW) (Mar. 30, 2020) [Docket No. 151] (authorizing payments to foreign vendors, 503(b)(9) claimants, and lien claimants); *In re BL Rests. Holding, LLC*, No. 20-10156 (MWF) (Bankr. D. Del. Jan. 28, 2020 and Feb. 26, 2020) [Docket Nos. 49, 181] (interim and final orders allowing payments of up to $2 million and $5 million respectively); *In re Dura Auto. Sys., LLC*, No. 19-12378 (KBO) (Nov. 19, 2019) [Docket No. 337] (authorizing payments to critical vendors, foreign vendors, 503(b)(9) claimants, and lien claimants); *In re Hosp. Acquisition LLC*, No. 19-

14

10998 (BLS) (Bankr. D. Del. May 8, 2019 and May 29, 2019) [Docket Nos. 45, 167] (interim and final orders authorizing payment of up to $1.5 million and $3 million, respectively, on account of claims held by critical vendors); *In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. Apr. 2, 2019 and May 1, 2019) [Docket Nos. 102, 293] (interim and final orders authorizing payment of up to $27.1 million and $39.5 million, respectively, on account of claims held by critical vendors); *In re VER Techs. Holdco LLC*, No. 18-10834 (KG) (Bankr. D. Del. Apr. 6, 2018 and May 4, 2018) [Docket Nos. 69, 220] (interim and final orders authorizing payment of up to $12.7 million and $14 million, respectively, on account of claims held by critical vendors); *In re Claire's Stores, Inc.*, No. 18-10584 (MFW) (Bankr. D. Del. Mar. 20, 2018 and Apr. 17, 2018) [Docket Nos. 98, 279] (interim and final orders authorizing payment of up to $7.9 million and $11.7 million, respectively, on account of claims held by critical vendors).

41.     As described above, the Debtors require continued access to ordinary goods and services from the Vendors in order to ensure the smooth operation of their business.  Without such access, the Debtors would not be able to continue to operate as a going concern, thereby severely jeopardizing their ongoing efforts in the Chapter 11 Cases.

42.     Additionally, if the Debtors do not pay certain of the Foreign Vendor Claims, they may simply refuse to do business with the Debtors unless and until they receive payment on account of their prepetition claims.  The Foreign Vendors may take other precipitous actions in foreign jurisdictions against the Debtors based on the incorrect belief that they are not bound by the automatic stay.  As a result, the Debtors would be unable to procure products and services, potentially causing harm and disruptions to the Debtors' estates.

43.     Therefore, the Debtors request that the Court to authorize them to satisfy the Vendors' obligations.

B.      **The Court Should Authorize the Payment of 503(b)(9) Claims**

44.      Section 503(b)(9) of the Bankruptcy Code provides administrative priority for the "value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which goods have been sold to the debtor in the ordinary course of such debtor's business."  11 U.S.C. § 503(b)(9).  These claims must be paid in full for the Debtors to confirm a chapter 11 plan.  *See* 11 U.S.C. § 1129(a)(9)(A).  Consequently, payment of such claims now only provides such parties with what they would be entitled to receive under a chapter 11 plan.  Moreover, the timing of such payments also lies squarely within the Court's discretion. *See In re Global Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court"); 4 Collier on Bankruptcy ¶ 503.16[3] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("[P]rior to confirmation bankruptcy courts have discretion to determine when section 503(b)(9) claims should be paid.").

45.      The Debtors' ongoing ability to obtain goods as provided herein is key to their survival and necessary to preserve the value of their estates.  Absent payment of the 503(b)(9) Claims at the outset of these Chapter 11 Cases—which merely accelerates the timing of payment and not the ultimate treatment or recovery of such claims—the Debtors could be denied access to the goods necessary to maintain the Debtors' businesses and maximize the value of the Debtors' estates.

46.      Moreover, the Bankruptcy Code does not prohibit a debtor from paying such claims prior to confirmation.  As administrative claims incurred in the ordinary course of business, the Debtors believe that they may pay such claims in accordance with their business judgment pursuant to section 363(c)(1) of the Bankruptcy Code.  *See, e.g.*, Transcript of Hearing held on

16

Oct. 31, 2006 at 49, *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Nov. 6, 2006)

("THE COURT:  I think arguably the debtor could pay its 503(b)(9) claimants without court

approval.").  The timing of such payments lies squarely within the Court's discretion.  *See In re*

*Glob. Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del.

Dec. 21, 2006).

47.     Courts in this district have routinely authorized the payment of claims arising under

section 503(b)(9) of the Bankruptcy Code in the ordinary course of business.  *See, e.g.*, *In re*

*Akorn, Inc.*, No. 20-11177 (KBO) (June 11, 2020) [Docket No. 161] (authorizing payments to

503(b)(9) claimants, among others); *In re TPC Grp. Inc.*, No. 22-10493 (CTG) (June 7, 2022)

[Docket No. 341] (same); *In re Gold Standard Baking, LLC*, No. 22-10559 (JKS) (July 18, 2022)

[Docket No. 136] (same).

## C.     Failure to Pay Certain of the Trade Claims (and Especially Lien Claimants) Could Subject the Debtors' Assets to the Perfection of Statutory Liens

48.     As noted above, certain potential Lien Claimants may be entitled under applicable

non-bankruptcy law to assert certain possessory liens on the Debtors' goods or equipment in their

possession (notwithstanding the automatic stay under section 362 of the Bankruptcy Code) in an

attempt to secure payment of their prepetition claims.

49.     Without payment, the potential Lien Claimants may be unwilling to release the

goods in their possession against which they may be entitled to assert liens because doing so may

convert their claims against the Debtors from secured to unsecured.  Pursuant to section 362(b)(3)

of the Bankruptcy Code, the act of perfecting certain possessory liens, to the extent consistent with

section 546(b) of the Bankruptcy Code, is expressly excluded from the automatic stay.  As a result,

the Debtors anticipate that certain of the potential Lien Claimants may assert or perfect liens, refuse

to turn over goods in their possession, or stop performing their ongoing obligations.  Even absent

a valid lien, to the extent that certain potential Lien Claimants have possession over the Debtors' goods, mere possession or retention would be problematic for the Debtors' ongoing businesses.

50.     The relief requested in this Motion is appropriate under sections 363(b) and 105(a) of the Bankruptcy Code, represents a sound exercise of the Debtors' business judgment, and is necessary for the preservation of the Debtors' estates.  Payment of the potential Lien Claimants as they become due in the ordinary course of business will facilitate the flow of goods to the Debtors and ultimately maximize the value of the Debtors' estates.

51.     Courts in this district have routinely granted relief similar to the relief requested herein.  *See, e.g.*, *In re TPC Grp. Inc.*, No. 22-10493 (CTG) (June 7, 2022) [Docket No. 341] (authorizing payment of lien claimants, among others); *In re Akorn, Inc.*, No. 20-11177 (KBO) (June 11, 2020) [Docket No. 161] (same); *In re Bluestem Brands, Inc.*, No. 20-10566 (MFW) (Mar. 30, 2020) [Docket No. 151] (same); *In re Dura Auto. Sys., LLC*, No. 19-12378 (KBO) (Nov. 19, 2019) [Docket No. 337] (same).

**D.     Cause Exists to Authorize Applicable Banks and Financial Institutions to Honor Checks and Electronic Funds Transfers Related to the Trade Claims**

52.     In order to stabilize the Debtors' businesses and to transition smoothly into chapter 11, it is imperative that the Debtors maintain their ability to perform their most basic functions.  The Debtors request that all applicable banks and other financial institutions should be authorized, when requested by the Debtors in their discretion, to receive, process, honor, and pay any and all checks and electronic funds transfer requests made by the Debtors related to the Trade Claims, whether such checks or electronic funds transfer requests were submitted before or after the Petition Date.  Any such financial institution may rely on the representations of such Debtors as to which checks and electronic funds transfer requests are made and authorized to be paid in accordance with this Motion without any duty of further inquiry and without liability for following

18

the Debtors' instructions.  The Debtors also seek authority to issue new postpetition checks, or effect new electronic funds transfers, to replace any prepetition checks or electronic funds transfer requests that may be dishonored or rejected as a result of the commencement of these Chapter 11 Cases with respect to amounts owed in connection with the Trade Claims.

E.     **Bankruptcy Rule 6003 is Satisfied Because the**
       **Requested Relief is Necessary to Avoid Immediate and Irreparable Harm**

53.     Under Bankruptcy Rule 6003, the court may grant a motion to "use . . . property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition," within 21 days after the commencement of a chapter 11 case to the extent that the "relief is necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  Here, the relief requested is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as set forth in the First Day Declaration, and is therefore appropriate under Bankruptcy Rule 6003.

54.     As discussed above, the urgency of the relief requested justifies immediate relief. To ensure that the relief requested is implemented immediately, the Debtors request that the Court waive the notice requirements under Bankruptcy Rule 6004(a), if applicable, and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

55.     Nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  If the Court grants the relief requested in this Motion, any authorized payment is not an admission of the validity of any claim or a waiver of the Debtors' or any other party's right subsequently to dispute such claim.  In addition, authorization to pay the claims described in this Motion will not be deemed a direction to the Debtors to pay such claims.

## NOTICE

i.        The Debtors will provide notice of this Motion to: (a) the Office of the U.S. Trustee for the District of Delaware, 844 King Street, Suite 2207, Lock Box 35, Wilmington, Delaware, 19801, Attn: John Schanne, Esq. (John.Schanne@usdoj.gov); (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Lenders, DIP Agent and the Foris Prepetition Secured Lenders, Goodwin Procter LLP, 620 Eighth Avenue, New York, NY 10018, Attn: Michael H. Goldstein, Esq. (mgoldstein@goodwinlaw.com), and Alexander J. Nicas, Esq. (anicas@goodwinlaw.com); (d) co-counsel to the DIP Lenders, the DIP Agent and the Foris Prepetition Secured Lenders, Troutman Pepper Hamilton Sanders LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899; Attn: David M. Fournier, Esq. (david.fournier@troutman.com); (e) the United States Attorney's Office for the District of Delaware; (f) the state attorneys general for all states in which the Debtors conduct business; (g) the Securities Exchange Commission; and (h) any party that requests service pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).

## NO PRIOR REQUEST

56.       The Debtors have not made any prior request for the relief sought herein to this Court or any other court.

DOCS_DE:243859.7

## <u>CONCLUSION</u>

WHEREFORE, the Debtors respectfully request the entry of interim and final orders, substantially in the forms attached hereto as **<u>Exhibit A</u>** and **<u>Exhibit B</u>**, respectively, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: August 9, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ James E. O'Neill*
Richard M. Pachulski (*pro hac vice* forthcoming)
Debra I. Grassgreen (*pro hac vice* forthcoming)
James E. O'Neill (DE Bar No. 4042)
Jason H. Rosell (*pro hac vice* forthcoming)
Steven W. Golden (DE Bar No. 6807)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:  rpachulski@pszjlaw.com
      dgrassgreen@pszjlaw.com
      joneill@pszjlaw.com
      jrosell@pszjlaw.com
      sgolden@pszjlaw.com

*Proposed Counsel to the*
*Debtors and Debtors in Possession*