## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC., *et al.*, | Case No. 23-11131 (___) |
| Debtors. [1] | (Joint Administration Requested) |

## MOTION FOR ENTRY OF INTERIM AND FINAL
## ORDERS AUTHORIZING THE DEBTORS TO (A) CONTINUE
## OPERATING CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN
## PREPETITION OBLIGATIONS RELATED THERETO, (C) MAINTAIN
## EXISTING BUSINESS FORMS, AND (D) GRANTING RELATED RELIEF

The above-captioned debtors and debtors-in-possession (the "Debtors" or the "Company") file this motion (the "Motion") for the entry of an interim order on an expedited basis, substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and, following a final hearing to be set by the Court (the "Final Hearing"), the entry of a final order, substantially in the form attached hereto as **Exhibit B** (the "Final Order"), pursuant to sections 105, 345, and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2015-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"):   (i) authorizing the Debtors to (a) continue operating the Cash Management System (as defined herein), (b) honor and pay the Bank Fees (as defined herein) in the normal course, and (c) maintain existing business forms; and (ii) granting related relief, as described more fully herein.  In support of this Motion, the Debtors rely upon and refer this Court

---

[1]     A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Amyris.   The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

to the *Declaration of Han Kieftenbeld in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "Underline Declaration"), incorporated herein by reference.[2]  In further support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. The Debtors confirm their consent, pursuant to Rule 9013-1(f) of the Local Rules, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The statutory bases for the relief requested herein are sections 105, 345, and 363 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 2015-2.

## BACKGROUND

4.    On the date hereof (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases, and no committees have been appointed or designated.

---

[2]    A capitalized term used but not defined herein shall have the meaning ascribed to it in the First Day Declaration.

1

5.      The Debtors were founded in 2003 to create a more stable supply of a key anti-malarial treatment.  Through the Debtors' cutting-edge science, artemisinin—the most effective anti-malarial drug in the world—is now consistently available to treat the deadly disease.  Using the same technological innovations that produced artemisinin, the Debtors have become the world's leading manufacturer of ingredients made with synthetic biology.   The Debtors provide sustainable ingredients that are eco-friendly alternatives to raw material sourced for flavors and fragrances, sweeteners, cosmetics, pharmaceuticals, and other consumer products.

6.      In addition, the Debtors operate a family of consumer brands that utilize the Company's ingredients to meet the growing demand for sustainable, effective, and accessible products, including Biossance® (clean beauty skincare), JVN™ (haircare), Rose Inc.™ (clean color cosmetics), Pipette® (clean baby skincare), OLIKA™ (clean wellness), MenoLabs™ (healthy living and menopause wellness), Stripes™ (menopausal wellness), and 4U by Tia™ (a new clean haircare line).

7.      A detailed description of the Debtors' business and facts precipitating the filing of the Debtors' chapter 11 proceedings are set forth in the First Day Declaration.

## CASH MANAGEMENT SYSTEM

8.      In the ordinary course of business, the Debtors use a centralized cash management system (the "Cash Management System") to collect, manage, and disburse funds used in their business.  The Cash Management System is essential to the stability of the Debtors' assets and business objectives, and it is essential to maximizing the value of the Debtors' estates.

9.      As of the Petition Date, the Debtors maintain twenty-four (24) bank accounts (the "Bank Accounts") at J.P. Morgan, U.S. Bank, and Bank of the West (each a "Bank" and, collectively, the "Banks").  Receipts into and payments out of the Bank Accounts occur in a variety

of ways, including checks, drafts, wire transfers, credit cards, and automated clearinghouse ("ACH") transfers.  A general diagram of the movement of funds within the Cash Management System is attached hereto as **Exhibit C**, and a summary of bank accounts and a short description of the purpose of each account is attached hereto as **Exhibit D**.

10.    All funds on deposit in the Debtors' Bank Accounts are insured by the Federal Deposit Insurance Corporation to the extent provided by law.  All of the Banks are on the Region 3 United States Trustee's (the "U.S. Trustee") list of approved depository institutions.  The Debtors do not invest any of their excess cash on hand.

11.    The following is a brief narrative summary of the typical cash flow for the key accounts in the Cash Management System.  Further explanation is provided on **Exhibit C** to this Motion.

12.    The Debtor Amyris, Inc. ("Amyris") has five (5) core accounts at J. P. Morgan (the "Core Accounts") through which all of the Debtors' funds flow.  One account is specifically used for Letters of Credit (MMDA) and is not accessed as a part of the daily Cash Management System. The other four accounts listed below are all linked through the a zero balance process where, at the end of each day the Revenue, Disbursement, and Payroll accounts are zeroed out and all debits and credits are transferred to the Concentration Account.  The Core Accounts are as follows:

    a.    Revenue Account (X2708): The Debtors maintain a Revenue Account which is used to collect revenue generated from the Debtors' operations.

    b.    Concentration Account (X2591):  The Debtors maintain a concentration account.  All transfers from deposits made into the Debtors' other accounts (discussed below) are made on a daily basis to the Concentration Account. The Debtors hold funds in the Concentration Account to fund the Disbursement Account described below.  On the Petition Date, the Debtors held approximately $8,400,000.00 in the Concentration Account.

    c.    Disbursement Account (X2898):  The Debtors maintain a Disbursement Account to pay the Debtors' accounts payable in the ordinary course.  The Disbursement Account is also used to fund the Payroll Account.

3

d.     Payroll Account (X2799): The Debtors maintain a Payroll Account to fund payroll expenses to, and on account of, the Debtors' employees. The Payroll Account is manually funded from the Concentration Account in an amount sufficient to cover bi-weekly payroll disbursements prior to their initiation each pay period. ADP, a third-party vendor, handles the actual payroll payments. In making these payments, ADP requests cash from the Payroll Account and funds the payroll through ACH transfers. The Payroll Account is essentially a zero balance account but maintains a small balance to cover certain Bank Fees (as defined herein) and other account maintenance obligations.[3]

e.     MMDA Account (X8876): This account is used to collateralize letters of credit and is not accessed as a part of the daily Cash Management System.

13.     Amyris' affiliated Debtors maintain nine (9) other accounts, eight (8) accounts at JP Morgan and one (1) account at US Bank (the "Other Accounts") through which the businesses of the affiliated Debtors are funded from the Concentration Account, customer remittances are received and payments are made to trade vendors. The flow of funds for the Other Accounts is depicted in **Exhibit D**. Customer remittances are received into the Other Accounts and trade vendors of the affiliated Debtors are paid out of the Other Accounts. Cash is swept from the Other Accounts into the Concentration Account. The approximate aggregate balance in the Other Accounts as of the Petition Date is $535,000.00.

14.     The Debtors traditionally maintained nine (9) accounts at Bank of the West (the "BOTW Accounts") from a prior lending relationship. The accounts are minimally active and occasionally receive customer remittances which are swept into the Concentration Account. The Debtors are in the process of closing these accounts. The aggregate balance in the BOTW Accounts as of the Petition Date as $15,000.00. A listing of the BOTW Accounts is attached hereto as **Exhibit E**.

---

[3]     The "Wages Motion" means *The Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*, filed contemporaneously herewith.

15.     Through the Core Accounts, the Debtors fund operations of certain non-Debtor subsidiaries located in Brazil, the United Kingdom, the Netherlands, and Portugal (the "Non-Debtor Affiliates").

## INTERCOMPANY TRANSACTIONS AND CLAIMS

16.     In the ordinary course of business, the Debtors have historically engaged in intercompany transactions ("Intercompany Transactions") with each other and the Non-Debtor Affiliates, which in turn give rise to intercompany receivables and payables (each, an "Intercompany Claim") in the ordinary course of their business.   The Debtors have generally accounted for and record all Intercompany Transactions and Intercompany Claims in their centralized accounting system, the results of which are recorded concurrently on the Debtors' balance sheets and regularly reconciled.   The accounting system requires that all general ledger entries be balanced at the legal entity level.   Therefore, when the accounting system enters an intercompany receivable on one entity's balance sheet, it also automatically creates a corresponding intercompany payable on the applicable affiliate's balance sheet.   This results in a net balance of zero when consolidating all intercompany accounts.   All accounting entries, including Intercompany Transactions, are recorded in the Debtors' accounting system.

17.     Most of the Intercompany Transactions take place between Amyris and certain of its Brazilian Non-Debtor Affiliates: Amyris Fermentacao de Performance Ltda. ("AFP") and Amyris Biotecnologia do Brasil Ltda. ("ABB").   Prepetition, two types of Intercompany Transactions occurred between Amyris and AFP: (a) Amyris bought products from AFP through the submission of purchase orders to AFP which, in turn, shipped product to and invoiced Amyris; and (b) Amyris also provided funding to AFP in the form of capital infusions.   These cash payments for products and capital infusions were made by Amyris to AFP through Non-Debtor

Affiliate Amyris Realsweet LLC on behalf of Amyris.  Notwithstanding these historical practices, postpetition, funds transferred from Amyris to AFP will either be through postpetition payment on account of a direct purchase order for postpetition goods, or a postpetition loan that will be separately accounted for and documented as part of the Post-Petition Global Note required by the DIP Financing.  Amyris will not pay AFP on account of prepetition purchase orders.  Postpetition payments to ABB will be pursuant to a postpetition loan that will be separately accounted for and documented as part of the Post-Petition Global Note required by the DIP Financing.  Prepetition, Intercompany Transactions between AFP and ABB have been approximately $13 million on a monthly basis.

18.    A portion of the funding provided to AFP is forwarded on to Brazilian Non-Debtor Affiliates Amyris Clean Beauty Latam, Ltda. ("ACBL") and Interfaces Industria E Comercio De Cosmeticos Ltda ("IICC") to meet their cash needs. IICC also sells product to Amyris.  Amyris submits purchase orders to IICC and, in turn, IICC ships product to Amyris and invoices Amyris for such purchases.  Postpetition, funds transferred from Amyris through AFP to ACBL and IICC will either be through postpetition payment on account of a direct purchase order for postpetition goods, or a postpetition loan that will be separately accounted for and documented as part of the Post-Petition Global Note required by the DIP Financing.  Amyris will not pay ACBL or IICC on account of prepetition purchase orders.

19.    Amyris also conducts Intercompany Transactions with its Portuguese Non-Debtor Affiliate, Amyris Bio Products Portugal, Unipessoal, LDA. and its United Kingdom Non-Debtor Affiliate, Amyris UK Trading Limited. Funding is provided to these two entities through Amyris in the approximate amount of $500,000 each on a monthly basis to cover salaries for employees and other expenses. These Intercompany Transactions are booked as intercompany

payables/receivables due from the particular entity to Amyris. Postpetition, funds transferred from Amyris to these two entities will be on account of a postpetition loan that will be separately accounted for and documented as part of the Post-Petition Global Note required by the DIP Financing.

20.    Smaller Intercompany Transactions are incurred between Amyris and its Netherlands Non-Debtor Affiliate, Amyris Europe Trading B.V. in the amount of approximately $1,500 per month to cover bank fees. Additionally, Non-Debtor Affiliate Clean Beauty Collaborative, Inc. (Rose, Inc.) will need to receive postpetition funding of approximately $2,000,000 per month and Non-Debtor Affiliate Clean Beauty 4U Holdings, LLC will need to receive postpetition funding of approximately $500,000 per month, all for the purchase of goods and payment of operating expenses associated with the businesses. Postpetition, funds transferred from Amyris to these two entities will only occur upon documentation of a post-petition loan that will be separately accounted for and documented as part of the Post-Petition Global Note required by the DIP Financing.

21.    Based upon its historical averages, Amyris anticipates that it will, on a postpetition basis, transfer approximately $7 million per month to the Non-Debtor Affiliates to pay for products that the Non-Debtor Affiliates provide to Amyris, and approximately $11 million per month to the Non-Debtor Affiliates to fund the operations of these Non-Debtor Affiliates. The purchase of products supplied by the Non-Debtor Affiliates and the loans required to fund their operations are critical to maintaining the Debtors' ongoing operations. The Debtors will account for the purchase of such goods and such intercompany loans on a weekly basis, will provide reports of the same to the DIP Agent, and will only transfer such funds to the Non-Debtor Affiliates as provided for in the Budget and in compliance with the DIP Documents.

7

22.    The Debtors seek authority to continue Intercompany Transactions with the Non-Debtor Affiliates in the ordinary course of business.

23.    Through the relief requested by this Motion, the Debtors seek authority to continue effectuating Intercompany Transactions with the Non-Debtor Affiliates in accordance with the foregoing, the DIP Facility, and the Budget. The Debtors intend to continue undertaking Intercompany Transactions, subject to the Budget and the terms and conditions of the DIP Facility, on account of obligations arising on a postpetition basis as between Debtors and Non-Debtors. The Debtors maintain, and will continue to maintain, records of these transfers of cash and bookkeeping entries on a postpetition basis, and the Debtors can ascertain, trace, and account for the Intercompany Transactions on demand.

## BANK FEES

24.    The Debtors incur certain fees and charges in connection with the ordinary course operation of the Cash Management System, including, without limitation, those fees as specified in the prepetition agreements entered into between the Debtors and the Bank (collectively, the "Bank Fees").  The Bank Fees include account maintenance charges, charges relating to ACH and wire transfers, lockbox and depository service charges, and other customary miscellaneous charges.  On average, the Debtors incur approximately $15,000.00 in Bank Fees per month.  In the ordinary course of business and typically on a monthly basis, the Bank charges the Debtors and deducts from the appropriate bank accounts certain service charges and other fees, costs, and expenses.  The Debtors believe that there is approximately one month's worth of Bank Fees $15,000.00 that has accrued prepetition and is outstanding as of the Petition Date.  Accordingly, the Debtors seek approval to pay prepetition Bank Fees up to $15,000.00, to pay any postpetition Bank Fees, and for the Bank to deduct any such Bank Fees in the ordinary course when due.

8

## BUSINESS FORMS

25.     The Debtors use numerous preprinted business forms in the ordinary course of their business (including, without limitation, letterhead, purchase orders, invoices, and checks), including in connection with their Cash Management System.  The Debtors would be required by the U.S. Trustee under its *Operating Guidelines for Chapter 11 Case* (the "U.S. Trustee Guidelines") to incur the expense and delay of ordering entirely new business forms referencing the Debtors' status as debtors-in-possession absent relief from the Court.  To the extent necessary, the Debtors seek authority to use pre-existing business forms without such a reference in order to minimize expense to the Debtors' estates.  The Debtors submit that parties in interest will not be prejudiced if such relief is granted because parties doing business with the Debtors will likely be aware of their status as debtors-in-possession, and thus changing business forms is unnecessary and would be unduly burdensome.  In accordance with Local Rule 2015-2(a), to the extent that the Debtors exhaust their existing supply of checks, the Debtors will reissue checks with the designation "Debtor-in-Possession" and the corresponding case number.

## THE DEBTORS' BANK ACCOUNTS COMPLY WITH
## SECTION 345 OF THE BANKRUPTCY CODE

26.     Pursuant to the U.S. Trustee Guidelines, the U.S. Trustee generally requires chapter 11 debtors to, among other things, deposit all estate funds into an account with an authorized depository that agrees to comply with the requirements of the U.S. Trustee's Office.  As noted above, the Banks at which the Bank Accounts are maintained have executed a Uniform Depository Agreement ("UDA") with, and are designated as authorized depositories by, the U.S. Trustee, pursuant to the U.S. Trustee Operating Guidelines.  For this reason and the reasons articulated above, the Debtors submit that they are in compliance with section 345 of the Bankruptcy Code and with the U.S. Trustee Operating Guidelines.

## RELIEF REQUESTED

27.     The Debtors seek entry of the Interim Order and Final Order, pursuant to sections 105, 345, and 363 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 2015-2, substantially in the forms attached hereto as <u>Exhibit A</u> and <u>Exhibit B</u>:  (i) authorizing the Debtors to (a) continue operating the Cash Management System, (b) honor and pay the Bank Fees in the normal course, including any prepetition Bank Fees, and (c) maintain existing business forms; and (ii) granting related relief, as described more fully herein.   In addition, the Debtors request that the Court schedule a final hearing within approximately thirty-five (35) calendar days of the commencement of the Chapter 11 Cases to consider approval of this Motion on a final basis.

## BASIS FOR RELIEF

**A.      Maintaining the Existing Cash Management System
is Essential to the Debtors' Operational Stability**

28.     The U.S. Trustee Guidelines require a debtor-in-possession to, among other things:

      a.      establish one debtor-in-possession bank account for all estate monies required for the payment of taxes, including payroll taxes;

      b.      close all existing bank accounts and open new debtor-in-possession accounts;

      c.      maintain a separate debtor-in-possession account for cash collateral; and

      d.      obtain checks that bear the designation "debtor-in-possession" and reference the bankruptcy case number and type of account on such checks.

29.     These requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments and to help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.   Enforcement of this provision of the U.S. Trustee Guidelines during these Chapter 11 Cases would severely disrupt the administration of the Debtors' estates.   Accordingly,

the Debtors respectfully request authorization to operate the Bank Accounts in the same manner as was maintained in the ordinary course of business prior to the Petition Date.

30.    Continuation of the Cash Management System is permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor-in-possession to "use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  Additionally, courts in this and other districts have recognized that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash."  *In re Columbia Gas Sys.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993).  The Third Circuit has agreed, emphasizing that requiring a debtor to maintain separate accounts "would be a huge administrative burden and economically inefficient."  *Columbia Gas*, 997 F.2d at 1061; *see also Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1114 (5th Cir. 1995) (finding that a cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

31.    Here, continued use of the Cash Management System will facilitate the Chapter 11 Cases by, among other things, avoiding administrative inefficiencies and expenses associated with disrupting the Cash Management System and minimizing delays in the payment of postpetition obligations.  The Debtors respectfully submit that parties in interest will not be harmed by the maintenance of the existing Cash Management System because the Debtors employ appropriate mechanisms and internal control procedures to prevent unauthorized payments on account of obligations incurred before the Petition Date.  As such, maintaining the Cash Management System is in the best interests of the Debtors' estates.

32.    Moreover, as discussed above, in the ordinary course of business the Debtors conduct transactions through electronic wire transfers and other similar methods.  If the Debtors' ability to conduct transactions by debit, wire, credit card, ACH transfer, or other similar methods is impaired, their estates will incur additional and unnecessary costs.  Accordingly, the Debtors submit that it is in the best interests of all stakeholders for the Court to grant further relief from the U.S. Trustee Guidelines to the extent that they require the Debtors to make all disbursements by check.

**B.    Authorizing (i) the Bank to Continue to Maintain, Service, and Administer the Bank Accounts, and (ii) the Debtors to Pay Bank Fees, Each in the Ordinary Course of Business, Is Warranted**

33.    The Debtors respectfully request that the Court authorize the Bank to continue to maintain, service, and administer the Bank Accounts as an account of the Debtors as debtors-in-possession, without interruption and in the ordinary course of business.  In this regard, the Bank should be authorized to receive, process, honor, and pay any and all checks, ACH transfers, other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto; *provided, however*, that any check, advise, draft, or other notification that the Debtors advised the Bank to have been drawn, issued, or otherwise presented before the Petition Date may be honored by the Bank only to the extent authorized by order of the Court.

34.    The Debtors further request that the Court authorize the Bank to accept and honor all representations from the Debtors as to which checks, drafts, wires, or ACH transfers should be honored or dishonored consistent with any order of the Court and governing law, whether such checks, drafts, wires, or ACH transfers are dated before or after the Petition Date.  The Debtors also request that, to the extent that a Bank honors a prepetition check or other item drawn on any account either:  (i) at the direction of the Debtors; (ii) in a good-faith belief that the Court has

12

authorized such prepetition check or item to be honored; or (iii) as a result of an innocent mistake made despite the above-described protective measures, the Bank will not be deemed to be liable to the Debtors or their estates on account of such prepetition check or other item honored postpetition.  The Debtors respectfully submit that such relief is reasonable and appropriate because the Bank is not in a position to verify independently or audit whether a particular item may be paid in accordance with a Court order or otherwise.

35.     The Debtors further request that the Court authorize them to pay the Bank Fees and authorize the Bank to:  (i) continue to charge the Bank Fees; and (ii) effect chargebacks of returned items to the applicable Bank Account, whether such items are dated before, on, or after the Petition Date, in the ordinary course of business.  The Debtors' inability to pay the prepetition Bank Fees or to continue to pay the Bank Fees in the ordinary course of business postpetition could hinder the Debtors' ability to manage the Cash Management System to the detriment of the Debtors' estates.

36.     Courts in this district routinely have waived the U.S. Trustee Operating Guidelines in operating chapter 11 cases with ongoing business operations and restructuring efforts.  *See, e.g.*, *In re GigaMonster Networks, LLC*, No. 23-10051 (JKS) (Bankr. D. Del. Feb. 9, 2023) (authorizing the debtors' continued use of existing bank accounts); *In re Medly Health Inc.*, No. 22-11257 (Bankr. D. Del. Jan. 6, 2023) (same); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022) (same); *In re TZEW Holdco, LLC*, No. 20-10910 (CSS) (Bankr. D. Del. April 14, 2020) (same); *In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. D. Del. Aug. 20, 2019) (same); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 9, 2019) (same).

13

**C.**    **The Continued Performance of Intercompany Transactions Is Warranted**

37.     As stated above, the Debtors engaged in Intercompany Transactions before the Petition Date.  In this regard, section 363(c)(1) of the Bankruptcy Code authorizes a debtor to "enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business . . . and [] use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1).  Additionally, under section 503(b)(1)(A) of the Bankruptcy Code, "[a]fter notice and a hearing, there shall be allowed, administrative expenses . . . including the actual, necessary costs and expenses of preserving the estate . . . ." 11 U.S.C. § 503(b)(1)(A).

38.     The Debtors believe that they do not require the Court's approval to continue entering into and performing under the Intercompany Transactions because such transactions are in the ordinary course of business within the meaning of section 363(c)(1) of the Bankruptcy Code. The Intercompany Transactions are not just a matter of routine in the Debtors' business; they are the types of transactions that are common among many business enterprises that operate through affiliates.  Yet, precisely because of their routine nature, the Intercompany Transactions are integral to the Debtors' ability to operate their businesses and emerge successfully from chapter 11. Accordingly, out of an abundance of caution, the Debtors request express authority to engage in such transactions postpetition subject to and in compliance with (i) the requirements imposed on the Debtors under the terms of each DIP Order and the DIP Credit Agreement, including compliance with the DIP Budget and any other terms and conditions thereof, (ii) the entity level modeling provided by the Debtors to the DIP Agent in connection with the DIP Budget, and (iii) the execution, on an entity-by-entity basis, of a Post-Petition Global Note in accordance with the DIP Orders and the DIP Credit Agreement.

39.     Each Non-Debtor Affiliate provides good or services to the Debtors which are essential for the Debtors' operations.

14

40.     Similar relief has been granted in other comparable multi-debtor chapter 11 cases in this district and others.  *See, e.g.*, *In re GigaMonster Networks, LLC*, No. 23-10051 (JKS) (Bankr. D. Del. Feb. 9, 2023) (authorizing postpetition intercompany transactions between debtors and granting administrative expense status to intercompany claims related thereto); *In re Medly Health Inc.*, No. 22-11257 (Bankr. D. Del. Jan. 6, 2023) (same); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022).

**D.     Granting Administrative Expense Priority to Postpetition Intercompany Claims is Necessary and Appropriate**

41.     The Debtors also request that the Court grant administrative expense status to all Intercompany Claims that arise postpetition as a result of an Intercompany Transaction, subject and junior in all respects to any superpriority claims, including any adequate protection claims as set forth in the DIP Orders.  If Intercompany Claims are accorded such status, each entity using funds that flow through the Cash Management System will continue to bear the ultimate responsibility for its ordinary-course transactions with affiliates.

42.     The Debtors' funds are aggregated in the Cash Management System.  The Debtors track all fund transfers in their accounting system and have the ability to identify and account for all Intercompany Transactions, including all cash receipts and disbursements.  Continuation of the Intercompany Transactions is in the best interests of the Debtors, their estates, and parties in interest.  To ensure that each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors request that, pursuant to sections 503(b)(1) and 507(a) of the Bankruptcy Code, all Intercompany Claims arising after the Petition Date be accorded administrative expense priority.

**E.    The Court Should Authorize the Debtors to Continue
Using Their Existing Business Forms**

43.    To avoid disruption of the Cash Management System and to avoid unnecessary expenses, the Debtors request, pursuant to Local Rule 2015-2(a), authorization to continue to use their business forms substantially in the form existing immediately before the Petition Date, without reference to the Debtors' status as debtors-in-possession.  The Debtors submit that parties in interest will not be prejudiced if such relief is granted because parties doing business with the Debtors will likely be aware of the Debtors' status as debtors-in-possession, and thus changing business forms is unnecessary and would be unduly burdensome.  In accordance with Local Rule 2015-2(a), to the extent that the Debtors exhaust their existing supply of checks, the Debtors will reissue checks with the designation "Debtor-in-Possession" and the applicable case number.

44.    In other large chapter 11 cases, courts in this district have allowed debtors to use their prepetition business forms without the "Debtor-In-Possession" label.  *See, e.g.*, *In re GigaMonster Networks, LLC*, No. 23-10051 (JKS) (Bankr. D. Del. Feb. 9, 2023) (authorizing the debtors' continued use of preprinted check stock without a "Debtor-in-Possession" marking); *In re Medly Health Inc.*, No. 22-11257 (Bankr. D. Del. Jan. 6, 2023) (same); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Aug. 24, 2022).

**SATISFACTION OF BANKRUPTCY RULE 6003**

45.    The Debtors believe that they are entitled to immediate authorization for the relief contemplated by this Motion.  Pursuant to Bankruptcy Rule 6003, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting the following: . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001."

Fed. R. Bankr. P. 6003.   To the extent that the requirements of Bankruptcy Rule 6003 are applicable to the relief requested in the Motion, the Debtors submit that, for the reasons already set forth herein, the relief requested in this Motion is necessary to avoid immediate and irreparable harm.   For the reasons discussed above, the relief requested herein is integral to the Debtors' administrative activities in these Chapter 11 Cases and is necessary to preserve the value of the Debtors' business and maximize the value of their estates for the benefit of all stakeholders. Failure to receive such authorization and other relief during the first 21 days of these Chapter 11 Cases would severely disrupt the administration of the Debtors' estates at this critical juncture. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## RESERVATION OF RIGHTS

46.     Nothing contained herein is intended or shall be construed as:  (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay a prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

## WAIVER OF BANKRUPTCY RULE 6004

47.     The Debtors seek a waiver of any stay of the effectiveness of any order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the

17

order, unless the court orders otherwise." As set forth in the Motion, the relief requested herein is essential to prevent immediate and irreparable harm to the Debtors' business operations. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## NOTICE

48.     The Debtors will provide notice of this Motion to: (a) the Office of the U.S. Trustee for the District of Delaware, 844 King Street, Suite 2207, Lock Box 35, Wilmington, Delaware, 19801, Attn: John Schanne, Esq. (John.Schanne@usdoj.gov); (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Lenders, DIP Agent and the Foris Prepetition Secured Lenders, Goodwin Procter LLP, 620 Eighth Avenue, New York, NY 10018, Attn: Michael H. Goldstein, Esq. (mgoldstein@goodwinlaw.com), and Alexander J. Nicas, Esq. (anicas@goodwinlaw.com); (d) co-counsel to the DIP Lenders, the DIP Agent and the Foris Prepetition Secured Lenders, Troutman Pepper Hamilton Sanders LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899; Attn: David M. Fournier, Esq. (david.fournier@troutman.com); (e) the United States Attorney's Office for the District of Delaware; (f) the state attorneys general for all states in which the Debtors conduct business; (g) the Securities Exchange Commission; (h) the Bank; and (i) any party that requests service pursuant to Bankruptcy Rule 2002. As this Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).

## NO PRIOR REQUEST

49.     No prior request for the relief sought in this Motion has been made to this Court or any other Court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the proposed Interim Order and Final Order, substantially in the forms attached hereto as <u>Exhibit A</u> and <u>Exhibit B</u>:  (i) authorizing the Debtors to (a) continue operating the Cash Management System, (b) honor and pay the Bank Fees in the normal course, including any prepetition Bank Fees, and (c) maintain existing business forms; and (ii) granting such further relief as may be appropriate and proper.

Dated: August 9, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ James E. O'Neill*
Richard M. Pachulski (*pro hac vice* forthcoming)
Debra I. Grassgreen (*pro hac vice* forthcoming)
James E. O'Neill (DE Bar No. 4042)
Jason H. Rosell (*pro hac vice* forthcoming)
Steven W. Golden (DE Bar No. 6807)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:  rpachulski@pszjlaw.com
         dgrassgreen@pszjlaw.com
         joneill@pszjlaw.com
         jrosell@pszjlaw.com
         sgolden@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

DOCS_DE:243865.6 03703/003