# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AMYRIS, INC., et al.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-11131<br><br>(Joint Administration Requested) |

**DECLARATION OF STEVEN FLEMING IN SUPPORT OF
(a) MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (I)
AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B)
TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF,
AND (b) MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING
THE DEBTORS TO (A) CONTINUE OPERATING CASH MANAGEMENT SYSTEM,
(B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO, (C)
MAINTAIN EXISTING BUSINESS FORMS, AND (D) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Steven Fleming, hereby declare, under penalty of perjury to the best of my knowledge and belief, that:

1. In conjunction with the Chapter 11 Cases of Amyris, Inc. ("Amyris") and its affiliated and related above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company"), I submit this declaration (the "Declaration") in support of (1) *Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing,*

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

*and (V) Granting Related Relief* (the "DIP Motion")[2] and (2) *Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Operating Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Granting Related Relief* (the "Cash Management Motion") filed contemporaneously with this Declaration. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, and information provided to me by the Debtors and their professionals, including, professionals working at my direction at PwC US Business Advisory LLP ("PwC"). If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

2. I am a Principal of PwC, an experienced, leading, full-service financial services, consulting, and accounting firm with over 79 offices and more than 50,000 employees in the United States. I am the leader of the firm's US Business Recovery Services Practice, a position that I've held since 2016 after being a senior member in the group for seven years. Prior to these positions, I held a senior position in PwC's Transaction Services practice in Dubai, UAE, where I was responsible for expanding the firm's Corporate Finance and Valuation practices across the Middle East and North Africa. I have been employed by PwC (and its predecessor entities) since August 1998, and have held other senior positions, both domestically and abroad.

3. I received a Bachelor of Science in Finance from Lehigh University in 1998 and a Master of Business Administration from Columbia Business School in 2004. I am a Certified Insolvency and Restructuring Advisor (CIRA) and hold a Certification in Distressed Business Valuation (CDBV), both of which are designations issued by the Association of Insolvency and

---

[2] Capitalized terms used but not otherwise defined in this Declaration shall have the meaning ascribed to them in the DIP Motion.

Restructuring Advisors. I am also a Certified Turnaround Professional (CTP), a designation issued by the Turnaround Management Association. During the course of my career, I have served as a chief restructuring officer and have testified in numerous chapter 11 cases on matters relating to financing, valuation, cash forecasting, liquidation analyses, and sale processes. I have been qualified as an expert witness with respect to valuation, cash forecasting, and section 363 sale processes.

4. In addition, PwC has considerable experience providing financial advisory services to businesses in chapter 11 scenarios, and has been employed in notable chapter 11 cases, such as: SunEdison Inc.; Takata Corporation (TK Holdings, Inc.); Valeritas Holdings, Inc., Metro Affiliates, Inc.; Clayton General, Inc.; Sportscraft, Ltd.; Acadiana Management Group, LLC; Kid Brands, Inc.; National Envelope Corporation; New Ashley Stewart, Inc.; SDA, Inc; NRAD Medical Associates P.C.; Allied Systems Holdings, Inc.; Munire Furniture Co., Inc., and many others.

5. As discussed in more detail in the *Declaration of Han Kieftenbeld in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), as part of the Company's "Fit-to-Win" restructuring strategy, the Company retained PwC in April 2023 to work with management to accelerate improvements and further the Company's "Fit-to-Win" efficiency and cost reduction program. Since PwC was retained, I have worked hand-in-hand with the Company's management, directors and other professionals to develop a restructuring strategy, consulted on the preparation and filing of these Chapter 11 Cases and assisted the Company's management with the development of the Budgets attached to the DIP Motion and proposed Interim Order. In connection with the development of these Budgets, I have worked closely with the professionals for the DIP Secured Parties and the Foris Prepetition Secured Lenders to ensure

that they have a full understanding of the Debtors' business and financial needs, and I am familiar with the development, analysis, and negotiation of the terms and conditions of the DIP Facility and the Interim Order. Ultimately, the DIP Facility will enable the Debtors to continue their operations in the ordinary course on a postpetition basis while the Debtors attempt to negotiate a consensual restructuring and/or market their assets for sale, and is the product of good faith arms' length negotiation.

6. The Debtors have an immediate and critical need for debtor in possession financing to, among other things, (a) permit the orderly continuation of their businesses; (b) maintain business relationships with vendors, suppliers, and customers; (c) make payroll; (d) fund expenses of the Chapter 11 Cases; and (e) satisfy other working capital, operational, and general corporate needs. Thus, absent access to the DIP Facility and the use of Cash Collateral, the Debtors' estates would suffer immediate and irreparable harm because the Debtors do not have sufficient sources of working capital and financing to operate their businesses in the ordinary course throughout the Chapter 11 Cases. Access to the DIP Facility will provide the Debtors with necessary working capital and liquidity to operate during these Chapter 11 Cases and is vital to the preservation and maintenance of the Debtors' business and assets. Without access to the DIP Facility and Cash Collateral, the Company would run out of money and its ability maintain going concern operations and value will be significantly impaired.

7. As described in the Cash Management Motion, in the ordinary course of business, the Debtors engage in intercompany transactions ("Intercompany Transactions") with each other and non-Debtor subsidiaries located in Brazil, the United Kingdom, the Netherlands, the United States, and Portugal (collectively, the "Non-Debtor Affiliates"),[3] which in turn give rise to

---

[3] The identity of the Non-Debtor Affiliates and their position in the corporate structure of the Debtors is more fully set out in the First Day Declaration and the Organizational Chart attached thereto as Exhibit A.

intercompany receivables and payables (each, an "Intercompany Claim") in the ordinary course of their businesses. I understand from my discussions with the Debtors' Chief Financial Officer and other members of the finance and accounting department that the Debtors generally account for and record all Intercompany Transactions and Intercompany Claims in their centralized accounting system, the results of which are recorded concurrently on the Debtors' balance sheets and periodically reconciled.

8. Most of the Intercompany Transactions take place between Amyris and certain of its Brazilian Non-Debtor Affiliates: Amyris Fermentacao de Performance Ltda. ("AFP") and Amyris Biotecnologia do Brasil Ltda. ("ABB"). Prepetition, two types of Intercompany Transactions occurred between Amyris and AFP: (a) Amyris bought products from AFP through the submission of purchase orders to AFP which, in turn, shipped product to and invoiced Amyris; and (b) Amyris also provided funding to AFP in the form of capital infusions. These cash payments for products and capital infusions were made by Amyris to AFP through Non-Debtor Affiliate Amyris Realsweet LLC on behalf of Amyris. Notwithstanding these historical practices, postpetition, funds transferred from Amyris to AFP will either be through postpetition payment on account of a direct purchase order for postpetition goods, or a postpetition loan that will be separately accounted for and documented as part of the Post-Petition Global Note required by the DIP Financing. Amyris will not pay AFP on account of prepetition purchase orders. Postpetition payments to ABB will be pursuant to a postpetition loan that will be separately accounted for and documented as part of the Post-Petition Global Note required by the DIP Financing. Prepetition, Intercompany Transactions between AFP and ABB have been approximately $13 million on a monthly basis.

9. A portion of the funding provided to AFP is forwarded on to Brazilian Non-Debtor Affiliates Amyris Clean Beauty Latam, Ltda. ("ACBL") and Interfaces Industria E Comercio De Cosmeticos Ltda ("IICC") to meet their cash needs. IICC also sells product to Amyris. Amyris submits purchase orders to IICC and, in turn, IICC ships product to Amyris and invoices Amyris for such purchases. Postpetition, funds transferred from Amyris through AFP to ACBL and IICC will either be through postpetition payment on account of a direct purchase order for postpetition goods, or a postpetition loan that will be separately accounted for and documented as part of the Post-Petition Global Note required by the DIP Financing. Amyris will not pay ACBL or IICC on account of prepetition purchase orders.

10. Amyris also conducts Intercompany Transactions with its Portuguese Non-Debtor Affiliate, Amyris Bio Products Portugal, Unipessoal, LDA. and its United Kingdom Non-Debtor Affiliate, Amyris UK Trading Limited. Funding is provided to these two entities through Amyris in the approximate amount of $500,000 each on a monthly basis to cover salaries for employees and other expenses. These Intercompany Transactions are booked as intercompany payables/receivables due from the particular entity to Amyris. Postpetition, funds transferred from Amyris to these two entities will be on account of a postpetition loan that will be separately accounted for and documented as part of the Post-Petition Global Note required by the DIP Financing.

11. Smaller Intercompany Transactions are incurred between Amyris and its Netherlands Non-Debtor Affiliate, Amyris Europe Trading B.V. in the amount of approximately $1,500 per month to cover bank fees. Additionally, Non-Debtor Affiliate Clean Beauty Collaborative, Inc. (Rose, Inc.) will need to receive postpetition funding of approximately $2,000,000 per month and Non-Debtor Affiliate Clean Beauty 4U Holdings, LLC will need to

receive postpetition funding of approximately $500,000 per month, all for the purchase of goods and payment of operating expenses associated with the businesses. Postpetition, funds transferred from Amyris to these two entities will only occur upon documentation of a post-petition loan that will be separately accounted for and documented as part of the Post-Petition Global Note required by the DIP Financing.

12. Based upon its historical averages, Amyris anticipates that it will, on a postpetition basis, transfer approximately $7 million per month to the Non-Debtor Affiliates to pay for products that the Non-Debtor Affiliates provide to Amyris, and approximately $11 million per month to the Non-Debtor Affiliates to fund the operations of these Non-Debtor Affiliates. The purchase of products supplied by the Non-Debtor Affiliates and the loans required to fund their operations are critical to maintaining the Debtors' ongoing operations. The Debtors will account for the purchase of such goods and such intercompany loans on a weekly basis, will provide reports of the same to the DIP Agent, and will only transfer such funds to the Non-Debtor Affiliates as provided for in the Budget and in compliance with the DIP Documents.

13. In the Cash Management Motion, the Debtors seek authority to continue effectuating Intercompany Transactions with the Non-Debtor Affiliates in accordance with the foregoing, the DIP Facility, and the Budget. The Debtors intend to continue undertaking Intercompany Transactions, subject to the Budget and the terms and conditions of the DIP Facility, on account of obligations arising on a postpetition basis as between Debtors and Non-Debtors. I have been informed by the Company that the Debtors maintain, and will continue to maintain, records of these transfers of cash and bookkeeping entries on a postpetition basis, and the Debtors can ascertain, trace, and account for the Intercompany Transactions on demand.

14. Each Non-Debtor Affiliate provides good or services to the Debtors which are essential for the Debtors' operations. The Non-Debtor affiliates will use the funding provided by Amyris to fund operations, pay for material and payroll for their employees. The goods and services provided by the Non-Debtor Affiliates to the Debtors are critical to the Debtors' ongoing business operations. If the Debtors were not able to use the proceeds of the DIP Facility to make these payments to the Non-Debtor Affiliates, the business operations of the Debtors would be impaired to the detriment of their creditors and estates. Therefore, I believe the Debtors should be authorized to continue to make the Intercompany Transfers in accordance with the foregoing, the DIP Facility, and the Budget.

15. The goods and services provided by the Non-Debtor Affiliates to the Debtors are critical to the Debtors' ongoing business operations. If the Debtors were not able to use the proceeds of the DIP Facility to make these payments to the Non-Debtor Affiliates, the business operations of the Debtors would be impaired to the detriment of their creditors and estates. Therefore, I believe the Debtors should be authorized to continue to make the Intercompany Transfers in accordance with the foregoing, the DIP Facility and the Budget.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: August 9, 2023

/*s/Steven Fleming*
Steven Fleming
Principal
PwC US Business Advisory LLP