## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AMYRIS, INC., et al.,<br><br>Debtors. [1] | Chapter 11<br><br>Case No. 23-11131<br><br>(Joint Administration Requested) |

## DECLARATION OF HAN KIEFTENBELD IN SUPPORT OF THE
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Han Kieftenbeld, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am the Interim Chief Executive Officer and Chief Financial Officer of the above-captioned debtors and debtors in possession (the "Debtors" and, together with their non-Debtor subsidiaries, "Amyris" or the "Company"). I was appointed Interim Chief Executive Officer in June 2023 following the departure of the Company's previous Chief Executive Officer, John Melo, who had served in that role since January 2007. Additionally, I have served as the Company's Chief Financial Officer since March 2020 and, previously, I served as Amyris' Chief Administration Officer and Interim Chief Accounting Officer. I have over thirty years of international business leadership, finance, and operations experience in science-driven food, health, nutrition, personal care, and industrial end-markets.

2. Prior to my positions with the Company, from April 2016 to April 2019, I served as Senior Vice President and Chief Financial Officer of Innophos Holdings, Inc., a leading international science-based producer of essential ingredients for health and nutrition, food and beverage and

---

[1]  A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, California 94608.

industrial brands and, from June 2014 to July 2015, I served as the Global Chief Financial Officer at AB Mauri, a worldwide leader in bakery ingredients. Prior to that, I held finance and operations roles of increasing reach and impact, including serving as Global Chief Procurement Officer of Ingredion Incorporated and Global Chief Financial Officer of National Starch. I started my career at Unilever in the Netherlands.

3.      I have a joint Master of Business Administration degree from New York University Stern School of Business, London School of Economics and Political Science, and the HEC School of Management, Paris. I hold a Bachelor of Science degree in Business Economics and Accounting from Windesheim University in the Netherlands.

4.      On the date hereof (the "Petition Date"), the Debtors each commenced a case (together, the "Chapter 11 Cases") by filing a petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

5.      I submit this declaration to provide an overview of the Debtors' business and the Chapter 11 Cases and in support of the Debtors' "first day" applications and motions (collectively, the "First Day Pleadings"). I am over the age of 18, competent to testify, and authorized to submit this declaration on behalf of the Debtors.

6.      As a result of my roles as Interim CEO and CFO, I am familiar with the Debtors' businesses, financial affairs, and day-to-day operations. Except as otherwise noted, I have personal knowledge of the matters set forth herein. All facts set forth in this declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, and/or my opinion based on my experience and knowledge of the Debtors' operations and financial condition. In making this declaration, I have relied in part on

information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing this declaration. If I were called to testify as a witness in this matter, I could and would testify competently to the facts set forth herein.

## **PRELIMINARY STATEMENT**

7. Amyris is the world's leading manufacturer of ingredients made with synthetic biology. Through its proprietary fermentation technology, Amyris provides sustainable ingredients that are eco-friendly alternatives to raw material sourced for flavors and fragrances ("F&F"), sweeteners, cosmetics, pharmaceuticals, and other consumer products. Traditionally, these raw materials were either (a) produced through petrochemistry,[2] which generates high greenhouse gas emissions and is, by definition, nonrenewable or (b) extracted from biological sources,[3] which in many cases can be harmful to the environment, resulting in severe imbalances to the ecosystem. Amyris has developed sustainable and scalable alternatives to these environmentally damaging processes by using microbes (primarily yeast) to transform simple, sustainably grown, plant-based sugars into ingredients that are used in everything from lifesaving vaccines to commonly used consumer products. In addition, Amyris operates a family of consumer brands that utilize the Company's ingredients.

8. Amyris was founded in 2003 with a foundation grant to create a more stable supply of a key antimalarial treatment, artemisinin. At the time, artemisinin was extracted from the *Artemisia*

---

[2]   The term "petrochemistry" refers to a branch of chemistry that focuses on how crude oil and natural gas are transformed into raw materials and other products.

[3]   For centuries, raw materials have been extracted from plants and animals. For example, squalene, an adjuvant (a vaccine component that increases efficacy) in the SARS-CoV-2 vaccine, is traditionally harvested from shark livers and santalols—the fragrant component of sandalwood oil—are traditionally extracted from the threatened *Santalum album* species of tropical tree.

*annua* (sweet wormwood) plant, which was in limited supply and subject to drastic price fluctuations. After scientists in the lab of Professor Jay Keasling at the University of California, Berkeley, demonstrated that microbes could be engineered to create a precursor[4] of artemisinin, Keasling and some of his colleagues founded Amyris to produce semi-synthetic artemisinin at an industrial scale utilizing fermentation technology. Through Amyris' cutting-edge science, artemisinin—the most effective anti-malarial drug in the world—is now consistently available to treat the deadly disease.

9.     Using the same technological innovations that produced lifesaving semisynthetic artemisinin through sugarcane fermentation, over the past fifteen years, the Company has successfully commercialized sixteen unique products. Thirteen of the Company's unique ingredients are biological products utilized across multiple industries and regulatory landscapes, including squalene (vaccine adjuvant), Reb M (zero calorie sweetener), and patchouli (sustainable woody fragrance); the three other products have been produced through semisynthesis, including squalane (an emollient for skin moisturization). A list and brief background of the Company's biological ingredients is attached hereto as **Exhibit B**. In addition to its core business—the development, commercialization, and manufacture of rare molecules (also referred to as "ingredients") through proprietary fermentation processes—the Company also has developed and launched a family of clean beauty brands that utilize the natural and sustainable ingredients that Amyris produces. The Company sells these clean beauty products through direct-to-consumer e-commerce platforms and a network of retail partners, including Sephora, Target, and Walmart, both in the United States and abroad.

10.     Through these Chapter 11 Cases, the Debtors seek to implement both an operational and balance sheet restructuring, address liquidity challenges, and preserve and maximize value for

---

[4]     A "precursor" refers to a chemical compound preceding another chemical compound in a metabolic pathway (i.e., a linked series of chemical reactions occurring within a cell).

DOCS_LA:350216.26

all stakeholders. In doing so, the Debtors expect to centralize their going-forward operations on their core business: developing molecules, manufacturing them at scale, and commercializing them with partners who are leaders in their markets. Accordingly, the Debtors plan to exit their consumer brands businesses, with a view to have these brands continue under new ownership while still leveraging Amyris' cutting-edge science and technology. As discussed in further detail in the DIP Motion, Euagore, LLC, an entity affiliated with Foris Ventures, LLC ("Foris"), has agreed to provide $190 million in debtor-in-possession financing to fund the administration of these Chapter 11 Cases through the end of 2023. During the initial weeks of these Chapter 11 Cases, the Debtors will focus on negotiating a consensual restructuring with their key stakeholders. However, given the Company's substantial cash burn, if the terms of a consensual restructuring cannot be agreed upon within the next thirty-five days, the proposed DIP financing contemplates that the Debtors will promptly seek to sell all or substantially all of their assets as a going concern through these Chapter 11 Cases.

11. To familiarize the Court with the Debtors and the relief they seek on the first day of these Chapter 11 Cases, this declaration is organized in three sections. The first section provides background information with respect to the Debtors' businesses and corporate history, as well as their prepetition capital structure. The second section describes the circumstances surrounding the commencement of these Chapter 11 Cases and the Debtors' plan of action in these Chapter 11 Cases. The last section sets forth the relevant facts in support of each of the First Day Pleadings.

# GENERAL BACKGROUND

## I.  THE DEBTORS' BUSINESSES

### A.  Overview

12.     Amyris produces ingredients and consumer products through an innovative Lab-to-Market™ technology platform.  The Company uses molecular biology and genetic engineering to sustainably produce materials that are scarce or endangered resources in nature by leveraging state-of-the-art machine learning, robotics, and artificial intelligence.  These capabilities enable Amyris' technology platform to rapidly bring new products to market.  Indeed, the Company's "expertise and knowledge" in biomanufacturing has been recognized as a "national resource" by the U.S. Department of Defense's Principal Director of Biotechnology, furthering the national objective of "expanding and strengthening biomanufacturing in the U.S."

### B.  History

13.     As set forth above, Amyris was founded in 2003 with a grant to create a molecule to treat malaria: artemisinin.  Amyris' artemisinin project set the tone for the Company's subsequent programs and led to its motto: ***Make Good, No Compromise***.  Consistent with its motto, the Company uses sustainable and scalable synthetic biology to produce compounds that are otherwise only found in nature, without adverse impacts to natural resources and the environment.  For example, Amyris has developed the production of squalene—a valuable vaccine component traditionally produced from shark liver oil.  Amyris' technology now permits sustainable squalene production through yeast fermentation, avoiding the need to continue to decimate vulnerable deep-sea shark populations and delicate ocean ecosystems while helping assure future production of this medically important compound.

DOCS_LA:350216.26

14.    By engineering the genetics of yeast strains and fermenting them in sugarcane syrup, Amyris pioneered the ability to convert basic plant sugars into broad classes of small biological molecules.  To date, the Company successfully has created and scaled a total of sixteen sustainable ingredients that are used by hundreds of millions of people in products made by more than 3,000 top global brands and continues to use its proprietary technology—supported by nearly 700 patents—to develop additional sustainable ingredients on the same commercial scale.

**C.    Operations**

**i.    The Debtors' Facilities**

15.    The Company has its principal office and operates a strain engineering and lab automation facility, as well as a pilot-scale production facility, in Emeryville, California.  Through a nondebtor, wholly owned subsidiary, the Company also leases pilot-scale production, demonstration-scale facilities, and related office and laboratory space in Campinas, Brazil.  The Company holds a 99% ownership interest in a commercial-scale production facility in Leland, North Carolina.  The Company is the majority owner (through a nondebtor joint venture) of a precision bio-fermentation facility located in Barra Bonita, Brazil, and wholly owns a facility for the scale-up and development of formulas and the production of clean beauty products in Vinhedo in the state of São Paolo, Brazil.



*Barra Bonita Fermentation Facility*

###### ii. Ingredients Formulation and Licensing

16.     As of the Petition Date, Amyris has brought sixteen molecules to market (thirteen derived from biofermentation and three derived from semisynthesis) that are, in turn, utilized by leaders in the broader ingredients sector to bring unique, sustainably sourced ingredients to market. Amyris realizes the market potential of its sustainably produced molecules through partnerships with these market leaders, leveraging their large go-to-market footprint, commercial relationships, and formulation capability. As discussed in further detail in subsections iii. and iv., below, the Company has active partnerships with Koninklijke DSM N.V. ("DSM") and its affiliates for its human and animal health and nutrition portfolio; Firmenich S.A. ("Firmenich") (now a wholly owned subsidiary of DSM) for its F&F portfolio, Givaudan International SA ("Givaudan") for its cosmetic actives portfolio, Ingredion Incorporated ("Ingredion") for Reb M, Yifan Pharmaceutical Co., Ltd. ("Yifan") for specified vitamins, MF 92 VENTURES LLC ("Minerva") for the sustainable production and distribution of products in the food segment, ImmunityBio ("ImmunityBio") for a COVID-19

vaccine, and Croda Europe for squalene as a vaccine adjuvant and as a component of carriers for mRNA vaccines and other oligonucleotide therapeutics.[5]

17.     ***Strain Engineering***.     The Company's proprietary Lab-to-Market™ technology platform allows Amyris to design, build, and analyze thousands of strains in a single experiment through the use of artificial intelligence and robotics automation, thereby enabling the Company to test thousands of hypotheses simultaneously.  This allows the Company's talented scientists to devote more time to innovation.



Continued investments in automation across the Company's pipeline have resulted in significant decreases in the average time and cost to engineer a manufacturing-ready strain.  In total, Amyris has seen an exponential increase in the number of molecules in its pipeline in active development with

---

[5]     "Oligonucleotide therapeutics" is a term for a type of gene therapy that uses chemically synthesized molecules for delivery (e.g., squalene) with a single- or double-stranded DNA or RNA backbone, which modulates the expression level of proteins that cannot be modulated by conventional drugs, resulting in the development of innovative drugs to treat cancers and genetic diseases.

limited increases in its yearly R&D spend. Importantly, through its lab-scale and pilot-plant fermentation operations and proprietary analytical tools, the Company is now able to predict, with high reliability, the performance of candidate strains at an industrial scale.

18.     ***Process Development.*** In order to maximize the quantity and quality of products Amyris produces, Amyris has invested extensively in advanced capabilities (including prediction models and analytical tools), which include fermentation optimization and the development of scalable product isolation techniques that enable cost-effective manufacturing. The Company developed scalable manufacturing processes for a wide variety of product types, including insoluble liquids and solids, intracellular products, water-soluble solids, and gaseous products. Recently developed products have required increasingly complex purification strains and stringent product purity requirements, yet the overall time to develop a scalable, cost-effective manufacturing process has decreased due to a combination of increased automation and experience.

### iii.     Commercial Partner Agreements

19.     The Company relies on various agreements with business partners in order to support its research and development activities and to manufacture its product offerings, including the following:

20.     ***DSM 2017 License Agreement***. In 2017, the Company monetized the use of one of its molecules in certain fields of use by licensing farnesene to DSM. The Company also sold its subsidiary, Amyris Brasil Ltda., which owned and operated a biofuel-oriented manufacturing facility in Brotas, Brazil, to DSM. Farnesene is manufactured at the Brotas facility and is supplied to the Company's Leland facility for the production of squalane and a contract manufacturer for the production of hemisqualane.

DOCS_LA:350216.26

21.     ***DSM 2021 License Agreement***.  On March 31, 2021, Amyris and DSM entered into asset purchase, license, and supply agreements, pursuant to which DSM acquired exclusive production rights to specified ingredients that are subject to existing third-party exclusive go-to-market rights in the flavor and fragrance and cosmetic sectors.  The Company also granted DSM exclusive production licenses covering specific intellectual property of the Company and assigned the Company's rights and obligations under third-party exclusive ingredients supply agreements to DSM in exchange for upfront consideration totaling $150 million and performance-based earnout payments if and when certain commercial milestones are achieved in each of the calendar years 2022 through 2024.  The Company also entered into a fifteen-year agreement to manufacture certain F&F ingredients for DSM for supply to third parties.

22.     ***Firmenich Collaboration Agreement***.  Amyris provided Firmenich with research and development services under the terms of that certain Collaboration Agreement, dated March 13, 2013, as amended (the "Firmenich Collaboration Agreement"), which was partially assigned to DSM on March 31, 2021.  On August 7, 2023, Amyris terminated the Firmenich Collaboration Agreement for cause pursuant to the terms thereof.

23.     ***Givaudan Collaboration Agreement and Asset Purchase Agreement***.  Under the terms of a Collaboration Agreement, dated September 14, 2018, between Amyris and Givaudan, the parties entered into a long-term partnership agreement under which the Company manufactures cosmetic ingredients for Givaudan.

24.     On April 3, 2023, Amyris and Givaudan entered into an Asset Purchase Agreement, dated as of February 21, 2023, pursuant to which Amyris sold, assigned, or licensed certain assets of its cosmetic ingredients businesses, including an assignment of certain distribution agreements, a sale of certain trademarks, and a grant of an exclusive, worldwide, irrevocable license to distribute,

market, and sell Neossance® squalane emollient, Neossance® hemisqualane silicone alternative, and CleanScreen™ sun protector in cosmetics actives, to Givaudan for $200 million upfront cash consideration and performance-based earnout payments.

25. ***PureCircle License and Supply Agreement***. On June 1, 2021, an Amyris affiliate and PureCircle Limited ("PureCircle"), a subsidiary of Ingredion, (a) entered into an intellectual property license agreement under which the Company granted certain intellectual property licenses to PureCircle to make, commercialize, and advance the development of sustainably sourced, zero calorie, fermentatively produced sweeteners, including fermented Rebaudioside M ("Reb M") (b) entered into a sales agreement to provide manufacturing services and products to PureCircle; and (c) assigned and transferred certain customer contracts to PureCircle related to the sale and distribution of Reb M.

26. Under the PureCircle license agreement, the Company continues to own and market its Purecane® consumer brand offering of tabletop and culinary sweetener products to consumers. As consideration for the license agreements, the Company received a $10 million license fee at closing and may receive additional payments upon achievement of certain milestones related to Reb M sales and manufacturing cost targets. Additionally, under the product-supply and profit-sharing agreement, the Company will earn revenues from Reb M sales to PureCircle and a royalty for Reb M sold by PureCircle to its customers in either pure or blended form.

### iv. Manufacturing Joint Ventures

27. From time to time, Amyris has entered into joint ventures and collaborations with partners for the commercialization of its ingredients, including the following:

28. ***Aprinnova***. In December 2016, the Company, Nikko Chemicals Co., Ltd. (an existing commercial partner), and Nippon Surfactant Industries Co., Ltd., an affiliate of Nikko Chemicals

(collectively, "Nikko"), entered into a joint venture—Aprinnova LLC ("Aprinnova")—to focus on the worldwide commercialization of the Neossance cosmetic ingredients business. Under the terms of the Aprinnova joint venture, the Company contributed certain intellectual property and other commercial assets relating to its business-to-business cosmetic ingredients business in exchange for a 50% ownership share in Aprinnova. The Company also agreed to provide Aprinnova with exclusive royalty-free licenses to certain of the Company's intellectual property. Nikko purchased its 50% interest in Aprinnova in exchange for $10 million plus profits, if any, distributed to Nikko in cash as members of the joint venture during the three-year period from 2017 to 2019, up to $10 million.

29.     On December 15, 2022, as a precursor to the 2023 transaction with Givaudan discussed above, Nikko and Amyris entered into an agreement whereby Amyris agreed to purchase thirty-nine shares of Aprinnova from Nikko Chemicals Co., Ltd. and ten shares of Aprinnova from Nippon Surfactant Industries Co., Ltd., which collectively constituted 49% of the membership interests in Aprinnova, for approximately $49 million. As a result of this transaction, as of the Petition Date, the Company owns 99% of Aprinnova.

30.     *Amyris RealSweet*.  On June 1, 2021, the Company entered into a Membership Interest Purchase Agreement (the "RealSweet Purchase Agreement") with Ingredion to purchase 31% of Amyris RealSweet LLC ("RealSweet"), a then wholly owned subsidiary of Amyris, Inc., which entity indirectly owns the manufacturing facility in Barra Bonita, Brazil (the "Barra Bonita Plant").

31.     Under the terms of the RealSweet Purchase Agreement, Amyris funded the construction costs of the project in the aggregate amount of approximately $128 million, with approximately $7 million of purchase commitments for construction-related costs as of March 31, 2023.  The Company estimates the total construction costs of the Barra Bonita Plant to be

approximately $155 million.  As set forth above, the Barra Bonita Plant is currently operational and producing Reb M for PureCircle, as well as other ingredients for DSM and its customers.

### v. Consumer Brands

32.     As of the Petition Date, the Company offers eight consumer brands: Biossance® clean beauty skincare, JVN™ haircare, Rose Inc.™ clean color cosmetics, Pipette® clean baby skincare, Purecane™ zero-calorie sweetener, MenoLabs™ healthy living and menopause wellness, Stripes™ (peri)menopausal wellness, and 4U by Tia™, a new clean haircare line exclusively available in Walmart.  Prior to the Petition Date, the Debtors discontinued four brands: Terasana® clean skincare, EcoFabulous™ clean beauty for Gen-Z consumers, Costa Brazil® luxury skincare, and OLIKA™ clean wellness.  In addition, the Company previously operated MG Empower ("MGE"), a consumer marketing agency based in the United Kingdom that served both the Company's consumer brands and third-party clients; Beauty Labs, a consumer technology company; and Onda Beauty, a beauty retail and spa treatment business.  Prior to the Petition Date, the Company sold MGE back to its founder in a share purchase agreement.

33.     The majority of the Company's consumer brands utilize Amyris' clean and sustainable ingredients and are distributed through various retail partnerships including with Sephora, Target, Amazon, and Walmart, both in the United States and abroad.

### D. Employees

34.     As of the Petition Date, the Debtors employ approximately 708 employees, 557 of whom are salaried and 151 of whom are hourly (the "Employees"), all of whom are located in the United States.[6]  No Employees are represented by a labor union or covered by a collective bargaining

---

[6]     In addition, as of the Petition Date, the Company employs approximately 309 individuals in Brazil, 40 individuals in Portugal, and 33 individuals in the United Kingdom, all of whom are employees of non-Debtors.

agreement. On each of June 26 and August 7, 2023, the Company announced reductions in force, which together accounted for an approximately 30% reduction in the Company's total labor force.

## II.     THE DEBTORS' ORGANIZATIONAL STRUCTURE

35.     Amyris was originally incorporated in California in 2003 under the name Amyris Biotechnologies, Inc., before reincorporating in Delaware in 2010 under the name Amyris, Inc. The Company's principal executive offices are located at 5885 Hollis Street, Suite 100, Emeryville, California 94608.

36.     Amyris, Inc. is a Debtor in these Chapter 11 Cases and is the parent company of numerous direct and indirect subsidiaries organized in the United States, Brazil, and Europe. Each of the other Debtors is a Delaware entity that is a wholly owned[7] subsidiary of Amyris, Inc. A corporate organizational chart depicting the Company's legal entity structure, including Debtor and non-Debtor subsidiaries and joint ventures, is attached hereto as **Exhibit A**.

37.     The Debtors' management team[8] consists of experienced senior executives, including:

| Han Kieftenbeld | Interim Chief Executive Officer and Chief Financial Officer | <ul><li>Over 30 years of international business leadership including at Innophos, AB Mauri, and Ingredion</li><li>MBA from NYU Stern, London School of Economics, and HEC School of Management</li></ul> |
|---|---|---|
| Eduardo Alvarez | Chief Operating Officer | <ul><li>Joined Amyris in 2017</li><li>Former Global Operations Strategy Leader for PwC and over 16 years of strategic consulting at Booz Allen Hamilton</li><li>MBA from Harvard and MS in Mechanical Engineering from UC Berkeley</li></ul> |

---

[7]     Amyris, Inc. holds 99% of the membership interests in Debtor Aprinnova, LLC ("Aprinnova"), with the remaining 1% held by Nikko Chemicals Co., Ltd.

[8]     On June 26, 2023, the Company announced the departure of John Melo from his roles as President & Chief Executive Officer and member of Amyris' Board of Directors and my appointment to the Interim CEO position.

| Elizabeth Dreyer | Chief Accounting Officer and Corporate Controller | • Over 20 years of public company accounting experience, including at Travel + Leisure, Edgewell, and Hillenbrand<br>• B.S. in Business from Indiana University |
|---|---|---|
| Annie Tsong, Ph.D. | Chief Strategy and Product Officer | • Joined Amyris in 2008 and has been central in several of the Company's foundational technologies<br>• Ph.D. in genetics from UCSF and A.B. in Biochemical Sciences from Harvard |
| Michael Leavell, Ph.D. | Senior Vice President, Research & Development | • Joined Amyris in 2006 where he built the Screening and Analytical Science department<br>• Ph.D. in Analytical Chemistry from UC Berkeley and BS in Chemistry from University of Colorado Denver |
| Doris Choi | General Counsel and Secretary | • Experienced corporate counsel of public companies with prior roles at Jazz Pharmaceuticals, QuinStreet, and Latham & Watkins<br>• J.D. from Columbia Law School |
| Christine Ofori | Chief People Officer | • Joined Amyris in 2015 after senior HR positions at Equinix<br>• Studied business at University of Minnesota |

38. The members of the Company's Board of Directors, several of whom hold significant ownership stakes in the Company either directly or via their companies or affiliated entities, are:

| John Doerr | • Chairman of Kleiner Perkins and a Principal of Foris |
|---|---|
| Ana Dutra | • Experienced CEO and business advisor with directorship experience on numerous public and private boards<br>• MBA from Kellogg School of Business, Masters in Economics from Pontificia Universidade do Rio de Janeiro, and J.D. from Universidade do Estado do Rio de Janeiro |
| Geoffrey Duyk, M.D., Ph.D. | • Partner at Circularis Partners, a firm focused on supporting technology-enabled companies that advance sustainability and a former Assistant Professor at Harvard Medical School<br>• M.D./Ph.D from Case Western (where he currently serves as a trustee) |
| Philip Eykerman | • President of Human Nutrition and Health of DSM-Firmenich and formerly led McKinsey's Chemicals Practice in Benelux and France |

16

| | |
|---|---|
| | • Masters Degrees in Chemical Engineering from KU Leuven and Refinery Engineering from Institut Français du Pétrole |
| Frank Kung, Ph.D. | • Founding member of Vivo Capital, a global healthcare investment firm, and over 40-year veteran of the biotechnology industry<br>• Ph.D. in Molecular Biology and M.B.A. from UC Berkeley |
| James McCann | • Founder, CEO, and Chairman of 1-800-FLOWERS.com with experience serving as director of WTW, Scotts Miracle-Gro, and International Game Technology |
| Steve Mills | • More than 30 years' experience in accounting, corporate finance, strategic planning, risk management, and mergers & acquisitions, including a 33-year career at Archer-Daniels-Midland<br>• BS in Mathematics from Illinois College, where he now serves as Chairman of the Board of Trustees |
| Ryan Panchadsaram | • Partner at Foris and Advisor to Chairman at Kleiner Perkins |
| Lisa Qi | • Founder and CEO of Daling Family, a large Chinese e-commerce company, and former Brand Director of Dupont Lycra (Hong Kong & China) and Chief Representative of YSL China in France |
| Julie Spencer Washington | • Experienced senior marketing executive, including at Trinity Health, Champion Petfoods, Jamba Juice, and Luxottica<br>• MBA from Washington University and BA in Chemistry and Psychology from Emory University |
| M. Freddie Reiss, CIRA, CTP | • Over 30 years of experience in strategic planning, M&A due diligence, cash management, forensic accounting and valuation<br>• Retired from leadership roles at FTI Consulting Corporate Finance, PricewaterhouseCoopers<br>• Has held independent director and audit committee roles<br>• MBA from City College of New York's Baruch College, BBA from City College of New York's Bernard Baruch's School of Business |

39. On June 5, 2023, the Company announced that its Board of Directors had established a Restructuring Committee, made up of three independent directors, to work with management to address cost and capital structure and liquidity issues.

40. As of the Petition Date, the Board of Directors appointed M. Freddie Reiss, CIRA, CTP (retired), formerly a senior managing director at FTI Consulting, as an additional independent director and member of the Restructuring Committee.

41. As of the Petition Date, the Board of Directors also appointed Philip J. Gund, Senior Managing Director at Ankura Consulting Group, LLC, as the Company's Chief Restructuring

17

Officer.  Mr. Gund will report directly to the Restructuring Committee.  Mr. Gund has over forty years of professional experience, including thirty-four years working with troubled companies and their creditors, investors, and court-appointed officials, and has successfully advised clients on all aspects of the workout process.

## III.    THE DEBTORS' CAPITAL STRUCTURE

### A.    Secured Debt

#### i.    Foris

42.    *Foris Prepetition Secured Loans*.  Pursuant to those certain (i) Amended and Restated Loan and Security Agreement by and among Amyris, Inc., as borrower, Amyris Clean Beauty, Inc. ("Clean Beauty"), Amyris Fuels, LLC ("Amyris Fuels"), and AB Technologies LLC, as guarantors ("AB Technologies," and together with Clean Beauty and Amyris Fuels, the "Subsidiary Guarantors" or "Subsidiary Grantors," as applicable herein), and Foris, as lender, dated as of October 28, 2019, as amended by that certain Omnibus Amendment Agreement, dated as of June 5, 2023, and as further amended, restated, supplemented or otherwise modified from time to time, (ii) Amended and Restated Loan and Security Agreement by and among Amyris, Inc., as borrower, the Subsidiary Guarantors, as guarantors, and Foris, as lender, dated as of September 27, 2022, as amended by that certain Omnibus Amendment Agreement, dated as of June 5, 2023, and as further amended, restated, supplemented or otherwise modified from time to time, (iii) Bridge Loan and Security Agreement by and among Amyris, Inc., as borrower, the Subsidiary Guarantors, as guarantors, and Perrara Ventures, LLC ("Perrara"), as lender, dated as of March 10, 2023, as amended by that certain Omnibus Amendment Agreement, dated as of June 5, 2023, and as further amended, restated, supplemented or

otherwise modified from time to time, (iv) Loan and Security Agreement by and among Amyris, Inc., as borrower, the Subsidiary Guarantors, as guarantors, and Anesma Group, LLC ("Anesma"), as lender, dated as of June 5, 2023, (v) Loan and Security Agreement by and among Amyris, Inc., as borrower, the Subsidiary Guarantors, as guarantor, and Anjo Ventures, LLC ("Anjo"), as lender, dated June 29, 2023, and (vi) Loan and Security Agreement by and among Amyris, Inc., as borrower, the Subsidiary Guarantors, as guarantors, and Muirisc, LLC ("Muirisc"), and lender, dated as of August 2, 2023 (all of the foregoing as further amended, supplemented, amended and restated, or otherwise modified prior to the Petition Date, the "Foris Prepetition Secured Loans," and collectively with any other agreements and documents executed or delivered in connection with the Foris Prepetition Secured Loans, including the Foris Security Agreements (as defined herein), the "Foris Prepetition Secured Loan Agreements"), and Foris, Perrara, Anesma, Anjo, and Muirisc (collectively, the "Foris Prepetition Secured Lenders"), provided prepetition term loans to the Company.[9]

43.     As of the Petition Date, the aggregate principal amount outstanding under the Foris Prepetition Secured Loan Agreements is at least $295,000,000 (*plus* accrued and unpaid nondefault interest, additional fees, costs, expenses, and other obligations as provided under the Foris Prepetition Secured Loan Agreements) (collectively, the "Foris Prepetition Obligations"), which Foris Prepetition Obligations have been guaranteed on a joint and several basis by each of the Subsidiary Guarantors.

---

[9]     As noted above, John Doerr is one of the Company's directors. Through various related entities managed by his family office, including the Foris Prepetition Secured Lenders, Mr. Doerr has made equity investments into the Company and has provided loans to the Company to help facilitate the development of its proprietary and revolutionary technology. As of the Petition Date, Foris or its related entities hold equity interests in the Company representing approximately 30% of the Company's issued and outstanding equity interests.

44.     *Foris Prepetition Loan Collateral*. In connection with the Foris Prepetition Secured Loan Agreements, Amyris, Inc. and the Subsidiary Grantors, as applicable, entered into various security, patent, copyright, and trademark security agreements (all of the foregoing as further amended, supplemented, amended and restated, or otherwise modified from time to time, the "Foris Security Agreements"), pursuant to which the Foris Prepetition Obligations are secured by first priority security interests in and liens on the "Collateral," as defined in the Foris Security Agreements (the "Prepetition Collateral").

45.     *Foris Cash Collateral*. Any and all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any account or accounts by the Debtors, including any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date, and the proceeds of any of the foregoing is the Foris Prepetition Secured Lenders' cash collateral.

**ii.     DSM**

46.     Amyris, Inc., is the borrower under that certain Loan and Security Agreement dated as of October 11, 2022, as amended and restated by that certain Amendment and Restatement Agreement dated as of December 12, 2022 (as further amended, restated, supplemented or otherwise modified from time to time, the "DSM LSA"), by and among Amyris, Inc., certain subsidiaries thereof as guarantors, and DSM Finance B.V. ("DSM BV"), pursuant to which the Company obtained, among other financial accommodations, term loans in three tranches consisting of Tranche 1 with principal obligations of $50,000,000, Tranche 2 with principal obligations of $25,000,000, and Tranche 3 with principal obligations of $25,000,000. As of the Petition Date, the aggregate

outstanding principal amount of Tranches 1 and 2 is approximately $45 million and the aggregate outstanding principal amount of Tranche 3 is approximately $29 million.

47.     Pursuant to that certain Security Agreement dated as of October 11, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "DSM Security Agreement"), by and among Amyris, Inc., and DSM BV, certain of the Company's obligations under the DSM LSA are secured by a lien and security interest in favor of DSM BV in all of Amyris, Inc.'s rights to any earn-out amounts that may become payable from DSM Nutritional Products Ltd. to Amyris, Inc., in accordance with Section 3.5 of the Purchase Agreement (as defined in the DSM Security Agreement) and any and all claims, rights, and interests in any of the above.

48.     Pursuant to that certain Pledge Agreement dated as of December 12, 2022, by and among Amyris, Inc., and DSM BV, Amyris, Inc., certain of the Company's obligations under the DSM LSA are secured by a lien and security interest in favor of DSM BV in Amyris, Inc.'s 69.00% equity interests in Amyris RealSweet, LLC.

### B.     Unsecured Debt

49.     On November 15, 2021, Amyris completed a sale of $600 million aggregate principal amount of 1.50% convertible unsecured senior notes due 2026 (the "Convertible Notes"). The Convertible Notes were issued pursuant to an Indenture, dated as of November 15, 2021 (the "Indenture"), between the Company and U.S. Bank National Association, as trustee ("U.S. Bank"). The Convertible Notes bear interest at a rate of 1.50% per year, payable in cash semiannually in arrears on November 15 and May 15 of each year, beginning on May 15, 2022, and mature on November 15, 2026, unless earlier repurchased, redeemed, or converted in accordance with their terms prior to such date.

DOCS_LA:350216.26

50.     The initial purchasers of the Convertible Notes exercised their options to purchase an additional $90 million aggregate principal amount of notes in full, on November 11, 2021, for issuance on November 15, 2021. As a result, as of the Petition Date, the outstanding balance of the Convertible Notes is approximately $690 million.

51.     As of July 31, 2023, the Debtors estimate that the total amount of outstanding trade payables totals approximately $95 million.

**C.      Equity**

52.     Amyris became a public company through an initial public offering on the Nasdaq Stock Market on September 28, 2010, where it trades under the symbol AMRS.

53.     As of December 31, 2022, over 30% of Amyris capital stock was beneficially owned by a limited number of stockholders, including Foris and DSM. Furthermore, Foris and other insider stockholders hold some or a combination of convertible preferred stock, warrants, and purchase rights, pursuant to which they may acquire additional shares of common stock and thereby increase their ownership interest in the Company.

54.     At July 10, 2023, there were 182 common stockholders of record (not including beneficial holders of stock held in street names).

**IV.     SIGNIFICANT LITIGATION**

**A.      Securities Actions**

55.     On June 21, 2019, and October 1, 2019, respectively, two separate purported shareholder derivative complaints were filed in the U.S. District Court for the Northern District of California (the "Northern California District Court") (*Bonner v. Doerr, et al.* and *Carlson v. Doerr, et al.*), naming the Company, and certain of the Company's current and former officers and directors, as defendants. An additional shareholder derivative complaint (*Kimbrough v. Melo, et al.*),

substantially identical to the Bonner complaint, was filed on December 18, 2020, in the U.S. District Court for the Northern District of California. The derivative lawsuits sought to recover, on the Company's behalf, unspecified damages purportedly sustained by the Company in connection with allegedly misleading statements and omissions made in connection with the Company's securities filings. The derivative lawsuits were later consolidated into one action (the "Derivative Lawsuit").

56. On June 20, 2022, the Northern California District Court granted the Company's motion to dismiss the Derivative Lawsuit without prejudice. Subsequently, Bonner informed the court that it did not intend to file a second amended complaint. On August 18, 2022, the court issued the judgment in favor of the Company and awarded the Company an immaterial amount in costs. On September 9, 2022, Bonner filed a notice of appeal of the Court's decision, which appeal is pending as of the Petition Date.

**B.     Lavvan Litigation**

57. On August 23, 2020, Lavvan, Inc. ("Lavvan") brought claims in arbitration against the Company under that certain Research, Collaboration and License Agreement dated March 18, 2019, and on September 10, 2020, Lavvan filed a complaint against the Company in the U.S. District Court for the Southern District of New York ("SDNY"). The evidentiary hearing took place in arbitration from October 24 – 28, 2022. Both the arbitration and SDNY proceedings are pending as of the Petition Date.

**C.     Beauty Labs Litigation**

58. On February 22, 2023, Disruptional Ltd. and & Vest Beauty Labs LP, sellers of Beauty Labs International Ltd., a business acquired by the Company on August 31, 2021, filed a complaint against the Company in New York State court, alleging, among other things, a breach of contract related to earnout payments. On March 15, 2023, the Company removed the lawsuit to SDNY.

## EVENTS LEADING TO THE COMMENCEMENT
## OF THE CHAPTER 11 CASES AND PLAN OF ACTION

### A.     Financial and Operational Challenges

59.     The Company has incurred operating losses since its inception, thus requiring a continuing need for equity and debt capital to sustain operations. Over the past two years, total revenues have plunged more than 20%; revenue in 2021 totaled $341.8 million and declined to $269.8 million the following year. During that same period, the Company faced manufacturing input, freight, and logistics cost increases as well as increased operating expenses, such as brand management and marketing expenses. At the end of 2022, the Company implemented a "Fit-to-Win" restructuring strategy that involved targeted price increases, production, shipping, and unit cost reductions and other cost-reduction strategies.

60.     As part of the need to restructure, the Company retained the Business Recovery Services unit of PricewaterhouseCoopers ("PwC") in April 2023 to work with the Restructuring Committee and management to accelerate improvements and further the Company's "Fit-to-Win" efficiency and cost reduction program. As CFO since PwC was retained, I have worked hand-in-hand to implement this restructuring strategy. Additionally, the Company established a Transformation Office, supported by PwC, to oversee various work streams to help deliver the Company's cost reduction targets and to simplify its business portfolio.

61.     These efforts have yielded mixed results. In May 2023, the Company announced its 2023 first quarter financial results, which showed a reduction in total revenue of $56.1 million as compared to $57.7 million in the first quarter of 2022, a 3% decrease. However, the Company remains challenged by an overleveraged balance sheet, continuing trade losses, mounting litigation risk, deeply unprofitable contracts, and dwindling trade vendor support.

62. Notably, Amyris' two core businesses—Technology Access (comprising revenue from ingredient product sales, R&D collaboration programs, and technology licensing) and Consumer (brands and services)—continue to incur significant losses; each of the Company's consumer brands are loss-generating and losses generated in the Technology Access business are principally a result of unfavorable margin economics in certain of the Company's contracts.

**B.      Key Prepetition Actions**

63. With the support of its advisors, the Company began implementing "Amyris 2.0" prior to the Petition Date, focusing its strategy and go-forward business plan around the Company's core Lab-to-Market™ competencies of research, formulation, and development of ingredients and ingredient applications, commercial scaling, and commercialization of its sustainable ingredients. As such, the Company made the strategic decision to re-focus away from its consumer brands, some of which were shut down prior to the Petition Date. In July 2023, Amyris engaged Intrepid Investment Bankers LLP ("Intrepid") to, among other things, market the Company's consumer brands, a process that will continue during these Chapter 11 Cases.

64. In addition, prior to the Petition Date, the Company implemented aggressive cost-reduction actions, which included the shutdown of several loss-generating consumer brands and two workforce downsizings in June and August 2023.

65. On June 5, 2023, the Company announced the entry into loan amendments with its principal secured lenders—Foris and DSM—that resulted in a waiver of all existing defaults, and a secured term loan facility with a Foris-affiliate, Anesma, through which Anesma provided the Company with a $50 million loan for working capital and general corporate purposes.

66. Additionally, (a) on June 29, 2023, the Company announced entry into a secured term loan facility with Foris-affiliate Anjo, through which Anjo provided the Company with a $50 million

loan for working capital and general corporate purposes and (b) on August 3, 2023, the Company announced entry into a secured term loan facility with Foris-affiliate Muirisc through which Muirisic provided the Company with a $20 million loan for working capital and general corporate purposes, including to fund separation costs associated with the Company's reductions in force around the date of such loan.

67.     Prior to the Petition Date, certain holders of the Company's Convertible Notes formed an ad hoc group (the "Ad Hoc Noteholders Group") and retained counsel for the purpose of addressing Amyris' financial condition and performance under the Convertible Notes.  In an effort to work cooperatively towards a consensual restructuring, subject to confidentiality, the Company began to share information with the Ad Hoc Noteholders Group and its advisors, prior to the Petition Date.

### C.     Supply Chain and Accounting Investigation

68.     Prior to the commencement of the Chapter 11 Cases, the Company became aware of allegations of potential supply-chain administration irregularities that may have resulted in accounting issues during the third quarter of 2021 through the fourth quarter of 2022.  Upon being advised of the allegations, the Audit Committee of the Company's Board of Directors engaged outside legal and forensic experts to undertake an investigation of the alleged irregularities.  The investigation was not concluded as of the Petition Date.  However, certain individuals that were involved in the alleged irregularities have been separated from the Company and there is no evidence that any of the alleged improper conduct is ongoing.

### D.     In-Court Restructuring Strategy

69.     The Company has turned to chapter 11 to implement an operational and balance-sheet restructuring and to reorganize its business operations to focus on its core competencies of research and development and the proven capability to commercialize and manufacture sustainable

ingredients. Amyris intends to use the chapter 11 process to reorganize around its Lab-to-Market™ platform with its in-house capability to cost-effectively manufacture ingredients at an industrial scale, which necessitates the renegotiation of certain of the Company's existing supply agreements. Pursuant to the proposed DIP Financing, the Company intends to use the first thirty-five days of these Chapter 11 Cases to engage with major constituencies in furtherance of developing a consensual plan of reorganization while continuing the process of marketing its noncore consumer brands. In the event such a deal is not reached, the DIP Financing contemplates a toggle, as set forth in the below chart, whereby the Debtors would pivot to a sale of substantially all assets pursuant to section 363 of the Bankruptcy Code.

| Milestone | Proposed Timing | Proposed Outside Date |
|---|---|---|
| Petition Date ("PD") | August 9, 2023 | |
| Entry of Interim DIP Order | PD + 3 business days | August 14, 2023 |
| Plan Support Deadline ("PSD") or Sale Toggle Event ("STE") | PD + 35 days | September 13, 2023 |
| Entry of Final DIP Order | PD + 36 days | September 14, 2023 |
| Filing of Bid Procedures Motion | STE + 3 days | September 16, 2023 |
| Plan, Disclosure Statement, and Solicitation Procedures Motion Filing Deadline | PSD + 14 days | September 27, 2023 |
| Entry of Bid Procedures Order | STE + 35 days | October 18, 2023 |
| Entry of Disclosure Statement Order | Plan Filing + 37 days | November 3, 2023 |
| Plan Voting Deadline | DS Order + 35 days | December 8, 2023 |
| Entry of Sale Approval Order | STE + 90 days | December 12, 2023 |
| Entry of Confirmation Order | Plan Filing + 82 days | December 18, 2023 |
| Sale Closing Deadline / Plan Effective Date Deadline | December 29, 2023 | |
| DIP Maturity Date | December 31, 2023 | |

## EVIDENCE IN SUPPORT OF FIRST DAY PLEADINGS

70.     Contemporaneously herewith, the Debtors have filed a number of First Day Pleadings seeking orders that grant various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, and expedite a swift and smooth restructuring process.  On August 9, 2023, the Debtors filed the following First Day Pleadings:

- **Joint Administration Motion.** *Motion for Order Directing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only*

- **Section 156(c) Retention Application.** *Debtors' Application for Appointment of Stretto, Inc. as Claims and Noticing Agent*

- **Consolidated Matrix Motion.** *Motion for Entry of an Order: (I) Authorizing the Debtors to: (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, and (C) Redact Certain Personally Identifiable information for Individual Creditors; (II) Modifying the Requirement to File a List of All Equity Security Holders of Amyris, Inc. and Modifying Notice Thereto; and (III) Granting Related Relief*

- **Cash Management Motion.** *Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Operating Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Granting Related Relief*

- **Employee Wage and Benefits Motion.** *Motion for Entry of Interim and Final Orders: (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*

- **Utility Motion.** *Motion for Entry of Interim and Final Orders: (I) Approving Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief*

- **Customer Programs Motion.** *Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Honor Certain Prepetition Obligations to Customers and (B) Otherwise Continue Certain Customer Programs in the Ordinary Course of Business and (II) Granting Related Relief*

- **Worldwide Stay Motion.** *Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, and (II) Approving the Related Form and Manner of Notice*

- **Stock Transfer Procedures Motion.** *Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for (I) Certain Transfers of and Declarations of Worthlessness With Respect to Common Stock, (II) Certain Transfers of Claims Against Debtors and (II) Granting Related Relief*

- **Critical Vendor Motion.** *Motion for Entry of Interim and Final Orders: (I) Authorizing Debtors to Pay Prepetition Claims of Critical Vendors, Foreign Vendors, 503(b)(9) Claimants, and Lien Claimants; (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders; (III) Authorizing All Financial Institutions to Honor All Related Payment Requests; and (IV) Granting Related Relief*

- **Tax Motion.** *Motion for Entry of Interim and Final Orders: (I) Authorizing the Payment of Certain Taxes and Fees; and (II) Granting Related Relief*

- **Insurance Motion.** *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Maintain Their Insurance Policies and Programs, (B) Honor all Insurance Obligations, (C) Renew, Amend, Supplement, Extend, or Purchase and Finance Insurance Policies; (II) Authorizing Continuation of Insurance Premium Financing Agreement; and (III) Granting Related Relief*

- **Schedule Extension Motion.** *Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Granting Related Relief*

- **DIP Financing Motion.** *Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*

71.     The First Day Pleadings request authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.  Other relief will be deferred for consideration at a later hearing.  Further, to the extent that any of the First

Day Pleadings seek authorization to pay prepetition claims, such payments are consistent with the Debtors' DIP Financing budget.

72.     I am familiar with the information contained in each First Day Pleading and believe that the relief sought in each such motion (a) is necessary to enable the Debtors to undertake certain postpetition activities in connection with their restructuring efforts, (b) constitutes a critical element for the Debtors to successfully implement the foregoing chapter 11 objectives, and (c) best serves the Debtors' estates and creditors' interests.

73.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated:  August 9, 2023

*/s/ Han Kieftenbeld*
Han Kieftenbeld
Interim Chief Executive Officer and
Chief Financial Officer
