## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AMYRIS, INC., et al.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-11131<br><br>(Joint Administration Requested) |

**MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Amyris, Inc. ("Amyris") and its affiliated and related above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company") hereby file this postpetition financing motion (the "DIP Motion"). In support of the DIP Motion, the Debtors submit (i) the *Declaration of Han Kieftenbeld in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"),[2] (ii) the *Declaration of Lorie Beers in Support of the Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Beers Declaration"), and (iii) the *Declaration of Steve Fleming in Support of the Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V)*

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

[2] Capitalized terms used but not defined herein shall have the meanings set forth in the Debtors' First Day Declaration.

*Granting Related Relief* (the "Fleming Declaration") filed concurrently herewith and incorporated herein by reference. In further support of this DIP Motion, the Debtors respectfully represent as follows:

## I.  SUMMARY OF RELIEF REQUESTED

1.      The Debtors seek entry of interim and Final orders, substantially in the form of the Interim Order attached hereto as **Exhibit 1** and a Final order to be submitted at a later date (respectively, the "Interim Order" and "Final Order" and collectively, the "DIP Orders"):

(i)      authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis (the "DIP Financing") in an aggregate principal amount of up to **$190 million** (the "DIP Loans") pursuant to the terms and conditions of that certain *Senior Secured Superpriority Debtor in Possession Financing Agreement* attached as **Exhibit A** to the proposed Interim Order (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "DIP Credit Agreement"), by and among Debtors (i) Amyris, Inc., Amyris Clean Beauty, Inc., and Aprinnova, LLC (the "Borrowers") and the affiliated Debtors and designated non-Debtor subsidiaries as guarantors (the "Guarantors") and (ii) and Euagore, LLC (together with the other lenders from time to time party thereto, the "DIP Lenders"), and Euagore, LLC, as Administrative Agent (the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties").

(ii)      authorizing the Debtors to execute the DIP Credit Agreement and the other documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, all as may be reasonably requested by the DIP Lenders (as the same may be amended, restated, supplemented or otherwise modified from time to time, and collectively with the DIP Credit Agreement, the "DIP Documents");

(iii)      authorizing the Debtors to consummate the transactions contemplated by the DIP Documents;

(iv)      granting to the DIP Lenders the DIP Liens (as defined below) on all of the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding under the DIP Documents, and the Interim Order and any Final Order, as applicable (collectively, the "DIP Obligations"), subject only to prior payment of the Carve-Out (as defined below);

(v)      granting superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code to the DIP Lenders as well as liens pursuant to section 364(d) of the Bankruptcy Code, as further described herein, on all prepetition and postpetition property of the Debtors' estate and all proceeds thereof (each as defined below));

2

(vi)　　　authorizing the Debtors to use Prepetition Collateral and Cash Collateral (each as defined below) (together with the DIP Facility, the "Postpetition Financing Arrangement");

(vii)　　　authorizing the Debtors to grant adequate protection to the DIP Lenders (as defined below);

(viii)　　　scheduling a hearing (the "Final Hearing"), pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to consider entry of the Final Order; and

(ix)　　　granting such other and further relief as this Court deems necessary and just.

## II.　JURISDICTION AND VENUE

2.　　　The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a Final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter Final orders or judgments consistent with Article III of the United States Constitution.

3.　　　Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.　　　The statutory basis for the relief requested herein are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 507 and 552 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9013 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Local Rules 4001-2, 9006-1, and 9013.

## III.   BACKGROUND

### A.   General Background

5.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date of this DIP Motion, no official committee, trustee or examiner has been appointed in these chapter 11 cases (the "Chapter 11 Cases").

6.      Amyris was founded in 2003 to create a more stable supply of a key anti-malarial treatment.  Through Amyris' cutting-edge science, artemisinin—the most effective anti-malarial drug in the world—is now consistently available to treat the deadly disease.  Using the same technological innovations that produced artemesin, Amyris has become the world's leading manufacturer of ingredients made with synthetic biology.   Amyris provides sustainable ingredients that are eco-friendly alternatives to raw material sourced for flavors and fragrances, sweeteners, cosmetics, pharmaceuticals, and other consumer products.

7.      In addition, Amyris operates a family of consumer brands that utilize the Company's ingredients to meet the growing demand for sustainable, effective, and accessible products, including Biossance® (clean beauty skincare), JVN™ (haircare), Rose Inc.™ (clean color cosmetics), Pipette® (clean baby skincare), OLIKA™ (clean wellness), MenoLabs™ (healthy living and menopause wellness), Stripes™ (menopausal wellness), and 4U by Tia™ (a new clean haircare line).

8.      Through these Chapter 11 Cases, the Debtors seek to implement both an operational and balance sheet restructuring, address liquidity challenges, and preserve and maximize value for all stakeholders.  In doing so, the Debtors expect to centralize their going-

4

forward operations on their core business: developing molecules, manufacturing them at scale, and commercializing them with partners who are leaders in their markets. Accordingly, the Debtors plan to exit certain of their consumer brands businesses, with a view to have these brands continue under new ownership while still leveraging Amyris's cutting-edge science and technology. Euagore, LLC, an entity affiliated with Foris Ventures, LLC ("Foris"), has agreed to provide $190 million in debtor-in-possession financing to fund the administration of these Chapter 11 Cases through the end of 2023. During the initial weeks of these Chapter 11 Cases, the Debtors will focus on negotiating a consensual restructuring with their key stakeholders. However, given the Company's substantial cash burn, if the terms of a consensual restructuring cannot be agreed upon within the next thirty-five days, the proposed DIP financing contemplates that the Debtors will promptly seek to sell all or substantially all of their assets as a going concern through these Chapter 11 Cases.

9.     Additional information regarding the Debtors' organizational structure, business operations, historical revenues and liabilities, and a description of the events precipitating the filing of the Chapter 11 Cases, is set forth in the First Day Declaration.

**B.     Prepetition Secured Debt**

**(1)     Foris**

10.     Pursuant to those certain (i) Amended and Restated Loan and Security Agreement by and among Amyris, Inc. ("Amyris"), as borrower, Amyris Clean Beauty, Inc. ("Clean Beauty"), Amyris Fuels, LLC ("Amyris Fuels"), and AB Technologies LLC, as guarantors ("AB Technologies," and together with Clean Beauty and Amyris Fuels, the "Subsidiary Guarantors" or "Subsidiary Grantors," as applicable herein), and Foris Ventures, LLC ("Foris"), as lender, dated as of October 28, 2019, as amended by that certain Omnibus Amendment

5

Agreement, dated as of June 5, 2023, and as further amended, restated, supplemented or otherwise modified from time to time, (ii) Amended and Restated Loan and Security Agreement by and among Amyris, as borrower, the Subsidiary Guarantors, as guarantors, and Foris, as lender, dated as of September 27, 2022, as amended by that certain Omnibus Amendment Agreement, dated as of June 5, 2023, and as further amended, restated, supplemented or otherwise modified from time to time, (iii) Bridge Loan and Security Agreement by and among Amyris, as borrower, the Subsidiary Guarantors, as guarantors, and Perrara Ventures, LLC ("Perrara"), as lender, dated as of March 10, 2023, as amended by that certain Omnibus Amendment Agreement, dated as of June 5, 2023, and as further amended, restated, supplemented or otherwise modified from time to time, (iv) Loan and Security Agreement by and among Amyris, as borrower, the Subsidiary Guarantors, as guarantors, and Anesma Group, LLC ("Anesma"), as lender, dated as of June 5, 2023, (v) Loan and Security Agreement by and among Amyris, as borrower, the Subsidiary Guarantors, as guarantor, and Anjo Ventures, LLC ("Anjo"), as lender, dated June 29, 2023, and (vi) Loan and Security Agreement by and among Amyris, as borrower, the Subsidiary Guarantors, as guarantors, and Muirisc, LLC ("Muirisc"), and lender, dated as of August 2, 2023 (all of the foregoing as further amended, supplemented, amended and restated, or otherwise modified prior to the Petition Date, the "Foris Prepetition Secured Loans," and collectively with any other agreements and documents executed or delivered in connection with the Foris Prepetition Secured Loans, including the Security Agreements (as defined herein), the "Foris Prepetition Secured Loan Agreements"), and Foris, Perrara, Anesma, Anjo, and Muirisc (collectively, the "Foris Prepetition Secured Lenders"), provided prepetition term loans to the Company.

11.     As of the Petition Date, the aggregate principal amount outstanding under the Foris Prepetition Secured Loan Agreements is at least $295,000,000 (*plus* accrued and unpaid

nondefault interest, additional fees, costs, expenses, and other obligations as provided under the Foris Prepetition Secured Loan Agreements) (collectively, the "<u>Foris Prepetition Obligations</u>"), which Foris Prepetition Obligations have been guaranteed on a joint and several basis by each of the Subsidiary Guarantors.

12.    In connection with the Foris Secured Prepetition Loan Agreements, Amyris and the Subsidiary Guarantors, as applicable, entered into those certain (i) Security Agreement, by and between Amyris, the Subsidiary Grantors, and Foris, dated as of September 27, 2022; (ii) Security Agreement, by and between Amyris, the Subsidiary Grantors, and Perrara, dated as of March 10, 2023; (iii) Patent Security Agreement, by and between Amyris, the Subsidiary Grantors, and Foris, dated as of June 5, 2023; (iv) Trademark Security Agreement, by and between Amyris, the Subsidiary Grantors, and Foris, dated as of June 5, 2023; (v) Security Agreement, by and between Amyris, the Subsidiary Grantors, and Anesma, dated as of June 5, 2023; (vi) Patent Security Agreement, by and between Amyris, the Subsidiary Grantors, and Anesma, dated as of June 5, 2023; (vii) Trademark Security Agreement, by and between Amyris, the Subsidiary Grantors, and Anesma, dated as of June 5, 2023; (viii) Patent Security Agreement by and between Amyris, the Subsidiary Grantors, and Perrara, dated as of June 5, 2023; (ix) Trademark Security Agreement by and between Amyris, the Subsidiary Grantors, and Perrara, dated as of June 5, 2023; (x) Security Agreement by and between Amyris, the Subsidiary Grantors, and Anjo dated as of June 29, 2023; (xi) Patent Security Agreement, by and between Amyris, the Subsidiary Grantors, and Anjo, dated as of June 29, 2023; (xii) Trademark Security Agreement, by and between Amyris, the Subsidiary Grantors, and Anjo, dated as of June 29, 2023; (xiii) Security Agreement by and between Amyris, the Subsidiary Grantors, and Muirisc, dated as of August 2, 2023; (xiv) Trademark Security Agreement, by and between Amyris, the Subsidiary Grantors, and Muirisc,

7

dated as of August 2, 2023; (xv) Patent Security Agreement, by and between Amyris, the Subsidiary Grantors, and Muirisc, dated as of August 2, 2023; and (xvi) Copyright Security Agreement, by and between Amyris, the Subsidiary Grantors, and Muirisc, dated as of August 2, 2023 (all of the foregoing as further amended, supplemented, amended and restated, or otherwise modified from time to time, the "Security Agreements").  Pursuant to the Foris Prepetition Secured Loan Agreements, the Foris Prepetition Obligations are secured by valid, binding, perfected first priority security interests in and liens (the "Foris Liens") on the "Collateral," as defined in the Security Agreements (the "Prepetition Collateral").

13.    Any and all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any account or accounts by the Debtors, including any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date, and the proceeds of any of the foregoing is the Foris Prepetition Secured Lenders' cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

**(2)    DSM Finance B.V.**

14.    Amyris, Inc., is the borrower under that certain Loan and Security Agreement dated as of October 11, 2022, as amended and restated by that certain Amendment and Restatement Agreement dated as of December 12, 2022 (as further amended, restated, supplemented or otherwise modified from time to time, the "DSM LSA"), by and among Amyris, Inc., certain subsidiaries thereof as guarantors, and DSM Finance B.V. ("DSM BV"), pursuant to which the Company obtained, among other financial accommodations, term loans in three tranches consisting of Tranche 1 with principal obligations of $50,000,000, Tranche 2 with principal obligations of $25,000,000, and Tranche 3 with principal obligations of $25,000,000.  As of the

Petition Date, the aggregate outstanding principal amount of Tranches 1 and 2 is approximately $45 million and the aggregate outstanding principal amount of Tranche 3 is approximately $29 million.

15.     Pursuant to that certain Security Agreement dated as of October 11, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "DSM Security Agreement"), by and among Amyris, Inc., and DSM BV, certain of the Company's obligations under the DSM LSA are secured by a lien and security interest in favor of DSM BV in all of Amyris, Inc.'s rights to any earn-out amounts that may become payable from DSM Nutritional Products Ltd. to Amyris, Inc., in accordance with Section 3.5 of the Purchase Agreement (as defined in the DSM Security Agreement) and any and all claims, rights, and interests in any of the above.

16.     Pursuant to that certain Pledge Agreement dated as of December 12, 2022, by and among Amyris, Inc., and DSM BV, Amyris, Inc., certain of the Company's obligations under the DSM LSA are secured by lien and security interest in favor of DSM BV in Amyris, Inc.'s 69.00% equity interests in Amyris RealSweet, LLC.

17.     None of DSM's collateral or liens (as described above, the "DSM Liens") constitute or generate cash collateral within the meaning of section 363(a) of the Bankruptcy Code.

## IV.   PROPOSED DIP FACILITY

18.     As discussed in detail in the First Day Declaration, the Company has incurred operating losses since its inception, thus requiring a continuing need for equity and debt capital to sustain operations.  Increased operating costs and expenses also burdened the Company. These factors created a severe liquidity challenge for the Debtors, such that it was necessary for

the Company to consider a sale of the Company or its assets, a refinancing of its secured debt or other strategic options, including a chapter 11 bankruptcy filing.

19. The Debtors have filed these Chapter 11 Cases to implement both an operational and balance sheet restructuring, address liquidity challenges, and preserve and maximize value. In doing so, the Debtors expect to centralize their going-forward operations on their core business: developing molecules, manufacturing them at scale, and commercializing them with partners who are leaders in their markets. Accordingly, the Debtors plan to exit certain of their consumer brands businesses, with a view to have these brands continue under new ownership while still leveraging Amyris's cutting-edge science and technology. During the initial weeks of these Chapter 11 Cases, the Debtors will focus on negotiating a consensual restructuring with their key stakeholders. However, given the Company's substantial cash burn, if the terms of a consensual restructuring cannot be agreed upon within the next thirty-five days, the proposed DIP financing contemplates that the Debtors will promptly seek to sell all or substantially all of their assets as a going concern through these Chapter 11 Cases.

20. As set forth in the Beers Declaration, Intrepid Investment Bankers LLC ("Intrepid") was engaged in July 2023 as investment banker to the Debtors to advise the Debtors in regard to the Debtors' capital structure, liquidity needs, and business operations. Following its engagement, Intrepid, with assistance of the Debtors and their other advisors, considered potential sources of financing that would provide the liquidity necessary to fund the Debtors' Chapter 11 Cases. As part of this process, Intrepid solicited proposals for debtor in possession financing by contacting approximately twenty (20) well-established and experienced third-party financial institutions and other capital sources. Such parties included lenders that often make loans in distressed and bankruptcy situations and have the capital necessary to provide adequate financing

10

to the Debtors.  Of these parties, seven (7) executed non-disclosure agreements and accessed information available in a data room established by Intrepid for prospective financing purposes.

21.    The foregoing efforts did not result in any actionable financing proposals from any third parties.  The Debtors received an offer from an entity affiliated with the Foris Prepetition Secured Lenders to provide the necessary postpetition financing and authorize the use of the Foris Prepetition Secured Lenders' Cash Collateral in order to fund the Debtors' operations during these Chapter 11 Cases on a senior secured superpriority basis.  As set forth in the Fleming Declaration, the negotiations with the DIP Secured Parties and the Foris Prepetition Secured Lenders and their professionals were conducted at arm's length and in good faith by the Debtors and their professionals.

22.    The proposed DIP Facility and the authorization to use Cash Collateral as offered by the DIP Secured Parties and the Foris Prepetition Secured Lenders are the best financing options that the Debtors could obtain.  Fully unsecured postpetition financing was not available to Debtors.  Other potential sources of debtor in possession financing for the Debtors, including on a junior secured basis, were also nonexistent.  However, as noted above, the Debtors were able to obtain (i) financing from the DIP Secured Parties on the terms of the proposed DIP Facility and (ii) the consent of the Foris Prepetition Secured Lenders' to use Cash Collateral, all on the terms set forth herein.

A.    **Summary of Essential Terms of DIP Facility**

23.    In accordance with Bankruptcy Rule 4001(b) and Local Rule 4001-2(a)(i)-(iii), below is a summary[3] of the essential terms of the proposed financing and use of cash collateral and the location of the same in the proposed Interim Order and/or the DIP Credit Agreement:

---

[3] The summary and descriptions of the terms and conditions for the proposed financing and use of cash collateral and the provisions of the proposed Interim Order and the Final Order set forth in this DIP Motion are intended solely for

| | |
|---|---|
| **a. Debtor/Borrowers**: | Amyris, Inc.<br>Amyris Clean Beauty, Inc.<br>Aprinnova, LLC |

**b. Guarantors**:

Debtor Guarantors
- AB Technologies LLC
- Amyris Fuels, LLC
- Amyris-Olika, LLC
- Onda Beauty Inc.
- Upland 1 LLC

Non-Debtor Guarantors
- Amyris Clean Beauty LATAM Ltda.
- Interfaces Industria e Comerico de Cosmeticos Ltda.
- Amyris Biotechnologia Do Brasil Ltda.
- Amyris Europe Trading B.V. (Netherlands)
- Amyris Bio Products Portugal Unipessoal, Lda.
- Beauty Labs International Limited
- Amyris UK Trading Limited
- Amyris Eco-Fab LLC
- Clean Beauty 4U Holdings, LLC

**c. DIP Lenders/DIP Agent**: Euagore, LLC (together with the other lenders from time to time party thereto, the "DIP Lenders"), and Euagore, LLC, as Administrative Agent (the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties")

**d. Type**: A superpriority multiple-draw senior secured term loan facility

**e. Maturity/Term. Date**: Unless otherwise agreed to in writing by the DIP Agent in its sole discretion, all obligations of the Loan Parties under the DIP Documents, including, without limitation, all principal, accrued interest, costs, fees and premiums provided for therein (collectively, the "DIP Obligations"), shall be due and payable in full in cash on the earlier of:

i.  December 31, 2023 (the "Maturity Date");

ii.  the effective date (the "Effective Date") of any chapter 11 plan of reorganization in the Chapter 11 Cases (a "Plan");

---

informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof. The summaries and descriptions are qualified in their entirety by the proposed Interim Order, the Final Order, and the DIP Documents. In the event there is any conflict between this Motion and the Interim Order, the Final Order, or the DIP Documents, the Interim Order, the Final Order, and the DIP Documents will control in all respects. Capitalized Terms used herein that are otherwise undefined shall have the meaning ascribed to them in the DIP Credit Agreement.

12

iii.     the date of dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code;

iv.     the consummation of any sale or other disposition of all or substantially all of the Amyris Assets (collectively, the Consumer Brands Business and Other Amyris Assets, as defined herein) pursuant to section 363 of the Bankruptcy Code; and

v.     the date of the DIP Agent's written notice to the Borrowers of the occurrence of an Event of Default under the DIP Documents.

The first to occur of the events set forth in subsections i-v herein shall be the "<u>DIP Termination Date</u>."  [DIP Credit Agreement §1]

On the DIP Termination Date, (a) all DIP Obligations shall be immediately due and payable, and all commitments to extend credit under the DIP Facility will terminate; (b) all authority to use Cash Collateral shall cease; provided, however, that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral to fund the Carve-Out and Trust Fund Amounts in accordance with the Budget (subject to the Permitted Variances); and (c) the DIP Secured Parties shall be otherwise entitled to exercise rights and remedies under the DIP Documents in accordance with Paragraph 15 of the Interim Order. [Interim Order ¶ 12]

**f. Interim Loan Amount**:     Upon entry of the Interim Order, no more than two draws prior to entry of the Final Order in the aggregate principal amount of up to **$70 million** (each an "<u>Initial Borrowing</u>") [Interim Order Recitals ¶ (i)]

**g. Final Loan Amount**:     Upon entry of the Final Order, multiple additional draws (each a "<u>Subsequent Borrowing</u>" and collectively, the "<u>Subsequent Borrowings</u>") in the aggregate principal amount not to exceed **$120 million**; *provided* that (x) each Subsequent Borrowing shall not be in an amount greater than the amounts specified in the Budget (each as defined herein) to be drawn through the date of such Subsequent Borrowing and (y) each Subsequent Borrowing shall be at least twenty-one (21) calendar days apart [Interim Order Recitals ¶ (i)].

**h. Use of DIP Loans**:     The proceeds of the DIP Loan shall only be used for the following purposes and, in the case of payments pursuant to provisions and limitations on the investigation, interference with, or challenge to the Secured Obligations, the Adequate Protection Obligations, the Foris Prepetition Obligations and/or the liens, claims, rights, or security interests securing or supporting the Secured Obligations and the Adequate Protection Obligations, subject to the amounts and

13

timing specified in the Budget: (i) working capital and other general corporate purposes of the Obligors and certain Subsidiaries of the Parent which are not Debtors, *provided* that the Borrowers and such Subsidiaries shall execute a Post-Petition Global Note evidencing the payment obligation of such Subsidiaries for all amounts transferred after the Petition Date by the Borrowers, the Debtors or any non-debtor Subsidiary to such Subsidiaries, (ii) any adequate protection payments in accordance with the Budget and the DIP Orders, (iii) professional fees and expenses of administering the Cases, to the extent authorized by any Order of the Bankruptcy Court (including payments benefiting from the Carve-Out and any Investigation, including allowed professional fees subject to the terms and conditions set forth in the DIP Orders, and (iv) any other amounts payable to the Secured Parties hereunder.

[Interim Order ¶ 3(c); DIP Credit Agreement §§ 7.15(a) and (b)]

**i. Interest Rate**: DIP Loans will bear interest at a fixed rate equal to 12% per annum, compounded monthly, and shall be paid in-kind, in arrears, monthly on the first day of each month. [DIP Credit Agreement § 2.1(c)]

**j. Default Rate**: After the occurrence and during the continuance of an Event of Default, all amounts outstanding under the DIP Facility will bear interest at an additional rate per annum of 2.0%. [DIP Credit Agreement § 2.3]

**k. Loan/DIP Lender Fees:** There are no upfront loan fees. Upon the closing in one or more transactions or series of transactions of a sale of all or substantially all of the Amyris Assets in accordance with the All Assets Bidding Procedures Order, the Borrowers shall pay to the Administrative Agent (for the account of the Lenders) a premium in cash (the "Exit Premium") in an amount equal to 3.0% of the aggregate amount of all then outstanding Advances, together with accrued and unpaid interest on such amount and all fees and expenses due and payable hereunder, as of the closing date of such sale(s); *provided* that (i) such Exit Premium shall be approved by the Bankruptcy Court as part of the Final Order and shall be fully earned upon entry of the Final Order, but, for the avoidance of doubt, shall only be payable upon the closing in one or more transactions or series of transactions of a sale of all or substantially all of the Amyris Assets in accordance with the All Assets Bidding Procedures Order and (ii) the payment of such Exit Premium shall be structured in the most tax efficient manner for the Lenders so long as such tax structuring shall not be adverse in any material respect to the Obligors.  [DIP Credit Agreement § 2.8]

The fees of the DIP Secured Parties referred to in the DIP Documents, including all fees and other amounts owed to the DIP Agent and the DIP Lenders, will be paid as of the Termination Date. [Interim Order ¶ 3(d)(3)]

**l. Prepayments**:

(a)    _Optional Prepayment_.  No Borrower may prepay all or any part of the Advances unless in accordance with the express provisions of the DIP Credit Agreement.

(b)    _Mandatory Prepayments_.  Subject in all respects to the DIP Orders, if applicable, if and on each occasion that any Net Proceeds are received by or on behalf of the Parent or any of its Subsidiaries in respect of the disposition of Collateral (other than any disposition in the ordinary course of business), the Borrowers shall, immediately after such Net Proceeds are received by them or any Subsidiary thereof prepay the Advances, together with accrued and unpaid interest on the principal amount thereof and all fees and expenses payable hereunder, pro rata in an aggregate amount equal to 100% of such Net Proceeds.  For the avoidance of doubt, any Advance prepaid under Section 2.5 of the DIP Credit Agreement may not be re-borrowed. [DIP Credit Agreement § 2.5]

**m. DIP Liens/Collateral**:

As security for the DIP Obligations, effective and perfected upon the date of the Interim Order, the following security interests and liens are granted by the Debtors to the DIP Agent, for the benefit of the DIP Secured Parties (all property identified below being collectively referred to as the "DIP Collateral"), subject to (x) the Permitted Liens (as defined in the DIP Credit Agreement) and (y) the Carve-Out (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Lenders, pursuant to the Interim Order and the DIP Documents, the "DIP Liens"):

i.    _First Priority Lien on Unencumbered Property_. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, non-avoidable, automatically and properly perfected, first priority security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the "Prepetition Unencumbered Collateral").[4]  Subject to entry of the

---

[4] As of the Petition Date, the Prepetition Unencumbered Assets primarily consist of owned real estate in Leland, North Carolina, leased real estate in various locations, and equity interests in certain joint ventures and foreign subsidiaries.

Final Order, the Prepetition Unencumbered Collateral shall include the Avoidance Actions Proceeds. [Interim Order ¶ 8(a)]

ii.      *Liens Priming the Foris Liens*. Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, non-avoidable, automatically and properly perfected, first priority priming security interest in and lien upon the Prepetition Collateral, (the "<u>Priming Liens</u>"), which Priming Liens shall prime in all respects the interests of the Foris Prepetition Secured Lenders arising from the current and future liens of the Foris Prepetition Secured Lenders (the "<u>Primed Liens</u>"). The Foris Prepetition Secured Lenders have consented to the Primed Liens. [Interim Order ¶ 8(b)]

iii.      *Liens Junior to Certain Other Liens*. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, non-avoidable, automatically and properly perfected, security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors that is subject to (i) valid, perfected and non-avoidable senior liens in existence immediately prior to the Petition Date (other than the Primed Liens) or (ii) valid and non-avoidable senior liens (other than the Primed Liens) in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date, as permitted by section 546(b) of the Bankruptcy Code (the "<u>Other Encumbered Prepetition Collateral</u>"), which shall be (x) immediately junior and subordinate to any valid, perfected and non-avoidable liens (other than the Primed Liens) in existence immediately prior to the Petition Date, and (y) any such valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code. The DIP Liens shall be junior to the DSM Liens. [Interim Order ¶ 8(c)]

iv.      *Liens Senior to Certain Other Liens*. The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Secured Parties, or (C) any intercompany or affiliate liens of the Debtors or its non-Debtor affiliates or security interests of the Debtors; or (ii) subordinated to or made *pari passu* with any other

16

lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.  [Interim Order ¶ 8(d)]

**n. Priority**: The DIP Liens shall have the priory set forth in Paragraph 24(m), above.  [Interim Order ¶ 8]

**o. Superpriority Claims**: *DIP Superpriority Claims*. Pursuant to, and to the extent provided by section 364(c)(1) of the Bankruptcy Code, but subject to the Carve-Out, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates (the "<u>DIP Superpriority Claims</u>") (without the need to file any proof of claim) with priority over any and all administrative expenses, Adequate Protection Claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(c), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, subject to entry of the Final Order, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code (the "<u>Avoidance Actions Proceeds</u>"), subject only to the payment of the Carve-Out.  Except as set forth in the Interim Order or the Final Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases. [Interim Order ¶ 7]

**p. Adequate Protection**: *Adequate Protection for the Foris Prepetition Secured Lenders*. The Foris Prepetition Secured Lenders are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral (including Cash Collateral) in an amount equal to the aggregate diminution in the value as of the Petition Date of their interests in the Prepetition Collateral (including Cash Collateral), which diminution is as a result of, or arises from, or is attributable to, the sale, lease or use by the Debtors of the Prepetition Collateral, the priming of the Foris Liens by the DIP Liens pursuant to the DIP Documents and the Interim Order, the grant of any other lien under section 364 of the Bankruptcy Code or the stay of the Foris Prepetition Secured

Lenders' rights under the Prepetition Collateral, the payment of any amounts under the Carve-Out or pursuant to the Interim Order, the Final Order or any other order of the Court or provision of the Bankruptcy Code or otherwise, and the imposition of the Automatic Stay ("Adequate Protection" and the resulting claims, "Adequate Protection Claims"). In consideration of the foregoing, and as an inducement to the Foris Prepetition Secured Lenders to consent to the priming of the Foris Liens and use of the Prepetition Collateral (including Cash Collateral), the Foris Prepetition Secured Lenders will be granted the following as Adequate Protection:

i.       *Prepetition Adequate Protection Liens*. The Foris Prepetition Secured Lenders will be granted in the amount of their Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (the "Adequate Protection Liens"), including upon entry of the Final Order, all Avoidance Actions Proceeds, subject and subordinate only to (A) the DIP Liens, (B) the Carve-Out, and (C) Permitted Liens or any valid and non-avoidable senior liens (other than the Primed Liens) in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date. For the avoidance of doubt, the Adequate Protection Liens shall be junior and subordinate to the DSM Liens. [Interim Order ¶ 9(a)]

ii.       *Adequate Protection Superpriority Claims*. The Foris Prepetition Secured Lenders will be granted, subject to the Carve-Out, an allowed superpriority administrative expense claim to the fullest extent provided by sections 503(b) and 507(b) of the Bankruptcy Code in each of the Chapter 11 Cases in an amount equal to the Adequate Protection Obligations that are not secured by the Adequate Protection Liens (the "Adequate Protection Superpriority Claims"). The Adequate Protection Superpriority Claims shall be ahead of and senior to any and all other administrative expense claims of any kind specified or ordered pursuant to any provision of the Bankruptcy Code, but junior to the DIP Superpriority Claims and subject to and subordinate to the Carve-Out and shall have recourse to and be payable from all prepetition or postpetition DIP Collateral, including upon entry of the Final Order, all Avoidance Actions Proceeds. The Foris Prepetition Secured Lenders shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Superpriority Claims under section 507(b) of the Bankruptcy Code granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full. [Interim Order ¶ 9(b)]

iii.    *Adequate Protection Payments*. The Debtors are authorized and directed to pay, without the necessity of filing fee applications with, or seeking approval of, the Court or in compliance with the U.S. Trustee fee guidelines, all reasonable and documents fees, costs, and expenses the counsel, financial advisors and other professionals of the Foris Prepetition Secured Lenders in connection with these Chapter 11 Cases whether arising on, prior to or after the Petition Date (all payments referenced herein, collectively, the "Adequate Protection Payments"); *provided* that all Adequate Protection Payments shall be deferred until the DIP Termination Date.  [Interim Order ¶ 9(c)]

**q. DIP Budget**:    All Advances under the DIP Credit Agreement are subject to an approved budget (the "Budget", consisting of the Initial Budget and the periodic updated budgets, all as required by the Interim Order and DIP Credit Agreement). The Debtors seek approval of the Initial Budget, covering the first 60 days of these Chapter 11 Cases pursuant to the Interim Order.  The Debtors shall thereafter prepare an updated Budget which shall be approved pursuant to the Final Order.  By 5:00 p.m. Pacific Time on the date that is two weeks after the date the Final Order approving the updated Budget is entered (or such date as mutually agreed in writing (email being sufficient) by the Debtors and DIP Secured Parties), and every two weeks thereafter on the second business day of such week, the Debtors shall prepare and provide the DIP Secured Parties with an updated Budget.  [Interim Order ¶ 4(a)

By 5:00 p.m. Pacific Time on August 23, 2023, and then on Wednesday of every week thereafter, the Debtors shall deliver to the DIP Agent a Budget variance report and reconciliation (the "Approved Budget Variance Report") comparing on a line by line item basis: (x) total receipts for such period to total receipts for such period as set forth in the Budget on a weekly and cumulative basis; (y) total disbursements for such period to total disbursements for such period as set forth in the Budget on a weekly and cumulative basis; together with a statement certifying compliance with the Permitted Variances (as defined herein) for such period (each a "Measuring Period") and explaining in reasonable detail any Material Variance (as defined below) (each such report, a "Variance Report," which shall be in a form satisfactory to the DIP Agent). For purposes of each Measuring Period, the Borrowers shall calculate on a line item by line item basis: (x) the numerical difference between total receipts for such period to total receipts for such period as set forth in the Budget for the then applicable week and on a cumulative basis (the "Receipts Variance"), and the percentage such Receipts Variance (as an absolute amount) is of the applicable week and cumulative basis budgeted amount for receipts for such Measuring Period (the "Receipts Variance Percentage")

and (y) the numerical amount by which total disbursements for such Measuring Period are greater than total disbursements, respectively, on a line item by line item basis, for such Measuring Period as set out in the Budget for the then applicable week and on a cumulative basis for such Measuring Period (the "Disbursements Variance"), and the percentage such Disbursements Variance (as an absolute amount) is of the applicable week and cumulative budgeted amount for disbursements for such Measuring Period (the "Disbursements Variance Percentage").  For purposes of the Interim Order, (w) "receipts" shall not include any Initial Borrowing or Subsequent Borrowing under the DIP Facility or any proceeds from the sale of DIP Collateral; (x) the calculation of the Disbursements Variance shall exclude any amounts in the Budget related to professional fees for the Debtors and the Committee, which, at all times, for purposes of any Initial Borrowing or Subsequent Borrowing under the DIP Facility, shall not exceed amounts set forth in the then approved Budget, (y) a "Material Variance" shall mean on a line item by line item basis with respect to each Measuring Period either (i) a Receipts Variance Percentage greater than 15% or (ii) a Disbursements Variance Percentage greater than 10%, and (z) "Permitted Variance" shall mean on a line item by line item basis with respect to each Measuring Period: (i) if the Receipts Variance is a negative number, the Receipts Variance Percentage shall not be greater than 25% measured on a four (4) week cumulative basis and (ii) if the Disbursements Variance is a positive number, the Disbursements Variance Percentage shall not be greater than (A) 20% measured on a two (2) week and cumulative basis and (B) 15% measured on a four (4) week and cumulative basis.  For purposes hereof, "line item by line item" shall mean each line of the Budget (excluding any amounts in the Budget related to professional fees for the Debtors and the Committee); *provided*, *however*, for line items labeled "Other AP Disbursements", "InterCo disbursements for Goods", and "InterCo Loan", "line item by line item" shall be with references to the line items set forth in the supporting schedules provided to the DIP Secured Parties in connection with the Budget. [Interim Order ¶ 4(b)]

The Initial Budget is attached to the proposed Interim Order as **Exhibit B**.  Additionally, attached to this DIP Motion are a Plan Scenario Budget through December 31, 2023 (**Exhibit 2**) and a Sale Scenario Budget through December 31, 2023 (**Exhibit 3**).

**r. Carve-Out**:    As set forth in the Interim Order, each of the DIP Liens, DIP Superpriority Claims, Foris Liens, Foris Prepetition Obligations, Adequate Protection Liens, and Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve-Out.  [Interim Order ¶ 6(a)]

The "Carve-Out" means:

i.      all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iv) below);

ii.      all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below);

iii.      all obligations due and owing under any key employee incentive plan and retention plan consistent with the Budget, consented to by the DIP Agent, and approved by the Bankruptcy Court;

iv.      to the extent allowed at any time, whether by interim order, procedural order, or otherwise, and whether allowed before or after delivery of a Trigger Notice, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtors' Professionals") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committees' Professionals" and, together with the Debtors' Professionals, the "Professional Persons"), but subject to the then Budget for each Professional Person, as approved by the DIP Agent, for the period of time from the Petition Date to the date of a Trigger Notice; and

v.      Allowed Professional Fees of the Debtors Professionals and Committee Professionals in an amount not to exceed $750,000 incurred after the delivery of a Trigger Notice (this clause (v), the "Carve-Out Cap"), less the amount of any prepetition retainers received by such Professional Persons and not previously returned or applied to Allowed Professionals Fees; *provided*, *however*, nothing herein shall be construed to impair any party's ability to object to court approval of the fees, expenses, reimbursement of expenses or compensation of the Debtors' Professionals or the Committees' Professionals.

"Trigger Notice" shall mean a written notice delivered by the DIP Agent to the U.S. Trustee and counsel to the Debtors and Committee describing the Event of Default that is alleged to continue under the DIP Documents (or after the payment in full of the DIP Obligations, delivered by the Prepetition Lenders under the Foris Prepetition Secured Loan Agreements describing the reason for termination of the use of Cash Collateral).  [Interim Order ¶ 6(b)]

*Carve-Out Account.* On the day on which a Trigger Notice is given by the DIP Agent, and prior to the payment to any of the DIP Agent,

DIP Lenders or the Foris Prepetition Secured Lenders on account of the DIP Obligations, the Foris Prepetition Obligations, any Adequate Protection Obligations (as defined herein), claims or liens, or otherwise, the Debtors shall immediately, and be authorized and required to, deposit, as soon as reasonably practicable, in a non-interest bearing trust fund account of the Debtors' general bankruptcy counsel for the benefit of Professional Persons not subject to the control of the DIP Agent, DIP Lenders or the Foris Prepetition Secured Lenders (the "Carve-Out Account"), an amount equal to the Carve-Out Cap. If any amounts remain in the Carve-Out Account after payment of Professional Persons in accordance with the Carve-Out (subject to the Budget), such amounts shall be returned to the DIP Agent and shall be subject to the DIP Liens and Adequate Protection Liens; *provided* that to the extent the DIP Loans are indefeasibly paid in full at the time such amounts are to be returned, such amounts shall be returned to the Foris Prepetition Secured Lenders. Prior to the date of delivery of a Trigger Notice, the Debtors shall be authorized to make weekly deposits into the Carve-Out Account in accordance with the Budget. Funds which are on deposit in the Carve-Out Account shall be available only to satisfy obligations benefitting from the Carve-Out, and the DIP Agent, DIP Lenders and the Foris Prepetition Secured Lenders, each on behalf of itself and the relevant secured parties, (i) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve-Out Account, (ii) shall subordinate their security interests and liens in the Carve-Out Account to the payment of the Allowed Professional Fees in accordance with the Carve-Out and the Carve-Out Cap, and shall only have a security interest upon, and shall only have a right of enforcement against, any residual interest in the Carve-Out Account available following satisfaction in full in cash of all obligations benefitting from the Carve-Out Account; and (iii) waive, and agree not to assert, any right of disgorgement with respect to the payment of the Allowed Professional Fees.  [Interim Order ¶ 6(c)]

*Trust Fund Amounts*. Notwithstanding the delivery and effectiveness of a Trigger Notice, the Debtors shall be entitled to use Cash Collateral to pay payroll expenses that have accrued through the date of the Trigger Notice and trust fund taxes that have accrued through the date of the Trigger Notice, each in an amount included in the Budget through the date of the Trigger Notice but which such amounts remain unpaid (the "Trust Fund Amounts").   [Interim Order ¶ 6(d)]

**s. Case Milestones**:    The DIP Documents shall require compliance with the following milestones (the "Milestones"):

a)    the Petition Date shall occur no later than August 9, 2023;

b)    the Bankruptcy Court shall enter the Interim Order no later than three (3) Business Days following the Petition Date;

c)    the Bankruptcy Court shall enter the Final Order no later than thirty-six (36) calendar days following the Petition Date; and

d)    no later than thirty-five (35) calendar days following the Petition Date (the "Plan Support Deadline"), the Debtors shall have executed a plan support agreement (the "Plan Support Agreement") by and among the Debtors, the Administrative Agent, the Lenders, the Foris Prepetition Secured Lenders, and such other party- or parties-in-interest determined by the Administrative Agent, the Required Lenders, and the Foris Prepetition Secured Lenders, in their sole and absolute discretion, to be necessary and sufficient for the Administrative Agent, the Lenders and the Foris Prepetition Secured Lenders to support a Chapter 11 Plan (collectively, the "Plan Support Persons"), with such Plan Support Agreement being acceptable to the Administrative Agent and the Foris Prepetition Secured Lenders in their sole discretion (the "Plan Support Agreement Milestone"); *provided* that (x) the Debtors shall not file a motion to sell any Amyris Assets on or prior to the Plan Support Deadline and (y) (A) if the Plan Support Agreement Milestone Date occurs on or prior to the Plan Support Deadline, the Plan Support Agreement shall include, and the Obligors shall achieve, each of the following Milestones:

(i)    no later than fourteen (14) calendar days following the Plan Support Agreement Milestone Date, the Debtors shall file with the Bankruptcy Court a Chapter 11 Plan, a Disclosure Statement (each consistent with the Plan Support Agreement and in form and substance acceptable to the Administrative Agent), and a motion to approve the Plan, the Disclosure Statement and the related solicitation materials, dates and deadlines (the "Plan Filing Deadline");

(ii)    no later than thirty-seven (37) calendar days following the Plan Filing Deadline (the "Disclosure Statement Hearing Order Deadline"), the Bankruptcy Court shall enter an order approving the Disclosure Statement, which order shall provide that the date upon which votes to accept or reject the Chapter 11 Plan must be submitted shall be no later than thirty-five (35) calendar days following the Disclosure Statement Hearing Order Deadline;

(iii)    no later than eighty-two (82) calendar days following the Plan Filing Deadline, the Bankruptcy Court shall enter the Acceptable Confirmation Order *provided* that the

23

Acceptable Confirmation Order and Chapter 11 Plan shall be in form and substance consistent in all respects with the Plan Support Agreement and in form and substance acceptable to the Administrative Agent;

(iv)    no later than December 29, 2023, the Plan Effective Date shall occur; and

(v)     if the Plan Support Agreement provides for the sale of the Consumer Brands Business and/or the Other Amyris Assets, the Plan Support Agreement shall include Milestones to commence a sale of the Consumer Brands Business and/or the Other Amyris consistent in form and substance with the Milestones described in clause (B) below and otherwise in form and substance acceptable to the Administrative Agent and, for the avoidance of doubt, the distribution of Net Proceeds from such sale shall be governed by the Plan Support Agreement and the Chapter 11 Plan;

and (B) if the Plan Support Agreement Milestone is not satisfied on or prior to the Plan Support Deadline, the Administrative Agent, in its sole discretion, may elect to require the Debtors to initiate a process to market and sell the Amyris Assets (such election, the "Sale Toggle Event") by delivering written notice of the occurrence of the Sale Toggle Event to the Parent (the "Sale Toggle Event Notice"), which process shall include the following Milestones:

(i)     no later than three (3) calendar days following the Debtors' receipt of the Sale Toggle Event Notice, the Debtors shall file with the Bankruptcy Court a motion (the "All Assets Bidding Procedures Motion") seeking approval of the bidding procedures for the sale in one or more of a series of transactions all or substantially all of the All Assets Sale Transaction (the "All Assets Bidding Procedures"); *provided* that the All Assets Bidding Procedures Motion, the All Assets Bidding Procedures, and the order approving the All Assets Bidding Procedures (the "All Assets Bidding Procedures Order"), shall be in form and substance acceptable to the Administrative Agent, and shall include, without limitation, (x) the date upon which preliminary bids and qualified bids for the Amyris Assets shall be submitted and the date of the sale hearing for the Amyris Assets shall be submitted and the date the sale hearing shall occur, (y) the terms and conditions of acceptance of a qualified bid, and (z) the distribution of 100% of the Net Proceeds from the All Asset Sale Transaction, which shall, for the avoidance of

24

doubt, be subject in all respects to the Liens and claims of the Secured Parties and the Foris Prepetition Secured Lenders and shall be paid (I) first to the Secured Parties and/or the Foris Prepetition Secured Lenders in order of priority and applied to the Loans and the Foris Prepetition Obligations as determined by the Lenders and the Foris Prepetition Secured Lenders in their sole discretion, and (II) second, any remaining balance, if any, shall be retained by the Debtors; *provided* that, as set forth in the DIP Orders, the Administrative Agent and the Foris Prepetition Secured Lenders shall have the right to credit bid up to the full amount of the Secured Obligations and Foris Prepetition Obligations, respectively, in connection with such sale;

(ii)  no later than thirty-five (35) calendar days following the Debtors' receipt of the Sale Toggle Event Notice, the Bankruptcy Court shall enter the All Assets Bidding Procedure Order;

(iii)  no later than ninety (90) calendar days following the Debtors' receipt of the Sale Toggle Event Notice, the Bankruptcy Court shall enter an order approving the sale of the All Assets Sale Transaction; and

(iv)  no later than December 29, 2023, the All Asset Sale Transaction shall close and be effective.

[Interim Order ¶ 14; DIP Credit Agreement § 7.25]

**t. DIP Documents**: The DIP Documents will be executed and delivered in accordance with the terms of the Interim Order. [Interim Order ¶ 3]

**u. Stipulations/Releases**: The DIP Orders include (i) customary Stipulations regarding the validity and priority of the Foris Prepetition Secured Loan Agreements, the Foris Prepetition Obligations, the Foris Liens and Prepetition Collateral, and (ii) customary waivers by the Debtors and releases of the Foris Prepetition Secured Lenders, the DIP Secured Parties, and each of their respective Representatives (collectively, the "Released Parties") with respect to any and all claims and causes of action arising from or related to the Foris Prepetition Secured Loan Agreements, the Foris Prepetition Obligations, the Foris Liens, the Prepetition Collateral, the DIP Liens, the DIP Secured Parties and the DIP Documents. The Releases are effective as of the date of the Interim Order for the Debtors. As set forth in the Interim Order, the Stipulations and Releases are only binding on other parties in interest, including any Committee, upon

25

the expiration of the Challenge Period. [Interim Order ¶¶ F (viii); 11, 27]

The Challenge Period for parties in interest (including any Creditors' Committee) is seventy-five (75) days from entry of the Interim Order or such later date as the Prepetition Agent may consent in writing. Except for an Investigation Budget of $50,000.00, no proceeds of the DIP Loans and/or DIP Collateral (including Cash Collateral) may be used to challenge the liens or claims of the Foris Prepetition Secured Lenders or the DIP Lenders. [Interim Order ¶¶ 11, 27]

| | |
|---|---|
| **v. Events of Default**: | *Events of Default*. The occurrence of any of the following events, unless waived by the DIP Agent in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "Events of Default"): (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under the Interim Order; (b) the failure of the Debtors to comply with the Milestones; or (c) the occurrence of an "Event of Default" under the DIP Credit Agreement. [Interim Order ¶ 13; DIP Credit Agreement § 8] |
| **w. Credit Bidding**: | The DIP Agent shall have the right to credit bid up to the full amount of the DIP Obligations in any sale of the DIP Collateral. The Foris Prepetition Secured Lenders shall have the right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of the Foris Prepetition Obligations pursuant to section 363(k) of the Bankruptcy Code, without the need to further Court order authorizing the same and whether any such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise. [Interim Order ¶ 25] |
| **x. Waivers**: | The DIP Orders shall include terms and conditions customary for interim or Final DIP financing orders and shall be acceptable to the DIP Agent and DIP Lender including, without limitation, waiver of the automatic stay, "no marshaling" provisions, and upon entry of the Final Order, waivers of the imposition of costs pursuant to Section 506(c) of the Bankruptcy Code and the "equities of the case" exception in Section 552(b) of the Bankruptcy Code, in each case, to the extent applicable, in favor of the DIP Lenders and Foris Prepetition Secured Lenders. Relief from the automatic stay is subject to a five (5) days' Remedies Notice Period. [Interim Order ¶¶ 15, 16 17, 23, 34]. |

26

**y. Conditions to Funding**:   The DIP Documents shall contain conditions precedent customarily found in loan documents for similar debtor-in-possession financings and as otherwise deemed by the DIP Agent appropriate to the specific transactions. [DIP Credit Agreement § 4]

**z. Covenants**:   The DIP Documents shall contain affirmative and negative covenants customarily found in loan documents for similar debtor-in-possession financings and as otherwise deemed by the DIP Agent appropriate to the specific transactions, such as financial reporting, limitations on incurred indebtedness, limitations on the incurrence of additional liens. [DIP Credit Agreement § 7]

## B.    Additional Required Disclosures

24.    Pursuant to Local Rule 4001-2(a)(i), a debtor in possession seeking authority to use cash collateral or obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing. The debtor in possession must also justify the inclusion of certain such provisions. Set forth below are the disclosures required in accordance Local Rule 4001-2(a)(i)(A)-(X) (most of which is also disclosed in Paragraph 23(a)-(z) of this DIP Motion as set forth above):

(i)    Local Rule 4001-2(a)(i)(A) requires a debtor to disclose the amount of cash collateral the debtor seeks permission to use or the amount of credit the debtor seeks to obtain under the proposed loan agreement, including the committed amount of the proposed loan agreement and the amount of new funding that will actually be available for borrowing by the debtor.

**New credit loan of $190,000,000 [Interim Order Recitals ¶ (i)]**

(ii)    Local Rule 4001-2(a)(i)(B) require the disclosure of pricing and economic terms, including letter of credit fees, commitment fees, and any other fees, provided that when any such terms are sought to be filed under seal, they shall not be disclosed in the Financing Motion itself, but shall be set forth in a separate document filed pursuant to the procedures set forth in Local Rule 9018-1(d), the filing of which shall be disclosed in the Financing Motion.

**The economic terms of the DIP Facility and the applicable paragraphs of the proposed Interim Order and/or DIP Credit Agreement, as applicable, are disclosed in Paragraph 23(i), (j), and (k), above. There are no terms sought to be filed under seal.**

27

(iii)      Local Rule 4001-2(a)(i)(C) requires the disclosure of provisions that specifically limit the Court's power or discretion to enter future orders in the case.

**While certain provisions of the DIP Facility limit the issues the Debtors may raise before the Court, no provisions of the DIP Facility or the proposed DIP Orders limit the power or discretion of the Court to enter future orders in the Chapter 11 Cases.**

(iv)      Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that provide for the funding of non-debtor affiliates with cash collateral or proceeds of the loan, as applicable, and the approximate amount of such funding.

**The Budget, the Cash Management Motion, and the Fleming Declaration disclose the use of proceeds of the DIP Facility by non-debtor affiliates and the reasons for such use. Any such intercompany transfers shall be subject to the Budget, including the "Other AP Disbursements", "InterCo disbursements for Goods", and "InterCo Loan" line items therein and supporting schedules to the Budget, as well as the provisions of any interim and final orders approving the Debtors' cash management motion, including, without limitation, execution of a Post-Petition Global Note.**

(v)      Local Rule 4001-2(a)(i)(E) requires disclosure of material conditions to closing and borrowing, including budget provisions.

**The material conditions to closing and borrowing and the applicable paragraphs of the proposed Interim Order or DIP Credit Agreement, as applicable, are disclosed in Paragraph 23(h), (q), (s), and (y), above.**

(vi)      Local Rule 4001-2(a)(i)(F) requires disclosure of any carve-outs from liens or superpriority claims, including the material terms of any professional fee carve-out.

**The provisions of the Carve-Out and the applicable paragraphs of the proposed Interim Order or DIP Credit Agreement, as applicable, are disclosed in Paragraph 23(r), above.**

(vii)      Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for postpetition liens on unencumbered assets, including the identification of such assets.

**The provisions of the proposed DIP Order providing liens on unencumbered assets, the identity of such assets and the applicable paragraphs of the Interim Order or DIP Credit Agreement, as applicable, are disclosed in Paragraph 23(m), above.**

(viii)      Local Rule 4001-2(a)(i)(H) requires disclosure of provisions that establish any sale or plan milestones.

**The provisions of the proposed Interim Order establishing sale and plan milestones and the applicable paragraphs of the Interim Order or DIP Credit Agreement, as applicable, are disclosed in Paragraph 23(s), above.**

(ix)     Local Rule 4001-2(a)(i)(I) requires disclosure of provisions that provide for a prepayment penalty or other provisions that affect the debtor's right or ability to repay the financing in full during the course of the chapter 11 case.

**No provisions of the DIP Order or DIP Credit Agreement provide for a prepayment penalty.  Any limitations on prepayment contained in the proposed DIP Order and DIP Credit Agreement are disclosed in Paragraph 23(l), above.**

(x)     Local Rule 4001-2(a)(i)(J) requires disclosure of provisions, in jointly administered cases, that govern joint liability of the debtors, including any provisions that would cause one jointly administered debtor to become liable for the prepetition debt of another jointly administered debtor for which it was not previously subject to.

**No provisions of the proposed DIP Orders or the DIP Credit Agreement make any debtor liable for any prepetition debt of another debtor for which it was not previously liable.**

(xi)     Local Rule 4001-2(a)(i)(K) requires disclosure of provisions that require the debtor to pay an agent's or lender's expenses and attorneys' fees in connection with the proposed financing or use of cash collateral, without any notice or review by the Office of the United States Trustee, the committee appointed under section 1102 of the Bankruptcy Code (if formed) or, upon objection by either of the foregoing parties, the Court.

**The provisions regarding payment of the fees and expenses of the Foris Prepetition Secured Lenders are disclosed in Paragraph 23(p)(iii), above.  The provisions regarding payment of the fees and expenses of the DIP Lenders are disclosed in Paragraph 23(k), above.  All such fees and expenses accrue and are only payable upon the DIP Termination Date.  Payment of each of these fees is subject to applicable notice to the U.S. Trustee and Creditors' Committee.  [Interim Order ¶ 19]**

(xii)     Local Rule 4001-2(a)(i)(L) requires disclosure of provisions that prohibit the use of estate funds to investigate the liens and claims of the prepetition lender.

**As set forth in Paragraph 23(h)(iii) and (u), above, use of estate funds to investigate the liens and claims of the Foris Prepetition Secured Lenders is limited to $50,000.**

(xiii)     Local Rule 4001-2(a)(i)(M) requires disclosure of any termination or default provisions concerning the use of cash collateral or the availability of credit.

**The default and termination provisions of the proposed Interim Order and the applicable paragraphs of the Interim Order or DIP Credit Agreement, as applicable, are disclosed in Paragraph 23(v), above.**

(xiv)     Local Rule 4001-2(a)(i)(N) requires disclosure of any provisions that grant cross-collateralization protection or elevate prepetition debt to administrative expense (or higher) status or that secure prepetition debt with liens on postpetition assets (which liens the creditor would not otherwise have by virtue of the prepetition security agreement or applicable law).

**Nothing in the proposed DIP Orders cross-collateralizes or elevates prepetition debt to administrative expense (or higher) status or secures prepetition debt with liens on postpetition assets.**

(xv)     Local Rule 4001-2(a)(i)(O) requires disclosure of any provisions that apply the proceeds of postpetition financing to pay, in whole or in part, prepetition debt or which otherwise have the effect of converting (or "rolling up") prepetition debt to postpetition debt.

**Nothing in the proposed DIP Orders provides for the application of the proceeds of postpetition financing to pay, in whole or in part, prepetition debt and no roll-up or conversion of prepetition debt to postpetition debt is contemplated in the DIP Orders or the DIP Credit Agreement.**

(xvi)     Local Rule 4001-2(a)(i)(P) requires disclosure of any provisions that immediately prime valid, perfected and non-avoidable liens existing immediately prior to the petition date or that are perfected subsequent to the petition date as permitted by section 546(b) of the Bankruptcy Code, in each case that are senior to the lender's prepetition liens under applicable law, without the consent of the affected secured creditors, and the proposed notice to be provided to such affected secured creditors.

**The proposed DIP Orders do not provide for the priming of any pre-existing secured liens without the consent of the applicable lienholder.  The Foris Prepetition Secured Lenders have consented to the priming of their liens as set forth in the DIP Orders.**

(xvii)     Local Rule 4001-2(a)(i)(Q) requires disclosure of any provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest, including, but not limited to, any official committee appointed in these cases, at least seventy-five (75) days from the entry of the initial interim order to investigate such matters or (ii) limit the Court's ability to grant relief in the event of a successful challenge.

**The proposed DIP Orders provide that any stipulations by the Debtors relating to the validity and amount of the Prepetition Liens and claims of the Prepetition Lender are subject to challenge by parties in interest, including**

**any official Creditors' Committee, during a period of seventy-five (75) days from date of entry of the Interim Order, as disclosed in Paragraph 23(u), above. No provisions in the proposed DIP Orders limit the ability of the Court to grant relief in the event of a successful challenge.**

(xviii)    Local Rule 4001-2(a)(i)(R) requires disclosure of any provisions that immediately approve all terms and conditions of the underlying loan agreement (provided that provisions in the order that provide that the debtor is authorized to enter into and be bound by the terms and conditions of such loan agreement do not need to be summarized).

**As set forth more specifically in Paragraph 23, above, the DIP Credit Agreement and the authority of the Debtors to enter into same are approved upon entry of the Interim Order, except as to certain provisions (liens on Avoidance Actions and certain waivers), which are only approved upon entry of the Final Order.**

(xix)    Local Rule 4001-2(a)(i)(S) requires disclosure of any provisions that modify or terminate the automatic stay or permit the lender to enforce remedies following an event of default that do not require at least five (5) days' written notice to the trustee or debtor in possession, the Office of the United States Trustee and each committee appointed under sections 1102 and 1114 of the Bankruptcy Code (the "Remedies Notice Period"), prior to such modification or termination of the automatic stay or the enforcement of the lender's remedies.

**As set forth in Paragraph 23(x), above, termination of the automatic stay to enable the DIP Lenders to enforce remedies is subject to the five (5) day Remedies Notice Period.**

(xx)    Local Rule 4001-2(a)(i)(T) requires disclosure of any provisions that seek to limit what parties in interest (other than the debtor) may raise at any emergency hearing scheduled during the Remedies Notice Period.

**As set forth in Paragraph 23(x), with reference to Paragraph 16 of the Interim Order, no provisions of the DIP Orders limit what parties in interest (other than the Debtors) may raise at any emergency hearing scheduled during the Remedies Notice Period.**

(xxi)    Local Rule 4001-2(a)(i)(U) requires disclosure of any provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, and 548 of the Bankruptcy Code or, in each case, the proceeds thereof.

**Liens on the proceeds of Avoidance Actions are effective only upon entry of the Final Order.**

(xxii)      Local Rule 4001-2(a)(i)(V) requires disclosure of any provisions that immediately waive the debtor's rights under section 506(c) of the Bankruptcy Code.

**As disclosed in Paragraph 23(x), above, these provisions are subject to entry of the Final Order as it relates to the Foris Prepetition Secured Lenders and the Prepetition Collateral and the Interim Order as it relates to the DIP Secured Parties and the DIP Collateral.**

(xxiii)      Local Rule 4001-2(a)(i)(W) requires disclosure of any provisions that immediately seek to affect the Court's power to consider the equities of the case doctrine under section 552(b)(1) of the Bankruptcy Code.

**As disclosed in Paragraph 23(x), above, these provisions are subject to entry of the Final Order as it relates to the Foris Prepetition Secured Lenders and the Prepetition Collateral and the Interim Order as it relates to the DIP Secured Parties and the DIP Collateral.**

(xxiv)      Local Rule 4001-2(a)(i)(X) requires disclosure of any provisions that immediately shield the lender from the equitable doctrine of "marshalling" or any similar doctrine.

**As disclosed in Paragraph 23(x), above, these provisions are subject to entry of the Final Order as it relates to the Foris Prepetition Secured Lenders and the Prepetition Collateral and the Interim Order as it relates to the DIP Secured Parties and the DIP Collateral.**

C.     **Need for Financing and Use of Cash Collateral**

25.     The Debtors have an immediate and critical need to obtain the DIP Facility and to use Cash Collateral (solely to the extent consistent with the Budget (subject to Permitted Variances as set forth in the Interim Order and the DIP Documents)) to, among other things, (a) permit the orderly continuation of their businesses; (b) maintain business relationships with vendors, suppliers, and customers; (c) make payroll; (d) fund expenses of the Chapter 11 Cases; and (e) satisfy other working capital, operational, and general corporate needs.  The Debtors do not have sufficient sources of working capital and financing to operate their businesses in the ordinary course throughout the Chapter 11 Cases without access to the DIP Facility and authorized use of Cash Collateral.  In the absence of the DIP Facility and the use of Cash Collateral, the

Debtors' business and estates would suffer immediate and irreparable harm. Access to the DIP Facility will provide the Debtors with sufficient working capital and liquidity to operate during these Chapter 11 Cases and is vital to the preservation and maintenance of the Debtors' business and assets. Without access to the DIP Facility and Cash Collateral, the Company would run out of money and its ability maintain going concern operations and value will be significantly impaired.

26.     As set out in the Beers Declaration, the Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without granting to the DIP Secured Parties, the DIP Liens and the DIP Superpriority Claims (each as defined herein), in each case subject to the Carve-Out to the extent set forth herein, under the terms and conditions set forth in the Interim Order and the DIP Documents. Importantly, the Foris Prepetition Secured Lenders consent to the priming of their liens contemplated by the DIP Documents and there is no roll-up of prepetition debt to postpetition debt included in the DIP Facility.

## V.   BASIS FOR RELIEF

**A.     The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code.**

27.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

33

28.     In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

a.      unencumbered credit or alternative financing without superpriority status is available to the debtor;

b.      the credit transactions are necessary to preserve assets of the estate;

c.      the terms of the credit agreement are fair, reasonable, and adequate;

d.      the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and its creditors; and

e.      the proposed financing agreement adequately protects the DIP Lender.

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)).

29.     For the reasons discussed below, the Debtors satisfy the standards required to obtain postpetition financing in the Chapter 11 Cases on a partial priming and senior secured superpriority basis as to the DIP Collateral under sections 364(c)(1), (2), and (d)(1) of the Bankruptcy Code.

**B.      The Debtors are Unable to Obtain Financing on More Favorable Terms.**

30.     As discussed above and in the First Day Declaration and Beers Declaration, the Debtors carefully considered their financing options.  Ultimately, the Debtors determined that the DIP Facility provides the Debtors with the best postpetition financing option available and should be approved by this Court.

31.     The Debtors respectfully submit that their efforts to obtain postpetition financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code. *See, e.g., In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can

34

or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

C.    **The Proposed DIP Financing is Necessary to Maximize the Value of the Debtors' Estates.**

32.    The Debtors seek to use the DIP Facility to for general working capital purposes, ordinary business expenses such as payroll, and bankruptcy-related costs and expenses, in accordance with the Budget, to maximize value through a consensual plan and/or an orderly sale process.  The DIP Facility represents the best economic alternative for a new debtor-in-possession lending arrangement.

33.    As set forth in the Fleming Declaration, the Debtors need to continue to operate in the ordinary course, including buying products from and selling products to their foreign subsidiaries, and otherwise providing financial accommodations to their foreign subsidiaries so as to maximize the value of the Debtors' businesses.  All such transactions are contemplated by and will be conducted in accordance with the Budget and the proposed Cash Management Order.

34.    Simply put, without immediate access to the DIP Facility and use of Cash Collateral, the Debtors cannot continue to operate their businesses.  Failure to access and have use of the DIP Facility would irreparably damage the Debtors' efforts to effectuate a going concern asset sale for the benefit of all constituents.  Accordingly, the Debtors urge the Court to authorize the DIP Facility on the terms contemplated herein.

D.    **The Terms of the Proposed DIP Financing are Fair, Reasonable, and Appropriate.**

35.    In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen*

35

*MacLean Oil Co.*), 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

36.     The terms of the DIP Facility were negotiated in good faith and at arm's-length between the Debtors and the DIP Lender, resulting in an agreement that is designed to permit the Debtors to maximize the value of their assets.  The Debtors submit that the proposed terms of the DIP Facility are fair, reasonable, and appropriate under the circumstances.  *See, e.g.*, *Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender); *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997) (authorizing postpetition financing that would preserve the value of the debtor's assets).  Further, the DIP Lender consent to the DIP Facility on the terms set forth in the DIP Documents.

**E.      The Carve-Out is Appropriate.**

37.     The DIP Liens and Adequate Protection are subject and subordinate to the Carve-Out. The Carve-Out contains similar terms to others that this Court has found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from their advisors. Without the Carve-Out, the Debtors' estates may be deprived of possible rights and powers if the services for which professionals may be compensated are restricted. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of these cases by ensuring that assets remain for the payment of the U.S. Trustee fees and professional fees, notwithstanding the grant of superpriority claims and replacement liens as part

36

of the adequate protection of the Foris Prepetition Secured Lenders' interests in the Prepetition Collateral. Accordingly, the Carve-Out is appropriate and should be approved.

**F.     The DIP Lender Should Be Deemed Good Faith Lenders.**

38.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

39.     Here, the Debtors believe the DIP Facility embodies the most favorable terms on which the Debtors could obtain postpetition financing. As described in the First Day Declaration and the Fleming Declaration, negotiations of the terms of the DIP Facility with the DIP Lender were conducted in good faith and at arms' length. The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, and in accordance with the DIP Orders and the DIP Documents, including the Budget.  Any consideration being provided to any of the DIP Lender is described herein.  Accordingly, the Court should find that the DIP Lender are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

G.    **The Proposed DIP Financing Reflects the Debtors' Sound Business Judgment.**

40.    A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See, e.g.*, *Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

41.    Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money.  *See, e.g., Group of Inst. Investors v. Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court.").  Further, one court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

42.    Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  *In re Curlew Valley Associates*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see also Trans World Airlines, Inc.,* 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor).  Generally courts will not second-guess a debtor in possession's business decisions involving "a business judgment made

in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley,* 14 B.R. at 513-14 (footnotes omitted).

43.     For the reasons set forth above, the Debtors' sound business judgment clearly supports approval of the DIP Facility.  Access to the DIP Facility will allow the Debtors to continue to operate, thus maximizing value for all of their constituents.

**H.     Section 363 of the Bankruptcy Code Authorizes the Debtors' Use of Cash Collateral.**

44.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (A) each entity that has an interest in such cash collateral provides consent, or (B) the court approves the use of cash collateral after notice and a hearing. *See* 11 U.S.C. § 363(c).  Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

45.     Here, the Debtors seek authority to use the Cash Collateral pursuant to the Budget and have sought approval of various forms of adequate protection in favor of the Foris Prepetition Lenders, including adequate protection liens and superpriority claims on the DIP Collateral to the extent of any diminution and reimbursement of reasonable professional fees incurred by the Prepetition Agent.  Importantly, the DIP Lender and Foris Prepetition Lenders consent to the use of Cash Collateral on the terms set forth in the Interim Order and Final Order.

46.     Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a Final hearing."  Bankruptcy Rule 4001(b)(2).  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to

other business decisions. *See, e.g., In re Simasko Production Co.*, 47 B.R. at 449; *see also In re Ames Dep't Stores Inc.,* 115 B.R. at 38. After the 14-day period, the request for use of cash collateral is not limited to those amounts necessary to prevent harm to the debtor's business.

47. As previously noted, in order to continue operating and satisfy accruing administrative expenses, the Debtors require access to the DIP Facility and the use of Cash Collateral. Such use will provide the Debtors with the necessary funds to remain administratively solvent, while the Debtors pursue a going concern sale of their assets.

48. Absent access to Cash Collateral, the Debtors would face immediate and irreparable harm. The Debtors would likely be forced to cease operations and convert these Chapter 11 Cases to ones under chapter 7. Jobs would be lost and substantial value destroyed. Thus, immediate access to Cash Collateral is essential to the Debtors' ability to maximize value for the benefit of all constituents.

I.    **Interim Order and Final Hearing**

49. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court schedule a Final hearing within approximately thirty-six (36) calendar days of the commencement of the Chapter 11 Cases to consider approval of this DIP Motion on a Final basis.

50. The urgent need to avoid immediate and irreparable harm to the Debtors' estates makes it imperative that the Debtors be authorized to access the DIP Facility and use Cash Collateral pending the Final Hearing, in order to allow the Debtors to operate and administer these Chapter 11 Cases on a postpetition basis. Without the ability to make draws under the DIP Facility and use Cash Collateral, the Debtors would be unable to satisfy accruing postpetition obligations, including payroll, and would not be able to conduct a value-maximizing sale process, thus causing

40

irreparable harm to the Debtors and the value of these estates.   Accordingly, the Debtors respectfully request that, pending the Final Hearing, the Interim Order be approved and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

**J.**      **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

51.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## VI.   NOTICE

52.     The Debtors will provide notice of this Motion to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Lenders, DIP Agent and the Foris Prepetition Secured Lenders, Goodwin Procter LLP, 620 Eighth Avenue, New York, NY 10018, Attn: Michael H. Goldstein, Esq. (mgoldstein@goodwinlaw.com), and Alexander J. Nicas, Esq. (anicas@goodwinlaw.com); (d) co-counsel to the DIP Lenders, the DIP Agent and the Foris Prepetition Secured Lenders, Troutman Pepper Hamilton Sanders LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899; Attn: David M. Fournier, Esq. (david.fournier@troutman.com); (e) the United States Attorney's Office for the District of Delaware; (f) the state attorneys general for all states in which the Debtors conduct business; and (g) any party that requests service pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve

copies of the Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).

## VII.  NO PRIOR REQUEST

53.     The Debtors have not made any prior request for the relief sought herein to this Court or any other court.

**WHEREFORE**, the Debtors respectfully request entry of the Interim Order and, after Final Hearing, the Final Order, granting the relief requested herein and such other relief as is just and proper.

Dated: August 9, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ James E. O'Neill*

Richard M. Pachulski (*pro hac vice* forthcoming)
Debra I. Grassgreen (*pro hac vice* forthcoming)
James E. O'Neill (DE Bar No. 4042)
Jason H. Rosell (*pro hac vice* forthcoming)
Steven W. Golden (DE Bar No. 6807)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:  rpachulski@pszjlaw.com
        dgrassgreen@pszjlaw.com
        joneill@pszjlaw.com
        jrosell@pszjlaw.com
        sgolden@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*