**<u>Exhibit A</u>**

**Motion**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC., et al., | Case No. 23-11131 |
| Debtors.[1] | (Joint Administration Requested) |

### MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL  HEARING, AND (V) GRANTING RELATED RELIEF

Amyris, Inc. ("Amyris") and its affiliated and related above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company") hereby file this postpetition financing motion (the "DIP Motion").  In support of the DIP Motion, the Debtors submit (i) the *Declaration of Han Kieftenbeld in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"),[2] (ii) the *Declaration of Lorie Beers in Support of the Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Beers Declaration"), and (iii) the *Declaration of Steve Fleming in Support of the Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V)*

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/amyris.  The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

[2] Capitalized terms used but not defined herein shall have the meanings set forth in the Debtors' First Day Declaration.

*Granting Related Relief* (the "Fleming Declaration") filed concurrently herewith and incorporated herein by reference. In further support of this DIP Motion, the Debtors respectfully represent as follows:

## I.  SUMMARY OF RELIEF REQUESTED

1.    The Debtors seek entry of interim and Final orders, substantially in the form of the Interim Order attached hereto as **Exhibit 1** and a Final order to be submitted at a later date (respectively, the "Interim Order" and "Final Order" and collectively, the "DIP Orders"):

(i)    authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis (the "DIP Financing") in an aggregate principal amount of up to **$190 million** (the "DIP Loans") pursuant to the terms and conditions of that certain *Senior Secured Superpriority Debtor in Possession Financing Agreement* attached as **Exhibit A** to the proposed Interim Order (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "DIP Credit Agreement"), by and among Debtors (i) Amyris, Inc., Amyris Clean Beauty, Inc., and Aprinnova, LLC (the "Borrowers") and the affiliated Debtors and designated non-Debtor subsidiaries as guarantors (the "Guarantors") and (ii) and Euagore, LLC (together with the other lenders from time to time party thereto, the "DIP Lenders"), and Euagore, LLC, as Administrative Agent (the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties").

(ii)    authorizing the Debtors to execute the DIP Credit Agreement and the other documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, all as may be reasonably requested by the DIP Lenders (as the same may be amended, restated, supplemented or otherwise modified from time to time, and collectively with the DIP Credit Agreement, the "DIP Documents");

(iii)    authorizing the Debtors to consummate the transactions contemplated by the DIP Documents;

(iv)    granting to the DIP Lenders the DIP Liens (as defined below) on all of the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding under the DIP Documents, and the Interim Order and any Final Order, as applicable (collectively, the "DIP Obligations"), subject only to prior payment of the Carve-Out (as defined below);

(v)    granting superpriority claims pursuant to section 364(c)(1) of the Bankruptcy Code to the DIP Lenders as well as liens pursuant to section 364(d) of the Bankruptcy Code, as further described herein, on all prepetition and postpetition property of the Debtors' estate and all proceeds thereof (each as defined below));

(vi)      authorizing the Debtors to use Prepetition Collateral and Cash Collateral (each as defined below) (together with the DIP Facility, the "Postpetition Financing Arrangement");

(vii)     authorizing the Debtors to grant adequate protection to the DIP Lenders (as defined below);

(viii)    scheduling a hearing (the "Final Hearing"), pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to consider entry of the Final Order; and

(ix)      granting such other and further relief as this Court deems necessary and just.

## II.   JURISDICTION AND VENUE

2.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a Final order by the Court in connection with this matter to the extent that it is later determined that the Court, absent consent of the parties, cannot enter Final orders or judgments consistent with Article III of the United States Constitution.

3.      Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The statutory basis for the relief requested herein are sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 507 and 552 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004 and 9013 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Local Rules 4001-2, 9006-1, and 9013.

DOCS_NY:48137.7 03703/001

## III.   BACKGROUND

A.     **General Background**

5.     On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date of this DIP Motion, no official committee, trustee or examiner has been appointed in these chapter 11 cases (the "Chapter 11 Cases").

6.     Amyris was founded in 2003 to create a more stable supply of a key anti-malarial treatment.  Through Amyris' cutting-edge science, artemisinin—the most effective anti-malarial drug in the world—is now consistently available to treat the deadly disease.  Using the same technological innovations that produced artemesin, Amyris has become the world's leading manufacturer of ingredients made with synthetic biology.  Amyris provides sustainable ingredients that are eco-friendly alternatives to raw material sourced for flavors and fragrances, sweeteners, cosmetics, pharmaceuticals, and other consumer products.

7.     In addition, Amyris operates a family of consumer brands that utilize the Company's ingredients to meet the growing demand for sustainable, effective, and accessible products, including Biossance® (clean beauty skincare), JVN™ (haircare), Rose Inc.™ (clean color cosmetics), Pipette® (clean baby skincare), OLIKA™ (clean wellness), MenoLabs™ (healthy living and menopause wellness), Stripes™ (menopausal wellness), and 4U by Tia™ (a new clean haircare line).

8.     Through these Chapter 11 Cases, the Debtors seek to implement both an operational and balance sheet restructuring, address liquidity challenges, and preserve and maximize value for all stakeholders.  In doing so, the Debtors expect to centralize their going-

4

forward operations on their core business: developing molecules, manufacturing them at scale, and commercializing them with partners who are leaders in their markets. Accordingly, the Debtors plan to exit certain of their consumer brands businesses, with a view to have these brands continue under new ownership while still leveraging Amyris's cutting-edge science and technology. Euagore, LLC, an entity affiliated with Foris Ventures, LLC ("Foris"), has agreed to provide $190 million in debtor-in-possession financing to fund the administration of these Chapter 11 Cases through the end of 2023. During the initial weeks of these Chapter 11 Cases, the Debtors will focus on negotiating a consensual restructuring with their key stakeholders. However, given the Company's substantial cash burn, if the terms of a consensual restructuring cannot be agreed upon within the next thirty-five days, the proposed DIP financing contemplates that the Debtors will promptly seek to sell all or substantially all of their assets as a going concern through these Chapter 11 Cases.

9.      Additional information regarding the Debtors' organizational structure, business operations, historical revenues and liabilities, and a description of the events precipitating the filing of the Chapter 11 Cases, is set forth in the First Day Declaration.

**B.      Prepetition Secured Debt**

**(1)      Foris**

10.      Pursuant to those certain (i) Amended and Restated Loan and Security Agreement by and among Amyris, Inc. ("Amyris"), as borrower, Amyris Clean Beauty, Inc. ("Clean Beauty"), Amyris Fuels, LLC ("Amyris Fuels"), and AB Technologies LLC, as guarantors ("AB Technologies," and together with Clean Beauty and Amyris Fuels, the "Subsidiary Guarantors" or "Subsidiary Grantors," as applicable herein), and Foris Ventures, LLC ("Foris"), as lender, dated as of October 28, 2019, as amended by that certain Omnibus Amendment

Agreement, dated as of June 5, 2023, and as further amended, restated, supplemented or otherwise modified from time to time, (ii) Amended and Restated Loan and Security Agreement by and among Amyris, as borrower, the Subsidiary Guarantors, as guarantors, and Foris, as lender, dated as of September 27, 2022, as amended by that certain Omnibus Amendment Agreement, dated as of June 5, 2023, and as further amended, restated, supplemented or otherwise modified from time to time, (iii) Bridge Loan and Security Agreement by and among Amyris, as borrower, the Subsidiary Guarantors, as guarantors, and Perrara Ventures, LLC ("Perrara"), as lender, dated as of March 10, 2023, as amended by that certain Omnibus Amendment Agreement, dated as of June 5, 2023, and as further amended, restated, supplemented or otherwise modified from time to time, (iv) Loan and Security Agreement by and among Amyris, as borrower, the Subsidiary Guarantors, as guarantors, and Anesma Group, LLC ("Anesma"), as lender, dated as of June 5, 2023, (v) Loan and Security Agreement by and among Amyris, as borrower, the Subsidiary Guarantors, as guarantor, and Anjo Ventures, LLC ("Anjo"), as lender, dated June 29, 2023, and (vi) Loan and Security Agreement by and among Amyris, as borrower, the Subsidiary Guarantors, as guarantors, and Muirisc, LLC ("Muirisc"), and lender, dated as of August 2, 2023 (all of the foregoing as further amended, supplemented, amended and restated, or otherwise modified prior to the Petition Date, the "Foris Prepetition Secured Loans," and collectively with any other agreements and documents executed or delivered in connection with the Foris Prepetition Secured Loans, including the Security Agreements (as defined herein), the "Foris Prepetition Secured Loan Agreements"), and Foris, Perrara, Anesma, Anjo, and Muirisc (collectively, the "Foris Prepetition Secured Lenders"), provided prepetition term loans to the Company.

11.     As of the Petition Date, the aggregate principal amount outstanding under the Foris Prepetition Secured Loan Agreements is at least $295,000,000 (*plus* accrued and unpaid

6

nondefault interest, additional fees, costs, expenses, and other obligations as provided under the Foris Prepetition Secured Loan Agreements) (collectively, the "Foris Prepetition Obligations"), which Foris Prepetition Obligations have been guaranteed on a joint and several basis by each of the Subsidiary Guarantors.

        12.     In connection with the Foris Secured Prepetition Loan Agreements, Amyris and the Subsidiary Guarantors, as applicable, entered into those certain (i) Security Agreement, by and between Amyris, the Subsidiary Grantors, and Foris, dated as of September 27, 2022; (ii) Security Agreement, by and between Amyris, the Subsidiary Grantors, and Perrara, dated as of March 10, 2023; (iii) Patent Security Agreement, by and between Amyris, the Subsidiary Grantors, and Foris, dated as of June 5, 2023; (iv) Trademark Security Agreement, by and between Amyris, the Subsidiary Grantors, and Foris, dated as of June 5, 2023; (v) Security Agreement, by and between Amyris, the Subsidiary Grantors, and Anesma, dated as of June 5, 2023; (vi) Patent Security Agreement, by and between Amyris, the Subsidiary Grantors, and Anesma, dated as of June 5, 2023; (vii) Trademark Security Agreement, by and between Amyris, the Subsidiary Grantors, and Anesma, dated as of June 5, 2023; (viii) Patent Security Agreement by and between Amyris, the Subsidiary Grantors, and Perrara, dated as of June 5, 2023; (ix) Trademark Security Agreement by and between Amyris, the Subsidiary Grantors, and Perrara, dated as of June 5, 2023; (x) Security Agreement by and between Amyris, the Subsidiary Grantors, and Anjo dated as of June 29, 2023; (xi) Patent Security Agreement, by and between Amyris, the Subsidiary Grantors, and Anjo, dated as of June 29, 2023; (xii) Trademark Security Agreement, by and between Amyris, the Subsidiary Grantors, and Anjo, dated as of June 29, 2023; (xiii) Security Agreement by and between Amyris, the Subsidiary Grantors, and Muirisc, dated as of August 2, 2023; (xiv) Trademark Security Agreement, by and between Amyris, the Subsidiary Grantors, and Muirisc,

dated as of August 2, 2023; (xv) Patent Security Agreement, by and between Amyris, the Subsidiary Grantors, and Muirisc, dated as of August 2, 2023; and (xvi) Copyright Security Agreement, by and between Amyris, the Subsidiary Grantors, and Muirisc, dated as of August 2, 2023 (all of the foregoing as further amended, supplemented, amended and restated, or otherwise modified from time to time, the "Security Agreements").  Pursuant to the Foris Prepetition Secured Loan Agreements, the Foris Prepetition Obligations are secured by valid, binding, perfected first priority security interests in and liens (the "Foris Liens") on the "Collateral," as defined in the Security Agreements (the "Prepetition Collateral").

13.    Any and all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any account or accounts by the Debtors, including any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date, and the proceeds of any of the foregoing is the Foris Prepetition Secured Lenders' cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

**(2)    DSM Finance B.V.**

14.    Amyris, Inc., is the borrower under that certain Loan and Security Agreement dated as of October 11, 2022, as amended and restated by that certain Amendment and Restatement Agreement dated as of December 12, 2022 (as further amended, restated, supplemented or otherwise modified from time to time, the "DSM LSA"), by and among Amyris, Inc., certain subsidiaries thereof as guarantors, and DSM Finance B.V. ("DSM BV"), pursuant to which the Company obtained, among other financial accommodations, term loans in three tranches consisting of Tranche 1 with principal obligations of $50,000,000, Tranche 2 with principal obligations of $25,000,000, and Tranche 3 with principal obligations of $25,000,000.  As of the

Petition Date, the aggregate outstanding principal amount of Tranches 1 and 2 is approximately $45 million and the aggregate outstanding principal amount of Tranche 3 is approximately $29 million.

15.     Pursuant to that certain Security Agreement dated as of October 11, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "DSM Security Agreement"), by and among Amyris, Inc., and DSM BV, certain of the Company's obligations under the DSM LSA are secured by a lien and security interest in favor of DSM BV in all of Amyris, Inc.'s rights to any earn-out amounts that may become payable from DSM Nutritional Products Ltd. to Amyris, Inc., in accordance with Section 3.5 of the Purchase Agreement (as defined in the DSM Security Agreement) and any and all claims, rights, and interests in any of the above.

16.     Pursuant to that certain Pledge Agreement dated as of December 12, 2022, by and among Amyris, Inc., and DSM BV, Amyris, Inc., certain of the Company's obligations under the DSM LSA are secured by lien and security interest in favor of DSM BV in Amyris, Inc.'s 69.00% equity interests in Amyris RealSweet, LLC.

17.     None of DSM's collateral or liens (as described above, the "DSM Liens") constitute or generate cash collateral within the meaning of section 363(a) of the Bankruptcy Code.

## IV.   PROPOSED DIP FACILITY

18.     As discussed in detail in the First Day Declaration, the Company has incurred operating losses since its inception, thus requiring a continuing need for equity and debt capital to sustain operations.  Increased operating costs and expenses also burdened the Company. These factors created a severe liquidity challenge for the Debtors, such that it was necessary for

9

the Company to consider a sale of the Company or its assets, a refinancing of its secured debt or other strategic options, including a chapter 11 bankruptcy filing.

19.     The Debtors have filed these Chapter 11 Cases to implement both an operational and balance sheet restructuring, address liquidity challenges, and preserve and maximize value.  In doing so, the Debtors expect to centralize their going-forward operations on their core business: developing molecules, manufacturing them at scale, and commercializing them with partners who are leaders in their markets.  Accordingly, the Debtors plan to exit certain of their consumer brands businesses, with a view to have these brands continue under new ownership while still leveraging Amyris's cutting-edge science and technology.  During the initial weeks of these Chapter 11 Cases, the Debtors will focus on negotiating a consensual restructuring with their key stakeholders.  However, given the Company's substantial cash burn, if the terms of a consensual restructuring cannot be agreed upon within the next thirty-five days, the proposed DIP financing contemplates that the Debtors will promptly seek to sell all or substantially all of their assets as a going concern through these Chapter 11 Cases.

20.     As set forth in the Beers Declaration, Intrepid Investment Bankers LLC ("Intrepid") was engaged in July 2023 as investment banker to the Debtors to advise the Debtors in regard to the Debtors' capital structure, liquidity needs, and business operations.  Following its engagement, Intrepid, with assistance of the Debtors and their other advisors, considered potential sources of financing that would provide the liquidity necessary to fund the Debtors' Chapter 11 Cases. As part of this process, Intrepid solicited proposals for debtor in possession financing by contacting approximately twenty (20) well-established and experienced third-party financial institutions and other capital sources.  Such parties included lenders that often make loans in distressed and bankruptcy situations and have the capital necessary to provide adequate financing

to the Debtors.  Of these parties, seven (7) executed non-disclosure agreements and accessed information available in a data room established by Intrepid for prospective financing purposes.

21.     The foregoing efforts did not result in any actionable financing proposals from any third parties.  The Debtors received an offer from an entity affiliated with the Foris Prepetition Secured Lenders to provide the necessary postpetition financing and authorize the use of the Foris Prepetition Secured Lenders' Cash Collateral in order to fund the Debtors' operations during these Chapter 11 Cases on a senior secured superpriority basis.  As set forth in the Fleming Declaration, the negotiations with the DIP Secured Parties and the Foris Prepetition Secured Lenders and their professionals were conducted at arm's length and in good faith by the Debtors and their professionals.

22.     The proposed DIP Facility and the authorization to use Cash Collateral as offered by the DIP Secured Parties and the Foris Prepetition Secured Lenders are the best financing options that the Debtors could obtain.  Fully unsecured postpetition financing was not available to Debtors.  Other potential sources of debtor in possession financing for the Debtors, including on a junior secured basis, were also nonexistent.  However, as noted above, the Debtors were able to obtain (i) financing from the DIP Secured Parties on the terms of the proposed DIP Facility and (ii) the consent of the Foris Prepetition Secured Lenders' to use Cash Collateral, all on the terms set forth herein.

A.     **Summary of Essential Terms of DIP Facility**

23.     In accordance with Bankruptcy Rule 4001(b) and Local Rule 4001-2(a)(i)-(iii), below is a summary[3] of the essential terms of the proposed financing and use of cash collateral and the location of the same in the proposed Interim Order and/or the DIP Credit Agreement:

---

[3] The summary and descriptions of the terms and conditions for the proposed financing and use of cash collateral and the provisions of the proposed Interim Order and the Final Order set forth in this DIP Motion are intended solely for

**a. Debtor/Borrowers**:  Amyris, Inc.
Amyris Clean Beauty, Inc.
Aprinnova, LLC

**b. Guarantors**:  <u>Debtor Guarantors</u>
- AB Technologies LLC
- Amyris Fuels, LLC
- Amyris-Olika, LLC
- Onda Beauty Inc.
- Upland 1 LLC

<u>Non-Debtor Guarantors</u>
- Amyris Clean Beauty LATAM Ltda.
- Interfaces Industria e Comerico de Cosmeticos Ltda.
- Amyris Biotechnologia Do Brasil Ltda.
- Amyris Europe Trading B.V. (Netherlands)
- Amyris Bio Products Portugal Unipessoal, Lda.
- Beauty Labs International Limited
- Amyris UK Trading Limited
- Amyris Eco-Fab LLC
- Clean Beauty 4U Holdings, LLC

**c. DIP Lenders/DIP Agent**:  Euagore, LLC (together with the other lenders from time to time party thereto, the "<u>DIP Lenders</u>"), and Euagore, LLC, as Administrative Agent (the "<u>DIP Agent</u>" and, together with the DIP Lenders, the "<u>DIP Secured Parties</u>")

**d. Type**:  A superpriority multiple-draw senior secured term loan facility

**e. Maturity/Term. Date**:  Unless otherwise agreed to in writing by the DIP Agent in its sole discretion, all obligations of the Loan Parties under the DIP Documents, including, without limitation, all principal, accrued interest, costs, fees and premiums provided for therein (collectively, the "<u>DIP Obligations</u>"), shall be due and payable in full in cash on the earlier of:

i.  December 31, 2023 (the "<u>Maturity Date</u>");

ii.  the effective date (the "<u>Effective Date</u>") of any chapter 11 plan of reorganization in the Chapter 11 Cases (a "<u>Plan</u>");

---

informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof. The summaries and descriptions are qualified in their entirety by the proposed Interim Order, the Final Order, and the DIP Documents. In the event there is any conflict between this Motion and the Interim Order, the Final Order, or the DIP Documents, the Interim Order, the Final Order, and the DIP Documents will control in all respects. Capitalized Terms used herein that are otherwise undefined shall have the meaning ascribed to them in the DIP Credit Agreement.

iii.    the date of dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code;

iv.    the consummation of any sale or other disposition of all or substantially all of the Amyris Assets (collectively, the Consumer Brands Business and Other Amyris Assets, as defined herein) pursuant to section 363 of the Bankruptcy Code; and

v.    the date of the DIP Agent's written notice to the Borrowers of the occurrence of an Event of Default under the DIP Documents.

The first to occur of the events set forth in subsections i-v herein shall be the "<u>DIP Termination Date</u>."  [DIP Credit Agreement §1]

On the DIP Termination Date, (a) all DIP Obligations shall be immediately due and payable, and all commitments to extend credit under the DIP Facility will terminate; (b) all authority to use Cash Collateral shall cease; provided, however, that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral to fund the Carve-Out and Trust Fund Amounts in accordance with the Budget (subject to the Permitted Variances); and (c) the DIP Secured Parties shall be otherwise entitled to exercise rights and remedies under the DIP Documents in accordance with Paragraph 15 of the Interim Order. [Interim Order ¶ 12]

**f.  Interim Loan Amount**:    Upon entry of the Interim Order, no more than two draws prior to entry of the Final Order in the aggregate principal amount of up to **$70 million** (each an "<u>Initial Borrowing</u>") [Interim Order Recitals ¶ (i)]

**g.  Final Loan Amount**:    Upon entry of the Final Order, multiple additional draws (each a "<u>Subsequent Borrowing</u>" and collectively, the "<u>Subsequent Borrowings</u>") in the aggregate principal amount not to exceed **$120 million**; *provided* that (x) each Subsequent Borrowing shall not be in an amount greater than the amounts specified in the Budget (each as defined herein) to be drawn through the date of such Subsequent Borrowing and (y) each Subsequent Borrowing shall be at least twenty-one (21) calendar days apart [Interim Order Recitals ¶ (i)].

**h.  Use of DIP Loans**:    The proceeds of the DIP Loan shall only be used for the following purposes and, in the case of payments pursuant to provisions and limitations on the investigation, interference with, or challenge to the Secured Obligations, the Adequate Protection Obligations, the Foris Prepetition Obligations and/or the liens, claims, rights, or security interests securing or supporting the Secured Obligations and the Adequate Protection Obligations, subject to the amounts and

13

timing specified in the Budget: (i) working capital and other general corporate purposes of the Obligors and certain Subsidiaries of the Parent which are not Debtors, *provided* that the Borrowers and such Subsidiaries shall execute a Post-Petition Global Note evidencing the payment obligation of such Subsidiaries for all amounts transferred after the Petition Date by the Borrowers, the Debtors or any non-debtor Subsidiary to such Subsidiaries, (ii) any adequate protection payments in accordance with the Budget and the DIP Orders, (iii) professional fees and expenses of administering the Cases, to the extent authorized by any Order of the Bankruptcy Court (including payments benefiting from the Carve-Out and any Investigation, including allowed professional fees subject to the terms and conditions set forth in the DIP Orders, and (iv) any other amounts payable to the Secured Parties hereunder.

[Interim Order ¶ 3(c); DIP Credit Agreement §§ 7.15(a) and (b)]

**i. Interest Rate**: DIP Loans will bear interest at a fixed rate equal to 12% per annum, compounded monthly, and shall be paid in-kind, in arrears, monthly on the first day of each month. [DIP Credit Agreement § 2.1(c)]

**j. Default Rate**: After the occurrence and during the continuance of an Event of Default, all amounts outstanding under the DIP Facility will bear interest at an additional rate per annum of 2.0%. [DIP Credit Agreement § 2.3]

**k. Loan/DIP Lender Fees:** There are no upfront loan fees.  Upon the closing in one or more transactions or series of transactions of a sale of all or substantially all of the Amyris Assets in accordance with the All Assets Bidding Procedures Order, the Borrowers shall pay to the Administrative Agent (for the account of the Lenders) a premium in cash (the "Exit Premium") in an amount equal to 3.0% of the aggregate amount of all then outstanding Advances, together with accrued and unpaid interest on such amount and all fees and expenses due and payable hereunder, as of the closing date of such sale(s); *provided* that (i) such Exit Premium shall be approved by the Bankruptcy Court as part of the Final Order and shall be fully earned upon entry of the Final Order, but, for the avoidance of doubt, shall only be payable upon the closing in one or more transactions or series of transactions of a sale of all or substantially all of the Amyris Assets in accordance with the All Assets Bidding Procedures Order and (ii) the payment of such Exit Premium shall be structured in the most tax efficient manner for the Lenders so long as such tax structuring shall not be adverse in any material respect to the Obligors.  [DIP Credit Agreement § 2.8]

14

The fees of the DIP Secured Parties referred to in the DIP Documents, including all fees and other amounts owed to the DIP Agent and the DIP Lenders, will be paid as of the Termination Date. [Interim Order ¶ 3(d)(3)]

**l. Prepayments:**

(a)    Optional Prepayment.  No Borrower may prepay all or any part of the Advances unless in accordance with the express provisions of the DIP Credit Agreement.

(b)    Mandatory Prepayments.  Subject in all respects to the DIP Orders, if applicable, if and on each occasion that any Net Proceeds are received by or on behalf of the Parent or any of its Subsidiaries in respect of the disposition of Collateral (other than any disposition in the ordinary course of business), the Borrowers shall, immediately after such Net Proceeds are received by them or any Subsidiary thereof prepay the Advances, together with accrued and unpaid interest on the principal amount thereof and all fees and expenses payable hereunder, pro rata in an aggregate amount equal to 100% of such Net Proceeds.  For the avoidance of doubt, any Advance prepaid under Section 2.5 of the DIP Credit Agreement may not be re-borrowed. [DIP Credit Agreement § 2.5]

**m. DIP Liens/Collateral:**

As security for the DIP Obligations, effective and perfected upon the date of the Interim Order, the following security interests and liens are granted by the Debtors to the DIP Agent, for the benefit of the DIP Secured Parties (all property identified below being collectively referred to as the "DIP Collateral"), subject to (x) the Permitted Liens (as defined in the DIP Credit Agreement) and (y) the Carve-Out (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Lenders, pursuant to the Interim Order and the DIP Documents, the "DIP Liens"):

i.    *First Priority Lien on Unencumbered Property*. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, non-avoidable, automatically and properly perfected, first priority security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (the "Prepetition Unencumbered Collateral").[4]  Subject to entry of the

---

[4] As of the Petition Date, the Prepetition Unencumbered Assets primarily consist of owned real estate in Leland, North Carolina, leased real estate in various locations, and equity interests in certain joint ventures and foreign subsidiaries.

Final Order, the Prepetition Unencumbered Collateral shall include the Avoidance Actions Proceeds. [Interim Order ¶ 8(a)]

ii.      *Liens Priming the Foris Liens.* Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, non-avoidable, automatically and properly perfected, first priority priming security interest in and lien upon the Prepetition Collateral, (the "<u>Priming Liens</u>"), which Priming Liens shall prime in all respects the interests of the Foris Prepetition Secured Lenders arising from the current and future liens of the Foris Prepetition Secured Lenders (the "<u>Primed Liens</u>"). The Foris Prepetition Secured Lenders have consented to the Primed Liens. [Interim Order ¶ 8(b)]

iii.     *Liens Junior to Certain Other Liens.* Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, non-avoidable, automatically and properly perfected, security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors that is subject to (i) valid, perfected and non-avoidable senior liens in existence immediately prior to the Petition Date (other than the Primed Liens) or (ii) valid and non-avoidable senior liens (other than the Primed Liens) in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date, as permitted by section 546(b) of the Bankruptcy Code (the "<u>Other Encumbered Prepetition Collateral</u>"), which shall be (x) immediately junior and subordinate to any valid, perfected and non-avoidable liens (other than the Primed Liens) in existence immediately prior to the Petition Date, and (y) any such valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.  The DIP Liens shall be junior to the DSM Liens. [Interim Order ¶ 8(c)]

iv.     *Liens Senior to Certain Other Liens.*  The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Secured Parties, or (C) any intercompany or affiliate liens of the Debtors or its non-Debtor affiliates or security interests of the Debtors; or (ii) subordinated to or made *pari passu* with any other

16

lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.  [Interim Order ¶ 8(d)]

**n. Priority**:

The DIP Liens shall have the priory set forth in Paragraph 24(m), above.  [Interim Order ¶ 8]

**o. Superpriority Claims**:

*DIP Superpriority Claims*. Pursuant to, and to the extent provided by section 364(c)(1) of the Bankruptcy Code, but subject to the Carve-Out, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates (the "DIP Superpriority Claims") (without the need to file any proof of claim) with priority over any and all administrative expenses, Adequate Protection Claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(c), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, subject to entry of the Final Order, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code (the "Avoidance Actions Proceeds"), subject only to the payment of the Carve-Out.  Except as set forth in the Interim Order or the Final Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases. [Interim Order ¶ 7]

**p. Adequate Protection**:

*Adequate Protection for the Foris Prepetition Secured Lenders*. The Foris Prepetition Secured Lenders are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral (including Cash Collateral) in an amount equal to the aggregate diminution in the value as of the Petition Date of their interests in the Prepetition Collateral (including Cash Collateral), which diminution is as a result of, or arises from, or is attributable to, the sale, lease or use by the Debtors of the Prepetition Collateral, the priming of the Foris Liens by the DIP Liens pursuant to the DIP Documents and the Interim Order, the grant of any other lien under section 364 of the Bankruptcy Code or the stay of the Foris Prepetition Secured

17

Lenders' rights under the Prepetition Collateral, the payment of any amounts under the Carve-Out or pursuant to the Interim Order, the Final Order or any other order of the Court or provision of the Bankruptcy Code or otherwise, and the imposition of the Automatic Stay ("Adequate Protection" and the resulting claims, "Adequate Protection Claims"). In consideration of the foregoing, and as an inducement to the Foris Prepetition Secured Lenders to consent to the priming of the Foris Liens and use of the Prepetition Collateral (including Cash Collateral), the Foris Prepetition Secured Lenders will be granted the following as Adequate Protection:

i.      *Prepetition Adequate Protection Liens*. The Foris Prepetition Secured Lenders will be granted in the amount of their Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (the "Adequate Protection Liens"), including upon entry of the Final Order, all Avoidance Actions Proceeds, subject and subordinate only to (A) the DIP Liens, (B) the Carve-Out, and (C) Permitted Liens or any valid and non-avoidable senior liens (other than the Primed Liens) in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date. For the avoidance of doubt, the Adequate Protection Liens shall be junior and subordinate to the DSM Liens. [Interim Order ¶ 9(a)]

ii.     *Adequate Protection Superpriority Claims*. The Foris Prepetition Secured Lenders will be granted, subject to the Carve-Out, an allowed superpriority administrative expense claim to the fullest extent provided by sections 503(b) and 507(b) of the Bankruptcy Code in each of the Chapter 11 Cases in an amount equal to the Adequate Protection Obligations that are not secured by the Adequate Protection Liens (the "Adequate Protection Superpriority Claims"). The Adequate Protection Superpriority Claims shall be ahead of and senior to any and all other administrative expense claims of any kind specified or ordered pursuant to any provision of the Bankruptcy Code, but junior to the DIP Superpriority Claims and subject to and subordinate to the Carve-Out and shall have recourse to and be payable from all prepetition or postpetition DIP Collateral, including upon entry of the Final Order, all Avoidance Actions Proceeds. The Foris Prepetition Secured Lenders shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Superpriority Claims under section 507(b) of the Bankruptcy Code granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full. [Interim Order ¶ 9(b)]

18

iii.    *Adequate Protection Payments*. The Debtors are authorized and directed to pay, without the necessity of filing fee applications with, or seeking approval of, the Court or in compliance with the U.S. Trustee fee guidelines, all reasonable and documents fees, costs, and expenses the counsel, financial advisors and other professionals of the Foris Prepetition Secured Lenders in connection with these Chapter 11 Cases whether arising on, prior to or after the Petition Date (all payments referenced herein, collectively, the "Adequate Protection Payments"); *provided* that all Adequate Protection Payments shall be deferred until the DIP Termination Date.  [Interim Order ¶ 9(c)]

**q. DIP Budget**:    All Advances under the DIP Credit Agreement are subject to an approved budget (the "Budget", consisting of the Initial Budget and the periodic updated budgets, all as required by the Interim Order and DIP Credit Agreement). The Debtors seek approval of the Initial Budget, covering the first 60 days of these Chapter 11 Cases pursuant to the Interim Order.  The Debtors shall thereafter prepare an updated Budget which shall be approved pursuant to the Final Order.  By 5:00 p.m. Pacific Time on the date that is two weeks after the date the Final Order approving the updated Budget is entered (or such date as mutually agreed in writing (email being sufficient) by the Debtors and DIP Secured Parties), and every two weeks thereafter on the second business day of such week, the Debtors shall prepare and provide the DIP Secured Parties with an updated Budget.  [Interim Order ¶ 4(a)

By 5:00 p.m. Pacific Time on August 23, 2023, and then on Wednesday of every week thereafter, the Debtors shall deliver to the DIP Agent a Budget variance report and reconciliation (the "Approved Budget Variance Report") comparing on a line by line item basis: (x) total receipts for such period to total receipts for such period as set forth in the Budget on a weekly and cumulative basis; (y) total disbursements for such period to total disbursements for such period as set forth in the Budget on a weekly and cumulative basis; together with a statement certifying compliance with the Permitted Variances (as defined herein) for such period (each a "Measuring Period") and explaining in reasonable detail any Material Variance (as defined below) (each such report, a "Variance Report," which shall be in a form satisfactory to the DIP Agent). For purposes of each Measuring Period, the Borrowers shall calculate on a line item by line item basis: (x) the numerical difference between total receipts for such period to total receipts for such period as set forth in the Budget for the then applicable week and on a cumulative basis (the "Receipts Variance"), and the percentage such Receipts Variance (as an absolute amount) is of the applicable week and cumulative basis budgeted amount for receipts for such Measuring Period (the "Receipts Variance Percentage")

and (y) the numerical amount by which total disbursements for such Measuring Period are greater than total disbursements, respectively, on a line item by line item basis, for such Measuring Period as set out in the Budget for the then applicable week and on a cumulative basis for such Measuring Period (the "Disbursements Variance"), and the percentage such Disbursements Variance (as an absolute amount) is of the applicable week and cumulative budgeted amount for disbursements for such Measuring Period (the "Disbursements Variance Percentage").  For purposes of the Interim Order, (w) "receipts" shall not include any Initial Borrowing or Subsequent Borrowing under the DIP Facility or any proceeds from the sale of DIP Collateral; (x) the calculation of the Disbursements Variance shall exclude any amounts in the Budget related to professional fees for the Debtors and the Committee, which, at all times, for purposes of any Initial Borrowing or Subsequent Borrowing under the DIP Facility, shall not exceed amounts set forth in the then approved Budget, (y) a "Material Variance" shall mean on a line item by line item basis with respect to each Measuring Period either (i) a Receipts Variance Percentage greater than 15% or (ii) a Disbursements Variance Percentage greater than 10%, and (z) "Permitted Variance" shall mean on a line item by line item basis with respect to each Measuring Period: (i) if the Receipts Variance is a negative number, the Receipts Variance Percentage shall not be greater than 25% measured on a four (4) week cumulative basis and (ii) if the Disbursements Variance is a positive number, the Disbursements Variance Percentage shall not be greater than (A) 20% measured on a two (2) week and cumulative basis and (B) 15% measured on a four (4) week and cumulative basis.  For purposes hereof, "line item by line item" shall mean each line of the Budget (excluding any amounts in the Budget related to professional fees for the Debtors and the Committee); *provided*, *however*, for line items labeled "Other AP Disbursements", "InterCo disbursements for Goods", and "InterCo Loan", "line item by line item" shall be with references to the line items set forth in the supporting schedules provided to the DIP Secured Parties in connection with the Budget. [Interim Order ¶ 4(b)]

The Initial Budget is attached to the proposed Interim Order as **Exhibit B**.  Additionally, attached to this DIP Motion are a Plan Scenario Budget through December 31, 2023 (**Exhibit 2**) and a Sale Scenario Budget through December 31, 2023 (**Exhibit 3**).

**r. Carve-Out**:

As set forth in the Interim Order, each of the DIP Liens, DIP Superpriority Claims, Foris Liens, Foris Prepetition Obligations, Adequate Protection Liens, and Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve-Out.  [Interim Order ¶ 6(a)]

The "Carve-Out" means:

i.      all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iv) below);

ii.     all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below);

iii.    all obligations due and owing under any key employee incentive plan and retention plan consistent with the Budget, consented to by the DIP Agent, and approved by the Bankruptcy Court;

iv.     to the extent allowed at any time, whether by interim order, procedural order, or otherwise, and whether allowed before or after delivery of a Trigger Notice, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtors' Professionals") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committees' Professionals" and, together with the Debtors' Professionals, the "Professional Persons"), but subject to the then Budget for each Professional Person, as approved by the DIP Agent, for the period of time from the Petition Date to the date of a Trigger Notice; and

v.      Allowed Professional Fees of the Debtors Professionals and Committee Professionals in an amount not to exceed $750,000 incurred after the delivery of a Trigger Notice (this clause (v), the "Carve-Out Cap"), less the amount of any prepetition retainers received by such Professional Persons and not previously returned or applied to Allowed Professionals Fees; *provided*, *however*, nothing herein shall be construed to impair any party's ability to object to court approval of the fees, expenses, reimbursement of expenses or compensation of the Debtors' Professionals or the Committees' Professionals.

"Trigger Notice" shall mean a written notice delivered by the DIP Agent to the U.S. Trustee and counsel to the Debtors and Committee describing the Event of Default that is alleged to continue under the DIP Documents (or after the payment in full of the DIP Obligations, delivered by the Prepetition Lenders under the Foris Prepetition Secured Loan Agreements describing the reason for termination of the use of Cash Collateral).  [Interim Order ¶ 6(b)]

*Carve-Out Account*. On the day on which a Trigger Notice is given by the DIP Agent, and prior to the payment to any of the DIP Agent,

DIP Lenders or the Foris Prepetition Secured Lenders on account of the DIP Obligations, the Foris Prepetition Obligations, any Adequate Protection Obligations (as defined herein), claims or liens, or otherwise, the Debtors shall immediately, and be authorized and required to, deposit, as soon as reasonably practicable, in a non-interest bearing trust fund account of the Debtors' general bankruptcy counsel for the benefit of Professional Persons not subject to the control of the DIP Agent, DIP Lenders or the Foris Prepetition Secured Lenders (the "Carve-Out Account"), an amount equal to the Carve-Out Cap. If any amounts remain in the Carve-Out Account after payment of Professional Persons in accordance with the Carve-Out (subject to the Budget), such amounts shall be returned to the DIP Agent and shall be subject to the DIP Liens and Adequate Protection Liens; *provided* that to the extent the DIP Loans are indefeasibly paid in full at the time such amounts are to be returned, such amounts shall be returned to the Foris Prepetition Secured Lenders. Prior to the date of delivery of a Trigger Notice, the Debtors shall be authorized to make weekly deposits into the Carve-Out Account in accordance with the Budget. Funds which are on deposit in the Carve-Out Account shall be available only to satisfy obligations benefitting from the Carve-Out, and the DIP Agent, DIP Lenders and the Foris Prepetition Secured Lenders, each on behalf of itself and the relevant secured parties, (i) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve-Out Account, (ii) shall subordinate their security interests and liens in the Carve-Out Account to the payment of the Allowed Professional Fees in accordance with the Carve-Out and the Carve-Out Cap, and shall only have a security interest upon, and shall only have a right of enforcement against, any residual interest in the Carve-Out Account available following satisfaction in full in cash of all obligations benefitting from the Carve-Out Account; and (iii) waive, and agree not to assert, any right of disgorgement with respect to the payment of the Allowed Professional Fees. [Interim Order ¶ 6(c)]

*Trust Fund Amounts.* Notwithstanding the delivery and effectiveness of a Trigger Notice, the Debtors shall be entitled to use Cash Collateral to pay payroll expenses that have accrued through the date of the Trigger Notice and trust fund taxes that have accrued through the date of the Trigger Notice, each in an amount included in the Budget through the date of the Trigger Notice but which such amounts remain unpaid (the "Trust Fund Amounts"). [Interim Order ¶ 6(d)]

**s. Case Milestones**:    The DIP Documents shall require compliance with the following milestones (the "Milestones"):

a)      the Petition Date shall occur no later than August 9, 2023;

b)      the Bankruptcy Court shall enter the Interim Order no later than three (3) Business Days following the Petition Date;

c)      the Bankruptcy Court shall enter the Final Order no later than thirty-six (36) calendar days following the Petition Date; and

d)      no later than thirty-five (35) calendar days following the Petition Date (the "Plan Support Deadline"), the Debtors shall have executed a plan support agreement (the "Plan Support Agreement") by and among the Debtors, the Administrative Agent, the Lenders, the Foris Prepetition Secured Lenders, and such other party- or parties-in-interest determined by the Administrative Agent, the Required Lenders, and the Foris Prepetition Secured Lenders, in their sole and absolute discretion, to be necessary and sufficient for the Administrative Agent, the Lenders and the Foris Prepetition Secured Lenders to support a Chapter 11 Plan (collectively, the "Plan Support Persons"), with such Plan Support Agreement being acceptable to the Administrative Agent and the Foris Prepetition Secured Lenders in their sole discretion (the "Plan Support Agreement Milestone"); *provided* that (x) the Debtors shall not file a motion to sell any Amyris Assets on or prior to the Plan Support Deadline and (y) (A) if the Plan Support Agreement Milestone Date occurs on or prior to the Plan Support Deadline, the Plan Support Agreement shall include, and the Obligors shall achieve, each of the following Milestones:

(i)      no later than fourteen (14) calendar days following the Plan Support Agreement Milestone Date, the Debtors shall file with the Bankruptcy Court a Chapter 11 Plan, a Disclosure Statement (each consistent with the Plan Support Agreement and in form and substance acceptable to the Administrative Agent), and a motion to approve the Plan, the Disclosure Statement and the related solicitation materials, dates and deadlines (the "Plan Filing Deadline");

(ii)      no later than thirty-seven (37) calendar days following the Plan Filing Deadline (the "Disclosure Statement Hearing Order Deadline"), the Bankruptcy Court shall enter an order approving the Disclosure Statement, which order shall provide that the date upon which votes to accept or reject the Chapter 11 Plan must be submitted shall be no later than thirty-five (35) calendar days following the Disclosure Statement Hearing Order Deadline;

(iii)      no later than eighty-two (82) calendar days following the Plan Filing Deadline, the Bankruptcy Court shall enter the Acceptable Confirmation Order *provided* that the

23

Acceptable Confirmation Order and Chapter 11 Plan shall be in form and substance consistent in all respects with the Plan Support Agreement and in form and substance acceptable to the Administrative Agent;

(iv) no later than December 29, 2023, the Plan Effective Date shall occur; and

(v) if the Plan Support Agreement provides for the sale of the Consumer Brands Business and/or the Other Amyris Assets, the Plan Support Agreement shall include Milestones to commence a sale of the Consumer Brands Business and/or the Other Amyris consistent in form and substance with the Milestones described in clause (B) below and otherwise in form and substance acceptable to the Administrative Agent and, for the avoidance of doubt, the distribution of Net Proceeds from such sale shall be governed by the Plan Support Agreement and the Chapter 11 Plan;

and (B) if the Plan Support Agreement Milestone is not satisfied on or prior to the Plan Support Deadline, the Administrative Agent, in its sole discretion, may elect to require the Debtors to initiate a process to market and sell the Amyris Assets (such election, the "Sale Toggle Event") by delivering written notice of the occurrence of the Sale Toggle Event to the Parent (the "Sale Toggle Event Notice"), which process shall include the following Milestones:

(i) no later than three (3) calendar days following the Debtors' receipt of the Sale Toggle Event Notice, the Debtors shall file with the Bankruptcy Court a motion (the "All Assets Bidding Procedures Motion") seeking approval of the bidding procedures for the sale in one or more of a series of transactions all or substantially all of the All Assets Sale Transaction (the "All Assets Bidding Procedures"); *provided* that the All Assets Bidding Procedures Motion, the All Assets Bidding Procedures, and the order approving the All Assets Bidding Procedures (the "All Assets Bidding Procedures Order"), shall be in form and substance acceptable to the Administrative Agent, and shall include, without limitation, (x) the date upon which preliminary bids and qualified bids for the Amyris Assets shall be submitted and the date of the sale hearing for the Amyris Assets shall be submitted and the date the sale hearing shall occur, (y) the terms and conditions of acceptance of a qualified bid, and (z) the distribution of 100% of the Net Proceeds from the All Asset Sale Transaction, which shall, for the avoidance of

24

doubt, be subject in all respects to the Liens and claims of the Secured Parties and the Foris Prepetition Secured Lenders and shall be paid (I) first to the Secured Parties and/or the Foris Prepetition Secured Lenders in order of priority and applied to the Loans and the Foris Prepetition Obligations as determined by the Lenders and the Foris Prepetition Secured Lenders in their sole discretion, and (II) second, any remaining balance, if any, shall be retained by the Debtors; *provided* that, as set forth in the DIP Orders, the Administrative Agent and the Foris Prepetition Secured Lenders shall have the right to credit bid up to the full amount of the Secured Obligations and Foris Prepetition Obligations, respectively, in connection with such sale;

(ii)       no later than thirty-five (35) calendar days following the Debtors' receipt of the Sale Toggle Event Notice, the Bankruptcy Court shall enter the All Assets Bidding Procedure Order;

(iii)      no later than ninety (90) calendar days following the Debtors' receipt of the Sale Toggle Event Notice, the Bankruptcy Court shall enter an order approving the sale of the All Assets Sale Transaction; and

(iv)      no later than December 29, 2023, the All Asset Sale Transaction shall close and be effective.

[Interim Order ¶ 14; DIP Credit Agreement § 7.25]

**t. DIP Documents**:       The DIP Documents will be executed and delivered in accordance with the terms of the Interim Order. [Interim Order ¶ 3]

**u. Stipulations/Releases**:       The DIP Orders include (i) customary Stipulations regarding the validity and priority of the Foris Prepetition Secured Loan Agreements, the Foris Prepetition Obligations, the Foris Liens and Prepetition Collateral, and (ii) customary waivers by the Debtors and releases of the Foris Prepetition Secured Lenders, the DIP Secured Parties, and each of their respective Representatives (collectively, the "Released Parties") with respect to any and all claims and causes of action arising from or related to the Foris Prepetition Secured Loan Agreements, the Foris Prepetition Obligations, the Foris Liens, the Prepetition Collateral, the DIP Liens, the DIP Secured Parties and the DIP Documents.   The Releases are effective as of the date of the Interim Order for the Debtors.  As set forth in the Interim Order, the Stipulations and Releases are only binding on other parties in interest, including any Committee, upon

the expiration of the Challenge Period.  [Interim Order ¶¶ F (viii); 11, 27]

The Challenge Period for parties in interest (including any Creditors' Committee) is seventy-five (75) days from entry of the Interim Order or such later date as the Prepetition Agent may consent in writing. Except for an Investigation Budget of $50,000.00, no proceeds of the DIP Loans and/or DIP Collateral (including Cash Collateral) may be used to challenge the liens or claims of the Foris Prepetition Secured Lenders or the DIP Lenders. [Interim Order ¶¶ 11, 27]

**v. Events of Default**: *Events of Default*. The occurrence of any of the following events, unless waived by the DIP Agent in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "Events of Default"): (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under the Interim Order; (b) the failure of the Debtors to comply with the Milestones; or (c) the occurrence of an "Event of Default" under the DIP Credit Agreement.  [Interim Order ¶ 13; DIP Credit Agreement § 8]

**w. Credit Bidding**: The DIP Agent shall have the right to credit bid up to the full amount of the DIP Obligations in any sale of the DIP Collateral. The Foris Prepetition Secured Lenders shall have the right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of the Foris Prepetition Obligations pursuant to section 363(k) of the Bankruptcy Code, without the need to further Court order authorizing the same and whether any such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise. [Interim Order ¶ 25]

**x. Waivers**: The DIP Orders shall include terms and conditions customary for interim or Final DIP financing orders and shall be acceptable to the DIP Agent and DIP Lender including, without limitation, waiver of the automatic stay, "no marshaling" provisions, and upon entry of the Final Order, waivers of the imposition of costs pursuant to Section 506(c) of the Bankruptcy Code and the "equities of the case" exception in Section 552(b) of the Bankruptcy Code, in each case, to the extent applicable, in favor of the DIP Lenders and Foris Prepetition Secured Lenders.  Relief from the automatic stay is subject to a five (5) days' Remedies Notice Period. [Interim Order ¶¶ 15, 16 17, 23, 34].

**y. Conditions to Funding**:   The DIP Documents shall contain conditions precedent customarily found in loan documents for similar debtor-in-possession financings and as otherwise deemed by the DIP Agent appropriate to the specific transactions.  [DIP Credit Agreement § 4]

**z. Covenants**:   The DIP Documents shall contain affirmative and negative covenants customarily found in loan documents for similar debtor-in-possession financings and as otherwise deemed by the DIP Agent appropriate to the specific transactions, such as financial reporting, limitations on incurred indebtedness, limitations on the incurrence of additional liens.  [DIP Credit Agreement § 7]

## B.   Additional Required Disclosures

24.   Pursuant to Local Rule 4001-2(a)(i), a debtor in possession seeking authority to use cash collateral or obtain financing must disclose the presence and location of certain provisions contained in the documentation evidencing the cash collateral usage or financing.  The debtor in possession must also justify the inclusion of certain such provisions.  Set forth below are the disclosures required in accordance Local Rule 4001-2(a)(i)(A)-(X) (most of which is also disclosed in Paragraph 23(a)-(z) of this DIP Motion as set forth above):

(i)   Local Rule 4001-2(a)(i)(A) requires a debtor to disclose the amount of cash collateral the debtor seeks permission to use or the amount of credit the debtor seeks to obtain under the proposed loan agreement, including the committed amount of the proposed loan agreement and the amount of new funding that will actually be available for borrowing by the debtor.

**New credit loan of $190,000,000 [Interim Order Recitals ¶ (i)]**

(ii)   Local Rule 4001-2(a)(i)(B) require the disclosure of pricing and economic terms, including letter of credit fees, commitment fees, and any other fees, provided that when any such terms are sought to be filed under seal, they shall not be disclosed in the Financing Motion itself, but shall be set forth in a separate document filed pursuant to the procedures set forth in Local Rule 9018-1(d), the filing of which shall be disclosed in the Financing Motion.

**The economic terms of the DIP Facility and the applicable paragraphs of the proposed Interim Order and/or DIP Credit Agreement, as applicable, are disclosed in Paragraph 23(i), (j), and (k), above.  There are no terms sought to be filed under seal.**

27

(iii)     Local Rule 4001-2(a)(i)(C) requires the disclosure of provisions that specifically limit the Court's power or discretion to enter future orders in the case.

**While certain provisions of the DIP Facility limit the issues the Debtors may raise before the Court, no provisions of the DIP Facility or the proposed DIP Orders limit the power or discretion of the Court to enter future orders in the Chapter 11 Cases.**

(iv)     Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that provide for the funding of non-debtor affiliates with cash collateral or proceeds of the loan, as applicable, and the approximate amount of such funding.

**The Budget, the Cash Management Motion, and the Fleming Declaration disclose the use of proceeds of the DIP Facility by non-debtor affiliates and the reasons for such use. Any such intercompany transfers shall be subject to the Budget, including the "Other AP Disbursements", "InterCo disbursements for Goods", and "InterCo Loan" line items therein and supporting schedules to the Budget, as well as the provisions of any interim and final orders approving the Debtors' cash management motion, including, without limitation, execution of a Post-Petition Global Note.**

(v)     Local Rule 4001-2(a)(i)(E) requires disclosure of material conditions to closing and borrowing, including budget provisions.

**The material conditions to closing and borrowing and the applicable paragraphs of the proposed Interim Order or DIP Credit Agreement, as applicable, are disclosed in Paragraph 23(h), (q), (s), and (y), above.**

(vi)     Local Rule 4001-2(a)(i)(F) requires disclosure of any carve-outs from liens or superpriority claims, including the material terms of any professional fee carve-out.

**The provisions of the Carve-Out and the applicable paragraphs of the proposed Interim Order or DIP Credit Agreement, as applicable, are disclosed in Paragraph 23(r), above.**

(vii)     Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that provide for postpetition liens on unencumbered assets, including the identification of such assets.

**The provisions of the proposed DIP Order providing liens on unencumbered assets, the identity of such assets and the applicable paragraphs of the Interim Order or DIP Credit Agreement, as applicable, are disclosed in Paragraph 23(m), above.**

(viii)     Local Rule 4001-2(a)(i)(H) requires disclosure of provisions that establish any sale or plan milestones.

**The provisions of the proposed Interim Order establishing sale and plan milestones and the applicable paragraphs of the Interim Order or DIP Credit Agreement, as applicable, are disclosed in Paragraph 23(s), above.**

(ix)    Local Rule 4001-2(a)(i)(I) requires disclosure of provisions that provide for a prepayment penalty or other provisions that affect the debtor's right or ability to repay the financing in full during the course of the chapter 11 case.

**No provisions of the DIP Order or DIP Credit Agreement provide for a prepayment penalty.  Any limitations on prepayment contained in the proposed DIP Order and DIP Credit Agreement are disclosed in Paragraph 23(l), above.**

(x)    Local Rule 4001-2(a)(i)(J) requires disclosure of provisions, in jointly administered cases, that govern joint liability of the debtors, including any provisions that would cause one jointly administered debtor to become liable for the prepetition debt of another jointly administered debtor for which it was not previously subject to.

**No provisions of the proposed DIP Orders or the DIP Credit Agreement make any debtor liable for any prepetition debt of another debtor for which it was not previously liable.**

(xi)    Local Rule 4001-2(a)(i)(K) requires disclosure of provisions that require the debtor to pay an agent's or lender's expenses and attorneys' fees in connection with the proposed financing or use of cash collateral, without any notice or review by the Office of the United States Trustee, the committee appointed under section 1102 of the Bankruptcy Code (if formed) or, upon objection by either of the foregoing parties, the Court.

**The provisions regarding payment of the fees and expenses of the Foris Prepetition Secured Lenders are disclosed in Paragraph 23(p)(iii), above.  The provisions regarding payment of the fees and expenses of the DIP Lenders are disclosed in Paragraph 23(k), above.  All such fees and expenses accrue and are only payable upon the DIP Termination Date.  Payment of each of these fees is subject to applicable notice to the U.S. Trustee and Creditors' Committee.  [Interim Order ¶ 19]**

(xii)    Local Rule 4001-2(a)(i)(L) requires disclosure of provisions that prohibit the use of estate funds to investigate the liens and claims of the prepetition lender.

**As set forth in Paragraph 23(h)(iii) and (u), above, use of estate funds to investigate the liens and claims of the Foris Prepetition Secured Lenders is limited to $50,000.**

(xiii)    Local Rule 4001-2(a)(i)(M) requires disclosure of any termination or default provisions concerning the use of cash collateral or the availability of credit.

29

**The default and termination provisions of the proposed Interim Order and the applicable paragraphs of the Interim Order or DIP Credit Agreement, as applicable, are disclosed in Paragraph 23(v), above.**

(xiv)     Local Rule 4001-2(a)(i)(N) requires disclosure of any provisions that grant cross-collateralization protection or elevate prepetition debt to administrative expense (or higher) status or that secure prepetition debt with liens on postpetition assets (which liens the creditor would not otherwise have by virtue of the prepetition security agreement or applicable law).

**Nothing in the proposed DIP Orders cross-collateralizes or elevates prepetition debt to administrative expense (or higher) status or secures prepetition debt with liens on postpetition assets.**

(xv)     Local Rule 4001-2(a)(i)(O) requires disclosure of any provisions that apply the proceeds of postpetition financing to pay, in whole or in part, prepetition debt or which otherwise have the effect of converting (or "rolling up") prepetition debt to postpetition debt.

**Nothing in the proposed DIP Orders provides for the application of the proceeds of postpetition financing to pay, in whole or in part, prepetition debt and no roll-up or conversion of prepetition debt to postpetition debt is contemplated in the DIP Orders or the DIP Credit Agreement.**

(xvi)     Local Rule 4001-2(a)(i)(P) requires disclosure of any provisions that immediately prime valid, perfected and non-avoidable liens existing immediately prior to the petition date or that are perfected subsequent to the petition date as permitted by section 546(b) of the Bankruptcy Code, in each case that are senior to the lender's prepetition liens under applicable law, without the consent of the affected secured creditors, and the proposed notice to be provided to such affected secured creditors.

**The proposed DIP Orders do not provide for the priming of any pre-existing secured liens without the consent of the applicable lienholder. The Foris Prepetition Secured Lenders have consented to the priming of their liens as set forth in the DIP Orders.**

(xvii)     Local Rule 4001-2(a)(i)(Q) requires disclosure of any provisions or findings of fact that (i) bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest, including, but not limited to, any official committee appointed in these cases, at least seventy-five (75) days from the entry of the initial interim order to investigate such matters or (ii) limit the Court's ability to grant relief in the event of a successful challenge.

**The proposed DIP Orders provide that any stipulations by the Debtors relating to the validity and amount of the Prepetition Liens and claims of the Prepetition Lender are subject to challenge by parties in interest, including**

**any official Creditors' Committee, during a period of seventy-five (75) days from date of entry of the Interim Order, as disclosed in Paragraph 23(u), above.  No provisions in the proposed DIP Orders limit the ability of the Court to grant relief in the event of a successful challenge.**

(xviii)    Local Rule 4001-2(a)(i)(R) requires disclosure of any provisions that immediately approve all terms and conditions of the underlying loan agreement (provided that provisions in the order that provide that the debtor is authorized to enter into and be bound by the terms and conditions of such loan agreement do not need to be summarized).

**As set forth more specifically in Paragraph 23, above, the DIP Credit Agreement and the authority of the Debtors to enter into same are approved upon entry of the Interim Order, except as to certain provisions (liens on Avoidance Actions and certain waivers), which are only approved upon entry of the Final Order.**

(xix)    Local Rule 4001-2(a)(i)(S) requires disclosure of any provisions that modify or terminate the automatic stay or permit the lender to enforce remedies following an event of default that do not require at least five (5) days' written notice to the trustee or debtor in possession, the Office of the United States Trustee and each committee appointed under sections 1102 and 1114 of the Bankruptcy Code (the "Remedies Notice Period"), prior to such modification or termination of the automatic stay or the enforcement of the lender's remedies.

**As set forth in Paragraph 23(x), above, termination of the automatic stay to enable the DIP Lenders to enforce remedies is subject to the five (5) day Remedies Notice Period.**

(xx)    Local Rule 4001-2(a)(i)(T) requires disclosure of any provisions that seek to limit what parties in interest (other than the debtor) may raise at any emergency hearing scheduled during the Remedies Notice Period.

**As set forth in Paragraph 23(x), with reference to Paragraph 16 of the Interim Order, no provisions of the DIP Orders limit what parties in interest (other than the Debtors) may raise at any emergency hearing scheduled during the Remedies Notice Period.**

(xxi)    Local Rule 4001-2(a)(i)(U) requires disclosure of any provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, and 548 of the Bankruptcy Code or, in each case, the proceeds thereof.

**Liens on the proceeds of Avoidance Actions are effective only upon entry of the Final Order.**

31

(xxii)     Local Rule 4001-2(a)(i)(V) requires disclosure of any provisions that immediately waive the debtor's rights under section 506(c) of the Bankruptcy Code.

**As disclosed in Paragraph 23(x), above, these provisions are subject to entry of the Final Order as it relates to the Foris Prepetition Secured Lenders and the Prepetition Collateral and the Interim Order as it relates to the DIP Secured Parties and the DIP Collateral.**

(xxiii)     Local Rule 4001-2(a)(i)(W) requires disclosure of any provisions that immediately seek to affect the Court's power to consider the equities of the case doctrine under section 552(b)(1) of the Bankruptcy Code.

**As disclosed in Paragraph 23(x), above, these provisions are subject to entry of the Final Order as it relates to the Foris Prepetition Secured Lenders and the Prepetition Collateral and the Interim Order as it relates to the DIP Secured Parties and the DIP Collateral.**

(xxiv)     Local Rule 4001-2(a)(i)(X) requires disclosure of any provisions that immediately shield the lender from the equitable doctrine of "marshalling" or any similar doctrine.

**As disclosed in Paragraph 23(x), above, these provisions are subject to entry of the Final Order as it relates to the Foris Prepetition Secured Lenders and the Prepetition Collateral and the Interim Order as it relates to the DIP Secured Parties and the DIP Collateral.**

## C.     Need for Financing and Use of Cash Collateral

25.     The Debtors have an immediate and critical need to obtain the DIP Facility and to use Cash Collateral (solely to the extent consistent with the Budget (subject to Permitted Variances as set forth in the Interim Order and the DIP Documents)) to, among other things, (a) permit the orderly continuation of their businesses; (b) maintain business relationships with vendors, suppliers, and customers; (c) make payroll; (d) fund expenses of the Chapter 11 Cases; and (e) satisfy other working capital, operational, and general corporate needs.  The Debtors do not have sufficient sources of working capital and financing to operate their businesses in the ordinary course throughout the Chapter 11 Cases without access to the DIP Facility and authorized use of Cash Collateral.  In the absence of the DIP Facility and the use of Cash Collateral, the

32

Debtors' business and estates would suffer immediate and irreparable harm.  Access to the DIP Facility will provide the Debtors with sufficient working capital and liquidity to operate during these Chapter 11 Cases and is vital to the preservation and maintenance of the Debtors' business and assets.  Without access to the DIP Facility and Cash Collateral, the Company would run out of money and its ability maintain going concern operations and value will be significantly impaired.

26.     As set out in the Beers Declaration, the Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without granting to the DIP Secured Parties, the DIP Liens and the DIP Superpriority Claims (each as defined herein), in each case subject to the Carve-Out to the extent set forth herein, under the terms and conditions set forth in the Interim Order and the DIP Documents.  Importantly, the Foris Prepetition Secured Lenders consent to the priming of their liens contemplated by the DIP Documents and there is no roll-up of prepetition debt to postpetition debt included in the DIP Facility.

## V.  BASIS FOR RELIEF

**A.      The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code.**

27.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

33

28.   In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

a.   unencumbered credit or alternative financing without superpriority status is available to the debtor;

b.   the credit transactions are necessary to preserve assets of the estate;

c.   the terms of the credit agreement are fair, reasonable, and adequate;

d.   the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and its creditors; and

e.   the proposed financing agreement adequately protects the DIP Lender.

*See, e.g.*, *In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)).

29.   For the reasons discussed below, the Debtors satisfy the standards required to obtain postpetition financing in the Chapter 11 Cases on a partial priming and senior secured superpriority basis as to the DIP Collateral under sections 364(c)(1), (2), and (d)(1) of the Bankruptcy Code.

**B.**   **The Debtors are Unable to Obtain Financing on More Favorable Terms.**

30.   As discussed above and in the First Day Declaration and Beers Declaration, the Debtors carefully considered their financing options.  Ultimately, the Debtors determined that the DIP Facility provides the Debtors with the best postpetition financing option available and should be approved by this Court.

31.   The Debtors respectfully submit that their efforts to obtain postpetition financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code. *See, e.g., In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can

34

or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

## C. **The Proposed DIP Financing is Necessary to Maximize the Value of the Debtors' Estates.**

32.     The Debtors seek to use the DIP Facility to for general working capital purposes, ordinary business expenses such as payroll, and bankruptcy-related costs and expenses, in accordance with the Budget, to maximize value through a consensual plan and/or an orderly sale process.   The DIP Facility represents the best economic alternative for a new debtor-in-possession lending arrangement.

33.     As set forth in the Fleming Declaration, the Debtors need to continue to operate in the ordinary course, including buying products from and selling products to their foreign subsidiaries, and otherwise providing financial accommodations to their foreign subsidiaries so as to maximize the value of the Debtors' businesses.   All such transactions are contemplated by and will be conducted in accordance with the Budget and the proposed Cash Management Order.

34.     Simply put, without immediate access to the DIP Facility and use of Cash Collateral, the Debtors cannot continue to operate their businesses.   Failure to access and have use of the DIP Facility would irreparably damage the Debtors' efforts to effectuate a going concern asset sale for the benefit of all constituents.   Accordingly, the Debtors urge the Court to authorize the DIP Facility on the terms contemplated herein.

## D. **The Terms of the Proposed DIP Financing are Fair, Reasonable, and Appropriate.**

35.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.   *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen*

35

*MacLean Oil Co.*), 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

36.     The terms of the DIP Facility were negotiated in good faith and at arm's-length between the Debtors and the DIP Lender, resulting in an agreement that is designed to permit the Debtors to maximize the value of their assets.  The Debtors submit that the proposed terms of the DIP Facility are fair, reasonable, and appropriate under the circumstances.  *See, e.g.*, *Bray v. Shenandoah Fed. Sav. and Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender); *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997) (authorizing postpetition financing that would preserve the value of the debtor's assets).  Further, the DIP Lender consent to the DIP Facility on the terms set forth in the DIP Documents.

**E.      The Carve-Out is Appropriate.**

37.     The DIP Liens and Adequate Protection are subject and subordinate to the Carve-Out. The Carve-Out contains similar terms to others that this Court has found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from their advisors. Without the Carve-Out, the Debtors' estates may be deprived of possible rights and powers if the services for which professionals may be compensated are restricted. *See In re Ames Dep't Stores, Inc*., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of these cases by ensuring that assets remain for the payment of the U.S. Trustee fees and professional fees, notwithstanding the grant of superpriority claims and replacement liens as part

of the adequate protection of the Foris Prepetition Secured Lenders' interests in the Prepetition

Collateral. Accordingly, the Carve-Out is appropriate and should be approved.

**F.**   **The DIP Lender Should Be Deemed Good Faith Lenders.**

38.   Section 364(e) of the Bankruptcy Code protects a good faith lender's right

to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section
> [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant
> under this section of a priority or a lien, does not affect the validity of any
> debt so incurred, or any priority or lien so granted, to an entity that extended
> such credit in good faith, whether or not such entity knew of the pendency
> of the appeal, unless such authorization and the incurring of such debt, or
> the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

39.   Here, the Debtors believe the DIP Facility embodies the most favorable

terms on which the Debtors could obtain postpetition financing. As described in the First Day

Declaration and the Fleming Declaration, negotiations of the terms of the DIP Facility with the

DIP Lender were conducted in good faith and at arms' length. The terms and conditions of the DIP

Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for

purposes that are permissible under the Bankruptcy Code, and in accordance with the DIP Orders

and the DIP Documents, including the Budget.  Any consideration being provided to any of the

DIP Lender is described herein.  Accordingly, the Court should find that the DIP Lender are "good

faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all

of the protections afforded by that section.

G.     **The Proposed DIP Financing Reflects the Debtors' Sound Business Judgment.**

40.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g.*, *Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38 (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

41.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See, e.g., Group of Inst. Investors v. Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."). Further, one court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

42.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Associates*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); *see also Trans World Airlines, Inc.*, 163 B.R. at 974 (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor). Generally courts will not second-guess a debtor in possession's business decisions involving "a business judgment made

38

in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley,* 14 B.R. at 513-14 (footnotes omitted).

43.     For the reasons set forth above, the Debtors' sound business judgment clearly supports approval of the DIP Facility.  Access to the DIP Facility will allow the Debtors to continue to operate, thus maximizing value for all of their constituents.

**H.     Section 363 of the Bankruptcy Code Authorizes the Debtors' Use of Cash Collateral.**

44.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor in possession may not use cash collateral unless (A) each entity that has an interest in such cash collateral provides consent, or (B) the court approves the use of cash collateral after notice and a hearing. *See* 11 U.S.C. § 363(c).  Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used . . . by the [debtor in possession], the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

45.     Here, the Debtors seek authority to use the Cash Collateral pursuant to the Budget and have sought approval of various forms of adequate protection in favor of the Foris Prepetition Lenders, including adequate protection liens and superpriority claims on the DIP Collateral to the extent of any diminution and reimbursement of reasonable professional fees incurred by the Prepetition Agent.  Importantly, the DIP Lender and Foris Prepetition Lenders consent to the use of Cash Collateral on the terms set forth in the Interim Order and Final Order.

46.     Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 14-day period following the filing of a motion requesting authorization to use cash collateral, "only . . . as is necessary to avoid immediate and irreparable harm to the estate pending a Final hearing."  Bankruptcy Rule 4001(b)(2).  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to

39

other business decisions. *See, e.g., In re Simasko Production Co.*, 47 B.R. at 449; *see also In re Ames Dep't Stores Inc.,* 115 B.R. at 38. After the 14-day period, the request for use of cash collateral is not limited to those amounts necessary to prevent harm to the debtor's business.

47. As previously noted, in order to continue operating and satisfy accruing administrative expenses, the Debtors require access to the DIP Facility and the use of Cash Collateral. Such use will provide the Debtors with the necessary funds to remain administratively solvent, while the Debtors pursue a going concern sale of their assets.

48. Absent access to Cash Collateral, the Debtors would face immediate and irreparable harm. The Debtors would likely be forced to cease operations and convert these Chapter 11 Cases to ones under chapter 7. Jobs would be lost and substantial value destroyed. Thus, immediate access to Cash Collateral is essential to the Debtors' ability to maximize value for the benefit of all constituents.

## I. Interim Order and Final Hearing

49. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court schedule a Final hearing within approximately thirty-six (36) calendar days of the commencement of the Chapter 11 Cases to consider approval of this DIP Motion on a Final basis.

50. The urgent need to avoid immediate and irreparable harm to the Debtors' estates makes it imperative that the Debtors be authorized to access the DIP Facility and use Cash Collateral pending the Final Hearing, in order to allow the Debtors to operate and administer these Chapter 11 Cases on a postpetition basis. Without the ability to make draws under the DIP Facility and use Cash Collateral, the Debtors would be unable to satisfy accruing postpetition obligations, including payroll, and would not be able to conduct a value-maximizing sale process, thus causing

irreparable harm to the Debtors and the value of these estates.  Accordingly, the Debtors respectfully request that, pending the Final Hearing, the Interim Order be approved and that the terms and provisions of the Interim Order be implemented and be deemed binding and that, after the Final Hearing, the Final Order be approved in all respects and the terms and provisions of the Final Order be implemented and be deemed binding.

**J.**      **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

51.    To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## VI.  NOTICE

52.    The Debtors will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Lenders, DIP Agent and the Foris Prepetition Secured Lenders, Goodwin Procter LLP, 620 Eighth Avenue, New York, NY 10018, Attn: Michael H. Goldstein, Esq. (mgoldstein@goodwinlaw.com), and Alexander J. Nicas, Esq. (anicas@goodwinlaw.com); (d) co-counsel to the DIP Lenders, the DIP Agent and the Foris Prepetition Secured Lenders, Troutman Pepper Hamilton Sanders LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899; Attn: David M. Fournier, Esq. (david.fournier@troutman.com); (e) the United States Attorney's Office for the District of Delaware; (f) the state attorneys general for all states in which the Debtors conduct business; and (g) any party that requests service pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve

copies of the Motion and any order entered in respect to this Motion as required by Local Rule 9013-1(m).

### VII.  NO PRIOR REQUEST

53.     The Debtors have not made any prior request for the relief sought herein to this Court or any other court.

**WHEREFORE**, the Debtors respectfully request entry of the Interim Order and, after Final Hearing, the Final Order, granting the relief requested herein and such other relief as is just and proper.

Dated: August 9, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ James E. O'Neill*

Richard M. Pachulski (*pro hac vice* forthcoming)
Debra I. Grassgreen (*pro hac vice* forthcoming)
James E. O'Neill (DE Bar No. 4042)
Jason H. Rosell (*pro hac vice* forthcoming)
Steven W. Golden (DE Bar No. 6807)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:  rpachulski@pszjlaw.com
        dgrassgreen@pszjlaw.com
        joneill@pszjlaw.com
        jrosell@pszjlaw.com
        sgolden@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Amyris, Inc.,[1] | ) | Case No. 23-11131 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. [●]** |

## INTERIM ORDER (I) AUTHORIZING THE DEBTORS
## (A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE
## CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO
## PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,
## (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Upon the motion (the "DIP Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above captioned chapter 11 cases (collectively, the "Chapter 11 Cases") for entry of an interim order (this "Interim Order"), pursuant to sections 105, 361, 362, 363, 364, 507, and 552 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1(b), 4001-2, 9006-1, and 9013 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking entry of this Interim Order:

(i)  authorizing Amyris, Inc., Amyris Clean Beauty, Inc., and Aprinnova, LLC, in their capacity as borrowers (collectively, the "Borrowers"), to obtain postpetition financing, and for each of the other Debtors and such other non-Debtor subsidiaries to guarantee unconditionally (the Debtors and such other non-Debtor subsidiaries, other than the Borrowers as specified below[3], and such other non-Debtor

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

[2] Capitalized terms used but not defined herein have the meanings given to such terms in the Motion or the DIP Credit Agreement (as defined herein).

[3] The Guarantors shall be AB Technologies LLC, Amyris Fuels, LLC, Amyris-Olika LLC, Onda Beauty Inc., Upland 1, LLC, Amyris Eco-Fab LLC, Clean Beauty 4U Holdings, LLC, Amyris Clean Beauty LATAM Ltda., Amyris

subsidiaries as required by the DIP Agent (as defined below) collectively, the "Guarantors"), on a joint and several basis, the Borrowers' obligations in connection with a senior secured superpriority multiple-draw term loan facility (the "DIP Facility") in the aggregate principal amount of up to **$190 million** (the "DIP Loans"), subject to and in accordance with the terms and conditions set forth in that certain *Senior Secured Super Priority Debtor In Possession Loan Agreement*, dated as of August [9], 2023, attached hereto as **Exhibit A** (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), by and among the Borrowers, the Guarantors, and Euagore, LLC (together with the other lenders from time to time party thereto, the "DIP Lenders"), and Euagore, LLC, as Administrative Agent (the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties"), and consistent with all other terms and conditions of the DIP Documents (as defined herein) and upon entry of the Interim Order, and subject to the terms of the Final Order (as defined herein), resulting in:

   a. upon entry of the Interim Order, no more than two draws prior to entry of the Final Order in the aggregate principal amount of up to **$70 million** (each an "Initial Borrowing" and collectively the "Initial Borrowings"); and

   b. upon entry of the Final Order, multiple additional draws (each a "Subsequent Borrowing" and collectively, the "Subsequent Borrowings") in the aggregate principal amount not to exceed **$120 million**; *provided* that (x) each Subsequent Borrowing shall not be in an amount greater than the amounts specified in the Budget (each as defined herein) to be drawn through the date of such Subsequent Borrowing and (y) each Subsequent Borrowing shall be at least twenty-one (21) calendar days apart; and

(ii)   authorizing the Debtors to execute, deliver and perform under the DIP Credit Agreement, and together with this Interim Order, the Final Order and all other related agreements, documents, and instruments delivered or executed in connection therewith, including, without limitation, as applicable, security agreements, pledge agreements, control agreements, mortgages, deeds, charges, guaranties, promissory notes, intercompany notes, certificates, intellectual property security agreements, and such other documents that may be reasonably requested by the DIP Agent (collectively, as such may be amended, restated supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Documents"), each of which shall be in form and substance satisfactory to the DIP Secured Parties; and to perform such other and further acts as may be reasonably necessary, desirable or appropriate in connection with the DIP Documents;

---

Biotecnologia do Brasil Ltda., Amyris Europe Trading B.V.,Amyris Bio Products Portugal, Unipessoal, Lda., Beauty Labs International Limited, Interfaces Industria e Comericio de Cosmeticos Ltda., and Amyris UK Trading Limited.

(iii)     authorizing the Debtors to use the DIP Loans, the proceeds thereof, and the Prepetition Collateral (as defined herein), including Cash Collateral (as defined herein), in accordance with the Budget (subject only to Permitted Variances (as defined herein) and in accordance with the DIP Documents) in form and substance acceptable to the DIP Lenders, to provide working capital for, and for other general corporate purposes of, the Debtors, solely in accordance with this Interim Order and the DIP Documents;

(iv)     granting the DIP Agent, for itself and the for the benefit of the DIP Lenders, a valid, binding, continuing, enforceable, non-avoidable, automatically and properly perfected, first priority priming senior security interest in and lien upon the Prepetition Collateral (as defined herein) and all proceeds thereof, subject only to the Carve-Out (as defined herein);

(v)     granting to the DIP Agent, for itself and for the benefit of the DIP Lenders, a valid, binding, continuing, enforceable, non-avoidable, automatically and properly perfected, first priority senior security interest in and lien upon the Prepetition Unencumbered Collateral (as defined herein) and all proceeds thereof, including upon entry of the Final Order, all Avoidance Actions Proceeds (as defined herein), subject only to (x) the Carve-Out and (y) other valid and unavoidable liens perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) on the terms and conditions set forth herein and in the DIP Documents; *provided* that with respect to: (i) any unencumbered equity interests in any foreign subsidiaries of the Borrower that are Guarantors; or (ii) any unencumbered intellectual property rights (including, without limitation, licenses, grants, contracts, in lieu of such lien, the DIP Agent may elect[4] to take a grant of a non-avoidable, automatically vested, senior and first priority right to, the value of such unencumbered assets, including any proceeds realized on account thereof, or in connection therewith, which value shall not be allocated, distributed, or realized by any party until the payment in full of the DIP Obligations (as defined herein);

(vi)     granting the DIP Agent, for itself and the for the benefit of the DIP Lenders, a valid, binding, continuing, enforceable, non-avoidable, automatically and properly perfected, security interest in and lien upon any Other Encumbered Prepetition Collateral (as defined herein) (Other Encumbered Prepetition Collateral, together with the Prepetition Collateral and the Prepetition Unencumbered Collateral, the "<u>DIP Collateral</u>") and all proceeds thereof, junior only to the valid, binding, continuing enforceable and non-avoidable liens on the Other Prepetition Encumbered Collateral as of the Petition Date, subject to the Carve-Out

(vii)     granting to the DIP Agent, for itself and for benefit of the DIP Lenders, allowed superpriority administrative expense claims against each of the Debtors' estates in

---

[4] For all acts required of the DIP Agent as set forth in this Interim Order, the DIP Agent acts at the direction of the Required Lenders, as defined in the DIP Credit Agreement.

respect of all DIP Obligations over any and all administrative expenses of any kind or nature, subject and subordinate only to the payment of the Carve-Out on the terms and conditions set forth herein and in the DIP Documents;

(viii)   authorizing and directing the Debtors to pay all principal, interest, fees, costs, expenses, and other amounts payable under the DIP Documents as such become due and payable, as provided and in accordance therewith;

(ix)   authorizing the Debtors, the DIP Secured Parties, and the Foris Prepetition Secured Lenders (as defined herein) to take all commercially reasonable actions to implement and effectuate the terms of this Interim Order;

(x)   authorizing the Debtors to waive (a) their right to surcharge the DIP Collateral (as defined herein) pursuant to section 506(c) of the Bankruptcy Code, (b) subject to entry of the Final Order, to the extent provided therein, their right to surcharge the Prepetition Collateral (as defined herein) pursuant to section 506(c) of the Bankruptcy Code, and (c) any "equities of the case" exception under Bankruptcy Code section 552(b) with respect to the proceeds, products, offspring, or profits of any of the Prepetition Collateral, subject to entry of the Final Order, to the extent provided therein, or the DIP Collateral, as applicable;

(xi)   authorizing the Debtors to waive the equitable doctrine of "marshaling" and similar doctrines (i) subject to the entry of the Final Order, to the extent provided therein, with respect to any of the Prepetition Collateral (including Cash Collateral (as defined herein)) for the benefit of any party other than the Foris Prepetition Secured Lenders, (ii) with respect to the DIP Collateral for the benefit of any party other than the DIP Secured Parties and (iii) with respect to the Adequate Protection (as defined herein) granted to the Foris Prepetition Secured Lenders;

(xii)   granting Adequate Protection to the Foris Prepetition Secured Lenders to the extent of any diminution in value as of the Petition Date of their interests in the Prepetition Collateral (as defined herein), including, without limitation, any diminution in value resulting from the imposition of the automatic stay under section 362 of the Bankruptcy Code (the "Automatic Stay"), the Debtors' use, sale, or lease of the Prepetition Collateral (as defined herein), including Cash Collateral and the priming of its interests in the Prepetition Collateral (including Cash Collateral);

(xiii)   vacating and modifying the Automatic Stay as set forth herein to the extent necessary to permit the Debtors and their affiliates, the DIP Secured Parties, and the Foris Prepetition Secured Lenders to implement and effectuate the terms and provisions of this Interim Order, the DIP Documents, and, upon entry, the Final Order, to implement and effectuate the terms and provisions of the Final Order and the DIP Documents, as further set forth herein and therein, respectively;

(xiv)   waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order and, upon entry, the Final Order; and

4

(xv)        scheduling a final hearing (the "Final Hearing") to consider the relief requested in the DIP Motion and entry of a final order (the "Final Order") authorizing, among other things, the Subsequent Borrowings, continued use of Cash Collateral and the DIP Documents on a final basis, and approving the form of notice with respect to the Final Hearing.

The Court having considered the interim relief requested in the DIP Motion; the exhibits thereto; the (i) the *Declaration of Han Kieftenbeld in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), (ii) the *Declaration of Lorie Beers in Support of the Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Beers Declaration"), and (iii) the *Declaration of Steve Fleming in Support of the Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Fleming Declaration"); and the other evidence submitted or adduced and the arguments of counsel made at the interim hearing on August [●], 2023 (the "Interim Hearing"); and due and sufficient notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, otherwise is fair and reasonable and in the best interests of the Debtors' and their estates, and is essential for the continued operations of the Debtors' business and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' entry

into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:[5]

A.     _Petition Date_. On August 9, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware commencing these Chapter 11 Cases.

B.     _Debtors in Possession_. The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

C.     _Jurisdiction and Venue_. The Court has jurisdiction over the Motion, these Chapter 11 Cases, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334 and the _Amended Standing Order of Reference from the United States District Court for the District of Delaware_, dated February 29, 2012.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Court may enter a final order consistent with Article III of the United States Constitution.  Venue for these Chapter 11 Cases and proceedings on the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     _Committee_. As of the date hereof, the United States Trustee for the District of Delaware (the "U.S. Trustee") has not formed an official committee of unsecured creditors in these

---

[5] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

6

Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (any such committee, the "Committee").

E. _Notice_. The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). As evidenced by the proofs of service filed on the docket for these Chapter 11 Cases, proper, timely, adequate and sufficient notice of the Interim Hearing and the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no further notice of the Motion or entry of this Interim Order shall be required.

F. _Debtors' Stipulations_. Without prejudice to the rights of parties in interest, other than the Debtors, but subject to the limitations thereon contained in Paragraphs 11 and 27 in the Interim Order herein, the Debtors stipulate and agree, having considered and reviewed the facts and circumstances and record, that the following states are true and correct (collectively, Paragraphs F(i) through (vii) below are referred to herein as the "Debtors' Stipulations"):

      (i)      _Foris Prepetition Secured Loans_.

      (a)      Pursuant to those certain (i) Amended and Restated Loan and Security Agreement by and among Amyris, Inc. ("Amyris"), as borrower, Amyris Clean Beauty, Inc. ("Clean Beauty"), Amyris Fuels, LLC ("Amyris Fuels"), and AB Technologies LLC, as guarantors ("AB Technologies," and together with Clean Beauty and Amyris Fuels, the "Subsidiary Guarantors" or "Subsidiary Grantors," as applicable herein), and Foris Ventures, LLC ("Foris"), as lender, dated as of October 28, 2019, as amended by that certain Omnibus Amendment Agreement, dated as of June 5, 2023, and as further amended, restated, supplemented or otherwise modified from time to time, (ii) Amended and Restated Loan and Security Agreement by and among Amyris, as borrower, the Subsidiary Guarantors, as guarantors, and Foris, as lender, dated as of September 27, 2022, as amended by that certain Omnibus Amendment Agreement,

dated as of June 5, 2023, and as further amended, restated, supplemented or otherwise modified from time to time, (iii) Bridge Loan and Security Agreement by and among Amyris, as borrower, the Subsidiary Guarantors, as guarantors, and Perrara Ventures, LLC ("Perrara"), as lender, dated as of March 10, 2023, as amended by that certain Omnibus Amendment Agreement, dated as of June 5, 2023, and as further amended, restated, supplemented or otherwise modified from time to time, (iv) Loan and Security Agreement by and among Amyris, as borrower, the Subsidiary Guarantors, as guarantors, and Anesma Group, LLC ("Anesma"), as lender, dated as of June 5, 2023, (v) Loan and Security Agreement by and among Amyris, as borrower, the Subsidiary Guarantors, as guarantor, and Anjo Ventures, LLC ("Anjo"), as lender, dated June 29, 2023, and (vi) Loan and Security Agreement by and among Amyris, as borrower, the Subsidiary Guarantors, as guarantors, and Muirisc, LLC ("Muirisc"), and lender, dated as of August 2, 2023 (all of the foregoing as further amended, supplemented, amended and restated, or otherwise modified prior to the Petition Date, the "Foris Prepetition Secured Loans," and collectively with any other agreements and documents executed or delivered in connection with the Foris Prepetition Secured Loans, including the Security Agreements (as defined herein), the "Foris Prepetition Secured Loan Agreements"), and Foris, Perrara, Anesma, Anjo, and Muirisc (collectively, the "Foris Prepetition Secured Lenders"), provided prepetition term loans to the Company.

(b)       As of the Petition Date, Amyris and the Subsidiary Guarantors were justly and lawfully indebted and liable to the Foris Prepetition Secured Lenders pursuant to the Foris Prepetition Secured Loan Agreements, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of at least $295,000,000, *plus* accrued and unpaid non-default interest, any additional fees, costs, expenses (including any attorneys', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations,

contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations (as defined in the Foris Prepetition Secured Loan Agreements) owing, in each case under or in connection with the Foris Prepetition Secured Loan Agreements without defense, counterclaim, or offset of any kind (but subject to liquidation of unliquidated obligations) (collectively, the "Foris Prepetition Obligations"), which Foris Prepetition Obligations has been guaranteed on a joint and several basis by each of the Subsidiary Guarantors.

(c)     From and after the Petition Date, Amyris and the Subsidiary Guarantors are justly and lawfully indebted and liable to the Foris Prepetition Secured Lenders pursuant to the Foris Prepetition Secured Loan Agreements for accrued default interest, *plus* any additional fees, costs, expenses (including any attorneys', financial advisors', and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing, and all other Obligations owing, in each case, under or in connection with the Foris Prepetition Secured Loan Agreements after the Petition Date and without defense, counterclaim, or offset of any kind (but subject to liquidation of unliquidated obligations).

(ii)     *Foris Prepetition Loan Collateral*. In connection with the Foris Secured Prepetition Loan Agreements, Amyris and the Subsidiary Guarantors, as applicable, entered into those certain (i) Security Agreement, by and between Amyris, the Subsidiary Grantors, and Foris, dated as of September 27, 2022; (ii) Security Agreement, by and between Amyris, the Subsidiary Grantors, and Perrara, dated as of March 10, 2023; (iii) Patent Security Agreement, by and between Amyris, the Subsidiary Grantors, and Foris, dated as of June 5, 2023; (iv) Trademark Security Agreement, by and between Amyris, the Subsidiary Grantors, and Foris, dated as of June 5, 2023;

9

(v) Security Agreement, by and between Amyris, the Subsidiary Grantors, and Anesma, dated as of June 5, 2023; (vi) Patent Security Agreement, by and between Amyris, the Subsidiary Grantors, and Anesma, dated as of June 5, 2023; (vii) Trademark Security Agreement, by and between Amyris, the Subsidiary Grantors, and Anesma, dated as of June 5, 2023; (viii) Patent Security Agreement by and between Amyris, the Subsidiary Grantors, and Perrara, dated as of June 5, 2023; (ix) Trademark Security Agreement by and between Amyris, the Subsidiary Grantors, and Perrara, dated as of June 5, 2023; (x) Security Agreement by and between Amyris, the Subsidiary Grantors, and Anjo dated as of June 29, 2023; (xi) Patent Security Agreement, by and between Amyris, the Subsidiary Grantors, and Anjo, dated as of June 29, 2023; (xii) Trademark Security Agreement, by and between Amyris, the Subsidiary Grantors, and Anjo, dated as of June 29, 2023; (xiii) Security Agreement by and between Amyris, the Subsidiary Grantors, and Muirisc, dated as of August 2, 2023; (xiv) Trademark Security Agreement, by and between Amyris, the Subsidiary Grantors, and Muirisc, dated as of August 2, 2023; (xv) Patent Security Agreement, by and between Amyris, the Subsidiary Grantors, and Muirisc, dated as of August 2, 2023; and (xvi) Copyright Security Agreement, by and between Amyris, the Subsidiary Grantors, and Muirisc, dated as of August 2, 2023 (all of the foregoing as further amended, supplemented, amended and restated, or otherwise modified from time to time, the "Security Agreements").  Pursuant to the Foris Prepetition Secured Loan Agreements, the Foris Prepetition Obligations are secured by valid, binding, perfected first priority security interests in and liens (the "Foris Liens") on the "Collateral," as defined in the Security Agreements (the "Prepetition Collateral").

(iii)     *Cash Collateral*. Any and all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any account or accounts by the Debtors, including any amounts generated by the collection of accounts receivable or other disposition of

10

the Prepetition Collateral existing as of the Petition Date, and the proceeds of any of the foregoing is the Foris Prepetition Secured Lenders' cash collateral within the meaning of Bankruptcy Code section 363(a) (the "Cash Collateral").

(iv)     _Bank Accounts_. The Debtors acknowledge and agree that as of the Petition Date, none of the Debtors has either opened or maintains any bank accounts other than the accounts listed in the exhibit attached to any order authorizing the Debtors to continue to use the Debtors' existing cash management system (the "Cash Management Order").

(v)     _Validity, Perfection, and Priority of Foris Liens and Prepetition Obligations_. Each of the Debtors acknowledges and agrees that: (a) as of the Petition Date, the Foris Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral and were granted to, or for the benefit of, the Foris Prepetition Secured Lenders for fair consideration and reasonably equivalent value; (b) as of the Petition Date, the Foris Liens are subject and/or subordinate only to valid, perfected, and unavoidable liens and security interests existing as of the Petition Date that are senior in priority to the Foris Liens as permitted by the terms of the Foris Prepetition Secured Loan Agreements; (c) the Foris Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of Amyris and the Subsidiary Guarantors enforceable in accordance with the terms of the applicable Foris Prepetition Secured Loan Agreements; (d) no offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Foris Liens or Foris Prepetition Obligations exist, and no portion of the Foris Liens or Foris Prepetition Obligations is subject to any challenge or defense including impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination (whether equitable or otherwise), attack, offset, defense, counterclaims, cross-claims, or "claim"

11

(as defined in the Bankruptcy Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action, derivative claims, or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 541 through 553 of the Bankruptcy Code), against the Foris Prepetition Secured Lenders, or any of their respective affiliates, agents, representatives, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or related to their loans under the Foris Prepetition Secured Loan Agreements, the Foris Prepetition Obligations, or the Foris Liens; and (f) the Debtors waive, discharge, and release any right to challenge any of the Foris Prepetition Secured Loans, the amount, allowance, character and priority of the Debtors' Obligations under the Foris Prepetition Secured Loans, and the validity, binding, legal, enforceability, allowance, amount, characterization, extent and priority as to the Foris Liens securing the Foris Prepetition Secured Loans.

(vi)     *No Claims or Causes of Action*. No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the Foris Prepetition Secured Lenders, the Foris Prepetition Secured Loans, the Foris Prepetition Secured Loan Agreements, or under any agreements, documents, facts or circumstances, by and among, or related to, the Debtors and the Foris Prepetition Secured Lenders.

(vii)     *Releases*.  Effective as of the date of entry of this Interim Order, as to the Debtors only, subject solely to the rights and limitations set forth in Paragraphs 11 and 27 herein, each of the Debtors and the Debtors' estates, on its and their own behalf, on behalf of its and their

12

respective past, present and future predecessors, heirs, successors, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the Foris Prepetition Secured Lenders, the DIP Secured Parties, and each of their respective Representatives (as defined herein) (collectively, the "Released Parties"), from any and all (a) obligations and liabilities to the Debtors (and their successors and assigns) and (b) claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the date of this Interim Order of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, in each case arising out of or related to (as applicable) the Foris Prepetition Secured Loan Agreements, the DIP Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order. For the avoidance of doubt, nothing in this release shall relieve the DIP Lenders or the Debtors of their Obligations under the DIP Documents from and after the date of this Interim Order.

G. *Corporate Authority*. Each Debtor has all requisite corporate power and authority to execute and deliver the DIP Documents to which it is a party and to perform its obligations thereunder.

13

H.    *Findings Regarding the DIP Facility and Use of Cash Collateral*.

(i)    The Debtors have an immediate and critical need to obtain the DIP Facility and to use Cash Collateral (solely to the extent consistent with the Budget (subject to Permitted Variances as set forth in this Interim Order and the DIP Documents)) to, among other things, (a) permit the orderly continuation of their businesses; (b) maintain business relationships with vendors, suppliers, and customers; (c) make payroll; (d) fund expenses of the Chapter 11 Cases; and (e) satisfy other working capital, operational, and general corporate needs. The Debtors do not have sufficient sources of working capital and financing to operate their businesses in the ordinary course throughout the Chapter 11 Cases without access to the DIP Facility and authorized use of Cash Collateral. In the absence of the DIP Facility and the use of Cash Collateral, the Debtors' business and estates would suffer immediate and irreparable harm. Access to the DIP Facility will provide the Debtors with sufficient working capital and liquidity to operate during these Chapter 11 Cases and is vital to the preservation and maintenance of the Debtors' business and assets.

(ii)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without granting to the DIP Secured Parties, the DIP Liens and the DIP Superpriority Claims (each as defined herein), in each case subject to the Carve-Out to the extent set forth herein, under the terms and conditions set forth in this Interim Order and the DIP Documents.

14

(iii)    As a condition to entry into the DIP Documents, the extension of credit under the DIP Facility, and authorization to use Cash Collateral, the Debtors, the DIP Secured Parties, and the Foris Secured Prepetition Lenders have agreed that as of and commencing on the date of the Interim Hearing, the Debtors shall utilize the proceeds of the DIP Collateral in accordance with this Interim Order.

(iv)    The DIP Facility has been negotiated in good faith and at arm's length among the Debtors and the DIP Secured Parties, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility and the DIP Documents including, without limitation, all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents and all other obligations under the DIP Documents (collectively, the "DIP Obligations") shall be deemed to have been extended by the DIP Secured Parties in good faith as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code.  The DIP Obligations, the DIP Liens, and the DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, and any liens or claims granted to, or payments made to, or payments made to, the DIP Secured Parties hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

(v)    The Debtors have prepared and delivered to the DIP Secured Parties an initial budget (the "Initial Budget") covering the first 60 days of these Chapter 11 Cases, attached hereto as **Exhibit B**.  The Initial Budget reflects, among other things, the anticipated sources and

15

uses of cash for each calendar week, in form and substance satisfactory to the DIP Secured Parties. The Initial Budget may be modified, amended, and updated from time to time in accordance with the DIP Documents, and once approved by the DIP Secured Parties, shall supplement and replace the Initial Budget (the Initial Budget, and each subsequent approved budget, shall constitute without duplication, the "Budget). The Debtors believe that the Initial Budget is reasonable under the facts and circumstances of these Chapter 11 Cases. The DIP Secured Parties are relying, in part, upon the Debtors' agreement to comply with the Budget, the DIP Documents, and this Interim Order in determining to enter into DIP Facility as provided for in this Interim Order.

(vi)     The Foris Prepetition Secured Lenders are entitled to the rights and benefits of section 552(b) of the Bankruptcy Code and, subject to and upon entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Foris Prepetition Secured Lenders with respect to proceeds, product, offspring, or profits with respect to any of the Prepetition Collateral.

(vii)     In light of the financing made available under the DIP Facility to the Debtors to fund the ongoing working capital requirements to operate and maintain their businesses in the ordinary course and preserve value, the DIP Secured Parties and the Foris Prepetition Secured Lenders are entitled to the benefit of a waiver of the rights of the Debtors under section 506(c) of the Bankruptcy Code and the Debtors waive any right to surcharge the DIP Collateral, and upon entry of the Final Order, to the extent provided therein, the Debtors waive any rights to surcharge the Prepetition Collateral, in each case, pursuant to section 506(c) of the Bankruptcy Code.

(viii)     The DIP Secured Parties and the Foris Prepetition Secured Lenders are entitled to the rights and benefits of section 363(k) of the Bankruptcy Code and, subject to and

16

upon entry of the Final Order, the DIP Secured Parties and the Foris Prepetition Secured Lenders shall be entitled to credit bid their respective secured claims in connection with any sale of the DIP Collateral.

I.    _Good Cause Shown; Best Interest_. Good cause has been shown for entry of this Interim Order, and entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing business and enhance the value of the Debtors' estates and assets. Absent granting the relief sought by this Interim Order, the Debtors' estates will be immediately and irreparably harmed.

J.    _Immediate Entry_. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2), (c)(2), and 6003. Absent granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed as they will have no ability to pay employees or suppliers, honor contractual obligations, or otherwise maintain operations and thus would be forced to liquidate. Entry into the DIP Facility and the use of Prepetition Collateral (including Cash Collateral), in accordance with this Interim Order and the DIP Documents are therefore in the best interests of the Debtors' estates and consistent with the Debtors' sound exercise of their fiduciary duties.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

DOCS_NY:48169.5 03703/001

**IT IS HEREBY ORDERED THAT**:

1.     *DIP Facility Approved on Interim Basis*. The DIP Motion is granted as set forth herein on an interim basis, and the use of Cash Collateral on an interim basis is authorized, subject to the terms of this Interim Order.

2.     *Objections Overruled*. Any objections, reservations of rights, or other statements with respect to entry of the Interim Order, to the extent not withdrawn or resolved, are overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

3.     *Authorization of the DIP Facility and the DIP Documents*.

(a)     The Debtors are hereby immediately authorized and empowered to execute, deliver, enter into, and perform all of their obligations under the DIP Documents, and such additional documents, instruments, certificates and agreements as may be reasonably required or requested by the DIP Secured Parties to implement the terms or effectuate the purposes of this Interim Order and the DIP Documents.  In addition, the Debtors are authorized and empowered to cause the non-Debtor subsidiaries to enter into any DIP Documents.  To the extent not entered into as of the date hereof, the Debtors and the DIP Secured Parties shall negotiate the DIP Documents in good faith, and in all respects such DIP Documents shall be, subject to the terms of this Interim Order and the Final Order, consistent with the terms of the DIP Credit Agreement and otherwise acceptable to the DIP Secured Parties.  Upon entry of this Interim Order, the Interim Order, the DIP Credit Agreement, and other DIP Documents shall govern and control the DIP Facility.  Upon entry of this Interim Order and until execution and delivery of all DIP Documents required by the DIP Secured Parties, the Debtors and the DIP Secured Parties shall be bound by this Interim Order and all executed DIP Documents shall govern and control the DIP Facility.  The DIP Secured Parties are hereby authorized to execute and enter into its respective obligations under the DIP

18

Documents, subject to the terms and conditions set forth therein and this Interim Order. Upon execution and delivery thereof, the DIP Documents shall constitute valid and binding obligations of the Debtors enforceable in accordance with their terms. To the extent there exists any conflict among the terms and conditions of the DIP Motion, the DIP Documents, and this Interim Order, the terms and conditions of this Interim Order shall govern and control. To the extent there is a conflict between the terms and conditions of the DIP Motion and the DIP Documents, the terms and conditions of the DIP Documents shall govern.

(b)        Upon entry of this Interim Order, the Borrowers are hereby authorized to borrow, and the Guarantors are hereby authorized to guaranty, borrowings up to an aggregate principal amount of the Initial Borrowings in DIP Loans, subject to the terms of the DIP Credit Agreement and in accordance with this Interim Order.

(c)        In accordance with the terms of this Interim Order and the DIP Documents, proceeds of the DIP Loans shall be used solely for the purposes permitted under the DIP Documents and this Interim Order, and in accordance with the Budget (subject to Permitted Variances as set forth in this Interim Order and the DIP Documents).

(d)        In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized, and the Automatic Stay imposed by section 362 of the Bankruptcy Code is hereby lifted to the extent necessary to allow each Debtor, to perform all acts and to make, execute, and deliver all instruments and documents (including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby, or the DIP Credit Agreement), and to pay on the DIP Termination Date (as defined in the DIP Credit Agreement) all fees (including all amounts owed to the DIP Lenders and the DIP Agent under the DIP Documents), that may be reasonably required or necessary for the Debtors'

DOCS_NY:48169.5 03703/001

performance of their obligations under the DIP Facility including, without limitation:

(1)  the execution, delivery, and performance of the DIP Documents, including, without limitation, the DIP Credit Agreement, any security and pledge agreement, and any mortgage to the extent contemplated thereby;

(2)  the execution, delivery, and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Documents (in each case in accordance with the terms of the applicable DIP Documents and in such form as the Debtors and the DIP Secured Parties may agree), it being understood that no further approval of the Court shall be required for amendments, waivers, consents, or other modifications to and under the DIP Documents or the DIP Obligations that do not shorten the maturity of the extensions of credit thereunder or modify the commitments or the rate of interest or other amounts payable thereunder;

(3)  the non-refundable payment as of the DIP Termination Date to each of and/or on behalf of the DIP Secured Parties, as applicable, of the fees referred to in the DIP Documents, including all fees and other amounts owed to the DIP Agent and the DIP Lenders; and

(4)  the performance of all other acts required under or in connection with the DIP Documents.

(e)  Upon entry of this Interim Order, the DIP Lenders shall have the right to sell, assign, or otherwise transfer any interest in the DIP Facility, or any of the obligations thereunder, or any portion thereof, and to syndicate the DIP Loans (or any portion thereof), to any person or persons selected by each DIP Lender in its sole discretion and subject to the terms of the

20

DIP Credit Agreement.

(f)    Without the prior written consent of the DIP Lender, the Borrowers shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral or interest in the DIP Facility, except as may be expressly permitted by the DIP Documents and this Interim Order.

(g)    The Guarantors hereby are authorized and directed to jointly, severally, and unconditionally guarantee, and upon entry of this Interim Order shall be deemed to have guaranteed, in full, all of the DIP Obligations of the Borrowers.

(h)    *DIP Obligations*.  Upon entry of this Interim Order and the execution of the DIP Documents, the DIP Obligations and the DIP Liens shall constitute valid, binding, and non-avoidable obligations of the Borrowers and Guarantors, enforceable against the Borrowers or Guarantors or their estates in accordance with the terms of the DIP Documents and this Interim Order, and any successors thereto, including and trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases").  Upon execution and delivery of the DIP Documents, the DIP Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Borrowers or Guarantors to any of the DIP Secured Parties under, or secured by, the DIP Documents or this Interim Order, including all principal, interest, costs, fees, expenses, premiums, indemnities and other amounts under the DIP Documents.  No obligation, payment, transfer, or grant of security under the DIP Credit Agreement, the other DIP Documents, or this Interim Order to the DIP Secured Parties shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any

21

applicable law (including without limitation, under sections 502(d), 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, or counterclaim. All DIP Obligations shall be allowed claims against the Debtors' estates without the need to file a proof of claim.

    4.    *Budget and Variance Reporting*.

    (a)    The Initial Budget, covering the first 60 days of these Chapter 11 Cases, shall be approved pursuant to this Interim Order. The Debtors shall thereafter prepare an updated Budget which shall be approved pursuant to the Final Order. By 5:00 p.m. Pacific Time on the date that is two weeks after the date the Final Order approving the updated Budget is entered (or such date as mutually agreed in writing (email being sufficient) by the Debtors and DIP Secured Parties), and every two weeks thereafter, the Debtors shall prepare and provide the DIP Secured Parties with an updated Budget. The DIP Agent, in its reasonable discretion, shall have the right to approve or object to any such updated Budget by providing the Borrowers specific notice thereof within three (3) business days after the delivery by the Borrowers of any such update or amendment ("Updated Budget Notice Deadline"). To the extent the DIP Agent objects to the updated Budget by the Updated Budget Notice Deadline, the then existing Budget shall continue to constitute the applicable Budget until such time as an update or amendment is approved by the DIP Agent.

    (b)    By 5:00 p.m. Pacific Time on August 16, 2023, and then on Wednesday of every week thereafter, the Debtors shall deliver to the DIP Agent a Budget variance report and reconciliation (the "Approved Budget Variance Report") comparing on a line item by line item basis: (x) total receipts for such period to total receipts for such period as set forth in the Budget on a weekly and cumulative basis; (y) total disbursements for such period to total

22

disbursements for such period as set forth in the Budget on a weekly and cumulative basis; together with a statement certifying compliance with the Permitted Variances (as defined herein) for such period (each a "Measuring Period") and explaining in reasonable detail any Material Variance (as defined herein) (each such report, a "Variance Report," which shall be in a form satisfactory to the DIP Agent. For purposes of each Measuring Period, the Borrowers shall calculate on a line item by line item basis: (x) the numerical difference between total receipts for such period to total receipts for such period as set forth in the Budget for the then applicable week and on a cumulative basis (the "Receipts Variance"), and the percentage such Receipts Variance (as an absolute amount) is of the applicable week and cumulative basis budgeted amount for receipts for such Measuring Period (the "Receipts Variance Percentage") and (y) the numerical amount by which total disbursements for such Measuring Period are greater than total disbursements, respectively, on a line item by line item basis, for such Measuring Period as set out in the Budget for the then applicable week and on a cumulative basis for such Measuring Period (the "Disbursements Variance"), and the percentage such Disbursements Variance (as an absolute amount) is of the applicable week and cumulative budgeted amount for disbursements for such Measuring Period (the "Disbursements Variance Percentage"). For purposes of this Interim Order, (w) "receipts" shall not include any Initial Borrowing or Subsequent Borrowing under the DIP Facility or any proceeds from the sale of DIP Collateral; (x) the calculation of the Disbursements Variance shall exclude any amounts in the Budget related to professional fees for the Debtors and the Committee, which, at all times, for purposes of any Initial Borrowing or Subsequent Borrowing under the DIP Facility, shall not exceed amounts set forth in the then approved Budget, (y) a "Material Variance" shall mean on a line item by line item basis with respect to each Measuring Period either (i) a Receipts Variance Percentage greater than 15% or (ii) a Disbursements Variance Percentage

23

greater than 10%, and (z) "Permitted Variance" shall mean on a line item by line item basis with respect to each Measuring Period: (i) if the Receipts Variance is a negative number, the Receipts Variance Percentage shall not be greater than 25% measured on a four (4) week cumulative basis and (ii) if the Disbursements Variance is a positive number, the Disbursements Variance Percentage shall not be greater than (A) 20% measured on a two (2) week and cumulative basis and (B) 15% measured on a four (4) week and cumulative basis. For purposes hereof, "line item by line item" shall mean each line of the Budget (excluding any amounts in the Budget related to professional fees for the Debtors and the Committee); *provided*, *however*, for line items labeled "Other AP Disbursements", "InterCo disbursements for Goods", and "InterCo Loan", "line item by line item" shall be with references to the line items set forth in the supporting schedules provided to the DIP Secured Parties in connection with the Budget.

5.     *Access to Records*. The Debtors shall provide the advisors to the DIP Secured Parties with all reporting and other information required to be provided to the DIP Agent or DIP Lenders under the DIP Documents. In addition to, and without limiting, whatever rights to access the DIP Secured Parties have under the DIP Documents, upon reasonable notice to Debtors' counsel (email being sufficient), the Debtors shall permit representatives, agents, and employees of the DIP Secured Parties to have reasonable access to (i) inspect the Debtors' assets, and (ii) all information (including historical information and the Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the Debtors and other company advisors (during normal business hours), and the DIP Secured Parties shall be provided with access to all information they shall reasonably request, excluding any information for which confidentiality is owed to third parties, information subject to attorney client or similar privilege, or where such disclosure would not be permitted by any applicable requirements of law.

24

6. *Carve-Out*.

(a) *Priority of Carve-Out*. Subject to the terms and conditions contained in this Paragraph 6, each of the DIP Liens, DIP Superpriority Claims, Foris Liens, Foris Prepetition Obligations, Adequate Protection Liens, and Adequate Protection Superpriority Claims shall be subject and subordinate to payment of the Carve-Out. The Carve-Out shall have such priority over all assets of the Debtors, including any DIP Collateral, Prepetition Collateral, and any funds in the account into which the DIP Loans are funded. The Carve-Out shall not reduce or affect in any respect the obligations owing to the DIP Secured Parties or the Foris Prepetition Secured Lenders.

(b) *Definition of Carve-Out*. As used in this Interim Order, the "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iv) below); (ii) all reasonable fees and expenses up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) all obligations due and owing under any key employee incentive plan and retention plan consistent with the Budget, consented to by the DIP Agent, and approved by the Bankruptcy Court; (iv) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, and whether allowed before or after delivery of a Trigger Notice, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtors' Professionals") and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committees' Professionals" and, together with the Debtors' Professionals, the "Professional Persons"), but subject to the then Budget for each Professional Person, as approved by the DIP Agent, for the period of time from the Petition Date to the date of a Trigger Notice; and (v) Allowed

25

Professional Fees of the Debtors Professionals and Committee Professionals in an amount not to exceed $750,000 incurred after the delivery of a Trigger Notice (this clause (v), the "Carve-Out Cap"), less the amount of any prepetition retainers received by such Professional Persons and not previously returned or applied to Allowed Professionals Fees; *provided*, *however*, nothing herein shall be construed to impair any party's ability to object to court approval of the fees, expenses, reimbursement of expenses or compensation of the Debtors' Professionals or the Committees' Professionals. For purposes of this Paragraph 6, "Trigger Notice" shall mean a written notice delivered by the DIP Agent to the U.S. Trustee and counsel to the Debtors and Committee describing the Event of Default that is alleged to continue under the DIP Documents (or after the payment in full of the DIP Obligations, delivered by the Prepetition Lenders under the Foris Prepetition Secured Loan Agreements describing the reason for termination of the use of Cash Collateral).

(c)    *Carve-Out Account*. On the day on which a Trigger Notice is given by the DIP Agent, and prior to (and not conditioned upon, or subject to any delay on account of) the payment to any of the DIP Agent, DIP Lenders or the Foris Prepetition Secured Lenders on account of the DIP Obligations, the Foris Prepetition Obligations, any Adequate Protection Obligations (as defined herein), claims or liens, or otherwise, the Debtors shall immediately, and be authorized and required to, deposit, as soon as reasonably practicable, in a non-interest bearing trust fund account of the Debtors' general bankruptcy counsel for the benefit of Professional Persons not subject to the control of the DIP Agent, DIP Lenders or the Foris Prepetition Secured Lenders (the "Carve-Out Account"), an amount equal to the Carve-Out Cap. If any amounts remain in the Carve-Out Account after payment of Professional Persons in accordance with the Carve-Out (subject to the Budget), such amounts shall be returned to the DIP Agent and shall be subject to

26

the DIP Liens and Adequate Protection Liens; *provided* that to the extent the DIP Loans are indefeasibly paid in full at the time such amounts are to be returned, such amounts shall be returned to the Foris Prepetition Secured Lenders.  Prior to the date of delivery of a Trigger Notice, the Debtors shall be authorized to make weekly deposits into the Carve-Out Account in accordance with the Budget. Funds which are on deposit in the Carve-Out Account shall be available only to satisfy obligations benefitting from the Carve-Out, and the DIP Agent, DIP Lenders and the Foris Prepetition Secured Lenders, each on behalf of itself and the relevant secured parties, (i) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve-Out Account, (ii) shall subordinate their security interests and liens in the Carve-Out Account to the payment of the Allowed Professional Fees in accordance with the Carve-Out and the Carve-Out Cap, and shall only have a security interest upon, and shall only have a right of enforcement against, any residual interest in the Carve-Out Account available following satisfaction in full in cash of all obligations benefitting from the Carve-Out Account; and (iii) waive, and agree not to assert, any right of disgorgement with respect to the payment of the Allowed Professional Fees.

(d)　　*Trust Fund Amounts*. Notwithstanding the delivery and effectiveness of a Trigger Notice, the Debtors shall be entitled to use Cash Collateral to pay payroll expenses that have accrued through the date of the Trigger Notice and trust fund taxes that have accrued through the date of the Trigger Notice, each in an amount included in the Budget through the date of the Trigger Notice but which such amounts remain unpaid (the "Trust Fund Amounts").

(e)　　*Compensation and Reimbursement of Expenses*. Notwithstanding the foregoing, so long as no Carve-Out Trigger Notice has been issued by the DIP Agent, the Borrowers shall be permitted to pay compensation and reimbursement of expenses Allowed and payable under sections 330 and 331 of the Bankruptcy Code but solely to the extent such amounts

27

are incurred in accordance with and provide for in the Budget, as the same may be due and payable and otherwise allowed and payable by order of the Bankruptcy Court, and the same shall not reduce the Carve-Out amount.

(f)     *Payment of Allowed Professional Fees*. For the avoidance of doubt, the Carve-Out shall be secured by a senior perfected first lien on the DIP Collateral, including the Carve-Out Account, and the DIP Agent, DIP Lenders, and the Foris Prepetition Secured Lenders shall have no right to seek disgorgement of any Allowed Professional Fees paid and allowed by a final order, provided, however, that, in connection with the determination by the Bankruptcy Court of the Allowed Professional Fees, the DIP Agent, DIP Lenders and Foris Prepetition Secured Lenders agree that they will not challenge such allowance (or seek disgorgement) on account of any administrative claim, or super-priority claim, they may have or assert; provided, further, that all rights of the DIP Agent, DIP Lenders, and the Foris Prepetition Secured Lenders are expressly reserved with respect to the reasonableness and allowance of any fees and expenses of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.

(g)     *No Direct Obligation To Pay Allowed Professional Fees*. None of the DIP Agent, DIP Lenders, or the Foris Prepetition Secured Lenders shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code. Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent, the DIP Lenders, or the Foris Prepetition Secured Lenders, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

7.     _DIP Superpriority Claims_. Pursuant to, and to the extent provided by, section 364(c)(1) of the Bankruptcy Code, but subject to the Carve-Out, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors' estates (the "DIP Superpriority Claims") (without the need to file any proof of claim) with priority over any and all administrative expenses, Adequate Protection Claims, diminution claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 365, 503(b), 506(c), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code or otherwise, which allowed claims shall for the purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and which shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, including, without limitation, subject to entry of the Final Order, to the extent provided therein, any proceeds or property recovered in connection with the pursuit of claims or causes of action arising under chapter 5 of the Bankruptcy Code (the "Avoidance Actions Proceeds"), subject only to the payment of the Carve-Out.  Except as set forth in this Interim Order or the Final Order, no other superpriority claims shall be granted or allowed in these Chapter 11 Cases.

8.     _DIP Liens_.  As security for the DIP Obligations, effective and perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Agent or any DIP Lenders of, or over, any DIP Collateral, the following security interests and liens are hereby

29

granted by the Debtors to the DIP Agent, for the benefit of the DIP Secured Parties, subject to (x) the Permitted Liens (as defined in the DIP Credit Agreement) and (y) the Carve-Out (all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Lenders, pursuant to this Interim Order and the DIP Documents, the "DIP Liens"):

    (a)    *First Priority Lien on Unencumbered Property*. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, non-avoidable, automatically and properly perfected, first priority security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, and the proceeds, products, rents, and profits thereof, that, on or as of the Petition Date, is not subject to (i) a valid, perfected and non-avoidable lien or (ii) a valid and non-avoidable lien in existence as of the Petition Date that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, including, without limitation, any and all unencumbered cash of the Debtors and any investment of cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, goodwill, causes of action, insurance policies and rights, claims and proceeds from insurance, commercial tort claims and claims that may constitute commercial tort claims (known and unknown), chattel paper (including electronic chattel paper and tangible chattel paper), interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, equity interests of subsidiaries, joint ventures and other entities, wherever located, and the proceeds, products, rents and profits of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise (the "Prepetition Unencumbered Collateral"), in each case other

than the Avoidance Actions Proceeds (but, for the avoidance of doubt, subject to entry of the Final Order, to the extent provided therein, the Prepetition Unencumbered Collateral shall include the Avoidance Actions Proceeds).

(b)     *Liens Priming the Foris Liens*. Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, non-avoidable, automatically and properly perfected, first priority priming security interest in and lien upon the Prepetition Collateral, including, without limitation, all tangible and intangible prepetition and postpetition property of the Debtors subject to the Foris Liens, regardless of where located, regardless of whether or not any liens on such assets are voided, avoided, invalidated, lapsed, or unperfected (the "Priming Liens"), which Priming Liens shall prime in all respects the interests of the Foris Prepetition Secured Lenders arising from the current and future liens of the Foris Prepetition Secured Lenders (the "Primed Liens").  The Foris Prepetition Secured Lenders have consented to the Primed Liens.

(c)     *Liens Junior to Certain Other Liens*. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, non-avoidable, automatically and properly perfected, security interest in and lien upon all tangible and intangible prepetition and postpetition property of the Debtors that is subject to (i) valid, perfected and non-avoidable senior liens in existence immediately prior to the Petition Date (other than the Primed Liens) or (ii) valid and non-avoidable senior liens (other than the Primed Liens) in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date, as permitted by section 546(b) of the Bankruptcy Code (the "Other Encumbered Prepetition Collateral"), which shall be (x) immediately junior and subordinate to any valid, perfected and non-avoidable liens (other than the Primed Liens) in existence immediately prior to the Petition Date, and (y) any such valid

31

and non-avoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; *provided* that nothing in the foregoing clauses (i) and (ii) shall limit the rights of the DIP Secured Parties under the DIP Documents to the extent such liens are not permitted thereunder.  For the avoidance of doubt, the DIP Liens shall be junior and subordinate to any properly perfected first priority security interest in and lien upon any Other Encumbered Prepetition Collateral arising under that certain Loan and Security Agreement dated as of October 11, 2022, as amended and restated by that certain Amendment and Restatement Agreement dated as of December 12, 2022 (as further amended, restated, supplemented or otherwise modified from time to time, the "DSM LSA"), by and among Amyris, certain subsidiaries thereof as guarantors, and DSM Finance B.V. ("DSM"); and

(d)  *Liens Senior to Certain Other Liens.*  The DIP Liens shall not be (i) subject or subordinate to or made *pari passu* with (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (B) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Secured Parties, or (C) any intercompany or affiliate liens of the Debtors or its non-Debtor affiliates or security interests of the Debtors; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code granted after the date hereof.

9.  *Adequate Protection for the Foris Prepetition Secured Lenders.*  The Foris Prepetition Secured Lenders are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the

Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral (including Cash Collateral) in an amount equal to the aggregate diminution in the value as of the Petition Date of their interests in the Prepetition Collateral (including Cash Collateral), which diminution is as a result of, or arises from, or is attributable to, the sale, lease or use by the Debtors of the Prepetition Collateral, the priming of the Foris Liens by the DIP Liens pursuant to the DIP Documents and this Interim Order, the grant of any other lien under section 364 of the Bankruptcy Code or the stay of the Foris Prepetition Secured Lenders' rights under the Prepetition Collateral, the payment of any amounts under the Carve-Out or pursuant to this Interim Order, the Final Order or any other order of the Court or provision of the Bankruptcy Code or otherwise, and the imposition of the Automatic Stay ("Adequate Protection" and the resulting claims, "Adequate Protection Claims"). In consideration of the foregoing, the Foris Prepetition Secured Lenders are hereby granted the following as Adequate Protection for, and to secure repayment of an amount equal to such Adequate Protection Claims, and as an inducement to the Foris Prepetition Secured Lenders to consent to the priming of the Foris Liens and use of the Prepetition Collateral (including Cash Collateral) (collectively, the "Adequate Protection Obligations"):

(a)     *Prepetition Adequate Protection Liens*. The Foris Prepetition Secured Lenders are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements) in the amount of their Adequate Protection Claims, a valid, perfected replacement security interest in and lien upon all of the DIP Collateral (the "Adequate Protection Liens"), including upon entry of the Final Order, all Avoidance Actions Proceeds, in each case subject and subordinate only to (A) the DIP Liens, (B) the Carve-Out, and (C) Permitted Liens or any valid and non-avoidable senior liens (other than the Primed Liens) in

existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date. For the avoidance of doubt, the Adequate Protection Liens shall be junior and subordinate to any properly perfected first priority security interest in and lien upon any Other Encumbered Prepetition Collateral in favor of DSM under the DSM LSA.

(b)     *Adequate Protection Superpriority Claims*. The Foris Prepetition Secured Lenders are hereby granted, subject to the Carve-Out, an allowed superpriority administrative expense claim to the fullest extent provided by sections 503(b) and 507(b) of the Bankruptcy Code in each of the Chapter 11 Cases in an amount equal to the Adequate Protection Obligations that are not secured by the Adequate Protection Liens (the "Adequate Protection Superpriority Claims"). The Adequate Protection Superpriority Claims shall be ahead of and senior to any and all other administrative expense claims of any kind specified or ordered pursuant to any provision of the Bankruptcy Code, but junior to the DIP Superpriority Claims and subject to and subordinate to the Carve-Out and shall have recourse to and be payable from all prepetition or postpetition DIP Collateral, including, subject to entry of the Final Order, to the extent provided therein, any Avoidance Action Proceeds. The Foris Prepetition Secured Lenders shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Superpriority Claims under section 507(b) of the Bankruptcy Code granted hereunder unless and until the DIP Obligations have been indefeasibly paid in full.

(c)     *Adequate Protection Payments*. The Debtors are authorized and directed to pay, without the necessity of filing fee applications with, or seeking approval of, the Court or in compliance with the U.S. Trustee fee guidelines, all reasonable and documents fees, costs, and expenses of (i) Goodwin Procter LLP and Troutman Pepper Hamilton Sanders LLP, counsel to the Foris Prepetition Secured Lenders, (ii) CR3 Partners LLC, financial advisor to the Foris Prepetition

34

Secured Lenders, and (iii) any other professionals necessary to represent the interests of the Foris Prepetition Secured Lenders in connection with these Chapter 11 Cases whether arising on, prior to or after the Petition Date (all payments referenced herein, collectively, the "<u>Adequate Protection Payments</u>"); *provided* that all Adequate Protection Payments shall be deferred until the DIP Termination Date.

(d) <u>*Right to Seek Additional Adequate Protection*</u>. This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Foris Prepetition Secured Lenders to request further or alternative forms of Adequate Protection at any time or the rights of the Debtors or any other party to contest such request.

(e) <u>*Other Covenants*</u>. The Debtors shall (i) contemporaneously provide the Foris Prepetition Secured Lenders and the DIP Agent with all reports, documents and other information required to be delivered to the DIP Lenders and DIP Agent under the DIP Loan Documents and this Interim Order and (ii) use Cash Collateral in accordance with the Budget.

10. <u>*Reservation of Rights of the DIP Agent, DIP Lenders, and Foris Prepetition Secured Lenders*</u>. Subject in all cases to the Carve-Out, notwithstanding any other provision in this Interim Order or the DIP Documents to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of any of the Foris Prepetition Secured Lenders to seek any other or supplemental relief in respect of the Debtors including the right to seek additional Adequate Protection at and following the Final Hearing; (b) any of the rights of the DIP Secured Parties or the Foris Prepetition Secured Lenders under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of any of the DIP Secured Parties or the Foris Prepetition Secured Lenders to (i) request modification of the Automatic Stay of section 362 of the Bankruptcy Code, (ii) request

dismissal of any of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers in any of the Chapter 11 Cases, (iii) seek to propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Secured Parties or the Foris Prepetition Secured Lenders. The delay in or failure of the DIP Secured Parties and/or the Foris Prepetition Secured Lenders to seek relief or otherwise exercise their rights and remedies shall not constitute a waiver of any of the DIP Secured Parties' or the Foris Prepetition Secured Lenders' rights and remedies.

11. _Reservation of Certain Committee and Third Party Rights and Bar of Challenges and Claims_. The Debtors' Stipulations, admissions, agreements, waivers, and releases contained in this Interim Order, shall be binding upon the Debtors, their estates, and any of their respective successors (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors) in all circumstances and for all purposes. The Debtors' Stipulations, admissions, agreements, waivers, and releases contained in this Interim Order shall be binding upon all other parties in interest, including any Committee and any other person acting on behalf of the Debtors' estates, unless and to the extent such Committee or party in interest with requisite standing (in each case, to the extent requisite standing is obtained pursuant to an order of this Court entered prior to the expiration of the Challenge Period (as defined herein) and subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so) has timely and properly filed an adversary proceeding or contested matter (i) before 75 calendar days after entry of this Interim Order, each subject to further extension by written agreement of the Debtors, the DIP Agent, and the Foris Prepetition Secured Lenders, (in each case, a "Challenge Period" and the date of expiration of each Challenge Period being a

36

"Challenge Period Termination Date"); (ii) seeking to avoid, object to, or otherwise challenge the findings or Debtors' Stipulations regarding: (a) the validity, binding, legal, enforceability, allowance, amount, characterization, extent and priority as to Foris Prepetition Secured Lenders under the Foris Prepetition Secured Loan Agreements; (b) the validity, enforceability, allowability, priority, characterization, secured status, or amount of the Foris Prepetition Obligations; or (c) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances subordination, recharacterization, avoidance power claims under the Bankruptcy Code or applicable state or federal law, other avoidance power claims or other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Challenges") against the Foris Prepetition Secured Lenders or their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, or agents, and the respective successors and assigns thereof, in each case in their respective capacity as such (each, a "Representative" and, collectively, the "Representatives") in connection with any matters directly or indirectly related to, arising from, or connected with the Foris Prepetition Secured Loan Agreements, and Foris Prepetition Obligations, the Foris Liens, and the Prepetition Collateral, and the negotiation, implementation and facts and circumstances related to any of the foregoing and (iii) in which there is a final non-appealable order entered in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim, and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever waived, released, and barred, including any amended or additional claims that may or could have been asserted thereafter through an amended complaint under Fed. R. Civ. P. 15 or otherwise. If the Chapter 11 Cases convert to cases under chapter 7, or if a chapter 11 trustee

37

is appointed, in each case prior to the end of the Challenge Period, the Challenge Period shall be extended solely for the chapter 7 or chapter 11 trustee to 30 days after the respective appointment of any such trustee to the extent the Challenge Period had not expired prior the appointment of such trustee.  Upon the expiration of the Challenge Period Termination Date without the filing of a Challenge (or if any such Challenge is filed and overruled): (a) any and all such Challenges by any party (including the Committee, any chapter 11 trustee, and/or any examiner or other estate representative appointed or elected in these Chapter 11 Cases, and any chapter 7 trustee and/or examiner or other estate representative appointed or elected in any Successor Case) shall be deemed to be forever barred; (b) the Foris Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense, or avoidance for all purposes in these Chapter 11 Cases and any Successor Cases; (c) the Foris Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, enforceable and perfected secured claims, not subject to recharacterization, subordination, or avoidance; and (d) all of the Debtors' Stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, and all other waivers, releases, affirmations, and other stipulations regarding the validity, binding, legal, enforceability, allowance, amount, characterization, priority, and extent as to the Foris Prepetition Secured Lenders' claims, liens, and interests contained in this Interim Order shall be of full force and effect and forever binding upon the Debtors, the Debtors' estates, and all creditors, interest holders, and other parties in interest in these Chapter 11 Cases and any Successor Cases.  If any such adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules and remains pending and the Chapter 11 Cases are converted to a case under chapter 7, the chapter 7 trustee may continue to prosecute such adversary proceeding or contested matter on behalf of the Debtors' estates.  Furthermore, if any such

adversary proceeding or contested matter is timely and properly filed under the Bankruptcy Rules, the stipulations and admissions contained in this Interim Order, including the Debtors' Stipulations, shall nonetheless remain binding and preclusive on any Committee and any other person or entity except to the extent that such stipulations and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Challenge Period Termination Date. Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including, without limitation, any Committee appointed in the Chapter 11 Cases, requisite standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation any challenges (including a Challenge) with respect to the Foris Prepetition Secured Loan Agreements, the Foris Liens, and the Foris Prepetition Obligations, and a separate order of the Court conferring such requisite standing on any Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by such Committee or such other party-in-interest. Notwithstanding the foregoing, to the extent a motion seeking standing to commence a Challenge is timely filed and attaches a draft complaint setting forth the legal and factual bases of the proposed Challenge prior to the expiration of the Challenge Period and the Challenge Period expires before such motion is ruled upon by this Court, the Challenge Period will be tolled solely with respect to the Challenges asserted in the draft complaint until the earlier of (x) the thirtieth (30th) day following the filing of such motion (which may be extended by Court order or written agreement of the DIP Agent, Debtors and movant, in each case, to accommodate the Court's calendar) or (y) three (3) business days from the entry of an order ruling on such motion. If standing is denied by the Court, the Challenge Period shall be deemed to have expired with respect to such Challenges; *provided*, *however* nothing herein shall limit the Foris Prepetition Secured Lenders' right to seek an expedited ruling on any such motion.

39

12.     _DIP Termination Date_.  On the DIP Termination Date, (a) all DIP Obligations shall be immediately due and payable, and all commitments to extend credit under the DIP Facility will terminate; (b) all authority to use Cash Collateral shall cease; provided, however, that during the Remedies Notice Period (as defined below), the Debtors may use Cash Collateral to fund the Carve-Out and Trust Fund Amounts in accordance with the Budget (subject to the Permitted Variances); and (c) the DIP Secured Parties shall be otherwise entitled to exercise rights and remedies under the DIP Documents in accordance with Paragraph 15 of this Interim Order.

13.     _Events of Default_. The occurrence of any of the following events, unless waived by the DIP Agent in accordance with the terms of the DIP Documents, shall constitute an event of default (collectively, the "Events of Default"): (a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order; (b) the failure of the Debtors to comply with the Milestones (as defined herein); or (c) the occurrence of an "Event of Default" under the DIP Credit Agreement.

14.     _Milestones_. The failure of the Debtors to comply with any of the Milestones (as defined in, and set forth in, Section 7.25 of the DIP Credit Agreement) shall (a) constitute an Event of Default under (i) the DIP Credit Agreement and (ii) this Interim Order, (b) result in the automatic termination of the Debtors' authority to use Cash Collateral under this Interim Order, and (c) permit the DIP Agent, subject to the terms of Paragraph 15 hereof (as applicable), to exercise the rights and remedies provided for in this Interim Order and the DIP Documents.

15.     _Rights and Remedies upon Event of Default_. Immediately upon the occurrence and during the continuation of an Event of Default, notwithstanding the Automatic Stay, which is lifted with respect to the provisions of this paragraph, without any application, motion, or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order, the DIP

Agent may declare (any such declaration shall be referred to herein as a "Termination Declaration") (i) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtors to the extent any such commitment remains under the DIP Facility, (iii) the termination of the DIP Facility and the DIP Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) the termination of the Debtors' ability to use Cash Collateral, except for payment of the Trust Fund Amounts and funding of the Carve-Out Account and any obligations to fund the Carve-Out through the delivery of the Carve-Out Trigger Notice to the Borrowers (the date which is the earliest to occur of any such date a Termination Declaration is delivered and the DIP Termination Date shall be referred to herein as the "Termination Date" and the remedies set forth in clauses (i) through (v) hereof, the "Automatic Remedies"). The Termination Declaration shall not be effective until notice has been provided by electronic mail (or other electronic means) to counsel to the Debtors, counsel to any Committee, and the U.S. Trustee.

16. With respect to all rights and remedies of the DIP Agent, the DIP Lenders and the Foris Prepetition Secured Lenders other than the Automatic Remedies, the Automatic Stay in the Chapter 11 Cases otherwise applicable to the DIP Agent, the DIP Lenders, and the Foris Prepetition Secured Lenders is hereby modified so that five (5) business days after the date a Termination Declaration is delivered (the "Remedies Notice Period"), the DIP Agent shall be entitled to exercise all of its rights and remedies (other than the Automatic Remedies) in accordance with the DIP Documents and this Interim Order to satisfy the DIP Obligations, DIP Liens, and Adequate Protection Obligations subject to the Carve-Out. During the Remedies Notice Period, the Debtors, the Committee (if appointed), and/or any party in interest shall be entitled to

41

seek an emergency hearing within the Remedies Notice Period with the Court. Upon expiration

of the Remedies Notice Period, the DIP Agent and the Foris Prepetition Secured Lenders shall be

permitted to exercise all remedies set forth herein, and in the DIP Documents, the Foris Prepetition

Secured Loan Agreements and as otherwise available at law without further order of or application

or motion to this Court consistent with this Interim Order; *provided* that the Foris Prepetition

Secured Lenders shall be permitted to exercise remedies to the extent available solely with respect

to the Debtors' use of Cash Collateral and the Adequate Protection Obligations. In the event the

Debtors request a hearing (after providing no less than five (5) business days' prior notice), at

which the Debtors seek to prevent the DIP Agent from exercising any of its rights and remedies

that arise after an Event of Default (except for those provided for in the DIP Agent remedies), the

sole issue before the Bankruptcy Court at such hearing shall be whether an Event of Default has

occurred and has not been waived. No other issue or argument shall be relevant to any opposition

to enforcement of the DIP Agent's rights.

17. *Limitation on Charging Expenses Against Collateral*. No expenses of

administration of the Chapter 11 Cases or any future proceeding that may result therefrom,

including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be

charged against or recovered from (a) the Prepetition Collateral or the Foris Prepetition Secured

Lenders, subject to entry of the Final Order, to the extent provided therein, or (b) the DIP Collateral

(except to the extent of the Carve-Out), the DIP Agent or the DIP Lenders, in each case, pursuant

to sections 105(a) or 506(c) of the Bankruptcy Code or any similar principle of law or equity,

without the prior written consent of the DIP Agent, the DIP Lenders, and the Foris Prepetition

Secured Lenders, as applicable, and no such consent shall be implied from any other action,

inaction, or acquiescence by the DIP Agent, the DIP Lenders, or the Foris Prepetition Secured Lenders.

18.     _Use of Cash Collateral_. The Debtors are hereby authorized to use all Cash Collateral of the Foris Prepetition Secured Lenders, but solely for the purposes set forth in this Interim Order and in accordance with the Budget (subject to Permitted Variances as set forth in this Interim Order and the DIP Documents) including, without limitation, to make payments on account of the Adequate Protection Obligations provided for in this Interim Order, from the date of this Interim Order through and including the Termination Date.

19.     _Expenses and Indemnification_.

(a)     The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Documents as such amounts become due and without need to obtain further Court approval, including, without limitation, all fees and other amounts owed to the DIP Lenders or the DIP Agent, the reasonable and documented fees and disbursements of counsel and other professionals to the extent set forth in Paragraphs 3(d) and 9(c) of this Interim Order, whether or not such fees arose before or after the Petition Date, all to the extent provided in this Interim Order or the DIP Documents; _provided that_ payment of such fees, expenses, and other disbursements shall be deferred to the DIP Termination Date; and _further provided that_ payment shall be made after at least ten (10) days' notice (which may be via email) of an invoice has been provided to the Debtors, the U.S. Trustee, and the Committee.

(b)     The Foris Prepetition Secured Lenders and the DIP Secured Parties have acted in good faith and without negligence, misconduct, or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating,

implementing, documenting, or obtaining requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Obligations, any challenges or objections to the DIP Facility or the use of Cash Collateral, the DIP Documents, the Interim Order, and all other documents related to and all transaction contemplated by the foregoing.  Accordingly, without limitation to any other right to indemnification, the DIP Secured Parties and their Representatives and the Foris Prepetition Secured Lenders and their Representatives shall be and hereby are indemnified (as applicable) as provided in the DIP Documents.  The Debtors agree that no exception or defense in contract, law, or equity exists as of the date of this Interim Order to any obligation set forth, as the case may be, in this Paragraph 19 or in the DIP Documents to indemnify and/or hold harmless the DIP Secured Parties, and the Foris Prepetition Secured Lenders and any such defenses that may be in existence as of the date of this Interim Order are hereby waived, except in the case of bad faith, fraud, or gross negligence.

20.     _No Third Party Rights_.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

21.     _Section 507(b) Reservation_.  Subject to the Carve-Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the Adequate Protection provided to the Foris Prepetition Secured Lenders is insufficient to compensate for any diminution in the value as of the Petition Date of their interests in the Prepetition Collateral (including Cash Collateral) during the Chapter 11 Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Foris Prepetition Secured Lenders that the Adequate Protection granted herein does in fact adequately protect any of the

44

Foris Prepetition Secured Lenders against any diminution in the value as of the Petition Date of their respective interests in the Prepetition Collateral (including the Cash Collateral).

22.     _Insurance_. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf of the DIP Secured Parties) and the Foris Prepetition Secured Lenders, shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

23.     _No Waiver for Failure to Seek Relief_. The failure or delay of the DIP Agent or the DIP Lenders to exercise rights and remedies under this Interim Order, the DIP Documents, or applicable law, as the case may be, shall not constitute a waiver of their respective rights hereunder, thereunder, or otherwise.

24.     _Perfection of the DIP Liens and Adequate Protection Liens_.

(a)     Without in any way limiting the automatic validity and effective perfection of the DIP Liens and Adequate Protection Liens granted herein, the DIP Agent, the DIP Lenders, and the Foris Prepetition Secured Lenders are hereby authorized, but not required, to file or record (and to execute in the name of the Borrowers and Guarantors and the Foris Prepetition Secured Lenders (as applicable), as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, patent filings, copyright filings, other intellectual property filings, mortgages, deposit account control agreements, notices of lien or similar instruments in any jurisdiction, or to take possession of or control over cash or securities, or to amend or modify security documents, or to subordinate existing liens and any other similar action or action in connection therewith or take any other action in order to document, validate and perfect the liens and security interests granted hereunder (the

"Perfection Actions").  Whether or not the DIP Agent, on behalf of the DIP Secured Parties, or the Foris Prepetition Secured Lenders shall take such Perfection Actions, the liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not, subject to challenge, dispute, or subordination, at the time and on the date of entry of this Interim Order. If the DIP Agent and the Foris Prepetition Secured Lenders determine to take any Perfection Actions, the Debtors shall cooperate and assist in any such execution and/or filings as reasonably requested by the DIP Agent, and the Automatic Stay shall be modified to allow such Perfection Actions to be taken.

(b)    A certified copy of this Interim Order may, at the direction of the DIP Agent, and/or the Foris Prepetition Secured Lenders, be filed with or recorded in filing or recording offices by the DIP Agent and the Foris Prepetition Secured Lenders in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording; *provided*, *however*, that notwithstanding the date of any such filing, the date of such perfection shall be the date of this Interim Order.

(c)    Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords, licensor, contract counterparty  or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, license, contracts, or other rights, or the proceeds thereof, or other collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, subject to applicable law. Any such provision shall have no force and effect with respect to the granting of the DIP Liens the Adequate Protection Liens on such leasehold interest, license, contract or

46

other rights, or the proceeds thereof, of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Credit Agreement or this Interim Order, subject to applicable law.

25. _Credit Bidding_. The DIP Agent shall have the right to credit bid up to the full amount of the DIP Obligations in any sale of the DIP Collateral. The Foris Prepetition Secured Lenders shall have the right to credit bid (either directly or through one or more acquisition vehicles), up to the full amount of the Foris Prepetition Obligations pursuant to section 363(k) of the Bankruptcy Code, subject to the rights and limitations set forth in Paragraphs 11 and 27 of this Interim Order, without the need to further Court order authorizing the same and whether any such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

26. _Preservation of Rights Granted Under this Interim Order_.

(a) Unless and until all DIP Obligations are indefeasibly paid in full, in cash, and all commitments to extend credit under the DIP Facility are terminated, unless the DIP Lenders agree otherwise, the Foris Prepetition Secured Lenders shall: (i) have no right to and shall take no action to foreclose upon, or recover in connection with, the liens granted thereto pursuant to the Foris Prepetition Secured Loan Agreements or this Interim Order, or otherwise seek to exercise or enforce any rights or remedies against such DIP Collateral; and (ii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral, except as set forth in Paragraph 24 herein.

(b) In the event this Interim Order or any provision hereof is vacated, reversed, or modified on appeal or otherwise, any liens or claims granted to the DIP Secured Parties or the

Foris Prepetition Secured Lenders hereunder arising prior to the effective date of any such vacatur, reversal, or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Foris Prepetition Secured Lenders shall be entitled to all the rights, remedies, privileges, and benefits afforded in section 364(e) of the Bankruptcy Code.

(c)     Unless and until all DIP Obligations, Foris Prepetition Obligations, and Adequate Protection Payments are indefeasibly paid in full, in cash, and all commitments to extend credit under the DIP Facility are terminated, the Debtors irrevocably waive the right to seek and shall not seek or consent to, directly or indirectly (i) except as permitted under the DIP Documents or, if not provided for therein, with the prior written consent of the DIP Agent and (x) any modification, stay, vacatur, or amendment of this Interim Order or (y) a priority claim for any administrative expense or unsecured claim against any of the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of the kind specified in sections 503(b), 507(a), or 507(b) of the Bankruptcy Code) in any of the Chapter 11 Cases, *pari passu* with or senior to the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, or the Foris Prepetition Obligations, or (z) any other order allowing use of the DIP Collateral; (ii) except as permitted under the DIP Documents (including the Carve-Out), any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, the Adequate Protection Liens or the Foris Liens, as applicable; (iii) the use of Cash Collateral for any purpose other than as permitted in the DIP Documents and this Interim Order; (iv) except as set forth in the DIP Documents, the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness) to any creditor of any Debtor; (v) an order converting or dismissing any of the Chapter 11 Cases; (vi) an

order appointing a chapter 11 trustee in any of the Chapter 11 Cases; or (vii) an order appointing

an examiner with enlarged powers in any of the Chapter 11 Cases.

(d)     Notwithstanding any order dismissing any of the Chapter 11 Cases entered

at any time, (x) the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the

Adequate Protection Obligations and the Adequate Protection Superpriority Claims, and the other

administrative claims granted pursuant to this Interim Order, shall continue in full force and effect

and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and

Adequate Protection Obligations are indefeasibly paid in full, in cash (and such DIP Liens, DIP

Superpriority Claims, Adequate Protection Liens, Adequate Protection Obligations and Adequate

Protection Superpriority Claims, and the other administrative claims granted pursuant to this

Interim Order, shall, notwithstanding such dismissal, remain binding on all parties in interest); and

(y) to the fullest extent permitted by law the Court shall retain jurisdiction, notwithstanding such

dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause

(x) above.

(e)     Except as expressly provided in this Interim Order or in the DIP Documents,

the DIP Liens, the DIP Obligations, and the Adequate Protection Obligations, and all other rights

and remedies of the DIP Agent, the DIP Lenders, and the Foris Prepetition Secured Lenders

granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not

be modified, impaired, or discharged by (i) the entry of an order converting any of the Chapter 11

Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, terminating the joint

administration of these Chapter 11 Cases or by any other act or omission, (ii) the entry of an order

approving the sale of any Prepetition Collateral or DIP Collateral pursuant to section 363(b) of the

Bankruptcy Code, or (iii) the entry of an order confirming a chapter 11 plan in any of the Chapter

49

11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations. The terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases, in any Successor Cases if these Chapter 11 Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code. The DIP Liens, the DIP Obligations and the Adequate Protection Obligations and all other rights and remedies of the DIP Secured Parties and the Foris Prepetition Secured Lenders granted by the provisions of this Interim Order shall continue in full force and effect until the DIP Obligations and the Adequate Protection Obligations are indefeasibly paid in full, in cash (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the DIP Lenders and the DIP Agent).

(f) Other than as set forth in this Interim Order, neither the DIP Liens nor the Adequate Protection Liens shall be made subject to or *pari passu* with any lien or security interest granted in any of the Chapter 11 Cases or arising after the Petition Date, and neither the DIP Liens nor the Adequate Protection Liens shall be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551.

27. *Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral*. Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral (including Cash Collateral) or any portion of the Carve-Out, may be used directly or indirectly, including, without limitation through reimbursement of professional fees of any non-Debtor party (a) in connection with the investigation, threatened initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation or challenges (i) against any of the DIP Secured Parties, the Foris Prepetition Secured Lenders, or their Representatives, or any action purporting to do the foregoing

in respect of the DIP Obligations, the DIP Liens, Foris Prepetition Obligations, and/or the Adequate Protection Obligations or (ii) challenging the validity, binding, legal, enforceability, allowance, amount, characterization, extent and priority or asserting any defense, counterclaim or offset with respect to, the DIP Obligations, the Adequate Protection Obligations, the Foris Prepetition Secured Loans and/or the liens, claims, rights, or security interests securing or supporting the DIP Obligations and the Adequate Protection Obligations granted under this Interim Order, the Final Order, the DIP Documents or the Foris Prepetition Secured Loan Agreements in respect of the Foris Prepetition Secured Loans, including, in the case of each (i) and (ii), without limitation, for lender liability, recharacterization, subordination, derivative claims, or pursuant to section 105, 510, 544, 547, 548, 549, 550 or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise (provided that, notwithstanding anything to the contrary herein, the proceeds of the DIP Loans and/or DIP Collateral (including Cash Collateral) may be used by the Committee to investigate (but not to prosecute or initiate the prosecution of, including the preparation of any complaint or motion on account of) (A) the claims and liens of the Foris Prepetition Secured Lenders and (B) potential claims, counterclaims, causes of action or defenses against the Foris Prepetition Secured Lenders (together, the "Investigation"), up to an aggregate cap of no more than $50,000 (the "Investigation Budget"), (b) to prevent, hinder, or otherwise delay or interfere with the Foris Prepetition Secured Lenders', or the DIP Agent's, or the DIP Secured Parties', as applicable, enforcement or realization on the Foris Prepetition Obligations, Foris Liens, Prepetition Collateral, Adequate Protection Obligations, DIP Obligations, DIP Liens, DIP Collateral, and the liens, claims and rights granted to such parties under the Interim Order or Final Order, as applicable, each in accordance with the DIP Documents, the Foris Prepetition Secured Loan Agreements or this Interim Order; (c) to seek to modify any of the rights and remedies

granted to the Foris Prepetition Secured Lenders, the DIP Agent or the DIP Lenders under this Interim Order, the Foris Prepetition Secured Loan Agreements or the DIP Documents, as applicable; (d) to apply to the Court for authority to approve superpriority claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Obligations, and Adequate Protection Obligations, or (e) to pay or to seek to pay any amount on account of any claims arising prior to the Petition Date unless such payments are approved or authorized by the Court, agreed to in writing by the DIP Lenders, expressly permitted under this Interim Order or permitted under the DIP Documents (including the Budget, subject to the Permitted Variance), in each case unless all DIP Obligations, Foris Prepetition Secured Loans, Adequate Protection Obligations, and claims granted to the DIP Agent, DIP Lenders and Foris Prepetition Secured Lenders under this Interim Order, have been refinanced or paid in full in cash or otherwise agreed to in writing by the DIP Secured Parties and the Foris Prepetition Secured Lenders.

28.     _Conditions Precedent_. No DIP Lenders shall have any obligation to make any DIP Loan under the respective DIP Documents unless all of the conditions precedent to the making of such extensions of credit under the applicable DIP Documents have been satisfied in full or waived in accordance with such DIP Documents.

29.     _Binding Effect; Successors and Assigns_. The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including without limitation, the DIP Secured Parties, the Foris Prepetition Secured Lenders, any Committee appointed in these Chapter 11 Cases, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter

appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties and the Foris Prepetition Secured Lenders; *provided* that, except to the extent expressly set forth in this Interim Order, the Foris Prepetition Secured Lenders shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors. In determining to make any loan (whether under the DIP Credit Agreement, a promissory note or otherwise) to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Secured Parties and the Foris Prepetition Secured Lenders shall not (i) be deemed to be in control of the operations of the Debtors, or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

30. *Limitation of Liability*. Subject to entry of the Final Order, to the extent provided therein, in determining to make any loan under the DIP Documents, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents, the DIP Secured Parties and the Foris Prepetition Secured Lenders shall not, solely by reason thereof, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute). Furthermore, nothing in this Interim Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the

imposition upon the DIP Secured Parties, or the Foris Prepetition Secured Lenders of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

31. _No Requirement to File Claim for DIP Obligations_. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, the DIP Secured Parties and the Foris Prepetition Secured Lenders shall not be required to file any proof of claim or request for payment of administrative expenses with respect to any of the DIP Obligations, Adequate Protection Obligations, all of which shall be due and payable in accordance with the DIP Documents without the necessity of filing any such proof of claim or request for payment of administrative expenses, and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, binding, legal, enforceability, allowance, amount, characterization, extent and priority as to any of the DIP Documents or of any indebtedness, liabilities, or obligations arising at any time thereunder or under this Interim Order, or prejudice or otherwise adversely affect the DIP Secured Parties' or the Foris Prepetition Secured Lenders' respective rights, remedies, powers, or privileges under any of the DIP Documents, this Interim Order, or applicable law. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

32. _No Requirement to File Claim for Foris Prepetition Obligations_. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under section 503(b) of the Bankruptcy Code, no Foris

DOCS_NY:48169.5 03703/001

Prepetition Secured Lender shall be required to file any proof of claim or request for payment of administrative expenses with respect to any of the Foris Prepetition Obligations; and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, binding, legal, enforceability, allowance, amount, characterization, extent and priority as to any of the Foris Prepetition Secured Loan Agreements or of any indebtedness, liabilities, or obligations arising at any time thereunder or prejudice or otherwise adversely affect the Foris Prepetition Secured Lenders' rights, remedies, powers, or privileges under any of the Foris Prepetition Secured Loan Agreements, this Interim Order, or applicable law. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

33.    *No Marshaling*.  In no event shall (a) the DIP Agent or the DIP Secured Parties with respect to the DIP Collateral and the DIP Obligations, or the Foris Prepetition Secured Lenders with respect to the Adequate Protection Obligations, or (b) the Foris Prepetition Secured Lenders with respect to the Prepetition Collateral or the Foris Prepetition Obligations, subject to entry of a Final Order, to the extent provided therein, in each case, be subject to the equitable doctrine of "marshaling" or any other similar doctrine.

34.    *Equities of the Case*. Subject to entry of the Final Order, to the extent provided therein, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Foris Prepetition Secured Lenders with respect to proceeds, product, offspring, or profits of any of the Prepetition Collateral.

35.    *Joint and Several Liability*. Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however,

that the Debtors and the Guarantors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and of the DIP Documents.

36.     _Discharge_. Subject to entry of the Final Order, to the extent provided therein, the DIP Obligations and the obligations of the Debtors with respect to the Adequate Protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted), on or before the effective date of such plan of reorganization, or each of the DIP Secured Parties and the Foris Prepetition Secured Lenders as applicable, has to otherwise agreed in writing; provided, that the DIP Facility, at the sole option of the DIP Lenders may be continued and/or converted into an exit term facility financing, subject to and in accordance with the DIP Credit Agreement.

37.     _Payments Held In Trust_. Except as expressly permitted in this Interim Order or the DIP Documents, and subject to the Carve-Out, in the event that any person or entity receives any payment on account of a security interest in DIP Collateral, receives any DIP Collateral or any proceeds of the DIP Collateral, or receives any other payment with respect thereto from any other source prior to all DIP Obligations, Adequate Protection Obligations, and Foris Prepetition Obligations, in accordance with the DIP Documents and the Foris Prepetition Secured Loan Agreements, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of the DIP Collateral in trust for the benefit of the DIP Secured Parties and the Foris Prepetition Secured Lenders and shall immediately turn over such proceeds to them in accordance with their relative priority, or as otherwise instructed by this Court, for application in

56

accordance with the DIP Credit Agreement, the Foris Prepetition Secured Loan Agreements and this Interim Order.

38.  *Final Hearing*. The Final Hearing on the Motion shall be held on [DATE], at [TIME], prevailing Eastern Time. Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on [DATE] and shall be served on: (a) proposed counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, Wilmington, DE 19801, Attn: Richard M. Pachulski, Esq. (rpachulski@pszjlaw.com) and Debra I. Grassgreen, Esq. (dgrassgreen@pszjlaw.com); (c) counsel to the DIP Lenders, DIP Agent and the Foris Prepetition Secured Lenders, Goodwin Procter LLP, 620 Eighth Avenue, New York, NY 10018, Attn: Michael H. Goldstein, Esq. (mgoldstein@goodwinlaw.com) and Alexander Nicas, Esq. (anicas@goodwinlaw.com); (d) co-counsel to the DIP Lenders, the DIP Agent and the Foris Prepetition Secured Lenders, Troutman Pepper Hamilton Sanders LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899; Attn: David M. Fournier, Esq. (david.fournier@troutman.com); (e) the Office of the U.S. Trustee for the District of Delaware (Attn. John Schanne); and (f) counsel to the Committee (if any). In the event no objections to entry of the Final Order on the Motion are timely received, this Court may enter such Final Order without need for the Final Hearing.

39.  *Effect of this Interim Order*. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon execution hereof.

40.  *Retention of Jurisdiction*. The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Interim Order.

41.     _Reservations to Final Order_.  Notwithstanding language in this Interim Order that provides that certain relief is subject to or conditioned upon entry of a Final Order, such provisions are not intended to be automatically effective and are without prejudice to rights of parties in interest to object to the relief on a final basis and the Court's authority to determine the final relief.

DOCS_NY:48169.5 03703/001

## **Exhibit A**

## **DIP Credit Agreement**

**Exhibit B**

**Budget**

DOCS_NY:48569.8 76803703/001

**EXHIBIT 2**

Plan Scenario Budget through December 31, 2023

DOCS_NY:48137.7 03703/001

Exhibit 2 - Plan Scenario

**Amyris, Inc., et al.**

| $ thousands | Week 1 14-Aug | Week 2 21-Aug | Week 3 28-Aug | Week 4 4-Sep | Week 5 11-Sep | Week 6 18-Sep | Week 7 25-Sep | Week 8 2-Oct | Week 9 9-Oct | Week 10 16-Oct | Week 11 23-Oct | Week 12 30-Oct | Week 13 6-Nov | Week 14 13-Nov | Week 15 20-Nov | Week 16 27-Nov | Month Dec-23 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Operating cash flows* | | | | | | | | | | | | | | | | | | |
| Receipts | 2,631 | 1,280 | 3,440 | 3,191 | 3,191 | 2,408 | 2,574 | 2,773 | 2,683 | 2,683 | 2,683 | 6,091 | 7,256 | 7,256 | 7,256 | 4,864 | 6,746 | 69,006 |
| Other receipts | - | - | - | - | - | 480 | - | - | - | - | - | - | - | 2,000 | - | - | - | 2,480 |
| Total Receipts | 2,631 | 1,280 | 3,440 | 3,191 | 3,191 | 2,888 | 2,574 | 2,773 | 2,683 | 2,683 | 2,683 | 6,091 | 7,256 | 9,256 | 7,256 | 4,864 | 6,746 | 71,486 |
| | | | | | | | | | | | | | | | | | | |
| Payments per First day orders | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | - | - | - | - | - | - | - | - | - | - | - | (15,000) |
| Other AP disbursements | (2,343) | (2,343) | (2,343) | (2,059) | (5,468) | (5,510) | (5,141) | (5,220) | (5,215) | (5,257) | (5,257) | (4,273) | (5,122) | (5,116) | (5,158) | (5,211) | (17,595) | (88,631) |
| InterCo Disbursements for Goods | (3,063) | (1,932) | (1,932) | (2,357) | (2,158) | (2,440) | (1,761) | (1,434) | (1,434) | (1,434) | (1,434) | (1,434) | (1,741) | (1,741) | (1,741) | (1,741) | (5,787) | (35,563) |
| InterCo Loan | (7,623) | (6,071) | (6,018) | (5,414) | (4,501) | (4,777) | (4,532) | (3,113) | (3,114) | (3,574) | (3,465) | (1,810) | (1,849) | (2,385) | (2,182) | (1,826) | (7,553) | (69,806) |
| Payroll | (6,000) | (65) | (4,832) | (865) | (4,832) | (65) | (4,832) | (865) | (4,832) | (65) | (65) | (4,832) | (865) | (4,832) | (65) | (4,832) | (8,594) | (51,336) |
| Insurance | - | - | - | (1,500) | - | - | - | - | - | - | - | - | - | - | - | - | - | (1,500) |
| Rent | (1,457) | - | - | (1,457) | - | - | - | (1,457) | - | - | - | - | (1,457) | - | - | - | (1,457) | (7,285) |
| Total disbursements | (22,986) | (12,911) | (17,624) | (16,152) | (19,459) | (15,291) | (16,266) | (12,089) | (14,595) | (10,330) | (10,221) | (12,349) | (11,033) | (14,074) | (9,145) | (13,609) | (40,987) | (269,122) |
| | | | | | | | | | | | | | | | | | | |
| **Total Operating cash flows** | **(20,354)** | **(11,631)** | **(14,184)** | **(12,961)** | **(16,268)** | **(12,404)** | **(13,692)** | **(9,316)** | **(11,912)** | **(7,647)** | **(7,538)** | **(6,258)** | **(3,778)** | **(4,819)** | **(1,889)** | **(8,745)** | **(34,240)** | **(197,635)** |
| | | | | | | | | | | | | | | | | | | |
| *Financing cash flows* | | | | | | | | | | | | | | | | | | |
| Financing | 30,000 | - | 40,000 | - | - | 40,000 | - | - | 35,000 | - | - | 25,000 | - | - | - | 20,000 | - | 190,000 |
| Total financing cash flows | 30,000 | - | 40,000 | - | - | 40,000 | - | - | 35,000 | - | - | 25,000 | - | - | - | 20,000 | - | 190,000 |
| | | | | | | | | | | | | | | | | | | |
| *Restructuring costs* | | | | | | | | | | | | | | | | | | |
| Employee Separation costs | (754) | - | (83) | - | - | (773) | - | - | - | - | - | - | - | - | - | - | - | (1,610) |
| Board member fees | - | (168) | - | - | - | (168) | - | - | - | (168) | - | - | - | - | (168) | - | (168) | (838) |
| UST / Court / Deposit fees | (200) | - | - | - | - | - | - | - | - | - | (250) | - | - | - | - | - | (250) | (700) |
| KEIP / KERP | - | - | - | - | - | - | - | - | - | - | - | (2,000) | - | - | - | - | (3,500) | (5,500) |
| Professional fees | - | - | (3,085) | - | - | - | (4,720) | - | - | - | - | (4,518) | - | - | - | - | (3,389) | (19,757) |
| Total Restructuring costs | (954) | (168) | (3,168) | - | - | (941) | (4,720) | - | - | (168) | (250) | (6,518) | - | - | (168) | - | (3,389) | (28,404) |
| | | | | | | | | | | | | | | | | | | |
| **Net Cash flow** | **8,692** | **(11,798)** | **22,648** | **(12,961)** | **(16,268)** | **26,656** | **(18,412)** | **(9,316)** | **23,088** | **(7,815)** | **(7,788)** | **12,224** | **(3,778)** | **(4,819)** | **(2,057)** | **7,866** | **(42,203)** | **(36,040)** |
| | | | | | | | | | | | | | | | | | | |
| *Cash roll-forward* | | | | | | | | | | | | | | | | | | |
| Beginning cash | 10,853 | 19,545 | 7,747 | 30,395 | 17,434 | 1,166 | 27,822 | 9,410 | 94 | 23,182 | 15,367 | 7,579 | 19,804 | 16,026 | 11,207 | 9,151 | 17,017 | 10,853 |
| (+) / (-) Net cash flow | 8,692 | (11,798) | 22,648 | (12,961) | (16,268) | 26,656 | (18,412) | (9,316) | 23,088 | (7,815) | (7,788) | 12,224 | (3,778) | (4,819) | (2,057) | 7,866 | (42,203) | (36,040) |
| **Ending cash** | **19,545** | **7,747** | **30,395** | **17,434** | **1,166** | **27,822** | **9,410** | **94** | **23,182** | **15,367** | **7,579** | **19,804** | **16,026** | **11,207** | **9,151** | **17,017** | **(25,186)** | **(25,186)** |

**EXHIBIT 3**

Sale Scenario Budget through December 31, 2023

Exhibit 3 - Sale Scenario

**Amyris, Inc., et al.**

*$ thousands*

| | Week 1 14-Aug | Week 2 21-Aug | Week 3 28-Aug | Week 4 4-Sep | Week 5 11-Sep | Week 6 18-Sep | Week 7 25-Sep | Week 8 2-Oct | Week 9 9-Oct | Week 10 16-Oct | Week 11 23-Oct | Week 12 30-Oct | Week 13 6-Nov | Week 14 13-Nov | Week 15 20-Nov | Week 16 27-Nov | Month Dec-23 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Operating cash flows* | | | | | | | | | | | | | | | | | | |
| Receipts | 2,631 | 1,280 | 3,440 | 3,191 | 3,191 | 2,408 | 2,574 | 2,773 | 2,683 | 2,683 | 2,683 | 4,946 | 5,943 | 5,943 | 5,943 | 4,216 | 4,726 | 61,255 |
| Other receipts | - | - | - | - | - | 480 | - | - | - | - | - | - | - | 2,000 | - | - | - | 2,480 |
| Total Receipts | 2,631 | 1,280 | 3,440 | 3,191 | 3,191 | 2,888 | 2,574 | 2,773 | 2,683 | 2,683 | 2,683 | 4,946 | 5,943 | 7,943 | 5,943 | 4,216 | 4,726 | 63,735 |
| | | | | | | | | | | | | | | | | | | |
| Payments per First day orders | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | (2,500) | - | - | - | - | - | - | - | - | - | - | - | (15,000) |
| Other AP disbursements | (2,343) | (2,343) | (2,343) | (2,059) | (5,468) | (5,510) | (5,273) | (4,544) | (4,538) | (4,580) | (4,580) | (3,675) | (4,541) | (4,535) | (4,577) | (4,625) | (16,047) | (81,582) |
| InterCo Disbursements for Goods | (3,063) | (1,932) | (1,932) | (2,357) | (2,158) | (2,440) | (1,761) | (1,414) | (1,414) | (1,414) | (1,414) | 988 | (991) | (991) | (991) | (991) | (2,136) | (28,385) |
| InterCo Loan | (7,623) | (6,071) | (6,018) | (5,414) | (4,501) | (4,777) | (4,532) | (1,574) | (1,575) | (2,035) | (1,926) | (1,452) | (1,247) | (1,783) | (1,579) | (1,224) | (4,374) | (57,705) |
| Payroll | (6,000) | (65) | (4,832) | (865) | (4,832) | - | (65) | (4,832) | (865) | (65) | (65) | (4,832) | (865) | (4,832) | (65) | (4,832) | (10,594) | (53,336) |
| Insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (1,500) |
| Rent | (1,457) | - | - | (1,457) | - | - | - | (1,457) | - | - | - | - | (1,457) | - | - | - | (1,457) | (7,285) |
| Total disbursements | (22,986) | (12,911) | (17,624) | (16,152) | (19,459) | (15,291) | (16,398) | (9,854) | (12,360) | (8,095) | (7,986) | (10,946) | (9,100) | (12,141) | (7,212) | (11,671) | (34,608) | (244,794) |
| | | | | | | | | | | | | | | | | | | |
| **Total Operating cash flows** | **(20,354)** | **(11,631)** | **(14,184)** | **(12,961)** | **(16,268)** | **(12,404)** | **(13,824)** | **(7,081)** | **(9,677)** | **(5,412)** | **(5,302)** | **(6,001)** | **(3,157)** | **(4,198)** | **(1,269)** | **7,455** | **(29,882)** | **(181,059)** |
| | | | | | | | | | | | | | | | | | | |
| *Financing cash flows* | | | | | | | | | | | | | | | | | | |
| Financing | 30,000 | - | 40,000 | - | - | 40,000 | - | - | 35,000 | - | - | 25,000 | - | - | - | 20,000 | - | 190,000 |
| Total financing cash flows | 30,000 | - | 40,000 | - | - | 40,000 | - | - | 35,000 | - | - | 25,000 | - | - | - | 20,000 | - | 190,000 |
| | | | | | | | | | | | | | | | | | | |
| *Restructuring costs* | | | | | | | | | | | | | | | | | | |
| Employee Separation costs | (754) | - | (83) | - | - | (773) | - | - | - | - | - | - | - | - | - | - | - | (1,610) |
| Board member fees | - | (168) | - | - | - | (168) | - | - | - | (168) | - | - | - | - | (168) | - | (168) | (838) |
| UST / Court / Deposit fees | (200) | - | - | - | - | - | - | - | - | - | (250) | - | - | - | - | - | (250) | (700) |
| KEIP / KERP | - | - | - | - | - | - | - | - | - | - | - | (2,000) | - | - | - | - | (3,500) | (5,500) |
| Professional fees | - | - | (3,085) | - | - | - | (4,720) | - | - | - | - | (4,468) | - | - | - | (3,089) | (3,420) | (18,782) |
| Total Restructuring costs | (954) | (168) | (3,168) | - | - | (941) | (4,720) | - | - | (168) | (250) | (6,468) | - | - | (168) | (3,089) | (7,338) | (27,429) |
| | | | | | | | | | | | | | | | | | | |
| **Net Cash flow** | **8,692** | **(11,798)** | **22,648** | **(12,961)** | **(16,268)** | **26,656** | **(18,544)** | **(7,081)** | **25,323** | **(5,579)** | **(5,552)** | **12,532** | **(3,157)** | **(4,198)** | **(1,436)** | **9,456** | **(37,220)** | **(18,488)** |
| | | | | | | | | | | | | | | | | | | |
| *Cash roll-forward* | | | | | | | | | | | | | | | | | | |
| Beginning cash | 10,853 | 19,545 | 7,747 | 30,395 | 17,434 | 1,166 | 27,822 | 9,277 | 2,196 | 27,520 | 21,941 | 16,388 | 28,920 | 25,763 | 21,565 | 20,129 | 29,585 | 10,853 |
| (+) / (-) Net cash flow | 8,692 | (11,798) | 22,648 | (12,961) | (16,268) | 26,656 | (18,544) | (7,081) | 25,323 | (5,579) | (5,552) | 12,532 | (3,157) | (4,198) | (1,436) | 9,456 | (37,220) | (18,488) |
| **Ending cash** | **19,545** | **7,747** | **30,395** | **17,434** | **1,166** | **27,822** | **9,277** | **2,196** | **27,520** | **21,941** | **16,388** | **28,920** | **25,763** | **21,565** | **20,129** | **29,585** | **(7,635)** | **(7,635)** |