# Exhibit B

## Engagement Agreement



11755 Wilshire Blvd.
22nd Floor
Los Angeles, CA 90025

T 310.478.9000
F 310.478.9004

intrepidib.com

July 21, 2023

Amyris, Inc.
5885 Hollis Street, Suite 1000
Emeryville, California 94608

Re:  Engagement Agreement

Dear Mr. Han Kieftenbeld,

This letter agreement (together with the Exhibits attached hereto, the "<u>Agreement</u>"), is made between Amyris, Inc., a Delaware corporation and its subsidiaries and affiliates, (individually or collectively referred to herein as the "<u>Company</u>") on the one hand, and Intrepid Investment Bankers LLC, a Delaware limited liability company, a FINRA registered broker-dealer ("<u>Intrepid</u>") on the other hand, regarding the retention of Intrepid as the Company's exclusive investment banker in connection with any Transaction (as defined in Exhibit A) on the terms and conditions set forth herein. Certain additional capitalized terms used in this Agreement not otherwise defined herein are defined in Exhibit A.

## A.  <u>SERVICES PROVIDED BY INTREPID</u>

Subject to the terms and conditions of this Agreement, with the assistance and at the direction of the Company, Intrepid, in consideration of the compensation provided in Section C below, agrees to provide the following services:

1.      Assist the Company in analyzing its business, operations, properties, financial condition and prospects;

2.      Assist the Company in its analysis and consideration of strategic alternatives available to the Company;

3.      Assist the Company in its analysis and consideration of financing alternatives to the Company, including if necessary, Debtor-in-possession (DIP) and Exit Financing

4.      Prepare and distribute Company information in connection with a Transaction (as supplemented or amended from time to time, the ("<u>Company Information</u>"));

5.      Identify and solicit potential acquirors, financing sources or partners for a Transaction;

6.      Assist in the determination of the form, structure, terms, and pricing of a Transaction;

7.      Assist the Company on tactics and strategies for negotiating with potential counterparties and stakeholders, and if requested by the Company, participate in such negotiations;

8.      Advise the Company on the timing, nature and terms of new securities, other consideration, or other inducements to be offered pursuant to a Transaction;

9.     Render financial advice to the Company and participate in meetings or negotiations with stakeholders and/or outside agencies or appropriate parties in connection with a Transaction;

10.    Attend meetings of the Company's Board of Directors and its committees with respect to matters on which Intrepid has been engaged to advise the Company;

11.    Provide oral and written testimony, as necessary, with respect to matters on which Intrepid has been engaged to advise the Company in any proceedings before the Bankruptcy Court (as defined below); and

12.    Provide other services as may be mutually agreed by Intrepid and the Company and as approved by the United States Bankruptcy Court.

It is expressly understood and acknowledged that Intrepid's engagement does not constitute any commitment or guarantee, express or implied, on the part of Intrepid or of any of its affiliates of a successful Transaction.  The Company acknowledges that Intrepid will be providing the services on a reasonable effort basis, and that market and other conditions may adversely affect the Company's ability to complete a Transaction.

It is expressly understood and agreed that Intrepid is not undertaking to provide any advice relating to legal, regulatory, accounting or tax matters.  In furtherance thereof, the Company acknowledges and agrees that (a) it and its affiliates have relied and will continue to rely on the advice of its own legal, regulatory, accounting and tax advisors for all legal, regulatory, accounting and tax matters and (b) neither it, nor any of its affiliates, has received or has relied upon, the advice of Intrepid or any of its affiliates regarding matters of law, regulation, accounting or taxation.  Moreover, in performing its services pursuant to this Agreement, Intrepid is not assuming any responsibility for the decision of the Company or any other party to pursue (or not pursue) any business strategy or to effect (or not to effect) any Transaction.  Intrepid shall not have any obligation or responsibility to provide "crisis management" or business consultant services to the Company and shall have no responsibility for designing or implementing operational, organizational, administrative, cash management or liquidity improvements.  Intrepid is providing the Company with Intrepid's services hereunder as an independent contractor, and the parties agree that this Agreement does not create an agency or fiduciary relationship between Intrepid, on the one hand, and the Company and/or its creditors, its securityholders or any other person, on the other hand.  The Company agrees that the advice rendered to it by Intrepid may not be relied upon by any other person or entity or used for any purpose except as contemplated in this Agreement.

The Company acknowledges that Intrepid and its affiliates engage in a wide range of activities for their own accounts and the accounts of customers, including corporate finance, mergers and acquisitions, private equity, direct lending and related activities.  Subject to the maintenance of an appropriate "wall" between those parties working on matters related to this Agreement and those persons engaged in the above activities, in connection with such activities, Intrepid and its affiliates and/or their respective employees, as well as investment funds in which any of them may have a financial interest, may at any time, directly or indirectly and may trade or otherwise effect transactions for their own accounts or the accounts of customers, in debt or equity securities, senior loans and/or derivative products relating to the Company or its affiliates, potential parties to any



Transaction and their affiliates, or persons that are competitors, customers or suppliers of the Company. In addition, in the ordinary course of these activities, Intrepid may have provided financial advisory or other investment banking services to a potential party in a Transaction and may have solicited a potential party in a Transaction for financial advisory and/or investment banking business.

## B. RETENTION IN BANKRUPTCY COURT PROCEEDINGS

In the event of the commencement of Chapter 11 proceedings, the Company agrees that it will use its best efforts to obtain prompt authorization from the Bankruptcy Court to retain Intrepid on the terms and conditions set forth in this Agreement under the provisions of Section 328(a) of the Bankruptcy Code. Subject to being so retained, Intrepid agrees that during the pendency of any such proceedings, it shall continue to perform its obligations under this Agreement and that it shall file interim and final applications for the allowance of reasonable and documented fees and expenses payable to it under the terms of this Agreement pursuant to the applicable Federal Rules of Bankruptcy Procedures, and the local rules and order of the Bankruptcy Court. The Company shall supply Intrepid with a draft of the application and proposed retention order authorizing Intrepid's retention sufficiently in advance of filing of such application and proposed order to enable Intrepid and its counsel to review and comment thereon. Intrepid shall be under no obligation to provide any services under this Agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless Intrepid's retention under this Agreement is approved under Section 328(a) of the Bankruptcy Code by final order of the Bankruptcy Court in a form which is reasonably acceptable to Intrepid. The retention application shall note that in so agreeing to seek Intrepid's retention under Section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that Intrepid's general restructuring experience and expertise, its knowledge of the capital markets and its merger and acquisition capabilities will inure to the benefit of the Company in pursuing any Transaction, that the value to the Company of Intrepid's services hereunder derives in substantial part form that expertise and experience and that, accordingly, the structure and amount of the deferred fees, including the Transaction Fees is reasonable regardless of the number of hours to be expended by Intrepid professionals in the performance of the services to be provided hereunder and that the deferred fees shall not be considered to be "bonuses" or fee enhancement under applicable law.

## C. COMPENSATION

1.    Intrepid compensation shall be payable as follows (it being understood that in the event of a bankruptcy filing with the United States Bankruptcy Court (the "Court"), all such fees and reimbursement of expenses, other than the Initial Restructuring Fee and any fees which become earned and payable prior to the petition date, will be payable upon approval of a fee application submitted in accordance with all applicable fee procedures and orders as set forth by the Court):

   a.   An earned upon receipt and non-refundable initial restructuring fee (the "Initial Restructuring Fee") payable upon the execution of this Agreement equal to $150,000;



Amyris, Inc.
July 21, 2023
Page 4

   b.   An earned upon receipt and non-refundable monthly fee (the "Monthly Fee") which shall, be payable upon each monthly anniversary of the Initial Restructuring Fee payment date, equal to $150,000 per month; provided, that, 100% of each Monthly Fee earned after the sixth monthly anniversary of this Agreement shall be creditable against the earliest of any Financing Fee (as defined below), Restructuring Fee (as defined below) or Sale Fee (as defined below);

   c.   A non-refundable financing fee (a "Financing Fee") payable at each closing of a Financing equal to the applicable percentage set forth below of the gross proceeds and/or aggregate principal amount (as applicable) of any Financing irrevocably committed or funded in connection with such Financing (whether or not actually drawn):

         i.   1.0% for bank debt or first lien secured debt or DIP, inclusive of any exit facility (collectively "Senior Debt");

         ii.   2.0% for any debt junior to Senior Debt that is not an Equity-Linked Security (as defined below);

         iii.   4.0% for equity or equity-linked securities (including but not limited to, preferred securities, securities with warrants, and convertible notes) ("Equity-Linked Securities"); and

         iv.   Provided, that, any Financing related to a DIP Facility provided or arranged by Foris, Ingredion, DSM, Givaudan, Corbion, Schottenfeld, Silverback, Vivo or any of their respective related entities or respective affiliates shall be waived, and any Financing provided or arranged by Foris, or any of its related entities or affiliates shall be waived.

   d.   A restructuring fee equal to $3,000,000 payable upon the consummation of a Restructuring (a "Restructuring Fee"); provided, however, if a Restructuring is to be completed through a "pre-packaged" or "pre-arranged" plan of reorganization, the Restructuring Fee shall be earned upon the earlier of (i) execution of definitive agreements with respect to such plan and (ii) delivery of binding consents to such plan by a sufficient number of creditors and/or bondholders, as the case may be, to the plan; provided further, that the Restructuring Fee shall be payable upon the earlier of the effective date of the plan of reorganization or an order authorizing payment by the United States Bankruptcy Court;

   e.   A non-refundable sale fee (a "Sale Fee") payable upon the consummation of any Sale equal to the greater of:

         i.   $4,500,000, plus



    ii.    1.5% of the Aggregate Consideration greater than $250,000,000;

    iii.    Any Sale by the Company of ONDA, MG Empower, Costa Brazil and Rose Inc (pursuant to discussions existing at the time of the effective date of this Agreement) that is ultimately consummated shall not be credited to the Sale Fee earned by Intrepid under this Agreement.

    f.    The Company and Intrepid acknowledge and agree that more than one fee may be payable to Intrepid under section C.1, subsections (d) and (e) above in the event of a sale of the Consumer Brands Business, whether in connection with any single Transaction or series of Transactions, and (ii) the fees payable to Intrepid under section C.1, subsections (a), (b) and (c), as applicable, shall be paid in addition to any fee payable under section C.1, subsections (d) and (e).It is understood and agreed that if more than one fee becomes so payable to Intrepid, each such fee shall be paid to Intrepid.

    f.    If Intrepid provides services to the Company for which a fee is not provided herein, such services shall, except insofar as they are the subject of a separate agreement, be treated as falling within the scope of this Agreement, and the Company and Intrepid will agree upon a fee for such services based upon good faith negotiations, taking into account, among other things, the terms and conditions of this Agreement, the custom and practice among investment banks acting in similar transactions, and the particular facts and circumstances presented.

    g.    The Company will use its commercially reasonable efforts to ensure that Intrepid's post-petition compensation, expense reimbursements and payment received pursuant to the provisions of the indemnification agreement attached hereto as Exhibit B shall be entitled to priority as expenses of administration under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code, and shall be entitled to the benefits of any "carve-outs" for professional fees and expenses in effect pursuant to one or more cash collateral and/or financing orders entered by the Bankruptcy Court. Following entry of an order authorizing Intrepid's retention, the Company will reasonably assist Intrepid in preparing, filing and serving fee statements, interim fee applications, and a final fee application. The Company will support Intrepid's fee applications that are consistent with this Agreement in papers filed with the Bankruptcy Court and during any Bankruptcy Court hearing. The Company will pay promptly the fees and expenses of Intrepid, in each case, which are both (i) owed pursuant to this Agreement and (ii) approved by the Bankruptcy Court in accordance with the orders of the Bankruptcy Court.

2.    <u>Reimbursement of Expenses</u>.

In addition to any other compensation payable to Intrepid under this Agreement, the Company shall reimburse Intrepid for all reasonable and documented (as



requested), out-of-pocket expenses incurred by Intrepid in connection with the performance of this Agreement, irrespective of whether a Transaction is completed. Such expenses may include, without limitation, costs relating to printing, delivery, database charges, out-of-town travel (economy class or business class in the case of Managing Directors on flights longer than four hours), direct out-of-pocket expenses and required advice from counsel. All reimbursements pursuant to this paragraph shall be made within 10 business days of being invoiced by Intrepid. Intrepid shall seek the prior written approval of the Company to incur expenses which in the aggregate exceed $50,000.   In the event of a bankruptcy filing by the Company, reimbursement of expenses shall be payable upon approval of an appropriate fee application.

D.  TERM OF AGREEMENT

This Agreement will become effective on the date of the Company's execution of this Agreement and remain in effect (and will not terminate, expire or be deemed completed) until terminated by either party hereto upon thirty (30) days' prior written notice of termination to the other party and without liability or continuing obligation to the Company or Intrepid, except (a) following any termination by the Company, Intrepid shall remain entitled to any fees accrued on or prior to such time pursuant to Section C but not yet paid prior to such termination and to reimbursement of reasonable and documented expenses incurred prior to such termination and (b) in the case of termination by the Company, Intrepid shall remain entitled to full payment of all fees contemplated by Section C in respect of any Transaction announced or for which definitive documentation is executed during the period from the date of this Agreement until the first to occur of: (i) the effective date of a plan of reorganization for the Company or the closing of a sale of all or substantially all of the assets of the Company; and (ii) 12 months following such termination (the "Tail Period"); provided, that such Transaction is actually consummated within three months of the termination (even if such consummation occurs after the Tail Period).

This Section D and the following provisions shall remain in full force and effect following the termination of this Agreement (whether of its own accord or as a result of either party): (i) the compensation provisions of Section C and the Exhibit A; (ii) the confidentiality provisions of Section E; (iii) the announcement provisions of Section K; (iv) the indemnification provisions of Section L and Exhibit B; (v) the choice of law and arbitration provisions of Section M; and (vi) the miscellaneous provisions of Section N.

E.  CONFIDENTIALITY

Any advice, written, oral or otherwise, provided by Intrepid shall be treated by the Company as confidential, will be solely for use by the Company in connection with its evaluation of a Transaction and will not be used, shared, disclosed or otherwise referred to for any other purpose, except to the extent required by applicable law or judicial or regulatory process. Without limiting the generality of the foregoing, no advice from Intrepid (or portion thereof) may be filed with, included in or referred to in any registration



DocuSign Envelope ID: 130F3226-B1CA-4890-B911-0ECECEE80E6B

statement, proxy statement or any other communication, whether written or oral, prepared, issued or transmitted by the Company or any affiliate, director, officer, employee, agent or representative of any thereof, without, in each instance, Intrepid's prior written consent.

The Company may supply to Intrepid certain non-public or proprietary information concerning the Company in connection with this Agreement ("Confidential Information"). Intrepid shall hold in strict confidence such Confidential Information and solely use such Confidential Information in connection with (i) performing its services under this Agreement, or (ii) other services provided to you by Intrepid or its Affiliates, or (iii) complying with its regulatory obligations as a registered broker-dealer and clearing internal conflict checks with its Affiliates. "Affiliates" shall include any entity in which Intrepid or its direct or indirect parent entity/-ies directly or indirectly holds a material ownership interest. Any disclosure by Intrepid of Confidential Information to a third party shall require consent of the Company. Notwithstanding anything to the contrary herein, the following shall not constitute Confidential Information: any information that (a) becomes publicly available other than as a result of the breach of Intrepid's undertakings hereunder, (b) was already publicly available at the time of disclosure to Intrepid, (c) is independently developed by Intrepid or (d) Intrepid is required to disclose by judicial or administrative process in connection with any action, suit, proceeding or claim. Intrepid's obligations hereunder shall survive the termination of this Agreement for a period of one year from termination.

F.  COMPANY REPRESENTATIONS, WARRANTIES AND ADDITIONAL COVENANTS

The Company represents, warrants and covenants as follows:

1.  The Company will furnish Intrepid with true, accurate and complete copies of all financial and other information and data as Intrepid believes appropriate in connection with its activities on the Company's behalf.

2.  Any material delivered to Intrepid including without limitation the Company Information, at all times through the closing of any Transaction, will not contain any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading.

3.  The Company will promptly notify Intrepid if it learns of any inaccuracy or misstatement in, or omission from, any information theretofore delivered to Intrepid.

4.  The Company acknowledges and agrees that Intrepid, in connection with performing its services hereunder, (i) will be relying without investigation upon all information that is available from public sources or supplied to it by or on behalf of the Company or its advisors, (ii) will not in any respect be responsible for the accuracy or completeness of, or have any obligation to verify, the same, (iii) will not conduct any appraisal of any assets of



the Company and (iv) may require that the Company Information contain appropriate disclaimers consistent with the foregoing.

5.      The Company will also cause to be furnished to Intrepid promptly after the closing of any Transaction copies of such agreements, opinions, certificates and other documents delivered at the closing as Intrepid may reasonably request.

6.      The Company has not entered into and is not subject to any prior or existing agreements or relationships which conflict with this Agreement.  This Agreement has been duly executed and delivered by an authorized representative of the Company.

7.      The Company agrees to forward to Intrepid the names of potential parties to a Transaction that are or become known to the Company, its equity holders, affiliates, employees, directors, agents or other representatives.

G.   <u>COMPLIANCE WITH APPLICABLE LAW</u>

Each party represents, warrants and covenants as follows:

1.   Each party shall conduct its activities in connection with a Transaction in compliance with all applicable laws.  The Company will be solely responsible for ensuring that the Transaction itself complies in all respects with applicable law.  The Company agrees that it will not engage in any form of "general solicitation" in connection with the Transaction as such term is defined under applicable securities laws and will coordinate with Intrepid regarding any contacts that the Company has with potential Transaction parties (such as investors, acquirors and financing sources) to ensure compliance with this provision and preservation of any applicable private placement exemptions.

2.   Each party represents that no director, officer, employee, agent or other person acting on behalf of the parties (i) is a Sanctioned Person, (ii) has any business affiliation or commercial dealings with, or investments in, any Sanctioned Country or Sanctioned Person as such applies in its relevant jurisdiction or (iii) is the subject of any action or investigation under any Sanctions Law, Anti-Corruption Laws or Anti-Money Laundering Laws.

3.   Each party represents that no director, officer, employee, agent or other person acting on behalf of the parties has taken any action, directly or indirectly, that would result in a violation of Anti-Corruption Laws and Anti-Money Laundering Laws. Under the requirements imposed on Intrepid under these Anti-Money Laundering Laws, Intrepid shall ask the Company and its owners to provide identification documents and/or other information during the Transaction process to collect information in order to comply with the Beneficial Ownership Rule, and Intrepid shall require that potential investors or acquirors provide such information to it prior to the closing of any Transaction or acceptance of any subscription agreements in connection therewith.



Amyris, Inc.
July 21, 2023
Page 9

## H. CONFLICTS

The Company acknowledges that Intrepid and its Affiliates may have investment banking and other relationships, including customer relationships, with parties other than the Company, including Prospects or their affiliates, pursuant to which Intrepid may acquire information of interest to the Company. Intrepid shall have no obligation to disclose such information to the Company, or to use such information in connection with any Transaction. Notwithstanding the foregoing, Intrepid shall not represent any counterparty in connection with the Transaction contemplated hereby, without the prior consent of the Company.  In addition, Intrepid and its Affiliates may own or trade in the securities of the Company, its competitors, prospects or any party to a Transaction.

## I. RELATIONSHIP

Intrepid is being engaged as an independent contractor hereunder to provide the services described herein only to the Company and is not acting as an agent or a fiduciary of, and shall have no duties or liability to, the equity holders of the Company or any third party in connection with its engagement hereunder, all of which are hereby expressly waived. Nothing herein shall be deemed to constitute a promise or a commitment by Intrepid on behalf of itself or any of its Affiliates to provide financing or other services in connection with the Transaction. There is no guarantee that a Transaction will be consummated. No one other than the Company is authorized to rely upon the engagement of Intrepid hereunder or any statements, advice, opinions or conduct by Intrepid.  Intrepid will not provide any tax, accounting or legal advice in connection with this Agreement and the Company agrees to retain its own advisors to render such advice in connection with the Transaction.

## J. EXCLUSIVITY

No other investment bank is or will be authorized during the term of this Agreement to perform services on behalf of the Company of the type which Intrepid is authorized to perform hereunder. No fee payable to any other investment bank either by the Company or any other entity shall reduce or otherwise affect the fees payable hereunder to Intrepid.

## K. PUBLIC ANNOUNCEMENTS

Intrepid shall be permitted to make announcements and advertisements (including tombstones) describing the services in connection with any Transaction, with the written consent of the Company, where such consent shall not be unreasonably withheld.

## L. INDEMNIFICATION; EXCULPATION

Intrepid may become subject to certain liability as a result of the performance of their duties hereunder. In order to induce Intrepid to enter into this Agreement, the Company agrees to the terms set forth on Exhibit B.



DocuSign Envelope ID: 130F3226-B1CA-4890-B911-0ECECEE80E6B

## M. ARBITRATION/GOVERNING LAW

This Agreement shall be governed by the internal laws of the State of California without giving effect to any conflicts of laws principles that would require the application of any other law. Any dispute related to, in connection with or arising out of this Agreement (including the determination of the arbitrability of any dispute), shall be conclusively and exclusively settled by binding and non-appealable arbitration in Los Angeles, California, before JAMS (Judicial Arbitration and Mediation Services), and judgment upon the award rendered may be entered in any court of competent jurisdiction. Any award rendered shall include an award of interest at 10% per annum and recovery of costs and reasonable attorney's fees of the prevailing party. The provisions of Section 1283.05 of the California Code of Civil Procedure, authorizing the taking of depositions and obtaining discovery, are incorporated herein by this reference and shall be applicable to any such arbitration. In order to compel arbitration, or in the event that arbitration cannot be enforced, the parties agree to submit all disputes exclusively to the federal and state courts located in Los Angeles, California, and each party waives any objection to forum or jurisdiction. To the extent permitted by law, the parties hereby waive any right to a jury trial in connection with this Agreement. For the avoidance of doubt, in event of a bankruptcy filing by the Company, any disputes regarding retention of Intrepid or this Agreement shall, in the first instance, be subject to the jurisdiction of the United States Bankruptcy Court where the Company's case is pending and the applicable provisions of the Bankruptcy Code, Bankruptcy Rules and local court rules shall govern.

## N. MISCELLANEOUS

This Agreement contains all of the understandings between the parties hereto with reference to the subject matter hereof. No other understanding not specifically referred to herein, oral or otherwise, shall be deemed to exist or to bind any of the parties hereto and any such understandings, oral or otherwise, not specifically referred to herein shall be merged into this Agreement and superseded by the provisions hereof. No officer or employee of any party has any authority to make any representation or promise not contained herein or, in the case of the Company, in any confidential memorandum or other written document prepared in connection with the services to be provided under this Agreement.

This Agreement cannot be modified or changed except by a written instrument signed by each party hereto.

The rights and remedies of the parties hereunder are cumulative and not alternative. Neither any failure nor any delay by any party in exercising any right, power or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.



Amyris, Inc.
July 21, 2023
Page 11

In case any provision in this Agreement is determined to be invalid, illegal or unenforceable, the remaining provisions hereof shall in no way be affected and shall remain in full force and effect.

This Agreement and all obligations and benefits of the parties hereto shall bind and shall inure to their benefit and that of their respective successors and assigns.

This Agreement may be signed in one or more counterparts and may be delivered by facsimile or email scan with attachment.

Each party acknowledges that it has consulted with, or has been afforded the opportunity to consult with, counsel of its own choosing in connection with the drafting, negotiation and execution of this Agreement and that it enters into this Agreement of its own free will and as its independent act. The language used in this Agreement has been chosen by the parties to express their mutual intent, and no rule of construction shall be applied against or in favor of any party, no party shall be deemed the drafter of this Agreement, and the parties all waive any statute, principle or rule of law to the contrary.

*Please confirm that the foregoing is in accordance with your understanding by signing and returning to us this Agreement. We look forward to the successful completion of this project.*

Very truly yours,
INTREPID INVESTMENT BANKERS LLC,
a Delaware limited liability company

By: Ms. Lorie Beers
Its: Managing Director, Head of Special Situations
Date: July 21, 2023

Accepted as of the date set forth below:

Amyris, Inc.
a Delaware corporation

*DocuSigned by:*
*Han Kieftenbeld*

By: Mr. Han Kieftenbeld
Its: Interim CEO
Date: ___July 24, 2023_____



DocuSign Envelope ID: 130F3226-B1CA-4890-B911-0ECECEE80E6B

## Exhibit A

## Definitions

 "Aggregate Consideration" shall mean the value of all consideration paid or payable, or otherwise to be distributed to, or received by, directly or indirectly, the Company, its bankruptcy estate, its creditors and/or its securityholders in connection with a Sale (in the case of any non-wholly owned assets, brands or businesses, the consideration will be net of any proceeds due to a third party or partner), including all (i) cash, securities and other property, (ii) debt assumed, satisfied or paid by a purchaser or which remains outstanding at the closing of a Sale (including, without limitation, the amount of any indebtedness, securities or other property "credit bid" in any Sale) and any other indebtedness, liabilities, and other obligations, including tax claims, that will actually be paid, satisfied or assumed by a purchaser from the Company or the securityholders of the Company and (iii) amounts placed in escrow and deferred contingent and installment payments.  The fair market value of non-cash consideration shall be determined as follows:

1.  The value of securities (whether debt or equity) that are freely tradable in an established public market will be determined on the basis of the closing market price on the last trading day prior to the public announcement of a Sale; it being understood that for the purposes herein, restricted securities for which there is a public market for the underlying security shall be deemed to be valued at the public market price of such securities without applying any type of discount; and

2.  The value of securities that are not freely tradable or have no established public market, and the value of non-cash consideration that consists of other property shall be the fair market value as determined in good faith by Intrepid.

"Consumer Brands Business" is defined as the following brands: Biossance, JVN Hair, Pipette, Rose Inc, Menolabs, Stripes, and 4U by Tia Mowry.

"Financing" is defined as a capital raise by the Company and/or one of its affiliated companies, from one or more investors, lenders, or other financing sources (each, an "Investor"), through the issuance, sale and/or placement of newly issued or treasury equity, equity-linked or debt securities, and/or other instruments or obligations of the Company with one or more Investors, including without limitation, a "debtor-in-possession financing" or "exit financing" in connection with a case under the United States Bankruptcy Code, a rights offering, or any loan or other financing obligation.

"Restructuring" is defined as any restructuring, reorganization (whether or not pursuant to Chapter 11 of the United States Bankruptcy Code) and/or recapitalization of all or a substantial portion of the Company's outstanding indebtedness, liabilities and preferred equity, if any (including without limitation, bank debt, bond debt, and other on and off balance sheet indebtedness and liabilities) (collectively, the "Existing Obligations") that is achieved without limitation, through a solicitation of waivers and consents from the holders of Existing Obligations; repurchase, settlement or forgiveness of Existing Obligations; conversion of Existing Obligations into equity or debt; an exchange offer involving the issuance of new securities or indebtedness in exchange for Existing Obligations; and/or other material modifications or amendments to the Existing Obligations, including the transfer of the ownership of the Company's assets to a new entity in connection with such Restructuring.



Amyris, Inc.
July 21, 2023
Page 13

"Sale" shall mean whether or not in one transaction or series of related transactions that is either: (a) the disposition to one or more third-parties of all or a portion of the Consumer Brands Business; or (b) the disposition to one or more third-parties of all of the Company's assets, whether such transaction or series of related transactions is implemented through: (i) the disposition to one or more third-parties of all or a portion of the issued and outstanding equity securities or any other issued and outstanding securities of the Company by the existing equity security holders of the Company, whether or not pursuant to the Bankruptcy Code; (b) an acquisition, merger, consolidation, or other business combination, including a sale pursuant to the Bankruptcy Code, of which all or a portion of the business, assets or existing equity or securities of the Company are, directly or indirectly, sold or transferred to, or combined with, a third-party; (c) an acquisition, merger, consolidation, sale, including a sale pursuant to the Bankruptcy Code, or other business combination pursuant to a successful "credit bid"; and/or (d) the formation of a joint venture, partnership or similar entity, or any similar sale transaction; provided, however, for the avoidance of doubt, a Sale does not include the transfer of the ownership of all or a portion of the Company's assets to a new entity in connection with a Restructuring.

"Transaction" is defined as any Financing, Restructuring or Sale transaction or series or combination of Financing, Restructuring or Sale transactions, as defined above.

"Transaction Fees" is defined collectively as the Financing Fee, Initial Restructuring Fee, Monthly Fees, Restructuring Fee, and Sale Fee, as defined in the Agreement.

"Anti-Corruption Laws" means the U.S. Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and the rules and regulations promulgated thereunder, and all other laws, rules, and regulations of any jurisdiction that are applicable to the Company concerning or relating to bribery or corruption.

"Anti-Money Laundering Laws" means the Patriot Act, the Money Laundering Control Act of 1986, the Bank Secrecy Act, and the rules and regulations promulgated thereunder, and corresponding laws of the jurisdictions in which the Company operates or in which the proceeds of the transactions will be used.

"Beneficial Ownership Rule" means 31 C.F.R. § 1010.230.

"Sanctioned Country" means a country or territory that is or whose government is subject to a U.S. sanctions program that broadly prohibits dealings with that country, territory or government.

"Sanctioned Person" means, at any time, any person (a) that is listed on the Specially Designated Nationals and Blocked Persons list or the Consolidated Sanctions list maintained by OFAC, or any similar list maintained by OFAC, the U.S. Department of State, the European Union, any European Union member state or the United Nations Security Council; (b) that is fifty-percent or more owned, directly or indirectly, in the aggregate by one or more persons described in clause (a) above; (c) that is operating, organized or resident in a Sanctioned Country or (d) with whom a U.S. person is otherwise prohibited or restricted by Sanctions Laws from engaging in trade, business or other activities.

"Sanctions Laws" means the laws, rules, regulations and executive orders promulgated or administered to implement economic sanctions or anti-terrorism programs by (a) any U.S. Governmental Authority (including, without limitation, OFAC), including, but not limited to, Executive Order 13224, Executive Order 13660, Executive order 13661, Executive Order 13662, Executive Order 13685, the Patriot Act, the Trading with the Enemy Act , the International Emergency Economic Powers Act and the laws, regulations,

DocuSign Envelope ID: 130F3226-B1CA-4890-B911-0ECECEE80E6B

Amyris, Inc.
July 21, 2023
Page 14

rules and/or executive orders relating to restrictive measures against Iran; (b) the European Union in pursuit of the Common Foreign and Security Policy objectives set out in the Treaty on European Union; (c) the United Nations Security Council or any other legislative body of the United Nations; and (d) any jurisdiction in which the Company, operates or in which the proceeds of the transactions will be used.



DocuSign Envelope ID: 130F3226-B1CA-4890-B911-0ECECEE80E6B

## Exhibit B

### Indemnity

The Company shall indemnify and hold harmless Intrepid and its Affiliates, the respective directors, officers, attorneys, finders and other agents, equity holders and employees of Intrepid and their Affiliates and each other person, if any, controlling Intrepid or any of their Affiliates (Intrepid and each such person and entity being referred to as an "Indemnified Party"), from and against any losses, claims, damages, expenses or liabilities or actions (including, without limitation, equity holder actions and actions arising from the use of information contained in any Company Information or omissions from such materials) related to or arising out of the Agreement, and will pay (or, if paid by an Indemnified Party, reimburse such Indemnified Party) for all fees and expenses (including, without limitation, attorneys' fees and charges for the time of Intrepid's employees at their then current hourly rates) incurred by such Indemnified Party in connection with investigating, preparing or defending any such action or claim, irrespective of whether in connection with pending or threatened litigation, in which any Indemnified Party is a party. Intrepid's current hourly rates are set forth in Exhibit C.

The Company will not, however, be responsible for any claims, liabilities, losses, damages or expenses which result from any compromise or settlement not approved by the Company (which approval may not be unreasonably withheld) or which are determined by a final judgment of a court of competent jurisdiction to have resulted primarily from the fraud, willful misconduct or gross negligence of any Indemnified Party. The Company also agrees that no Indemnified Party shall have any liability to the Company for or in connection with this engagement, except for any such liability for losses, claims, damages, liabilities or expenses incurred by the Company, which are determined by a final judgment of a court of competent jurisdiction to have resulted primarily from the fraud, willful misconduct or gross negligence of the Indemnified Party. The foregoing agreement shall be in addition to any rights that any Indemnified Party may have at common law or otherwise, including without limitation any right to contribution.

The Company's agreement to indemnify the Indemnified Parties shall not be disclosed publicly or made available to third parties by either party hereto without the other party's prior written consent. If any action or proceeding is brought against any Indemnified Party in respect of which indemnity may be sought against the Company, or if any Indemnified Party receives notice from any potential claimant of a claim which such person reasonably believes will result in the commencement of any such action, proceeding, or claim, then such Indemnified Party shall promptly notify the Company in writing of the commencement of such action or proceeding, or of the existence of any such claim, but the failure to so notify the Company of any such action or proceeding shall not relieve the Company from any obligation or liability which it may have hereunder to any Indemnified Party except to the extent such failure has materially prejudiced the Company. In case any such action or proceeding is brought against any Indemnified Party with respect to which such Indemnified Party gives notice of its intention to seek indemnification hereunder, the Company shall be entitled to participate in such action or proceeding and to assume the defense thereof (it being understood that such assumption shall be an acknowledgment of the Company's obligations to indemnify), with counsel reasonably acceptable to the Indemnified Party. Notwithstanding the Company's election to assume the defense of such action or proceeding, the Indemnified Party shall have the right to employ separate counsel and to participate in the defense of such action or proceeding, and the Company shall bear the reasonable fees, costs and expenses of such separate counsel (and shall pay such fees, costs and expenses within 15 days following written demand therefor), if (a) the use of counsel chosen by the Company to represent such Indemnified Party would, in the judgment of the Indemnified Party, present such counsel with a conflict of

DocuSign Envelope ID: 130F3226-B1CA-4890-B911-0ECECEE80E6B

interest; (b) the defendants in, or targets of, any such action or proceeding include both an Indemnified Party and the Company, and such Indemnified Party reasonably concludes that there may be legal defenses available to it or to other Indemnified Parties that are different from or additional to those available to the Company (in which case the Company shall not have the right to direct the defense of such action or proceeding on behalf of the Indemnified Party); or (c) the Company fails to employ counsel reasonably satisfactory to such Indemnified Party to represent such Indemnified Party within a reasonable time after notice of the institution of such action or proceeding. The Company shall not have the right to settle or compromise any claim against an Indemnified Party without such Indemnified Party's consent, unless the settlement involves no admission of liability, a complete release of all claims and the Company fully discharges any amounts owed to the applicable claimants.

In order to provide for the just and equitable contribution, if a claim for indemnification hereunder is found unenforceable in a final judgment by a court of competent jurisdiction (not subject to further appeal), even though the express provisions hereof provide for indemnification in such case, then each Indemnified Party shall be entitled to receive from the Company, and the Company shall pay, contributions for the losses, claims, damages, judgments, liability, expenses or costs to which the Indemnified Party may be subject in accordance with the relative benefits received by, and the relative fault of, the Company, on one hand, and Intrepid, on the other hand, in connection with the statements, acts or omissions which resulted in such losses, claims, damages, judgments, liabilities, or costs. The Company agrees that a pro rata allocation would be unfair. No person found liable for a fraudulent misrepresentation or omission shall be entitled to contribution from any person who is not also found liable for such fraudulent misrepresentation or omission. Notwithstanding the foregoing, Intrepid's allocated responsibility for any losses, claims, damages, judgments, liabilities, expenses, or costs shall not exceed the amount of fees previously received by Intrepid for its services to the Company.

In the event of a bankruptcy filing, upon application to the Court, this Indemnification section shall be modified as follows:

(a) Subject to the provisions of subparagraphs (b) and (c) below, the Company are authorized to indemnify, contribute, or reimburse, and shall indemnify, contribute, or reimburse Intrepid and the Indemnified Parties for any claims arising from, related to, or in connection with services to be provided by Intrepid as specified in the Investment Banking Agreement;

(b) The Company shall have no obligation to indemnify Intrepid, or a Covered Person, or provide contribution or reimbursement to Intrepid or a Covered Person, for any claim or expense that is either: (i) judicially determined (the determination having become final and non-appealable) to have arisen from Intrepid or such Covered Person's (as applicable) gross negligence, willful misconduct, breach of fiduciary duty, if any, bad faith, or self-dealing; (ii) for a contractual dispute in which the Company alleges, and a court of competent jurisdiction determines (such determination having become final and non-appealable), a breach by Intrepid of Intrepid's contractual obligations, unless this Court determines that indemnification, contribution, or reimbursement would be permissible pursuant to *In re United Artists Theatre Co.*, 315 F.3d 217 (3d Cir. 2003); or (iii) settled prior to a judicial determination as to the exclusions set forth in clauses (i) and (ii) above, but determined by this Court, after notice and a hearing pursuant to subparagraph (c)

DocuSign Envelope ID: 130F3226-B1CA-4890-B911-0ECECEE80E6B

below, to be a claim or expense for which Intrepid should not receive indemnity, contribution, or reimbursement under the terms of the Engagement Agreements modified by this Order; and

If, before the earlier of: (i) the entry of an order confirming a chapter 11 plan in these chapter 11 cases (that order having become a final order no longer subject to appeal); and (ii) the entry of an order closing these chapter 11 cases, Intrepid or the Indemnified Parties believe that they are entitled to the payment of any amounts by the Company on account of the Company's indemnification, contribution, or reimbursement obligations under the Engagement Agreement (as modified by this Order), including, without limitation, the advancement of defense costs, Intrepid or the Indemnified Parties must file an application in this Court, and the Company may not pay any such amounts to Intrepid or the Indemnified Parties before the entry of an order by this Court approving the payment. This subparagraph (c) is intended only to specify the period of time during which this Court shall have jurisdiction over any request for fees and expenses by Intrepid or the Indemnified Parties for indemnification, contribution, or reimbursement and is not a provision limiting the duration of the Company's obligation to indemnify Intrepid or the Indemnified Parties. All parties in interest shall retain the right to object to any demand by Intrepid or the Indemnified Parties for indemnification, contribution, or reimbursement.



Amyris, Inc.
July 21, 2023
Page 18

## Exhibit C

## Current Hourly Rates

Managing Director              $1,000.00 / hour

Director/Sr. Vice President   $750.00 / hour

Vice President                    $600.00 / hour

Associate                          $400.00 / hour

Analyst                             $250.00 / hour



**Intrepid Investment Bankers LLC**
**Client Profile Addendum**

*Please complete and return with executed Engagement Agreement. This addendum is required to be completed in its entirety prior to Intrepid Investment Bankers proceeding with the Engagement Agreement.*

**Customer Identification Verification/USA PATRIOT Act** – To help the government fight the funding of terrorism and money laundering activities, Federal Law requires all financial institutions to obtain, verify, and record information that identifies each person and/or entity who establishes a relationship with a covered financial institution. What this means to you and your firm: When you establish a relationship with Intrepid Investment Bankers, you will be asked to provide your name, address, date of birth, and other information that will allow us to identify you.

**Firm Information**

| |
|---|
| Legal Entity Name: Amyris, Inc. |
| Firm Registered/Legal Address: 5885 Hollis Street, Suite 100, Emeryville, CA 9608 |
| Firm Operating Address (if different than above): Same as above |
| Firm TIN/EIN or Government Issued ID: 55-0856151 |
| Firm Industry: Biotechnology |
| Firm Website (if available): https://amyris.com/ |
| Verification Document: Good Standing Certificate |

**Firm Beneficial Owners and Control Persons**

<u>Beneficial Owner:</u> Each individual, if any, who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, owns 25% or more of the equity interests of a legal entity customer. If a trust owns directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, 25% or more of the equity interests of a legal entity customer, the beneficial owner is the trustee. Include all Beneficial Owners that own 25% or more of the legal entity. In certain instances, we may require disclosure of Beneficial Owners at the 10% threshold.

| | |
|---|---|
| Name: Foris Ventures, LLC | Name: |
| Legal Address: 751 LAUREL STREET, #717, SAN CARLOS, CA, 94070 | Legal Address: |
| Date of Birth: | Date of Birth: |
| Title: | Title: |
| Ownership % (if any): 29.9% | Ownership % (if any): |
| Nationality: | Nationality: |
| TIN//EIN/ SSN: 20-4574231 | EIN/TIN or SSN: |
| Photo ID Collected: ☐ Yes ☐ No | Photo ID Collected: ☐ Yes ☐ No |

| | |
|---|---|
| Name: | Name: |
| Legal Address: | Legal Address: |
| Date of Birth: | Date of Birth: |
| Title: | Title: |
| Ownership % (if any): | Ownership % (if any): |
| Nationality: | Nationality: |
| EIN/TIN or SSN: | EIN/TIN or SSN: |
| Photo ID Collected: ☐ Yes ☐ No | Photo ID Collected: ☐ Yes ☐ No |

| | |
|---|---|
| Name: | Name: |
| Legal Address: | Legal Address: |
| Date of Birth: | Date of Birth: |
| Title: | Title: |
| Ownership % (if any): | Ownership % (if any): |
| Nationality: | Nationality: |
| EIN/TIN or SSN: | EIN/TIN or SSN: |
| Photo ID Collected: ☐ Yes ☐ No | Photo ID Collected: ☐ Yes ☐ No |

DocuSign Envelope ID: 130F3226-B1CA-4890-B911-0ECECEE80E6B

| | |
|---|---|
| Name: | Name: |
| Legal Address: | Legal Address: |
| Date of Birth: | Date of Birth: |
| Title: | Title: |
| Ownership % (if any): | Ownership % (if any): |
| Nationality: | Nationality: |
| EIN/TIN or SSN: | EIN/TIN or SSN: |
| Photo ID Collected: ☐ Yes ☐ No | Photo ID Collected: ☐ Yes ☐ No |

| | |
|---|---|
| Name: | Name: |
| Legal Address: | Legal Address: |
| Date of Birth: | Date of Birth: |
| Title: | Title: |
| Ownership % (if any): | Ownership % (if any): |
| Nationality: | Nationality: |
| EIN/TIN or SSN: | EIN/TIN or SSN: |
| Photo ID Collected: ☐ Yes ☐ No | Photo ID Collected: ☐ Yes ☐ No |

<u>Control Person</u>: Single individual with significant responsibility to control, manage, or direct the legal entity. This includes, an executive officer or senior manager (e.g., CEO or CFO), or any other individual who regularly performs similar functions. Only one Control Person is required.

| | |
|---|---|
| Name: Han Kieftenbeld | Name: |
| Legal Address:15 Heather Lane, Basking Ridge, NJ 07920 | Legal Address: |
| Date of Birth: June 20, 1965 | Date of Birth: |
| Title: Interim Chief Executive Officer and Chief Financial Officer | Title: |
| Ownership % (if any): Less than 1% | Ownership % (if any): |
| Nationality:  Dutch (Netherlands) | Nationality: |
| EIN/TIN or SSN:  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 | EIN/TIN or SSN: |
| Photo ID Collected: X Yes ☐ No | Photo ID Collected: ☐ Yes ☐ No |

Please use additional pages, as needed.

I, *Han Kieftenbeld,* hereby certify, to the best of my knowledge,   that the information provided  above is complete  and correct.

Signature: _____ Date: _____
*DocuSigned by:*
*Han Kieftenbeld*
A144E0E76B6E45A...
July 24, 2023

Legal  Entity  Identifier  (optional): _____

Intrepid Investment Bankers LLC
Addendum to Engagement Agreement
V2022