# EXHIBIT B

**Fleming Declaration**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> AMYRIS, INC., *et al.*, <br><br> Debtors.[1] | Chapter 11 <br><br> Case No. 23-11131 (TMH) <br><br> (Jointly Administered) |

**DECLARATION OF STEVEN J. FLEMING IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER (I) APPROVING KEY EMPLOYEE INCENTIVE PLAN FOR SENIOR LEADERSHIP EMPLOYEES AND (II) APPROVING KEY EMPLOYEE RETENTION PLAN FOR NON-INSIDER EMPLOYEES**

I, Steven J. Fleming, hereby declare that the following is true and accurate to the best of my knowledge, information, and belief:

1. In conjunction with the Chapter 11 Cases of Amyris, Inc. ("Amyris") and its affiliated and related above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company"), I submit this declaration (the "Declaration") in support of the *Debtors' Motion for an Order (I) Approving Key Employee Incentive Plan for Senior Leadership Employees and (II) Approving Key Employee Retention Plan for Non-Insider Employees* (the "Motion") filed concurrently herewith. Capitalized terms used buy not defined herein shall have the meanings ascribed to them in the Motion. Except as may otherwise be noted, I could and would testify to the following based upon my personal knowledge.

2. I am familiar with the terms of the Debtors' proposed Key Employee Incentive Plan (the "KEIP") and the Debtors' Key Employee Retention Plan (the "KERP") as described in the Motion.

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

A.     **General Employee Overview and Prepetition Bonus Programs**

3.     As of the Petition Date, the Debtors employ approximately 708 employees, 557 of whom are salaried and 151 of whom are hourly (the "Employees"). The Employees perform a variety of functions critical to the preservation of value and the administration of the Debtors' estates. In many instances, the Employees include personnel who have specialized and unique technical and scientific expertise, are intimately familiar with the Debtors' businesses, processes, and systems, and who cannot be easily replaced. Without the continued, uninterrupted services of the Employees, the Debtors simply could not run their business and preserve value for the benefit of all stakeholders. None of the Debtors' employees are subject to collective bargaining agreements.

4.     On the Petition Date, the Debtors filed that certain *Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Grant Related Relief* [Docket No. 11] (the "Wage Motion").  Among other things, the Wage Motion sets forth the various programs and compensation that the Debtors proposed to offer their employees postpetition.  The Wage Motion further discloses the existence of certain bonus and incentive programs offered by the Debtors prepetition (the "Prepetition Bonus Programs"), but explicitly does not request authority to continue to honor Prepetition Bonus Programs on a postpetition basis.

5.     In this regard, and among the Prepetition Bonus Programs were annual and quarterly bonuses offered to substantially all of the Debtors' employees (the "Annual/Quarterly Bonus Program").  However, as of the Petition Date, the Debtors have not made payments

pursuant to the Annual/Quarterly Bonus Program based on annual and fourth quarter performance in 2022.

5.      Additionally, a material component of the prepetition compensation for many of the Debtors' employees were restricted stock units and non-qualified stock options ("Equity Compensation"). However, in light of the Debtors' financial condition, it is unlikely that the Equity Compensation will have any value.

6.      Furthermore, in the forty-five days preceding the Petition Date, the Debtors reduced their workforce by approximately thirty percent (30%) over two workforce reductions that took place on or about June 26th and August 8th. As a result of the reductions in force, many of the remaining employees in the Debtors' accounting, finance, legal, human resources, and operations departments will have substantial additional responsibilities as they work toward a restructuring of the business. The Debtors must seek to shore up morale in various areas of operation and management to preserve the business and ensure a successful restructuring in these cases. The Employees' continued focus, energy, and efforts are critical to the Debtors' ability to restructure and to maximize creditor recoveries in these Chapter 11 Cases.  As a result of the reduction in force, the Debtors' workforce has been streamlined to only include those most crucial employees who are fundamental to the Debtors' success during these Chapter 11 Cases.

**B.      The Proposed KEIP**

7.      The "Senior Leadership Employees" are twelve members of the Debtors' senior leadership team, consisting of among others the Debtors' Chief Financial Officer/Interim Chief Executive Officer, Chief Operations Officer, Chief Strategist/Product Development, and Chief People Officer.  The Senior Leadership Team is responsible for executing the Debtors' operating and strategic plans, including maintaining the Debtors' business operations, overseeing and

3

addressing issues during these Chapter 11 Cases, managing the Debtors' sale and marketing process, and maintaining employee morale and a positive culture among the Debtors' employees during these Chapter 11 Cases.  The Debtors believe that the Senior Leadership Employees cannot be easily replaced without significant operational setbacks and material efficiency losses, especially during the anticipated brief duration of these Chapter 11 Cases.  The Senior Leadership Employees are vital to the on-going stability, continuity, and strength of the Debtors' business during these Chapter 11 Cases. A material component of compensation of certain of these Employees was equity grants that are now worthless.

8. There are two tranches of KEIP awards – the "Consumer Brands Sale KEIP Award" and the "Supplemental KEIP Award". The first tranche (the "Consumer Brands Sale KEIP Award") is payable to the twelve Senior Leadership Employees based upon either (a) the amount of total consideration received in connection with a sale of the Debtors' consumer assets or (b) the total consideration received from the sale of a particular brand. The second tranche (the "Supplemental KEIP Award") is payable to seven of the twelve Senior Leadership Employees who are most critical to the overall restructuring efforts based on compliance with the DIP budget and confirmation of a chapter 11 plan. The performance targets were developed carefully to ensure they are an appropriate "reach" to drive performance, on the one hand, but will not present unrealistic or unattainable goals, on the other hand—which would of course thwart the incentivizing nature of the KEIP.

9. **Consumer Brands Sale KEIP Award.** The Consumer Brands Sale KEIP Award is a tiered award based upon, and funded by, the sale proceeds of a transaction or transactions (the "Consumer Brands Sale Proceeds"). The total Consumer Brands Sale KEIP Award ranges from $0 - $5,225,000, depending upon the sale proceeds received. Seven of the Senior

4

Management Employees' award will be measured based upon the aggregate sale proceeds for all of the consumer brands. The other five Senior Management Employees' award will be measured based upon the sale proceeds solely for a particular consumer brand.

10. **Supplemental KEIP Award.** In addition to the Consumer Brands KEIP Award, the Supplemental KEIP Award is a pool in the amount of $691,000 (the "Supplemental KEIP Award Pool"). Supplemental KEIP Awards are payable to seven of the Senior Management Employees instrumental in effectuating a successful restructuring and will be in addition to the Consumer Brands KEIP Award, based upon the following targets:

- Fifty percent (50%) of the target payout ($345,500) is conditioned on the Debtors staying within 15% of the cumulative "Total Operating Cash Flows" line item of the approved DIP financing budget in effect at the time through confirmation of the chapter 11 plan.

- The remaining fifty percent (50%) of the pay-out ($345,500) is earned upon the successful confirmation of a chapter 11 plan.

11. In the event that the employment of a Senior Management Employee is terminated without cause, prior to target, such Senior Management Employee will receive his/her KEIP Award on a *pro rata* basis based on the percentage of the amount of time from the Petition Date to the date the KEIP Award is earned. Under all other employment termination scenarios, Senior Management Employees will not be eligible for any payments under the KEIP.

12. Subject to Court approval of the KEIP, the Senior Management Employees will waive any contractual cash severance and/or bonus payments, including claims arising from rejection of change in control agreements.

C. **The Proposed KERP**

13. The seventy-eight Non-Insider Employees, who each serve crucial roles in the Debtors' various, engineering, sales, operational, and back office and administrative positions, are divided into three tiers under the KERP:

5

- Tier One includes Non-Insider Employees who play a critical role in maintaining the Debtors' operations and have direct knowledge and expertise required to execute the Debtors' sale process and operational restructuring.

- Tier Two includes Non-Insider Employees who for the most part are direct reports to certain of the Tier One Non Insider-Employees. The loss of any Non-Insider Employees in Tier Two would directly affect the ability of the Tier One Non-Insider Employees to carry out their essential duties.

- Tier Three consists of Non-Insider Employees who are necessary to support the continuity of the Debtors' operations. The continued focus of Tier Three Non-Insider Employees is needed to support the administration of the chapter 11 cases and manage the normal day-to-day responsibilities critical to the continued operation of the Debtors' business.

14. Under the proposed KERP, each Non-Insider Employee will receive aggregate payments totaling between one to three months' base salary, depending on their tier level, in two installments. In order to receive the first payment under the KERP, a Non-Insider Employee must be employed by the Debtors as of November 30, 2023 (the "First KERP Trigger Date"). In order to receive the second payment under the KERP, a Non-Insider Employee must be employed by the Debtors upon emergence from chapter 11 (the "Second KERP Trigger Date"). However, if a Non-Insider Employee's employment with the Debtors is terminated without Cause (as defined below), or due to death or disability, prior to the closing date of a sale of substantially all the Debtors' assets, the such Non-Insider Employee shall be entitled to receive any payment they would have been entitled to receive under the KERP, had the Non-Insider Employee been employed through the KERP Trigger Date.

15. For purposes of the preceding paragraph, "Cause" means (i) a Non-Insider Employee' failure to materially perform the duties for which they are employed, (ii) a Non-Insider Employee's willful violation of a material policy of the Debtors, (iii) a Non-Insider Employee's commission of any act or acts of fraud, embezzlement, dishonesty, or other willful misconduct, (iv) a Non-Insider Employee's material breach of any of their obligations under any

6

written agreement or covenant with the Debtors, or (v) an act of dishonesty on the part of the Non-Insider Employee resulting or intended to result, directly or indirectly, in their gain for personal enrichment at the expense of the Debtors.

16. Subject to Court approval of the KERP, the Senior Management Employees will waive any contractual cash severance and/or bonus payments, including claims arising from rejection of change in control agreements. The KERP replaces all of the Debtors' prepetition incentive and severance plans for the Non-Insider Employees.

17. Because the Debtors have not made payments to the Non-Insider Employees pursuant to the Annual/Quarterly Bonus Program for annual and fourth quarter of 2022, the Debtors are seeking to provide the KERP in lieu of such payments in order to meaningfully incentivize the Non-Insider Employees to continue to provide their services to the Debtors during these Chapter 11 Cases. The KERP proposes to incentivize approximately ten percent (10%) of the Debtors' total workforce and has a maximum cost of approximately $2,66,307, in the aggregate.

**D.    The KEIP and KERP Should be Approved**

18. In order to maintain the Debtors' operations and preserve going concern value while the Debtors' prosecute their Chapter 11 Cases and pursue consumer brands sale transactions to maximize value for their stakeholders, their management and employees have had to both maintain the Debtors' day-to-day operations and concurrently pursue a value maximizing transaction for the benefit of their stakeholders. In addition, the Debtors' management and key employees have had and must continue to minimize the disruption caused by the Chapter 11 Cases on their customers, vendors, and other stakeholders. In order to meet and overcome these challenges, the Debtors' must rely on the continued guidance of their Senior Leadership

Employees and the superb performance of the Non-Insider Employees, who are difficult to replace within the timeline of these Chapter 11 Cases.

19.     Accordingly, I have determined that implementing the KEIP and KERP is essential to effectively and efficiently accomplish the Debtors' goals of maximizing the value of their estates through a strategic transaction, including the sale of substantially all of their assets. I believe that the KEIP and KERP will help ensure that the Senior Leadership Employees and the Non-Insider Employees are properly motivated to achieve these goals. Furthermore, the KEIP and KERP are structured to align the incentives of the Debtors' employees with the Debtors' economic stakeholders, which include working to maximize the value that may be derived from the Debtors' estates. I respectfully submit that the KEIP and KERP will provide the necessary incentive to the Senior Leadership Employees and Non-Insider Employees to consummate a strategic transaction, which will benefit the Debtors' chapter 11 estates, creditors, and other parties in interest.

20.     The awards available under the KEIP total $2.8 million at the target threshold and are reflective of inventive-based compensation plans approved in other Chapter 11 cases.

- Nine of the KEIP participants are foregoing previously awarded bonuses totaling over $800 thousand, or twenty-nine percent (29%) of the target KEIP pay-out.
- Three of the KEIP participants are waiving any contractual claims on account of existing executive severance programs which total $1.5 million, or fifty-four percent (54%) of the Target KEIP pay-out.
- Certain KEIP participants have equity grants that are now worthless.

21.     As noted, the Sale KEIP awards are payable based upon the amount of gross consideration received in connection with a sale of the Debtors' consumer assets. The performance targets were developed carefully to ensure they are an appropriate "reach" to drive performance, on the one hand, but will not present unrealistic or unattainable goals, on the other

hand, which would have the counterproductive effect of thwarting the incentivizing nature of the plan

22. In addition to the Sale KEIP, there is a supplemental KEIP for the executives who are most critical to the overall restructuring efforts. The supplemental KEIP pay-out triggers are based on compliance with the DIP budget and the confirmation of a chapter 11 plan.

23. The KEIP was approved by the Leadership, Development, Inclusion and Compensation Committee of Debtors' Board of Directors, which does not include any Senior Leadership Employees who hold seats on the Board of Directors.

24. The Debtors, with their advisors and stakeholders in this case, have developed the Programs, which are appropriately designed to retain the services of the KERP Participants and incentivize the KEIP Participants as the Debtors continue to operate while marketing and selling the consumer business units. Without this relief, KERP Participants are likely to leave, and KEIP Participants will not be properly incentivized, which will imperil the success of these Chapter 11 Cases.

25. In evaluating the appropriateness of the KERP, PwC undertook to define a set of relevant market comparables to that of the Debtors, and benchmarked comparable key employee retention plans from select chapter 11 cases of ten different companies that (a) were approved by bankruptcy courts in 2019 or later and (b) had no more than 151 participants in the retention plan. Following a review of this set of market comparables, PwC observed a number of market practice factors, including:

- the total cost of the KERP;
- the number of participants; and
- the average award per participant.

26. Based on the above factors, I believe the design and the cost of the KERP to be within the range of the market practice as compared to plans proposed and approved at similarly situated companies. Specifically, the approximate $2.66 million aggregate, maximum cost of the KERP program with respect to the KERP Participants is reasonable in comparison to the total cost of KERPs in the comparative set, which ranged from $1.5 million to approximately $3.9 million, and only slightly above the average of approximately $2.54 million. Further, the percentage of base salary per KERP Participant of fourteen percent (14%) is within the range of the market average percentage of base salary of 41.1 percent per participant included in the comparative set.

27. PwC also found the design and the cost of the proposed KEIP to be within the range of market practices as compared to plans proposed and approved for similarly situated companies. Specifically, when measured with respect to the twelve KEIP Participants, the average KEIP Award is $231,750, which is less than the average in the comparative set of $295,069. Additionally, when measured with respect to the twelve KEIP Participants, the aggregate proposed payments under the KEIP with respect to such KEIP Participants of $2.78 million is reasonable in comparison to the total cost of KEIPs in the comparative set, which ranged from $850 thousand to $3.18 million. In evaluating the appropriateness of the KEIP with respect to the Senior Management Employees, PwC undertook to define a set of relevant market comparables to that of the Debtors, and benchmarked comparable key employee incentive plans from select chapter 11 cases of eight different companies approved in year 2018 or later that had Section 363 sale targeted KEIPs and the assets ultimately were sold for $300 million or less of sale proceeds.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 24, 2023

　　　　　　　　　　　　　　　　　　　　　　*/s/ Steven J. Fleming*
　　　　　　　　　　　　　　　　　　　　　　Steven J. Fleming