# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AMYRIS, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-11131 (TMH)<br><br>(Jointly Administered) |

**DECLARATION OF PHILIP J. GUND IN SUPPORT OF THE DEBTORS' MOTION TO ASSUME AND/OR ENTER INTO REIMBURSEMENT AGREEMENTS WITH PROFESSIONALS FOR THE AD HOC NOTEHOLDER GROUP**

I, Philip J. Gund, declare under penalty of perjury as follows:

1. I am a Senior Managing Director with Ankura Consulting Group, LLC (together with its wholly owned subsidiaries, agents, independent contractors, and employees "Ankura"), a global multidisciplinary consulting firm with 35 office around the world. Services provided by Ankura include turnaround advisory services to companies in crisis or those in need of performance improvement in specific financial and operational areas. On August 9, 2023, I was appointed Chief Restructuring Officer ("CRO") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors").

2. I submit this declaration (this "Declaration") in support of the Debtors' Emergency Motion to Assume and/or Enter Into Reimbursement Agreements with Professionals for the Ad Hoc Noteholder Group (the "Motion"),[2] filed contemporaneously herewith.

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

3. Except as otherwise indicated, the statements in this Declaration are based on: (a) my personal knowledge of the Debtors' operations; (b) my review of relevant documents; (c) information provided to me by, or discussions with, members of the Debtors' management team, other employees, or the Debtors' other advisors; and/or (d) my general experience and knowledge. I am authorized to submit this declaration on behalf of the Debtors. If called upon to testify, I can and will testify competently as to the facts set forth herein.

## BACKGROUND AND QUALIFICATIONS

4. I have held the title of Senior Managing Director at Ankura since March 2016. I have worked in the turnaround and restructuring field for 33 years. Prior to joining Ankura, I was a founding principal of Marotta Gund Budd & Dzera LLC and was a principal at Zolfo Cooper LLC. I have a BBA from Pace University and am a Certified Public Accountant and Certified Insolvency and Restructuring Advisor. I am a member of the American Institute of Certified Public Accountants, New York State Society of Certified Public Accountants, Association of Insolvency & Restructuring Advisors, American Bankruptcy Institute, and Turnaround Management Association.

5. Since May 1989, I have served as an advisor or interim executive in the transformation, turnaround, and restructuring of numerous large and complex companies, advising management teams, boards of directors, equity sponsors, and creditor constituents. During the course of my career, I have been involved in numerous large and complex restructurings. Among other roles, I have served as the Chief Restructuring Officer of Vivaro Corporation, Cedar and Vicksburg Chemical Companies, and Family Golf, the Restructuring Officer and Chief Financial Officer of American Commercial Barge Lines, Inc. and the Chief Financial Officer of SunEdison, Inc. Additional examples of large, complex restructurings in which I served a lead role include,

but are not limited to Bradlees Stores, Inc., Global Brands Group, Sbarro, and Intelsat Connect Finance.

6.  Since being appointed as CRO, I have been actively involved with discussions with the Debtors' major stakeholders, including Foris and the Ad Hoc Noteholder Group, regarding the terms of a comprehensive and consensual restructuring of the Debtors through these Chapter 11 Cases. I am familiar with the Debtors' decision to enter into the Noteholder Group Reimbursement Agreements and to agree to pay the reasonable and documented fees and expenses of the Noteholder Group Professionals.

## BENEFITS PROVIDED BY THE NOTEHOLDER GROUP REIMBURSEMENT AGREEMENTS

7.  To facilitate an efficient negotiation, maximize the likelihood of reaching broad consensus, and ease the administrative burden on the Debtors' estates, the Debtors believe that it is most effective to negotiate with the holders of Convertible Notes through an organized ad hoc committee. To facilitate such coordinated and efficient negotiations, I understand that the Debtors agreed prepetition to pay the reasonable fees and expenses of Paul Hastings, counsel to the Ad Hoc Noteholder Group, in connection with the terms of a comprehensive and consensual restructuring of the Debtors. Following the Petition Date, the Ad Hoc Noteholder Group retained Blank Rome as Delaware counsel and BRG as financial advisor.

8.  The benefit of working to consensually align major constituencies in these Chapter 11 Cases is difficult to overstate. Put simply, if the Debtors are able to reach consensus with major stakeholders on the terms of a chapter 11 plan of reorganization, the Chapter 11 Cases will likely be shorter in duration, the parties will have eliminated costly and unnecessary litigation, and—ultimately—will facilitate the confirmation of a plan. Reaching consensus with the Ad Hoc Noteholder Group—which represents the interests of the Debtors' the single-largest creditor

constituency—not only avoids drawn-out disputes between the Debtors and a fragmented creditor body, but also substantially diminishes the risks and costs attendant to the Debtors resulting from languishing in bankruptcy, maximizing value available for all creditors.

9. Relatedly, the Debtors greatly benefit from the efficiencies that come from having organized negotiation counterparties in light of the sheer volume of individual creditors with whom they would otherwise need to negotiate on a highly fragmented basis. In my opinion, it would be far more difficult and certainly more costly to the estates if the Debtors were unable to negotiate with an organized group of holders of Convertible Notes. I do not believe that it is feasible to successfully progress on the terms of a plan of reorganization—or these Chapter 11 Cases generally—without the continued engagement of the Ad Hoc Noteholder Group.

10. Moreover, the cooperation of the Ad Hoc Noteholder Group has allowed the Debtors to focus on the most pressing matters at hand—ensuring operational stability and pursuing a successful restructuring that would comprehensively resolve the Debtors' liabilities. The continued engagement—as opposed to value-destructive litigation—of the Ad Hoc Noteholder Group, advised by competent and consistent professionals in what has been a constructive process thus far, is essential towards maximizing enterprise value and recovery to creditors, and a successful reorganization.

## CONSEQUENCES OF NON-PAYMENT OF THE NOTEHOLDER GROUP PROFESSIONALS

11. If the Debtors do not receive authorization to pay the reasonable and documented fees and expenses of the Noteholder Group Professionals, then all of the above-listed benefits may be lost. The Debtors' inability to reimburse the Noteholder Group Professionals would jeopardize the continued viability of the Ad Hoc Noteholder Group itself and the efficiencies associated with its involvement in these cases. If the Debtors are not approved to cover these fees and expenses,

then the Ad Hoc Noteholder Group would be faced with the undesirable options of (i) disbanding, (ii) relying on their professionals to agree to continue working with no assurance of payment, or (iii) attempting to obtain the agreement of their members to shoulder the burden of the group's professional fees themselves.

12. Absent assurance of payment for the reasonable fees and expenses arising from their professionals' engagement with the Debtors, the coordinated approach taken by the Ad Hoc Noteholder Group to date could erode or be abandoned altogether. The Debtors could be forced to negotiate with numerous parties on a one-off basis or bring new advisors up to speed, creating tremendous inefficiency. Especially given the short time frame afforded to the Debtors to negotiate with their stakeholders on the terms of a consensual in-court restructuring, the loss of momentum attendant to any disengagement by the Ad Hoc Noteholder Group would seriously imperil the Debtors' restructuring efforts. The trajectory of the Debtors' cases would become substantially more uncertain, the Debtors would likely spend substantially more time in bankruptcy (with correspondingly higher restructuring costs), and the Debtors' employees, vendors, and customers could lose confidence in the Debtors, harming the Debtors' business and potentially reducing the value of the enterprise.

13. As should be clear from the foregoing, the cost of the reasonable and documented fees and expenses of the Ad Hoc Noteholder Group—which, here, is subject to a negotiated cap—will in all likelihood be meaningfully less than the potential loss of value should the Ad Hoc Noteholder Group disengage or disband.

**FEE PAYMENT IS TYPICAL AND WITHIN THE DEBTORS' BUDGET**

14. In my experience, it is customary for debtors to engage with ad hoc committees of creditors for efficiency and to minimize costs. In addition, it is customary for ad hoc groups

working in good faith toward a consensual restructuring to require that their professionals' fees be paid in consideration of that support.  This case is no exception.  The Debtors have the agreement of Foris and thus the liquidity to pay the reasonable and documented fees and expenses of the Noteholder Group Professionals, subject to the agreed-to cap, which will be incorporated into the Approved Budget.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  August 25, 2023

 */s/ Philip J. Gund*  
PHILIP J. GUND  
Senior Managing Director  
Ankura Consulting Group, LLC
