# EXHIBIT B-1

# PAUL HASTINGS

Dated as of August 1, 2023

Amyris, Inc.
5885 Hollis Street, Suite 100
Emeryville, CA 94608

Re:     Payment of Fees and Expenses of Paul Hastings LLP

Dear Sir or Madam:

Paul Hastings LLP (the "Firm," "we" and "our") has been retained by an ad hoc group of convertible noteholders (the "Ad Hoc Group" or the "Client") who collectively hold more than 50% of the notes (the "Notes") issued by Amyris, Inc. (the "Company or "you") under that certain Indenture dated as of November 15, 2021, by and among Amyris, Inc. as issuer, and U.S. Bank National Association, as trustee, governing the issuance of the Company's 1.50% Convertible Senior Notes Due 2026 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Indenture") in connection with a potential financial and/or operational transaction and/or restructuring involving the Company (any such transaction or restructuring, a "Transaction," and such engagement, the "Engagement"). This letter and the attached Additional Terms set forth the terms of our engagement for this matter (collectively, the "Fee Letter").

The purpose of this Fee Letter is to confirm that the Company has agreed to pay the Firm's reasonable and documented fees and expenses incurred in connection with the Engagement, effective as of July 1, 2023; provided that the Company's obligation to reimburse the Firm for fees incurred by the Ad Hoc Group prior to August 1, 2023 will be $25,000; provided further, that the Company may terminate this agreement by providing written notice of such termination to the Firm at any time beginning on the date that is thirty (30) days after the Company's filing of chapter 11 proceedings. Notwithstanding the Company's obligations hereunder to pay the reasonable and documented fees and expenses of the Firm, the Firm will in no way be deemed to represent the Company and no attorney-client relationship between the Firm and the Company or any of its affiliates is or will be created or reflected hereby. The Company hereby acknowledges and agrees that nothing in this Fee Letter shall, directly or indirectly, by implication or otherwise, waive, or be deemed to constitute a waiver of, or otherwise prejudice in any manner whatsoever, applicable privileges (if any) including, without limitation, the attorney-client privilege, covering all communication and correspondence between the Firm and the Ad Hoc Group and any work product and analyses prepared by or on behalf of the Firm or the Ad Hoc Group.

*Fees and Expenses.* We typically bill for our services and expenses on a monthly basis and expect prompt payment. Unless otherwise agreed in writing, we will charge fees based on the hourly rates of the attorneys, paralegals or other personnel providing services. The current hourly rates of the attorneys principally responsible work on the Engagement are as follows: John Storz, $1,625; Frank Merola, $1,875; and Sal Perrotto, $1,625. We will use the services of other attorneys, paralegals or other personnel when appropriate which will be charged at the hourly rates for such individuals. The current hourly rates of the attorneys we expect to work on the Engagement range from $855 to $1,875. Our hourly rates are based on experience, training, specialty, and other relevant factors. We periodically revise these rates based on various factors including market information. We also will invoice you for ancillary services and expenses. Please refer to the section on Billing and Expenses in the attached Additional Terms for additional details.

# PAUL
# HASTINGS

Dated as of August 3, 2023

Page 2

*Advance Payments.* As we have discussed, the Company has agreed to provide the Firm an advance payment in the amount of $175,000 to be applied against our fees and expenses. If at the end of the Engagement, the amount you paid us as an advance exceeds the outstanding balance of our fees and expenses, we will refund the unused portion. If our aggregate charges have significantly reduced or exhausted the advance, at our request you agree to promptly remit an additional advance in an amount to be agreed upon. Please refer to the section on Advance Payments in the attached Additional Terms for additional details.

*Fee Disputes.* We will, where applicable, provide you with redacted statements indicating a breakout by attorney of the aggregate hours and charges for each attorney working on the matter and a breakout of expenses and disbursements incurred (subject to paragraph 4 of the attached Additional Terms); provided, however, that under no circumstances shall the Firm be required to include any information in such statements that is, or that the Firm deems to be, confidential and/or protected by the attorney-client privilege or other privilege. We encourage you to raise questions promptly about any billing matters. While the Firm will respond promptly to the Company's reasonable inquiries concerning its statements, in no event shall the due date for each statement be deferred pending the Firm's response to the Company's questions, with respect to any undisputed amount of any statement. You agree to review our statements and raise any questions or concerns within 30 days of receipt. If you object to a portion of the charges on a statement, you agree to pay the remaining charges promptly, which will not constitute a waiver of your objection. If there is a disagreement about a billing issue, we will work with you to try to reach an amicable resolution. If we are unable to reach a resolution, you have the right to: (1) elect non-binding arbitration of any fee dispute under the terms and procedures of Part 137 of the Rules of the Chief Administrator of the Courts of the State of New York provided the dispute meets the requirements of the rule; and (2) seek de novo judicial review of any arbitration award. (*See* Attachment A hereto). Notwithstanding these rights, by signing below you agree to waive your rights under Part 137 and to resolve any dispute concerning attorney's fees for legal services by final and binding arbitration administered by JAMS in accordance with its rules (information about JAMS is available at www.jamsadr.com). You further agree that any arbitration or litigation of a fee dispute arising out of our representation of you will be governed under New York law. Finally, you acknowledge that you have received and read the official written instructions and procedures for both Part 137 and the New York State Fee Dispute Resolution Program Rules.

*Confirmation of Agreement.* To memorialize our understanding, please sign and return the enclosed copy of this Fee Letter. Your signature confirms that this Fee Letter, including the attached Additional Terms, is approved and accepted by you.

Very truly yours,

*/s/ John F. Storz*
John F. Storz

Agreed to this 8 day of August, 2023.

By: *Han Kieftenbeld* (DocuSigned)
Name: Han Kieftenbeld
Title: Interim CEO and Chief Financial Officer
Authorized to sign on behalf of Amyris, Inc.

# PAUL HASTINGS

Dated as of August 3, 2023

Page 3

## Paul Hastings LLP Additional Terms

The following provisions will apply to the relationship between Paul Hastings LLP, including its affiliates (the "Firm" and "we"), and the Company ("you" and "your"), as identified in the accompanying letter agreement:

1. **Client Identity.** Unless otherwise agreed in a later writing, we will not represent or form an attorney-client relationship with you or any person or entity related to you, including (i) any officer, director, employee or agent; (ii) any parent, subsidiary or other affiliate; (iii) any entity of which you are a partner or member; (iv) any shareholders, partners, members, or other related interests; (v) any fund or account that you manage; or (vi) any of your insurers (when we represent a party in defending a claim covered by insurance, we represent the insured, not the insurer, even though we may be approved, selected or paid by the insurer).

2. **[Reserved].**

3. **Non-Binding Estimates.** The Firm understands the importance of the budgeting process, and we will accommodate reasonable requests to prepare budgets and estimates. However, budgets and estimates are by their nature inexact and shall not be binding.

4. **Billing and Expenses.** The Firm will invoice you for ancillary services and expenses, such as photocopying, scanning, messenger and courier services, court reporter services, filing fees, online or computerized research, litigation support service, document processing, facsimile, postage, printing, secretarial or administrative overtime, travel related expenses, parking and similar expenses, whether internal or paid to third parties. Charges for ancillary services are typically based on the Firm's direct and indirect cost, a consideration of the market price and customary charges of other providers, or some combination of these factors. However, the charges for ancillary services shall not exceed the actual cost of such services. If a matter requires the services of a third party (*e.g.*, experts, consultants, mediators, e-discovery vendors), you agree to pay such third parties directly whether they are retained by the Firm on the Ad Hoc Group's behalf or by the Ad Hoc Group directly; provided, that, in no event shall the fees, expenses, or other charges for services of a third party be payable by the Company unless the Company has expressly consented to pay such fees, expenses or other charges for services of a third party. However, if the Firm assumes an obligation or makes payment on your behalf, you agree to promptly reimburse the Firm. Subject to the Company's express written consent, if the matter necessitates a substantial expenditure on the Ad Hoc Group's behalf, we may request that you pay the expense directly or that you pay the funds to the Firm before the expense is incurred or paid. All payments may be sent directly to our lockbox at Paul Hastings LLP, P.O. Box 894803, Los Angeles, CA 90189-4803, or via ACH or wire in accordance with the instructions provided on each billing statement.

5. **Advance Payments.** The Firm may require an advance payment before working on this matter or any other matter that we agree to handle. Unless otherwise agreed, all advance payments shall be deemed to be advances on attorneys' fees and shall not constitute advances for costs. Where permitted, the Firm may maintain such advance fee payments in a general account. The amount of this advance payment does not represent our estimate of the total charges that may be incurred, but is only a partial advance payment. You understand that the amount of work that we may need to perform may exceed our current expectations. The Firm reserves its right, as a condition to the provision of further services,

# PAUL
# HASTINGS

Dated as of August 3, 2023

Page 4

to require an advance payment, if none has previously been provided, or an additional advance payment. Any charges not covered by the advance payment are due and payable directly by you on receipt of each monthly statement. At the conclusion of our representation, any portion of any advance payment which has not been used to pay outstanding invoices will be refunded to you, along with a summary accounting of fees and expenses charged versus payments made by the Company.

In the event of an imminent bankruptcy filing by you and/or any of your affiliates, the Firm shall apply (and shall be deemed to have applied, as of immediately prior to the bankruptcy filing) all amounts then outstanding under any invoice submitted by the Firm to you against any remaining advance payment held by the firm at such time and, in the event that the advance payment is not sufficient to pay such amounts in full, you will provide immediate payment of all such excess amounts.

6. **[Reserved].**

7. **[Reserved].**

8. **[Reserved].**

9. **[Reserved].**

10. **Conclusion of Representation.** The Ad Hoc Group has the right to terminate our services at any time, subject to court approval if required. Likewise, subject to applicable ethical rules, the Firm has the right to terminate this Engagement if you fail to pay our invoices in a timely manner or for any other reason.

    Our engagement on any specific matter will conclude at the earlier of the completion of our work on such matter or upon termination of our representation by the Ad Hoc Group or the Firm. However, you will remain obligated to pay for services rendered and costs or expenses paid or incurred on the Ad Hoc Group's behalf before the termination.

11. **Consent to Digital Communications, Media and Solutions.** In order to maximize our efficiency and facilitate communication and collaboration, we use a variety of digital communication methods, solutions, devices and media including, but not limited to, email, document transfer by computer, mobile phones, tablets, cloud solutions, cloud storage and other such solutions, devices and media. The Firm supports email encryption in transit using industry standard TLS encryption for both inbound and outbound email messages. If you prefer that emails between our organizations are subject to mandatory encryption, we can work with your email administrator to establish such a protocol. The Firm endeavors to use reasonable security measures consistent with applicable law, including our ethical obligations, and appropriate to the sensitivity of the information. However, no electronic medium is without risk. Your acceptance of these Additional Terms constitutes consent to the use of electronic communications, media and solutions, and acceptance of the risks that they entail.

12. **Data Protection – Global.** We will collect, process, store and transfer all personally identifying information disclosed to us by or on behalf of you in compliance with relevant data protection laws and regulations and for the purposes set out in our Global Privacy Statement (available at www.paulhastings.com) or as otherwise permitted or required by applicable law. You acknowledge and agree that we may collect, process, store and transfer personally identifying information within our

# PAUL
# HASTINGS

Dated as of August 3, 2023

Page 5

Firm at any of our offices and affiliates around the globe and to agents and third parties retained by us, together with their successors and assigns, in accordance with relevant data protection laws and regulations as set out in our Global Privacy Statement. You also agree to notify the Firm in writing if you are subject to any other law that requires special treatment of data. After receiving such notification, we will discuss with you how we might assist you in complying with such law.

13. **Data Protection – EEA and Switzerland.**

    (a) Unless otherwise expressly provided, when our services require us to collect or process Personal Data[1] (1) in the European Economic Area (EEA) (which in this provision shall include the United Kingdom, regardless of "Brexit") or Switzerland or (2) belonging to a resident of the EEA or Switzerland, you (including, for purposes of this provision, any subsidiaries and affiliates) agree to the terms of this agreement with regard to the processing of that data.

    (b) The Firm treats all Personal Data received within or from the EEA or Switzerland or relating to persons located in those jurisdictions in accordance with GDPR and the legislation implementing GDPR in EEA member states (or, in the case of Switzerland, with its equivalent legislation).

    (c) Taking into account the state of the art, the costs of implementation and the nature, scope, context and purposes of processing as well as the risk of varying likelihood and severity for the rights and freedoms of natural persons, we will, in relation to Personal Data, implement appropriate technical and organizational measures to ensure a level of security appropriate to that risk, including, as appropriate, the measures referred to in Article 32(1) of GDPR.

    (d) We will act only on your instructions in relation to any Personal Data that we process on your behalf or at your direction, including, with regard to transfers of Personal Data, to a third country or an international organization, unless otherwise required by law. In such cases, we will inform you of such legal requirement before processing unless disclosure is prohibited under applicable law. We may use any Personal Data (including Sensitive Personal Data) that we Process on your behalf primarily for the provision of legal services to you and for related purposes including: (1) updating and enhancing client records and improving our ability to provide you with legal services; (2) statutory returns; and (3) legal and regulatory compliance.

    In relation to Personal Data transferred to us by you or at your direction, you agree that we may transfer Personal Data (including Sensitive Personal Data) outside of the EEA or Switzerland to the United States or other locations around the world in which we have offices or business operations. The Firm has executed Data Transfer Agreements, which include the Standard Contractual Clauses, approved under Directive 95/46/EC (as it may be amended or modified), between its EEA offices and each of our global offices outside of the EEA, as well as with all sub-

---

[1] "Personal Data" and any other defined terms that appear in this provision that are not expressly defined shall have the meaning provided in the General Data Protection Regulation ("GDPR"), (EU) 2016/679. References to "Personal Data" and other defined terms as they relate to Switzerland shall have the meanings ascribed to them in the Swiss Federal Data Protection Act, and references to "GDPR" in the context of Switzerland (i.e., to Personal Data processed or relating to persons in Switzerland) shall be understood to refer to that Act.

# PAUL
# HASTINGS

Dated as of August 3, 2023

Page 6

processors where applicable. You also agree that we may provide Personal Data (including Sensitive Personal Data) to third parties as required to fulfill our engagement (e.g., to other professional advisers and expert witnesses), regardless of where they are located.

(e) In relation to Personal Data, where practicable, we will assist you, by using appropriate technical and organizational measures, in fulfilling your obligations as the Data Controller to respond to requests for exercising the data subject's rights laid down in GDPR, Articles 12-23.

(f) For the purposes of vendors, suppliers, or other third parties we may engage as sub-processors of Personal Data:

(i) We will require those sub-processors to adhere to the requirements of Article 32 of the GDPR regarding the security of processing.

(ii) A list of sub-processors who support our operations and may process Personal Data is available on request or via our website at www.paulhastings.com/subprocessors. You consent to our use of these sub-processors and acknowledge that this list may be updated from time to time. If you object to a sub-processor, we will work with you in good faith to address the objection.

(iii) In the event that we engage a new sub-processor specifically and principally for the purpose of supporting your matters, we will provide you advance notice and an opportunity to object.

(g) Upon your request, and subject to and in accordance with applicable laws, we will delete or return to you all Personal Data.

(h) We will notify you without undue delay if we become aware of any breach affecting your Personal Data, in an attempt to provide you with sufficient information to allow you to meet any obligations to report or inform data subjects or the appropriate Data Protection Authority of the Personal Information breach under applicable data protection laws.

14. **Market Abuse Directive.** You agree to notify the Firm in writing if you are subject to the European Union's Market Abuse Directive 2003/6/EC (the "Directive") and the legislation implementing the Directive in EU member states, and require the Firm to maintain an insider list for your matter. Upon such notice, we will prepare and maintain a list of those persons working for the Firm who have access to certain inside information by virtue of our representation of you. If you have any questions relating to such list or any other issues, please contact the partner who signed the accompanying letter agreement.

15. **[Reserved].**

16. **[Reserved].**

17. **[Reserved].**

# PAUL HASTINGS

Dated as of August 3, 2023

Page 7

18. **Entire Agreement.** The accompanying letter agreement and these Additional Terms supersede all other prior and contemporaneous written and oral agreements and understandings and contain the entire agreement between you and the Firm. The accompanying letter agreement and these Additional Terms may be modified only by subsequent written agreement between you and the Firm that expressly states that it is modifying the accompanying letter agreement and these Additional Terms. You acknowledge that no promises have been made to you other than those stated in the accompanying letter agreement and these Additional Terms.

19. **Severability.** If any section or portion of the accompanying letter agreement and these Additional Terms is determined by any court or arbitrator to be illegal, invalid or unenforceable, such section or portion shall be deemed stricken and the remaining terms shall not be affected.