**Exhibit B**

**Security Agreement**

EXECUTION VERSION

## SECURITY AGREEMENT

This **Security Agreement** (this "**Security Agreement**"), dated as of May 2, 2019, is entered into between **Amyris, Inc.**, a Delaware corporation with its principal address at 5885 Hollis Street, Emeryville, CA 94608, USA (the "**Grantor**") and **Lavvan, Inc.**, a Delaware corporation with its principal address at 434 West 33rd Street, New York, NY 10001, USA (the "**Secured Party**").

<u>Background</u>

**WHEREAS**, the Grantor and the Secured Party have entered into a Research, Collaboration and License Security Agreement dated as of March 18, 2019 (as amended or modified from time to time, the "**RCL Agreement**"); and

**WHEREAS**, Section 5.12.2(a) of the RCL Agreement requires that the Grantor grant to the Secured Party a lien and security interest on all Amyris Platform Improvement IP and Amyris Background IP (each as defined below) to secure all obligations of Amyris to Lavvan under the RCL Agreement (the "**Lavvan Lien**"), provided that, *notwithstanding anything to the contrary herein, all rights and remedies of the Secured Party hereunder in and to the Intellectual Property Collateral (defined below) shall be subject to any applicable Subordination Agreement (defined below) as may be in effect*;

**NOW THEREFORE**, in consideration of the foregoing, and for other good and valuable consideration, the receipt of which is hereby acknowledged by the parties hereto, the Grantor and the Secured Party hereby agree as follows:

ARTICLE I
**CERTAIN DEFINITIONS**

Section 1.01.  **Definitions.**

As used herein:

"**Affiliate**" means with respect to any Person, any Person which directly or indirectly controls, is controlled by, or is under common control with such Party. A Person shall be deemed to "control" another Person if it has (a) the power to direct or cause the direction of the management or policies of the other Person whether through ownership of fifty percent (50%) or more of the outstanding stock or shares having the right to vote for the election of directors of such Person (or if the jurisdiction where such Person is domiciled limits foreign ownership of such entity, the maximum foreign ownership interest permitted under such Laws; provided, that such ownership interest provides the power to direct the management and policies of such Person, (b) status as a general partner in any partnership, or (c) the possession, directly or indirectly, of the power to direct, or cause the direction of, the management or policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Amyris Background IP**" means all Background IP Controlled by the Grantor and/or its Affiliates.

"**Amyris Cannabinoid Foreground IP**" means all Foreground IP Controlled by the Grantor and/or its Affiliates and Covering the biosynthesis of cannabigerolic acid, cannabinoids, or derivatives thereof, any cannabinoid thereby produced, or any enzyme, intermediate or substrate that is downstream of geranyl pyrophosphate or olivetolic acid in a biosynthetic pathway for cannabinoid production.

"**Amyris Platform Improvement IP**" means all Foreground IP Controlled by the Grantor and/or its Affiliates other than Amyris Cannabinoid Foreground IP.

"**Background IP**" means any Intellectual Property, other than Foreground IP, Controlled by the Grantor and/or its Affiliates prior to March 18, 2019 or independently of the RCL Agreement.

"**Amyris Additional IP Collateral**" means any property or asset that is not within the scope of the definition of Amyris Background IP or Amyris Platform Improvement IP (as such terms are defined herein, and including defined terms directly and indirectly referenced in such definitions) as of the date hereof but that later becomes within the scope of such defined terms as a result of any amendment or modification of the RCL Agreement following the date hereof.

"**Control**" means, as to any portion of the Intellectual Property Collateral, that the Grantor has the rights necessary to grant the rights and licenses granted or to be granted in the RCL Agreement as to such Intellectual Property Collateral, whether by ownership or otherwise.

"**Covering**" means, when referring to a product, invention or other Know-How: (a) with respect to a patent, that the practice by such Person of a specified activity with respect to such product, or the practice by such Person of such invention or the use by such Person of such Know-How, would infringe a claim included in such patent unless such Person had a license under, or other interest permitting such practice in, such claim, or (b) with respect to a patent application, that the practice by such Person of a specified activity with respect to such product, or the practice by such Person of such invention or the use by such Person of such Know-How, would infringe a claim included in such patent application, if such patent application were to issue as a patent, unless such Person had a license under, or other interest permitting such practice in, such claim.

"**Event of Default**" means the occurrence and continuation, after any grace or cure period as may be applicable under the RCL Agreement, of any material default by the Grantor in respect of any obligation of the Grantor to the Secured Party under the RCL Agreement.

"**Foreground IP**" means any Intellectual Property that is conceived, reduced to practice, obtained or developed by or on behalf of the Grantor and/or its Affiliates in connection with the RCL Agreement after March 18, 2019.

"**Intellectual Property**" means all worldwide intellectual property and industrial property rights and rights in proprietary and/or confidential information, whether registered or unregistered, including all (A) Patent Rights, (B) trademarks, trademark rights, service marks, service mark rights, corporate names, trade names, trade name rights, domain names, logos, slogans, trade dress, design rights, and other similar designations of source or origin, together with the goodwill symbolized by and of the foregoing, (C) trade secrets and all other confidential information, ideas, Know-How, inventions, proprietary processes, formulae, models, and other methodologies, (D) copyrights and copyright registrations, (E) computer programs (whether in object code, subject code or other form), designs, design registrations, algorithms, internet domain names (and registrations and applications therefor),databases, database rights, compilations and data, technology supporting the foregoing, and all related documentation, (F) licenses to any of the foregoing, and (G) all applications and registrations of the foregoing, and (H) all other similar proprietary rights.

"**Intellectual Property Collateral**" means all of the Grantor's right, title, and interest in the Amyris Background IP, the Amyris Platform Improvement IP, and the Amyris Additional IP Collateral, whether now existing or hereafter arising, and all products and proceeds thereof.

"**Know-How**" means any and all technical information, research and development information, trade secrets, formulae, technical specifications, directions, instructions, user guides, operation guides, test protocols, test and qualification approaches, procedures and results, studies, analyses, raw material sources, data, formulation or production technology, conceptions, ideas, innovations, discoveries, inventions, processes, methods, enhancements, modifications, technological developments, techniques, systems, tools, designs, schematics, semiconductor masks, business specifications, engineering drawings and software code.

"**Law**" means any applicable law, statute, rule or regulation.

"**Patent Rights**" means all patents and patent applications (including provisional applications), including all divisionals, continuations, substitutions, continuations-in-part, re-examinations, reissues, additions, renewals, extensions, confirmations, registrations, any confirmation patent or registration patent or patent of addition based on any such patent, patent term extensions, and supplemental protection certificates or requests for continued examinations, foreign counterparts, and the like of any of the foregoing.

"**Permitted Debt**" means any indebtedness in respect of borrowed money owed by the Grantor to any Permitted Senior Lender.

"**Permitted Lien**" means any lien or security interest granted by the Grantor to any Permitted Senior Lender to secure any Permitted Debt, so long as such lien or security interest is subject to a Subordination Agreement.

"**Permitted Senior Lender**" shall mean Foris Ventures, LLC, as successor in interest to GACP Finance Co., LLC, and any other lender who has advanced debt for borrowed money to the Grantor on a senior secured basis (or any other lender who refinances any such debt), provided that no licensee or similar counterparty to the Grantor in respect of the Amyris Platform Improvement IP or Amyris Background IP shall be a Permitted Senior Lender.

"**Person**" means any natural person, corporation, general partnership, limited partnership, joint venture, proprietorship or other business organization.

"**Secured Obligations**" means all obligations of the Grantor to the Secured Party under the RCL Agreement.

"**Subordination Agreement**" means a subordination agreement in the applicable Permitted Senior Lender's standard form with such changes as necessary to comply with Section 5.12.2(a) of the RCL Agreement and providing, among other things, that the liens and security interests granted hereunder are junior and subordinate in all respects to the liens and security interests of the applicable Permitted Senior Lender, on terms and conditions customary for subordination agreements of this type, and that, in the event that the applicable Permitted Senior Lender exercises remedies in respect of any Amyris Platform Improvement IP and Amyris Background IP, such Permitted Senior Lender (and any successors or transferees thereof) shall honor the licenses granted to the Secured Party in the Amyris Platform Improvement IP and Amyris Background IP under the RCL Agreement notwithstanding such exercise and any related transfer or assignment, as if such exercise, transfer, and assignment, as applicable, were subject to such license rights.

"**UCC**" means the Uniform Commercial Code as in effect on the date hereof in the State of New York, as amended from time to time, and any successor statute; provided that if by reason of mandatory provision of law, the perfection or the effect of perfection or non-perfection of the security interest in the Intellectual Property Collateral is governed by the Uniform Commercial Code of another jurisdiction, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provision hereof relating to such perfection or effect of perfection or non-perfection.

Section 1.02.  **UCC Definitions.**  Unless otherwise defined herein or the context otherwise requires, terms for which meanings are provided in the UCC are used in this Security Agreement, including its preamble and recitals, with such meanings.

Section 1.03.  **Interpretation; Headings.**  Each term used in any exhibit to this Security Agreement and defined in this Security Agreement but not defined therein shall have the meaning set forth in this Security Agreement. Unless the context otherwise requires, (i) "including" means "including, without limitation" and (ii) words in the singular include the plural and words in the plural include the singular. A reference to any party to this Security Agreement, the RCL Agreement, or any other document shall include such party's successors and permitted assigns. A reference to any agreement or order shall include any amendment of

such agreement or order from time to time in accordance with the terms hereof and thereof. A reference to any legislation, to any provision of any legislation or to any regulation issued thereunder shall include any amendment thereto, any modification or re-enactment thereof, any legislative provision or regulation substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto. The headings contained in this Security Agreement are for convenience and reference only and do not form a part of this Security Agreement. Section, article and exhibit references in this Security Agreement refer to sections or articles of, or exhibits to, this Security Agreement unless otherwise specified.

ARTICLE II
**SECURITY INTEREST**

Section 2.01.    **Grant of Security Interest.**  As collateral security for the Secured Obligations, the Grantor hereby grants to Secured Party a continuing lien on and security interest in all of the Intellectual Property Collateral, wherever the same may be now or hereafter located, subject only to Permitted Liens.

Section 2.02.    **Continuing Security Interest; Termination of Security Interest.**

(a)    This Security Agreement creates a continuing security interest in the Intellectual Property Collateral and shall: (i) remain in full force and effect until the date on which the Secured Obligations are performed in full as set forth in Section 5.12.2(d) of the RCL Agreement; (ii) be binding upon the Grantor and its successors, transferees and assigns; and (iii) inure, together with the rights and remedies of the Secured Party, to the benefit of the Secured Party and its successors and assigns.

(b)    The liens and security interests granted hereunder shall terminate as set forth in Section 5.12.2(d) of the RCL Agreement. The Secured Party shall execute all terminations, releases, acknowledgements, reconveyances and other documents reasonably requested by the Grantor that may be necessary or appropriate to effect or memorialize the foregoing.

Section 2.03.    **Authorization to File Financing Statements.**

(a)    The Grantor hereby irrevocably appoints the Secured Party as its attorney-in-fact and authorizes the Secured Party at any time and from time to time, without notice to the Grantor, to file in any jurisdiction or other appropriate location any UCC financing statements or other appropriate documents and any amendments thereto and continuations thereof that: (i) describe or indicate the Intellectual Property Collateral; and (ii) contain any other information required by Article 9 of the UCC or other applicable law or as otherwise appropriate for the sufficiency or filing office acceptance of any financing statement or other document or amendment or continuation, including, as applicable, whether the Grantor is an organization, the type of organization and any organization identification number issued to the Grantor.

(b)     The Grantor agrees to furnish any such information required for purposes of section 2.03(a) to the Secured Party promptly upon request.

Section 2.04.  **Other Actions.**  Without limiting any other obligations of the Grantor in respect of the Intellectual Property Collateral set forth herein or in the RCL Agreement, the Grantor hereby agrees to take any action reasonably requested by the Secured Party, at the expense of the Secured Party, to effect the attachment, perfection and priority of (subject to any Permitted Liens), and the ability of the Secured Party to enforce, the Secured Party's security interest in any and all of the Intellectual Property Collateral.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES

The Grantor represents and warrants to the Secured Party as follows:

Section 3.01.  **Grantor's Legal Status.** (a) The Grantor's exact legal name is that indicated in the preamble hereto, the Grantor has not, during the past five years, been known by or used any other corporate or fictitious name, nor been a party to any merger, acquisition or consolidation; and (b) the Grantor is an organization of the type and organized in the jurisdiction set forth in the preamble hereto.

Section 3.02.  **[Registered Intellectual Property.**  All registered Intellectual Property Collateral owned by the Grantor as of the date hereof is identified on Exhibit A hereto.][1]

Section 3.03.  **Ownership; No Liens.**  The Grantor owns, or holds its other applicable right, title, or interest in, the Intellectual Property Collateral free and clear of any liens, except for non-exclusive licenses granted in the ordinary course of business, the security interest created by this Security Agreement and any Permitted Liens.

Section 3.04.  **Validity.**  Subject to Permitted Liens, to the knowledge of the Grantor, (i) this Security Agreement creates a valid security interest in the Intellectual Property Collateral securing the Secured Obligations; and (ii) upon the timely filing and recordation of appropriate financing statements and/or security agreements in the Office of the Secretary of State of Delaware, the United States Patent and Trademark Office and the United States Copyright Office, together with the payment of all applicable filing and recordation fees associated therewith, in the manner specified by such office and in accordance with its rules and regulations, and the taking of all other actions required under the laws of Delaware with respect to the perfection of a security interest in intangible property, all filings, registrations and recordings presently necessary to create and perfect the security interest granted to the Secured Party in the Intellectual Property Collateral will have been taken.

Section 3.05.  **Authorization; Approval.**  No authorization or approval by, and no notice to or filing with, any Governmental Authority or any person: (a) is required for the grant

---

[1] **NTD**:  To be aligned with the Foris Senior Loan schedule of IP.

by the Grantor of the security interest granted hereby; or (b) is required for the perfection of the security interest of the Secured Party in the Intellectual Property Collateral or exercise by the Secured Party of its rights and remedies hereunder, other than the filing of financing statements and/or security agreement in the Office of the Secretary of State of Delaware, the United States Patent and Trademark Office and the United States Copyright Office.

Section 3.06.  **Enforceability.**  This Security Agreement is the legal, valid and binding obligation of the Grantor, enforceable against the Grantor in accordance with its terms, subject, as to enforcement of remedies, to bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or general equitable principles.

ARTICLE IV
**COVENANTS**

Section 4.01.  **Covenants.**

(a)     For so long as this Security Agreement shall remain in effect, the Grantor hereby covenants and agrees (i) to abide by and perform all obligations and covenants set forth in the RCL Agreement and herein and (ii) not to incur or suffer to exist any liens or security interests in the Intellectual Property Collateral, other than Permitted Liens; and (iii) not to sell, transfer, assign, or otherwise dispose of any Intellectual Property Collateral, in each case without the prior written consent of the Secured Party, unless such transfer, assignment, or other disposition is subject to the license rights granted to the Secured Party under the RCL Agreement.

(b)     The Grantor agrees that it will not interfere with any right, power and remedy of Secured Party provided for in this Security Agreement or now or hereafter existing at law or in equity or by statute or otherwise, or the exercise or beginning of the exercise by the Secured Party of any one or more of such rights, powers, or remedies.

(c)     The Grantor shall provide the Secured Party with an updated Exhibit A hereto upon the acquisition by the Grantor of ownership of any registered Intellectual Property Collateral, within thirty (30) days following such acquisition.

ARTICLE V
**RIGHTS AND DUTIES OF SECURED PARTY**

Section 5.01.  **Secured Party Appointed Attorney-in-Fact.**

(a)     The Grantor, on behalf of itself and its subsidiaries, hereby irrevocably appoints the Secured Party as the Grantor's and such subsidiaries' true and lawful attorney-in-fact, with full authority and power in the place and stead of the Grantor and such subsidiaries and in the name of the Grantor, such subsidiaries, the Secured Party or otherwise, from time to time in the Secured Party's discretion, but only from and after the occurrence and during the

continuation of an Event of Default, to take any appropriate action and to execute any instrument that the Secured Party may then deem reasonably necessary or advisable to accomplish the purposes of this Security Agreement, including: (i) to ask, demand, collect, enforce, sue for, recover, compromise, receive, and acquit any receipts for monies due and to become due under or in respect of any of the Intellectual Property Collateral; (ii) to perform the affirmative obligations of the Grantor hereunder; (iii) to execute and deliver, for and on behalf of the Grantor, any and all instruments, documents, Security Agreements, and other writings necessary or advisable for the exercise on behalf of the Grantor of any rights, benefits or options created or existing under or pursuant to the Intellectual Property Collateral (including but not limited to executing and delivering to any Governmental Authority any correspondence or other documentation necessary or advisable to effect a transfer of any regulatory approval); and (vi) to execute endorsements, assignments, or other instruments of transfer with respect to the Intellectual Property Collateral.

(b)     Notwithstanding the foregoing, the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to take any of the actions described in section 5.01(a).

(c)     The Grantor hereby acknowledges, consents and agrees that the power of attorney granted pursuant to this section 5.01 is irrevocable and coupled with an interest.

(d)     Notwithstanding anything to the contrary herein, all rights and remedies of the Secured Party hereunder in and to the Intellectual Property Collateral shall be subject to any applicable Subordination Agreement as may be in effect.

## ARTICLE VI
### **REMEDIES**

Section 6.01.  **Certain Remedies.**  If any Event of Default shall have occurred and is continuing: (a) upon written notice to the Grantor from the Secured Party the Secured Party may exercise in respect of the Intellectual Property Collateral, in addition to other rights available to it at law or in equity or otherwise, or under the RCL Agreement, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Intellectual Property Collateral) or any other applicable law, and also may: (i) require the Grantor to, and the Grantor hereby agrees that it shall, at the Grantor's expense and promptly upon request of the Secured Party, assemble all or part of the Intellectual Property Collateral as directed by the Secured Party and make it available to the Secured Party at a place to be designated by the Secured Party that is reasonably convenient to both parties; (ii) exercise any and all rights and remedies of the Grantor under or in connection with the Intellectual Property Collateral; (iii) foreclose or otherwise enforce the Secured Party's security interest in any manner permitted by law or provided for in this Security Agreement, and sell any or all of the Intellectual Property Collateral in any commercially reasonable manner; and (iv) without notice (except as provided above) or demand of legal process, all of which are hereby expressly waived by the Grantor, enter into property where any of the Intellectual Property Collateral is located and take

-8-

possession thereof; provided, however, that notwithstanding the foregoing, the Secured Party may transfer the Intellectual Property Collateral or any portion thereof without any preparation or processing; and (b) the Grantor, on behalf of itself and its subsidiaries, specifically waives (to the extent permitted by law) all rights of redemption, stay or appraisal which it has or may have under any law now existing or hereafter adopted.  **Notwithstanding anything to the contrary herein, all rights and remedies of the Secured Party hereunder in and to the Intellectual Property Collateral shall be subject to any applicable Subordination Agreement as may be in effect.**

# ARTICLE VII
## MISCELLANEOUS

Section 7.01.   **Assignments.**  Neither the Grantor nor the Secured Party shall be permitted to assign this Security Agreement without the prior written consent of the other party except to any permitted assignee of the RCL Agreement in connection with any assignment of the RCL Agreement to such assignee, and any purported assignment in violation of this section 7.01 shall be null and void.

Section 7.02.   **Successors and Assigns.**  The provisions of this Security Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

Section 7.03.   **Notices.**  All notices and other communications shall be given as set forth in the RCL Agreement.

Section 7.04.   **Entire Security Agreement.**  This Security Agreement and the RCL Agreement contain the entire agreement between the parties relating to the subject matter hereof and supersede all oral statements and prior writings with respect thereto.

Section 7.05.   **Modification.**  No provision hereof may be amended or modified except by an agreement in writing executed by the Grantor and the Secured Party.

Section 7.06.   **No Delay; Waivers; etc.**  No failure to exercise and no delay in the exercise, on the part of the Secured Party, of any right, remedy, power or privilege hereunder and no course of dealing with respect thereto shall impair such right, remedy, power or privilege or be construed to or operate as a waiver thereof, nor shall any single or partial exercise of any power or right hereunder preclude other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The Secured Party shall not be deemed to have waived any rights hereunder unless such waiver shall be in writing and signed by the Secured Party.

Section 7.07.   **Severability.**  If any provision of this Security Agreement shall be held to be invalid, illegal or unenforceable, then, to the fullest extent permitted by law, the validity,

legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 7.08.   **Governing Law.**  This Security Agreement shall be governed by and construed in accordance with the laws of the State of New York (without giving effect to any conflict of laws principles).

Section 7.09.   **Jurisdiction.**  The Grantor irrevocably submits to the jurisdiction of the courts of the State of New York and of the United States sitting in the City of New York, State of New York, and of the courts of its own corporate domicile with respect to actions or proceedings brought against it as a defendant, for purposes of all proceedings. The Grantor irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any proceeding and any claim that any proceeding has been brought in an inconvenient forum. Any process or summons for purposes of any proceeding may be served on the Grantor by mailing a copy thereof by registered mail, or a form of mail substantially equivalent thereto, addressed to it at its address as provided above.

Section 7.10.   **Waiver of Jury Trial. THE GRANTOR HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING.**

Section 7.11.   **Counterparts; Facsimile Signatures.**  This Security Agreement may be executed and delivered by facsimile signature (including PDF) and in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

Section 7.12.   **Rights Not Exclusive.**  The rights, powers and remedies of the Secured Party under this Security Agreement are cumulative and are not exclusive of, and shall be in addition to, all rights, powers and remedies given to the Secured Party by virtue of any law and/or the RCL Agreement, all of which rights, powers and remedies shall be cumulative and may be exercised successively or concurrently without impairing the Secured Party's security interest in the Intellectual Property Collateral.

[Remainder of page left blank. Signatures follow.]

IN WITNESS WHEREOF, the undersigned have duly executed this Security Agreement as of the date first set forth above.

**LAVVAN, INC.**

AS THE SECURED PARTY

By: _____
Name: Etan Bendheim
Title: President


**AMYRIS, INC.**

AS THE GRANTOR

By: _____
Name:
Title:

[Signature Page to Security Agreement]

IN WITNESS WHEREOF, the undersigned have duly executed this Security Agreement as of the date first set forth above.

LAVVAN, INC.

AS THE SECURED PARTY

By: _____
Name:
Title:

AMYRIS, INC.

AS THE GRANTOR

By: _____
Name: Kathleen Valiasek
Title: CFO

[Signature Page to Security Agreement]

[Exhibit A

**Registered Intellectual Property Collateral]**