# Exhibit A

## Letters



Michael H Goldstein
+1 212 813 8840
MGoldstein@goodwinlaw.com

Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018

goodwinlaw.com
+1 212 813 8800

**VIA EMAIL**

August 31, 2023

Russell Silberglied
Richards, Layton & Finger, P.A.
One Rodney Square, 920 King Street
Wilmington, Delaware 19801

Re:   *In re Amyris, Inc., et al.* (Case No. 23-11131) (TMH)

Dear Russell:

As you know, Goodwin Procter LLP represents Foris Ventures, LLC ("Foris"), Perrara Ventures, LLC ("Perrara"), Anesma Group, LLC ("Anesma"), Anjo Ventures, LLC ("Anjo"), Muirisc, LLC ("Muirisc"), and Euagore, LLC ("Euagore") in connection with the chapter 11 cases of Amyris, Inc. ("Amyris") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors").

We understand that you represent Lavvan, Inc. ("Lavvan") in connection with the Debtors' chapter 11 cases.  We understand that the Debtors are, at our request, presenting to you the subordination agreement attached hereto as **Exhibit A** (the "Subordination Agreement") for execution in accordance with the terms and conditions of the *Research, Collaboration and License Agreement*, between Amyris and Lavvan, effective as of March 18, 2019 (the "RCL Agreement").  By this letter, Foris, Perrara, Anesma, Anjo, and Muirisc (collectively, the "Permitted Senior Lenders") hereby demand that Lavvan immediately execute the Subordination Agreement.  As you will see, the Subordination Agreement is in form and substance consistent with that certain subordination agreement, by and between Foris and Lavvan, dated as of May 2, 2019 (the "Foris Subordination Agreement"), as required by the RCL Agreement.[1]

Lavvan's compliance with the Debtors' request and the Permitted Senior Lenders' demand is contractually required pursuant to the RCL Agreement.  In particular, section 5.12.2(a) of the RCL Agreement provides that any liens granted to Lavvan "shall be junior in priority to the existing liens and security interests of Great American and any other Permitted Senior Lender and shall be subject to a subordination agreement with Great American and any other Permitted Senior Lender."  Moreover, the Permitted Senior Lenders fit squarely within the definition of "Permitted Senior Lender" in section 5.12.2(b) of the RCL Agreement, as that section defines "Permitted Senior Lender" as "Great American

---

[1] Pursuant to the Foris Subordination Agreement, Lavvan cannot be paid until the prior Payment in Full (as defined in the Foris Subordination Agreement) of the debt owed to Foris as provided for therein.  The Foris Subordination Agreement also provides that any liens granted to Lavvan under the Security Agreement (as defined herein) are expressly subordinate and junior to the properly perfected first priority liens granted to Foris on the same collateral pursuant to the Amended and Restated Loan and Security Agreement dated October 28, 2019 (the "2019 LSA")—which liens provided to Foris under the 2019 LSA were granted to Foris's predecessor in 2018 and were properly perfected well before any liens were granted to Lavvan under the Security Agreement.

ACTIVE/124704599



August 31, 2023
Page 2

and any other lender who has advanced debt for borrowed money to Amyris [Inc.] on a senior secured basis . . . ."[2] The RCL Agreement also includes a further assurances clause in section 14.9, which provides that Lavvan "shall execute, acknowledge and deliver such further instruments as may be necessary or appropriate in order to carry out the expressly stated purposes and the clear intent of this Agreement [*i.e.*, the RCL Agreement]." It is undisputed that the Permitted Senior Lenders advanced debt for borrowed money to Amyris on a senior secured basis. Because the RCL Agreement contains no temporal limitation on when any such secured debt for borrowed money must be advanced (*i.e.*, before, contemporaneous, or after the RCL Agreement was entered into), the Permitted Senior Lenders are each a "Permitted Senior Lender" under the RCL Agreement, and therefore Lavvan is required to execute the Subordination Agreement.

The *Security Agreement*, between Amyris and Lavvan, dated May 2, 2019 (the "<u>Security Agreement</u>") confirms the same.

- The second whereas clause in the Security Agreement states that any lien and security interest granted to Lavvan under the RCL Agreement and all rights and remedies of Lavvan to any collateral "shall be subject to any applicable Subordination Agreement (defined below) as may be in effect[.]" This same language is used in sections 5.01(d) and 6.01(a) of the Security Agreement, which limits Lavvan's authority as attorney-in-fact. The reference to "**any** applicable Subordination Agreement" in these two clauses is dispositive—by its plain language, the Security Agreement expressly supports the subordination of Lavvan's liens and claims pursuant to **any** subordination agreement, including the Subordination Agreement, once executed.

- The definition of "Permitted Senior Lender" in the Security Agreement is in accord with the same definition in section 5.12.2(a) of the RCL Agreement. This definition is then utilized in the definitions of "Permitted Debt" (*i.e.*, any indebtedness in respect of borrowed money owed by Amyris to any Permitted Senior Lender) and "Permitted Lien" (*i.e.*, any lien or security interest granted by Amyris to any Permitted Senior Lender to secure any Permitted Debt, so long as such lien or security interest is subject to a "Subordination Agreement" (as defined in the Security Agreement). Because these definitions do not require that a "Subordination Agreement" be executed contemporaneous with the incurrence of any Permitted Debt, Lavvan is required to comply with the Permitted Senior Lenders' demand set forth in this letter.[3]

- Further, the definition of "Subordination Agreement" in the Security Agreement refers to a subordination agreement in favor of "any applicable Permitted Senior Lender" that complies with section 5.12.2(a) of the RCL Agreement, which the Subordination Agreement here does.

With respect to the Foris Subordination Agreement, please be reminded that per its express terms and applicable law, the Foris Subordination Agreement is fully enforceable pursuant to Section 510(b) of

---

[2] Although the definition of "Permitted Senior Lender" in the RCL Agreement includes certain exceptions, those exceptions are plainly not applicable here.

[3] "Permitted Lien" is used throughout the Security Agreement as an exception to the grant of any lien on and security interest in any Amyris collateral. *See* Security Agreement sections 2.01, 2.04, 3.03, 3.04, and 4.01.



August 31, 2023
Page 3

the Bankruptcy Code.[4]  Foris therefore expects Lavvan to honor its obligations and all covenants and limitations set forth in the Foris Subordination Agreement in connection with the Debtors' chapter 11 cases.  If Lavvan fails to adhere to the terms of the Foris Subordination Agreement, Foris will aggressively exercise all rights and remedies afforded to it.  Specifically, please be reminded that until Foris is Paid in Full, Lavvan cannot undertake any Enforcement Action, has waived the right of marshalling and any other similar right, and has expressly agreed not to: (a) vote in favor of any plan of reorganization or other arrangement in connection with an Insolvency Proceeding that provides for treatment of the Senior Lienholder or the Junior Lienholder in a manner that violates or is otherwise inconsistent with the terms and conditions of the Foris Subordination Agreement; (b) object, contest or support any other person or entity objecting to or contesting, (i) any request by the Senior Lienholder for adequate protection in respect of the Senior Lienholder Collateral or any adequate protection provided to the Senior Lienholder in respect of the Senior Lienholder Collateral, or (ii) the payment of interest, fees, expenses or other amounts to the Senior Lienholder in respect of the Senior Lienholder Collateral under Sections 506(b) or 506(c) of the Bankruptcy Code; (c) seek adequate protection or the payment of interest, fees or other expenses in respect of the Junior Lienholder Collateral unless or until there has been Payment in Full of the Senior Debt; and (d) directly or indirectly take or support, or induce or instigate others to take or support, any action inconsistent with the Foris Subordination Agreement.

Lastly, we remind you that Lavvan shall not directly or indirectly take any action inconsistent with the Foris Subordination Agreement, including with respect to the debtor-in-possession financing (the "DIP Financing") provided by Euagore, as approved by the bankruptcy court pursuant to the *Interim Order (I) Authorizing The Debtors (a) To Obtain Postpetition Financing and (B) To Utilize Cash Collateral, (II) Granting Adequate Protection To Prepetition Secured Parties, (III) Modifying The Automatic Stay; (iv) Scheduling Final Hearing, and (V) Granting Related Relief*, entered August 11, 2023 [Docket No. 54] (the "Interim Order") and any subsequent order approving the DIP financing on an interim and/or final basis.[5]  The Interim Order expressly granted the DIP Secured Parties a senior priming lien on all assets subject to the liens of the Prepetition Secured Parties, which parties include Foris and the Permitted Senior Lenders.  This means that the DIP Facility is to be paid before the obligations owing to Foris and the Permitted Senior Lenders.  Consequently, as Lavvan is not entitled to be paid until Foris is Paid in Full per the terms of the Foris Subordination Agreement, Lavvan is not entitled to be paid until the DIP Facility is indefeasibly paid in full.  Not only has Lavvan waived any right to contest the same, it has waived its right to seek adequate protection regarding the same, as well as any right to marshalling.

The Permitted Senior Lenders and Euagore expressly reserve all rights, powers and remedies provided for in the Foris Subordination Agreement, the Interim Order, any subsequent interim or final order approving the DIP Financing, or at law or in equity, whether now or hereafter existing, including to contest the validity, enforceability, allowability, priority, characterization, extent

---

[4] Capitalized terms used in this paragraph and not defined shall have the meaning given to such term in the Foris Subordination Agreement.

[5] Capitalized terms used in this paragraph and not defined shall have the meaning given to such term in the Interim Order or Foris Subordination Agreement.



August 31, 2023
Page 4

and priority of any liens granted to Lavvan. Nothing contained in this letter, nor in any other communication (whether written, oral or electronic) or contact with Lavvan, or conduct by, between or among the Permitted Senior Lenders, Euagore, the Debtors, or Lavvan, shall constitute (or be deemed to constitute) or be construed as a waiver, modification, alteration, amendment or release of any rights, powers or remedies against Lavvan.

Please let me know when you are available to discuss this matter.

Sincerely,

/s/ Michael H. Goldstein

Michael H Goldstein

MHG

**Exhibit A**

## Subordination Agreement

This **Subordination Agreement** (this "**Agreement**") is entered into as of August [●], 2023, by and between Foris Ventures, LLC, Perrara Ventures, LLC, Anesma Group, LLC, Anjo Ventures, LLC and Muirisc, LLC (together, the "**Senior Lienholders**") and Lavvan, Inc. (the "**Junior Lienholder**") regarding their respective liens and security interests in assets of Amyris, Inc. (the "**Grantor**").

### RECITALS

A.  The Senior Lienholders hold certain liens and security interests (the "**Senior Liens**") in certain assets of the Grantor (the "**Senior Lienholder Collateral**") pursuant to the Senior Loan Documents.

B.  The Junior Lienholder holds certain liens and security interests (the "**Junior Liens**") in certain assets of the Grantor (the "**Junior Lienholder Collateral**") pursuant to that certain Research, Collaboration and License Agreement dated as of March 18, 2019 (the "**License Agreement**") and that certain Security Agreement dated as of May 2, 2019 (collectively with the License Agreement and as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**Junior Agreements**").

C.  The Senior Lienholders and the Junior Lienholder desire to state their respective rights in respect of the assets of the Grantor constituting Senior Lienholder Collateral and Junior Lienholder Collateral.

D.  NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, each of the Senior Lienholders and the Junior Lienholder hereby agrees as follows:

### AGREEMENT

1.  Terms defined in the Preamble and the Recitals to this Agreement will have the same meaning when used in this Agreement. In this Agreement, the following terms shall have the following meanings:

"**Bankruptcy Code**" means the federal bankruptcy law of the United States as from time to time in effect, currently as Title 11 of the United States Code.

"**Event of Default**" means an "Event of Default", as defined in the Senior Agreements or the Junior Agreements.

"**Insolvency Proceeding**" shall have the meaning ascribed to it in <u>Section 6</u> of this Agreement.

"**Obligations**" means all present and future indebtedness of the Grantor that may be incurred by the Grantor from time to time, including, but not limited to, any negotiable instruments evidencing the same, all guaranties, debts, demands, monies, indebtedness, liabilities and obligations owed or to become owing, including principal, interest, premium (if any), fees, costs,

expenses (including attorneys' fees), and other charges (including interest, premium, fees, costs, expenses, and other charges accruing after the filing of a petition by or against the Grantor under the Bankruptcy Code or any similar federal or state statute, whether or not such interest, premium, fees, costs, expenses, and other charges are allowed), and all claims, rights, causes of action, judgments, decrees, remedies, or other obligations of any kind whatsoever and howsoever arising, whether voluntary, involuntary, absolute, contingent, direct, indirect, or by operation of law.

"**Paid in Full**," "**Payment in Full**," "**paid in full**" or "**payment in full**" means, as of any date of determination with respect to the Senior Debt, that: (a) all of such Senior Debt (other than the Grantor's inchoate indemnification obligations) has been finally and indefeasibly paid in full in cash, and (b) all commitments to lend under the Senior Loan Documents are terminated.

"**Senior Agreements**" means (a) that certain Loan Agreement dated as of September 27, 2022, between, among others, Foris Ventures, LLC and the Grantor, (b) that certain Loan Agreement dated as of March 10, 2023, between, among others, Perrara Ventures, LLC and the Grantor, (c) that certain Loan Agreement dated as of June 5, 2023, between, among others, Anesma Group, LLC and the Grantor, (d) that certain Loan Agreement dated as of June 29, 2023, between, among others, Anjo Ventures, LLC and the Grantor, and (e) that certain Loan Agreement dated on or about August 2, 2023, between, among others, Muirisc, LLC and the Grantor, as each of those agreements may be amended, restated, supplemented or otherwise modified from time to time.

"**Senior Debt**" means any and all Obligations owing to the Senior Lienholders under or in respect of the Senior Loan Documents.

"**Senior Loan Documents**" means the "Loan Documents", as defined in the Senior Agreements.

Other capitalized terms used herein and not otherwise defined herein shall have the meaning given such terms in the Uniform Commercial Code as in effect in the State of California, as in effect from time to time.

2. Until Payment in Full of the Senior Debt, the Junior Lienholder subordinates any and all Junior Liens to any and all Senior Liens. Notwithstanding the respective dates of attachment or perfection of any Senior Liens and any Junior Liens and notwithstanding (i) any lack or defect in the perfection of the Senior Liens, or (ii) any avoidance, equitable subordination or recharacterization of the Senior Lienholders' rights or claims in an Insolvency Proceeding of the Grantor, the Senior Liens shall at all times be prior to the Junior Liens. The Junior Lienholder acknowledges that all Junior Lienholder Collateral as of the date hereof is also Senior Lienholder Collateral, provided that if at any time the Junior Lienholder holds any lien or security interest in any asset of the Grantor that is not Senior Lienholder Collateral, the Junior Lienholder agrees that it shall hold such lien or security interest and any products or proceeds thereof in trust for the Senior Lienholders, subject to the terms of this Agreement, as if the Senior Lienholders held a Senior Lien in such asset and as if such asset were Senior Lienholder Collateral.

3. Junior Lienholder hereby subordinates any claim or right to payment it has or may have against the Grantor to which the Junior Lender holds (and has not waived) (including, without limitation, any such unsecured or deficiency claim in any Insolvency Proceeding of the Grantor)

to the Payment in Full of any and all debts, claims, rights to payment or Obligations of the Grantor to Senior Lienholders (including, without limitation, any such unsecured or deficiency claim of Senior Lienholders in any Insolvency Proceeding of the Grantor), regardless of whether the security interests of Senior Lienholders are perfected or unperfected, set aside, or avoided in an Insolvency Proceeding of the Grantor, or whether any such claim or Obligation of the Grantor to Senior Lienholders is equitably subordinated or recharacterized in any Insolvency Proceeding of the Grantor.

4.   Except as otherwise permitted hereunder, so long as any of the Senior Debt has not been Paid in Full, the Junior Lienholder shall not, without the prior written consent of the Senior Lienholders, exercise any remedy with respect to any Junior Lienholder Collateral, nor shall the Junior Lienholder commence, or cause to commence, prosecute or participate in any administrative, legal or equitable action against any Junior Lienholder Collateral or against the Grantor in respect of any Junior Lienholder Collateral (each an "**Enforcement Action**"). Notwithstanding the foregoing, "Enforcement Action" shall not include (a) filing proofs of claim against the Grantor in any proceeding involving the Grantor, (b) any suit or action initiated or maintained to prevent the loss of a claim as a result of the running of any applicable statute of limitations or other similar restriction on claims, (c) any counterclaim or comparable action brought against the Grantor in an action commenced against the Junior Lienholder, provided that such action is not inconsistent with another provision of this Agreement, (d) any exercise of rights and remedies for specific performance or equitable relief to compel the Grantor to comply with the Junior Agreements, provided that such action is not inconsistent with another provision of this Agreement, or (e) any non-judicial procedural actions that may be required or desired as a precondition to acceleration or relating to preservation of rights (such as giving a notice of default or reservation of rights (including acceleration in accordance with the terms of the Junior Agreements)).

5.   Notwithstanding anything in this Agreement to the contrary, the Junior Lienholder may, after the occurrence and during the continuance of an Event of Default under the Junior Agreements and following the Payment in Full of the Senior Debt (such period commencing from the occurrence and continuance of such Event of Default and terminating upon the Payment in Full of the Senior Debt, the "**Standstill Period**") take any Enforcement Action. In connection with any Insolvency Proceeding, the Junior Lienholder agrees not to assert and hereby waives, to the fullest extent permitted by applicable law, any right to demand, request, plead or otherwise assert or otherwise claim against the Senior Lienholders the benefit of any marshaling or other similar doctrine or right that may otherwise be available under applicable law or any other similar rights a junior secured creditor might have under applicable law with respect to any and all Junior Lienholder Collateral.

6.   The Junior Lienholder shall have the right to file such proofs of claim and, subject to this Agreement, other documents as may be necessary or appropriate to establish and protect its claims in any liquidation, bankruptcy, receivership, assignment for the benefit of creditors, or any other judicial, equitable, or administrative action or proceeding commenced by or against the Grantor or any of the assets or property of the Grantor under the Bankruptcy Code or under any other federal or state law involving the adjustment or restructuring of any or all of its assets, obligations, business, or property (collectively, an "**Insolvency Proceeding**"). The Junior Lienholder shall not, without the prior written consent of the Senior Lienholders, vote in favor of

3

any plan of reorganization or other arrangement in connection with an Insolvency Proceeding that provides for treatment of the Senior Lienholders or the Junior Lienholder in a manner that violates or is otherwise inconsistent with the terms and conditions of this Agreement. The Junior Lienholder agrees not to object, contest or support any other person or entity objecting to or contesting, (i) any request by the Senior Lienholders for adequate protection in respect of the Senior Lienholder Collateral or any adequate protection provided to the Senior Lienholders in respect of the Senior Lienholder Collateral, or (ii) the payment of interest, fees, expenses or other amounts to the Senior Lienholder in respect of the Senior Lienholder Collateral under Sections 506(b) or 506(c) of the Bankruptcy Code. Junior Lienholder agrees not to seek adequate protection or the payment of interest, fees or other expenses in respect of the Junior Lienholder Collateral unless or until there has been Payment in Full of the Senior Debt.

7.   The Junior Lienholder further agrees that if the Junior Lienholder should take or receive any security interest in, or lien on, any Senior Lienholder Collateral by way of the exercise of remedies by the Junior Lienholder in any manner contrary this Agreement, at any time prior to the Payment in Full of the Senior Debt, the Senior Lienholders shall be entitled to have the same vacated, dissolved and set aside by such proceedings at law, or otherwise, as the Senior Lienholders may deem proper and this Agreement shall be and constitute full and sufficient grounds therefor and shall entitle the Senior Lienholders to become a party to any proceedings at law, or otherwise, initiated by the Senior Lienholders or by any other party, in or by which the Senior Lienholder may deem it proper to protect its interests hereunder.

8.   If the Junior Lienholder, contrary to this Agreement, takes any action with respect to any Senior Lienholder Collateral, then the Senior Lienholders may obtain relief against the Junior Lienholder by injunction, specific performance, and/or other appropriate equitable relief, it being understood and agreed by the Junior Lienholder that (a) the Senior Lienholders' damages from such actions may at that time be difficult to ascertain and may be irreparable, and (b) the Junior Lienholder waives any defense that the Senior Lienholders cannot demonstrate damage and/or be made whole by the awarding of damages.

9.   Except as otherwise expressly agreed to in this Agreement, if the Junior Lienholder shall receive any payments, security interests or liens, or other rights in any property of the Grantor in violation of this Agreement, such payment or property shall be received by the Junior Lienholder in trust for the Senior Lienholders and shall be delivered promptly to the Senior Lienholders in the form received.

10.  In the event that, following Payment in Full of the Senior Debt or the Obligations of the Grantor to Senior Lienholders (or any of them), all or any portion of such payment is avoided, set aside, clawed back, recovered, returns, refunded, equitably subordinated, recharacterized (collectively or individually, a "**Claw Back**") or any security interest of Senior Lienholders is avoided, set aside, equitably subordinated or recharacterized (collectively or individually, an "**Avoidance**"), this Agreement shall be reinstated and, as between the Senior Lienholders and the Junior Lienholder, (i) this Agreement shall remain fully enforceable the same as if such Claw Bank or Avoidance had never occurred, and (i) any payment made to Junior Lienholder in respect of its Junior Lienholder Collateral or claims against the Grantor shall be held in trust for Senior Lienholders and paid over to it in accordance with Section 9 hereof.

4

11. Until the Senior Debt has been finally Paid in Full, the Junior Lienholder shall not assign, sell or otherwise transfer all or any portion of the Junior Agreements without the sale, assignment or transfer thereof being conditioned on the transferee thereof agreeing to become a party to this Agreement and being bound by the provisions of this Agreement as "Junior Lienholder" hereunder.  The Junior Lienholder further agrees that if the Grantor is in the process of refinancing all or any part of the Senior Debt with a new lender, and if the Senior Lienholders make a request of the Junior Lienholder, then the Junior Lienholder shall agree to enter into a new subordination agreement with such new lender on substantially the terms and conditions of this Agreement and in any case reasonably acceptable to such new lender and the Junior Lienholder

12. In the event that the Senior Lienholders exercise remedies in respect of any Senior Lienholder Collateral, the Senior Lienholders shall honor the licenses granted to the Junior Lienholder in the Senior Lienholder Collateral notwithstanding such exercise and any related transfer or assignment of such Senior Lienholder Collateral, as if such exercise, transfer, and assignment, as applicable, were subject to such license rights; provided, however, that this Section 12 shall not apply to the extent that the same would impair Senior Lienholders' recovery, return, or the Payment in Full of the Senior Debt.

13. The Junior Lienholder agrees to not directly or indirectly take or support, or induce or instigate others to take or support, any action inconsistent with this Agreement.

14. This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code, shall remain in full force and effect during and after the commencement of an Insolvency Proceeding.  This Agreement shall terminate and be of no further force and effect upon the earlier to occur of the following:  (a) the Payment in Full of the Senior Debt, or (b) all the Senior Lienholders otherwise consenting thereto in writing.

15. This Agreement shall be binding upon the successors and assigns of the parties hereto, and shall inure to the benefit of the respective successors and assigns of the parties hereto. This Agreement represents the entire agreement with respect to the subject matter hereof, and supersedes all prior negotiations, agreements and commitments.

16. This Agreement and all rights and liabilities to the parties hereto shall be governed as to validity, interpretation, enforcement and effect by the laws of the State of California.

17. This Agreement may be executed in one or more counterparts, each of which is deemed an original and all of which together constitute one and the same document.  Signature pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one document.

18. All notices and other communications under this Agreement shall be in writing and shall be deemed to have been given three days after deposit in the mail, first class mail, postage prepaid, or one day after being entrusted to a reputable commercial overnight delivery service, or when sent out by e-mail transmission addressed to the party to which such notice is directed at its address set forth beneath its signature line hereto.  Any party to this Agreement may change the

address to which notices shall be directed hereunder by giving 10 days' written notice of such change to the other party.

[Remainder of Page Intentionally Left Blank]

This Subordination Agreement has been duly executed by the undersigned as of the date first referenced above.

## Junior Lienholder

**LAVVAN, INC.**

By: _____

Name: _____

Title: _____


Address: 434 West 33rd Street, New York, NY 10001, USA
Attention: Head of Operations
E-mail: [●]

## Senior Lienholders

**FORIS VENTURES, LLC**

By: _____

Name: _____

Title: _____


Address: 1180 San Carlos Avenue, #717, San Carlos, CA 94070
Attention: Barbara Hager
E-mail: hager@jemallc.com

**PERRARA VENTURES, LLC**

By: _____

Name: _____

Title: _____


Address: 1180 San Carlos Avenue, #717, San Carlos, CA 94070
Attention: Barbara Hager
E-mail: hager@jemallc.com

[SIGNATURE PAGE TO SUBORDINATION AGREEMENT]

**ANESMA GROUP, LLC**

By: _____

Name: _____

Title: _____

Address:     1180 San Carlos Avenue, #717, San Carlos, CA 94070
Attention:   Barbara Hager
E-mail:      hager@jemallc.com

**ANJO VENTURES, LLC**

By: _____

Name: _____

Title: _____

Address:     1180 San Carlos Avenue, #717, San Carlos, CA 94070
Attention:   Barbara Hager
E-mail:      hager@jemallc.com

**MUIRISC, LLC**

By: _____

Name: _____

Title: _____

Address:     1180 San Carlos Avenue, #717, San Carlos, CA 94070
Attention:   Barbara Hager
E-mail:      hager@jemallc.com

[SIGNATURE PAGE TO SUBORDINATION AGREEMENT]



Russell C. Silberglied
Director
302-651-7545
silberglied@rlf.com

September 8, 2023

**BY EMAIL**
Michael H. Goldstein
Goodwin Procter LLP
620 Eighth Avenue
New York, NY 10018

      Re:    *In re Amyris, Inc., et al. (*Case No. 23-11131) (TMH)

Dear Michael:

      Debra Grassgreen of Pachulski Stang Ziehl & Jones LLP forwarded me your letter, dated August 31, 2023, that requests Lavvan, Inc. ("Lavvan") to enter into a Subordination Agreement (the "New Subordination Agreement") attached thereto as Exhibit A.  Furthermore, I am in receipt of your letter, dated August 31, 2023 to me, demanding that Lavvan execute the New Subordination Agreement.  Lavvan respectfully declines your request.

      On May 2, 2019, Lavvan, entered into a Subordination Agreement (the "Existing Subordination Agreement") with Foris Ventures, LLC ("Foris") to subordinate its Junior Liens (as defined therein) as described in that certain Research, Collaboration and License Agreement, dated as of March 18, 2019 (the "RCLA"), to "the existing liens and security interests of Great American [whose interests Foris succeeded to] and any other Permitted Senior Lender," relating to that certain Loan and Security Agreement, dated as of June 29, 2018.  *See* RCLA Section 5.12.2(a). None of the loans subject to your proposed New Subordination Agreement were "existing liens and security interests of Great American" as of May 2, 2019 (the Closing Date as defined in the RCLA and, hereinafter, the "RCLA Closing Date").  As your letter notes, "Permitted Senior Lender" is defined as "Great American and any other lender who *has advanced* debt for borrowed money to Amyris on a senior secured basis (or any other lender who refinances any such debt)." *Id.* Section 5.12.2(b) (emphasis supplied). "Has advanced" is past-tense language; it does not provide that the subordination applies to any and all future liens for borrowed money.  None of the "Senior Agreements" listed in your proposed New Subordination Agreement are dated on or before the RCLA Closing Date, and none of the lenders party thereto "had advanced" funds as of such date.

Michael H. Goldstein
Goodwin Procter LLP
September 8, 2023
Page 2

      Lavvan has complied with its subordination obligations under the RCLA by entering into the Existing Subordination Agreement and, under the terms and conditions of the RCLA, Lavvan is not required to enter into the New Subordination Agreement. For good measure, we also note that Foris and its affiliates are not parties to the RCLA, and Section 14.4 of the RCLA clearly provides that no third party is an intended third-party beneficiary of the RCLA. Therefore, Foris and its affiliates are not permitted to make, and should not be making, demands to Lavvan under the terms of that agreement.

      With respect to the portions of your letter concerning the effect of a subordination in a bankruptcy case, Lavvan has taken no position inconsistent with the Existing Subordination Agreement. But it bears noting that although the Existing Subordination Agreement does contain several provisions concerning its effect in a bankruptcy case, the Existing Subordination Agreement does not address DIP financing, nor does it purport to prevent Lavvan from taking positions concerning DIP financing. Furthermore, the Existing Subordination Agreement provides for Lavvan's liens created under that certain May 2, 2019 security agreement with Amyris, Inc. to be subordinated only to the liens granted to Foris (as successor to GACP Finance Co., LLC.) under the Loan and Security Agreement, dated June 29, 2018 (the "LSA"), between GACP Finance Co., LLC. and Amyris, Inc., until the Senior Debt (i.e., the Obligations (as defined in the Existing Subordination Agreement) arising under the LSA) is paid in full.

      On behalf of our client, we reserve all rights, powers and remedies provided for under any agreements between Foris and Lavvan, or at law or in equity, whether now or hereafter existing. Nothing contained in this letter, nor in any other communication (whether written, oral or electronic) or contact with Foris or Euagore or any other person or entity, or conduct by, between or among our client and the Debtors, Euagore, Foris, or any of their respective affiliates, shall constitute (or be deemed to constitute) or be construed as a waiver, modification, alteration, amendment, or release of any rights, powers, or remedies against Debtors, Foris, Euagore, or any of their respective affiliates.

      Very truly yours,

      */s / Russell C. Silberglied*

      Russell C. Silberglied

RCS/lam