## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC., *et al.*, | Case No. 23-11131 (TMH) |
| Debtors.[1] | (Jointly Administered) |

**Hearing Date:  October 18, 2023 at 2:00 p.m. (ET)**
**Objection Deadline:  October 11, 2023 at 4:00 p.m. (ET)**

**MOTION FOR (I) AN ORDER (A) APPROVING BID PROCEDURES FOR THE SALE OF THE DEBTORS' BRAND ASSETS; (B) APPROVING CERTAIN BID PROTECTIONS IN CONNECTION WITH THE DEBTORS' ENTRY INTO ANY POTENTIAL STALKING HORSE AGREEMENTS; (C) SCHEDULING THE AUCTION AND SALE HEARING; (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (E) GRANTING RELATED RELIEF; AND (II) AN ORDER OR ORDERS (A) APPROVING THE SALE OF THE DEBTORS' BRAND ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

The above-captioned debtors and debtors-in-possession (the "Debtors") file this motion (the "Motion") for entry of an order, pursuant to sections 105(a), 363, 365, 503, 507, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), substantially in the proposed form attached hereto as **Exhibit A** (the "Bid Procedures Order"):

     i.       establishing bid procedures (the "Bid Procedures"), substantially in the form attached as Exhibit 1 to the Bid Procedures Order, in connection with the sale or sales (each, a "Sale") of the Debtors' assets (the "Brand Assets")[2] associated with

---

[1]    A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Amyris.  The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

[2]    The Debtors also reserve the right, by separate motion, to seek to apply these Bid Procedures to the sale of all or substantially all of their assets in accordance with the *Senior Secured Super Priority Debtor in Possession Loan*

their Operating Consumer Brands (as defined herein)[3] pursuant to section 363 of the Bankruptcy Code;

ii.       authorizing, but not directing, the Debtors, in consultation with the Consultation Parties[4] and with the express consent of the DIP Secured Parties and the Foris Prepetition Secured Lenders as set forth in the Bid Procedures, to enter into one or more stalking horse agreements (each, a "Stalking Horse Agreement") with one or more parties (each, a "Stalking Horse Bidder") for one or more Sales (each, a "Stalking Horse Bid") of certain Brand Assets;[5]

iii.      authorizing the Debtors, consistent with the Bid Procedures, to offer a break-up fee of up to 3.0% of the total cash consideration offered for each applicable Stalking Horse Bid (each, a "Break-Up Fee") and an expense reimbursement of up to $350,000 per Stalking Horse Bid (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Bid Protections") for the Stalking Horse Bidder(s), if any; *provided, however*, that the aggregate Bid Protections with respect to any Stalking Horse Bid shall not exceed 5.0% of the total cash consideration offered for such Stalking Horse Bid;

iv.      scheduling an auction or auctions for a Sale or Sales (each, an "Auction") and approving the form and manner of notice thereof (the "Bid Procedures/Auction Notice");

v.       setting a hearing for approval of any Sale(s) (the "Sale Hearing"); and

vi.      granting related relief.

In support of this Motion, the Debtors rely upon and refer this Court to the *Declaration of Han Kieftenbeld in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket

---

*Agreement* dated as of August 9, 2023, as amended by the *Amendment No. 1 to Senior Secured Super Priority Debtor in Possession Loan Agreement* dated as of September 13, 2023 (collectively, the "DIP Facility").

[3]   The "Operating Consumer Brands" consist of Biossance®, JVN™, Rose Inc.™, Pipette®, MenoLabs™, Stripes™, and 4U by Tia™. Terasana®, Eco-Fabulous™, Costa Brazil®, OLIKA™, Beauty Labs, Purecane™, and Onda Beauty (the "Non-Operating Consumer Brands") are subject to the procedures set forth in the *Order (I) Establishing Procedures Governing the Sale or Transfer of Certain De Minimis Assets and Non-Operating Brands, and (II) Granting Related Relief* [Docket No. 205]. However, the Debtors reserve the right to include any of the Non-Operating Brands in the process contemplated by these Bid Procedures if the Debtors determine that doing so is in the best interests of the Debtors' estates.

[4]   The "Consultation Parties" are, collectively, the DIP Secured Parties, the Foris Prepetition Secured Lenders, and the official committee of unsecured creditors (the "Committee") appointed in these Chapter 11 Cases.

[5]   For the avoidance of doubt, the Debtors do not seek to enter into multiple Stalking Horse Agreements with respect to the same Brand Assets.

No. 18] (the "<u>First Day Declaration</u>"),[6] incorporated herein by reference.  In further support of the Motion, the Debtors respectfully represent as follows:

<b><u>PRELIMINARY STATEMENT</u></b>

1.      By this Motion, the Debtors seek approval of the Bid Procedures and related relief to facilitate the marketing and sale of Biossance®, JVN™, Rose Inc.™, Pipette®, MenoLabs™, Stripes™, and 4U by Tia™ (collectively, the "<u>Operating Consumer Brands</u>") through one or more Sales under section 363 of the Bankruptcy Code.  The Debtors file this Motion to facilitate the marketing and sale of the Brand Assets through an open process that protects the best interests of the Debtors' estates and creditors and preserves the Debtors' ability to exercise their fiduciary duties throughout the Sale process (the "<u>Sale Process</u>").

2.      With the assistance of their investment banker, Intrepid Investment Bankers LLC ("<u>Intrepid</u>"), and in consultation with their major stakeholders, the Debtors will continue their robust marketing process to identify one or more parties interested in pursuing a Sale or Sales (each, a "<u>Potential Bidder</u>") for all or a portion of the Debtors' Brand Assets.

3.      The Bid Procedures provide the formal framework for a Sale or Sales and have been structured to elicit value-maximizing bids for the Brand Assets.  Among other things, the Bid Procedures: (a) set forth the timeline for the Sale Process that is reasonable and appropriate to produce value-maximizing bids for the Debtors' Brand Assets and are consistent with the milestones set forth in the DIP Facility; (b) establish the basic rules for submitting bids for the purchase of any or all of the Debtors' Brand Assets; (c) provide parameters for the selection of one or more Stalking Horse Bidders; and (d) provide major creditor groups with consultation rights at

---

[6]     A capitalized term used but not defined herein shall have the meaning ascribed to it in the First Day Declaration.

DOCS_DE:243863.7

various stages in the process.  The proposed Bid Procedures comply with the requirements of the

Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and, therefore, should be approved.

4.      Consistent with the Debtors' need to consummate a Sale or Sales as efficiently as

possible, the Debtors propose the following key dates and deadlines for the Sale Process:[7]

| Date[8] | Event |
|---|---|
| **October 11, 2023 at 5:00 p.m.** | Bid Procedures Motion Objection Deadline |
| **October 18, 2023 at 2:00 p.m.** | Bid Procedures Hearing |
| **October 20, 2023** | Deadline to File Bid Procedures Notice |
| **October 25, 2023 at 5:00 p.m.** | Stalking Horse Bid Deadline |
| **November 1, 2023** | Deadline to (i) Designate Stalking Horse Bidder(s) and (ii) Execute Stalking Horse Agreement(s) |
| **November 6, 2023 at 5:00 p.m.** | Deadline to File and Serve Stalking Horse Objections |
| **November 14, 2023 at 5:00 p.m.** | Deadline to Submit Qualified Bids |
| **November 22, 2023** | Deadline to Designate Qualified Bids and File Auction Notice |
| **November 28, 2023 at 10:00 a.m.** | Sale Auction(s) |
| **December 1, 2023** | Deadline to File Notice of Successful Bidder(s) and Back-Up Bidder(s) |
| **December 5, 2023 at 5:00 p.m.** | Adequate Assurance Objection Deadline |
| | Deadline to Object to Sale(s) |
| **December 12, 2023 at 11:00 a.m.** | Sale Hearing |
| **December 29, 2023** | Deadline to Close Transaction(s) |

5.      In addition, pursuant to the *Motion for an Order (A) Approving Procedures Related*

*to the Assumption, Assumption and Assignment, or Transfer of Executory Contracts and*

*Unexpired Leases; and (B) Granting Related Relief* (the "Contract and Lease Procedures Motion"),

filed concurrently herewith, the Debtors seek to establish certain procedures relating to the

assumption, assumption and assignment, or transfer of executory contracts and unexpired leases

---

[7]     The Debtors, consistent with their fiduciary duties, in the exercise of their business judgment, and in consultation with the Consultation Parties, reserve the right to modify these dates consistent with the terms of the DIP Facility to achieve a value-maximizing Sale or Sales.

[8]     All times are prevailing Eastern time. The Debtors, after consultation with the Consultation Parties, may extend the deadlines set forth herein.

in connection with any Restructuring Transaction (as defined therein), which includes any Sale pursuant to this Motion. Accordingly, as discussed in detail herein, the Debtors respectfully request entry of the Bid Procedures Order.

## JURISDICTION AND VENUE

6. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. The Debtors confirm their consent, pursuant to Rule 9013-1(f) of the Local Rules, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8. The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 507, 1107, and 1108 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006, and 9014, and Local Rules 2002-1(b), 6004-1, and 9006-1.

## BACKGROUND

### A.    General Case Background

9. On August 9 and August 21, 2023 (as applicable, the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing these Chapter 11 Cases. The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections

DOCS_DE:243863.7

1107(a) and 1108 of the Bankruptcy Code.  On August 27, 2023, the Office of the United States

Trustee (the "U.S. Trustee") appointed the Committee, including the following members:  U.S.

Bank Trust Co. NA; Cosan U.S. Inc.; Sartorius Stedim North America Inc.; Hearst Magazine

Media Inc.; Wiley Companies; Park Wynwood LLC; and Allog Participacoes Ltda.

       10.     The Debtors were founded in 2003 to create a more stable supply of a key anti-

malarial treatment.  Through the Debtors' cutting-edge science, artemisinin—the most effective

anti-malarial drug in the world—is now consistently available to treat the deadly disease.  Using

the same technological innovations that produced artemisinin, the Debtors have become the

world's leading manufacturer of ingredients made with synthetic biology.  The Debtors provide

sustainable ingredients that are eco-friendly alternatives to raw material sourced for flavors and

fragrances, sweeteners, cosmetics, pharmaceuticals, and other consumer products.

       11.     In addition, the Debtors operate a family of consumer brands that utilize the

Company's ingredients to meet the growing demand for sustainable, effective, and accessible

products, including Biossance® (clean beauty skincare), JVN™ (haircare), Rose Inc.™ (clean

color cosmetics), Pipette® (clean baby skincare), MenoLabs™ (healthy living and menopause

wellness), Stripes™ (menopausal wellness), and 4U by Tia™ (a new clean haircare line).

       12.     A detailed description of the Debtors' business and facts precipitating the filing of

the Debtors' chapter 11 proceedings are set forth in the First Day Declaration.

**B.**      **The Debtors' Brand Assets**

       13.     As discussed in further detail in the First Day Declaration, Amyris produces

ingredients and consumer products through an innovative Lab-to-Market™ technology platform.

The Debtors use molecular biology and genetic engineering to sustainably produce materials that

are scarce or endangered resources in nature by leveraging state-of-the-art machine learning,

robotics, and artificial intelligence.  As applicable to the Motion, the Debtors currently have seven Operating Consumer Brands: Biossance® clean beauty skincare, JVN™ haircare, Rose Inc.™ clean color cosmetics, Pipette® clean baby skincare, MenoLabs™ healthy living and menopause wellness, Stripes™ (peri)menopausal wellness, and 4U by Tia™, a new clean haircare line exclusively available in Walmart.  Each of the Operating Consumer Brands utilize the Debtors' clean and sustainable ingredients and are distributed through various retail partnerships including with Sephora, Target, Amazon, and Walmart, both in the United States and abroad.

C.    **The Marketing Process**

14.    The Debtors' Sale Process is being managed by their investment banker, Intrepid. Intrepid was retained by the Debtors in July 2023 to, among other things, assist the Debtors in marketing their Brand Assets.  To that end, prior to the Petition Date, Intrepid worked closely with the Debtors' management to analyze the Brand Assets' current financial position, prepare marketing and diligence materials, and populate a digital data  room (the "Data Room") for prospective purchasers interested in purchasing all or any portion of the Debtors' Brand Assets.

15.    To date, Intrepid has identified and contacted over 300 potential buyers, both industry and financial players, nearly 200 of whom remain active in the process.  As of September 15, 2023, over 85 of these parties have signed non-disclosure agreements, have received access to the comprehensive Data Room maintained by Intrepid, and have begun to conduct due diligence. Of these, more than a dozen Potential Bidders have provided the Debtors with non-binding indications of interest with respect to one or more Operating Consumer Brands.

**RELIEF REQUESTED**

A.    **Bid Procedures Order**

16.    By this Motion, the Debtors seek the entry of the Bid Procedures Order: (i) approving the Bid Procedures; (ii) approving various forms and the manner of notice thereof; (iii) authorizing the Debtors, in accordance with the Bid Procedures, to designate one or more Stalking Horse Bidder(s) and to provide the Bid Protections in connection therewith; (iv) approving the Bid Protections; (v) scheduling the Auction and a Sale Hearing; and (vi) granting related relief.

17.    Additionally, by this Motion, the Debtors further request that, at the Sale Hearing, the Court enter an order or orders approving the Sale(s) of the Brand Assets free and clear of all Encumbrances.[9]

---

[9]    As used herein, "Encumbrance" and "Encumbrances" include all of the following, in each case, to the extent against or with respect to the Debtors, or in, on, or against, or with respect to any of the Brand Assets: liens (including as defined in section 101(37) of the Bankruptcy Code, and whether consensual, statutory, possessory, judicial, or otherwise), claims (as defined in section 101(5) of the Bankruptcy Code) ("Claims"), debts (as defined in section 101(12) of the Bankruptcy Code), encumbrances, obligations, liabilities, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, or interests of any kind or nature whatsoever, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to, on, or subsequent to, the commencement of these Chapter 11 Cases, and in each case, whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to: (i) mortgages, security deeds, deeds of trust, pledges, charges, security interests, levies, hypothecations, encumbrances, easements, servitudes, leases, subleases, licenses, rights-of-way, encroachments, restrictive covenants, restrictions on transferability, voting, sale, transfer or other similar restrictions, rights of setoff (except for setoffs validly exercised before the Petition Date, or preserved in a timely filed proof of claim or motion filed with the Court), rights of use or possession, conditional sale arrangements, deferred purchase price obligations, profit sharing interest, or any similar rights; (ii) all Claims, including, without limitation, all rights or causes of action (whether in law or equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff (except for setoffs validly exercised before the Petition Date, or preserved in a timely filed proof of claim or motion filed with the Court), indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other Person, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, or otherwise; (iii) all debts, liabilities, obligations, contractual rights and claims, including labor, employment, and pension claims; (iv) any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtors' or the Successful Bidder(s)' interest in the Brand Assets, or any similar rights; (v) any rights under labor

B.    **Bid Procedures**

18.    To maximize the value of their Brand Assets for the benefit of the Debtors' estates and creditors, the Debtors seek to implement a competitive bidding process to culminate in one or more Sales.  As described more fully in the Bid Procedures and the Bid Procedures Order, the Debtors seek approval to sell the Brand Assets to one or more Qualified Bidders (as defined below) that make the highest or otherwise best offers for the Brand Assets.  The Debtors request that competing bids for the Brand Assets, including the submission of any Stalking Horse Bids, be governed by the Bid Procedures and Bid Procedures Order, which, among other things, collectively establish:

> a.    the requirements that an Interested Party must satisfy to be entitled to participate in the bidding process and become a Potential Bidder [Bid Procedures at § I.A.2];

---

or employment agreements; (vi) any rights under pension, multiemployer plan (as such term is defined in section 3(37) or section 4001(a)(3) of the Employment Retirement Income Security Act of 1974 (as amended, "ERISA")), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (vii) any other employee claims related to worker's compensation, occupation disease, or unemployment or temporary disability, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and the Age Discrimination in Employment Act, each as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code of any similar state law, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (l) the WARN Act (29 U.S.C. §§ 2101, et seq.) or any state or other laws of similar effect; (viii) any bulk sales or similar law; (ix) any tax statutes or ordinances or other laws of similar effect, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Brand Assets before the closing of a Sale; (x) any unexpired and executory contract or unexpired lease to which the Debtors are a party that is not an Transferred Contract; (xi) any other excluded liabilities under the Purchase Agreement; and (xii) Encumbrances arising under or in connection with any acts, or failures to act, of the Debtors or any of their predecessors, affiliates, or subsidiaries, including, but not limited to, Encumbrances arising under any doctrines of successor liability (to the greatest extent permitted by applicable law), or transferee or vicarious liability, violation of the Securities Act, the Exchange Act, or other applicable securities laws or regulations, breach of fiduciary duty, or aiding or abetting breach of fiduciary duty, or any similar theories under applicable law or otherwise.

b. the requirements for Potential Bidders to submit bids and the method and criteria by which such bids become Qualified Bids [Bid Procedures at §§ I.B.3, I.C];

c. the process for the selection of Stalking Horse Bid(s), if any [Bid Procedures at § I.B.1];

d. the deadline by which bids must be submitted [Bid Procedures at § I.C.1];

e. certain procedures related to the assumption and assignment or transfer of executory contracts and unexpired leases [Bid Procedures at § I.J]; and

f. various other matters relating to the Sale Process generally, including the Auction, designation of Successful Bidder(s), and Sale Hearing [Bid Procedures at §§ I.D, I.E, I.G].

19. In addition, the Debtors seek the authority, subject to the terms of the Bid Procedures Order and the Bid Procedures, to accept one or more Stalking Horse Bids from Potential Bidders and to enter into one or more Stalking Horse Agreements with one or more Stalking Horse Bidders in the Debtors' business judgment. To facilitate a competitive, value-maximizing Sale(s), by this Motion, the Debtors request authority, in the exercise of their business judgment, to offer Bid Protections in accordance with the Bid Procedures to one or more Stalking Horse Bidders in accordance with the terms of any Stalking Horse Agreements, in the form of (a) a Break-Up Fee of up to an aggregate of three percent (3%) of the cash portion of the purchase price of each Stalking Horse Bid, and (b) Expense Reimbursement for any Stalking Horse Bidders in connection with their bids, up to a maximum amount of $350,000; *provided, however*, that the aggregate Bid Protections with respect to any Stalking Horse Bid shall not exceed 5.0% of the total cash consideration offered for such Stalking Horse Bid.

20. To the extent the Debtors designate one or more Stalking Horse Bidder(s) in accordance with the Bid Procedures, the Debtors shall, by **November 1, 2023**, file a notice of such determination with the Court (the "Stalking Horse Notice"). The Stalking Horse Notice, if filed, shall also include a copy of any Stalking Horse Bidder's Stalking Horse Agreement.

21.     After submission of all Qualified Bids, the Debtors, after consultation with the Consultation Parties, will select the highest or otherwise best Qualified Bid(s) for one or more of the Brand Assets or all or substantially all of the Brand Assets (any one or more such Qualified Bids, a "Baseline Bid").  In no event shall any Qualified Bidder, other than a Stalking Horse Bidder, be entitled to any Bid Protections.

22.     The Bid Procedures contain the following provisions, some of which are required to be highlighted pursuant to Local Rule 6004-1(c) and which are more fully described in the Bid Procedures and the Bid Procedures Order:[10]

(a)     **Provisions Governing Qualification of Bidders** [Bid Procedures § I.A.2].  To participate in the bidding process and receive due diligence information, including full access to the Data Room and additional non-public information regarding the Debtors (the "Diligence Materials"), parties interested in receiving due diligence information to participate in the bidding process (each, an "Interested Party") must deliver or have previously delivered to the Debtors, if determined to be necessary by the Debtors in their sole discretion, the following documents (collectively, the "Preliminary Bid Documents"): (a) an executed confidentiality agreement using the Debtors' form, as may be amended, on terms reasonably acceptable to the Debtors, to the extent not already executed (a "Confidentiality Agreement"); (b) a statement and/or other factual support demonstrating to the Debtors' satisfaction in the exercise of their reasonable business judgment that the Interested Party has a *bona fide* interest in purchasing all or any portion of the Brand Assets; and (c) preliminary proof by the Interested Party of its financial capacity to close its proposed Sale Transaction(s), which may include verbal or written representations of an Interested Party's financial wherewithal or financial statements of, or verified financial commitments obtained by, the Interested Party (or, if the Interested Party is an entity formed for the purpose of acquiring all or any portion of the Brand Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors (including in consultation with their advisors).

(b)     **Stalking Horse Bidder(s) and Bid Protections** [Bid Procedures § I.B.1].  The Debtors may, pursuant to these Bid Procedures, after consultation with the Consultation Parties and with the express consent of the DIP Agent and the Foris Prepetition Secured Lenders, (i) designate one or more Qualified Bidders that submit a Qualified Bid for all or any portion of the Brand Assets a stalking horse bidder (the "Stalking Horse Bidder"), whose Qualified Bid shall serve as the

---

[10]   These provisions are excerpted from the Bid Procedures.  However, to the extent any inconsistencies between this summary and the Bid Procedures exist, the Bid Procedures shall govern.

DOCS_DE:243863.7

stalking horse bid ("Stalking Horse Bid"), and  (ii) execute, subject to higher or otherwise better offers, one or more purchase agreements memorializing the proposed transaction set forth in the Stalking Horse Bid (a "Stalking Horse Agreement"), which may include: (x) a break-up fee of no more than 3.0% of the total cash consideration payable under such Stalking Horse Agreement (the "Break-Up Fee") plus (y) an expense reimbursement for the Stalking Horse Bidder's actual out-of-pocket costs of up to $350,000 (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Bid Protections"); *provided, however*, that the aggregate Bid Protections with respect to any Stalking Horse Bid shall not exceed 5.0% of the total cash consideration offered in such Stalking Horse Bid; *provided, further*, that if at such time the DIP Agent and the Foris Prepetition Secured Lenders have provided a Credit Bid (as defined below) to be a Stalking Horse Bidder they shall not have consent rights with respect to such Brand Assets that are the subject of such Credit Bid so long as such Credit Bid has not been withdrawn.  For the avoidance of doubt, to the extent the Debtors designate more than one Stalking Horse Bidder pursuant to these Bid Procedures, no two Stalking Horse Bidders will be designated with respect to any of the same Brand Assets.

(c)     **Provisions Governing Qualified Bids** [Bid Procedures § I.C.2]

(i)     <u>Purpose and Identity of Assets to be Purchased</u>.  Each Bidder must state that the Bid includes an offer by the Bidder to effectuate a Sale Transaction and identify with specificity which Brand Assets are included in the Bid.

(ii)    <u>Good Faith Deposit</u>.  Each Bid must be accompanied by a cash deposit (the "Good Faith Deposit") in the form of a wire transfer, certified check, or cash payable to the order of counsel pursuant to instructions to be provided by Debtors equal to 10% of the Bidder's proposed Purchase Price (as defined herein), which will be held in a non-interest bearing escrow or trust account; *provided however*, that a Secured Party submitting a credit bid shall not be required to post a Good Faith Deposit.

(iii)   <u>Purchase Price</u>.  Each Bid must clearly set forth the cash purchase price (the "Cash Consideration") and identify any non-cash consideration included in such Bid (together with the Cash Consideration, the "Purchase Price") including, without limitation, which executory contracts and unexpired leases the Bidder expects the Debtors to assume and assign to the Bidder (the "Transferred Contracts") and which liabilities, if any, of the Debtors the Bidder is agreeing to assume (the "Assumed Liabilities").  ***Any Bidder who submits a Bid for more than one Consumer Brand's Brand Assets must allocate the Purchase Price between or among each Consumer Brand's Brand Assets and include the basis and methodology for such allocation.  Further, any Bidder who submits a Bid for more than one Consumer Brand's Brand Assets must provide that such Bid is severable as between or among Operating Consumer Brands***.  The Purchase Price associated with each Bid may include only cash and/or other consideration acceptable to the Debtors after consultation with the Consultation Parties.

If a Stalking Horse Bidder(s) has been selected for all or any portion of the Brand Assets, the cash component of any other Qualified Bid with respect to all or any portion of the Brand Assets must be no less than an amount necessary to satisfy the Break-Up Fee and Expense Reimbursement, as defined herein, and be a Topping Bid with respect to the applicable Consumer Brand's Brand Assets. In order for the Bid to qualify as a "Topping Bid," it must provide for consideration at Closing (as defined herein) that is equal to or in excess of the sum of: (i) the Stalking Horse Bid; (ii) the Expense Reimbursement; (iii) the Break-Up Fee; and (iv) the Minimum Increment (as defined herein).

(iv)    Binding and Irrevocable. Each Bid must include a signed writing stating that it is binding and irrevocable until the selection of the Successful Bidder, provided that if such Bidder is selected as the Successful Bidder or the Back-Up Bidder, its offer shall remain irrevocable until the closing of the Sale with the Successful Bidder or, as applicable, the Back-Up Bidder (the "Closing").

(v)    Contemplated Transaction Documents. Each Bid must include an executed Purchase Agreement marked against the Form APA pursuant to which the Qualified Bidder proposes to effectuate the contemplated Sale Transaction including: (i) a redlined copy of the Purchase Agreement marked to show all changes requested by the Qualified Bidder against the Form APA; (ii) specification of the proposed Purchase Price allocated, if applicable, as set forth in section I.C.2.iii hereof; and (iii) any changes to any exhibits or schedules to the Purchase Agreement (collectively, the "Contemplated Transaction Documents"). The terms and conditions of the Contemplated Transaction Documents must be, in the aggregate, not materially more burdensome to the Debtors than the provisions contained in any applicable Stalking Horse Agreement. A Bid must identify with particularity each and every condition to Closing and all Transferred Contracts pursuant to the Contemplated Transaction Documents. All Bids must provide that all Cure Amounts (as defined herein) will be paid by such Bidder. ***The Contemplated Transaction Documents must include a commitment to close by no later than December 29, 2023***. A Bid shall contain a detailed description of how the Potential Bidder intends to treat current employees of the Debtors.

(vi)    Contingencies. A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or completion of due diligence, but may be subject to the accuracy in all material respects at Closing of representations and warranties at or before Closing or the satisfaction in all material respects of customary representations and warranties for transactions of similar size and nature at or before Closing or the satisfaction in all material respects of customary conditions for transactions of similar size and nature at or before Closing. A Bid must disclose any governmental approvals identified by the Potential Bidder other than as set forth in the

13

Contemplated Transaction Documents that may impact the evaluation of such Bid.

(vii)    <u>No Collusion</u>.  Each Bid must include a representation that the Bidder has not engaged in any collusion with respect to its Bid submission (though Potential Bidders are permitted to make joint bids) and that the Bidder will not engage in any collusion with respect to any Bids, the Auction, or the Sale Process.

(viii)   <u>Authorization to Bid and Identity of Bidder</u>.  Each Bid must include evidence of authorization and approval from such Potential Bidder's board of directors (or comparable governing body, or a statement as to why such approval is unnecessary) with respect to the submission, execution, delivery, and closing of the Contemplated Transaction Documents.  A Bid must also fully disclose the identity of the entity that is submitting the Bid, including the identity of the ultimate beneficial owners of the Bidder and the identity of any person or entity providing debt or equity financing for the Bid.

(ix)     <u>Financing Sources</u>.   Each Bid must include written evidence that demonstrates the Potential Bidder has the necessary financial ability to close the contemplated Sale Transaction and provide adequate assurance of future performance under all Transferred Contracts.   Such information may include, *inter alia*, the following:

   a.  the Potential Bidder's current financial statements (audited, if they exist);

   b.  contact names, telephone numbers, and e-mail addresses for verification of financing sources;

   c.  evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated Sale Transaction (including confirmation that the funding of such commitments is not subject to any contingency); and

   d.  any other form of financial disclosure of credit-quality support information acceptable to the Debtors demonstrating that such Potential Bidder has the ability to close the contemplated Sale Transaction.

(x)      <u>Adequate Assurance of Future Performance</u>.  Each Bid must demonstrate, in the Debtors' reasonable business judgment and after consultation with the Consultation Parties, that the potential Bidder can provide adequate assurance of future performance to the applicable counterparty under all Transferred Contracts as required by section 365 of the Bankruptcy Code.

(xi)     <u>No Fees Payable to Qualified Bidder</u>.  Other than any Stalking Horse Bidder(s), a Bidder may not request any break-up fee, termination fee,

DOCS_DE:243863.7

expense reimbursement, or any similar type of payment. Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code relating in any way to the submission of its Bid, compliance with the Bid Procedures, or participation in the Sale Process.

(xii)   Payment of the Break-Up Fee and Expense Reimbursement. If a Stalking Horse Bidder has been selected for all or any portion of the Brand Assets that are the subject of a Bid, a Bid must allow for the payment of the Break-Up Fee and Expense Reimbursement to the applicable Stalking Horse Bidder from the first proceeds of the cash portion of the Purchase Price of such Bid upon Closing to the extent the Bid overlaps with the Stalking Horse Bid in regard to the Brand Assets included in such Bid. The applicable Bid Protections will only be earned by the applicable Stalking Horse Bidder if the Successful Bidder has Overbid the Stalking Horse Bidder on the same Brand Assets included in the applicable Stalking Horse Bid, and will only be payable at the Closing of the applicable Sale Transaction to the Successful Bidder. To the extent a party is designated Stalking Horse Bidder for multiple Brand Assets and is ultimately the Successful Bidder for only a portion of such Brand Assets, the payment of the Break-Up Fee and Expense Reimbursement shall not exceed 5.0% of the value of the Brand Assets for which the Stalking Horse Bidder was not named the Successful Bidder.

(xiii)   Non-Reliance. A Bid must include an acknowledgement and representation of the Potential Bidder that it has had an opportunity to conduct any and all due diligence regarding the Brand Assets (as applicable to its Bid) and Assumed Liabilities prior to making its Bid, that it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Brand Assets in making its Bid, and that it did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Brand Assets, the financial performance of the Brand Assets or, as applicable, the physical condition of the Brand Assets, the Assumed Liabilities, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Contemplated Transaction Documents.

(xiv)   As Is, Where Is. A Bid must include an acknowledgement and representation of the Potential Bidder that it understands that any Sale Transaction shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents, or their estates except to the extent set forth in the Purchase Agreement of the Successful Bidder.

(d)    **Right to Credit Bid** [Bid Procedures § I.B.4].  At the Auction, if any, a Qualified Bidder who has a valid and perfected lien[11] on any Brand Assets (a "<u>Secured Party</u>") shall be permitted to submit a credit bid for all or a portion of the assets subject to such lien, up to the amount of such Secured Party's claims (a "<u>Credit Bid</u>"), to the extent permitted under section 363(k) of the Bankruptcy Code; *provided*, *however*, that any Secured Party, other than the Foris Prepetition Secured Lenders and the DIP Agent, that intends to participate in the Auction with a Bid that includes a Credit Bid shall, as a condition to such participation, (i) notify the Debtors at least five (5) calendar days prior to the Bid Deadline that it intends to submit a Credit Bid, and (ii) provide all documentation requested by the Debtors to establish the lien, claims, and encumbered assets that will be the subject of the Secured Party's potential Credit Bid.  The Foris Prepetition Secured Lenders and the DIP Secured Parties qualify as a Potential Bidder and Qualified Bidder and may submit a Credit Bid any time after the Bid Deadline or during the Auction, and such Credit Bid shall be a Qualified Bid unless otherwise ordered by the Court for cause (any such Credit Bid, the "<u>Foris Credit Bid</u>"); *provided*, *however*, that the Foris Prepetition Secured Lenders and the DIP Secured Parties must provide Contemplated Transaction Documents (as defined herein) to the Debtors no later than two (2) business days after the Bid Deadline.  Other than with respect to the Contemplated Transaction Documents, the Foris Credit Bid shall not be subject to the requirements herein for a Qualified Bid or a Back-Up Bid.

To the extent that any Secured Party who is a Consultation Party submits a Credit Bid for all or any portion of the Brand Assets, such Secured Party's respective rights as a Consultation Party and any consent rights provided for herein shall be terminated as of such time solely with respect to bids related to the same Brand Assets as that for which the Secured Party submitted a Credit Bid, and the Debtors shall establish reasonable procedures to prevent such Secured Party or its representatives from thereafter being privy to confidential information concerning the bids of other Bidders for such Brand Assets for so long as such Secured Party remains a Bidder; *provided, however*, that (i) any Secured Party who submits a Credit Bid and later withdraws such bid shall immediately resume being treated as a Consultation Party and shall regain any consent rights provided for herein, as applicable, for purposes of these Bid Procedures and (ii) any Secured Party who does not submit a Credit Bid shall at all times be a Consultation Party for purposes of these Bid Procedures.

---

[11]    Any credit bid by the holder of a junior lien must include a cash component sufficient to indefeasibly pay in full, in cash all claims and obligations of the holder of all liens senior to such junior lien.

For the avoidance of doubt, the Debtors dispute the nature, extent, priority, and validity of any lien and security interest asserted by Lavvan, Inc. ("<u>Lavvan</u>") against Amyris, Inc.  The Debtors reserve all rights against Lavvan, including, but not limited to, the right to challenge any request by Lavvan to credit bid pursuant to section 363(k) of the Bankruptcy Code.  Nothing herein should be construed or implied as any agreement of or consent by the Debtors to Lavvan's ability to credit bid, nor a waiver of any of the Debtors' rights under the Bankruptcy Code or applicable law.

DOCS_DE:243863.7

(e)    **Provisions Governing the Auction** [Bid Procedures § I.D].  After the receipt and review of all Qualified Bids, the Debtors shall make a determination, after consultation with the Consultation Parties, whether to accept the highest or best Qualified Bid(s) for all or any portion of the Brand Assets.

To the extent the Debtors receive Qualified Bids and determine to proceed to Auction, the Debtors, after consultation with the Consultation Parties, shall determine which Qualified Bid(s) represent the then highest or otherwise best Bid(s) for all or any subset of the Brand Assets, as applicable (the "Baseline Bid(s)").  The determination of which Qualified Bid(s) constitute the Baseline Bid(s) and which Qualified Bid(s) constitute the Successful Bid(s) (as defined herein) shall take into account any factors the Debtors, after consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid(s) to their estates, including, *inter alia*: (a) the amount and nature of the consideration; (b) the certainty of closing; (c) the net economic effect of any changes to the value to be received by the Debtors' creditors from the proposed Sale Transaction(s); (d) the allocation of the Purchase Price between or among Brand Assets; (e) tax consequences of such Qualified Bid(s); and (f) any other quantitative or qualitative criteria available to assess such Bid (collectively, the "Bid Assessment Criteria"). If the Debtors, pursuant to these Bid Procedures, designate a Stalking Horse Bidder(s), the Baseline Bid(s), to the extent not the Stalking Horse Bid(s), must be not less than the Purchase Price of the Stalking Horse Bid *plus* (ii) the Break-Up Fee *plus* (iii) the Expense Reimbursement *plus* (iv) the Minimum Increment (as defined herein).

On or before ***November 22, 2023***, the Debtors shall file a notice on the Court's docket (an "Auction Notice") providing (i) notice of the location of the Auction; and (ii) notice of whether the Debtors believe, in the exercise of their business judgment and after consultation with the Consultation Parties, that the Auction should be held in two or more parts over multiple days so as to maximize value for the estates.

Unless otherwise designated by the Debtors, after consultation with the Consultation Parties, the Auction shall commence at ***10:00 a.m. (Eastern Time) on November 28, 2023,*** at a location to be designated in the Auction Notice.  In the Debtors' discretion, the Auction may be held by telephonic or video conference.

The Auction shall be conducted according to the following procedures:

(i)    *Participation at the Auction*. Only the Stalking Horse Bidder(s) and Qualified Bidders that have submitted Qualified Bids are eligible to participate at the Auction.  Only the authorized representatives and professional advisors of each of the Qualified Bidders, the Stalking Horse Bidder(s), the Debtors, the Consultation Parties, and the United States Trustee for the District of Delaware shall be permitted to attend the Auction.

17

Except as otherwise set forth herein, the Debtors, after consultation with the Consultation Parties, may conduct the Auction in the manner they determine will result in the highest or best offer(s) for the Brand Assets in accordance with the Bid Procedures, including sequencing the sale of any Consumer Brand's Brand Assets.

In the event, after the conclusion of the Auction, that certain discrete Brand Assets which are not included in the Successful Bid(s) have not been sold (the "Unsold Assets"), the Debtors may, in the exercise of their business judgment and after consultation with the Consultation Parties, resume an auction for the sale of the Unsold Assets, on such bid procedures as may be implemented by the Debtors after consultation with the Consultation Parties.

(ii)   *The Debtors Shall Conduct the Auction*.   The Debtors and their professionals shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of any Baseline Bid(s).  All Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders.  The Debtors reserve the right to conduct the Auction, after consultation with the Consultation Parties, in the manner designed to maximize value based upon the nature and extent of the Qualified Bids received in accordance with the Bid Procedures, the Bid Procedures Order, the Bankruptcy Code, and any other order of the Court entered in connection herewith and disclosed to each Qualified Bidder.  The Debtors shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid(s), all Overbids, and the Successful Bid(s).  Pursuant to Local Rule 6004-1, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the Sale Process, the Bid Procedures, the Auction, or the proposed Sale Transaction(s).

(iii)   *Terms of Overbids*.  An "Overbid" is any Bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the applicable Baseline Bid(s) that satisfies the following conditions:

a.   Minimum Increment.  During the Auction, bidding shall begin with the Baseline Bid.  Due to the potential combinations of Brand Assets that may be included in any Bid, the Debtors reserve all rights with respect to the comparison of Qualified Bids to Stalking Horse Bids and the determination of the Baseline Bid(s) subject to the rights of the Consultation Parties as provided for herein.  The initial Overbid after the Baseline Bid (the "Initial Overbid") shall be made in an increment announced on the record prior to the start of the Auction (the "Minimum Increment") *plus*, solely in the event the Baseline Bid is a Stalking Horse Bid, (ii) the Break-Up Fee *plus* (iii) the Expense Reimbursement, as applicable to the Brand Assets included in the Bid, in cash or other

18

consideration acceptable to the Debtors, after consultation with the Consultation Parties. Any Overbids subsequent to the Initial Overbid shall be made in increments of at least the applicable Minimum Increment; *provided, however*, that any Overbids by the Stalking Horse Bidder(s) shall only be required to be equal to the sum of (x) (1) the Baseline Bid or the then existing highest Bid *plus* (2) the Minimum Increment *less* (y) the sum of the amount of the Bid Protections applicable to the Brand Assets included in the Bid.

Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless the Debtors, after consultation with the Consultation Parties, accept a higher Qualified Bid as an Overbid.

b.  <u>Consideration of Overbids</u>. Subject to compliance with the terms of the DIP Orders, the Debtors reserve the right, after consultation with the Consultation Parties, to make one or more adjournments in the Auction to, among other things: facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in the exercise of their business judgment and after consultation with the Consultation Parties, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Sale Transaction at the prevailing Overbid amount.

c.  <u>Closing Evidence</u>. To the extent not previously provided on or before the Bid Deadline, a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, evidence reasonably acceptable to the Debtors, after consultation with the Consultation Parties, demonstrating such Qualified Bidder's ability to close the Sale Transaction proposed by such Overbid.

*(iv)*  *Additional Procedures*. The Debtors, after consultation with the Consultation Parties, may (a) determine which Qualified Bid or Qualified Bids, if any, is the highest or best offer for all Brand Assets or any Consumer Brand's Brand Assets and (b) reject at any time before entry of an order of the Court approving a Sale Transaction of all or any portion of the Brand Assets pursuant to a Qualified Bid, any Bid that is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the Bid Procedures Order; or (iii) contrary to the best interest of the Debtors, their estates, and their creditors.

*(v)*  *Consent to Jurisdiction as Condition to Bidding*. All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Court and to have waived any right to a jury trial in connection with any disputes relating to the Sale Process, the Auction, the Bid Procedures, and

19

the construction and enforcement of each Qualified Bidder's Contemplated Transaction Documents, as applicable.

(vi)    *Closing the Auction*.  The Auction shall continue until there is only one Qualified Bid for all of the Brand Assets or for one or more Consumer Brand's Brand Assets (or multiple, non-overlapping Qualified Bids for any subsets of the Brand Assets if there is no single Qualified Bid for all the Brand Assets) that the Debtors determine, in the exercise of their business judgment and after consultation with the Consultation Parties, is the highest or otherwise best Qualified Bid(s) (such Qualified Bid(s), the "<u>Successful Bid(s)</u>", and such Qualified Bidder(s), the "<u>Successful Bidder(s)</u>"), and that further bidding is unlikely to result in a higher or otherwise better Qualified Bid, at which point, the Auction will be closed.  The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction.  In selecting the Successful Bid, the Debtors, after consultation with the Consultation Parties, may consider all factors relevant to the sale of the Brand Assets, including the Bid Assessment Criteria.

Upon the closing of the Auction, the Debtors, after consultation with the Consultation Parties, shall identify the Successful Bidder(s) and the Successful Bid(s) and the Back-Up Bidder(s) and Back-Up Bid(s) as soon as reasonably practicable which highest or best offer will provide the greatest amount of net value to the Debtors, and advise the Qualified Bidders of such determination.  Due to the potential combinations of Brand Assets that may be included in any Bid, the Debtors reserve all rights with respect to the comparison of Qualified Bids and the determination of the Successful Bidder(s) and Back-Up Bidder(s) (as defined herein).

The Qualified Bidder with the second highest or otherwise best Bid at the Auction, as determined by the Debtors after consultation with the Consultation Parties, shall be required to serve as the back-up bidder (the "Back-Up Bidder(s)").  The identity of the Back-Up Bidder(s) and the amount and material terms of the final Bid of the Back-Up Bidder(s) (the "Back-Up Bid(s)") shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the Successful Bid(s). Any Back-Up Bidder shall keep its Back-Up Bid open and irrevocable until the Closing of the Sale Transaction with the Successful Bidder.  The Good Faith Deposit of the Back-Up Bidder(s) shall be returned by the Debtors within three (3) days after Closing.

Within one (1) business day after the close of the Auction, the Successful Bidder(s) shall supplement the Successful Bidder(s)' Good Faith Deposit(s) such that the Good Faith Deposit(s) shall be equal to an amount that is ten percent (10%) of the Purchase Price of the Successful Bid(s).

DOCS_DE:243863.7

The Debtors shall not consider any Bids or Overbids submitted after the closing of the Auction and any and all such Bids and Overbids shall be deemed untimely.

As stated above, the Successful Bid(s) of the Successful Bidder(s) and the Back-Up Bid(s) of the Back-Up Bidder(s), respectively, must be irrevocable until Closing.

## C.    Procedures Related to the Assumption and Assignment or Transfer of Contracts

23.    Pursuant to the Contract and Lease Procedures Motion, filed concurrently herewith, the Debtors seek to establish certain procedures relating to the assumption, assumption and assignment, or transfer of executory contracts and unexpired leases in connection with any Restructuring Transaction (as defined therein), which includes any Sale pursuant to this Motion. Among other things, the Contract and Lease Procedures Motion seeks to establish procedures (the "Contract and Lease Procedures") related to (i) the Debtors' identification and notice of executory contracts and unexpired leases that may be assumed, assumed and assigned, or transferred by the Debtors pursuant to a plan or sale (the "Potential Assumed/Assigned Contracts") and the amount, if any, the Debtors believe is necessary to cure all monetary defaults under such Potential Assumed/Assigned Contracts pursuant to section 365 of the Bankruptcy Code (the "Cure Amounts"); and (ii) the procedures and deadlines for the non-Debtor counterparties to such Potential Assumed/Assigned Contracts (the "Contract Counterparties") to object to the Cure Amounts and/or the assumption, assumption and assignment, or transfer of their Potential Assumed/Assigned Contracts (a "Contract Objection").

24.    Pursuant to this Motion, to the extent a Potential Assumed/Assigned Contract is a Transferred Contract pursuant to a proposed Sale of Brand Assets, the Debtors request that any Contract Objections be heard at (i) the Sale Hearing or (ii) on such other date subsequent to the Sale Hearing as the Court may designate prior to, during, or after the Sale Hearing (the "Cure/Assignment Hearing"). Any Additional Contract Objections (as defined in the Contract and

21

Lease Procedures) will be resolved at a hearing to be held by the Court (i) on or before seven (7) calendar days from the timely filing of the Additional Contract Objection; (ii) at the Cure/Assignment Hearing; or (iii) such other date designated by the Court.

25.     In addition, pursuant to this Motion, the Debtors seek to establish procedures with respect to a Successful Bidder's provision of adequate assurance of future performance of a Transferred Contract.  As discussed below, upon determination of the Successful Bid(s), on or before *December 1, 2023*, the Debtors will file a Notice of Successful Bidder with the Court.  Any Contract Counterparty to a Transferred Contract seeking additional assurance of future performance than that provided by the Successful Bidder(s) (the "Adequate Assurance Objection") should immediately contact Steven W. Golden (sgolden@pszjlaw.com) and the applicable Successful Bidder to attempt to resolve any Adequate Assurance Objection.  All Adequate Assurance Objections must be filed and served on the Notice Parties (as defined in the Bid Procedures) and the applicable Successful Bidder no later than **December 5, 2023 at 5:00 p.m. (prevailing Eastern Time)**.  To the extent the parties are unable to consensually resolve the Adequate Assurance Objection prior to Closing, the Court will set a hearing on the Adequate Assurance Objection to determine whether terms of the Successful Bid are compliant with section 365 of the Bankruptcy Code in providing adequate assurance of future performance to the Contract Counterparty of the applicable Transferred Contract, which may be at the Sale Hearing.  The Debtors intend to cooperate with Contract Counterparties to Transferred Contracts to attempt to reconcile any Adequate Assurance Objection.

26.     At the Sale Hearing, (i) the Successful Bidder(s) shall present evidence necessary to demonstrate adequate assurance of future performance by the Successful Bidder(s) with respect to the Transferred Contracts and (ii) the Debtors will request entry of an order approving the

assumption and assignment of any or all Potential Assumed/Assigned Contracts to be assumed by the applicable Debtors and assigned to the Successful Bidder(s).  For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

**D.    Scheduling and Notice**

27.    Pursuant to the terms of the DIP Facility, the Debtors are required to (i) obtain entry of the Bid Procedures Order by no later than **October 18, 2023**, and (ii) obtain entry of an order approving the Sale(s), no later than **December 12, 2023**.  In addition, the terms of the DIP Facility requires that the Closing occur no later than **December 29, 2023**.

28.    Given the Debtors' robust marketing efforts to date and the 97 day post-petition marketing and diligence period (*i.e.*, the period from the Petition Date through the Bid Deadline) to be established by the Bid Procedures, the proposed timeline is sufficient to complete a fair and open sale process that will maximize the value received for the Brand Assets while complying with the milestones established by the DIP Facility.  The proposed timeline will provide all Potential Bidders with sufficient time to perform due diligence given that the process is well understood at this juncture and all relevant materials are readily available.  Thus, the schedule proposed above will allow for the consummation of the Sale Transactions(s) as quickly as possible and in a manner designed to maximize the value received for the brand Assets.

29.    **Notice of Motion**.  On the date the notice of this Motion is filed or as soon as is practicable thereafter, the Debtors will cause this Motion and all exhibits hereto, the Bid Procedures, and a copy of the proposed Bid Procedures Order, to be served upon (a) the Office of the U.S. Trustee for the District of Delaware, 844 King Street, Suite 2207, Lock Box 35, Wilmington, Delaware, 19801, Attn: John Schanne, Esq. (John.Schanne@usdoj.gov); (b) counsel

to the Committee, White & Case LLP, 1221 Avenue of the Americas, New York, NY 10020-1095; Attn: Gregory Pesce, Esq. (gregory.pesce@whitecase.com), Andrew O'Neill, Esq. (aoneill@whitecase.com), and John Ramirez, Esq. (john.ramirez@whitecase.com); and local counsel to the Committee, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, DE 19801; Attn: Christopher M. Samis, Esq. (csamis@potteranderson.com), Katelin A. Morales, Esq. (kmorales@potteranderson.com), Sameen Rizvi, Esq. (srizvi@potteranderson.com); (c) counsel to the DIP Lenders, DIP Agent and the Foris Prepetition Secured Lenders, Goodwin Procter LLP, 620 Eighth Avenue, New York, NY 10018, Attn: Michael H. Goldstein, Esq. (mgoldstein@goodwinlaw.com), Alexander J. Nicas, Esq. (anicas@goodwinlaw.com), and Debora Hoehne, Esq. (dhoehne@goodwinlaw.com); (d) co-counsel to the DIP Lenders, the DIP Agent and the Foris Prepetition Secured Lenders, Troutman Pepper Hamilton Sanders LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899; Attn: David M. Fournier, Esq. (david.fournier@troutman.com); (e) the United States Attorney's Office for the District of Delaware; (f) the state attorneys general for all states in which the Debtors conduct business; (g) the Securities Exchange Commission; (g) all parties reasonably known to the Debtors that assert liens, claims, and encumbrances, and other interests with respect to the Assets; (h) all entities known to have expressed an interest in bidding on the Assets; (j) the Internal Revenue Service, the Securities and Exchange Commission, and any other federal, state or local governmental agency to the extent required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or order of the Court; and (h) any party that requests service pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").

30.     **Notice of Bid Procedures**. Within two (2) calendar days of the entry of the Bid Procedures Order, or as soon thereafter as practicable, the Debtors shall cause to be served, by

first-class mail, postage prepaid, a notice (the "Bid Procedures Notice") setting forth, among other things, the dates established for submission of Qualified Bids, the Auction, and the Sale Hearing, substantially in the form attached to the Bid Procedures Order as Exhibit 2, upon the Sale Notice Parties and all of the Debtors' known creditors.

31.     **Notice of Successful Bidder(s)**.  Following the Auction, the Debtors will promptly file with the Court a notice (the "Notice of Successful Bidder") that will inform the Court of the results of the Auction.  The Notice of Successful Bidder will identify, among other things: (i) the Successful Bidder(s) as the proposed purchaser(s) of the Brand Assets; (ii) the amount and form of consideration to be paid by the Successful Bidder(s) for the Brand Assets; (iii) the liabilities to be assumed by the Successful Bidder(s); and (iv) the Potential Assumed/Assigned Contracts to be assumed by the Debtors and assigned to the Successful Bidder(s), or the Debtors' rights and interests therein sold and transferred to the Successful Bidder(s), as the case may be, in connection with the Sale Transaction(s) (*i.e.*, the Transferred Contracts).[12]  The Notice of Successful Bidder will also include similar information relating to the Back-Up Bidder(s) and the Back-Up Bid(s). In addition, the Debtors will attach to the Notice of Successful Bidder: (i) the Sale Order(s) approving the Sale(s) to the Successful Bidder(s); (ii) a copy of the Purchase Agreement(s) entered into by the Debtors and the Successful Bidder(s) following the Auction; and (iii) any additional information or documentation relevant to the Successful Bid(s).  The Debtors will file the Notice of Successful Bidder on the docket for these Chapter 11 Cases as promptly as is reasonably practicable prior to the Sale Hearing, but will not be required to serve the same on any parties-in-interest in these Chapter 11 Cases.

---

[12]    For the avoidance of doubt, the identification of the Transferred Contracts in the Notice of Successful Bidder may be accomplished through the attachment of any relevant schedule(s) to the Purchase Agreement(s) attached to such notice.

E.      **Sale Order**

32.      To ensure the Debtors are in compliance with the terms of the DIP Facility, the Debtors request that this Court set the Sale Hearing on the omnibus hearing currently scheduled for December 12, 2023 at 11:00 a.m. (prevailing Eastern Time).  At the Sale Hearing, the Debtors intend to seek the entry of the Sale Order: (a) approving the Sale(s) free and clear of all Encumbrances, and (b) authorizing the assumption and assignment or transfer of the Transferred Contracts, among other things.[13]  Pursuant to the Sale Order, the Debtors will sell any Brand Assets that are the subject of a Sale Transaction free and clear of all Encumbrances to the fullest extent possible pursuant to section 363(f) of the Bankruptcy Code (except for those Assumed Liabilities and obligations expressly assumed by the Successful Bidder(s)), and the Successful Bidder(s) will be protected from liability for and cannot be pursued for any claims owed by the Debtors, except as otherwise agreed by the Successful Bidder(s) and the Debtors or as set forth in the Sale Order. In addition, the Sale Order will have findings that the Sale(s) is not a fraudulent conveyance.  The Bid Procedures provide proper and adequate notice for these and the other terms and conditions of the bidding, Auction, and Sale Processes.

## BASIS FOR RELIEF REQUESTED

A.      **Approval of the Sale(s) Is Warranted Under Section 363(b) of the Bankruptcy Code and the Bid Procedures Are Appropriate and in the Best Interests of the Debtors' Estates and their Creditors**

33.      Section 363(b)(1) of the Bankruptcy Code provides that the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . ."[14]  Section 105(a) of the Bankruptcy Code further provides, in relevant part, that "[t]he

---

[13]   To the extent the Debtors seek to consummate more than one Sale Transaction, the Debtors reserve the right to seek the entry of multiple Sale Orders in accordance with these procedures.

[14]   11 U.S.C. § 363(b)(1).

court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

34.     A debtor may be authorized to sell assets outside of the ordinary course of business pursuant to section 363 of the Bankruptcy Code if it demonstrates a sound business purpose for doing so.[15]

35.     Indeed, the paramount goal of a chapter 11 process is to maximize the proceeds received by the estate.[16]  To that end, courts have recognized that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate of a debtor and therefore are appropriate.[17]  With this in mind, courts have deferred to a debtor's business judgment in the context of bidding and auction procedures.[18]

---

[15]     *See In re Fed. Mogul Glob., Inc.*, 293 B.R. 124, 126 (D. Del . 2003) (finding that a court should approve a debtor's use of assets outside ordinary course of business if debtor can demonstrate a sound business justification for proposed transaction); *see also In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 154 (Bankr. D. Del. 1999) (finding that the debtor's sound business purpose justified its sale of the assets outside of the ordinary course of business).

[16]     *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149 (3d Cir. 1986) (noting the fairness and reasonableness of prices); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . debtor's duty . . . is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bag Co. v. Champion Intl Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)); *In re Summit Glob. Logistics, Inc.*, No. 08-11566, 2008 Bankr. LEXIS 896, at *43 (Bankr. D.N.J. Mar. 26, 2008) (describing a proposed transaction as one that "maximize[d] value and return to interested parties.").

[17]     *See, e.g., In re Dura Auto. Sys.*, 379 B.R. 257, 263 (Bankr. D. Del. 2017); *Integrated Res.*, 147 B.R. at 659 (providing that such procedures "encourage bidding and to maximize the value of the debtor's assets."); *In re Fin. News Network Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate.").

[18]     *See, e.g., In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.' If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale." (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Trans World Airlines Inc.*, No. 01-0056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001) ("It is not the function of a bankruptcy court to independently exercise a business judgment as to which proposal among competing proposals should be adopted by the debtor in effecting a § 363(b) sale.").

36.     In exercising its fiduciary duties and in the sound exercise of their business judgment, the Debtors have determined that the Bid Procedures are the most appropriate method for encouraging competing bids that will maximize creditor recoveries and that will ensure the value received for their Brand Assets is the highest or best the market can generate.

37.     The Bid Procedures provide a framework to facilitate and entertain bids for the purchase of any or all of the Debtors' Brand Assets and, if such bids are received, to conduct an Auction in an orderly yet competitive fashion, thereby encouraging bids that maximize the value realized from a Sale of the Brand Assets.  In particular, the Bid Procedures contemplate an open and fair auction process with minimum barriers to entry and provide Bidders with sufficient time to perform due diligence and to acquire the information necessary to submit a timely and well-informed bid.

38.     The Bid Procedures provide the Debtors with an adequate opportunity to consider competing bids and select the highest or best offer(s) for the purchase of any or all of the Debtors' Brand Assets.  The Debtors therefore believe that submitting the purchase of their Brand Assets to a market-based test will ensure maximum recovery for all stakeholders.  Accordingly, the Debtors and their stakeholders can be assured that the consideration obtained will be fair and reasonable.

39.     Similar bidding, auction, and notice procedures have been previously approved by this Court in other chapter 11 cases. *See, e.g.*, *In re PhaseBio Pharms., Inc.*, No. 22-10995 (LSS) (Bankr. D. Del. Nov. 28, 2022); *In re Genapsys, Inc.*, No. 22-10621 (BLS) (Bankr. D. Del. Aug. 17, 2022); *In re SanityDesk, Inc.*, No. 22-10527 (JTD) (Bankr. D. Del. Aug. 3, 2022); *In re Enjoy Tech., Inc.*, No. 22-10580 (JKS) (Bankr. D. Del. July 26, 2022); *In re Hamon Holdings Corp.*, No.  22-10375 (JTD) (Bankr. D. Del. July 13, 2022); *In re Healthe, Inc.*, No. 21-11567 (MFW) (Bankr. D. Del. Mar. 21, 2022); *In re Wardman Hotel Owner, L.L.C.*, No. 21-10023 (JTD)

(Bankr. D. Del. June 15, 2021); *In re MobiTV, Inc.*, No. 21-10457 (LSS) (Bankr. D. Del. Apr. 7, 2021); *In re EHT US1, Inc.*, No. 21-10036 (CSS) (Bankr. D. Del. Mar. 24, 2021); *In re RTI Holding Co., LLC*, No. 20-12456 (JTD) (Bankr. D. Del. Nov. 20, 2020); *In re BL Rests. Holding, LLC*, No. 20-10156 (MFW) (Bankr. D. Del. Feb. 28, 2020); *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Feb. 4, 2020).[19]

40.     In sum, the Debtors believe that the proposed Bid Procedures create an appropriate framework for expeditiously establishing that the Debtors are receiving the best and highest offers for their Brand Assets.  Accordingly, the proposed Bid Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances.

**B.     The Purchased Assets Should be Sold Free and Clear of Liens, Claims, and Encumbrances Pursuant to Section 363(f) of the Bankruptcy Code**

41.     In the interest of attracting the best offers, the Debtors request authorization to sell their Brand Assets free and clear of any and all Encumbrances in accordance with section 363(f) of the Bankruptcy Code, with any such Encumbrances attaching to the proceeds of the Sale(s) of the Brand Assets and distributed as provided for in a further order of the Bankruptcy Court.

42.     Under section 363(f) of the Bankruptcy Code, a debtor may sell estate property free and clear of liens, claims, encumbrances, and other interests if one of the following conditions is satisfied: (i) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (ii) such entity consents; (iii) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (iv) such interest is in bona fide dispute; or (v) such entity could be compelled, in a legal or equitable proceeding, to

---

[19]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' counsel.

accept a money satisfaction of such interest.[20]  Because section 363(f) of the Bankruptcy Code is written in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens, claims, encumbrances, and other interests.[21]

43.    Furthermore, section 105(a) of the Bankruptcy Code grants the court broad discretionary powers, providing that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  This equitable power may be utilized to effectuate the provisions of section 363(f).[22]

44.    The Debtors will demonstrate at the Sale Hearing that the Sale(s) satisfies the requirements of section 363(f).  Accordingly, the Debtors request authorization to sell their Brand Assets free and clear of all Encumbrances.

**C.     Successful Bidders Should Be Entitled to the Protections
of Section 363(m) of the Bankruptcy Code**

45.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.[23]  As noted above, any Purchase Agreement executed by a Successful Bidder will have been negotiated at arm's-length and in good faith in accordance with the Bid Procedures and Bid Procedures Order, with each of the parties represented by its own advisors and counsel.  Accordingly, the Debtors request that the Sale Order include a provision that any Successful Bidder(s) for the Debtors' Brand Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.

---

[20]   11 U.S.C. § 363(f).

[21]   *See, e.g., In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992).

[22]   *See, e.g., In re Trans World Airlines, Inc.*, 2001 Bankr. LEXIS 723, at *18–19 (Bankr. D. Del. Mar. 27, 2001) (highlighting bankruptcy courts' equitable authority to authorize sale of estate assets free and clear).

[23]   *See, e.g., In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *Miami Ctr. Ltd. P'ship v. Bank of New York*, 838 F.2d 1547, 1554 (11th Cir. 1988); *In re Mark BellFurniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985).

The Debtors maintain that providing the Successful Bidders with such protection will ensure that the maximum price will be received by the Debtors for the Brand Assets.

**D.      Assumption and Assignment or Transfer of Certain Executory Contracts and Unexpired Leases Should be Authorized**

46.      To enhance the value of the Debtors' estates, the Debtors request authority under section 365 of the Bankruptcy Code to assume and assign or transfer the Transferred Contracts to the Successful Bidder(s).  The Debtors further request that the Sale Order provide that the Transferred Contracts will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder(s) notwithstanding any provisions in such assigned contracts and/or leases, including those described in sections 365(b)(2), (f)(1), and (f)(3) of the Bankruptcy Code, that prohibit such assignments.

47.      A debtor may, subject to court approval, assume and assign executory contracts and unexpired leases under section 365(a) of the Bankruptcy Code.  Courts routinely approve motions to assume and assign executory contracts or unexpired leases upon a showing that a debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment.[24]  The assumption and assignment of the Transferred Contracts related to the Brand Assets is an integral component of any Sale, without which a Sale would not be a viable option.

48.      Section 365(b)(1) of the Bankruptcy Code requires that, if there has been a default in a debtor's unexpired lease or executory contract, other than certain nonmonetary defaults as set forth in the statute, such unexpired lease or executory contract may not be assumed unless, at the time of the assumption, (i) such default is cured or there is adequate assurance that such default will be cured, (ii) compensation or adequate assurance of compensation is provided for any actual

---

[24]    *In re Fleming Co. Inc.*, 499 F.3d 300, 305 (3d Cir. 2007).

pecuniary loss resulting from such default, and (iii) adequate assurance of future performance under the lease is provided.[25] The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case but should be given "practical, pragmatic construction."[26]

49.    As set forth above and in the Contract and Lease Procedures Motion, the Debtors will send a Cure Notice and Additional Cure Notice, as applicable, to all Contract Counterparties to the Potential Assumed/Assigned Contracts notifying such Contract Counterparties of the potential assumption, assumption and assignment, or transfer of such contract and/or lease, including pursuant to a Sale of Brand Assets.  The Cure Notice and Additional Cure Notice, as applicable, will also set forth the Cure Amount, if any, owing for all such contracts and/or leases according to the Debtors' books and records.

50.    Contract Counterparties to Potential Assumed/Assigned Contracts will be given sufficient time (as set forth herein and in the Contract and Lease Procedures Motion) to object to the proposed Cure Amounts, if any, set forth in the Cure Notice.  If no objection is filed with regard to a particular Cure Amount and the Potential Assumed/Assigned Contract is a Transferred Contract pursuant to proposed Sale of Brand Assets, such Cure Amount shall be binding on the Debtors, the Successful Bidder(s), and the applicable Contract Counterparty.  The payment of the Cure Amounts specified in the Cure Notice or Additional Cure Notice (or a different amount, either agreed to by the Debtors or resolved by this Court as a result of a timely-filed objection by the relevant Contract Counterparty) will be in full and final satisfaction of all obligations to cure

---

[25]    11 U.S.C. § 365(b)(1).

[26]    *EBG Midtown South Corp. v. McLaren/Hart Env. Eng' g Corp.* (*In re Sanshoe Worldwide*), 139 B.R. 585, 593 (S.D.N.Y. 1992); *see also In re Fleming Co. Inc.*, 499 F.3d at 305; *Cinicola v. Scharffeberger*, 248 F.3d 110, 120 (3d Cir. 2001).

defaults and compensate the Contract Counterparties for any pecuniary losses under the applicable

Transferred Contracts pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtors

determine, before the Sale Hearing, that a particular lease or contract is not executory or unexpired,

and does not need to be cured to transfer the Brand Assets to the relevant Successful Bidder.

51.     Section 365(f) of the Bankruptcy Code states that a debtor may assign its unexpired

leases and executory contracts if, *inter alia,* the assignee provides "adequate assurance of future

performance."[27]  If necessary, the Successful Bidder(s) must submit, among other things, written

evidence of the ability to provide adequate assurance of future performance under the applicable

contracts or leases as set forth above and in the Bid Procedures Order.  The affected Contract

Counterparties will also be able to challenge the ability of the Successful Bidder(s) to provide

adequate assurance as provided in the Bid Procedures Order.

52.     Any assumption and assignment or transfer of the Transferred Contracts will be

subject to all of the provisions of such contract and/or lease, to the extent required by applicable

law and in accordance with applicable provisions of the Bankruptcy Code.  The Bid Procedures

are designed to ensure that any Successful Bidder(s) is financially able and prepared to undertake

all of the relevant obligations under the Transferred Contracts.  The Debtors, together with the

relevant Successful Bidder, will establish, as necessary, at the Sale Hearing, the requisite adequate

assurance of future performance pursuant to section 365 of the Bankruptcy Code with respect to

the potential assumption and assignment or transfer of the applicable Transferred Contracts.

Consequently, assumption and assignment of the Transferred Contracts in connection with the

Sale(s) is appropriate under the circumstances.

---

[27]   11 U.S.C. § 365(f)(2)(B).

E.    **The Bid Protections are Necessary and Appropriate and Should be Approved**

53.    The Debtors submit that the Bid Protections are a normal and necessary component of transactions outside the ordinary course of business under section 363 of the Bankruptcy Code. In particular, such protections encourage a potential transaction counterparty to invest the requisite time, money, and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process.[28]  The Debtors believe that the presence of Stalking Horse Bidder(s) will set a floor for the value of the particular Brand Assets and attract other potential buyers to bid for such Brand Assets, thereby maximizing the realizable value of such assets for the benefit of the Debtors' estates, their creditors, and all other parties-in-interest. The Bid Protections, if any, will only be paid out of the cash proceeds of a Sale Transaction arising from a Topping Bid or Overbid, as applicable, or, in the event a Topping Bid or Overbid is a credit bid under section 363(k) of the Bankruptcy Code, from the applicable Secured Parties.

54.    A proposed bidding incentive, such as the Bid Protections, should be approved when it is in the best interests of the estate.[29]  Typically, this requires that the bidding incentive provide some benefit to the debtor's estate.[30]

---

[28]    *See, e.g., In re Integrated Res., Inc.*, 147 B.R. 650, 660 (S.D.N.Y. 1992) (noting that fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs and the risks such bidder faces by having its offer held open, subject to higher and better offers); *In re Hupp Indus.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . due diligence"); *In re Marrose Corp.*, 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to provide reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citations omitted).

[29]    *See In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); *see also In re America West Airlines, Inc.*, 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus., Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992).

[30]    *Calpine Corp. v. O'Brien Envtl. Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

55.     In *O'Brien Environmental Energy*, the United States Court of Appeals for the Third Circuit found that whether breakup fees and expenses could be paid to a "stalking horse" bidder depended on whether such fees were necessary to preserve the value of the estate.[31]   Providing such protections would be appropriate, the court held, where the bidder provides a benefit to the debtor's estate by promoting competitive bidding or researching the value of the assets at issue to increase the likelihood that the selling price reflected the true value of the company.[32]   The Debtors believe that approval of the Bid Protections will promote a competitive bidding process.

56.     The Debtors believe that the proposed Bid Protections are fair and would reasonably compensate any Stalking Horse Bidder(s) for taking actions that will benefit the Debtors' estates.   The Bid Protections compensate the Stalking Horse Bidder(s) for diligence and professional fees incurred in negotiating the terms of the Purchase Agreement on an expedited timeline.

57.     The Debtors do not believe that the Bid Protections will have a chilling effect on the Sale Process.   Rather, any Stalking Horse Bidder(s) will increase the likelihood that the Debtors will receive the best possible price for the Brand Assets by permitting other Qualified Bidders to rely on the diligence performed by the Stalking Horse Bidder(s), and moreover, by allowing Qualified Bidders to utilize the Stalking Horse Agreement(s) (if executed) as a platform for negotiations and modifications in the context of a competitive bidding process.   Accordingly, the Bid Protections satisfy the requirements for approval in this Circuit and should be approved.

---

[31]     *See* 181 F.3d at 536.

[32]     *Id.* at 537.

DOCS_DE:243863.7

Moreover, the amount of the Bid Protections is consistent with the range of bid protections typically paid in sale transactions that have been recently approved by courts in this District.[33]

## F.    The Proposed Notices Are Appropriate Under Bankruptcy Rule 2002

58.    The notices contemplated by the Bid Procedures give notice of the proposed Sale Process including a disclosure of the time, place, and methodology of the Auction, the terms and conditions for being a Qualified Bidder, the necessary terms to be included in any proposed Sale Transaction(s), and the deadline for filing any objections to the Sale Process or any part thereof. The Debtors submit that the notice procedures comply with Bankruptcy Rule 2002 and include information regarding the Bid Procedures necessary to enable interested Bidders to participate in the Auction, and constitute good and adequate notice of the Bid Procedures and the other components of the Sale Process.   Therefore, the Debtors respectfully request that this Court approve the proposed notice procedures.

## G.    Relief from Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

59.    Under Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen (14) days after entry of the order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented.[34] Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory

---

[33]    *See, e.g.*, *In re Am. Eagle Del. Holding Co., LLC*, Case No. 22-10028 (JKS) (Bankr. D. Del. Mar. 8, 2022) (approving a breakup fee of 3% of the cash consideration of the stalking horse bid plus expense reimbursements equal to a maximum of 1.25% of the cash consideration of the stalking horse bid); *In re Makeup Liquidating Holdings, LLC*, Case No. 22-10050 (CSS) (Bankr. D. Del. Feb. 18, 2022) (approving breakup fee equal to 4% of the cash consideration of the stalking horse bid plus expense reimbursements equal to a maximum of approximately 3.5% of the cash consideration of the stalking horse bid); *In re Sequential Brands Grp., Inc.*, Case No. 21-11194 (JTD) (Bankr. D. Del. Sept. 24, 2021) (approving a break-up fee of 3.65% of the purchase price); *In re Knotel, Inc.*, Case No. 21-10146 (MFW) (Bankr. D. Del. Case 22-10367 Mar. 11, 2021) (approving a break-up fee of 3% of the purchase price).

[34]    *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for fourteen (14) days, unless the court orders otherwise.

60.     To preserve the value of the Debtors' estates and limit the costs of administering and preserving the Brand Assets, it is critical that the Debtors close the Sale(s) of the Brand Assets as soon as possible after all closing conditions have been met or waived.  Accordingly, the Debtors hereby request that the Court waive the fourteen (14) day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## NO PRIOR REQUEST

61.     No prior request for the relief sought in this Motion has been made to this or any other court.

## NOTICE

62.     The Debtors will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware, 844 King Street, Suite 2207, Lock Box 35, Wilmington, Delaware, 19801, Attn: John Schanne, Esq. (John.Schanne@usdoj.gov); (b) counsel to the Committee, White & Case LLP, 1221 Avenue of the Americas, New York, NY 10020-1095; Attn: Gregory Pesce, Esq. (gregory.pesce@whitecase.com), Andrew O'Neill, Esq. (aoneill@whitecase.com), and John Ramirez, Esq. (john.ramirez@whitecase.com); and local counsel to the Committee, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, DE 19801; Attn: Christopher M. Samis, Esq. (csamis@potteranderson.com), Katelin A. Morales, Esq. (kmorales@potteranderson.com), Sameen Rizvi, Esq. (srizvi@potteranderson.com); (c) counsel to the DIP Lenders, DIP Agent and the Foris Prepetition Secured Lenders, Goodwin Procter LLP, 620 Eighth Avenue, New York, NY 10018, Attn: Michael H. Goldstein, Esq. (mgoldstein@goodwinlaw.com), Alexander J. Nicas, Esq. (anicas@goodwinlaw.com), and

Debora Hoehne, Esq. (dhoehne@goodwinlaw.com); (d) co-counsel to the DIP Lenders, the DIP Agent and the Foris Prepetition Secured Lenders, Troutman Pepper Hamilton Sanders LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899; Attn: David M. Fournier, Esq. (david.fournier@troutman.com); (e) the United States Attorney's Office for the District of Delaware; (f) the state attorneys general for all states in which the Debtors conduct business; (g) the Securities Exchange Commission; (g) all parties reasonably known to the Debtors that assert liens, claims, and encumbrances, and other interests with respect to the Assets; (h) all entities known to have expressed an interest in bidding on the Assets; (j) the Internal Revenue Service, the Securities and Exchange Commission, and any other federal, state or local governmental agency to the extent required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or order of the Court; and (h) any party that requests service pursuant to Bankruptcy Rule 2002.

**WHEREFORE**, the Debtors respectfully request that the Court enter the Bid Procedures Order, granting the relief requested herein, and such other and further relief as this Court deems appropriate.

Dated: September 18, 2023                    **PACHULSKI STANG ZIEHL & JONES LLP**

                                            */s/ James E. O'Neill*
                                            Richard M. Pachulski (admitted *pro hac vice*)
                                            Debra I. Grassgreen (admitted *pro hac vice*)
                                            James E. O'Neill (DE Bar No. 4042)
                                            Jason H. Rosell (admitted *pro hac vice*)
                                            Steven W. Golden (DE Bar No. 6807)
                                            919 N. Market Street, 17th Floor
                                            P.O. Box 8705
                                            Wilmington, DE 19899-8705 (Courier 19801)
                                            Telephone: (302) 652-4100
                                            Facsimile: (302) 652-4400
                                            rpachulski@pszjlaw.com
                                            dgrassgreen@pszjlaw.com
                                            joneill@pszjlaw.com
                                            jrosell@pszjlaw.com
                                            sgolden@pszjlaw.com

                                            *Counsel to the Debtors and Debtors in Possession*