**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC., *et al.*, | Case No. 23-11131 (TMH) |
| | (Jointly Administered) |
| Debtors.[1] | |

**OPENING BRIEF OF LAVVAN, INC. IN OPPOSITION TO MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

**September 29, 2023**

Jason Cyrulnik
Paul Fattaruso
CYRULNIK FATTARUSO LLP
55 Broadway, Third Floor
New York, NY 10006
Telephone: (917) 353-3005
Email: jcyrulnik@cf-llp.com
      pfattaruso@cf-llp.com

Mark D. Collins
Russell C. Silberglied
Sarah E. Silveira
Emily R. Mathews
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7815
Email: collins@rlf.com
      silberglied@rlf.com
      silveira@rlf.com
      mathews@rlf.com

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS ..................................................................................................5

      A.     Proceedings to Date ................................................................................5

      B.     The RCLA and the Security Agreement ...................................................7

      C.     The Subordination Agreement .................................................................8

      D.     The Arbitration and Litigation ...............................................................11

ARGUMENT ....................................................................................................................11

    I.     LAVVAN HAS NOT CONSENTED TO BEING PRIMED BY THE
           PROPOSED DIP FACILITY ...............................................................11

      A.     The Parties to the Subordination Agreement Could Have Included a
            Consent to Priming Provision in the Subordination Agreement but
            Did Not.................................................................................................12

      B.     Lavvan Only Agreed Not to Affirmatively Seek Adequate Protection .....16

    II.    LAVVAN ONLY AGREED TO SUBORDINATE ITS LIEN AND ITS
           PAYMENT TO THE 2018 FORIS LOAN .............................................21

    III.   AMYRIS BEARS THE BURDEN OF PROVING THAT THE
           SUBORDINATION AGREEMENT IS STILL IN EFFECT ..............................25

      A.     The Material Modifications to the 2018 Foris Loan ..................................25

      B.     Amyris is Required, and Has Failed, to Produce Information to
            Establish the Subordination Agreement is Still in Effect ..........................31

      C.     Because Amyris Failed to Produce the Evidence, the Court Should
            Make an Adverse Inference .....................................................................33

    IV.   WITHOUT LAVVAN'S CONSENT, THE COURT CANNOT ENTER THE
           FINAL DIP ORDER WITHOUT FIRST FINDING THAT LAVVAN IS
           ADEQUATELY PROTECTED .............................................................34

      A.     The Debtor has Not Proved that Lavvan is Adequately Protected ............34

      B.     The Final DIP Order Should not Contain a Marshaling Waiver as to
            Lavvan.................................................................................................38

CONCLUSION.................................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*In re Anderson News, LLC*,
    615 B.R. 45 (Bankr. D. Del. 2020) ...................................................31

*Aurelius Cap. Master, Ltd. v. Tousa Inc.*,
    Case No. 08-61317-CIV, 2009 WL 6453077 (S.D. Fla. Feb. 6, 2009) .......................16, 17, 18

*In re Barbara K. Enter., Inc.*,
    No. 08-11474 (MG), 2008 WL 2439649 (Bankr. S.D.N.Y. June 16, 2008) ..........................20

*Bayside Cap. Inc. v. TPC Grp. Inc. (In re TPC Grp. Inc.)*,
    Nos. 22-10493 (CTG), 22-50372 (CTG), 2022 Bankr. LEXIS 1901 (Bankr. D. Del.
    July 11, 2022)...................................................................37

*In re Bear Island Paper Co.* L.L.C.,
    Case No. 10-31202 (DOT), 2011 Bankr. LEXIS 1884 (Bankr. E.D. Va. Mar. 30,
    2011) ..........................................................................16, 17

*In re C.B.G. Ltd.*,
    150 B.R. 570 (Bankr. M.D. Pa. 1992) ...............................................36

*In re Capitol Station 65, LLC*,
    2018 WL 333863 (Bankr. E.D. Ca. Jan. 8, 2018)....................................36

*CDI Tr. v. U.S. Elec., Inc. (In re Commc'n Dynamics, Inc.)*,
    382 B.R. 219 (Bankr. D. Del. 2008) ...............................................14

*In re Commc'n Dynamics, Inc.*,
    300 B.R. 220 (Bankr. D. Del. 2003) ...............................................33

*Douglass v. Douglass*,
    88 U.S. 98 (1874)................................................................14

*In re Energy Future Holdings Corp.*,
    513 B.R. 651 (Bankr. D. Del. 2014) ...............................................31

*Fla. Can. Corp. v. Union Carbide & Carbon Corp.*,
    280 F.2d 193 (6th Cir. 1960) ....................................................14

*In re Grant Broad. of Phila., Inc.*,
    71 B.R. 376 (Bankr. E.D. Pa.), *aff'd*, 75 B.R. 819 (E.D. Pa. 1987).......................34

*In re High Strength Steel, Inc.*,
    269 B.R. 560 (Bankr. D. Del. 2001) ...............................................38

iii

*Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*,
 662 F. Supp. 2d 375 (D. Del. 2009)........................................................................31

*In re Kain*,
 86 B.R. 506 (Bankr. W.D. Mich. 1988)...................................................................19

*Lannett Co., Inc. v. KV Pharms., Drugtech Corp.*,
 No. CV 08-338-JJF, 2009 WL 10737502 (D. Del. Mar. 6, 2009)...........................31

*Lemm v. Stillwater Land & Cattle Co.*,
 217 Cal. 474, 19 P.2d 785 (Cal. 1933)....................................................................25

*In re LTAP US, LLLP*,
 No. 10-14125 (KG), 2011 WL 671761 (Bankr. D. Del. Feb. 18, 2011)..................19

*In re McKillips*,
 81 B.R. 454 (Bankr. N.D. Il. 1987).....................................................................35, 36

*In re Mellor*,
 734 F.2d 1396 (9th Cir. 1984) .................................................................................35

*Meyer v. U.S.*,
 375 U.S. 233 (1963).................................................................................................38

*Morgan v. Sundance, Inc.*,
 142 S. Ct. 1708, 212 L. Ed. 2d 753 (2022) ..............................................................14

*In re Ne. Chick Servs., Inc.*,
 43 B.R. 326 (Bankr. D. Mass. 1984) ........................................................................19

*Nicolson Pavement Co. v. Jenkins*,
 81 U.S. 452, 20 L. Ed. 777 (1871) ...........................................................................25

*RCD Invs. No. 4, Ltd. v. Foothill Cap. Corp. (In re GDH Int'l, Inc.)*,
 Case No. 00-45647-BJH-11 (BJH), Adv. Proc. No. 00-4185 (BJH), 2001 Bankr.
 LEXIS 2230 (Bankr. N.D.T.X. Apr. 2, 2001) ....................................................16, 17

*Resol. Tr. Corp. v. BVS Dev.*,
 42 F.3d 1206 (9th Cir. 1994) ...................................................................................30

*S. Pac. Co. v. Grangers' Bus. Ass'n*,
 1 P.2d 477 (Cal. Ct. App. 1931) ..............................................................................29

*In re Stone & Webster, Inc.*,
 547 B.R. 588 (Bankr. D. Del. 2016) .........................................................................33

*In re SuperMedia LLC*,
 No. 13-10546 (KG), 2016 WL 1367070 (Bankr. D. Del. Apr. 4, 2016) ..................33

RLF1 29670372v.7

*In re Swedeland Dev. Grp., Inc.*,
    16 F.3d 552 (3d Cir.1994) ................................................................................................. 19, 34, 38

*Sys. Unlimited, Inc. v. Cisco Sys., Inc.*,
    221 F. App'x 950 (11th Cir. 2007) .......................................................................................... 14

*In re The Colad Grp., Inc.*,
    324 B.R. 208 (Bankr. W.D.N.Y. 2005) .................................................................................. 20

*In re Tucker*,
    5 B.R. 180 (Bankr. S.D.N.Y. 1980). ....................................................................................... 35

*Utley v. Donaldson*,
    94 U.S. 29, 24 L. Ed. 54 (1876) ........................................................................................ 14, 15

*In re YL W. 87th Holdings I LLC*,
    *423 B.R. 421* (Bankr. S.D.N.Y. Jan. 13, 2010) ............................................................... 20, 35

## STATUTES & RULES

11 U.S.C. § 361 ............................................................................................................................ 35

11 U.S.C. § 363 ............................................................................................................................ 19

California Civil Code § 1638 ....................................................................................................... 25

California Civil Code § 1639 ....................................................................................................... 25

California Civil Code § 3528 ....................................................................................................... 29

UCC 9-509(a) ............................................................................................................................... 27

## OTHER AUTHORITIES

64 Ops. Cal. Atty. Gen. 722 ........................................................................................................ 29

Michael H. Goldstein, et al., *Intercreditor Agreements and the Bankruptcy Code*, Pratt's
    J. of Bankr. L. 278 (2022) ....................................................................................................... 13

## INTRODUCTION[2]

At the September 14, 2023 hearing, Amyris showed that despite prominent statements in the DIP Motion and the First Day Hearing that the DIP Motion only sought consensual priming of Foris's prepetition loans by Foris's DIP Lender affiliate, Euagore, it actually was attempting to prime Lavvan without notice and without legal or factual justification. That is an exceedingly rare occurrence in this Court; there have been well less than a handful of opinions in this Court over the last 30 years concerning requests for nonconsensual priming. After taking evidence and hearing lengthy oral argument, the Court agreed that it did not have a sufficient record to decide the issue and directed additional briefing, discovery and a further hearing.

As is shown below, there remains no basis in law or fact for the Court to enter an order permitting Euagore – an insider of the Debtors – to prime Lavvan by $190 million. For perspective, that $190 million is <u>triple</u> the amount that even the Debtors and the Foris Lenders assert is the current amount to which Lavvan is subordinated (a fact not conceded by Lavvan), i.e., $63.5 million. And it is about 550% more than the amount of the Foris debt outstanding at the time that Lavvan and Foris executed their Subordination Agreement. So this is not a priming case where the DIP loan is a small percentage of the prepetition indebtedness of the primed party; it is exactly the reverse. The prejudice to Lavvan of being primed by $190 million is obvious and neither the Debtors nor the insider lenders have attempted to argue otherwise.

The Debtors and the Foris Lenders attempt to sidestep this by arguing that Lavvan consented to priming through the Subordination Agreement. But the Subordination Agreement – which contemplates bankruptcy and has numerous *other* bankruptcy terms – fails to even mention DIP financing, much less provide that Lavvan consented to it. As shown below, many sources

---

[2] Capitalized terms used but not defined in this Introduction shall have the meanings ascribed to them in the ensuing sections of this Brief.

confirm that consent to DIP financing and priming is a very common provision in subordination agreements.  Since the parties could have, but did not, include such a provision, the Court cannot just infer it here.  The Foris Lenders therefore are left to argue that any provision that in any way limits a party's actions with respect to adequate protection essentially works, *sub silencio,* as a consent to any and all priming.  That cannot be correct; otherwise, subordination agreements would not bother to have both DIP financing and cash collateral adequate protection provisions, but as shown below, they frequently do.  In any event, the provision in the Subordination Agreement here is not a "waiver" of adequate protection, but merely an agreement not to "seek" it.  As argued at the Final DIP Hearing and as further shown below, the Bankruptcy Code requires that the Court must independently determine that Lavvan is adequately protected in order to grant the priming of its perfected prepetition lien; whether or not Lavvan "seeks" adequate protection is legally irrelevant and thus an agreement not to "seek" adequate protection can have no bearing on the requirements of Section 364.

Moreover, none of Amyris's and the Foris Lenders' arguments work unless the Subordination Agreement remains in place; no one is even attempting to argue that there is a basis to prime Lavvan without it.  The Subordination Agreement, by its terms, terminates when the 2018 Foris Loan no longer is operative or has no remaining amounts due under it.  It was with that in mind that Lavvan raised, at the Final DIP Hearing, the fact that Amyris's own 2020 10-K disclosed that due to a series of very complex transactions, its accountants analyzed and concluded that there was an "extinguishment" of loans and a "reissuance" of new debt.  Upon further (post-hearing) inspection, this is also contained in Amyris's 2019 10-K – the very same year the Subordination Agreement was executed.  The document production and the parties' expert reports have at least begun to shed some light on what occurred.  In a series of insider transactions, the Foris Lenders

2

(who also are Amryis's largest shareholders and whose principal is an Amyris board member) and Amyris amended and/or amended and restated the 2018 Foris Loan numerous times in 2019 to change most of the major attributes of the loan until what was left was unrecognizable from the loan to which Lavvan agreed to subordinate. Most dramatically, they significantly expanded the amount loaned – and therefore the amount to which Lavvan is purported to be subordinated – from $35 million to $91 million in a matter of months. This was done, in part, by Amyris and insider Foris unilaterally agreeing to take what were previously issued as <u>unsecured</u> notes and roll them into the 2018 Foris Loan, thereby converting the amounts loaned not only into secured indebtedness but to amounts to which Lavvan allegedly is subordinated. Several months later when Foris decided to purchase equity in Amyris by cancelling indebtedness rather than paying cash, the insider lenders and Amyris again agreed among themselves what portions of the debt should be considered to have been paid down and what should be considered to remain. In doing so, they seem to have carefully decided that the loans that they contend are traceable to the original 2018 Foris Loan were the ones that remained outstanding, presumably for the very reason that they wanted the Subordination Agreement to remain in place. Since the amount of debt that was cancelled was more than the entire amount of the loan as it existed on the date of the Subordination Agreement, that decision was tactical; allocating it differently would have shown that the 2018 Foris Loan was cancelled.

Given that series of insider transactions, it is no surprise that the accountants had to perform an "extinguishment" analysis. As set forth below, there also are legal consequences. For example, under California law (which governs the Subordination Agreement), parties to a senior loan must receive the junior lender's consent to a material amendment if that amendment, as here, has material consequences to the subordinated lender. Additionally, Lavvan is examining whether the

effect of such substantial modifications to the 2018 Foris Loan render it a new agreement that is not subject to the Subordination Agreement and/or was a breach of the covenant of good faith and fair dealing. Those are "Challenge Period" issues under the Draft Final DIP Order, and the October 4 hearing is prior to the challenge deadline. Accordingly, the Court should not use the Subordination Agreement as a basis to prime Lavvan with these issues outstanding.

Finally, Amyris has not attempted to, and cannot, prove that Lavvan is adequately protected. No one has argued, much less proved, that there is an equity cushion here, and it appears that no one can. In addition, there is no basis for the term in the Draft Final DIP Order purporting to waive the equitable doctrine of marshaling. The Debtors affirmatively introduced evidence at the Final DIP Hearing that, in their opinion, the main value of the Debtors lies in assets other than Lavvan's collateral package and questioned whether Lavvan's collateral package has any real value. Having made that argument, there simply is no basis in law, fact or equity to order in advance that Euagore would be within its rights to look to a recovery first from Lavvan's collateral and only thereafter to the assets that the Debtors contend are the real value of the company. Indeed, the attempt to have an insider lender prime Lavvan by $190 million (approximately 550% more than what Lavvan agreed to in the Subordination Agreement) with no equity cushion and simultaneously insist on a waiver of marshaling should be viewed as exactly what it is: an attempt to eliminate Lavvan from these cases as soon as the DIP order is entered (and before the Arbitration Panel rules). After all, if it really is true, as the Debtors contend, that Lavvan's collateral package has little value, the entry of the DIP order with both $190 million of priming and a marshaling waiver will mean that Euagore may, with the Court's blessing, liquidate Lavvan's collateral first, and if its value is less than $190 million (or, if the Subordination Agreement remains in effect,

$253.5 million), Lavvan will become an unsecured creditor.  The Debtors and Foris have not met their burden to be granted such extraordinary relief.

**STATEMENT OF FACTS**

A.      **Proceedings to Date**

On August 9, 2023 (the "**Petition Date**"), Amyris, Inc. ("**Amyris**") and the other Debtors filed these chapter 11 cases.  The next day they filed the *Declaration of Han Kieftenbeld in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 18] (the "**First Day Declaration**") and the *Motion of the Debtors for Interim and Final Orders (i) Authorizing Debtors (a) to Obtain Postpetition Financing and (b) to Utilize Cash Collateral, (ii) Granting Adequate Protection to Prepetition Secured Parties, (iii) Modifying the Automatic Stay, (iv) Scheduling a Final Hearing, and (v) Granting Related Relief* [Docket No. 19] (the "**DIP Motion**").  In the DIP Motion, the Debtors sought authorization to obtain postpetition financing in an aggregate principal amount of up to $190 million (the "**DIP Loans**") from Euagore, LLC (the "**DIP Lender**" or "**Euagore**").

Shockingly, both the First Day Declaration and the DIP Motion failed to (i) identify Lavvan, Inc. ("**Lavvan**") as a secured creditor and (ii) explain that the Debtors sought to prime Lavvan's lien with the DIP Loans.  Indeed, the DIP Motion provides:  **"[t]he proposed DIP Orders do not provide for the priming of any pre-existing secured liens without the consent of the applicable lienholder."**  *See* DIP Motion, ¶ 24(xvi); *cf. id*. at ¶ 23(m)(ii) (defining "Primed Liens" as "the interests of the Foris Prepetition Secured Lenders").  Similarly, at the August 11, 2023, hearing (the "**First Day Hearing**"), counsel for Foris Ventures, LLC ("**Foris**") and Euagore confirmed that "Foris is being primed, Your Honor, they're being primed consensually by the new DIP, no one else is being primed; there is no nonconsensual priming under this DIP."  Aug. 11,

2023 Hr'g Tr., 65:19-21 (emphasis supplied).  After the Court entered an order [Docket No. 54] (the "**Interim DIP Order**") granting the relief requested in the DIP Motion on an interim basis and Lavvan filed a limited objection [Docket No. 171[3]] (the "**Limited Objection**") to the DIP Motion, the parties met and conferred.  Only at that point did Lavvan learn that Euagore in fact was attempting to prime Lavvan.  As a result, Lavvan promptly filed a supplemental objection [Docket No. 211] (the "**Supplemental Objection**") on September 8, 2023.

On September 11, 2023, Euagore, Foris and Foris's affiliates that were prepetition secured lenders of the Debtors (the "**Foris Prepetition Secured Lenders**" and collectively, with Euagore and Foris, the "**Foris Lenders**") filed a reply to the Supplemental Objection [Docket No. 235] (the "**Foris Reply**").  Contemporaneously therewith, the Debtors also filed a reply [(Sealed) Docket No. 236; (Redacted) Docket No. 238] (the "**Debtors' Reply**"), which attached a proposed final DIP order [Sealed] Docket No. 236, Ex. 1; (Redacted) Docket No. 238, Ex. 1] (the "**Draft Final DIP Order**").  The Foris Reply, for the first time three days before the hearing, made clear that Euagore was seeking to prime Lavvan and the Draft Final DIP Order contained, for the first time, provisions that expressly so provided.

On September 14, 2023, the Court held a hearing (the "**Final DIP Hearing**") regarding the DIP Motion and therefore heard argument on the Limited Objection, the Supplemental Objection, the Foris Reply and the Debtors' Reply.  At the conclusion of the Final DIP Hearing, the Court held that it did not "have the record today to fully decide the issues".  Sept. 14, 2023 Hr'g Tr., 109:5-6.  Instead, it directed further briefing and discovery on the issue and continued the Final DIP Hearing to October 4, 2023 (the "**Continued Hearing**").

---

[3] The Limited Objection was filed under seal at Docket No. 171.  A redacted version of the Limited Objection is available at Docket No. 172.

On September 19, 2023, the Court entered a scheduling order [Docket No. 323] (the "**Scheduling Order**"), which set forth deadlines for discovery and supplemental briefing, among other things, as well as a list of "Issues To Be Presented at" the Continued Hearing.

### B.    The RCLA and the Security Agreement

Lavvan and Amyris are parties to that certain *Research, Collaboration and License Agreement*, dated as of March 18, 2019 (as amended from time to time, the "**RCLA**"). A redacted version of the RCLA was attached to the Limited Objection as <u>Exhibit A</u> and admitted into evidence at the Final DIP Hearing as Lavvan's <u>Exhibit 1</u>. Lavvan entered into the RCLA because, as an ingredients and formulations business focused on the production and commercialization of cannabinoids for use in a variety of end markets, Lavvan recognized the excellence of Amyris's scientific capabilities and a unique opportunity to leverage Amyris's platform to establish itself as the clear leader in a large and growing field. *See* RCLA, p. 1. Under the RCLA, Amyris was responsible for research and development and delivering the technology and process to produce certain molecules through fermentation, while Lavvan controlled the manufacturing and commercialization of the molecules. *Id.*

In accordance with the requirements of the RCLA, Lavvan and Amyris also entered into that certain Security Agreement, dated as of May 2, 2019 (the "**Security Agreement**"), attached to the Limited Objection as <u>Exhibit B</u> and admitted into evidence as Lavvan's <u>Exhibit 2</u>, wherein Amyris granted Lavvan a security interest in substantially all of the Debtors' intellectual property.[4]

---

[4] Amyris has consistently misrepresented that Lavvan's lien is limited either to the intellectual property used in Amyris's collaboration with Lavvan, or the intellectual property as of the date of the RCLA, or both. As demonstrated in the Limited Objection (at ¶ 6) and at the Final DIP Hearing (Sept. 14, 2023 Hr'g. Tr., 69:3-70:10), that assertion is plainly false. The Court initially identified the extent of Lavvan's liens as an issue for the Continued Hearing. *See* Sept. 15, 2023 Hr'g. Tr., at 19:8-16. Likely because they desperately want the Court not to focus on the prior misrepresentations, the Debtors insisted, in their proposed form of scheduling order, that this is an "Issue[] to be Determined at Another Date" rather than at the Continued Hearing. *See* Ex. A to *Certification of Counsel Regarding Debtors' Proposed Scheduling Order With Respect to Continued Hearing on the Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral,*

7

The Security Agreement contained certain covenants made by Amyris.  One was that "[f]or so long as this Security Agreement shall remain in effect, the Grantor [i.e., Amyris] hereby covenants and agrees . . . (ii) not to incur or suffer to exist any liens or security interests in the Intellectual Property Collateral, other than Permitted Liens."  Security Agreement, § 4.01(a).  As will be demonstrated below, "Permitted Liens" were liens that (a) existed at the time of the Security Agreement and (b) were subject to a subordination agreement.  Yet the Debtors thereafter purported to grant additional liens on the Intellectual Property Collateral multiple times, none of which were subject to a subordination agreement.

Foris knew about the Security Agreement, including section 4.01(a) thereof.  On May 2, 2019, Foris executed a "consent and waiver" (the "**Foris Consent**"), which provided its consent to the Security Agreement and its terms.  The Foris Consent is attached hereto as **Exhibit A**.

To perfect its security interest in the Intellectual Property Collateral, Lavvan filed the UCC Financing Statement (the "**UCC-1**"), attached to the Limited Objection as Exhibit C, and admitted into evidence at the Final DIP Hearing as Lavvan **Exhibit 3**, on May 9, 2019, with the Delaware Department of State.  Yet, despite this perfected security interest, neither the discussion of the Debtors' secured obligations in the First Day Declaration nor the DIP Motion mention Lavvan as a secured creditor.

### C.    The Subordination Agreement

Shortly after entering into the RCLA, and contemporaneously with entering into the Security Agreement and the Foris Consent, Lavvan, Amyris and Foris entered into that certain

---

*(II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 319].  Because the Court adopted that concept in its Scheduling Order, Lavvan has not briefed the issue here, but the Debtors' misrepresentations should not be lost on the Court.

Subordination Agreement, dated as of May 2, 2019 (the "**Subordination Agreement**").[5]    The Subordination Agreement documents the terms of Lavvan's agreement to subordinate its security interest in the Intellectual Property Collateral to liens Foris held, as successor in interest to GACP Finance Co., LLC ("**Great American**"), in certain assets of Amyris pursuant to one specific agreement: the "Loan and Security Agreement, dated as of June 29, 2018 (as the same has been and may be amended from time to time)" (the "**2018 Foris Loan**").    A critical term of the Subordination Agreement -- as was specifically required by the RCLA -- was that Foris promised to honor Lavvan's license rights if it exercised its remedies on the shared collateral.    *See* Subordination Agreement, ¶ 12; RCLA ¶ 5.12.2(a); *infra* p. 23-24.

The DIP Motion lists six separate prepetition loan agreements between one or more of the Debtors and Foris and/or one or more affiliates of Foris.    *See* DIP Motion ¶ 10.    According to the DIP Motion, the current amount outstanding under all six agreements totals $295 million. *Id.* ¶ 11. By its terms, the Subordination Agreement only subordinates Lavvan's interests to the amounts owed under the 2018 Foris Loan, not to any and all loan agreements the Debtors would thereafter enter into with any Foris affiliate.    *See* Subordination Agreement, ¶ 2.    The 2018 Foris Loan does not appear to be among the six loan agreements listed in the DIP Motion.    *See* DIP Motion ¶ 10. Given section 4.01(a) of the Security Agreement and the Foris Consent (*see supra*, p. 8), it is not clear how these other Foris loans originated and why they are not a breach of the Security Agreement to the extent that they purport to grant a security interest in the Intellectual Property Collateral.

The Subordination Agreement, by its terms, is only in effect if there is a balance remaining on the 2018 Foris Loan.    *See* Subordination Agreement ¶ 14 ("This Agreement shall terminate and

---

[5] The Subordination Agreement was attached to the Supplemental Objection as <u>Exhibit A</u>, and was admitted into evidence at the Final DIP Hearing as Lavvan's <u>Exhibit 5</u>.

be of no further force and effect upon the earlier to occur of the following: (a) the Payment in Full of the Senior Debt, or (b) the Senior Lienholder has otherwise consented thereto in writing."); *id.*, ¶ 2 ("Until Payment in Full of the Senior Debt, [Lavvan] subordinates any and all Junior Liens to any and all Senior Liens.").

Amyris's Form 10-K for fiscal year ending 2020 ("**2020 10-K**") discloses that Foris has equitized certain loans, including portions of the 2018 Foris Loan. *See* 2020 10-K, pp. 83-84. Moreover, as explained in further detail below, Foris and Amyris have amended and restated the 2018 Foris Loan so many times -- starting mere months after the Subordination Agreement was executed -- that it is now utterly unrecognizable. Most major terms have been altered, some radically so: (a) the amount which could be borrowed was roughly tripled; (b) the maturity date was extended; (c) a feature was added to make the loan convertible into equity at Foris's option; (d) the collateral package securing the loan was altered; (e) additional fees were charged and (f) the method of calculation of the interest rate was changed several times. In addition, the "Change in Control" provision was changed in a material manner: it no longer constituted a "Change in Control" if DSM International B.V. ("DSM") ceased to have the right to appoint two board members. *Compare* AMYRIS-DIP 001997 (attached hereto as <u>Exhibit D</u>) *with* AMYRIS-DIP 002232 (attached hereto as <u>Exhibit E</u>). This is important because upon a Change of Control, Amyris was required to pay off the 2018 Foris Loan in full (*see* Ex. D § 2.6 (b) (iv)), which in turn would cause the Subordination Agreement to terminate by its terms. As of March 1, 2021, DSM ceased to have the right to appoint two directors and one of its two director designees resigned from the Board on April 1, 2004. *See* Amyris Form 8-K dated March 31, 2021. Accordingly, but for this change to the 2018 Foris Loan, it would have been paid in full two years ago and the Subordination Agreement would have terminated.

10

As a result of all of these material changes, the Debtors' accountants were forced to test, in both 2019 and 2020, if loans were "extinguished" and new debt was issued and concluded that the answer was yes.  Thus, at this point, and as set forth more fully below, it is not clear if the Subordination Agreement continues to subordinate Lavvan to any amounts currently outstanding and/or if what the Debtors are referring to as the 2018 Foris Loan really can be characterized as the 2018 Loan after all of its restatements.  If there is no balance remaining on the 2018 Foris Loan, the Subordination Agreement would have terminated and therefore it would be irrelevant to the DIP Motion.

### D.      The Arbitration and Litigation

Lavvan provided a description in its Limited Objection as well as its motion for relief from the automatic say [(Sealed) Docket No. 174; (Redacted) Docket No. 175] ("**Stay Relief Motion**") of the two separate actions pending between Lavvan and Amyris.  *See* Limited Objection ¶¶ 13-16; Stay Relief Motion ¶¶ 13-16.  In the interest of avoiding duplication, that description is incorporated herein by reference.

On September 11, 2023, the Court entered an order [Docket No. 230] (the "**Stay Relief Order**") modifying the automatic stay to permit the issuance of a decision in the Arbitration.  The Arbitration Panel has not yet issued its decision.  Lavvan will update the Court if the Panel rules before the Continued Hearing.  Of course, the litigation in the United States District Court for the Southern District of New York remains stayed.

## ARGUMENT

## I.      LAVVAN HAS NOT CONSENTED TO BEING PRIMED BY THE PROPOSED DIP FACILITY.

Lavvan has been very clear from the outset that it does not consent to having a new $190 million prime it, and to date no party has made a serious argument that Lavvan is adequately

protected against being so far pushed down the ladder of priorities.  Because they cannot credibly contend that Lavvan actually consents to being primed, the Foris Lenders and the Debtors try to read into the Subordination Agreement a term that does not exist and then use that (absent) term as deemed consent.  The effort fails.

Under the Subordination Agreement, Lavvan agreed, in the event of a bankruptcy filing by Amyris, that Lavvan would "not to seek adequate protection or the payment of interest, fees or other expenses in respect of [Lavvan's collateral]".  Subordination Agreement, ¶ 6.

The Foris Lenders contend that, based on this provision, Lavvan has consented to the priming of its lien by the DIP Facility.  Foris Reply, ¶ 25 ("when a creditor has waived its right to seek adequate protection, it has consented to the priming of a junior lien by a senior lienholder").  However, as shown below, one of the most common provisions of typical subordination agreements is a consent to being primed by DIP financing, but such a provision is absent from the Subordination Agreement here.  Thus, what the Foris Lenders are requesting is that the Court read a provision into the Subordination Agreement that it could have negotiated for but did not.  In any event, the quoted passage of the Subordination Agreement is not a "waiver" of adequate protection but only an agreement not to seek it – a distinction with significant legal consequences to a request for a priming order.

A.     **The Parties to the Subordination Agreement Could Have Included a Consent to Priming Provision in the Subordination Agreement but Did Not.**

As is typical, the parties to the Subordination Agreement specifically contemplated the impact a bankruptcy filing would have on their agreement and negotiated the terms with such a contingency in mind.  Thus, as Foris has noted, the Subordination Agreement has an adequate protection provision, which is addressed *infra*, and several other bankruptcy provisions.  *See*, *e.g.*, Subordination Agreement ¶ 6 (defining "Insolvency Proceeding" and containing several terms

applicable to insolvency proceedings).   What is very noticeably absent is any term providing

consent to a DIP loan and to priming.   This choice not to include a DIP financing consent provision,

even though bankruptcy was specifically contemplated, is consequential.   Foris's own counsel has

correctly noted in a recent publication that among "Common Bankruptcy Specific Provisions" in

intercreditor and subordination agreements, the very first is "[a]dvance consent of junior lender to

DIP financing and use of cash collateral."[6]   *See* Michael H. Goldstein, et al., *Intercreditor*

*Agreements and the Bankruptcy Code*, Pratt's J. of Bankr. L. 278, 281 (2022).   Moreover, in 2010,

the Intercreditor Agreement Task Force created by the Committee on Commercial Finance of the

Business Law Section of the American Bar Association (the "**Task Force**") developed a Model

Form Intercreditor Agreement (the "**Model Agreement**")[7] with standard provisions and advice to

practitioners when drafting similar agreements.   As set forth in the commentary to the Model

Agreement, "most intercreditor agreements include a deemed consent to the use of cash collateral

by the second lien claimholders if supported by the first lien claimholders, as well as a deemed

consent to permit a priming DIP financing if consented to by the first lien claimholders."   *See*

Model Agreement, n. 56 (emphasis supplied).   As a result, the Model Agreement provides

examples of different types of DIP financing consent provisions.   Similarly, the opinions cited at

p. 25 of Foris's Reply (which are discussed *infra*) are cases where the parties' subordination

agreement contained express DIP financing consent provisions.

In contrast, the Subordination Agreement here only provides that in the event of a

bankruptcy filing, Lavvan would not seek adequate protection.   Subordination Agreement, ¶ 6.

Nowhere in the Subordination Agreement is there a consent by Lavvan to be primed by the DIP

---

[6] The Subordination Agreement here <u>does</u> require Lavvan not to object to a request by Foris for adequate protection if the Debtors seek to use Foris's cash collateral in a bankruptcy case but <u>does not</u> address DIP financing.
[7] The Model Agreement is attached hereto as **Exhibit B**.

Loans -- or even any mention at all of DIP financing.  If parties to the Subordination Agreement desired to obtain Lavvan's consent to a priming DIP loan, they surely could have included it, as most other intercreditor and subordination agreements do, yet they chose not to.

In the absence of such a provision, this Court should not create one.  Federal courts have consistently held that they will not read into a contract a provision that the parties could have included but did not.  *See, e.g., Douglass v. Douglass*, 88 U.S. 98, 103 (1874) (refusing to insert a new provision into a bond, holding that "[w]e cannot interpolate what the contract does not contain. Our duty is to execute it as we find it, and not to make a new one."); *Sys. Unlimited, Inc. v. Cisco Sys., Inc.*, 221 F. App'x 950, 952 (11th Cir. 2007) ("we will not read [a] provision into a contract where one plainly does not exist."); *Fla. Can. Corp. v. Union Carbide & Carbon Corp.*, 280 F.2d 193, 196 (6th Cir. 1960) ("The courts do not write contracts for the parties nor do they read into an unambiguous contract words or provisions it does not contain.").

Additionally, the term that Amyris and the Foris Lenders seek to infer is a waiver, which raises an additional concern:  courts strictly construe waivers such that they must be clear and explicit in order to be enforced.  *See CDI Tr. v. U.S. Elec., Inc. (In re Commc'n. Dynamics, Inc.)*, 382 B.R. 219, 238 (Bankr. D. Del. 2008) ("A waiver is the intentional relinquishment or abandonment of a known right or privilege. Waiver may be implied from conduct but the conduct must be free from ambiguity and clearly manifest the intention not to assert the benefit.") (internal quotation marks and citations omitted); *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713, 212 L. Ed. 2d 753, 759 (2022) ("Waiver, we have said, is the intentional relinquishment or abandonment or a known right. To decide whether a waiver has occurred, the court focuses on the actions of the person who held the right […] That analysis applies to the waiver of a contractual right, as of any other.") (internal quotation marks and citations omitted); *Utley v. Donaldson*, 94 U.S. 29, 49, 24

L. Ed. 54, 57 (1876) ("A waiver of a stipulation in an agreement, to be effectual, must be made intentionally, and with knowledge of the circumstances.") (internal quotation marks and citations omitted).

Indeed, while courts are never supposed to read absent terms into a commercial agreement and are not supposed to lightly infer waivers, a consent to DIP financing provision would be a particularly problematic term to infer.  The Model Agreement's commentary points out that if parties include a consent to DIP financing, they typically negotiate several specific sub-issues, including "pre-consent to a DIP financing ... typically [being] conditioned on the amount of the DIP financing not exceeding a specific amount ... [, a] reserve[ation of] the right to object to provisions of a proposed DIP financing that would have the effect of dictating the terms of a restructuring or that would require the company to liquidate its assets on a rapid schedule" and other issues.  *See* Model Agreement n. 56.  If the Court holds that an agreement not to seek adequate protection somehow *sub silencio* acts as a consent to DIP financing and being primed, no senior lender will ever again feel the need to negotiate these specific issues that usually are negotiated when there is a consent to DIP financing; they instead will tactically omit any mention of DIP financing from their subordination agreement and wind up with the broadest possible consent through a different provision that does not even raise the subject.

In short, the Subordination Agreement clearly does not contain the provision that Foris and the Debtors believe should be implied – that Lavvan agreed to waive any objection to priming by the DIP Loans.  Given that the term is so common in other agreements, but the parties did not include it here, this Court should not read such a provision into the Subordination Agreement where it does not exist.

**B.      Lavvan Only Agreed Not to Affirmatively Seek Adequate Protection.**

The Subordination Agreement has one single sentence about adequate protection, buried as the last sentence of paragraph 6, which contains unrelated concepts.  It says: "Junior Lienholder agrees not to seek adequate protection or the payment of interest, fees or other expenses in respect of the Junior Lienholder Collateral unless or until there has been payment in full of the Senior Debt."  Subordination Agreement, ¶ 6.  The words "waiver" and "consent" do not appear in the sentence, nor do the words "DIP Financing" nor "priming."  Yet the Foris Lenders read this sentence to say, "Junior Lienholder waives adequate protection in connection with DIP financing, to which it consents."  This reading is incorrect for multiple reasons.

**1.      Even an Actual Waiver of Adequate Protection is Not a Consent to DIP Financing.**

The Foris Lenders contend that "when a creditor has waived its right to seek adequate protection, it has consented to the priming of a junior lien by a senior lienholder."  Foris Reply, ¶ 25 (citing *RCD Invs. No. 4, Ltd. v. Foothill Cap. Corp. (In re GDH Int'l, Inc.*), Case No. 00-45647-BJH-11 (BJH), Adv. Proc. No. 00-4185 (BJH), 2001 Bankr. LEXIS 2230 (Bankr. N.D.T.X. Apr. 2, 2001) and *In re Bear Island Paper Co.* L.L.C., Case No. 10-31202 (DOT), 2011 Bankr. LEXIS 1884, *20-21 (Bankr. E.D. Va. Mar. 30, 2011)); *see also* Foris Reply, ¶ 29 (citing *Aurelius Cap. Master, Ltd. v. Tousa Inc.*, Case No. 08-61317-CIV, 2009 WL 6453077, at *8 (S.D. Fla. Feb. 6, 2009)).

Leaving aside that no waiver has occurred here (as will be discussed *infra*), none of the cases cited by the Foris Lenders stand for such a proposition, and all are readily distinguishable.  In *In re GDH Int'l, Inc.*, the intercreditor agreement provided that the junior creditor "'expressly consent[ed] to the granting . . . to [the senior lender] of senior liens and priorities in connection with any post-petition financing'" and "'waive[d] any claim or defense [it] may now or hereafter

have arising out of the election by Senior Lender…of any use of cash collateral, any borrowing or any grant of security interest under Section 363 and/or 364 of the Bankruptcy Code'". *In re GDH Int'l, Inc.*, 2001 Bankr. LEXIS 2230, at *11 (quoting intercreditor agreement).  As set forth in the prior section, *supra*, the Subordination Agreement here does not contain such a provision, so *GDH Int'l* is distinguishable, and because the *GDH Int'l* opinion was addressing an intercreditor agreement with an express consent to DIP financing provision, the case does not stand for the sweeping proposition championed by Foris that a "wavier" of adequate protection automatically constitutes a consent to DIP Financing.  *In re Bear Island*, 2011 Bankr. LEXIS 1884, at *20-21 also does not support the Foris Lenders' position.  Indeed, *In re Bear Island* is not even an opinion, but rather a final DIP financing order that LEXIS, for whatever reason, published.  In any event, the order specifically cites the junior lienholder's consent to DIP financing.  That consent is demonstrated by the second lien lenders' "statement" in connection with the DIP financing motion, which quotes the portion of the parties' intercreditor agreement where the second lien lenders expressly consented to subordinate to the liens securing DIP financing.  *In re Bear Island Paper Co. L.L.C.*, Case No. 10-31202 (DOT) (Bankr. E.D. Va. Mar. 15, 2010) (Docket No. 118, n. 5) ("the Second Lien Collateral Agent will subordinate its Liens in the Collateral to the Liens securing such DIP Financing").  Lavvan has not agreed to such a provision.

At oral argument, counsel for Foris mostly relied on *Aurelius Cap. Master, Ltd. v. Tousa Inc.*  But that case involved a dispute related to the terms of an order granting the use of cash collateral, not priming DIP financing.  *See Aurelius*, 2009 WL 6453077, at *2 (noting that the debtor "did not seek final approval of DIP Financing.").  Thus, *Aurelius* did not address the issue of whether a waiver of the right to seek adequate protection constituted consent to a priming DIP order, as opposed to a cash collateral order -- an important distinction, as shown *infra* in section 2.

Moreover, the intercreditor agreement in *Aurelius* provided that the junior lienholder "will not request **or accept** any form of adequate protection." *Id.*, at *4 (emphasis added). Those words -- which are very different than the ones at issue here -- plainly connote that the subordinated lender in *Aurelius* agreed that it could not receive adequate protection even if the Court granted it without the subordinated lender having requested it. Unlike the agreement in *Aurelius*, the Subordination Agreement here says nothing about Lavvan's ability to "accept" adequate protection, only its ability to "seek" it.

Thus, the cases cited by the Foris Lenders provide no support for the proposition that Lavvan's agreement to refrain from affirmatively seeking adequate protection in the Subordination Agreement automatically results in Lavvan's "consent" to any and all priming by the DIP Loans. Moreover, Lavvan has found no case standing for that proposition. What the cases do demonstrate is that, if the parties wished to include a consent to priming in the Subordination Agreement, they could have done so.

## 2.    Lavvan Did Not "Waive" Adequate Protection

The Foris Lenders also repeatedly state that Lavvan waived its right to adequate protection. *See, e.g.,* Foris Reply, ¶ 24 ("Lavvan has waived the right to seek adequate protection in all instances"); Sept. 14, 2023 Hr'g Tr. 45:17-18 ("there's a waiver of the right to adequate protection"), 45:21-22 ("they waived adequate protection"). But that is not what the Subordination Agreement says; it's one, single sentence concerning adequate protection says that Lavvan agreed "not to seek adequate protection" and then lists common examples like "payment of interest, fees or other expenses." It does not say that Lavvan "waives" its right to be adequately protected. Subordination Agreement, ¶ 6. This distinction matters because the issue at bar is DIP Financing, not use of cash collateral.

### 3.    The Court Cannot Grant a Priming Lien Unless it Finds that Lavvan is Adequately Protected

If this case were about the use of cash collateral under Section 363, it would have been the secured lender's duty to request (or "seek") adequate protection; if it failed to do so, it receives none, even if it were entitled to it. *See* 11 U.S.C. § 363(e) (stating that adequate protection shall be provided when the debtor uses cash collateral "on request of an entity that has an interest in property used, sold, or leased") (emphasis supplied).[8]  However, the statutory language concerning the granting of adequate protection in the context of a priming DIP order is decidedly different. Under Section 364(d)(1), "the Court may authorize" a priming DIP "only if" .... "(B) there is adequate protection of the interest of the holder of the lien ...".  This is exactly the opposite of the "if you don't seek it, you don't get it" concept of Section 363(e).  By using the words "The Court ... may authorize ... only if," the statute provides that the Court lacks the power to authorize the order unless that condition is met.  And by using the words "there is adequate protection," the statute uses objective language.

Courts interpreting the requirements of Section 364 have uniformly held that a finding of adequate protection of the pre-petition lien is a requirement for approval of a priming DIP loan. *See, e.g.*, *In re Swedeland Dev. Grp., Inc.,* 16 F.3d 552, 564 (3d Cir.1994) ("[F]or the bankruptcy court to have approved [the loan] on a superpriority basis, the court had to find that [the pre-petition lender]'s interests were adequately protected."); *In re LTAP US, LLLP*, No. 10-14125 (KG), 2011 WL 671761, at *3 (Bankr. D. Del. Feb. 18, 2011) ("Priming is extraordinary relief requiring a strong showing that the loan to be subordinated is adequately protected.  Bankruptcy judges are

---

[8] *See also In re Kain*, 86 B.R. 506, 512 (Bankr. W.D. Mich. 1988) (stating the following in a dispute over use of cash collateral:  "Because the [creditor] did not request that its interest ... be adequately protected, it is not entitled to such protection."); *In re Ne. Chick Servs., Inc.*, 43 B.R. 326, 331 (Bankr. D. Mass. 1984) (adequate protection for use of cash collateral "is not an automatic power of the Court ... but one which is exercised on request of an entity that has an interest in the property sought to be used.").

required to grant Section 364(d) financing only upon a tangible demonstration of adequate protection.") (internal citations omitted); *In re The Colad Grp., Inc.*, 324 B.R. 208, 223 (Bankr. W.D.N.Y. 2005) ("[I]n order to grant a priming lien, the court must make a finding of adequate protection of all senior or equal interests."); *In re Barbara K. Enter., Inc.*, No. 08-11474 (MG), 2008 WL 2439649, at *13 (Bankr. S.D.N.Y. June 16, 2008) (denying priming due to lack of adequate protection).

As a result, it does not matter if the secured party asks for adequate protection when a priming DIP loan is requested; the Court <u>must</u> find or provide adequate protection in order to grant the relief. Accordingly, Lavvan's inability to "seek" adequate protection is legally irrelevant here.

Amyris and/or Foris, to Lavvan's surprise, submitted as one of the "Issues to be Presented at Continued Hearing" in the Scheduling Order the following question: "If Lavvan receives adequate protection, must it turn over that adequate protection to Foris based on the provisions in the Lavvan Documents." This question appears to miss completely how a party normally is adequately protected from being primed, as opposed to how it is adequately protected from use of its cash collateral.

Adequate protection in cash collateral disputes typically consists of tangible things like fees, replacement liens, and interest. *See, e.g.*, 3 Collier on Bankruptcy ¶ 361.03 (16th ed. 2023) (discussing the meaning of "indubitable equivalent" and noting that a "debtor in possession may substitute tangible collateral for cash collateral or provide a stream of payments to compensate an entity for the declining value of its collateral."). But when a debtor seeks to prime a prepetition secured creditor, courts typically only find that the secured creditor is adequately protected if the debtor can demonstrate that there is an equity cushion. *See e.g., In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) (collecting cases) ("The exist[ence] of an equity

cushion seems to be 'the preferred test in determining whether priming of a senior lien is appropriate under section 364'"). Presumably that is because things like replacement liens and attorney's fees do very little, if anything, to actually protect a secured lender whose priority is being pushed much further down the line unless a cushion already existed that is so large that relative priorities ultimately do not matter -- which no one, not even Amyris or Foris, has contended is the case here. The examples of adequate protection listed in the Subordination Agreement, which Lavvan agreed not to seek, are exactly the types of adequate protection common in cash collateral disputes. *See* Subordination Agreement, ¶ 6 (" . . . the payment of interest, fees or other expenses"), but which are irrelevant here.

Thus, paragraph 6 of the Subordination Agreement has no bearing on the fact that the statute requires that Lavvan may not be primed unless it affirmatively holds that "there is" adequate protection under § 364.

* * *

Accordingly, putting these concepts together, the parties did <u>not</u> include a consent to DIP financing in the Subordination Agreement and the caselaw does <u>not</u> support a sweeping theory that an adequate protection provision *sub silencio* acts a provision consenting to priming. In any event, the adequate protection provision here is not a waiver but rather an agreement not to "seek" adequate protection. The plain language of Section 364(d)(1) provides that the Court cannot grant a priming order without having found, on its own, that the party to be primed is adequately protected.

## II.    LAVVAN ONLY AGREED TO SUBORDINATE ITS LIEN AND ITS PAYMENT TO THE 2018 FORIS LOAN.

The Subordination Agreement provides that Lavvan subordinated its liens until payment in full of the "Senior Debt". Subordination Agreement, ¶ 2 (the "**Lien Subordination**

**Provision**").  The Subordination Agreement defines Senior Debt as all obligations owing to Foris

in respect of the "Senior Agreement," which in turn is defined as the 2018 Foris Loan -- not other

loans.  *Id.*, ¶ 1 (defining Senior Debt); *id.* at Recital A (defining Senior Agreement).  Thus, the

Lien Subordination Provision only applies to the 2018 Foris Loan.

Similarly, paragraph 3 of the Subordination Agreement (the "**Payment Subordination**

**Provision**") provided for the subordination of Lavvan's right to payment in favor of obligations

owed to Foris Ventures, LLC[9] by Amyris.

Amyris and the Foris Lenders have argued that the two subordination provisions are

uncapped and there is no covenant against adding further debt under which Lavvan would be

subordinated.  This argument ignores section 4.01(a) of the Security Agreement, discussed in the

next paragraph below.  Since Amyris had no right to take on further indebtedness without Lavvan's

consent, there was no need for such a covenant.  Similarly, the Foris Lenders have argued that the

Payment Subordination Provision is broader than the Lien Subordination Provision because it

subordinates payment to all loans made by Foris Ventures, LLC, not just the 2018 Foris Loan.

This distinction is irrelevant because by its very terms, once the 2018 Foris Loan is paid in full,

the Subordination Agreement "shall terminate" -- even if Amyris has other loans outstanding to

Foris Ventures, LLC.  *See* Subordination Agreement ¶ 14.

Moreover, to the extent there are loans between Foris and Amyris other than the 2018 Foris

Loan, such loans appear to exist only because Amyris breached section 4.01(a) of the Security

Agreement -- an agreement Foris expressly consented to in the Foris Consent. As set forth above,

---

[9] The Payment Subordination Provision only applies to Foris Ventures, LLC.  *See* Subordination Agreement, ¶ 3 (subordination is to "Senior Lienholder"); *id.* at introductory paragraph (defining "Senior Lienholder" as "Foris Ventures, LLC").  Although the lenders under several of the prepetition loans as well as the DIP Lender, Euagore, LLC, are affiliated with Foris, the Payment Subordination Provision only applies to the specific entity, Foris Ventures, LLC, not its affiliates.

section 4.01(a) of the Security Agreement provides that Amyris agrees "not to incur or suffer to exist any liens or security interests in the Intellectual Property Collateral, other than Permitted Liens." "Permitted Liens" are defined as "any lien or security interest granted by [Amyris] to any Permitted Senior Lender to secure any Permitted Debt, so long as such lien or security interest is subject to a Subordination Agreement." Security Agreement, § 1.01. In turn, "Permitted Senior Lender" means Foris, as successor in interest to Great American and "any other lender who **has advanced** debt for borrowed money to [Amyris] on a senior secured basis (or any other lender who refinances any such debt), provided that no licensee or similar counterparty to [Amyris] in respect of the Amyris Platform Improvement IP or Amyris Background IP shall be a Permitted Senior Lender." *Id.* (emphasis supplied). The Security Agreement is clear in using the past tense, "has advanced", in this provision. In other words, "Permitted Senior Lender" means only Foris as a successor to Great American for a loan that had already been initiated, and also would have applied if there was any other lender that, as of the date of the Security Agreement, already "has advanced debt for borrowed money." Consistent with the foregoing, the RCLA specifies that the lien Amyris must grant to Lavvan is only "junior in priority to the existing liens and security interests of Great American and any other Permitted Senior Lender." RCLA §5.12.2.(a) (emphasis supplied).

Similarly, because "Permitted Liens" are only liens where "such lien or security interest is subject to a Subordination Agreement", and there are no other subordination agreements, there are no other Permitted Liens. The provision that nothing qualifies as a Permitted Lien unless it is subject to a Subordination Agreement is material and non-standard. "Subordination Agreement" has a very unique definition in the Security Agreement which is key to understanding the Parties' commercial deal. It is defined as an otherwise standard subordination agreement "with such

changes as necessary to comply with Section 5.12.2(a) of the RCL Agreement and providing, among other things, ... that, in the event that the applicable Permitted Senior Lender exercises remedies in respect of [Lavvan's collateral], such Permitted Senior Lender ... shall honor the licenses granted to [Lavvan] in the [Lavvan collateral] ... notwithstanding such exercise and any related transfer of assignment, as if such exercise, transfer, and assignment, as applicable, were subject to such license rights." Security Agreement, § 1.01. Thus, as a whole, this provision provided Lavvan with an important protection by ensuring that the existing senior lender agreed that, if it ever exercised its lien rights, it would not interfere with Lavvan's exclusive license rights.

Thus, no other incurrence of secured debt with a lien on the Intellectual Property Collateral was permitted -- whether from Foris, other Foris affiliates or otherwise. As of the date of the Subordination Agreement, Lavvan only knew of one loan made by Foris Ventures, LLC to the Debtors -- the 2018 Foris Loan -- and only entered into one subordination agreement concerning that same loan. To the extent that Foris loaned additional money to the Debtors under different agreements thereafter that purported to be secured by a lien on the Intellectual Property Collateral, it cannot rely on the Payment Subordination Provision of paragraph 3 because the loans themselves were in breach of Amyris' covenant to Lavvan, which Foris consented to in the Foris Consent.

Moreover, as is contemplated in the Security Agreement's definition of "Subordination Agreement" (*see* p. 23, *supra*), the Subordination Agreement requires that if Foris, as the first priority lender, exercises remedies over the parties' joint collateral (*i.e.*, the intellectual property), it "shall honor the licenses granted to [Lavvan] in the Senior Lienholder Collateral notwithstanding such exercise and any related transfer or assignment of such Senior Lienholder Collateral, as if such exercise, transfer, and assignment, as applicable, were subject to such license rights." Subordination Agreement, ¶ 12. Thus, Lavvan only agreed to be subordinated to Foris if Lavvan

was able to maintain its license rights in the event Amyris defaulted and Foris, as the senior lender, exercised remedies with respect to the joint intellectual property collateral.  Given this provision, which demonstrates the intent of the parties,[10] it is clear that Lavvan would not allow itself to be primed by a third-party DIP Lender which, as the senior lienholder, would have the ability to foreclose on the Intellectual Property Collateral without providing Lavvan with the license rights it negotiated for under the Subordination Agreement.

## III.    AMYRIS BEARS THE BURDEN OF PROVING THAT THE SUBORDINATION AGREEMENT IS STILL IN EFFECT.

Amyris and the Foris Lenders contend that Lavvan can be primed by the DIP Loans by virtue of the existence of the Subordination Agreement.  *See* Foris Reply, ¶ 31.  Amyris bears the burden of proof on this issue, both because Section 364(d)(2) puts the burden of priming squarely on Amyris and because if the basis for priming is the Subordination Agreement, Amyris must prove that the Subordination Agreement is still in effect.  Amyris has not met that burden.

### A.    The Material Modifications to the 2018 Foris Loan.

The Subordination Agreement, by its terms, is only in effect if there is a balance remaining on the 2018 Foris Loan.  *See* Subordination Agreement ¶ 14 ("This Agreement shall terminate and be of no further force and effect upon the earlier to occur of the following: (a) the Payment in Full of the Senior Debt, or (b) the Senior Lienholder has otherwise consented thereto in writing.").  Therefore, if Amyris and the Foris Lenders cannot show that the 2018 Foris Loan was never

---

[10] In construing contracts, the role of the Court is to determine the intent of the parties by looking at the agreement as whole rather than terms in isolation.  *See Nicolson Pavement Co. v. Jenkins*, 81 U.S. 452, 456, 20 L. Ed. 777, 778 (1871) ("There is no artificial rule in construing a contract, and effect, if possible, is to be given to every part of it, in order to ascertain the meaning of the parties to it."); *see also, Lemm v. Stillwater Land & Cattle Co.*, 217 Cal. 474, 480, 19 P.2d 785, 788 (Cal. 1933) ("In the interpretation of contracts, the duty of the court is to ascertain the intent of the parties. Although the language of the contract must govern its interpretation (Civ. Code, §§ 1638, 1639), nevertheless the meaning is to be obtained from the entire contract and not from any one or more isolated portions thereof.").

extinguished, the Subordination Agreement no longer applies, in which case there is no conceivable basis for priming.

The Debtors have maintained -- in the Debtors' Reply, at the Final DIP Hearing and in their recent expert report (the "**Martens Report**") -- that a balance of at least $63.5 million remains under the 2018 Foris Loan, comprised of approximately $50 million in principle and, apparently, $13.5 million in interest.  To put this in perspective, Exhibit B to the Martens Report demonstrates that at the time of the Subordination Agreement, the principal balance was $36 million, so the $50 million is approximately 39% more principal than what Lavvan agreed to subordinate to.  Since principal generally goes down, not up, it is a legitimate question to ask:  is the $63.5 million really associated with the 2018 Foris Loan which Lavvan agreed to be subordinated to in the Subordination Agreement, and if so, was the increase permitted and appropriate?

Amyris's Form 10-K for fiscal year ending 2019 ("**2019 10-K**") and the Martens Report both show that Amyris and the Foris Lenders began making modifications to the 2018 Foris Loan almost immediately after the Subordination Agreement was signed.  For example, the 2019 10-K states that "the outstanding principal balance" of the 2018 Foris Loan totaled $36 million on April 15, 2019, but after a modification on August 14, 2019, "there was $71.0 million aggregate principal amount of loans outstanding under the LSA." 2019 10-K, p. 81.  The 2019 10-K further states that, after several additional amendments and/or restatements, "there was $91.0 million aggregate principal amount of loans outstanding" as of November 27, 2019.  *Id.* at p. 82; *see also* Martens Report Exhibit B.  Thus, within 7.5 months of executing the Subordination Agreement, Amyris and Foris increased the amount of what they were still referring to as the 2018 Foris Loan by over 250%.  Moreover, it wasn't just the amount that was changed.  Through utilizing a series of amendments and restatements, nearly every major term of a loan agreement was altered:  amount

26

loaned, maturity date (extended), ability to convert the loan into equity at Foris's sale option (added in June 2020), collateral for loan (extended),[11] fees (additional ones added) and description of interest rate.[12]   And as set forth above, the amendments effectively prevented the tripping of a change of control provision which would have required payment in full of the 2018 Foris Loan two years ago, therefore terminating the Subordination Agreement. Given that every major term of the loan has changed, while it is certainly possible to construct an argument to trace amounts back to the ancestor of the 2018 Foris Loan, it is difficult to meaningfully characterize it in any way as somehow being the same loan.  Thus, it is no surprise that not just in 2020 (as was discussed at length at the Final DIP hearing), but also in 2019, Foris's accountants were called upon to analyze the situation.  They concluded that for accounting purposes, the changes as of November 27, 2019 were to be "accounted for as a debt extinguishment and a new debt issuance."  2019 10-K, p. 82.

It is also informative to understand the source of funds by which the 2018 Foris Loan was increased.  At least three times, Foris appears to have taken what previously were issued as <u>unsecured</u> notes and folded them into the 2018 Foris Loan.  *See* Expert Rebuttal Report of Michael Gaul ("**Gaul Report**") at p. 4.  By this dint of magic, Foris contends that these previously unsecured notes not only became secured but were a part of what Lavvan "agreed" to subordinate to.

---

[11] Amyris does not appear to have authorized Foris to file the June 5, 2019, September 17, 2019, November 21, 2019 and April 1, 2021 UCC-3 amendments which restated the collateral package.  That makes the filings unauthorized under UCC 9-509(a).  Moreover, the collateral package was amended other times as well, including in the August 14, 2019 loan agreement.

[12] It is difficult to tell from the continuing changes to the description of the interest rate in the various amendments and restatements whether the effective interest rate actually changed very much, but it is undeniable that the description kept changing, which is unusual, and every time the description changed, the possibility existed that the rate would change.

Then, for whatever reason, instead of continuing to add to the 2018 Foris Loan, Amyris and Foris started to subtract from it.  The 2020 10-K describes a series of transactions whereby Foris exercised warrants and paid for them not with cash but rather by extinguishing certain amounts of the 2018 Foris Loan. *See* 2020 10-K, pp. 83-84.  It is important to note that the amount of the debt that was extinguished was significantly more than the entire amount of the loan as it existed on the date of the Subordination Agreement, *i.e.*, the only amount that Lavvan actually consented to.  As a result, it appears that insider Foris and the Debtors carefully concocted an allocation most favorable to themselves and treated the "newer" portions of what was added to the 2018 Foris Loan as satisfied rather than allocating the repayments to the original amounts loaned. *See* Gaul Report, p. 5.[13]

Given this dizzying set of transactions, the attempt to peg $50 million as the principal remaining under the ancestor to the original 2018 Foris Loan is not a valid approach.  *See* Gaul Report, p. 1 (describing the characterization that $50 million "derives directly from the 2018 Original LSA Agreement" as "misleading").

Further, Amyris entered into a certain Credit and Security Agreement ("**CSA**") with a third party that is not part of the present dispute, dated November 14, 2019, as explained in and attached to Amyris's Form 8-K filed November 20, 2019. The CSA states that the obligations under the CSA are *pari passu* to those of the "Junior Foris Indebtedness," but junior to those of the "Senior

---

[13] It also appears that an additional $15 million of the debt should have been retired but seems not to have been.  The June 1, 2020 *Amendment No 1 to Amended and Restated Loan and Security Agreement* added a convertibility feature to the loan.  *See* Amyris – DIP 002330-2340 (attached hereto as <u>Exhibit C</u>).  Because Foris's exercise of conversion rights would have required Amyris to issue additional equity, Amyris sought shareholder approval.  The Amendment stated: "if Stockholder Approval is granted at the Special Meeting, then Foris agrees to exercise a Conversation Option with respect to no less than $15,000,000 of the Secured Obligations within thirty (30) days after the Special Meeting."  *See* Ex. C at § 1.4(e)(i).  Amyris's 2020 10-K confirms that "Stockholder approval was obtained on August 14, 2020."  But there does not appear, from Amyris's disclosures, to be any record that the conversion occurred.  If it had occurred, presumably $15 million (plus three years of interest on $15 million) less would remain of the amount that even the Debtors contend remains under the 2018 Foris Loan.

Foris Indebtedness" under the "Foris LSA" and junior to "the Liens in favor of Lavvan." *See* CSA ¶ 7(c). The "Foris LSA" is defined as "that certain Amended and Restated Loan and Security Agreement dated as of October 28, 2019, by and between the Company, certain of its subsidiaries and Foris." *Id.* at ¶ 8. Thus, the CSA implies that, during one of the aforementioned amendments to the 2018 Foris Loan, Amyris and the Foris Lenders categorized certain amounts of the 2018 Foris Loan as being junior indebtedness and certain amounts as being senior indebtedness. Additionally, the CSA establishes that Lavvan's interest is senior to the Junior Foris Indebtedness. It is unclear how much of Amyris's asserted $63.5 million amount (assuming that amount really is traceable to the 2018 Foris Loan) is part of the Senior Foris Indebtedness or the Junior Foris Indebtedness, and thus, how much of that stated amount remains subject to the Subordination Agreement.

Thus, there is an open question of whether the descendant of what once was the 2018 Foris Loan remains the 2018 Foris Loan after every major term of the loan was amended and after the repayments were more than the amount of the original 2018 Foris Loan and the Subordination Agreement. This is especially true given that the 2018 Foris LSA is governed by California law. Under California Civil Code Section 3528, "the law respects form less than substance." Thus, "How the parties characterize their transaction is irrelevant; what is important is the function of the arrangement. An objective standard is applied to determine the actual intent of the parties." 64 Ops. Cal. Atty. Gen. 722 (1981) at 10-11. As a result, California courts will not permit a party to enforce a contractual provision even if it is in technical compliance if doing so elevates form over substance. *See*, *e.g.*, *S. Pac. Co. v. Grangers' Bus. Ass'n*, 1 P.2d 477, 479 (Cal. Ct. App. 1931) (citing Cali. Civ. C. § 3528). Characterizing what used to be unsecured loans as part of the Foris

2018 Loan just to take advantage of the Subordination Agreement elevates form over substance in violation of California law.

In any event, the extreme changes to the 2018 Foris Loan make it no longer enforceable against Lavvan as part of a Subordination Agreement.  The 2018 Foris Loan is governed by California law.  Under California law, "a lender and a borrower may not bilaterally make a material modification in the loan to which the seller has subordinated, without the knowledge and consent of the seller to that modification, if the modification materially affects the seller's rights." *Resol. Tr. Corp. v. BVS Dev.*, 42 F.3d 1206, 1215 (9th Cir. 1994) (quoting *Gluskin v. Atl. Sav. & Loan Ass'n*, 108 Cal. Rptr. 318, 321 (Cal. Ct. App. 1973)).  There can be no denying here that the modifications – including materially changing the amount due and the modification to the Change of Control provisions (*supra* p. 26-27) which would have required immediate payment in full of the entire 2018 Foris Loan two years ago – affected Lavvan's rights under the Subordination Agreement and that Lavvan's consent was neither sought nor obtained.  Thus, under California law, even if amounts remain that are ultimately traceable to the 2018 Foris loan, the material modifications without Lavvan's consent render the Subordination Agreement no longer enforcable.

Moreover, Lavvan is investigating whether Foris's and Amyris's use of the 2018 Foris Loan as a vehicle to park other, unrelated loans into simply to take advantage of the Subordination Agreement constitutes a violation of the covenant of good faith and fair dealing or otherwise breaches the Subordination Agreement.  Lavvan reserves the right to file an adversary proceeding or other lawsuit pursuing this or related claims on or before the Challenge Period, which is weeks after the October 4 hearing here.  The Court should not enter a priming order, relying on the existence of the Subordination Agreement, which will moot such a challenge before it is filed.

**B.     Amyris is Required, and Has Failed, to Produce Information to Establish the Subordination Agreement is Still in Effect.**

As explained above, if there no longer is a balance under the 2018 Foris Loan that is senior to Lavvan's interest, then the Subordination Agreement is terminated, and Lavvan cannot be primed by the DIP Loans.  To say the least, the dizzying set of transactions described above, and the "extinguishment" conclusion of the accountant, raise serious questions about whether the 2018 Foris Loan remains operative.  Therefore, Amyris must produce evidence on this issue on which it bears the burden of proof.  Yet Amyris declined to produce communications about this issue.  Thus, the Court should make an adverse inference as described herein.

**1.     The information related to the 2018 Foris Loan is relevant to the questions at issue.**

Given the discussion in section (a) above about (i) materially changing every major term of what was the 2018 Foris Loan, including increasing its amount by more than 250% before reducing it; (ii) folding unsecured loans into what they are calling the 2018 Foris Loan; (iii) cancelling more of the 2018 Foris Loan than the entire original amount of the loan and (iv) having to account for the transactions as an extinguishment and a reissuance of debt, it was highly relevant and material to discover what communications were occurring at the time and, for example, whether all of this was designed specifically to thwart Lavvan, as seems quite possible or even likely.  Lavvan did not seek communications on other topics, just this one.  The communications were relevant and targeted and discovery should have been produced.  "For purposes of discovery, relevancy is broadly construed." *Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*, 662 F. Supp. 2d 375, 380 (D. Del. 2009); *see also In re Anderson News, LLC*, 615 B.R. 45, 50 (Bankr. D. Del. 2020) ("[T]he standard for discovery is broad."); *Lannett Co., Inc. v. KV Pharms., Drugtech Corp.*, No. CV 08-338-JJF, 2009 WL 10737502 at *2 (D. Del. Mar. 6, 2009) ("The scope of relevance in discovery is very broad.").  In broadly construing relevance, the question for the Court is "whether

31

the documents and information sought relate to any of the legal or factual issues in dispute." *In re Energy Future Holdings Corp.*, 513 B.R. 651, 656 (Bankr. D. Del. 2014). Here, Lavvan's request for communications, in an effort to determine whether the 2018 Foris Loan really continues to exist in light of all of the transactions described above, was directly relevant to the factual and legal questions at issue.

Nevertheless, Foris refused to produce a single document, and Amyris only produced the final version of the analyses of the accountants, the various loan documents, and a very limited set of communications solely related to Board materials. They did not produce the requested communications.

### 2.    The Court has Approved a Broad Interpretation of the Extinguishment Issue

Perhaps Amyris' and Foris's unilateral decision to limit their document production was based upon their unduly restrictive interpretation of the issue at hand. But the Court already has put that to rest. On September 19, 2023, Lavvan and the Debtors filed competing proposed orders regarding the briefing schedule and, of relevance here, the issues to be decided at the hearing. As explained in Lavvan's *Certification of Counsel Regarding Proposed Order Approving Briefing Schedule* [Docket No. 320] ("**Lavvan's Certification of Counsel**"), one of the issues on which the parties could not reach an agreement was how to frame the question of whether the 2018 Foris Loan was extinguished. *See* Lavvan's Certification of Counsel ¶ 6 ("By way of example only, the Debtor's version would limit the issue concerning the possible extinguishment of the 2018 Foris Loan to whether the accounting treatment itself caused an extinguishment, as opposed to whether the underlying issues that resulted in the accounting treatment also mean that the loan was extinguished (the "**Extinguishment Issue**")."). Ultimately, the Court entered an order which included Lavvan's version of the Extinguishment Issue, not the Debtors' competing version. *See*

Scheduling Order.  This should have put the scope of the issue to rest and should have made clear that targeted discovery into the communications behind that one issue was relevant, necessary and appropriate.

      **C.**    **Because Amyris Failed to Produce the Evidence, the Court Should Make an Adverse Inference.**

Amyris's and Foris's failure to produce the requested communications is especially problematic since they have the burden of proof, they are the ones seeking the order that will prejudice Lavvan, and they are the ones that sought expedited scheduling, so they should not be heard to complain that there was insufficient time to conduct a limited document review. Therefore, the Court should make an adverse inference against Amyris and the Foris Lenders that, if they had produced documents, those documents would have been harmful to their position.  "In appropriate circumstances, a fact finder in a civil dispute may draw a negative inference from the failure of the party with the burden of proof to call a witness or produce information within the party's control which would shed light on the party's position on a material issue." *In re Stone & Webster, Inc.*, 547 B.R. 588, 610 (Bankr. D. Del. 2016) (quoting *Auto. Insurers Bureau of Mass. V. Comm'r of Ins.*, 430 Mass. 285, 291, 718 N.E.2d 830, 836 (1999)); *see also In re Commc'n Dynamics, Inc.*, 300 B.R. 220, 224 (Bankr. D. Del. 2003) ("where information is in one party's control and is not produced, a negative inference may be drawn that the information is adverse to that party."); *In re SuperMedia LLC*, No. 13-10546 (KG), 2016 WL 1367070, at *8 (Bankr. D. Del. Apr. 4, 2016) (stating that in order for a court to find an adverse inference "[a] party must show: (1) the evidence was in the party's control, (2) the evidence is relevant, (3) there was withholding of the evidence, and (4) the duty to preserve evidence was foreseeable.").

Here, Amyris bears the burden of proof and therefore must provide evidence relevant to the issue of whether the 2018 Foris Loan remained in effect, which includes the issue of whether,

after all of the many massive changes to the 2018 Foris Loan, it may still be considered the same loan for purposes of the Subordination Agreement. That evidence is squarely within the control of Amyris and Foris. Therefore, the Court should find that the evidence would have negatively impacted Amyris and Foris if they had produced such evidence.

## IV.    WITHOUT LAVVAN'S CONSENT, THE COURT CANNOT ENTER THE FINAL DIP ORDER WITHOUT FIRST FINDING THAT LAVVAN IS ADEQUATELY PROTECTED.

As set forth above, since Lavvan has not consented to priming, in the Subordination Agreement or otherwise, the Court is not permitted to enter a priming order unless it makes an affirmative determination that Lavvan is adequately protected. The Debtors have not met their burden of proof on this issue.

### A.    The Debtor has Not Proved that Lavvan is Adequately Protected

The Bankruptcy Code and the case law interpreting it make clear that, when post-petition financing seeks to prime a pre-existing lender, the Debtor must show that the lien to be primed is adequately protected. *See* § 364(d)(2); *see also In re Swedeland Dev. Grp., Inc.*, 16 F.3d at 564 ("A debtor has the burden to establish that the holder of the lien to be subordinated has adequate protection."); *In re Grant Broad. of Phila., Inc.*, 71 B.R. 376, 385 (Bankr. E.D. Pa.), *aff'd*, 75 B.R. 819 (E.D. Pa. 1987) (finding that the Debtors have the burden of showing adequate protection).

In the context of a priming DIP loan, adequate protection serves to protect a prepetition lender from increased risk as a result of the post-petition financing. 3 Collier on Bankruptcy ¶ 364.05 (16th ed. 2023) ("When the effect of the new borrowing from a senior lender is merely to pass the risk of loss to the holder of the prepetition lien, the request for authorization should be denied absent the lien holder's consent. The authorization to prime an existing lien should not be read as authorization to increase substantially the risk of the prepetition lender in order to provide additional protection for a new, postpetition lender.").

For this reason, Section 361 of the Bankruptcy Code sets forth a non-exhaustive list of appropriate forms of adequate protection, including "periodic cash payments" and "an additional or replacement lien", while also recognizing that other forms of adequate protection may be appropriate in order to "result in the realization by such entity of the indubitable equivalent of such entity's interest in such property". *See* 11 U.S.C. § 361.  Thus, in the context of priming as opposed to use of cash collateral, adequate protection may also be found where there is "sufficient equity in the subject property to protect the existing lienholder", or a so-called "equity cushion."  3 Collier on Bankruptcy ¶ 364.05 (16th ed. 2023); *cf. supra* pp. 20-21.

The Debtors have not offered any evidence that Lavvan is adequately protected, and no such evidence exists.  No equity cushion is apparent here and no other form of adequate protection could possibly adequately protect Lavvan from being leap frogged by a new $190 million of priming loans.  The only purported adequate protection that the Debtors have suggested is the continued existence of the Debtors as a going concern.  Without more, such continued existence does not ensure that Lavvan's pre-petition bargained-for interest is adequately protected.

### 1.      There is No Equity Cushion Available to Serve as Adequate Protection.

Many courts have found that a proven equity cushion is sufficient to find that a pre-petition lender's interest is adequately protected.  *See* 3 Collier on Bankruptcy ¶ 364.05 (16th ed. 2023); *see also In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984) (finding that the existence of an equity cushion can provide adequate protection); *In re McKillips*, 81 B.R. 454, 458 (same).  Indeed, the Bankruptcy Court for the Southern District of New York has stated the "existe[nce] of an equity cushion seems to be 'the preferred  test in determining whether priming of a senior lien is appropriate under Section 364.'"  *In re YL W.*, 423 B.R. at 443.  The extent of the equity cushion that is required to ensure that an interest is adequately protected is to be determined on a case-by-case basis.  *In re Tucker*, 5 B.R. 180, 183 (Bankr. S.D.N.Y. 1980).  Case law almost uniformly

holds that an equity cushion of more than 20% is considered sufficient, while an equity cushion of less than 11% is inadequate, with divided opinions among courts regarding the adequacy of an equity cushion in the range of 12%-20%. *See In re McKillips*, 81 B.R. at 458 (collecting cases regarding the determinations of various courts on the adequacy of an equity cushion as adequate protection based on the magnitude of the equity cushion); *see also In re C.B.G. Ltd.*, 150 B.R. 570, 572-73 (Bankr. M.D. Pa. 1992) (finding a 14% equity cushion insufficient to serve as adequate protection); *see also In re Capitol Station 65, LLC*, 2018 WL 333863 at *11 (Bankr. E.D. Ca. Jan. 8, 2018) ("case law almost uniformly holds that an equity cushion of at least 20% constitutes adequate protection").

This Court does not need to split hairs on the precise percentage of equity cushion required to find adequate protection since no one -- not Amyris, Foris, or anyone else -- has even attempted to argue (much less prove) that such a cushion exists here. Presumably no one has tried to make that showing because the calculation would need to be that the value of Lavvan's collateral exceeds the sum of the $63.5 million they contend is owed under the 2018 Foris Loan plus $190 million of DIP funds plus the amount of Lavvan's claim, which as previously described will be very significant, plus whatever other loans Amyris and Foris are arguing (incorrectly) also fall into the payment priority provision (*see supra*, p. 9), plus a cushion of 12-20%. No one has made or is willing to make that assertion – and if they were, then one would wonder what the need really is to prime Lavvan. Moreover, given the representation about how precarious these chapter 11 cases are, any argument that an equity cushion exists here should be taken with a grain of salt. *See, e.g.*, Sept. 14, 2023 Hr'g Tr. 64:11-12 ("we have a cash flow negative debtor before any administrative costs"); *id.* at 57:3-6 ("The DIP budget demonstrates that without financing this debtor, that is, hemorrhaging cash would have no option but to cease operations and liquidate."). Perhaps more

importantly, the Debtors specifically have contended that Lavvan's collateral is "unlikely to generate material value." Debtor's Reply, ¶ 5, 14. If that is true, it is impossible to also argue that there is enough of an equity cushion here to cover an extra $190 million encumbering that collateral.

### 2.    The Continued Existence of the Debtor is Not Adequate Protection

Given the lack of commonly accepted forms of adequate protection, the Court at the Final DIP Hearing asked Counsel to the Debtors what "a finding on adequate protection [would] look like based on [the] record?". Sept. 14, 2023 Hr'g Tr. 106:25-107:1. In response, Counsel to the Debtors stated that "[i]f Your Honor had to make a finding of adequate protection. . . the finding would be the company would not survive" and that this Court "could easily make that finding that they are adequately protected because of the continuation of the company, and the sales process, and the potential reorganization process that is going forward." Sept. 14, 2023 Hr'g Tr. 107:6-9, 15-18. Counsel's statements miss the mark. The inability of the Debtors to continue as a going-concern absent the entry of the Final DIP Order speaks only to the Debtors' need for post-petition financing. *See, e.g., Bayside Cap. Inc. v. TPC Grp. Inc. (In re TPC Grp. Inc.)*, Nos. 22-10493 (CTG), 22-50372 (CTG), 2022 Bankr. LEXIS 1901, at *21 (Bankr. D. Del. July 11, 2022) ("[I]n order to obtain approval of the DIP loan, the debtor will be required to make a showing that borrowing money 'is necessary to preserve the assets of the estate.'") (internal quotation omitted). Such statements do nothing to prove that Lavvan's interests are adequately protected, which requires, in substance, the mathematical formula set forth in section (1), *supra*. To the extent that counsel was attempting to make an argument that adequate protection may be found any time that DIP financing enables the possibility of enhanced recoveries, the argument is incorrect for at least two reasons. First, the very point of adequate protection is that a debtor, in its business judgment, might want to take a shot at maximizing value through a plan that entails risk, but the secured

creditor is not required to be the party that bears the risk without adequate protection. Thus, Amyris' opinion that a reorganization might maximize value is an entirely separate concept from adequate protection. Second, counsel's argument might have more appeal for a lender with a blanket lien on all assets, but Lavvan's lien solely is on intellectual property. There is no evidence that the intellectual property has a higher value as a going concern than in a liquidation or a sale.

In short, without any evidence of the anticipated value expected from the sale process or potential reorganization, the continued existence of the Debtors provides no evidence that Lavvan would receive "the same level of protection it would have had if there had no been post-petition superpriority financing". *In re Swedeland Dev. Grp., Inc.*, 16 F.3d at 564 (stating the standard for adequate protection).

**B.        The Final DIP Order Should not Contain a Marshaling Waiver as to Lavvan.**

The DIP Motion requests that the Final DIP Order contain "no marshaling" provisions. *See* Draft Final DIP Order, ¶ 32. "Marshaling is an equitable doctrine which provides that where a creditor has two funds from which to satisfy its debt, it 'may not, by application of them to [its] demand, defeat another creditor who may resort to only one of the funds. *In re High Strength Steel, Inc.*, 269 B.R. 560, 572 (Bankr. D. Del. 2001). The purpose of marshaling is "to prevent the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security." *Meyer v. U.S.*, 375 U.S. 233, 237 (1963). Marshaling applies "where a creditor, by virtue of a lien or interest, can resort to two funds for payment, while another can only resort to one of the funds." *In re Ector County Energy Center, LLC*, Case No. 22-10320 (JTD) (Bankr. D. Del.), Jun. 2, 2022 Hr'g Tr., 7:24-8:1. For this reason, DIP financing motions seeking the waiver of the equitable doctrine of marshaling are not granted as a matter of course (absent consent) but rather are only permitted where there is a showing of its appropriateness.

Such a waiver is not appropriate here and this Court should strike the marshaling waiver from the Final DIP Order.  Lavvan and the DIP Lender are both secured creditors of the Debtor. However, the DIP Lender -- which is an insider of the Debtors -- has a much broader collateral package than Lavvan:  an all assets lien as opposed to only intellectual property.  Indeed, at the Final DIP Hearing, the Debtors introduced evidence itemizing the various assets that they contend have "real" value that are part of the DIP Lender's collateral, but not Lavvan's collateral.  *See Amended Declaration of Steven Fleming in Support of Reply of the Debtors in Support of Final Order (I) Authorizing the Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief*, ¶ 8 [Docket No. 273] (listing, among other things, real property and various direct and indirect equity interests related to the pilot and manufacturing plants located in Brazil).  In contrast, the Debtors have expressly take the position that they believe that the assets securing Lavvan's claims are "unlikely to generate material value." Debtors' Reply, ¶ 5, 14.  If this is true, why does the DIP lender need to look to the supposedly worthless collateral first?  Accordingly, there is no basis in law or equity to order a waiver of marshaling on these facts and this Court should strike the anti-marshaling waiver contained in ¶ 32 of the Final DIP Order.[14]

---

[14] Lavvan is aware of the provisions addressing marshaling against Foris in the Subordination Agreement, but it does not follow that it also must waive marshaling against Euagore.

## CONCLUSION

For the reasons set forth above, the Debtors have not met their burden to prime Lavvan with $190 million of insider DIP financing.  Unless priming is stricken from the request, the DIP motion should be denied.

Dated: September 29, 2023

<div style="margin-left: 40%;">

Respectfully submitted,

*/s/ Russell C. Silberglied*
Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Emily R. Mathews (No. 6866)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Email:     collins@rlf.com
           silberglied@rlf.com
           mathews@rlf.com

          -and-

Jason Cyrulnik
Paul Fattaruso
**CYRULNIK FATTARUSO LLP**
55 Broadway, Third Floor
New York, New York  10006
Telephone:  (646) 844-2466
Email:     cyrulnik@cf-llp.com
           pfattaruso@cf-llp.com

*Counsel for Lavvan, Inc.*

</div>