**Exhibit B**

**65 Bus. Law. 809**

Business Lawyer
May, 2010

Report

The Committee on Commercial Finance, ABA Section of Business Law[a1]

Copyright © 2010 by the American Bar Association; The Committee on Commercial Finance, ABA Section of Business Law

**REPORT OF THE MODEL FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT TASK FORCE**

This is the Report of the Model First Lien/Second Lien Intercreditor Agreement Task Force ("Task Force") established by the Commercial Finance Committee of the Business Law Section of the American Bar Association. This Report will first review the reasons for the creation of the Task Force, its goals, and its methodology. It will then introduce and examine each major provision of the Model Agreement, exploring its purpose, perceived market practice, and the perspectives of first and second lien creditors. Where appropriate, the Report will present alternative provisions and views.

**Creation of the Task Force**

Intercreditor agreements are used in a variety of financing transactions to establish the respective rights and remedies of two or more creditors in credit facilities provided to a common borrower. Intercreditor agreements are not standardized, and their scope varies widely Intercreditor agreements may include payment subordination provisions, payment standstill terms, and other creditor rights and remedies that do not involve collateral. Such payment subordination arrangements are typically found in unsecured mezzanine financing, for example. In secured financing transactions, however, the intercreditor agreement may also govern the relative rights and priorities of each creditor's liens in the borrower's assets, and it is here that the Task Force has concentrated its efforts.

The past five to eight years have witnessed an increase in the use of "second lien" structures in institutional senior secured syndicated financing transactions. These structures involve a "first lien" loan secured by a first priority lien in substantially all of the assets of the borrower, and a separate pari passu "second lien" loan, typically provided by a separate lender group, secured by a second priority lien in the same collateral. Second lien structures have enjoyed increased popularity in recent years because of the increased liquidity provided by second lien lenders that might not have provided financing on an unsecured basis, and because of the relatively narrow interest rate spreads available in the second lien market before the financial crisis in the latter half of 2008.

**\*810**  Until the financial crisis, the second lien market had grown rapidly. According to the Loan Pricing Corporation, the dollar volume of second lien loans grew from approximately $8 billion in 2003 to over $29 billion in 2006.[1] In the second quarter of 2007, second lien loans reached $15.21 billion, the highest quarter recorded for second lien issuance.[2] Like other forms of leveraged finance, second lien financing fell sharply with the 2008 credit crisis. By the second quarter of 2009, second lien issuance was under $300 million.[3]

Second lien structures also migrated to the middle market, and to asset-based loans, where second lien structures became common. A typical structure is for a revolving lender to hold a first lien in all accounts, inventory, and other current assets while a term lender holds a first lien in equipment, real estate, and other fixed assets, with each lender also holding a second lien in the other's primary collateral. Variations of such "wrap" structures have become increasingly creative.

As the second lien market grew, counsel to first lien lenders drafted various forms of substantially similar first lien/second lien intercreditor agreements. In the early years of the second lien market, the second lien lender generally subordinated virtually all of its rights as a secured creditor to the rights of the first lien creditor until the first lien creditor was paid in full--a so-called "silent second." Surprisingly, there was little published guidance on the issues that counsel should consider in drafting or reviewing an intercreditor agreement, and participants relied heavily on "market practice." It gradually became apparent, however, that the market had only a limited experience of the effect of these provisions following a default by the borrower or the initiation of a bankruptcy proceeding.

Although second lien transactions are structured in myriad ways, the principal intercreditor issues remain consistent throughout all structures. Similar intercreditor issues arise in most other secured transactions involving lien subordination. Therefore, the Task Force believes that the development of a form of first lien/second lien intercreditor agreement that covers the major recurring issues and fairly protects the interests of first and second lien creditors while reflecting market expectations would be a useful resource for practitioners.

**Principal Goals and Use of Model Agreement**

It is important to identify what the Model Agreement is not. The Task Force initially received the criticism that its work would be of limited utility because an intercreditor agreement could not be standardized for all transactions. Although this is a legitimate concern, it is important to note that nearly all intercreditor agreements dealing with priority of liens in common collateral must necessarily address similar lien subordination issues. Likewise, all must address the effect of the intercreditor terms both outside of bankruptcy and during the pendency of a **\*811** bankruptcy proceeding. While there will be structural differences in the transaction itself, the same issues will be present.

The Model Agreement and accompanying comments, other footnotes, and text are intended, first and foremost, to be a reference tool for the practitioner. The comments are intended to explain the general purpose of each section, highlight the principal issues encountered in practice, and convey the prevailing market expectation. Accordingly, the Model Agreement is not a universal solution to the problem of identifying the "correct form" to use for a transaction. The form will necessarily be determined by the details of the transaction. The Model Agreement introduces the major components of lien intercreditor agreements generally, addresses why such provisions are necessary, and explores the effect of drafting a provision in a manner more favorable to a first or second lien lender. Armed with an understanding of these basic concepts and their implementation in the Model Agreement, the practitioner may construct an intercreditor agreement that fits his or her transaction.

The Model Agreement does not address all types of transactions. For example, an intercreditor agreement for an asset-based transaction would typically include a provision requiring the holder of a first lien in fixed assets in a wrap structure to allow the holder of the first lien in the current assets to remain on the real property for a certain period of time to use the fixed assets to complete manufacture of goods to provide finished product for pending orders. Increasingly, lien intercreditor agreements also deal with payment subordination provisions and rights of additional secured parties such as third and fourth lienholders on common collateral. These variations are beyond the scope of the Model Agreement.

**How the Task Force Conducted Its Work**

The Task Force is sponsored by the Syndications and Lender Relations Subcommittee of the Commercial Finance Committee of the Section of Business Law of the American Bar Association. The Chair of the Task Force is Gary D. Chamblee. The Vice Chairs of the Task Force are Alyson Allen, Christian Brose, Richard K. Brown, Robert L. Cunningham, Jr., Randall Klein, and Jane Summers, and the Editor is Howard Darmstadter. In addition to the Chair and the Vice Chairs, other members of the Task Force have played key roles in drafting the text and commentary of the Model Agreement, including Anthony R. Callobre, John Francis Hilson, and Matthew W. Kavanaugh. Many other members of the Task Force regularly attended meetings of the Task Force, contributed significantly to the ongoing discussion regarding the many difficult issues faced by the Task Force, and otherwise made contributions essential to the goal of providing a balanced, market-driven Model Agreement. The names of the

over 200 members of the Task Force and their law firms or other affiliations can be found on the Task Force web site at http://www.abanet.org/dch/committee.cfm?com=CL190029.

The Task Force was formed in the spring of 2006 and met for the first time at the 2006 Annual Meeting in Honolulu, Hawaii. The Task Force is composed of practitioners who represent primarily first lien lenders, practitioners who represent **812 primarily second lien lenders, and practitioners who represent both. As a result, the Task Force reflected a relatively balanced representation among all concerned parties. At the initial meeting, it was determined that the Task Force would meet at each scheduled meeting of the Section, which includes the Spring Meeting in April, the Annual Meeting in August, and the Fall Meeting in November of each year, and would also meet by telephone conference on a regular basis.

The agreement selected by the Task Force as a source document is an institutional first lien/second lien intercreditor agreement commonly used in the market for second lien transactions initially prepared by Latham & Watkins LLP. This form was disassembled by subject matter sections, with each section being the focus of one or more of the Task Force meetings. Where possible, the Task Force utilized experts in certain practice areas among its members to lead the review and revision of the respective sections in the member's specialty. After each Task Force meeting, the Model Agreement was revised to reflect the concerns raised by Task Force members at the meeting.

Significant discussion was devoted to the presentation of alternative provisions favoring second lien lenders. Task Force members who represented primarily second lien lenders were troubled by the placement of such provisions as footnotes or at the end of the agreement, feeling that such placement implied that the alternative text did not reflect market terms. It was decided that alternative text that involved concepts important to second lien lenders and that was actually used in practice would be placed in the body of the relevant section of the agreement as a second lien favorable alternative. Concepts deemed less important or not widely used in practice, as well as clarifications and explanations of differences and concerns of the various parties, would be placed in the footnotes. In addition, introductory comments are included in notes to most sections of the Model Agreement.

Following the initial revision of each section, the Model Agreement was further edited and revised stylistically by Howard Darmstadter. The Task Force is grateful for Howard's fine work in making the Model Agreement more concise and user friendly.

The Task Force intends from time to time to publish appendices or revisions to the Model Agreement to deal with special situations or to reflect the experience of practitioners working with the document and to reflect market changes.

### *813  First Lien/Second Lien Intercreditor Agreement

*[First Lien Agent]*

*[Second Lien Agent]*

*[Control Agent]*

*[Borrower]*

*[Holdings]*

*[Guarantor Subsidiaries]*

*[date]*

### *814  Table of Contents

| | |
|---|---|
| Preamble | 816 |
| Parties | 816 |
| Background | 816 |
| Agreement | 817 |

| | | |
|---|---|---|
| 1 | Lien Priorities | 817 |
| | 1.1 Seniority of Liens Securing First Lien Obligations | 817 |
| | 1.2 No Payment Subordination | 820 |
| | 1.3 First Lien Obligations and Second Lien Obligations | 820 |
| | 1.4 First Lien Cap | 822 |
| | 1.5 First and Second Lien Collateral to Be Identical | 827 |
| | 1.6 Pledged Collateral | 828 |
| | 1.7 Limitations on Duties and Obligations | 830 |
| | 1.8 Prohibition on Contesting Liens; No Marshaling | 830 |
| | 1.9 Confirmation of Subordination in Second Lien Collateral Documents | 832 |
| | 1.10 Release of Liens [or Guaranties] | 832 |
| | 1.11 Subordination of Liens Securing Excess First Lien Obligations | 834 |
| 2 | Modification of Obligations | 836 |
| | 2.1 Permitted Modifications | 836 |
| | 2.2 Modifications Requiring Consent | 837 |
| | 2.3 Parallel Modifications to Second Lien Obligations | 839 |
| | 2.4 Notice of Modifications | 840 |
| 3 | Enforcement | 840 |
| | 3.1 Who May Exercise Remedies | 840 |
| | 3.2 Manner of Exercise | 844 |
| | 3.3 Specific Performance | 845 |
| | 3.4 Notice of Exercise | 845 |
| 4 | Payments | 845 |
| | 4.1 Application of Proceeds | 845 |
| | 4.2 Insurance | 847 |
| | 4.3 Payment Turnover | 847 |
| | 4.4 Refinancing After Discharge of First Lien Obligations | 848 |
| 5 | Purchase of First Lien Obligations by Second Lien Claimholders | 849 |
| | 5.1 Purchase Right | 849 |
| | 5.2 Purchase Notice | 850 |
| | 5.3 Purchase Price | 851 |
| | 5.4 Purchase Closing | 852 |
| | 5.5 Excess First Lien Obligations Not Purchased | 853 |
| | 5.6 Actions After Purchase Closing | 853 |
| | 5.7 No Recourse or Warranties; Defaulting Creditors | 854 |
| 6 | Insolvency Proceedings | 855 |
| | 6.1 Use of Cash Collateral and DIP Financing | 855 |
| | 6.2 Sale of Collateral | 858 |
| | 6.3 Relief from the Automatic Stay | 860 |
| | 6.4 Adequate Protection | 860 |
| | 6.5 First Lien Objections to Second Lien Actions | 862 |
| | 6.6 Avoidance; Reinstatement of Obligations | 863 |
| | 6.7 Reorganization Securities | 864 |
| | 6.8 Post-Petition Claims | 865 |
| | 6.9 Waivers | 865 |
| | 6.10 Separate Grants of Security and Separate Classification | 866 |
| | 6.11 Effectiveness in Insolvency Proceedings | 867 |
| 7 | Miscellaneous | 867 |
| | 7.1 Conflicts | 867 |
| | 7.2 No Waivers; Remedies Cumulative; Integration | 867 |
| | 7.3 Effectiveness; Severability; Termination | 867 |
| | 7.4 Modifications of This Agreement | 868 |
| | 7.5 Information Concerning Financial Condition of Borrower and Its Subsidiaries | 868 |
| | 7.6 No Reliance | 869 |
| | 7.7 No Warranties; Independent Action | 869 |
| | 7.8 Subrogation | 870 |
| | 7.9 Applicable Law; Jurisdiction; Service | 870 |
| | 7.10 Waiver of Jury Trial | 870 |

|      | 7.11  | Notices                                     | 871 |
|------|-------|---------------------------------------------|-----|
|      | 7.12  | Further Assurances                          | 871 |
|      | 7.13  | Successors and Assigns                      | 871 |
|      | 7.14  | Authorization                               | 872 |
|      | 7.15  | No Third-Party Beneficiaries                | 872 |
|      | 7.16  | No Indirect Actions                         | 872 |
|      | 7.17  | Counterparts                                | 872 |
|      | 7.18  | Original Grantors; Additional Grantors      | 873 |
| 8    | Definitions |                                       | 873 |
|      | 8.1   | Defined Terms                               | 873 |
|      | 8.2   | Usages                                      | 882 |

**\*816  [date]**

**Preamble**

**Parties**

• _____, as collateral agent for the holders of the First Lien Obligations defined below (in such capacity, **First Lien Agent**)[4]

• _____, as collateral agent for the holders of the Second Lien Obligations defined below (in such capacity, **Second Lien Agent**)

• _____, as control agent for First Lien Agent and Second Lien Agent (in such capacity, the **Control Agent**)

• _____ (**Borrower**)

• _____ (**Holdings**)

• The Guarantor Subsidiaries (as defined below).

**Background**

Borrower, Borrower's parent company, Holdings, certain lenders and agents, and First Lien Agent have entered into a **First Lien Credit Agreement** dated the date hereof providing for a revolving credit facility and term loan.

Borrower, Holdings, certain lenders and agents, and Second Lien Agent have entered into a **Second Lien Credit Agreement** dated the date hereof providing for a term loan.

Holdings has guaranteed, and Holdings and Borrower have agreed to cause certain current and future Subsidiaries of Borrower [and Holdings] (the *Guarantor Subsidiaries*) to guarantee, Borrower's Obligations under the First Lien Credit Agreement and the Second Lien Credit Agreement.

Each of Borrower, Holdings, each Guarantor Subsidiary, and each other Person that executes and delivers a First Lien Collateral Document or a Second Lien Collateral Document as a "grantor" or "pledgor" (or the equivalent) is a *Grantor*.

A Grantor may enter into Hedge Agreements and Cash Management Agreements with one or more lenders under the First Lien Credit Agreement or their affiliates as counterparties, which may be included in the First Lien Obligations defined below.[5]

**\*817**  The First Lien Obligations and the Second Lien Obligations are secured by Liens on substantially all the assets of Borrower, Holdings, and the Guarantor Subsidiaries.

The Parties desire to set forth in this First Lien/Second Lien Intercreditor Agreement (this *Agreement*) their rights and remedies with respect to the Collateral securing the First Lien Obligations and the Second Lien Obligations.

Agreement

## 1 Lien Priorities[6]

### 1.1 Seniority of Liens Securing First Lien Obligations

(a) A Lien on Collateral securing any First Lien Obligation that is included in the Capped Obligations up to but not in excess of the First Lien Cap will at all times be senior and prior in all respects to a Lien on such Collateral securing any Second Lien Obligation, and a Lien on Collateral securing any Second Lien Obligation will at all times be junior and subordinate in all respects to a Lien on such Collateral securing any First Lien Obligation that is included in the Capped Obligations up to but not in excess of the First Lien Cap.

(b) A Lien on Collateral securing any First Lien Obligation that is not included in the Capped Obligations will at all times be senior and prior in all respects to a Lien on such Collateral securing any Second Lien Obligation, and a Lien on Collateral securing any Second Lien Obligation will at all times be junior and subordinate in all respects to a Lien on such Collateral securing any First Lien Obligation that is not included in the Capped Obligations.

(c) The Lien on Collateral securing any First Lien Obligation that is included in the Capped Obligations in excess of the First Lien Cap will have the priority set forth in section 1.11, "*Subordination of Liens Securing Excess First Lien Obligations*."

(d) Except as otherwise expressly provided herein, the priority of the Liens securing First Lien Obligations and the rights and obligations of the Parties will remain in full force and effect irrespective of

(1) how a Lien was acquired (whether by grant, possession, statute, operation of law, subrogation, or otherwise),

(2) the time, manner, or order of the grant, attachment, or perfection of a Lien,

**\*818**  (3) any conflicting provision of the U.C.C. or other applicable law,

(4) any defect in, or non-perfection, setting aside, or avoidance of, a Lien or a First Lien Loan Document or a Second Lien Loan Document,

(5) the modification of a First Lien Obligation or a Second Lien Obligation,

(6) the modification of a First Lien Loan Document or a Second Lien Loan Document,

(7) the subordination of a Lien on Collateral securing a First Lien Obligation to a Lien securing another obligation of a Grantor or other Person that is permitted under the First Lien Loan Documents as in effect on the date hereof or secures a DIP Financing deemed consented to by the Second Lien Claimholders pursuant to section 6.1, "*Use of Collateral and* DIP *Financing*,"

(8) the exchange of a security interest in any Collateral for a security interest in other Collateral,

(9) the commencement of an Insolvency Proceeding, or

(10) any other circumstance whatsoever, including a circumstance that might be a defense available to, or a discharge of, a Grantor in respect of a First Lien Obligation or a Second Lien Obligation or holder of such Obligation.

[Alternative Section Favorable to Second Lien Lenders][7]

**[1.1 Seniority of Liens Securing First Lien Obligations**

(a) A Lien on Collateral securing any First Lien Obligation that is included in the Capped Obligations up to but not in excess of the First Lien Cap will at all times be senior and prior in all respects to a Lien on such **\*819** Collateral securing any Second Lien Obligation, and a Lien on Collateral securing any Second Lien Obligation will at all times be junior and subordinate in all respects to a Lien on such Collateral securing any First Lien Obligation that is included in the Capped Obligations up to but not in excess of the First Lien Cap so long as the Lien securing the First Lien Obligations is valid, perfected, [and unavoidable] [and is not avoided in an Insolvency Proceeding].

(b) A Lien on Collateral securing any First Lien Obligation that is not included in the Capped Obligations will at all times be senior and prior in all respects to a Lien on such Collateral securing any Second Lien Obligation, and a Lien on Collateral securing any Second Lien Obligation will at all times be junior and subordinate in all respects to a Lien on such Collateral securing any First Lien Obligation that is not included in the Capped Obligations so long as the Lien securing the First Lien Obligations is valid, perfected, [and unavoidable] [and is not avoided in an Insolvency Proceeding].

(c) The Lien on Collateral securing any First Lien Obligation that is included in the Capped Obligations in excess of the First Lien Cap will have the priority set forth in section 1.11, "*Subordination of Liens Securing Excess First Lien Obligations*."

(d) Except as otherwise expressly provided herein, the priority of the Liens securing First Lien Obligations and the rights and obligations of the Parties will remain in full force and effect irrespective of

(1) how a Lien was acquired (whether by grant, possession, statute, operation of law, subrogation, or otherwise),

(2) the time, manner, or order of the grant, attachment, or perfection of a Lien,

 **\*820**  (3) any conflicting provision of the U.C.C. or other applicable law,

(4) the modification of a First Lien Obligation or a Second Lien Obligation,

(5) the modification of a First Lien Loan Document or a Second Lien Loan Document,

(6) the subordination of a Lien on Collateral securing a First Lien Obligation to a Lien securing another obligation of a Grantor or other Person that is permitted under the First Lien Loan Documents as in effect on the date hereof or secures a DIP Financing deemed consented to by the Second Lien Claimholders pursuant to Section 6.1, "*Use of Collateral and DIP Financing*,"

(7) the exchange of a security interest in any Collateral for a security interest in other Collateral, or

(8) the commencement of an Insolvency Proceeding.]

[End of Alternative Section]

## 1.2 No Payment Subordination[8]

The subordination of Liens securing Second Lien Obligations to Liens securing First Lien Obligations set forth in the preceding section 1.1 affects only the relative priority of those Liens, and does not subordinate the Second Lien Obligations in right of payment to the First Lien Obligations. Nothing in this Agreement will affect the entitlement of any Second Lien Claimholder to receive and retain required payments of interest, principal, and other amounts in respect of a Second Lien Obligation unless the receipt is expressly prohibited by, or results from the Second Lien Claimholder's breach of, this Agreement.

## 1.3 First Lien Obligations and Second Lien Obligations

(a) *First Lien Obligations* means all Obligations of the Grantors under

(1) the First Lien Credit Agreement and the other First Lien Loan Documents,

(2) the guaranties by Holdings and the Guarantor Subsidiaries of the Borrower's Obligations under the First Lien Loan Documents,

(3) any Hedge Agreement entered into with an agent or a lender (or an Affiliate thereof) under the First Lien Credit Agreement (even if the counterparty or an Affiliate of the counterparty ceases to be an agent or a lender under the First Lien Credit Agreement),

(4) any Cash Management Agreement, or

(5) any other agreement or instrument granting or providing for the perfection of a Lien securing any of the foregoing.

Notwithstanding any other provision hereof, the term "First Lien Obligations" will include accrued interest, fees, costs, and other charges incurred **\*821** under the First Lien Credit Agreement and the other First Lien Loan Documents, whether incurred before or after commencement of an Insolvency Proceeding, and whether or not allowable in an Insolvency Proceeding. To the extent that any payment with respect to the First Lien Obligations (whether by or on behalf of any Grantor, as proceeds of security, enforcement of any right of set-off, or otherwise) is declared to be fraudulent or preferential in any respect, set aside, or required to be paid to a debtor in possession, trustee, receiver, or similar Person, then the obligation or part thereof originally intended to be satisfied will be deemed to be reinstated and outstanding as if such payment had not occurred.

[Alternative Definition More Favorable to Second Lien Lenders]

[(a) ***First Lien Obligations*** means all Obligations of the Grantors under

(1) the First Lien Credit Agreement and the First Lien Loan Documents,

(2) the guaranties by Holdings and the Guarantor Subsidiaries of the Borrower's Obligations under the First Lien Loan Documents,

(3) any Hedge Agreement entered into with an agent or a lender (or an Affiliate thereof) under the First Lien Credit Agreement (even if the counterparty or an Affiliate of the counterparty ceases to be an agent or a lender under the First Lien Credit Agreement),

(4) any Cash Management Agreement, or

(5) any other agreement or instrument granting or providing for the perfection of a Lien securing any of the foregoing, except that such Obligations will only be considered First Lien Obligations to the extent

(i) they are secured by a valid, perfected, and unavoidable Lien on the Collateral in favor of First Lien Agent,[9] and

(ii) a claim for such Obligations would be allowed or allowable in an Insolvency Proceeding applicable to the relevant Grantor.]

[End of Alternative Definition]

(b) ***Second Lien Obligations*** means all Obligations of the Grantors under

(1) the Second Lien Credit Agreement and the other Second Lien Loan Documents,

(2) the guaranties by Holdings and the Guarantor Subsidiaries of Borrower's Obligations under the Second Lien Loan Documents,

(3) any Hedge Agreement entered into with an agent or a lender (or an Affiliate thereof) under the Second Lien Credit Agreement if such agent or lender is not an agent or lender under the First Lien Credit Agreement (even if the counterparty or an Affiliate of the counter-  **\*822**  party ceases to be an agent or a lender under the Second Lien Credit Agreement),

(4) any agreement or instrument granting or providing for the perfection of a Lien securing any of the foregoing[, except that the aggregate principal amount of the Second Lien Obligations (other than Obligations under Hedge Agreements or Cash Management Agreements) in excess of the Second Lien Cap (as defined below) will not be Second Lien Obligations].[10]

Notwithstanding any other provision hereof, the term "Second Lien Obligations" will include accrued interest, fees, costs, and other charges incurred under the Second Lien Credit Agreement and the other Second Lien Loan Documents, whether incurred before or after commencement of an Insolvency Proceeding[, and whether or not allowable in an Insolvency Proceeding].

(c) The inclusion of Obligations under Hedge Agreements in the First Lien Obligations will not create in favor of the applicable counterparty any rights in connection with the management or release of any Collateral or of the Obligations of any Grantor under any First Lien Collateral Document, and the inclusion of Obligations under Hedge Agreements in the Second Lien Obligations will not create in favor of the applicable counterparty any rights in connection with the management or release of any Collateral or of the Obligations of any Grantor under any Second Lien Collateral Document.

(d) First Lien Agent and the holders of First Lien Obligations are, together, the *First Lien Claimholders*. Second Lien Agent and the holders of Second Lien Obligations are, together, the *Second Lien Claimholders***.**

## 1.4 First Lien Cap[11]

*Capped Obligations* means First Lien Obligations for the payment of principal of Loans and reimbursement obligations in respect of Letters of Credit [, Obligations under Interest Rate Protection Agreements,] and interest, premium, if any, and fees accruing or payable in respect thereof or in respect of commitments therefor.

 **\*823**  *First Lien Cap* means the sum of

(a) the excess of

(1) the aggregate principal amount of First Lien Obligations (including the undrawn amount of all letters of credit constituting First Lien Obligations (*Letters of Credit*) and the aggregate original principal amount of any term loan that is a First Lien Obligation but excluding First Lien Obligations under Hedge Agreements) up to, but not in excess of, $_____,[12] over

(2) the sum of (A) principal payments applied to term loans that are First Lien Obligations, (B) permanent reductions of revolving credit loans (and accompanying commitments) under the revolving credit facility provided for in the First Lien Credit Agreement, and (C) reimbursements of drawings under Letters of Credit constituting First  **\*824**  Loan Obligations to the extent that any such reimbursement results in a permanent reduction of the

Letter of Credit commitment amount under the First Lien Loan Documents, excluding reductions resulting from a Refinancing, plus

(b) amounts in respect of accrued, unpaid interest, fees, and premium (if any), in each case above accruing in respect of or attributable to, but only in respect of or attributable to, the aggregate principal amount of First Lien Obligations (including the undrawn amount of all Letters of Credit constituting First Lien Obligations and the aggregate original principal amount of any term loan that is a First Lien Obligation) at any one time not to exceed the amount referred to in clause (a) above,[13] *provided* that the First Lien Cap shall not apply to any First Lien Obligations other than Capped Obligations[, and plus

(c) [Obligations owing by Grantors to First Lien Claimholders under nonspeculative Hedge Agreements] [Obligations owing by Grantors to First Lien Claimholders under Interest Rate Protection Agreements designed to protect a Grantor against fluctuations in interest rates on an aggregate principal amount of First Lien Obligations (including the undrawn amount of all Letters of Credit constituting First Lien Obligations and the aggregate original principal amount of any term loan that is a First Lien Obligation) at any one time not to exceed the amount referred to in clause (a) above, plus amounts in respect of accrued, unpaid interest on such Obligations,][, plus

(d) the aggregate amount of all Second Lien Adequate Protection Payments to the extent paid from a DIP financing or Proceeds of Collateral[14] [, and

(e) if there is an Insolvency Proceeding, $_____].[15]

**\*825**  [Alternative Definition of First Lien Cap for First Lien Loans Involving a Borrowing Base]

[**First Lien Cap**[16] means the excess of

(a) the sum of (1) the aggregate principal amount of First Lien Obligations (including the undrawn amount of all letters of credit constituting First Lien Obligations (**Letters of Credit**) but excluding for purposes of this section (a) only the principal amount of any term loan that is a First Lien Obligation and any First Lien Obligations under Hedge Agreements) up to, but not in excess of, the lesser of (A) $_____, and (B) [110%] of Availability as determined by First Lien Agent at the time each principal amount is made, issued, or otherwise incurred, plus (2) the aggregate original principal amount of any term loan that is a First Lien Obligation, over

(b) the sum of (1) the aggregate amount of all payments of the principal of any term loan included in the First Lien Obligations, and (2) the amount of all payments of revolving loans or reimbursements of drawings under Letters of Credit that permanently reduce the accompanying revolving credit commitment or letter of credit commitment amount under the First Lien Credit Agreement (excluding reductions in sub-facility commitments not accompanied by a corresponding permanent reduction in the revolving facility or letters of credit commitment

amount, excluding reductions under (A) and (B) as a result of a Refinancing, and *provided* that the First Lien Cap shall not apply to any First Lien Obligations other than Capped Obligations)[, plus

(c) [Obligations owing by Grantors to First Lien Claimholders under non-speculative Hedge Agreements] [Obligations owing by Grantors to First Lien Claimholders under Interest Rate Protection Agreements designed to protect a Grantor against fluctuations in interest rates on an aggregate principal amount of First Lien Obligations (including the undrawn amount of all Letters of Credit constituting First Lien Obligations and the aggregate original principal amount of any term loan that is a First Lien Obligation) at any one time not to exceed the amount referred to in clause (a) above, plus amounts in respect of accrued, unpaid interest on such Obligations,][, plus

(d) all Second Lien Adequate Protection Payments to the extent paid from any DIP Financing or Proceeds of Collateral][17,] [,plus

(e) if there is an Insolvency Proceeding, $_____]].]

[End of Alternative Definition]

## *826  [Alternative Definition More Favorable to Second Lien Lenders][18]

***Capped Obligations*** means First Lien Obligations for the payment of principal of Loans and reimbursement obligations in respect of Letters of Credit, and interest, premium, if any, and fees accruing or payable in respect thereof or in respect of commitments therefor[, plus obligations under Interest Rate Protection Agreements in respect of interest on First Lien Principal Obligations not in excess of the First Lien Cap]

[***First Lien Cap*** means the sum of

(a) the excess of (1) the outstanding amount of First Lien Principal Obligations not to exceed in the aggregate [the sum of (x)] $_____ of term Indebtedness [plus (y) the lesser of (A) [110]% of [Availability] as determined by First Lien Agent at the time each principal amount is made, issued, or otherwise incurred, and (B) $_____ of revolving credit Indebtedness included in the First Lien Obligations [(including the outstanding undrawn amount of, and reimbursement obligations in respect of, letters of credit constituting First Lien Obligations (***Letters of Credit***))] [(calculated, in the case of any First Lien Principal Obligations issued at a discount, at the aggregate amount due at maturity thereof)]], over (2) the aggregate amount of all repayments of term Indebtedness, and all repayments or reductions of revolving credit Indebtedness, included in the First Lien Principal Obligations[, and of reimbursement obligations under Letters of Credit,] (to the extent effected with a corresponding permanent commitment reduction under the First Lien Credit Agreement but excluding reductions as a result of a Refinancing) (First Lien Principal Obligations in excess of the First Lien Cap being the ***Excess First Lien Principal Obligations***), plus

(b) accrued but unpaid interest, commitment, facility, utilization, and other analogous fees and, if applicable, prepayment premiums on the First Lien Principal Obligations referred to in clause (a) above [(at [rates] [interest

rate margins] not in excess of ___ basis points [or ___ %] above the [rates] [interest rate margins] provided for under the First Lien Credit Agreement as in effect on the date hereof)], plus

(c) all fees, expenses, premium (if any), reimbursement obligations, and other amounts of a type not referred to in clause (a) or (b) above payable in respect of the amounts referred to in clauses (a) and (b) above, [plus

 **\*827** (d) Obligations under Hedge Agreements in respect of interest on First Lien Principal Obligations referred to in clause (a) above not to exceed $_____ in the aggregate,] in each case payable pursuant to the First Lien Loan Documents *provided* that the First Lien Cap shall not apply to any First Lien Obligations other than Capped Obligations.

For purposes of this definition, all payments of First Lien Principal Obligations will be deemed to be applied first to reduce the First Lien Principal Obligations referred to in clause (a)(1) above and thereafter to reduce any Excess First Lien Principal Obligations.]

[End of Alternative Definition]

Any net increase in the aggregate principal amount of a loan or Letter of Credit (on a U.S. Dollar equivalent basis) after the loan is incurred or the Letter of Credit issued that is caused by a fluctuation in the exchange rate of the currency in which the loan or Letter of Credit is denominated will be ignored in determining whether the First Lien Cap has been exceeded[, except with respect to the principal amount of First Lien Obligations made, issued, or advanced after the calculation of such fluctuation in exchange rate].[19]

## 1.5 First and Second Lien Collateral to Be Identical

(a) The Parties intend that the First Lien Collateral and the Second Lien Collateral be identical, except [specify any exceptions]. Accordingly, subject to the other provisions of this Agreement, the Parties will cooperate

(1) to determine the specific items included in the First Lien Collateral and the Second Lien Collateral, the steps taken to perfect the Liens thereon, and the identity of the Persons having First Lien Obligations or Second Lien Obligations, and

(2) to make the forms, documents, and agreements creating or evidencing the First Lien Collateral and Second Lien Collateral and the guaranties of the First Lien Obligations and the Second Lien Obligations materially the same, other than with respect to the first and second lien nature of the Liens.

(b) Until the Discharge of First Lien Obligations, and whether or not an Insolvency Proceeding has commenced, Borrower and Holdings will not grant, and will use their best efforts to prevent any other Person from granting, a Lien on any property

(1) in favor of a First Lien Claimholder to secure the First Lien Obligations unless Borrower, Holdings, or such other Person grants (or offers to grant with a reasonable opportunity for the Lien to be accepted) **\*828** Second Lien Agent a junior Lien on such property to secure the Second Lien Obligations (however, the refusal of Second Lien Agent to accept such Lien will not prevent the First Lien Claimholder from taking the Lien), and

(2) in favor of a Second Lien Claimholder to secure the Second Lien Obligations unless Borrower, Holdings, or such other Person grants (or offers to grant with a reasonable opportunity for the Lien to be accepted) First Lien Agent a senior Lien on such property to secure the First Lien Obligations (however, the refusal of First Lien Agent to accept such Lien will not prevent the Second Lien Claimholder from taking the Lien).

(c) Subject to section 1.1, "*Seniority of Liens Securing First Lien Obligations,*" if a Second Lien Claimholder hereafter acquires a Lien on property to secure a Second Lien Obligation where the property is not also subject to a Lien securing the First Lien Obligations, then such Second Lien Claimholder will give First Lien Agent written notice of such Lien no later than five Business Days after acquiring such Lien. If First Lien Agent also obtains a Lien on such property or if such Second Lien Claimholder fails to provide such timely notice to First Lien Agent, then such property will be deemed to be Collateral for all purposes hereunder.

## 1.6 Pledged Collateral

(a) If First Lien Agent has any Collateral in its possession or control (such Collateral being the ***Pledged Collateral***), then, subject to section 1.1, "*Seniority of Liens Securing First Lien Obligations,*" and this section 1.6, First Lien Agent will possess or control the Pledged Collateral as gratuitous bailee and/or gratuitous agent for perfection for the benefit of Second Lien Agent as secured party, so as to satisfy the requirements of sections 8-106(d)(3), 8-301(a)(2), and 9-313(c) of the U.C.C. In this section 1.6, "control" has the meaning given that term in sections 8-106 and 9-314 of the U.C.C.

(b) First Lien Agent will have no obligation to any First Lien Claimholder or Second Lien Claimholder to ensure that any Pledged Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this section 1.6. The duties or responsibilities of First Lien Agent under this section 1.6 will be limited solely to possessing or controlling the Pledged Collateral as bailee and/or agent for perfection in accordance with this section 1.6 and delivering the Pledged Collateral upon a Discharge of First Lien Obligations as provided in subsection (d) below.

(c) Second Lien Agent hereby waives and releases First Lien Agent from all claims and liabilities arising out of First Lien Agent's role under this section 1.6 as bailee and/or agent with respect to the Pledged Collateral [except for claims arising by reason of First Lien Agent's gross negligence or willful misconduct].

 **\*829**  (d) Upon the Discharge of First Lien Obligations, First Lien Agent will deliver or transfer control of any Pledged Collateral in its possession or control, together with any necessary endorsements (which endorsements will be without recourse and without any representation or warranty),

(1) *first*, to Second Lien Agent if any Second Lien Obligations remain outstanding, and

(2) *second*, to Borrower,

and will take any other action reasonably requested by Second Lien Agent (at the expense of Borrower or, upon default by Borrower in payment or reimbursement thereof, Second Lien Agent) in connection with Second Lien Agent obtaining a first-priority interest in the Pledged Collateral.

(e) If Second Lien Agent has any Pledged Collateral in its possession or control, then, subject to section 1.1, "*Seniority of Liens Securing First Lien Obligations*," and this section 1.6, Second Lien Agent will possess or control the Pledged Collateral as gratuitous bailee and/or gratuitous agent for perfection for the benefit of First Lien Agent as secured party, so as to satisfy the requirements of sections 8-106(d)(3), 8-301(a)(2), and 9-313(c) of the U.C.C.

(f) Second Lien Agent will have no obligation to any First Lien Claimholder or Second Lien Claimholder to ensure that any Pledged Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this section 1.6. The duties or responsibilities of Second Lien Agent under this section 1.6 will be limited solely to possessing or controlling the Pledged Collateral as bailee and/or agent for perfection in accordance with this section 1.6 and delivering the Pledged Collateral upon a Discharge of Second Lien Obligations [up to any Second Lien Cap] as provided in subsection (h) below.

(g) First Lien Agent hereby waives and releases Second Lien Agent from all claims and liabilities arising out of Second Lien Agent's role under this section 1.6 as bailee and/or agent for perfection with respect to the Pledged Collateral [except for claims arising by reason of Second Lien Agent's gross negligence or willful misconduct].

(h) Upon the Discharge of Second Lien Obligations up to any Second Lien Cap, Second Lien Agent will deliver or transfer control of any Pledged Collateral in its possession or control, together with any necessary endorsements (which endorsements will be without recourse and without any representation or warranty),

(1) *first*, to First Lien Agent if any First Lien Obligations remain outstanding, and

(2) *second*, to Borrower,

and will take any other action reasonably requested by First Lien Agent (at the expense of the Borrower or, upon default by the Borrower in payment or reimbursement thereof, First Lien Agent) in connection with First Lien Agent obtaining a first-priority interest in the Pledged Collateral.

**\*830  1.7 Limitations on Duties and Obligations**

(a) (1) First Lien Agent will be solely responsible for perfecting and maintaining the perfection of its Liens on the First Lien Collateral, and (2) except for First Lien Agent's obligations under section 1.6, "*Pledged Collateral*," Second Lien Agent will be solely responsible for perfecting and maintaining the perfection of its Liens on the Second Lien Collateral.

(b) This Agreement is intended solely to govern the respective Lien priorities as between First Lien Claimholders and Second Lien Claimholders and does not impose on First Lien Agent or Second Lien Agent any obligations in respect of the disposition of Proceeds of foreclosure on any Collateral that would conflict with a prior perfected claim in favor of another Person, an order or decree of a court or other Governmental Authority, or applicable law.

(c) Notwithstanding any other provision of this Agreement, First Lien Agent will only be required to verify the payment of, or other satisfactory arrangements with respect to, First Lien Obligations arising under Cash Management Agreements or Hedge Agreements if First Lien Agent receives notice of such Obligations, together with any supporting documentation First Lien Agent requests, from the applicable Person.

(d) Except for obligations expressly provided for herein, the Control Agent and First Lien Claimholders will have no liability to any Second Lien Claimholder for any action by a First Lien Claimholder with respect to any First Lien Obligations or Collateral, including

(1) the maintenance, preservation, or collection of First Lien Obligations or any Collateral, and

(2) the foreclosure upon, or the sale, liquidation, maintenance, preservation, or other disposition of, any Collateral.

(e) First Lien Agent will not have by reason of this Agreement or any other document a fiduciary relationship with any First Lien Claimholder or Second Lien Claimholder. The parties recognize that the interests of First Lien Agent and Second Lien Agent may differ, and First Lien Agent may act in its own interest without taking into account the interests of any Second Lien Claimholder.

**1.8 Prohibition on Contesting Liens; No Marshaling**

(a) First Lien Agent will not contest in any proceeding (including an Insolvency Proceeding) the validity, enforceability, perfection, or priority of any Lien securing a Second Lien Obligation, but nothing in this section 1.8 will impair the rights of any First Lien Claimholder to enforce this Agreement, including the priority of the Liens securing the First Lien Obligations or the provisions for exercise of remedies.

(b) Second Lien Agent will not contest in any proceeding (including an Insolvency Proceeding) the validity, enforceability, perfection, or priority of any Lien securing a First Lien Obligation up to the First Lien Cap with respect to the Capped Obligations and in their entirety with **\*831** respect to First Lien Obligations that are not Capped Obligations, but nothing in this section 1.8 will impair the rights of any Second Lien Claimholder to enforce this Agreement, including the priority of the Liens securing the Second Lien Obligations or the provisions for exercise of remedies.[20]

(c) Until the Discharge of First Lien Obligations, Second Lien Agent will not assert any marshaling, appraisal, valuation, or other similar right that may otherwise be available to a junior secured creditor.[21]

[Additional Sections More Favorable to Second Lien Lenders]

[(d) The assertion in any proceeding (including an Insolvency Proceeding) or otherwise by one Party (Party A) of the invalidity or nonperfection of the **\*832** other Party's (Party B's) security interest as a defense to a claim or assertion by Party B against Party A for or alleging breach of this Agreement arising out of Party As exercise or assertion of claims or other rights or enforcement of remedies under this Agreement or any First Lien Loan Documents or Second Lien Loan Documents, as applicable, will not be a "contest" for purposes of this section 1.8.

(e) A Second Lien Claimholder who intends to assert a claim or exercise a right or remedy that would violate this Agreement but for the invalidity or nonperfection of the Lien purporting to secure First Lien Obligations will give First Lien Agent at least five Business Days' prior notice of the contemplated action, stating the basis for the claimant's belief that the invalidity or nonperfection exists.

(f) No First Lien Claimholder or Second Lien Claimholder will assert a claim that challenges the perfection or validity of a Lien or Indebtedness of another Claimholder that is based on allegations

(1) of fraudulent conveyance, unlawful payment of distributions to equity holders, or other like allegations, or

(2) that could be asserted with comparable merit against Liens, interests, or rights of the Person asserting the claim.]

[End of Additional Sections]

### 1.9 Confirmation of Subordination in Second Lien Collateral Documents

Borrower will cause each Second Lien Collateral Document to include the following language (or language to similar effect approved by First Lien Agent) and any other language First Lien Agent reasonably requests to reflect the subordination of the Lien:

> Notwithstanding anything herein to the contrary, the Lien and security interest granted to Second Lien Agent pursuant to this Agreement and the exercise of any right or remedy by Second Lien Agent hereunder are subject to the provisions of the Intercreditor Agreement, dated _____ (as amended, restated, supplemented, or otherwise modified from time to time, the "Intercreditor Agreement"), among _____, as First Lien Agent, _____, as Second Lien Agent, _____, as Control Agent, and the Grantors (as defined therein) from time to time party thereto and other persons party or that may become party thereto from time to time. If there is a conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement will control.

### 1.10 Release of Liens [or Guaranties]

(a) If First Lien Agent releases a Lien on Collateral[, or releases a Grantor from its Obligations under its guaranty of the First Lien Obligations which guaranty is secured by a Lien on Collateral,[22]] in connection with:

**\*833**  (1) an Enforcement Action, or

(2) a Disposition of any Collateral under the First Lien Loan Documents other than pursuant to an Enforcement Action (whether or not there is an event of default under the First Lien Loan Documents),

then any Lien of Second Lien Agent on such Collateral[, and the Obligations of the Grantor under such guaranty of the Second Lien Obligations,] will be, except as otherwise provided below, automatically and simultaneously released to the same extent, and Second Lien Agent will promptly execute and deliver to First Lien Agent [or the Grantor] such termination statements, releases, and other documents as First Lien Agent [or the Grantor] requests to effectively confirm the release, *provided* that such release will not occur without the consent of Second Lien Agent

(x) for an Enforcement Action, as to any Collateral the net Proceeds of the disposition of which will not be applied to repay (and, to the extent applicable, to reduce permanently commitments with respect to) the First Lien Obligations, or

(y) for a Disposition, if the Disposition is prohibited by a provision of the Second Lien Credit Agreement [other than solely as the result of the existence of a default or event of default under the Second Lien Loan Documents].[23]

(b) Second Lien Agent hereby appoints First Lien Agent and any officer or agent of First Lien Agent, with full power of substitution, as its true and lawful attorney-in-fact with full power and authority in the place and stead of Second Lien Agent or in First Lien Agent's own name, in First Lien Agent's discretion to take any action and to execute any and all documents and instruments that may be reasonable and appropriate for the limited purpose of carrying out the terms of this section 1.10, including any endorsements or other instruments of transfer or release. This appointment is coupled with an interest and is irrevocable until the Discharge of First Lien Obligations or such time as this Agreement is terminated in accordance with its terms.

(c) Until the Discharge of First Lien Obligations, to the extent that First Lien Agent

(1) releases a Lien on Collateral or a Grantor from its Obligations under its guaranty, which Lien or guaranty is reinstated, or

(2) obtains a new Lien or additional guaranty from a Grantor,

then Second Lien Agent will be granted a Lien on such Collateral and an additional guaranty, as the case may be, subject to section 1.1, "*Seniority of Liens Securing First Lien Obligations.*"

**\*834  1.11 Subordination of Liens Securing Excess First Lien Obligations**[24]

(a) If this Agreement provides for a Second Lien Cap, then all Liens securing Second Lien Obligations up to but not exceeding the Second Lien Cap will be senior in all respects and prior to any Lien on the Collateral securing any Excess First Lien Obligations, as defined below (but only with respect to such excess amounts), and all Liens securing any Excess First Lien Obligations will be junior and subordinate in all respects to any Lien securing a Second Lien Obligation up to but not exceeding the Second Lien Cap. All Liens securing Excess First Lien Obligations will be senior in all respects and prior to any Lien on the Collateral securing any Excess Second Lien Obligations and all Liens securing any Excess Second Lien Obligations will be junior and subordinate in all respects and prior to any Lien securing Excess First Lien Obligations.

*Example*[25]: *Suppose First Lien Obligations are $150 million, with a First Lien Cap of $100 million; Second Lien Obligations are $50 million, with a Second Lien Cap of $20 million; and the total Collateral has a fair market value of $175 million. Then First Lien Claimholders will have a first priority Lien on the first $100 million of Collateral (including Proceeds), Second Lien Claimholders will have a second priority Lien in the next $20 million of Collateral, First Lien Claimholders will have a third priority Lien in the remaining $55 million of Collateral up to the $50 million of Excess First Lien Obligations, and Second Lien Claimholders will have a fourth priority Lien in the remaining $5 million of Collateral. If all of the Collateral is sold at its fair market value, then the $175*

*million in sales proceeds will be sufficient to pay the First Lien Obligations of $150 million in full and $25 million of the Second Lien Obligations. See also* section 4.1, "*Application of Proceeds.*"

**\*835**  (b) If this Agreement provides for a First Lien Cap but does not provide for a maximum limitation of the amount of the Second Lien Obligations (i.e., a Second Lien Cap), then all Liens securing Second Lien Obligations will be senior in all respects and prior to any Lien on the Collateral securing any Excess First Lien Obligations, as defined below (but only with respect to such excess amounts), and all Liens securing any Excess First Lien Obligations will be junior and subordinate in all respects to any Lien securing a Second Lien Obligation.

*Example: Suppose First Lien Obligations are $150 million, with a First Lien Cap of $100 million; Second Lien Obligations are $50 million with no Second Lien Cap; and the total Collateral has a fair market value of $175 million. Then First Lien Claimholders will have a first priority Lien on the first $100 million of Collateral (including Proceeds), Second Lien Claimholders will have a second priority Lien in the next $50 million of Collateral, and First Lien Claimholders will have a third priority Lien on the remaining $25 million in Collateral. If all of the Collateral is sold at its fair market value, then the $175 million in sales proceeds will be sufficient to pay $125 million of the First Lien Obligations of $150 million and the Second Lien Obligations totaling $50 million in full. See also* section 4.1, "*Application of Proceeds.*"

(c) *Excess First Lien Obligations* means any First Lien Obligations that are included in the Capped Obligations and that are in excess of the First Lien Cap.

(d) With respect to the Excess First Lien Obligations and Collateral (including Proceeds),

(1) First Lien Claimholders will have rights and obligations (other than the obligations in respect to the Standstill Period) analogous to the rights and obligations Second Lien Claimholders have under this Agreement with respect to the Second Lien Obligations [not in excess of any Second Lien Cap] and the Collateral (including Proceeds), and

(2) Second Lien Claimholders will have rights and obligations analogous to the rights and obligations First Lien Claimholders have under this Agreement with respect to the First Lien Obligations that are included in the Capped Obligations and that are not in excess of the First Lien Cap, and the Collateral (including Proceeds).

(e) Nothing in this section 1.11 will waive any default or event of default under the Second Lien Loan Documents resulting from

(1) the incurrence of Obligations under the First Lien Loan Documents in excess of the First Lien Cap with respect to the Capped Obligations, or

(2) the grant of Liens under the First Lien Collateral Documents securing any such excess amounts,

or the right of Second Lien Claimholders to exercise any rights and remedies under the Second Lien Loan Documents as a result thereof.

**\*836  2 Modification of Obligations**[26]

**2.1 Permitted Modifications**[27]

Except as otherwise expressly provided in this section 2,

> (a) the First Lien Obligations may be modified in accordance with their terms, and their aggregate amount increased or Refinanced, without notice to or consent by any Second Lien Claimholder, *provided* that the holders of any Refinancing Indebtedness (or their agent) bind themselves in a writing addressed to Second Lien Claimholders to the terms of this Agreement, and

> (b) the Second Lien Obligations may be modified in accordance with their terms, and their aggregate amount increased or Refinanced, without notice to or consent by any First Lien Claimholder, *provided* that the holders of any Refinancing Indebtedness (or their agent) bind themselves in a writing addressed to First Lien Claimholders to the terms of this Agreement.

**\*837**  However, no such modification may alter or otherwise affect sections 1.1, "*Seniority of Liens Securing First Lien Obligations,*" or 1.8, "*Prohibition on Contesting Liens; No Marshaling.*"

**2.2 Modifications Requiring Consent**[28]

Notwithstanding the preceding section 2.1, [and except as otherwise permitted as DIP Financing provided by the First Lien Lenders and deemed consented to by the Second Lien Lenders pursuant to section 6.1, "*Use of Cash Collateral and* DIP *Financing,*"] Second Lien Agent must consent to any modification to or Refinancing of the First Lien Obligations, and First Lien Agent must consent to any modification to or Refinancing of the Second Lien Obligations, that:

> (a) increases the aggregate principal amount of loans, letters of credit, bankers acceptances, bonds, debentures, notes, or similar instruments or other similar extensions of credit [(but excluding obligations under Hedge Agreements or Cash Management Agreements) [and, for Second Lien Obligations, any increase resulting from payment of interest in kind permitted under the Second Lien Credit Agreement as in effect on the date hereof]] or commitments therefor beyond

> (1) for the First Lien Obligations, the amount permitted by the First Lien Cap, or[29]

> (2) for the Second Lien Obligations, the [amount theretofore permitted under the First Lien Credit Agreement] [the amount permitted by the Second Lien Cap];

**\*838**  (b) increases

(1) the interest rate or yield, including by increasing the "applicable margin" or similar component of the interest rate or by modifying the method of computing interest, or

(2) a letter of credit, commitment, facility, utilization, or similar fee so that the combined interest rate and fees are increased by more than [_____]% per annum[30] in the aggregate [at any level of pricing], but excluding increases resulting from

(A) increases in an underlying reference rate not caused by a modification or Refinancing of such Obligations,

(B) accrual of interest at the "default rate" defined in the loan documents at the date hereof or, for a Refinancing, a rate that corresponds to the default rate, or

(C) application of a pricing grid set forth in the loan documents at the date hereof;

(c) for the First Lien Obligations, extends a scheduled amortization payment or the scheduled final maturity date of the First Lien Credit Agreement or a Refinancing beyond the scheduled final maturity date of the Second Lien Credit Agreement or Refinancing;

(d) for the First Lien Obligations, modifies a mandatory prepayment provision in a manner [prohibited by the Second Lien Credit Agreement] [that allows amounts that would otherwise be required to be used to prepay First Lien Obligations to be retained by the Grantors to an amount greater than permitted under the Second Lien Credit Agreement];

(e) for the First Lien Obligations, increases the amount of Proceeds of dispositions of Collateral that are not required to be used to prepay First Lien Obligations and that may be retained by the Grantors to an amount greater than permitted under the Second Lien Credit Agreement;

(f) for the First Lien Obligations, modifies a covenant or event of default that directly restricts one or more Grantors from making payments under the Second Lien Loan Documents that would otherwise be permitted under the First Lien Loan Documents as in effect on the date hereof;

(g) for the Second Lien Obligations, modifies covenants, defaults, or events of default to make them materially more restrictive as to any Grantor, except for modifications to match changes made to the First Lien Obligations so as to preserve, on substantially similar economic terms, any differential that exists on the date hereof between the covenants, defaults, or events of default in the First Lien Loan Documents and the covenants, defaults, or events of default in the Second Lien Loan Documents;

(h) for the Second Lien Obligations, accelerates any date upon which a scheduled payment of principal or interest is due, or otherwise decreases the weighted average life to maturity;

**\*839** (i) for the Second Lien Obligations, changes a prepayment, redemption, or defeasance provision so as to require a new payment or accelerate an existing payment Obligation; or

(j) for the Second Lien Obligations,

(1) changes a term that would result in a default under the First Lien Credit Agreement,

(2) increases the Obligations of a Grantor, or

(3) confers additional rights on a Second Lien Claimholder in a manner materially adverse to a First Lien Claimholder.

[Additional Section for Asset-Based Lending Transaction]

[(\*) for the First Lien Obligations, increases the Advance Rate applicable to the Borrowing Base to a rate higher than the Advance Rate on the date hereof, or modifies the definitions of "Borrowing Base," "Eligible Account," "Eligible Inventory," or "Reserves" in the First Lien Credit Agreement on the date hereof so as to increase the amount of credit available to Borrower, *provided* that First Lien Agent's discretion to establish additional reserves, to release reserves, and to determine eligibility will not be affected or limited in any manner.]

[End of Additional Section]

## 2.3 Parallel Modifications to Second Lien Obligations[31]

Subject to Section 2.2, "*Modifications Requiring Consent,*" if a First Lien Claimholder and a Grantor modify a First Lien Collateral Document, the modification **\*840** will apply automatically to any comparable provision of a Second Lien Collateral Document in which the Grantor grants a Lien on the same Collateral, without the consent of any Second Lien Claimholder and without any action by Second Lien Agent or any Grantor, *provided* that no such modification will

(a) remove or release Second Lien Collateral, except to the extent that (1) the release is permitted or required by section 6.1, "*Use of Cash Collateral and* DIP *Financing*," and (2) there is a corresponding release of First Lien Collateral,

(b) impose duties on Second Lien Agent without its consent, [or]

(c) permit other Liens on the Collateral not permitted under the terms of the Second Lien Loan Documents or section 6, "*Insolvency Proceedings*," of this Agreement [, or

(d) be prejudicial to the interest of Second Lien Claimholders to a greater extent than First Lien Claimholders (other than by virtue of their relative priorities and rights and obligations hereunder)].

## 2.4 Notice of Modifications[32]

First Lien Agent will notify Second Lien Agent, and Second Lien Agent will notify First Lien Agent, of each modification to the First Lien Obligations or Second Lien Obligations, respectively, within ten Business Days after the modification's effective date and, if requested by the notified Agent, promptly provide copies of any documents executed and delivered in connection with the modification.

Notice and copies will not be required to the extent Borrower or a Grantor has provided the same to the Agent to be notified.

## 3 Enforcement[33]

### 3.1 Who May Exercise Remedies

(a) Subject to subsections (b) and (c) below, until the Discharge of First Lien Obligations up to the First Lien Cap with respect to the Capped Obligations  **\*841**  and in their entirety with respect to First Lien Obligations that are not Capped Obligations, First Lien Claimholders will have the exclusive right to

(1) commence and maintain an Enforcement Action (including the rights to set off or credit bid their debt),

(2) subject to section 1.10, "*Release of Liens or Guaranties*," make determinations regarding the release or disposition of, or restrictions with respect to, the Collateral, and

(3) otherwise enforce the rights and remedies of a secured creditor under the U.C.C. and the Bankruptcy Laws of any applicable jurisdiction, so long as any Proceeds received by First Lien Agent and other First Lien Claimholders in the aggregate in excess of those necessary to achieve Discharge of First Lien Obligations up to the First Lien Cap with respect to First Lien Obligations that are Capped Obligations and in their entirety with respect to First Lien Obligations  **\*842**  that are not Capped Obligations are distributed in accordance with Section 4.1, "*Application*

*of Proceeds*," except as otherwise required pursuant to the U.C.C. and applicable law,[34] subject to the relative priorities described in section 1.1, "*Seniority of Liens Securing First Lien Obligations.*"

(b) Notwithstanding the preceding section 3.1(a), Second Lien Claimholders may commence an Enforcement Action or exercise rights with respect to a Lien securing a Second Lien Obligation if

(1) [120-180] days have elapsed since Second Lien Agent notified First Lien Agent that the Second Lien Obligations were due in full as a result of acceleration or otherwise (the ***Standstill Period***),[35]

(2) First Lien Claimholders are not then diligently pursuing an Enforcement Action with respect to all or a material portion of the Collateral or diligently attempting to vacate any stay or prohibition against such exercise, [and]

(3) any acceleration of the Second Lien Obligations has not been rescinded [, and

(4) [no] [the applicable] Grantor is [not] then a debtor in an Insolvency Proceeding].[36]

(c) Notwithstanding section 3.1(a), [but subject to section 1.5, "*First and Second Lien Collateral to Be Identical,*"] a Second Lien Claimholder may

(1) file a proof of claim or statement of interest, vote on a plan of reorganization (including a vote to accept or reject a plan of partial or complete liquidation, reorganization, arrangement, composition, or extension), and make other filings, arguments, and motions, with respect to the Second Lien Obligations and the Collateral in any Insolvency Proceeding commenced by or against any Grantor, in each case in accordance with this Agreement,

(2) take action to create, perfect, preserve, or protect its Lien on the Collateral, so long as such actions are not adverse to the priority status in accordance with this Agreement of Liens on the Collateral securing the First Lien Obligations or First Lien Claimholders' rights to exercise remedies,

 **\*843**  (3) file necessary pleadings in opposition to a claim objecting to or otherwise seeking the disallowance of a Second Lien Obligation or a Lien securing the Second Lien Obligation,

(4) join (but not exercise any control over) a judicial foreclosure or Lien enforcement proceeding with respect to the Collateral initiated by First Lien Agent, to the extent that such action could not reasonably be expected to interfere materially with the Enforcement Action, but no Second Lien Claimholder may receive any Proceeds thereof unless expressly permitted herein, and

(5) bid for or purchase Collateral at any public, private, or judicial foreclosure upon such Collateral initiated by any First Lien Claimholder, or any sale of Collateral during an Insolvency Proceeding; *provided* that such bid may not include a "credit bid" in respect of any Second Lien Obligations unless the proceeds of such bid are otherwise sufficient to cause the Discharge of First Lien Obligations up to the First Lien Cap with respect to the Capped Obligations and in their entirety with respect to First Lien Obligations that are not Capped Obligations.

[Optional Provisions]

[(6) take or fail to take any Lien securing First Lien Obligations or any other collateral security therefor, or take or fail to take any action necessary or appropriate to ensure that any Lien is enforceable, perfected, or entitled to priority as against any other Lien or to ensure that any Proceeds of any property subject to a Lien are applied to the payment of any Obligation secured thereby, or

(7) otherwise release, discharge, or permit the lapse of any Lien securing a First Lien Obligation.]

[End of Optional Provisions]

(d) [Notwithstanding any provision of this Agreement] [Except as otherwise expressly set forth in this section 3.1 [and _____]],[37] Second Lien Claimholders may exercise any rights and remedies that could be exercised by an unsecured creditor [other than initiating or joining in an involuntary case or proceeding under the Bankruptcy Code with respect to a Grantor] [prior to the end of the Standstill Period] against a Grantor that has guaranteed or granted Liens to secure the Second Lien Obligations in accordance with the terms of the Second Lien Loan Documents and applicable law, *provided* that any judgment Lien obtained by a Second Lien Claimholder as a result of such exercise of rights will be included in the Second Lien Collateral and be subject to this Agreement for all purposes (including in relation to the First Lien Obligations).

**\*844** [Optional Provision]

[(e) First Lien Agent will promptly notify Second Lien Agent of the Discharge of First Lien Obligations.]

[End of Optional Provision]

## 3.2 Manner of Exercise[38]

(a) A First Lien Claimholder may take any Enforcement Action

(1) in any manner in its sole discretion in compliance with applicable law,

(2) without consultation with or the consent of any Second Lien Claimholder,

(3) regardless of whether an Insolvency Proceeding has been commenced,

(4) regardless of any provision of any Second Lien Loan Document (other than this Agreement), and

(5) regardless of whether such exercise is adverse to the interest of any Second Lien Claimholder.

(b) The rights of a First Lien Claimholder or the Control Agent to enforce any provision of this Agreement or any First Lien Loan Document will not be prejudiced or impaired by

(1) any act or failure to act of any Grantor, any other First Lien Claimholder, or the Control Agent, or

(2) noncompliance by any Person other than such First Lien Claimholder with any provision of this Agreement, any First Lien Loan Document, or any Second Lien Loan Document, regardless of any knowledge thereof that any First Lien Claimholder or the Control Agent may have or otherwise be charged with.

(c) No Second Lien Claimholder will contest, protest, object to, or take any action to hinder, and each waives any and all claims with respect to, any Enforcement Action by a First Lien Claimholder in compliance with this Agreement and applicable law.

## *845  3.3 Specific Performance[39]

First Lien Agent and Second Lien Agent may each demand specific performance of this Agreement, and each waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action brought by a Second Lien Claimholder or a First Lien Claimholder, respectively

## 3.4 Notice of Exercise[40]

The First and Second Lien Agents will each provide reasonable prior notice to the other of its initial material Enforcement Action.

## 4 Payments

## 4.1 Application of Proceeds[41]

Until the Discharge of First Lien Obligations and the Discharge of Second Lien Obligations, and regardless of whether an Insolvency Proceeding has been commenced, **\*846** Collateral or Proceeds received in connection with an Enforcement Action or subject to section 6.7, "*Reorganization Securities*," received in connection with any Insolvency Proceeding involving a Grantor will be applied

> (a) *first*, to the payment in full or cash collateralization of all First Lien Obligations that are not Excess First Lien Obligations,

> (b) *second*, to the payment in full of the Second Lien Obligations [that are not Excess Second Lien Obligations],

> (c) *third*, to the payment in full of any Excess First Lien Obligations[,

> (d) *fourth*, to the payment in full of any Excess Second Lien Obligations],[42] and

> (e) *fifth*, to the applicable Grantor or as otherwise required by applicable law.

> in each case as specified in the First Lien Documents or the Second Lien Documents, or as otherwise determined by the First Lien Claimholders or the Second Lien Claimholders, as applicable.

[Notwithstanding the foregoing, until the Discharge of First Lien Obligations up to the First Lien Cap with respect to First Lien Obligations that are capped Obligations and in their entirety with respect to First Lien Obligations that are not Capped Obligations, any non-cash Collateral or non-cash Proceeds will be held by First Lien Agent as Collateral unless the failure to apply such amounts as set forth above would be commercially unreasonable.[43]]

## \*847  4.2 Insurance[44]

First Lien Agent and Second Lien Agent will be named as additional insureds and/or loss payees, as applicable, under any insurance policies maintained by any Grantor. Until the Discharge of First Lien Obligations up to the First Lien Cap with respect to the Capped Obligations and in their entirety with respect to First Lien Obligations that are not Capped Obligations, and subject to the rights of the Grantors under the First Lien Loan Documents,

> (a) First Lien Agent will have the exclusive right to adjust settlement for any losses covered by an insurance policy covering the Collateral, and to approve an award granted in a condemnation or similar proceeding (or a deed in lieu of condemnation) affecting the Collateral, and

(b) all Proceeds of such policy, award, or deed will be applied in the order provided in section 4.1, "*Application of Proceeds*," and thereafter, if no Second Lien Obligations are outstanding, to the payment to the owner of the subject property, such other Person as may be entitled thereto, or as a court of competent jurisdiction may otherwise direct.

## 4.3 Payment Turnover[45]

Until the Discharge of First Lien Obligations up to the First Lien Cap with respect to the Capped Obligations and in their entirety with respect to First Lien Obligations that are not Capped Obligations, whether or not an Insolvency Proceeding has commenced, Collateral or Proceeds (including insurance proceeds or property or Proceeds subject to Liens referred to in paragraph (d) of section 1.5, "*First and Second Lien Collateral to Be Identical* ") received by a Second Lien Claimholder in connection with an Enforcement Action or, subject to section 6.7, "*Reorganization Securities*," received in connection with any Insolvency Proceeding, will be

(a) segregated and held in trust, and

(b) promptly paid over to First Lien Agent in the form received, with any necessary endorsements or as a court of competent jurisdiction may **\*848** otherwise direct. First Lien Agent is authorized to make such endorsements as agent for the Second Lien Claimholder. This authorization is coupled with an interest and is irrevocable until the Discharge of First Lien Obligations.

## 4.4 Refinancing After Discharge of First Lien Obligations[46]

If, after the Discharge of First Lien Obligations, Borrower issues or incurs Refinancing[47] of the First Lien Obligations that is permitted to be incurred under the Second Lien Loan Documents, then the First Lien Obligations will automatically be deemed not to have been discharged for all purposes of this Agreement (except for actions taken as a result of the initial Discharge of First Lien Obligations). Upon Second Lien Agent's receipt of a notice stating that Borrower has entered into a new First Lien Loan Document and identifying the new First Lien Agent (the *New Agent*),

(a) the Obligations under such Refinancing indebtedness will automatically be treated as First Lien Obligations for all purposes of this Agreement, including for purposes of the Lien priorities and rights in respect of Collateral set forth herein,

(b) the New Agent under such new First Lien Loan Documents will be First Lien Agent for all purposes of this Agreement,

(c) Second Lien Agent will promptly

(1) enter into such documents and agreements (including amendments or supplements to this Agreement) as Borrower or the New Agent reasonably requests to provide to the New Agent the rights contemplated hereby, in each case consistent in all material respects with the terms of this Agreement, and

(2) deliver to the New Agent any Pledged Collateral held by it together with any necessary endorsements (or otherwise allow the New Agent to obtain control of such Pledged Collateral), and

(d) the New Agent will promptly agree in a writing addressed to Second Lien Agent to be bound by the terms of this Agreement.

**\*849**  If any Obligations under the new First Lien Loan Documents are secured by Collateral that does not also secure the Second Lien Obligations, then the Grantors will cause the Second Lien Obligations to be secured at such time by a second priority Lien on such Collateral to the same extent provided in the First Lien Collateral Documents and this Agreement.

## 5 Purchase of First Lien Obligations by Second Lien Claimholders[48]

### 5.1 Purchase Right

(a) If there is

(1) an acceleration of the First Lien Obligations in accordance with the First Lien Credit Agreement,

(2) a payment default under the First Lien Credit Agreement that is not cured, or waived by First Lien Claimholders, within sixty days of its occurrence, or

(3) the commencement of an Insolvency Proceeding,[49]

(each a ***Purchase Event***), then Second Lien Claimholders may purchase all, but not less than all, of the First Lien Obligations that are included in the Capped Obligations up to but not in excess of the First Lien Cap plus all, but not less than all, of the First Lien Obligations that are not included in the Capped Obligations (the ***Purchase Obligations***). Such purchase will

**\*850**  (A) include all principal of, and all accrued and unpaid interest, fees, and expenses in respect of, all First Lien Obligations outstanding at the time of purchase that are included in the Capped Obligations up to but not in excess of the First Lien Cap plus all principal of, and all accrued and unpaid interest, fees, and expenses in respect of, all First Lien Obligations that are not included in the Capped Obligations,

(B) be made pursuant to an *Assignment Agreement* [(as such term is defined in the First Lien Credit Agreement)] [substantially in the form attached hereto as Exhibit A (the bracketed provisions therein to be appropriately modified to reflect the terms of the First Lien Documents and the outstanding First Lien Obligations)][in form and substance reasonably satisfactory to, and prepared by counsel for, First Lien Agent (with the cost of such counsel to be paid by the Purchasing Creditors)], whereby Second Lien Claimholders will assume all funding commitments and Obligations of First Lien Claimholders under the First Lien Loan Documents, and

(C) otherwise be subject to the terms and conditions of this section 5.

Each First Lien Claimholder will retain all rights to indemnification provided in the relevant First Lien Loan Documents for all claims and other amounts relating to periods prior to the purchase of the First Lien Obligations pursuant to this section 5.

(b) First Lien Claimholders will not commence an Enforcement Action while Second Lien Claimholders have a right to purchase the First Lien Obligations under this section 5.[50]

## 5.2 Purchase Notice

(a) Second Lien Claimholders desiring to purchase all of the Purchase Obligations (the *Purchasing Creditors*) will deliver a *Purchase Notice* to First Lien Agent that

(1) is signed by the Purchasing Creditors,

(2) states that it is a Purchase Notice under this section 5,

(3) states that each Purchasing Creditor is irrevocably electing to purchase, in accordance with this section 5, the percentage of all of the Purchase Obligations[51] stated in the Purchase Notice for that Purchasing Creditor, which percentages must aggregate exactly 100% for all Purchasing Creditors,[52]

 **\*851**  (4) represents and warrants that the Purchase Notice is in conformity with the Second Lien Loan Documents and any other binding agreement among Second Lien Claimholders, and

(5) designates a ***Purchase Date*** on which the purchase will occur, that is (x) at least five but not more than [fifteen] Business Days after First Lien Agent's receipt of the Purchase Notice, and (y) not more than sixty days after the Purchase Event.

A Purchase Notice will be ineffective if it is received by First Lien Agent after the occurrence giving rise to the Purchase Event is waived, cured, or otherwise ceases to exist.

[Alternative Subsection Favorable to Second Lien Lenders]

[(5) designates a ***Purchase Date*** on which the purchase will occur that is at least five but not more than [fifteen] Business Days after First Lien Agent's receipt of the Purchase Notice.

The Purchase Notice must be received by First Lien Agent during the period following the occurrence of, and during the continuance of, a Purchase Event.]

[End of Alternative Subsection]

(b) Upon First Lien Agent's receipt of an effective Purchase Notice conforming to this section 5.2, the Purchasing Creditors will be irrevocably obligated to purchase, and the First Lien Creditors will be irrevocably obligated to sell, the First Lien Obligations in accordance with and subject to this section 5.

## 5.3 Purchase Price

The ***Purchase Price*** for the Purchase Obligations will equal the sum of

**\*852**  (a) the principal amount of all loans, advances, or similar extensions of credit included in the Purchase Obligations (including unreimbursed amounts drawn on Letters of Credit, but excluding the undrawn amount of outstanding Letters of Credit), and all accrued and unpaid interest thereon through the Purchase Date ([including] [excluding] any acceleration prepayment penalties or premiums[53]),

(b) the net aggregate amount then owing to counterparties under Hedge Agreements that are First Lien Loan Documents, including all amounts owing to the counterparties as a result of the termination (or early termination) thereof to the extent not allocable to Excess First Lien Obligations,

(c) the net aggregate amount then owing to creditors under Cash Management Agreements that are First Lien Loan Documents, including all amounts owing to the creditors as a result of the termination (or early termination) thereof to the extent not allocable to Excess First Lien Obligations, and

(d) all accrued and unpaid fees, expenses, [indemnities,] and other amounts owed to the First Lien Creditors under the First Lien Loan Documents on the Purchase Date to the extent not allocable to Excess First Lien Obligations.

**5.4 Purchase Closing**

On the Purchase Date,

(a) the Purchasing Creditors and First Lien Agent will execute and deliver the Assignment Agreement,

(b) the Purchasing Creditors will pay the Purchase Price to First Lien Agent by wire transfer of immediately available funds,

(c) the Purchasing Creditors will deposit with First Lien Agent or its designee by wire transfer of immediately available funds, [105%] of the aggregate undrawn amount of all then outstanding Letters of Credit and the aggregate facing and similar fees that will accrue thereon through the stated maturity of the Letters of Credit (assuming no drawings thereon before stated maturity), and

(d) Second Lien Agent will execute and deliver to First Lien Agent a waiver of all claims arising out of this Agreement and the transactions contemplated hereby as a result of exercising the purchase option contemplated by this section 5.

**\*853  5.5 Excess First Lien Obligations Not Purchased**

Any Excess First Lien Obligations will, after the closing of the purchase of the First Lien Obligations in accordance with this section 5, remain Excess First Lien Obligations for all purposes of this Agreement.[54]

**5.6 Actions After Purchase Closing**

(a) Promptly after the closing of the purchase of all Purchase Obligations, First Lien Agent will distribute the Purchase Price to First Lien Claimholders in accordance with the terms of the First Lien Loan Documents.

(b) After the closing of the purchase of all Purchase Obligations, the Purchasing Creditors may request that First Lien Agent immediately resign as administrative agent and, if applicable, collateral agent under the First Lien

Loan Documents, and First Lien Agent will immediately resign if so requested. Upon such resignation, a new administrative agent and, if applicable, a new collateral agent will be elected or appointed in accordance with the First Lien Loan Documents.

(c) First Lien Agent will apply cash collateral to reimburse Letter of Credit issuers for drawings under Letters of Credit, any customary fees charged by the issuer in connection with such draws, and facing or similar fees. After giving effect to each such payment, any remaining cash collateral that exceeds [105%] of the sum of the aggregate undrawn amount of all then outstanding Letters of Credit and the aggregate facing and similar fees that will accrue thereon through the stated maturity of such Letters of Credit (assuming no drawings thereon before stated maturity) will be returned to the Purchasing Creditors (as their interests appear). When all Letters of Credit have been cancelled with the consent of the beneficiary thereof, expired, or been fully drawn, and after all payments from the account described above have been made, any remaining cash collateral will be returned to the Purchasing Creditors, as their interests appear.

(d) If for any reason other than the gross negligence or willful misconduct of First Lien Agent, the cash collateral is less than the amount owing with respect to a Letter of Credit described in the preceding subsection (c), then the Purchasing Creditors will, in proportion to their interests, promptly reimburse First Lien Agent (who will then pay the issuing bank) the amount of the deficiency.

**\*854  5.7 No Recourse or Warranties; Defaulting Creditors**

(a) First Lien Claimholders will be entitled to rely on the statements, representations, and warranties in the Purchase Notice without investigation, even if First Lien Claimholders are notified that any such statement, representation, or warranty is not or may not be true.

(b) The purchase and sale of the First Lien Obligations under this section 5 will be without recourse and without representation or warranty of any kind by First Lien Claimholders, except that First Lien Claimholders represent and warrant that on the Purchase Date, immediately before giving effect to the purchase,

(1) the principal of and accrued and unpaid interest on the First Lien Obligations, and the fees and expenses thereof, are as stated in the Assignment Agreement,

(2) First Lien Claimholders own the First Lien Obligations free and clear of any Liens (other than participation interests not prohibited by the First Lien Credit Agreement, in which case the Purchase Price will be appropriately adjusted so that the Purchasing Creditors do not pay amounts represented by participation interests), and

(3) each First Lien Claimholder has the full right and power to assign its First Lien Obligations and such assignment has been duly authorized by all necessary corporate action by such First Lien Claimholder.

[Alternative Section Favorable to First Lien Lenders]

[(b) The purchase and sale of the Purchase Obligations under this section 5 will be without recourse and without any representation or warranty whatsoever by First Lien Claimholders, except that First Lien Claimholders represent and warrant that on the Purchase Date, immediately before giving effect to the purchase, First Lien Claimholders

(1) own the Purchase Obligations free and clear of all Liens (other than participation interests not prohibited by the First Lien Credit Agreement, in which case the Purchase Price will be appropriately adjusted so that the Purchasing Creditors do not pay amounts represented by participation interest), and

(2) have the right to convey whatever claims and interests they may have in respect of the Purchase Obligations.]

[End of Alternative Section]

(c) The obligations of First Lien Claimholders to sell their respective Purchase Obligations under this section 5 are several and not joint and several. If a First Lien Claimholder (a *Defaulting Creditor*) breaches its obligation to sell its Purchase Obligations under this section 5, no other First Lien Claimholder will be obligated to purchase the Defaulting Creditor's Purchase Obligations for resale to the holders of Second Lien Obligations. A First Lien Claimholder that complies with this section 5 will not be in default of this Agreement or otherwise be deemed liable for any action or inaction of any Defaulting Creditor, *provided* that nothing  **\*855**  in this subsection (c) will require the Purchasing Creditors to purchase less than all of the Purchase Obligations.

(d) Borrower and Holdings irrevocably consent, and will use their best efforts to obtain any necessary consent of each other Grantor, to any assignment effected to one or more Purchasing Creditors pursuant to this section 5.

# 6 Insolvency Proceedings[55]

## 6.1 Use of Cash Collateral and DIP Financing[56]

(a) Until the Discharge of First Lien Obligations up to the First Lien Cap with respect to the Capped Obligations and in their entirety with respect  **\*856**  to First Lien Obligations that are not Capped Obligations, if an Insolvency Proceeding has commenced, Second Lien Agent, as holder of a Lien on the Collateral, will not contest, protest, or object to, and each Second Lien Claimholder will be deemed to have consented to,

(1) any use, sale, or lease of "cash collateral" (as defined in section 363(a) of the Bankruptcy Code), and

(2) Borrower or any other Grantor obtaining DIP Financing

if First Lien Agent consents[57] in writing to such use, sale, or lease, or DIP Financing, *provided* that

(A) Second Lien Agent otherwise retains[58] its Lien on the Collateral, [and]

(B) any Second Lien Claimholder may seek adequate protection as permitted by section 6.4, "*Adequate Protection*," and, if such adequate protection is not granted, Second Lien Agent may object under this section 6.1 solely on such basis[.] [,]

[(C) after taking into account the use of cash collateral and the principal amount of any DIP Financing (after giving effect to any Refinancing of First Lien Obligations) on any date, the sum of the then outstanding principal amount of any First Lien Obligations and any DIP Financing does not exceed the First Lien Cap[59] on such date,[60]

(D) such DIP Financing and the Liens securing such DIP Financing are pari passu with or superior in priority to the then outstanding First Lien Obligations and the Liens securing such First Lien Obligations,[61] and

**\*857**  (E) the interest rate, fees, advance rates, lending limits, and sublimits are commercially reasonable under the circumstances.[62]]

[Upon written request from First Lien Agent, Second Lien Agent, as holder of a Lien on the Collateral, will join any objection by First Lien Agent to the use, sale, or lease of cash collateral for any purpose other than adequate protection payments to Second Lien Claimholders.][63]

[(b) Any customary "carve-out" or other similar administrative priority expense or claim consented to in writing by First Lien Agent to be paid prior to the Discharge of First Lien Obligations up to the First Lien Cap with respect to the Capped Obligations and in their entirety with respect to First Lien Obligations that are not Capped Obligations will be deemed for purposes of section 6.1(a)

(1) to be a use of cash collateral, and

(2) [not to be] a principal amount of DIP Financing

at the time of such consent.][64]

[No Second Lien Claimholder may provide DIP Financing to a Borrower or other Grantor secured by Liens equal or senior in priority to the Liens securing any First Lien Obligations[, *provided* that if no First Lien Claimholder offers to provide DIP Financing to the extent permitted under section 6.1(a) on or before the date of the hearing to approve DIP Financing, then a Second Lien Claimholder may seek to provide such DIP Financing secured by Liens equal or senior in priority to the Liens securing any First Lien Obligations, and First Lien Claimholders may object thereto].][65]

  **\*858**  [(c) Nothing in this section 6.1 limits or impairs the right of Second Lien Agent to object to any motion regarding DIP Financing (including a DIP Financing proposed by one or more First Lien Claimholders) or cash collateral to the extent that

(1) the objection could be asserted in an Insolvency Proceeding by unsecured creditors generally[, is consistent with the other terms of this section 6.1, and is not based on the status of any Second Lien Claimholder as holder of a Lien], or

(2) the DIP Financing does not meet the requirements of section 6.1(a).][66]

## 6.2 Sale of Collateral[67]

Second Lien Agent, as holder of a Lien on the Collateral and on behalf of the Second Lien Claimholders, will not contest, protest, or object, and will be deemed to have consented pursuant to section 363(f) of the Bankruptcy Code, to a Disposition of Collateral free and clear of its Liens or other interests under section 363 of the Bankruptcy Code if First Lien Agent consents in writing to the Disposition, *provided* that

(a) either (i) pursuant to court order, the Liens of Second Lien Claimholders attach to the net Proceeds of the Disposition with the same priority and validity as the Liens held by Second Lien Claimholders on such Collateral, and the Liens remain subject to the terms of this Agreement, or  **\*859**  (ii) the Proceeds of a Disposition of Collateral received by First Lien Agent in excess of those necessary to achieve the Discharge of First Lien Obligations, up to the First Lien Cap with respect to the Capped Obligations and in their entirety with respect to First Lien Obligations that are not Capped Obligations, are distributed in accordance with the U.C.C. and applicable law[,] [.]

[(b) the net cash Proceeds of the Disposition that are applied to First Lien Obligations permanently reduce the First Lien Obligations pursuant to section 4.1, "*Application of Proceeds*," or if not so applied, are subject to the rights of Second Lien Agent to object to any further use notwithstanding section 6.1(a),[68] and

(c) Second Lien Claimholders [may] [are not deemed to have waived any rights to][69] credit bid on the Collateral in any such Disposition in accordance with section 363(k) of the Bankruptcy Code.[70]]

Notwithstanding the preceding sentence, Second Lien Claimholders may object to any Disposition of Collateral that could be raised in an Insolvency Proceeding by unsecured creditors generally [so long as not otherwise inconsistent with the terms of this Agreement].[71]

**\*860**  [Upon First Lien Agent's request, Second Lien Agent, solely in its capacity as holder of a Lien on Collateral, will join any objection asserted by First Lien Agent to any Disposition of Collateral during an Insolvency Proceeding.][72]

### 6.3 Relief from the Automatic Stay[73]

Until the Discharge of First Lien Obligations up to the First Lien Cap with respect to the Capped Obligations and in their entirety with respect to First Lien Obligations that are not Capped Obligations, no Second Lien Claimholder may[, during any Standstill Period,][74] seek relief from the automatic stay or any other stay in an Insolvency Proceeding in respect of the Collateral without First Lien Agent's prior written consent [or oppose any request by First Lien Agent for relief from such stay][75] [, except to the extent that

[a First Lien Claimholder (in such capacity)] [First Lien Agent] seeks or obtains relief from or modification of such stay[, or a motion for adequate protection permitted under section 6.4, "*Adequate Protection*," is denied by the Bankruptcy Court]].[76]

### 6.4 Adequate Protection[77]

(a) No Second Lien Claimholder will contest, protest, or object to

(1) a request by a First Lien Claimholder for "adequate protection" under any Bankruptcy Law, or

**\*861**  (2) an objection by a First Lien Claimholder to a motion, relief, action, or proceeding based on a First Lien Claimholder claiming a lack of adequate protection.

(b) Notwithstanding the preceding section 6.4(a), in an Insolvency Proceeding:

(1) Except as permitted in this section 6.4, no Second Lien Claimholders may seek or request adequate protection or relief from the automatic stay imposed by section 362 of the Bankruptcy Code [or other relief].[78]

(2) [If a First Lien Claimholder is granted adequate protection in the form of additional or replacement Collateral in connection with a motion described in section 6.1,[79] "*Use of Cash Collateral and DIP Financing*," then] Second Lien Agent may seek or request adequate protection in the form of a Lien on [such] additional or replacement Collateral, which Lien will be subordinated to the Liens securing the First Lien Obligations and any DIP Financing

(and all related Obligations) on the same basis as the other Liens securing the Second Lien Obligations are subordinated to the Liens securing First Lien Obligations under this Agreement.

(3) Any claim by a Second Lien Claimholder under section 507(b) of the Bankruptcy Code will be subordinate in right of payment to any claim of First Lien Claimholders under section 507(b) of the Bankruptcy Code and any payment thereof will be deemed to be Proceeds of Collateral [, *provided* that, subject to section 6.7, "*Reorganization Securities*," Second Lien Claimholders will be deemed to have agreed pursuant to section 1129(a)(9) of the Bankruptcy Code that such section 507(b) claims may be paid under a plan of reorganization in any form having a value on the effective date of such plan equal to the allowed amount of such claims[80]].

 **\*862**   [(4) So long as First Lien Agent is receiving payment in cash of [all] Post-Petition Claims [consisting of all interest at the applicable rate under the First Lien Loan Documents], Second Lien Agent may seek and, subject to the terms hereof, retain payments of Post-Petition Claims [consisting of interest at the [non-default] [applicable] rate][81] under the Second Lien Loan Documents (***Second Lien Adequate Protection Payments***). If a Second Lien Claimholder receives Second Lien Adequate Protection Payments before the Discharge of First Lien Obligations up to the First Lien Cap with respect to the Capped Obligations and in their entirety with respect to First Lien Obligations that are not Capped Obligations, then upon the effective date of any plan or the conclusion or dismissal of any Insolvency Proceeding, the Second Lien Claimholder will pay over to First Lien Agent pursuant to section 4.1, "*Application of Proceeds*," an amount equal to the lesser of (i) the Second Lien Adequate Protection Payments received by the Second Lien Claimholder and (ii) the amount necessary to Discharge the First Lien Obligations. [Notwithstanding anything herein to the contrary, First Lien Claimholders will [not] be deemed to have consented to, and expressly [waive] [retain] their rights to object to, the payment of Second Lien Adequate Protection Payments.[82]]]

## 6.5 First Lien Objections to Second Lien Actions[83]

Subject to section 3.1, "*Who May Exercise Remedies*," nothing in this section 6 limits a First Lien Claimholder from objecting in an Insolvency Proceeding or otherwise to any action taken by a Second Lien Claimholder, including the Second  **\*863**  Lien Claimholder's seeking adequate protection [or asserting any of its rights and remedies under the Second Lien Loan Documents or otherwise].

[Alternative Section Favorable to Second Lien Lenders][84]

## [6.5 First Lien Objections to Second Lien Actions

Subject to section 3.1, "*Who May Exercise Remedies*," nothing in this section 6 limits a First Lien Claimholder from objecting in an Insolvency Proceeding or otherwise to any action taken by a Second Lien Claimholder, including the Second Lien Claimholder's seeking adequate protection (other than adequate protection permitted under section 6.4(b)) or asserting any of its rights and remedies under the Second Lien Loan Documents or otherwise.]

[End of Alternative Section]

**6.6 Avoidance; Reinstatement of Obligations**[85]

If a First Lien Claimholder or a Second Lien Claimholder receives payment or property on account of a First Lien Obligation or Second Lien Obligation, and the payment is subsequently invalidated, avoided, declared to be fraudulent or preferential, set aside, or otherwise required to be transferred to a trustee, receiver, or the estate of Borrower or other Grantor (a ***Recovery***), then, to the extent of the **\*864** Recovery, the First Lien Obligations or Second Lien Obligations intended to have been satisfied by the payment will be reinstated as First Lien Obligations or Second Lien Obligations, as applicable, on the date of the Recovery, and no Discharge of First Lien Obligations or Discharge of Second Lien Obligations, as applicable, will be deemed to have occurred for all purposes hereunder. If this Agreement is terminated prior to a Recovery, this Agreement will be reinstated in full force and effect, and such prior termination will not diminish, release, discharge, impair, or otherwise affect the obligations of the Parties from the date of reinstatement. [Upon any such reinstatement of First Lien Obligations, each Second Lien Claimholder will deliver to First Lien Agent any Collateral or Proceeds thereof received between the Discharge of First Lien Obligations and their reinstatement in accordance with section 4.3, "*Payment Turnover*."][86] [No Second Lien Claimholder may benefit from a Recovery, and any distribution made to a Second Lien Claimholder as a result of a Recovery will be paid over to First Lien Agent for application to the First Lien Obligations in accordance with section 4.1, "*Application of Proceeds*."][87]

**6.7 Reorganization Securities**[88]

Nothing in this Agreement prohibits or limits the right of a Second Lien Claimholder to receive and retain any debt or equity securities that are issued by a reorganized debtor pursuant to a plan of reorganization or similar dispositive restructuring plan in connection with an Insolvency Proceeding [, *provided* that any debt securities received by a Second Lien Claimholder on account of a Second Lien Obligation that constitutes a "secured claim" within the meaning of section 506(b) of the Bankruptcy Code will be paid over or otherwise transferred to First Lien Agent for application in accordance with section 4.1, "*Application of Proceeds*," unless such distribution is made under a plan that is consented to by the affirmative vote of all classes composed of the secured claims of First Lien Claimholders].

If, in an Insolvency Proceeding, debt Obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a plan of reorganization or similar dispositive restructuring plan, both **\*865** on account of First Lien Obligations and on account of Second Lien Obligations, then, to the extent the debt Obligations distributed on account of the First Lien Obligations and on account of the Second Lien Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt Obligations pursuant to such plan and will apply with like effect to the Liens securing such debt Obligations.[89]

**6.8 Post-Petition Claims**[90]

(a) No Second Lien Claimholder may oppose or seek to challenge any claim by a First Lien Claimholder for allowance or payment in any Insolvency Proceeding of First Lien Obligations consisting of Post-Petition Claims.[91]

(b) No First Lien Claimholder may oppose or seek to challenge in an Insolvency Proceeding a claim by a Second Lien Claimholder for allowance [and any payment permitted under section 6.4, "*Adequate Protection*,"] of Second Lien Obligations consisting of Post-Petition Claims.

## 6.9 Waivers[92]

Second Lien Agent waives

*866  (a) any claim it may hereafter have against any First Lien Claimholder arising out of any cash collateral or financing arrangement or out of any grant of a security interest in connection with the Collateral in an Insolvency Proceeding, so long as such actions are not in express contravention of the terms of this Agreement; [and]

(b) any right to assert or enforce any claim under section 506(c) or 552 of the Bankruptcy Code as against First Lien Claimholders or any of the Collateral to the extent securing the First Lien Obligations[93] [; and

(c) solely in its capacity as a holder of a Lien on Collateral, any claim or cause of action that any Grantor may have against any First Lien Claimholder, except to the extent arising from a breach by such First Lien Claimholder of the provisions of this Agreement].

## 6.10 Separate Grants of Security and Separate Classification[94]

The grants of Liens pursuant to the First Lien Collateral Documents and the Second Lien Collateral Documents constitute two separate and distinct grants. Because of, among other things, their differing rights in the Collateral, the Second Lien Obligations, to the extent deemed to be "secured claims" within the meaning of section 506(b) of the Bankruptcy Code, are fundamentally different from the First Lien Obligations and must be separately classified in any plan of reorganization in an Insolvency Proceeding. Second Lien Claimholders will not seek in an Insolvency Proceeding to be treated as part of the same class of creditors as First Lien Claimholders and will not oppose or contest any pleading by First Lien Claimholders seeking separate classification of their respective secured claims.

*867  ## 6.11 Effectiveness in Insolvency Proceedings[95]

The Parties acknowledge that this Agreement is a "subordination agreement" under section 510(a) of the Bankruptcy Code, which will be effective before, during, and after the commencement of an Insolvency Proceeding. All references in this Agreement to any Grantor will include such Person as a debtor-in-possession and any receiver or trustee for such Person in an Insolvency Proceeding.

## 7 Miscellaneous

## 7.1 Conflicts

If this Agreement conflicts with the First Lien Loan Documents or the Second Lien Loan Documents, this Agreement will control.

## 7.2 No Waivers; Remedies Cumulative; Integration

A Party's failure or delay in exercising a right under this Agreement will not waive the right, nor will a Party's single or partial exercise of a right preclude it from any other or further exercise of that or any other right.

The rights and remedies provided in this Agreement will be cumulative and not exclusive of other rights or remedies provided by law.

This Agreement constitutes the entire agreement between the Parties and supersedes all prior agreements, oral or written, relating to its subject matter.

**7.3 Effectiveness; Severability; Termination**

This Agreement will become effective when executed and delivered by the Parties.

Each First Lien Claimholder and each Second Lien Claimholder waives any right it may have under applicable law to revoke this Agreement or any provision thereunder or consent by it thereto.

This Agreement will survive, and continue in full force and effect, in any Insolvency Proceeding.

If a provision of this Agreement is prohibited or unenforceable in a jurisdiction, the prohibition or unenforceability will not invalidate the remaining provisions hereof, or invalidate or render unenforceable that provision in any other jurisdiction.

 **\*868**  Subject to sections 1.6(d) and 1.6(g), "*Pledged Collateral*," 4.1, "*Application of Proceeds*," 4.4, "*Refinancing After Discharge of First Lien Obligations*," 6.5, "*First Lien Objections to Second Lien Actions*," and 6.6, "*Avoidance; Reinstatement of Obligations*," this Agreement will terminate and be of no further force and effect

> (a) for First Lien Claimholders, upon the Discharge of First Lien Obligations, and


> (b) for Second Lien Claimholders, upon the Discharge of Second Lien Obligations.


**7.4 Modifications of This Agreement**

A modification or waiver of any provision of this Agreement will only be effective if in writing signed on behalf of each Party or its authorized agent, and a waiver will be a waiver only for the specific instance involved and will not impair the rights of the Parties making the waiver or the obligations of the other Parties to such Party in any other respect or at any other time. Notwithstanding the foregoing, neither Borrower nor Holdings will have a right to consent to or approve a modification of this Agreement except to the extent its rights are directly affected.

**7.5 Information Concerning Financial Condition of Borrower and Its Subsidiaries**

The Control Agent, First Lien Claimholders, and Second Lien Claimholders will each be responsible for keeping themselves informed of

> (a) the financial condition of the Grantors, and

(b) all other circumstances bearing upon the risk of nonpayment of the First Lien Obligations or the Second Lien Obligations.

Neither the Control Agent nor any First Lien Claimholder will have any duty to advise any Second Lien Claimholder, and no Second Lien Claimholder will have any duty to advise the Control Agent or any first Lien Claimholder, of information known to it regarding any such condition or circumstances or otherwise.

If the Control Agent or a First Lien Claimholder provides any such information to a Second Lien Claimholder, or a Second Lien Claimholder provides any such information to the Control Agent or any First Lien Claimholder, the Control Agent or the First Lien Claimholder, or Second Lien Claimholder, respectively, will have no obligation to:

(a) make, and it does not make, any express or implied representation or warranty, including as to accuracy, completeness, truthfulness, or validity,

(b) provide additional information on that or any subsequent occasion,

(c) undertake any investigation, or

(d) disclose information that, pursuant to applicable law or accepted or reasonable commercial finance practices, it desires or is required to maintain as confidential.

**\*869  7.6 No Reliance**

(a) First Lien Agent acknowledges that it and each other First Lien Claimholder has, independently and without reliance on any Second Lien Claimholder, and based on documents and information the First Lien Claimholder deemed appropriate, made its own credit analysis and decision to enter into the First Lien Loan Documents and this Agreement, and will continue to make its own credit decisions in taking or not taking any action under the First Lien Loan Documents or this Agreement.

(b) Second Lien Agent acknowledges that it and each other Second Lien Claimholder has, independently and without reliance on any First Lien Claimholder, and based on documents and information the Second Lien Claimholder deemed appropriate, made its own credit analysis and decision to enter into the Second Lien Loan Documents and this Agreement, and will continue to make its own credit decisions in taking or not taking any action under the Second Lien Loan Documents or this Agreement.

**7.7 No Warranties; Independent Action**

(a) Except as otherwise expressly provided herein,

(1) no Second Lien Claimholder has made any express or implied representation or warranty to any First Lien Claimholder, including with respect to the execution, validity, legality, completeness, collectability, or enforceability of any Second Lien Loan Document, the ownership of any Collateral, or the perfection or priority of any Liens thereon, and

(2) each Second Lien Claimholder may manage and supervise its loans and extensions of credit under the Second Lien Loan Documents in accordance with applicable law and as it may otherwise, in its sole discretion, deem appropriate.

(b) Except as otherwise expressly provided herein,

(1) no First Lien Claimholder has made any express or implied representation or warranty to any Second Lien Claimholder, including with respect to the execution, validity, legality, completeness, collectability, or enforceability of any First Lien Loan Document, the ownership of any Collateral, or the perfection or priority of any Liens thereon, and

(2) each First Lien Claimholder may manage and supervise its loans and extensions of credit under the First Lien Loan Documents in accordance with law and as it may otherwise, in its sole discretion, deem appropriate.

No Second Lien Claimholder will have any duty to any First Lien Claimholder, and no First Lien Claimholder will have any duty to any Second Lien Claimholder, to act or refrain from acting in a manner that allows, or results in, the **\*870** occurrence or continuance of an event of default or default under any agreements with Borrower or any other Grantor (including the First Lien Loan Documents and the Second Lien Loan Documents), regardless of any knowledge thereof that it may have or be charged with.

### 7.8 Subrogation

If a Second Lien Claimholder pays or distributes cash, property, or other assets to a First Lien Claimholder under this Agreement, the Second Lien Claimholder will be subrogated to the rights of the First Lien Claimholder with respect to the value of the payment or distribution, *provided* that the Second Lien Claimholder waives such right of subrogation until the Discharge of First Lien Obligations up to the First Lien Cap with respect to the Capped Obligations and in their entirety with respect to First Lien Obligations that are not Capped Obligations. Such payment or distribution will not reduce the Second Lien Obligations.

### 7.9 Applicable Law; Jurisdiction; Service

**This Agreement, and any claim or controversy relating to the subject matter hereof, will be governed by the law of the [State of New York].**

All judicial proceedings brought against a Party arising out of or relating hereto may be brought in any state or federal court of competent jurisdiction in [the state, county, and city of New York]. Each Party irrevocably

(a) accepts generally and unconditionally the nonexclusive personal jurisdiction and venue of such courts,

(b) waives any defense of forum non conveniens, and

(c) agrees that service of process in such proceeding may be made by registered or certified mail, return receipt requested, to the Party at its address provided in accordance with section 7.11, "*Notices*," and that such service will confer personal jurisdiction over the Party in such proceeding and otherwise constitutes effective and binding service in every respect.

## 7.10 Waiver of Jury Trial

**Each Party waives its right to jury trial of any claim or cause of action based upon or arising hereunder. The scope of this waiver is intended to encompass any and all disputes that may be filed in any court and that relate to the subject matter hereof, including contract claims, tort claims, breach of duty claims, and all other common law and statutory claims. Each Party acknowledges that this waiver is a material inducement to enter into a business relationship, that it has already relied on this waiver in entering into this Agreement, and that it will continue to rely on this waiver in its related future dealings. Each Party further represents and warrants that it knowingly and voluntarily waives its jury trial rights following consultation with legal \*871 counsel. This waiver is irrevocable, meaning that it may not be modified either orally or in writing (other than by a mutual written waiver specifically referring to this section 7.10 and executed by each of the Parties), and will apply to any subsequent modification hereof. In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.**

## 7.11 Notices

(a) Any notice to a First Lien Claimholder or a Second Lien Claimholder under this Agreement must also be given to First Lien Agent and Second Lien Agent, respectively. Unless otherwise expressly provided herein, notices and consents must be in writing and will be deemed to have been given (i) when delivered in person or by courier service and signed for against receipt thereof, (ii) upon receipt of facsimile, and (iii) three Business Days after deposit in the United States mail with first-class postage prepaid and properly addressed. For the purposes hereof, the address of each Party will be as set forth below the Party's name on the signature pages hereto, or at such other address as the Party may designate by notice to the other Parties.

(b) Failure to give a notice or copies as required by section 2.4, "*Notice of Modifications*," [or] section 3.4, "*Notice of Exercise*," [or section 3.1(e) regarding notice of Discharge of First Lien Obligations] will not affect the effectiveness or validity of any modification or of this Agreement, or the effectiveness or validity of the exercise of remedies otherwise permitted hereunder and under applicable law, impose any liability on any First Lien Claimholder or Second Lien Claimholder, or waive any rights of any Party

**7.12 Further Assurances**

First Lien Agent, Second Lien Agent, and Borrower will each take such further action and will execute and deliver such additional documents and instruments (in recordable form, if requested) as First Lien Agent or Second Lien Agent may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

**7.13 Successors and Assigns**

This Agreement is binding upon and inures to the benefit of each First Lien Claimholder, each Second Lien Claimholder, the Control Agent, and their respective successors and assigns. However, no provision of this Agreement will inure to the benefit of a trustee, debtor-in-possession, creditor trust or other representative of an estate or creditor of Borrower, or other Grantor, including where such estate or creditor representative is the beneficiary of a Lien securing Collateral by virtue of the avoidance of such Lien in an Insolvency Proceeding.

If either First Lien Agent or Second Lien Agent resigns or is replaced pursuant to the First Lien Credit Agreement or Second Lien Credit Agreement, as applicable,  **\*872**  its successor will be a party to this Agreement with all the rights, and subject to all the obligations, of this Agreement. Notwithstanding any other provision of this Agreement, this Agreement may not be assigned to any Person except as expressly contemplated herein.

**7.14 Authorization**

By its signature hereto, each Person signing this Agreement on behalf of a Party represents and warrants to the other Parties that it is duly authorized to execute this Agreement.

**7.15 No Third-Party Beneficiaries**

No Person is a third-party beneficiary of this Agreement and no trustee in bankruptcy for, or bankruptcy estate of, or unsecured creditor of, any Grantor will have or acquire or be entitled to exercise any right of a First Lien Claimholder or Second Lien Claimholder under this Agreement, whether upon an avoidance or equitable subordination of a Lien of First Lien Claimholder or Second Lien Claimholder, or otherwise. None of Borrower, any other Grantor, or any other creditor thereof has any rights hereunder, and neither Borrower nor any Grantor may rely on the terms hereof. Nothing in this Agreement impairs the Obligations of Borrower and the other Grantors to pay principal, interest, fees, and other amounts as provided in the First Lien Loan Documents and the Second Lien Loan Documents. Except to the extent expressly provided in this Agreement, no Person will have a right to notice of a modification to, or action taken under, this Agreement or any First Lien Collateral Document (including the release or impairment of any Collateral) other than as a lender under the First Lien Credit Agreement, and then only to the extent expressly provided in the First Lien Loan Documents. Except to the extent expressly provided in this Agreement, no Person will have a right to notice of a modification to or action taken under, this Agreement or any Second Lien Collateral Document (including the release or impairment of any Collateral) other than as a lender under the Second Lien Credit Agreement, and then only to the extent expressly provided in the Second Lien Loan Documents.

**7.16 No Indirect Actions**

Unless otherwise expressly stated, if a Party may not take an action under this Agreement, then it may not take that action indirectly, or assist or support any other Person in taking that action directly or indirectly. "Taking an action indirectly" means taking an action that is not expressly prohibited for the Party but is intended to have substantially the same effects as the prohibited action.

**7.17 Counterparts**

This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which will constitute an original, but  **\*873**  all of which when taken together will constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy or electronic facsimile or other electronic means will be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable, and each Party utilizing telecopy, electronic facsimile, or other electronic means for delivery will deliver a manually executed original counterpart to each other Party on request.

**7.18 Original Grantors; Additional Grantors**

Borrower and each other Grantor on the date of this Agreement will constitute the original Grantors party hereto. The original Grantors will cause each Subsidiary of Borrower and of Holdings that becomes a Grantor after the date hereof to contemporaneously become a party hereto (as a Guarantor Subsidiary) by executing and delivering a joinder agreement (in form and substance satisfactory to First Lien Agent) to First Lien Agent. The Parties further agree that, notwithstanding any failure to take the actions required by the immediately preceding sentence, each Person that becomes a Grantor at any time (and any security granted by any such Person) will be subject to the provisions hereof as fully as if it constituted a Guarantor Subsidiary party hereto and had complied with the requirements of the immediately preceding sentence.

**8 Definitions**[96]

**8.1 Defined Terms**

Unless otherwise stated or the context otherwise clearly requires, the following terms have the following meanings:

 **\*874**  *Affiliate* means, for a specified Person, another Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the specified Person. For these purposes, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and "controlled" has a correlative meaning.

*Agreement* is defined in the Preamble.

*Assignment Agreement* is defined in section 5.1(a)(B).

*Bankruptcy Code* means the federal Bankruptcy Code.

*Bankruptcy Law* means the Bankruptcy Code and any similar federal, state, or foreign bankruptcy, insolvency, receivership, or similar law affecting creditors' rights generally.

*Borrower* is defined in the Preamble.

*Business Day* means a day other than a Saturday, Sunday, or other day on which commercial banks in [New York City] are authorized or required by law to close.

*Capped Obligations* is defined in section 1.4.

*Cash Management Agreement* means an agreement to provide cash management services, including treasury, depository, overdraft, credit or debit card, electronic funds transfer, or other cash management arrangements, to which a Grantor is a party

and a lender under the First Lien Credit Agreement or an Affiliate of such lender is the applicable counterparty at the date hereof or at the time it enters into such agreement (even if such counterparty later ceases to be such a lender or Affiliate).

*Collateral* means all of the property of any Grantor, whether real, personal, or mixed, that is (or is required to be) both First Lien Collateral and Second Lien Collateral, including any property subject to Liens granted pursuant to section 6, "*Insolvency Proceedings*," to secure both First Lien Obligations and Second Lien Obligations.[97]

[Alternative Definition][98]

[*Collateral* means, at any time of determination, the First Lien Collateral and all other property of any Grantor in which each of First Lien Agent and Second Lien Agent has, pursuant to the First Lien Collateral Documents and the Second Lien Collateral Documents, respectively, a valid and perfected Lien (which Lien has not been avoided, disallowed, set aside, invalidated, or subordinated pursuant to Chapter 5 of the Bankruptcy Code or otherwise) securing payment of First Lien Obligations or Second Lien Obligations, respectively, and including any Liens **\*875** granted pursuant to section 6, "*Insolvency Proceedings*," to secure both First Lien Obligations and Second Lien Obligations.]

[End of Alternative Definition]

*Control Agent* is defined in the Preamble.

*Defaulting Creditor* is defined in section 5.7(c).

*DIP Financing* means the obtaining of credit or incurring debt secured by Liens on the Collateral pursuant to section 364 of the Bankruptcy Code (or similar Bankruptcy Law).

*Discharge of First Lien Obligations*[99] means, except to the extent otherwise expressly provided in section 5, "*Purchase of First Lien Obligations by Second Lien Claimholders*,"

(a) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of an Insolvency Proceeding, whether or not such interest would be allowed in the proceeding)[100] on all outstanding Indebtedness included in the First Lien Obligations,

(b) payment in full in cash of all other First Lien Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (other than indemnification Obligations for which no claim or demand for payment, whether oral or written, has been made at such time),[101]

(c) termination or expiration of any commitments to extend credit that would be First Lien Obligations [(other than pursuant to Cash Management Agreements or Hedge Agreements, in each case as to which satisfactory arrangements have been made with the applicable lender or Affiliate)], and

(d) termination or cash collateralization (in an amount and manner reasonably satisfactory to First Lien Agent, but in no event greater than 105% of the aggregate undrawn face amount) of all Letters of Credit.

[Alternative Clause]

[(d) [termination or cash collateralization (in an amount reasonably satisfactory to First Lien Agent) of any Hedge Agreement issued or entered into **876** by any First Lien Claimholder] [termination of any Hedge Agreement and the payment in full by wire transfer of immediately available funds of all Obligations thereunder].


[End of Alternative Clause]

***Discharge of Second Lien Obligations*** means

(a) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of an Insolvency Proceeding, whether or not such interest would be allowed in the proceeding) on all outstanding Indebtedness included in the Second Lien Obligations, and


(b) payment in full in cash of all other Second Lien Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (other than indemnification Obligations for which no claim or demand for payment, whether oral or written, has been made at such time).


***Disposition*** means an "Asset Sale" (as defined in the First Lien Credit Agreement), or other sale, lease, exchange, transfer, or other disposition.

***Enforcement Action***[102] means an action under applicable law to

(a) foreclose, execute, levy, or collect on, take possession or control of, sell or otherwise realize upon (judicially or non-judicially), or lease, license, or otherwise dispose of (whether publicly or privately), Collateral, or otherwise exercise or enforce remedial rights with respect to Collateral under the First Lien Loan Documents or the Second Lien Loan Documents (including by way of set-off, recoupment notification of a public or private sale or other disposition pursuant to the U.C.C. or other applicable law, notification to account debtors, notification to depositary banks under deposit account control agreements, or exercise of rights under landlord consents, if applicable),


(b) solicit bids from third Persons to conduct the liquidation or disposition of Collateral or to engage or retain sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers, or other third Persons for the purposes of valuing, marketing, promoting, and selling Collateral,


**877** (c) to receive a transfer of Collateral in satisfaction of Indebtedness or any other Obligation secured thereby, [or]


(d) to otherwise enforce a security interest or exercise another right or remedy, as a secured creditor or otherwise, pertaining to the Collateral at law, in equity, or pursuant to the First Lien Loan Documents or Second Lien Loan

Documents (including the commencement of applicable legal proceedings or other actions with respect to all or any portion of the Collateral to facilitate the actions described in the preceding clauses, and exercising voting rights in respect of equity interests comprising Collateral), [or

(e) effect the Disposition of Collateral by any Grantor after the occurrence and during the continuation of an event of default under the First Lien Loan Documents or the Second Lien Loan Documents with the consent of First Lien Agent or Second Lien Agent, as applicable,][103] *provided* that "Enforcement Action" will [not] be deemed to include the commencement of, or joinder in filing of a petition for commencement of, an Insolvency Proceeding against the owner of Collateral.[104]

*Equity Interest* means, for any Person, any and all shares, interests, participations, or other equivalents, including membership interests (however designated, whether voting or non-voting) of equity of the Person, including, if the Person is a partnership, partnership interests (whether general or limited) or any other interest or participation that confers on a holder the right to receive a share of the profits and losses of, or distributions of assets of, the partnership, but not including debt securities convertible or exchangeable into equity unless and until actually converted or exchanged.

*Excess First Lien Obligations* is defined in section 1.11(c).

*Excess First Lien Principal Obligations* is defined in section 1.4(a).

*First Lien Agent* is defined in the Preamble.

*First Lien Cap* is defined in section 1.4.

*First Lien Claimholders* is defined in section 1.3(d).

*First Lien Collateral* means the assets of any Grantor, whether real, personal, or mixed, as to which a Lien is granted as security for a First Lien Obligation.

**878** [Alternative Definition][105]

[*First Lien Collateral* means the assets of any Grantor, whether real, personal, or mixed, as to which a Lien is granted as security for a First Lien Obligation pursuant to the First Lien Collateral Documents, which Lien is, at any time of determination, a valid and perfected Lien that has not been avoided, disallowed, set aside, invalidated, or subordinated pursuant to Chapter 5 of the Bankruptcy Code or otherwise.]

[End of Alternative Definition]

*First Lien Collateral Documents* means the [security] [Collateral] documents defined in the First Lien Credit Agreement, and any other documents or instruments granting a Lien on real or personal property to secure a First Lien Obligation or granting rights or remedies with respect to such Liens.

*First Lien Credit Agreement* is defined in the Preamble.

*First Lien Lenders* means the "Lenders" under and as defined in the First Lien Loan Documents.

***First Lien Loan Documents*** means

(a) the First Lien Credit Agreement and the "Loan Documents" defined in the First Lien Credit Agreement,

(b) each other agreement, document, or instrument providing for, evidencing, guaranteeing, or securing an Obligation under the First Lien Credit Agreement,

(c) any other document or instrument executed or delivered at any time in connection with Borrower's Obligations under the First Lien Credit Agreement, including any guaranty of or grant of Collateral to secure such Obligations, and any intercreditor or joinder agreement to which holders of First Lien Obligations are parties, and

(d) each other agreement, document, or instrument providing for, evidencing, guaranteeing, or securing any DIP Financing provided by or consented to in writing by the First Lien Lenders and deemed consented to by the Second Lien Lenders pursuant to section 6.1, "*Use of Cash Collateral and DIP Financing*," to the extent effective at the relevant time[, *provided* that any such documents or instruments to which any First Lien Claimholder is a party in connection with a DIP financing (other than a DIP financing deemed consented to by Second Lien Lenders pursuant to section 6.1, "*Use of Cash Collateral and DIP Financing*") will not be deemed First Lien Loan Documents unless so designated in writing by First Lien Agent].[106]

**\*879  *First Lien Obligations*** is defined in section 1.3(a).

***Governmental Authority*** means any federal, state, municipal, national, or other government, governmental department, commission, board, bureau, court, agency, or instrumentality, or political subdivision thereof, or any entity or officer exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

***Grantor*** is defined in the Preamble.

***Guarantor Subsidiaries*** is defined in the Preamble.

***Hedge Agreement*** means

(a) an Interest Rate Protection Agreement, or

(b) a foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap, or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with the operations of any Grantor,

in either case, to the extent that the incurrence of the obligations in respect thereof was permitted under the First Lien Loan Documents as in effect on the date hereof.

***Holdings*** is defined in the Preamble.

***Indebtedness*** means and includes all Obligations that constitute "Indebtedness" under the First Lien Credit Agreement or the Second Lien Credit Agreement, as applicable.

***Insolvency Proceeding*** means

(a) a voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to a Grantor,

(b) any other voluntary or involuntary insolvency, reorganization, or bankruptcy case or proceeding, or any receivership, liquidation, reorganization, or other similar case or proceeding with respect to a Grantor or a material portion of its property,

(c) a liquidation, dissolution, reorganization, or winding up of a Grantor, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy, or

(d) an assignment for the benefit of creditors or other marshaling of assets and liabilities of a Grantor.

***Interest Rate Protection Agreement*** means an interest rate swap, cap or collar agreement, or other similar agreement or arrangement designed to protect a Grantor against fluctuations in interest rates.

***Letters of Credit*** is defined in section 1.4.

***Lien*** means any lien (including, without limitation, judgment liens and liens arising by operation of law, subrogation, or otherwise), mortgage or deed of trust, pledge, hypothecation, assignment, security interest, charge, or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional  **\*880**  sale or other title retention agreement, and any lease in the nature thereof), and any option, call, trust, U.C.C. financing statement, or other preferential arrangement having the practical effect of any of the foregoing, including any right of set-off or recoupment.

***Modify***, as applied to any document or obligation, includes

(a) modification by amendment, supplement, termination, or replacement of the document or obligation,

(b) any waiver of a provision (including waivers by course of conduct), and

(c) the settlement or release of any claim,

whether oral or written, and regardless of whether the modification is in conformity with the provisions of the document or obligation governing modifications.

***New Agent*** is defined in section 4.4.

***Obligations*** means all obligations of every nature of a Person owed to any obligee under an agreement, whether for principal, interest, or payments for early termination, fees, expenses, indemnification, or otherwise, and all guaranties of any of the foregoing, whether absolute or contingent, due or to become due, now existing or hereafter arising, and including interest and fees that accrue after the commencement by or against any Person of any proceeding under any Bankruptcy Law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

***Party*** means a party to this Agreement.

***Person*** means any natural person, corporation, limited liability company, trust, business trust, joint venture, association, company, partnership, Governmental Authority, or other entity.

***Pledged Collateral*** is defined in section 1.6(a).

***Post-Petition Claims*** means interest, fees, costs, expenses, and other charges that pursuant to the First Lien Credit Agreement or the Second Lien Credit Agreement continue to accrue after the commencement of an Insolvency Proceeding, to the extent such interest, fees, expenses, and other charges are allowed or allowable under Bankruptcy Law or in the Insolvency Proceeding.

***Proceeds*** means

(a) all "proceeds," as defined in Article 9 of the U.C.C., of the Collateral, and

(b) whatever is recovered when Collateral is sold, exchanged, collected, or disposed of, whether voluntarily or involuntarily, including any additional or replacement Collateral provided during any Insolvency Proceeding and any payment or property received in an Insolvency Proceeding on account of any "secured claim" (within the meaning of section 506(b) of the Bankruptcy Code or similar Bankruptcy Law).[107]

***Purchase Date*** is defined in section 5.2(a)(5).

***Purchase Event*** is defined in section 5.1(a).

 **\*881** ***Purchase Notice*** is defined in section 5.2(a).

***Purchase Obligations*** is defined in section 5.1(a).

***Purchase Price*** is defined in section 5.3.

***Purchasing Creditors*** is defined in section 5.2(a).

***Recovery*** is defined in section 6.6.

***Refinance*** means, for any Indebtedness, to refinance, replace, refund, or repay, or to issue other Indebtedness in exchange or replacement for such Indebtedness in whole or in part, whether with the same or different lenders, agents, or arrangers. "Refinanced" and "Refinancing" have correlative meanings.

***Second Lien Adequate Protection Payments*** is defined in section 6.4(b)(4).

***Second Lien Agent*** is defined in the Preamble.

***Second Lien Claimholders*** is defined in section 1.3(d).

***Second Lien Collateral*** means all of the property of any Grantor, whether real, personal, or mixed, as to which a Lien is granted as security for a Second Lien Obligation.

***Second Lien Collateral Documents*** means the [security] [Collateral] documents defined in the Second Lien Credit Agreement, and any other documents or instruments granting a Lien on real or personal property to secure a Second Lien Obligation or granting rights or remedies with respect to such Liens.

***Second Lien Credit Agreement*** is defined in the Preamble.

***Second Lien Lenders*** means the "Lenders" under and as defined in the Second Lien Loan Documents.

***Second Lien Loan Documents*** means

    (a) the Second Lien Credit Agreement and the "Loan Documents" defined in the Second Lien Credit Agreement,

    (b) each other agreement, document, or instrument providing for, evidencing, guaranteeing, or securing an Obligation under the Second Lien Credit Agreement, and

    (c) any other document or instrument executed or delivered at any time in connection with Borrower's Obligations under the Second Lien Credit Agreement, including any guaranty of or grant of Collateral to secure such Obligations, and any intercreditor or joinder agreement to which holders of Second Lien Obligations are parties, to the extent effective at the relevant time.

***Second Lien Obligations*** is defined in section 1.3(b).

***Standstill Period*** is defined in section 3.1(b)(1).

***Subsidiary*** of a Person means a corporation or other entity a majority of whose voting stock is directly or indirectly owned or controlled by the Person. For these purposes, "voting stock" of a Person means securities or other ownership interests of the

Person having general power under ordinary circumstances to vote in the election of the directors, or other persons performing similar functions, of the Person. References to a percentage or proportion of voting stock refer to the relevant percentage or proportion of the votes entitled to be cast by the voting stock.

**U.C.C.** means the Uniform Commercial Code (or any similar legislation) as in effect in any applicable jurisdiction.

### *882  8.2 Usages

Unless otherwise stated or the context clearly requires otherwise:

*Agents*. References to First Lien Agent or Second Lien Agent will refer to First Lien Agent or Second Lien Agent acting on behalf of itself and on behalf of all of the other First Lien Claimholders or Second Lien Claimholders, respectively. Actions taken by First Lien Agent or Second Lien Agent pursuant to this Agreement are meant to be taken on behalf of itself and the other First Lien Claimholders or Second Lien Claimholders, respectively

*Singular and plural*. Definitions of terms apply equally to the singular and plural forms.

*Masculine and feminine*. Pronouns will include the corresponding masculine, feminine, and neuter forms.

*Will and shall*. "Will" and "shall" have the same meaning.

*Time periods*. In computing periods from a specified date to a later specified date, the words "from" and "commencing on" (and the like) mean "from and including," and the words "to," "until," and "ending on" (and the like) mean "to but excluding."

*When action may be taken*. Any action permitted under this Agreement may be taken at any time and from time to time.

*Time of day*. All indications of time of day mean [New York City] time.

*Including*. "Including" means "including, but not limited to."

*Or*. "A or B" means "A or B or both."

*Statutes and regulations*. References to a statute refer to the statute and all regulations promulgated under or implementing the statute as in effect at the relevant time. References to a specific provision of a statute or regulation include successor provisions. References to a section of the Bankruptcy Code also refer to any similar provision of Bankruptcy Law.

*Agreements*. References to an agreement (including this Agreement) refer to the agreement as amended at the relevant time.

*Governmental agencies and self-regulatory organizations*. References to a governmental or quasi-governmental agency or authority or a self-regulatory organization include any successor agency, authority, or self-regulatory organization.

*Section references*. Section references refer to sections of this Agreement. References to numbered sections refer to all included sections. For example, a reference to section 6 also refers to sections 6.1, 6.1(a), etc. References to a section or article in an agreement, statute, or regulation include successor and renumbered sections and articles of that or any successor agreement, statute, or regulation.

*Successors and assigns*. References to a Person include the Person's permitted successors and assigns.

*Herein, etc.* "Herein," "hereof," "hereunder," and words of similar import refer to this Agreement in its entirety and not to any particular provision.

*Assets and property*. "Asset" and "property" have the same meaning and refer to both real and personal, tangible and intangible assets and property, including cash, securities, accounts, and general intangibles.

 **\*883**  Signatures

First Lien Agent:

[Name of First Lien Agent], as First Lien Agent

By:

Name:

Title:

[Notice Address]

Control Agent:

[Name of Control Agent], as Control Agent

By:

Name:

Title:

[Notice Address]

Second Lien Agent:

[Name of Second Lien Agent], as Second Lien Agent

By:

Name:

Title:

[Notice Address]

Acknowledged and Agreed to by:

Borrower:

[Name of Borrower]

By:

Name:

Title:

[Notice of Address]

Holdings:

[Name of Holdings]

By:

Name:

Title:

[Notice Address]

The other Grantors:

[Name of Grantor]

By:

Name:

Title:

[Notice Address]

[Name of Grantor]

By:

Name:

Title:

[Notice Address]


Footnotes

a1        As of March 22, 2010.

1    LoanConnector, www.loanconnector.com (downloaded Apr. 1, 2010).

2    *Id.*

3    *Id.*

4    The first and second lien agents are parties to the intercreditor agreement, but the first and second lien lenders are not. Therefore, the first and second lien credit agreements should each (i) bind each lender to the terms of the intercreditor agreement, (ii) authorize the agent to enter into the intercreditor agreement on behalf of the lenders and to exercise all the agent's rights and comply with all its obligations under the intercreditor agreement, and (iii) specify what lender direction or authorization is required for the agent to agree to consents, waivers, or amendments, or to take or refrain from other actions under the intercreditor agreement.

5    The parties may wish to provide for hedge agreements provided by a second lien lender or affiliate.

6    The heart of the intercreditor agreement is the lien subordination provision pursuant to which the second lien lenders agree that their lien on the common assets will be junior and second in priority to the lien of the first lien lenders, including typically both liens on personal property and liens on real estate. Even at this preliminary stage of the intercreditor agreement, the first lien lenders and the second lien lenders are likely to have different points of view as to how broadly the lien subordination provision should be worded. The first lien lenders are likely to insist that their lien on the common assets should remain superior (at least up to the amount of the first lien cap) even if the first lien lenders fail to perfect their lien properly or allow their lien to lapse or their lien is avoided in bankruptcy or otherwise. Second lien lenders will often take the position that only collateral in which both first and second lien lenders have a valid and perfected security interest not subject to avoidance as a preferential transfer or otherwise by the debtor or a trustee in bankruptcy should be subject to the lien priority provisions. *See* alternative section 1.1 and notes to that section and alternative section 1.7. In practice, the view of the first lien lenders has typically prevailed on this issue although there is increasing recognition of the unintended "payment subordination" by the second lien lenders that may result if the first lien lapses or is avoided in bankruptcy, and the second lien lenders are forced by their agreement to an "absolute" priority provision to be subordinate to the now unsecured first lien lenders.

7    First and second lien lenders typically agree not to challenge the priority, perfection, or validity of their respective liens. However, a first lien agent may fail to perfect, or maintain perfection, of its lien, or may be determined by a court to have participated in a fraudulent transfer or other transaction that results in their claims being disallowed or equitably subordinated. This has occurred in several recent high-profile cases. In such situations, second lien lenders will often argue, particularly in negotiated middle-market transactions, that an agreement to continue to treat an unperfected or equitably subordinated first lien lender as being perfected and senior to the second lien lender converts lien subordination into payment subordination to unsecured or equitably subordinated indebtedness that is not reflected in the coupon on or underwriting assumptions for the second lien obligations. This could place the second lien lenders in a far worse position than if they were unsecured creditors. Therefore, second lien lenders often take the position that only collateral in which both first and second lien lenders have a valid and perfected security interest not subject to avoidance as a preferential transfer or otherwise by the debtor or a trustee in bankruptcy should be subject to the lien priority provisions of the intercreditor agreement. Payment subordination as described in this note can occur if (i) the lien securing first lien obligations maintains priority, and a turn-over right, under the intercreditor agreement even if invalid, unperfected, equitably subordinated, or avoidable, or (ii) first lien obligations include amounts "whether or not allowable in an insolvency proceeding" and the amounts are not allowed. This can result in payment subordination of the claims of second lien lenders to the extent of first lien claims not allowed in an insolvency proceeding, which also leaves the second lien lenders with no enforceable subrogation rights in respect of such claims, and in a position that may be worse than that of an unsecured creditor. On the other hand, application of proceeds to second lien claimholders from unperfected first lien collateral may result in a greater recovery than had the first lien collateral been perfected, and some intercreditor agreements attempt to address this issue. As an example, consider a debtor with $100 million of assets, $50 million of first lien debt, $50 million of second lien debt, and $50 million of unsecured obligations. If the first lien lenders' claims are unsecured for failure to maintain perfection, the second lien lenders will recover in full ($50 million) on their lien, but pay the entire recovery over to the first lien lenders, and have only an unsecured subrogation claim from the first lien lenders, which will result in a recovery of only $25 million, all due to the failure of the first lien lenders to perfect. If the first lien lenders' claims

are equitably subordinated or disallowed because of bad acts of the first lien lenders, the result for the second lien lenders will be catastrophic. In the example above, they would turn over their $50 million recovery to the first lien lenders, who would be paid in full notwithstanding their bad acts, and the innocent second lien lenders would have no recovery at all. For a detailed discussion of this issue, please see, among other articles, Robert L. Cunningham & Yair Y. Galil, *Lien Subordination and Intercreditor Agreements*, 25 Rev. Banking & Fin. Services 49 (2009).

[8]     The typical second lien financing intercreditor agreement does not require payment subordination.

[9]     These changes in the definition of "First Lien Obligations" would typically be used in connection with the alternative definition of "First Lien Cap" and the alternative lien priority provisions in section 1.1 noted as being more favorable to second lien lenders.

[10]     Second lien caps are less common than first lien caps. If there is a second lien cap, the following definition should be added:

**Second Lien Cap** means $_____ minus the aggregate amount of principal payments on the term loan under the Second Lien Credit Agreement (other than payments in connection with a Refinancing).

[11]     The Model Agreement includes a fairly broad definition of "First Lien Obligations" that encompasses principal, interest, fees, indemnity obligations, the cost of unwinding hedging obligations, and cash management obligations. However, it also provides for a "first lien cap" in an agreed-upon maximum principal amount. The standard definition of "first lien cap" is limited to a cap on principal and a related cap on interest, premiums, and fees on the capped principal amount. The alternative definition more favorable to second lien lenders includes optional limits on other first lien obligations, including separate caps on interest payments and on obligations under hedge agreements. Many intercreditor agreements provide for a first lien cap but fail to address the consequences of the first lien lenders exceeding the cap. The Model Agreement specifically provides in section 1.1 ("Seniority of Liens Securing First Lien Obligations") that the lien on collateral securing first lien obligations will have priority over the second lien obligations up to but not in excess of the first lien cap. The Model Agreement also deals with the question of how the first lien lenders' lien securing first lien obligations in excess of the cap should be handled. See section 1.11, "Subordination of Liens Securing Excess First Lien Obligations," which provides, among other things, that the second lien lenders will be subordinate only to the extent that the principal amount of the first lien loan does not exceed the first lien cap. Similarly, the buy-out provisions of the Model Agreement that permit the second lien lenders to purchase the first lien loan at par following the occurrence of an event of default only apply to the portion of the first lien loan that does not exceed the agreed-upon cap and the uncapped portion of the loan. While a first lien cap is designed to protect the second lien lenders from unanticipated increases in the first lien debt, the first lien lenders will want to make sure that they have a sufficient "cushion" under the first lien cap to increase the first lien loan by a reasonable amount to deal with additional cash needs by the borrower as part of a loan workout or otherwise. The first lien lenders also should consider including an additional "cushion" for debtor-in-possession ("DIP") financing to be provided by the first lien lenders in the event of bankruptcy. The definition of first lien cap in the Model Agreement includes optional provisions for including DIP financing under the first lien cap. The Task Force has intentionally omitted any provision stating that a breach of the agreement occurs if the first lien lenders exceed the cap. Instead, the agreement provides that exceeding the cap will result in a subordination of the excess amount to the lien of the second lien lenders as provided in section 1.11. The parties may wish to consider including an express agreement by the first lien lenders not to exceed the first lien cap but, in most cases, the Task Force believes that the subordination of the excess will provide a sufficient and appropriate remedy for the second lien lenders. Section 1.11(e) expressly provides that the second lien lenders reserve any rights against the borrower under the second lien loan documents for any event of default resulting from the incurrence of obligations exceeding the first lien cap.

[12]     In the absence of unusual provisions in the first lien credit agreement (e.g., delayed draw term loans or accordion features), a typical first lien cap for a negotiated transaction would be in the range of 110 percent to 115 percent of the aggregate commitment under the first lien loan documents, with 110 percent being the most common percentage. If the modification section restricts extending scheduled amortization, consider whether the borrower should be prohibited from reallocating its term facility to revolving exposure. This form of agreement assumes that the parties have negotiated a reducing cap as opposed to, for instance, a leverage-based incurrence option or a flat, non-reducing cap. If the parties have agreed to a form of non-reducing cap, then appropriate changes will need to be made to the definition of "First Lien Cap." This definition of first lien cap applies only to principal. Second lien lenders may argue that the cap should be expanded to include other first lien obligations, including interest, costs, expenses, indemnities, and

obligations under hedge agreements and cash management agreements. See the alternative definition of first lien cap more favorable to second lien lenders.

[13] It is common to see first lien caps that apply only to principal and do not directly address whether or not interest, fees, and premium (if any) on the "excess principal" above the first lien cap should be entitled to the same priority as interest and fees on outstanding principal up to the cap. That approach may leave open the question of how the "excess" fees, interest, and premium (if any) should be treated for priority purposes. The alternative followed in the Model Agreement is to provide in this section that interest, fees, and premium (if any) on principal up to the first lien cap will have the same priority as such principal, while interest, fees, and premium (if any) on principal in excess of the first lien cap will be treated as "excess first lien obligations" under section 1.11(c). Second lien lenders may logically object to the ability of the first lien lenders to capitalize all interest and add that capitalized interest as an additional priority principal obligation in excess of the stated dollar cap amount. First lien lenders may logically object to not having the ability to capitalize interest to help a debtor though difficult periods without eroding any principal cushion they may have available within the capped amount. The parties should attempt to balance these concerns by negotiation, perhaps by specifying when capitalized interest will not utilize the principal cap.

[14] Include if section 6.4 permits second lien adequate protection payments.

[15] The parties also need to decide whether a separate basket for potential DIP financing and carveouts should be included. *See also* section 6.1 and notes to that section.

[16] If this alternative definition of "First Lien Cap" is used, then the following definition should be added to section 8.1:

*Availability* means, at any time, the aggregate amount of the revolving loans, letter of credit accommodations, and other credit accommodations available to Borrower from the First Lien Lenders based on the Borrowing Base (as such term, and the definitions used in such term, are defined in the First Lien Loan Documents as in effect on the date hereof) (determined without regard to any revolving loans, letter of credit accommodations, or other credit accommodations then outstanding).

[17] Include if section 6.4 permits second lien adequate protection payments.

[18] If this alternative definition of "First Lien Cap" is used, then the following definitions should also be included in section 8.1:

*Excess Second Lien Principal Obligations* means Second Lien Principal Obligations in excess of the Second Lien Cap.

*First Lien Principal Obligations* means, at any time of determination, the aggregate unpaid principal of the loans outstanding under the First Lien Loan Documents together with the undrawn amount of all outstanding Letters of Credit under the First Lien Loan Documents.

*Second Lien Principal Obligations* means, at any time of determination, the aggregate unpaid principal of the loans outstanding under the Second Lien Loan Documents [together with the undrawn amount of all outstanding letters of credit under the Second Lien Loan Documents].

[19] In asset-based transactions with foreign currencies, changes in exchange rates are taken into account in calculation of availability from time to time. The language above should not reverse that requirement to the detriment of the second lien lenders.

[20] In light of the recent *ION Media* decision, if the second lien claimholders wish to preserve an express right to challenge priority on the grounds that certain property does not constitute "first lien collateral," they may wish to consider arguing for adding language to the effect that: "Nothing in this section 1.8(b) shall prevent the Second Lien Agent or any Second Lien Claimholder from asserting that any property does not constitute First Lien Collateral under the First Lien Collateral Documents." In the memorandum decision by the Bankruptcy Court in *In re ION Media Networks, Inc.*, 419 B.R. 585 (Bankr. S.D.N.Y. 2009), the intercreditor agreement included an express acknowledgment by the parties "to the relative priorities as to the Collateral ... as provided in the Security Agreement"

and an agreement by the parties that such priority would not be affected or impaired by "any nonperfection of any lien purportedly securing any of the Secured Obligations." *Id.* at 594 (emphasis omitted). The purchaser of the second lien obligations argued in a motion objecting to confirmation of the debtor's plan of reorganization that certain FCC licenses owned by a special purpose vehicle within the debtor's capital structure were immune from being encumbered due to their special character and that the licenses therefore did not constitute "collateral" for purposes of the intercreditor agreement. *Id.* at 589. While the first lien lender had a security interest in the proceeds of the FCC licenses, there were no proceeds to which the lien could attach. *Id.* The court found that the use of the term "purportedly securing" in the intercreditor agreement to describe the liens granted in the security agreement "evidenced the intent of the [s]ecured [p]arties to establish their relative legal rights [with respect to the FCC licenses themselves] *vis à vis* each other," regardless not only of the ultimate validity of any lien therein granted by the debtors, but also regardless of whether a lien was even intended to be granted in the FCC licenses. *Id.* at 594. The court's attempt to determine and enforce the intent of the parties based on the negotiated terms of the agreement is a positive step for the enforcement of intercreditor agreements based on the agreement of the parties rather than bankruptcy policy grounds. However, the court, in attempting to determine the parties' intent, arguably ignored the clear language of the security agreement, which expressly excluded the FCC licenses from the collateral, and the fact that a lien on the FCC licenses (as opposed to proceeds thereof) would be prohibited by law. Notwithstanding the foregoing, the court concluded that "[a]t bottom, the language of the Intercreditor Agreement demonstrates that the Second Lien Lenders agreed to be 'silent' as to any dispute regarding the validity of liens granted by the Debtors in favor of the First Lien Lenders and conclusively accepted their relative priorities regardless of whether a lien ever was properly granted[, or intended to be granted,] in the FCC Licenses." *Id.* First lien lenders can accomplish the result implicit in the court's decision in a manner that does not ignore the law and the express language of the security agreement by (i) contractually prohibiting the second lien lenders from asserting claims such as those asserted by the second lien lender in *ION Media*, (ii) ensuring that the language of the granting clause in the security agreement picks up all general intangibles relating to the FCC licenses, including all enterprise value relating to the ownership thereof, as well as all proceeds of the disposition thereof, (iii) insulating the FCC licenses in a bankruptcy remote license subsidiary, and prohibiting any debt (other than the debt of the second lien lenders) in that subsidiary, (iv) subordinating the guarantee or other claims of the second lien lenders against the FCC license subsidiary, and (v) taking a first priority lien on the equity in that subsidiary.

[21] Note that the marshaling waiver is not limited to collateral upon which both the first lien and second lien lenders have a lien. Many transactions may involve some collateral, such as foreign collateral, where there is no shared lien, and careful consideration should be given to the marshaling waiver in those circumstances.

[22] The bracketed language is an alternative favorable to first lien claimholders. Rights to release a grantor should be considered carefully and may be limited to subsidiaries, as this provision has the effect of subordinating the claims of second lien claimholders to unsecured creditors of the grantor.

[23] Bracketed language is a first lien favorable alternative.

[24] Many intercreditor agreements simply state that amounts in excess of the first lien cap are not first lien obligations. These agreements do not address the matter further. This leaves a lot of room for speculation. What is the result of the first lien creditors exceeding the cap? The second lien lenders may argue that exceeding the cap is a breach of the intercreditor agreement by the first lien creditors and should allow the second lien creditors to assume first lien priority That would be a result outside of the intent of the parties to the intercreditor agreement. Even though obligations in excess of the first lien cap are not intended by the parties to be treated as "first lien obligations," the liens securing the first lien obligations (including U.C.C. Financing Statements and mortgages or deeds of trust) are usually filed before the second lien U.C.C. Financing Statements and mortgages or deeds of trust and would therefore remain first priority liens under the "first to file" rule. There is no guidance with respect to treatment of the excess in such a case. A common alternative in intercreditor agreements in which the parties and their counsel have actually considered this issue is to assign third lien priority to all first lien obligations in excess of the first lien cap. This most closely aligns with the parties' expectations and assigns a specific "waterfall" of priorities. Section 1.11 takes that approach and goes further to deal with other priority issues relating to any second lien cap included in the intercreditor agreement. See also section 4.1, which establishes a "waterfall" for the application of proceeds received in connection with an enforcement action by either the first lien lenders or the second lien lenders. Although much less common than first lien caps, second lien caps do appear in some intercreditor agreements, particularly more negotiated middle-market transactions.

25    This and the following example are part of the agreement itself, rather than being comments to the agreement.

26    The modification provisions are intended to balance the desire of each class of creditor to administer freely its loan documents and refinance the debt thereunder against the interest of the other class of creditor in protecting against any modification or refinancing that alters any fundamental assumption about the borrower's capital structure relied on in underwriting the transaction. Fundamental issues usually addressed in the modification provisions include prohibitions on:

i) increasing the maximum permitted advances of first lien/second lien obligations above negotiated caps;

ii) extension of the maturity of the first lien obligations beyond the maturity date of the second lien obligations;

iii) accelerating the amortization/maturity of the second lien obligations or increasing any mandatory prepayment obligations; and

iv) increasing interest rates above specified levels.

Additional restrictions may or may not appear in the intercreditor agreement or in the first lien loan documents or second lien loan documents.

The scope of restrictions on amendments is highly negotiated and varies depending on the market in question. While first lien and second lien claimholders will usually object to the borrower or its counsel becoming deeply involved in negotiating the terms of the intercreditor agreement, the borrower will be highly motivated to scrutinize the modification restrictions and the debt cap definitions. The borrower's interests will be aligned with those of the first lien claimholders as these provisions greatly impact the future flexibility of the borrower to incur additional debt, refinance existing debt on market terms, and obtain covenant relief.

27    The Model Agreement starts with the baseline concept that the first lien claimholders and second lien claimholders are generally free to amend their respective loan documents and refinance the obligations thereunder subject to meeting a limited set of parameters. This concept respects the status of the second lien obligations as debt that is senior in priority of payment and may be contrasted with the approach generally taken with respect to mezzanine or other payment subordinated obligations. Payment subordinated obligations are most often subject to broad restrictions on amendments and other modifications and will almost always prohibit any prepayment or refinancing of the subordinated obligations until the senior obligations are paid in full. While the Model Agreement focuses primarily on the economic terms of the obligations and does not prohibit the first and second lien claimholders from tightening or adding covenants or events of default, such amendments are usually prohibited by covenants in the first lien credit agreement in order to preserve any negotiated covenant cushion existing at the outset of the transaction. Likewise, cross-default provisions in the second lien loan documents should be reviewed and qualified as necessary to preserve any such negotiated covenant cushion.

28    The "laundry list" approach set forth in the Model Agreement is frequently encountered in middle-market transactions. Larger syndicated loan transaction and bond second lien deals often have fewer restrictions on the modification or refinancing of the first lien obligations. The restrictions in this section may also be largely addressed in the applicable loan documents rather than in the intercreditor agreement. As discussed above, restrictions on any modification or refinancing must be carefully considered relative to the definitions used to formulate any debt caps. See also note 12 above concerning potential restrictions on amendments that reallocate portions of term facility exposure to revolving exposure in cases where the second lien claimholders are seeking to require a minimum amount of amortization. While it is a case involving payment subordinated obligations, a worst-case scenario for a second lien claimholder (or a best-case scenario for a first lien claimholder) concerning flexibility to modify a class of debt with senior lien priority is illustrated by *In Re Musicland Holding Corp.,* 374 B.R. 113 (Bankr. S.D.N.Y 2007). In that case, a senior revolving credit facility was successfully modified pursuant to the terms of a broadly drafted intercreditor agreement to incorporate an additional term loan facility that "leapfrogged" the subordinated creditors in the priority of distribution of the debtor's Chapter 11 estate. *Id.* at 118-19.

The amount of any permitted percentage increase in the interest rate is among the items subject to negotiation between the parties. A maximum 2 percent per annum increase has been a common agreed upon amount; however, this negotiated amount is being revisited by many in the aftermath of the recent market disruption and widespread re-pricing of transaction exposure. The alternative text with respect to asset-based lending transactions is often strongly resisted. To the extent that such alternative text is included, the first lien

claimholders should consider whether sufficient flexibility to make protective advances or over-advances generally is included in the first lien loan documents or needs to be expressly addressed in the intercreditor agreement.

29    Consider whether subordination of excess first lien obligations is a sufficient remedy, or whether the agreement should also include an outright prohibition on extensions of credit in excess of the cap.

30    The amount of any permitted percentage increase in the interest rate is subject to negotiation between the parties. A maximum 2 percent per annum increase is a typical agreed-upon amount.

31    Consistent with the expectation of the first lien claimholders to control issues related to common collateral, the Model Agreement provides that when the first lien claimholders amend the provisions of the first lien collateral documents, such revisions will automatically apply with respect to corresponding provisions of the second lien collateral documents. This "drag-along" concept is intended to cover only provisions that relate to the collateral and, accordingly, applies only to the collateral documents. It does not apply to covenants in the first lien credit agreement or second lien credit agreement that may relate directly or indirectly to the collateral, such as disposition or insurance covenants or tangible net worth requirements. To that end, the counsel to the first lien claimholders will closely review any such restrictions in the second lien credit agreement for appropriate cushion, where applicable, to allow some flexibility in dealing with the borrower on such issues without the need to obtain an amendment or waiver from the second lien claimholders. The drag-along provision obviates the need to negotiate cushion on potentially highly focused covenants and threshold amounts in the second lien collateral documents, which are generally duplicated from the corresponding first lien collateral documents. That said, the automatic amendment provisions will not apply to amendments that require the release of collateral, except to the extent that such releases are required by other sections of the Model Agreement. Releases of collateral in the context of an enforcement action or dispositions are addressed in section 1.10, "*Release of Liens or Guaranties*," and releases in the context of an insolvency proceeding are addressed in section 6.2, "*Sale of Collateral*." The automatic amendment provisions are, likewise, qualified to protect the second lien agent from being required to assume additional responsibilities, to protect the second lien claimholders from amendments that permit additional liens that could undermine their collateral position, and, in the case of the optional language, to protect from an amendment that could prejudice a second lien claimholder to a larger degree than a first lien claimholder. Such optional language may be objectionable to first lien claimholders based on the language being somewhat vague in nature and open to interpretation. Second lien claimholders may object to this section--especially in financings where specialized covenants are essential to preserve the expected value of the collateral or the validity of the liens. One such area that comes to mind would be customary geographic restrictions, maintenance, and insurance requirements applicable in vessel financings. Provisions pertaining to the application of casualty and condemnation proceeds also merit careful consideration.

32    In order to allow the first lien claimholders and second lien claimholders to track compliance of the other party with the provisions in section 2 of the Model Agreement, we have provided a mutual notice provision. This notice requirement applies after the effectiveness of the modification in question and, while a claim for damages is theoretically possible, the failure to give such notice is not intended to impair the effectiveness of the agreement. Often, parties may prefer to put the burden of providing notices on the borrower; however, this provision is consistent with the general theme in the Model Agreement of attempting to foster reasonable cooperation between the creditors on administrative issues. As the notice provision is also acknowledged by the borrower, it also may provide a waiver by the borrower of confidentiality provisions that might otherwise restrict communication between the creditors on issues covered by the intercreditor agreement.

33    In addition to enjoying relative lien priority over second lien claimholders, first lien claimholders are afforded enforcement priority over the second lien claimholders with respect to the collateral. This lien enforcement priority is not unlimited, however. First lien claimholders are permitted a finite period in which to exercise their exclusive right to bring enforcement actions with respect to the collateral. This exclusive enforcement period afforded the first lien claimholders (which is referred to in the Model Agreement and in practice as a "Standstill Period"--i.e., a period during which second lien claimholders agree to refrain from exercising their subordinate security interests) frequently is a matter of intense negotiation. The length of the standstill period typically ranges from 120 to 180 days, depending upon factors such as the relative bargaining strength of the parties, the nature of the borrower's business and the collateral, and other factors that may reduce or lengthen the amount of time necessary for first lien claimholders to evaluate whether or not to commence an enforcement action. Accordingly, the Model Agreement provides a range of days for the standstill period, rather than suggesting a single, specific period. Along with their exclusive right during the standstill period to commence

an enforcement action with respect to the collateral, first lien claimholders have the exclusive right during the standstill period to exercise certain other rights and remedies. First lien claimholders may exercise all the rights and remedies of a secured creditor under the Uniform Commercial Code. Additionally, first lien claimholders may agree to release or dispose of the collateral (or to place or eliminate restrictions with respect to the collateral), so long as the consent of second lien claimholders is obtained if the proceeds received by first lien claimholders in connection with any such events are not applied to reduce the first lien obligations or if any such action is prohibited under the second lien loan documents. Following the expiration of the standstill period, second lien claimholders may commence an enforcement action against the collateral under certain conditions. These conditions include the requirement that first lien claimholders have not commenced an enforcement action with respect to all or a material portion of the collateral prior to the end of the standstill period and are not then continuing the diligent pursuit of such enforcement action (or diligently attempting to vacate any stay or prohibition against such enforcement action) and the requirement that second lien claimholders have not rescinded any acceleration of the second lien obligations. Even during the standstill period, second lien claimholders may take certain actions to preserve their position as provided in the Model Agreement. For example, second lien claimholders are granted the rights to file a proof of claim, to vote on a plan of reorganization, and to make other filings, arguments, and motions with respect to the second lien obligations and the collateral in any insolvency proceeding involving the borrower. A question of much current interest is whether or not the second lien claimholders should be allowed to join in an involuntary bankruptcy petition against the borrower in the exercise of their reserved rights as unsecured creditors or whether any right to join in an involuntary petition should be expressly excluded on the grounds that it effectively undermines the rights of the first lien claimholders to bring an enforcement action under the standstill provisions. *See* section 3.1(d) below, including optional language prohibiting the second lien claimholder from initiating or joining in an involuntary bankruptcy petition.

34   Under section 9-617(a) of the U.C.C., the lien securing the second lien obligations will not automatically attach to the proceeds of collateral received following a foreclosure of the first lien, as the second lien will be discharged. U.C.C. § 9-617(a) (2008).

35   Second lien lenders may seek to have an earlier trigger for the commencement of a standstill such as certain actions by the first lien lenders, and they may also oppose acceleration as a requirement for the commencement of the standstill.

36   Second lien claimants will likely take the position that the bankruptcy laws should dictate what rights the first and second lien claimholders have if an insolvency proceeding is commenced, and that a blanket prohibition on remedies is not appropriate. However, first lien claimants do not want the second lien claimants to exercise remedies against any loan parties or accompanying collateral that may not be subject to the protection of the bankruptcy court and may prefer to exercise remedies contemporaneously against all the loan parties.

37   Consider specifying provisions precluding objections to claims, liens, and other agreed provisions that might be more favorable to second lien lenders.

38   The right of first lien claimholders to take an enforcement action against the collateral is generally unfettered. The only real limitation on such right is that first lien claimholders must comply with applicable law First lien claimholders otherwise are free to take an enforcement action without consultation with or the consent of second lien claimholders. This is so irrespective of whether an insolvency proceeding has been commenced, whether any second lien loan document provides to the contrary, or whether the enforcement action is adverse to the interest of second lien claimholders. Additionally, first lien claimholders are not impeded in bringing any enforcement action by any action or failure to act of the borrower, any guarantor, any other first lien claimholder, or any other party. Nor are first lien claimholders impeded in bringing an enforcement action by the non-compliance by any person other than first lien claimholders with any provision of the intercreditor agreement, the first lien loan documents, or the second lien loan documents, even if the first lien claimholders are aware of such non-compliance. Second lien claimholders specifically agree not to contest, protest, or otherwise take any action to interfere with any enforcement action properly conducted by first lien claimholders.

39   The Model Agreement recognizes that the right to bring an enforcement action or prevent an unauthorized enforcement action is an essential right for which the parties have specifically bargained under the Model Agreement. Accordingly, the Model Agreement

grants each party the right to demand specific performance under the Agreement, and each party waives the right to assert the adequacy of a remedy at law or any other defense that might be asserted to bar the remedy of specific performance.

40      First lien claimholders and second lien claimholders have a common interest in the collateral and a common desire to ensure that enforcement actions are conducted in a manner that will yield the maximum possible proceeds for application to the first lien obligations and the second lien obligations. Accordingly, both first lien claimholders and second lien claimholders agree to give each other notice of their commencement of an initial material enforcement action.

41      As has been detailed earlier, among the primary benefits to the first lien claimholders of the Model Agreement are the priority of their liens over those of the second lien claimholders and the enforcement priority that they enjoy relative to their liens. *See* note 33 to section 3. The enforcement priority is effectuated by the standstill period, which provides the first lien claimholders a "head start" relative to enforcement of their liens. The Model Agreement also continues the exclusivity relative to lien enforcement if, prior to the expiration of the standstill period or prior to the permitted commencement of lien enforcement by the second lien claimholders, as applicable, the first lien claimholders have commenced and thereafter are diligently pursuing the exercise of their rights or remedies with respect to all or any material portion of the collateral. As a corollary to the exclusive enforcement remedies, this section provides for the application of proceeds received in connection with an enforcement action. Commonly referred to as a "waterfall" provision, the section expressly provides that it is applicable before or after the commencement of an insolvency proceeding. It should be noted, however, that this section does not apply to payments or other distributions made in an insolvency proceeding unless those payments or other distributions are received in connection with an enforcement action. It should also be noted that the section is applicable to collateral or proceeds received in connection with an enforcement action irrespective of whether the action was taken by the first lien claimholders or the second lien claimholders. In the unlikely event that the first lien claimholders have allowed the standstill period to expire and the second lien claimholders exercise their rights to take enforcement actions, this section still requires that the proceeds of such exercise be run through the waterfall. While, as to collateral that is subject to Article 9, this would appear to conflict with section 9-615(a) of the U.C.C., section 9-615(a) is not one of the sections of the U.C.C. that section 9-602 expressly states cannot be waived or varied by the debtor. Presumably, the execution of the Model Agreement by the various grantors would be deemed to be a waiver of the provisions of section 9-615(a) when the proceeds result from an enforcement action taken by the second lien claimholders. The waterfall provision establishes a priority of application of the proceeds of the collateral, first to the first lien obligations (up to the amount of the first lien cap), second to the second lien obligations (up to the amount of any second lien cap), third to the excess first lien obligations (i.e., the amount of the obligations owing under the first lien loan documents in excess of the first lien cap), and fourth to the excess second lien obligations (i.e., the amount of the obligations owing under the second lien loan documents in excess of a second lien cap). In each case, the application within a particular tier is as specified in the applicable loan documents. Presumably, the loan documents will contain their own order of application of payments, including applying collateral proceeds to the costs and expenses of enforcement, to accrued and unpaid interest, and to the outstanding principal balance of the loans. When combined with the other provisions of the Model Agreement, this section completes a trifecta, i.e., the liens of the first lien claimholders have priority, the enforcement rights of the first lien claimholders have priority, and the first lien claimholders have priority as to the application of the proceeds of any enforcement action. The section does not distinguish between cash proceeds and non-cash proceeds, but should be interpreted to require the application of cash proceeds to the applicable obligations as and when received and to defer the application of the non-cash proceeds to the applicable obligations until such non-cash proceeds have been monetized.

42      Some intercreditor agreements do not address the consequences of the first lien lender exceeding the first lien cap or the second lien lender exceeding a second lien cap. In the absence of an agreement between the parties as to the effect of the first lien lender exceeding the first lien cap, the second lien lender might argue that the breach by the first lien lender of the intercreditor agreement should preclude it from enforcing the agreement. One alternative for addressing this issue is to provide in the intercreditor agreement that excess first lien obligations (i.e., obligations in excess of the first lien cap) will be given a priority immediately after the second lien obligations. This "waterfall' may be implemented without formally classifying the excess amount as "subordinated debt," as such classification of a portion of the first lien obligations as "third lien" or "subordinated" may run afoul of the terms of the first lien lender's credit approval. *See* section 1.11.

43      See U.C.C. § 9-615(c) (2008).

[44] This section is an ancillary set of provisions in aid of the other priorities set forth elsewhere in the Model Agreement. First, it provides that the first lien agent and the second lien agent are to be named as additional insureds and loss payees, as applicable, of insurance policies maintained by the grantors. Of course, this includes insurance policies beyond those that cover casualty losses to the collateral. Second, the section provides that the first lien agent will have the exclusive right to adjust settlement of any claims under an insurance policy covering the collateral as well as approve any award in a condemnation or similar proceeding affecting the collateral. Last, continuing the priority theme discussed above, the section provides that the proceeds of any policy covering the collateral or proceeds of any award will be applied in a manner consistent with the waterfall provision relative to proceeds received from enforcement actions.

[45] The requirement in this section that a second lien claimholder turn over any amounts it receives in connection with the exercise of enforcement actions (and certain other actions) is essential to the operation of the waterfall provisions of section 4.1. The section requires that all such amounts be segregated and held in trust for the benefit of the first lien agent and promptly paid over to the first lien agent. Once the second lien claimholders have turned over the proceeds of their enforcement activities, the first lien agent should apply those proceeds in accordance with the waterfall.

[46] The first lien obligations may be paid off and, subsequently, the borrower may seek to incur new indebtedness on a first lien basis. This section allows for that possibility and provides that the newly incurred indebtedness should be entitled to the benefits of the Model Agreement to the same extent as if the original first lien obligations were not retired. The provisions of the section should not be interpreted to permit the incurrence of indebtedness that is not permitted under the second lien loan documents or to permit indebtedness in excess of the amount of the first lien cap to enjoy a first priority with respect to the collateral. If such refinancing indebtedness is incurred, the second lien agent is required to enter into appropriate documents and agreements to give effect to the substitution, and the new agent is required to agree with the second lien agent that it is bound by the terms of the Model Agreement.

[47] Second lien claimholders may resist the application of this section 4.4 to situations other than the incurrence of new first lien obligations that are used to refinance then-existing first lien obligations, as opposed to a permanent subordination of second lien obligations to future first lien obligations not to exceed the first lien cap.

[48] If the collateral agent for the first lien lenders arranges a private sale of the collateral to a third party at a price sufficient to satisfy both the first lien obligations and the second lien obligations, then the second lien lenders will be protected as secured parties second only to the first lien lenders and with a claim superior to all unsecured creditors. However, if the first lien lenders pursue a public sale of the collateral under the U.C.C., the first lien lenders can credit bid and purchase the collateral at the sale. Since the first lien lenders will not bid more than the amount of the first lien debt, the second lien lenders' lien on the collateral will be extinguished unless the second lien lenders elect to outbid the first lien lenders at the public sale. A more orderly alternative to the uncertainties of a private or public sale of the collateral under the U.C.C. is for the second lien lenders to be granted a right in the intercreditor agreement to purchase the first lien debt following an acceleration of the first lien debt, the filing of bankruptcy proceedings, or for a short period of time (e.g., sixty days) following an uncured payment default. The purchase price is at par. Because first lien credit facilities often include hedge arrangements provided by one of the first lien lenders (usually the agent) or an affiliate of one of the first lien lenders, the Model Agreement includes specific provisions for the unwinding of any hedging obligations. Similarly, provisions are included to deal with undrawn letters of credit and with prepayment premiums. During most of the years that first lien/second lien transactions were closed, first lien debt typically traded on the secondary market at par or close to par. The right of the second lien lenders to purchase all of the first lien position at par was therefore a valuable right. During the financial crisis, first lien debt positions have often traded considerably below par, making it impractical and financially unfeasible for second lien lenders to purchase first lien debt under the intercreditor agreement at par. Still, even during distressed times, the option to purchase provisions provide a valuable starting point and framework for negotiations between first and second lien lenders for purchase of the first lien position by the second lien lenders following a default.

[49] Second lien claimholders may wish to include additional purchase events such as (i) notice of a disposition or enforcement action that would force a lien release, or (ii) a payment default under the first lien credit agreement not cured or waived by a specified time period.

50  This concept may work only for purchase options that have a limited exercise window First lien claimholders should have an exception if exigent circumstances exist.

51  First lien claimholders may wish to consider requiring that the purchase notice include all excess first lien obligations.

52  Second lien claimholders may also negotiate the right to receive (or preferably to have the second lien agent receive on their behalf) notice ten to fifteen days in advance of any acceleration or commencement of an enforcement action, or the taking of any action by the first lien claimholders, and of an estimate of the amount of first lien obligations (not in excess of the first lien cap), within which time, pursuant to specified procedures set forth in the intercreditor agreement or in the second lien credit agreement, (i) the second lien agent would notify the second lien claimholders of the event underlying the notice, (ii) each second lien claimholder would have a specified number of business days to notify the second lien agent as to whether it wishes to exercise its purchase right, and whether it is willing to purchase more (or less) than its pro rata share of the first lien obligations (and commitments) and irrevocably commit to purchasing its allocable portion of the first lien obligations not in excess of the first lien cap, (iii) non-committing second lien claimholders would lose their purchase right as to the event that is the subject of the notice, (iv) the second lien agent would allocate the total amount of first lien obligations not in excess of the first lien cap pro rata among the second lien claimholders wishing to exercise the purchase right (with any shortfall being allocated equitably to those willing to purchase more than their pro rata share), and (v) the second lien agent would send a binding notice to the first lien agent committing the purchasing second lien claimholders to consummate the purchase by a pre-negotiated deadline. A standstill would exist during the period specified prohibiting the first lien claimholders from taking any of the specified actions with an exception for exigent circumstances. This right allows the second lien claimholders to exercise their purchase right before significant damage (e.g., the loss of trade credit, the triggering of cross-acceleration clauses in other debt, etc.) is done to the enterprise value of the grantors that may result from an acceleration or the commencement of enforcement actions. The Model Agreement sets forth relatively basic purchase option mechanics. For syndicated transactions with a large number of lenders, consideration should be given to setting forth in detail procedures for the allocation and exercise of the purchase right.

53  Another option for the parties to consider regarding prepayment premiums is to provide that the purchasing creditors will pay to the first lien agent as a deferred portion of the purchase price any prepayment premium that is actually paid to the purchasing creditors within a designated period of time but will not pay any prepayment premium at the closing of the purchase unless the premium was then due and payable.

54  Please note section 1.11(e), which provides in part that, with respect to the excess first lien obligations, first lien claimholders will have rights and obligations (other than the obligations in respect to the Standstill Period) analogous to the rights and obligations that second lien claimholders have under the Agreement with respect of the second lien obligations. With respect to any excess first lien obligations remaining after the exercise of the purchase option by the second lien lenders, section 5.5 and section 1.11(e) would result, for example, in the first lien lenders having the same rights and obligations with respect to the excess first lien obligations that the second lien lenders have under the insolvency provisions in section 6.

55  Holders of a secured claim in bankruptcy have a variety of statutory rights to protect the creditor's interest in the grantor's property When lenders hold a collective security interest under one granting clause, they act by majority instruction to the agent or at times by unanimous instruction. When the secured claims are divided into separate granting clauses, two groups (the first lien claimholders and the second lien claimholders) may assert the rights of secured creditors. Absent agreement to the contrary, the second lien claimholders' assertion of these rights may be made in a manner that is in conflict with the interests of the first lien claimholders. Such actions may include consenting or objecting to financing secured by priming liens on the collateral, consenting or objecting to the use of cash collateral to operate during the bankruptcy, or consenting or objecting to sale of collateral free and clear of liens. On the other hand, if the second lien claimholders waive these rights as secured creditors, the grantors and first lien claimholders could agree to the use and disposition of collateral in a manner that could cause the diminution of the value of the interest of the second lien claimholders in the collateral. As such, one of the key functions of an intercreditor agreement is to set forth the extent to which the rights of second lien claimholders in collateral may be asserted in a manner that does not conflict with the interests of the first lien claimholders during the bankruptcy

56    In a Chapter 11 bankruptcy where substantially all of the debtors' assets have been pledged to secure the first and second lien debt, the debtors will have an urgent need to use cash collateral starting with the first days of the case. In addition, in most situations, the debtors will also want to incur DIP financing both to provide the debtors with liquidity and also to inspire confidence in customers, vendors, and employees. DIP lenders generally insist on super priority claims and priming liens that are senior to both the existing first and second liens. The first lien claimholders generally want to facilitate the debtors' use of cash collateral under a budget that they approve, so as to preserve the value of the first lien claimholders' collateral. They are also the most frequent source for DIP financing, given the reluctance of secured lenders to permit other lenders to prime their liens. In order for the debtors to have the right to use cash collateral of the first and second lien claimholders, or to have priming liens on collateral pledged to secure the first and second lien loans approved, they must either obtain the consent of both first and second lien claimholders, or secure an order of the bankruptcy court finding that adequate protection has been given to such claimholders to protect them from any loss of value from the use or priming. ==A finding of adequate protection can be difficult or impossible to obtain, and is not a requirement that debtors or first lien claimholders want to have imposed at the outset of the bankruptcy. As such, most intercreditor agreements include a deemed consent to the use of cash collateral by the second lien claimholders if supported by the first lien claimholders, as well as a deemed consent to permit a priming DIP financing if consented to by the first lien claimholders. The deemed consent typically has certain limitations and conditions. For example, a pre-consent to a DIP financing is typically conditioned on the amount of the DIP financing not exceeding a specified amount. The second lien claimholders will often reserve the right to object to provisions of a proposed DIP financing that would have the effect of dictating the terms of a restructuring, or that would require the company to liquidate its assets on a rapid schedule. While the second lien claimholders' right to object to use of cash collateral or a priming DIP is limited, second lien claimholders typically do have the right to insist on replacement liens in the debtors' post-bankruptcy assets to the extent of any loss of value in the collateral so long as any such replacement liens are junior to the approved DIP financing and any replacement liens granted to first lien claimholders.==

57    *See* note to section 6.2 below.

58    First lien claimholders will want no interference with the use of cash collateral, but second lien claimholders will not want to have their other interests "primed" or have their liens stripped, by reason of the broad concept of "use" of collateral.

59    As noted above in connection with the definition of "First Lien Cap," it may be desirable to formulate the cap differently in the context of a DIP financing. Common approaches include (i) an incremental cushion for a DIP financing, or (ii) a cap that is the lesser of the first lien cap and some cushion over outstanding first lien obligations at the commencement of the case.

60    This clause is applicable when the first lien cap is tied to a borrowing base. With respect to principal amounts of new loans that increase the first lien obligations and reduce the amount of collateral available for second lien obligations, most agreements limit the amount of diminution that would be suffered. However, most agreements do not limit the amount of diminution that may result from the use of cash collateral or other diminution of the borrowing base. Consideration should be given as to whether cash collateral objections could be asserted by the second lien agent if the amount of collateral diminution, when added to the first lien obligations, would exceed the first lien cap by reason of the erosion of the borrowing base.

61    First lien claimholders should consider deleting this requirement based upon the protection provided to second lien claimholders from the first lien cap and the fact that the first lien claimholders can condition consent to the DIP financing upon an intercreditor agreement with the DIP lender that subordinates the lien securing the DIP financing to the lien securing the first lien obligations. In addition, it may be beneficial to the first lien claimholders to have a DIP financing that is "junior" to the first lien obligations in connection with plan confirmation requirements for the payment in full of all DIP obligations.

62    First lien claimholders may regard this proviso as creating the potential for delay and uncertainty The second lien claimholders have the right to assert objections that may be asserted by unsecured creditors that the terms of the DIP financing are not appropriate.

63    The market has developed to generally give first lien claimholders the power to compel second lien claimholders to consent to the diminution of collateral, in the form of use of cash collateral or permitting additional secured financing even if the first lien obligations

are sufficiently oversecured that first lien claimholders are otherwise not motivated to police the excess use of cash collateral or DIP financing. On the other hand, the market has not similarly developed to give first lien claimholders the ability to use second lien claimholders' rights of adequate protection in order to more effectively prevent the diminution of collateral. This draft proposes the first set of rights in favor of first lien claimholders and references the second as an alternative favorable to the first lien claimholders. To the extent that the second lien claimholders are required to join in, or prosecute, such an objection, they should consider requiring that their expenses be paid by the first lien claimholders, which could increase the size of the first lien claim, but will assure that the second lien claimholders will not go out of pocket.

64    Some intercreditor agreements attempt to restrict first lien claimholders from consenting to the subordination of the lien securing first lien obligations and, in turn, such agreements often exclude DIP financing from the scope of such restriction. However, the treatment of "carve-outs" is often omitted or not considered the same as if the first lien agent made advances to fund retainers for professionals. This form treats carve-outs as a use of collateral, but not as though they are the same as if being incurred or used as of the date such "carve-out" obligations are incurred. An alternative approach would be to treat administrative carve-outs as extensions of credit that need to be capped. If this approach is taken, additional consideration should be given to the first lien cap and the inclusion of additional, incremental amounts in the event of an insolvency proceeding, and to the need to reflect clear dollar limits on administrative carve-outs in the DIP orders. For a discussion of "carve-outs" generally, see Richard Levin, *Almost All You Ever Wanted to Know About Carve Out*, 76 Am. Bankr. L.J. 445 (2002).

65    First lien claimholders may want an absolute bar on second lien claimholders attempting to provide "priming" DIP financing, while second lien claimholders will generally resist any limitation against DIP financing due to the ability of third parties to propose the same. A compromise position is bracketed.

66    Second lien claimholders may seek to preserve unsecured creditor objections to a DIP financing, while first lien claimholders may expect second lien claimholders not to object in any capacity so long as a DIP financing satisfies the parameters specified in the intercreditor agreement. The parties may want to consider alternative permitted objections to DIP financing or cash collateral orders such as: (a) provisions that purport to bind parties to a plan, (b) provisions that compel the sale of collateral, and (c) provisions that are otherwise inconsistent with the intercreditor agreement and priorities of the liens.

67    Second lien creditors typically agree not to contest or object to a sale, lease, exchange, or transfer of collateral under section 363 of the Bankruptcy Code if the first lien creditors have consented in writing to such disposition, provided that (i) the liens of the second lien creditors attach to the proceeds of such disposition to the extent so ordered by the court, (ii) the net cash proceeds are applied to reduce the first lien obligations permanently, and (iii) the second lien creditors will not be deemed to have waived any right to bid in connection with such disposition (subject to the lien priorities set forth in the intercreditor agreement). Once again, second lien creditors may attempt to retain the right to assert any objection that may be available to unsecured creditors generally. First lien creditors will most likely object to this inclusion, as it provides the second lien creditors an opportunity to interfere with the first lien creditors' exercise of remedies. Alternatively, the first lien creditors may require that such second lien objections be otherwise consistent with the other terms of the intercreditor agreement. The first lien creditors may also argue that the second lien creditors have the ability to protect themselves by the exercise of their buyout right. Some intercreditor agreements also require that the second lien creditors, solely in their capacity as holders of a lien on the collateral, join the first lien creditors in any objection to a sale of collateral to the extent asserted by the first lien creditors. The second lien creditors would typically resist this. In transactions where each party has priority in certain types of collateral, the parties should consider agreeing on a methodology to allocate value received in a disposition among the various categories of assets.

68    Second lien claimholders may seek to preserve rights to object to any proposed sale where liabilities of grantors are assumed (given that this permits trade debt to leapfrog the second lien in terms of priority) or where proceeds are not solely applied to repay first lien obligations or second lien obligations. Provisions of this kind may present impediments to sales, present complexities, and require careful negotiation and drafting. For example, cure payments in connection with the assumption and assignment of contracts would need to be carved out, as would payments of DIP financings (if not included in "First Lien Obligations") and administrative claims entitled to a "carve-out" under any adequate protection arrangements.

69    Second lien claimholders may want assurances that they will be permitted to credit bid their claims in any bankruptcy sale. First lien claimholders will want merely to preserve any rights that second lien claimholders may have, not assure that they have such rights.

70    It may be desirable to include a provision that any credit bid must respect the priorities set forth in the intercreditor agreement, i.e., any credit bid of second lien obligations must contemplate the payment in full in cash of first lien obligations (other than excess first lien obligations) on closing of any resulting disposition.

71    Second lien lenders will generally expect to be permitted to assert any rights they may have to object to dispositions of collateral that would be available to unsecured creditors in a bankruptcy proceeding. First lien lenders may seek to restrict such rights, or to condition the exercise of such rights on there having been a concession or determination that all or a portion of the second lien obligations are unsecured, arguing that second lien claimholders have the ability to protect themselves through exercise of their buyout rights and that a price for the priority second lien claimholders enjoy over other creditors is that they must give up any rights to interfere with collateral dispositions that first lien claimholders support. An alternative approach is to rely solely on a provision like section 3.1(d), which generally preserves unsecured creditor rights. This approach can be favorable to the second lien, depending on how drafted, since it then applies to all aspects of the agreement that are not expressly carved out. The first lien may expect that certain waivers by second lien claimholders will be unqualified, such as waivers of objections to DIP financings supported or provided by the first lien, objections to liens or claims of first lien claimholders, and where commencement of an involuntary bankruptcy is included in the term "Enforcement Action," the right to initiate or join in an involuntary bankruptcy.

72    First lien lenders may seek to require the second lien agent to actually support objections that the first lien may have to sales of collateral and other matters in an insolvency proceeding. This is not a usual provision, and many second lien lenders would resist it. To the extent that it is insisted upon, second lien claimholders should consider limiting this undertaking to withholding consent to the applicable disposition of collateral or filing a pleading indicating support for the first lien agent's objections, and also including a requirement that the second lien claimholders be indemnified for any expenses or other losses incurred in complying with this requirement (that any reimbursement by first lien claimholders not add to the amount of priority first lien obligations).

73    The commencement of a bankruptcy case imposes an automatic stay on actions to foreclose on collateral or otherwise to seek collection of pre-bankruptcy claims. Secured creditors may nonetheless seek a bankruptcy court order lifting the stay and permitting the creditors to take enforcement actions against collateral under appropriate circumstances. First lien claimholders want to control the timing of any effort to pursue remedies against collateral following the bankruptcy filing, and it is thus typical for intercreditor agreements to prevent or severely limit second lien claimholders from seeking relief from the stay to take action against shared collateral.

74    Second lien lenders may seek to retain the right to take action following the standstill period (which would then be modified such that it does not extend indefinitely in bankruptcy). First lien lenders and borrowers would generally resist this.

75    Many agreements only require that second lien claimholders not seek relief themselves. More first lien favorable provisions would go on to preclude second lien claimholders from opposing relief sought by the first lien. This clause would operate in conjunction with section 6.4(b)(1) and could be provided for there as well.

76    First lien lenders would prefer the agreement not to seek relief from the stay to be unqualified.

77    As noted above, in order for the debtors to use cash collateral or grant priming liens on collateral, the debtors must either obtain consent of the secured lenders or must provide adequate protection for any diminution in the value of the secured lenders' interest in the collateral. Adequate protection can take the form of cash payments of fees and/or interest, principal reductions, or liens on replacement collateral. If the second lien claimholders retain their right to seek adequate protection in connection with a proposed priming DIP financing or use of cash collateral, this can add a significant and perhaps prohibitive cost to the debtors.

It has become customary for intercreditor agreements to provide that second lien claimholders may only seek adequate protection in the form of replacement liens on collateral and many agreements restrict replacement liens unless the first lien claimholders also

have been granted replacement liens in the same collateral as adequate protection. Note that the first lien claimholders may well have differing interests from the second lien claimholders in terms of whether replacement collateral is needed as adequate protection, because the first lien claimholders can have a significant cushion when the second lien claimholders do not. As such, the first lien claimholders may not insist upon, or be entitled to receive, replacement liens, while the second lien claimholders may suffer loss of value without them.

78    A pro-second lien provision would eliminate a general restriction against seeking adequate protection and limit the waivers to cash collateral, DIP financing, and asset sales.

79    While common in the marketplace, second lien claimholders and their counsel may question why this should be a condition to second lien claimholders obtaining junior replacement liens on collateral.

80    The parties should consider whether the payment of administrative claims arising under section 507(b) should be paid over to the first lien agent as proceeds of collateral and be applied to reduce the first lien obligations permanently. If first lien claimholders seek confirmation of a plan, the right of second lien claimholders to assert a claim under section 507(b) may preclude confirmation of the plan. The bracketed text would permit the confirmation of the plan so long as second lien claimholders' section 507(b) claim would otherwise be satisfied under a "cram-down"-type test. The parties may wish to consider an alternative treatment for section 507(b) claims that may include being silent (prosecond) or subordinating the right to assert section 507(b) claims in their entirety until the discharge of first lien obligations.

81    Second lien adequate protection payments could include any or all post-petition claims, or other amounts as may be negotiated between the parties.

82    The bracketed language gives the parties the option to negotiate whether adequate protection payments may be contested or not by the first lien claimholders. To the extent the first lien agent asserts a lien on substantially all property of the applicable grantor, the first lien agent likely would assert that any payment constitutes "proceeds" of collateral and would be subject to turnover and application to payment of the first lien obligations. Second lien claimholders would want to provide expressly that any payments turned over to the first lien agent will be applied to reduce the first lien cap permanently

83    The first lien claimholders prefer to have complete freedom to act in the bankruptcy, even where this means that they may choose to contest the claims and liens of the second lien claimholders or to oppose actions by the second lien claimholders that are not inconsistent with the intercreditor agreement. For example, the first lien claimholders may want to support the position that the second lien is wholly unsecured because this may facilitate the completion of a bankruptcy plan or sale. This provision preserves the right of the first lien claimholders to object generally to actions taken, or relief requested, by the second lien claimholders.

84    The second lien favorable version specifies that the first lien claimholders may not object to the second lien claimholders' seeking of adequate protection consistent with the agreement.

85    A debtor or bankruptcy trustee may have the ability to "avoid" or set aside pre-bankruptcy payments or transfers of value as fraudulent or preferential transfers. Fraudulent transfers can be transfers with actual intent to hinder, delay, or defraud creditors. More common in large and mid-size cases are allegations of constructive fraud, where a payment or other transfer was made while the debtor was insolvent and for less than reasonably equivalent value. An example is the debtor repaying debt that was incurred as a result of a leveraged buyout, where the value from incurring the debt flowed to shareholders rather than the borrower. Preferential transfers are those made to creditors within the ninety days prior to a bankruptcy (a year in the case of insider creditors) that result in the creditor receiving more than if the payment had not been made and the debt had been liquidated. Preferences are not a concern where a creditor is, at all points since the offending transfer, oversecured. If a payment is avoided, the creditor will have a claim against the debtor for the value disgorged. Where a first lien loan or a second lien loan has been repaid prior to bankruptcy, the possibility exists that the payment could be subject to avoidance on one of the above theories. The purpose of section 6.6 is to specify that if that does occur, the intercreditor agreement continues to govern the relationship between the first and second lien claimholders, with respect to

their claims against the debt as a result of the disgorgement. The more controversial language at the end of the section endeavors to compel second lien claimholders to disgorge to the first lien claimholders amounts that they may have received constituting collateral proceeds during the time between the initial payment to the first lien claimholder and the avoidance of that payment. Second lien claimholders often will strenuously resist any contractual undertaking that would require them to disgorge, on the basis that the payment made to them was permitted under the intercreditor agreement when made and they may well have passed the payment along to their own investors, with no power to obtain a return of such payment. When determining whether and to what extent to resist such provisions, note that the second lien claimholders are likely to be subject to a similar risk of avoidance. As such, though undertaking a contractual obligation to disgorge may be unpalatable, it may not greatly increase the actual risk of disgorgement.

86    Second lien claimholders will oppose disgorgement of proceeds of collateral received after the first lien obligations are discharged. The parties may negotiate a middle ground where disgorgement is applicable only if demanded within a set time period after payment is received by second lien claimholders.

87    Second lien claimholders will object to a pro rata disgorgement of avoidance action proceeds on the grounds that general unsecured creditors would have the right to share in such payments, and that the lien subordination should only pertain to the receipt of proceeds of collateral.

88    In a restructuring, it is common for holders of first and second lien debt to receive debt or equity securities in the reorganized company One purpose of section 6.7 is to confirm that this is permissible and that second lien claimholders can receive distributions prior to payment in full of the first lien claimholders. The first lien favorable variation specifies that distributions to the second lien claimholders on account of their secured claims are only permitted if the first lien claimholder classes support the plan. Another purpose of this section is to specify that, if both first and second lien claimholders do receive new secured debt that shares collateral, the intercreditor provisions will continue to govern the relative priorities and other rights of such secured debt.

89    There is a hypothetical issue with the fact that this provision covers all debt securities issued with respect to the second lien obligations, in that it is possible that the second lien obligations could be bifurcated into a secured and unsecured component, and that secured debt obligations could be issued with respect to the unsecured component. To the extent that other unsecured creditors also receive the same type of security or the same security, the obligations issued to second lien claimholders could be treated differently because of this provision. Consider whether this potential should be addressed by carving out debt obligations to the extent issued to any unsecured claim held by second lien claimholders and, potentially, to the extent such debt obligations are also issued to other creditors holding unsecured claims.

90    In this section, the second lien claimholders agree not to oppose the allowance of post-petition claims held by the first lien claimholders and the first lien claimholders agree not to oppose the allowance of post-petition claims held by the second lien claimholders. This waiver applies to valuation of the collateral as a component of determination of the secured claim held by the first and second lien claimholders. In addition, the waiver prevents either the first lien or second lien claimholders from objecting to the *allowance* of the amount of first and second lien debt held by the other parties. Finally, if and to the extent the first lien claimholders have allowed secured claims, the second lien claimholders agree not to oppose the *payment* of the first lien debt. While this latter waiver is less common in the marketplace, it is consistent with the notion that the second lien claimholders have no right to payment from collateral until after the first lien claimholders have been paid and, therefore, the second lien claimholders should benefit, dollar-for-dollar, from the repayment of the first lien debt. The practical effect of these waivers is that third parties with an incentive to challenge the extent, validity, and priority of the first and/or second lien debt will be the ones to challenge the secured claims and there should not be a challenge commenced by either of the first or second lienholders against the other.

91    Many intercreditor agreements qualify the agreement not to object to claims based upon the extent of the value of any collateral securing the first lien obligations without regard to the existence of the lien securing the second lien obligations. This language is regarded as inconsistent with the notion that the parties to the intercreditor agreement should not interfere with each others' claims against the grantors.

92    In the mezzanine world, where the junior creditor could not receive payment on its unsecured claims until the senior debt was paid in full, an election by the senior lender under section 1111(b) of the Bankruptcy Code could cause the waiver of the unsecured creditor "dividend" and make it more difficult for the junior creditor to ever receive payment under a plan. Hence, the subordination agreements in a mezzanine context often contained a "waiver" of any claims resulting from the senior lender making the section 1111(b) election. The Model Agreement deletes this waiver as the Task Force believes that the section 1111(b) election does not affect the rights of the second lien claimholders. The other waivers that relate to cash collateral, financing, and granting of security interests are general provisions that are consistent with the DIP financing and cash collateral provisions discussed above. Some second lien claimholders may prefer to be governed by those more specific sections and may object to the more general waiver.

93    Any payment received by a second lien claimholder as a result of a surcharge against collateral under section 506(c) of the Bankruptcy Code would result in the receipt of proceeds of collateral that would otherwise be required to be applied to payment of the first lien obligations.

94    Many forms in the marketplace have elaborate provisions dealing with the classification of claims. The Model Agreement attempts a more streamlined provision that should be sufficient under most circumstances. We believe that the more lengthy waiver grew out of structures where the second lien claimholders held claims under the same security documents, thereby creating the risk of classification in the same class. Separate granting clauses, at least with respect to the secured claims held by the first lien claimholders and second lien claimholders, should result in separate classification as a matter of law.

95    Section 510 of the Bankruptcy Code contains a general reference to the enforceability of "subordination" agreements. There is some difference of opinion as to whether the reference to subordination is to "debt subordination," "lien subordination," or both From the perspective of waivers and estoppel, the Model Agreement takes the position that the claimholders should not dispute that the reference in section 510 includes "lien subordination." Therefore, no claimholder should be permitted to avoid its contractual obligations set forth in the intercreditor agreement by arguing that the bankruptcy court lacks jurisdiction to enforce a contract between two non-debtors. Of course, the parties cannot confer jurisdiction on the court where none would otherwise exist, but at least this acknowledgement should be evidence of the parties' intent and should dissuade parties from conduct inconsistent with that intent.

96    Much of the detail, and key substantive terms and distinctions, are found in the definitions. A few of the important ones are discussed briefly in footnotes below, but all of them should be scrutinized as the most mundane could be important in a particular transaction. A quick note as to form: Breaking with tradition, at least for many of us, the Model Agreement does not group all of the defined terms into a separate section but rather sprinkles many of them throughout the agreement, providing a definition when a term is first employed. As editor Howard Darmstadter pointed out to the drafters of the Model Agreement, it is easier to read a document from the start if uninterrupted by searches for definitions. More common and obvious terms are found in the definition section at the end. Note also that section 8.2, "Usages," sets forth various conventions as to certain terms and points of interpretation, including as to the calculation of time periods and the time of day, and that a reference to an agreement includes its amendments. Comments on the following few key definitions appear in notes to each of the applicable definitions: "Cash Management Agreement," "First Lien Obligations," "Hedge Agreement," and "Obligations." These terms all relate to the breadth of the Model Agreement--it includes all of the obligations and indebtedness held by the First Lien Lenders, and certain affiliates and potentially others, including obligations relating to bank products and cash management arrangements such as interest rate swaps and automated clearing services. This broad scope is mitigated by the concept of the first lien cap, and care should be taken as to its definition, as more fully discussed in note 11, and as to the definition of first lien obligations, as to which an alternative definition is provided.

97    Note the alternative definition, available for use with the alternative provisions of section 1.1. As a general matter, the first lien claimholders and second lien claimholders typically expect to hold liens on the same pool of assets (very often all assets), but exceptions to this often occur and the definition as well as the substantive provisions in section 1.5 may need to be adjusted.

98    If the parties use alternative section 1.1, then this definition of "Collateral" can be used.

99  This term is employed throughout the Model Agreement to indicate when the second lien claimholders are no longer subject to the restrictions of the intercreditor agreement and therefore is a key definition. See in particular note 45. Also, the parties should consider whether certain restrictions against the second lien claimholders contained in the intercreditor agreement, as well as certain other provisions of the Model Agreement, should apply only until the first lien obligations have been paid to the amount of the first lien cap or whether such restrictions or provisions should continue to apply until all first lien obligations have been paid in full.

100  If the parties agree as provided in section 1.3 that the first lien agent should not continue to have priority if its lien is not properly perfected, lapses, or is avoided in bankruptcy, then the language in parentheses concerning post-petition claims should be deleted.

101  Clause (b) excludes indemnification obligations for which no claim has been made. Consideration should be given to whether "Discharge of First Lien Obligations" should also include cash collateralization for contingent exposure on claims that have been made, threatened, or, in some cases, may reasonably be expected to be asserted.

102  This definition is broad in scope, capturing in clauses (a), (c), and (d) not only the foreclosure against collateral and other standard secured party remedies, but also the initial steps of a consensual disposition of collateral as described in clause (b). However, it does not include the filing of an involuntary bankruptcy proceeding or the exercise of other unsecured creditor remedies. The broad scope benefits the first lien claimholders since the first lien claimholders are given the exclusive right to exercise enforcement actions (section 3.1), and certain events such as the automatic release of liens on collateral securing second lien obligations are triggered by the first lien agent's enforcement action (section 1.10). On the other hand, section 5.1(b) bars the first lien claimholders from commencing any enforcement action so long as the second lien claimholders' purchase option right under section 5 is outstanding, thereby benefiting the second lien claimholders by the broad definition.

103  *See* section 1.10, "Release of Liens [or Guaranties]." First lien claimholders may wish to cause a disposition of collateral by an action of the grantor in lieu of a foreclosure sale.

104  Consider whether the enforcement action concept should, or should not, include commencement of an involuntary bankruptcy proceeding. First lien lenders may consider a right to interrupt their efforts to realize on collateral through filing an insolvency proceeding against a grantor as inconsistent with the proposition that the second lien will defer to the first lien in such efforts. A second lienor may argue that it should not be required to forfeit a right that it would have if it were entirely unsecured. In considering how much to value this right (or to fear it), the parties should note that to commence, or join in commencing, an involuntary bankruptcy petition, a second lienor would likely have to concede that its claims are not fully secured, making this a somewhat unattractive option. A common solution to this issue is to permit second lien claimholders to commence an involuntary insolvency proceeding after the expiration of the standstill period, making the remedy similar to that exercisable by unsecured mezzanine creditors.

105  If the parties use the alternative definition of "Collateral," then this definition of "First Lien Collateral" can be used.

106  Many intercreditor agreements fail to address whether a non-conforming DIP financing (i.e., one that is not consented to by second lien claimholders) would be subject to the remaining terms and provisions of the intercreditor agreement insofar as the new DIP financing would likely be, at least in part, a refinancing of the first lien obligations. Second lien claimants may resist this provision as it gives first lien claimholders the benefit of opting into the pro-senior intercreditor agreement provisions for a non-conforming DIP financing.

107  Consider whether this additional clause is necessary or should be used in lieu of negotiated provisions regarding bankruptcy distributions in section 6.7, "Reorganization Securities."

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.