## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC., *et al.*, | Case No. 23-11131 (TMH) |
| Debtors.[1] | (Jointly Administered) |
| | **Relates to Docket No. 323** |
| | **Hearing Date: October 4, 2023 @ 10:00 a.m. (ET)** |

**SUPPLEMENTAL BRIEF OF EUAGORE, LLC AND THE FORIS PREPETITION SECURED LENDERS WITH RESPECT TO CONTINUED HEARING ON THE MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF**

Euagore, LLC, as DIP Lender and DIP Agent (the "DIP Secured Parties"), and the Foris Prepetition Secured Lenders[2] (together with the DIP Secured Parties, the "Foris Lenders" or "Foris") submit this supplemental brief (the "Foris Supplemental Brief") pursuant to the *Scheduling Order With Respect to Continued Hearing on the Motion of the Debtors for Interim and Final Orders (I) Authorizing the Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III)*

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

[2] The Foris Prepetition Secured Lenders include Foris Ventures, LLC ("Foris"), Perrara Ventures, LLC ("Perrara"), Anesma Group, LLC ("Anesma"), Anjo Ventures, LLC ("Anjo"), and Muirisc, LLC ("Muirisc"). Foris is the lender under the Foris 2018 Loan (as defined herein) and party to the Subordination Agreement, while all five lenders (Foris, Perrara, Anesma, Anjo, and Muirisc) provided secured loans to the Debtors from and after September 27, 2022.

*Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*

[Docket No. 323] (the "Scheduling Order"),[3] and respectfully state as follows:

## PRELIMINARY STATEMENT[4]

1.      Lavvan has agreed to clear and unequivocal lien and payment subordination in the Lavvan Transaction Documents.  Lavvan also cannot be paid until the Foris 2018 Loan is paid in full because of the limitations and prohibitions on Lavvan's actions, including agreeing not to seek adequate protection, Lavvan's waivers of rights and remedies, and the turnover provisions in the Lavvan Transaction Documents.  The aggregate effect of these contractual agreements and limitations establishes Lavvan's consent (or deemed consent) to the DIP Motion.

2.      The following provisions of the Subordination Agreement, when read together as an integrated whole, limit Lavvan's rights and remedies, both generally and specifically, with respect to its asserted junior collateral interest and the receipt of any property, until the indefeasible payment in cash in full of the Amended & Restated Loan and Security Agreement dated October 28, 2019 (the "Foris 2018 Loan"):

---

[3]    The Foris Lenders join in the legal arguments set forth in the DIP Motion, the *Reply of the Debtors in Support of Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 238] (the "Debtors' Reply"), the *Reply of Euagore, LLC and the Foris Prepetition Secured Lenders to Objection of Lavvan, Inc., and Joinder to Reply of the Debtors in Support of Final Order (I) Authorizing Debtors To (A) Obtain Postpetition Financing And (B) To Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying The Automatic Stay, and (IV) Granting Related Relief* [Docket No. 235] (the "Foris Reply"), and the *Opening Supplemental Brief of the Debtors in Support of Entry of Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* (the "Debtors' Supplemental Brief"), and incorporate those arguments as though set forth herein. Capitalized terms used herein but not otherwise defined will have the meanings set forth in the Foris Reply.

[4]    To avoid duplication, the Debtors and Foris have allocated the issues identified in the Scheduling Order.  The Debtors' memorandum will cover items 1, 2, 3 and 8 (with respect to whether the Court has an independent duty to make an adequate protection finding) of the Scheduling Order.  This memorandum covers items 4, 5, 6, 7, 8 (with respect to the issue of adequate protection), and 9. Accordingly, this memorandum focuses on the application of the Subordination Agreement, Lavvan's deemed consent to the DIP Motion, whether Lavvan is entitled to a grant of adequate protection, and Amyris' ability to incur "Permitted Debt" under the Lavvan Transaction Documents.

- Lavvan subordinated its lien to the lien securing the Foris 2018 Loan.[5] (Subordination Agreement ¶ 2.)

- Lavvan subordinated its right to payment to the indefeasible prior payment in cash in full of the obligations owing under the Foris 2018 Loan (the "<u>Foris 2018 Obligations</u>") – without regard to any defect or challenge to such Foris 2018 Obligations. (Subordination Agreement ¶ 3.)

- Lavvan cannot exercise any remedy with respect to its asserted junior collateral interest, or participate in any proceeding against any of its asserted junior collateral interest, or against Amyris with respect to its collateral.[6]  (Subordination Agreement ¶ 4.) To the extent Lavvan has a junior collateral interest, Foris' interest is co-extensive and senior.

- Lavvan cannot assert and expressly waived any "marshaling or other similar doctrine **or** right that may otherwise be available under applicable law **or** any other similar rights a junior secured creditor might have under applicable law with respect to any and all Junior Lienholder Collateral." (Subordination Agreement ¶ 5) (emphasis added).

- Lavvan "agrees not to seek adequate protection" until the indefeasible payment in cash in full of the Foris 2018 Obligations. (Subordination Agreement ¶ 6.)

- If Lavvan exercises any remedy contrary to the Subordination Agreement and takes or receives any security interest, lien or other protection prior to the indefeasible payment in cash in full of the Foris 2018 Obligations, Foris is entitled to have the "same vacated, dissolved and set aside." (Subordination Agreement ¶ 7.)

---

[5]  This lien subordination is "notwithstanding" any defect or claims challenging the liens securing the Foris 2018 Loan. Subordination Agreement ¶ 2 ("Notwithstanding the respective dates of attachment or perfection of any Senior Liens and any Junior Liens and notwithstanding (i) any lack or defect in the perfection of the Senior Liens or (ii) any avoidance, equitable subordination or recharacterization of the Senior Lienholder's rights or claims in an Insolvency Proceeding of Borrower, the Senior Liens shall at all times be prior to the Junior Liens."). The seniority of the lien securing the Foris 2018 Loan is also established under California law as Foris' lien was perfected first in time. *See* Cal. U. Com. Code § 9322(a)(1) ("Conflicting perfected security interests and agricultural liens rank according to priority in time of filing or perfection. Priority dates from the earlier of the time a filing covering the collateral is first made or the security interest or agricultural lien is first perfected, if there is no period thereafter when there is neither filing nor perfection."). There is no dispute as to the timing of the respective UCC Financing Statements. *See* Foris Reply Ex. B-C; Lavvan Initial Objection Ex. C.

[6]  The expansive application of this limitation on an exercise of remedies was noted by the court in its decision in *In re Boston Generating, LLC* 440 B.R. 302 (Bankr. S.D.N.Y. 2010). In this case, the issue presented was whether a junior creditor could object to bidding procedures which, in part, turned on language in the intercreditor agreement at issue granting the senior creditor the exclusive right with respect to enforcement actions and whether the objections prosecuted by the junior creditor is precluded by these provisions. *Id.* at 317-21. Because the parties stipulated that the junior creditor's objection was not an "exercise of remedies," the court concluded that the junior creditor's actions were not an exercise of remedies. *Id.* at 318. Significantly the court expressly qualified its ruling: "However, absent this stipulation, I may have concluded that consent under section 363(f)(2) is an exercise of the rights afforded to a secured creditor and is thus an exercise of remedies." *Id.*

- If Lavvan receives any payments, security interests or liens, or other rights in property in violation of the Subordination Agreement, it "shall be delivered promptly to the Senior Lienholder in the form received."[7] (Subordination Agreement ¶ 9.)

- Lavvan "agrees to not directly or indirectly take … any action inconsistent with this Agreement." (Subordination Agreement ¶ 13.)

3.      Lavvan raises no objection to Foris, as the senior lien holder on its shared collateral, consenting to Foris being primed by the DIP Facility.  Nor could Lavvan.  The comprehensive suite of limitations, waivers and prohibitions on Lavvan's rights and remedies encompassed by the Subordination Agreement preclude it from lodging this objection.  Because Lavvan cannot object to Foris' consensual priming of its senior lien, the direct consequence of Lavvan's subordinated position is that Lavvan cannot be paid until the DIP Facility and the Foris 2018 Loan both are indefeasibly paid in cash in full.

4.      Further, the DIP Motion does not provide Lavvan with adequate protection because none is required.  Lavvan cannot request adequate protection, nor does Lavvan assert that it reserved the right to seek adequate protection.  Lavvan has, therefore, waived the right to receive adequate protection through the Subordination Agreement.  Indeed, Lavvan has not objected to the absence of a grant of adequate protection—and it cannot, as the omission of not objecting is coextensive with the commission of consenting.  Lavvan does, however, seek adequate protection in violation of the Subordination Agreement by insisting that the Court cannot grant the DIP Motion unless it finds that Lavvan is adequately protected.[8]

---

[7]    Paragraph 10 of the Subordination Agreement also includes a turnover provision by Lavvan to Foris if the Foris 2018 Obligations are subject to challenge and recovery by another person.

[8]    *See* Hr'g Tr., dated September 14, 2023 at 76:18-77:23 [Docket No. 308].

5.      Lavvan's agreement not to seek adequate protection, when read in the context of the numerous other clear and unequivocal limitations and prohibitions on Lavvan's rights, unquestionably constitutes waiver of any right to adequate protection as a matter of law.[9]  Lavvan instead "seeks to" argue that this Court has an independent duty to make an adequate protection finding.  But, contrary to Lavvan's position, its deemed consent (and waiver of the right to seek or receive adequate protection) is a sufficient basis for the Court to find that no adequate protection is required, regardless of whether or not the Court has an independent duty to make a finding of adequate protection (which it does not).

6.      Further, if this Court were to conclude, notwithstanding the contractual limitations Lavvan bargained for, that it must independently look after Lavvan's asserted interest, the Court should find that no adequate protection of Lavvan's asserted interest is required under the DIP Facility.[10]  This is so for the simple reason that Lavvan's junior interest (if any) in Amyris' assets is circumscribed by the contractual limitations Lavvan itself imposed on that interest.  Because the Foris 2018 Loan is being primed by the DIP Facility, Lavvan, by agreeing to payment subordination, lien subordination, turnover, and a standstill on exercising any rights or remedies or actions against shared collateral until the Foris 2018 Loan is paid in cash in full, is precluded from receiving any payment or enforcing any rights or remedies until the DIP Facility is paid.  By operation of the express terms of the Subordination Agreement, Lavvan thus cannot be paid until both the DIP Facility and the Foris 2018 Loan are fully paid, and Lavvan expressly waived any

---

[9]     The case law finding that deemed consent to adequate protection relieves the Court of any independent duty to make a finding of adequate protection is discussed in detail in Section III below.  Further, Section II herein also discusses in detail how Lavvan's agreements in the Subordination Agreement constitute a waiver under applicable law.

[10]    As set forth in the Scheduling Order, the nature and scope of Lavvan's asserted liens is not before the Court at this time.  Scheduling Order at 3.

marshaling or similar junior lienholder rights to avoid that result.  The DIP Facility's priming of Lavvan's lien thus implements nothing more than what Lavvan agreed to in the Subordination Agreement, which imposes no restriction on Foris' ability to subordinate its claim or lien to that of a third party.

7.    If the Court finds that, notwithstanding the terms to which Lavvan agreed in the Subordination Agreement, it must determine adequate protection, Lavvan would only be entitled to adequate protection for any diminution of the Petition Date value[11] of its interest in Amyris' interest in the collateral securing Lavvan's asserted lien.  That interest, of course, is subject to Amyris' right to incur additional debt and to Foris' right to subordinate to such additional debt, including the DIP Facility.  As a result of Foris' consensual subordination to the DIP Facility, Lavvan, by contract, cannot be paid until the Foris 2018 Loan is paid in full in cash.   As such, the DIP Facility and the priming lien cannot be said to effect any diminution in the value of Lavvan's interest because that interest is itself subject to Amyris' right to contractually incur additional debt and to Foris' right to subordinate to that additional debt.  The DIP Facility, which is secured by a priming lien, is an incurrence of debt within Amyris' purview to undertake, and Foris' purview to subordinate to, and thus entirely consonant with Lavvan's limited junior "interest."  Lavvan's agreement to be subordinated to the Foris claims and liens, is augmented by its agreement to not enforce rights and remedies against its collateral, seek adequate protection, or take actions inconsistent with these prohibitions.  Read as a whole, the Subordination Agreement defines and severely limits Lavvan's interest and makes clear that there is no diminishment of that interest that requires adequate protection as a result of the DIP Facility.

---

[11]  *See ESL Invs. v. Sears Holdings Corp. (In re Sears Holdings Corp.)*, 51 F.4th 53, 58 (2d. Cir. 2022).  A determination of the Petition Date value of Lavvan's asserted lien-subordinated and payment-subordinated interest in the Debtors' property is not before the Court in connection with the DIP Motion.

8.      Even if Lavvan were somehow entitled to some form of adequate protection, Lavvan has contractually ceded such entitlement to Foris.  Any adequate protection given to Lavvan in respect of its asserted junior collateral interest cannot be retained by Lavvan because Foris has not been indefeasibly paid in cash in full.  Subordination Agreement ¶¶ 7, 9.  The Court can and should find, therefore, that granting Lavvan any adequate protection would be futile, as Foris would be entitled to receive all the benefit of, or have the Court vacate, such an adequate protection grant.

9.      The inescapable result of the foregoing is that the incurrence of the DIP Facility triggers no protectable interest for Lavvan that requires adequate protection in the first instance.

## BACKGROUND

10.      Foris incorporates herein by reference the background facts set forth in the Debtors' Supplemental Brief.

## ARGUMENT

**I.  PURSUANT TO THE LAVVAN TRANSACTION DOCUMENTS, LAVVAN HAS CONSENTED TO (OR IS DEEMED TO HAVE CONSENTED TO) THE DIP FACILITY BEING APPROVED WITHOUT ANY REQUIREMENT OF ADEQUATE PROTECTION FOR LAVVAN'S ASSERTED JUNIOR COLLATERAL INTEREST.**

**A.  California Law Requires A Holistic Plain Meaning Interpretation Of The Language Of The Subordination Agreement.**

11.      Under California law,[12] contracts are to be interpreted to effectuate the intent of the parties, as reflected in the contractual language.[13]  California law instructs that the intent of a

---

[12]      The Subordination Agreement is governed by California law.  *See* Subordination Agreement ¶ 16.

[13]      *See* CAL. CIV. CODE § 1635 ("All contracts, whether public or private, are to be interpreted by the same rules, except as otherwise provided by this code."), § 1636 ("A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful."); § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."); § 1639 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this title.").

contract starts with the plain and ordinary meaning of the contract language, which is to be applied as written:

> Our initial inquiry is confined to the writing alone. The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense unless used by the parties in a technical sense or a special meaning is given to them by usage controls judicial interpretation. Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. (internal citations omitted).

See *Mountain Air Enterprises, LLC v. Sundowner Towers, LLC*, 3 Cal. 5th 744, 752 (Cal. 2017).[14]

12.     In the first instance, a court should not vary from the written words when interpreting a contract. *See Dore v. Arnold Worldwide,* Inc. 39 Cal. 4th 384, 391 (Cal. 2006) (concluding that in the context of an employment contract the term "at any time" was not per se ambiguous and "[a]s a matter of simple logic, rather, such a formulation ordinarily entails the notion of 'with or without cause.'").

13.     Moreover, contracts should be construed as a whole such that no words are rendered superfluous. *See Mountain Air Enterprises, LLC v. Sundowner Towers, LLC*, 3 Cal. 5th 744, 754 (Cal. 2017) (citing *Barrett v. Superior Court* 222 Cal. App. 3d 1176, 1190 (Cal. Dist. Ct. App. 1990) (the doctrine of *ejusdem generis* is "'an attempt to reconcile an incompatibility between specific and general words' so all words may be 'construed together, and no words will be superfluous'")). Importantly, competing interpretations of contract language do not make the language ambiguous. *See New Bank of New England, N.A. v. Toronto-Dominion Bank*, 768 F.

---

[14]    *See also Perez–Encinas v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d 1127, 1133 (N.D. Cal. 2006) ("The court must look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. In searching for a plain meaning, a court is to interpret the language of an agreement in its 'ordinary and popular sense, unless used by the parties in a technical sense.'") (applying California law); *see, e.g., Owens v. County of Los Angeles*, 220 Cal. App. 4th 107, 118-19 (Cal. Dist. Ct. App. 2013) (finding party that forever discharged counterparty from any and all "Released Claims" pursuant to a settlement agreement was barred from pursuing such claims based on a plain meaning of the written contract); *Bank of the West. v. Superior Court*, 2 Cal. 4th 1254, 1264 (Cal. 1992) ("If contractual language is clear and explicit, it governs.").

Supp. 1017, 1022 (S.D.N.Y. 1991) (applying California law, the court held "[w]here … the meaning of an agreement among sophisticated parties is unambiguous on its face, the agreement does not become ambiguous simply because one of the parties later asserts that it intended a different interpretation").  Courts should not "read an ambiguity into an agreement merely because one of the parties becomes dissatisfied with its position under the plain terms of the agreement." *Id.*  Rather, a contract is ambiguous only where, upon examining the contract as a whole, it is capable of two or more reasonable meanings.  *See Perez–Encinas v. AmerUs Life Ins. Co.*, 468 F. at 1133 ("A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable.").

14.    Lastly, California law teaches that "language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract."  *State of California v. Continental Ins. Co.*, 55 Cal. 4th 186, 195 (Cal. 2012) (citing *Bank of the West*, 2 Cal. 4th at 1265).

## B. Subordination Agreements Are Enforced In Bankruptcy, In Accordance With Their Written Terms.

15.    The Subordination Agreement includes an express acknowledgement that it is a "subordination agreement" under Bankruptcy Code Section 510(a)[15] and shall remain in full force and effect and be treated as such during these chapter 11 cases.  Subordination Agreement ¶ 14; *see also* 11 U.S.C. § 510(a) ("A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law.").[16]

---

[15]    Hereinafter, references to "Section [ ]" shall mean to the applicable Section of the Bankruptcy Code, 11 U.S.C. § 101, *et. seq.*

[16]    Although not necessary to demonstrate enforceability in light of the Section 510(a) designation in the contract, the Subordination Agreement is governed by California law and under California law, the Subordination Agreement is enforceable against the parties.  *See Simas v. Western Distrib. Ctrs. (In re Western Distrib. Ctrs.)*, Case No. 93-17193, 1994 U.S. App. LEXIS 26221, at *6 (9th Cir. 1994) ("Subordination agreements are enforceable under California law.  *See* Cal. Com. Code § 1209.  There is no California law which indicates that

16.     Bankruptcy courts in this District enforce subordination agreements in accordance with their written terms, including lien and payment subordination provisions. *See e.g.*, *In re La Paloma Generating Co., et al.*, 595 B.R. 466, 477 (Bankr. D. Del. 2018) *aff'd sub nom, In re La Paloma Generating Co. LLC,* 609 B.R. 80 (D. Del. 2019) (finding a subordination agreement that contained payment subordination provisions was enforceable); *In re Consol. Bedding, Inc.*, Case No. 09-11875 (BLS), Adv. Proc. No. 19-50727 (BLS), 2021 Bankr. LEXIS 1720, at *15, 2021 WL 2638594, at *5 (Bankr. D. Del. June 25, 2021) (finding, under an intercreditor agreement, a junior secured creditor could not receive payment until the senior secured creditor was paid in full); *see also In re Energy Future Holdings Corp.*, 773 F. App'x. 89, 93 (3d Cir. 2019) (affirming the bankruptcy court and district court decisions finding that payments or distributions of collateral would be subject to the waterfall provisions of an intercreditor agreement).[17]

17.     Agreements governing rights among creditors typically cover more than just lien subordination and payment subordination. They commonly include, as here, provisions that limit and prohibit related conduct of the subordinated creditor to implement the subordination intent and purpose.  The effect of such provisions is that the junior creditor becomes what is known as a "silent second."  *See* Committee on Commercial Finance, ABA Section of Business Law, *Report of the Model First Lien/Second Lien Intercreditor Agreement Task Force*, 65 Bus. Lawyer, 809, 809 (2010) (noting "[i]n secured financing transactions, however, the intercreditor agreement may also govern the relative rights and priorities of each creditor's liens in the borrower's assets").  As

---

the enforceability of a subordination agreement depends on the fulfillment of all conditions *prior* to the filing of bankruptcy.  Therefore, under California nonbankruptcy law, the agreement is enforceable.").

[17]   Courts in other jurisdictions also enforce subordination agreements as written.  *See*, *e.g.*, *In re First Baldwin Bancshares, Inc.*, Case No. 13-00563, 2013 WL 5429844, at *7 (Bankr. S.D. Ala. Sept. 30, 2013) (enforcing a payment subordination provision); *Highland Park CDO I Grantor Trust, Series A v. Wells Fargo Bank, N.A.*, Case No. 08 Civ. 5723, 2009 WL 1834596, at *5, 2009 U.S. Dist. LEXIS 53272, at *14 (S.D.N.Y. June 16, 2009) ("[T]he Intercreditor Agreement bars Highland from recovering on the mezzanine loan until the senior loan is repaid in full.").

intercreditor agreements and subordination agreements are intended to limit conduct, "plainly worded contracts establishing priorities and limiting obstructionist, destabilizing and wasteful behavior should be enforced and creditor expectations should be appropriately fulfilled." *In re Ion Media Networks Inc.*, 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009) ("Ion Media") (finding intercreditor agreement's express waiver of the right to vote contrary to senior lenders prohibited the junior lender from objecting to a plan).

18.    Not surprisingly, courts routinely recognize and enforce restrictions on junior creditor conduct imposed under such agreements, including reading general prohibitions to bar junior creditor conduct even if that conduct is not specifically enumerated.  For example:

- **Waiver Of Voting Rights**: *see, e.g.*, *In re Avondale Gateway Ctr. Entitlement, LLC,* Case No. 02-09-BK-12153-CGC, 2011 WL 1376997, at *4 (D. Ariz. Apr. 12, 2011) (upholding a subrogation provision in an intercreditor agreement that allowed senior creditor to exercise junior creditor's voting rights because such rights could be assigned under bankruptcy law, and state law permitted subrogation of assignable rights); *In re Coastal Broad. Sys., Inc.*, Case No. 11-10596 (GMB), 2012 WL 2803745, at *7-8 (Bankr. D.N.J. July 6, 2012) (holding assignment of voting rights provision in subordination agreement to be enforceable and further noting that "enforcement of such agreements is necessary to prevent junior creditors from receiving windfalls after having explicitly agreed to accept less lucrative payment arrangements"); *In re Curtis Ctr. Ltd. P'ship*, 192 B.R. 648, 660 (Bankr. E.D. Pa. 1996) (holding provision of subordination agreement allowing senior creditor to vote for junior creditor was enforceable); *Blue Ridge Investors, II, LP v. Wachovia Bank, N.A. (In re Aerosol Packaging, LLC)*, 362 B.R. 43, 47 (Bankr. N.D. Ga. 2006) (finding that under the express terms of a subordination agreement, the voting rights of the junior creditor were assigned to the senior creditor);

- **Prohibition Against Seeking Appointment Of An Examiner**: *see, e.g.*, *In re Erickson Retirement Cmtys*, LLC, 425 B.R. 309, 314-16 (Bankr. N.D. Tex. 2010) ("Erickson") (finding sophisticated commercial parties, pursuant to terms of subordination agreements barring them from exercising certain bankruptcy rights, including filing any actions or pursuing any remedies to collect on their claims or enforce their rights until senior indebtedness had been paid in full, had knowingly and intelligently waived standing to file motion for appointment of examiner in jointly administered chapter 11 cases); and

- **Deemed Consent**:  *see, e.g.*, *Aurelius Cap. Master, Ltd. v. Tousa Inc.*, Case No. 08-61317-CIV, 2009 WL 6453077 (S.D. Fla. Feb. 6, 2009) (squarely holding that

a person's waiver of a right can be deemed to be a waiver of an objection to (and deemed consent to) the entry of relief against the person).

19.     As discussed herein, a plain reading of the Subordination Agreement confirms that Lavvan is not permitted to seek relief in connection with the DIP Motion, nor can Lavvan abrogate the contractual restrictions on its actions with respect to its asserted junior collateral interest.  These restrictions preclude Lavvan from challenging Foris' rights with respect to its collateral (including consenting to priming), participating in any proceeding against Lavvan's asserted junior collateral interest, seeking adequate protection, seeking any other remedies or enforcing any other rights as a secured creditor with respect to its asserted junior collateral interests, or otherwise exercising remedies in any manner contrary to the Subordination Agreement.  Read together, the extent of Lavvan's junior interest in the collateral (if any) is necessarily circumscribed by all of these limitations.

20.     The relief requested in the DIP Motion, including the approval of priming liens without any requirement of adequate protection for Lavvan's asserted junior collateral interest, is wholly consistent with Lavvan's limited rights (and the expansive waiver of rights to which Lavvan agreed) in connection with its asserted junior collateral interest until the Foris 2018 Loan is indefeasibly paid in cash in full.

## II. UNDER THE TERMS OF THE SUBORDINATION AGREEMENT, READ AS A WHOLE, LAVVAN HAS FORFEITED ITS RIGHTS AND REMEDIES AS A JUNIOR CREDITOR WITH RESPECT TO ITS ASSERTED JUNIOR COLLATERAL INTEREST UNTIL THE FORIS 2018 LOAN IS PAID IN CASH IN FULL, INCLUDING IN CONNECTION WITH THE DIP MOTION.

21.     California law instructs: "[T]he court must interpret the language in context, with regard to its intended function in the policy.  This is because language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." *Bank of the West*, 2 Cal. 4th at 1265.  Reading

all of the provisions of the Subordination Agreement as a whole, as is required by law, there is nothing abstract about Lavvan's express agreement (a) not to be paid until Foris is paid and to turnover any such prior payment, and (b) (i) not to request adequate protection, (ii) not to pursue enforcement rights against its asserted junior collateral interest, (iii) not to seek any remedy as a junior secured creditor with respect to its asserted junior collateral interest, (iv) not to participate in any proceeding regarding its asserted junior collateral interest, and (v) not to take any action inconsistent with its agreement, in each case, until the Foris 2018 Loan is indefeasibly paid in cash in full.  In this light, the only reasonable interpretation of the Subordination Agreement in the context of the DIP Motion is that Lavvan has waived its right to adequate protection and, thus, is deemed to consent to the DIP Motion, without being granted such adequate protection.

22. **Payment Subordination and Turnover.**    The Subordination Agreement subordinates Lavvan's right to payment and liens to Foris' right to payment and liens.[18]  Giving effect to the payment subordination provision means that Lavvan cannot be paid until the Foris 2018 Loan is paid.  With Foris consenting to being primed by the DIP Facility, it follows that Lavvan cannot be paid until the DIP Facility is paid.  By contract, Lavvan has agreed to this structure and cannot request adequate protection on account of it.  Moreover, the payment subordination and turnover provisions are not limited to collateral and collateral proceeds, but

---

[18]   *See* Subordination Agreement ¶ 2 ("Until Payment in Full of the Senior Debt, the Junior Lienholder subordinates any and all Junior Liens to any and all Senior Liens."); ¶ 3 ("Junior Lienholder hereby subordinates any claim or right to payment it has or may have against Grantor or Borrower … to the Payment inf Full of any and all debts, claims, rights to payment or Obligations of Borrower to Senior Lienholder"; ¶ 7 ("if the Junior Lienholder shall receive any payments, security interests or liens, or other rights in any property of the Grantor in violation of this Agreement, such payment or property shall be received by the Junior Lienholders in trust for the Senior Lienholder and shall be delivered promptly to the Senior Lienholder in the form received."); ¶ 9 ("Except as otherwise expressly agreed to in this Agreement,18 if the Junior Lienholder shall receive any payments, security interests or liens, or other rights in any property of the Grantor in violation of this Agreement, such payment or property shall be received by the Junior Lienholder in trust for the Senior Lienholder and shall be delivered promptly to the Senior Lienholder in the form received.").

apply to any property that Lavvan might take, receive, or retain prior to Foris being paid in cash in full. Thus, even if this Court were to find that Lavvan is not deemed to consent to the DIP Motion and that it has an independent duty to determine adequate protection for Lavvan, and granted adequate protection to Lavvan in the form of a junior replacement security interest or lien, Foris would be entitled to have that grant vacated, dissolved, and set aside in the same order and/or turned over. The Court is not required to engage in that exercise in futility. Once again, the Subordination Agreement by its express terms operates as the functional equivalent of deemed consent to the DIP Motion.

23.     Holding a junior creditor to its bargain, and enforcing the benefit of the senior creditor's bargain, is honored in chapter 11 proceedings. In an insolvency proceeding, the maximization of value and distribution of that value in accordance with relative priorities is black letter law. Pre-bankruptcy payment subordination provisions govern relative rights among the senior and junior stakeholders and implement an enforceable pre-bankruptcy ordering of priorities that carry over into an insolvency proceeding. *See e.g., La Paloma*, 595 B.R. at 477 (finding a subordination agreement that contained payment subordination provisions was enforceable); *In re Consol. Bedding, Inc.*, Case No. 09-11875 (BLS), Adv. Proc. No. 19-50727 (BLS), 2021 Bankr. LEXIS 1720, at *15 (Bankr. D. Del. June 25, 2021) (finding, under an intercreditor agreement, a junior secured creditor could not receive payment until the senior secured creditor was paid in full).

24.     Here, Section 364 of the Bankruptcy Code independently vests the Debtors with the right to incur post-petition debt. The Debtors have demonstrated the critical need for that financing, the reasonableness of the terms, and the benefit to the estates. *See* Fleming Declaration ¶ 6. The Subordination Agreement provides Lavvan no right to prevent Foris from consenting to

such debt incurrence, including on a priming basis, and Lavvan has expressly waived any marshaling or other similar rights to protect its asserted junior collateral interest. *See* Subordination Agreement ¶ 5 (Lavvan waived "any other similar rights a junior secured creditor might have under applicable law with respect to any and all Junior Lienholder Collateral."). The only right Lavvan would have under the Bankruptcy Code to protect itself from such lien priming is seeking adequate protection—a right Lavvan expressly relinquished.

25.     In short, Lavvan has no entitlement to any adequate protection.  Under the payment subordination provisions of the Subordination Agreement, Lavvan cannot receive, take or retain any property whatsoever from the Debtors, whether as adequate protection or otherwise, until the DIP Facility and the Foris 2018 Loan are fully paid.  Lavvan's agreement to this comprehensive subordination construct reflects consent to priming, and also necessarily circumscribes the value of its purported junior interest in the Debtor's interest in its property.

26.     **Adequate Protection.**  The Subordination Agreement provides in pertinent part: "Junior Lienholder agrees not to seek adequate protection or the payment of interest, fees or other expenses in respect of the Junior Lienholder Collateral unless or until there has been Payment in Full of the Senior Debt." Subordination Agreement ¶ 6.  The agreement not to seek adequate protection is express and unequivocal.  As the Court previously noted, adequate protection is a term of art. *See* Hr'g Tr., Sept. 14, 2023, at 76:8.  Adequate protection derives its meaning in the context of Sections 361, 362, 363 and 364 of the Bankruptcy Code.

27.     Lavvan argues that its agreement not to seek adequate protection is not consent to the DIP Facility or a waiver of adequate protection. *See id.* at 76-78.  If agreeing "not to seek" is not a waiver of adequate protection, what legal meaning or consequence is there to "not seek"?

Any suggestion that agreeing "not to seek" permits a party to try to "receive" adequate protection so long as it is not "asking" for it, is a meaningless semantic excursion.

28.     Putting aside Lavvan's agreement "not to seek" adequate protection, by reason of the turnover provisions in the Subordination Agreement, Lavvan cannot accept and/or retain adequate protection payments unless Foris is fully paid.  As the Bankruptcy Court found in *Tousa*, agreeing not to accept and receive adequate protection is tantamount to consent and waiver.[19]  And, as discussed in the Debtors' Supplemental Brief, it also obviates any requirement to make an independent finding of adequate protection.

29.     To conclude that "not to seek" permits an "objection" patently designed to cause one to "receive" that which it may not "seek" renders the obligation "not to seek" meaningless, thus violating the rule of not interpreting contract language to be superfluous.  *See Mountain Air Enterprises, LLC v. Sundowner Towers, LLC*, 3 Cal. 5th 744, 754 (Cal. 2017) (citing *Barrett v. Superior Court*, 222 Cal. App. 3d 1176, 1190 (Cal. Dist. Ct. App. 1990)) (the *ejusdem generis* doctrine is "'an attempt to reconcile an incompatibility between specific and general words' so all words may be 'construed together, and no words will be superfluous'").

30.     Such an interpretation of "not to seek" would also lead to the absurd result that a subordinated creditor can receive that which it agreed not to seek. It is a cardinal rule that contracts should not be interpreted in a manner that leads to an absurd result.  *See Edwards v. Arthur*

---

[19]   *Tousa*, 2009 WL 6453077 at *8 ("Pursuant to Article 5.2 of the Intercreditor Agreement, Wells Fargo is barred from 'requesting any form of adequate protection or any other relief in connection with the use of cash.'  Put differently, Wells Fargo had bargained away its right to object by entering into the Intercreditor Agreement. . . . Accordingly, the Bankruptcy Court appropriately overruled Wells Fargo's objection and its finding that the Cash Collateral Order was a consensual one on the basis that under the Intercreditor Agreement, Wells Fargo was deemed to have consented to the Cash Collateral Order."). In reaching the merits of the appeal, the District Court referenced Wells Fargo's argument that the "Debtor was required to prove pursuant to 11 U.S.C. § 363(e) that Wells Fargo was adequately protected before its cash collateral could be used."  *Id.* at *19.   While the District Court considered and rejected Wells Fargo's position on the merits, the merits decision was also supported by the "conclusion that Wells Fargo has consented to the Cash Collateral Order and that its objection to the use of the cash collateral to fund the avoidance action was properly overruled by the Bankruptcy Court."  *Id.*

*Andersen LLP,* 44 Cal. 4th 937, 953 (Cal. 2008) ("Where the language of a contract is clear and not absurd, it will be followed.").[20]

31.    With Lavvan having contractually relinquished any right to seek adequate protection and any right to object to not receiving adequate protection, the words "not to seek" are nothing less than a waiver of adequate protection.

32.    Further, Lavvan's argument (i) is at odds with the ABA Model First Lien/Second Lien Intercreditor Agreement, which equates an agreement not to seek or request adequate protection with a waiver;[21] (ii) is contradicted by the numerous other limiting provisions of the Subordination Agreement discussed herein that, read as a whole and in context, underscore that Lavvan cannot exercise any rights or remedies as to the shared collateral and thus is deemed to consent to the DIP Motion; and (iii) if adopted, would be inconsistent with the entire purpose of the Subordination Agreement in limiting Lavvan's rights and remedies until Foris is paid in cash in full.

33.    **Waiver Of Lavvan's Right To Exercise Rights And Remedies With Respect To Its Asserted Junior Collateral Interests.**  Under the Subordination Agreement, prior to the indefeasible payment in cash in full of the Foris 2018 Loan, Lavvan agreed it would adhere to

---

[20]    *See also MacKinnon v. Truck Ins. Exchange,* 31 Cal. 4th 635, 649-50 (Cal. 2003) (declining to read the pollution exclusion in the contract to "extend to virtually all acts of negligence involving substances that can be characterized as irritants or contaminants, that is, are capable of irritating or contaminating so as to cause personal injury" including movant's assertion that "pesticides are 'chemicals' capable of causing irritation and can therefore be defined as an 'irritant' and a "pollutant . . .' noting as other courts have pointed out "[w]ithout some limiting principle, the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results").

[21]    With respect to adequate protection, the Model Agreement suggests language that is very similar to the language used in the Subordination Agreement to limit Lavvan's rights.  *See* MODEL FIRST LIEN/SECOND LIEN INTERCREDITOR AGREEMENT § 6.4 (AM. BAR. ASS'N 2010) (the "Model Agreement")  ("Except as permitted in this section 6.4(b), no Second Lien Claimholders may seek or request adequate protection…") In connection with this specific suggested language regarding adequate protection, the Model Agreement comments upon a pro-second lien alternative that equates this limitation on adequate protection to other waivers. *See* Model Agreement, Section 6.4(b)(1), n.78 ( "A pro-second lien provision would eliminate a general restriction against seeking adequate protection and limit the waivers to cash collateral, DIP financing, and asset sales.").

numerous restrictions on its rights as a junior secured creditor with respect to its asserted collateral interest; namely:

- Lavvan agreed not to "exercise any remedy with respect to[22] any Junior Lienholder Collateral"; and

- "nor shall the Junior Lienholder … participate in any administrative, legal or equitable action against any Junior Lienholder Collateral."

Subordination Agreement ¶ 4.

34.    Underscoring the broad limitations on Lavvan's enforcement rights, Paragraph 4 of the Subordination Agreement preserved only five narrowly tailored rights: (i) filing a proof of claim; (ii) taking action to prevent the running of a statute of limitations; (iii) asserting a counterclaim against Amyris in an action commenced by Amyris, but only if Lavvan's action was not inconsistent with the Subordination Agreement; (iv) exercising a right of specific performance to compel Amyris to comply with its contractual agreements, but only if such action was not

---

[22] The phrase "with respect to" is not a limiting qualifier, but rather has broad application. *See Anderson v. BMO Harris Bank, N.A. (In re Anderson)*, Case No 16 C 4748,  2017 U.S. Dist. LEXIS 142599, at *9-10, 2017 WL 3872458, at *3 (N.D. Ill. Sept. 5, 2017) (N.D. Ill. 2017) (interpreting a stay relief order "with respect to the property," the Court dismissed the argument that the phrase was limited to *in rem* relief).  The court in *Anderson* held:

> Read naturally, the 'with respect to the property' language does not limit the remedies BMO may pursue but merely identifies the particular foreclosure action BMO is permitted to litigate. In support of this interpretation, the debtors have cited a case, *In re Wright*, in which the bankruptcy court interpreted an order that lifted the automatic stay 'so that [the creditor] may exercise all of its rights and remedies with respect to each of the Properties' . . . to mean that the creditor was entitled 'to pursue all remedies under applicable law, including the commencement of one or more deficiency actions,' such as a deficiency action against the debtor personally. 486 B.R. 491, 496, 500-01 (Bankr. D. Ariz. 2012) (*citing In re Tyler*, 166 B.R. 21, 25 (Bankr. W.D.N.Y. 1994)) ("When . . . this Court modifies or terminates the automatic stay . . . to allow a party to commence or continue a pending state court mortgage foreclosure proceeding . . . , it is the Court's expectation that it has modified or terminated the stay for the completion of all related state court mortgage foreclosure proceedings, including the establishment of any deficiency judgment, unless any such state court proceedings are specifically excepted by the order.")). *Wright* and *Tyler* are persuasive, and the Court agrees with debtors' reading of the Stay Relief Order. By its own terms, the Stay Relief Order permitted BMO to proceed with the Wing St. Foreclosure Action as if there were no bankruptcy and to pursue against Mark whatever remedies the law afforded BMO in that litigation, whether *in rem* or *in personam*.

*Id*.

inconsistent with the Subordination Agreement, and (v) non-judicial actions required as a precondition to acceleration or for the preservation of rights. Notably, these enumerated rights that Lavvan contractually preserved contemplate only one action in a bankruptcy: the filing of a proof of claim.

35.     Further limiting Lavvan's rights in an insolvency proceeding, Paragraph 5 of the Subordination Agreement imposes sweeping restrictions on Lavvan's actions with respect to marshalling and similar rights with respect to its asserted junior collateral interest:

> In connection with any Insolvency Proceeding, the Junior Lienholder agrees not to assert and hereby waives, to the fullest extent permitted by applicable law, any right to demand, request, plead or otherwise assert or otherwise claim <u>against Senior Lienholder</u> the benefit of any marshaling **or** other *similar doctrine* **or** right that may be otherwise available under applicable law **or** <u>any other</u> *similar rights* a junior secured creditor might have under applicable law <u>with respect to any and all Junior Lienholder Collateral.</u>

Subordination Agreement ¶ 5 (emphasis added).[23]

36.     If all of the above were not sufficient to conclusively demonstrate that Lavvan has no legal basis upon which to "receive" adequate protection, Lavvan further limited its junior creditor interests by agreeing "not directly or indirectly to take … any action inconsistent with this

---

[23]    Although not before the Court for determination, the scope of the waiver set forth in Paragraph 5 of the Subordination Agreement is arguably far beyond marshaling or similar rights. To give full effect to the independent clauses separated by "or," the distinct references to "against Senior Lienholder" and "with respect to any and all Junior Lienholder Collateral" and the distinction between "similar doctrine" and "similar rights," (as highlighted in the quotation above) the only reasonable parsing of this paragraph that gives full meaning to each of its constituent clauses is to differentiate clauses noted as **[A]** and **[B]** as follows:

> In connection with any Insolvency Proceeding, the Junior Lienholder agrees not to assert and hereby waives, to the fullest extent permitted by applicable law, any right to demand, request, plead or otherwise assert or otherwise claim **[A]** <u>against Senior Lienholder</u> the benefit of **(i)** any marshaling **or (ii)** other *similar doctrine* **or** right that may be otherwise available under applicable law **or [B]** <u>any other</u> *similar rights* a junior secured creditor might have under applicable law <u>with respect to any and all Junior Lienholder Collateral.</u>

As so read, the clause marked **[B]** is a comprehensive waiver of rights similar to marshaling with respect to any and all Junior Lienholder Collateral. As marshaling is at its core an argument to prevent a right, remedy or action taken as against collateral, a similar (lesser included right) is necessarily adequate protection for the imposition of the grant of a priming lien. Lavvan has waived that right.

Agreement." Subordination Agreement ¶ 13.  This provision operates as a self-imposed injunction against Lavvan.  Thus, Lavvan cannot request or receive any relief in connection with the DIP Motion inconsistent with the Subordination Agreement and must turn over, and not retain, any relief, if granted by the Court.  Arguing that this Court has an independent duty to grant adequate protection, and raising objections and challenges to the approval of the DIP Motion, all transparently geared to obtaining adequate protection, are all actions "inconsistent with" the Subordination Agreement.  So, too, would be receiving any adequate protection granted. The express prohibition on Lavvan taking any "inconsistent action" is yet another contractual basis for Lavvan's deemed consent to the DIP Motion under the Subordination Agreement.

37.     In the insolvency context, the agreement not to take action as a junior creditor or with respect to collateral has definite import.  Under the Bankruptcy Code, numerous rights are granted to a secured creditor vis-à-vis its collateral, including under Sections 361 (adequate protection), 363 (sale, use, lease or property), 502 (allowance of claims), 1111 (secured creditor election), 506(a) (allowance of secured claims), and 1129(b) (cramdown).

38.     With the law requiring that agreements be interpreted, as written, in accordance with their plain meaning, and with a view to avoid superfluous provisions or absurd results, courts have repeatedly enforced intercreditor agreements and subordination agreements that broadly limit the rights of a junior creditor as waivers even in the absence of an express waiver of a particular right.[24]

---

[24]    In the context of intra-creditor "no-action" agreements, courts have similarly construed limitations on the exercise of rights and remedies as a limitation on unenumerated specific actions.  *See, e.g.*, *In re American Roads LLC*, 496 B.R. 727, 730 (Bankr. S.D.N.Y. 2013) ("Here, the relevant provisions of the financing documents make clear that the limitations on the Bondholders' collective action rights and the delegation of authority to Syncora are substantial.… As such, '[t]he specific, unambiguous language of several provisions, read in the context of the agreements as a whole,' convinces this Court that individual bondholders are precluded from enforcing rights or remedies against the debtor or the collateral."); *In re InnKeepers USA Trust, et al.*, 448 B.R. 131, 140 n.18 (Bankr. S.D.N.Y. 2019) (contractual agreement providing that "[n]o Certificate holder shall have any right by virtue of

39.     In *Erickson*, the court found, pursuant to subordination agreements that barred junior creditors from filing any actions or pursuing any remedies to collect on their claims or enforce their rights until senior indebtedness had been paid in full, junior creditors had knowingly and intelligently waived standing to file a motion for appointment of an examiner, even though the subordination agreements did not specifically address the appointment of an examiner.  425 B.R. at 314-16.  In reaching this decision, the court relied upon the junior lenders' undertaking in the intercreditor agreements not to "exercise any rights or remedies or take any action or proceeding to collect or enforce any of the Subordination Obligations" without "the prior written consent of the Agent."  *Id.* at 313.  Even though this language did not use the word "waive," the court in *Erickson* still interpreted it as a waiver of rights.  *See id.* at 314 ("The court agrees with the Agent that the Subordination Agreements are enforceable in this case, pursuant to Section 510 of the Bankruptcy Code, and that, because of these agreements, the Michigan Retirement System Entities lack standing and/or have contractually waived the right to seek an examiner in these cases. Accordingly, the court hereby denies the Examiner Motion.").

40.     In *Ion Media*, the second lien creditors objected to confirmation of the debtors' plan and filed an adversary proceeding against the first lien creditors arguing that certain of the debtors' assets were not subject to the first lien creditors' security interest.  419 B.R. at 591-592.  The intercreditor agreement expressly prohibited the junior lenders from challenging the priority of the senior creditors' claims, including on the basis the senior liens were unperfected.  *Id.* at 594.  The bankruptcy court determined that the intercreditor agreement prevented the second lien creditors

any provision of this Agreement to institute any suit, action or proceeding" barred Certificate holder from having any standing to appear and be heard in the debtor's chapter 11 case).

from objecting to the plan even though there was no specific language in the intercreditor agreement so stating. *Id.* at 597-598.  The bankruptcy court reasoned:

> Giving effect to the plain language of the Intercreditor Agreement in this manner also reinforces general principles of public policy. Affirming the legal efficacy of unambiguous intercreditor agreements leads to more predictable and efficient commercial outcomes and minimizes the potential for wasteful and vexatious litigation. The sophisticated parties who entered into the Intercreditor Agreement were certainly aware of the nature of ION's business and the well-known restrictions and limitations applicable to security interests in FCC Licenses. This reality adds credence to the notion that the parties fully intended to place the Second Lien Lenders in an indisputably subordinate position and to prevent interference with the stipulated senior rights of the First Lien Lenders.

*Id.* at 595.

41.     Giving full force and effect to the language, intent and purpose of Paragraphs 4, 5, and 13 of the Subordination Agreement limiting Lavvan's asserted junior collateral interests, and read along with Lavvan's agreement to payment subordination, turnover, and not to seek adequate protection, there is only one inescapable conclusion: Lavvan is deemed to consent to the DIP Motion.

## III. IF THE COURT DETERMINES IT IS REQUIRED TO MAKE AN INDEPENDENT FINDING OF ADEQUATE PROTECTION, LAVVAN IS ADEQUATELY PROTECTED.

42.     The Foris Lenders submit that the Court has no independent duty to make an adequate protection finding under Section 364(d)(1) where consent is deemed, as it is in this case, and refers to, joins, and incorporates by reference the Debtors' Supplemental Brief.  Assuming, *arguendo*, that the Court has an independent duty to make an adequate protection finding, the Foris Lenders submit that (i) the DIP Facility does not diminish or alter Lavvan's interest in the Debtors' property, and so Lavvan is not entitled to any adequate protection, and (ii) if the Court determines

that adequate protection must be provided to Lavvan, such adequate protection is subject to turnover.

**A. The DIP Facility Does Not Diminish Or Alter Lavvan's Interest In The Debtor's Property Because, Pursuant To The Lavvan Transaction Documents, Lavvan Cannot Be Paid On Those Interests Until The Foris 2018 Loan Is Paid In Full, And The DIP Facility Is Senior To The Foris 2018 Loan.**

43.     The Supreme Court in *Timbers* established long ago that an undersecured creditor is not entitled to adequate protection of an "interest in property" where that interest is not depreciating or declining in value. *See United Savings Association of Texas v. Timbers of Inwood Forest Associates,* 484 U.S. 365, 370 (1988); *see also Marasek v. U.S. Bank Cust For Pro Capital I, LLC (In re Marasek)*, Case No. 14-5213 (MAS), 2015 U.S. Dist. LEXIS 49930, *7 (D.N.J. 2015) (holding an "interest is not adequately protected if the security is depreciating during the term of the stay"). In *Assocs. Commer. Corp. v. Rash*, the Supreme Court also explained that when valuing a secured creditor's claim for cramdown purposes, the subject of the valuation inquiry is the scope and nature of the creditor's interest in the debtor's interest in property of the estate.

> A debtor may own only a part interest in the property pledged as collateral, in which case the court will be required to ascertain the 'estate's interest' in the collateral. Or, a creditor may hold a junior or subordinate lien, which would require the court to ascertain the creditor's interest in the collateral. The § 506(a) phrase referring to the 'creditors interest in the estates interest in such property' thus recognizes that a court may encounter, and in such instances must evaluate, limited or partial interests in collateral.

520 U.S. 953, 961 (1997)*; see also In re Aerogroup Int'l*, 601 B.R. 571, 589 (Bankr. D. Del. 2019) ("Section 506(a) of the Bankruptcy Code fixes the amount of a creditor's secured claim based on the value of the property that is **subject to the creditor's lien**.") (emphasis added).

44.     The Supreme Court's focus on the secured creditor's interest in the debtor's interest in property is directly applicable to the determination of adequate protection, which similarly focuses on "an interest of an entity in property." *See* 11 U.S.C. § 361 (providing examples of

adequate protection of "an interest of an entity in property"); *see also In re Nine Point Energy Holdings, Inc.*, Case No. 21-10570 (MFW), 2021 Bankr. LEXIS 1797, *30 (Bankr. D. Del. 2021) (providing examples of adequate protection of "an interest of an entity in property").  Similarly, when an adequate protection issue is triggered by application of Section 364 of the Bankruptcy Code, that section also focuses on "adequate protection of the interest of the holder of the lien on the property of the estate."  11 U.S.C. § 364(d)(1); *see also Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland Dev. Group)*, 16 F.3d 552, 564 (3d Cir. 1994) ("Section 364(d)(1) of the Code provides that the bankruptcy court may authorize post-petition financing supported by a superpriority lien only if 'there is adequate protection of the **interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted**.'") (emphasis added).

45.     The Bankruptcy Code's anchoring of adequate protection in the nature and scope of the creditor's interest in the debtor's interest in property is particularly relevant here, given the limited rights and remedies that attach to Lavvan's asserted junior liens.  As discussed herein, Lavvan's asserted junior collateral interest is subject to lien and payment subordination, Lavvan is subject to broad waivers and prohibitions on taking actions with respect to its asserted junior collateral interest, and Lavvan is subject to turnover of any payments or liens it receives before the Foris 2018 Loan is indefeasibly paid in cash in full.  That Lavvan's asserted junior collateral interest is defined by these limiting terms in the Subordination Agreement is a precise example of what the Supreme Court was referring to in *Rash* when it said:  "[o]r, a creditor may hold a junior or subordinate lien, which would require the court to ascertain the creditor's interest in the collateral."  520 U.S. at 961.

46.     As more fully described in the next Section, as defined and cabined by the Lavvan Transaction Documents, the nature and scope of Lavvan's interest in Amyris' interest in the collateral includes Amyris having the ability to incur additional secured debt, Amyris' right to demand that Lavvan execute a subordination agreement in connection with such secured debt, and Foris' having the right to subordinate its own liens and claims to the prior payment of new such secured debt.  Because the Lavvan Transaction Documents permit Amyris' incurrence of the DIP Facility, and result in the subordination of the Foris 2018 Loan debt and liens to that DIP Facility, Lavvan has no interest that is impaired by the DIP Facility and, thus, deserving of adequate protection.

**B.   The Lavvan Documents Provide For The DIP Facility.**

47.     The Lavvan Transaction Documents contemplate the DIP Facility, evidencing further that Lavvan is deemed to have consented to the DIP Motion and is not entitled to adequate protection.  The Security Agreement between Amyris and Lavvan, dated May 2, 2019 (the "Security Agreement") not only confirms that Amyris can incur additional secured debt, but it provides the roadmap to doing so.  The Security Agreement provides that Amyris agrees "not to incur or suffer to exist any liens or security interests in the Intellectual Property Collateral, other than Permitted Liens."  Security Agreement § 4.01(a)(iii).[25]  A Permitted Lien is defined in the Security Agreement as "any lien or security interest granted by the Grantor [Amyris] to **any** Permitted Senior Lender to secure **any** Permitted Debt, **so long as such lien or security interest is subject to a Subordination Agreement**."  Security Agreement § 1.01 (emphasis added).

---

[25]     Permitted Lien is used throughout the Security Agreement as a carve-out to the grant of a lien to Lavvan. *See* Security Agreement §§ 2.01, 2.04, 3.03, 3.04, and 4.01.

Therefore, Amyris can incur[26] permitted secured debt if the required subordination agreement[27] is executed. Importantly, Permitted Debt is defined in the Security Agreement as "**any** indebtedness in respect of borrowed money owed by the Grantor to **any** Permitted Senior Lender." *Id.* (emphasis added). The use of the term "any" is expansive – placing no temporal limitation on when the debt is incurred and placing no limits on the qualifying Permitted Senior Lender. That is, "any" debt can be incurred to "any" Permitted Senior Lender. Similarly, the definition of Permitted Senior Lender is expansive and includes Foris Ventures, LLC by name and "**any** other lender who has advanced debt for borrowed money." *Id.* (emphasis added). Again, the use of the term "any" is not a word of limitation. If "Permitted Senior Lender" is limited to Foris Ventures, LLC, the phrase "any other lender who has advanced debt for borrowed money" would be surplusage—a contract interpretation that is to be avoided.

48.    The Security Agreement also defines Permitted Senior Lender as "Foris Ventures, LLC, as successor in interest to GACP Finance Co., LLC, and any other lender who has advanced debt for borrowed money to Amyris on a senior secured basis (or any other lender who refinances any such debt), provided that no licensee or similar counterparty to Amyris in respect of the Amyris Platform Improvement IP or Amyris Background IP shall be a Permitted Senior Lender." At

---

[26]    If this covenant has no forward-looking application, instead of carving out "Permitted Lien" it would have use precise language for the carve out such as "liens existing on the date hereof," or "the liens of Foris Ventures, LLC".

[27]    Subordination Agreement is defined in the Security Agreement as "a subordination agreement in the applicable Permitted Senior Lender's standard form with such changes as necessary to comply with Section 5.12.2(a) of the RCLA and providing, among other things, that the liens and security interests granted hereunder are junior and subordinate in all respects to the liens and security interests of the applicable Permitted Senior Lender, on terms and conditions customary for subordination agreements of this type, and that, in the event that the applicable Permitted Senior Lender exercises remedies in respect of any Amyris Platform Improvement IP and Amyris Background IP, such Permitted Senior Lender (and any successors or transferees thereof) shall honor the licenses granted to the Secured Party in the Amyris Platform Improvement IP and Amyris Background IP under the RCLA notwithstanding such exercise and any related transfer or assignment, as if such exercise, transfer, and assignment, as applicable, were subject to such license rights." Security Agreement § 1.01.

present, there can no dispute that Euagore LLC "has advanced debt for borrowed money to Amyris on a senior secured basis."

49.     Lavvan argues "has advanced," as used in the definition of Permitted Senior Lender, refers to the past, and only covers a lender in existence at the time the Lavvan Transaction Documents were executed.  This proposition fails for several reasons.

50.     **First**, "has advanced" as a matter of grammar is not a past tense verb formulation. The grammatically correct past tense verb formulation would be "had advanced."[28]  *See* Merriam-Webster's Online Dictionary (2023) (definition of had: "past tense and past participle of have"). For example, I had a car, He had a car, They had a car.  The verb "has advanced" is the present perfect verb tense.  *See id.* (definition of has: "present tense third-person of have").  For example, I have a car, He has a car, They have a car.  As the present perfect verb tense, "has advanced" is one that includes a future action.[29]  The plain and ordinary grammatical meaning of "has advanced"[30] is consistent with the reading that a Permitted Senior Lender is a lender that advances

---

[28]  *See e.g., Benner v. Carlton*, 58 F.4th 923, 926 (7th Cir. 2023) (confirming that "has" is the present tense).  *See also In re Vessillo, In re Vessillo*, Case No. 14-16134-PDR, Adv. Case No. 20-01393-PDR, 2022 Bankr. LEXIS at *7 (Bankr. S.D. Fla. Jan. 3, 2022) (concluding that "has" is present tense in the context of section 506(a) of the Bankruptcy Code when ruling that the estate's interest in property need not be fixed as of the petition date but rather that the estate must have an interest when the court provides relief); *Shuster v. Shuster*, Case No. 16-cv-05515, 2017 WL 20254 at *2 (D. Ariz. Jan. 1, 2017) (construing "has failed" in FRCP 55(a) as a "present failure, not one that happened in the past").

[29]  *See Concern, Inc. v. Pataki*, 2005 N.Y. Slip Op. 50821(U), 2005 WL 1310478 at *20 n.10 (N.Y. Sup. Ct. Erie Cty. May 25, 2005) ("The Court finds it clear that the State's obligations under paragraph 11(b)(3) are all prospective, but the State's agreement to the site must take place before its obligation to assist the Nation with the Settlement Act arises, thus requiring the use of the present perfect tense ('has agreed')"). *In re Walker*, 502 B.R. 324, 329-30 (Bankr. N.D. Ill. Dec. 9, 2013) (stating that "has received" is present perfect and that "[u]nlike the simple past tense, which generally points to single occurrences in the past that are completed, the present perfect may be used to denote both past and present time. The present perfect is concerned 'with a time-span beginning in the past and extending up to now. It is not used in contexts where the now component of this is explicitly or implicitly excluded.'").

[30]  Plain meaning of words as would be ordinarily attached to them is a governing guidepost of contract interpretation under California law.  *See Perez–Encinas v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d at 1133 ("The court must look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it.  In searching for a plain meaning, a court is to interpret the language of an agreement in its 'ordinary and popular sense, unless used by the parties in a technical sense.'") (applying California law).

debt or borrowed money after the date of the Lavvan Transaction Documents. Stated differently, such lender has advanced the debt or borrowed money after the date of the Lavvan Transaction Documents.

51. **Second**, "has advanced" cannot be read to limit a Permitted Senior Lender to a lender as of the date of the Lavvan Transaction Documents. As noted, the Security Agreement provides that Amyris agrees not to incur or to suffer any liens or security interests other than a Permitted Lien. As the "other than" carve-out is not specific to existing liens (which were known) the language suggests a forward-looking application. This is reinforced by the use of the words "to incur" or "to suffer." Incur is a forward-looking verb.[31]  *See id.* (definition of incur: to become liable or subject to: bring down upon oneself). Suffer is similarly a present tense verb.[32]  *See id.* (definition of suffered: past simple and past participle of suffer). If Amyris' debt or advances from a Permitted Senior Lender were limited to debt or advances as of the date of the Lavvan Transaction Documents, the Security Agreement covenant would have said "the Intellectual Property Collateral shall not be subject to any liens or security liens other than the liens or security interests as of the date hereof." To read "Permitted Senior Lender" to freeze Amyris' ability to incur secured debt would be to render meaningless the provision for Permitted Lien in Section 4.01(a) of the Security Agreement, which definition itself contemplates Permitted Debt from a Permitted Senior Lender. New York law, which governs the interpretation of the Security

---

[31]  *See also Corthera, Inc. v. Scottsdale Ins. Co.*, Case No. 14-cv-05014-EMC, 2016 U.S. Dist. LEXIS 8388, *21 (N.D. Cal. Jan, 22, 2016) (explaining a cost is not **incurred** until the underlying task is performed because only then does the obligation to pay arise) (emphasis added); *Am. Nat'l Prop. & Cas. Co. v. Felix*, 399 F. Supp. 3d 324, 342 n.16 (W.D. Pa. 2019) (explaining "[t]o incur an expense, an individual must take on a liability").

[32]  *See also Hayes v. Colvin*, Case No. 5:15-CV-253-D, 2016 U.S. Dist. LEXIS 106331, *13 (E.D.N.C. July 6, 2016) (noting that there is "use of the present tense throughout the statement when the statement provides: "[i]s the patient suffering from a chronic pain syndrome? . . . [i]n my opinion the patient suffers from pain that is . . . moderate to severe"); *Middlesex Mut. Assur. Co. v. Hitchcock*, Case No. CV 990431600, 2000 Conn. Super. LEXIS 620, *9  (Conn. Super. Ct, Mar. 8, 2000) ("The defendant's affidavit is written in the present tense; 'I suffer from the disease of alcoholism, and as a result, suffer from black-outs.'").

Agreement, does not permit such a reading. *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible."); *Minerals Techs. Inc. v. Omya AG*, 406 F.Supp.2d 335, 337 (S.D.N.Y. 2005) ("Principles of contract interpretation require that a contract be interpreted in a manner that ascribes meaning to all provisions of the contract.").

52.    **Third**, given the context and circumstances of the Lavvan Transaction Documents, it defies logic, and would rewrite the commercial agreement, to conclude that the Lavvan Transaction Documents prohibit Amyris from incurring secured debt in the future.  Under the RCLA, Lavvan did not loan Amyris money and the RCLA does not describe a lending relationship between the parties.  Rather, the RCLA describes a commercial relationship regarding the license of certain intellectual property and the collaborative development of certain products. *See* RCLA, Fourth Whereas Clause ("WHEREAS, the Parties wish to enter into this Agreement whereby Amyris shall perform research and development work to produce Collaboration Cannabinoids for Commercialization of Cannabinoids Compounds and/or Products in the Lavvan Field").  The RCLA provides for the grant of a security interest with respect to claims for breaches under the RCLA. *See* RCLA § 5.12.2.  Viewed in this light, it is not surprising that the Lavvan Transaction Documents do not hamstring Amyris' operations by placing debt limits or other limits on Amyris' ability to finance its operations.  Similarly, the Subordination Agreement puts no limits on the amount of debt that Foris could loan to Amyris.[33]  Accordingly, to read "Permitted Senior Lender"

---

[33]   The Subordination Agreement defines "Senior Debt" as "any and all obligations owing to the Senior Lienholder under or in respect of the Senior Agreement."  Subordination Agreement ¶ 1. The "Senior Lienholder" is defined as Foris, and "Senior Agreement" is defined by reference to the Foris 2018 Loan (**as the same has been and may be amended from time to time**)." *Id*. (emphasis added).

as fixed as of the date of the Lavvan Transaction Documents is inconsistent with the foundational commercial relationship between the parties.

53.     **Fourth**, the RCLA, like the Security Agreement, contemplates that any Permitted Debt will be subject to a subordination agreement that protects Lavvan's licenses granted under the RCLA.[34] This requirement puts into context the structure and purpose of the Permitted Debt and Permitted Senior Lender provisions in the Lavvan Transaction Documents to allow the Debtors to fund operations with senior debt provided Lavvan's license rights were protected.

54.     The form of subordination agreement to be executed by any other Permitted Senior Lender and Lavvan, like the Subordination Agreement between Foris and Lavvan, also provides protections to the Permitted Senior Lender until it is paid in cash in full – lien subordination, payment subordination, restrictions on conduct of the junior creditor, and turnover by the junior creditor. *See* RCLA § 5.12.2(c); *supra* note 27 (defining Subordination Agreement). The Security Agreement's requirement that a Permitted Senior Lender and Lavvan execute the agreed form of subordination agreement does not operate to limit additional debt incurred by Amyris, but, rather, creates a structure where Lavvan provides these protections to the new lender. There is a condition: the subordination agreement must provide that Lavvan's licenses—the focus of the commercial relationship set out in the RCLA—are protected. It is the protection of Lavvan's licenses, not the restriction on new debt, that is at the core of Lavvan's rights in the Permitted Debt and Permitted Senior Lender formulations in the Lavvan Transaction Documents. If "Permitted Senior Lender" was limited to lenders existing at the time the Lavvan Transaction Documents were

---

[34] The definition of Subordination Agreement in the Security Agreement provides that the form of the Subordination Agreement must include a provision that requires the "Permitted Senior Lender (and any successors or transferees thereof) shall honor the licenses granted to the Secured Party in the Amyris Platform Improvement IP and Amyris Background IP." The RCLA includes this same requirement in Section 5.12.2(c).

executed, there would be no need for the definitions of Permitted Senior Lender and Permitted Debt, a covenant permitting liens and security interests to be incurred or suffered if a subordination agreement is executed, or even the guidelines for such a subordination agreement. The reason for this is straightforward. The lenders to the Debtors at the time the Lavvan Transaction Documents were entered into were by definition known. There would be no need to govern the parties' conduct with respect to debt owed to some as yet identified "Permitted Lender"—particularly to protect Lavvan's license rights—if the Lavvan Transaction Documents only applied to lenders existing at the time the documents were executed.

55.    **Fifth**, that the Lavvan Transaction Documents contemplate Amyris incurring future debt is further evidenced by the qualified scope of the security interest granted to Lavvan. The second Whereas clause of the Security Agreement states (in bold): **"notwithstanding anything to the contrary herein, all rights and remedies of the Secured Party hereunder in and to the Intellectual Property Collateral (defined below) shall be subject to any applicable Subordination Agreement (defined below) as may be in effect."** This same language is repeated in Section 6.01 of the Security Agreement, which defines Lavvan's remedies:[35] If no future

---

[35]    Section 6.01 of the Security Agreement provides:

> **Certain Remedies.** If any Event of Default shall have occurred and is continuing: (a) upon written notice to the Grantor from the Secured Party the Secured Party may exercise in respect of the Intellectual Property Collateral, in addition to other rights available to it at law or in equity or otherwise, or under the RCLA, all the rights and remedies of a secured party on default under the UCC (whether or not the UCC applies to the affected Intellectual Property Collateral) or any other applicable law, and also may: (i) require the Grantor to, and the Grantor hereby agrees that it shall, at the Grantor's expense and promptly upon request of the Secured Party, assemble all or part of the Intellectual Property Collateral as directed by the Secured Party and make it available to the Secured Party at a place to be designated by the Secured Party that is reasonably convenient to both parties; (ii) exercise any and all rights and remedies of the Grantor under or in connection with the Intellectual Property Collateral; (iii) foreclose or otherwise enforce the Secured Party's security interest in any manner permitted by law or provided for in this Security Agreement, and sell any or all of the Intellectual Property Collateral in any commercially reasonable manner; and (iv) without notice (except as provided above) or demand of legal process, all of which are hereby expressly waived by the Grantor, enter into property where any of the Intellectual Property Collateral is located and take possession thereof; provided, however, that notwithstanding the foregoing, the Secured Party

Permitted Debt could be incurred, there would be no possibility of "any applicable" subordination agreement other than the Subordination Agreement executed by Foris and Lavvan, and no need for the phrase "as may be in effect."  In fact, both the RCLA and the Security Agreement use the phrase "any applicable" and "any other" when describing Permitted Debt, Permitted Senior Lender and Subordination Agreement, thus consistently conveying the point that there is no temporal limitation on such defined terms and they are triggered in "any applicable" circumstance.  RCLA § 5.12.2(a) (referring to "any other Permitted Senior Lender"), § 5.12.2(b) (referring to "any other lender"); Security Agreement § 5.10(d), § 6.01(a) (each referring to "any applicable" Subordination Agreement).

56.     The DIP Facility falls squarely within the four corners of the definitions of Permitted Debt and Permitted Senior Lender, as used in the Lavvan Transaction Documents. Accordingly, Lavvan has consented to the DIP Facility and no adequate protection is required.

## IV. IF THE COURT DETERMINES THAT ADEQUATE PROTECTION MUST BE PROVIDED TO LAVVAN, ANY SUCH ADEQUATE PROTECTION MUST BE TURNED OVER TO FORIS.

57.     Paragraphs 7 and 9 of the Subordination Agreement apply directly to any payments, security interests, liens or other rights in property of Amyris that Lavvan may obtain with respect to obligations owing to it.  Paragraph 9 requires turnover of any such security interests, liens or other rights.  Paragraph 7 authorizes Foris to have any such grant "vacated, dissolved and set aside."  Together, these provisions negate any benefit that Lavvan would otherwise obtain if

---

may transfer the Intellectual Property Collateral or any portion thereof without any preparation or processing; and (b) the Grantor, on behalf of itself and its subsidiaries, specifically waives (to the extent permitted by law) all rights of redemption, stay or appraisal which it has or may have under any law now existing or hereafter adopted. **Notwithstanding anything to the contrary herein, all rights and remedies of the Secured Party hereunder in and to the Intellectual Property Collateral shall be subject to any applicable Subordination Agreement as may be in effect**."

Security Agreement § 6.01 (emphasis added).

replacement liens or other adequate protection were granted and retained by Lavvan in violation of the payment and lien subordination provisions of the Subordination Agreement which subordinates Lavvan's claims and liens to the prior payment in cash in full of the Foris 2018 Loan. This result is not draconian, but rather is consistent with the fundamental bargain of the Subordination Agreement – Lavvan is not entitled to take or receive any property until Foris is indefeasibly paid in cash in full. Applied in this case, the circularity and futility of any grant of adequate protection further underscore why the Court should give full voice to Lavvan's waiver of adequate protection and deemed consent to the DIP Motion.

## **CONCLUSION**

58.     For the reasons set forth in this Foris Supplemental Brief, the Debtors' Supplemental Brief, the DIP Motion, the Debtors' Reply, the Foris Reply, and the record established, the Foris Lenders respectfully request that the Court overrule Lavvan's objection and enter the proposed Final Order.

*[Remainder of Page Left Intentionally Blank]*

Dated: September 29, 2023
Wilmington, Delaware

*/s/ Kenneth A. Listwak*
David M. Fournier (DE No. 2812)
Kenneth A. Listwak (DE No. 6300)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Hercules Plaza, Suite 5100
1313 N. Market Street, P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Facsimile: (302) 421-8390
E-mail:  david.fournier@troutman.com
        ken.listwak@troutman.com
-and-

Michael H. Goldstein (admitted *pro hac vice*)
Alexander J. Nicas (admitted *pro hac vice*)
Debora A. Hoehne (admitted *pro hac vice*)
Artem Skorostensky (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 813-8800
Email:   mgoldstein@goodwinlaw.com
        anicas@goodwinlaw.com
        dhoehne@goodwinlaw.com
        askorostensky@goodwinlaw.com

*Counsel to the Foris Prepetition Secured Lenders and the DIP Secured Parties*