**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC., et al., | Case No. 23-11131 (TMH) |
| Debtors.[1] | (Jointly Administered) |
| | Re: Docket Nos. 19, 171, 211 and 323 |

**OPENING SUPPLEMENTAL BRIEF OF THE DEBTORS IN SUPPORT OF ENTRY OF FINAL ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF**

Amyris, Inc. ("Amyris") and its related above-captioned debtors and debtors in possession (collectively, the "Debtors") file this opening supplemental brief ("Brief") in further support of the *Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 19] ("DIP Motion").

This Brief is submitted pursuant to the *Scheduling Order with Respect to Continued Hearing on the Motion of the Debtors for Interim and Final Orders, et seq.* [Docket No. 323] entered by the Court on September 19, 2023 ("Scheduling Order").[2] By this Brief, the Debtors will address two issues within their purview—(1) the continued existence and amount of the

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

[2] Capitalized terms used but not defined herein shall have the meanings set forth in the Scheduling Order or the DIP Motion.

obligations due to Foris Ventures, LLC ("Foris") under the 2018 LSA (issues 1, 2 and 3 in the Scheduling Order), and (2) the lack of any obligation on the part of the Debtors under Section 364(d)(1)(B) to adequately protect the interest claimed by Lavvan in certain of the Debtors' assets due to Lavvan's advance contractual waiver and consent to the relief sought in the DIP Motion being granted without adequate protection (Issue 8 in the Scheduling Order).

First, Foris is currently owed approximately $63.5 million under the 2018 LSA in outstanding principal and interest as of the Petition Date. The ***accounting treatment*** of the changes made in 2020 to the 2018 LSA (i.e., changes that were treated for accounting purposes as an "extinguishment and reissuance"), did not result in the ***legal cancellation*** of the Debtors' obligations to Foris. Rather, the debt was simply revalued for purposes of its continued presentation as a liability on the company's balance sheet. The Debtors will present the expert opinion of Theodore Martens for the conclusion that the application of debt extinguishment accounting to a particular amendment or modification of a loan obligation does not mean that the underlying debt instrument has been extinguished as a legal matter—only the transaction documents themselves can effectuate such an outcome, not the application of standard accounting guidance to a borrower's financial statements.[3]

Second, Lavvan has indisputably agreed under the Subordination Agreement that it will "not seek adequate protection." Lavvan's agreement to relinquish any claim to adequate protection is consistent with the overall architecture of the Subordination Agreement, which leaves the exercise of rights and remedies against the shared collateral within the exclusive control and

---

[3] The Debtors provided the *Expert Report of Theodore Martens* ("Martens Report") to Lavvan on September 22, 2023, the deadline specified in the Scheduling Order.

discretion of Foris until its debt is "Paid in Full."[4]  Lavvan's bargained-for consent to this construct precludes Lavvan from inviting the Court to independently evaluate whether Lavvan is entitled to adequate protection and relieves the Court of any need to do so.  Indeed, under established practice, the consent of existing pre-petition secured creditors routinely forms the basis for the approval of a priming lien in favor of a DIP lender without a separate assessment by the Court of whether the secured creditor's interest is otherwise adequately protected.  Bankruptcy courts do not second-guess decisions by sophisticated secured creditors as to what level of protection is "adequate," or whether they should forego adequate protection entirely.

## I. INTRODUCTION

1.       Lavvan's dispute with the Debtors centers on competing liens serving very distinct purposes—one granted to Lavvan as security for a possible claim under the RCLA, and one granted to any lenders that "advanced debt for borrowed money to Amyris on a senior secured basis."[5]  Both liens were contemplated under, and their relative priority and repayment rights were pre-arranged, in general, by the RCLA and, more specifically, by the Subordination Agreement. The shared collateral is limited to certain intellectual property (IP) of Amyris: specifically, certain IP that was owned by Amyris at the time the RCLA was executed, and certain IP that was expected to be the fruit of the parties' collaboration under the RCLA.[6]  Lavvan was granted its lien as

---

[4] See Subordination Agreement §§ 4-5.  The "debt extinguishment accounting" treatment of the 2018 LSA is plainly not the equivalent of payment in full in cash, which is required by the Subordination Agreement.

[5] See § 5.12 of the *Research, Collaboration and License Agreement* dated March 19, 2019 ("RCLA").  The *Security Agreement* dated May 2, 2019 ("Security Agreement"), between Lavvan and the Debtors reiterates the same principle—the lien granted thereunder to Lavvan is subordinated to "any other lender who has advanced debt for borrowed money to [Amyris] on a senior secured basis."  *See* definition of "Permitted Senior Lender," at page 4 of Security Agreement.

[6] While there is a dispute between Amyris and Lavvan regarding the extent of Lavvan's asserted security interest, pursuant to the Scheduling Order that issue is not before the Court at this time.

security for potential, future claims that might arise under the RCLA.  That claim, however, was purely contingent and speculative (and was never expected to materialize) at the time the parties initially entered into the RCLA.

2.     At that same time, however, Amyris was already a party to a secured loan agreement for "borrowed money."  As a result, the RCLA contemplated that Lavvan's lien, given as security for a contingent, future claim, would not stand as an obstacle to Amyris's need for additional "advanced debt" to operate.  Any such future funding—by the express assent of Lavvan—would enjoy priority over Lavvan's backstop lien.  Without this arrangement, Lavvan's lien could be expected, quite naturally, to stymie Amyris's ability to finance its future operations, including its ability to perform under its collaboration with Lavvan.

3.     This common sense backdrop informs the present dispute.  Lavvan agreed always to maintain the junior status of its lien in order to accommodate "debt for borrowed money."  As an integral part of the Subordination Agreement, Lavvan ceded control to Foris over the exercise of rights and remedies with respect to the shared collateral.  Now that Lavvan has averred a claim for alleged damages under the RCLA,[7] it is trying to extricate itself from this basic bargain.  By opposing the DIP Motion on the basis that it is entitled to adequate protection, Lavvan is violating the Subordination Agreement under which it agreed not to take the very enforcement steps that it is now advocating.  Lavvan's request that the Court must exercise a roving duty to protect Lavvan from its own waiver is without merit.

---

[7] The existence and amount of any claim for damages under the RCLA is dependent on the outcome of a decision by the International Chamber of Commerce (ICC) arbitral panel.  The Debtors and Lavvan have stipulated to relief from stay to allow the tribunal to issue its decision.  Pending the issuance of the arbitration decision, Lavvan's claims and liens remain in *bona fide* dispute.

## II.  BACKGROUND

A.    **Commencement of the Chapter 11 Cases**

4.      On August 9 and August 21, 2023 (as applicable, the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code ("Chapter 11 Cases").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      Amyris is a leading manufacturer of synthetically derived molecules.  These compounds are eco-friendly, sustainable alternatives to key ingredients that are used in flavors and fragrances, sweeteners, cosmetics, pharmaceuticals and other consumer products.  A detailed description of the Debtors' business and the reasons for the Chapter 11 Cases is set forth in the First Day Declaration.

6.      On August 11, 2023, the Court entered its *Interim Order (I) Authorizing the Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* ("Interim Order") [Docket No. 54].

7.      On August 31, 2023, Lavvan filed its limited objection [Docket No. 171] and on September 8, 2023, Lavvan filed its supplemental objection [Docket No. 211] to the entry of a final order granting the DIP Motion (together, the "Lavvan Objections").  The Lavvan Objections are the only remaining objections to the approval of the DIP Motion.

8.      Lavvan did not assert, in either of the Lavvan Objections, that the relief sought in the DIP Motion could not be approved absent the provision of adequate protection to Lavvan pursuant to Section 364(d)(1).  In light of the prohibition on seeking adequate protection contained in the Subordination Agreement, this omission is not surprising.  But subsequently, at the September 14 final hearing, Lavvan's counsel argued, for the first time, that Lavvan must receive adequate protection pursuant to Section 364(d)(1) as a condition to approval of the DIP Motion.

9.      On September 19, 2023, the Court entered the *Second Interim Order (I) Authorizing the Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* ("Second Interim Order") [Docket No. 322].

10.     On September 19, 2023, the Court entered the Scheduling Order pursuant to which the Final Hearing on the DIP Motion was continued to October 4, 2023, in order to permit discovery and additional briefing on the specific issues identified in the Scheduling Order.

**B.      Amyris's Collaboration with Lavvan**

i.      The Research, Collaboration and License Agreement.

11.     In March 2019, Amyris and Lavvan entered into the RCLA.  Lavvan was a newly formed entity created for the purpose of serving as Amyris's partner under the RCLA.  The RCLA established a collaboration under which the parties would jointly develop up to 20 biosynthetically produced cannabinoids.   Cannabinoids are naturally occurring molecular

compounds found in the cannabis sativa plant.  Amyris planned to contribute its proprietary R&D expertise to bio-engineer yeast strains to emit synthetic cannabinoids as a by-product of natural fermentation.  Lavvan promised to provide the funding for the R&D effort upon satisfaction of a series of milestones. Once the synthetic cannabinoids were commercially viable, Lavvan was responsible for their manufacture, marketing and sale.  Amyris would then be entitled to profit-sharing payments from Lavvan.

12.     Ultimately, Lavvan paid only the first $10 million of the milestones due to Amyris for the R&D work contemplated by the RCLA.  In May 2020, Lavvan terminated the RCLA.  Although Amyris disputed that it had breached the RCLA, in August 2020, Lavvan commenced the arbitration proceeding with the ICC.  The Debtors have stipulated to relief from the stay to allow the tribunal to issue its ruling.

ii.     The Security Agreement.

13.     Under the RCLA, Amyris agreed to grant a security interest to Lavvan (defined in the Security Agreement as the "Lavvan Lien") to secure its contingent obligations to Lavvan under the RCLA.[8]   The assets covered by the security interest are limited to the "background" intellectual property owned by Amyris as of March 2019 *before* the RCLA became

---

[8] *See* § 5.12.2(a) of the RCLA ("Amyris shall grant to Lavvan a lien and security interest on all Amyris Platform Improvement IP and Amyris Background IP to secure all obligations of Amyris to Lavvan hereunder (the "Lavvan Lien").  The Lavvan Lien shall be junior in priority to the existing liens and security interests of Great American and any other Permitted Senior Lender and shall be subject to a subordination agreement with Great American and any other Permitted Senior Lender (a "Subordination Agreement").").

effective, and a narrow subset of "foreground" intellectual property developed by Amyris pursuant to the activities contemplated by the RCLA *after* it became effective in March 2019.[9]

14.    The RCLA provided that Lavvan's security interest would be subordinated in favor of GACP Finance Co., LLC ("GACP") and any Permitted Senior Lender.  A Permitted Senior Lender was defined to include both GACP (the existing lender as of the March 2019 date of the RCLA), and "any other lender who has advanced debt for borrowed money to Amyris on a senior secured basis."[10]  This provision ensured that Amyris would retain the ability to obtain funding for operational needs despite the lien granted to Lavvan as security for a potential claim arising under the RCLA.  The use of the present perfect tense ("has advanced")[11] confirms that the RCLA included both the then existing loan to GACP and other advances of debt continuing into the present.

15.    The RCLA obligated Lavvan to periodically affirm the junior status of its lien by entering into a subordination agreement with any Permitted Senior Lender.[12]  Here too, the

---

[9] These two categories of collateral are defined as the Amyris Background IP and the Amyris Platform Improvement IP under the RCLA.  Another subset of "foreground" intellectual property (defined in the RCLA as the Amyris Cannabinoid Foreground IP) that was expected to be generated under the collaboration activities contemplated by the RCLA was contributed to a special purpose entity (DIPA Co., LLC) and then licensed to each of Amyris and Lavvan consistent with the RCLA.  That special purpose entity, which is 99.99% owned by Amyris, is not a debtor in these Chapter 11 Cases.

[10] *See* § 5.12.2(b) of the RCLA ("'Permitted Senior Lender' shall mean Great American and any other lender who has advanced debt for borrowed money to Amyris on a senior secured basis (or any other lender who refinances any such debt), provided that no licensee or similar counterpart to Amyris in respect of the Amyris Platform Improvement IP or Amyris Background IP shall be a Permitted Senior Lender.").

[11] Merriam-Webster defines the present perfect verb tense as "a verb tense that is used to refer to an action that began in the past *and is completed at the time of speaking*." (emphasis added).  *See* "The present perfect." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/the present perfect.

[12] *See* § 5.12.2(c) of the RCLA ("*Each* Subordination Agreement shall be in the applicable Permitted Senior Lender's standard form with such changes as necessary to comply with Section 5.12.2(a) and shall provide, among other things, that the Lavvan Lien is junior and subordinate in all respects to the liens and security interests of *the applicable Permitted Senior Lenders*, on terms and conditions customary for subordination agreements of this type . . . .") (emphasis added).

RCLA accommodated the possibility of multiple "applicable Permitted Senior Lenders" as and when Amyris might obtain additional borrowed money.

16.     The Security Agreement executed by Amyris in favor of Lavvan reaffirms that the Lavvan Lien would be subject to any Permitted Liens.[13]  The Security Agreement was not entered into, however, until May 2019 (two months after the RCLA).  By then, as described in Section II(C) below, Foris had already acquired the GACP loan (the purchase was consummated in April 2019).  Hence, the definition of a Permitted Senior Lender was revised under the Security Agreement to include both "Foris Ventures, LLC, as successor in interest to GACP Finance, LLC," and "any other lender who has advanced debt for borrowed money to Amyris on a senior secured basis."[14]

17.     Like the RCLA, the Security Agreement anticipated the possibility that the Lavvan Lien would be "subject to *any applicable* Subordination Agreement *as may be in effect*."[15] The defined term "Subordination Agreement" refers to an agreement with any "*applicable*"

---

[13] *See* definition of "Permitted Lien" under Security Agreement ("'Permitted Lien' means any lien or security interest granted by the Grantor to **any** Permitted Senior Lender to secure **any** Permitted Debt, so long as such lien or security interest is subject to a Subordination Agreement.") (emphasis added); *see* definition of "Permitted Debt" under Security Agreement ("'Permitted Debt' means **any** indebtedness in respect of borrowed money owed by the Grantor to **any** Permitted Senior Lender.") (emphasis added).

[14] *See* definition of "Permitted Senior Lender" under Security Agreement ("'Permitted Senior Lender' shall mean Foris Ventures, LLC, as successor in interest to GACP Finance Co. LLC, and any other lender who has advanced debt for borrowed money to Amyris on a senior secured basis (or any other lender who refinances any such debt), provided that no licensee or similar counterparty to Amyris in respect of the Amyris Platform Improvement IP or Amyris Background IP shall be a Permitted Senior Lender.").

[15] *See* § 5.01(d) of Security Agreement ("Notwithstanding anything to the contrary herein, all rights and remedies of the Secured Party hereunder in and to the Intellectual Property Collateral shall be subject to **any applicable** Subordination Agreement **as may be in effect**.") (emphasis added); *see* § 6.01 of Security Agreement ("Notwithstanding anything to the contrary herein, all rights and remedies of the Secured Party hereunder in and to the Intellectual Property Collateral shall be subject to **any** applicable Subordination Agreement **as may be in effect**.") (emphasis added).

Permitted Senior Lender.[16]  In combination, this fluid language reinforces the prospect that Amyris

might obtain further advances for borrowed money that would be senior to the Lavvan Lien.

      iii.    <u>The Subordination Agreement</u>.

      18.    Consistent with the requirements of the RCLA and the Security Agreement,

in May 2019 (two months after the RCLA was executed) Lavvan and Foris entered into the

Subordination Agreement.  Lavvan agreed to subordinate its right to payment under the RCLA,

and the ranking of the Lavvan Lien, to the prior payment in full of Foris's claims under the 2018

LSA.[17]

      19.    Critically, Lavvan also agreed that it would not seek any adequate

protection on account of its interest in the property of the Debtors that was covered by the Lavvan

Lien.[18]  To bolster this waiver, Lavvan further agreed that it would neither "exercise any remedy"

nor "commence, or cause to commence, prosecute or participate in any administrative, legal or

equitable action" with respect to its collateral.[19]  The prohibition on taking an "Enforcement

---

[16] *See* definition of "Subordination Agreement" under Security Agreement ("'Subordination Agreement' means a subordination agreement in the applicable Permitted Senior Lender's standard form with such changes as necessary to comply with Section 5.12.2(a) of the RCL Agreement and providing, among other things, that the liens and security interests granted hereunder are junior and subordinate in all respects to the liens and security interests of the applicable Permitted Senior Lender . . . .").

[17] *See* Subordination Agreement §§ 2, 3.

[18] *See* Subordination Agreement § 6 ("Junior Lienholder agrees not to seek adequate protection or the payment of interest, fees or other expenses in respect of the Junior Lienholder Collateral unless or until there has been Payment in Full of the Senior Debt.").

[19] *See* Subordination Agreement § 4 ("Except as otherwise permitted hereunder, so long as any of the Senior Debt has not been Paid in Full, the Junior Lienholder shall not, without the prior written consent of the Senior Lienholder, exercise any remedy with respect to any Junior Lienholder Collateral, nor shall the Junior Lienholder commence, or cause to commence, prosecute or participate in any administrative, legal or equitable action against any Junior Lienholder Collateral or against Borrower in respect of any Junior Lienholder Collateral . . . .").

Action" is so all-encompassing that it carves-out such minor matters as filing a proof of claim or actions taken to preserve rights or avoid the passage of statutes of limitation.

20.    In order to implement the re-allocation of Lavvan's distributive entitlement on account of its potential claim under the RCLA, Lavvan also agreed that, if and to the extent it received any payments or rights in property at odds with the requirements of the Subordination Agreement, it would turnover such payments or property, exactly in the form received, to Foris.[20] Hence, any adequate protection payments or liens that might otherwise flow to Lavvan on account of any decrease in the value of Lavvan's interest in the property covered by the Lavvan Lien would automatically revert to Foris.  *See* § 361 of Bankruptcy Code (adequate protection only to the extent of a "decrease in the value of such entity's interest in such property").

21.    None of the foregoing is disputed by Lavvan.  Lavvan acknowledges that it has waived the right to request adequate protection.[21]  And Lavvan concedes that its payment and priority rights are junior to, at least, the 2018 LSA.[22]  The only available basis for objection to the approval of a priming lien under Section 364(d)(1)(B) of the Bankruptcy Code is a lack of adequate protection of the interest of the holder of the lien in property of the estate (here, Lavvan), on which a senior lien is proposed to be granted (here, the DIP Lender).  But no adequate protection is necessary for a secured party that has consented in advance that it is not entitled to any such

---

[20] *See* Subordination Agreement § 9 ("Except as otherwise expressly agreed to in this Agreement, if the Junior Lienholder shall receive any payments, security interests or liens, or other rights in any property of the Grantor in violation of this Agreement, such payment or property shall be received by the Junior Lienholder in trust for the Senior Lienholder and shall be delivered promptly to the Senior Lienholder in the form received.").

[21] *See* Transcript of September 14, 2023, Hearing at p.104:1-4 ("You know, I would just suggest that there is no case law cited to support the proposition that was made here that we have waived adequate protection.  We have agreed not to seek it.").

[22] Foris asserts that other pre-petition obligations owed to it and certain of its affiliates also qualify as Permitted Debt; the resolution of that question will be subject to further proceedings.

protection.  And no adequate protection is needed for a secured party that has relinquished "any

remedy" and surrendered its right "to prosecute or participate in any administrative, legal or

equitable action."

## C.   <u>The History of the Foris 2018 LSA</u>

22.   At the time Lavvan and Amyris commenced their collaboration under the

RCLA, Amyris was already indebted to GACP under a secured loan in the initial principal amount

of $36 million pursuant to a *Loan and Security Agreement* dated as of June 29, 2018 (the "<u>2018</u>

<u>LSA</u>").  The original 2018 LSA accommodated an increase in the facility (upon request by Amyris

and acceptance by GACP) by an additional $35 million (for a total loan of $71 million), and was

otherwise amendable with the assent of the parties.[23]

23.   The 2018 LSA was amended on four separate occasions by Amyris and

GACP from June 2018 through December 2018.  In March 2019, the RCLA was executed.  Shortly

thereafter, in April 2019, Foris and GACP entered into a *Loan Purchase Agreement* dated as of

April 15, 2019, under which Foris purchased from GACP all right, title and interest of GACP

under the 2018 LSA and related documents.  At the closing of the acquisition in April 2019, the

starting balance due under the 2018 LSA, as then assigned to Foris, was $36 million.  As part of

---

[23] *See* 2018 LSA at §2.1 ("<u>Facility Increase</u>. Prior to July 1, 2019, Borrower may, by written notice to Agent, elect to request the establishment of a new loan commitment by an aggregate amount not in excess of $35,000,000.00 (the "Incremental Term Loan Commitment").  Lender may elect to accept or decline Borrower's request for the Incremental Term Loan Commitment (in whole or in part) in its sole and absolute discretion.  Any Incremental Term Loan Commitment shall become effective and shall be an Advance subject to the conditions, requirements and limitations set forth in Section 2.2(b) as of date advanced.").  In fact, the Subordination Agreement expressly contemplates, and Lavvan has agreed, that the Lavvan Lien is junior to all obligations owed under or in respect of the "Senior Agreement," which refers to the 2018 LSA, "*as the same has been and may be amended from time to time*." *See* § 1 of Subordination Agreement

the transaction, Amyris agreed to repay to Foris $2.5 million of the purchase price paid by Foris to GACP on account of the loan acquisition.

24.    During this time period, Foris also made advances to Amyris pursuant to four separate unsecured promissory notes.  As of August 2019, the aggregate principal outstanding under the four notes was $32.5 million.  On August 14, 2019, Foris and Amyris entered into a fifth amendment to the 2018 LSA.  Pursuant to this amendment, and in connection with certain waivers and amendments under the 2018 LSA, the loan balance under the 2018 LSA was increased to $71.041 million to reflect the addition of the advances made under the four notes as well as the amortization of the $2.541 million due on account of the repayment obligation incurred by Amyris at the time of the GACP loan acquisition in April 2019 (i.e., $71.041 million is the sum of the original $36 million *plus* $32.5 million representing the advances made under the four notes *plus* $2.541 million on account of the repayment obligation to Foris).  As a consequence of the fifth amendment, Amyris's obligations under the four notes and on account of the repayment obligation were cancelled and satisfied.

25.    In October 2019, Foris and Amyris entered into a sixth amendment to the 2018 LSA under which the loan balance increased to $81.041 million on account of an additional advance for $10 million.  Later that month, the parties entered into an *Amended and Restated Loan and Security Agreement*, dated as of October 28, 2019.  The amendment acknowledged that the loan balance due under the existing 2018 LSA was $81.041 million.  A further borrowing under the amended and restated 2018 LSA in the amount of $10 million was made on November 27, 2019, increasing the total outstanding principal balance to $91.041 million.

26.     Each of the foregoing adjustments to the principal amount due under 2018 LSA was contemporaneously disclosed by Amyris in its public 8-K, 10-Q and 10-K filings as and when each change was effectuated.  In its Form 10-K for the period ending December 31, 2019, Amyris disclosed that it owed Foris $91.041 million under the 2018 LSA plus an additional $19 million under a separate unsecured borrowing dated August 28, 2019.

27.     In January 2020, Foris and Amyris entered into a *Warrant Exercise and Debt Equitization Agreement* dated January 31, 2020 ("Equitization Agreement").  Under this agreement, the 2018 LSA was partially equitized (i.e., debt was converted to equity) by using amounts due under that loan (a combination of principal and accrued interest and fees) to satisfy (i) the exercise price of certain warrants (total price of approximately $54.8 million) and (ii) the purchase price of certain new shares of common stock and rights (total price of approximately $15.1 million).  As a result of this transaction, approximately $50 million due under the 2018 LSA was cancelled (the equitization was also effectuated through the cancellation in full of the amounts due under the separate $19 million unsecured loan dated August 2019), leaving a principal balance due under the 2018 LSA of $50.041 million.

28.     A copy of the Equitization Agreement is attached to this Brief at **Exhibit A**.  Exhibit B to the Equitization Agreement contains a detailed breakdown of the precise amounts of Foris debt that were converted to equity, as set forth below:

**Cancelled Debt**

| Issue Date | Total Principal under Debt Instrument | Total Principal being applied to Exercise Price | Total Principal being applied to Purchase Price | Total Accrued and Unpaid Interest and fees under Debt Instrument (as of January 31, 2020) | Total Unpaid Interest and fees being applied to Purchase Price | Total Principal remaining under Debt Instrument | Total Unpaid Interest and fees remaining under Debt Instrument (as of January 31, 2020) |
|---|---|---|---|---|---|---|---|
| 8/28/2019 | $19,000,000.00 | $19,000,000.00 | $0.00 | $974,465.75 | $974,465.75 | 0 | 0 |
| 10/11/2019 | $10,000,000.00 | $10,000,000.00 | $0.00 | $388,888.89 | $388,888.89 | 0 | 0 |
| 11/27/2019 | $10,000,000.00 | $10,000,000.00 | $0.00 | $225,694.44 | $225,694.44 | 0 | 0 |
| 8/14/2019 | $71,041,000.00 | $15,767,092.12 | $5,232,907.88 | $8,329,266.13 | $8,329,266.13 | $50,041,000.00 | 0 |
| | | | | | | | |
| **Total** | **$110,041,000.00** | **$54,767,092.12** | **$5,232,907.88** | **$9,918,315.21** | **$9,918,315.21** | **$50,041,000.00** | **$0.00** |

29.     In its Form 8-K filed on February 2, 2020, describing the equitization, Amyris disclosed that Foris had paid to exercise the warrants and to purchase the new shares/rights by the application of approximately $50 million due under the 2018 LSA and the application of approximately $19 million due under the August 2019 loan—for a total purchase price (and corresponding cancellation of debt) of approximately $69.9 million.[24]

---

[24] As set forth in Exhibit B to the Equitization Agreement, the exact amount of the principal, interest and fees due under the 2018 LSA that was applied to the exercise price of the warrants and the purchase price of the new common stock was $49,943,849.46.  The exact amount of the principal, interest and fees due under the August 2019 loan that was applied to the exercise price of the warrants and the purchase price of the new common stock was $19,974,465.75. The total amount, thus, of Foris debt that was converted to equity was $69,918,315.21.

30.     Ever since the consummation of the equitization transaction in early 2020, Amyris has consistently recognized and disclosed (in various subsequent amendments, waivers and consents issued under the 2018 LSA and in parallel SEC filings) that the outstanding principal balance under the 2018 LSA was $50.041 million, as set forth below:



## Foris 2018 LSA Balance Per SEC Filings



31.     Solely for accounting purposes, the debt for equity transaction was treated as an extinguishment and reissuance of the remaining balance of the 2018 LSA.  In its Form 10-K filing for the year ended December 31, 2020,[25] Amyris disclosed that it had analyzed the changes made to the 2018 LSA due to the equitization transaction (i.e., the decrease in outstanding principal, among other changes), to determine whether they resulted in a "modification or extinguishment" of the 2018 LSA.  As stated in the 10-K:  "Based on the before and after cash

---

[25] This Form 10-K was the Exhibit 7 identified by counsel for Lavvan at the September 14, 2023, hearing.

flows, the change was significantly different.  Consequently, the accelerated paydown of the Foris

LSA loan balance through the exercise price of the remaining outstanding warrants and the

purchase price of the private placement common stock *was accounted for* as a debt extinguishment

and a new debt issuance"[26] (emphasis added).  Lavvan claims, incorrectly, that the accounting

treatment supports the inference that the 2018 LSA has been cancelled as a legal matter.

### III.  OPENING BRIEF

A.    **The Foris Debt Under the 2018 LSA Remains Outstanding**.

          32.    The obligations due to Foris under the 2018 LSA remain outstanding under

Amyris's books and records and fully subject to the rights, benefits and obligations under the

Subordination Agreement.  The debt originated with the acquisition by Foris of the GACP loan in

April 2019.   Since then, the principal amount under the loan has periodically increased by

additional amounts of "advanced debt for borrowed money."[27]  Each of the additional amounts

loaned is directly linked to the facility created by the 2018 LSA.[28]  At the time of the debt for

equity swap in January 2020, the principal balance due under the 2018 LSA was $91.041 million.

As a result of the equitization transaction, principal obligations of $41 million were cancelled in

partial satisfaction of the exercise price for warrants and the purchase price for new common

stock—leaving a balance due of $50.041 million.  The principal balance of the 2018 LSA has

---

[26] *See* Form 10-K Annual Report for fiscal year ended December 31, 2020 at p.84.

[27] *See* § 5.12.2(a), (b) of the RCLA (Lavvan agreed to the junior priority of its liens and claims compared to the liens of GACP and "any other lender who has advanced debt for borrowed money to Amyris on a senior secured basis (or any other lender who refinances any such debt) . . . .").

[28] As noted above, the 2018 LSA originally (at inception in June 2018) permitted a potential loan increase of an additional $36 million.  When the 2018 LSA was amended and restated in October 2019, it also permitted a potential increase in the maximum loan amount upon the request of Amyris and with the acceptance of Foris.  All amounts borrowed by Amyris, thus, are connected to the root form of the underlying 2018 LSA.

never fallen below the amount of the debt that was originally assigned by GACP to Foris, as illustrated below:



## Foris 2018 LSA Balance Over Time

*(in $ millions)*

| | |
|---|---|
| June 2018 Original GACP Loan | $36.0 |
| April 2019 Foris Acquires GACP Loan | $36.0 |
| August 2019 Amendment No. 5 | $71.0 |
| October 2019 Amendment No. 6 | $81.0 |
| November 2019 Amended and Restated LSA | $91.0 |
| January 2020 Partial Equitization Transaction | $50.0 |

33.     The Martens Report affirms that the "outstanding balance of loan principal owed by Amyris to Foris under the Foris LSA (as defined herein) derives directly from the 2018 Original LSA Agreement (as defined herein), as adjusted in several amendments . . . and does not consist of any extinguished or newly issued debt."[29]   Mr. Martens tracked the continuity of the 2018 LSA from the inception of the lending relationship between GACP, Foris and Amyris and further correlated the loan history against the underlying loan documents and the contemporaneous SEC disclosures.   According to Mr. Martens, at all times following the January 2020 equitization

---

[29] *See* Martens Report at p.1.

transaction, the "contractual outstanding principal" due from Amyris to Foris was $50.041 million and did not change.

34.    Importantly, Lavvan's obligations under the Subordination Agreement continue until "Payment in Full" of the "Senior Debt." "Payment in Full" is defined to mean payment "in full in cash," and "Senior Debt" is defined to mean "any and all Obligations owing to the Senior Lienholder under or in respect of the Senior Agreement." The "Senior Agreement" is the 2018 LSA, "as the same has been and may be amended from time to time." [30] As set forth above, Amyris has, at all relevant times, continued to owe obligations to Foris under the 2018 LSA, including following the debt for equity swap in January 2020. The equitization transaction had no effect on Lavvan's ongoing contractual obligations under the Subordination Agreement— Foris has not yet been paid in full in cash. With interest and fees, the outstanding amount due to Foris as of the Petition Date under the 2018 LSA is now approximately $63.5 million.

**B.    The Foris Debt Under the 2018 LSA Has Not Been Cancelled.**

35.    As noted, the debt for equity transaction under the Equitization Agreement contemplated the "retirement of certain amounts of debt through equity instruments." *See* Martens Report p.1. As a result of these changes to the 2018 LSA, Amyris was required under applicable accounting standards to evaluate the proper presentation of the remaining outstanding debt as a liability on its balance sheet. According to Mr. Martens, the company had two options to assess the impact of a transaction that modifies debt—"debt extinguishment accounting" or "debt modification accounting." The former standard would apply if the changes to the terms of the debt

---

[30] *See* Subordination Agreement § 1.

were substantial.  Otherwise, debt modification accounting would apply and there would be no gain or loss recognized as a result of the modification.  *Id*. at p.2.

36.    Here, due to the substantial nature of the changes effectuated by the debt for equity swap, debt extinguishment accounting was applied by Amyris.  Mr. Martens assessed that this treatment was consistent with issued accounting standards and GAAP.  As a consequence, gain or loss was required to be recognized on the difference between the price of the "deemed reissued" debt and the value of the original debt (in this case, as stated in the Form 10-K, Amyris recorded a $10.4 million loss).  Such accounting treatment, however, does not entail "derecognizing a debt instrument" (a legal consequence) as opposed to "derecognizing a debt" (an accounting principle).  *Id*. at p.2.

37.    Mr. Martens concluded that:

> Importantly, the application of debt extinguishment accounting to an Amendment does not mean that the entirety of the Foris LSA debt was extinguished in the Amendment and replaced by new loans. That can only occur to the extent provided for in the transactional documents.  It means only that the net effect of the extinguishment provided for in the Amendment was deemed substantial in relation to the loan as a whole.  Application of debt extinguishment accounting cannot change contractual liabilities.[31]

38.    Consequently, none of the various amendments and restatements of the 2018 LSA provided for the "complete extinguishment of old Foris LSA debt and replacement with new loans."  *Id*.  The obligations due to Foris under the 2018 LSA, totaling $63.5 million as of the Petition Date, thus, remain valid, outstanding and enforceable.

---

[31] *See* Martens Report at p.2.

**C.**     **As a Result of Lavvan's Agreement Not to Seek Adequate Protection,**
**the Court Need Not Independently Find that the Lavvan Lien Is Adequately**
**Protected Under Section 364(d) in Order to Approve the DIP Motion**

i.     <u>Lavvan Has Unequivocally Waived Adequate Protection</u>.

39.     The Court is not required to find that Lavvan's asserted interest in its collateral is adequately protected under Section 364(d)(1) in order to approve the DIP Motion because Lavvan waived its right to seek (or receive) adequate protection in the Subordination Agreement and, therefore, has consented to the relief sought in the DIP Motion being granted without adequate protection.

40.     Section 6 of the Subordination Agreement states plainly:    "Junior Lienholder agrees not to seek adequate protection or the payment of interest, fees or other expenses in respect of the Junior Lienholder Collateral unless or until there has been Payment in Full of the Senior Debt."[32]  Lavvan is the "Junior Lienholder" under the Subordination Agreement and, as set forth above, there has been no "Payment in Full of the Senior Debt."  Hence, Lavvan is precluded from seeking adequate protection under the Subordination Agreement.

41.     Initially, Lavvan honored this prohibition when it did not raise the issue of adequate protection in either of the Lavvan Objections.  But, at the hearing held on September 14, Lavvan's counsel argued for the first time that Lavvan was not impeded from accepting an award of adequate protection if it was otherwise statutorily required.  Lavvan's counsel theorized that, although Lavvan agreed in the Subordination Agreement "not to *seek* adequate protection," it was not prohibited from *receiving* adequate protection.  In particular, Lavvan's counsel stated:

---

[32] *See* § 6 of Subordination Agreement.

> [T]he provision that was read to you by counsel multiple times doesn't say we waive adequate protection.  It says, we will not seek adequate protection.  If it said different words, it's, I suppose, possible you might get to a different point because maybe you would conclude, well, even if the Court grants it, I'm not allowed to accept it.  That's not what the words of our contract say.  It says, we will not seek it.[33]

42.     That argument is too cute by half.  There can be little doubt that, by pursuing the argument itself, Lavvan is, in fact, *seeking* adequate protection, despite its admission that the Subordination Agreement "says, we will not seek it."  Merriam-Webster defines the word "seek" to include (i) "to ask for," (ii) "to try to acquire or gain," and (iii) "to make an attempt."[34]  By claiming that the Court cannot grant the DIP Motion without the provision of adequate protection, Lavvan is certainly asking for, and trying or attempting to acquire or gain, adequate protection.

43.     Lavvan cannot elide the express prohibition in the Subordination Agreement through semantic contortions; there is simply no difference between "seeking" and "accepting" when the object of those verbs is identical—an award of adequate protection.  Lavvan is prohibited from trying to obtain any adequate protection in the first place.  Indeed, the Subordination Agreement clarifies that both direct and indirect actions inconsistent with the terms of the Subordination Agreement are equally prohibited.[35]

---

[33] *See* Transcript of September 14, 2023, Hearing at p.77:15-22

[34] *See* "Seek."  Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/seek.

[35] Section 13 of the Subordination Agreement provides: "The Junior Lienholder agrees to not directly ***or indirectly*** take or support, or induce or instigate others to take or support, any action inconsistent with this Agreement." (emphasis added).  Lavvan's claim that the DIP Motion must be denied unless Lavvan is provided adequate protection under Section 364(d)(1) is inconsistent with Section 6 of the Subordination Agreement which precludes Lavvan from seeking adequate protection.  Just as Section 6 of the Subordination Agreement precludes Lavvan from demanding adequate protection, Section 13 precludes Lavvan's attempt to obtain that relief "indirectly" by contending that the DIP Motion must be denied unless it receives adequate protection.

44.    As further confirmation that there is no substantive difference between relinquishing "the right to seek" and surrendering "the right to accept," the Subordination Agreement requires Lavvan to hold in trust and turn over to Foris any consideration received by Lavvan as adequate protection.  Section 9 of the Subordination Agreement provides that, "if the Junior Lienholder shall receive any payments, security interests or liens, or other rights in any property of the Grantor in violation of this Agreement, such payment or property shall be received by the Junior Lienholder in trust for the Senior Lienholder and shall be delivered promptly to the Senior Lienholder in the form received."

45.    The final nail in the semantic coffin stems from Lavvan's agreement to neither "exercise any remedy" nor commence or participate in any "legal or equitable action" with respect to the treatment of its collateral.  Section 4 of the Subordination Agreement provides, in relevant part:

> Except as otherwise permitted hereunder, so long as any of the Senior Debt has not been Paid in Full, ***the Junior Lienholder shall not***, without the prior written consent of the Senior Lienholder, ***exercise any remedy with respect to any Junior Lienholder Collateral, nor shall the Junior Lienholder commence, or cause to commence, prosecute or participate in any administrative, legal or equitable action against any Junior Lienholder Collateral or against Borrower in respect of any Junior Lienholder Collateral*** . . . .

46.    This provision contains two independent prohibitions on Lavvan's attempt to invoke Section 364(d)(1) as a hurdle to the relief sought in the DIP Motion.  First, Lavvan's very argument that the Court must provide, and that Lavvan can passively accept, adequate protection for its interest in its collateral under Section 364(d)(1) is the exercise of a remedy that is barred by the Subordination Agreement.  Lavvan contends that, because it is a creditor secured

by the Junior Lienholder Collateral, it must be provided adequate protection for that interest before its lien may be primed.  By invoking its alleged rights under Section 364(d)(1), Lavvan is seeking to exercise a remedy that is available exclusively to secured creditors under the Bankruptcy Code and which would be available to Lavvan only based on its asserted interest in its collateral.

47.     Second, Lavvan's Objection to the DIP Motion in adequate protection grounds is a proceeding both "against" and "in respect of" the Junior Lienholder Collateral, because Lavvan is seeking to enforce rights arising from, and to obtain adequate protection for, its asserted interest in the collateral.  Lavvan is opposing the Debtors' DIP Motion by seeking to enforce its rights as a secured creditor under Section 364(d)(1).  Section 4 of the Subordination Agreement precludes Lavvan from commencing, causing to commence, prosecuting, or participating in such proceedings.  In the overall context of the Subordination Agreement, the specific waiver of the right to seek adequate protection ***coupled with*** the general waiver of the exercise of any remedy, confirms that there is no linguistic daylight between actively seeking adequate protection and passively accepting it after raising the issue with the Court.

ii.     <u>Lavvan's Waiver Is Tantamount to Consent</u>.

48.     In sum, Lavvan waived the right to seek adequate protection, directly or indirectly, and is barred by contract from opposing the relief sought in the DIP Motion on the theory that it is entitled to passively accept adequate protection.  Since Lavvan is precluded from arguing that its asserted lien cannot be primed absent the provision of adequate protection, it has no basis for opposing the relief sought in the DIP Motion and must be deemed to have consented to the relief sought in the Motion.  *See, e.g., Aurelius Capital Master, Ltd. v. Tousa Inc.*, No. 08-

61317-CIV-GOLD, 2009 U.S. Dist. LEXIS 12735, at *29-30 (S.D. Fla. Feb. 5, 2009) ("Wells

Fargo has no standing to pursue its appeal because despite its limited objection, it was deemed to

have consented to the Cash Collateral Order by the Bankruptcy Court and therefore cannot be

considered an aggrieved party.  Pursuant to Article 5.2 of the Intercreditor Agreement, Wells Fargo

is barred from 'request[ing] any form of adequate protection or any other relief in connection with

the use of the cash.'  Put differently, Wells Fargo had bargained away its right to object by entering

into the Intercreditor Agreement."); *see also In re Bear Island Paper Co., L.L.C.*, No. 10-31202

(DOT), 2011 Bankr. LEXIS 1884, at *20-21 (Bankr. E.D. Va. Mar. 30, 2011) (approving priming

liens under Section 364(d) in financing order and noting that junior creditors had agreed in an

intercreditor agreement to be primed and to "not request adequate protection or any other relief in

connection with the Debtor's entry into the Postpetition Facility").

      49.    As a result of Lavvan's waiver, the Court need not independently ensure

that Lavvan's interests are adequately protected under Section 364(d)(1).  The court in *RCD Invs.*

*No. 4, Ltd. v. Foothill Capital Corp. (In re GDH Int'l, Inc.)*, rejected an argument almost identical

to the one being made by Lavvan when it stated:

> RCD4 also contends that its I.P. Lien cannot be primed because its
> "interests in the I.P. Lien could [not] be adequately protected against
> priming by Foothill.  Indeed, the Debtors never even tried to offer
> any adequate protection."  **RCD4 further contends that its**
> **agreement in Section 11 of the Inter-Creditor Agreement "not**
> **to assert any right it may have to 'adequate protection' of its**
> **interests" is not at issue here because Section 364(d) of the**
> **Bankruptcy Code mandates a finding of adequate protection**
> **before a priming lien can be granted—it did not have to assert**
> **a right to adequate protection.  The Court disagrees**. Before a
> priming lien can be granted, Section 364(d)(1) requires that the
> trustee (or debtor-in-possession) be unable to obtain such credit
> otherwise and that the interest being primed be adequately protected.

Here, the Court found in the Financing Orders that credit was not available on lesser terms. However, **no adequate protection finding is required in light of RCD4's waiver of its right to adequate protection** and its further waiver of any claim or defense to Foothill's postpetition loans to the Debtors.[36]

50.     This outcome is consistent with accepted practice in this jurisdiction. Courts in this district often accept the consent of junior secured creditors to a priming lien pursuant to the terms of an intercreditor agreement without independently assessing whether the creditors' interests in fact have been adequately protected. *See, e.g., In re Am. Safety Razor Co., LLC*, No. 10-12351 (MFW), 2010 Bankr. LEXIS 5994, at *18 (Bankr. D. Del. July 30, 2010) (financing order providing that, "under the Intercreditor Agreement, the Second Lien Agent and the Second Lien Lenders are deemed to consent to the financing under the DIP Facility and, upon approval of the DIP Facility, the DIP Facility Liens shall have first priority in the Collateral, the Prepetition First Liens shall have second priority in the Collateral, and the Prepetition Second Liens shall have third priority in the Collateral."); *see also In re Nuverra Envtl. Sols., Inc.*, No. 17-10949 (KJC), 2017 Bankr. LEXIS 4547, at *49 (Bankr. D. Del. June 6, 2017) (financing order approving senior, priming liens pursuant to section 364(d)(1) and stating "the Existing Pari Passu Secured Parties have consented to, and, pursuant to the Second Lien Intercreditor Agreement, the Second Lien Parties are deemed to have consented to, the terms set forth in this Final Order").

---

[36] *See* Nos. 00-45647-BJH-11, 00-4185, 2001 Bankr. LEXIS 2230, at *12-13 n.4 (Bankr. N.D. Tex. Apr. 2, 2001) (emphasis added); *cf. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) (where junior creditors withdrew their objections to a request for a priming lien, the court held that, "by tacitly consenting to the superpriority lien, those [junior] creditors relieved the debtor of having to demonstrate that they were adequately protected.")

iii.   Consent Routinely Suffices To Meet Section 364(d)(1).

51.     Taken to its logical conclusion, Lavvan's argument that Section 364(d)(1) requires the Court to independently canvas the record for adequate protection each time a priming lien is sought under a DIP financing motion would undermine accepted practice in this jurisdiction (and elsewhere).  Although cases involving a junior creditor's consent to such relief appear rarely to result in reported decisions, Debtor's counsel has been unable to locate any reported decision in which a court in this district held that it has an independent obligation to find that a junior secured creditor's interests were adequately protected where the creditor was deemed to have waived the right to such relief by contract.

52.     Indeed, it is not uncommon for an existing pre-petition lender to offer superior terms for post-petition financing (for a variety of reasons, including its familiarity with the debtor).  Typically, the pre-petition lender consensually agrees to being primed by the claims and liens granted in its capacity as DIP lender.[37]  The Court does not, in these circumstances, undertake an impartial review to determine whether the consensual adequate protection is otherwise sufficient under Section 364(d)(1).  Here too, the Court has treated the adequate protection to which the Foris Prepetition Secured Lenders have consented under the Interim Order and the Second Interim Order as sufficient without a separate investigation and determination that the adequate protection consensually granted meets the standard of Section 364(d)(1).  Under the

---

[37] *See, e.g., In re AmeriMark Interactive, LLC*, Case No. 23-10438 (TMH) (Bankr. D. Del. May 9, 2023, D.I. 190); *In re CBC Restaurant Corp.*, Case No. 23-10245 (KBOP) (Bankr. D. Del. May 5, 2023, D.I. 427); *In re GigaMonster Networks, LLC*, Case No. 23-10051 (JKS) (Bankr. D. Del. Feb. 21, 2023, D.I. 180); *In re Medly Health, Inc.*, Case No. 22-11257 (KBO) (Bankr. D. Del. Jan. 18, 2023, D.I. 309); *In re Agspring Mississippi Region, LLC*, Case No. 21-11238 (CTG) (Bankr. D. Del. Nov. 4, 2021, D.I. 174); *The Weinstein Company Holdings LLC*, Case No. 18-10601 (MFW) (Bankr. D. Del. Apr. 19, 2018, D.I. 267); *In re Unilife Corp.*, Case No. 17-10805 (JTD) (Bankr. D. Del. May 4, 2017, D.I. 118).

Subordination Agreement, Lavvan has surrendered any claim to adequate protection thereby obviating any requirement for the Court to independently assess whether any adequate protection is necessary.

## IV.  CONCLUSION

For the reasons set forth in this Brief, the Lavvan Objections to the DIP Motion should be overruled and the Court should enter the proposed Final Order.

Dated: September 29, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ James E. O'Neill*

Richard M. Pachulski (admitted *pro hac vice*)
Debra I. Grassgreen (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
Jason H. Rosell (admitted *pro hac vice*)
Steven W. Golden (DE Bar No. 6807)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:  rpachulski@pszjlaw.com
        dgrassgreen@pszjlaw.com
        joneill@pszjlaw.com
        jrosell@pszjlaw.com
        sgolden@pszjlaw.com

*Counsel to the Debtors and Debtors in Possession*