**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC., *et al.*, | Case No. 23-11131 (TMH) |
| Debtors.[1] | (Jointly Administered) |

**JOINT REPLY OF THE DEBTORS, EUAGORE, LLC, AND THE FORIS
PREPETITION SECURED LENDERS TO OPENING BRIEF OF LAVVAN, INC. IN
OPPOSITION TO MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B)
TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO
PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

Amyris, Inc. ("Amyris") and its related above-captioned debtors and debtors in possession

(collectively, the "Debtors"), Euagore, LLC, as DIP Lender and DIP Agent (the "DIP Secured

Parties"),[2] and the Foris Prepetition Secured Lenders[3] (together with the DIP Secured Parties, the

"Foris Lenders") submit this reply (the "Reply") to the *Opening Brief of Lavvan, Inc. in Opposition*

*to Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain*

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

[2] Capitalized terms used but not defined herein shall have the meanings set forth in either (1) the DIP Motion, (2) *Supplemental Brief of Euagore, LLC and the Foris Prepetition Secured Lenders with respect to Continued Hearing on the Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 403] (the "Foris Opening Brief"), or (3) *the Opening Supplemental Brief of the Debtors in Support of Entry of Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 404] (the "Debtors' Opening Brief" and together with the Foris Opening Brief, the "Opening Briefs").

[3] The Foris Prepetition Secured Lenders include Foris Ventures, LLC ("Foris"), Perrara Ventures, LLC, Anesma Group, LLC, Anjo Ventures, LLC, and Muirisc, LLC. Foris is the lender under the Foris LSA (as defined herein) and party to the Subordination Agreement.

*Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 402] (the "<u>Lavvan Opening Brief</u>") and respectfully state as follows:

<u>**REPLY**</u>

**I.      <u>THE SUBORDINATION AGREEMENT IS IN FULL FORCE AND EFFECT</u>**.

1.      Lavvan argues that, if the Subordination Agreement falls away, there is no basis to invoke its waiver of adequate protection and, hence, Lavvan has the right to seek adequate protection.  This argument, however, fails completely.  Until "Payment in Full" of the "Obligations" to Foris under the Foris LSA has occurred, the Subordination Agreement remains effective.  For purposes of the Subordination Agreement, Payment in Full requires that the Obligations have been "fully and indefeasibly paid in full in cash."[4]  Lavvan has the burden of establishing that all Obligations under the Foris LSA have in fact been repaid in full.  That has not happened—in fact, ***no*** Obligations under the Foris LSA have been paid in cash—and Lavvan cannot proffer any evidence to the contrary.

2.      Instead, Lavvan resorts to an alternative argument that is not tethered to the terms of the Subordination Agreement—that the original 2018 LSA (the "<u>GACP LSA</u>")[5] is "unrecognizable" due to "extreme" and "radical" changes and, as a result, it is not the "same loan" that Lavvan agreed to subordinate to.  *See* Lavvan Opening Brief at 26-27, 30.  In other words,

---

[4]    *See* ¶ 1 of Subordination Agreement ("'Paid in Full,' 'Payment in Full,' 'paid in full' or 'payment in full' means, as of any date of determination with respect to the Senior Debt, that: (a) all of such Senior Debt (other than Borrower's inchoate indemnification obligations) has been finally and indefeasibly paid in full in cash and (b) all commitments to lend under the Senior Loan Documents are terminated.").

[5]    The GACP LSA refers to the form of that certain Loan and Security Agreement, dated June 29, 2018.  The Foris LSA refers to the form of that certain Amended & Restated Loan & Security Agreement, dated October 28, 2019. The Foris LSA amended and restated the GACP LSA, consistent with the terms of the GACP LSA.

according to Lavvan, the mere modification of the GACP LSA constitutes "Payment in Full" and thus the "current" Foris LSA is no longer the "original" Foris LSA. But this argument also fails because it disregards the terms of the Subordination Agreement, which placed no restrictions on the ability of the parties to the GACP LSA or the Foris LSA to amend it without notice to, or the consent of Lavvan, with respect to the amount owing and the terms thereof.

3.      Lavvan agreed to subordinate to all "Obligations" under the "Senior Agreement." The Subordination Agreement defined "Obligations" broadly to include all "present **and future indebtedness** of Borrower that may be incurred from time to time." Subordination Agreement § 1 (emphasis added). And the "Senior Agreement" means "that certain Loan and Security Agreement dated as of June 29, 2028 [*i.e.*, the GACP LSA] (as the same **has been and may be amended** from time to time)." Subordination Agreement, Recital A (emphasis added). Lavvan agreed to a Subordination Agreement that imposed no restrictions on the ability of the parties to amend it nor any limit on the amount of senior debt that could be incurred under that agreement. Lavvan has thus agreed that it would subordinate to any Obligations under any amendments to the GACP LSA or the Foris LSA.

**A. The Foris LSA Has Not Been Paid in Full in Cash.**

4.      The Subordination Agreement is crystal clear—until Payment in Full of the Senior Debt under the GACP LSA (as amended by the Foris LSA), the Lavvan Lien is and remains subordinated.[6] Under that agreement, payment in full means that "all of such Senior Debt (other than Borrower's inchoate indemnification obligations) has been finally and indefeasibly paid in full *in cash*. *See* ¶ 1 of Subordination Agreement (emphasis added). Lavvan has the burden of

---

[6]    *See* ¶ 14 of Subordination Agreement ("This Agreement shall terminate and be of no further force and effect upon the earlier to occur of the following: (a) the Payment in Full of the Senior Debt, or (b) the Senior Lienholder has otherwise consented thereto in writing.").

demonstrating that "payment in full" in cash has occurred.  Not surprisingly, however, Lavvan has offered no evidence that indebtedness under the Foris LSA has been paid in cash—because no such evidence exists.  Aside from Foris' consent to the termination of the Subordination Agreement (which has not occurred), payment in full in cash is the ***only*** basis for the termination of the Subordination Agreement.

5.    The Debtors' books and records are clear and definitive:  as of the Petition Date, a balance of $50.041 million of principal remains outstanding under the Foris LSA.  The expert report of Theodore Martens confirms that the "[t]he outstanding balance of loan principal owed by Amyris to Foris under the [Foris LSA] derives directly from the [GACP LSA], as adjusted in several Amendments . . ., and does not consist of any extinguished or newly issued debt."  Indeed, Mr. Martens determined that there was "no evidence of any new loans that replaced any portion of the outstanding loan principal during the relevant time period."  *See* Martens Report at II.1.

6.    The outstanding principal due under the Foris LSA has remained constant since 2020 and is rooted in the GACP LSA.  Lavvan has not offered any evidence otherwise.  Nor has it offered any legal authority (or accounting guidance), for the theory that Amyris (or Foris) were required to allocate different (or older) portions of the debt under the Foris LSA to the partial debt for equity swap that occurred in 2020.  The simple and incontrovertible fact is that a balance that was not paid in cash remains due under the Foris LSA and, therefore, the Subordination Agreement remains in effect.

**B.  Lavvan Agreed to Subordinate to Any "Present and Future" Obligations Under the Foris LSA as "Amended from Time to Time".**

7.    Unable to demonstrate that Foris has been paid in full in cash, Lavvan instead claims that the outstanding $50.041 balance (plus interest) presently owing under the Foris LSA is not "really associated" with the $36 million first borrowed under the GACP LSA.  *See* Lavvan

Opening Brief at 26.[7]  Lavvan claims that increases in the amount borrowed under the Foris LSA, and changes to other terms of the Foris LSA (such as fees and maturity date), render the debt due thereunder a "different" loan, one that (apparently) is not at all subject to the benefits of the Subordination Agreement.  In Lavvan's view, it agreed only to subordinate to a GACP LSA frozen in time at the moment of its inception in June 2018.

8.      **First,** the Subordination Agreement does not freeze the amount of debt that is senior to Lavvan.  The terms of both the GACP LSA and the Subordination Agreement establish that the current Foris LSA is directly traceable to, and remains the same as, the GACP LSA that is the "Senior Agreement" under the Subordination Agreement.  The GACP LSA itself contemplated a potential increase in the amount loaned by GACP by an additional $35 million (for a total loan of $71 million).  *See* GACP LSA at § 2.1.  Lavvan, thus, was on notice that even without any amendment to the GACP LSA it might be subordinated to $71 million of senior debt (plus interest and fees).  Because that happened as expressly permitted, Lavvan can hardly claim that the increase in the loan balance rendered the loan under the GACP LSA a completely new obligation.

9.      **Second**, by its terms, the original GACP LSA was capable of being freely amended with the consent of the parties.  Indeed, at the time the GACP LSA was assigned from GACP to Foris, it had already been amended on four separate occasions.  Starting with the GACP LSA through the Foris LSA, and thereafter, all the loan agreements contained (1) provisions allowing for additional debt capacity to be issued under the relevant loan document and (2) freedom to execute amendments to the terms thereto, assuming lender consent:

---

[7]    Recognizing that Amyris's transaction documents and public filings repeatedly confirm that Amyris is indebted to Foris under the Foris LSA in the principal amount of $50.041 million, Lavvan resorts to attacking this balance.  *See* Lavvan Opening Brief at n 13.  Lavvan's attack is misplaced as evidenced by among other things the terms of the Consent and Waiver entered into by Amyris and Foris dated May 2, 2019.  More to the point, Lavvan is subject to payment subordination as long as any amounts are owed under the Foris LSA.  Lavvan's efforts to distract from this controlling fact is misplaced.

- GACP LSA, § 2.2(a) (providing for initial advances of $36,000,000);[8]

- GACP LSA, §§ 2.1 and 2.2(b) (providing for additional advances of $35,000,000 in additional debt);[9]

- GACP LSA, § 11.3(b) (providing for amendments by agreement with the Required Lenders);[10]

- Foris LSA, § 2.2(a) (noting $81,041,000 in advances);[11]

- Foris LSA, §§ 2.1 and 2.2(b) (providing for additional advances of an uncapped amount of additional debt with Lender consent);[12]

- Foris LSA, § 10.3 (providing for amendments by agreement with the Lender).[13]

---

[8]   Section 2.2(a) provides: "Lender will severally (and not jointly) make in an amount not to exceed its respective Term Commitment, and Borrower agrees to draw an Advance of Thirty-Six Million Dollars ($36,000,000) on the Closing Date."

[9]   Section 2.1 provides: "Prior to July 1, 2019, Borrower may, by written notice to Agent, elect to request establishment of a new loan commitment … not in excess of $35,000,000.00 (the "Incremental Term Loan Commitment"). Lender may elect to accept or decline Borrower's request for the Incremental Term Loan Commitment…. Any Incremental Term Loan Commitment shall become effective and shall be an Advance subject to the conditions, requirements and limitations set forth in Section 2.2(b) as of date advanced."

Section 2.2(b) provides: "Subject to the terms and conditions of this Agreement, Lender will severally (and not jointly) make up to three additional Advances up to an aggregate amount not in excess of the Incremental Term Loan Commitment (each, an "Incremental Advance") upon written notice to Agent set forth in an Advance Request. Such notice shall specify (x) the date on which the Borrower proposes that the applicable Incremental Advance shall be effective on the applicable Advance Date, which shall be a date not less than 15 Business Days after the date on which such notice is delivered to Agent, and (y) the amount of such Incremental Term Loan Commitment (in minimum $5,000,000.00 increments)…The terms and provisions of any loans made pursuant to an Incremental Advance shall be, except as otherwise set forth herein or in an agreement entered into among Borrower, Agent and Lender as of the applicable Advance Date, identical to the Loans (it being understood that loans under the Incremental Advance may be a part of the Loans)."

[10]   The GACP LSA was amended on August 24, 2018, November 14, 2018, December 14, 2018, April 4, 2019, and October 10, 2019.  None of the above referenced sections were amended.

[11]   Section 2.2(a) provides: "Advances. As of the Effective Date, the Lender has made and Borrower has drawn Advances in a principal amount of Eighty-One Million, Forty-One Thousand Dollars ($81,041,000)."

[12]   Section 2.1 provides: " At any time, so long as no Event of Default has occurred and is continuing, the Borrowers may, by written notice to the Lender, **request a new loan commitment in an aggregate amount in excess of the Maximum Term Loan Amount** (as of the Effective Date)…Any such request accepted by Lender (an "Incremental Term Loan Commitment") shall become effective and any funds advanced by the Lender pursuant thereto shall be an Advance subject to the conditions, requirements and limitations set forth in Section 2.2(b) as of the date advanced." (emphasis added).

Section 2.2(b) provides: "… Lender will make additional Advances up to an aggregate amount not in excess of the Incremental Term Loan Commitment (each, an "Incremental Advance") upon written notice to the Lender set forth in an Advance Request... The terms and provisions of any loans made pursuant to an Incremental Advance shall be, except as otherwise set forth herein or in an agreement entered into among the Borrowers and the Lender as of the applicable Advance Date, identical to the Loan (it being understood that loans under the Incremental Advance may be a part of the Loan)."

[13]   The Foris LSA was amended on June 1, 2020, November 9, 2021, and June 30, 2022 but none of the above referenced sections were amended.

10.     These historical transactions demonstrate that the "Senior Agreement" (as defined in the Subordination Agreement) was amended over time, consistent with the terms of all of the parties' loan agreements, resulting in the Foris LSA.

11.     **Third**, the Subordination Agreement itself contemplated that Lavvan would be subordinated to both "present and future indebtedness" under the GACP LSA "as the same has been and may be amended from time to time."[14]

12.     **Fourth**, Lavvan has no grounds, therefore, to assert that the current Foris LSA is "unrecognizable" and therefore not subject to the Subordination Agreement.  Lavvan agreed to subordinate until payment in full of the Senior Debt.   "Senior Debt" was defined to mean all "Obligations under or in respect of the Senior Agreement."   "Obligations," in turn, was defined broadly to include "all present and future indebtedness of Borrower that may be incurred by Borrower from time to time."   And the Senior Agreement was defined as the GACP LSA "as the same has been and may be amended from time to time."   The plain language of the Subordination Agreement thus establishes that Lavvan understood and agreed that it was subordinating to an amendable senior loan agreement subject to future increases or other changes in the loan balance.

13.     Indeed, in light of Lavvan's written acknowledgment in the Subordination Agreement that the terms of the senior debt instrument might change, and that the amount of the senior loan balance might increase in the future, there is no basis for Lavvan to complain that Amyris and Foris made changes to the GACP LSA and Foris LSA without Lavvan's consent.  The terms of the Subordination Agreement placed Lavvan on notice that such changes would not affect the scope of its subordination.  Only the payment in full in cash of Obligations under the GACP

---

[14]   *See* Subordination Agreement at Recital A ("The Senior Lienholder, as successor in interest to GACP Finance Co., LLC, holds certain liens and security interests (the "Senior Liens") in certain assets of the Grantor (the "Senior Lienholder Collateral") pursuant to that certain Loan and Security Agreement, dated as of June 29, 2018 (**as the same has been and may be amended from time to time, the "Senior Agreement"**) (emphasis added).

LSA (as the same might be amended) could relieve Lavvan of its duties under the Subordination Agreement. Thus, it is not only merely "possible to construct an argument to trace amounts back to the ancestor" of the Foris LSA, it is inescapable—for purposes of the Subordination Agreement, the Foris LSA today is the same as the GACP LSA on June 29, 2018. *See* Lavvan Opening Brief at 27.[15]

14.     The fundamental flaw in Lavvan's challenge to the enforceability of the Subordination Agreement is that its challenge is premised on an attempt to impose restrictions on amendment of the GACP LSA or Foris LSA and on the ability to incur future indebtedness under that agreement for which it did not bargain and which are nowhere to be found in the Subordination Agreement. No such cap was negotiated here. *Cf.* ABA Model First Lien/Second Lien Intercreditor Agreement[16] § 1.4; n. 11-13 (proposing that parties to an intercreditor agreement negotiate a ceiling on the type and amount of senior debt that would benefit from the arrangement) (the "Model Agreement").

15.     The Model Agreement contemplates that parties to an intercreditor agreement should negotiate limitations on the ability of the senior lender to modify or amend its senior debt documents. As set out in the comments to Section 2.2 of the Model Agreement: "The modification provisions are intended to balance the desire of each class of creditor to administer freely its loan documents and refinance the debt thereunder against the interest of the other class of creditor in

---

[15]     Lavvan also refers to a *Credit and Security Agreement* ("CSA") with a third party that is not a part of the present dispute to speculate how much of the $63.5 million of principal and interest under the Foris LSA "remains subject to the Subordination Agreement." *See* Lavvan Opening Brief at 28-29. According to Lavvan, the transaction under the CSA suggests that the obligations under the Foris LSA were bifurcated into senior and junior obligations vis-à-vis the obligations under the CSA leaving "unclear" how much of the $63.5 million is still subject to the Subordination Agreement. Putting aside the rather murky logic behind this syllogism, what Lavvan fails to recognize is that the CSA did not re-rank **Lavvan's** obligations vis-à-vis Foris under the Foris LSA, but only the third party lender's rights under the CSA vis-à-vis Foris.

[16]     Committee on Commercial Finance, ABA Section of Business Law, *Report of the Model First Lien/Second Lien Intercreditor Agreement Task Force*, 65 Bus. Lawyer, 809 (2010).

protecting against any modification or refinancing that alters any fundamental assumption about the borrower's capital structure relied on in underwriting the transaction." *See* Model Agreement, n. 26. The Model Agreement suggests that parties clearly set out in their intercreditor agreement the type and scope of potential amendments, what type of amendments can be made without the consent of the junior creditor and what types of amendments require the consent of the junior creditor. *See* Model Agreement, §§ 2.1, 2.2; n. 26, 28. No such limitations are contained in the Subordination Agreement.

16.    Even more apt, courts have determined that general references to the "credit agreement, as it may be amended" in a subordination agreement without express limitations are sufficient to enable a senior lender to significantly expand the scope of senior debt through a variety of transactions, even if structured intentionally for that very purpose. *See In re Musicland Holding Corp.*, 374 B.R. 113 (Bankr. S.D.N.Y 2007) (intercreditor agreement permitted amendment to Revolving Credit Agreement without restriction; therefore, transaction that brought a different lender's term loan into the amended facility was senior to the liens of trade creditors), *aff'd* 386 B.R. 428, 438 (S.D.N.Y. 2008) ("While Appellants could have, and perhaps should have, included language specifically restricting Wachovia's ability to incorporate a term loan into the Revolving Credit Agreement by amendment, courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.") (internal citations omitted); *Salus Capital Partners, LLC v. Std. Wireless Inc. (In re RadioShack Corp*.), 550 B.R. 700, 711 (Bankr. D. Del. 2016) (holding that general right to amend ABL credit agreement was sufficient to permit ABL Lenders to refinance their loans without the prior consent of the junior SCP Lenders).

17.     **Lastly**, Lavvan's final argument, by resort to a maxim of jurisprudence under California law, that the continued enforceability of the Foris LSA elevates "form over substance" is puzzling.  *See* Lavvan Opening Brief at 29.  The uncontestable "substance" of the matter is that Foris remains unpaid under the Foris LSA.  And that fact, according to the unambiguous language of the Subordination Agreement, is all that matters in terms of Lavvan's ongoing duties and restrictions under that agreement.  Another maxim of jurisprudence under California law states that "he who consents to an act is not wronged by it."  Cal. Civ. Code § 3515.  Having agreed to subordinate to all present and future debt under the GACP LSA, without any cap, and pursuant to a freely amendable loan agreement, Lavvan cannot be heard to question whether the Foris LSA in effect today derives from the GACP LSA of yesterday for purposes of the Subordination Agreement.  *Cf.* Lavvan Opening Brief at 27.

### C. California Law Does Not Render the Subordination Agreement Unenforceable.

18.     Lavvan's argument that a modification of the Foris LSA without its consent rendered the Subordination Agreement unenforceable under California law is unavailing because that argument (like the rest of Lavvan's Brief) ignores a critical term of the Subordination Agreement.  As discussed immediately above, Lavvan ***agreed*** to subordinate to indebtedness under the GACP LSA, as ***amended*** from time to time.  Thus, Lavvan's consent to future amendments was baked into the definition of "Senior Agreement."

19.     Moreover, even without this express contractual acknowledgment that future amendments of the senior loan document could occur, California law does not stand for the proposition that any modification made to a senior debt obligation without the assent of the junior lender results in a nullification of the intercreditor arrangement.

20.     As the Ninth Circuit Court of Appeals explained in *Resolution Trust Corporation*, "[t]he rule articulated in *Gluskin* aims to protect subordinated sellers from secret agreements

between buyers and lenders against the interest of the subordinated seller.  More specifically, the *Gluskin* court was concerned about modifications that materially increase the risk of default." *Resolution Tr. Corp. v. BVS Dev.*, 42 F.3d 1206, 1215 (9th Cir. 1994) (citing *Gluskin v. Atl. Sav. & Loan Ass'n*, 32 Cal. App. 3d 307, 314–15 (Cal. App. 1973)).  The court in *Gluskin* found that public policy considerations warranted special protection for the subordinating seller where the buyer and lender enter into an undisclosed agreement between themselves "whose result is to destroy a seller's [security] interest." 32 Cal. App. 3d at 323 (emphasis added).  Here, by contrast, every amendment to the GACP LSA and Foris LSA was contemporaneously disclosed by Amyris in its public 8-K, 10-Q and 10-K filings as and when each change was effectuated.  Amyris and Foris did not enter into any secret agreements impacting Lavvan.

21.     Most importantly, *Gluskin* held that equitable relief might be appropriate only if the parties "proceed without … consent." *Gluskin* at 315.  Here, of course, Lavvan has consented to the ability to amend the Foris LSA.  At least one court has held that *Gluskin* does not apply to situations where, as here, a junior lien holder executed a subordination agreement agreeing that its lien would be subordinate notwithstanding future amendments the senior loan documents.  *See Korman v. United Language Grp., Inc.*, No. B313271, 2023 WL 3558203, at *10 (Cal. Ct. App. May 19, 2023) (finding *Gluskin* to be distinguishable because *Gluskin* did not involve a situation where the subordinated lender expressly agreed the borrower and senior lenders "could increase the amount, and change the payment terms, of the senior debt without notice to the subordinated lender.").

## II.   THE TERMS OF THE SUBORDINATION AGREEMENT MANDATE THAT LAVVAN CONSENTED OR IS DEEMED TO CONSENT TO THE RELIEF SOUGHT IN THE DIP MOTION.

22.     As detailed above, in the Opening Briefs and through the evidence to be presented at the hearing on October 4, 2023, there remained an outstanding balance on the Foris LSA as of

the Petition Date. Therefore, the Subordination Agreement executed by Lavvan and Foris in 2019 was in full force and effect as of the Petition Date. The Subordination Agreement, read as whole, mandates the conclusion that Lavvan has waived its right to adequate protection and thus Lavvan consented, or is deemed to consent, to the DIP Motion.[17]

**A. Lavvan has Forfeited its Rights and Remedies as a Junior Creditor with Respect to its Asserted Junior Collateral Interest Until the Foris LSA is Paid in Cash in Full, Including in Connection with the DIP Motion.**

23.     The aggregate effect of the contractual agreements and limitations in the Subordination Agreement establishes Lavvan's consent (or deemed consent) to the DIP Motion.

24.     This results from Lavvan's limited rights (and the expansive waiver of rights to which Lavvan agreed) in connection with its asserted junior collateral interest until the Foris LSA is indefeasibly paid in cash in full. Reading the Subordination Agreement in its entirety, as is required by law, Lavvan expressly agreed to be a "silent second" with (a) no right to be paid until Foris is paid and to turnover any such prior payment, and (b) (i) no right to request adequate protection, (ii) no right pursue enforcement rights against its asserted junior collateral interest, (iii) no right to seek any remedy as a junior secured creditor with respect to its asserted junior collateral interest, (iv) no right to participate in any proceeding regarding its asserted junior collateral interest, and (v) no right to take any action inconsistent with its agreement, in each case, until the Foris LSA is indefeasibly paid in cash in full.

---

[17]    As discussed in the Foris Opening Brief, California law (which governs the Subordination Agreement) instructs that contracts should be interpreted as a whole such that no words are rendered superfluous. *See Mountain Air Enterprises, LLC v. Sundowner Towers, LLC,* 3 Cal. 5th 744, 754 (Cal. 2017) (citing *Barrett v. Superior Court,* 222 Cal. App. 3d 1176, 1190 (Cal. Dist. Ct. App. 1990) (the doctrine of *ejusdem generis* is "'an attempt to reconcile an incompatibility between specific and general words' so all words may be 'construed together, and no words will be superfluous'")); *State of California v. Continental Ins. Co.,* 55 Cal. 4th 186, 195 (Cal. 2012) ("language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the contract").

25.     *La Paloma Generating Co.* illustrates the principle that the terms of intercreditor agreements should be read in their entirety and applied as a whole.  595 B.R. 466, 476 (Bankr. D. Del. 2018), *aff'd sub nom*, *In re La Paloma Generating Co. LLC*, 609 B.R. 80 (D. Del. 2019).  The intercreditor agreement in *La Paloma* contained an express lien subordination provision and a separate turnover provision whereby the junior lien holder could not collect any proceeds from collateral unless and until the senior lienholder was discharged. 595 B.R. at 476.  The junior lienholders argued the intercreditor agreement provided for "lien subordination" and not "payment subordination"  *Id*.  Judge Sontchi, reading the intercreditor agreement as whole, disagreed and held, notwithstanding a lack of an express provision mandating payment subordination, the effect of the turnover provision demonstrated the parties intended for the senior lienholder to be paid in full prior to the junior lienholder.  *Id.*

26.     Applying the legal principle from *La Paloma*, this Court should find  the intent and purpose of Paragraphs 4, 5, and 13 of the Subordination Agreement are to expressly limit Lavvan's rights and asserted junior collateral interests, and when read along with Lavvan's agreement to payment subordination, turnover, and waiver of the right to seek adequate protection, lead to only one conclusion:  Lavvan has consented, or is deemed to consent to the DIP Motion.

27.     Moreover, Lavvan's entire objection to the DIP Motion is prohibited by these same paragraphs, wherein Lavvan agreed, among other things, not to "directly or indirectly take or support, or induce or instigate others to take or support, any action inconsistent with this Agreement."  Subordination Agreement ¶ 13.

### B. An Agreement "Not to Seek" Adequate Protection is Equivalent of a Waiver of Adequate Protection.

28.     Lavvan's argument that it has not waived any right to receive adequate protection rests on the assumption that a contractual waiver must contain the term "waiver" to be enforceable.

Lavvan Opening Brief at 14. This is not the law—contractual provisions relinquishing rights need not use the word "waiver" for courts to construe them as waivers.

29.     In *Erickson*, the court held language in a subordination agreement barring junior creditors from filing actions or pursuing remedies to collect on their claims or enforce their rights until senior indebtedness was paid in full was, in fact, a ***waiver*** of standing to file a motion for appointment of an examiner, even though the subordination agreement did not expressly state junior creditors waived their right to seek the appointment of an examiner.  *In re Erickson Retirement Cmtys, LLC,* 425 B.R. 309, 314-16 (Bankr. N.D. Tex. 2010).  *See also id.* at 314 ("The court agrees with the Agent that the Subordination Agreements are enforceable in this case, pursuant to Section 510 of the Bankruptcy Code, and that, because of these agreements, the Michigan Retirement System Entities lack standing and/or ***have contractually waived the right to seek an examiner in these cases***.") (emphasis added).   Similarly, in *GDH Int'l*, the court interpreted the phrase "agrees not to assert any right it may have to 'adequate protection'" as a broad waiver of the right to seek adequate protection made by the junior lien lender.  In *RCD Invs. No. 4, Ltd. v. Foothill Capital Corp. (In re GDH Int'l, Inc.)*, Case No. 00-45647-BJH-11 (BJH), Adv. Proc. No. 00-4185 (BJH), 2001 Bankr. LEXIS 2230, *11-12 (Bankr. N.D.T.X. Apr. 2, 2001) ("<u>Foothill Capital</u>"), the court noted:

> Section 11 also contains ***waivers*** by RCD4 of: (i) any 'adequate protection' argument it might have in an insolvency proceeding, and (ii) any 'claim or defense' it might have with respect to Foothill's decision to consent to the use of cash collateral and/or loan monies to the Debtors pursuant to Sections 363 and/or 364 of the Bankruptcy Code"). This case law demonstrates that courts do not narrowly construe waiver to those circumstances where "waiver" is used in the text of the agreement, but instead review the language at issue and the parties' agreement as a whole to, in fact, infer waiver when appropriate.

30.     Conversely, the cases cited by Lavvan are readily distinguishable and completely out of context because they do not involve intercreditor agreements or other junior creditor issues. In *CDI Tr. v. U.S. Elec., Inc. (In re Commc'n. Dynamics, Inc.)*, the court considered whether a claim to setoff or recoupment was precluded by the equitable doctrines of waiver and estoppel. 382 B.R. 219, 238-39 (Bankr. D. Del. 2008). The court in *CDI* ultimately found that there was no waiver because the agreement at issue expressly preserved any claims that the party had under the agreement. *Id.* Here, in contrast, Lavvan agreed not to seek or retain adequate protection. In *Morgan v. Sundance, Inc*., the Supreme Court analyzed the waiver of a right to litigate or compel arbitration. 142 S. Ct. 1708 (2022). This case bears no resemblance to the issues presented here. *Morgan* provides no support to ignore Lavvan's complete and comprehensive waivers of its rights and remedies with respect to its asserted junior collateral interests. Likewise, *Utley v. Donaldson* is a Supreme Court decision from 1876 that did not involve intercreditor issues and instead considered whether a contract change resulted in a waiver of a condition by one of the counterparties. 94 U.S. 29, 49 (1876). *Utley*—a case involving contract modifications—does not support Lavvan's argument. The inescapable fact is that Lavvan cites no cases in its opening brief that directly supports the conclusion, in the intercreditor context, that a contractual waiver must contain the term "waiver" in order to be effective.

31.     Moreover, apart from the foregoing case law, the Model Agreement suggests that language very similar to the adequate protection language used in the Subordination Agreement constitutes a waiver of adequate protection. *See* Model Agreement, § 6.4; 6.4(b)(1), n.78.

### C. Lavvan's Reliance on the Model Agreement Contradicts Lavvan's Arguments.

32.     Lavvan argues it could not have consented to the relief sought in the DIP Motion because the Subordination Agreement does not mention priming or DIP financing. *See* Lavvan Opening Brief at 12-15. In support of that argument, Lavvan relies on certain language and

commentary contained in the Model Agreement. *Id.* Reliance on the Model Agreement for this point is misplaced; while certain intercreditor agreements may contain the words priming and/or DIP financing, inclusion of one or both is not mandatory. This is self-evident from the holdings in *La Paloma*, *Erickson*, *Foothill Capital*, *Tousa*[18], and other cases that stand for the proposition that courts review intercreditor agreements—which are largely bespoke and vary in form from transaction to transaction—in their entirety to determine how to appropriately give effect to the parties' contractual bargain.

### D. The Security Agreement Permits Amyris to Enter Into The DIP Facility.

33.    Lavvan argues that Amyris "had no right to take on further indebtedness without Lavvan's consent" by operation of section 4.01(a) of the Security Agreement. *See* Lavvan Opening Brief at 22. Further, to the extent there are loans between Foris and Amyris other than the Foris LSA, Lavvan asserts those loans only exist because Amyris breached section 4.01(a) of the Security Agreement. *Id.*

34.    Contrary to Lavvan's interpretation, Section 4.01(a) of the Security Agreement is forward-looking and, therefore, contemplates future secured debt to which Lavvan would be subordinated.[19] The Security Agreement defines "Permitted Lien" as "any lien or security interest granted by [Amyris] to **any** Permitted Senior Lender to secure any Permitted Debt, so long as such lien or security interest is subject to a Subordination Agreement." Security Agreement at §1.01 (emphasis added). The same use of "any " is contained in "Permitted Debt" (noting "indebtedness in respect of borrowed money owed by Grantor to **any** Permitted Senior Lender) and "Permitted Senior Lender" (noting "shall mean Foris . . . and **any other lender** who has advanced debt for

---

[18]    *Aurelius Cap. Master, Ltd. v. Tousa Inc.*, Case No. 08-61317-CIV, 2009 WL 6453077 (S.D. Fla. Feb. 6, 2009).

[19]    Importantly, Section 4.01(a) of the Security Agreement has no bearing on Amyris' ability to incur unsecured debt to Foris and Lavvan's subordination to the payment in cash in full of such debt.

borrowed money to the Grantor . . .").  Security Agreement at §1.01 (emphasis added).  By using

"*any*" rather than "*the*" in each of these definitions, the Security Agreement contemplates that

Permitted Debt, secured by a Permitted Lien, could be provided by any Permitted Senior Lender

after the Security Agreement was entered into.  *See also* Security Agreement at §1.01 (defining

Subordination Agreement as "a subordination agreement *in the applicable Permitted Senior*

*Lender's standard form*[,]" which suggests that more than one Permitted Senior Lender is possible

and thus, future debt) (emphasis added).

35.     The Security Agreement also provides that Amyris agrees "not to incur or suffer

any liens . . . *other than* Permitted Liens."  Security Agreement at §4.01 (emphasis added).  Plainly,

this carve-out is not specific to existing liens.  If debt provided a Permitted Senior Lender was

limited to debt as of the execution of the Lavvan Transaction Documents, the Security Agreement

covenant would not have carved out Permitted Liens, but, rather, would have limited liens to those

existing as of the date the Security Agreement was executed.

36.     Moreover, Lavvan's argument that section 4.01(a) uses "has advanced" in the past

tense and only covers lenders in existence at the time the Lavvan Transaction Documents were

executed is an incorrect reading of that language.  As discussed in the Foris Opening Brief, "has

advanced" is the present perfect tense and therefore, it includes debt or borrowed money following

the date of execution of the Lavvan Transaction Documents.  *See* Foris Opening Brief ¶¶ 50-51.

In short, this Court should not read "has advanced" to limit a Permitted Senior Lender to one that

has advanced debt as of the date the Lavvan Transaction Documents were executed.

37.     And finally, Lavvan's reliance on the terms "existing liens and security interests of

Great American and any other Permitted Senior Lender" is of no significance to the present

dispute.  RCLA at § 5.12.2(a).  The RCLA is not the controlling security agreement, it is the

Security Agreement that governs the incurrence of debt, and the Security Agreement does not use the quoted language.  But even if it did, the parties would not have added the words "any other lender who has advanced debt for borrowed money on a senior secured basis" to the definition of Permitted Senior Lender in section 5.12.2(b) of the RCLA because that would have rendered the "existing lien" language superfluous.  *Id*. at 5.12.2(b).

38.     As set forth in the Foris Opening Brief, given the context and circumstances of the Lavvan Transaction Documents, it is unreasonable to conclude that the Lavvan Transaction Documents prohibited Amyris from incurring secured debt after the date the Lavvan Transaction Documents were executed.  To do so would rewrite the parties' agreements and is inconsistent with the foundational commercial relationship between the parties.  Foris Opening Brief ₱ 52. That Amyris would be limited to only one lender and one debt facility was never anticipated when the Lavvan Transaction Documents were executed.

39.     Review of the foregoing not only suggests that the DIP Facility falls within the express definitions of Permitted Debt and Permitted Senior Lender, but also that the Lavvan Transaction Documents were specifically drafted to contemplate subordination of Lavvan's debt to debt provided by a future senior secured lender, such as the DIP Lender.

## III.     THE COURT NEED NOT INDEPENDENTLY FIND THAT LAVVAN IS ADEQUATELY PROTECTED UNDER THE BANKRUPTCY CODE.

40.     Lavvan claims the Court should not read into the Foris LSA a provision that the parties could have included but did not.  *See* Lavvan Opening Brief at 13-14.  Since Lavvan only agreed by the Subordination Agreement to not seek adequate protection, but did not explicitly agree to being primed by future DIP financing, its argument goes, Lavvan argues that the Court should not infer that the scope of the adequate protection waiver could fairly apply in the DIP

financing context.  According to Lavvan, only a specific provision addressing consent to a priming DIP lien could satisfactorily evince Lavvan's consent to being primed.

41.     Later in its brief, however, Lavvan returns to its argument that—whether or not a waiver or consent may be found—the Court must still make an affirmative, objective determination that Lavvan is adequately protected.  *See* Lavvan Opening Brief at 34.  Yet, both principles cannot co-exist.  On the one hand, Lavvan insists that only express verbiage in the Subordination Agreement can meet the statutory requirements of Section 364(d).  On the other hand, even such a clear, robust provision could never suffice because the Court would still have to make an independent assessment of whether the primed secured creditor is adequately protected.  Plainly, both paradigms cannot co-exist.

42.     Moreover, Lavvan has offered zero support for the proposition that the Court has an independent obligation to find adequate protection.  Each of the cases cited by Lavvan merely supports the unremarkable precept that Section 364(d) requires adequate protection, not that consent is irrelevant.  For example, in *Swedeland Development Group*, the Third Circuit Court of Appeals recited the Code's provision regarding adequate protection and noted:

> The Code does not expressly define adequate protection, but section 361 states that it may be provided by (1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the 'indubitable equivalent' of the secured creditor's interest in such property.  The last possibility is regarded as a catch all, allowing courts discretion in fashioning the protection provided to a secured party.  Therefore, a determination of whether there is adequate protection is made on a case by case basis.

*Resolution Tr. Corp. v. Swedeland Dev. Grp. (In re Swedeland Dev. Grp.)*, 16 F.3d 552, 564 (3d Cir. 1994) (citing 11 U.S.C. § 361).  The court did not address the issue of consent or make a finding that, even where there is consent, the court has a roving duty to canvass the record and make a separate determination on adequate protection.

43.    Likewise, in *LTAP*, the court stated the general proposition that adequate protection is required but it did not determine that an independent finding must be made when the secured creditor has consented.  Based on the specific facts of that case, the court found that a sufficient equity cushion was lacking; there was no discussion of the effect of consent.  *See In re LTAP US, LLLP*, No. 10-14125 (KG), 2011 Bankr. LEXIS 667, at *8–9 (Bankr. D. Del. Feb. 18, 2011).

44.    In *The Colad Group*, the court also made a general statement reciting the statutory requirement for adequate protection without any support for Lavvan's contention that the court must make an independent finding even when there is consent.  Moreover, the issue in *Colad* was that the debtors did not specifically identify the secured creditors that would be primed.  "In the present instance, Continental seeks the benefit of a generalized priming as against the positions of all other secured creditors.  However, the moving papers fail to identify any secured creditors whose liens would be primed. . . .  [A]s required by section 364(d)(1)(B), in order to grant a priming lien, the court must make a finding of adequate protection of all senior or equal interests.  With no identification of those interests, the court cannot begin to assess the adequacy of protection."  *In re Colad Grp.*, Inc., 324 B.R. 208, 223 (Bankr. W.D.N.Y. 2005).

45.    Finally, in *Barbara K Enterprises*, the court again stated the general proposition without discussing the issue of consent or the alleged requirement of an independent finding by the court.  *In re Barbara K. Enterprises, Inc.*, No. 08-11474 (MG), 2008 WL 2439649 at * 13 (Bankr. S.D.N.Y. June 16, 2208).

46.     In sum, Lavvan has offered no support for its reading of Section 364(d) to impose and independent duty on the Court to objectively find the existence of adequate protection regardless of the terms of the arrangement between sophisticated creditors.  Lavvan agreed never to seek adequate protection so long as the Foris LSA remained unpaid, and it agreed not to directly

or indirectly take actions inconsistent with that.  It is absurd for Lavvan to maintain that it is not "seeking" adequate protection, but assert that it remains entitled to point out its absence and that the Court has an independent obligation to assess it.

## IV.   LAVVAN IS EITHER ADEQUATELY PROTECTED OR ANY SUCH ADEQUATE PROTECTION MUST BE TURNED OVER TO FORIS.

47.    As detailed herein, the Court has no independent duty to make an adequate protection finding under Section 364(d)(1) of the Bankruptcy Code.  Assuming, *arguendo*, that the Court has an independent duty to make an adequate protection finding (which as detailed above, it does not), the Foris Lenders and the Debtors submit (i) the DIP Facility does not diminish or alter Lavvan's interest in the Debtors' property, and so Lavvan is not entitled to any adequate protection, and (ii) if the Court determines that adequate protection must be provided to Lavvan, such adequate protection is subject to turnover.

48.    The Bankruptcy Code roots the scope of adequate protection in the creditor's interest in the debtor's interest in property.  *See In re Nine Point Energy Holdings, Inc.*, Case No. 21-10570 (MFW), 2021 Bankr. LEXIS 1797, *30 (Bankr. D. Del. 2021) (providing examples of adequate protection of "an interest of an entity in property").  Here, Lavvan's asserted junior collateral interest is subject to lien and payment subordination.  *See* Subordination Agreement ¶¶ 2, 3; Foris Supplemental Brief ¶ 22.  The effect of this is that Lavvan cannot be paid until the Foris LSA is paid in full.  And because the DIP Facility is senior to the Foris LSA (by virtue of Foris subordinating its lien to the DIP Liens), Lavvan cannot get paid before the DIP Facility is paid. These are the existing facts given application of the Subordination Agreement itself.  As a result, the DIP Facility does not diminish or alter Lavvan's alleged junior collateral interest because the relationship vis-à-vis Foris and Lavvan remain the same—Lavvan always was and continues to be subordinated to the Foris LSA.

49.     Moreover, if the Court determines that adequate protection must be provided to Lavvan, any such adequate protection would have to be turned over to Foris.  As discussed in the Foris Opening Brief, paragraphs 7 and 9 of the Subordination Agreement apply directly to any payments, security interests, liens or other rights in property of Amyris that Lavvan may obtain with respect to obligations owing to it.  Paragraph 9 requires turnover of any such security interests, liens or other rights to Foris.  Paragraph 7 authorizes Foris to have any such grant "vacated, dissolved and set aside."  Together, these provisions remove any benefit that Lavvan would otherwise obtain if **any form of** adequate protection were granted to Lavvan.  *See* Foris Opening Brief ¶ 57.

50.     Enforcing the express terms of the Subordination Agreement necessarily circumscribes the value of Lavvan's purported junior interest in the Debtors' interest in its property.  Therefore, Lavvan has no entitlement to any adequate protection and thus the Court should not impose any over the objection of the Debtors and Foris.

## V. THE DEBTORS' AND FORIS LENDERS' DISCOVERY PRODUCTION IS CONSISTENT WITH THE SCOPE OF THE SCHEDULING ORDER, THE COURT'S DIRECTIVE AND THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.

51.     Lavvan makes numerous self-serving statements about the Debtors' and Foris Lenders' responses to discovery requests that are intended to hijack the Court's agenda of issues set for continued hearing on the DIP Motion, and only serve to further highlight the weaknesses in Lavvan's arguments on the merits

52.     The Court entered the Scheduling Order at 2:00 P.M. ET on September 19, 2023. The Scheduling Order required that document discovery was to be completed on September 22, 2023.  At 11:54 PM ET on September 19, 2023, Lavvan requested, *inter alia*, that the Debtors and Foris Lenders produce a very broad category of communications related to the Foris LSA (the

"Discovery Request").[20]    To put it in perspective, Lavvan requested that the Debtors and the Foris

Lenders produce practically every communication pertaining to the Foris LSA by no later than

September 22, 2023 (the deadline for the exchange of documents under the Scheduling Order).

Just one day later on September 20, 2023, the Debtors and Foris Lenders wrote Lavvan objecting

to the broad and burdensome scope of the Discovery Request, communicating that the discovery

request would not be recognized, and communicated the position that the request fell outside of

this Court's directive at the September 15, 2023 status conference regarding the appropriate scope

of discovery in connection with the resolution of the DIP Motion.[21]

---

[20]    Lavvan's Discovery Request demanded the production of the following records:

    i.    The Foris LSA transaction documents, including all purported amendments or modifications thereto; (ii) Debtors'/Foris's documents and communications concerning the status of the Foris LSA.

    ii.    Debtors'/Foris's documents and communications concerning the flow of funds or other assets between Debtors and Foris (or any other entity owned or controlled by John Doerr).

    iii.    Debtors'/Foris's documents and communications concerning the extinguishment, or potential extinguishment, of debt related to the Foris LSA.

    iv.    Debtors'/Foris's documents and communications concerning the analysis of whether any of Debtors' transactions with Foris (including certain equity transactions with Foris on or about January 31, 2020) resulted in "a modification or extinguishment of the Foris LSA," as described in Amyris's Form 10-K for the fiscal year ended December 31, 2020.

    v.    Debtors'/Foris's documents and communications concerning "the accelerated paydown of the Foris LSA loan balance," as described in Amyris's Form 10-K for the fiscal year ended December 31, 2020.

    vi.    Debtors'/Foris's documents and communications concerning Amyris's accounting for the "accelerated paydown" of the Foris LSA loan balance as "a debt extinguishment and new debt issuance," as described in Amyris's Form 10-K for the fiscal year ended December 31, 2020, including the accountant's conclusions, any related reports or memoranda, and communications leading it to undertake such analysis.

    vii.    Any of Debtors'/Foris's books and records in which Debtors/Foris recorded or identified the Foris LSA debt as extinguished.

    viii.    Debtors'/Foris's documents and communications concerning the application of the Subordination Agreement in the event that Foris purported to subordinate its rights to those of a third party or related party.

    ix.    Debtors'/Foris's documents and communications concerning adequate protection for Lavvan.

    x.    All documents reviewed by Steven Fleming in connection with his September 2023 Declaration and Amended Declaration in support of Debtors' motion.

[21]    Specifically, this Court expressly stated that the issues should be "cabin[ed]" and that the parties had to work to "get to finality." *See* Hr'g Tr., dated September 15, 2023 at 19:21-25.  Further, the Court expressly acknowledged the "limited time and space" for discovery, and the need for the parties to "work realistically within the time that we have." *Id*. at 20:14-21.  With regard to discovery in particular, the Court cautioned that the parties could not

53.     Lavvan neither sought to compel the requested discovery nor wrote to the Court regarding the dispute.  Instead, Lavvan chose to wait until September 29, 2023, when it filed its opening brief and now—only in that brief—requests that this Court make an adverse inference against the Debtors and the Foris Lenders on a core issue in this dispute:  whether the debt under the Foris LSA was extinguished.  *See* Lavvan Opening Brief at 33-34.  The Debtors and the Foris Lenders respectfully submit that Lavvan's desired result would be inequitable and draconian because (i) the Debtors and Foris Lenders asserted legitimate objections to the Discovery Request and (ii) the non-production was not a result of bad faith but rather reasonable disagreement as to the relevance and proportionality of the discovery sought.  It is also improper to impose any such relief given that the Debtors have produced all of the relevant transaction documents, supporting accounting memoranda, provided its witness for deposition on the subject, and have produced an expert witness report and that expert was deposed.

54.     Rule 7026-1(d) of the Local Rules for the United States Bankruptcy Court for the District of Delaware provides that any discovery motion "shall be accompanied by an averment of Delaware Counsel for the moving party that a reasonable effort has been made to reach agreement with the opposing party on the matters set forth in the motion or the basis for the moving party not making such an effort. Unless otherwise ordered, failure to so aver may result in dismissal of the motion."  Local Rule 7026-1(d).  No such averment has been made here; Lavvan's request for preclusion is therefore procedurally defective on its face.

55.     Moreover, no adverse inference should be drawn here because the Debtors and the Foris Lenders each acted in good faith.  In the Third Circuit, the non-production of documents

---

engage in a "free w[heel]ing inquiry into everything that Foris is alleged to have done or could be alleged to have done," because such an inquiry would amount to a "fishing expedition."  *Id*. at 30:2-18.  The Court "trust[ed] that the parties are going to appropriately limit discovery to get the issues that we've identified."  *Id*. at 30:13-15.

properly requested under the federal rules may constitute spoliation and can be treated in the same manner as the destruction of relevant information as "a party's failure to produce a document can have the same practical effect as destroying it." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012). However, there can be no spoliation finding where the non-producing party did not act in "bad faith." *Id*. at 79. "This only makes sense, since spoliation of documents that are merely withheld, but not destroyed, requires evidence that the documents are actually withheld, rather than—for instance—misplaced." *Id*. "No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for." *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995).

56.    The Debtors' and Foris Lenders' objection cannot equate to bad faith—particularly given that the document request itself was improper under the Court's Scheduling Order which contemplated identification of witnesses, the exchange of documents, expert reports, and deposition of such identified witnesses and experts. *See* Scheduling Order. The Debtors and the Foris Lenders promptly responded to the Discovery Request and identified legitimate reasons for why they believed the Discovery Request fell outside the scope of this Court's directive. "A party is substantially justified in failing to produce required discovery when a reasonable person could conclude that parties could differ as to whether disclosure was required." *In re Atomica Design Group, Inc.*, 591 B.R. 217, 233 (Bankr. E.D. Pa. 2018) (citing *LightStyles, Ltd. ex rel. Haller v. Marvin Lumber & Cedar Co.*, No. 1:13-CV-1510, 2015 WL 4078826 at *2 (M.D. Pa. July 6, 2015)); *see also Johnson v. Fed. Express Corp.*, No. 1:12-CV-444, 2014 WL 65761, at *1 (M.D. Pa. Jan. 8, 2014) ("Substantial justification for the failure to make a required disclosure means justification to a degree that could satisfy a reasonable person that parties could differ as to whether

the party was required to comply with the disclosure request.") (internal citations and quotations omitted).

57.     The Debtors timely produced 4,150 pages of responsive documents including board and committee minutes, transactional documents, and SEC filings.  The Debtors also promptly ran search terms through the emails of relevant custodians to determine if production of "all communications" was proportional under the circumstances, which searches generated approximately 100,000 hits.  In anticipation that Lavvan might comply with the rules and follow-up on its informal request, counsel for Foris similarly used search terms for custodians to determine the potential universe of email communications and that initial search generated approximately 30,000 hits. The Debtors' and the Foris Lenders' position is consistent with the Court's directive that the discovery necessary for this expedited hearing not become a fishing expedition and with applicable discovery rules.  Rule 26(b)(1) of the Federal Rules of Civil Procedure requires that discovery be "proportional to the needs of the case."  FRCP 26(b)(1).  Local Rule 7026-1(d) requires that every discovery motion (absent here) be accompanied by a certification of counsel that "reasonable effort has been made to reach agreement with the opposing party on the matters set forth in the motion." Local Rule 7026-1(d).  Lavvan has complied with neither directive.

58.     The cases cited by Lavvan to support its request for an adverse inference are factually distinguishable and do not support an adverse inference against the Foris Lenders and the Debtors.  In *Stone & Webster, Inc.*, the court drew an adverse inference against a party that refused to comply with a discovery order that specifically ordered a party to produce certain documents. 547 B.R. 588, 610-611 (Bankr. D. Del. 2016).  In *Communication Dynamics, Inc.*, the subpoena recipient claimed to have lost a document at issue in the case and made no attempt to obtain an additional copy of the report to be provided.  300 B.R. 220, 224 (Bankr. D. Del. 2003).  The Court

found this account to be noncredible and authorized an adverse inference from the nonproduction.

*Id.*  In *SuperMedia LLC*, the court expressly **refused to award adverse inferences** as the requesting party "failed to convince the Court that SuperMedia's conduct amounted to fraud or an intentional action" as there was no evidence of bad faith in the non-production nor was there any evidence of a duty to have preserved the missing documents.  No. 13-10546 (KG), 2016 WL 1367070, at *8 (Bankr. D. Del. Apr. 4, 2016).

59.  Accordingly, this Court should not make an adverse inference against the Debtors and the Foris Lenders.

## VI.  A MARSHALING WAIVER IS INTEGRAL TO THE DIP FACILITY, REASONABLE AND APPROPRIATE UNDER THE CIRCUMSTANCES AND CONSISTENT WITH THE SUBORDINATION AGREEMENT.

60.  Lavvan argues that this Court should strike the marshaling waiver in the proposed Final DIP Order.[22]  *See* Lavvan Opening Brief at 38-39.  This argument fails on three independent grounds.  **First,** Lavvan raises this issue now for the first time in these proceedings.[23]  On the basis

---

[22]  Final DIP Order at ¶ 32 ("In no event shall (a) the DIP Agent or the DIP Secured Parties with respect to the DIP Collateral and the DIP Obligations, or the Foris Prepetition Secured Lenders with respect to the Adequate Protection Obligations (except with respect to the marshaling of Avoidance Action Proceeds as provided in Paragraph 9(a) and (b)), or (b) the Foris Prepetition Secured Lenders with respect to the Prepetition Collateral or the Foris Prepetition Obligations subject to entry of this Final Order, in each case, be subject to the equitable doctrine of "marshaling" or any other similar doctrine.").  This identical language is included in the entered Interim Order at ¶ 33 [Docket No. 322].

[23]  *Limited Objection of Lavvan, Inc. to Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling A Final Hearing, and (V) Granting Related Relief* [(Sealed) Docket No. 171]; [(Redacted) Docket No. 172] at 7 ("Lavvan takes no position on, and does not object to, the DIP Loan itself.  Rather, its objection is limited to the specific terms set forth below.").  The specific terms were limited to a reservation of rights with respect to Lavvan's and Foris' credit bid rights and the recitation in the proposed Final DIP Order of language agreed during the first interim hearing to be included the proposed Final Order.) [(Sealed) Docket No. 171] [(Redacted) Docket No. 172]; *Supplemental Objection of Lavvan, Inc. to Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (which raised one issue in paragraph 9 thereof: "Lavvan objects to entry of the Final DIP Order to the extent that it attempts to nonconsensually prime Lavvan.") [Docket No. 211], and arguments made at prior hearings (*See* Hr'g Tr., dated September 14, 2023 at 44:22-25), never once did Lavvan raise an objection to the marshaling waiver required under the DIP Facility.

of lateness, prejudice and estoppel alone, Lavvan's argument should be rejected.  But more to the

point here, this Court expressly enumerated the issues to be considered at this hearing.  Marshaling

is not included in the enumerated issues identified in the Scheduling Order.  Lavvan's attempt to

expand the scope of the hearing violates the express language in the Scheduling Order.  Moreover,

Lavvan's prior efforts to reserve its right to raise any issue – for the first time – and at any time –

was previously rejected by this Court in connection with identifying the issues in the Scheduling

Order.[24]  It should do so again and not countenance Lavvan's disregard for the Scheduling Order.

61.    **Second**, Lavvan is barred under the Subordination Agreement from objecting to

the marshaling waiver in the proposed Final DIP Order.   The relevant language in the

Subordination Agreement is in Paragraph 5:

> In connection with any Insolvency Proceeding, the Junior Lienholder
> agrees not to assert and hereby waives, to the fullest extent permitted
> by applicable law, **[A]** any right to demand, request, plead or otherwise
> assert or otherwise claim against <u>Senior Lienholder</u> the benefit of any
> marshaling **or** other *similar doctrine* **or** right that may be otherwise
> available under applicable law **or [B]** any other *similar rights* a junior
> secured creditor might have under applicable law with respect to any
> and all <u>Junior Lienholder Collateral</u>.

Subordination Agreement ⁋ 5 (emphasis added).

62.    Lavvan asks the Court to gloss over this language when it states in footnote 14 of

its opening brief that although "Lavvan is aware of the provisions addressing marshaling against

Foris in the Subordination Agreement, but it does not follow that it also must waive marshaling

against Euagore."  Lavvan does not substantiate this assertion with any additional facts or legal

support.

---

[24]   *Compare* Lavvan Proposed Scheduling Order at Ex. A, Issues to Be Presented at Continued Hearing ("Nothing
in this list of issues precludes, or is intended to preclude, any party from presenting any issue identified during
briefing or discovery, nor do the parties concede that these issues to be presented are necessarily determinative or
dispositive of the Court's resolution of the motion") [Docket No. 320] *with* Scheduling Order at Issues to be
Presented at Continued Hearing (omitting Lavvan's requested language in full) [Docket No. 323].

63.    Paragraph 5 of the Subordination Agreement expressly bars Lavvan from asserting (and expressly waives) "any other *similar rights* a junior secured creditor might have under applicable law with respect to any and all Junior Lienholder Collateral."  The DIP Facility is secured by the all of the Debtors' assets and Lavvan's request to excise the marshaling waiver in the DIP order directly violates its agreement "not to demand, request, plead or otherwise assert or otherwise claim" rights regarding marshaling against its asserted junior collateral interest.

64.    Lavvan instead asks this Court to ignore the express waiver of marshaling with respect to shared collateral and to limit the marshaling waiver in the Subordination Agreement to an *in personam* prohibition.  Such a reading ignores the two independent clauses that comprise Paragraph 5, and the reference to Senior Lienholder in the first clause and Junior Lienholder Collateral in the second clause.[25]  That Paragraph 5 includes different clauses, and different language to separately describe prohibitions as to the Senior Lienholder and as to the Junior

---

[25]    Even if Paragraph 5 was read as a continuum of similar clauses, the reference to Junior Lienholder Collateral cannot be ignored – which is exactly what Lavvan hopes this Court does. *Cf. U.S. Bank Nat'l Assoc, v. Wilmington Trust Co (In re Spansion, Inc.)*, 426 B.R. 114 (Bankr. D. Del 2010).  In *Spansion*, the Court confronted an X-Clause where "Permitted Junior Securities" was defined to mean:

> as to the Issuer or a Guarantor, as the case may be, any securities of the Issuer or such Guarantor, as the case may be, that constitute either (x) **capital stock of the Issuer or the Guarantor, as the case may be,** or (y) Indebtedness of the Issuer or the Guarantor, as the case may be, **subordinated in right of payment** to all Senior Indebtedness of the Issuer or Guarantor, as relevant, **then outstanding** to at least the same extent as the Debentures are subordinated as provided in this Indenture.

*Id.* at 150 (emphasis added).  Although the reference to "capital stock" was not qualified by the language "subordinated in right of payment" and was by definition subordinated to then outstanding Senior Indebtedness, the court did not allow the subordinated debt holders to retain a distribution of common stock as the common stock was not subordinated to the common stock issued to the holders of senior indebtedness. *Id.* at 151.  The Court explained:

> The X-Clause must not be considered on its grammatical structure alone, but also within the context of the entire agreement, which is more reflective of the parties' intent that, except in limited circumstances, no payment can be made to the holders of the Exchangeable Debentures until (i) the Senior Noteholders are paid in full, or (ii) the Senior Noteholders consent.

*Id.*

Lienholder Collateral cannot be ignored. More to the point, California law does not permit the rendering of the second independent clause superfluous by giving it no meaning. *See Mountain Air Enterprises, LLC v. Sundowner Towers, LLC*, 3 Cal. 5th 744, 754 (Cal. 2017) (*citing Barrett v. Superior Court*, 222 Cal. App. 3d 1176, 1190 (Cal. Dist. Ct. App. 1990) (the doctrine of *ejusdem generis* is "'an attempt to reconcile an incompatibility between specific and general words' so all words may be 'construed together, and no words will be superfluous'")).

65.    **Third**, Lavvan asks this Court to strike the marshaling waiver on equitable grounds on the sole basis that in Lavvan's judgment it is not necessary. Lavvan Opening Brief at Section IV.B. [26]  Lavvan's business judgment is not the relevant standard. As this Court is aware, the standard for approving the DIP Motion requires a determination that: (i) unsecured credit is not otherwise available; (ii) the terms and provisions are fair and reasonable; and (iii) the financing is in the best interest of the estates. These are all settled issues in the context of the DIP Facility and are not germane to the dispute that is before this Court.

66.    Indeed, even if a waiver of marshaling was before the Court, no party is entitled to substitute its business judgment for that of the Debtors, or to cherry-pick provisions that it may not like. The Court is required to review the DIP Facility and its terms and conditions in their totality, as a package of economic and legal terms and consideration negotiated in exchange for critical funding to continue the Debtors' operations and achieve a value-maximizing reorganization through these chapter 11 cases. *See*, *e.g.*, *In re Exide Holdings, Inc. et al.*, No. 20-11157 (CSS) (Bankr. D. Del. June 19, 2020), Hr'g Tr. 68:5-17 [Docket No. 354] (noting specific terms must be

---

[26]    As with every argument that Lavvan advances, it directly contravenes the language of the Subordination Agreement. *See* Subordination Agreement at ¶ 4 (providing "nor shall the Junior Lienholder commence, or cause to commence, prosecute or participate in any administrative, legal or **equitable action** against any Junior Lienholder Collateral" and ¶ 13 ("The Junior Lienholder agrees to not directly or indirectly take or support, or induce or instigate others to take or support, any action **inconsistent** with this Agreement.") (emphasis added). Lavvan's equitable argument is prohibited by, and inconsistent with, the Subordination Agreement.

reviewed as part of the DIP financing's "global package"). Moreover, marshaling waivers are commonplace in postpetition lending arrangements,[27] and such a waiver is appropriate in these Chapter 11 cases where the DIP Lenders are obtaining a postpetition lien on a diverse pool of assets of the Debtors.

67.    The DIP Facility clearly provides a benefit to the Debtors' estates and its component parts are all integral to the package deal that is being approved. There is no ground to justify excising the waiver of the equitable doctrine of marshaling under these circumstances.

## **CONCLUSION**

68.    For the reasons set forth in this Reply, the Opening Briefs, the DIP Motion, the Debtors' Reply, the Foris Reply, and the record established, the Debtors and Foris Lenders respectfully request that the Court enter the proposed Final Order.

*[Remainder of Page Left Intentionally Blank]*

---

[27]    *See*, *e.g.*, *In re Lucky Bucks, LLC*, No. 23-10758 (KBO) (Bankr. D. Del. July 14, 2023) [Docket No. 169] (approving marshaling waiver upon entry of the final order); *In re DeCurtis Holdings, LLC*, No. 23-10548 (JKS) (Bankr. D. Del. June 23, 2023) [Docket No. 285] (same); *In re Plastiq Inc.*, No. 23-10671 (BLS) (Bankr. D. Del. June 22, 2023) [Docket No. 138] (same); *In re Christmas Tree Shops, LLC*, No. 23-10576 (TMH) (Bankr. D. Del. June 5, 2023) [Docket No. 229] (same); *In re Structurlam Mass Timber U.S., Inc.*, No. 23-10497 (CTG) (Bankr. D. Del. May 19, 2023) [Docket No. 136] (same); *In re Tritek International Inc.*, No. 23-10520 (TMH) (Bankr. D. Del. May 19, 2023) [Docket No. 116] (same); *In re Amerimark Interactive, LLC*, No. 23-10438 (TMH) (Bankr. D. Del. May 9, 2023) [Docket No. 190] (same); *In re Virgin Orbit Holdings, Inc.*, No. 23-10405 (KBO) (Bankr. D. Del. May 1, 2023) [Docket No. 202] (same); *In re SiO2 Medical Products, Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. April 26, 2023) [Docket No. 216] (same); *In re Ryze Renewables II, LLC*, No. 23-10289 (BLS) (Bankr. D. Del. April 11, 2023) [Docket No. 96] (same).

Dated: October 3, 2023
Wilmington, Delaware

/s/ James E. O'Neill
PACHULSKI STANG ZIEHL & JONES LLP
Richard M. Pachulski (admitted pro hac vice)
Debra I. Grassgreen (admitted pro hac vice)
Alan J. Kornfeld (admitted pro hac vice)
James E. O'Neill (DE Bar No. 4042)
Steven W. Golden (DE Bar No. 6807)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
rpachulski@pszjlaw.com
dgrassgreen@pszjlaw.com
akornfeld@pszjlaw.com
joneill@pszjlaw.com
sgolden@pszjlaw.com

*Counsel to the Debtors and Debtors in Possession*

/s/ David M. Fournier
David M. Fournier (DE No. 2812)
Kenneth A. Listwak (DE No. 6300)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Hercules Plaza, Suite 5100
1313 N. Market Street, P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Facsimile: (302) 421-8390
E-mail:   david.fournier@troutman.com
      ken.listwak@troutman.com
-and-

Michael H. Goldstein (admitted *pro hac vice*)
Alexander J. Nicas (admitted *pro hac vice*)
Debora A. Hoehne (admitted *pro hac vice*)
Artem Skorostensky (admitted *pro hac vice*)
**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 813-8800
Email:   mgoldstein@goodwinlaw.com
      anicas@goodwinlaw.com
      dhoehne@goodwinlaw.com
      askorostensky@goodwinlaw.com

*Counsel to the Foris Prepetition Secured Lenders and the DIP Secured Parties*