## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC., *et al.*, | Case No. 23-11131 (TMH) |
| | (Jointly Administered) |
| Debtors.[1] | |

**REPLY BRIEF OF LAVVAN, INC. IN OPPOSITION TO MOTION OF THE DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

**October 3, 2023**

Jason Cyrulnik
Paul Fattaruso
CYRULNIK FATTARUSO LLP
55 Broadway, Third Floor
New York, NY 10006
Telephone: (917) 353-3005
Email: jcyrulnik@cf-llp.com
      pfattaruso@cf-llp.com

Mark D. Collins
Russell C. Silberglied
Emily R. Mathews
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7815
Email: collins@rlf.com
      silberglied@rlf.com
      mathews@rlf.com

---

[1]  A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ......................................................................................................... 1

RESPONSE .................................................................................................................... 5

   I.     LAVVAN'S AGREEMENT NOT TO "SEEK" ADEQUATE PROTECTION; DOES NOT RELIEVE THE COURT OF THE STATUTORY OBLIGATION TO GRANT PRIMING "ONLY IF ... THERE IS ADEQUATE PROTECTION." ........................... 5

   II.    THE DEBTORS' AND THE FORIS LENDERS' NEW AUTHORITIES ARE IRRELEVANT. ........................................................................................................ 7

   III.   PARAGRAPH 4 OF THE SUBORDINATION AGREEMENT DOES NOT PROHIBIT LAVVAN FROM OBJECTING TO PRIMING. ......................................... 8

   IV.   LAVVAN ONLY AGREED TO SUBORDINATE ONLY TO THEN EXISTING LENDERS WHO ENTERED INTO A SUBORDINATION AGREEMENT. ............... 9

       (1)   The Language Is Phrased In The Past Tense. ............................................. 9

       (2)   The Definition Of "Permitted Senior Lender." ....................................... 10

       (3)   The Court Should Disregard The Debtors' Attempt To Argue Their Opinion Of The Purpose Of The Subordination Agreement ............................................... 12

       (4)   By The Debtors' Own Filings, Lavvan's Lien Was Senior To Certain Other Secured Creditors. ............................................................................................... 13

   V.    THE DEBTORS' BRIEF IMPERMISSIBLY ADDRESSES ISSUES THAT THEY SUCCESSFULLY FOUGHT TO KEEP OUT OF THE SCHEDULING ORDER ...... 14

   VI.   LAVVAN WOULD SUFFER DIMINUTION OF VALUE. ....................................... 15

   VII.  LAVVAN IS NOT BEING "OBSTRUCTIONIST" NOR CHANGING THE BENEFIT OF ITS BARGAIN -- THE DEBTORS AND FORIS LENDERS ARE DOING SO. ..................................................................................................... 16

CONCLUSION ............................................................................................................ 19

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anchor Sav. Bank FSB v. Sky Valley, Inc.*,
  99 B.R. 117 (N.D. Ga. 1989) ................................................................................7, 8

*Aurelius Cap. Master, Ltd. v. Tousa Inc.*,
  Case No. 08-61317-CIV, 2009 WL 6453077 (S.D. Fla. Feb. 6, 2009) ....................................5

*Davis v. Wakelee*,
  156 U.S. 680 (1895)................................................................................13

*In re Energy Future Holdings Corp.*,
  546 B.R. 566 (Bankr. D. Del. 2016) ....................................................................15

*In re Ion Media Networks Inc.*,
  419 B.R. 585 (Bankr. S.D.N.Y. 2009)............................................................16, 17

*Med. Sales & Consulting Grp. v. Plus Orthopedics USA, Inc.*,
  No. 08CV1595 BEN BGS, 2011 WL 5075970 (S.D. Cal. Oct. 25, 2011)............................13

*Montrose Med. Grp. Participating Sav. Plan v. Bulger*,
  243 F.3d 773 (3d Cir. 2001)................................................................13

*In re YL W. 87th Holdings I LLC*,
  423 B.R. 421 (Bankr. S.D.N.Y. 2010)................................................................1

STATUTES & RULES

11 U.S.C. § 364(d)(1) ................................................................................2, 6

OTHER AUTHORITIES

Merriam-Webster Dictionary................................................................10

RLF1 29719816v.4

## INTRODUCTION

In 63 combined pages of briefing, neither the Foris Lenders[2] nor the Debtors have addressed perhaps the most fundamental question: if the Subordination Agreement was meant to preclude Lavvan from contesting DIP financing and provide its consent to being primed, why didn't it include a provision that expressly so stated, as the Model Agreement (which the Foris Lenders' brief cites to)[3] says "most" subordination agreements do?  The answer is simple: that is not what it says.  Despite the extraordinary relief they are requesting, Amyris and the Foris Lenders still have not identified a single case (and Lavvan is aware of none) where a court primed a secured creditor in the absence of an express provision consenting to DIP financing, and in reliance solely on an agreement not to *seek* adequate protection.

Both the Foris Lenders and the Debtors continue to argue that an agreement not to "seek" adequate protection is the functional equivalent of a "waiver" of adequate protection - going so far as to argue the counterfactual proposition that "seek" and "accept" are the same.  While that is simply wrong as a matter of the English language, it also assumes a premise that obscures a more fundamental (if rarely litigated) concept.  Under Section 363(e), adequate protection generally means tangible things like fees, periodic payments, or replacement liens that the Court can "provide."  But in the context of priming, adequate protection is not generally something that courts "provide" (and that word does not appear in Section 364(d) unlike Section 363(e)); instead, it is a question of fact, and is generally satisfied by the existence of an equity cushion.  *See e.g., In*

---

[2] Capitalized terms not otherwise defined herein are intended to have the same meaning as assigned in the *Opening Brief of Lavvan, Inc. in Opposition to Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 402] (the "**Lavvan Brief**").

[3] *See* Foris Brief, pp. 10-11 (citing Committee on Commercial Finance, ABA Section of Business Law, *Report of the Model First Lien/Second Lien Intercreditor Agreement Task Force*, 65 Bus. Lawyer 809 (2010)) (also attached to Lavvan's opening Brief as **Exhibit B**).

*re YL W. 87th Holdings I LLC,* 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) (collecting cases) ("The exist[ence] of an equity cushion seems to be 'the preferred test in determining whether priming of a senior lien is appropriate under section 364'").  In exercising their statutory obligation to authorize priming "only if…there is adequate protection" (*see* 11 U.S.C. § 364(d)(1)), courts have consistently found that the best way to assure adequate protection for a secured creditor whom the debtor seeks to prime is to find that the secured creditor does not need further protection because the existing equity cushion already provides sufficient protection to that creditor that its secured rights are not being impaired by the priming.  In essence, the equity cushion analysis is a finding of fact, not a tangible thing that is "provided."  It does not even make sense to say "Lavvan will not accept an equity cushion" or, even more nonsensically, that the turnover provision of the Subordination Agreement means that if the Court were to find that there is adequate protection as a result of an equity cushion, Lavvan needs to turn that cushion over to Foris.

As a result, Amyris and the Foris Lenders now scramble to focus on a different provision in the Subordination Agreement – paragraph 44.  But that paragraph is plainly inapposite too, as it limits Lavvan from commencing an action "in respect of any Junior Lienholder Collateral." Lavvan has not tried to foreclose on collateral (or moved for relief from stay to do so) or anything of the sort.  The only action it has taken is to oppose a baseless motion by noting that it has not consented to being primed by $190 million.  Limitations on actions Lavvan can take "in respect of any Junior Lienholder Collateral" – as opposed to "in connection with its status as a secured creditor" -- do not apply in this context.

Foris also argues that Lavvan is not entitled to adequate protection because it supposedly is not suffering a diminution of value since under the terms of the Subordination Agreement, its rights in the collateral allegedly were limited.  But that is plainly wrong, and there simply is no

other way to characterize what is happening to Lavvan other than as a diminution in value: on the Petition Date, Lavvan had a lien on Intellectual Property Collateral that, according to the Debtors, was behind only $63.5 million. If the DIP Motion is granted, in their view Lavvan's years-old lien will now sit behind $253.5 million. As a matter of basic arithmetic, that is $190 million of diminution unless it later turns out (directly contrary to what the Debtors are contending) that the collateral is sold for the liquidated amount of Lavvan's claim plus $253.5 million. Coupled with the Debtors' own argument that the Intellectual Property Collateral is not worth $253.5 million, the Debtors' requested relief thus threatens the complete elimination of Lavvan's secured claim after the Petition Date. Lavvan's secured claim will have gone from likely having some value to, according to the Debtor's statements, having no value. That is grievous post-petition diminution.

Amyris and Foris both argue that the relief they seek simply flows from the Subordination Agreement because Foris is agreeing to subordinate to Euagore and then, by operation of the Subordination Agreement, Lavvan will not get paid until Foris gets paid. But the relief they are seeking is not limited to letting the Subordination Agreement have whatever effect it has; if it was, they would not be asking this Court to grant priming rights. Instead, Foris and Amyris are specifically demanding from this Court a priming order and using the Subordination Agreement to justify their request.

In the Lavvan Brief, Lavvan argued that there is substantial doubt that the 2018 Foris Loan, which is the only loan that is subject to the Subordination Agreement, continues to be in existence today given that every one of its major terms has been changed and that the covenant of good faith and fair dealing prevents insider Foris from using the Subordination Agreement in the ways it has and is now trying to do. Those are Challenge Period issues and the Challenge Period has not yet run. The Court should not enter an order now that vitiates a Challenge by Lavvan.

3

The Debtors' brief argues that the accountant's analysis of changes to the 2018 Foris Loan, which resulted in treatment as an extinguishment, "did not result in the ***legal cancellation*** of the Debtors' obligations to Foris."  Debtors' Brief, p. 2 (emphasis in original).  But that is a strawman: Lavvan never argued that accounting changes "resulted" in legal cancellation of that loan.  Rather, some of the very same <u>facts</u> that caused the accountants to contemporaneously (before any bankruptcy) recognize that the loan needed to be treated as extinguished also carry legal consequences, as detailed in the Lavvan Brief.  It is worth noting, moreover, that the Debtors' Brief gets one fact materially wrong.  In attempting to explain why the principal amount of the loan kept going up rather than down, Amyris argues that "[t]he original 2018 LSA accommodated an increase in the facility (upon request by Amyris and acceptance by GACP) by an additional $35 million (for a total loan of $71 million)," and implies that it was able to fold several unsecured notes into the 2018 Foris LSA for that reason.  *See* Debtors' Brief, pp. 12-13.  This leaves out a material fact:  under Amendment No. 4 to the 2018 Foris LSA, dated April 4, 2019, that very provision was eliminated from the 2018 Foris LSA.  *See* AMYRIS-DIP003930 *et seq*. (Form 8-K) ("the Company's ability to obtain the Incremental Term Loan Facility (as defined in the Prior 8-K) was eliminated") (attached here to as **Exhibit A**); AMYRIS-DIP002182 *et seq*.  That occurred *before* Lavvan entered into the Subordination Agreement with Foris.  Thus, as Lavvan has maintained, the only amount contemplated under the 2018 Foris LSA as of the date of the Subordination Agreement was $36 million.  This bolsters the point made in Lavvan's opening brief: the 2018 Foris Loan changed so dramatically thereafter that it cannot reasonably be characterized as the same loan.

Finally, it bears noting that while Foris argues additional (erroneous) reasons why adequate protection should be unnecessary, no one is arguing that there is an equity cushion.  There is simply

4

no debate: no equity cushion exists here, which is fatal to the Debtors' and Foris's demand for priming.

**RESPONSE**

I.    **LAVVAN'S AGREEMENT NOT TO "SEEK" ADEQUATE PROTECTION; DOES NOT RELIEVE THE COURT OF THE STATUTORY OBLIGATION TO GRANT PRIMING "ONLY IF ... THERE IS ADEQUATE PROTECTION."**

The Debtors and the Foris Lenders argue that Lavvan's agreement not to "seek" adequate protection is the same as contracting to change the requirements the Court is obligated to find to be in existence in order to permit priming and should be read to mean that Lavvan contracted that it would not "receive" adequate protection.  *See* Debtors' Brief, pp. 21-24[4]; Foris Brief, pp. 15-17[5].  The Debtors go so far as to state that "there is simply no difference between 'seeking' and 'accepting' when the object of those verbs is identical" (Debtors' Brief, p. 22).  That is simply wrong on its face as a matter of the English language; these words are simply not synonyms and is particularly hard to reconcile with Foris' explanation that "California law instructs that the intent of a contract starts with the plain and ordinary meaning of the contract language."  (Foris Brief pp.7-8).[6]  As set forth in the Lavvan Brief, the Subordination Agreement describes types of

---

[4] The "Debtors' Brief" refers to the *Opening Supplemental Brief of the Debtors in Support of Entry of Final Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 404].

[5] The "Foris Brief" refers to the *Supplemental Brief of Euagore, LLC and the Foris Prepetition Secured Lenders With Respect to Continued Hearing on the Motion of the Debtors for Interim and Final Orders (I) Authorizing Postpetition (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 403].

[6] Indeed, *Tousa*, the main case cited for the Debtors' and Foris Lender's proposition that an agreement not to seek adequate protection is the equivalent of an agreement not to receive adequate protection, actually proves Lavvan's point.  The intercreditor agreement in that case provided that the junior lienholder "will not request *or accept* any form of adequate protection." *Aurelius Cap. Master, Ltd. v. Tousa Inc.,* Case No. 08-61317-CIV, 2009 WL 6453077, at *4 (S.D. Fla. Feb. 6, 2009) (emphasis supplied).  If the parties to the Subordination Agreement intended to prohibit Lavvan from "accepting" adequate protection, they would have included the word "accept," as was done in *Tousa*.  Instead, the Subordination Agreement provides only that Lavvan "agrees not to seek adequate protection".  Subordination Agreement ¶ 6.  As set forth in the Lavvan Brief, if this were a case about nonconsensual use of cash collateral (which it is not), the inability to seek adequate protection, standing alone, would be a bar to Lavvan because

5

adequate protection that Lavvan agreed not to seek: "interest, fees or other expenses in respect of the Junior Lienholder Collateral." Subordination Agreement ¶ 6. These tangible things are the types of adequate protection that courts will "provide," in the words of Section 363(e), as compensation for use of cash collateral; they are *not* the finding that the Court must make in a DIP priming dispute to determine that "there is adequate protection" under Section 364(d)(1). *See* Lavvan Brief, pp. 16-21.

The Debtors and the Foris Lenders argue that Lavvan's objection amounts to an attempt by Lavvan to receive adequate protection, which they argue is impermissible. Debtors' Brief, pp. 21-22; Foris Brief, p. 4. That is wrong for two reasons. First, it cannot be that Lavvan somehow violates the Subordination Agreement merely by pointing out to the Court that (a) the Subordination Agreement does not contain a consent to DIP financing, even though such a term is common in other agreements and (b) the law requires that the Court make a factual finding that adequate protection exists in order for the Court to have the authority to grant the requested relief. Second, Lavvan will not "receive" anything at all. Courts almost universally hold that the standard by which to determine if "there is adequate protection" under Section 364(d)(1) is whether an equity cushion is in existence already. *See* Lavvan Brief, pp. 20-21, 35. That essentially is a *finding* of fact that must be made by the Court. Lavvan cannot "receive" a finding; to articulate the issue is to demonstrate how absurd of a concept it is.[7] That is materially different from adequate protection under Section 363(e), which the statute says the Court must "provide," and which is why it takes the form of tangible things that a creditor can "request" and "receive."

---

Section 363(e) is phrased in a "if you don't seek it, you don't get it" manner. But Section 364(d) is phrased very differently and therefore the result is different. *See* Lavvan Brief, pp. 19-21.

[7] For similar reasons, Amyris's and the Foris Lenders' argument that "any adequate protection payments or liens" that Lavvan would receive would "automatically revert to Foris" by the terms of the Subordination Agreement also is as nonsensical as it is irrelevant. *See* Debtors' Brief, p. 11, Foris Brief, pp. 13-14. While it is true that the Subordination Agreement contains a turnover provision, one does not and cannot turn over a finding of fact or a conclusion of law.

6

Thus, setting aside the threshold fact that Lavvan never contracted to receive adequate protection, even the question of whether or not Lavvan may "receive" adequate protection under the Subordination Agreement is beside the point, because in the context of priming there is nothing for Lavvan to receive. At the bottom, nothing changes the legal requirement that the Court has an independent restriction that it can grant a requested priming order "only if…there is adequate protection."

## II.    THE DEBTORS' AND THE FORIS LENDERS' NEW AUTHORITIES ARE IRRELEVANT.

The Debtors and the Foris Lenders still have not identified *any* case holding that an intercreditor agreement or subordination agreement which fails to even mention DIP financing somehow still acts as a consent to DIP financing.

The Foris Lenders' primary new citation is to the Model Agreement. *See* Foris Brief, p.17, n. 21. According to Foris, the Model Agreement's adequate protection language is similar to the language in the Subordination Agreement. This argument misses the fact that the Model Agreement anticipates a separate DIP financing provision that includes consent to priming -- missing from the Subordination Agreement here -- and comments that "most" intercreditor agreements contain such language. *See* Lavvan Brief, p. 13 (citing Model Agreement n. 56). Indeed, it discusses numerous variations of submissions that must be decided by the parties once they include a DIP financing provision. Lavvan Brief, p. 15 (citing Model Agreement n. 56). Thus, the Model Agreement does not suggest, much less provide that any adequate protection provision can substitute for a consent to DIP financing provision.

The only new case the Debtors cite concerning Section 364 issues is *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989), cited at Debtors' Brief, p. 26, n. 36, in an attempt to support their contention that the Court need not make a finding of adequate protection

in order to grant a priming lien.  But that case does not remotely support Debtors' position here.

For starters in *Anchor Sav. Bank FSB*, the Court did perform an adequate protection analysis and

found that whether there was a sizeable equity cushion for non-consenting lienholders.  *Id*. at 123-

124.   The  potion  of  the  decision  that  Debtors  cite  concerns  lienholders  that  withdrew  their

objections  to  a  DIP  financing  motion,  and  the  court  merely  observed  that  in  the  face  of  the

withdrawal  of  the  lienholders'  objection,  the  debtor  no  longer  had  to  demonstrate  adequate

protection for those non-objecting lienholders.  That of course is not the case here, as Lavvan has

not withdrawn its objection to priming.

Similarly, the Debtors also cite numerous uncontested orders for the proposition that the

Court need not undertake an independent review to determine whether there is adequate protection

where a party consents.  Debtors' Brief, p. 27.  These unremarkable orders are irrelevant because

Lavvan did not consent to priming; it only agreed not to seek adequate protection.  In any event,

orders entered where the issue was not presented to the Court are of no persuasive authority.

### III.    PARAGRAPH 4 OF THE SUBORDINATION AGREEMENT DOES NOT PROHIBIT LAVVAN FROM OBJECTING TO PRIMING.

The Debtors and the Foris Lenders argue that Lavvan's objection to priming somehow

violates Lavvan's covenants not to "exercise any remedy with respect to any Junior Lienholder

Collateral" and not to "participate in any administrative, legal or equitable action against any

Junior Lienholder Collateral" under the Subordination Agreement.  Subordination Agreement, ¶

4; *see* Foris Brief, pp. 18-22; Debtors' Brief, pp. 23-24.  They are wrong.

Lavvan seeks only to avoid being primed by 550% of the amount to which it agreed to

subordinate.  That is not a "remedy with respect to any Junior Lienholder Collateral," nor an action

"against any Junior Lienholder Collateral."  Lavvan has not attempted to foreclose on collateral

(or moved from relief from stay to do so) or anything else in that vein.  Nor is Lavvan seeking to

terminate exclusivity to propose a plan that sells its collateral.  Those are quintessential actions

"against" or "with respect to" the "Junior Lienholder Collateral".  Lavvan objects only to being

primed by the DIP Loans -- a massive new subordination to $190 million.  That might be an action

"with respect to" its status as a secured creditor, but not with respect to the collateral itself.

Accordingly, the limitations set forth in paragraph 4 of the Subordination Agreement are irrelevant

to this dispute.

IV.    **LAVVAN ONLY AGREED TO SUBORDINATE ONLY TO THEN EXISTING LENDERS WHO ENTERED INTO A SUBORDINATION AGREEMENT.**

As explained in the Lavvan Brief, Lavvan agreed only to subordinate its liens to any of

Amyris's lenders as of the date of the RCLA and the Security Agreement who would agree to enter

into a subordination agreement with a specific (and unusual) term that protected Lavvan's license.

*See* Lavvan Brief, pp. 23-25.  The Debtors and the Foris Lenders argue, instead, that Lavvan agreed

to subordinate to any lender that would emerge in the future.  In doing so, the Debtors and the

Foris Lenders ignore the licensing rights issue altogether.

**(1)    The Language is Phrased in the Past Tense.**

In support of their erroneous argument that Lavvan agreed to subordinate its lien and claims

to any future lenders, the Debtors and the Foris Lenders focus on the words "has advanced" as

used in the definition of "Permitted Senior Lender" in the Security Agreement.  They argue that

"has advanced" is phrased in the present perfect tense rather than the past tense.  *See* Foris Brief,

pp. 27-32; Debtors Brief, pp. 8-10.  That concession is fatal to their argument. The "present

perfect" tense, while it contains the word "present," is in fact "used to express a ***past event*** that has

present consequences."  https://en.wikipedia.org/wiki/Present_perfect (emphasis added).

As stated in Lavvan's Brief, "has advanced" is past tense language, such that "Permitted

Senior Lender" means only Foris as successor to Great American for a loan that already had been

initiated and any other lender that, as of the date of the Security Agreement, already "has advanced debt for borrowed money." Lavvan Brief, p. 23. Further confirmation of this interpretation comes from the RCLA, which expressly required Amyris to enter into the Security Agreement. The RCLA specifies that the lien Amyris must grant to Lavvan is only "junior in priority to the <u>existing</u> liens and security interests of Great American and any other Permitted Senior Lender." RCLA § 5.12.2(a) (emphasis supplied). The word "existing" is unambiguous and underscores that Lavvan plainly did not agree to subordinate to future lenders. The Debtors' and the Foris Lenders' position entirely ignores the word "existing" and is thus not a reasonable construction.

The Debtors' and Foris Lenders' contention that "has advanced" is phrased in the present perfect tense relies on the definition of that grammatical term in the Merriam-Webster Dictionary: "an action that began in the past and is completed at the time of speaking." *See* Debtors' Brief, p. 8 n. 11; Foris Brief, p. 27. But this again actually supports Lavvan's interpretation of who is included in the definition of "Permitted Senior Lender." The effective date of the Security Agreement would be the "time of speaking" (in this case at the time of execution of the Security Agreement), such that the "action that began in the past" and would have had to be "completed" by then. That confirms that the definition of "Permitted Senior Lender" includes only those who had advanced debt for borrowed money *as of the effective date of the Security Agreement.*

### (2)    The Definition of "Permitted Senior Lender."

The Debtors and the Foris Lenders also argue that Lavvan's reading that Lavvan only agreed to subordinate to then-existing lenders must be wrong because if it were right, they can conceive of no reason that the Security Agreement would provide that "Permitted Senior Lender" includes not only Foris but "any other lender who has advanced debt"; they argue that it would have been clear who the other lenders were at that time. Foris Brief, pp. 31-32; Debtors' Brief, p. 9-10. Here again, they are simply incorrect.

10

As set forth above, the requirement for the Debtors to enter into the Security Agreement originated from the RCLA, which had been entered into 45 days prior.  *See* RCLA § 5.12.2(a). Because section 5.12.2(a) of the RCLA contemplates the Security Agreement and related documents would be executed in the future ("Amyris shall grant," not "hereby grants"), and that the closing of the RCLA would be more than a month after it was executed, the language had to be broad enough to cover any changes that would arise between the time of the execution and the time of closing.  That wasn't merely caution.  At this very time, Great American was considering the sale of the 2018 Foris Loan, and the parties understood that the sale of the loan might close before the closing of the RCLA.  The language of the RCLA was drafted to include other lenders, anticipating this likely change.

Thus, the use of the phrase "has advanced" in the Security Agreement's definition of "Permitted Senior Lender,"[8] referred to the point in time where the Security Agreement was executed, which was the same date as the RCLA closing.  This is further illustrated by the "Lender Consent" closing condition under the RCLA, which uses the same defined term, "Permitted Senior Lender."  Section 2.1 of the RCLA provides that:  "Lender Consent(s)" "means any and all necessary consents and releases by Great American and any other Permitted Senior Lender [*i.e.*, the same defined term] as required by Section 5.12."  Section 5.12.1(c) of the RCLA, in turn, requires "the specific and express release of all liens and security interests on the Amyris Cannabinoid Foreground IP held by Great American and any other existing lien or security interest holder."  To account for a potential change in senior lenders prior to closing, Section 2.1's closing condition for delivery of consents and releases could not be limited to Great American.  Instead, the definition of Permitted Senior Lender had to be defined more generally, to ensure that

---

[8] *i.e.*, "Foris Ventures, LLC as successor in interest to GCAP Finance Co., LLC and any other lender who <u>has advanced</u> debt for borrowed money ...".  Security Agreement Section 1.01 (emphasis supplied).

whichever lender wound up owning the 2018 Foris Loan would be required, as a closing condition, to execute consents and releases. And in fact, as this Court is aware, that is precisely what happened – Great American did in fact sell the 2018 Foris Loan to Foris between the RCLA execution date and the date that the Subordination Agreement was executed, and Foris executed the required consent. *See* Lavvan Brief, **Exhibit A**.

To implement the requirements of the RCLA, the Security Agreement directly incorporated the same definition of Permitted Senior Lender as required by the RCLA, other than changing "Great American" to "Foris". This did not convert the agreement into one whereby Lavvan agreed to subordinate to all future lenders.[9]

### (3) The Court Should Disregard the Debtors' Attempt to Argue Their Opinion of the Purpose of the Subordination Agreement

The Debtors speculate that the purpose of Section 4.01(a) of the Security Agreement and the RCLA was to obtain an agreement from Lavvan that it would subordinate to all future borrowings so that the Debtors would be able to obtain financing in the future. *See* Debtors' Brief at p. 4, 8. That concept is found nowhere in the documents, and Lavvan disputes that this was ever Lavvan's intent or a purpose communicated to Lavvan. The Debtors' attempt to advance that argument is particularly improper because they vociferously and repeatedly objected to providing Lavvan discovery of extrinsic evidence of the parties' intent under the relevant agreements. *See, e.g.,* Docket No. 319 (the "**Debtors' Proposed Scheduling Order**"). And in reliance on that objection, the Court accepted the Debtors' position and entered a version of the "Issues to be

---

[9] The Debtors also argue that "The RCLA obligated Lavvan to periodically affirm the junior status of its lien by entering into a subordination agreement with any Permitted Senior Lender." Debtors' Brief, p. 8. The agreement says no such thing; the words "periodically" and "affirm" nowhere appear in the agreement. *See* RCLA §5.12.2(c). Instead, the key aspect of Section 5.12.2(c) is that any subordination agreement must contain the senior lender's commitment and obligation to honor Lavvan's license rights if it foreclosed on the joint collateral. *Id.* Only one lender ever did so – Foris, in the Subordination Agreement. Thus, this provision does nothing to aid the Debtors' and Foris's "present perfect tense" argument.

Presented at Continued Hearing," as part of the Scheduling Order, that excluded intent of the parties from the upcoming hearing.

Having fought successfully, to avoid discovery of extrinsic evidence or the issue of intent, the Debtors are judicially estopped from now trying to present evidence of, or argue, their intent outside the plain language of the four corners of the document. *See, e.g., Davis v. Wakelee*, 156 U.S. 680, 689 (1895) ("where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."); *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779 (3d Cir. 2001) ("judicial estoppel bars a litigant from asserting a position that is inconsistent with one he or she previously took before a court or agency.")  The Court should not consider the Debtors' purported explanation of the intent of this provision.

### (4)    By the Debtors' Own Filings, Lavvan's Lien Was Senior to Certain Other Secured Creditors.

The Debtors' and the Foris Lenders' argument that Lavvan agreed to subordinate its liens and claims to any future lenders also ignores the Debtors' own public securities filings.  The Debtors have publicly disclosed that Lavvan's lien has been senior to the liens of at least certain other secured lenders.  *See* Amyris Form 8-K dated Nov. 20, 2019; Lavvan Brief, pp. 28-29.  If the Security Agreement was designed to make Lavvan junior to any future Amyris lender, the Debtors would not have disclosed that Lavvan was senior to other lenders in its own public filings. Their argument now to the contrary is the type of litigation driven argument that Courts disregard in favor of the far more probative and reliable contemporaneous pre-litigation positions.  *See, e.g., Med. Sales & Consulting Grp. v. Plus Orthopedics USA, Inc.*, No. 08CV1595 BEN BGS, 2011 WL 5075970, at *5 (S.D. Cal. Oct. 25, 2011) ("'The parties' conduct after execution and before

13

any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions.'") (quoting *Kennecott Corp. v. Union Oil Co.*, 196 Cal. App. 3d 1179, 1189–90, 242 Cal. Rptr. 403, 410 (Ct. App. 1987)).

## V.    THE DEBTORS' BRIEF IMPERMISSIBLY ADDRESSES ISSUES THAT THEY SUCCESSFULLY FOUGHT TO KEEP OUT OF THE SCHEDULING ORDER.

In addition to the impermissible briefing of intent (*see supra* pp. 11-12), the Debtors' Brief discusses other impermissible topics.  For example, for reasons unexplained, they provide their erroneous view of the extent of Lavvan's collateral package.  *See* Debtors' Brief, pp. 7-8 ("The assets covered by the security interest are limited to the 'background' intellectual property owned by Amyris as of March 2019 ***before*** the RCLA became effective, and a narrow set of subset 'foreground' intellectual property developed by Amyris pursuant to the activities contemplated by the RCLA ***after*** it became effect in March 2019.") (emphasis in original).  While the Court originally stated that the extent of Lavvan's lien might be a relevant issue for the hearing, the Debtors strongly objected and advocated that the extent of Lavvan's lien should be an "Issue to be Determined at Another Date".  *See* Debtors' Proposed Scheduling Order, p. 2 ("Issues to be Determined at Another Date: . . . the nature and extent of Lavvan's asserted liens are not being determined at this time ...").  The Court adopted this position in its Scheduling Order.  *See* Scheduling Order [Docket No. 323], p.3 (same).  The Debtors cannot now be heard to reverse course and seek to rely on their blatant misstatement of the scope of Lavvan's lien part of their arguments in connection with their current Motion.

Moreover, the Debtors again attempt to assert the merits of their damages position by arguing (as they also did at the Final DIP Hearing) that "Lavvan paid only the first $10 million of the milestones" under the RCLA.  Debtors' Brief, p. 7.  As the Debtors know, that fact is legally irrelevant to the Arbitration, the pending SDNY IP claims, and to Lavvan's damages.  But even

14

that is beside the point to this priming dispute, where the issues have been cabined at the Debtors'

request and damages in the Arbitration is not one of them.  The Court should disregard the Debtors'

improper (and erroneous) arguments about damages.

### VI.    LAVVAN WOULD SUFFER DIMINUTION OF VALUE.

The Foris Lenders further assert that Lavvan is not entitled to adequate protection because

they contend that Lavvan is not suffering a diminution of the value of its interest.  *See* Foris Brief,

p. 6.  According to the Foris Lenders, this is because Lavvan purportedly agreed to unlimited future

subordination by the terms of the Subordination Agreement, so it knew its collateral would

ultimately hold little value and that collateral could not have lost any more value since the Petition

Date.  *Id.*  Setting aside the fact that Lavvan did not consent to unlimited subordination (*see* Lavvan

Brief, pp. 21-25; *see also supra* pp. 8-13), this argument also fails on its own terms.

Lavvan's collateral package is intellectual property, not all assets or going concern value.

*See* Lavvan Brief pp. 7-8; Foris Brief p. 25, Debtors' Brief pp. 7-8.  There is no evidence that the

value of the Intellectual Property Collateral would differ in a liquidation as opposed to a

reorganization or going concern sale. *See* Lavvan Brief, p. 37.  If the Debtors had simply liquidated

rather than filed for Chapter 11 and sought DIP financing, the collateral would be worth

approximately the same and Lavvan's lien would be behind, at most, $63.5 million.  But the

priming of Lavvan by $190 million would balloon the amount by which Lavvan is subordinated

to $253.5 million.  Given that the Debtors have asserted that Lavvan's collateral package is worth

very little, the Debtors seem to believe that this priming will completely eliminate any value at all

in Lavvan's security interest. Where the security interest has value on the Petition Date and no

longer has value afterward, that is textbook diminution of value.

The purpose of adequate protection is to protect against diminution in value of Lavvan's

interest occurring after the Petition Date.  *See In re Energy Future Holdings Corp.*, 546 B.R. 566,

581 (Bankr. D. Del. 2016) ("[A]dequate protection is designed to protect secured creditors against diminution in value of their collateral.  The purpose of adequate protection is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use by the debtor.").  Given the clear diminution present here, the Court has no record by which it can conclude that "there is adequate protection" as bankruptcy law requires.

### VII.   LAVVAN IS NOT BEING "OBSTRUCTIONIST" NOR CHANGING THE BENEFIT OF ITS BARGAIN -- THE DEBTORS AND FORIS LENDERS ARE DOING SO.

The suggestion in the Foris Lenders' brief that Lavvan is somehow engaging in "obstructionist, destabilizing and wasteful behavior," is absurd.  *See* Foris Brief, pp. 10-11 (citing *In re Ion Media Networks Inc.*, 419 B.R. 585 (Bankr. S.D.N.Y. 2009)).  Lavvan emerged in this Chapter 11 case when it learned that (a) the Debtors failed to disclose to the Court the existence of Lavvan's secured claims, and (b) the express representations of the Debtors and the Foris Lenders that no one was being primed other than Foris were apparently false.  Lavvan has raised one issue:  that there is no basis for entering an insider priming order, massively subordinating Lavvan's claim.   Indeed, the Foris Lenders' reliance on *Ion Media*, to complain about "obstructionist" behavior shows just how off base the contention is.  In *Ion Media*, the junior creditor purchased a discounted second lien debt "for pennies on the dollar," and proceeded to "us[e] aggressive bankruptcy litigation tactics […] to earn outsize returns on its bargain basement debt purchases at the expense of the First Lien Lenders."   419 B.R. at 588-89.   The court characterized the junior lender as "using the bankruptcy process to its own economic advantage." *Id.* at 589, n.1.  The contrast to Lavvan's actions -- doing nothing until it found out an insider was trying to surreptitiously prime its secured claim out of existence -- could not be more clear.

The Foris Lenders argue that the court in *Ion Media* "determined that the intercreditor agreement prevented the second lien creditors from objecting to the plan even though there was

16

no specific language in the intercreditor agreement so stating." Foris Brief, pp. 21-22. Not so. The court found that the intercreditor agreement was unambiguous and that its ruling was based on a reading of the plain language of the agreement. *See* 419 B.R. at 598. Indeed, the court quotes the intercreditor agreement twice, which explicitly provides that the junior lender cannot object to the plan but did so. *Id.* at 597.

The Debtors and the Foris Lenders also assert that Lavvan is somehow trying to "extricate itself" from the benefit if its bargain. *See, e.g.*, Debtors' Brief, p. 4; Foris Brief, pp. 32-33. That characterization of Lavvan's objection to being primed by an insider by $190 million, nearly triple the amount Foris asserts Lavvan is currently subordinated to (a fact not conceded by Lavvan), when the subordination agreement never once mentions the words "DIP financing" or "priming," is plainly wrong. Lavvan never agreed to, bargained for, or otherwise consented to be primed by DIP Financing and no term of its agreement says otherwise. Indeed, it is the Foris Lenders who are changing the benefit of the parties' bargain, not Lavvan. Foris has consistently attempted to take advantage of Lavvan by increasing the amount to the debt ahead of it -- tripling the amount in a matter of months post-closing of the Subordination Agreement. *See* Lavvan Brief pp. 26-30. The Debtors attempt to suggest that everyone always contemplated that amounts owed under the 2018 Foris Loan could be substantially increased (and therefore the subordination would be substantially increased) by stating: the "2018 LSA accommodated an increase in the facility (upon request by Amyris and acceptance by GACP) by an additional $35 million (for a total loan of $71 million)." Debtors' Brief, p. 12. However, they fail to note that this very component of the original 2018 Foris Loan was eliminated <u>prior to</u> the execution of the Subordination Agreement. *See*

17

**Exhibit A** hereto.[10]  That fact highlights that the immediate doubling and tripling of the amount of the 2018 Foris Loan just after the Subordination Agreement was executed was not something Lavvan had any reason to contemplate.

Finally, it is ironic that Lavvan is being accused of changing it position given what this Court has seen from the Debtors and the Foris Lenders in connection with this very DIP Motion.  The Debtors had been preparing for these cases presumably for months.  They formulated their strategy for these cases, together with the Foris insiders.  This strategy either completely failed to account for Lavvan's interest, or willfully failed to be forthright about their scheme to eviscerate Lavvan's interest.   Either way, they both told the Court -- in the Motion and at the First Day hearing -- that no one other than Foris was being primed, which was untrue.  Now that Lavvan has stood up for its basic rights, they have scrambled to construct a justification for the unprecedented relief they sought surreptitiously to obtain.  Counsel for Lavvan appeared at the first day hearing, hours after having been retained, and said "we're just here to make sure we're not being primed."  Nobody stood up to say "actually that's exactly what's happening."  Understanding the apparent urgency of these cases, the Debtors and Foris could have clarified and begun working to resolve or litigate the dispute.  Instead, they waited until Lavvan raised the issue, and filed replies first setting forth their position to the Cour three days before the hearing.  Now they complain that time is of the essence.  The Bankruptcy Code does not authorize the relief they have requested, and court should not reward the attempt to tie it to a manufactured emergency.

---

[10] In fact, the amendment which so provided, Amendment No. 4, which was signed in the period between the execution and closing of the RCLA, explicitly amended the 2018 Foris Loan to account for Lavvan's rights (adding certain IP related to the RCLA to the definition of Excluded Intellectual Property).

## <u>CONCLUSION</u>

For all of the reasons set forth herein and in the Lavvan Brief, the DIP Motion should be

denied unless it eliminates the priming of Lavvan.


Dated: October 3, 2023

Respectfully submitted,

*/s/ Russell C. Silberglied*
Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Emily R. Mathews (No. 6866)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Email:      collins@rlf.com
                 silberglied@rlf.com
                 mathews@rlf.com

-and-

Jason Cyrulnik
Paul Fattaruso
**CYRULNIK FATTARUSO LLP**
55 Broadway, Third Floor
New York, New York  10006
Telephone:  (646) 844-2466
Email:      cyrulnik@cf-llp.com
                 pfattaruso@cf-llp.com


*Counsel for Lavvan, Inc.*