# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AMYRIS, INC., *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-11131 (TMH)<br><br>(Jointly Administered)<br><br>Hearing Date: October 18, 2023 at 2:00 p.m. (ET)<br>Obj. Deadline: October 4, 2023 at 4:00 p.m. (ET)<br><br>**[Related D.I. 334]** |

**DEBTORS' OBJECTION TO APPLICATION OF THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS FOR ENTRY OF AN ORDER (I)
AUTHORIZING THE RETENTION AND EMPLOYMENT OF JEFFERIES LLC AS
INVESTMENT BANKER PURSUANT TO 11 U.S.C. §§ 328(a) AND 1103(a)**

Amyris, Inc. ("Amyris") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned Chapter 11 Cases file this Objection (the "Objection") to the *Application of the Official Committee of Unsecured Creditors for Entry of an Order (I) Authorizing the Retention and Employment of Jefferies LLC as Investment Banker Pursuant to 11 U.S.C. §§ 328(a) and 1103(a)* [D.I. 334] (the "Application"), and respectfully represent as follows:

## INTRODUCTION

1. The proposed employment of Jefferies LLC ("Jefferies") as investment banker for the Official Committee of Unsecured Creditors (the "Committee") is effectively a giveaway of a $2,000,000 "Transaction Fee" and $125,000 monthly flat fee to Jefferies. The Debtors are running the sale process. Their investment banker, Intrepid Investment Bankers LLC ("Intrepid") does not require Jefferies' assistance, nor is there any need for oversight, much less at a price tag exceeding

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

1

$2 million.  So long as the Debtors' plan and sale process is ongoing, Jefferies will be providing only advisory services and perhaps expert testimony on valuation to the Committee.  But, *first*, the Committee has financial advisors to analyze assets and sale proposals, something that is squarely within FTI's scope of duties and core competencies, and Jefferies' advisory services would duplicate services that FTI provides on an hourly basis.  *Second*, a valuation expert is not entitled to a $2,000,000 "Transaction Fee" and $125,000 flat monthly fee.  *Third*, the very fact that Jefferies would have a financial interest in the outcome of the matter in which it purports to testify as an "independent expert" would negate the value of such testimony.

2. *Fourth*, as might be inferred from the abandonment of the "success fee" label, the "Transaction Fee" is not tied to any measurement of success, nor to any contribution by Jefferies or its client to the subject transaction and so may be payable without any benefit to the estate.  This does not meet the standard for what is effectively pre-approval of compensation under section 328(a) of the Bankruptcy Code.  Accordingly, even if the Court were inclined to permit the employment of Jefferies, which the Committee has not shown is necessary, its compensation should instead be subject to the standard of reasonableness under section 330.  There is no market basis for Jefferies' proposed compensation based on any services it might be called upon to perform *at this time*.  No one knows exactly what services Jefferies will provide to these estates that warrants such compensation.  Therefore, if retained, Jefferies should be required to prove at the conclusion of these cases that the services provided by the firm merit the monthly fees and Transaction Fee.

**BACKGROUND**

A. **The Debtors' Chapter 11 Cases**

3. On August 9 and August 21, 2023 (as applicable, the "Petition Date"), the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Court. The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. On August 27, 2023, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") which consists of the following members: U.S. Bank Trust Co. NA; Cosan U.S. Inc.; Sartorius Stedim North America Inc.; Hearst Magazine Media Inc.; Wiley Companies; Park Wynwood LLC; and Allog Participacoes Ltda.

5. The Debtors were founded in 2003 to create a more stable supply of a key anti-malarial treatment. Through the Debtors' cutting-edge science, artemisinin—the most effective anti-malarial drug in the world—is now consistently available to treat the deadly disease. Using the same technological innovations that produced artemisinin, the Debtors have become the world's leading manufacturer of ingredients made with synthetic biology. The Debtors provide sustainable ingredients that are eco-friendly alternatives to raw material sourced for flavors and fragrances, sweeteners, cosmetics, pharmaceuticals, and other consumer products.

6. In addition, the Debtors operate a family of consumer brands that utilize the Company's ingredients to meet the growing demand for sustainable, effective, and accessible products, including Biossance® (clean beauty skincare), JVN™ (haircare), Rose Inc.™ (clean color cosmetics), Pipette® (clean baby skincare), OLIKA™ (clean wellness), MenoLabs™

(healthy living and menopause wellness), Stripes™ (menopausal wellness), and 4U by Tia™ (a new clean haircare line).

7. The Debtors have turned to chapter 11 to implement an operational and balance-sheet restructuring and to reorganize their business operations to focus on their core competencies of research and development and the proven capability to commercialize and manufacture sustainable ingredients. Amyris intends to use the chapter 11 process to reorganize around its Lab-to-Market™ platform with its in-house capability to cost-effectively manufacture ingredients at an industrial scale, which necessitates the renegotiation of certain of the Debtors' existing supply agreements. To the extent the Debtors own assets inconsistent with this restructuring strategy, the Debtors intend to sell such assets to maximize value for their estates and their creditors.

B. **DIP Financing, Asset Sales and Restructuring Transactions**

8. In order to obtain the funds necessary to effectuate the Debtors' restructuring strategy, contemporaneous with the filing of these Chapter 11 Cases, the Debtors filed their *Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 19] (the "DIP Financing Motion"). On August 11, 2023, the Court entered the First Interim DIP Order and on September 19, 2023, the Court entered the Second Interim DIP Order approving the DIP Facility on an interim basis.[2] Pursuant to the Interim DIP

---

[2] *Interim Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 54] (the "First Interim DIP Order") and *Second Interim Order (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 322] (the "Second Interim DIP Order", and collectively, the "Interim DIP Orders"). A hearing regarding entry of a final DIP Order is set for October 4, 2023.

4

Orders and the DIP Credit Agreement executed by the Debtors and the DIP Lenders,[3] certain Milestones were established, pursuant to which the Debtors were to utilize the first two months of these Chapter 11 Cases to engage with major constituencies in furtherance of developing a consensual plan of reorganization while continuing the process of marketing its noncore consumer brands. In the event such a deal cannot be reached, the DIP Financing contemplates a toggle, whereby the Debtors would pivot to a sale of substantially all their assets pursuant to section 363 of the Bankruptcy Code.

9. Consistent with the above strategy, on September 18, 2023, the Debtors filed their "Brand Assets Sale Motion"[4] seeking to establish bid and other procedures to market and potentially sell their Brand Assets associated with the Operating Consumer Brands.

C. **Retention of Financial Advisors and Investment Bankers**

10. As noted, the Debtors have employed Intrepid as their investment banker.[5] The Committee did not object to Intrepid's retention.

11. On September 20, 2023, the Committee filed its Application for an Order Authorizing the Retention and Employment of FTI Consulting, Inc. as Financial Advisor to the

---

[3] *Senior Secured Super Priority Debtor in Possession Loan Agreement* dated as of August 9, 2023, as amended by *Amendment No. 1 to Senior Secured Super Priority Debtor in Possession Loan Agreement* dated as of September 13, 2023 (collectively, the "DIP Facility").

[4] *Motion for (I) an Order (A) Approving Bid Procedures for the Sale of the Debtors' Brand Assets; (B) Approving Certain Bid Protections in Connection with the Debtors' Entry Into Any Potential Stalking Horse Agreements; (C) Scheduling the Auction and Sale Hearing; (D) Approving the Form and Manner of Notice Thereof; and (E) Granting Related Relief; and (II) an Order or Orders (A) Approving the Sale of the Debtors' Brand Assets Free and Clear of All Encumbrances; and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases* [Docket No. 316]. A capitalized term used but not otherwise defined in this paragraph shall have the meaning ascribed to it in the Brand Assets Sale Motion.

[5] *See Order (I) Authorizing the Retention and Employment of Intrepid Investment Bankers LLC as Investment Banker for the Debtors and Debtors In Possession, Pursuant to 11 U.S.C. §§ 327(A) and 328, Nunc Pro Tunc to the Petition Date; (II) Waiving Certain Requirements Imposed by Local Rule 2016-2; and (III) Granting Related Relief*, filed 9/14/2023 [D.I. 280]

Official Committee of Unsecured Creditors Effective as of August 30, 2023 [D.I. 333]. Among the services that FTI was retained to provide are:

- Assistance with the review of the Debtors' analysis of core business assets and potential disposition or liquidation of non-core assets;

- Assistance with the review of the Debtors' cost/benefit analysis with respect to the affirmation or rejection of various executory contracts and leases;

- Assistance in the review of other financial information prepared by the Debtors, including, but not limited to, cash flow projections and budgets, business plans, cash receipts and disbursement analysis, asset and liability analysis, and the economic analysis of proposed transactions for which Court approval is sought;

- Assistance in the review and/or preparation of information and analysis necessary for the confirmation of a plan and related disclosure statement in these chapter 11 proceedings . . . .

*Id*. at 4.

12. The scope of services described in the Jefferies Application necessarily overlaps with FTI's. The Application contemplates that Jefferies will, among other things:

- Become familiar with, to the extent Jefferies deems appropriate, and analyze the business, operations, properties, financial condition and prospects of the Debtors;

- Analyze various Transaction scenarios and the potential impact of these scenarios on the value of the Debtors and the recoveries of those stakeholders impacted by a Transaction;

- Advise the Committee on any capital structure, debt capacity and feasibility issues in connection with any Transaction;

- Assist and advise the Committee in analyzing historical financing transactions;

- Assist and advise the Committee in evaluating and negotiating any Transaction. . . .

*Id*. at 6.

13. Jefferies will perform these duplicative services in service of a function that is only nominally distinct from FTI's: serving as the Committee's "exclusive investment banker" in connection with an "M&A Transaction" (including a merger, stock purchase, asset purchase,

recapitalization or reorganization), and in connection with any "Restructuring" or a "Financing" (each, and together, a "Transaction").[6] *Id.* at 5.

14. As compensation, Jefferies is to receive a monthly flat fee of $125,000[7] and a one-time $2 million "Transaction Fee" if any one of these Transactions occurs, whether or not Jefferies or its client proposes or contributes anything to the Transaction, or whether the Transaction is successful by any benchmark relevant to the Committee or its constituency. For example, if the estates are administratively insolvent and there is a sale of substantially all of the Debtors' assets, a $2 million Transaction Fee is earned—whether the sale is for $1 or $100 million. And there is no requirement that the sale even be a going concern sale, only that substantially all of the Debtors' assets be sold. If a plan of reorganization is confirmed, no matter what the terms (or even whether the plan provides a single cent of recovery to unsecured creditors), as long as plan provides for either a reorganization or the assets being sold as a going concern, the Transaction Fee is earned. Moreover, although a sale must actually be consummated for the sale-related Transaction Fee to be earned, no requirement exists with respect to a plan of reorganization since the fee is triggered by confirmation of a plan without regard to what that plan provides for unsecured creditors and whether that plan even becomes effective. Consequently, the Transaction Fee is not contingent upon the estate receiving any benefit but is nonetheless insulated from review pursuant to section 328(a) of the Bankruptcy Code.

---

[6] Roughly, a "Restructuring" comprises "an offer by any party to convert, exchange or acquire any material outstanding indebtedness, or any similar balance sheet restructuring involving the Debtors" and a Financing is "any material investment by any third party in the Debtors and/or any other financing activities the Debtors engage in…." *Id*. at 5.

[7] Half of the flat fees earned after five months may be applied as a credit against the Transaction Fee. This credit is likely illusory in view of the DIP Financing Milestones, which provide for a prompt disposition of these cases.

**OBJECTION**

15. The Debtors' estates should not bear the cost of another investment banking firm at all, and it certainly should not be saddled with a success fee, particularly when it is not tied to any objective measure of success or contribution to a Transaction.

16. *First*, there is no need for Jefferies' services, and certainly not at the proposed compensation. Although Jefferies is a highly qualified investment banker and typically receives a success fee in its engagements, this is just not that type of case. Its services at best will of a nature that can be provided by FTI, and will have nothing to do with finding alternative transactions for the Debtors' restructuring. So long as Intrepid—the Debtors' retained investment banker—is running the sale process, Jefferies will not be acting in the fulsome role connoted by the label "exclusive investment banker," but in a duplicative or compromised role as advisor and/or valuation expert. As such, the tasks that Jefferies will actually be called upon to perform in order to serve in that advisory capacity – in essence, the financial evaluation of the transactions proposed by the Debtors – are duplicative of tasks that are within the purview of FTI's employment, and FTI is well qualified to perform them. Indeed, FTI has investment bankers. All that distinguishes Jefferies' employment from the services provided by FTI is the label "exclusive investment banker," a label that does not apply here in any meaningful sense.

17. *Second*, the services are not only duplicative but the compensation to be paid for them is grossly excessive. This is evidenced by the terms of FTI's employment. Whereas FTI is compensated on an hourly basis, Jefferies is to receive a $125,000 monthly flat fee *and* a $2,000,000 fee for essentially any approved Transaction. So long as Jefferies is acting solely in an advisory capacity, or as a valuation expert, there is no market basis for such compensation.

18. *Third*, Jefferies cannot independently fulfill even this limited role if the firm is inherently biased and its independence is undermined in favor of achieving a restructuring – any restructuring. Jefferies would be entitled to the Transaction Fee for nothing more than rubber stamping the Debtors' plan. As an "independent" expert, Jefferies would be tainted by the prospect of any "success" fee. *See, e.g.,* Bernstein, Seabury & Williams, "The Empowerment of Bankruptcy Courts in Addressing Financial Expert Testimony," 80 Am. Bankr. L.J. 377, 432 (Summer 2006) ("[T]he existence of a contingency in the retention of an expert should generally result in the disqualification of the expert. An expert who has a 'financial dog in the fight' cannot be objective; his opinion will be swayed by his financial stake and, thus, be inherently unreliable."); *Accrued Fin. Servs., Inc. v. Prime Retail, Inc*., 298 F.3d 291, 300 (4th Cir. 2002) (supplying expert testimony for a contingent fee violates public policy); *see also In re Chemtura Corp*., 439 B.R. 561 (Bankr. S.D.N.Y. 2010) (success fees may be desirable to incentivize investment bankers to find buyers or investors, but materially and adversely affect witness credibility); *In re Granite Broad. Corp*., 369 B.R. 120, 142 (Bankr. S.D.N.Y. 2007) (an expert's testimony "was seriously undermined by the fact that his compensation from the Preferred Holders is contingent on the total consideration to be received by the Preferred Holders under a confirmed plan"); *In re Oneida Ltd*., 351 B.R. 79, 92 (Bankr. S.D.N.Y. 2006) (a valuation expert's retention with a contingency fee "seriously undermine[d]" the expert's credibility).

19. If there are services actually needed by the Committee that FTI cannot provide, which the Committee has not shown, Jefferies can agree to an hourly arrangement. As an independent financial advisor and potential testifying expert, Jefferies should not be entitled to any fee contingent on the approval of any Transaction.

DOCS_LA:351427.4 03703/004

20.  *Fourth*, as set forth below, the Committee does not and cannot satisfy the requirements for approval of the terms of Jefferies' employment under section 328 of the Bankruptcy Code. Accordingly, and alternatively, if Jefferies' retention is approved at all, the Court should require that its compensation be subject to review under section 330 of the Bankruptcy Code, and not section 328(a).

21.  The Committee seeks to retain Jefferies pursuant to sections 327(a) and 328(a) of the Bankruptcy Code. Section 327(a) provides:

> The trustee, with the court's approval, may employ … professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a).

22.  Section 328(a) of the Bankruptcy Code, upon which the Application also relies, provides for retention of professionals on the basis of, among other things, fixed fees that are approved upon their retention, but subject to revisiting at the conclusion of the case under the narrow circumstance that the fee approved up front was "improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." Section 328(a) thus authorizes:

> employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingency fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a).

23. Were Jefferies to seek compensation under section 330 of the Bankruptcy Code, its fees would be subject to review for reasonableness "based on (i) the nature of the services, (ii) the extent of the services, (iii) the value of the services, (iv) the time spent on the services, and (v) the cost of comparable services in non-bankruptcy cases." *In re Busy Beaver Bldg. Ctrs.*, 19 F.3d 833, 840 (3d Cir. 1994). The court, on its own initiative, may "award compensation that is less than the amount of compensation that is requested." 11 U.S.C. § 330(a)(2).

24. But for professionals seeking to be compensated under section 328, as Jefferies would here, a court must make an initial determination of the benefit that the professionals' services will provide a benefit to the estate. This is essential because once the bankruptcy court has determined that the terms and conditions of a professional's retention application are reasonable, under section 328(a), it may thereafter reduce that compensation only if it determines that "such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." *In re Federal Mogul-Global Inc.*, 348 F.3d 390, 397 (3d Cir. 2003). For this reason, section 328 applications require particularly close scrutiny at the outset because the money paid to these professionals will be even more difficult, if not impossible, to disgorge once distributed. *See In re XO Communications, Inc.*, 323 B.R. 330, 339 (Bankr. S.D.N.Y. 2005) ("A finding of improvidence pursuant to section 328 is a difficult determination to make and therefore, courts rarely disturb the original terms and conditions of a professional's employment."); *see also Circle K Corp. v. Houlihan, Lokey, Howard & Zukin, Inc.* (*In re Circle K Corp.*), 279 F.3d 669, 671 (9th Cir. 2002).

25. In its duties as gatekeeper, this Court thus "has an obligation to determine the reasonableness of terms and conditions before authorizing the employment of professionals under § 328(a) and may eliminate, modify, or impose additional terms and conditions to satisfy the

requirement of reasonableness." *In re High Voltage Engineering Corp.*, 311 B.R. 320, 333 (Bankr. D. Mass. 2004). As the applicant seeking approval of Jefferies' employment under section 328(a), the Committee "must establish that the terms and conditions of employment are reasonable, and evidence, not conclusory statements, is required to satisfy that burden." *Id*.

26. Here, the Committee has not done so. Its narrative seeking to justify the retention consists solely of conclusory statements that lack substance and are largely non-responsive to the foregoing concerns:

> [G]iven the uncertainties and exigencies of these cases, Jefferies' services as an investment banker are particularly needed in these cases for at least two reasons. *First*, these are large and complex cases—the Debtors potentially have up to $2.2 billion in debt outstanding, with unsecured creditors holding the lion's share of this amount, including almost $700 million in unsecured bonds, more than $100 million in trade debt, and up to a $1 billion dollars in contract-related claims. Given the magnitude of these claims, as well as the fact that unsecured creditors will likely populate the only non-insider voting class(es) in these cases, the Committee will play a critical role in evaluating all sale and restructuring options available to the Debtors, and it will require the services of both FTI and Jefferies to successfully undertake this evaluation.
>
> *Second*, the extremely compressed timeframe and "toggle" nature of the cases as proposed by the Debtors mandate that the Committee have the services of both a financial advisor and an investment banker at its disposal…. In the event a deal to pursue a plan is not reached, the Debtors would pivot to a sale of substantially all assets pursuant to section 363 of the Bankruptcy Code, and they would then have approximately two months to market and complete a sale of the Lab-to Market™ platform.
>
> It is clear that the Committee will require Jefferies' services with respect to both sides of this "toggle" structure. On the restructuring side, Jefferies will need to evaluate the plan's overall structure, test its assumptions, understand valuation implications, and ultimately weigh in on its feasibility. It may also be required to assist the Committee with assessing the potential equity split and future value considerations that will undergird relevant plan structures. These are all pure investment banking workstreams, and the Committee deserves to have access to Jefferies for this expertise. On the sale side, Jefferies will be expected to assess the marketing efforts

12

> undertaken to date by Intrepid Investment Bankers LLP ("Intrepid"), the Debtors' investment banker, use its connections to bring more potential bidders to the table, and work with Intrepid to ensure that the bids received and the conduct of the auction itself are handled in such a way so as maximize the proceeds ultimately available for the benefit of the Debtors' estates and their unsecured creditors.

Application at 7-8.

27. That the cases are large does not bear on anything more than, hypothetically, the possibility that FTI will have insufficient resources to handle the workload. That is highly unlikely, as FTI would likely concur. That the timeline is "compressed" and there is a toggle structure raises essentially the same issue of resources. The short answer is that if the burden becomes too great for FTI (which is hard to conceive given FTI's vast complement of professionals), then the Committee at that time could seek to retain Jefferies on reasonable hourly terms. The hypothesized need for another professional to "evaluate the plan's overall structure, test its assumptions, understand valuation implications and ultimately weigh in on its feasibility" are services that FTI provides. Finally, there is no need for oversight of Intrepid's marketing efforts, but even if there were, it would not be worth $2 million and $125,000 per month, and the same is true of any hypothetical added value of Jefferies' "connections."

28. On the facts here, none of these rationales support approval of the retention, let alone under section 328. Courts have examined section 328(a) retentions under a nonexclusive list of factors to be considered, including: "(1) whether terms of an engagement agreement reflect normal business terms in the marketplace; (2) the relationship between the Debtor and the professionals, *i.e.*, whether the parties involved are sophisticated business entities with equal bargaining power who engage in an arms-length negotiation; (3) whether the retention, as proposed, is in the best interests of the estate; (4) whether there is creditor opposition to the retention and retainer provisions; and (5) whether, given the size, circumstances and posture of the

13

case, the amount of the retainer is itself reasonable, including whether the retainer provides the appropriate level of "risk minimization," especially in light of the existence of any other "risk-minimizing" devices, such as an administrative order and/or a carve-out." *In re Insilco Techs., Inc.*, 291 B.R. 628, 633 (Bankr. D. Del. 2003). "This list is not intended to be exhaustive, nor will every factor necessarily be of equal weight, depending upon the circumstances." *Id*. at 634.

29.     The Debtors submit that these considerations do not support approval of Jefferies' retention or the proposed terms thereof. Pursuant to the Application, Jefferies is to be compensated as if it were acting as the "exclusive investment banker" for a transaction, when it will actually be acting solely in an advisory capacity, in which role its services are largely duplicative of FTI's and Intrepid's, or potentially as an expert witness, where its testimony would be severely if not entirely compromised by its success fee. In such a scenario, a monthly flat fee of $125,000 and a Transaction Fee of $2,000,000 is flatly unreasonable. Even if the Court were to approve the retention, which it should not, any approval should be subject to review for reasonableness under section 330 of the Bankruptcy Code.

## CONCLUSION

**WHEREFORE**, the Debtors respectfully request that the Court deny the Application, or as a lesser alternative, approve it solely on an hourly-rate basis and subject to review of Jefferies' compensation under section 330 of the Bankruptcy Code.

| | |
|---|---|
| Dated: October 4, 2023 | **PACHULSKI STANG ZIEHL & JONES LLP**<br><br>*/s/ James E. O'Neill*<br>Richard M. Pachulski (admitted *pro hac vice*)<br>Debra I. Grassgreen (admitted *pro hac vice*)<br>James E. O'Neill (DE Bar No. 4042)<br>Jason H. Rosell (admitted *pro hac vice*)<br>Steven W. Golden (DE Bar No. 6807)<br>919 N. Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, DE 19899-8705 (Courier 19801)<br>Telephone: (302) 652-4100<br>Facsimile: (302) 652-4400<br>Email:  rpachulski@pszjlaw.com<br>          dgrassgreen@pszjlaw.com<br>          joneill@pszjlaw.com<br>          jrosell@pszjlaw.com<br>          sgolden@pszjlaw.com<br><br>*Counsel to the Debtors and Debtors in Possession* |