## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC. *et al.*,[1] | Case No.:  23-11131 (TMH) |
| Debtors. | (Jointly Administered) |
| | **Re: Docket No. 334, 446, 450** |

## OMNIBUS REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO (A) OBJECTION OF THE DEBTORS AND (B) OBJECTION OF THE DIP LENDER AND FORIS PREPETITION LENDERS TO THE COMMITTEE'S APPLICATION TO RETAIN JEFFERIES LLC AS INVESTMENT BANKER

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**") of Amyris, Inc. and its affiliated debtors and debtors in possession (collectively, the "**Debtors**") hereby files this reply (the "**Reply**") to (a) *Debtors' Objection To Application Of The Official Committee Of Unsecured Creditors For Entry Of An Order (I) Authorizing The Retention And Employment Of Jefferies LLC As Investment Banker Pursuant To 11 U.S.C. §§ 328(A) And 1103(A)* [D.I. 446] (the "**Debtors' Objection**"); and (b) *Joinder Of Euagore, LLC And The Foris Prepetition Secured Lenders To The Debtors' Objection To Application Of The Official Committee Of Unsecured Creditors For Entry Of An Order (I) Authorizing The Retention And Employment Of Jefferies LLC As Investment Banker Pursuant To 11 U.S.C. §§ 328(A) And 1103(A)* [D.I. 450] (the "**Lenders' Objection**", together with the Debtors' Objection, the "**Objections**").  In support of this Reply, the Committee

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Amyris.  The location of Debtor Amyris, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

also submits the Declaration of Committee member Joshua Wiley, Executive Vice Chairman and CFO of Wiley Companies (the "**Wiley Declaration**"), attached as **Exhibit A**, and the Declaration of Leon Szlezinger, Managing Director and Joint Global Head of Debt Advisory & Restructuring at Jefferies (the "**Szlezinger Declaration**"), attached as **Exhibit B**.

## PRELIMINARY STATEMENT

1.      It is well-established that, as part of discharging its fiduciary duties, an official committee of unsecured creditors may retain advisors, and that such retention decisions should be afforded deference.  The Committee believes that, given the complexity of these cases (which the Debtors have repeatedly acknowledged)[2] and the likelihood of future substantial transactions during these cases, including with the Debtors' insiders, the Committee requires an investment banker so that it can engage on equal terms with the Debtors, the Foris Prepetition Secured Lenders and Euagore, LLC (together, the "**Lenders**") and other stakeholders in these cases, and maximize unsecured creditor recoveries.  After lengthy internal deliberations and multiple rounds of interviews, the Committee retained Jefferies to provide necessary investment banking advisory services in connection with these cases.

2.      Seeking to substitute their judgment for the Committee's, the Debtors and the Lenders take the highly unusual step of objecting not just to the Committee's retention of Jefferies, but to the Committee's retention of any investment banker *at all*.  Notably, the Debtors and the Lenders acknowledge that Jefferies is a "highly qualified investment banker" (Debtors' Obj. ¶ 16),

---

[2]      *See* First Day Hr'g Tr. 9:9-16 (calling the cases "fairly complicated"); *see also* DIP Hr'g Tr. October 4, 2023 18:18-19:5 (Debtors' counsel providing status update to Court and referencing "renegotiations of some extremely complicated agreements," "not be[ing] optimistic about getting this sale done by the end of December," "hav[ing] not had the time we would have wanted to, to engage with the committee and with the bondholders to try to come up with . . a fully consensual plan," "the number of brands that are being sold" and "multiple days of auctions," and not being able to "come today and say things are fantastic and we're ready to go." ).

2

do not deny that investment banking advisory services will inure to the Committee's benefit, and do not challenge the thorough process by which Jefferies was selected.  Rather, the Debtors and the Lenders argue—without offering any evidence—that the Committee does not really need to retain an investment banker and can instead rely on its financial advisor, FTI Consulting, Inc. ("**FTI**") or Intrepid Investment Bankers LLC ("**Intrepid**"), the Debtors' investment banker.  The Court should overrule the Debtors' and the Lenders' Objections and grant the Committee's application to retain Jefferies.

3.      *First,* the Committee has satisfied the low threshold necessary to warrant deference for its decision to retain Jefferies.  There is no dispute that these Chapter 11 Cases—which seek to restructure more than $1 billion of funded debt, including approximately $690 million of unsecured convertible notes and hundreds of millions of dollars of unsecured obligations to trade vendors, litigation counterparties, employees, and other junior stakeholders—are large and complex.  The Debtors operate eight major consumer brands in addition to their core businesses of developing, commercializing, and manufacturing rare molecules through proprietary fermentation processes, and have material operations in the United States, Brazil, the United Kingdom, and Portugal, among other countries.  These cases currently contemplate multiple sale transactions, including the sale of all of the Debtors' operating consumer brands, either on a combined or standalone basis, the sale of certain non-operating assets (which has already resulted in one auction and proposed sale transaction), and a plan or sale process for the remaining parts of the Debtors' businesses.  In other words, there is no dispute that there is significant work relating to multiple asset sales and plan negotiation and confirmation left to be done in these cases.  The Committee determined, after substantial deliberations, that the assistance of an investment banker would ensure that unsecured creditors' interests are adequately represented during these cases and

AMERICAS 125313499

in these transactions, which will be a significant source of unsecured creditors' recoveries in these cases. The Committee's request to retain an investment banker is reasonable and customary under these circumstances, and plainly meets the applicable "deference" threshold.

4.    *Second,* the Debtors' and the Lenders' arguments against Jefferies' retention lack merit. As discussed below, the Committee cannot rely on its financial advisor to perform the investment banking function for which the Committee seeks to retain Jefferies (nor would doing so save any money for the estates). Nor can it rely on Intrepid, which has different fiduciary duties from the Committee and is contractually prohibited from rendering advice to any party other than the Debtors, to address its investment banking needs. Rather, the Committee needs Jefferies so that it can receive expert, industry-specific advice and engage fully in the ongoing sales process and negotiate any future transactions with the Debtors and the Lenders on equal footing. Additionally, the terms of Jefferies' retention—many of which mirror the terms of Intrepid's retention at a significantly lesser cost—are plainly reasonable and should be approved.

5.    Ultimately, the Debtors' and Lenders' Objections reflect nothing more than an entrenched and unreasonable resistance by those parties to spend money on Committee professionals.[3] But the Committee cannot, as the Debtors and Lenders seem to suggest, simply delegate its work and duties to the Debtors and their professionals and trust that those parties will seek the best result for unsecured creditors. That is especially the case here, given that certain of the transactions proposed by the Debtors in these Chapter 11 Cases will primarily benefit the insider secured prepetition and Lenders. Instead, the Committee, as a fiduciary and with the

---

[3]    The Lenders have stated that they "d[o] not consent to the use of cash collateral or the proceeds of the DIP Loan to pay for Jefferies' compensation." Lenders' Obj. ¶ 1. However, pursuant to the reservation of rights added to the proposed final DIP financing order [D.I. 508-1], to the extent that "the Committee is authorized to retain Jefferies in these Chapter 11 Cases," the Final DIP Order definition of "Committee Professionals" should be modified to include Jefferies and the Debtors should be authorized to pay its compensation in accordance with the terms of the Retention Order. D.I. 508-1 ¶ 6(b) n.8.

4

assistance of advisors on par with the Debtors' advisors, must serve as a counter-balance to the Debtors and the insiders to facilitate a favorable outcome for unsecured creditors in these Chapter 11 Cases.

6.      In addition to their unwillingness to pay the freight for the relevant Committee advisors in these complex cases, despite the Committee's measured approach to selecting its advisors and negotiating the terms of their engagement, the Debtors' and Lenders' Objections are indicative of two other unsettling trends in these cases:  delay and a complete lack of cooperation with the Committee as it attempts to fulfill its statutory obligations.  The Debtors filed a plan only last night, and purport to want to negotiate terms and move towards consensus, but at the same time seek to deny the Committee one of its advisors that will be needed for any plan negotiation. They are also, after weeks of ignoring the Committee's document requests, and on the heels of the time-consuming and expensive Lavvan litigation, seeking to initiate another costly, contested litigation over a non-core (to them, not to the Committee) element of these cases.  It is unfortunate that the Debtors have chosen this approach, over trying to advance the plan process and cooperating with the Committee's work.

7.      In the end, it is the Committee's non-delegable fiduciary duty to ensure that the interests of unsecured creditors are fully and properly represented, and the Committee has determined, after substantial deliberations and in the sound exercise of its business judgment, that it requires Jefferies' assistance to do so.  The Court should overrule the Objections and grant the Committee's application to retain Jefferies.

AMERICAS 125313499

# BACKGROUND

### I.   The Debtors' Chapter 11 Cases

8.     On August 9 and August 21, 2023 (each, as applicable, the "**Petition Date**"), the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

9.     On August 27, 2023, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  The Committee consists of the following seven members: (i) Cosan U.S. Inc., (ii) U.S. Bank Trust Company, National Association as Trustee; (iii) Sartorius Stedim North America, Inc.; (iv) Hearst Magazine Media, Inc.; (v) Wiley Companies; (vi) Park Wynwood, LLC.; and (vii) Allog Participacoes, Ltda [D.I. 152].

10.     From the outset of its appointment, the Committee has focused on the risks and uncertainties associated with the "toggle" transactions that form the centerpiece of these Chapter 11 Cases.  Wiley Decl. ¶ 2.  In light of the Debtors' proposed sale process (or processes), as part of an overall "toggle" plan framework, the Committee solicited, shortly after its formation, engagement proposals from firms that provide financial advisory services and/or investment banking services.  Wiley Decl. ¶ 3.  On August 30, 2023, the Committee conducted a remote meeting during which it interviewed eight separate firms.  *Id.*  Following these interviews, the Committee members (and, where applicable, their respective individual advisors) engaged in lengthy discussions with the Committee's counsel, White & Case and Potter Anderson, regarding the qualifications of the firms the Committee had interviewed and the terms on which such firms

6

proposed to be retained.  Wiley Decl. ¶ 4.  The Committee also considered whether it needed the services of one or more advisory firms given the circumstances of these Chapter 11 Cases.  *Id.*

11.     After discussion and deliberation regarding the advisory firms' capabilities and proposed compensation, on August 30, 2023, the Committee unanimously decided to select FTI Consulting, Inc. ("**FTI**") as its financial advisor.  Wiley Decl. ¶ 5.

12.     Also on August 30, 2023, Jefferies participated in a conference call with the Committee and White & Case to discuss Jefferies' possible retention as an advisor to the Committee in the Chapter 11 Cases.  Szlezinger Decl. ¶ 5.  On that call, Jefferies presented its capabilities, experience with similar restructurings and its views on certain issues likely to arise in the Chapter 11 Cases.  *Id.*  The Committee asked questions of Jefferies, including with respect to its credentials and the proposed terms of Jefferies' compensation.  *Id.*

13.     Among other matters, the Committee was presented with materials demonstrating that Jefferies and its senior professionals have extensive experience in the reorganization and restructuring of troubled companies, both out of court and in chapter 11 proceedings.  *Id.*  Jefferies has advised debtors, creditor and equity constituencies, and purchasers in numerous reorganizations in the United States and worldwide.  *Id.*  Since 2007, Jefferies has been involved in over 250 restructurings representing more than $550 billion in restructured liabilities.  *Id.*

14.     In addition, Jefferies apprised the Committee of the strength and expertise of its Beauty & Wellness Investment Banking group, which Jefferies identified as important given the Debtors' contemplated sale of their performing and non-performing consumer brands.  *Id.* ¶ 6.  Jefferies further underlined the credentials and reputation of its Specialty Chemicals Investment Banking group, which Jefferies presented as critical given the complex and highly technical nature of the Debtors' core ingredients businesses and Jefferies' prior engagement by the Company.  *Id.*

AMERICAS 125313499

In addition, Jefferies explained its presence in the Brazil market, where a material portion of the Debtors' operations and certain Committee members are located. *Id.*

15.     Following the call with the Committee, White & Case contacted Jefferies on the Committee's behalf to further discuss its potential retention and, specifically, Jefferies' proposed compensation. *Id.* ¶ 7. After further vigorous discussion, deliberation, and arms-length negotiations regarding the proposed fee structure, Jefferies agreed to modify its proposed compensation by reducing its Transaction Fee from $2,750,000 to $2,000,000. *Id.*

16.     On September 1, 2023, the Committee unanimously selected Jefferies as its investment banker. Wiley Decl. ¶ 6.

17.     As noted, one of the topics the Committee considered at length was the need to avoid unnecessary duplication of work from the retention of separate financial and investment banking advisors. Wiley Decl. ¶ 8; Szlezinger Decl. ¶ 8. To this end, at the outset of their engagements, FTI and Jefferies prepared, at the Committee's request, a presentation describing the discrete tasks that each firm agreed to perform. Wiley Decl. ¶ 8; Szlezinger Decl. ¶ 8. A copy of that presentation is attached to the Szlezinger Declaration, **Exhibit 1**. Both Jefferies and FTI have significant experience performing discrete roles in dual financial advisor/investment banker chapter 11 representations, and have worked together on behalf of numerous unsecured creditor committees in these same capacities. Szlezinger Decl. ¶ 8. Accordingly, the Committee is confident that both firms will be able to avoid duplication of effort.

18.     In sum, Jefferies, as investment banker, is responsible for assisting and advising the Committee on the current (and any future) sale processes, including whether any bids are viable and advisable under the circumstances, any potential or proposed restructuring, the status and prospects in the capital markets, and capital markets aspects of any avoidance actions, including

8

potential testimony related thereto.  Szlezinger Decl. ¶ 9.  Jefferies has and will continue to provide the Committee with independent analysis of the proposals and alternatives available to the Debtors as they seek to sell or restructure their businesses.  *Id.*  Jefferies will also assist with plan negotiations if the Debtors head down that path and provide valuation analysis and expert testimony on value and plan feasibility, as needed.  *Id.*  Notably, the majority of Jefferies' fees are earned in the form of a Transaction Fee which will only be earned in the event that a Transaction, as reflected in a chapter 11 plan confirmed by the Bankruptcy Court, is consummated.  *Id.*

19.    By contrast, FTI's primary responsibility is to review and analyze the financial aspects of the Debtors' complex day-to-day businesses and the administration of the Chapter 11 Cases.  *Id.* ¶ 10.  This role is complementary, and in no way duplicative, of Jefferies' role.  *Id.*  As befits its specific expertise and industry reputation, FTI's focus has been on, among other things, reviewing and analyzing financial disclosures and information, issues related to assumption or rejection of executory contracts, tax issues, employee retention and compensation plans, operating plan and projections, claims analysis and reconciliation, intercompany activities and claims, liquidity and cash flow, and operating results.  *Id.*  FTI will also perform an investigation of potential avoidance actions and other claims against insiders and third parties.  *Id.*  Where warranted, Jefferies will coordinate with FTI in connection that investigation.  *Id.*

20.    Jefferies' projected compensation is on the lower end of the range of aggregate compensation approved for investment bankers in comparable cases.  *Id.* ¶ 11 & ex. 2.  Further, the terms of Jefferies' proposed engagement in this case, including its retention under section 328(a) of the Bankruptcy Code, are consistent with customary terms for engagements of this nature.  *Id.* ¶ 12.  Significantly, the engagements of both Jefferies and Intrepid, the Debtors' investment banker, are subject to approval under section 328(a), which, in Intrepid's case, has

AMERICAS 125313499

already been granted.  *Id.*  Jefferies' fee structure, including the amount of its Monthly Fee and the terms of its Transaction Fee, are on the lower end of the market range and fair in light of the assigned tasks that Jefferies anticipates undertaking under the agreed division of labor with FTI.  *Id.*

21.     Jefferies has already devoted significant time and resources to this matter.  *Id.* ¶ 13. To date Jefferies has, among other things, provided input on the Debtors' DIP financing, reviewed and commented on draft marketing and presentation materials prepared by Intrepid in connection with the Consumer Brands sale process, analyzed and provided input on bid procedures, analyzed and augmented Intrepid's list of potentially interested bidders, and regularly advised the Committee and its other professionals on the status of the sale process.  *Id.*  Jefferies has also assisted the Committee in evaluating the Debtors' dual track process of pursuing a plan of reorganization as it pertains to potential value for unsecured creditors.  *Id.*  As the Debtors' Plan process progresses, Jefferies anticipates that it will, among other things, analyze indications of interest from potential bidders, provide input on the designation of qualified bidders, provide comments on mark-ups of asset purchase agreements and be active at the auction on behalf of the Committee in its role as a consultation party.  *Id.*

## **REPLY**

I.   **The Committee's Decision to Retain Jefferies Was a Necessary and Proper Exercise of its Fiduciary Duties.**

22.     It is well established that "[i]n performing its duties, the committee may employ counsel or other professionals to represent it."  *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) ("The committee members and the debtor are entitled to retain professional services to assist in the reorganization."); *In re ABC Auto. Prod. Corp., 210 B.R. 437, 442 (Bankr. E.D. Pa. 1997)*; *see also* 11 U.S.C. § 1103(a) ("[W]ith the court's approval, such committee may select and authorize the employment by such committee of one or more attorneys, accountants, or other

10

agents, to represent or perform services for such committee."). Courts have held that a Committee's decision to employ professionals should be afforded deference, consistent with a "business judgment" standard. *See, e.g.*, *Exco Resources, Inc. v. Milbank, Tweed, Hadley & McCloy LLP (In re Enron Corp.)*, No. 02 Civ. 5638(BSJ), 2003 WL 223455, at *4 (S.D.N.Y. 2003) (providing that a committee's decision to employ a professional under section 1103 should be given deference); *United Artists Theatre Co. v. Walton*, 315 F.3d 217, 233 (3d Cir. 2003) (finding the business judgment rule "well suited" to considering debtors' professional retentions in the bankruptcy context); *In re Caldor, Inc.*, 193 B.R. 165, 170 (Bankr. S.D.N.Y. 1996) ("Public policy favors permitting parties to retain professionals of their choice.").

23.     The Committee's decision to retain Jefferies as its investment banker more than meets this standard. The Debtors have acknowledged that these Chapter 11 Cases are "fairly complicated"[4] and with a "complex set of entities where things are held."[5] Indeed, the Debtors generated revenue of over $250 million in 2022,[6] operate eight major consumer brands in addition to their core businesses of developing, commercializing, and manufacturing rare molecules through proprietary fermentation processes, and have material operations in the United States, Brazil, the United Kingdom, and Portugal, among other countries. The Debtors commenced these cases to restructure over $1 billion of funded indebtedness, including approximately $690 million of unsecured convertible notes and hundreds of millions of dollars of unsecured obligations to trade vendors, litigation counterparties, employees, and other junior stakeholders. *Id.* at ¶ 50. These cases currently contemplate the sale of all of the Debtors' operating consumer brands either

---

[4]     *See* First Day Hr'g Tr. 9:9-16.

[5]     *See* Second Day Hr'g Tr. 42:20-21.

[6]     *See* First Day Declaration ¶ 59.

AMERICAS 125313499

on a combined or standalone basis, the sale of certain non-operating assets (which has already resulted in one auction and proposed sale transaction), and a plan or sale process for the remaining parts of their businesses.  The Debtors filed a plan and disclosure statement on October 13, 2023.[7]

24.    In these circumstances, it is essential for the Committee to retain an investment banker to guide it through these complicated transactions and help it to maximize value for unsecured creditors.  Additionally, the Committee will need an investment banker to represent the Committee in discussions and negotiations with the Debtors and the Lenders, both of whom will be represented by financial advisors of their own choosing.  And if a dispute ever arises regarding a proposed transaction—particularly a proposed transaction between the Debtors and their DIP Lender insiders—the Committee will be at a significant disadvantage if, unlike the Debtors and the Lenders, it lacks an expert capable of supporting the Committee's litigation position.

25.    In addition to reflecting a real need for investment banking services, the Committee's decision to retain Jefferies is also reasonable.  Indeed, it is customary in cases of this size and complexity for Committees to retain investment bankers.  *See, e.g.*, *In re Yellow Corp.*, No. 23-11069 (Bankr. D. Del. October 4, 2023), D.I. 764 (committee investment banker retention order); *In re Wesco Aircraft Holdings, Inc.*, No. 23-90611 (Bankr. S.D. Tex. Sept. 6, 2023), D.I. 721 (same); *In re Kidde-Fenwal, Inc.*, No. 23-10638 (Bankr. D. Del. Aug. 22, 2023), D.I. 363 (same); *In re Envision Healthcare Corp.*, No. 23-90342 (Bankr. S.D. Tex. Aug. 15, 2023), D.I. 1338 (same); *In re Sorrento Therapeutics, Inc.*, No. 23-90085 (Bankr. S.D. Tex. July 27, 2023), D.I. 1111 (same); *In re Genesis Global*, No. 23-10063 (Bankr. S.D.N.Y. April 13, 2023), D.I. 219 (same).

---

[7]    [D.I. 523, 524].

AMERICAS 125313499

26.     In such cases, moreover, courts have not hesitated to reject efforts by debtors and secured lenders to limit a committee's discretion and deny committee access to the services of an investment banker.  In *In re Southland Royalty Co., LLC, Case*, No. 20-10158 (KBO) (Bankr. D. Del. May 8, 2020), for example, the debtors and secured lenders opposed the retention by the official committee of both a financial advisor and an investment banker.  The *Southland* debtors and lenders argued that the Committee did not need an investment banker for many of the same reasons advanced by the Debtors and the Lenders in these cases.  Judge Owens was not persuaded by these arguments, finding instead that the committee had acted "reasonably" when "in its business judgment the committee ha[d] determined that it require[d] the aid of two financial advisors to accomplish those tasks and to fulfill their duties."  *Id.* (May 8, 2022 Hr'g Tr. at 57:21-58:1).[8]  Her decision turned, in part, on the fact that "uncertainty" about the course that case would take had "played a part in [the committee's] decision-making," and that such uncertainty showed no signs of abating and thus warranted the retention of an investment banker.  *Id.*; see *In re iHeartmedia*, Inc. Case No. 18-31274 (Bankr. S.D. Tex. May 30, 2018), D.I. 864 (approving retention by committee of investment banker after initial objection by prepetition term lenders).[9]

27.     Moreover, the record demonstrates (and the Debtors and the Lenders do not dispute) that the Committee considered Jefferies' retention carefully in the specific context of these

---

[8]     An excerpt of the transcript is attached hereto at **Exhibit C**.

[9]     Courts (like in *Southland*) have resisted Lenders' efforts to deprive committees of their chosen professionals, and in so doing echoed more broad-based warnings against allowing overbearing Lenders to "run roughshod over numerous sections of the Bankruptcy Code" and "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit" of the secured creditor.  *In re Tenney Vill. Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989); *see In re Berry Good, LLC*, 400 B.R. 741, 747 (Bankr. D. Az. 2008) ("[B]ankruptcy courts do not allow terms in financing arrangements which convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender"); *see also Resolution Tr. Co. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores Inc.)*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992); *Gen. Elec. Capital Corp. v. Hoerner (In re Grand Valley Sport & Marine, Inc.)*, 143 B.R. 840, 852 (Bankr. W.D. Mich. 1992) (same); *In re Ames Dep't. Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (same).

AMERICAS 125313499

Chapter 11 Cases.  As described in more detail in the Wiley Declaration, the Committee carefully considered the need for an investment banker and ultimately selected Jefferies after interviewing several financial advisory firms, investment banks and firms providing joint investment banking and financial advisory services.

28.     The Committee also has instructed FTI and Jefferies to take steps to ensure that they do not duplicate efforts, and it has satisfied itself that both firms are committed to this goal.

29.     Despite the Committee's reasoned decision to retain Jefferies, the Debtors and the Lenders argue—without any supporting evidence—that unsecured creditors do not need the benefit of an investment banker.  These arguments lack merit.

30.     *First*, the Debtors assert, in conclusory fashion, that "FTI has investment bankers" and is "well qualified" to do the work that Jefferies would do.  Debtors' Obj. ¶ 16.  This argument is misplaced.  The question is not whether FTI is capable of providing investment banking services generally, but whether it can provide such services of the kind needed in these Chapter 11 Cases. The Debtors and the Lenders do not argue, much less demonstrate, that this is the case.  To the contrary, after extensive consideration, including interviews and discussions with advisors, the Committee determined that FTI does not have the industry experience or foreign markets expertise that Jefferies possesses, which the Committee views as essential to advising regarding the complicated, large, and foreign sale process (or processes) contemplated here.   First Day Declaration ¶ 69.  The Debtors and the Lenders, having done none of the work that the Committee did in reaching this conclusion, are in no position to substitute their judgment for the Committee's.

31.     The Debtors' alternative contention that the Committee does not need an investment banker of its own and, instead, can rely on the efforts of Intrepid—the "Debtors' retained investment banker [who] is running the sale process"—is equally without merit.  Debtor

Obj. ¶ 16.  It is undermined both by the precedent cited above, the fact that Intrepid owes duties that are different from those of the Committee, and the terms of Intrepid's own engagement agreement, which permits it to render advice only to the Debtors and precludes the Committee from relying on any advice offered by Intrepid.  *See* Intrepid Retention Application [D.I. 139] Ex. B (Engagement Agreement) § A ("The Company agrees that the advice rendered to it by Intrepid may not be relied upon by any other person or entity or used for any purpose except as contemplated in this Agreement."); *id.* § I ("No one other than the Company is authorized to rely upon the engagement of Intrepid here under or any statements, advice, opinions or conduct by Intrepid").  In light of these facts, any argument that Jefferies can have only a "duplicative or compromised role as advisor and/or valuation expert" (Obj. ¶ 16) is meritless.

32.     *Second*, the Debtors and the Lenders mistakenly argue that hiring Jefferies, rather than using FTI, will cost the estates more money.  This argument is simply wrong.  As an initial matter, the Debtors and the Lenders ignore that if FTI were to supplement its existing services with investment banking services, as the Debtors and the Lenders propose, it would necessarily revise its fee structure to charge more, diminishing or even eliminating any purported savings to the estates.  Moreover, if FTI's investment banking affiliate were brought in to provide investment banking services, that affiliate would likely not work under a financial advisor hourly structure but under an investment banking transaction fee structure, like Jefferies.  *See In re MobiTV, Inc.*, No. 21-10457 (Bankr. D. Del), D.I. 77, 127 (providing for an hourly fee for financial advisory services, and a transaction-based fee for investment banking services); *In re Francesca's Holdings Corp.*, No. 20-13076 (Bankr. D. Del), D.I. 261 (similar); *see also In re Surgalign Holdings, Inc.*, No. 23-90731 (Bankr. S.D. Tex.), D.I. 258 (similar for two Alvarez & Marsal affiliates).  Finally, the Debtors and the Lenders ignore that, by providing investment banking advisory services to the

AMERICAS 125313499

Committee, Jefferies will endeavor to create value for unsecured creditors by assisting the Committee in identifying and negotiating a value-maximizing transaction, which the Committee believes will far outstrip the costs to the estates.

## II.    Jefferies and FTI Are Performing Separate and Distinct Work for the Committee

33.    The Debtors and Lenders allege that Jefferies will duplicate the work of FTI.  But the Debtors' own Objection demonstrates that this is false.  Specifically, the Debtors list several items from the scope of work contained in FTI's and Jefferies' engagement letters.  This comparison, although apparently intended to highlight similarities, actually underscores key differences.

34.    As demonstrated in the Debtors' Objection, the Jefferies engagement letter focuses almost entirely on providing advisory services in connection with a potential "Transaction," including "Advise the Committee on any capital structure, debt capacity and feasibility issues in connection with any Transaction"; "Assist and advise the Committee in evaluating and negotiating any Transaction"; and "Analyze various Transaction scenarios and the potential impact of these scenarios on the value of the Debtors and the recoveries of those stakeholders impacted by a Transaction."  Debtors' Obj. ¶ 12.

35.    By contrast, none of the excerpts that the Debtors cite from FTI's engagement letter mentions a "transaction."  Instead, these excerpts focus on general case milestones such as "Assistance with the review of the Debtors' cost/benefit analysis with respect to the affirmation or rejection of various executory contracts and leases" and "Assistance in the review and/or preparation of information and analysis necessary for the confirmation of a plan and related disclosure statement in these chapter 11 proceedings."  Debtors' Obj. ¶ 11.  This is exactly the type

16

of work one would expect a financial advisor in a chapter 11 case to perform—and has nothing to do with the transaction-focused work identified in Jefferies' engagement letter.[10]

36.     Moreover, as noted above, one of the issues that the Committee considered in determining to retain a separate financial advisor and investment banker is the need to avoid duplication of effort.  Both FTI and Jefferies have affirmed their commitment to this goal, including by formulating and assenting to the "division of labor" workplan set forth in Exhibit 1 to the Szlezinger Declaration.  Both Jefferies and FTI have significant experience performing discrete roles in chapter 11 representations and have worked together on behalf of numerous unsecured creditor committees in these same capacities and—based on this division of labor, the Committee satisfied itself that both firms would be able to avoid duplication of effort.  The Debtors and the Lenders offer no evidence to the contrary.

### III.     The Terms and Conditions of the Jefferies' Retention Are Reasonable and Should be Approved under Section 328(a) of the Bankruptcy Code

37.     In a final bid to block the Committee, the Debtors make a series of arguments attacking the terms of Jefferies' retention.  None has merit.

38.     *First*, the Debtors and Lenders argue that Jefferies' fees are unreasonable, specifically the $2 million Transaction Fee.  However, the Transaction Fee is reasonable given the size of the transactions contemplated in these Chapter 11 Cases and falls on the lower end of similar fees that are regularly charged by investment bankers and approved by courts in this and other Circuits.  *See* Szlezinger Declaration, Ex. B (citing to fourteen transactions of comparable size and complexity where similar fees were approved) (the "**Fee Comparison**").  Moreover, the

---

[10]    While Jefferies' engagement letter contemplates that Jefferies, like FTI, will "[b]ecome familiar with, to the extent Jefferies deems appropriate, and analyze the business, operations, properties, financial condition and prospects of the Debtors," this is work that Jefferies must do as a predicate to advising on any transaction and is not the focus of Jefferies' work for the Debtors, as the other tasks identified in the engagement letter demonstrate.

17

Debtors' and Lenders' complaint that the Transaction Fee is earned upon the consummation of a Transaction, be it a sale or a restructuring, with no additional requirements or benchmarks, lacks merit. Debtors' Obj. ¶ 14; Lenders' Obj. ¶ 1. It is market for investment bankers to earn a fee upon the achievement be it a sale or a restructuring, without additional thresholds. *See In re Yellow Corporation*, Case No. 23-11069 (CTG) (Bankr. D. Del. Oct. 4, 2023) [D.I. 764] (order approving $3.75 million transaction fee for investment banker); *In re Kiddie-Fenwal, Inc.*, Case No. 23-10638 (LSS) (Bankr. D. Del. Aug. 22, 2023) [D.I. 363] (order approving $4 million deferred fee payable upon confirmation of structuring plan or liquidation); *In re Cineworld Group PLC*, Case No 22-90168 (MI) (Bankr. S.D. Tex. Oct. 28, 2022) [D.I. 661] (order approving a $6.25 million deferred fee payable upon achievement of transaction). Indeed, the Debtors' own investment banker will earn a $3 million fee for a "Restructuring"—$1 million *more* than the Transaction Fee Jefferies would receive. Intrepid Retention Application ¶ 17(a). What's more, Intrepid will also receive a "Sale Fee" upon the consummation of any Sale, in an amount equal to the greater of $4,500,000 plus 1.5% of the Aggregate Consideration greater than $250,000,000. Intrepid Retention Application ¶ 17(a).[11] Jefferies will receive no such additional payouts.[12]

39.     *Second*, Jefferies' fee structure, which conforms with industry standards, does not create any conflict. Indeed, as shown above, the Debtors' investment banker has a nearly identical fee structure to Jefferies' structure, yet the Debtors do not explain why their advisor's fee structure does not give rise to similar concerns. Moreover, the cases the Debtors cite to suggest a conflict

---

[11]    Additionally, Intrepid receives a Monthly Fee of $150,000, 20% more than Jefferies' monthly fee of $125,000. Intrepid Retention Application ¶ 17(b).

[12]    In contrast, Intrepid's fee structure clearly states: "(i) more than one fee may be payable to Intrepid under the Restructuring Fee and Sale Fee subsections above in the event of a sale of the Consumer Brands Business, whether in connection with any single Transaction or series of Transactions, and (ii) the fees payable to Intrepid under the Monthly Fee and Financing Fee subsections, as applicable, shall be paid in addition to any fee payable under Restructuring Fee and Sale Fee subsections." D.I. 280 ¶ 4.f.

AMERICAS 125313499

all pertain to inapposite situations where an expert earned a percentage of, or other interest in, the transaction amount. *The Empowerment of Bankruptcy Courts in Addressing Financial Expert Testimony*, 80 Am. Bankr. L.J. 377, 432 (citing *In re Oneida Ltd.*, 351 B.R. 79, 92 (Bankr. S.D.N.Y. 2006)) (finding a witness's expert testimony "seriously undermine[d]" where the witness's firm had been hired by the equity committee with a success fee of 1% of any equity recovery); *Accrued Fin. Servs., Inc. v. Prime Retail, Inc.,* 298 F.3d 291, 300 (4th Cir. 2002) (holding that expert testimony violated public policy where expert witness took assignment of cause of action); *In re Granite Broad. Corp.,* 369 B.R. 120, 142 (Bankr. S.D.N.Y. 2007) (expert's testimony "was seriously undermined by the fact that his compensation from the Preferred Holders is contingent on the total consideration to be received by the Preferred Holders under a confirmed plan"). That is not the case here, where Jefferies (like Intrepid) stands to earn only a flat transaction fee.

40.     *Finally*, section 328(a) of the Bankruptcy Code provides that a committee appointed in a chapter 11 case may employ a professional person "on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis." 11 U.S.C. § 328(a). In deciding whether to approve the retention of an investment banker under section 328(a), the appropriate inquiry is whether the terms of the retention are fair and reasonable, and the retention is in the best interest of the estate. *In re Insilco Techs., Inc.*, 291 B.R. 628 (Bankr. D. Del. 2003). In making such determination, courts consider a non-exhaustive list of factors, including the following:

    a.  Whether the terms of engagement reflect normal business terms in the marketplace;

    b.  Whether the parties are sophisticated entities with equal bargaining power who engaged in an arm's length negotiation;

AMERICAS 125313499

  c. Whether the retention is in the best interests of the estate;

  d. Whether there is creditor opposition to the retention and the compensation provisions; and

  e. Whether, given the size, circumstances and posture of the case, the amount of compensation is reasonable.

See *Insilco Techs.*, 291 B.R. at 634.  Courts have noted that, in evaluating the reasonableness of a professional's proposed retention under section 328(a), not "every factor [will] necessarily be of equal weight, depending upon the circumstances." *See id*.  All of these factors are met here.

41. *First*, the terms of Jefferies' engagement reflect, as illustrated by the Fee Comparison, normal business terms in the marketplace.  Indeed, these terms are similar to—and less costly than—those of the Debtors' investment banker, Intrepid.

42. *Second*, Jefferies and the Committee are sophisticated entities with equal bargaining power.  As discussed above, the Committee interviewed multiple investment bankers, and after considering both the expertise of, and the requested compensation for, each investment bank, selected Jefferies.  The Committee and Jefferies then engaged in an arm's-length negotiation, following which Jefferies agreed to a material reduction to its proposed fee structure.  As noted in the Wiley Declaration, Jefferies is a large, experienced, and knowledgeable firm that has handled restructurings of similar complexity and scale, and is well-equipped to assist the Committee in discharging its duties.

43. *Third*, the retention is in the best interests of the estate and unsecured creditors because it will help the Committee to maximize recoveries for unsecured creditors in an amount that will likely far outstrip any fees Jefferies may charge in connection with its work.  Jefferies possesses industry relationships and market knowledge that Intrepid does not have, and it will provide necessary oversight to the sale process.  These considerations are particularly relevant here, where the potential transactions in these Chapter 11 Cases will primarily benefit the Debtors'

AMERICAS 125313499

insider secured prepetition and Lenders.  Indeed, circumscribing the Committee's discretion with respect to choosing retained professionals would facilitate the Lenders' ability to dictate the course of the case, thus enabling the Debtors' insiders to control the process and more easily achieve their ends at the expense of other stakeholders.

44.     Under such circumstances, the Committee cannot simply assume that the Debtors' professionals will seek the best result for unsecured creditors.  Rather, it is the Committee's fiduciary duty to unsecured creditors to ensure that their interests are fully and properly represented, and the Committee has determined, after substantial deliberations and in the sound exercise of its business judgment, that it requires Jefferies' assistance to do so.

45.     *Fourth*, there is no creditor opposition to the retention of Jefferies.  The Committee members voted unanimously to retain Jefferies as investment banker, and no unsecured creditor has filed an objection to Jefferies' retention.  In addition, statements in support of the Application have been filed by the Ad Hoc Noteholder Group and the Ad Hoc Cross-Holder Group, highlighting that there is broad non-insider creditor support for Jefferies' retention.

46.     *Finally*, given the size, circumstances and posture of the case, the amount of compensation is reasonable.  Courts in this circuit have recognized that "what constitutes 'reasonable' compensation for professionals, takes a 'market-driven' approach." *In re Insilco*, 291 B.R. at 633–34 (quoting *In re Busy Beaver Bldg. Ctrs., Inc.*, 19 F.3d 833, 852 (3d Cir. 1994)); *see also In re XO Commc'ns, Inc.*, 323 B.R. at 343 (adopting a "'market driven' approach").  Neither the Lenders nor the Debtors have provided any evidence—much less any market-based evidence— that Jefferies' fees are unreasonable.  To the contrary, as the Committee has noted above based upon the comparable transaction fee analysis annexed to the Szlezinger Declaration, Jefferies' Transaction Fee is market—indeed, at the demonstrably low end of the market based on transaction

fees in other similar cases.  Moreover, approval of its fees structure under section 328(a) is a condition precedent to Jefferies' retention, and Jefferies therefore has the right to walk away from its retention if its fee structure is not approved.[13]  Such a result would be disastrous for these cases, as Jefferies has already spent weeks analyzing the Debtors and their businesses and assets and working cooperatively on the sale process of the Consumer Brands.  Requiring the Committee to find another investment banker at this late stage and after expending considerable time, effort and expense would unduly prejudice creditors and the estates.

47.     For these reasons, the requirements of section 328(a) are satisfied, and Jefferies' retention should be approved.

## <u>CONCLUSION</u>

48.     WHEREFORE, the Committee respectfully requests for the foregoing reasons that the Court overrule the Objections, enter an order approving the Jefferies Retention Application, and grant such other and further relief as may be just and proper.

*[Remainder of page intentionally left blank]*

---

[13] This is a common term for investment bankers in chapter 11 cases, including Intrepid.  *See* Intrepid Engagement Letter p. 3 ("Intrepid shall be under no obligation to provide any services under this Agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless Intrepid's retention under this Agreement is approved under Section 328(a) of the Bankruptcy Code by final order of the Bankruptcy Court in a form which is reasonably acceptable to Intrepid").

AMERICAS 125313499

Dated: October 13, 2023
          Wilmington, Delaware

Respectfully submitted,

*/s/ Sameen Rizvi*
Christopher M. Samis (No. 4909)
Katelin A. Morales (No. 6683)
Sameen Rizvi (No. 6902)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile:  (302) 658-1192
Email:    csamis@potteranderson.com
              kmorales@potteranderson.com
              srizvi@potteranderson.com

-and-

**WHITE & CASE LLP**
Gregory F. Pesce (admitted *pro hac vice*)
Andrew F. O'Neill (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606
Telephone: (312) 881-5400
Facsimile:  (312) 881-5450
Email:  gregory.pesce@whitecase.com
              aoneill@whitecase.com

-and-

**WHITE & CASE LLP**
Samuel P. Hershey (admitted *pro hac vice*)
John Ramirez (admitted *pro hac vice*)
Andrea Kropp (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
Email: sam.hershey@whitecase.com
              john.ramirez@whitecase.com
              andrea.kropp@whitecase.com

*Counsel for the Official Committee*
*of Unsecured Creditors*

AMERICAS 125313499