IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AMYRIS, INC., *et al.*,<br><br>  Debtors.¹<br><br>LAVVAN, INC.,<br><br>  Plaintiff,<br><br>  v.<br><br>FORIS VENTURES, LLC,<br><br>  Defendant. | Chapter 11<br><br>Case No. 23-11131 (TMH)<br><br>(Jointly Administered)<br><br><br><br>Adversary No. _____ |

**CHALLENGE-PERIOD ADVERSARY COMPLAINT TO CHALLENGE ENFORCEABILITY, PRIORITY, AND EXTENT OF SECURITY INTERESTS AND LIENS, AND FOR OTHER RELIEF**

Plaintiff, Lavvan, Inc., for its challenge-period adversary complaint against defendant, Foris Ventures, LLC,² alleges as follows:

**NATURE OF THE ACTION**

1. Defendant, Foris Ventures, LLC ("Foris"), an entity under the control of powerful multi-billionaire Amyris insider L. John Doerr, exploited its position and leverage to maintain the appearance of an outstanding loan balance on what was originally a $36 million loan issued by GACP Finance Co., LLC ("Great American") in June 2018. Foris did so by repeatedly

---

¹ A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

² Lavvan brings this complaint pursuant to paragraph 11 of the DIP Order (Dkt. 558), solely to assert a timely challenge to that Order. Lavvan reserves all rights with respect to any and all other rights and claims against defendant or its affiliates.

RLF1 29855614v.1

purporting to "amend" the loan agreement—changing every one of its major terms, many beyond recognition from the original agreement. Foris's goal in doing so was to exploit a Subordination Agreement it had entered with Lavvan, hoping to maintain a priority position over Lavvan's important security interest in an extensive portfolio of Amyris intellectual property, including hundreds of valuable patents as well as numerous trademarks for Amyris's valuable brands, such as Biossance and Pipette, among others.

2. For the reasons described herein, Foris's machinations with the loan—and exploitation and misuse of its insider position to do so—preclude Foris from relying on the purported continued existence of the 2018 Great American loan as a basis for subordinating Lavvan's liens and claims to Foris or any other party.

3. Additionally, any portions of the DIP Order that deem the "Primed Liens" to include any liens of Lavvan or that deem the "Priming Liens" to be senior to any liens of Lavvan as a matter of contract pursuant to the Subordination Agreement should be vacated, as they are based on the erroneous premise that Foris was entitled to rely on the purported continued existence of the 2018 Great American loan as a basis for enforcing the Subordination Agreement.

## PARTIES

4. Plaintiff, Lavvan, is a Delaware corporation which had its principal place of business in New York, New York, and offices in Toronto, Ontario. Incorporated in 2019, Lavvan was formed to commercialize high-quality cannabinoid ingredients for a range of industries, including health, beauty and cosmetics, food and beverage, and pharmaceuticals.

5. Defendant, Foris, is a Delaware limited liability company with its principal place of business in California. Foris is controlled by its Principal, L. John Doerr, who also sits on Amyris's board of directors. At least one other Foris partner, Ryan Panchadsaram, also sits on

Amyris's board of directors. Foris is also an affiliate of Euagore, LLC, the DIP lender in this matter.

## JURISDICTION AND VENUE

6. This Court has jurisdiction pursuant to Title 11 of the United States Bankruptcy Code, as well as 28 U.S.C. §§ 1334 and 2201.

7. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Plaintiff confirms its consent to the entry of final orders or judgments by the Court in connection with this matter.

8. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## GENERAL ALLEGATIONS

**A. Amyris's Astonishing Technology**

9. Amyris holds the keys to a remarkable technology that sounds like the stuff of science fiction: Amyris uses "synthetic biology" to develop, manufacture, and commercialize rare molecules that can be used for anything from medicines to fragrances to emollients for skin moisturization. Amyris's technology combines molecular biology and genetic engineering and leverages state-of-the-art machine learning, robotics, and artificial intelligence. The backbone of these remarkable technological capabilities is Amyris's valuable portfolio of intellectual property.

**B. Amyris's Multi-Billionaire Puppet-Master, John Doerr**

10. Amyris is under the de facto control of multi-billionaire John Doerr, chairman of the venture capital firm Kleiner Perkins. *Forbes* estimates Doerr's current net worth as over $10 billion and lists him as the 223rd richest person in the world.

11. As Amyris's interim CEO acknowledged in his First Day Declaration, Doerr not only sits on Amyris's board of directors, but also has made substantial equity investments in the

company and has provided substantial loans to the company. As of Amyris's bankruptcy, Foris and related entities, all controlled by Doerr, held "approximately 30% of the Company's issued and outstanding equity interests," and meanwhile had loaned Amyris a purported aggregate principal outstanding amount of "at least" $295 million, "*plus* accrued and unpaid nondefault interest, additional fees, costs, expenses, and other obligations." First Day Decl. at 19 & n.9.

12. With direct, real-time access to Amyris's management and board (by email, cell phone, or text message whenever he wishes) as well as massive stakes in the company as both equity holder and creditor, Doerr is the 800-pound gorilla behind Amyris.

**C. Amyris's Business Struggles**

13. Despite the sophistication and tremendous potential of its technology and intellectual property, Amyris foundered as a business. Amyris itself stated in its annual report for 2018: "We have incurred significant operating losses since our inception, and we continue to incur losses and negative cash flows from operations for at least the next 12 months . . . ." As of December 31, 2018, Amyris had "negative working capital of $119.5 million and an accumulated deficit of $1.5 billion." Amyris Form 10-K for 2018.

**D. Amyris's 2018 Great American Loan**

14. In June 2018, Amyris entered a secured term loan facility with Great American for an aggregate principal amount of up to $36 million and borrowed the full amount available under the facility. The loan agreement also provided for the potential availability of an incremental secured term loan facility in an aggregate principal amount of up to $35 million, subject to certain conditions and approvals, to fund the construction of a custom-built manufacturing facility in Brazil.

15. The 2018 Great American loan had a maturity date of July 1, 2021.

**E. Lavvan's Collaboration with Amyris to Produce Biosynthetic Cannabinoids**

16.     In late 2018, members of Lavvan's founding team initiated discussions with Amyris about a collaboration to develop and commercialize biosynthetic cannabinoids. Cannabinoids, the chemicals found in cannabis plants, have experienced skyrocketing commercial demand in recent years, as state and national governments have decriminalized and legitimized cannabis cultivation. The two most commercialized cannabinoids are THC (tetrahydrocannabinol), which produces a psychoactive effect, and CBD (cannabidiol), which has no intoxicating elements and has rapidly grown in popularity.

17.     Traditional agricultural methods for producing cannabinoids carry many risks and impediments to commercial scalability, such as difficulties ensuring crop consistency, purity, and cycle time, which pose significant challenges to creating a dependable supply chain to service large product markets such as health, beauty and cosmetics, food and beverage, and pharmaceuticals.

18.     The ability to produce cannabinoids through a controlled fermentation process at defined, precise purity levels and with predictable consistency, reliability, repeatability, and at a fraction of the cycle time, could not only help meet existing commercial demand but also usher in significant additional future domestic and international demand for cannabinoids. This was the plan Lavvan conceived when it approached Amyris to discuss a potential venture.

19.     Recognizing the excellence of Amyris's scientific capabilities and the unique opportunity to leverage Amyris's platform to establish itself as the clear leader in a large and growing field, Lavvan entered the Research, Collaboration and License Agreement, dated as of March 18, 2019 ("RCL Agreement"), with Amyris.

20.     Under the RCL Agreement, Amyris was responsible for research and development and delivering the technology and process to produce certain molecules through

5

fermentation, while Lavvan controlled the manufacturing and commercialization of the molecules.

21. The RCL Agreement provides, among other things, as follows:

> Amyris shall grant to Lavvan a lien and security interest on all Amyris Platform Improvement IP and Amyris Background IP to secure all obligations of Amyris to Lavvan hereunder (the "Lavvan Lien"). The Lavvan Lien shall be junior in priority to the existing liens and security interests of Great American and any other Permitted Senior Lender and shall be subject to a subordination agreement with Great American and any other Permitted Senior Lender (a "Subordination Agreement").

Section 5.12.2(a).

22. The RCL Agreement further provides:

> Each Subordination Agreement shall be in the applicable Permitted Senior Lender's standard form with such changes as necessary to comply with Section 5.12.2(a) and shall provide, among other things, that the Lavvan Lien is junior and subordinate in all respects to the liens and security interests of the applicable Permitted Senior Lenders, on terms and conditions customary for subordination agreements of this type, and that, in the event that the applicable Permitted Senior Lenders exercise remedies in respect of any Amyris Platform Improvement IP and Amyris Background IP, such Permitted Senior Lenders (and any successors or transferees thereof) shall honor the licenses granted to Lavvan in the Amyris Platform Improvement IP and Amyris Background IP hereunder notwithstanding such exercise and any related transfer of assignment, as if such exercise, transfer, and assignment, as applicable, were subject to such license rights.

Section 5.12.2(c).

**F. Amendment to the 2018 Great American Loan**

23. On April 4, 2019 (well prior to execution of the Subordination Agreement), Amyris and Great American amended their loan agreement, eliminating the potential availability of the incremental $35 million loan facility contemplated by the original loan agreement. The

maximum loan amount under the Great American loan was thus $36 million. The loan's maturity date remained July 1, 2021.

**G. Foris's Purchase of the 2018 Great American Loan**

24. Pursuant to a Loan Purchase Agreement dated as of April 15, 2019, Foris purchased the $36 million loan from Great American. Amyris agreed to repay Foris $2.5 million of the purchase price Foris paid to Great American.

**H. Lavvan's Security Agreement and Subordination Agreement**

25. In May 2019, in accordance with the RCL Agreement, Lavvan and Amyris entered a Security Agreement, under which Amyris granted Lavvan a security interest in substantially all the Debtors' intellectual property.

26. The Security Agreement contained covenants by Amyris, including that "for so long as this Security Agreement shall remain in effect," Amyris covenants and agrees "not to incur or suffer to exist any liens or security interests in the Intellectual Property Collateral, other than Permitted Liens." Security Agreement § 4.01(a)(ii). "Permitted Liens" were liens that (i) existed at the time of the Security Agreement and (ii) were subject to a subordination agreement. Yet the Debtors thereafter purported to grant additional liens on the Intellectual Property Collateral multiple times (mostly to Foris affiliates), none of which were subject to a subordination agreement, in breach of Section 4.01(a)(ii) of the Security Agreement.

27. Foris executed a Consent and Waiver on May 2, 2019, providing its consent to the Security Agreement and its terms.

28. Lavvan filed a UCC Financing Statement with the Delaware Department of State on May 9, 2019, perfecting its security interest in the Intellectual Property Collateral.

29. Lavvan, Amyris, and Foris also entered a Subordination Agreement, dated as of May 2, 2019. The Subordination Agreement documents the terms of Lavvan's agreement to

subordinate its security interest in the Intellectual Property Collateral to Foris's liens as successor in interest to Great American pursuant solely to the Great American loan. Recital A of the agreement defines the Great American loan as the "Loan and Security Agreement dated as of June 29, 2018 (as the same has been and may be amended from time to time)." The word "amended" (or variations thereof) does not appear anywhere else in the Subordination Agreement (other than a similar parenthetical in the definition of Lavvan's Security Agreement).

30. As had been specifically required under the RCL Agreement, the Subordination Agreement required Foris to honor Lavvan's license rights if it exercised its remedies on the shared collateral. *See* Subordination Agreement ¶ 12; RCL Agreement ¶ 5.12.2(a).

31. The Subordination Agreement subordinates Lavvan's interests only to the amount owed under the 2018 Great American loan—not to any and all loan agreements the Debtors might thereafter enter with Foris or any of its affiliates. *See* Subordination Agreement ¶ 2.

32. By its terms, the Subordination Agreement remains in effect only if there is a balance remaining on the Great American loan. *See* Subordination Agreement ¶ 14.

**I.  Foris's Radical Changes to the Great American Loan, Without Lavvan's Consent**

33. With Doerr effectively controlling both sides, Amyris and Foris colluded to exploit the Subordination Agreement and the 2018 Foris Loan, including not only to leave the original $36 million principal balance purportedly outstanding for far longer than permitted under the loan agreement's original terms, but also to dramatically *increase* the purported loan balance, and meanwhile prioritize Amyris's repayment of other, later-in-time, unsecured loans from Foris.

34. Foris and Amyris have amended and restated the Great American loan so many times—starting mere months after the Subordination Agreement was executed—that it is now unrecognizable.

35. Most major terms have been altered, some radically so: (i) the amount which could be borrowed was roughly tripled, (ii) the maturity date was extended, (iii) a feature was added to make the loan convertible into equity at Foris's option, (iv) the collateral package securing the loan was altered, (v) additional fees were charged, and (vi) the method of calculation of the interest rate was changed several times.

36. For instance, in August 2019, Amyris and Foris purported to "amend" the Great American loan agreement to add over $35 million in additional principal (effectively doubling the original loan amount), all arising from prior unsecured loans from Foris to Amyris (including an $8 million Foris unsecured loan from April 8, 2019, before Foris had even purchased the Great American loan) and from Amyris's prior unsecured promise to pay $2.5 million of Foris's purchase price for the Great American loan.

37. Amyris has tried to justify its drastic increases to the principal amount of the loan by arguing that the "original 2018 LSA accommodated an increase in the facility (upon request by Amyris and acceptance by GACP) by an additional $35 million (for a total loan of $71 million)," and has implied that it was permitted to fold several unsecured notes into the Great American loan for that reason. Dkt. 404, Amyris Br. at 12-13. That argument omits the material fact that, as noted above, Amyris and Great American had specifically *eliminated* the provision for a potential additional $35 million in April 2019, *before* Lavvan entered the Subordination Agreement with Foris. Under the Great American loan agreement as of the date of the Subordination Agreement, the maximum amount permitted under the Great American loan agreement was $36 million.

38. In addition, Foris and Amyris materially altered the "Change in Control" provision in a fully "restated" loan agreement in October 2019, to remove a provision that would

9

trigger a "Change in Control" if DSM International B.V. ceased to have the right to appoint two board members. Upon a Change in Control, Amyris was required to pay off the Great American loan in full, which in turn would cause the Subordination Agreement to terminate. As of March 1, 2021, DSM International ceased to have the right to appoint two board members, and one of its two director designees resigned from the board on April 1, 2021. Accordingly, if not for the alteration of the loan terms, the loan would have been paid in full more than two years ago, and the Subordination Agreement would have been terminated.

39. In January 2020, Foris equitized certain loans, including outstanding amounts under the purportedly "amended" Great American loan.

40. Over the years, Amyris had given Foris numerous stock warrants—including, at a minimum, in July 2015, February 2016, April 2019, May 2019, August 2019, October 2019, and November 2019. Many of these warrants were very valuable when issued—for example, warrants issued to Foris on August 14, 2019, were valued at over $2.8 million; warrants issued to Foris on October 10, 2019, were valued at over $4 million, and warrants issued to Foris on November 27, 2019, were valued at over $2 million. No amount, however, was credited to Amyris's purported outstanding loan balance in connection with these warrant issuances.

41. Similarly, Amyris also from time to time amended previously issued warrants to Foris, reducing the per-share purchase prices under those warrants. For instance, in July 2019, Amyris entered a warrant amendment reducing Foris's purchase price under an August 2018 warrant for 4,877,386 shares from $7.52 per share to $2.87 per share—a reduction of $4.65 per share, for a value of over $22.6 million as applied to all the subject shares. Again, none of this amount was credited to Amyris's outstanding loan balance.

42.     In January 2020, Foris elected to exercise its warrant rights to acquire roughly 19.3 million shares of Amyris stock, funded through Amyris's repayment of nearly $70 million of debt to Foris. That $70 million was more than sufficient to fully repay the $36 million Great American loan, which was the longest-outstanding debt between the parties. Instead, however, under Foris's Warrant Exercise and Debt Equitization Agreement with Amyris, dated as of January 31, 2020, Foris and Amyris ostensibly applied that $70 million first to a later-in-time, unsecured Foris loan of $19 million, which Foris had issued to Amyris in August 2019, and next to portions of the "amended" Great American loan balance that Foris had issued months after the Subordination Agreement.

43.     Significantly, however, Foris and Amyris recognized and expressly agreed that the remaining principal under the radically "amended" and transformed Great American loan agreement effectively represented a new and different debt instrument, with an "Issue Date" of *August 14, 2019*, corresponding to Foris and Amyris's "Amendment No. 5," which had increased the purported principal balance from $36 million to over $71 million. *See* Warrant Exercise and Debt Equitization Agreement, Ex. B. Foris's and Amyris's agreed-upon "Issue Date" of August 14, 2019, post-dates not only the original June 2018 Great American loan agreement, but also the May 2019 Subordination Agreement between Foris and Lavvan.

44.     In June 2020, Amyris and Foris added a convertibility feature to the loan. Because Foris's exercise of conversion rights would have required Amyris to issue additional equity, Amyris sought shareholder approval. The loan amendment stated: "if Stockholder Approval is granted at the Special Meeting, then Foris agrees to exercise a Conversion Option with respect to no less than $15,000,000 of the Secured Obligations within thirty (30) days after the Special Meeting." Amendment No. 1 to Am. & Restated LSA § 1.4(e)(i). Amyris expressly confirmed in

11

its securities filings that it obtained stockholder approval on August 14, 2020. But the conversion did not occur, in evident breach of the LSA. If it had occurred, it would have reduced Amyris's debt to Foris by $15 million (and reduced ensuing years of interest).

45.     All of this was done entirely without Lavvan's consent, in contravention of applicable California law. *See, e.g.*, *Resolution Tr. Corp. v. BVS Dev.*, 42 F.3d 1206, 1215 (9th Cir. 1994).

**J.  Lavvan's Arbitration and Litigation Against Amyris**

46.     As Foris was using its insider influence over Amyris to engineer transactions designed to try to exploit and distort the Great American loan's priority rights as well as to increase its control over Amyris and enrich itself with additional fees and warrants, Amyris was meanwhile badly breaching its obligations to Lavvan under the RCL Agreement. After securing a desperately needed $10 million initial payment from Lavvan, Amyris CEO John Melo immediately began pressuring Lavvan to change the terms of the parties' agreement.

47.     Melo admitted to Lavvan's CEO that Amyris was facing serious difficulties at the time that it signed the RCL Agreement and now that it was on slightly better footing, it had a case of "seller's remorse." Melo likened Amyris's decision to enter the RCL Agreement to "cutting off the arm to save the body." When Lavvan refused to capitulate to months of Melo's strong-arm tactics trying to force Lavvan to give up its contractual rights, Amyris outright repudiated the RCL Agreement in April 2020 and declared its intent to manufacture and commercialize cannabinoids without Lavvan, in flagrant breach of the contract and infringement of Lavvan's intellectual property rights.

48.     Lavvan filed its intellectual property claims against Amyris in federal court in September 2020 and its other claims against Amyris in an arbitration, consistent with the RCL Agreement's dispute resolution provisions. The parties' claims in arbitration have been

fully tried and briefed, and on September 11, 2023, this Court entered an order (Dkt. 230) modifying the automatic stay to permit the issuance of a decision in the arbitration. That decision is expected to be issued imminently. The parties' federal suit remains stayed.

**K.  Amyris's Bankruptcy and DIP Motion**

49.  On August 9, 2023, Amyris and the other Debtors filed for chapter 11 bankruptcy before this Court.

50.  The next day, they filed the First Day Declaration (Dkt. 18) from Amyris's interim CEO, Han Kieftenbeld, and a DIP Motion (Dkt. 19).

51.  In the DIP Motion, the Debtors sought authorization to obtain post-petition financing in an aggregate principal amount of up to $190 million from Euagore, LLC—another Doerr-controlled entity. Foris consented to the priming of its senior lien, and then shortly before the final hearing several weeks later contended that this effectuated a priming of Lavvan's liens by implication pursuant to the Subordination Agreement (although Foris and Debtors did not disclose and in fact affirmatively withheld that implication at the First Day Hearing).

52.  The DIP Order was entered, but expressly preserves the challenge period for parties to avoid, object to, or otherwise challenge "the validity, binding, legality, enforceability, allowance, amount, characterization, extent and priority as to the Foris Prepetition Secured Lenders under the Foris Prepetition Secured Loan Agreements" and "the validity, enforceability, allowability, priority, characterization, secured status, or amount of the Foris Prepetition Obligations." By this complaint, Lavvan brings such a challenge.

**L.  Other Creditors Raise Concerns Regarding Foris's Insider Deals with Amyris**

53.  As recently as October 24, 2023, the Ad Hoc Group of holders of Amyris convertible notes raised with this Court their concerns that the Foris lenders have engaged in discovery "stonewalling" regarding the Ad Hoc Group's issues and concerns, including the

13

question of whether Amyris's board and officers "improperly approved multiple pre-petition loans to the Foris Lenders." Dkt. 614 ¶ 5. It is also apparently investigating whether Doerr and others caused Amyris to improperly reject lucrative prepetition offers to purchase certain of the company's consumer brands at exactly the time Foris and its affiliates were making additional insider loans to the company.

54. Consistent with the Ad Hoc Group's concerns, the circumstances surrounding Foris's pre-bankruptcy loans raise serious questions about their enforceability: the facts support the inference that a powerful Amyris insider leveraged his influence to build up a sufficiently large debt from Amyris to position himself to shape and control the bankruptcy proceedings and ultimately seize Amyris's crown jewels—its revolutionary and potentially world-altering intellectual property—for a tiny fraction of its true tremendous value.

### COUNT I: DECLARATORY RELIEF AS TO GREAT AMERICAN LOAN

55. Lavvan realleges the prior paragraphs as if set forth here.

56. The subordination of Lavvan's liens under the Subordination Agreement is predicated on Amyris's outstanding debt under the Great American loan. Upon termination of the Great American loan, Foris's subordination rights end.

57. Under the totality of the facts and circumstances, the Great American loan should be deemed to no longer exist, with any remaining outstanding debt originally incurred thereunder deemed to be a legally distinct debt instrument, and therefore Foris's subordination rights deemed terminated.

58. The facts and circumstances compelling these conclusions include the following:

   a. Foris's radical changes to the terms of the Great American loan (including as to the maximum loan amount, maturity date, and other material terms described above) render the current outstanding balance a legally distinct instrument to which Lavvan never agreed to subordinate.

    b. Amyris and Foris themselves recognized and agreed, in a signed agreement in January 2020, that the "Issue Date" of the outstanding principal balance of the loan is August 14, 2019, *after* the May 2019 Subordination Agreement.

    c. Foris's insider deals with Amyris—including deals to purportedly increase the principal balance of the Great American loan, issue numerous valuable warrants to Foris, and divert Amyris's $70 million repayment away from the repayment of Great American loan—were improper and unfair, and therefore unenforceable.

    d. Applicable California law prioritizes substance over form. *See* Cal. Civil Code § 3528. In substance, Amyris repaid Foris well more than the $36 million plus interest on the Great American loan, by the July 2021 maturity date. Foris's self-serving characterizations of its insider transactions with Amyris, including its self-serving allocation of Amyris's $70 million repayment to purported amounts other than the $36 million Great American loan, are not entitled to deference.

    e. Foris materially failed to perform its obligations even under the radically "amended" loan agreement—for instance, Foris failed to fulfill its $15 million conversion obligation—and thus cannot enforce the agreement.

59. Accordingly, Lavvan requests declaratory relief that the Great American loan, upon which the Subordination Agreement is predicated, is deemed to no longer exist, with any remaining outstanding debt deemed to be a legally distinct debt instrument, and Foris's subordination rights are deemed terminated.

## COUNT II: DECLARATORY RELIEF AS TO PRIORITY OF LIENS

60. Lavvan realleges the prior paragraphs as if set forth here.

61. Lavvan has a perfected lien in substantially all of Debtors' intellectual property. For the reasons set forth above, Lavvan's lien is not subordinated to Foris's by operation of the Subordination Agreement.

62. Nor can Foris enforce the Subordination Agreement against Lavvan, for the following additional reasons:

    a. Foris failed to obtain Lavvan's consent to the drastic post-Subordination Agreement purported "amendments" to the Great American loan, in contravention of applicable California law which requires Lavvan's consent to maintain subordination.

    b. Foris's manipulation of its insider transactions with Amyris to try to exploit and unfairly extend the Subordination Agreement beyond its intended scope contravenes not only the parties' intent under the Subordination Agreement but also Foris's covenant of good faith and fair dealing.

63. Lavvan does not consent to the subordination of its lien.

64. Accordingly, Lavvan requests declaratory relief that it retains a perfected, non-subordinated and non-primed lien in Debtors' intellectual property on the terms set forth in the Security Agreement and Lavvan's UCC filing.

## COUNT III: MODIFICATION OF DIP ORDER

65. Lavvan realleges the prior paragraphs as if set forth here.

66. For the reasons set forth above, Lavvan should be found to hold and retain a perfected, non-subordinated, non-primed lien in Debtors' intellectual property.

67. Accordingly, Lavvan requests appropriate modification of the DIP Order so as to void any and all provisions purporting to find or establish any subordination or priming of Lavvan's liens, and any other provisions inconsistent with the declarations requested in Counts I and II above.

                            \*                  \*                  \*

WHEREFORE, Plaintiff requests that the Court enter an Order (i) awarding declaratory relief as set forth in Counts I and II above; and (ii) modifying the DIP Order, so as to void any and all provisions purporting to prime Lavvan on the basis of its purported consent under the Subordination Agreement.

Dated: October 25, 2023

                        RICHARDS, LAYTON & FINGER, P.A.

                        */s/ Russell C. Silberglied*
                        Mark D. Collins (No. 2981)
                        Russell C. Silberglied (No. 3462)
                        Emily R. Mathews (No. 6866)
                        One Rodney Square
                        920 North King Street
                        Wilmington, Delaware 19801
                        302 651 7700

                        CYRULNIK FATTARUSO LLP

                        Jason Cyrulnik
                        Paul Fattaruso
                        55 Broadway, Third Floor
                        New York, New York 10006
                        646 844 2466

                        *Counsel for Plaintiff, Lavvan, Inc.*