## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
|  | ) Case No. 23-11131 (TMH) |
|  | ) |
| AMYRIS, INC., et al., | ) (Jointly Administered) |
|  | ) |
| Debtors.[1] | ) **Hearing Date: November 17, 2023 at 11:00 a.m. (ET)** |
|  | ) **Objection Deadline: November 10, 2023 at 4:00 p.m. (ET)** |

## MOTION OF AD HOC CROSS-HOLDER GROUP
## FOR APPOINTMENT OF EXAMINER PURSUANT TO 11 U.S.C. § 1104(C)

The ad hoc group (the "Ad Hoc Cross-Holder Group") of certain unaffiliated (a) holders of notes or other indebtedness issued under that certain Indenture, dated as of November 15, 2021 pursuant to which Amyris, Inc. issued certain 1.50% Convertible Senior Notes Due 2026 and/or (b) shareholders of Amyris, Inc., as identified on that certain *Verified Statement of Ad Hoc Cross-Holder Group Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 397], as the same may be amended or supplemented from time to time, by and through its undersigned counsel, hereby files this motion (the "Motion") for the appointment of an examiner under § 1104(c) of Title 11 of the United States Code (the "Bankruptcy Code") in the above-captioned cases jointly administered under Case No. 23-11131 (the "Chapter 11 Cases") and in support thereof states as follows:

### PRELIMINARY STATEMENT

1.      John Doerr controls the Debtors and the outcome of these cases.  The Debtors'

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/amyris.  The location of Debtor Amyris, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

board (the "Doerr Board,"),[2] the Foris Lenders, and the DIP Lender (the DIP Lender together with the Foris Lenders, the "Doerr Lenders")[3] all act under his direction and/or influence and purport to "negotiate" among themselves while sitting on all sides of the transactions.  There is no true independent fiduciary negotiating on behalf of the Debtors' estates.

2.      With the Doerr Board at the wheel, these cases are quickly approaching a critical juncture, and yet no independent investigation of the circumstances leading these Debtors into bankruptcy has been completed.  The Debtors claim that an "independent director"[4] hand-picked by the Doerr Board has, since the Petition Date, been conducting an "investigation," but the Debtors have provided no information about the scope, progress or methodology of such investigation whatsoever or whether they intend to release the results.  In fact, the Disclosure Statement is inexplicably silent about it.  In any event, the Debtors have *already released* the Doerr Board and the Doerr Lenders from Debtor and estate claims prior to completion of the investigation and tellingly, seek to secure for them non-consensual third party releases through the Placeholder Plan, rendering the alleged "independent investigation" moot.

3.      The Debtors have it backwards – debtors do not grant releases and reach legal

---

[2] The members of the Doerr Board are: (i) John Doerr, chairman of Kleiner Perkins and Principal of Foris; (ii) Ryan Panchadsaram, Principal of Foris; (iii) Ana Dutra; (iv) Geoffrey Duyk, Partner at Circularis Partners; (v) Frank Kung, founding member of Vivo Capital; (vi) James McCann, founder, CEO and Chairman of 1-800-FLOWERS.com; (vii) Steve Mills, former CFO of the Debtors; (viii) Lisa Qi, Founder and CEO of Daling Family; (ix) Julie Spencer Washington; and (x) M. Freddie Reiss.

[3] According to the Debtors, they have formed a "restructuring committee" of "independent" members.  That restructuring committee however, is not advised by separate counsel. Nor is it clear what authority if any, the restructuring has in the context of plan and settlement negotiations.  Rather, it appears that the restructuring committee has no independent decision-making authority and that Doerr himself attends the restructuring committee meetings and that the Doerr Board must approve all actions of the Debtors.

[4] The "independent director," M. Freddie Reiss, has no clear mandate for his investigation.  He was selected for his role by the Doerr Board and it is unclear how the selection process was conducted.  Furthermore, it is unclear whether Mr. Reiss interviewed independent counsel or whether counsel too was selected by the Doerr Board or its counsel, who admittedly have a relationship with the "independent" director's counsel.  According to the Debtors' 8-K, Mr. Reiss is being paid $50,000 per month.

conclusions *in advance* of completing an investigation.  Nor do debtors solicit a plan without disclosing the existence and results of an "investigation" to stakeholders.  Here, the Debtors have plainly signaled they will not and cannot hold the Doerr Board or the Doerr Lenders accountable. The Court need not look further than the Final DIP Order and the Placeholder Plan.  Under the Final DIP Order, the Debtors stipulated to the validity and priority of the Foris Lenders' liens and claims and agreed that regardless of the eventual outcome of the "independent investigation," the Debtors have *no claims* against certain Doerr Lenders for any actions related to the prepetition Foris Loans and *no remedial rights whatsoever* through, for example, equitable subordination, to address any misconduct uncovered.

4.       The Placeholder Plan is also quite revealing.  In it, the Doerr Board proposes to hand over the keys to the Doerr Lenders and grant all Doerr-related parties broad releases while merely shuffling around sale proceeds to unsecured creditors.[5]  The Placeholder Plan contemplates releasing Debtor and estate claims against the Doerr Board, the Doerr Lenders and various unidentifiable "related parties" for an undisclosed value.  Even to the extent a limited set of parties are excluded from the releases (again, as determined by the Doerr Board and Doerr Lenders), and those claims are preserved as a source of recovery, the Plan incredibly *redirects recoveries to the reorganized Debtors* who will be owned exclusively by the Doerr Lenders themselves.  The Placeholder Plan further proposes a convoluted and controversial structure to impose *non-consensual third-party releases* in favor of the Doerr Board, Doerr Lenders and other investigation targets.  Not surprisingly, the Debtors (at the direction of the Doerr Board) failed to secure any value in exchange for such releases or provide any information about the nature or value of claims being released.

---

[5] The Ad Hoc Cross-Holder Group believes present and future value exists and should be preserved for the Debtors' stakeholders and not simply handed over to Doerr related entities.

5.      Mr. Doerr's shadow looms large over these Chapter 11 Cases and is jeopardizing the integrity of this process. Contested litigation over the Debtors' and insiders' lack of transparency is already underway, and the Debtors have virtually assured that *substantially more* litigation is to come based on the structure of the Placeholder Plan.  The immediate appointment of an examiner under § 1104 of the Bankruptcy Code is not only warranted under these circumstances, but also the best way to avoid protracted, value-destructive litigation.  Only an independent court-appointed examiner can dispel the cloud of self-dealing surrounding the Doerr Lenders and the Doerr Board-controlled Debtors.  It is critical that stakeholders have an opportunity to evaluate a fully transparent and independent report, understand the nature and extent of the claims and causes of action being released, and then negotiate a consensual resolution based on a complete and public report that is not tainted by the Doerr Board's secret process.  Stakeholders cannot be expected to rely upon the fundamentally flawed process proposed by the Debtors.

6.      Unfortunately, the Official Committee of Unsecured Creditors (the "Creditors' Committee") has reported its own investigation into these issues has been stymied by the Debtors, Doerr Board and Doerr Lenders, who refuse to meaningfully respond to discovery requests or to make their key insiders available for examination.  The Ad Hoc Noteholders Group reports similar obstruction.  The Ad Hoc Cross-Holder Group does not question the Creditors' Committee's capabilities and is not proposing that the examiner usurp the Creditors' Committee. An examiner is distinct in that it does not serve as an advocate for a particular constituency or have an adversarial relationship with the Debtors.  Rather, the examiner investigates and reports for the benefit of all stakeholders, *including equity holders of a public company*. The Creditors' Committee is also not economically incentivized to analyze claims or

pursue remedies that could benefit holders of equity who will also be the subject of non-consensual third-party releases.  The scope of the examiner will be broader than the Creditors' Committee's investigation, but both will and should work together – one as an advocate and the other as an independent fiduciary issuing a report.  Continuing to expend resources on a costly and tainted "independent investigation" where the Debtors and estates have no recourse regardless of the outcome, is illusory protection for creditors and equity holders and a waste of estate resources.

7.      Transparency and integrity of the process requires an examiner at this time. An examiner and accompanying examiner report will, in the end, benefit these estates, limit litigation and facilitate a fair, transparent, and reliable process for a negotiated resolution.

## RELEVANT BACKGROUND

### A.  The Debtors' Prepetition Insider Dealings & Secured Debt

8.      As of  August 9, 2023 (the "Petition Date"), *all* of the Debtors' secured debt was sourced from affiliates of the Debtors' board members—either through entities controlled by multi-billionaire director John Doerr, or through entities associated with director Philip Eykerman.[6]  The Debtors historically demonstrated a pattern of running short on liquidity and engaging in a complicated web of loans and/or equity-related instruments with insiders and board members without the benefit of a market test; this pattern repeated itself in the years preceding the Petition Date.

9.      In just the year prior to the Petition Date, the Debtors incurred approximately $330 million in secured debt where Mr. Doerr (and other members of the Doerr Board) stood on both sides of the transactions.  It is unknown what steps (if any) the Doerr Board took to consider

---

[6] Eykerman resigned from the Debtors' board on August 14, 2023.  Eykerman served as a member of the board at all relevant times to the DSM Loan.

alternative non-insider financings during the relevant times, nor is it clear why the Doerr Board waited until the liquidity needs were so dire that emergency financing was required.

10.     The Debtors' most significant secured obligations are owed to certain entities affiliated with Foris Ventures, LLC (collectively, the "Foris Lenders").  The Foris Lenders are all controlled directly or indirectly by Mr. John Doerr, who serves and at all relevant times has served as a director of debtor Amyris and also serves as a principal of Foris Ventures, LLC. Another member of the Doerr Board, Mr. Panchadsaram, is also a principal of Foris. According to the *Declaration of Hans KieftenBeld in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 18] (the "First Day Declaration"), "[a]s of December 31, 2022, over 30% of Amyris capital stock was beneficially owned by a limited number of stockholders, including Foris[.]"  Foris is the Debtors' largest individual shareholder.

11.     The Debtors' reliance on funding from the Foris Lenders appears to have increased markedly in the run-up to the Petition Date.

- October 28, 2019, the Doerr Board approved borrowing no less than $81,041,000 from Foris Ventures, LLC (as may be amended or modified, the "First Foris Loan");

- On September 27, 2022, the Doerr Board approved entering into another secured loan facility with Foris for $80,000,000 (as may be amended or modified, the "Second Foris Loan");

- On March 10, 2023, the Doerr Board approved entering into another secured loan facility with a Foris affiliate controlled by John Doerr called Perrara Ventures, LLC for $50,000,000 (as may be amended or modified, the "Perrera Loan");

- On June 5, 2023, the Doerr Board approved entering into another secured loan facility with another Foris affiliate controlled by John Doerr named Anesma Group LLC for $50,000,000 (as may be amended or modified, the "Anesma Loan");

- On June 29, 2023, the Doerr Board approved entering into another secured loan facility with another Foris affiliate controlled by John Doerr named Anjo Ventures, LLC for $50,000,000 (as may be amended or modified, the "Anjo

<u>Loan</u>");

- On August 3, 2023, the Doerr Board approved entering into another secured loan facility with another Foris affiliate controlled by John Doerr named Muirisc, LLC for $20,000,000 (as may be amended or modified, the "<u>Muirisc Loan</u>, and together with the First Foris Loan, the Second Foris Loan, the Perrera Loan, the Anesma Loan, and the Anjo Loan, the "<u>Foris Prepetition Loans</u>").

12.     According to the First Day Declaration, as of the Petition Date there was a principal amount outstanding under the Foris Prepetition Loans of at least $295,000,000, not including accrued and unpaid interest and other fees and costs.

13.     There is no indication that the Doerr Board ever considered alternative financing transactions to any of the Foris Prepetition Loans.

14.     Serious questions exist regarding value allegedly funneled by the Doerr Board to Foris.  The *Challenge-Period Adversary Complaint to Challenge Enforceability, Priority, and Extent of Security Interests and Liens, and Other Relief* [Docket No. 620] filed by Lavvan, Inc., for example, claims Foris and the Debtors repeatedly amended a loan document to provide increasingly more favorable terms to Foris, including the loan amount, the collateral package, additional fees, interest rates, and the addition of an equity conversion option (which was also present in certain of the Foris Prepetition Loans).

15.     On October 11, 2022, the Doerr Board approved approximately $100,000,000 in financing in three separate tranches from DSM Finance B.V. ("<u>DSM</u>") and guaranteed by various other Debtors (the "<u>DSM Loan</u>"). DSM is associated with Debtor insider and former board member Philip Eykerman, who was a member of the Doerr Board at all times relevant to the DSM Loan.  According to the First Day Declaration, as of the Petition Date there remained approximately $74,000,000 of principal outstanding altogether under the DSM Loan.

16.     On June 4, 2023 (contemporaneously with approval of the $50,000,000 Anesma

Loan), the Doerr Board approved modifications to the prepetition loan documents in favor of the insider Foris Lenders.  These amendments added additional security and other terms favoring the Foris Lenders.

**B.  The Debtors' Unsecured Debt**

17.     On November 15, 2021, Amyris completed a sale of $600,000,000 in 1.50% convertible unsecured senior notes due 2026 (the "<u>Convertible Notes</u>").  On November 11, 2021, the initial purchasers exercised an option to purchase an additional $90,000,000 in aggregate principal amount of notes.  According to the First Day Declaration, as of the Petition Date, the outstanding balance of the notes is approximately $690,000,000.

**C.  Debtors' Conduct Leading to Chapter 11**

18.     Under the Doerr Board's guidance, the Debtors engaged in a number of missteps that lead to these Chapter 11 Cases.

19.     Questionable actions undertaken by the Debtors include, but are not limited to:

- "Supply-chain irregularities" that "may have resulted in accounting issues" in 2021 and 2022 are allegedly being investigated.  The impact and cost of these irregularities is unknown. First Day Decl., ¶ 68.

- In the few years prior to the Petition Date, the Debtors (under the control of the Doerr Board) entered into various licensing, royalty, collaboration and sale and transactions that the Debtors concede are not commercially viable.

- The Debtors allegedly provided stock warrants to Foris in July 2015, February 2016, April 2019, May 2019, August 2019, October 2019, and November 2019, for value, but allegedly not in reduction of any outstanding obligations owed to the Foris Lenders.  These equity warrants instead seem to have been gifts of the Debtors' equity to Foris.

- The Debtors provided $155 million to fund a large manufacturing facility in Barra Bonita, Brazil as part of a joint venture.  The joint venture is a non-Debtor and the value of the facility and the joint interest is unknown.

- The Debtors also apparently had opportunities to sell certain brands prepetition, but declined to do so.  The reasons for those decisions, in light of exiting the

consumer brands, now should be investigated.

- In response to its increasingly overleveraged position and declining sales, the Debtors' board began implementing cost-cutting strategies and other self-described "fit to win" campaigns in late 2022, including "targeted price increases, production, shipping, and unit cost reductions, and other cost-reduction strategies." By the Debtors' own admission, these strategies did not result in any appreciable benefit to the Debtors, who instead experienced further declining revenue year-over-year in the first quarter of 2023.

- In connection with issuing the Convertible Notes, the Debtors spent $65 million as part of a "capped call" in order to increase the conversion price. The Debtors never provided a cogent explanation of either the economics or process undertaken to make such an expenditure.

- The Debtors put together various instruments and insider transactions that benefited board members.

20.      These actions, taken together, raise serious questions of whether the Doerr Board appropriately discharged its fiduciary duties to the Debtors throughout this process during the last several years. An examiner will be best positioned to identify and evaluate potential claims and causes of action arising from these and other actions of the Doerr Board. The reliance on Foris financing on short intervals in the run-up to the Petition Date is particularly illustrative of the concerns over self-dealing and whether the Doerr Board and management undertook adequate steps for budgeting and planning. This pattern of failed financial planning and uninformed financial decisions extends at least as far back as 2019, and includes the $65 million purchase of the "capped call" related to the issuance of the unsecured notes.

21.      By the same token, the exigency of the Debtors' financing needs on a multitude of occasions appears to have impeded its ability to actually market-test. The entire nature of the Debtors' prepetition financing process is suspect, and strongly suggests that they were at all times at the mercy of Doerr through the Doerr Lenders—with leverage only continuing to build

in the Doerr Lenders' favor as time went on.[7]

**D. The Debtors' Purported "Independent Investigation" and Efforts to Frustrate an Independent Investigation**

22.     The Debtors claim that they are conducting an "independent investigation" of the Debtors' activities, including their relationship with the Doerr Lenders, headed by alleged "independent director" M. Freddie Reiss, selected by the Doerr Board for the role.  The Debtors' Disclosure Statement contains no information on the progress, or even the very existence, of this "independent investigation" whatsoever.  Nor has any other party in interest reported receiving any information about the progress or anticipated conclusion of this "independent investigation." Given that the Disclosure Statement and Placeholder Plan provide for releases of any and all claims, the only conclusion that can be reached is that the investigation is a white wash through reverse engineering.

23.     To fund these cases, the Debtors sought and were granted authority to obtain a superpriority secured priming loan of $190,000,000 from the Doerr-controlled DIP Lender. *See Final Order (I) Authorizing the Debtors (A) to Obtain Postpetition Financing and () to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 558].

24.     On October 12, 2023, the Official Committee of Unsecured Creditors (the "Committee") filed a Statement [Docket No. 522] with respect to the proposed form of Final DIP Order.  The Committee alleged therein that the Debtors had, to date, "produced zero custodial emails, and a paltry number of documents and other materials" in response to the Committee's

---

[7] These "emergencies" enabled the Doerr Lenders to shift more value and control to themselves.  An examiner is required to know the truth of the Debtors' financing arrangements and the Doerr Board's conduct.

propounded discovery in connection with "the circumstances that brought the Debtors into these cases, the Debtors' secured debt, and potential claims and causes of action[.]"  Committee Statement, ¶ 1.  The Committee further noted that if the Debtors did not "improve their record of meeting discovery obligations, the Committee expects to be back before this Court shortly on a motion to further extend the challenge period and compel the production of documents." *Id.*

25.     The Committee's statement further contended that Mr. Reiss, the alleged independent director appointed by the Debtors to head up their own investigation, "completely rebuffed" the Committee's attempts to communicate with him about its overlapping investigation.  *Id.* at ¶ 6.  In response to the Committee's proposal to attend Mr. Reiss' depositions of common targets, Mr. Reiss allegedly cancelled his scheduled formal depositions and elected to proceed with informal, non-noticed interviews that may or may not have ever actually occurred.  This behavior is not indicative of a transparent and independent process.

26.     Recently, the Ad Hoc Noteholder Group has had to file its own Rule 2004 motion to seek discovery from the Doerr-controlled Foris parties who refuse to comply with discovery requests. *See* Docket No. 614.

### E. The Placeholder Plan, Broad Debtor and Estate Releases and Non-Consensual Third-Party Releases of Insiders

27.     On October 12, 2023, the Debtors filed their *Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors* [Docket No. 523] (the "Placeholder Plan")[8] and the *Disclosure Statement with Respect to Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors* [Docket No. 524].

28.     The Placeholder Plan proposes to shuffle cash distributions from the sale of the consumer brands amongst creditor classes through a waterfall.  But the main focus of the

---

[8] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Placeholder Plan.

Placeholder Plan is clear: (i) secure Debtor and estate releases and non-consensual third-party releases of insiders including the Doerr Lenders and the Doerr Board and (ii) hand over the company and all value to the Doerr Lenders through any manner they choose.

29.     Glaringly missing from the Placeholder Plan and accompanying Disclosure Statement are the nature of the claims being released, the value of such claims, the identification of "Excluded Parties," the value of the Litigation Trust Assets, contributions from third-parties in exchange for releases of the direct claims and the underlying process undertaken to determine the appropriateness of sweeping broad releases and the negotiation of these provisions.  In fact, it does not appear there was any independent party negotiating this Placeholder Plan on behalf of the estates.  Instead, the Doerr Board is negotiating this Placeholder Plan for the benefit of the Doerr Board and the Doerr Lenders.

30.     Indeed, the Placeholder Plan provides the Doerr Lenders the right to elect, in their sole discretion, whether their claims will be repaid through a direct distribution of cash and an exit facility or through receipt of 100% of the New Common Stock of the Reorganized Debtors, which stock may be allocated among the Doerr Lender's affiliates as they choose.    *See* Placeholder Plan, Article II.B and III.B(3).[9]

31.     The Placeholder Plan also includes certain "death traps" that punish creditors who do not vote in favor of confirmation.  For example, Article III.B(7) of the Placeholder Plan provides holders of Convertible Notes Claims differing treatment based on how they vote.  If they vote in favor, they will receive a distribution of their pro rata portion of (i) $17,250,000

---

[9] Article II.B and III.B.(3) of the Placeholder Plan provides in relevant part, the DIP Lender and the Foris Lenders shall receive, at their respective option and in their respective sole discretion, "(x) a portion of the First Tranche Net Proceeds, the Second Tranche Net Proceeds, and the Third Tranche Net Proceeds, and (y) an amount equal to the DIP Facility Claims not paid on account of distributions of the First Net Tranche Proceeds, the Second Net Tranche Proceeds and the Third Net Tranche Proceeds rolled up, converted, exchanged, refinanced or amended and restated, into (i) the Exit First Lien Facility and/or (ii) 100% of New Common Stock."

from the First Net Cash Proceeds Tranche, (ii) $17,250,000 from the Second Net Cash Proceeds Tranche, (iii) 31% of the Third Net Cash Proceeds Tranche; (iv) 77.5% of the Fourth Net Cash Proceeds Tranche, and (y) the New Notes.  If they reject the Placeholder Plan, they will receive a distribution of their pro rata portion of (i) 31% of the Third Net Cash Proceeds Tranche, and (ii) 77.5% of the Fourth Net Cash Proceeds Tranche.  Holders of General Unsecured Claims similarly receive differing treatment based on how they vote.[10]

32.    The most complex aspects of the Placeholder Plan all relate to the convoluted structure engineered to release claims against the Debtors' insiders, including the Doerr Board and the Doerr Lenders.

33.    The Placeholder Plan provides that the Releasing Parties (as is relevant here, all holders of claims against the Debtors and all holders of interests in the Debtors) shall:

> forever release and waive, as against each and all of the Released Parties (as is relevant here, the Debtors, the DIP Lender, the Foris Lenders, and essentially all of their insiders and affiliates, along with certain other parties), any and all Direct Claims, whether liquidated or Unliquidated, fixed or Contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise that are or may be based in whole or in part upon any act, omission, transaction, event, or other occurrence taking place or existing on or prior to the Effective Date. *See* Placeholder Plan, Article IX.D.

34.    If the non-consensual Third-Party Releases of the Debtors' insiders are approved, the Debtors establish a "Direct Claims Recovery Pool" composed of distribution to be made to the holders of Direct Claims (i.e., any claims against a release party such as the Debtors' insiders or the Doerr Lenders) from any D&O Insurance Settlement and the Excluded Party Litigation Trust, with the mechanics of distributions to be sorted out through a to-be-filed plan supplement.

---

[10] If they vote to accept, they will receive a distribution of their pro rata portion of (i) $8,000,000 from the First Net Cash Proceeds Tranche, (ii) $5,000,000 from the Second Net Cash Proceeds Tranche, (iii) 22.5% of the Third Net Cash Proceeds Tranche; (iv) 22.5% of the Fourth Net Cash Proceeds Tranche.  If they reject the Placeholder Plan,

*See* Placeholder Plan, Article IV.C.  The Direct Claims Recovery Pool is distributed as follows: (i) 25% to holders of Direct Claims that are holders of Interests; (ii) 38.75% to holders of Direct Claims that are holders of Convertible Notes; (iii) 11.25% to holders of Direct Claims that are holders of General Unsecured Claims; and (iv) *25% to the Reorganized Debtors*.

35.    If the Bankruptcy Court does not approve the nonconsensual Third-Party Releases of the Debtors' insiders, then holders of Direct Claims may still participate in the Direct Claims Recovery Pool to the extent that they opt to consensually grant the Third-Party Releases and a critical mass of creditors and interest holders elects to do so as well.

36.    The Direct Claims Recovery Pool will be funded through the Excluded Party Litigation Trust. *See* Placeholder Plan, Article V.  The Excluded Party Litigation Trust purports to be a litigation trust that will pursue Excluded Party Direct Claims and liquidate them into distributions to holders of Direct Claims (and the Reorganized Debtors).

37.    Neither the Placeholder Plan nor the Disclosure Statement make any mention of the estimated $1.2 billion in Net Operating Losses ("NOLs") and how they are being preserved for the benefit of the estates, rather than for the benefit of just the Doerr Lenders.

38.    Similar questions surround other bankruptcy-remote assets, such as certain of the Debtors' intellectual property and the joint venture owning the Barra Bonita facility that the Debtors paid for.  Prior to bankruptcy, the Debtors' core assets (outside the consumer brands) had been valued in the billions of dollars.

39.    The Debtors' proposed hearing to consider confirmation of the Plan is scheduled for January 17, 2024.

---

they will receive a distribution of their pro rata portion of (i) 9% of the Third Net Cash Proceeds Tranche, and (ii) 22.5% of the Fourth Net Cash Proceeds Tranche. *See* Placeholder Plan, Article III.B(8).

## JURISDICTION

40.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 105 and 1104.  Consideration of this Motion is a "core" proceeding pursuant to 28 U.S.C. § 157(b).  Venue of this proceeding is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are (i) Sections 1104(c) and 105(a) of the Bankruptcy Code and (ii) Bankruptcy Rules 2007.1 and 9014.

## RELIEF REQUESTED

41.    The Debtors have fixed, liquidated, unsecured debts in excess of $5,000,000 (the minimum for mandatory examiner appointment), including, but not limited to, the Convertible Notes Claims in an amount of not less than $690,000,000.  By this Motion, pursuant to § 1104(c) of the Bankruptcy Code, the Ad Hoc Cross-Holder Group requests that the Court appoint an examiner to investigate the circumstances leading up to the chapter 11 cases, current and former management of the Debtors, including but not limited to the relationships and transactions among the Debtors, boards of directors and Foris Prepetition Lenders and the Debtors' prepetition conduct that may give rise to claims and causes of action on behalf of the estate.  Appointment of such an examiner is the only way to restore transparency and faith in the bankruptcy process and is in the best interests of the creditors, all non-insider equity security holders, and the other interest holders of the estate.

## ARGUMENT

### A.  An Examiner Is Required Because the Doerr Board Controlling the Debtors and the Doerr Lenders Have Released Themselves of Any Wrongdoing Without Any Investigation

42.    The realities and velocity of these cases and need for transparency and integrity of the process necessitate the immediate appointment of an examiner.  Only an examiner, acting as

a truly independent third party and officer of the Court, can ensure that the kind of investigation that needs to be done will be done within the necessary time constraints to keep these cases on track and preserve the integrity of the process of these cases.

43.     There is no dispute these cases are being prosecuted under the cloud of conflicts and secrecy.  The control of the bankruptcy process by Mr. Doerr and the related Doerr Board and lack of transparency have already resulted in contested disputes.[11]  And more disputes are inevitable if the Debtors continue on this path.  The Debtors have effectively thwarted any attempts for any outside investigation thus far.  Perhaps most importantly, the Debtors' own positions have made it clear that there is no independent voice speaking for the Debtors.  The allegedly independent director, Mr. Reiss (appointed by the Doerr Board), is conducting an undefined "investigation" under unknown parameters in secret.  If he does prepare a final report, there is little use in sharing it only with the "restructuring committee" who has no independent counsel and whose authority and role remains vague at best.  The Disclosure Statement's lack of *any mention whatsoever* of Mr. Reiss's investigation underscores the need for an examiner.  That investigation is, in any event, tainted and irrelevant given the Debtors' Placeholder Plan and the releases granted by the Final DIP Order.

44.     The need for an examiner is clear in light of the Debtors' Placeholder Plan, which grants broad and comprehensive releases to their insiders, including the purported targets of their own investigation, *before they have completed such investigation* and thus, without understanding or explaining the claims released, the value of such claims, and the contributions being made in exchange for such third-party releases.  In short, the Debtors have communicated that no action will be taken to hold the Doerr Lenders or Doerr Board accountable.

---

[11] Look no further than the contested DIP hearing, Committee statements and Ad Hoc Noteholder Committee's recent motion seeking information.

45.     Absent immediate action, these cases will continue to devolve down the wrong track into protracted contested litigation, leading to risk, uncertainty, and ultimately loss of value for all parties involved.  Stakeholders cannot be expected to rely upon the fundamentally unfair "process" the Doerr Board has established.  The integrity of these cases and a fair and balanced outcome for stakeholders requires more.

46.     Based upon the foregoing, the Court must appoint an examiner and at the Court's direction, provide the examiner with broad powers to complete an investigation.

### B.   Appointment of Examiner under Section 1104 of the Bankruptcy Code

47.     The primary function of an examiner is to "investigate the debtor's actions, financial condition, as is appropriate under the particular circumstances of the case including any allegations of fraud, dishonesty or gross mismanagement of the debtor by current or former management."  *In re Gilman Servs.*, 46 B.R. 322, 327 (Bankr. D. Mass. 1985).  Generally, an examiner does not replace a debtor-in-possession, but is appointed primarily to investigate.

48.     Section 1104(c) of the Bankruptcy Code provides, in pertinent part:

> on request of a party in interest or the United States trustee, and after notice and a hearing, the court *shall* order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if--
>
> (1)     such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
>
> (2)     the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

11 U.S.C. § 1104(c) (emphasis added).

49.     As the legislative history of Section 1104 indicates, an examiner's role is to "conduct an investigation of the debtor's actions and financial condition and report the results of such investigation." Pub. L. No. 95-598, 92 Stat. 2549 (1978), 1978 H.R. 8200, 95th Cong. Sess. 1978). In addition, such an investigation of a debtor should be reported "as is appropriate under the particular circumstances of the case, including an investigation of any allegations of fraud, dishonesty, or gross mismanagement of the debtor or by current or former management of the debtor." H.R. Rep. No. 95-595 at 403 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6359.

50.     Additional duties which a bankruptcy court in its discretion may delegate to an examiner should be understood as consistent with the investigative rubric: Section 1106(b), like its statutory predecessors, vests a court with discretion "to give the examiner additional duties as the circumstances warrant." H.R. Rep. No. 95-595 at 404 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6360; S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787; *In re Carnegie Int'l Corp.*, 51 B.R. 252, 255 (Bankr. S.D. Ind. 1984); *In re Liberal Market, Inc.*, 11 B.R. 742, 745 (S.D. Ohio 1981) (expanding the powers of the examiner to operate the debtor's business); *In re International Distrib. Ctrs.*, 74 B.R. 221, 224 (S.D.N.Y. 1987) (recognizing a bankruptcy court must be afforded flexibility to fashion an examiner's powers as specific circumstances may require).

### i.     Appointment of an Examiner Is Mandatory

51.     Section 1104(c) contains provisions for either mandatory or discretionary appointment of an examiner. Under this section, appointment of an examiner is mandatory if requested by a party in interest in a case with more than $5,000,000 of unsecured liabilities. If this monetary threshold is not met, a court may order the appointment of an examiner if such appointment is in the best interest of creditors.

52.     Here, the requirement of mandatory appointment of an examiner presents no undue difficulty for the Court since the fixed, liquidated, unsecured claims against the Debtors well exceed the statutory limit for the appointment of an examiner, and are not claims for goods, services, taxes or amounts owing to an insider.  In light of the fact that (i) no trustee has been appointed, (ii) no plan has been confirmed, (iii) a party in interest (here, the Ad Hoc Cross-Holder Committee) has requested appointment of an examiner, and (iv) there exists fixed, liquidated, unsecured claims against the Debtors in an amount in excess of $5,000,000, the appointment of an examiner in these cases is mandated by the plain meaning of Section 1104(c)(2).  *See In re Revco D.S., Inc.*, 898 F.2d 498 (6th Cir. 1990) (when the statutory requirements of Section 1104(b)(2) (now 1104(c)(2)) are present, the court has no discretion but to order the appointment of an examiner; the statute is clear on its face); *In re Loral Space & Comm'ns Ltd.,* No. 04 Civ. 8645RPP, 2004 WL 2979785 at *5 (S.D.N.Y. Dec. 23, 2004) (holding that "[i]n light of the straightforward language and legislative history . . . the Bankruptcy Court had no discretion to deny appointment of an examiner where . . . the $5,000,000 debt threshold is met . . . ."); *In re UAL Corp.*, 307 B.R. 80, 83-86 (holding that the "best reading of the statute" is that appointment of an examiner is mandatory if the above-mentioned four factors are met); *see also In re The Bible Speaks*, 74 B.R. 511, 514 (Bankr. D. Mass. 1987) (noting that appointment of examiner would be mandatory in deciding to appoint trustee; *In re Schepps Food Stores, Inc.*, 148 B.R. 27, 29–30 (S.D. Tex. 1992) (noting that appointment of examiner would be mandatory, but movant had waived right to seek such relief previously).

### ii.   Discretionary Appointment of an Examiner Is Warranted and Beneficial

53.     Even if such appointment were not mandatory, appointment of an examiner is nonetheless still warranted and appropriate under Section 1104(c)(1) of the Bankruptcy Code.

54.     Discretionary appointment of an examiner is warranted if, as here, it is in the best interests of unsecured creditors and other interests of the estates.  The United States Court of Appeals for the Third Circuit examined the language for discretionary appointment of a trustee under 11 U.S.C. § 1104(a)(2) (which language is identical to that of § 1104(c)(1) concerning discretionary appointment of an examiner) in *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463 (3d Cir. 1998).    There, the Third Circuit noted that the statute "envisions a flexible standard," and gives the court "discretion to appoint [an examiner] when to do so would serve the parties' and estates' interests." *Id.* at 474 (quotations omitted).

55.     As outlined at length above, there is ample proof in these cases that warrants the appointment of an examiner.  Under similar circumstances, courts have not hesitated to appoint an examiner.  The examination of the Debtors' slide into chapter 11 and the decision making of the Doerr Board, including its relationship with the Doerr Lenders, is essential to these cases. The Debtors' pre-and post-petition relationships with the Doerr Lenders implicates hundreds of millions of dollars' worth of secured financing (including the DIP Loan), exclusive of possible D&O claims and other causes of action that will also otherwise be lost if the Debtors' Placeholder Plan is ultimately confirmed.  Any wrongdoing uncovered could have a significant impact on these cases and the abilities of the insider Doerr Lenders to control and dictate value distributed to other stakeholders.

56.     An examiner report that is viewed as legitimate and transparent, upon which all parties can negotiate to achieve a resolution, will help, not harm these cases.  The formulation

and promulgation of a viable and confirmable plan of reorganization requires such an independent investigation. The current Placeholder Plan serves as nothing more than a vehicle to shed liability of the Doerr insider consortium through nonconsensual third-party releases, while also curtailing the investigation and prosecution of various claims and causes of action by any other party in interest.

57.    Examiners have helped move cases forward by allowing parties to negotiate off an independent examiner report. *See, e.g.*, *Dynegy Holdings, LLC*, Case No. 11-38111 at Docket No. 276 (Bankr. S.D.N.Y. Dec. 29, 2011) (appointing examiner to investigate prepetition conduct of debtors' board; chapter 11 plan later confirmed); *In re Caesars Enter. Operating Co., Inc.*, Case No. 15-01145 at Docket No. 675 (Bankr. N.D. Ill. Mar. 12, 2015) (appointing examiner to investigate avoidable transfers; chapter 11 plan later confirmed); *In re Cenveo, Inc.*, Case No. 18-22178 at Docket No. 203 (Bankr. S.D.N.Y. Mar. 15, 2018) (appointing examiner to investigate insider transactions; chapter 11 plan later confirmed).

58.    As a result, the Ad Hoc Cross-Holder Group believes the immediate appointment of an examiner is necessary to avoid further harm and deterioration to the Debtors' estates and creditors.  The appointment of an examiner will facilitate the most viable reorganization of these estates, maximize recoveries to the creditors and preserve the integrity of these cases.

## **CONCLUSION**

59.     For the above reasons, the Ad Hoc Cross-Holder Group respectfully asks that the

Court enter an order (i) granting the Motion, (ii) appointing an examiner in the Chapter 11 Cases

effective immediately, and (iii) granting such other and further relief as the Court deems proper.

<table>
<tr><td>Dated: November 1, 2023<br>Wilmington, Delaware</td><td>**WOMBLE BOND DICKINSON (US) LLP**<br><br>*/s/ Matthew P. Ward*<br>Matthew P. Ward (DE Bar No. 4471)<br>Morgan L. Patterson (DE Bar No. 5388)<br>1313 North Market Street, Suite 1200<br>Wilmington, Delaware 19801<br>Telephone: (302) 252-4320<br>Facsimile: (302) 252-4330<br>Email: matthew.ward@wbd-us.com<br>Email: morgan.patterson@wbd-us.com<br><br>-and-<br><br>**ARENTFOX SCHIFF LLP**<br><br>*/s/ Andrew I. Silfen*<br>Andrew I. Silfen<br>Beth N. Brownstein<br>1301 Avenue of the Americas, 42nd Floor<br>New York, New York 10019<br>Telephone: (212) 484-3900<br>Facsimile: (212) 484-3990<br>Email: andrew.silfen@afslaw.com<br>Email: beth.brownstein@afslaw.com<br><br>-and-</td></tr>
</table>

**STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.**

*/s/ Eric J. Silver*
Eric J. Silver
150 West Flagler Street, Suite 2200
Miami, Florida 33130
Telephone: (305) 789-4175
Facsimile: (305) 789-2688
Email: esilver@stearnsweaver.com

*Counsel to the Ad Hoc Cross-Holder Group*