# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC., *et al.*, | Case No. 23-11131 (TMH) |
| | (Jointly Administered) |
| Debtors.[1] | **Re: Docket No. 524, 525** |

## LAVVAN, INC.'S OBJECTION TO DISCLOSURE STATEMENT

Lavvan, Inc. ("**Lavvan**"), by and through its undersigned counsel, objects to the *Disclosure Statement with Respect to Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors* (the "**Disclosure Statement**") submitted by the above-captioned debtors ("**Debtors**") in connection with the solicitation of votes for acceptance of the *Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors* ("**Plan**"). In support of this objection, Lavvan respectfully states as follows:

### INTRODUCTION[2]

1. The Disclosure Statement fails to provide the most important details about how the Plan proposes to treat Lavvan's secured claim: how much—if anything—are the Debtors proposing to pay, when, and under what conditions?

2. On its surface, the Disclosure Statement states that Lavvan will retain its lien and will begin to receive payments on its secured claim after payment "in cash in full" of the secured claims to which Lavvan is deemed subordinated (the Foris 2018 Loan and the DIP Facility Claim that has primed that loan). But the Plan appears to be structured so that the Foris 2018 Loan and

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

[2] Undefined capitalized terms have the same meaning as in the Disclosure Statement.

DIP Facility Claims will *never* be paid "in cash in full." Rather, the Plan provides that those claims will be paid partly in cash, partly by an exchange into new debt (the exit facility), and partly by receiving a distribution of new equity (stock of the reorganized debtor). The Plan also contends that Foris's and Euagore's receipt of this new debt and equity will *not* satisfy the Foris 2018 Loan and DIP Facility Claims in full. Instead, it states that the Foris 2018 Loan and DIP Facility Claims will "continue in full force and effect after the Effective Date with respect to … any … unsatisfied obligations thereunder." Again, because the Plan contends that any new debt and equity distributed to Foris and Euagore will not satisfy their claims (and in any event will not satisfy those claims *in cash*), the condition needed to trigger a payment to Lavvan—satisfaction of the Foris 2018 Loan and DIP Facility "in cash in full"—seemingly will *never* occur. It thus appears that the Debtors are proposing a Plan that pays nothing at all to a secured creditor but that provides a recovery to two separate classes of unsecured creditors. The Disclosure Statement omits any mention of this patently unfair and unconfirmable trap.

3. The Disclosure Statement's opaqueness on this point is troubling: it should not be up to the creditor to piece together cryptic defined terms and technical plan language to guess at how its claim will be treated; the Disclosure Statement should say so in plain English. The Disclosure Statement fails this basic requirement. It buries the treatment of Lavvan's claim in a hodgepodge of defined terms and descriptions of how other classes will be treated. It does not say how subordination will work post–effective date. It hides what looks like an intent to never pay Lavvan's claim, in favor of paying insider claims and lower-priority claims instead. And even if that were not the case (*i.e.*, if the Debtors intend for Lavvan to be paid at some point years from now), the Disclosure Statement omits critical terms, such as the proposed repayment term and interest rate (both listed as "to be determined"). It also fails to provide projections through the

date by which Lavvan will be repaid, so assessing feasibility is impossible. In short, the Disclosure Statement fails to provide adequate information by which Lavvan can even determine, let alone evaluate, what if anything it will purportedly receive and when.

4. The Debtors may be trying to avoid disclosing in plain language that they are proposing a Plan that would result in Lavvan never recovering a penny on its secured claim, because doing so would expose that the Plan violates the absolute priority rule. This is an independent basis to deny approval of the Disclosure Statement: a plan that violates the absolute priority rule is patently unconfirmable.

## BACKGROUND

### A. Lavvan's Secured Claim

5. Lavvan's claim arises under that certain *Research, Collaboration and License Agreement*, dated as of March 18, 2019 (as amended from time to time, the "**RCL Agreement**"). A redacted version of the RCL Agreement which the Debtors have previously publicly filed is attached as **Exhibit A**.

6. The RCL Agreement was supposed to represent a collaboration between Lavvan and Amyris for the production of biosynthetic cannabinoids. Under the agreement, Amyris was responsible for delivering the technology and process to produce certain molecules through fermentation, while Lavvan controlled the manufacturing and commercialization of the molecules. But the partnership never materialized. In April 2020, Amyris repudiated the RCL Agreement and declared its intent to manufacture and commercialize cannabinoids without Lavvan.

7. Amyris's breaches of the RCL Agreement led Lavvan to sue for damages. Under the agreement's dispute resolution provisions, certain claims had to be arbitrated, while others were to be litigated in federal court. In accordance with those provisions, Lavvan filed certain

3

claims in the International Chamber of Commerce International Court of Arbitration, and others in federal court in the Southern District of New York.

8. The arbitration has been fully tried, and on September 11, 2023, this Court lifted the automatic stay to permit the issuance of a decision. The arbitration tribunal has indicated that it has reached a decision, and Lavvan expects a ruling and damages award imminently. Given the factual overlap and to avoid duplication, Lavvan's federal suit—which survived a motion to dismiss and an appeal of that ruling—was stayed pending the arbitration tribunal's ruling, and currently remains stayed.

9. The RCL Agreement grants Lavvan a lien and security interest on certain assets for claims arising under the agreement. RCL Agreement § 5.12.2(a). Lavvan entered into a security agreement and perfected its security interest on May 9, 2019, by filing a UCC Financing Statement with the Delaware Department of State.

**B. Lavvan's Secured Claim Was Subordinated Only To Amounts Owed Under the Foris 2018 Loan**

10. Under the RCL Agreement, Lavvan's liens were to be junior in priority to the liens held by Amyris's then-existing secured lender (Great American) under its loan agreement. RCL Agreement § 5.12.2(a).[3] Great American had extended a secured term loan for about $36 million, with a maturity date of July 1, 2021. The parties agreed to enter into a subordination agreement in connection with the closing. In the interim, Foris bought Great American's loan and became its successor under the loan agreement (the "**Foris 2018 Loan**"). Lavvan thus executed a

---

[3] "Amyris shall grant to Lavvan a lien and security interest on all Amyris Platform Improvement IP and Amyris Background IP to secure all obligations of Amyris to Lavvan hereunder (the 'Lavvan Lien'). The Lavvan Lien shall be junior in priority to the existing liens and security interests of Great American and any other Permitted Senior Lender and shall be subject to a subordination agreement with Great American and any other Permitted Senior Lender (a 'Subordination Agreement')."

4

subordination agreement with Foris in May 2019 (the "**Subordination Agreement**") (copy attached as **Exhibit B**).

11.     The Subordination Agreement subordinates Lavvan's interests only to the amount owed under the Foris 2018 Loan. *See* Subordination Agreement ¶ 2 (subordinating Lavvan's lien to the "Senior Debt," defined as obligations owed under "that certain Loan and Security Agreement, dated as of June 29, 2018 (as the same has been and may be amended from time to time….)"). The Subordination Agreement remains in effect only if and to the extent there is a balance remaining on the Foris 2018 Loan. *Id.* ¶ 14. The Debtors have contended that as of the petition date, about $50 million of principal remained owing under the Foris 2018 Loan. *See* Hr'g Tr. 10:11–10:14, Oct. 11, 2023.

12.     In connection with the Debtors' entry into DIP financing, this Court held that the DIP Facility primed the Foris 2018 Loan and Lavvan's secured claim. As a result, subject to Lavvan's pending appeal of that issue and its adversary complaint challenging the continuing enforceability of the Subordination Agreement, Lavvan's liens in these cases are currently deemed junior to the Foris 2018 Loan and the DIP Facility Claim.

C.     **The Plan Appears To Propose To Never Pay Lavvan's Secured Claim**

13.     Piecing together the Plan's description of Lavvan's claim, the Foris 2018 Loan, the DIP Facility Claim, and certain defined terms, it appears that the Debtors have structured the Plan to put repayment of Lavvan's claim in limbo permanently.

14.     The Plan places Lavvan's secured claim in a class of its own (Class 6). The Plan proposes for Lavvan to retain its lien, which will be junior to the Foris 2018 Loan and DIP Facility Claim:

> *Treatment:* On the Effective Date, in full and complete satisfaction of the Lavvan Secured Claim, Lavvan will retain whatever Lien it may have on the Debtors' assets

> solely to the extent it secured an Allowed Lavvan Secured Claim, and ***after such time as the Foris Prepetition Secured Lenders and/or the DIP Lender***, as applicable, ***[receive] the indefeasible payment in cash in full*** of the obligations owning under the (i) Foris 2018 Loan, (ii) the DIP Facility Claims, and (iii) such other Foris Prepetition Secured Claims as are determined by the Bankruptcy Court are required under the Lavvan Documents to be indefeasibly paid in cash in full prior to the Allowed Lavvan Secured Claim being paid, ***thereafter*** Lavvan will receive equal annual amortizing deferred cash payments ***at a duration and rate to be determined*** by the Bankruptcy Court.

Plan § III.A.6 (emphasis added). Notably, this provision appears to require "payment *in cash in full* of the obligations owing under the (i) Foris 2018 Loan and (ii) DIP Facility Claims" as preconditions of any payment to Lavvan. *Id.* (emphasis added). As explained below, the Plan appears to be structured to ensure these preconditions will never be met.

15. The "Foris 2018 Loan" is one of six loans made by Foris or its affiliates included within the defined term "Foris Prepetition Secured Claims." Plan § I.A.107. The Plan proposes to place the Foris Prepetition Secured Claims in Class 3 and to provide them with the following treatment:

> *Treatment*: On the Effective Date, Holders of the Foris Prepetition Secured Claims will, ***at the option of the Foris Prepetition Secured Lenders, in each of their sole discretion***, receive (x) a portion of the First Tranche Net Proceeds, the Second Tranche Net Proceeds, and the Third Tranche Net Proceeds as provided for herein, and (y) an amount equal to the Foris Prepetition Secured Claims not paid on account of distributions of the First Tranche Net Proceeds, the Second Tranche Net Proceeds, and the Third Tranche Net Proceeds, ***rolled up, converted, exchanged, refinanced or amended and restated, into the into the Exit First Lien Facility and/or 100% of New Common Stock of Reorganized Amyris***.

Plan § III.A.3 (emphasis added). In other words, the Foris Prepetition Secured Claims will receive some sale proceeds (at Foris's sole option), and on account of the remaining balance, Foris's loans will be rolled into new debt (the exit facility) and it will receive new equity (stock of the reorganized debtor). Given their repeated arguments at the Final DIP Financing hearing, it is virtually certain that the Debtors, Foris, and Euagore will argue that this treatment will not constitute "payment *in cash* in full." *See, e.g.*, Hr'g Tr. 245:8–11, Oct. 4, 2023 (Debtors' counsel:

6

"the subordination agreement provides that it is in place until the debt is paid in full in cash – cash – not in warrants, not in stock, not in any other kind of currency, paid in full in cash."); *id.* at 254:21–24 (Foris and DIP Lender counsel: "until Foris is paid in cash, Lavvan can't get paid.").[4]

16.     The Plan is sparse on detail about the new exit facility.[5] The Plan contemplates an exit facility of "up to [$100,000,000]." Plan § I.A.95–96. This new loan will be "on terms set forth in the Exit First Lien Facility Documents," which to Lavvan's knowledge do not yet exist. *Id.* The Disclosure Statement attaches a term sheet for the proposed exit facility that itself only has placeholder terms. *See* Disclosure Statement Ex. A. Even the most basic details such as the term of the loan are unknown: the Plan states that the exit facility will have a five-year term, except that the term will be "up to ten years" if any part (presumably even $1) of the Foris 2018 Loan or DIP Facility Claim are converted to exit financing. *Id.* The Disclosure Statement does not explain why the exit facility's term might double just because the source of some of its funds comes from a rollup or conversion of debt, but the intent is obvious: if the Court does not authorize the Debtors' apparent Plan A (to forever avoid paying Lavvan), then the Debtors will attempt to delay paying Lavvan for as long as possible by arguing that the exit financing continues some portion of the Foris 2018 Loan, and then stretching repayment of the exit financing for as long as possible.

---

[4] *See also id.* at 245:23–25 (Debtors' counsel: "Payment in full, paid in full. Paid in full; indefeasibly, indefeasibly paid in full in cash. This is a very important point, Your Honor, paid in full in cash."); *id.* at 286:20–25 (Debtors' counsel: "we traced everything back to the original agreement and we showed you nothing has been paid, nothing has been paid in cash and, if nothing has been paid in cash, the subordination agreement is in effect."); Joint Reply of the Debtors, Euagore, LLC, and the Foris Prepetition Secured Lenders to Opening Brief of Lavvan, Inc. [D.I. 433] at ¶ 6 ("The simple and incontrovertible fact is that a balance that was not paid in cash remains due under the Foris LSA and, therefore, the Subordination Agreement remains in effect.").

[5] While disclosure statements sometimes do not include the details of an exit facility, it is essential that *this* disclosure statement do so because understanding the treatment of Lavvan's claim depends on it.

17. In terms of new equity into which Foris will convert some its claim, the Plan defines the "New Common Stock of Reorganized Amyris" simply as "the common stock, common shares, ordinary shares, or other common Interest or unit, as applicable, of Reorganized Amyris." Plan § I.A.135. The Debtors apparently believe that subordination will continue upon the conversion of some of the Foris 2018 Loan or DIP Facility Claim into equity. Under this view, the Plan appears designed to keep Lavvan subordinated forever such that it would never receive a payment on its claim, on the theory that stock is never "repaid," and a distribution of stock is not repayment "in cash."

18. Consistent with the Debtors' apparent intent to extend subordination indefinitely to new facilities and securities that were not part of the Subordination Agreement, the Debtors included unusual language in the Plan's treatment of Class 3, providing that the Foris 2018 Loan will continue "in full force and effect" for any part of the loan that (x) is exchanged for exit financing or (y) remains unsatisfied:

> *Other.* Notwithstanding anything to the contrary in this Plan or the Confirmation Order, ***the Foris Prepetition Secured Claims shall continue in full force and effect after the Effective Date with respect to*** (x) any Foris Prepetition Secured Claims rolled up, converted, exchanged, refinanced, or amended and restated into the Exit First Lien Facility and (y) ***any*** contingent or ***unsatisfied obligations thereunder***, as applicable, including, but not limited to, those provisions [of the pre-petition loans relating to certain rights held by the prepetition secured lenders].

Plan § III.A.3 (emphasis added).

19. Not only do the Debtors contend that Foris's claims (presumably including subordination rights) will "continue in full force and effect" for the portion exchanged for exit financing, but they also appear to contend the same for the portion that will receive a distribution of stock. For example, the Plan's treatment of the DIP Facility Claims, which mirrors the treatment of Class 3, states that any part of the DIP Facility Claims that is exchanged for exit financing or that receives a stock distribution will *not* be deemed "satisfied" and will therefore stay alive:

8

> On the Effective Date, in full and complete satisfaction of the DIP Facility Claims (***other than the DIP Facility Claims rolled up, converted, exchanged, refinanced or amended and restated, into the Exit First Lien Facility or New Common Stock***), the DIP Lender will receive [cash sale proceeds, and the balance in exit facility debt and new common stock].

Plan § II.B (emphasis added). Likewise, in Class 3, the Debtors conspicuously omit language that they included for classes 4, 5, 6, 7, and 8—that the Plan's treatment of the claims in the class will be "in full and complete satisfaction" of those claims. *Compare* Plan §§ III.A.3–8 (including such language for classes 4 to 8, but omitting it from Class 3).

20. Putting this all together, the Plan appears to provide that:

    (1) Lavvan does not begin to receive payment until the Foris 2018 Loan and DIP Facility Claims are paid "in cash in full";

    (2) Foris and its DIP Lender affiliate will receive (at their sole choice) some cash, some new debt, and some equity on account of the Foris 2018 Loan and DIP Facility Claims (rather than payment "in cash in full");

    (3) Foris's receipt of debt or equity on account of the Foris 2018 Loan and DIP Facility Claims will not be deemed to "satisfy" those claims;

    (4) The underlying loan documents (including the Subordination Agreement) will continue "in full force and effect" until the claims are satisfied (in other words, for any part converted into the exit facility or stock); and

    (5) If it even matters given the above, the portion of the loans rolled up into new exit facility debt likely will not be paid off for ten years.

When combined with the concepts that (a) stock is never "repaid" or "satisfied" and (b) the 2018 Foris Loan and DIP Facility Claims will never be repaid fully "in cash," the Plan appears designed to accomplish an impermissible outcome: nonpayment of Lavvan's claim in perpetuity.

21. Remarkably, the Disclosure Statement does not discuss any of this. It does not plainly set forth the Debtors' position on how the Subordination Agreement will apply post–effective date. It does not explain why the Foris 2018 Loan and DIP Facility Claims are deemed "unsatisfied" even though they will be receiving cash and the balance through an exchange into

9

new debt and a distribution of new common stock. And it does not explain how subordination, which here is limited to claims under one particular loan agreement (and the priming DIP Facility), could apply to a new loan facility provided by a new lender, or to stock—the Debtors cannot "amend" the Foris 2018 Loan into an entirely different loan, let alone into equity. Other than parroting the Plan's confusing language, the Disclosure Statement's only mention of Lavvan is to summarize the procedural postures of Lavvan's arbitration and of the DIP financing proceedings.

22. The Disclosure Statement also does not disclose why it is appropriate for a Plan to provide a distribution to two classes of *unsecured* creditors when Lavvan's *secured* claim apparently will never be paid. Alternatively, if the Debtors' position is that Lavvan will be repaid when the exit facility is repaid—*i.e.*, beginning upwards of ten years from now——the Disclosure Statement does not explain how the Plan is feasible since it has provided projections for only four years.

## OBJECTION

### I. The Disclosure Statement Does Not Contain Adequate Information And Fails To Satisfy The Requirements of Bankruptcy Code § 1125

23. "Disclosure is the 'pivotal' concept in Chapter 11 reorganization." *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999) (citing 5 Lawrence P. King, COLLIER ON BANKRUPTCY ¶ 1125.03 (15th ed. 1992)). The Debtors bear the burden of proving that the Disclosure Statement contains "adequate information." *Off. Comm. of Unsecured Creditors v. Michelson (In re Michelson)*, 141 B.R. 715, 719–20 (Bankr. E.D. Cal. 1992). Adequate information means "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan. . . ." 11 U.S.C. § 1125(a).

24. Full disclosure is fundamental to the proper functioning of the bankruptcy process:

> The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of "adequate information."

*Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 2013); *see also Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) ("Because creditors and the bankruptcy court rely heavily on the debtor's disclosure statement in determining whether to approve a proposed reorganization plan, the importance of full and honest disclosure cannot be overstated."). The disclosure statement "plays a pivotal role in the give and take among creditors and between creditors and the debtor that leads to a confirmed negotiated plan of reorganization by requiring adequate disclosure to the parties, so they can make their own decisions on the plan's acceptability." *Nelson v. Dalkon Shield Claimants Tr.* (*In re A.H. Robins Co., Inc.*), 216 B.R. 175, 180 (E.D. Va. 1997).

25. A disclosure statement must provide enough information to creditors *in each particular class* to permit them to decide whether to vote for or against the plan. *See* 11 U.S.C. § 1125(a)(1). A court should examine each disclosure individually to discern whether the Bankruptcy Code's "adequate information" requirement is satisfied. *See In re Worldcom, Inc.*, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003) ("[T]he approval of a disclosure statement . . . involves a fact-specific inquiry into the particular plan to determine whether it possesses 'adequate information' under § 1125.") (internal citation omitted).

26. The Disclosure Statement fails to provide adequate information about the treatment of Lavvan's claim because it provides almost no information that would allow Lavvan to meaningfully assess how and when its claim will ever be repaid.

27. *Subordination*. First, the Disclosure Statement provides no concrete information about subordination. Based on the Debtors' proposal to give Foris and its insider-affiliates new debt and equity on account of the Foris 2018 Loan and DIP Facility Claims, Lavvan needs to know whether the Plan is attempting to extend the Subordination Agreement to these new facilities/securities. That appears to be the intent, but the Disclosure Statement does not directly say so. The Debtors should state clearly whether they are proposing that the Subordination Agreement apply to the exit facility and to any stock that Foris or its affiliates receive on account of the Foris 2018 Loan or DIP Facility Claim. And if so, they should clearly explain under what conditions they contend that subordination would terminate, or if they contend that subordination would last indefinitely. The Plan's proposed treatment of the Subordination Agreement is critical information pertaining to Lavvan's claim, and Lavvan should not have to guess at the Debtors' position. *Cf. In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) ("disclosure statements should not contain overly technical language that the average creditor cannot readily understand").

28. The Debtors should also explain the basis for their contention that any part of the Foris 2018 Loan or DIP Facility Claim will continue to exist once those claims receive the treatment proposed under the Plan (cash, new debt, new stock). As explained above, the Plan provides that the Foris 2018 Claim and DIP Facility Claims will continue to exist as if unsatisfied, even though Foris would be receiving new debt and equity on account of those claims—as if some part of those claims would ride through the Plan despite their treatment. Plan § III.A.3. The Debtors do not explain how this can be the case. The Plan provides Foris (and its DIP Lender affiliate) with a recovery on every part of their claims: one part will receive cash from sale proceeds, and the remainder will become exit financing or will receive new equity. *See* Plan § III.A.3 (after receiving sale proceeds at their election, Foris 2018 Loan will receive new debt or

equity in "an amount equal to the [claims] not paid on account of [sale proceeds]"); Plan § II.B (same for DIP Facility Claims). For other classes of the Plan, such as classes 4 through 8, the Debtors state that the Plan's treatment will be in full and final satisfaction of those claims. The Debtors should explain why they believe the result should be any different for the claims of their insiders.

29. The Plan also is ambiguous in that it states that the Foris 2018 Loan and DIP Facility Claims will be "rolled up, converted, exchanged, refinanced, or amended and restated" into exit financing and common stock. Plan §§ II.B & III.A.3 (treatment of DIP Facility Claims and Class 3). Although the Debtors contend that the Subordination Agreement applies to any amendments of the Foris 2018 Loan (based solely on the Subordination Agreement's inclusion of the parenthetical phrase "(as the same has been and may be amended from time to time)" in the definition of that loan), nothing in the Subordination Agreement states or implies that it will apply to wholly new loans into which the Foris 2018 Loan has been rolled up, converted, exchanged, or refinanced. And loan agreements, such as the Foris 2018 Loan, cannot be "amended and restated" into new and different loan facilities. Nor can they be "amended and restated" into new securities such as stock. For the Disclosure Statement to be accurate, it would need to state that Foris was receiving a distribution of stock on account of its claim, rather than using vague language designed to suggest that the Foris 2018 Loan is "amended" into stock. The Debtors should clearly disclose how they propose to issue new debt and stock, including whether they contend that it will be through a purported "amendment" of the Foris 2018 Loan.

30. *Terms of repayment.* Second, beyond its lack of clarity about subordination, the Disclosure Statement provides no specific information about the proposed repayment of Lavvan's secured claim. It states only that (1) Lavvan will retain its lien on secured assets and (2) the claim

will be repaid sometime after satisfaction in cash of the Foris 2018 Loan and DIP Facility Claims. Plan § III.A.6.  In terms of timing, even putting aside the Debtors' apparent attempt to indefinitely subordinate by ensuring that payment supposedly never will be "in cash in full," the Plan is silent about when Lavvan might see any distribution.  The Plan states only that the exit facility to which the Debtors want to subordinate Lavvan may have a term of "up to ten years."  If and when payment begins sometime between now and 2034, the Plan does not say over what term the Debtors would propose to repay the claim.  The Plan states only that payment terms are "to be determined."  Plan § III.A.6.  For example, if the Debtors propose to repay Lavvan over ten years, then Lavvan's claim would not be satisfied until 2044—while junior creditors receive immediate cash payments.

31.     In short, even putting aside the subordination issue, all that Lavvan can glean from the Plan is that it might receive a first payment in 2034—or later if the Debtors and their insider-controlled lenders continue their prepetition conduct of radically amending and extending loans—on terms that are "to be determined."  That is not enough information to intelligibly evaluate the economics of how the Plan treats Lavvan's claim.  *Cf. In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) ("a proper disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution"); *In re Galerie Des Monnaies of Geneva, Ltd.*, 55 B.R. 253, 259 (Bankr. S.D.N.Y. 1985) ("It is clear, however, that in all cases, facts which inform claimants about the financial results of acceptance or rejection of a plan, must be included.").

32.     *Deficiency claim.*  Third, the Disclosure Statement provides no information about how the Debtors would propose to determine how much of Lavvan's claim is secured and how much would be treated as a deficiency, and therefore placed in the general unsecured class.  That

would require a determination of the value of Lavvan's collateral package as well as what portion of the priming loans would be paid from Lavvan's collateral package, neither of which is disclosed.

33. *Information about feasibility.* The Disclosure Statement lacks meaningful projections or financial information for the period that the Debtors propose to pay Lavvan's claim. Although the Disclosure Statement contains high-level projections for the years 2024 through 2028, the Plan contemplates payments to Lavvan—if at all—beginning as late as 2034 and continuing for an unspecified number of years. Yet the Disclosure Statement offers no information to suggest that the Debtors, which were cash-flow-negative prepetition and are projected to have significant negative cash flow even post-emergence, will survive until 2034 and sufficiently beyond to pay Lavvan's secured claim. The failure of the Disclosure Statement to even project to the period when it would propose to *begin* paying Lavvan's claim is a critical omission, and leaves Lavvan with no information by which to evaluate the Plan's feasibility. *See, e.g.*, *F.H. P'trs, L.P. v. Inv. Co. of the Sw., Inc. (In re Inv. Co. of the Sw., Inc.)*, 341 B.R. 298, 315–16 (B.A.P. 10th Cir. 2006) (debtor must prove ability to fund balloon payments and did not do so when financial projections did not extend through date of such payments; court requires "some evidence, whether it be formal projections, or otherwise, to explain how those balloon payments are to be reasonably funded."); *In re Trenton Ridge Inv'rs, LLC*, 461 B.R. 440, 479, 493 (S.D. Ohio 2011) (debtor required to provide evidence to support contention of ability to pay deferred obligation).

34. In addition, even the existing projections leave much to be desired. *See* Disclosure Statement Ex. E. The Debtors project that they will lose $115 million in cash flow in the two years immediately following emergence, after which their revenue will suddenly double, leading them to just break even in cash flow in 2026. *Id.* The Disclosure Statement contains no specifics about why the Debtors believe this enormous projected leap in revenue is reasonable or achievable; the

projections offer only generic assurances that the revenues are based on "assumed volumes and average selling prices," without explaining what those are. *See In re Ligon*, 50 B.R. 127, 130 (Bankr. M.D. Tenn. 1985) (in a disclosure statement, "[c]onclusory allegations or opinions without supporting facts are generally not acceptable"); *In re E. Redley Corp.*, 16 B.R. 429, 430 (Bankr. E.D. Pa. 1982) ("opinions without factual support are not proper content of a disclosure statement and do not provide the parties voting on the plan with adequate information"). The Debtors state that their exit financing will plug the $115 million negative cash flow in their first two years post-emergence, but given their stated intent to convert existing funded debt into the exit facility, some or all of that facility will not provide new cash. In short, the projections provide no information that would allow Lavvan to evaluate the feasibility of its claim ever being paid.

35. *Patent unconfirmability*. For the reasons above, the Plan appears to propose to defer payment of Lavvan's secured claim in perpetuity while making distributions to unsecured creditors. That is a violation of the absolute priority rule and renders the Plan patently unconfirmable. *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012) ("a bankruptcy court may address the issue of plan confirmation where it is obvious at the disclosure statement stage that a later confirmation hearing would be futile because the plan described by the disclosure statement would be patently unconfirmable"); *In re Armstrong World Indus., Inc.*, 432 F.3d 507, 513 (3d Cir. 2005) ("The absolute priority rule, as codified, ensures that 'the holder of any claim or interest that is junior to the claims of [an impaired dissenting] class will not receive or retain under the plan on account of such junior claim or interest any property.'") (citing 11 U.S.C. § 1129(b)(2)(B)(ii)). By providing for unsecured creditors to receive a share of sale proceeds while at the same time deferring payment of Lavvan's secured claim indefinitely, so that Lavvan apparently will never be paid at all, the Plan as described in the Disclosure Statement

cannot satisfy 11 U.S.C. § 1129(b)(2)(B)(ii).

36.     *Third-party releases*.  Lavvan objects to the Plan's third-party releases and joins and incorporates the disclosure statement objections filed by other constituencies with respect to those releases.

## CONCLUSION

Because the Disclosure Statement omits basic details about the treatment of Lavvan's claim, and for all the reasons above, the Court should not approve the Disclosure Statement.

Dated: November 14, 2023

Respectfully submitted,

*/s/ Russell C. Silberglied*
Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Cory D. Kandestin (No. 5025)
Emily R. Mathews (No. 6866)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 North King Street
Wilmington, Delaware  19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701
Email:     collins@rlf.com
           silberglied@rlf.com
           kandestin@rlf.com
           mathews@rlf.com

-and-

Jason Cyrulnik
Paul Fattaruso
**CYRULNIK FATTARUSO LLP**
55 Broadway, Third Floor
New York, New York  10006
Telephone: (646) 844-2466
Email:     cyrulnik@cf-llp.com
           pfattaruso@cf-llp.com

*Counsel for Lavvan, Inc.*