## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>AMYRIS, INC., et al.,<br><br><br>Debtors. [1] | Chapter 11<br><br>Case No. 23-11131 (TMH)<br><br>(Jointly Administered)<br><br><br>Hearing Date: 11/21/23 at 11:00 am (ET)<br><br>Objection Deadline: 11/17/23<br>(extended for U.S. Trustee)<br><br>Related Docket Nos. 524, 525 |

**UNITED STATES TRUSTEE'S OBJECTION TO MOTION FOR AN ORDER (I) APPROVING THE DISCLOSURE STATEMENT; (II) SCHEDULING CONFIRMATION HEARING; (III) APPROVING FORM AND MANNER OF NOTICE OF CONFIRMATION HEARING; (IV) ESTABLISHING PROCEDURES FOR SOLICITATION AND TABULATION OF VOTES TO ACCEPT OR REJECT PLAN, INCLUDING (A) APPROVING FORM AND CONTENT OF SOLICITATION MATERIALS; (B) ESTABLISHING RECORD DATE AND APPROVING PROCEDURES FOR DISTRIBUTION OF SOLICITATION MATERIALS;(C) APPROVING FORMS OF BALLOTS; (D) ESTABLISHING VOTING DEADLINE FOR RECEIPT OF BALLOTS AND (E) APPROVING PROCEDURES FOR VOTE TABULATIONS; (V) APPROVING FORM AND MANNER OF NOTICE OF PLAN RELEASES; (VI) ESTABLISHING DEADLINE AND PROCEDURES FOR FILING OBJECTIONS TO CONFIRMATION OF PLAN; AND (VII) GRANTING RELATED RELIEF**

Andrew R. Vara, the United States Trustee for Region 3 ("U. S. Trustee"), by and through his undersigned counsel, hereby files this objection (the "Objection") to the *Motion for an Order (I) Approving the Disclosure Statement; (II) Scheduling Confirmation Hearing; (III) Approving Form and Manner of Notice of Confirmation Hearing; (IV) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan, Including (A) Approving Form and Content of Solicitation Materials;*

---

[1]    A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https:\cases.stretto.com\amyris.  The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

*(B) Establishing Record Date and Approving Procedures for Distribution of Solicitation Materials;(C) Approving Forms of Ballots; (D) Establishing Voting Deadline for Receipt of Ballots and (E) Approving Procedures for Vote Tabulations; (V) Approving Form and Manner of Notice of Plan Releases; (VI) Establishing Deadline and Procedures for Filing Objections to Confirmation of Plan; and (VII) Granting Related Relief* (Docket No. 525) (the "Motion"),[2] pursuant to which the Debtors seek, among other things, approval of (i) the Disclosure Statement and (ii) the form and manner of notice of the Confirmation Hearing as to both Voting Classes and Non-Voting Classes and notice of Third Party Release with opt out provisions and procedures, as applicable.  In support of this Objection, the U.S. Trustee states:

## PRELIMINARY STATEMENT

1.      The Disclosure Statement does not satisfy the requirement of Bankruptcy Code section 1125 to provide adequate information.  A disclosure statement must inform the average creditor what it is going to receive and when, and what contingencies there are to receipt of the distribution.  The pending Disclosure Statement however does not provide a plain language explanation of the estimated distributions to be received by creditors under the various scenarios envisioned under the Plan.   The Disclosure Statement similarly fails to include a simple and clear explanation of the proposed third-party releases and the differing recovery scenarios thereunder, which are tied to whether nonconsensual releases are approved.

2.      Approval of the Disclosure Statement is also predicated upon entry into agreements with key contract counterparties that are purportedly critical to the reorganization, yet those agreements have not been reached and therefore adequate information cannot be provided.

---

[2] Capitalized terms used herein and not otherwise defined are defined as set forth in the Motion or the *Disclosure Statement for Debtors' Chapter 11 Plan of Reorganization* (Docket No. 524) (the "Disclosure Statement").

3.      The Plan does not appear to enjoy the support of the Committee or Ad Hoc
Noteholders Group.  The Disclosure Statement does not identify the issues preventing those key
constituents from supporting the Plan or the risks of moving forward without that support.

4.      The Disclosure Statement should not be approved absent significant changes.
Any revision of the Disclosure Statement sufficient to satisfy the requirements of Bankruptcy
Code section 1125 would be material, and parties in interest must be provided adequate time to
meaningfully review such revisions.  Accordingly, the Disclosure Statement should not be
approved as filed and consideration of any revised Disclosure Statement should be adjourned for
a time sufficient to satisfy the noticing requirements of Bankruptcy Rules 2002 and 3017.

## JURISDICTION, VENUE AND STANDING

5.      Under (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District
Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C.
§ 157(b)(2)(A), this Court has jurisdiction to hear and determine this Objection.

6.      Pursuant to 28 U.S.C. § 586, the U. S. Trustee is charged with the administrative
oversight of cases commenced pursuant to chapter 11 of title 11 of the United States Code (the
"Bankruptcy Code"). This duty is part of the U. S. Trustee's overarching responsibility to
enforce the bankruptcy laws as written by Congress and interpreted by the courts. *See United
States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96
(3d Cir. 1994) (noting that the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307,
which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S.,
Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U. S. Trustee as a "watchdog").

7.      Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor plans and disclosure statements filed in Chapter 11 cases and to comment on such plans and disclosure statements.

8.       The U.S. Trustee has standing to be heard on the on the Motion and the issues raised in this Objection pursuant to 11 U.S.C. § 307.

## BACKGROUND

9.      On August 9 and August 21, 2023 (as applicable, the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code which initiated the Chapter 11 Cases.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

10.      On August 27, 2023, the U.S. Trustee appointed the committee of unsecured creditors (the "Committee") pursuant to Bankruptcy Code section 1102(a)(1).  The Committee members are: (i) Cosan U.S. Inc., (ii) U.S. Bank Trust Company, National Association as Trustee ("U.S. Bank"), (iii) Sartorius Stedim North America, Inc., (iv) Hearst Magazine Media, Inc., (v) Wiley Companies, (vi) Park Wynwood, LLC, and (vii) Allog Participacoes, Ltda.

11.      The Committee is not a proponent of the Plan.

12.      On August 25, 2023, the Debtors filed the *Debtors' Emergency Motion to Assume and/or Enter Into Reimbursement Agreements With Professionals for the Ad Hoc Noteholder Group* (Docket No. 148) (the "Bondholder Fee Motion"), pursuant to which the Debtors sought authority to pay the professional fees and expenses of the Ad Hoc Noteholders Group because that group's involvement was purported to be essential to a successful exit strategy.  *See e.g., Declaration of Philip J. Gund in Support of Debtors' Emergency Motion to Assume and/or Enter Into Reimbursement Agreements with Professionals for the Ad Hoc Noteholder Group* (Docket

No. 148-2) (the "<u>Gund Declaration</u>").[3]  Nevertheless, the Debtors have not garnered the support

of the Ad Hoc Noteholders Group, which is engaged in disputed discovery with respect to the

Plan.  *See e.g., Motion of the Ad Hoc Noteholder Group for an Order Pursuant to Bankruptcy*

*Rule 2004 and Local Bankruptcy Rule 2004-1 Directing the Production of Documents by the*

*Foris Lenders* (Docket No. 614) (the "<u>Rule 2004 Motion</u>").[4]

13.     In addition to any open issues with the Committee and Ad Hoc Noteholders

Group, consensual resolution of issues with the Debtors' key contract counterparties DSM and

Givaudan are necessary to approval of the Disclosure Statement and have not yet occurred.  *See*

Disclosure Stmt., p. 4.[5]

---

[3] Gund Decl., ¶ 8 ("I do not believe that it is feasible to successfully progress on the terms of a plan of reorganization – or these Chapter 11 Cases generally – without the continued engagement of the Ad Hoc Noteholder Group."); ¶ 9 ("The continued engagement – as opposed to value-destructive litigation – of the Ad Hoc Noteholder Group, advised by competent and consistent professionals in what has been a constructive process thus far, is essential towards maximizing enterprise value and recovery to creditors, and a successful reorganization.").

[4] Rule 2004 Mot., ¶ 2 ("That stonewalling is unacceptable. The discovery the Ad Hoc Group seeks is relevant and important for this Chapter 11 case. It is necessary for the Ad Hoc Group to investigate potential derivative claims to benefit the estate and assess the sweeping releases of its direct claims called for in the Plan. The Ad Hoc Group is entitled to that discovery to understand whether and how it is impaired under the Plan and what options it has in this case going forward.").

[5] Disclosure Stmt., p. 4 (emphasis added) ("Since the Petition Date, the Debtors and their advisors, and Foris and its advisors, have been engaged in extensive negotiations with the Company's key contract counterparties, DSM and Givaudan, with respect to amending their commercial relationships to enable the Debtors to implement a sustainable business plan going forward. The Plan, and ancillary documents, provide for a comprehensive operational restructuring of the Debtor with respect to its research and development and ingredient manufacturing business lines, including its commercial relationships with DSM and Givaudan. Specifically, the Plan and ancillary documents provide the respective treatment for the following agreements and claims: the DSM Contracts and DSM's Claims; and Givaudan Contracts and Givaudan's Claims. **The negotiations with DSM and Givaudan are ongoing, and *reaching an agreement on binding Term Sheets is a condition to approval of the Disclosure Statement.***").

## THE SOLICITATION PROCEDURES

14.     As set forth above, through the Motion, the Debtors seek, among other things, approval of the form and manner of notice of the Confirmation Hearing as to both Voting Classes and Non-Voting Classes and notice of the Third Party Release with opt-out provisions and procedures.  The Classes are numerous, and the ways that parties might respond to the Third Party Release and the differing ways the distributions would be affected by the Third-Party Releases appears to rest on whether this Court approves the Third Party Release "non-consensually" or "consensually."  For example, the Disclosure Statement provides:

> Holders of Direct Claims will receive a notice of the provisions in the Plan regarding the Third Party Release, the Excluded Party Litigation Trust, the Direct Claims Recovery Pool and the Direct Claim Injunction (the "Direct Claim Provisions").  The Debtors will seek approval of the Direct Claim Provisions based upon the governing standard for approval of non-consensual third party releases. In the event the Bankruptcy Court does not approve the Direct Claim Provisions, the Direct Claim Provisions shall be deemed a settlement offer to the holders of Direct Claims on the terms set forth in the Plan, which are less favorable than if the Court were to approve the Direct Claims Provisions.  In such a circumstance, each holder of a Direct Claim may voluntarily elect to receive its Pro Rata share of 50% of the portion of the Direct Claims Recovery Pool to which it is entitled by electing to grant the Third-Party Releases, through the following methods: (x) for (i) holders of Claims who are entitled to submit a ballot to vote on the Plan and vote to accept the Plan, (ii) holders of Claims who are entitled to submit a ballot to vote on the Plan and (a) vote to reject the Plan or (b) abstain from voting on the Plan and, in either case, do not elect to exercise their right to opt out of granting the Third-Party Releases, and (y) for holders of Claims and Interests who are deemed to accept or reject the Plan and are provided with a notice of non-voting status providing them with the right to opt out of granting the Third-Party Releases and do not elect to exercise such right; *provided*, that, as applicable, the Direct Claims Threshold is satisfied. Any undistributed amounts in the Direct Claims Recovery Pool that would have otherwise been allocated to holders of Direct Claims that opted out of granting the Third-Party Release shall revert to the Reorganized Amyris.

Disclosure Stmt., pp. 5-6.

**Non-Voting Classes**

15.    The Plan contains fifteen separate Classes of Claims or Interests.  Holders of
Claims in Classes 1 and 2 under the Plan are Unimpaired and deemed to have accepted the Plan,
and therefore are not entitled to vote.  Holders of Claims in Class 12 under the Plan, as well as
Holders of Interests in Class 15 under the Plan, are Impaired and shall not receive nor retain any
property under the Plan on account of such Claims or Interests, and therefore are deemed to have
rejected the Plan and are not entitled to vote.

16.    Pursuant to the Motion, the Debtors request that they not be required to transmit
Solicitation Materials to holders of Claims in Classes 1, 2, 12, and 15 of the Plan (each, a "Non-
Voting Class").  Rather, the Debtors propose to transmit the Non-Voting Class Notice, which
includes a description of the Plan's release, indemnification and exculpation provisions, and the
ability to elect to opt out of granting the Third Party Release.  The Non-Voting Class Notices
shall include an election form, with applicable instructions and procedures, to enable the
recipient to opt out of the Third Party Release (the "Opt Out Election Form"). The Opt Out
Election Form, however, does not explain or otherwise provide any information about the
differing recovery possibilities dependent on whether this Court approves the Third Party
Releases "non-consensually" or "consensually."

**Voting Classes**

17.    Holders of Claims in Classes 3, 4, 5, 6, 7, 8, 9, 10, and 13[6] (the "Voting Classes")
can vote.  The Debtors intend to transmit the Solicitation Materials to the Voting Classes, which
includes the Ballot.  Each Ballot will include an election for the Claimant to opt out of granting

---

[6] Class 13 is for Holders of Convenience Claims.  It is unclear whether the Debtors intend for there to be
any such Class in the Plan.

the Third Party Release where the Claimant votes to reject the Plan or abstains from voting on the Plan.  Likewise, the ballots for the voting classes do not explain or otherwise provide any information about the differing recovery possibilities dependent on whether this Court approves the Third Party Release "non-consensually" or "consensually."

**Affiliate Classes**

18.     The Debtors further propose that Holders of Claims in Class 11 (Intercompany Claims) and Interests in Class 14 (Intercompany Interests) should be deemed to have received all required notices upon entry of the proposed Disclosure Statement Order without actual delivery of such notices.  Neither Class 11 nor Class 14 are entitled to vote on the Plan.  Class 11 consists of the Claims of Debtors or wholly-owned Affiliates of Debtors which, while impaired, have consented to the Plan, and Class 14 consists of the Interests of Debtors or wholly-owned Affiliates of Debtors who are not impaired and are deemed to have accepted the Plan.

19.     Although the non-voting notices and ballots purportedly allow the creditors to "opt-out" of the third-party release, the Disclosure Statement provides that the Debtors will first seek approval of the Direct Claim Provisions based upon the standard governing ***non-consensual*** third-party releases.[7]

20.     If the third-party releases are ***not*** approved on a ***non-consensual*** basis, the Debtors will then seek approval of the third-party releases on a consensual basis.  However, creditors will receive a diminished recovery if approved on a consensual basis.[8]

---

[7] *See e.g.*, Disclosure Stmt., p. 5 ("The Debtors will seek approval of the Direct Claim Provisions based upon the governing standard for approval of non-consensual third party releases.")

[8] *See e.g.*, Disclosure Stmt., pp. 5-6 ("In the event the Bankruptcy Court does not approve the Direct Claim Provisions, the Direct Claim Provisions shall be deemed a settlement offer to the holders of Direct

21.     The Plan also provides for recoveries separate from the third-party releases, with recovery dependent upon whether the class accepts or rejects.[9]

22.     The Disclosure Statement does not include any estimate of recoveries to creditors.[10]

23.     The Disclosure Statement does not include a Liquidation Analysis.[11]

24.     An agreement on binding Term Sheets with DSM and Givaudan is a condition to approval of Disclosure Statement.[12]  There is nothing on the docket reflecting that those integral agreements have been reached, and information is not provided regarding the terms and conditions of any such potential agreements.

## OBJECTION

### I.     General Standards for Disclosure Statements

25.     Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan.  11 U.S.C. § 1125; *see also In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).   The Bankruptcy Code defines "adequate information" as:

---

Claims on the terms set forth in the Plan, which are less favorable than if the Court were to approve the Direct Claims Provisions.")

[9] *See e.g.*, Disclosure Stmt., pp. 35-36 (describing treatment of Class 8 General Unsecured claims "if the General Unsecured Claims Class votes to accept the Plan" and a differing treatment "if the General Unsecured Class votes to reject the Plan.")

[10] *See*, Disclosure Stmt., p. 10 (containing blanks for the "Estimated Distributions" for many of the Classes, including the Class 9 General Unsecured Claims).

[11] *See*, Disclosure Stmt., Ex. D (Liquidation Analysis not attached).

[12] *See*, Disclosure Stmt., p. 4 ("The negotiations with DSM and Givaudan are ongoing, and reaching an agreement on binding Term Sheets is a condition to approval of the Disclosure Statement.").

Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, ***that would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan*** . . . .

11 U.S.C. § 1125(a)(1) (emphasis added); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *Kunica v. St. Jean Fin., Inc*., 233 B.R. 46, 54 (S.D.N.Y. 1999).

26.     The disclosure statement requirement of section 1125 of the Bankruptcy Code is "crucial to the effective functioning of the federal bankruptcy system[;] . . . the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (*citing Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.*), 848 F.2d 414 (3d Cir. 1988)).

27.     The "adequate information" requirement is designed to help creditors in their negotiations with Debtors over the plan. *See Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94 (3d Cir. 1988). Section 1129(a)(2) conditions confirmation upon compliance with applicable Code provisions. The disclosure requirement of section 1125 is one of those provisions. *See* 11 U.S.C. 1129(a)(2); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000).

28.     To be approved, a disclosure statement must include sufficient information to apprise creditors of the risks and financial consequences of the proposed plan. *See In re McLean Indus.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan"); *In re Duratech Indus.*, 241 B.R. 291, 298 (Bankr.

10

E.D.N.Y.), *aff'd*, 241 B.R. 283 (E.D.N.Y. 1999) (the purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan).

29.     Section 1125 of the Bankruptcy Code is geared towards more disclosure rather than less.  *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990). The "adequate information" requirement merely establishes a floor, and not a ceiling for disclosure to voting creditors.  *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (*citing Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, at 100 (3d Cir. 1988).

30.     "Adequate information" under section 1125 is "determined by the facts and circumstances of each case."  *See Oneida*, 848 F.2d at 417 (*citing* H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)).

31.     A disclosure statement must inform the average creditor what it is going to get and when, and what contingencies there are that might intervene.  *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991).  Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code] alternatives . . . ."  *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

## II.     The Disclosure Statement Does Not Contain Adequate Information

32.     The Disclosure Statement and Solicitation Materials lack adequate information to allow an average creditor to understand the Plan in a manner sufficient to make an informed decision.  Despite its length, the Disclosure Statement does not contain the information that is most germane to creditors: *what distributions can creditors expect under the Plan*.  The

11

Disclosure Statement therefore does not provide the information most essential to creditors in voting on a Plan.

33.     The Disclosure Statement fails to provide adequate information regarding the Third Party Release.  The Disclosure Statement fails to explain in a clear and succinct manner what releases are being imposed on creditors, what support is found in the Bankruptcy Code and Third Circuit precedent for those broad third-party releases, and the likelihood of the Debtors' success in confirming a Plan with such broad third-party releases.

34.     The Disclosure Statement does not describe how the non-consensual Third Party Release, to the extent permissible at all, satisfies the exacting standards for approval thereof. *See In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000); *In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126 (3d Cir. 2019); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001).  There is insufficient information demonstrating that non-consensual releases are necessary to the reorganization, especially where some or all of the Debtors' assets will be sold rather than reorganized.  There is similarly insufficient information evidencing whether the non-consensual releases are fair because there is inadequate explanation of the financial contribution provided by the parties proposed to be released and whether the non-consenting non-debtors are receiving reasonable consideration in exchange for the release.

35.     The Disclosure Statement also lacks sufficient information regarding how approval of releases on a non-consensual versus consensual basis will affect recoveries. Although the Disclosure Statement discloses that creditors will receive a diminished recovery if the Third Party Release is approved on a consensual basis, the Disclosure Statement does not provide an estimated range of recoveries in either instance.  The Debtors' proposal to solicit a Plan with first a "non-consensual" and if that fails, a "consensual" path to approval of the Third

Party Release appears to be untenable due to the Debtors' inability to plainly explain in their balloting materials how parties can exercise their "options", and how their recoveries will be affected based on the different "paths" to approval.

36.     Although Holders of Claims are provided the option to opt-out, the Debtors will still seek to impose the Third Party Release upon them.  If the non-consensual Third Party Release is approved, the Debtors will establish a Direct Claims Recovery Pool.  If the non-consensual Third Party Release is not approved, then holders of Direct Claims may still participate in the Direct Claims Recovery Pool to the extent that they do not opt-out of the Third Party Release and the Direct Claims Threshold.  The Disclosure Statement does not provide estimated distributions in each instance.  It is also unclear whether a party is bound by the Third Party Release if it does not opt out and the Direct Claims Threshold is not met (*i.e.,* it is unclear whether the creditor can consent to the third-party releases in return for the promised consideration and then still be held to the release if the consideration does not materialize).

37.     The Disclosure Statement must provide a plain language description of (i) the estimated recoveries under the Plan, (ii) the timing of payment under the various scenarios possible under the Plan, (iii) the claims being released, (iv) the consideration being provided in exchange therefor, (v) the expected distributions in connection therewith, and (vi) an explanation of the likelihood of approval thereof.

38.     Approval of the Disclosure Statement is also predicated upon entry into agreements with key contract counterparties DSM and Givaudan.  Those agreements are purportedly critical to the reorganization and implementing a sustainable go-forward business plan, yet those agreements have not been reached.  Therefore, adequate information cannot be provided presently with respect to same.

39.     Finally, the Disclosure Statement does not indicate that the Plan is supported by the Committee or Ad Hoc Noteholders Group.  The Committee, of course, is a fiduciary to the unsecured creditor body as a whole and an understanding of its position is essential.  The Ad Hoc Noteholders Group's participation in the Plan process was deemed so essential that the Debtors received approval to pay their professional fees.  Yet the Ad Hoc Noteholders Group is engaged in disputed discovery with respect to the Plan.  The Disclosure Statement does not explain why those key groups do not support the Plan nor the risks attendant to seeking confirmation without their support.

40.     In sum, the Debtors proposed Plan contains a number of complex, moving pieces. It is the Debtors' burden to distill the Plan into a Disclosure Statement that provides "a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1).  The currently-filed Disclosure Statement does not satisfy that burden.

### III.     Consideration of the Disclosure Statement Should be Adjourned

41.     As set forth above, the Disclosure Statement contains inadequate information. Any revised form of Disclosure Statement, which must include the Term Sheets, must be submitted with sufficient time to allow parties in interest to review the voluminous documents and form a meaningful response.  Any changes to the Disclosure Statement and Plan at this juncture would not provide adequate notice for consideration at the hearing on November 21, 2023, at 11:00 am.  Accordingly, the U.S. Trustee submits that the hearing should be adjourned if the Debtors file a revised Disclosure Statement so that parties in interest have an opportunity to review and determine whether it provides adequate information.

14

## RESERVATION OF RIGHTS

42.      The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this Objection, file an appropriate Motion and/or conduct any and all discovery as may be deemed necessary or as may be required, and to assert such other grounds as may become apparent upon further factual discovery.   The U.S. Trustee also reserves all rights with respect to plan confirmation issues until the relevant objection deadline.

## CONCLUSION

**WHEREFORE**, the U.S. Trustee requests that this Court sustain this Objection and grant such other relief as it deems just and proper.

Dated:  November 16, 2023
            Wilmington, DE

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE,**
**REGIONS 3 & 9**

By: */s/ John Schanne*
        John Schanne
        Trial Attorney
        Office of the United States Trustee
        J. Caleb Boggs Federal Building
        844 King Street, Suite 2207, Lockbox 35
        Wilmington, DE 19801
        (202) 934-4154(Phone)
        (302) 573-6497 (Fax)
         john.schanne@usdoj.gov