**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC., et al., | Case No. 23-11131 (TMH) |
| Debtors. [1] | (Jointly Administered) |
| | **Re: Docket No. 651** |

**DEBTORS' OBJECTION TO THE MOTION OF THE AD HOC CROSS-HOLDER
GROUP FOR APPOINTMENT OF EXAMINER PURSUANT TO 11 U.S.C. § 1104(C)**

Amyris, Inc. ("Amyris") and its related and affiliated above-captioned debtors and debtors in possession (collectively, the "Debtors") file this objection (the "Objection") to the *Motion of Ad Hoc Cross-Holder Group for Appointment of Examiner Pursuant to 11 U.S.C. § 1104(c)* [Docket No. 651] (the "Motion"). In support of the Objection, the Debtors submit the *Declaration of Steven W. Golden in Support of the Debtors' Objection to the Motion of the Ad Hoc Cross-Holder Group for Appointment of Examiner Pursuant to 11 U.S.C. § 1104(c)* (the "Golden Declaration"), filed contemporaneously herewith, and in further support thereof, respectfully state as follows:

## I.    PRELIMINARY STATEMENT[2]

1.    A comparatively small group of noteholders (the "Ad Hoc Cross-Holder Group") (representing *one-tenth* the holdings of the Ad Hoc Noteholder Group) moved for the appointment of an examiner, apparently without coordinating or consulting with either the Ad Hoc Noteholder Group or the Official Committee of Unsecured Creditors (the "Committee") and without seeking

---

[1]    A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Amyris. The location of Debtor Amyris, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

[2]    Capitalized terms used but not otherwise defined in this Preliminary Statement are intended to have the meanings ascribed to them *infra*.

informal or formal discovery from the Debtors.  The result is a Motion based on factual assertions that are incorrect, supported by mere conjecture and innuendo, and dependent on a legal analysis that cites no authority from this district, thereby mistakenly claiming that the appointment of an examiner is mandatory.  Stripped of these infirmities, the Motion rests solely on the argument that the Court should exercise its discretion to appoint an examiner to investigate and report on the very same matters that have been thoroughly investigated by the Independent Director as well as by the Committee and the Ad Hoc Noteholder Group, all with the full cooperation of the Debtors, the Foris Prepetition Secured Lenders, and DIP Secured Parties (each as defined below).  Because, on the correct facts, the appointment of an examiner to conduct a *fourth* overlapping investigation would be wasteful and counterproductive, the Motion should be denied.

## II.    STATEMENT OF FACTS

### A.    Relevant History of the Debtors

2.     The Debtors were founded in 2003 to create a more stable supply of a key anti-malarial treatment.  Through the Debtors' cutting-edge science, artemisinin—the most effective anti-malarial drug in the world—is now consistently available to treat the deadly disease.  Using the same technological innovations that produced artemisinin, the Debtors have become the world's leading manufacturer of ingredients made with synthetic biology.  The Debtors provide sustainable ingredients that are eco-friendly alternatives to ingredients used for flavors and fragrances, sweeteners, cosmetics, pharmaceuticals, and other consumer products.

3.     A detailed description of the Debtors' business and facts precipitating the filing of the Debtors' Chapter 11 Cases are set forth in the *Declaration of Han Kieftenbeld in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 18] (the "First Day Declaration") and the *Declaration of Han Kieftenbeld in Support of Joint Motion of the Debtors*

*for Order (A) Directing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only, and (B) Applying Certain Order in the Chapter 11 Cases of Amyris, Inc. and Its Affiliated Debtors to the Chapter 11 Cases of Clean Beauty Collaborative, Inc., Clean Beauty 4U Holdings, LLC, and Clean Beauty 4U LLC* [Docket No. 120] (the "Supplemental First Day Declaration").[3]

4.     As previously disclosed,[4] the Debtors' senior secured lenders are entities associated with John Doerr (collectively, the "Foris Prepetition Lenders").  These loans (collectively, the "Foris Prepetition Loans") are summarized as follows:

- June 29, 2018: Amyris and GACP Finance Co., LLC ("GACP") enter into a *Loan and Security Agreement* (the "2018 LSA"), pursuant to which GACP advanced $36 million in secured loans to Amyris

- April 15, 2019: Foris Ventures, LLC ("Foris") purchases all of GACP's right, title, and interest in the 2018 LSA and related documents (the "GACP Loan Purchase")

- April–August 2019: Foris advances $32.5 million to Amyris under a series of unsecured promissory notes (collectively, the "Foris Unsecured Notes")

- August 14, 2019: Foris and Amyris enter into the fifth amendment to the 2018 LSA (the "Fifth Amendment"), adding the Foris Unsecured Notes to the principal amount under the 2018 LSA and bringing the aggregate principal amount owing to Foris under the 2018 LSA to $71.041 million

- October 11, 2019: Foris and Amyris enter into the sixth amendment to the 2018 LSA (the "Sixth Amendment"), providing for an additional secured advance of $10 million under the 2018 LSA and bringing the aggregate principal amount owing to Foris thereunder to $81.041 million

- October 28, 2019: Foris and Amyris enter into the *Amended and Restated Loan and Security Agreement* (the "A&R LSA"), amending and restating the 2018 LSA as modified (including pursuant to the Fifth Amendment and Sixth Amendment)[5]

---

[3]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

[4]     *See, e.g.,* First Day Declaration ¶¶ 42 – 45; Docket No. 404 at ¶¶ 22 – 31.

[5]     The Ad Hoc Cross-Holder Group incorrectly states that the Board "approved borrowing of no less than $81,041,000 from Foris Ventures, LLC" on October 28, 2019.  Motion ¶ 11.

- November 27, 2019: Foris and Amyris enter into the first amendment to the A&R LSA (the "First A&R Amendment"), providing for an additional secured advance of $10 million under the A&R LSA and bringing the aggregate principal amount owing to Foris thereunder to $91.041 million

- January 31, 2020: Foris and Amyris enter into the *Warrant Exercise and Debt Equitization Agreement* (the "Equitization Agreement"), the result of which was the satisfaction of the Foris Unsecured Notes and a reduced principal balance under the A&R LSA of $50.041 million

- September 13, 2022: Foris and Amyris enter into the *Loan and Security Agreement* (the "2022 Foris LSA"), pursuant to which Foris advanced $80 million of secured loans to Amyris

- March 10, 2023: Amyris and Perrara Ventures, LLC ("Perrara") enter into the *Bridge Loan and Security Agreement* (the "Perrara LSA"), pursuant to which Perrara advanced $50 million of secured loans to Amyris

- June 5, 2023: Amyris and Anesma Group LLC ("Anesma") enter into the *Loan and Security Agreement* (the "Anesma LSA"), pursuant to which Anesma advanced $50 million of secured loans to Amyris

- June 29, 2023: Amyris and Anjo Ventures, LLC ("Anjo") enter into the *Loan and Security Agreement* (the "Anjo LSA"), pursuant to which Anjo advanced $50 million of secured loans to Amyris

- August 2, 2023: Amyris and Muirisc, LLC ("Muirisc") enter into the *Loan and Security Agreement* (the "Muirisc LSA"), pursuant to which Muirisc advanced $20 million of secured loans to Amyris

**B.    The Debtors' Chapter 11 Filing**

5.      On August 9 and August 21, 2023 (as applicable, the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned jointly administered bankruptcy cases (the "Chapter 11 Cases"). The Debtors operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in their Chapter 11 Cases.

6.      On August 27, 2023, the Office of the United States Trustee (the "U.S. Trustee") appointed the Committee, consisting of the following seven members: (i) Cosan U.S. Inc.; (ii) the

U.S. Bank National Association, as trustee (the "Indenture Trustee"); (iii) Sartorius Stedim North America, Inc.; (iv) Hearst Magazine Media, Inc.; (v) Wiley Companies; (vi) Park Wynwood, LLC; and (vii) Allog Participacoes, Ltda.[6]

C.    **The Ad Hoc Noteholder Group and Ad Hoc Cross-Holder Group**

7.    On November 15, 2021, Amyris, Inc. issued $600 million in aggregate principal amount of 1.50% convertible unsecured notes due 2026 (the "Convertible Notes") pursuant to an indenture between Amyris, Inc. and the Indenture Trustee.  The initial purchasers of the Convertible Notes exercised their options to purchase an additional $90 million of aggregate principal amount of Convertible Notes, increasing the outstanding principal balance to approximately $690 million.

8.    In March 2023, a group of noteholders representing the majority in principal amount of the Convertible Notes (the "Ad Hoc Noteholder Group") was formed for the purpose of addressing the Debtors' financial condition and performance under the Convertible Notes.  The members of the Ad Hoc Noteholder Group collectively hold $476,625,000 of principal amount of Convertible Notes (or approximately 69.1%) and 3,050,000 shares of Amyris, Inc. common stock (or approximately 0.8%[7]).[8]

---

[6]    *See* Docket No. 152.

[7]    Based on 369,385,614 shares of Common Stock issued and outstanding as of May 5, 2023, as stated in Amyris, Inc.'s Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2023.

[8]    *See Amended Verified Statement of the Ad Hoc Noteholder Group Pursuant to Bankruptcy Rule 2019*, filed October 17, 2023 [Docket No. 579] (the "Noteholder Verified Statement").  In addition, according to the Noteholder Group Verified Statement, members of the Ad Hoc Noteholder Group collectively hold 4,959,554 shares of common equity short exposure, long call options exercisable into 43,600 shares of common stock, short call options exercisable into 900 shares of common stock, and long put options exercisable into 370,800 shares of common stock.

9.     By comparison, the members of the moving party, the Ad Hoc Cross-Holder Group, collectively hold $48,555,000 of principal amount of the Convertible Notes (or approximately 7%) and 13,606,353 shares of Amyris, Inc. common stock (or approximately 3.7%[9]).

10.     As described below, the Independent Director, the Committee, and the Ad Hoc Noteholder Group are each deeply engaged in the process of conducting a comprehensive investigation of the Debtors' affairs, with which the Debtors are fully cooperating.  The Ad Hoc Cross-Holder Group was early on encouraged to consult with the Committee and the Ad Hoc Noteholder Group (which holds roughly *ten times* more principal of Convertible Notes than the Ad Hoc Cross-Holder Group).  The Ad Hoc Cross-Holder Group has apparently not done so, nor taken discovery from the Debtors.

11.     Counsel to the Ad Hoc Cross-Holder Group first contacted Debtors' counsel on September 7, 2023.  Debtors' counsel provided a form of nondisclosure agreement to counsel to the Ad Hoc Cross-Holder Group on September 16, 2023, stating that the Debtors would enter into such agreement once the Ad Hoc Cross-Holder Group filed a Bankruptcy Rule 2019 statement or identified its members.  The Debtors emphasized, however (including at the September 14, 2023 hearing[10]), that while they would provide access to the Noteholder VDR, the Ad Hoc Cross-Holder Group should engage and coordinate with the much larger Ad Hoc Noteholder Group (which has substantially similar interests), as well as with the Committee, to avoid overtaxing estate resources.

12.     Counsel to the Ad Hoc Cross-Holder Group returned the nondisclosure agreement to the Debtors on September 28, 2023, and it was entered into on October 1, 2023, whereupon

---

[9]     *See Verified Statement of Ad Hoc Cross-Holder Group Pursuant to Rule 2019 of the Federal Rules of Civil Procedure*, filed September 28, 2023 [Docket No. 397] (the "Cross-Holder 2019 Statement").  Percentage of stock ownership is based on 369,385,614 shares of Common Stock issued and outstanding as of May 5, 2023, as stated in Amyris, Inc.'s Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2023.

[10]    *Transcript of September 14, 2023 Hearing in In re Amyris, Inc.* ("Sep. 14 Hr'g Tr.") at 12:23–14:4.  A true and correct copy of the Sep. 14 Hr'g Tr. is attached to the Golden Declaration as **Exhibit C-1**.

counsel to the Ad Hoc Cross-Holder Group was given access to the Noteholder VDR.[11]  ***The Ad Hoc Cross-Holder Group has never sought any formal or informal discovery from the Debtors***.

**D.**    **Control of the Debtors' Board**

13.    At the heart of the Motion is the following set of assertions:

> John Doerr controls the Debtors and the outcome of the cases.  The Debtors' board (the "Doerr Board,"), the Foris Lenders, and the DIP Lender (the DIP Lender together with the Foris Lenders, the "Doerr Lenders") all act under his direction and/or influence and purport to "negotiate" among themselves while sitting on all sides of the transactions. There is no true independent fiduciary negotiating on behalf of the Debtors' estates.[12]

None of these assertions is factually correct.

1.    ***Neither John Doerr nor Foris Controls the Board***

14.    The Board presently consists of eleven individuals, only two of whom (Mr. Doerr and Mr. Panchadsaram[13]) are affiliated with Foris.  The supermajority of the Board—nine of the eleven members—are entirely independent of Foris.

| Ana Dutra | <ul><li>Joined the Board on January 21, 2022</li><li>Experienced CEO and business advisor with directorship experience on numerous public and private boards</li></ul> |
|---|---|
| Geoffrey Duyk, M.D., Ph.D. | <ul><li>Joined the Board on May 3, 2012</li><li>Partner at Circularis Partners, a firm focused on supporting technology-enabled companies that advance sustainability, and a former Assistant Professor at Harvard Medical School</li></ul> |
| Frank Kung, Ph.D. | <ul><li>Joined the Board on November 2, 2017</li><li>Founding member of Vivo Capital, a global healthcare investment firm, and over 40-year veteran of the biotechnology industry</li></ul> |
| James McCann | <ul><li>Joined the Board on May 14, 2019</li></ul> |

---

[11]    After the Ad Hoc Cross-Holder Group adopted its present litigation posture, the Debtors withdrew access to the Noteholder VDR on November 1, 2023.

[12]    Motion ¶ 1-2.

[13]    Mr. Panchadsaram joined the Board on August 1, 2021— after the GACP Loan Purchase, the issuance of the Foris Unsecured Notes, and entry into the Fifth Amendment, Sixth Amendment, A&R LSA, First A&R Amendment, and the Equitization Agreement.

| | |
|---|---|
| | • Founder, CEO, and Chairman of 1-800-FLOWERS.com with experience serving as director of WTW, Scotts Miracle-Gro, and International Game Technology |
| Steven Mills | • Joined the Board on August 1, 2018<br>• More than 30 years' experience in accounting, corporate finance, strategic planning, risk management, and mergers & acquisitions, including a 33-year career at Archer-Daniels-Midland and service as Amyris' Chief Financial Officer from May 2012 to December 2013 |
| Lisa Qi | • Joined the Board on May 14, 2019<br>• Founder and CEO of Daling Family, a large Chinese e-commerce company, and former Brand Director of Dupont Lycra (Hong Kong & China) and Chief Representative of YSL China in France |
| M. Freddie Reiss | • Joined the Board on August 9, 2023<br>• Experienced restructuring professional who has served as an independent director of numerous public and private companies, including those undergoing financial restructuring |
| Julie Washington | • Joined the Board on August 4, 2020<br>• Experienced senior marketing executive, including at Trinity Health, Champion Petfoods, Jamba Juice, and Luxottica |
| J. Scott White | • Joined the Board on August 29, 2023<br>• President and CEO of Edsal Manufacturing with over 30 years' experience in global finance, marketing, and management, including at New Avon, Abbott Laboratories, and P&G |

15.     Historically, the audit committee of the Board (the "Audit Committee") has been charged with, among other things, "oversee[ing] management's plans and objectives for Amyris's capitalization and review[ing] new offerings of debt, equity or hybrid securities, stock splits, and credit agreements" and "review[ing] and approv[ing] any proposed transaction between Amyris and any related party."[14]

16.     On June 4, 2023, the Board formally established a restructuring committee (the "Restructuring Committee") comprised of three independent directors—Geoffrey Duyk, Steven

---

[14]     *See* Amyris, Inc. Schedule 14A Definitive Proxy Statement dated April 11, 2023 (the "2023 Proxy Statement") at 19.  A true and correct copy of the 2023 Proxy Statement is attached to the Golden Declaration as **Exhibit A-1**.

Mills, and Julie Washington—charged with "reviewing, analyzing and considering (i) short-term and medium-term funding needs; (ii) potential strategic options for the Company including sale, restructuring or recapitalization transactions; and (iii) contingency planning."[15]  Mr. Reiss and Mr. White also became members of the Restructuring Committee on the date of their appointments to the Board (the Petition Date and August 29, 2023, respectively).  From the formation of the Restructuring Committee through the Petition Date, the members of the Restructuring Committee were the same as the members of the Audit Committee.

2.    ***The Foris Prepetition Loans Were Negotiated at Arm's Length***

17.    Each of the Foris Prepetition Loans was: (a) negotiated at arms' length with each of the Debtors and Foris represented by separate independent counsel and (b) appropriately evaluated, discussed, and approved solely by Board members unaffiliated with Foris.  For example:

- On April 15, 2019, the Board (with Mr. Doerr abstaining) discussed and approved the delegation of the review and approval of the GACP Loan Purchase to the Audit Committee.[16]  Later that day, the Audit Committee (comprised of former director M. Neil Williams, Dr. Duyk, and Mr. Mills) considered and approved the GACP Loan Purchase.[17]

- On October 22, 2019, the Audit Committee (comprised of Dr. Duyk, Mr. Mills, and Mr. Williams) considered and ratified the Debtors' entry into the Fifth Amendment.[18]

---

[15]    *See* Joint Action by Unanimous Written Consent of the Audit Committee and the Board of Directors of Amyris, Inc. dated June 4, 2023 (the "June 4 UWC").  A true and correct copy of the June 4 UWC is attached to the Golden Declaration as **Exhibit A-2**.

[16]    *See* Minutes of a Special Telephonic Meeting of the Board of Directors of Amyris, Inc. dated April 15, 2019 (the "April 15 Board Minutes").  A true and correct copy of the April 15 Board Minutes are attached to the Golden Declaration as **Exhibit A-3**.

[17]    *See* Minutes of a Special Telephonic Meeting of the Audit Committee of Amyris, Inc. dated April 15, 2019 (the "April 15 AC Minutes").  A true and correct copy of the April 15 AC Minutes are attached to the Golden Declaration as **Exhibit A-4**.

[18]    *See* Minutes of a Regular Meeting of the Audit Committee of Amyris, Inc. dated October 22, 2019 (the "October 22 AC Minutes").  A true and correct copy of the October 22 AC Minutes is attached to the Golden Declaration as **Exhibit A-5**.

- On October 23, 2019, the Board (with Mr. Doerr abstaining) considered and ratified the Debtors' entry into the Fifth Amendment.[19]

- On October 10, 2019, the Audit Committee (comprised of Dr. Duyk, Mr. Mills, and Mr. Williams) considered and approved the Debtors' entry into the Sixth Amendment.[20]  On October 23, 2019, the Board (with Mr. Doerr abstaining) considered and approved the Debtors' entry into the Sixth Amendment.[21]

- On October 28, 2019, the Audit Committee (comprised of Mr. Williams and Dr. Duyk) considered and approved the Debtors' entry into the First A&R Amendment.[22]

- On September 12, 2022, the Audit Committee (comprised of Dr. Duyk and Mr. Mills, with Mr. Panchadsaram recused) considered and approved the Debtors' entry into the 2022 Foris LSA.[23]   On September 13, 2022, the Board (with Mr. Doerr and Mr. Panchadsaram recused) considered and approved the Debtors' entry into the 2022 Foris LSA.[24]

- On March 10, 2023, the Board (with Mr. Doerr and Mr. Panchadsaram recused) and the Audit Committee (with Mr. Panchadsaram recused) considered and approved the Debtors' entry into the Perrara LSA.[25]

- On June 1, 2023, the Restructuring Committee (comprised of Mr. Mills, Dr. Duyk, and Ms. Washington) considered and approved the Debtors' entry into the Anesma LSA.[26] Thereafter, on June 4, the Board (with Mr. Doerr and Mr. Panchadsaram recused) and

---

[19]    *See* Minutes of a Regular Meeting of the Board of Directors of Amyris, Inc. dated October 23, 2019 (the "October 23 Board Minutes").  A true and correct copy of the October 23 Board Minutes is attached to the Golden Declaration as **Exhibit A-6**.

[20]    *See* Action by Unanimous Written Consent of the Audit Committee of the Board of Directors of Amyris, Inc. dated October 10, 2019 (the "October 10 UWC").  A true and correct copy of the October 10 UWC is attached to the Golden Declaration as **Exhibit A-7**.

[21]    *See* October 23 Board Minutes.

[22]    *See* Minutes of a Special Telephonic Meeting of the Audit Committee of Amyris, Inc. dated October 28, 2019 (the "October 28 AC Minutes").  A true and correct copy of the October 28 AC Minutes is attached to the Golden Declaration as **Exhibit A-8**.

[23]    *See* Action by Unanimous Written Consent of the Audit Committee of the Board of Directors of Amyris, Inc. dated September 12, 2022 (the "September 12 UWC").  A true and correct copy of the September 12 UWC is attached to the Golden Declaration as **Exhibit A-9**.

[24]    *See* Action by Unanimous Written Consent of the Board of Directors of Amyris, Inc. dated September 13, 2022 (the "September 13 UWC").  A true and correct copy of the September 13 UWC is attached to the Golden Declaration as **Exhibit A-10**.

[25]    *See* Joint Action by Unanimous Written Consent of the Audit Committee and the Board of Directors of Amyris, Inc. dated March 10, 2023 (the "March 10 UWC").  A true and correct copy of the March 10 UWC is attached to the Golden Declaration as **Exhibit A-11**.

[26]    *See* Minutes of a Regular Virtual Meeting of the Restructuring Committee of Amyris, Inc. dated June 1, 2023 (the "June 1 RC Minutes").  A true and correct copy of the June 1 RC Minutes is attached to the Golden Declaration as **Exhibit A-12**.

the Audit Committee considered and approved the Debtors' entry into the Anesma LSA.[27]

- On June 28, 2023, the Restructuring Committee and Audit Committee (each comprised of Mr. Mills, Dr. Duyk, and Ms. Washington) and the Board (with Mr. Doerr and Mr. Panchadsaram recused) considered and approved the Debtors' entry into the Anjo LSA.[28]

- On August 1, 2023, the Board (with Mr. Doerr and Mr. Panchadsaram recused) and the Audit Committee  considered and approved the Debtors' entry into the Muirisc LSA.[29]

As detailed below, each of the foregoing Foris Prepetition Loans was vetted by the Audit Committee and/or Restructuring Committee and, upon the applicable committee's favorable recommendation, approved by the Board—in each case with the Foris-related directors recused from the process.

### E.      The Independent Director Investigation and the Committee Investigation

18.      Another central tenet of the Motion is the following allegation:

> The Debtors claim that an "independent director" hand-picked by the Doerr Board has, since the Petition Date, been conducting an "investigation," but the Debtors have provided no information about the scope, progress or methodology of such investigation whatsoever or whether they intend to release the results.[30]

These are misapprehensions of fact that simple inquiry could have corrected.   First, the Independent Director was not selected by (or even previously known to) Mr. Doerr.  Further, as set forth below, not only has the Independent Director been conducting an investigation through counsel (the "Independent Director Investigation"), but the extensive report has been in the hands

---

[27]      *See* June 4 UWC.

[28]      *See* Minutes of a Joint (I) Regular Virtual Meeting of the Restructuring Committee of Amyris, Inc.; (II) Special Virtual Meeting of the Board of Directors of Amyris, Inc.; and (III) Regular Meeting of the Audit Committee of Amyris, Inc. dated June 28, 2023 (the "June 28 Minutes").  A true and correct copy of the June 28 Minutes is attached to the Golden Declaration as **Exhibit A-13**.

[29]      *See* Joint Action by Unanimous Written Consent of the Audit Committee and the Board of Directors of Amyris, Inc. dated August 1, 2023 (the "August 1 UWC").  A true and correct copy of the August 1 UWC is attached to the Golden Declaration as **Exhibit A-14**.

[30]      Motion ¶ 2.

of the Committee, which conducted its own investigation (the "Committee Investigation"). Furthermore, the Ad Hoc Noteholder Group—the interests of which overlap with those of the Ad Hoc Cross-Holder Group—conducted its *own* investigation (the "Noteholder Group Investigation"). Each of the Debtors, the Foris Prepetition Secured Lenders' and DIP Secured Parties' cooperated with the parties conducting these three investigations which, as explained in further detail below, led to the Plan Settlement (as defined below).

### 3. *The Independent Director Investigation*

#### a. *Commencement of Investigation*

19.     Ancillary to its restructuring, Amyris recognized that there had been allegations of irregularities that may have resulted in accounting irregularities from the third quarter of 2021 through the fourth quarter of 2022 and that there may have been other conduct or misconduct—by commission or omission—that contributed to Amyris's financial distress. To address these issues, effective on the Petition Date, the Board delegated to Mr. Reiss (the "Independent Director") the exclusive power and authority of the Board to investigate the conduct of the Debtors' directors and officers ("D&Os") and the D&Os' affiliates to determine whether any of the Debtors have claims against any current or former D&Os or any of the D&Os' affiliates.[31]

20.     The Independent Director began working on the Independent Director Investigation upon his appointment on the Petition Date and promptly selected KTBS Law LLP ("KTBS") as special counsel for the Debtors to lead the examination and to report its findings to the Independent Director (the "Independent Director Report"). To date, the Independent Director Report has not been provided to the full Board. Rather, the Independent Director Report has been shared with the

---

[31]     *See, e.g., Application of the Debtors to Retain and Employ KTBS Law LLP as Special Counsel on Behalf of and at the Sole Direction of the Independent Director, Effective as of August 11, 2023* [Docket No. 108] ¶ 12.

Committee under the Committee Common Interest Agreement (defined below) and with the other recently appointed independent director (Mr. White).

        b.     *Investigation Focus and Process*

21.     The Independent Director focused the Independent Director Investigation on the three-year period preceding the Petition Date and investigated potential claims and estate causes of action against D&Os and affiliates of D&Os for transactions, acts, and omissions during the relevant period. The selection of the time period to be examined was driven by Delaware law, which applies a three-year statute of limitations to breach-of-fiduciary-duty and fraud claims.[32] The statute of limitations effectively ceases to run for two years following a bankruptcy filing by virtue of section 108(a) of the Bankruptcy Code.

22.     While the Debtors were not privy to the full extent and details of the Independent Investigation, the Debtors were informed that KTBS conducted numerous formal interviews of the Debtors' current and former directors, officers, and employees, in addition to numerous informal discussions with Steven Fleming of PwC and the Debtors' current internal counsel. The Debtors gave KTBS access to thousands of documents and internal emails, including documents protected by the Debtors' attorney-client privilege.

        c.     *The Independent Director Report*

23.     On October 20, 2023, the Independent Director and KTBS finalized the Independent Director Report, summarizing the Independent Investigation to date and the results thereof. The Independent Director Report comprises 61 pages, supplemented by 455 pages of appendices. As set forth below, notwithstanding the Ad Hoc Cross-Holder Group's pervasive

---

[32]    *See, e.g.,* 10 Del. C. § 8106(a); *Genelux Corp. v. Roeder (In re Genelux Corp.)*, 126 A.3d 644, 675 (Del. Ch. 2015) ("Whether a claim is styled as one for fraud or breach of fiduciary duty, among others, the applicable statute of limitations is three years.").

allegations of secrecy, the Independent Director Report has already been shared with the Committee.

4.    ***The Committee's Investigation***

24.    On August 29, 2023, the day after the Committee retained counsel, the Debtors provided the Committee's advisors with access to a comprehensive data room (the "Committee VDR") containing hundreds of documents, including prepetition debt documents, corporate governance documents, insurance policies, major commercial contracts, operative deal documents with respect to major transactions, and information regarding the Debtors' intellectual property.

25.    As a statutory fiduciary, the Committee has conducted a wide-ranging investigation since its formation.  On September 18, 2023, the Committee served forty-seven categories of document requests and thirteen interrogatories on the Debtors (the "Committee 2004 Requests"). Meet and confer sessions were held on September 21 and 26, 2023.  The Committee then provided the Debtors with a list of 20 "priority" document requests and initial proposed search terms for electronically stored information (the "Agreed Search Terms").  The Debtors: (a) identified the three custodians of emails (Han Kieftenbeld – Amyris CFO and interim CEO; John Melo – former Amyris CEO; and Kathleen Valiasek – former Amyris Chief Business Officer) (collectively, the "Agreed Custodians"); (b) explained the process for collecting and searching those emails, including the fact that the sole Amyris IT employee able to assist was on vacation from the end of September through October 8; (c) discussed their current knowledge and efforts regarding every document request; and (d) supplemented the Agreed Search Terms with additional terms relating to matters unknown to the Committee but potentially relevant to its investigation.

26.    Beginning on September 29, 2023, the Debtors began making formal productions to the Committee (in addition to those documents already in the Committee VDR) in response to

the Committee 2004 Requests, including the production of the Agreed Custodians' emails using the Agreed Search Terms. Additionally, subsequently, as discussed below, the Debtors began making formal productions to the Ad Hoc Noteholder Group in response to the Noteholder 2004 Requests. The documents produced included board materials, emails, and other documents responsive to the Committee and Noteholder 2004 Requests. The production schedule and volume of production is summarized in the chart below:

| Production No. | Date of Production | No. of Documents | No. of Pages |
|---|---|---|---|
| 1 | September 29, 2023 | 192 | 8,454 |
| 2 | October 6, 2023 | 459 | 6,173 |
| 3 | October 6, 2023 | 328 | 8,721 |
| 4 | October 10, 2023 | 33 | 2,026 |
| 5 | October 13, 2023 | 63 | 9,227 |
| 6 | October 16, 2023 | 1,784 | 9,696 |
| 7 | October 17, 2023 | 587 | 5,894 |
| 8 | October 18, 2023 | 826 | 10,386 |
| 9 | October 19, 2023 | 554 | 4,423 |
| 10 | October 23, 2023 | 1,198 | 12,578 |
| 11 | October 31, 2023 | 1,510 | 5,477 |
| 12 | October 31, 2023 | 684 | 7,054 |
| 13 | November 1, 2023 | 144 | 816 |
| 14 | November 2, 2023 | 296 | 1,072 |
| 15 | November 2, 2023 | 453 | 3,348 |
| 16 | November 2, 2023 | 832 | 6,977 |
| 17 | November 5, 2023 | 820 | 6,431 |
| 18 | November 6, 2023 | 1,408 | 8,024 |
| 19 | November 8, 2023 | 1,234 | 9,649 |
| 20 | November 9, 2023 | 1,817 | 12,387 |
| 21 | November 11, 2023 | 4,574 | 35,891 |
| 22 | November 13, 2023 | 2,075 | 10,776 |
| 23 | November 15, 2023 | 2,502 | 20,825 |
| **TOTAL** | | **24,373** | **206,305** |

27.    On October 17, 2023, the Debtors formally responded to the Committee's interrogatories. In addition to the Debtors' document productions, Foris has made several

document productions to the Committee and Ad Hoc Noteholder Group in response to separate discovery requests propounded in connection with the Committee's investigation.

28.     To further cooperate, the Debtors transmitted a form of common interest agreement to the Committee (the "Committee Common Interest Agreement"), which was executed on October 19, 2023.  The Committee Common Interest Agreement broadly covers the investigation and potential pursuit of claims (i) belonging to Debtors' bankruptcy estates (including tort and breach of contract claims, and claims under chapter 5 of the Bankruptcy Code) and/or (ii) against any equity holders of the Debtors or any affiliates of the Debtors.

29.     On October 23, 2023, the Debtors provided the Committee with a copy of the Independent Director Report, including all appendices.

30.     In connection with the Committee Investigation, to date, the Committee has taken three depositions: Mr. Panchadsaram on November 6, 2023;[33] Mr. Doerr on November 8, 2023;[34] and Mr. Melo on November 11, 2023[35] (collectively, the "Depositions").

5.     ***Cooperation With the Ad Hoc Noteholder Group***

31.     As evidenced by the *Debtors' Motion to Assume and/or Enter Into Reimbursement Agreements With Professionals for the Ad Hoc Noteholder Group* [Docket No. 148] (the "Reimbursement Motion"), the Debtors' goal—even prior to the filing of the Chapter 11 Cases—was to productively engage with major stakeholders, including their largest creditor constituency, represented by the Ad Hoc Noteholder Group.  In furtherance of that goal, on or about August 17, 2023, the Debtors provided the Ad Hoc Noteholder Group Professionals (as defined in the

---

[33]     *See* Docket No. 682.

[34]     *See* Docket No. 681.

[35]     *See* Docket No. 715.

Reimbursement Motion) with access to a comprehensive data room (the "Noteholder VDR") that was substantively identical to the Committee VDR.[36]

32.     The Ad Hoc Noteholder Group has *also* conducted an investigation focused on four principal matters: (i) "whether the Board and the officers considered selling the same brands that are going to be sold as part of the plan earlier;" (ii) "whether the Board and the officers improperly delayed implementing cost cutting measures;" (iii) "whether the Board and officers improperly approved prepetition loans to the Foris lenders;" and (iv) "whether the representations to the investors about the Fit to Win strategy were, in fact, false."[37]

33.     On October 18, 2023, in connection with the Noteholder Group Investigation, the Ad Hoc Noteholder Group served thirty requests for production of documents on the Debtors pursuant to Bankruptcy Rule 2004 (the "Noteholder 2004 Requests").  The Debtors met and conferred with the Ad Hoc Noteholder Group on October 20, 2023, and agreed to produce all nonprivileged documents and communications that had already been (or would in the future be) produced to the Committee in response to the Committee 2004 Requests.  In addition, the Debtors agreed to conduct a limited search of email communications responsive to one Noteholder 2004 Request for a fourth Agreed Custodian.  To streamline discovery, the Debtors encouraged the Ad Hoc Noteholder Group to coordinate with the Committee on any additional requested search terms. On November 2, 2023, the Debtors agreed to run additional Agreed Search Terms at the Ad Hoc Noteholder Group and Committee's joint request.  The Ad Hoc Noteholder Group has attended and coordinated with the Committee with respect to their participation in each of the Depositions.

---

[36]     Indeed, because the Committee had not yet been appointed, the Noteholder VDR preceded the Committee VDR and, when created, each were mirror images of each other.

[37]     *Transcript of November 6, 2023 Hearing in In re Amyris, Inc.* (the "Nov. 6 Hr'g Tr.") at 5:9–23.  A true and correct copy of the Nov. 6 Hr'g Tr. is attached to the Golden Declaration as **Exhibit C-2**.

34.     In addition to the Debtors' document productions, the Debtors have been informed that Foris has responded to the Ad Hoc Noteholder Group's separate discovery requests propounded pursuant to Rule 2004 in connection with the Ad Hoc Noteholder Group's investigations.

**F.     <u>The Plan of Reorganization</u>**

35.     Since the Petition Date, the Debtors have participated in arms' length negotiations with their principal stakeholders to develop a structure for and path to a successful reorganization. To that end, on October 12, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors* [Docket No. 523] (the "<u>Plan</u>") and the associated *Disclosure Statement With Respect to Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors* [Docket No. 524] (the "<u>Disclosure Statement</u>").  On December 1, 2023, the Debtors filed their *First Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors* [Docket No. 809-1] (the "<u>First Amended Plan</u>") and *Disclosure Statement With Respect to First Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors* [Docket No. 809-2].  The Amended Plan provides for a settlement of claims of the Debtors' estates in exchange for consideration provided by the DIP Secured Parties and the Foris Prepetition Secured Lenders.

36.     As announced on the record at the December 4, 2023 Status Conference, the Debtors, the DIP Secured Parties, the Foris Prepetition Secured Lenders, the Committee, and the Ad Hoc Noteholder Group agreed, subject to documentation, on the principal terms of a global settlement among such parties (the "<u>Plan Settlement</u>") to be incorporated into an amendment to the First Amended Plan.  On December 6, 2023, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors* [Docket No. 826-1]

(the "Second Amended Plan") and *Disclosure Statement With Respect to Second Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors* [Docket No. 826-2], implementing the Plan Settlement and providing for, among other things, a cash recovery to general unsecured creditors (along with the assignment of certain estate claims to a litigation trust) in exchange for their support of a release of certain estate claims and causes of action that were the subject of the Independent Investigation, the Committee Investigation, and the Noteholder Group Investigation as well as additional consideration in connection with third-party releases.

37.      The Second Amended Plan also provides for the satisfaction of administrative claims (subject to a cap), the treatment of secured claims in accordance with the Bankruptcy Code, and the continuation of the Debtors' operations to the benefit of employees, vendors, contract counterparties and customers.  The Second Amended Plan restructures the Debtors' balance sheet and operations by facilitating the Debtors' exit from and sale of their Consumer Brands Businesses, a potential sale of the Debtors' remaining assets, and a distribution to certain stakeholders through the Second Amended Plan.  The Second Amended Plan gives the DIP Secured Parties and holders of the Foris Prepetition Secured Claims discretion to satisfy such claims not paid from the Debtors' operations through an allocation of certain net sale proceeds, a rollup into the Exit Facility, and the new equity interests of Reorganized Amyris.

38.      On October 12, 2023, the Debtors entered into that certain *Plan Support Agreement* (the "PSA")[38] with the Consenting Foris Prepetition Lenders and the DIP Secured Parties (as defined in the PSA).  The PSA has been amended to conform to the Amended Plan and other developments in these Chapter 11 Cases.  The PSA is anticipated to be further amended to reflect

---

[38]      The PSA is attached to the Disclosure Statement as Exhibit C.

the Plan Settlement and the Debtors expect that the Committee and the Ad Hoc Noteholder Group will join in the PSA, as amended.

39.     The PSA has a "fiduciary out" providing that nothing "shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel to the Company Parties, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would, based on the advice of counsel to the Company Parties, be inconsistent with applicable Law or its fiduciary obligations under applicable Law" (collectively, "Permitted Fiduciary-Out Actions").

## III.    ARGUMENT

### A.    Appointment of an Examiner Is Not Mandatory

40.     The Ad Hoc Cross-Holder Group argues that appointment of an examiner is "mandatory" if the conditions set forth in section 1104(c) of the Bankruptcy Code are met.  The Motion does not cite a single case in this district in support of this argument because decisions from this district universally reject that view.[39]

---

[39]     *See, e.g., U.S. Bank Nat'l Assoc. v. Wilmington Trust Co.* (*In re Spansion, Inc.*), 426 B.R. 114, 127-28 (Bankr. D. Del. 2010) ("*Spansion*"); *see also In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Feb. 16, 2023) [Docket No. 737], Hr'g Tr. ("*FTX Tr.*") at 12:16–17 ("Indeed, every bankruptcy judge in this district to consider the issue has concluded that there is discretion"), attached to the Golden Declaration at **Exhibit B-1**; *In re Mallinckrodt PLC,* No. 20-12522 (Bankr. D. Del. Nov. 22, 2021) [Docket No. 5516], Hr'g Tr ("*Mallinckrodt Tr.*") at 40:19-41:4 ("While there is some debate among courts outside of Delaware regarding whether Section 1104(c) mandates the appointment of an examiner, in any case where the five million-dollar debt threshold is met, this Court has repeatedly held that Section 1104(c)'s inclusion of the phrase 'as is appropriate' gives the Court discretion."), attached to the Golden Declaration at **Exhibit B-2**; *In re Paddock Enters., LLC*, Case No. 20-10028 (LSS) (Bankr. D. Del. June 18, 2020) [Docket No. 376], Hr'g Tr. at 7:16–17 ("this court has consistently ruled that Section 1104(c) is not mandatory"), attached to the Golden Declaration at **Exhibit B-3**; *In re Cred Inc.*, No. 20-12836 (JTD) (Bankr. D. Del. Dec. 12, 2020) [Docket No. 277], Hr'g Tr. at 98:12-16 ("I disagree with the UST's position that the appointment of a -- of an examiner is mandatory. The language of -- the language of 1104(c) provides the Court with some discretion."), attached to the Golden Declaration at **Exhibit B-4**; *In re Visteon Corp.*, No. 09-11786 (CSS) (Bankr. D. Del. May 12, 2010) [Docket No. 3145], Hr'g Tr. ("*Visteon Tr.*") at 170:16-20 ("[I]t would be an absurd result to find that in every case where the financial criteria is met and a party-in-interest asks, the Court must appoint an examiner. There has to be an appropriate investigation that needs to be done."), attached to the Golden Declaration at **Exhibit B-5**; *In re Am. Home Mortg. Holdings, Inc.*, No. 07–11047 (CSS) (Bankr. D. Del.

41.    Section 1104(c) of the Bankruptcy Code states, in relevant part, that "the court shall order the appointment of an examiner to conduct such an investigation of the debtor *as is appropriate* . . . if – (1) such an appointment is in the interests of creditors, and equity security holders, and other interests of the estate; or (2) the debtor's fixed, liquidated unsecured debtors, other than debts for goods, services, or taxes or owing to an insider, exceed $5,000,000."[40]

42.    As Judge Sontchi explained in *EV Energy Partners*, in every examiner motion, the movant bears the "burden of establishing . . . some reason that it would be helpful to appoint an examiner."[41]  In fact, the movant must demonstrate that there is "an actual examination that needs to be done, an *appropriate* inquiry that needs to be pursued."[42]  "The court in *Washington Mutual* pointed to three factors in determining whether an investigation would be inappropriate, including (1) whether the investigation has already been conducted by other parties; (2) whether the appointment of an examiner would increase costs and cause a delay with no corresponding benefit; and (3) the timing and underlying motives of the motion, *i.e.* whether it is a litigation tactic or an attempt to gain an advocate, or whether the motion comes after an undue delay."[43]  Here, the Motion fails to satisfy a single factor.  First, the investigation proposed has been conducted by

---

Oct. 31, 2007) [Docket No. 1997], Hr'g Tr. at 76:09–12 (holding that even when the threshold in section 1104(c)(2) is met, "the other piece of the puzzle is that there has to be an investigation to perform that's appropriate"), attached to the Golden Declaration at **Exhibit B-6**; *In re Washington Mutual Inc*., No. 08-12229 (MFW) (Bankr. D. Del. May 5, 2010) [Docket No. 3699] ("*WaMu Tr.*"), Hr'g Tr. at 97:9-13 (holding that "if the Court determines that there's no appropriate investigation that needs to be conducted, the Court has the discretion to deny the appointment of an examiner"), attached to the Golden Declaration at **Exhibit B-7**.

Courts from outside this district have reached the same conclusion.  *See, e.g., In re Residential Capital LLC*, 474 B.R. 112, 117 (Bankr. S.D.N.Y. 2012) ("*ResCap*"); *In re Dewey & LeBoeuf*, 478 B.R. 627, 629 (Bankr. S.D.N.Y. 2012); *In re Erickson Retirement Commun.*, 425 B.R. 309, 312 (Bankr. N.D. Tex 2010); *In re Gilman Servs.*, 46 B.R. 322, 327 (Bankr. D. Mass 1985); *In re GHR Cos*., 43 B.R. 165, 170 (Bankr. D. Mass. 1984); *In re Shelter Resources*, 35 B.R. 304, 305 (Bankr. N.D. Ohio 1983).

[40]    11 U.S.C. § 1104(c) (emphasis added).

[41]    *In re EV Energy Partners*, No. 18-10814 (Bankr. D. Del. May 16, 2018), Hr'g Tr. at 197:3 – 5.

[42]    *Id.* at 197:1–2.

[43]    *ResCap*, 474 B.R. at 120 (citing *WaMu Tr.* at 97:14 – 24).

three separate parties, each of whom has enjoyed the full cooperation of the Debtors.  Second, at this stage of the Chapter 11 Cases, where each of the three investigations have been ongoing for months and the Debtors, Foris, the Committee, and the Ad Hoc Noteholder Group have reached agreement on the terms of a consensual restructuring through the Plan Settlement, a fourth investigation to commence after the Plan confirmation process will unnecessarily inflate administrative costs, not provide any additional benefit to any party in interest, and needlessly delay the Debtors' exit from bankruptcy.  Third, the timing of the Motion—months after the Petition Date and after the commencement of the Plan confirmation process—is suspect.[44]  All of the "facts" that underlie the Motion were known to the Ad Hoc Cross-Holder Group when it formed in early September and, indeed, the Ad Hoc Cross-Holder Group threatened to seek the appointment of an examiner weeks before filing the Motion.[45]

43.     Even where courts (in other jurisdictions) have found that section 1104(c) mandates the appointment of an examiner, such courts have determined that the "judicial discretion that comes into play is in defining the scope of the examiner's role/duties" and where the court is "hard pressed to find any useful purposes for an examiner," the court would "appoint an examiner *with no duties*, unless and until otherwise ordered by the court."[46]  But, as Judge Carey recognized in *Spansion*, there is "no sound purpose in appointing an examiner, only to significantly limit the examiner's role when there exists an insufficient basis for an investigation.  To appoint an

---

[44]     *See also* 7 *Collier on Bankruptcy* ¶ 1104.03[2][b] (16th ed. 2023) (opining that "the mandatory nature of this provision was not intended and should not be relied upon to permit blatant interference with the chapter 11 case or the plan confirmation process"); *In re Schepps Food Stores*, 148 B.R. 27, 30–31 (S.D. Tex. 1992) ("[A] creditor cannot use the provision to disrupt the proceedings. . . . By counsel's own admission, [Movant's] concern dates back to early August, when a request for an examiner would have given the bankruptcy court ample time to comply with the code and to structure the investigation appropriately. . . . [Movant's] request for use of the examiner provision, covering issues primarily dealt with in the confirmation process, at such a late date, is strong support of the bankruptcy court's decision.").

[45]     *See* Docket No. 531 n.7.

[46]     *Erickson Retirement Comm.*, 425 B.R. at 312, 317 (emphasis added).

examiner with no meaningful duties strikes me as a wasteful exercise, a result that could not have been intended by Congress."[47]   Judge Carey's justification for denial of the appointment of an examiner in *Spansion* is equally applicable here:

> Throughout this case, the Creditors Committee and various *ad hoc* committees have vigorously represented the interests of unsecured creditors. All of the parties have had ample opportunity to conduct —and have conducted—extensive discovery, and to investigate the Debtors. Appointment of an examiner at this time, based on this record, is neither warranted nor appropriate, and would cause undue cost to the estate, which would be harmful to the Debtors and would delay the administration of this chapter 11 case.[48]

**B.    Appointment of an Examiner Is Not in the
Best Interests of the Estates and Their Stakeholders**

44.    Because appointment of an examiner is not mandatory, the question is whether the Court should exercise its discretion to appoint an examiner in the interests of the estates, creditors, or equity security holders.  On the facts outlined above, the answer is clearly no.

45.    The Ad Hoc Cross-Holder Group makes the factually unfounded assertion that "[o]nly an independent court-appointed examiner" can conduct an investigation because the Committee's and the Ad Hoc Noteholder Group's investigations have been "stymied."[49]  But the

---

[47]    *Spansion*, 426 B.R. at 127.

[48]    *Id.* at 128.

[49]    Motion ¶ 6.  The Motion is replete with unfounded allegations that the Ad Hoc Cross-Holder Group alleges require investigation, none of which is supported by anything more than conjecture.  *See, e.g., id.* ¶ 14 (claiming that "[s]erious questions exist regarding value allegedly funneled by the Doerr Board to Foris" by citing to the adversary proceeding recently filed by Lavvan, Inc., the subject of which was already heavily litigated, and decided in the Debtors' favor, by this Court in connection with the approval of the Final DIP Order); ¶ 19 (claiming, without any evidence, that stock warrants provided to Foris "seem to have been gifts"); ¶ 21 (stating, again without any evidence, that the "entire nature" of the Debtors' prepetition financing "strongly suggests" that the Debtors were "at the mercy" of Mr. Doerr).  Similarly, the Motion's discussion of the "Debtors' conduct leading to chapter 11" simply pulls facts from the Debtors' own First Day Declaration that are not themselves indicative of wrongdoing (business strategies that failed) or are based on speculation or pure rhetorical flourish.  *Id.* ¶ 19.  In any event, the sum total of these unsupported statements is that the Ad Hoc Cross-Holder Group believes that an examiner "will be best positioned to identify and evaluate potential claims and causes of action" regarding the discharge of fiduciary duties.  *Id.* ¶ 10.  But any claims for breach of fiduciary duty are within the scope of the three existing investigations, and do not require a quadruplicate investigation by an examiner.

assertion that no adequate investigation is being undertaken, or that it is being thwarted by the Debtors, is false. Further, the fact that the scope of the proposed examination would be duplicative of the discovery and investigations by the Committee and the Ad Hoc Noteholder Group, in addition to the Independent Investigation, is a strong basis for denying the appointment of an examiner. As Judge Dorsey stated in *FTX*:

> Given the facts and circumstances of this highly unique case I have no doubt that the appointment of an examiner would not be in the best interests of the creditors. There are already multiple investigations underway by incredibly competent and independent parties. Requiring creditors to bear the burden of yet another investigation does not comport with the requirements of Section 1104(c)(1) or the general scheme of the bankruptcy code; that is to maximize to recovery to creditors.

> It is important to keep in mind that while we talk about the cost of an investigation being borne by the debtors we are actually talking about the cost being born by the creditors. Every dollar spent in these cases on administrative expenses is a dollar less to the creditors; therefore, I will deny the request to appoint an examiner under 1104(c)(1).[50]

46.  The Ad Hoc Cross-Holder Group also asserts, through citation to the Plan and the Final DIP Order, that the Debtors have *already* granted releases to insiders as a basis for the appointment of an examiner.[51]  In other words, the Ad Hoc Cross-Holder Group is complaining that the Final DIP Order improperly validated prepetition debt, notwithstanding the Court's determination that the Debtors satisfied all statutory requirements for the provision of DIP financing and the Final DIP Order's inclusion of a Challenge Period. The opportunity to oppose

---

[50]  *FTX Tr.* at 10:6 – 21. *See also ResCap*, 474 B.R. at 121 ("The appointment of an examiner would be inappropriate if the motion was filed for an improper purpose such as a litigation tactic to delay a case, or if there is no factual basis to conclude that an investigation needs to be conducted, *or if an appropriate and thorough investigation has already been conducted (or is nearly complete) by a creditors committee* or a governmental agency.") (emphasis added); *In re Allied Nevada Gold*, No. 15-10503 (MFW) (Bankr. D. Del. Sept. 11, 2015), Hr'g Tr. at 90:6–91:25 (denying appointment of examiner where the creditors' committee and equity committee both investigated the same potential causes of action), attached to the Golden Declaration at **Exhibit B-8**.

[51]  *E.g.*, Motion ¶¶ 2–4.

entry of the Final DIP Order was when it was proposed and heavily litigated; the suggestion that something was amiss is neither grounded in the record nor reality.

47.     The second component of the "release" argument is that, according to the Ad Hoc Cross-Holder Group, the Plan releases claims against insiders for no consideration, notwithstanding that the Plan has not been confirmed.  Since the filing of the Motion, and as a result of the hard fought negotiations among the parties that were underpinned by the Independent Investigation, the Committee Investigation, and the Noteholder Group Investigation, the Plan Settlement, which will provide a cash recovery to general unsecured creditors, has been reached. Notwithstanding the Plan Settlement having been reached, an unconfirmed plan releases nobody, and any release will have to satisfy applicable confirmation requirements.

48.     In any event, many of the issues raised by the Ad Hoc Cross-Holder Group (including the Ad Hoc Cross-Holder Group's beliefs as to the value of the Debtors) are self-evidently confirmation issues, not a basis for appointing an examiner.[52]   Nor would it be appropriate in any circumstances (much less in a case where there is absolutely no evidence that equity is in the money) for the Court to appoint an examiner "to analyze claims or pursue remedies that could benefit holders of equity."[53]   First, an examiner reports, but does not pursue causes of action;[54] although an examiner's report may "paint[] a picture, his or her image of what happened in the case . . .and provide[] context for a debate," that report is ultimately hearsay and thus has

---

[52]     *See, e.g, Visteon Tr.* at 171 7–15; *Mallinckrodt Tr.* at 40:19–41:4.

[53]     Motion ¶ 6.

[54]     *Official Comm. v. Chinery*, 330 F.3d 548, 578 (3d Cir. 2003) ("One concern is that, like a trustee, an examiner would incur direct costs through its fees, so to that extent this remedy is inferior to the alternative of derivative suit by a creditors' committee.  The more serious problem, however, is that it is less than obvious that § 1106(b) actually *does* permit examiners to initiate actions on the debtor's behalf. . . . [W]e conclude that § 1106(b)'s broad grant is most naturally interpreted to authorize only acts relating directly to investigation.").

limited evidentiary value.[55]  Second, the role of an examiner is "examine, not to act as a protagonist in the proceedings."[56]  It would be inappropriate for an examiner in *any case* to solely represent the interests of an out-of-the-money constituency in analyzing or pursuing direct claims to benefit only that constituency—all at great cost to the bankruptcy estate.    But—perhaps most importantly—the Ad Hoc Noteholder Group (which, in reality, is *also* comprised of cross-holders) has *already* done the precise analysis that the Ad Hoc Cross-Holder Group suggests is not being performed.

## IV.    CONCLUSION

49.    For the reasons set forth above, the Ad Hoc Cross-Holder Group has not carried its burden of proving that an examiner should or must be appointed and the Motion should therefore be denied.

Dated:  December 6, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Steven W. Golden*
Richard M. Pachulski (admitted *pro hac vice*)
Debra I. Grassgreen (admitted *pro hac vice*)
Alan J. Kornfeld (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
Steven W. Golden (DE Bar No. 6807)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
rpachulski@pszjlaw.com
dgrassgreen@pszjlaw.com
akornfeld@pszjlaw.com
joneill@pszjlaw.com
sgolden@pszjlaw.com

*Counsel to the Debtors and Debtors in Possession*

---

[55]    *In re FiberMark, Inc.*, 339 B.R. 321, 325 (Bankr. D. Vt. 2006).

[56]    *Official Comm. v. Sealed Air Corp.* (*In re W.R. Grace & Co.*), 285 B.R. 148, 156 (Bankr. D. Del. 2002).