**EXHIBIT 1**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| AMERICAN HOME MORTGAGE | . | Case No. 07-11047(CSS) |
| HOLDINGS, INC., a Delaware | . | (Jointly Administered) |
| corporation, *et al.*, | . | |
| | . | Oct. 31, 2007 (10:09 a.m.) |
| Debtors. | . | (Wilmington) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

INDEX

|                      | Direct | Cross | Redirect | Recross |
|----------------------|--------|-------|----------|---------|
| DEBTORS' EVIDENCE    |        |       |          |         |
| WITNESS:             |        |       |          |         |
| Steven Dickman       |   28   |  39   |          |         |
|                      |        |  40   |          |         |

1          THE CLERK: All rise.

2          THE COURT: Please be seated.

3          MR. BEACH: Good morning, Your Honor.  May it please

4    the Court, Sean Beach from Young, Conaway, Stargatt & Taylor

5    on behalf of the debtors.

6          THE COURT: Good morning.

7          MR. BEACH: Your Honor, to run through this lengthy

8    agenda, I think most things have been adjourned or resolved

9    until we get towards the end.  The first four items have been

10   adjourned.  The fifth item, Your Honor, is the application to

11   retain Kekst as corporate communication advisors.  Your

12   Honor, we still do not have a form of order for that, so

13   we're going to adjourn that matter.  Six through 11 have also

14   been adjourned.  Item number 11 has been withdrawn.  Twelve

15   through -

16         THE COURT: I'm sorry.  It's been - Oh, okay,

17   withdrawn, all right.

18         MR. BEACH: Your Honor, 12 through 15 you have

19   entered under certificates of no objection.  Item number 16,

20   Your Honor, a CNO was filed for that, I believe yesterday.

21         THE COURT: I don't have it.

22         MR. BEACH: You don't have it.

23         THE COURT: No one sent it over.  I mean, it's not

24   your motion, so I - is the movant here?  Mr. Riley?

25         MR. RILEY: Good morning, Your Honor.  Richard Riley

1  from Duane Morris for Aon.  I'm sorry it didn't get over to

2  you.  I have a copy here if you want to see it.

3        THE COURT: Yes, please.  Thank you.  Okay, I'll

4  have a look at that after the hearing.  I don't anticipate

5  any issues.

6        MR. BEACH: Thank you, Your Honor.

7        THE COURT: I assume the form of order attached to

8  the motion is what you want?  Okay.

9        MR. BEACH: Your Honor, items number 18 through 26

10 are various stay relief motions -

11        THE COURT: What about 17?

12        MR. BEACH: I'm sorry, Your Honor.

13        THE COURT: That's okay.

14        MR. BEACH: Item 17 was adjourned at the request of

15 Vantage Pointe.

16        THE COURT: Okay.

17        MR. BEACH: Eighteen through 26 are various stay

18 relief motions filed by certain parties for relief to

19 foreclose on property and clear title, Your Honor.  I'll cede

20 the podium to Mr. Hiller to address the Court with respect to

21 those, but I will say that we do have an agreement on a

22 modified form of order to resolve the objections.

23        THE COURT: Okay, thank you.  Good morning, Mr.

24 Hiller.

25        MR. HILLER: Good morning, Your Honor, Adam Hiller

1    from Draper & Goldberg on behalf of various movants listed on

2    the agenda that filed substantially identical motions for

3    relief from stay.  As Your Honor may be aware, I'm relatively

4    new at this firm, and our firm may have filed similar motions

5    in this case before, but just to give Your Honor a quick bit

6    of background.  This, like many cases, is a financial

7    institution that buys and sells and trades in mortgages that

8    may have been originated through this debtor or may have been

9    traded through this debtor and what often happens in these

10   instances is that another party will have another lien on the

11   same property.  So what we have in this instance, nine cases,

12   is a group of movants that holds liens that are believed to

13   be senior to the liens that the debtor holds on the same

14   property.  Technically, to foreclose on those liens might

15   impair -

16            THE COURT: Oh, I understand, okay.

17            MR. HILLER:  - the liens held by the debtor.  Just

18   so that the Court is aware, the order submitted with the

19   motion is a form of order that we had been using in different

20   cases seeking substantially the same relief here in Chapter

21   11 cases in Delaware.  After a limited response had been

22   filed by the debtors, we did modify that form of order, and

23   really the only two significant changes in the modified order

24   for each of these is first of all, that there are no longer

25   any findings in the order about the basis for cause.  It

1  simply says that cause exists to grant relief from the stay.

2          THE COURT: Right.

3          MR. HILLER: So that there was no issue about

4  whether there's equity in the property, et cetera.  And

5  secondly, on the basis of some concern that - I mentioned

6  before that a lot of these loans get transferred in and out

7  in the ordinary course.  I mean it's a routine thing for some

8  of these when they get packaged and securitized.  In some

9  instances it's possible that the debtor may actually have

10 assigned its interest in the mortgage to a third party non-

11 debtor before the filing of a motion, but that our records

12 had not been updated, that the land records had not been

13 updated, and therefore, there's an actual expressed statement

14 in the order that says that nothing in the order shall

15 constitute a determination that the debtors hold any interest

16 in the property or shall estop the debtors from denying that

17 they hold any interest in the property.  That way nobody can

18 hold them later to the fact that they had an interest or were

19 asserting an interest in property that they had transferred

20 out given rise to possible liability to third parties.  Your

21 Honor, I have one form of order revised for each of the nine

22 motions, if I can approach?

23         THE COURT: Yes, you may, thank you.  Okay.  Does

24 anyone wish to be heard in connection with these matters?

25 Hearing none, I'll approve the revised orders as unopposed.

1          MR. HILLER: Thank you, Your Honor.  May I be

2    excused from the hearing?

3          THE COURT: Yes, you may.

4          MR. HILLER: Thank you, Your Honor.

5          MR. BEACH: Thank you, Your Honor.  That brings us

6    to item number 27 on the agenda, which is the debtors'

7    application for an order to retain and employ Allen & Overy

8    as regulatory, securities, and class action litigation

9    counsel, *nunc pro tunc* to September 7th.  Your Honor, there

10   was an objection filed by the United States Trustee with

11   respect to the application.  We've been able to resolve that

12   objection, and we've also been in discussions with the

13   Committee, and we've been able to resolve the issues with the

14   Committee.  If I may hand up a form of order that may help

15   explain some of the changes that we've made to the form of

16   order as well as to the engagement letter.

17         THE COURT: Okay.

18         MR. BEACH: May I approach?

19         THE COURT: Yes.  I'm still signing Mr. Hiller's

20   orders here.

21         MR. BEACH: Your Honor, I'll give you a moment to

22   finish those orders.

23         THE COURT: Thank you.  I hope he didn't slip

24   anything in on me here.

25         MR. BEACH: I hope so, too, Your Honor, since we

1   haven't reviewed those orders other than having agreement on

2   a form.

3          THE COURT: All right.  Thank you.

4          MR. BEACH: Thank you, Your Honor.  Your Honor, if I

5   can ask you to turn to the blackline form of order.

6          THE COURT: Uh-huh.

7          MR. BEACH: The changes start on the second So

8   Ordered paragraph, and as you can see there, what we have

9   determined to do at this point is to - and have agreed with

10  the Committee and the U.S. Trustee to do, is to retain Allen

11  & Overy with respect to the regulatory and the securities

12  matters that were set forth in the retention application and

13  then to adjourn the application with respect to the class

14  action matters.  The debtors will determine when they need to

15  go forward with that, but we don't believe we need to go

16  forward with that at this point, and, you know, at this point

17  we certainly do need to go forward with respect to the

18  securities and the regulatory matters.  Your Honor, in the

19  next So Ordered paragraph, it specifically says that the

20  application or that this order isn't a retention with respect

21  to the class action matters, and it adjourns that matter, and

22  then the third So Ordered paragraph simply says that to the

23  extent we intend to expand the scope of Allen & Overy's

24  employment beyond what is in the application, that we'll file

25  a separate application on notice to parties in interest

1    including the U.S. Trustee and the Committee.

2              THE COURT: Okay.

3              MR. BEACH:  And with respect to the engagement

4    letter, I handed Your Honor a blackline, and the changes are

5    reflected on Appendix I to the engagement letter.  The former

6    Section 2 was a limitation of liability section, which has

7    been stricken in its entirety.  Section 6.1 is essentially a

8    clarification that the debtors are not waiving any

9    undisclosed potential conflicts, and it makes some other

10   language clarifications, and I would characterize the other

11   changes in Section 8 as language clarifications as well.

12             THE COURT: Uh-huh.

13             MR. BEACH:  Your Honor, Allen & Overy has

14   significant experience in securities and regulatory matters,

15   and while working with the SEC and the debtors believe that

16   their retention is appropriate under 327(a), that they don't

17   hold an interest adverse to the estate and would request that

18   Your Honor approve this modified form of order and the

19   engagement of Allen & Overy.

20             THE COURT: Okay, does anyone else wish to be heard

21   in connection with this matter?  Mr. McMahon?

22             MR. McMAHON: Your Honor, good morning.  Joseph

23   McMahon for the United States Trustee.  Counsel's correct

24   that the order is acceptable in form to our office and simply

25   note that with respect to our objection it's going to be

1    carried in part, that there were certain connections with

2    City Corp. or Citybank that were referenced in our objection.

3    That portion of the objection is also being carried because

4    it very well may be germane to issues relating to the

5    securities class action litigation matters.

6              THE COURT: All right.  And your objection - You

7    also had an objection to them representing both the debtors

8    and the officers and directors.  That was in connection with

9    the class action as well; correct?

10             MR. McMAHON: That is correct.

11             THE COURT: All right, all right.  Mr. Indelicato,

12   good morning.

13             MR. INDELICATO: Good morning, Your Honor.  Mark

14   Indelicato from Hahn & Hessen on behalf of the Committee.

15   Your Honor, we have been in discussions with the debtor.

16   When we saw the application we had the same concern the U.S.

17   Trustee had.  We were concerned about Allen & Overy

18   representing both the Ds&Os and the company.  I believe the

19   way they have limited their retention to just the securities

20   investigatory matters and we will save to another day the

21   issue about whether or not they're going to handle the

22   litigation and if they do, for whom; I think we're okay with

23   the application as is.  We do have that similar concern, and

24   we reserved our rights to file an objection should they so

25   move for expansion of their retention or to have them do the

1   securities litigation.

2        THE COURT: All right.

3        MR. INDELICATO: Thank you.

4        THE COURT: Anyone else?  Mr. Beach, do you have a

5   clean order?

6        MR. BEACH: I do, Your Honor, may I approach?

7        THE COURT: Yes, you may.  Thank you.  I'll approve

8   it as revised.

9        MR. BEACH: Thank you, Your Honor.  Your Honor, that

10  brings us to item number 28 on the agenda which is the motion

11  of Paula Rush, *pro se*, for disclosure under § 363 and 1106

12  and, Your Honor, I'll cede the podium to Ms. Rush.

13       THE COURT: All right.  Good morning.

14       MS. RUSH: Good morning, Your Honor.  I'm not sure

15  where you want to start since we're dealing with several

16  issues.

17       THE COURT: It's your motion, wherever you'd like to

18  begin.

19       MS. RUSH: Okay.  Let's start with the consumer

20  privacy ombudsman.  I'm aware that there was a hearing early

21  on where this issue was discussed and some testimony was

22  presented, and I believe that the consumer privacy statement

23  that I was given and how that consumer privacy statement was

24  represented does not match.  My statement says very clearly

25  that the information is not to be sold or transferred or used

 1    by a person other than the person acquiring that information,

 2    other than very select employees that need to know, as well

 3    as limited to direct people servicing the loan.  I

 4    specifically think that we're talking about two separate

 5    issues with the consumer privacy ombudsman.  One is the

 6    transfer of the servicing right and files and the other is

 7    the transfer of loans and loan information through sales of

 8    loans.  I believe that the debtors had made a statement that

 9    the servicing rights, the right to sell that information, to

10    sell the information in regards to a sale of the servicing

11    rights is allowed.  I think that the way it reads to me is

12    that it's allowed for a person who acquires that information

13    to give that to a third party who's performing that function

14    for them, but in this case it's a sale, it's a transfer of

15    information.  So I do believe that there are some disconnects

16    there between what was presented.  I also think that this

17    company acquired many different companies over the last four

18    or five years.  It's plausible that there are multiple

19    privacy statements out there that were given that are

20    supposed to be followed.  I think a consumer privacy

21    ombudsman's role is to insure that if contracts are written

22    in the process of this bankruptcy for either sale or transfer

23    of these informations that there are adequate protections in

24    there and that those policies are being followed.  I also

25    read testimony that there was some questions about computers,

1   equipment, locations, SEC questions about information and

2   consumer information.  So, as far as the ombudsman issue

3   goes, I think that there are open issues that have not been

4   addressed, and I do think that the testimony early on in this

5   case is not consistent with the policy that I was presented

6   as an individual borrower, and I believe that I attached that

7   particular -

8           THE COURT: Where is that?  That's Exhibit B?

9           MS. RUSH: Yes, I think it is Exhibit B.

10          THE COURT: No, Exhibit B is your complaint.

11          MS. RUSH: If you need it, I have it here.

12          THE COURT: Yeah, please, if you have a copy readily

13   available, I'd appreciate it.  Thank you, you may approach.

14          MS. RUSH: My papers are going to fall.

15          THE COURT: Take your time.  Thank you, ma'am.

16   Okay, thank you.

17          MS. RUSH: I have lots of research on this issue.  I

18   don't know how deeply you want to go into it, but I think

19   that it's in Section 6802 of the Gramm-Leach-Bliley Act that

20   the financial institution is allowed to use that information,

21   again, for them when they are having someone serviced.  I

22   don't think that it addresses a sale.

23          THE COURT: All right, so your position is that,

24   notwithstanding the statement of Ms. Morgan at a previous

25   hearing and notwithstanding the various items contained, for

1  instance, in the sale orders, that the debtors' sale of

2  servicing rights and other loans is inconsistent with their

3  privacy policies.

4       MS. RUSH: Right, and I also think that under

5  6802(e)(1)©), it says a proposed or actual securitization

6  secondary market sale including sales of servicing rights or

7  similar transaction.  This paragraph addresses other

8  secondary market institutions, and -

9       THE COURT: What are you reading to me from?  What

10  law?

11       MS. RUSH: The Gramm-Leach-Bliley.

12       THE COURT: All right.

13       MS. RUSH: Would you -

14       THE COURT: Yeah, let me see what you're showing.  I

15  just want to see what you're looking at here.  All right.

16  What's your point here?

17       MS. RUSH: I think the debtor was asserting that it

18  is authorized as a sale servicing rights under the secondary

19  market that that says clearly in that paragraph, to me says

20  that a financial institution, and that that is not included.

21  So, it's confusing.

22       THE COURT: Okay, thank you.

23       MS. RUSH: I also think that under FBR 6004, it

24  requires the debtor, the trustee to file a motion requesting

25  the authority to sell the information, and if it's

1    inconsistent with the debtors' privacy policy, again, an

2    ombudsman should be assigned.  So, the issue for me is two:

3    One is the multiple transactions.  We're not just talking

4    about the one sale of the servicing rights.  We're also

5    talking about the sale of loans and loan assets.  We're

6    talking about the potential of multiple privacy policies

7    being issued out of all these different organizations that

8    American Home has acquired over the last few years, and I

9    feel that the representation that was made to this Court from

10    the very beginning about what their policies were, I believe

11    that it was not only misrepresented, I believe that no one

12    ever looked into what the privacy policies were if they were

13    multiple policies.  I think that it was just something that

14    was, you know, other than for a borrower it's sort of a non-

15    issue, so, I think it was negated from the very beginning

16    that it has any importance whatsoever.

17          THE COURT: All right.  I think it makes logical

18    sense to take this issue by issue.  So, and I don't want to

19    cut you off.  If you have anything more to say about the

20    consumer privacy ombudsman, if not let me hear a response on

21    that issue.

22          MS. RUSH: Okay.

23          THE COURT: And then we'll - I think that will be

24    the most logical way, otherwise we'll lose the track of

25    what's going on.  Mr. Brady.

1          MR. BRADY: Your Honor, Robert Brady for the

2    debtors.  Ms. Rush is correct.  Your Honor did request a

3    report from the debtors back on August 20th with respect to

4    the need to appoint a consumer ombudsman, and Ms. Morgan did

5    deliver that report that we had provided our privacy policies

6    to the United States Trustees Office and had conducted a

7    review ourselves and had determined that the contemplated

8    sales would not impact those privacy policies.  We also cited

9    to a ruling by Judge Carey in the New Century case who found

10   that a sale of servicing rights was a secondary market sale

11   within the meaning of the Gramm-Leach-Bliley Act, which is a

12   permitted exception to the transfer of that information so

13   that the purchaser of the servicing rights would be able to

14   service the loans.  We've also been routinely including two

15   provisions in all of our sale orders before Your Honor.  Just

16   looking at one of the more recent ones, and this is the sale

17   to MidFirst but I'm advised that the same language appeared

18   in the servicing sale order.  This is paragraph (D): "Finding

19   and determination that the debtors are not selling personally

20   identifiable information to the buyer.  Additionally (1) The

21   privacy policy given by the debtors to homeowners does not

22   prohibit the sale contemplated under the purchase agreement,

23   and (2) The sale is consistent with the privacy policy given

24   by the debtors to homeowners."  So, the debtors believe that

25   is the case.  Second, there's an ordered paragraph that,

1    "Notwithstanding anything to the contrary in the purchase

2    agreement, to the extent any of the property consists of an

3    interest in a consumer credit transaction, subject to the

4    truth in lending act, or an interest in a consumer credit

5    contract as defined in § 433.1 of Title 16 of the Code of

6    Federal Regulations, the buyer shall remain subject to the

7    same claims and defenses that are related to such consumer

8    credit transaction or such consumer credit contract to the

9    same extent as the buyer would be subject to such claims and

10   the defenses of a consumer if such interest has been

11   purchased at a sale not under 363 of the Bankruptcy Code as

12   provided for in § 363(O) of the Bankruptcy Code."  It's kind

13   of a long provision, but it's a new provision, relatively new

14   of the Bankruptcy Code.  These provisions are requested by

15   the Trustee.  We often beat them to the punch and put them in

16   the sale order, so, we believe there's no evidence today to

17   contradict the report of Ms. Morgan back on August 20th.  We

18   think the ruling of Judge Carey that a servicing sale is a

19   secondary market, so covered by the Gramm-Leach-Bliley Act is

20   correct, and we think we've taken the necessary precautions

21   in the forms of order to make sure that we're protecting any

22   consumer information.  Ms. Rush's loan was actually sold pre-

23   petition.  It was sold to an investor and then securitized.

24   So it is in a securitization trust which virtually all of the

25   AHM originated loans sit in some form of a securitization

1    trust.  So that occurred pre-petition.  The servicing of that

2    loan for that trust is a servicing right that's contemplated

3    under the sale to the Ross entities that Your Honor, I

4    believe, signed the order yesterday on, and that will occur -

5    American Home, as Your Honor has heard will continue to

6    service that mortgage from the economic close to the final

7    close at which time there will be a final close and the

8    assets will become the property of the owner, but we believe

9    we've met our burden here, that no consumer privacy ombudsman

10   is required.

11          THE COURT: All right.  Anyone else?  Mr. McMahon.

12          MR. McMAHON: Your Honor, good morning, Joseph

13   McMahon.  Your Honor, we have had - our office has had our

14   eye on this issue since day one.  Shortly after the cases

15   were filed we contacted debtors' counsel and obtained copies

16   of their privacy policy, and specifically we were given two

17   versions of it.  And after reviewing the policies, our office

18   determined that there was essentially one expressed

19   restriction in that policy, and it was that they did not sell

20   - the company would not sell email lists or customer lists,

21   and reviewing that restriction in context, we concluded that

22   the restriction was geared towards addressing a distinction

23   between information derived from loan files, you know,

24   servicing files that the debtors had a right to use in the

25   ordinary course of their businesses versus selling an asset

1    independently to third parties.  In other words, the debtors

2    extracting that information from the loan servicing files and

3    then selling that off to third parties.  So, after we did our

4    diligence, Your Honor, and after having the experience that

5    we had in <u>New Century</u>, walking through some of these issues,

6    we did conclude that the debtors' privacy policy did not

7    prohibit the transactions that were contemplated by the

8    servicing unit sale, and in connection with a number of the

9    loan sales that the debtors have undertaken or are

10   undertaking, we came to that same conclusion.  We did do our

11   work in connection with this matter and arrived at a

12   conclusion that we believe is well-supported by the law and

13   facts.

14          THE COURT: Thank you.  Mr. Indelicato.

15          MR. INDELICATO: Thank you, Your Honor.  Just so the

16   record is clear, we agree that the U.S. Trustees Office has

17   had their eye on this since the beginning of the case.  As we

18   dealt with it in <u>New Century</u>, we believe that the sale of

19   this information is obviously necessary to a servicer and

20   does meet the exception.  We believe the debtor has met all

21   of the standards, and the protections are in place that are

22   contemplated by the statute.  We don't believe an additional

23   ombudsman is necessary, and we would request that that part

24   of the motion be denied.

25          THE COURT: Okay.  Thank you.  Anyone else?  Ms.

1    Rush, response or reply, if any?

2        MS. RUSH: Honestly, I feel that irregardless of

3    anything that's been said by the debtor today and in previous

4    statements, the consumer privacy ombudsman, and the

5    Bankruptcy Reform Act of 2005, the issues that I'm presenting

6    are having an independent person to determine that all of

7    those policies are being followed and to monitor and protect

8    the consumers and their information.  Personally, I feel that

9    it is a protection that was, obviously it was written for a

10   reason.  It wasn't written for the fun of it, but it seems

11   like in the lender issues which to me would be the most

12   important issues that this position should be filled in these

13   cases is the same cases that everybody is saying, We don't

14   need it, everything's fine.  Obviously, there was some reason

15   behind a code being written for a consumer privacy ombudsman.

16   It's very clear it's to be an independent person, a person

17   that understands this area and that can, you know, look at

18   the policies, analyze what's going on, track what's going on

19   through the sale documents to make sure that everything is

20   done as it should be.  So, I just feel like if there's any

21   case, any particular area of business that this is needed

22   more than anything else.  American Home had offices all over

23   the United States.  They acquired many different businesses.

24   They're doing contracts after contracts for sale of asset

25   servicing rights, all kinds of things where consumer

1   information is being viewed for sale, is being, you know,

2   transferred.  So, I think it's important that there is an

3   independent someone who is looking out for the borrowers.

4   That's all that I have.

5       THE COURT: Thank you.  I think the way to do this,

6   again, is to address these issues as sort of seriatim through

7   rather than waiting for the motion as a whole since it

8   contains various forms of relief.  So I will deal with the

9   request or motion for the appointment of consumer privacy

10  ombudsman first, and as Mr. McMahon stated, this is an issue

11  that the Office of the United States Trustee has been focused

12  on as an issue.  I was focused on very early in the case, and

13  was why I had requested Ms. Morgan to address the issue which

14  she did at the August 20th hearing, and I haven't heard any

15  facts, and I haven't seen any facts over the last two months

16  in this case, and I've had many hearings.  I've seen you

17  people quite a bit, and I've signed many orders, and I've

18  heard quite a bit of testimony including cross-examination by

19  objectors, and nothing before me would alter, I think, the

20  substance and merit of the statement by Ms. Morgan on August

21  20th to the effect that the appointment of a consumer privacy

22  ombudsman is not necessary because the debtors are not using,

23  selling, or leasing property in a manner that is inconsistent

24  with their privacy policies, and that's the key.  I agree

25  with Ms. Rush, I always assume Congress means what it says

1    and says what it means.  That's not always the case in

2    certain statutes where you have issues with statutory

3    interpretation.  I don't think that's a case there's any

4    ambiguity in the section dealing with consumer privacy

5    ombudsmen, and that's important because the appointment of an

6    ombudsman under the statute is only required to the extent

7    that the sale is inconsistent with the debtors' privacy

8    policies.  So, since I haven't - I don't have any evidence

9    and I don't believe that the debtors are acting,

10   notwithstanding Ms. Rush's argument to the contrary, based on

11   Judge Carey's holding, which I concur in, in connection with

12   servicing rights, and with the nature of the loans that are

13   being sold, I just don't believe that there's anything at all

14   inconsistent with those privacy policies, at least any

15   evidence that that's what's going on, and as a result the

16   appointment of a consumer privacy ombudsman is not required

17   under the statute, nor am I going to, to the extent I have

18   it, exercise my discretion to appoint a consumer privacy

19   ombudsman in this case because I don't think it's necessary.

20   The Office of the United States Trustee is very diligent in

21   these matters in our district.  They look at these issues

22   carefully.  They do their due diligence.  They are a -

23   although not appointed by the Court for this specific

24   purpose, but they are the watchdog of Chapter 11 in Delaware

25   and they do a heck of a good job at it, and I think these are

23

1  the types of issues they focus on.  They've done their due

2  diligence, and I'm satisfied that they're looking into these

3  issues.  The Committee's looking into these issues.  The

4  representations that have been made to me by the debtors as

5  to what they are doing and what they're not doing are

6  adequate, and this is a case that's expensive already in

7  connection with professionals, not inappropriately so, it's

8  complicated, but I really don't see the need to add yet

9  another level of administration on this case by the

10 appointment of an ombudsman and whatever that might cost.

11 So, I will deny that motion, and Ms. Rush, I don't know what

12 you want to turn to next.  We have the motion for appointment

13 of a trustee or an examiner.  You also requested a 2004 exam,

14 and you requested, in effect, the institution of an

15 injunction.  So, whichever those you wish to proceed to next

16 is fine with me.

17         MS. RUSH: Well, I'd like to actually go to the

18 issue of production of documents.

19         THE COURT: That's - very well.

20         MS. RUSH: The debtors have provided some loan file

21 information.  It does not cover some of the important issues.

22 I touched on this when I was here before.  The loans have

23 been sold off to third parties in many cases.  They're in

24 complex trusts and buckets, as they like to call them.

25 Depending on what bucket you're in, you may sink or you may

1    float.  Each one of these owners of these notes have their

2    own policies going right now.  There's no across-the-board

3    policy on, you know, how they want things to be handled when

4    it comes to managing their loans, whether that's litigation,

5    foreclosure, loan rescission, written request, any kind of

6    issue that a borrower might have.  American Home Mortgage

7    refuses to provide that information.

8              THE COURT: Which information?

9              MS. RUSH: Who owns the note, the owners of the

10   note.

11             THE COURT: Are you entitled to that?

12             MS. RUSH: Well, the law is that if a borrower

13   requests it in writing, they're required to give either the

14   owner of the note or the master servicer.  I'm assuming they,

15   you know, they do refuse that information entirely, but I'm

16   assuming that once they reveal the master servicer then you

17   have to go to them and try to find out more detail of the

18   structure of where your note is.  The information for a

19   borrower is critical, and it's also critical, I feel, for the

20   debtors' estate.  Obviously, if a property is held in a non-

21   debtor entity -

22             THE COURT: Let me ask you a question.  I'm sorry to

23   interrupt, but - They've told you that your loan has been

24   sold to a securitization trust.  Did they identify the

25   securitization trust for you?

1          MS. RUSH: No.

2          THE COURT: No, okay.

3          MS. RUSH: And so, you know, herein lies the problem

4    There's a debtor.  There's a debtor's estate.  There's loans.

5    Obviously my litigation is against American Home, but there's

6    also been in Fanco, for instance, Leighman Brothers was held

7    liable for aiding and abetting Fanco in financing their

8    loans.  So there are some cross issues, but the owner of the

9    note, I feel also it's wrong for the debtor to be the front,

10   shall we say, and protecting another party that is actually

11   the true owner, the owner in due course.  I did pull up all

12   of the UCC negotiable instruments, and, unfortunately,

13   everything in here is very clear that the holder in due

14   course, obviously, the owner of the note, even if it's a

15   trust, it identifies, you know, there is a person that's

16   payable on that account where those payments are going.  So,

17   there has to be a, you know, at the end of the day you can't

18   just say it's a trust and there's no party that's the

19   benefactor of that trust.  The debtors' estate, again, some

20   of these are - the financing structures are so complex and

21   they're so interrelated and there are subordinated notes and

22   sometimes an American Home debtor entity will be on the hook

23   for part of the trust.  I mean, this is all very complex and

24   for a borrower trying to find out who is the person that

25   should be addressing the issues, you know, have they given

1  that right to the servicer?  I obviously have asserted issues

2  of negligent handling of my litigation from the very

3  beginning from the time that I tried to contact the servicing

4  unit to alert them with issues that I had to the point where

5  it escalated to litigation, to the point where I have an

6  attorney who is actually negotiating for me trying to do a

7  settlement right before the bankruptcy which they ignored,

8  delayed, and then went into bankruptcy.  You know, that owner

9  of that note, the true owner of the note, that owner of the

10 trust, whoever those parties are, you know, are they aware?

11 Is this how they want this to be handled?  Again, this wedge

12 between the borrower and the owner of the note makes it

13 impossible not only for the borrower to figure out what

14 they're doing, but also makes it impossible to me, for the

15 debtors' estate to figure out where the litigation should

16 even fall.  And there's ongoing issues that go beyond just

17 the origination issues, everything that happened in the

18 servicing unit and then also who is the owner of the note?

19 Who got the fruits of the fraud?  And unless the debtor is

20 going to voluntarily give up that information, the debtors'

21 estate is basically protecting a third party.

22          THE COURT: Okay.  All right.  Anything else?  Mr.

23 Brady.  In your response in a few places, you say that the

24 debtors took all reasonable steps to provide Ms. Rush with

25 all information in your custody or control.  Can you maybe

1    put a little meat on that statement?

2          MR. BRADY: I can, Your Honor.  Basically, the

3    company has provided to the three movants their origination

4    file, as maintained by the company in the ordinary course of

5    business, and the servicing file.  And in fact, in recent

6    days, the company did become aware of some additional

7    information they had provided in connection with the

8    servicing of the movants' loans, and we actually have that

9    information today that we can provide to the movants either

10   who are present or if they're not present we'll send it out

11   to them.  So we have voluntarily provided them, basically,

12   the company's origination file and the servicing file, as

13   they're maintained in the ordinary course.

14         THE COURT: All right, so what you haven't provided

15   is, I guess, the details of the securitization transaction?

16         MR. BRADY: We've indicated that the loans were

17   sold.  In one instance the loan was sold to an investor and

18   then securitized.  In two instances they were securitized in

19   AHM third party securitizations that Your Honor has heard so

20   much about.

21         THE COURT: All right, and in each of those

22   securitizations, obviously, there are certificates that are

23   issued and those are publicly traded, and sort of who knows

24   who owns those, but is Ms. Rush entitled to - or are the

25   other movants entitled to know what securitization trust is

1    the mortgagee?

2         MR. BRADY: Your Honor, I actually have a witness

3    today that touches on several of the issues raised in the

4    papers.  I can put him on, happy to do so, in fact, I prefer

5    to do so, so Your Honor gets a view of how the company deals

6    with RESPA requests and other handlings of past-due

7    customers.  But in particular, what the witness will say, and

8    we can put him on to say it, is AHM Servicing gets paid to

9    service.  The owners of these loan rely on AHM Servicing to

10   do its job, to deal with the customers and issues that arise.

11   If every time a borrower called and said I want to talk to

12   the owner of my loan, and we simply passed them along, I

13   doubt very much they'd be interested in paying AHM Servicing

14   very much because that's what the company's supposed to do.

15   The company is supposed to be the party that collects the

16   data, provides borrowers with information, and ultimately if,

17   for instance, a loan modification is requested, collects all

18   the data necessary so that the owner of the loan or in a

19   securitization the master servicer can make the decision of

20   whether a loan modification is appropriate or whether simply

21   steps to collect on the loan in other means is the right way

22   to go.  So, if I may, it may make sense to put on Mr. Dickman

23   now.

24         THE COURT: Yeah, let's do that.

25         MR. BRADY: It's not particularly long, but I think

1    it would be helpful.

2              THE COURT: All right.

3              MR. BRADY: I'd like to call Steven Dickman to the

4    stand.

5                        STEVEN DICKMAN

6    having been duly sworn testifies as follows:

7              THE CLERK: Please state your name spelling your

8    last name.

9              THE WITNESS: My name is Steven Dickman, S-t-e-v-e-

10   n, D-I-c-k-m-a-n.

11                      DIRECT EXAMINATION

12   BY MR. BRADY:

13   Q.  Good morning, Mr. Dickman.  By whom are you currently

14   employed?

15   A.  American Home Mortgage Servicing, Incorporated.

16   Q.  And what is your title with American Home Mortgage

17   Servicing?

18   A.  Senior Vice President of Loan Administration.

19   Q.  Can you describe for the Court your responsibilities in

20   that role.

21   A.  Yes, I'm responsible for the management of escrowed

22   administration, customer care research, special loans, payoff

23   and lien release, new loan setup, final collateral

24   certification, and mail services.

25   Q.  And how long have you been with AHM Servicing?

1   A.  I've been employed by AHM Servicing since January of

2   2005.

3   Q.  And can you describe for the Court what you did prior to

4   joining AHM Servicing.

5   A.  Prior to joining AHM Servicing, I held similar positions

6   with HSBC Mortgage Corporation for 15 years.  Prior to that,

7   I worked for Anchor Mortgage Services and Empire of America

8   Realty Credit Corporation.

9   Q.  So, in total approximately how many years of experience

10  do you have in the mortgage servicing industry?

11  A.  Roughly 23 years.

12  Q.  Are you a member of AHM Servicing senior management team?

13  A.  Yes, I am.

14  Q.  And does the senior management team meet regularly?

15  A.  Yes, we do.

16  Q.  Approximately how often?

17  A.  At least weekly, more often than that.

18  Q.  And during those meetings, do the various units or

19  functions report to the senior management team?

20  A.  Yes.  Generally the senior management team will meet and

21  will provide a general status report of the individual units.

22  Q.  So as a member of the senior management team, are you

23  generally familiar with all aspects of the servicing

24  operations?

25  A.  Yes, I'm generally familiar with all aspects.

1   Q.  Approximately how many loans are serviced by AHM

2   Servicing today?

3   A.  As of today, there's just under 202,000 loans.

4   Q.  I think one of the functions you mentioned that you

5   manage is customer care research, can you describe what that

6   is for the Court.

7   A.  Yes, that group is specifically responsible for managing

8   research inquiries received from customers which include

9   qualified written correspondence.

10  Q.  Are you familiar with RESPA?

11  A.  Yes, I am.

12  Q.  Is the term "qualified written correspondence" a RESPA

13  term?

14  A.  "Qualified written request" is a RESPA term, yes.

15  Q.  And generally for the Court, what is a qualified written

16  request?

17  A.  It is a request received from a borrower indicating their

18  loan number, their account information, and their request in

19  regards to the error on their account.

20  Q.  So if a written correspondence comes in to AHM Servicing,

21  it goes to your department?

22  A.  Yes, it will go into my Customer Care Research Unit.

23  They will review the request, document the account

24  accordingly, and review and respond to that request within

25  RESPA guidelines.

1   Q.  Do you first have to make the decision of whether it's a

2   RESPA qualified request?

3   A.  Yes, we do.

4   Q.  And do you have access to legal counsel if you have

5   questions regarding whether such a correspondence complies?

6   A.  Yes, that group does have access to our legal counsel

7   that is in Melville, New York.

8   Q.  What happens if a piece of correspondence is not

9   considered a RESPA qualified written request?

10   A.  If we receive a document say that's written on the

11   payment coupon that is not considered a qualified written

12   correspondence, we'll review the request and forward that to

13   the appropriate area for review and response.  It may have

14   been a concern that a customer may have had or it may have

15   been about how their account was handled by an employee, so

16   we'd give that to the management team in that area so that

17   they can deal with that issue appropriately.

18   Q.  Is there coordination between the various units of

19   servicing?

20   A.  Yes, there are different areas within the servicing unit

21   but all of them, you know, work together in some way, shape,

22   or form on a daily basis.

23   Q.  Let's walk the Court through some examples of how AHM

24   Servicing might handle a delinquency.

25   A.  Uh-huh.

1    Q.  What generally happens if a borrower misses a payment?

2    A.  If a borrower has not made their monthly mortgage

3    payment, the first thing that will happen is they will

4    receive a phone call from a loan counselor in regards to the

5    status of their account.  At that point, if they make contact

6    with the borrower, they will discuss the status of their

7    account and ask them, you know, if they're going to make

8    their payment and when they will make their payment.  From

9    those discussions going forward, it can lead to a promise to

10   pay or it can lead to discussions about a repayment plan or

11   further other options which could include loss mitigation.

12   Q.  So at that stage, it's basically an information gathering

13   stage, and then based on the information gathered, it may go

14   to different units in the servicing chain.

15   A.  That would be correct.

16   Q.  What would happen if a borrower calls and requests a

17   modification to their payment schedule?

18   A.  If they called in regards to a loan modification, they

19   would be transferred to a loss mitigation specialist.  At

20   that time, the loss mitigation specialist would have a

21   conversation with the borrower in regards to their current

22   situation.  If they wanted to request a loan modification,

23   they would be sent a loss mitigation package which the

24   customer would have to complete that package, and that

25   package is information regarding the customer's current

1    financial situation which the customer then has to return to

2    the loan counselor or loss mitigation specialist so they can

3    review that to determine what options might be available for

4    that customer.

5    Q.  You mentioned options.  How much discretion does AHM

6    Servicing have in dealing with an individual borrower in

7    delinquency?

8    A.  AHM has some latitude in regards to dealing with

9    individual borrowers.  Again, it's on an individual case

10   basis and it depends on that customer's situation, but they

11   have the ability to offer repayment plans or offer loss

12   mitigation options.  Again, with the loss mitigation options

13   that they can offer, they need approval by either the master

14   servicer or the investor.

15   Q.  So there's some discretion but ultimately the investor or

16   the master servicer has guidelines that must be followed by

17   the servicing unit?

18   A.  Yes, generally speaking, I don't know the details of each

19   of the servicing agreements but within there, there should be

20   a section regarding loss mitigation and the requirements of

21   the servicer whether that investor allows loss mitigation or

22   modification or they do not allow them.  Also, if they do

23   allow them, it would outline the specific requirements that

24   need to be met in order for the master servicer or the

25   investor to approve that.

Dickman - Direct                                          35

1    Q.  And your colleagues in loss mitigation would know those

2    specific requirements by investor or master servicer.

3    A.  Yes, that specific unit would know that as they deal with

4    that on a day-to-day basis.

5    Q.  Who ultimately has the final say whether to accept a loan

6    modification for a borrower?

7    A.  The final say would be the master servicer or the

8    investor.

9    Q.  Now does AHM Servicing generally disclose to the borrower

10   the owner of the loan?

11   A.  Generally, we do not disclose that.  As previously stated

12   by yourself, we are paid by the master servicer and the

13   investor to service the loan on behalf of them.  As part of

14   that, we are charged with taking their phone calls, sending

15   them monthly statements.  We are charged with answering their

16   inquiries.  So, generally speaking, no, we do not provide

17   that information to the borrower.

18   Q.  If a borrower did determine the owner of the loan, would

19   the owner of the loan have any of the information on the

20   borrower's account?

21   A.  Generally, no, the owner of the loan would not have the

22   loan level information in regards to the account.  They would

23   not have access to any of the information that has been

24   presented by the borrower or any of the history of the

25   account in regards to the transactions that have occurred.

Case 07-11047-CSS   Doc 839-1   Filed 11/26/07   Page 36 of 91

Dickman - Direct                                    36

1    Q.  So they'd probably call AHM Servicing if they received

2    such a call.

3    A.  Yeah.

4    Q.  In your opinion, do the owners of the loan or the master

5    servicers rely on AHM Servicing to obtain the information

6    necessary for them to make these types of decisions?

7    A.  Yes, it is the requirement of the servicer to gather all

8    of the required information that may be existing in the

9    servicing agreements in order to present that to the master

10   servicer.

11   Q.  In your opinion, has the bankruptcy in any way affected

12   the communication between servicing and the investors or the

13   master servicers?

14   A.  No, currently the bankruptcy has not impacted that.  We

15   continue to do our normal course doing business which

16   includes dealing with the investors on the loans on a day-to-

17   day basis as needed.

18   Q.  Does AHM Servicing maintain any quality control in

19   connection with the various functions that deal with past-due

20   customers?

21   A.  Yes, we do.  There is a quality control department within

22   the collections and loss mitigation's group, which is

23   responsible for reviewing accounts, and there's also an

24   overall quality control department that reviews all aspects

25   of servicing, not just the collections and the loss

1   mitigation group.

2   Q.  While at AHM Servicing, have you had any involvement in

3   the origination of loans?

4   A.  No, I do not.

5   Q.  While with AHM Servicing, have you had any dealings with

6   the brokers who originate loans?

7   A.  No, I do not.

8   Q.  Are you familiar with the term "YSP"?

9   A.  No, I am not.

10  Q.  Now turning to the movants, does AHM Servicing service a

11  loan where Ms. Rush is the borrower?

12  A.  Yes, we do.

13  Q.  To your knowledge, has Ms. Rush ever sent a RESPA

14  qualified written request to AHM Servicing?

15  A.  To my knowledge, no, she has not.

16          MR. BRADY: One moment, Your Honor, I want to show

17  the witness one of the exhibits that Ms. Rush has moved.

18          THE COURT: All right.

19          MR. BRADY: Your Honor, this is one of the letters

20  attached as Exhibit A to Ms. Rush's motion.  It's a letter

21  dated April 1, 2007.

22          THE COURT: All right.

23          MR. BRADY: And if I may just hand the witness a

24  copy.

25          THE COURT: Yes.

1   BY MR. BRADY:

2   Q.  Mr. Dickman, I've shown you one of the Exhibit As to Ms.

3   Rush's motion.  Are you familiar with this document?

4   A.  In preparation for today's hearing, I recently reviewed

5   this document.

6   Q.  In your opinion is this letter a RESPA qualified written

7   request?

8   A.  In my opinion it is not a RESPA qualified written

9   correspondence.  It is a loan rescission request which is an

10  origination issue, and this would have been handled by our

11  legal department in Melville, New York.

12  Q.  So if you or your staff received such a letter, it would

13  have been sent to the legal department in Melville?

14  A.  Yes, if anyone in my research group would have received

15  this request they would have sent this on to that department

16  for review.

17  Q.  Does AHM Servicing service a loan for Ms. Dobben as

18  borrower?

19  A.  Yes, we do.

20  Q.  To your knowledge, has Ms. Dobben ever sent a RESPA

21  qualified written correspondence to AHM Servicing?

22  A.  No, she has not.

23  Q.  Does AHM Servicing service a loan from Ms. Beall as

24  borrower?

25  A.  Yes, we do.

Dickman - Cross                                              39

1  Q.  To your knowledge has Ms. Beall ever sent a RESPA

2  qualified written request to AHM Servicing?

3  A.  Yes, she has, and we received that response and show that

4  we responded to the customer within RESPA guidelines.

5  Q.  Thank you.

6         MR. BRADY: Your Honor, I have nothing further for

7  the witness.

8         THE COURT: Does anyone wish to cross-examine the

9  witness?  Ms. Rush?

10                    CROSS-EXAMINATION

11  BY MS. RUSH:

12  Q.  The TILA rescission letter, you're saying would have went

13  to the corporate headquarters; correct?

14  A.  If we received that copy within the servicing entity it

15  would have been sent to the origination office, yes, in

16  Melville.

17  Q.  So that it would have been their obligation to possibly

18  answer that.

19  A.  It would be their obligation to review the request, yes,

20  since it was an origination issue.

21         MS. RUSH:  I guess we're splitting hairs here.  It

22  was a letter that was asking for an answer or a response, and

23  I did not receive an answer or a response to my letter, so -

24  and I want to clarify one thing, when I spoke of that I

25  represent other borrowers, I'm a consumer advocate, and I

1  help other borrowers with borrower issues.  So, I'm not here

2  to speak for other borrowers.  Ms. Dobben is in Arizona, and

3  she could not be here today.  We tried to find an attorney to

4  represent her, but at $300 an hour, it just was not a

5  feasible option.  That particular piece of the puzzle is

6  something different, so I don't have anything further to ask

7  this witness.

8          THE COURT: Very well, thank you, Ms. Rush.  Anyone

9  else?  Ma'am, yes.

10          MS. BEALL: May I ask a question?

11          THE COURT: Please, yes, approach and identify

12  yourself.  If you're a movant, you may.

13          MS. BEALL: I'm Laura Beall.

14          THE COURT: Well, wait till you get to the

15  microphone, ma'am, or it won't come up.  That's all right.

16  You can lower that down.

17          MS. BEALL: Okay, I'm Laura Beall.

18          THE COURT: Okay.

19          MS. BEALL: Okay.

20                        CROSS-EXAMINATION

21  BY MS. BEALL:

22  Q.  I have a couple of questions for you.

23  A.  Good morning.

24  Q.  Good morning.  You stated -

25          MS. BEALL: Is that too loud?  I'll stand back.

1          THE COURT: You're fine.

2    BY MS. BEALL:

3    Q.  You stated that you responded to my RESPA written

4    request.

5    A.  I did not personally respond to your request, but I do

6    show that a response was completed.

7    Q.  Here's the envelope.  See?  Small -

8          THE COURT: Ma'am, do you have a question.

9          MS. BEALL: Yeah, I do.

10          THE COURT: All right.

11          MS. BEALL: My issue too, I can wait, a lot of my

12    issues are questions with the servicing unit for things -

13    they're not telling the truth, and I need to address it

14    because it affects me a lot.

15          THE COURT: That's fine.  Then you may ask a

16    question.

17          MS. BEALL: And I'll make it quick.

18          THE COURT: No, you don't even need to make it

19    quick.  You can take as long as you'd like.  You just need to

20    ask questions, and he'll answer them.

21          MS. BEALL: Thank you.  This isn't my profession.

22          THE COURT: I understand.

23    BY MS. BEALL:

24    Q.  Did you all ever originate loans?

25    A.  American Home Mortgage Servicing, Incorporated, does not

1    originate loans.

2    Q.  So you did not start calling people six months prior to

3    the loan adjustment to tell them that you could lower their

4    interest rate?  You did not approach them to refinance?

5    A.  American Home Mortgage Servicing cannot originate loans,

6    so that would not have been completed within the servicing

7    unit.

8    Q.  Are you aware that I have documentation from a Paul

9    Messer (phonetical) where you all did approach me to

10   refinance on May 27th?  Are you aware of that?

11   A.  I am not aware of that, nor do I know that individual's

12   name.

13   Q.  Well, are you familiar with David Freedman?

14   A.  Yes, I'm familiar with David Freedman.

15   Q.  Debra Cameron?

16   A.  Yes, I am familiar with Debra Cameron.

17   Q.  Andrew Glynn?

18   A.  Yes, I know who Andrew Glynn is, but he is not an

19   employee of American Home Mortgage Servicing.

20   Q.  Oh, he's not?

21   A.  No, he is not.

22   Q.  Well, that's not what David Freedman told me.  How about

23   Joe?  Joe Bordatolla (phonetical)?

24   A.  He is also not an employee of American Home Mortgage

25   Servicing, Incorporated.

1   Q.  Okay.  Next question: When you did approach people -

2          MR. BRADY: Objection, Your Honor.  I think the

3   witness -

4          MS. BEALL: He's saying he didn't, that's fine.  I

5   have proof he did, so I'll go beyond that.

6   BY MS. BEALL:

7   Q.  Okay, next question.  You just stated that you do contact

8   borrowers when they're going into default to work with them.

9   Would you please explain forbearance that you offer.

10  A.  Generally speaking, I can only comment because I do not

11  manage that specific area so I can't talk in details.  It's

12  on an individual basis that they would speak with a customer

13  in regards to their situation in regards to what they can and

14  can't offer the customer.

15  Q.  Are you aware that on September 28th, at 8:40 a.m., your

16  servicing unit told me that you did not have to respond to my

17  RESPA?  Are you aware that on October 1st, September 16th, you

18  did not have to respond to my RESPA?

19  A.  I am not aware of those conversations.

20  Q.  I have it taped, it's okay.  Okay.  Just wanted to ask.

21  Next question: Scott Ellerby (phonetical), you're aware of

22  who Scott Ellerby is?

23  A.  Yes, I do know who Scott -

24  Q.  (Microphone not recording.)

25  A.  Yes, he works in our loss mitigation area.

1  Q.  Are you aware that he's telling borrowers, like myself,

2  my loan's value with your loan is about 80 percent, and I

3  have a Wells Fargo very large second, which is why I'm trying

4  to - who I'm trying to protect ultimately.  Are you aware

5  that Scott is telling borrowers that those LTVs, that the

6  investor would not want to work with them because it would be

7  more economical to foreclose and get paid back?  Are you

8  aware of this?

9  A.  Ma'am, I'm not aware of those conversations that you may

10  have had with Mr. Ellerby.

11  Q.  That's okay, I have it taped.  The next question: Are you

12  aware that when someone calls loss mitigation, like I did

13  September 22nd, spoke to Reno Walker, Extension 7021, that he

14  also tells borrowers that their loan is too valuable to the

15  hedge fund it's in, therefore the investors will not work

16  with them most likely, but they'll try.  They'll let them

17  know December/January that the rate will probably go up.

18  A.  Again, ma'am, I'm not aware of those conversations that

19  you had.

20  Q.  I have it recorded.  Okay?  Are you aware, you said that

21  you have quality control over you collections.

22  A.  Uh-huh.

23  Q.  Are you aware that they call people and hang up?  Are you

24  aware that I have over 65 calls taped badgering me?  Offering

25  me the same forbearance over and over again that's

1   impossible?  Are you aware of this?

2   A.  I'm not aware on your personal account the number of

3   times that they called or the extent of those conversations.

4   We do call customers who are behind on their payments to find

5   out the status of their loan and what their intent is to make

6   those payments.

7   Q.  Okay.  Let me go over the forbearance agreement which is,

8   as you all claim, which I have on tape, is the only one you

9   offer.  Let me give you my example.  My mortgage payment went

10  from three thousand to forty-five hundred - and by the way, I

11  started May 27th.  This adjusted July 1st to work out the

12  problem way in advance.   The bottom line is, you all told me

13  first of all, that you'd try to refinance me.  That was the

14  option.  You went through your pay option arm is what you

15  offered me?  Yeah, seven and three-quarters 30-year fix.  And

16  then another question: You all stated that the investors do

17  not modify, but yet they will do one modification which was

18  Paul Messer told me and also Joe, nine and three-quarters 30-

19  year fix.  They won't modify, that that's an automatic

20  modification for $500 and a 165?

21  A.  Ma'am, I don't understand what your question is.

22          THE COURT: I don't either, ma'am.

23          MS. BEALL: Okay.

24          THE COURT: What's your point?

25          MS. BEALL: I'm sorry.

1   BY MS. BEALL:

2   Q.  Are you aware that you all tell people that the only way

3   they can modify automatically is for nine and three-quarters

4   30-year fixed?

5   A.  Ma'am, I'm not personally aware of that.

6   Q.  Just a few more questions, and I'll be done.

7            THE COURT: All right.

8   BY MS. BEALL:

9   Q.  You all - I'm very concerned about Mr. Love's testimony,

10  I read it, his whole deposition -

11           THE COURT: Whose testimony?

12           MS. BEALL: Love's.

13           THE COURT: All right, at the sale hearing, at the

14  servicing hearing?

15           MS. BEALL: Yeah, yeah.

16           THE COURT: All right.

17           MS. BEALL: Am I giving you a headache?  I'm sorry.

18           THE COURT: I'm thinking.

19  BY MS. BEALL:

20  Q.  Anyway -

21           THE COURT: People may wonder about that.  When I

22  have my head in my hand and my eyes closed, I'm listening as

23  hard as I can.  All right?

24           MS. BEALL: Thank you.  And if you're irritated,

25  you'll tell me if it was.

1          THE COURT: No, no, I'm not irritated.

2          MS. BEALL: Okay.

3   BY MS. BEALL:

4   Q.   The next thing is are you aware that when someone does

5   call way ahead of time because their loan is going to adjust

6   that you tell them that they're required to go into default

7   before the investor will consider a loan mod?

8   A.   I am not aware of that.

9   Q.   Okay.  I meant to go back, which I go off, I went off on

10  a tangent on forbearance that you offer, my example, briefly:

11  My mortgage payment went from 3 to 4,500.  So, like I said,

12  three months earlier, I said I can't do this, we've got to do

13  whatever, I want to protect Wells Fargo, which I really do,

14  and, blah, blah, blah, my house used to - It was worth 850 a

15  year ago, now it's probably worth 7-650.  So they're screwed

16  unless I can get a loan modification.  So, number one, when

17  this whole process started, you all basically told me that I

18  had to go into default.  That was a requirement or I could

19  take my 4,500, divide it into three payments, therefore

20  making my next three 6,000.  That was the only way that I

21  could not be in default.  So, even though I couldn't pay

22  4,500, you all required that I pay 6,000 for the next three

23  months.  I just am asking you how that could possibly work,

24  and is that truly what an investor wants based on Mr. Love's

25  testimony, you seem to be oblivious.  He said you all have

1    standard practices and you follow Fannie Mae guidelines, but

2    yet he said in his deposition that you all do not know what

3    the individual investor requires based on the loan that's in

4    question.  You have your own standard makeup, ow you do

5    things.  So the question I have is, are the investors aware

6    of that, that this is truly a trap or explain to me how that

7    could work?

8    A.  Specifically, in regards to your account, I don't - I

9    can't answer your specific questions, but in general nature,

10   at the beginning of loss mitigation there is a standard

11   procedure that we would follow which is along the lines of

12   Fannie Mae guidelines in gathering that information.  Once it

13   is determined that a loan modification is the proper way to

14   go forward, then that request has to go to the master

15   servicer for their review and approval.  Again, I do not know

16   the details of each one of those specific servicing

17   agreements, but those agreements would state out what the

18   requirements of us would be needed to deliver to the master

19   servicer or the investor to get that approved.

20   Q.  Next question, please: Scott Ellerby finally told me last

21   week that Wells Fargo is the master servicer of my loan,

22   which we also deducted based on what Mr. Patton so kindly

23   handed out in the Bankruptcy Court regarding all the pools

24   and when it was originated, yahda, yahda, I'm in 2004-2, 2001

25   is the . . . (microphone not recording) so the bottom line

1    is, I called Wells Fargo, and in fact we had a conference

2    call with Scott, the executive - one of the executives of

3    Wells Fargo.  He confirmed that Wells Fargo is the master

4    servicer.  Spoke to the executive of Wells Fargo.  In

5    addition to that, spoke to another executive who sent Horn a

6    letter last week.  He responded on the 25th stating that Wells

7    Fargo is not the master servicer.  So, of course, here we go

8    again . . .  So, this is the bottom line, I was told by Wells

9    Fargo that I have to go back to you all, that you all make

10   the decision on the modification, not Wells Fargo, not their

11   master servicer, whose name I have, that runs the account.

12   So herein lies the problem: What is the solution?  The

13   investors?  I'm an asset of the Court, and this is the reason

14   I'm requesting my loan file because of this division and

15   there's no way to get through it.  I've spent five months on

16   this, over 500 hours, every single day, trying to get a loan

17   modification.  And you all tell me to go buy a house I can

18   afford.  No problem, I can afford a bigger better house and

19   save two grand a month, but I don't want to do that to Wells

20   Fargo, it's not right.   Because they're going to take a hit.

21   You all told me you don't care, bottom line.  So those are

22   the questions that I've been dying to ask.  And just so

23   you're aware, I have tape recorded over 64 calls.  You record

24   me and I record you and you've been made aware of it, and I

25   am having a court reporter.

1          THE COURT: All right, I don't think there's a

2    pending question.

3          MS. BEALL: I'm done.  Now it has to do with them.

4          THE COURT: I'll strike that statement from the

5    record.  You may sit down.

6          MS. BEALL: Okay.  I'm done, thank you.

7          THE COURT: Any redirect?

8          MR. BRADY: Nothing further, Your Honor.

9          THE COURT: You can step down.  All right.  Any

10   other evidence, Mr. Brady?

11         MR. BRADY: No other evidence, Your Honor, although

12   I would note for the record, attached to Ms. Rush's papers,

13   the day she sent the rescission, loan rescission letter to

14   AHM, she also filed a lawsuit against AHM Servicing, among

15   others.  So it did immediately turn into a legal matter.

16         THE COURT: Are all three movants, all three *pro se*

17   movants parties to litigation that is stayed by the

18   bankruptcy?

19         MR. BRADY: They are not, Your Honor.  Only Ms. Rush

20   is a plaintiff in a lawsuit that was pending as of the

21   filing.

22         THE COURT: All right.  So, basically - Let me ask

23   you this, Mr. Brady: What is it that they've asked for that

24   you haven't given them and why shouldn't I allow them to

25   inquire into those areas?

1          MR. BRADY: Well, Your Honor, I think what that -

2     what the witness' testimony in the cross showed is that the

3     system, the servicing system is happening.  They are calling

4     American Home Servicing.  They are receiving options.  They

5     may not like the options.  The company has over 200,000

6     borrowers, and to some extent it's impressive to me that we

7     only have three who have been proceeding in this Bankruptcy

8     Court to try to question the quality of service AHM Servicing

9     is offering.  I think the vast majority of borrowers are not

10    unhappy with the way their loans are being serviced.  We -

11    Your Honor, the company is engaged in numerous sales, trying

12    to close sales that already occurred and trying to wrap up

13    this estate for the benefit of all creditors.  Similar to

14    Your Honor's ruling in the Vantage Pointe 2004, while parties

15    in interest, and at this point we don't know whether these

16    individuals are creditors or not, should have some access.

17    At the same time, the debtors' focus should be on maximizing

18    value and completing and consummating the sales they've had

19    approved and getting other sales approved.  We think we have

20    provided them with what is reasonable and that is their loan

21    file, their origination file, and their servicing file.  They

22    have, and as you heard, they use access to the servicing

23    group to attempt to deal with their individual issues with

24    respect to their individual loan.  What haven't we provided

25    them?  We haven't searched every, you know, data base for

1    emails.  We haven't looked for documents that may - that are

2    not in the files, but we have provided them the files that

3    are maintained in the ordinary course.   Their gripe here is

4    really with the process and whether they should have a loan

5    modification, whether they should have a forbearance.  It

6    sounds like the company has offered them the options that are

7    available to them, and you heard the uncontradicted testimony

8    of Mr. Dickman that to some extent, while an agent has some

9    discretion, it is an investor/master servicer final call and

10   governed by the documents.  There's no evidence that AHM

11   Servicing is not offering borrowers the options available

12   under those documents.  They may not like them, but they're

13   being offered those options.  Now in connection with Ms.

14   Rush, she is the party to a lawsuit, any further discovery

15   with respect to her really should be in connection with

16   either claims administration or if she seeks relief from stay

17   and it's granted, in connection with that lawsuit.  She

18   should not be able to use Rule 2004 to conduct basically

19   stayed discovery.

20           THE COURT: Anyone else?

21           MR. INDELICATO: Your Honor, Mark Indelicato on

22   behalf of the Committee.  Your Honor, from the argument and

23   the testimony I heard, I believe the only piece of

24   information that Ms. Rush did not get that Ms. Beall did get

25   is who the ultimate owner of the loan is, and if that makes

1    it all go away, I don't see why the debtor can't give them

2    that information, but I think you've heard from the testimony

3    and from Ms. Beall herself, they're saying that you have to

4    go back to the servicer to resolve these issues, and she's

5    been trying to get a loan modification, and it seems to me

6    that Mr. Brady is correct.  They're getting the options, they

7    just don't like the options.  I don't think 2004, Your Honor,

8    should be used by Ms. Rush here as an adjunct to her

9    litigation.  The appropriate procedures are a motion for

10   relief from the stay and this Court will either deny it or it

11   will be dealt with in the claims process.  I understand, or

12   at least I can understand the frustration that they're

13   feeling, but I don't believe that the examination and the

14   discovery they're seeking is appropriate.  I think the debtor

15   has demonstrated that they have complied with the

16   requirements of the servicing business.  They've given the

17   information, the appropriate information.  They've been

18   dealing with them as they're dealing with all other parties,

19   so we believe, except for maybe giving Ms. Rush the one piece

20   of information she may not have is, that we think this part

21   of the motion should also be denied.

22             THE COURT: All right.  Ms. Rush?

23             MS. RUSH: May I approach to hand you something?

24             THE COURT: Yes.  Thank you.

25             MS. RUSH: (Microphone not recording.)

1    THE COURT: Well, you have to be at the mike, sorry.

2    Go ahead.

3    MS. RUSH: These documents are from my loan file,

4    and they show you that the fraud in my loan origination where

5    this all began.  I was promised one loan and was given one

6    completely different.  Those documents prove that the

7    origination of the loan - they had two loans going at the

8    same time.  One for 540 or 586 and one for 649.  The thing

9    that is consistent in all of those documents is that they're

10   offering me a one percent interest rate, which is not what

11   this loan, the pay option on a loan is.  That is throughout

12   all of my documents.  It's very clear.  So this whole entire

13   nightmare for me started out when I was approached for a loan

14   that was represented fraudulently.  To me it is very clear

15   that things that sound in fraud and also statutory regulatory

16   remedies, like TILA or RESPA, TILA loan rescission, I have a

17   lot of RESPA violations in my loan, are things that a debtor

18   is not supposed to be protected from in the Bankruptcy Court.

19   I realize that I probably will continue and file for relief

20   from stay to continue my lawsuit.  My concern was, in the

21   meantime, loans are being sold and transferred to third

22   parties, and in those agreements we did get to the paragraph

23   added for the consumer protection clause, that was not

24   something that was in the original APA.  That was not

25   something that the debtors voluntarily put in.  You know, I

1    have been in this courtroom to protect my rights and

2    hopefully other rights of borrowers as well in reference to

3    all these sales and transfers.  It's very unclear to me which

4    loans are being transferred in what buckets and what trusts

5    and what individual owners, where they're going.  It's very

6    unclear.  I was - I'm here before relief from stay to ask for

7    the true owner of the note because I don't know where my loan

8    is, and I don't know if it's going to be transferred or not

9    transferred.  I don't know if it's part of the debtors'

10   estate or it's not part of the debtors' estate.  So,

11   therefore, you know, obviously I need relief from stay to

12   pursue my action against American Home Mortgage Servicing -

13   American Home Mortgage for loan origination issues, but

14   there's also another party involved in this transaction, and

15   American Home Mortgage is using its front to withhold that

16   information.  I would like the Court to understand how crazy

17   that is not only for the sense of a legal sense but also if

18   you don't even know if it's property of the debtors' estate

19   or it's not property of the debtors' estate, I don't know how

20   you even determine whether it's an issue for this Court or

21   it's not.  I mean, this whole entire situation with how they

22   finance and how they package and how they offer junior notes

23   and senior notes, and they swap partner and they credit

24   enhance.  I mean for a borrower trying to figure it all out

25   and figure out who even is the person that - for instance, if

1   I do not litigate and if I lost my home, as many borrowers do

2   and are, obviously American Home has petitioned for many

3   foreclosure professionals.  They don't even know who it is

4   that's foreclosing on their home.  I mean I think that's a

5   pretty pathetic, sad state of affairs.

6          THE COURT: All right.  Thank you.  Well, let me

7   deal with Ms. Rush's issue that is specific to her first in

8   connection with her request for discovery under Rule 2004.  I

9   think the pending litigation that she has, which is in

10  District Court in Maryland, but is stayed by the bankruptcy

11  at least currently.  The law if very clear that when there is

12  - discovery is really sought in connection with a pending

13  lawsuit or adversary proceeding, that Rule 2004 is an

14  inappropriate vehicle to obtain information that would

15  otherwise be obtainable under the discovery rules, and I

16  think that's important because Rule 2004 is extremely broad.

17  It goes - you know as broad as federal discovery is under the

18  discovery rules, Rule 26 through 37, 2004, is, I think, even

19  broader, and - or can be broader, at least in the areas of

20  inquiry that are appropriate.  So, I think the place for that

21  discovery to occur is in connection with the District Court

22  action in Maryland or if it ultimately gets there to the

23  claims administration process here in bankruptcy, and I don't

24  think - I think, frankly, Ms. Rush has been given a great

25  deal of information that she may not have otherwise been

1   entitled to if the debtors had simply refused to cooperate in

2   connection with the 2004 exam.  So, based on the pending

3   lawsuit, based on the fact that she's actually already

4   received as much if not more than she would have received if

5   I had granted the 2004 motion, I'll deny Ms. Rush's request

6   for 2004 relief.  In connection with Ms. - I apologize - Ms.

7   Beall and Ms. Dobben, where they don't have pending lawsuits,

8   again I think that the debtor has already provided all the

9   information that I would require them to provide in the event

10  that I were to grant the motion.  So, I think - and this

11  applies to Ms. Rush as well, I think, frankly, it's simply

12  moot to the extent she's seeking additional information such

13  as, you know, who the master servicer is or, you know, what

14  the policies of third parties are, who the actual owner of

15  the loan is, I'm not at all convinced that she's entitled to

16  that.  Her issues are with the servicer.  The servicer is the

17  debtor.  Lawyers have certified to the Court that the loan is

18  no longer owned by a debtor entity.  I think that's

19  sufficient under Rule 2004 and ends the inquiry.  And as a

20  result, I'm going to deny the motion.  Yes, ma'am.  Wait till

21  you get to the mike.

22          MS. BEALL: Last one.

23          THE COURT: Yes, ma'am.

24          MS. BEALL: This is the issue, Wells Fargo the

25  master servicer said that they cannot make this decision.

1   American Home says they have to.  Could I just request

2   something in writing from American Home stating that it is in

3   fact up to the master servicer so I can provide that to Wells

4   Fargo?  If that's what they're claiming.  I'd really

5   appreciate it.  That's the only reason I wanted to know who

6   my noteholder was, and again, I can't stress, it doesn't

7   matter to me any more.  I mean, I'm doing a short sale.  I'm

8   going to make out like a bandit, unfortunately, and Wells

9   Fargo is going to take - they're going to lose a lot of

10  money.  It's very sad, but they're trying to work for me and

11  they said they can't.  That's why this doesn't even make

12  sense.

13          THE COURT: I - Look, this is a nationwide if not

14  worldwide situation, and not that I'm belittling your

15  situation at all, ma'am.  There are literally hundreds of

16  thousands if not millions of ordinary people like yourself -

17  Look, I pay a mortgage every month too.  Believe me, people

18  are affected by this, they're affected by the whole host of

19  issues relating to the sub-prime crisis, how it's gone beyond

20  sub-prime.  I mean there are people who were making a lot of

21  money, aren't making a lot of money anymore, have lost their

22  jobs both at the consumer side and at the bank side, and

23  Wells Fargo is well capable of taking care of itself, so, I'm

24  not overly concerned with whether or not, frankly, they take

25  a loss on any individual loan.  I can only deal with the

1   issues that are in front of me.

2           MS. BEALL: Yeah, and also -

3           THE COURT: I'm not going to require the debtors to

4   make a statement to that effect.  I think you've got the

5   information that you're entitled to, and I'm not going to

6   require them to make some sort of affirmative representation

7   to you.  If they wish to do so, that's up to them, but if

8   they don't want to do it, I'm not going to require it at this

9   time.

10          MS. BEALL: Well, just for the record, Wells Fargo

11  is very upset about it.

12          THE COURT: Well, I'm sure they are.  Look -

13          MS. BEALL: Yeah, they really can't just take care

14  of it and -

15          THE COURT: I've yet to meet a bank that isn't upset

16  about not getting paid in full.  I see them every day.

17  Ma'am, I'm not belittling your position.  I absolutely -

18  Look, I have - one of the jobs I do is not just this Chapter

19  11 corporate stuff.  I have real people in my court all the

20  time doing real bankruptcies of individuals, and I sign a lot

21  of stay relief motions allowing for foreclosures.  I am not

22  in any way unsympathetic or belittling your position,

23  however, there's only so much that you're entitled to in a

24  commercial real estate or residential real estate

25  transaction.  You're a party to a contract.  It is heavily

Case 23-11131-TMH   Doc 799-1   Filed 11/16/23   Page 60 of 91

1    regulated.  You're entitled to what you're entitled to.  I'm

2    not going to expand those rights, and I think it would be

3    harmful to the thousands if not tens of thousands of

4    creditors, to the other 200,000 loans service personnel to

5    continue to distract this debtor by requiring it to do

6    anything other than it's required to do under the law.  I'm

7    not going to expand under the Bankruptcy Code their

8    responsibilities to provide you with additional information.

9    I think it would be harmful to the greater good of the

10   bankruptcy case.

11             MS. BEALL: Okay.  Thank you.

12             THE COURT: You're welcome, ma'am.

13             MS. BEALL: Very much.

14             THE COURT: So we have the additional issues - or

15   the remaining issues as I understand them are the appointment

16   of a trustee or examiner and the injunction.  So, however we

17   want to proceed next is fine.  Maybe we can take, if it's

18   okay - I've been on the bench for almost an hour and a half,

19   so, why don't I take a short recess.

20             (Whereupon at 11:40 a.m., a recess was taken in the

21   hearing in this matter.)

22             (Whereupon at 11:49 a.m., the hearing in this

23   matter reconvened and the following proceedings were had:)

24             THE CLERK: All rise.

25             THE COURT: Please be seated.  Let's take - If we

1   may, let's turn to the issues of appointment of a trustee or

2   examiner, unless you want to proceed otherwise, Ms. Rush.

3   It's your motion.

4        MS. RUSH: I have to go back to other things that

5   I've already stated which is the fraud of the company, the

6   TILA, the RESPA, all of these things sound in - are things

7   that this company has done as a matter or course of business.

8   For instance, the YSPs have been found to be in violation of

9   RESPA and kickbacks, illegal kickbacks.  Issues like that, to

10  me, with this company, the Bankruptcy Court, again, it's my

11  understanding that bankruptcy is for the honest and

12  unfortunate debtor not for a debtor that went out and through

13  loan originations, through lies and deception created loans

14  that they then sold off to other people, and then basically

15  they create this big huge nightmare for 200,000 borrowers,

16  and then they go under, and they walk away from everything,

17  and then through this Court they sell off all the assets.

18  The debtors' estate will be left with all the liabilities.

19  They will be the ones facing all the litigation, and there

20  will be plenty.  These loans have a three-year right of

21  rescission.  There's many, many lawyers out there that are

22  chomping at the bit, obviously, in this area.  I feel that

23  the Court is allowing the debtor to control this entire

24  process.  The debtor in possession, obviously, had an agenda

25  from day one.  They came in, wanted to sell assets without

1   any liabilities.  Again, we did get the protection paragraph

2   in the servicing.  Nothing was put in the Melville sales.  I

3   don't know what other loan sales are pending at this point.

4   Frankly, I think that this company, the Broad Hollow,

5   Melville is a perfect example.  A million dollar stalking

6   horse bid was requested to protect money to come back into

7   the estate, which obviously never happened.  To your credit,

8   Your Honor, you questioned in the testimony over that.  How

9   this was going to bring a hundred cents on the dollar.  You

10  knew that wasn't going to happen.  That wasn't the market

11  conditions yet that was the testimony that was given.  The

12  sale actually happened.  Bank of America - obviously the

13  petition has now come in where it was actually the credit

14  default swap partners that owed American Home when those

15  loans didn't sell for full value, not the other way around,

16  as I understand it.  So, I just feel like there's been a

17  series of events that has happened since day one that

18  probably have cost the debtors' estate money.  I don't think

19  anybody is looking into the process as closely, and again,

20  it's very confusing.  The financing arrangements on all of

21  these loans, the way that they're set up with the credit

22  enhancement, the swap partners, you know, it's hard to

23  determine who's going to owe who what at the end of the day.

24  The origination and fraud issues, if I were an individual,

25  and I came into your Bankruptcy Court, and I had committed

Case 23-11131-TMH   Doc 399-1   Filed 11/06/23   Page 63 of 91

63

1    any kind of acts that were fraudulent, that were things that

2    were regulatory issues, licensing issues, or criminal

3    activities, you would throw me out of your court in a second

4    and tell me that I had no right to have the protection of the

5    Bankruptcy Court.  Yet, again, that's what goes on in these

6    cases every time the debtor comes into the Court.  I realize

7    that the Court needs to liquidate, needs to, you know,

8    finalize things, get everything wrapped up and end this

9    nightmare for everyone, however, in the process, I feel that

10   the debtor being in controlled, the debtor in possession

11   being in controlled is going to cost this estate a lot of

12   money in the end, because I think that you're releasing all

13   the assets without any of the liabilities, and all of those

14   liabilities are going to come back on the debtors' estate. I

15   could present a mountain, obviously, of testimony evidence.

16   This company is under investigation by the FBI, the SEC.  A

17   lot of entities are looking into this company's practices,

18   the FTC.  There are pending issues.  Granted, nothing has

19   been proven, but by the time everybody catches up, it will

20   all be over, and all that will be left is the debtors'

21   estate, everything that they think that they're going to end

22   up with in the end is going to be reduced to zero anyway at

23   the end of the day because of the obligations and the

24   liabilities that are going to be left.   So, that's why I

25   feel that there should be a trustee or examiner appointed to

1   review the conduct and how all of these transactions are

2   being put through.  The debtor's in total control - the

3   debtor in possession is in total control.  The debtor in

4   possession gets all of his money back first.  So, I do feel

5   that it's in the best interests of the debtors' estate.  And

6   that's all.

7        THE COURT: Thank you.

8        MR. BRADY: Your Honor, Robert Brady for the

9   debtors.  Your Honor, it's obvious that Ms. Rush and Ms.

10  Beall are pretty angry.  They're angry at the originator of

11  their loans.  They're angry at the owners of the loans.

12  They're angry at American Home Mortgage Servicing.  Really

13  angry at the industry.  Ms. Rush even has a website,

14  lenderlawliability.com, a substantial portion of which is

15  devoted to AHM Servicing.  She appears today and talks about

16  protecting creditors.  It seems almost that the movants

17  really went through the Bankruptcy Code and looked for

18  provisions that might inflict some pain on AHM and the

19  debtors.  It's ironic, as she seeks to help creditors, it

20  really - if the Court grants the relief requested, a trustee

21  or an examiner, it's really inflicting pain on the very group

22  that she seeks to protect, and that's the creditors, because

23  it will unquestionably cause a delay and unnecessary costs

24  which the creditors will bear.  On the trustee motion, Your

25  Honor, I think it's fair to say really that request has been

1   abandoned by the movants.  They have not presented any

2   evidence.  The law is clear.  The movants have the burden for

3   what is really extraordinary relief, and to meet that burden

4   they have to come forward with some evidence.  What we've

5   heard are a number of unsubstantiated allegations against

6   American Home Mortgage Servicing, but no evidence in the

7   prayer for relief, and I recognize they're not lawyers, but

8   they really devote a very small portion of the motion to the

9   trustee or examiner.  They just simply copy the language

10  right out of the Code.  It's not in the prayer for relief.

11  It's not in the form of order, and they've come forward today

12  with no evidence to seek that relief, and I think it's fair

13  to say that they've abandoned that request.  The core of

14  their motion was really a Rule 2004 exam, and the debtors

15  voluntarily complied and provided them with a good bit of

16  information responsive to that request.  I can address more

17  fully, Your Honor, the points on trustee or examiner, but I

18  think it really is fair to say that they've abandoned that

19  request without coming forward with any evidence whatsoever.

20       THE COURT: Well, what about the - I think the

21  trustee - Well, let me just say that I think the trustee

22  piece of it, I agree with you, is easier to deal with than

23  the examiner piece.  I think the trustee's piece in the law

24  you set forth and some of the statements you say in the

25  response, I think, deal with it probably better than I can,

1   speaking off the cuff here on the bench, but Ms. Rush

2   mentions that bankruptcy is for the honest but unfortunate

3   debtor and that if this was a consumer case that - and I

4   found that there were, you know, I found fraud or whatnot,

5   that I kick that consumer out of the Court.  I take issue

6   with both those propositions.  It is clear that there are

7   elements of the consumer bankruptcy laws designed to achieve

8   the public policy of providing a fresh start for the honest

9   but unfortunate debtor.  But I don't think that is the only

10  policy of bankruptcy, and it's certainly not the only policy

11  of Chapter 11 even if it is perhaps the primary policy of

12  Chapter 7 or Chapter 13.  And I think it's fair to say that

13  obviously Congress in the Bapsiva (phonetical) amendments was

14  trying to promote payment of debt.  I mean there are a lot of

15  conflicting policies in the Bankruptcy Code and some of them

16  deal - there are different policies in the 7/13 issues of

17  consumers than there are policies in the 7 and 11 issues with

18  regard to a corporate debtor.  For instance, a corporate

19  debtor doesn't get a discharge in a Chapter 7, an individual

20  does.  The whole point of a fresh start policy is the

21  discharge, and while it may be true that evidence of fraud

22  would be grounds to revoke discharge or not grant discharge

23  in a consumer case, it's not necessarily grounds to kick

24  someone out of Court.  It depends, obviously, there can be

25  motions to dismiss in the appropriate instances.  The reason

1   I sort of go on this tangent - I guess it is a tangent, is

2   just to reiterate, if you will, that a lot of the policy

3   arguments I'm hearing in connection with Ms. Rush's motion,

4   frankly, I don't find to either be accurate or if they are

5   accurate, they're incomplete, and even if they're accurate

6   and somewhat incomplete, I'm not sure they're analogous or

7   applicable to the situation we have here.  Chapter 11

8   debtors, there's always, you know, the cases talk about it,

9   you know, there's almost an acknowledgment that there was

10  some mismanagement.  I mean, this debtor was doing very, very

11  well, and very quickly this debtor wasn't doing very, very

12  well, and as a matter of fact, was doing quite poorly.  Were

13  they an innocent victim of market conditions?  Or did they at

14  least participate in digging their own grave and becoming a

15  victim of the incredible swing in the market.  I don't know

16  what the answer to that is.  I expect it's somewhat the

17  latter, but I follow the financial press fairly closely, and

18  if I were capable of predicting market conditions, I'd have a

19  different job than I have, and I think we all would have

20  different jobs than we have.  You know, were there people who

21  nine months ago, twelve months ago were saying there were

22  issues with this industry?  Absolutely.  I remember reading

23  nine months ago in the New York Times a very interesting

24  article about housing prices, and how they were literally

25  double what they should be on an inflation adjusted basis,

1   and that was an anomaly going back 90 years, but frankly,

2   there are a lot of smarter, richer people who have lost their

3   jobs over the last four to five months and more who are going

4   to lose their jobs in the next four or five months, because

5   they failed to pick up this crisis or correction or whatever

6   you want to call it, and to say that they all engaged in

7   gross mismanagement or fraud as a result it would require the

8   appointment of a trustee in a bankruptcy case, I think goes

9   too far.  So, I haven't - I take seriously allegations that

10  as originator or servicer the debtors violated the law, that

11  they violated the truth in lending act, that they have

12  violated RESPA.  I do not discount Ms. Rush's or - I

13  apologize, I've seen a lot more of Ms. Rush, so I've got her

14  name on my brain, but Ms. -

15          MR. BRADY: Beall.

16          THE COURT: Beall, I apologize, ma'am - Ms. Rush or

17  Ms. Beall, I take those allegations very seriously.  However,

18  I haven't heard enough testimony or even representations that

19  those issues are broad enough or pervasive enough to rise to

20  a level that at this point would required the appointment of

21  a trustee, and I draw a distinction between how they

22  originated loans and serviced loans and what that effect that

23  may have on the consumers and what duties they have as debtor

24  in possession in managing their business on behalf of all

25  their creditors, which the consumers who may have claims

1    against the debtors are only one piece of that puzzle.  So,

2    I'm going to deny the motion for appointment of a trustee.  I

3    don't think the allegations, even taken on their face, rise

4    to a level sufficient to overcome the strong presumption that

5    the debtor in possession gets to stay in charge of the

6    company and run the company in a Chapter 11.  That's the way

7    the Code is designed, and that's what's supposed to happen.

8    The examiner issue, again, I think the 1104©)(1) issue, I

9    think the analysis is virtually identical in connection with

10   weighing the - balancing the interests of the different

11   parties.  I'm more concerned, I need to hear the debtors'

12   response and anyone else who wants to respond in connection

13   with the quote/unquote "mandatory appointment of an examiner

14   under ©)(2)".

15          MR. BRADY: Well, Your Honor, with respect to

16   1104©)(2) we're really asking for some practical application

17   of this section.  To borrow a line from Mr. Patton, it just

18   cannot be that a disgruntled customer can shout "examiner" in

19   a crowded bankruptcy and then burden the estate with the

20   costs of such an examiner.  Really, we've identified three

21   approaches courts have taken or treatises have written on how

22   courts could look at 1104©)(2).  One, obviously, as we cite

23   in our papers that it's not mandatory.  We have Judge Walsh,

24   we've attached a portion of the transcript where he indicates

25   he's never viewed § 1104©)(2) as mandatory nor had Judge

1    Balick before him and that it was longstanding in this

2    jurisdiction that 1104©)(2) was not viewed as mandatory, and

3    there is reported case law that supports that.  We cited to

4    the <u>Ruttenberg</u> case, the <u>GHR Company</u>'s case and the <u>Shelter</u>

5    case, and all of those look at situations where it's simply

6    just not appropriate for an examiner and that the Court

7    shouldn't be required to slavishly and blindly follow what

8    appears to be to some of these a mandatory section.  We

9    focus, Your Honor, not on the word "shall" because you no

10   doubt heard a lot about shall means shall, but really we

11   focus on the language as is appropriate that's in 1104, and

12   we think, Your Honor, that that has to mean something, and we

13   think it's just another prong that must be satisfied for the

14   appointment of an examiner.  The Court has to find that there

15   is an investigation for an examiner that is appropriate, and

16   we believe on the record, as Your Honor indicated, there

17   simply is no investigation that's appropriate.  There's some

18   support for that statutory construction in the Code itself,

19   Your Honor, where you look at § 102, the Rules of

20   Construction, and that talks about what the phrase "after

21   notice and a hearing" means, and it indicates that there

22   shall be such notice as is appropriate and such hearing as is

23   appropriate, and then goes on to say that it may be

24   appropriate that there be no hearing.  We believe then, Your

25   Honor, that the phrase "as is appropriate" must be given

1   meaning, and one of those meanings is that there is no

2   examination that is appropriate.  So, we think that there may

3   be instances, Your Honor, where the best interest of

4   creditors' test comes into play.  Congress seems to have

5   indicated that if a debtor has more than $5 million in

6   liabilities, you automatically hit that economic threshold,

7   but it still must be appropriate.  Your Honor, I would also

8   cite in that regard to <u>Colliers</u>.  It was interesting, just

9   recently, October 24th, Judge Lifland denied an examiner in

10   the <u>Calbine</u> case, and we just came across this or we would

11   have attached it, Your Honor.  He denied the examiner on

12   waiver grounds, finding that the creditor had simply waited

13   too long in the case to seek an examiner and had otherwise

14   participated, but he cites to <u>Colliers</u>, and I think it's

15   particularly compelling.  So as <u>Colliers</u> notes, and this is

16   on page 73 of the § 1104 section, "The mandatory nature of

17   § 1104©) was not intended and should not be relied upon to

18   permit blatant interferences with the Chapter 11 case or the

19   confirmation or the plan confirmation process nor should the

20   mandatory nature of the provision be used to allow one group

21   of creditors or interest holders to obtain a protagonist

22   supporting its litigation position under the guise of an

23   investigation."  And really, to the extent that they have not

24   abandoned this request, what Ms. Rush and the others are

25   seeking, Your Honor, is an examiner to come in and tell them

1   whether they have a claim against the estate.  Well, Ms. Rush
2   has a lawsuit and either through the claims administration
3   process or through relief from stay, she's going to find out
4   whether she has a claim against the estate, and frankly
5   that's another issue because 1104 requires the request be by
6   a party in interest, and I guess today we don't particularly
7   know if she's a party in interest.  We don't know if she's a
8   creditor.  She believes she's a creditor.  She believes she
9   may have claims, but certainly that has not been decided.
10  Your Honor, a second way that some of the literature looks at
11  1104©), it says that there is no temporal requirement.  In
12  other words, to the extent the Court believes 1104©)(2) is
13  mandatory, there is no requirement in the statute of when an
14  examiner would have to appointed.  So, some of the treatises
15  suggest that Your Honor could simply defer the hearing on the
16  examiner motion to a more appropriate time in the case.
17  There's an ample record created about what the debtor's
18  trying to do here to liquid its assets as quickly as possible
19  to maximize value.  We're not originating loans anymore.  So
20  the concerns that the consumers raise about origination
21  practices don't require any immediate action, and as
22  indicated, we have a Creditors Committee in the case, we have
23  the United States Trustee, and their both watching the case
24  very closely, and taking steps that's in the best interest of
25  creditors.  So, deferral is another concept.  I would also

1   cite to the Queenan treatise.  This was actually a section

2   written by Judge Sellers out of Ohio, and this appears in

3   that treatise, and this is James F. Queenan, Jr., Chapter 11

4   Theory and Practice, a Guide to Reorganizations, §§ 14-22.

5   This written again by Judge Sellers, "If an investigation is

6   needed the economic justification for the appointment is

7   presumed to be present if the debtors' qualifying debt

8   exceeds 5 million.  The statute should not be read to

9   require an appointment if there is no appropriate

10  investigation to undertake.  Requiring an appointment of an

11  examiner in the absence of any need to investigate will

12  encourage courts to appoint examiners to examine the debtors'

13  broom closet."  Again, although it's not a written case, it

14  is written by a Judge who had looked at this issue to

15  indicate that the words "as appropriate" must be given some

16  meaning.  And finally, Your Honor, we know that even if the

17  Court determines that appointment of an examiner is required,

18  the Court maintains a large discretion in fashioning the

19  scope of the investigation and the examiner's compensation

20  and expenses.  In the Owens Corning case, Judge Fitzgerald

21  initially denied an examiner's request.  It went to the

22  District Court.  The District Court remanded and asked the

23  Judge to rule on two issues: Of standing of the movant and

24  whether 1104©)(2) was mandatory.  What the Judge did in that

25  case was simply appoint an examiner with no powers and no

1    budget.  Her view was that if the Code required the

2    appointment of an examiner, she would appoint one and have

3    the examiner ready to go if an issue arose later in the case

4    that required an examination, but because there was no

5    examination required at that time, she would merely put the

6    examiner in place to satisfy some reading of 1004©)(2) and

7    keep that examiner in place until or unless an issue arose in

8    the case that required some examination.  So, we've seen

9    through the treatises and case law and largely this is

10   unreported in how courts have dealt with this, courts

11   applying a practical approach to 1104©)(2) because again,

12   Your Honor, burdening this estate with an examiner where

13   there is no apparent need or no established need for an

14   examination would simply waste the creditors' money.  So with

15   that, we would ask that the Court deny the request.

16        THE COURT: All right.  Thank you, Mr. Brady.  You

17   read from the elements of <u>Colliers</u> that I have actually up

18   here on the bench and marked, and I think it's important -

19   Clearly, and I'm dealing here with the narrow issue of

20   1104©)(2) because I don't think the appointment of an

21   examiner would be in the best interest of the creditors or

22   the equity security holders or the interests of the estate.

23   So, I would deny, as I said earlier, I would deny the motion

24   for appointment of an examiner under ©)(1), and I'd like to

25   pick up before I sort of speak more on, I think, Mr. Brady's

1    comment earlier in connection with the trustee motion and I

2    think it's equally applicable to the examiner motion, I

3    didn't see any real factual allegations contained in the

4    motion when it came to these issues.  I felt that the movants

5    basically parroted the language of the statute and sort of

6    said, Because I just said what the statute says, a trustee or

7    an examiner should be appointed, and obviously, you need to

8    do more than that.  The problem of course is that shall means

9    shall, and the courts require, when I see something like that

10    it obviously means the court's required to appoint an

11    examiner if the criteria are met.  I think it's important to

12    look at ©)(2) though as - not on its own, but as it relates

13    to the rest of the sentence.  So, the Court shall order the

14    appointment of an examiner to conduct such an investigation

15    of the debtor as is appropriate if the financial criteria are

16    met.  The problem isn't so much shall, it's that if and

17    whether if means, you know, if the financial criteria are met

18    you have to appoint an examiner.  Well, if you read it that

19    way, the first part of the sentence doesn't make any sense.

20    So I think you have to read it as a whole, and I think - I

21    have tons of respect for Judge Fitzgerald, but I think, you

22    know, appointing an examiner and then giving that examiner no

23    budget and no duties is tantamount to not appointing an

24    examiner, and having one ready to go, I mean, the process of

25    appointing an examiner is not particularly onerous, it

1    doesn't take a ton of time.  So - and I'm sensitive to this

2    issue and I know the Office of the United States Trustee is

3    sensitive, and I understand their position in connection with

4    shall meaning shall, and I think that's true, but I think in

5    order for - I would draw a bit of a distinction between what

6    Judge Walsh and Judge Balick have appeared to rule which is

7    simply that it's a best interest test.  I don't think that's

8    correct.  The best interest is in ©)(1).  It's not in ©)(2).

9    I think the financial criteria are important, and obviously,

10   they're met in this case, but that's only one piece of the

11   puzzle, and the other piece of the puzzle is that there has

12   to be an investigation to perform that's appropriate.  I

13   think the cases cited in the <u>Colliers</u> treatise discuss that.

14   I think that's a more nuance approach than sort of saying it

15   is what it is, and if you cry "examiner" in a crowded case,

16   you get one.  In this case, reading the motion carefully, I

17   really didn't see a request for any investigation.  There was

18   a complaint about practices.  A 2004 request for information

19   about individual loan files that we've already discussed, but

20   no real articulation of what it was that the movants wanted

21   to be investigated by an examiner, and even if one were to

22   sort of assume, okay, they want someone to examine the

23   debtors' practices in connection with loan origination and

24   servicing that may be violations of state or federal law, I

25   don't think that at this time giving someone sort of carte

1   blanche to look into that issue will be appropriate.  Again,

2   the Committee is extremely involved in this case.  There are

3   ongoing investigations, possibly by other governmental

4   entities.  There's obviously a lot of issues going on in

5   Congress right now in connection with these types of

6   practices that allegedly the debtor participated in, so I'm

7   not - I don't think in this case there would be anything to

8   be gained by appointing an examiner and giving that examiner

9   a budget and saying, I'd like you to investigate the debtors'

10  loan origination and servicing policies in connection with

11  whether it may have violated state or federal law.  I think

12  that's asking for a $20 million report, and I'm not sure what

13  it would accomplish.  So, with regard to the temporal

14  requirement, again, I'm not - I understand there are those

15  cases.  I think it would be more appropriate to deny the

16  motion without prejudice than to sort of say, Okay, I'm

17  granting the motion, but I'm not at this point going to

18  appoint an examiner.  Again, I think that's just tantamount

19  to denying the motion.  So, I'm going to do that.  I'm going

20  to deny the motion without prejudice to be brought again if

21  new facts arise or if the status of the case changes.  And

22  just an aside, I mean, I don't know what this case ultimately

23  ends up with, whether we end up in with a liquidating plan,

24  whether we convert to 7.  I mean, I know - I'm sure there are

25  discussions that I'm very happy to not be participating in

1    that may be focused on that, but my instincts tell me that to

2    the extent there's some real issues out here, that they are

3    going to be investigated by somebody in the future, and if

4    turns out that that's not the case, I'm certainly open to

5    hearing someone ask me to appoint someone to do that on

6    behalf of the debtors' estate at the appropriate time.  All

7    right?  Are there any other issues?  I'm going to - So, I

8    think we've addressed the issues raised by - Oh, there was

9    the issue of the injunction.  I think that's very easily

10   dealt with.  You can't get an injunction by filing a motion.

11   I've said it many times before.  You have to file an

12   adversary proceeding under Rule 7001, and you need to meet

13   the criteria to get an injunction and you have to support it

14   by evidence, and without that, I'll deny that.  So I'm going

15   to deny - For the foregoing reasons, I'm going to deny all

16   three motions, and I'd ask the debtors to submit a form of

17   order, please, under certification of counsel.

18          MR. BRADY: Your Honor, we will prepare forms of

19   order for each motion.

20          THE COURT: I think that turns me to cash

21   collateral.  I don't have those papers.  I know they came

22   over yesterday in connection with the motion to shorten,

23   which I granted, but I didn't actually save them, so -

24          MR. WAITE: Your Honor, I can hand up - I have a

25   copy of the motion and a copy of the order; is that helpful

1    to the Court?

2              THE COURT: Yes, that would be helpful.

3              MR. WAITE: I'm also going to hand up a blackline of

4    just the order that highlights some of the changes made to

5    paragraphs (6) and (11) of the existing final cash collateral

6    order.

7              THE COURT: Okay. Thank you.  Thank you.

8              MR. WAITE: Your Honor, the last item on the agenda

9    is the debtors' request for an extension of the use of cash

10   collateral, and I want to apologize to the Court for having

11   brought this on such short notice, and I appreciate the

12   Court's willingness to hear us today for entry of an interim

13   order.  As Your Honor may recall earlier on in the case, at

14   the first day hearing, the Court entered an interim order

15   granting use of cash collateral.  We had a final hearing on

16   September 4th at which point the Court entered a final order

17   regarding use of cash collateral.  That cash collateral order

18   provided for use of cash collateral through today, October

19   31st, and at the time - We were here on September 4th, it was

20   our hope and anticipation that that order would get us

21   through the point of a closing on the sale of the servicing

22   business and we would not need a further extension of the use

23   of cash collateral.  As Your Honor is aware, the cash

24   collateral is being used solely for the purpose of operating

25   the servicing business pending a sale and not for other

1   aspects of administering these cases.  As Your Honor is also

2   aware, as a result of the sale hearing that occurred over the

3   last couple of weeks and the Court's entry of an order

4   yesterday, we are not in a position where we're going to be

5   able to have our initial closing on the sale by today.  We

6   expect that that closing will occur in the first half,

7   probably towards the middle of November, and so we've, in

8   discussions with Bank of America, as administrative agent,

9   have agreed to extend out the use of cash collateral on

10  essentially the same terms as have existed since September 4th

11  with a few minor modifications, and I think it probably makes

12  most sense just to simply turn to the form of order and walk

13  through what the changes are, and I do have a clarification

14  to make on the record to satisfy some concerns raised by the

15  purchaser.

16          THE COURT: All right.

17          MR. WAITE: Does Your Honor have the -

18          THE COURT: Is this the blackline?

19          MR. WAITE: Yes, Your Honor.

20          THE COURT: All right.

21          MR. WAITE: The only parts of this order that are

22  blacklined are paragraphs (2) and (3), which are the amended

23  and restated paragraphs (6) and (11) of the existing final

24  cash collateral order.

25          THE COURT: Okay.

1         MR. WAITE: Obviously we have some background

2    paragraphs at the beginning of the stipulation and paragraph

3    (1) which adds a reference to the court-approved sale and the

4    asset purchase agreement.  Your Honor, paragraph (2) of the

5    order, which again is paragraph (6) of the existing final

6    cash collateral order, you can see there on page 3, we've

7    made some changes to reflect that amounts in the construction

8    lockbox account will be paid over to Bank of America as

9    administrative agent, and we struck the provision that

10   permitted a portion of those funds to be used in accordance

11   with the budget.  Your Honor may recall at the final hearing

12   we advised the Court that we were going to use a portion of

13   those funds with the consent of Bank of America to fund

14   certain construction loans, but the funding of those

15   construction loans has ceased, and Bank of America does not

16   wish to continue that at this point in time.  So we've

17   provided for those funds to be paid over as they had been

18   prior to the entry of a final order.  On page 4, Your Honor,

19   we've added language regarding what happens to cash

20   collateral on hand as of the initial closing date.  Your

21   Honor, once the initial closing date occurs, the debtors will

22   not need the use of cash collateral to operate the servicing

23   business as the servicing business will be funded using funds

24   which we made available from the purchaser, and this

25   provision, really, is intended to provide that the cash on

1    hand relating to the servicing business which primarily

2    consists of money that's in the cash collateral account that

3    the debtors have been using to operate the business.  Other

4    provisions of the cash collateral would provide that certain

5    funds that come into our possession are turned over on a

6    regular basis to the administrative agent, but its funds

7    which are placed in the cash collateral account related to

8    servicing fees and refunds of servicing advances have been

9    utilized by the debtors to operate the business.  Once the

10   initial closing occurs, that will not be necessary, so those

11   funds will be paid over to be applied to the loan.  We have

12   added language to make it clear though that part of those

13   funds will be held by the debtors in an amount necessary to

14   cover incurred but unpaid expenses as of the date of the

15   closing.  There's an existing provision in the order that

16   provides that upon termination of use of cash collateral, the

17   debtors can still use cash collateral to pay budgeted items

18   which are incurred and unpaid as of that point in time, and

19   that just carries over that concept.  That was added, I

20   think, at the Committee's assistance in connection with the

21   final order.  The language we have here is how this will work

22   is the debtor will provide the administrative agent with the

23   amount we think is necessary, subject to their agreement and

24   the reasonable discretion and to the extent there are any

25   disputes, we'll be calling upon the Court to resolve those

1    disputes.  I hope that won't be necessary.  Your Honor, at

2    this point, I'd like - might make the clarification that was

3    requested by the purchaser.  I think part of their confusion

4    relates to this language and the concern regarding the

5    transfer of all cash collateral on hand, and the concern that

6    that would somehow modify how cash that's being paid for the

7    servicing business, pursuant to the sale order and the asset

8    purchase agreement, would be dealt with, and just to make it

9    clear, to the extent that it's not, that nothing in this

10   interim order is intended to or shall change, modify, or

11   effect the asset purchase agreement or the sale order with AH

12   Mortgage Acquisition Company, which the Court approved

13   yesterday - I think that appears at Docket No. 1711, or the

14   supplemental Fannie Mae stipulation which appears at Docket

15   No. 1544.  Your Honor, at the end of paragraph (6), language

16   has been added at the request of the administrative agent

17   just to make it clear that the members of its bank syndicate

18   group and its collateral agent are required to hand over to

19   the administrative agent cash collateral which is in their

20   possession or comes into their possession so that it can be

21   applied to reduce the loan in accordance with the loan

22   documents.  Your Honor, paragraph (11), we've extended out

23   the termination date.  In the draft that was filed with the

24   Court we had a date of September 15th.  We've now changed that

25   to September 16th -

1          THE COURT: November.

2          MR. WAITE: November, I'm sorry, November 16th.

3     Primarily we changed that for a couple of reasons.  One, is

4     the cash collateral budget we've attached runs through

5     September 16th, that is a Friday which is a natural date to

6     run it through, and it does give us one more day if we need

7     it to get the closing done without, hopefully, the need to

8     come back for a further extension from the Court.  Your

9     Honor, further on in that paragraph there are a couple of

10    provisions, just making it clear that these provide to any

11    extensions or amendments of the final order, we've added a

12    definition at the end of this first interim stipulation to

13    paragraph (11).

14         THE COURT: Okay.

15         MR. WAITE: We've added the occurrence of the

16    initial closing date as an event of default - or actually not

17    as an event of default, but as a termination event, I'm

18    sorry, Your Honor.

19         THE COURT: I was going to say, isn't that the whole

20    point?

21         MR. WAITE: And then, Your Honor, there's a new

22    sentence added there towards the end of existing paragraph

23    (11) on page 6 of the interim order.  That language, subject

24    to further order of this Court, if any, has been paid in full

25    and cash, the administrative agent shall be entitled to

1    receive all proceeds from the collection, sale, disposition

2    or liquidation of the collateral including but not limited to

3    all collections of principal and interest on the mortgage

4    loans as set forth in this final order, including any

5    extensions or amendments hereof regardless of whether the

6    termination date has occurred.  The purpose of this language

7    was just to make it clear that notwithstanding the event of a

8    termination of the cash collateral order as a result of the

9    initial closing, that there are other orders out there that

10   require proceeds from the sale of various assets to be paid

11   over to the administrative agents in accordance with the cash

12   collateral order.  We want those provisions to continue being

13   operative subject to further order of the Court.  This is not

14   intended to change the provisions of any of those orders.

15   It's not intended to change other provisions of the cash

16   collateral order regarding net proceeds or what proceeds

17   they're entitled to, but to the extent the cash collateral

18   order or further order provides that proceeds to be paid over

19   in accordance with the cash collateral order, that will

20   continue on until further order of the Court in the ordinary

21   course.  Your Honor, there was another clarification that the

22   lender administrative agent asked me to make with respect to

23   the budget which is attached as Exhibit B of the order.

24   There is a line item in the budget regarding retention

25   payments, and in the week ending November 16th, there's a $3.8

1    million figure there and I wanted to bring to the Court's

2    attention -

3            THE COURT: All right, where are you?  I'm sorry.

4            MR. WAITE: Do you have the budget as Exhibit B?

5            THE COURT: Yes.

6            MR. WAITE: Under, Uses of Cash, the third line item

7    is retention payments.

8            THE COURT: Uh-huh.

9            MR. WAITE: And under the week ending November 16

10   there's a figure of 3.8 million.  Those are payments that are

11   to be scheduled to be made in accordance with the retention

12   plan that was approved by the Court.  That number includes

13   not only the normal weekly payments to be made but the

14   quarterly payments that would be due to be made at that point

15   in time plus payments that would be due upon the closing of

16   the transaction.  The lender asked me to make it clear that

17   to the extent the transaction does not close during that

18   week, those payments that relate to a closing would not be

19   made until some later period, at which point we would be back

20   to the Court for further extension of cash collateral.

21           THE COURT: Okay, all right.

22           MR. WAITE: I believe that the -

23           THE COURT: So the closing costs aren't paid unless

24   there's a closing.

25           MR. WAITE: Exactly.

1          THE COURT: Okay.

2          MR. WAITE: Your Honor, I think that really runs

3   through the changes we had made.  I think I've made the

4   clarification I've agreed to make with the purchaser.

5          THE COURT: I mean, the budget is what you're

6   authorized to do.  It's not what anybody is directing you to

7   do.

8          MR. WAITE: Exactly, Your Honor, and we would only

9   make the payments to the extent we were otherwise authorized

10  by order of the Court.

11         THE COURT: Okay.

12         MS. COUNIHAN: Your Honor, Victoria Counihan for the

13  Wilbur Ross entities both as the DIP lender and the servicing

14  sale purchaser.  Your Honor, my client was very concerned

15  when we saw the stipulation last night that the provisions of

16  the stipulation may be construed to conflict with either the

17  asset purchase agreement, the sale order, or the Fannie Mae

18  stipulation.  We haven't had a chance to go through it in

19  detail because of the timing, but we spoke to both Bank of

20  America and the debtor, and they explained that certainly was

21  not their intention, so that's why we asked for the

22  protective language that Mr. Waite has given Your Honor.  We

23  had asked that the language be included in the form of order.

24  Both Bank of America and the debtors wanted it to just be on

25  the record, so I would renew my request to Your Honor that

1   that language be specifically added to the order.  I'd also

2   just reserve our rights to bring up any additional objections

3   we might have at the final hearing, because I know this is

4   set for a final - or will be set for a final hearing since

5   we've not really had any time to review the stipulation or

6   the budget that was attached.

7       MR. TALMADGE: Good afternoon, Your Honor.  Scott

8   Talmadge from Kaye Scholer on behalf of Bank of America, the

9   administrative agent.  I just thought I should stand up and

10  tell Your Honor that we have indeed consented to the

11  additional use of cash collateral for the period as set forth

12  and under the terms and conditions in the stipulation that's

13  been prepared and handed up to Your Honor, with the

14  clarification that has been read in the record by Mr. Waite.

15      THE COURT: What's the clarification with the buyer

16  again that you've agreed to put on the record but you don't

17  want to put in the order?

18      MR. WAITE: Your Honor, the clarification really was

19  to make it clear that nothing in the order is intended to or

20  shall change the - or modify or correct the asset purchase

21  agreement, the sale order, or the Fannie Mae stipulation.  I

22  don't believe, and I don't believe Bank of America believes

23  that anything in the stipulation could be interpreted to do

24  that, and we were happy to make that statement on the record.

25  I'm not sure that it needs to be in the order.

1          THE COURT: No, I agree.  That doesn't need to be in

2    the order.  First of all, I'm not sure you could do it even

3    if you wanted to on this kind of notice to your buyer.

4    Second of all, why you would want to do it to your buyer is

5    beyond me after what's occurred over the last six weeks.

6    Third, I don't read it that way, so, I'm not concerned.  So,

7    I think the statement on the record is sufficient.

8          MR. WAITE: Thank you, Your Honor.  Again, we were

9    just trying to get to a closing not affect the closing.

10          THE COURT: Sure.

11          MR. WAITE: I have the original signed copy of the

12   stipulation with the exhibits to hand up.  I will note that

13   in paragraph (4) on page 6, the attached budget, I changed it

14   to Exhibit B at the end.  It incorrectly had A in the draft.

15          THE COURT: Right.

16          MR. WAITE: And I'll hand this up and we just have a

17   couple of dates to fill in.

18          THE COURT: Thank you.  Does anyone else wish to be

19   heard in connection with this matter?  Hearing none, I'll

20   sign it as agreed.

21          MR. WAITE: Your Honor, in terms of the dates at the

22   end of the stipulation, we have a date for a final hearing

23   with respect to entry of a final extension, and hopefully,

24   we'll be at or near our closing at that point in time.  We

25   may - and will not have a need for a further extension, but

1   we obviously reserve that right.  I know we have a hearing

2   before the Court on November 14th, at 10 a.m.   That would

3   give us the 15 days' notice from the filing of the motion

4   yesterday.

5            THE COURT: November 14th, 10 a.m.  Objections -

6            MR. WAITE: We generally go a week before, which

7   would be the 7th, but if the Court wants to make it a little

8   closer to the hearing, I'm fine with that too.

9            THE COURT: Yeah, let's go with the 9th.

10           MR. WAITE: Ninth.

11           THE COURT: Four p.m.

12           MR. WAITE: Thank you, Your Honor.  I think that's

13   all we have on the calendar for today.

14           (The remainder of this page is intentionally left

15   blank.)

16

17

18

19

20

21

22

23

24

25

1          THE COURT: All right.  Thank you very much.  I'll

2     await those orders under certification of counsel in

3     connection with the *pro se* motions, and thank you very much.

4     The hearing is adjourned.

5          ALL: Thank you, Your Honor.

6          (Whereupon at 12:40 p.m., the hearing in this

7     matter was concluded for this date.)

8

9

10

11

12

13

14

15

16

17

18          I, Elaine M. Ryan, approved transcriber for the

19     United States Courts, certify that the foregoing is a correct

20     transcript from the electronic sound recording of the

21     proceedings in the above-entitled matter.

22

23     /s/ Elaine M.  Ryan                      November 9, 2007
       Elaine M. Ryan
       2801 Faulkland Road
       Wilmington, DE 19808
       (302) 683-0221