# **<u>EXHIBIT B</u>**

Dated the 23rd day of December 2020

**WEMEDIA SHOPPING NETWORK TECHNOLOGY CO., LIMITED**

**AND**

**AMYRIS CLEAN BEAUTY, INC.**

---

**DISTRIBUTION AGREEMENT**
**regarding Biossance products**

---

**THIS DISTRIBUTION AGREEMENT** (this "**Agreement**") is made on  December 23rd, 2020 ("Commencement Date").

**BETWEEN**:

(1)     **WeMedia Shopping Network Technology Co., Limited**, (DBA SuperOrdinaryCo) a Company duly incorporated in Hong Kong SAR having its registered address at 14/F, Chun Wo Commercial Centre, 23-29 Wing Wo Street, Central, Hong Kong ("**Distributor**"); and

(2)     Amyris Clean Beauty, Inc., a Company duly incorporated in the state of Delaware, whose principal place of business is at 5885 Hollis Street, Suite 100, Emeryville, CA 94608 ("**Supplier**").

(together the "**Parties**", and each a "**Party**").

**WHEREAS:**

(A) The Distributor is a company whose main business is the distribution of products to customers in Greater China, including Hong Kong and Macau.

(B) The Supplier is a company which has the right to distribute sell, market and promote Biossance products and/or products by reference to the trademarks and trade names that are applied in relation to the Biossance products.

(C) The Supplier wishes to have the Products (herein defined) marketed and sold in the Territory and it considers in its best interest to do so by engaging the Distributor to distribute the Products in the Territory.

(D) The Parties have agreed to enter into this Agreement for the purpose of granting the Distributor an exclusive right to distribute the Products in the Territory according to the terms and conditions hereinafter set out.

**IT IS AGREED BETWEEN** the Parties as follows:

1.     <u>**INTERPRETATION**</u>

1.1     The following terms have the following meanings as used in this Agreement:

| | |
|---|---|
| "**Affiliate**" | means, excluding the Parties, (i) any corporation or business entity of which fifty percent (50%) or more of the voting stock is owned directly or indirectly by a Party; (ii) any corporation or business entity which directly or indirectly owns fifty percent (50%) or more of the voting stock of a Party; or (iii) any corporation or business entity under the direct or indirect control of a corporation or business entity described in (i) or (ii). |
| "**Business Day**" | means a day, other than a Saturday or Sunday, on which banks are open in the USA, Hong Kong, People's Republic of China and Macau to the general public for business. |
| "**Claims**" | means all complaints, proceedings, actions and claims in respect of the Products. |

CONFIDENTIAL

| "Commencement Date" | means December 23, 2020. |
|---|---|
| "Contract Year" | means the period of 12 months commencing from the February 22, 2021 and each consecutive period of 12 months thereafter. |
| "Distributor's Group" | means the Distributor and its Affiliates from time to time. |
| "Intellectual Property" | means all patents, trademarks, service marks, trade and business names (including internet domain names and e-mail address names), copyrights, database rights, design rights and registered designs, and all applications for any of those rights, in each case in any part of the world owned by the Supplier and relating to the Products. |
| "Products" | means the Supplier's current and future Biossance branded products (including gift packs) and products by reference to the trademarks and trade names that are applied in relation to the Biossance products. |
| "Territory" | means solely the e-commerce platforms listed in <u>Attachment A</u> hereto selling exclusively on a cross-border model in Greater China, Macau and Taiwan. |
| "Biossance Marks" | means any trademarks or trade names applied to or used in connection with the Products. |
| "USA" | means the United States of America; |

1.2    Any reference in this Agreement to gender shall include all genders, and words importing the singular number only shall include the plural and vice versa.

1.3    The division of this Agreement into Clauses, and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.  The recitals form part of this Agreement and shall have the same force and effect as if expressly set out in the body of this Agreement and any reference to the Agreement shall be to this Agreement as from time to time supplemented, varied or amended and shall include the said recitals and schedules.

1.4    The words "other", "including" and "in particular" do not limit the generality of any preceding words and are not to be construed as being limited to the same class as the preceding words where a wider construction is possible.

1.5    References to statutory provisions shall be construed as references to those provisions as respectively amended or renewed from time to time.

1.6    References herein to a Clause or Schedule is to such Clause of or Schedule to this Agreement unless the context otherwise requires.

CONFIDENTIAL

2.    **APPOINTMENT**

2.1    Supplier hereby appoints the Distributor as its **<u>exclusive</u>** distributor to distribute, sell, market and promote the Products in the Territory, and the Distributor accepts such appointment. During the Term, Distributor may submit to Supplier additional e-commerce platforms to be added to the Territory for approval by Supplier, which approval will not be unreasonably withheld.  Any such addition shall be mutually agreed in writing by the Parties via an amendment to this Agreement.

2.2    If and when during the Term the animal testing regulations applicable to products such as the Products in People's Republic of China are removed, and it is determined that the Products are compliant with the legal and regulatory framework for distribution in brick-and-mortar channels within Greater China, and subject to Distributor's ongoing compliance with the terms of this Agreement, Distributor shall have the right of first refusal with respect to the expanded distribution of Products in brick-and-mortar stores and other channels, under terms and conditions to be negotiated in good faith between the Parties and mutually agreed upon in writing.

2.3    The aforesaid exclusivity shall commence upon the Commencement Date and will automatically extend from the First Contract Year to the Second Contract Year and from the Second Contract Year to the Third Contract Year PROVIDED THAT the Distributor shall be able to achieve 65% of the agreed Sales Target for each Contract Year as provided in this Agreement.  If during the Term the Distributor shall fail to meet 65% of the agreed Sales Target for any applicable Contract Year, the Supplier shall have the sole discretion to terminate the exclusivity granted to the Distributor by notice in writing.

2.4    In the event this Agreement is renewed pursuant to Clause 3.2 herein, the aforesaid exclusivity may be extended upon mutual written agreement of the Parties and pursuant to terms to be negotiated in good faith between the Parties.

2.5    The Distributor shall only distribute, sell, market and promote the Products in the Territory in accordance with the terms and conditions of this Agreement.

3.    **TERM OF APPOINTMENT**

3.1    This Agreement shall commence on the date first set forth above and continue until the third anniversary of the Commencement Date (the "**Term**").

3.2    Provided that the Distributor has duly observed and performed the terms and conditions of this Agreement and subject to any mutually agreed changes to the Sales Target amounts (if any), this Agreement shall automatically renew for additional one (1) year periods ("**Extended Term**"), unless either Party provides written notice of non-renewal at least six (6) months prior to the end of the Term or then-current Extended Term, as applicable.

4.    **TERMS OF PURCHASE**

4.1    **Purchase Order**

(a)    The Supplier shall provide a list of updated Products to the Distributor from time to time and shall forthwith inform the Distributor of any changes to the list.

(b)    The Distributor shall submit purchase orders ("**Purchase Orders**") monthly or as and when needed to the Supplier specifying the Products to be purchased, the respective quantities and prices and the proposed pick up dates (lead time being not less than 2 weeks) and any other information required by the Supplier from time to time.  Each

CONFIDENTIAL

Purchase Orders shall contain Supplier's name, code and quantity of each Product, and required date of delivery.

(c)    Each Purchase Order is subject to Supplier's acceptance. Supplier shall inform the Distributor in writing within five (5) Business Days from the date of receipt of the Purchase Orders whether or not the Purchase Orders are accepted.

(d)    Once the Purchase Orders are accepted by the Supplier and except as otherwise set forth herein, the Purchase Orders shall be binding on the Parties and the Parties shall agree on pick up date(s) of the Products purchased.

(e)    For accepted Purchase Orders, if Supplier's inventory of Products is or becomes insufficient to ship the ordered Products on the proposed pick-up date, Supplier shall promptly inform the Distributor in writing of the same and specify a revised quantity and delivery date for the Distributor's confirmation and the original Purchase Order shall be deemed as cancelled without liability or penalty.

(f)    Any changes in the terms of an accepted Purchase Order must be agreed by the Parties in writing. Any terms and conditions of any Purchase Order or other writing issued by Distributor, in connection with this Agreement, which are in addition to or inconsistent with the terms and conditions of this Agreement, shall not be binding on Supplier in any matter whatsoever unless accepted by Supplier in a writing, which writing specifically references Clause 17.2 of this Agreement.

4.2    **Purchase Price**

Supplier shall supply the Products to Distributor at twenty-six percent (26%) of the standard retail price set forth in <u>Attachment D</u> hereto.

4.3    **Logistics**

The Products shall be picked up by the Distributor from the Supplier's warehouse in the USA at the address set out in <u>Attachment F</u> as notified by the Supplier to the Distributor. Products are provided **Ex Works (EXW)** Incoterms 2020. Distributor will be responsible for and will pay all packing, shipping, freight and insurance charges. Title to the Products, as well as all risk of loss or damage with respect to the Products will pass from Supplier to Distributor upon delivery of the Products to the common carrier.

4.4    **Costs, Taxes and Duties**

(a)    All costs of export/import and transport/freight shall be borne by the Distributor.

(b)    All taxes and duties for transferring the Products to the Territory shall be borne by the Distributor.

4.5    **Payment**

The Distributor shall pay for the Products within sixty (60) days from date of invoice issued by the Supplier.  Payments shall be made in US dollars and shall be paid by wire transfer to an account confirmed by Supplier by writing.

CONFIDENTIAL

4.6     **Forecast**

During the Term, on a calendar quarterly basis, Distributor shall submit a non-binding quarterly sales forecast for the purpose of the Supplier's production capacity planning. The forecast shall show forecasted purchases by month and by SKU.

## 5.     GRANT OF DISTRIBUTION RIGHTS

5.1     In order for the Distributor to perform its obligations and duties under this Agreement, the Supplier hereby grants the Distributor's Group a limited, revocable, non-transferable licence to distribute, sell, market and promote the Products in the Territory and use the Biossance Marks in the Territory solely for the purposes of promoting and advertising the Products, as further set forth in Clause 10.

5.2     For purposes of distributing the Products, Distributor shall have the right to select and authorize third-parties ("**Dealers**") to distribute and sell the Products on its behalf in the Territory, PROVIDED THAT Distributor uses best efforts to ensure each Dealer complies with Distributor's obligations under this Agreement.  Distributor shall also have the right to supply Products to its Affiliates set forth in <u>Attachment B</u> to carry out its obligations hereunder.

5.3     The Distributor shall remain responsible for the acts or omissions of each Dealer as if those acts and omissions were those of the Distributor.  Distributor agrees to use best efforts to resolve concerns raised by Supplier related to Dealers.

5.4     Other than the rights granted to the Distributor in this Clause 5, the Distributor shall have no right to assign any of its rights or delegate its obligations under this Agreement without the prior written consent of the Supplier.

## 6.     SALES TARGET

6.1     The Distributor shall meet an aggregate sales target per each Contract Year ("**Sales Target**"). Such Sales Targets represent the sales generated from the Products sold to customers at their retail price in the Territory. The Parties have further agreed on a performance rebate mechanism.  The performance rebate mechanism as well as the Sales Targets are set out in <u>Attachment E</u>.

## 7.     OBLIGATIONS OF THE DISTRIBUTOR

7.1     The Distributor shall:

(a)     make available all necessary resources to meet its obligations under this Agreement, including but not limited to personnel (all staff necessary to operate the business), technology required to operate the business such as computers, desktop software, servers, ERP, WMS, analytics systems, advertising platforms, etc. and back office services (such as human resources, finance, legal, corporate, administration, etc.);

(b)     distribute, sell, market and promote the Products at the Distributor's own costs and on its own account to customers in the Territory only;

(c)     establish and operate sales channels in the Territory to maximize Biossance Product brand awareness and sales revenue;

(d)     use its best efforts to keep the Supplier informed of all Claims concerning the Products of which the Distributor becomes aware of;

- 5 -

(e)     consider in good faith any suggestions from the Supplier which could help with the sale and market of the Products in the Territory;

(f)     use its best efforts to share market, product, sales and operational information on a regular basis to the Supplier and provide a monthly report to the Supplier as to the sales and marketing of the Products in the Territory and updated Product inventory forecast;

(g)     be responsible for all expenses for promoting the Products, including but not limited to research, advertising, etc.;

(h)     be responsible for any translation of information and/or details of the Products into the Chinese language, the costs of same shall be borne by the Distributor;

(i)     develop and implement marketing and promotional plans for selling the Products in the Territory in accordance to Supplier's brand guidelines, as set forth in <u>Attachment C</u> or as otherwise provided to Distributor in writing;

(j)     comply with all relevant and applicable laws and regulations in the Territory in the performance of its obligations under this Agreement and to ensure to obtain all necessary approvals and permits to perform the Distributor's obligations under this Agreement;

(k)     be entitled to describe itself as the Supplier's "Authorized Exclusive Distributor" for the Products in the Territory, provided always that it shall not hold itself out as the Supplier's agent or as being entitled to bind the Supplier in any way;

(l)     act in good faith to protect and not do anything that may adversely affect or dilute the Biossance Marks, the Products, the reputation of Supplier, and other Intellectual Property rights of the Supplier;

(m)     provide written weekly sales reports and monthly progress reports that include marketing, sales and inventory updates regarding the Products. Distributor will include in the monthly reports to Supplier the names of the third-party stores that Distributor is working with to distribute the Products in the Territory.  Distributor will give due consideration to feedback and comments from Supplier about such third-party stores and use best efforts to resolve concerns related to same raised by Supplier. All such reports shall constitute Confidential Information (as defined below) of both Parties.

7.2     Distributor hereby agrees to defend, indemnify and hold Supplier harmless against any liability, losses, damages or costs (including any reasonable legal costs) arising from a third-party claim incurred or suffered by Supplier as a result of (i) any material breach of this Agreement by Distributor, (ii) any grossly negligent act or omission or willful misconduct by Distributor or its Affiliates arising either directly or indirectly from the performance (or non-performance) by Distributor or its Affiliates or any of its representatives of any obligations under this Agreement; (iii) the transport, import, export, marketing, use, distribution and sale by or on behalf of Distributor of the Products; (iv) any misrepresentations by Distributor, or any violation by Distributor (or any of its employees, agents, or Affiliates), or (v) failure to adhere to, any applicable law, regulation or order in any country, in each case other than those certain losses, liabilities, damages and expenses arising out of the gross negligence or willful misconduct of Supplier.  The obligations of the Parties under this Clause 7.2 shall survive expiration or termination of this Agreement.

- 6 -

7.3     Distributor represents and warrants that it shall:

(a)     comply with all applicable laws, regulations, codes, and sanctions relating to anti-bribery and anti-corruption including but not limited to the US Foreign Corrupt Practices Act of 1977 and the Anti-Unfair Competition Law of the People's Republic of China (the "Relevant Requirements");

(b)     comply with the ethics and anti-bribery policies provided by Tmall, Taobao, Little Red Book and any other platform or channel on which the Products are sold in the Territory to Distributor from time to time;

(c)     have and shall maintain in place throughout the term of these Terms adequate anti-bribery policies and procedures to ensure compliance with the Relevant Requirements and will enforce them where appropriate;

(d)     promptly report to Supplier any request or demand for any undue financial or other advantage of any kind received by it in connection with the performance of this Agreement;

(e)     immediately notify Supplier in writing if a foreign public official becomes an officer or employee of it and/or acquires a direct or indirect interest in it and each Party warrants that it has no foreign public officials as officers or employees and/or direct or indirect owners at the date of these Terms;

(f)     ensure any person associated with it who is performing services associated with these Terms does so in compliance with the Relevant Requirements; and

(g)     not export or re-export the Products in violation of any US sanctions law, regulation or order.

## 8.     OBLIGATIONS AND RIGHTS OF THE SUPPLIER

8.1     The Supplier shall:

(a)     provide a reasonable amount of Free Samples (as defined below) according to the amount of Products purchased by Distributor. The Free Sample amount shall be calculated as follows: up to 8% of the value of each Purchase Order. For purposes of this Agreement, "Free Samples" means sample Products in sample size, sachets, or other sizes made available by Supplier as samples. For the avoidance of doubt, Free Samples may not be sold by Distributor or any Affiliates or Dealers.

(b)     provide samples to Distributor at cost to the extent Distributor requires samples in excess of the "Free Samples" provided by Supplier;

(c)     exclusively supply to the Distributor's Group the Products in order to distribute, sell, market and promote the same in the Territory;

(d)     not appoint any third party as a distributor of the Products in the Territory;

(e)     refer all third-party inquiries for the Products in the Territory to the Distributor after they are brought to the Supplier's attention, except for enquiries via the Supplier's customer service team; and

- 7 -

(f)     use its reasonable endeavors to ensure that no third party (including but not limited to global e-retailers) resells or distributes the Products inside the Territory except as permitted herein;

(g)     supply Products in accordance with the Purchase Orders accepted by the Supplier;

(h)     supply Products that at the time of pick up by the Distributor, all Products shall have (i) been manufactured within six (6) months of the time when the Products are picked up by the Distributor and (ii) a minimum of two-thirds of its shelf-life remaining;

(i)     not unreasonably withhold Products from the Distributor;

(j)     accept the Purchase Orders submitted by the Distributor from time to time unless the Supplier is unable to do so due to insufficient stock of the requested Products;

(k)     in the case where the Products are defective, the Supplier shall either (i) credit the Distributor for the Products which are defective or (ii) replace the Products at the Supplier's costs;

(l)     in the case where more than 10% of the Products are defective, the Distributor may choose to reject the whole order and the Supplier shall credit the Distributor fully for the entire lot of Products delivered;

(m)     provide a reasonable amount of product to be used by Distributor explicitly for marketing purposes only, such as influencer seeding and PR seeding at cost.

(n)     from time to time supply the Distributor with such advertising and promotional materials relating to the Products as the Supplier may consider necessary to enable the Distributor to actively promote the sale of the Products in accordance with the terms of this Agreement;

(o)     supply the Distributor with any information coming into its possession which may assist the Distributor to effect sales pursuant to this Agreement;

(p)     use its best efforts to share market, product, sales and operational information on a regular basis with the Distributor;

(q)     promptly and efficiently deal with any enquiry relating to the Products raised by a customer in the Territory; and

(r)     comply with all applicable laws and regulations relating to the nature, method of manufacture, packaging and labelling of the Products.

## 9.     PRODUCT WARRANTIES

9.1     The Supplier warrants to the Distributor that the Products will:

(a)     be fit for their intended purpose;

(b)     be free from defects in material and workmanship for a period of twelve (12) months from the pick-up date (other than defects caused by damage or mishandling by Distributor or its representatives, or the common carrier);

(c)     be free and clear of all liens, security interests, or other encumbrances;

CONFIDENTIAL

(d)     comply with laws applicable to e-commerce and free trade zone in the Territory; and

(e)     not to Supplier's knowledge infringe or misappropriate any third party's patent or other intellectual property rights.

9.2     Except as otherwise specified herein, the above warranties made by the Supplier shall survive any delivery, inspection, acceptance or payment of or for the Products by the Distributor.

9.3     The Distributor shall promptly notify the Supplier in writing of any potential claims or actions as a result of any breach of the above warranties given by the Supplier.  The Supplier shall, within seven (7) days from such notification, provide a satisfactory response to the Distributor to respond to the potential claims or actions.  Should the Supplier fail to provide a satisfactory response within fourteen seven (7) days, the Distributor shall have the right to defend against same on its own accord and at its own expense.

9.4     Subject to Distributor's compliance with the terms of this Agreement, the Supplier shall indemnify the Distributor from any liability to any third party for demonstrated infringement of patents, copyrights, trademarks, trade names or trade secrets with respect to the Products supplied to the Distributor for sale and distribution in the Territory.

## 10.    <u>INTELLECTUAL PROPERTY RIGHTS</u>

10.1    Subject to these terms of this Agreement, Distributor is hereby granted a non-exclusive, non-assignable, non-sublicensable (except to Affiliates and Dealers, as set forth below), and royalty-free right and license during the Term, to reproduce, copy, distribute, display  and otherwise use Biossance Marks solely for purposes of advertising, promotion and sale of the Products in the Territory and in any advertising, promotional, marketing or publicity materials, point-of-sale displays, stationary or business cards in any media ("**Promotional Materials**").

10.2    The Supplier shall at all times retain all Intellectual Property rights (including but not limited to trademarks, trade names, service marks, copyrights, patent rights or otherwise) in the Products and the Biossance Marks, other than the limited license granted to Distributor herein. Nothing in this Agreement shall be deemed to grant any rights to Distributor or any third party with respect to the Biossance Marks or Other Biossance IP (as defined below), except as expressly set forth herein.

10.3    The Distributor confirms and acknowledges that (and procures the Distributor's Group to confirm and acknowledge that) it shall not have any rights in respect of the Intellectual Property or of the goodwill associated with the Biossance Marks or the Products, and that all such rights and goodwill are, and shall remain, vested in the Supplier.

10.4    In each use of Biossance Marks, Distributor will, and shall cause its Affiliates and any Dealer to:

10.4.1  maintain the distinctiveness of the Biossance Marks and the image of Products in any Promotional Materials used in connection with the Products, in accordance with these Terms and other guidelines provided by Supplier, as updated from time to time at Supplier's sole discretion (collectively, "**Biossance Guidelines**"), including as set forth in <u>Attachment C</u> hereto;

10.4.2  not use the Biossance Marks in any manner that dilutes, endangers, or harms or decreases the value of their goodwill, or that disparages or reflects adversely on Supplier, the Products, or its business or reputation,

CONFIDENTIAL

10.4.3    not contest, dispute, challenge, oppose or seek to cancel any Biossance Marks,

10.4.4    not, and will not assist others to use or file for registration any trademark, service mark, trade dress, logo or other mark that incorporates any Biossance Marks in whole or in part or which is confusingly similar to any of the Biossance Marks, or

10.4.5    not to assign, transfer or pledge any of its rights under the license granted under these Terms, without the prior written consent of Supplier.

10.5    Each use of Biossance Marks and Other Biossance IP (as defined below) shall be as authorized in these Terms. Distributor will share the Promotional Materials it is using or desires to use to distribute the Products and that include Biossance Marks and Other Biossance IP with Supplier on a regular basis or any other materials bearing the Biossance Marks and Other Biossance IP in connection with the Products. Subject to this Clause 10.5, Distributor agrees to use reasonable best efforts to implement Supplier's feedback and comments about such Promotional Materials and use best efforts to resolve concerns related to any Promotional Materials raised by Supplier, including with respect to the size, color, design, trademark notice (*e.g.*, ™ or ®), placement and prominence of the Biossance Marks on such Promotional Materials, as well as claims used in connection with each Product. For the avoidance of doubt, Supplier retains full power and authority in regards to Promotional Materials used in connection with the Products, Biossance Marks and Other Biossance IP, for which if Supplier believes any of the foregoing includes unauthorized or inaccurate Product claims or other content that may negatively reflect on the reputation and goodwill of the Products or Supplier, or otherwise deviate from the overall look and feel of the Products and Biossance Marks, Supplier shall have the right to request Distributor to cease use of the content and Distributor shall honor such requests.

10.6    During the Term, each Party agrees to promptly give written notice to the other Party if it becomes aware of any (i) infringement or suspected or threatened infringement by a third party of the Biossance Marks, or (ii) alleged infringement by the Biossance Marks of a third party's trademarks or service marks. Upon learning of any such potential infringement, Supplier has the sole right, but shall not be obligated, to take whatever action it deems necessary or desirable to enforce or defend the Biossance Marks and Other Biossance IP.

10.7    To the extent that Distributor, its Affiliate(s), or a Dealer, or any third party acting on their behalf create any Biossance Marks in connection with the Products or other products that are materially similar to the Products ("**Other Biossance IP**"), Distributor hereby unconditionally assigns to Supplier, without further consideration, all of Distributor's right, title and interest in and to Other Biossance IP.  At Supplier's request and expense, as Supplier deems necessary or appropriate, Distributor (or its Affiliates) will perform, or cause employees and agents to perform, and cause its Dealers to perform, any and all acts necessary to assist Supplier in perfecting Supplier's right, title and interest in and to such Other Biossance IP. Such acts will include but not be limited to executing all documents associated with the filing and prosecution of copyrights, copyrights assignments, trademark assignments, and participating in other related legal proceedings.

10.8    Distributor represents and warrants to Supplier that (i) all of its employees and agents performing under these Terms are required to assign all of their right, title and interest in and to any Other Biossance IP to Distributor; (ii) it has the right and authority to cause its Affiliates to assign all of their right, title and interest in and to any Other Biossance IP to Distributor; and (ii) it will use best efforts to ensure that every Dealer will be (a) bound to terms at least as restrictive and protective of the Products and Biossance Marks as the terms herein; and (b) required to assign all of their right, title and interest in and to any Other Biossance IP to Supplier as a condition to be appointed as a Dealer.

CONFIDENTIAL

10.9    Distributor undertakes, and shall require every Dealer, to sell the Products only under the Biossance Marks and in exactly the same condition and packaging as the Products are delivered to Distributor by Supplier with the addition of appropriate Chinese labels applied to said packaging if applicable and required by law, PROVIDED THAT Distributor obtains the prior written notification and consent of Supplier for any such additions.

## 11.    **WARRANTY ON EXECUTION**

The Parties represent and warrant that (i) they have the power and authority to enter into this Agreement and are not subject to any legal obligation which prohibits them from performing their obligations hereunder, (ii) they have, and will maintain throughout the term of this Agreement, all necessary government licences and approvals necessary to perform their obligations under this Agreement, and (iii) shall comply with all applicable laws and regulations and maintain any permits, licenses and approvals required to perform its obligations hereunder.

## 12.    **TERMINATION**

12.1    Either Party may terminate this Agreement immediately by written notice to the other party if the defaulting party:

  (a)    undergoes or beings the process of administration, liquidation, receivership, bankruptcy, insolvency or any similar action;

  (b)    commits a breach of this Agreement that is incapable of remedy; or

  (c)    commits a breach of this Agreement that is capable of remedy and fails to remedy such breach within sixty (60) days from the date of receipt of written notice from the non-defaulting party.

12.2    **Distributor's Obligations After Termination**

Upon the expiry or termination of this Agreement, the Distributor's right to distribute and sell the Products in the Territory shall forthwith terminate and Distributor shall within 90 days:

  (a)    return to the Supplier all advertising, promotional and other material supplied by the Supplier in connection with this Agreement;

  (b)    return to the Supplier all originals and copies of any documents supplied by the Supplier which contain information which is confidential or proprietary to the Supplier;

  (c)    pay to the Supplier any amount which may be outstanding under this Agreement; and

  (d)    cease to promote, market or advertise the Products or to make any use of the Biossance Marks other than for the purpose of selling remaining stock in the possession of the Distributor.

12.3    The Parties shall provide for reasonable transition provisions for transitioning sales, marketing, distribution, and commercialization planning functions in the case of termination. This period will be 120 days.

12.4    Distributor shall be entitled to sell the stock of Products in its possession for a. period of up to 180 days from the date of expiry or termination of the Agreement.

- 11 -

12.5    **Supplier's Obligations After Termination.**

During any period in which any of the events described in Clause 12.2 has occurred and is continuing, the Supplier shall only be obliged to supply such quantities of Products as shall be required by the Distributor to fulfill orders where payment for such Products has been received by the Supplier.

12.6    **No Prejudice to Prior Rights and Obligations**

For the avoidance of doubt, the expiry or termination of this Agreement for whatever cause shall be without prejudice to any pre-existing rights and obligations of the Parties under this Agreement.

13.    **CONFIDENTIALITY**

13.1    Save for the exceptions under Clause 13.3, the receiving Party shall treat as confidential all information obtained from the disclosing Party in relation to the matters contemplated by this Agreement, including but not limited to specifications/recipes, financial/sales/pricing information, marketing information, strategies and trade secrets, in whatever form (collectively, "Confidential Information") and shall not use, exploit or divulge or disclose such information to any person (except to such receiving Party's own employees or affiliates and then only to those employees and affiliates who need to know the same) without the disclosing Party's prior written consent. Confidential Information shall be subject to the same provisions of the Mutual Confidential Disclosure Agreement dated September 15, 2020, executed between the Parties attached hereto as Attachment C and incorporated by reference into and made part of this Agreement.

13.2    Neither Party shall make announcements or any other disclosure to a third party in relation to the matters contemplated by this Agreement without the prior written agreement of the other Party.

13.3    The restrictions contained in Clauses 13.1 and 13.2 shall not apply where:

(i)    disclosure is necessary for the performance of the Parties' obligations under this Agreement;

(ii)    such information was lawfully in the possession of the receiving Party other than through disclosure by the disclosing Party;

(iii)    the information has entered into the public domain not due to a breach or default of the receiving Party;

(iv)    disclosure is made for a proper purpose to the senior management of the Distributor's Group; and

(v)    disclosure is required by law.

13.4    The restrictions contained in this Clause 13 will continue to bind the parties even if this Agreement is terminated and shall survive termination or expiration of this Agreement for a period of three (3) years, except with respect to trade secrets which shall be held in confidence indefinitely.

14.    **DISPUTE RESOLUTION**

CONFIDENTIAL

14.1    The Parties shall make good faith efforts to resolve any dispute or claim arising out of or in connection with or relating to this Agreement or this subject matter or formation, or the breach, termination or invalidity hereof ("**Dispute**") through friendly consultation.   Such consultation shall begin immediately after one Party has delivered to the other Party a written request for such consultation stating specifically the nature of the Dispute.

14.2    If within thirty (30) days following the date on which such notice is delivered, the Dispute cannot be resolved, then either Party may submit the dispute for arbitration to be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said Rules.  The language of the arbitration shall be English. The place of arbitration shall be New York, New York. It is expressly understood and agreed by the Parties that the rulings and award of the arbitration tribunal will be conclusive on the Parties, their successors and permitted assigns. Judgment on the award rendered by the tribunal may be entered in any court having jurisdiction thereof. Notwithstanding the foregoing, either Party may immediately bring a proceeding seeking preliminary injunctive relief in a court having jurisdiction thereof which shall remain in effect until a final award is made in the arbitration. All proceedings and decisions of the tribunal will be deemed Confidential Information of each of the Parties.

## 15.    NOTICES

15.1    **In Writing and Methods of Delivery**

Any notice shall be delivered by hand, or sent by internationally recognized overnight delivery service that maintains records of delivery, addressed to the Party at its respective address in this Clause, and shall be deemed given as of the earlier of date delivered by hand, or receipt confirmed by internationally recognized overnight delivery service.  This Clause 16 is not intended to govern the day-to-day business communications necessary between the Parties in performing their obligations under the terms of this Agreement. Either Party may change the address to receive notices in any manner provided for sending the notices.

15.2    **Authorised Addresses and Numbers**

**The Distributor**

Address:

  WeMedia (Shanghai) Technology & Trading Co., Limited.
  Suite 202-205, Platinum, 233 Taicang Road
  Huangpu District, Shanghai 200025,
  People's Republic of China

Email: ryanleung@superordinary.com

For the attention of: Ryan Leung

**The Supplier**

Address: As set forth above

Email: Copy to: generalcounsel@amyris.com

For the attention of: General Counsel

- 13 -

16.    **MISCELLANEOUS**

16.1    Counterparts. This Agreement (or any agreement that amends, modifies or supplements this Agreement) may be executed in two or more counterparts and all counterparts so executed will constitute the agreement of the Parties. Except as otherwise specified, this Agreement shall become legally binding at the time of execution of the last such counterpart and shall have effect from the date first above written.

16.2    Amendments. This Agreement may be amended, modified or supplemented only by a written instrument or instruments executed by each Party, which instrument shall be binding on all the Parties.

16.3    Waivers. No waiver of any provision of this Agreement shall be effective unless set forth in a written instrument signed by the Parties waiving such provision. No failure or delay by a Party in exercising any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy hereunder preclude any further exercise thereof or the exercise of any other right, power or remedy. Without limiting the foregoing, no waiver by a Party or any breach by any other Parties of any provision hereof shall be deemed to be a waiver of a subsequent breach of that or any other provision hereof.

16.4    Assignment. This Agreement shall enure to the benefit of and be binding upon the successors and permitted assigns of the relevant parties.

16.5    Entire Agreement. This Agreement represents the entire understanding and constitutes the whole agreement among the Parties with respect to the subject matter hereof and supersedes all previous agreements and understandings among the Parties relating to such subject matter.

16.6    Further Assurances. Each Party shall execute all such documents and do all such other things within its power as may be required to give full effect to the terms of this Agreement or to vest in any other Parties its full rights and entitlements hereunder.

16.7    Provisions Severable. If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future law (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or enforceable provision had never comprised a part hereof, and (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid and unenforceable provision or by its severance herefrom, it being intended that the rights of the Parties hereunder shall be enforceable to the fullest extent permitted by law.

16.8    Force Majeure. The Parties agree that any Party shall be excused from the performance or timely performance of its obligations hereunder to the extent that performance in prevented or hindered by any cause beyond the reasonable control of the affected Party, PROVIDED THAT the affected Party notifies the other Party in writing as soon as it becomes aware of the cause and takes all reasonable steps to mitigate the effect.

17.    **GOVERNING LAW**

17.1    This Agreement is governed by and must be construed and enforced in accordance with the internal laws of the State of New York, USA excluding that body of law known as choice of law or conflict of law, and is binding upon the Parties and their successors and assigns in the United States and worldwide. English shall be the governing language of this Agreement.

CONFIDENTIAL

**IN WITNESS** the duly authorised representatives of the Parties have executed this agreement on the day and year first above written.

**THE DISTRIBUTOR**

SIGNED by    *DEREK TRAU*                     )
duly authorized  by the                        )
Board of Directors,                            )
for and on behalf of WEMEDIA SHOPPING          )
NETWORK TECHNOLOGY CO., LIMITED                )
in the presence of:-                           )

*RYAN LEUNG*

**THE SUPPLIER**

SIGNED by                                      )
duly authorized  by the                        )
Board of Directors,                            )
for and on behalf of AMYRIS CLEAN              )
BEAUTY, INC.                                   )
in the presence of:-        Witness:           )

DocuSigned by:
*Catherine Gore*
91F54D395D064CC...
Catherine Gore
President, Biossance VP, Amyris Clean Beauty

DocuSigned by:
*Leslie Diaz-Orellana*
8FC6E09D9E8421C...
Leslie Diaz-Orellana

*Exhibits A to F follow in next pages*

CONFIDENTIAL

PAGE INTENTIONALLY LEFT BLANK

CONFIDENTIAL

DocuSign Envelope ID: 6D8A9F48-0F3A-46A7-9J75-537D7A0DG7EC

**ATTACHMENT A**

**APPROVED E-COMMERCE PLATFORMS**

1.  Tmall global platform (Alibaba Group Holding Limited)

2.  Taobao platform (Alibaba Group Holding Limited)

3.  Little Red Book platform (Xingyin Information Technology (Shanghai) Co., Ltd.)

4.  Wechat platform (Tencent Holdings Ltd)

5.  Westock platform (Shanghai Bole Network Technology Co., Ltd)

6.  Kaola platform (Alibaba Group Holding Limited)

7.  JD platform (JD.com, Inc.)

8.  Douyin

Distributor may sell to, and the approved platforms shall include, social influencer platforms and third-party vendors who sell through the above platforms, as long as all sales are performed pursuant to the cross-border model.

CONFIDENTIAL

**ATTACHMENT B**

**DISTRIBUTOR AFFILIATES**

1.   WeMedia (Shanghai) Technology & Trading Co., Ltd

CONFIDENTIAL

**ATTACHMENT C**

**BRAND GUIDELINES**

To be added by Amyris under separate cover

CONFIDENTIAL

**ATTACHMENT D**

**LIST OF PURCHASE PRICE OF BIOSSANCE PRODUCTS**

**(TO BE AMENDED BY SUPPLIER FROM TIME TO TIME)**

| | | | | | | | | USD |
|---|---|---|---|---|---|---|---|---|
| 100% Squalane Oil | Y | full | 3000610 | 810029620369 | 100 ML | $32.00 | 48 | $9.40 |
| 100% Squalane Oil- Travel | Y | travel | 3000611 | 810029620376 | 12 ML | $8.00 | 126 | $2.08 |
| Lactic Acid Resurfacing Serum | Y | full | 3000626 | 810029620437 | 30 ML | $62.00 | 54 | $16.12 |
| Lactic Acid Resurfacing Serum- Deluxe | Y | deluxe | 3000628 | 810029620451 | 4 ML | $9.00 | 200 | $3.35 |
| Lactic Acid Resurfacing Serum- Travel | Y | travel | 3000627 | 810029620444 | 10 ML | $21.00 | 144 | $4.50 |
| Marine Algae Eye Cream | Y | full | 3000513 | 859049007842 | 15 ML | $54.00 | 54 | $14.04 |
| Marine Algae Eye Cream Travel | Y | travel | 3000534 | 859049007866 | 3 ML | $11.00 | 48 | $4.25 |
| Rose Vegan Lip Balm | Y | full | 3000533 | 859049007859 | 10 GM | $18.00 | 54 | $7.25 |
| Squalane + Antioxidant Cleansing Oil | Y | full | 3000522 | 859049007613 | 200 ML | $30.00 | 27 | $12.50 |
| Squalane + Antioxidant Cleansing Oil - Travel Size | Y | travel | 3000344 | 859049007248 | 25 ML | $8.00 | 65 | $3.25 |
| Squalane + Glycolic Renewal Mask (tube) | Y | full | 3000888 | 810029620970 | 75 ML | $48.00 | 32 | $12.48 |
| Squalane + Glycolic Renewal Mask (tube)- Travel | Y | travel | 3000583 | 810029620161 | 30 ML | $28.00 | 48 | $7.28 |
| Squalane + Omega Repair Cream | Y | full | 3000543 | 859049007897 | 50 ML | $58.00 | 30 | $15.08 |
| Squalane + Omega Repair Cream - Deluxe | Y | deluxe | 3000547 | 859049007934 | 5 ML | $6.00 | 200 | $3.33 |
| Squalane + Omega Repair Cream - Travel | Y | travel | 3000546 | 859049007927 | 15 ML | $26.00 | 48 | $6.76 |
| Squalane + Peptide Eye Gel | Y | full | 3000544 | 859049007903 | 15 ML | $54.00 | 54 | $14.04 |
| Squalane + Peptide Eye Gel -Deluxe | Y | deluxe | 3000549 | 859049007958 | 4 ML | $15.00 | 187 | $4.25 |
| Squalane + Phyto-Retinol Serum | Y | full | 3000584 | 810029620178 | 30 ML | $72.00 | 36 | $18.72 |
| Squalane + Phyto-Retinol Serum- Deluxe | Y | deluxe | 3000586 | 810029620192 | 4 ML | $10.00 | 160 | $3.50 |
| Squalane + Phyto-Retinol Serum- Travel | Y | travel | 3000585 | 810029620185 | 10 ML | $29.00 | 126 | $7.54 |
| Squalane + Probiotic Gel Moisturizer | Y | full | 3000511 | 859049007828 | 50 ML | $52.00 | 30 | $13.52 |
| Squalane + Probiotic Gel Moisturizer- Deluxe | Y | deluxe | 3000723 | 810029620734 | 5 ML | $4.00 | 180 | $3.33 |
| Squalane + Probiotic Gel Moisturizer- Travel | Y | travel | 3000724 | 810029620741 | 15 ML | $16.00 | 54 | $4.16 |
| Squalane + Rose Vegan Lip Balm Travel | Y | travel | 3000535 | 859049007873 | 2.6 | $5.00 | 144 | $5.00 |
| Squalane + Vitamin C Dark Spot Serum | Y | full | 3000954 | 810029621052 | 30 ML | $62.00 | 48 | $16.12 |
| Squalane + Vitamin C Rose Oil Pink | Y | full | 3000712 | 810029620666 | 30 ML | $72.00 | 48 | $18.72 |
| Squalane + Vitamin C Rose Oil Pink Deluxe | Y | deluxe | 3000643 | 810029620536 | 5 ML | $12.00 | 200 | $5.00 |
| Squalane + Vitamin C Rose Oil Pink- Travel Size | Y | travel | 3000713 | 810029620680 | 12 ML | $32.00 | 100 | $8.32 |
| Squalane + Zinc Sheer Mineral Sunscreen | Y | full | 3000631 | 810029620499 | 50 ML | $30.00 | 54 | $7.80 |
| Squalane + Zinc Sheer Mineral Sunscreen- Travel | Y | travel | 3000632 | 810029620505 | 20 ML | $12.00 | 144 | $4.00 |
| Your Clean Routine, Overachievers -Starter Set | Y | set | 3000895 | 810029620925 | SET | $58.00 | 36 | $24.00 |
| Hydration Hits | Y | set | 3000945 | 810029621137 | SET | $25.00 | 36 | $10.00 |

CONFIDENTIAL

**ATTACHMENT E**

1. The Sales Target for each Contract Year is as follows:

| Year | Sales Target |
|---|---|
| February 22, 2021 – February 21, 2022 | $3,000,000 USD |
| February 22, 2022 – February 21, 2023 | $6,000,000 USD |
| February 22, 2023 – February 21, 2024 | $15,000,000 USD |

2. The Supplier hereby covenants to the Distributor a Performance Rebate on the following scale:

| Over Achievement of Yearly Sales Target Goal | Rebate Percentage of Purchase |
|---|---|
| 110-124% | 3% |
| 125-139% | 4% |
| 140+% | 7% |

The **"Performance Rebate"** will be calculated as a percentage of Distributor's purchases from Supplier in the given period as follows: total purchases of the given period multiplied by rebate percentage based on percentage overachievement of gross sales revenue received by Supplier.

For purposes of the "**Sales Target**" goals listed above, "Sales" shall mean the aggregate number of units of Product sold by Distributor during the given period, multiplied by the Standard Retail Price of the Products in the Territory.

CONFIDENTIAL

**ATTACHMENT F**

Expeditors
6054 Shook Rd, Suite 100 Lockburn, Ohio 43137

CONFIDENTIAL