THE COURT HAS NOT YET APPROVED THIS DISCLOSURE STATEMENT FOR USE IN SOLICITATION TO PARTIES ENTITLED TO VOTE ON THE PLAN. THE PLAN PROPONENTS ARE NOT SOLICITING YOUR VOTE ON THE PLAN AT THIS TIME.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AMYRIS, INC., *et al.*,[1]<br><br>               Debtors. | Chapter 11<br><br>Case No. 23-11131 (TMH)<br><br>(Jointly Administered) |

## DISCLOSURE STATEMENT WITH RESPECT TO SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF AMYRIS, INC. AND ITS AFFILIATED DEBTORS, AS MODIFIED

**PACHULSKI STANG ZIEHL & JONES LLP**
Richard M. Pachulski (admitted *pro hac vice*)
Debra I. Grassgreen (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
Jason H. Rosell (admitted *pro hac vice*)
Steven W. Golden (DE Bar No. 6807)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899-8705 (Courier 19801)
Telephone:  302-652-4100
Facsimile:  302-652-4400
Email:  rpachulski@pszjlaw.com
       dgrassgreen@pszjlaw.com
       joneill@pszjlaw.com
       jrosell@pszjlaw.com
       sgolden@pszjlaw.com

*Counsel to the Debtors and Debtors in Possession*

Dated:  December 12, 2023

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Amyris.  The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

## TABLE OF CONTENTS

**Page**

1.  INTRODUCTION ....................................................................................................1

   A.  Solicitation Materials ...............................................................................6

   B.  Only Impaired Classes Vote .....................................................................6

   C.  Voting Procedures.....................................................................................7

        1.  Plan Objection Deadline ................................................................8

        2.  Confirmation Hearing .....................................................................8

   D.  Overview of the Plan ................................................................................8

   E.  Summary of Plan Releases and Injunctions.............................................10

2.  BACKGROUND AND CHAPTER 11 CASES ...................................................12

   A.  Debtors' History and Formation ..............................................................12

   B.  Material Prepetition Commercial Transactions .......................................13

        1.  Givaudan ........................................................................................13

        2.  DSM ...............................................................................................14

   C.  Debtors' Corporate and Capital Structures..............................................14

        1.  Corporate Structure........................................................................14

        2.  Prepetition Capital Structure..........................................................15

   D.  Significant Litigation ...............................................................................17

        1.  Securities Class Action ..................................................................17

        2.  Lavvan Litigation...........................................................................18

        3.  Beauty Labs Litigation...................................................................18

   E.  Events Leading to the Commencement of the Bankruptcy Cases ...........19

        1.  Financial and Operational Challenges ...........................................19

        2.  Key Prepetition Actions .................................................................19

        3.  Supply Chain and Accounting Investigation .................................20

        4.  Commencement of the Bankruptcy Cases .....................................20

   F.  Events During the Chapter 11 Cases .......................................................21

        1.  First Day and Cash Collateral Relief .............................................21

        2.  Debtors' Retention of Professionals and Personnel.......................23

        3.  Formation of the Creditors' Committee; Retention of Professionals ........24

        4.  Investigations .................................................................................24

|   |   | a. | The Independent Director Investigation | 24 |
|   |   | b. | The Creditors' Committee's Investigation | 25 |
|   |   | 5. | Designation of Excluded Parties | 30 |
|   |   | 6. | Debtors' Schedules and Statement of Financial Affairs | 30 |
|   |   | 7. | The Claims Bar Date | 31 |
|   |   | 8. | Rejection of Certain Leases/Contracts | 31 |
|   |   | 9. | Meeting of Creditors | 31 |
|   |   | 10. | Sales of Assets | 31 |
|   |   | 11. | Procedures for the Assumption, Assumption and Assignment and/or Transfer of Executory Contracts and Unexpired Leases | 33 |
|   |   | 12. | DIP Financing | 33 |
|   |   | 13. | Extension of Exclusivity Periods | 36 |
|   |   | 14. | Lavvan Claims | 36 |
|   |   | 15. | Plan Negotiations | 37 |
| 3. | | | SUMMARY OF THE PLAN | 37 |
|   | A. | | General | 37 |
|   |   | 1. | Classification and Treatment of Claims and Interests | 38 |
|   |   | 2. | Classification and Treatment of Claims and Interests | 41 |
|   |   | 3. | Special Provision Governing Unimpaired Claims | 48 |
|   |   | 4. | Elimination of Vacant Classes | 49 |
|   |   | 5. | Voting Classes, Presumed Acceptance by Non-Voting Classes | 49 |
|   |   | 6. | Intercompany Interests | 49 |
|   |   | 7. | Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code | 49 |
|   |   | 8. | Controversy Concerning Impairment | 49 |
|   |   | 9. | Subordinated Claims | 50 |
|   | B. | | Means for Implementation of the Plan | 50 |
|   |   | 1. | General Settlement of Claims and Interests | 50 |
|   |   | 2. | Estate Claims Settlement | 50 |
|   |   | 3. | Third-Party Release Settlement | 52 |
|   |   | 4. | Sale of Consumer Brands Businesses and Other Assets and Allocation of Net Proceeds | 53 |
|   |   | 5. | Administrative Consolidation for Voting and Distribution Purposes Only | 53 |

6.   Restructuring Transactions .........................................................54

7.   Reorganized Debtors....................................................................54

8.   Sources of Consideration for Plan Distributions ........................55

9.   Section 1146 Exemption .............................................................58

10.  Corporate Existence ...................................................................58

11.  Vesting of Assets in the Reorganized Debtors ...........................59

12.  Cancellation of Existing Securities and Agreements..................59

13.  Corporate Action.........................................................................60

14.  New Organizational Documents .................................................61

15.  Managers and Officers of the Reorganized Debtors...................62

16.  Effectuating Documents; Further Transactions ..........................62

17.  Management Incentive Plan.........................................................62

18.  Preservation of Causes of Action...............................................62

19.  Sale Option..................................................................................63

20.  Convertible Notes Trustee Fees and Expenses ...........................63

21.  Lavvan Turnover .........................................................................64

C.   Creditor Trust.........................................................................................64

1.   Creation and Governance of the Creditor Trust..........................64

2.   Purpose of the Creditor Trust......................................................64

3.   Creditor Trust Agreement and Funding the Creditor Trust ........64

4.   Valuation of Assets .....................................................................65

5.   Creditor Trustee ..........................................................................65

6.   Creditor Trust Interests ...............................................................65

7.   Cooperation of the Reorganized Debtors....................................65

8.   United States Federal Income Tax Treatment of the Creditor Trust ........66

9.   Withholding .................................................................................67

10.  Dissolution of the Creditor Trust ...............................................68

11.  Tax Reporting ..............................................................................68

12.  Transferred Privileges .................................................................69

D.   Treatment of Executory Contracts and Unexpired Leases ...................70

1.   Assumption and Rejection of Executory Contracts and Unexpired Leases.......................................................................................70

2.   Indemnification Obligations .......................................................71

|  | 3. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 72 |
|  | 4. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 73 |
|  | 5. | Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases | 74 |
|  | 6. | Insurance Policies | 74 |
|  | 7. | Reservation of Rights | 75 |
|  | 8. | Nonoccurrence of Effective Date | 75 |
| E. | Provisions Concerning Distributions | | 75 |
|  | 1. | Distributions on Account of Claims or Interests Allowed as of the Effective Date | 75 |
|  | 2. | Disbursing Agent | 76 |
|  | 3. | Rights and Powers of Disbursing Agent | 76 |
|  | a. | Powers of the Disbursing Agent | 76 |
|  | 4. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 77 |
|  | 5. | Undeliverable and Unclaimed Distributions | 78 |
|  | 6. | Surrender of Cancelled Instruments or Securities | 78 |
|  | 7. | Manner of Payment | 79 |
|  | 8. | Compliance with Tax Requirements | 79 |
|  | 9. | Allocations | 79 |
|  | 10. | No Postpetition Interest on Claims | 79 |
|  | 11. | Preservation of Setoffs and Recoupment | 80 |
|  | 12. | Claims Paid or Payable by Third Parties | 80 |
| F. | Procedures for Resolving Contingent, Unliquidated, and Disputed Claims | | 81 |
|  | 1. | Allowance of Claims | 81 |
|  | 2. | Claims Administration Responsibilities | 81 |
| G. | Settlement, Release, Injunction, and Related Provisions | | 84 |
|  | 1. | Discharge of Claims and Termination of Interests | 84 |
| H. | Conditions Precedent to Consummation of the Plan | | 91 |
|  | 1. | Conditions Precedent to Approval of the Disclosure Statement | 91 |
|  | 2. | Conditions Precedent to the Confirmation Date | 91 |
| I. | Modification and Amendments | | 93 |

|  |  | 1. | Effect of Confirmation on Modifications | 94 |
|  | J. |  | Miscellaneous Provisions | 96 |
|  |  | 1. | Immediate Binding Effect | 96 |
|  |  | 2. | SEC Matters | 97 |
|  |  | 3. | Additional Documents | 97 |
|  |  | 4. | Statutory Committee and Cessation of Fee and Expense Payment | 97 |
|  |  | 5. | Reservation of Rights | 97 |
|  |  | 6. | Successors and Assigns | 97 |
|  |  | 7. | Notices | 98 |
|  |  | 8. | Term of Injunctions or Stays | 99 |
|  |  | 9. | Entire Agreement | 99 |
|  |  | 10. | Plan Supplement | 99 |
|  |  | 11. | Nonseverability of Plan Provisions | 100 |
|  |  | 12. | Votes Solicited in Good Faith | 100 |
|  |  | 13. | Closing of Chapter 11 Cases | 100 |
| 4. |  |  | VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN | 101 |
|  | A. |  | Parties in Interest Entitled to Vote | 101 |
|  | B. |  | Classes Impaired Under the Plan | 101 |
|  | C. |  | Confirmation Standards | 101 |
|  | D. |  | Liquidation Analysis | 103 |
|  | E. |  | Feasibility | 103 |
|  | F. |  | Acceptance by Impaired Classes | 104 |
|  | G. |  | Compliance with the Applicable Provisions of the Bankruptcy Code | 105 |
| 5. |  |  | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | 105 |
| 6. |  |  | RISK FACTORS | 106 |
|  | A. |  | Risks Relating to Confirmation and Consummation of the Plan | 106 |
|  |  | 1. | Parties in Interest May Object to Classification of Claims and Interests | 106 |
|  |  | 2. | The Debtors May Object to a Claim or Interest | 106 |
|  |  | 3. | The Debtors May Fail to Satisfy the Vote Requirement | 106 |
|  |  | 4. | Plan May Not Be Accepted, Confirmed or Consummated | 106 |

|  |  | 5. | The Debtors May Not Be Able to Amend Their Contracts with DSM and Givaudan | 107 |
|  |  | 6. | Non-Consensual Confirmation of the Plan May Be Necessary | 108 |
|  | B. | Risks Relating to the Chapter 11 Process | | 108 |
|  |  | 1. | The Debtors' Exclusivity Period May Terminate | 108 |
|  |  | 2. | Continuation of the Chapter 11 Cases May Harm the Debtors' Estates | 108 |
|  |  | 3. | The Sales of the Consumer Brands Business Assets May Not Close | 108 |
|  |  | 4. | The Debtors May Default on Their DIP Financing Obligations | 108 |
|  |  | 5. | The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 | 109 |
|  | C. | Risks Relating to Recoveries Under the Plan | | 109 |
|  | D. | Risks Relating to Projections | | 109 |
|  | E. | Certain Federal Income Tax Consequences Of The Plan | | 110 |
| 7. | U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS | | | 111 |
|  | A. | Federal Income Tax Rules Applicable to the Plan | | 111 |
|  |  | 1. | Cancellation of Indebtedness Income and Reduction of Tax Attributes | 111 |
|  |  | 2. | Bankruptcy Exception | 111 |
|  |  | 3. | Attribute Reduction | 111 |
|  |  | 4. | Election to Reduce Asset Basis | 112 |
|  |  | 5. | Limitation on NOLs and Other Tax Attributes | 112 |
|  | B. | U.S. Federal Income Tax Consequences of the Plan to the Debtors | | 113 |
|  |  | 1. | COD Income of the Debtors | 114 |
|  |  | 2. | Exclusion of the Debtors' COD Income under the Bankruptcy Exception | 114 |
|  |  | 3. | Limitations on NOLs and Other Tax Attributes of the Debtors Post-Emergence | 114 |
|  |  | 4. | Sale of the Consumer Brands Business Assets | 115 |
|  | C. | Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims Entitled to Vote | | 115 |
|  |  | 1. | Tax Consequences to U.S. Holders Generally | 116 |
|  |  | 2. | Payments in Respect of Accrued Interest on Claims | 116 |
|  |  | 3. | Treatment of Market Discount on a Claim | 116 |
|  |  | 4. | Limitations on Use of Capital Losses | 117 |

5.    Tax Consequences in Relation to Creditor Trust .....................................117

6.    Certain Additional Tax Consequences for DSM and Lavvan .................119

7.    Information Reporting and Backup Withholding ...................................119

8.    RECOMMENDATION ................................................................................120

## EXHIBITS

**EXHIBIT A:  THE PLAN**
**EXHIBIT B:  CORPORATE ORGANIZATIONAL CHART**
**EXHIBIT C:  PLAN SUPPORT AGREEMENT**
**EXHIBIT D:  LIQUIDATION ANALYSIS**
**EXHIBIT E:  PROJECTIONS**
**EXHIBIT F:  COMMITTEE SUPPORT LETTER**

## 1.   **INTRODUCTION**

Amyris, Inc., and its affiliated debtors and debtors in possession (collectively, the "Original Debtors"), as well as Clean Beauty Collaborative, Inc. ("CBC"), Clean Beauty 4U Holdings, LLC ("CB4U Holdings"), and Clean Beauty 4U LLC ("CB4U," and together with CBC, CB4U Holdings, the "Additional Debtors", and, collectively, with the Original Debtors, the "Debtors" or the "Company"), in the above-captioned chapter 11 cases (the "Chapter 11 Cases") have filed their proposed *Second Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors, as Modified* (as may be amended or modified, the "Plan"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). A copy of the Plan is attached hereto as **Exhibit "A"**.[2] The Debtors hereby submit this Disclosure Statement with respect to the Plan (as may be amended or modified, the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances or rejections of the Plan from certain Holders of Claims against the Debtors.[3]

On [_____ ___], 2023, the Court entered the *Order (I) Approving the Disclosure Statement; (II) Scheduling Confirmation Hearing; (III) Approving Form and Manner of Notice of Confirmation Hearing; (IV) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan, Including (A) Approving Form and Content of Solicitation Materials; (B) Establishing Record Date and Approving Procedures for Distribution of Solicitation Materials;(C) Approving Forms of Ballots; (D) Establishing Voting Deadline for Receipt of Ballots and (E) Approving Procedures for Vote Tabulations; (V) Approving Form and Manner of Notice of Plan Releases; (VI) Establishing Deadline and Procedures for Filing Objections to Confirmation of Plan; and (VII) Granting Related Relief* (the "Disclosure Statement Order"), which granted approval of the Disclosure Statement and approved of the forms of Plan ballots and various related notices, as well as set **January 24, 2024, at 10:00 a.m., prevailing Eastern Time,** as the time for the hearing to confirm the Plan to commence.

The Plan is a plan of reorganization which incorporates the terms of a global settlement among the Debtors, the DIP Secured Parties, the Foris Prepetition Secured Lenders, the Creditors' Committee, and the Ad Hoc Noteholder Group (the "Plan Settlement") that provides for, among other things, a cash recovery to unsecured creditors (along with the assignment of certain estate claims to a Creditor Trust) in exchange for their support of a release of certain estate claims and causes of action that were the subject of the Independent Investigation, the Creditors' Committee Investigation, and the Noteholder Group Investigation (detailed below), as well as additional consideration in connection with third-party releases.

The Plan provides for the satisfaction of Administrative Claims (subject to a cap), the treatment of secured claims in accordance with the Bankruptcy Code, and the continuation of the Debtors' operations to the benefit of employees, vendors, contract counterparties and customers. The Plan restructures the Debtors' balance sheet and operations by facilitating the Debtors' exit

---

[2] Capitalized terms used herein that are not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[3] To the extent any provision or statement in this Disclosure Statement is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the provisions of the Plan shall control (unless stated otherwise in the Confirmation Order).

from and sale of their Consumer Brands Businesses, a potential sale of the Other Assets, and a distribution to certain stakeholders through the Plan. The Plan gives the DIP Secured Parties and holders of the Foris Prepetition Secured Claims discretion to satisfy such claims not paid from the Debtors' operations through an allocation of certain net sale proceeds, a rollup into the Exit Facility, and the new equity interests of Reorganized Amyris.

Further, under the Plan, the Debtors seek a Direct Claims Injunction that bars all holders of Direct Claims[4] from pursuing such Claims against the Released Parties. In consideration for such releases, holders of Direct Claims will receive distributions from the Third-Party Release Settlement. Following the issuance of the Direct Claims Injunction in accordance with the Confirmation Order, any and all holders of Direct Claims will be permanently enjoined from seeking satisfaction of their Direct Claims against the Released Parties or any other Direct Claims Injunction Party or the property of any such Direct Claims Injunction Party.

Upon the Effective Date, the Plan shall establish a Creditor Trust for the benefit of Holders of Class 7 Convertible Notes Claims and Class 8 General Unsecured Claims that will be funded with $2 million and provided with certain Cash assets pursuant to the terms of the Plan and certain causes of action and preferences, the proceeds of which will be distributed according to the Plan, after payment of all direct out-of-pocket administrative, personnel, legal costs and expenses incurred after the Effective Date in administering the Creditor Trust, and making distributions from the Creditor Trust as provided for under the Plan. The mechanics for establishing, implementing and administering the Creditor Trust will be set forth in the Plan Supplement.

Separate and apart from the treatment of Classes 7 and 8, respectively, Holders of Allowed Claims in such Classes who are also Releasing Parties shall also receive, in exchange for their granting Third-Party Releases, pro rata distributions of the applicable Third-Party Release Settlement Amounts as set forth in Article I.A.198. of the Plan, and from the Estate Claims Settlement. Under the Plan, Holders of Claims in Classes 7 and 8 are eligible to receive estimated aggregate recoveries of $51.95 to $66.4 million. The sales of the Debtors' Consumer Brands Business were anticipated to generate substantial revenue to fund Administrative Claims and satisfy obligations under the DIP Facility. Unfortunately, the Consumer Brands Business sales proceeds fell far short of the amount needed to repay the DIP Facility and the outstanding Administrative Claims -- estimated in the aggregate amount of over $240 million which impacts the recoveries to unsecured creditors. Under the Plan, unsecured creditors will receive a baseline recovery within a reasonable time period plus litigation claims for the Creditor Trust to pursue.

In addition, the Plan also contemplates certain Debtor/Estate releases and third party releases of, among others, the DIP Lenders and the DIP Agent, Foris Prepetition Secured Lenders, Consenting Convertible Noteholders, the Consenting Contract Counterparties, and parties related to all of the foregoing, as well as the Debtors' current and former directors, managers, officers,

---

[4] "Direct Claims" means any claim or Cause of Action held by a Releasing Party against any of the Released Parties (excluding the Debtors) and their respective Related Parties, but only to the extent such claims arise from, relate to, or are connected with, directly or indirectly, in any manner whatsoever, the Debtors, including their respective assets, liabilities, operations, financings, contractual agreements, licenses, and including the governance thereof, and existing on or prior to the Effective Date (including prior to the Petition Date).

employees, professionals, and shareholders, to the extent that none of the foregoing is an Excluded Party.

The Reorganized Debtors' emergence from chapter 11 is supported by a $145 million Exit First Lien Facility, which certain of the DIP Lenders/Foris Prepetition Secured Lenders (who will be identified in the Plan Supplement) have agreed to backstop as necessary, subject to the satisfaction of the conditions set forth in the Plan Support Agreement and the Plan.

The Plan also includes a Sale Option, which provides the DIP Lenders and the Foris Prepetition Secured Lenders the right, up to Confirmation, to elect that the Debtors close a sale of the Other Assets, i.e., all of the Estate's assets, other than the Consumer Brands (and proceeds derived therefrom) and the Estate Claims Settlement Consideration. The Debtors' Other Assets are being marketed such that, if the Sale Option is exercised, a sale of Other Assets may close with either the DIP Lenders and the Foris Prepetition Lenders pursuant to their credit bid, or a third party submitting a higher and better offer in accordance with bid procedures governing the sale of the Other Assets. The proceeds of sale(s) of the Other Assets will be distributed pursuant to the Plan.

Since the Petition Date, the Debtors and their advisors, and Foris and its advisors, have been engaged in extensive negotiations with the Company's key contract counterparties, DSM and Givaudan, with respect to amending their commercial relationships to enable the Debtors to implement a sustainable business plan going forward. The negotiations with DSM and Givaudan are ongoing. In the event there is an agreement, the Plan and ancillary documents will provide the respective treatment for the DSM Contracts and DSM's Claims, and the Givaudan Contracts and Givaudan's Claims. If the parties are not able to reach an agreement on binding term sheets and definitive agreements, the DSM Contracts and Givaudan Contracts, respectively, may be rejected.

Prior to the Petition Date, certain holders of the Company's Convertible Notes formed an ad hoc group and retained counsel for the purpose of addressing Amyris' financial condition and performance under the Convertible Notes. In an effort to work cooperatively towards a consensual restructuring, subject to confidentiality, the Company began to share information with the Ad Hoc Group and its advisors, prior to the Petition Date. The Plan incorporates a resolution with the Ad Hoc Group, which includes the payment of certain Ad Hoc Group Restructuring Expenses if a sufficient number of holders of Convertible Notes execute a joinder to the Plan Support Agreement.

The Debtors seek Bankruptcy Court approval of the Plan. Before soliciting acceptances of a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan. This Disclosure Statement is being submitted in accordance with such requirements. This Disclosure Statement includes, without limitation, information about:

- the Debtors' corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness;

- events leading to the Chapter 11 Cases, including the Debtors' restructuring and sale/transaction negotiations;

- significant events in the Chapter 11 Cases;

- the classification and treatment of Claims and Interests under the Plan; including who is entitled to vote and how to vote on the Plan;

- certain important effects of Confirmation of the Plan;

- releases contemplated by the Plan;

- the statutory requirements for confirming the Plan;

- certain risk factors Holders of Claims should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan; and,

- certain United States federal income tax consequences of the Plan.

In light of the foregoing, the Debtors believe this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code. Pursuant to Section 1125(a)(1) of the Bankruptcy Code, "adequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan."

All creditors entitled to vote to accept the Plan should return their Ballots (as defined herein), so as to be **actually received** by the Claims Agent no later than **January 18, 2024, at 5:00 p.m. prevailing Eastern Time** (except for submission of the Class 7 Convertible Notes Claims Ballots which may only be submitted in accordance with the express instructions set forth in the applicable Beneficial Holder Ballot or Master Ballot). Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing. As described in the letter distributed with the Plan to Holders of Class 7 Convertible Notes Claims and Class 8 General Unsecured Claims, the Creditors' Committee believes that the Plan is in the best interests of creditors.

The Plan and all documents to be executed, delivered, assured, and/or performed in connection with the consummation of the Plan, including the documents to be included in the Plan Supplement, are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan).

Holders of Direct Claims will receive a notice of the provisions in the Plan regarding the Third-Party Release and the Direct Claims Injunction. The Debtors will seek approval of the Third-Party Release based upon the governing standard for approval of non-consensual third party releases. In the event the Bankruptcy Court does not approve the Third-Party Release on a non-consensual basis, the Third-Party Release shall be deemed a settlement offer to the holders of Direct Claims on the terms set forth in the Plan, which are less favorable than if the Court were to approve the Third-Party Release. In such a circumstance, each holder of a Direct Claim may voluntarily elect to receive its Pro Rata share of the Third-Party Release Settlement to which it is

entitled by electing to grant the Third-Party Releases, through the following methods: (x) for (i) holders of Claims who are entitled to submit a ballot to vote on the Plan and vote to accept the Plan, (ii) holders of Claims who are entitled to submit a ballot to vote on the Plan and (a) vote to reject the Plan or (b) abstain from voting on the Plan and, in either case, do not elect to exercise their right to opt out of granting the Third-Party Releases, and (y) for holders of Claims and Interests who are deemed to accept or reject the Plan and are provided with a notice of non-voting status providing them with the right to opt out of granting the Third-Party Releases and do not elect to exercise such right; *provided*, that, as applicable, the Direct Claims Threshold is satisfied. The DIP Lenders and Foris Prepetition Secured Lenders, as applicable, shall only allocate from the Net Proceeds, other assets of the Estates, or the Exit First Lien Facility (payable to the Creditor Trust or Plan Administrator, as applicable under the Plan) that portion necessary to pay the aggregate amount to be distributed to Holders of Allowed Convertible Note Claims, Allowed General Unsecured Claims, and Interests, respectively, who do not opt out of the Third-Party Release Settlement.

**NOTHING CONTAINED IN THIS DOCUMENT SHALL CONSTITUTE AN OFFER, ACCEPTANCE, OR A LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST, SINCE THIS DISCLOSURE STATEMENT AND THE PLAN IT SUPPORTS REMAINS, *INTER ALIA*, SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT.   THE INFORMATION CONTAINED HEREIN IS PRELIMINARY AND DEVELOPMENTS MAY OCCUR THAT REQUIRE MODIFICATIONS OR ADDITIONS TO, OR DELETIONS FROM, THIS DISCLOSURE STATEMENT AND THE PLAN IT SUPPORTS.**

THIS DISCLOSURE STATEMENT AND THE PLAN IT SUPPORTS ARE THE ONLY DOCUMENTS THAT CREDITORS AND OTHER PARTIES IN INTEREST SHOULD CONSIDER IN CONNECTION WITH CONFIRMATION OF THE PLAN, INCLUDING, WITHOUT LIMITATION, THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN.   NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT.   ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

APPROVAL OF THE DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN, NOR DOES SUCH APPROVAL CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT.

THE DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN.   EACH HOLDER OF A CLAIM OR INTEREST SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.   AFTER CAREFULLY REVIEWING THESE

DOCUMENTS, IF YOU ARE A CLAIM HOLDER ENTITLED TO VOTE, PLEASE INDICATE YOUR VOTE WITH RESPECT TO THE PLAN ON THE ENCLOSED BALLOT AND RETURN IT IN THE ENVELOPE PROVIDED.

## A.    <u>Solicitation Materials</u>

On [_____ ____, 2023], the Bankruptcy Court entered the Disclosure Statement Order.  Holders of Claims who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials (collectively, the "<u>Solicitation Materials</u>"), including:

- a flash drive or printed book containing the Disclosure Statement, as approved by the Bankruptcy Court (with all exhibits thereto, including the Plan);
- the Disclosure Statement Order (without exhibits thereto);
- the Confirmation Hearing Notice describing (i) entry of the order approving the Disclosure Statement, (ii) the commencement date of the Confirmation Hearing, (iii) the deadline and procedures for filing objections to confirmation of the Plan, (iv) the deadline for receipt of Ballots to accept or reject the Plan, and (v) **notice of the Plan's release, indemnification and exculpation provisions, including the Third Party Release and the Direct Claims Injunction, and the option to opt out of such Third Party Release as contained in the applicable Ballot**;
- an appropriate Ballot with voting instructions with respect thereto, together with a pre-addressed return envelope;
- a cover letter from the Debtors (1) describing the Solicitation Materials, and (2) urging the Holders of Claims in the voting Classes to vote to accept the Plan;
- a cover letter from the Creditors' Committee making a recommendation to the Holders of General Unsecured Claims and Convertibles Notes Claims with respect to voting on the Plan (the "<u>Committee Support Letter</u>"); and
- any supplemental documents the Debtors may file with the Bankruptcy Court prior to solicitation or that the Bankruptcy Court orders to be made available.

## B.    <u>Only Impaired Classes Vote</u>

Pursuant to the provisions of the Bankruptcy Code, only classes of claims and interests that are "impaired" under a plan may vote to accept or reject the plan.  Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan.  In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected the plan and shall not be afforded an opportunity to vote to accept or reject the plan.

Under the Plan, Claims in Classes 1, 2 and 13 are unimpaired and, consequently, are presumed to accept the Plan.  Claims in Classes 3, 4, 5, 6, 7, 8, 9, and 10 are Impaired and entitled to vote on the Plan (the "<u>Voting Classes</u>).  Holders of Claims in Class 12 and Holders of Interests in Class 14 will receive no distribution and, accordingly, such holders are deemed to reject the Plan.  Class 11 is Impaired under the Plan, but deemed to accept the Plan as the holders of the Class 11 Claims are Debtors, proponents of the Plan, or wholly-owned Affiliates of the Debtors.  ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 3 THROUGH 10.

Holders of Claims in Classes 1, 2, 11 and 12 and Holders of Interests in Classes 13 and 14 do not get to vote to accept or reject the Plan (the "Non-Voting Classes") and will not receive the Solicitation Materials.  Holders of Claims and/or Interests in the Non-Voting Classes (except Classes 11 and 13) will receive a Non-Voting Class Notice which will set forth: (a) the recipient's status as a member of a Non-Voting Class; (b) the date and time of the Confirmation Hearing; and (c) the deadline and procedures for filing objections to the Plan.  **The Non-Voting Class Notice will also include a description of the Plan's release, indemnification and exculpation provisions, including the Third Party Release, and an Opt-Out Election Form, and will set forth the deadline (January 18, 2024, at 5:00 p.m. prevailing Eastern Time) and procedures for each Holder of a Claim or Interest in a Non-Voting Class to make such opt-out election.** The Non-Voting Class Notices will further indicate that a holder of a Claim and/or Interest in a Non-Voting Class is entitled, upon written request to counsel to the Debtors, to receive a copy of the Plan and Disclosure Statement, in electronic format (or such other format as specifically requested by such Claimant or Interest Holder) at the expense of the Debtors.  The Non-Voting Class Notices will also contain the link to the Solicitation Agent's website where any party in interest can access copies of the Solicitation Materials, including the Plan and Disclosure Statement, at no cost.

Holders of Claims in Class 11 and Interests in Class 13 are deemed to have received the notices without actual delivery based on their status as a Debtor, a proponent of the Plan, or wholly-owned Affiliate of the Debtors.

### C.    Voting Procedures

The deadline to vote on the Plan is **January 18, 2024, at 5:00 p.m. prevailing Eastern Time** (the "Voting Deadline").  All votes to accept or reject the Plan must be received by the Debtors' solicitation agent, Stretto, Inc. (the "Solicitation Agent"), by the Voting Deadline.

Ballots must be actually received by the Solicitation Agent by the Voting Deadline at the following address, whether sent by first class mail, personal delivery, or overnight courier:

**Amyris Balloting**
**c/o Stretto**
**410 Exchange, Suite 100**
**Irvine, CA 92602**

An envelope addressed to the Solicitation Agent will be enclosed with the Solicitation Materials. Alternatively, Ballots may be submitted via the Solicitation Agent's online portal by visiting https://cases.stretto.com/Amyris.  Ballots that may be submitted electronically will have a unique code which must be used for that purpose.  These procedures do not apply to Class 7 Convertible Notes Claims Ballots which may only be submitted in accordance with the express instructions set forth in the applicable Beneficial Holder Ballot or Master Ballot.

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate ballot.  All Ballots must be properly executed, completed, and delivered to the Solicitation Agent by: (a) first class mail, (b) overnight

courier, (c) personal delivery, or (d) submission by no later than the Voting Deadline of an electronic Ballot through the Solicitation Agent's on-line electronic Ballot submission portal at https://cases.stretto.com/Amyris (except for submission of the Class 7 Convertible Notes Claims Ballots which may only be submitted in accordance with the express instructions set forth in the applicable Beneficial Holder Ballot or Master Ballot. Any Ballot that is properly executed by the Holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted. Ballots received by facsimile or by electronic means will not be counted.

Each Holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim held by such Holder. By signing and returning a Ballot, each Holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim has been cast or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are superseded and revoked.

It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in the Ballot not being counted.

### 1. Plan Objection Deadline

The Bankruptcy Court has established **January 18, 2024, at 5:00 p.m., prevailing Eastern Time**, as the deadline to object to confirmation of the Plan (the "Plan Objection Deadline"). All such objections must be filed with the Bankruptcy Court and served on the Debtors and certain Notice Parties in accordance with the Disclosure Statement Order and Solicitation Procedures so that they are actually received on or before the Plan Objection Deadline. The Debtors believe that the Plan Objection Deadline, as established by the Bankruptcy Court, affords the Bankruptcy Court, the Debtors, and other parties in interest reasonable time to consider the objections to the Plan before a Confirmation Hearing.

### 2. Confirmation Hearing

The Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for **January 24, 2024, at 10:00 a.m., prevailing Eastern Time**, in the Bankruptcy Court, located at 824 N. Market Street, 6th Floor, Courtroom 6, Wilmington, DE 19801 (the "Confirmation Hearing"). The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the entities who have filed objections to the Plan, without further notice to other parties in interest. The Bankruptcy Court, in its discretion and before a Confirmation Hearing, may put in place additional procedures governing such hearing. The Plan may be modified, if necessary, before, during, or as a result of the hearing to confirm the Plan without further notice to parties in interest, subject to the terms of the Plan.

### D. Overview of the Plan

THE FOLLOWING IS A BRIEF SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF.

Set forth below is a table summarizing the classification of and estimated recoveries on account of Allowed Claims and Interests under the Plan. The actual distributions may differ from those set forth in the table depending on the amount of Claims ultimately allowed in each category or Class. The amounts set forth below do **not** include any potential recoveries from the Creditor Trust.

| DESCRIPTION/CLASS | ESTIMATED ALLOWED AMOUNT | ESTIMATED DISTRIBUTION (%) |
|---|---|---|
| Superpriority DIP Facility Claims | $190,000,000+[5] | Unknown |
| Administrative Claims | $50,000,000[6] | 100% |
| Priority Tax Claims | $2,100,000 | 100% |
| Class 1 Other Secured Claims | $0 | 100% |
| Class 2 Other Priority Claims | $0 | 100% |
| Class 3 Foris Prepetition Secured Claims | $312,100,919 | Unknown |
| Class 4 DSM RealSweet Secured Claims | $29,518,925 | Unknown |
| Class 5 DSM Other Secured Claims | $45,450,000 | 0% |
| Class 6 Lavvan Secured Claim | $820,458.67[7] | *(see footnote)*[8] |
| Class 7 Convertible Note Claims | $690,000,000 | 5.8% - 7.5%[9] |
| Class 8 General Unsecured Claims | $200,000,000[10] | 5.8% - 7.5%[11] |
| Class 9 DSM Contract Claims | $0 | 100% |
| Class 10 Givaudan Contract Claims | $0 | 100% |
| Class 11 Intercompany Claims | $0 | 0% |
| Class 12 Section 510(b) Claims | Unknown | 0% |
| Class 13 Intercompany Interests | N/A | N/A |

[5] Not including interest and other amounts allocable to such Claim.

[6] The indicated Allowed amount of Administrative Claims constitutes the Debtors' current, good-faith estimate of the amount of Administrative Claims that may be incurred through the Effective Date and total amount of Administrative Claims that will ultimately be Allowed. However, the actual Allowed amount of such Administrative Claims could be greater or lesser than expected for a variety of reasons, including, for example, greater than anticipated administrative and litigation costs associated with resolving any disputes regarding Administrative Claims or the existence of currently unknown Administrative Claims or the partial or full satisfaction of Administrative Claims prior to the submission of such Claims by a bar date imposed by the Plan or otherwise. (To date, no bar date for Administrative Claims has been set). The estimated amount provided here assumes the application of projected sales proceeds and could increase or decrease materially based on the results of operations and other factors.

[7] The amount provided is the amount awarded in the Lavvan Arbitration. The Debtors reserve the right to object to the amount of Lavvan's Claim and the value of its putative collateral.

[8] Subject to subordination pursuant to the Lavvan Documents.

[9] Assuming the Third-Party Release Settlement Amount is funded as applicable in full, Classes 7 and 8, collectively, are projected to receive an aggregate recovery of $51.95 to $66.4 million, consisting of $26.95 to $31.4 million in Cash (a 3% to 3.5% recovery based on the current estimation of the allowed aggregate Class 7 and Class 8 Claims pools) plus estimated recoveries from Retained Estate Causes of Action in the range of $25 to $35 million (a 2.8% to 4% recovery based on the current estimation of the allowed aggregate Class 7 and Class 8 Claims pools).

[10] Includes approximately $121 million in trade claims as of the Petition Date, plus, among other things, contingent, unliquidated or disputed rejection damage claims in the amount of $49 million and litigation claims in the amount of $30 million, but excludes any unsecured claim of Lavvan.

[11] *See* fn. 12.

| DESCRIPTION/CLASS | ESTIMATED ALLOWED AMOUNT | ESTIMATED DISTRIBUTION (%) |
|---|---|---|
| Class 14 Amyris Equity Interests | N/A | N/A |

### E.    Summary of Plan Releases and Injunctions

The following is a brief summary of the third-party releases and injunctions contained in the Plan.  Parties in interest are urged to review the Plan and this Disclosure Statement in their entireties to fully understand their rights and options in connection with such provisions.

### 1.    Third-Party Release by the Releasing Parties

#### a.    Mandatory Third-Party Release Subject to Court Approval

In the first instance, the Debtors are seeking approval by the Court of the Third-Party Release of all Direct Claims[12] by all Releasing Parties (including "all Holders of Claims against the Debtors")[13] in favor of the Released Parties[14] on a mandatory, non-consensual basis.[15]  **If this mandatory Third-Party Release is approved by the Court, it does not matter that a particular creditor or interest holder has opted out of the Third-Party Release**.

If the Third-Party Release is **approved on a non-consensual basis**, portions of the Third-Party Release Settlement Amounts will be distributed to certain Holders of Claims and Interests in accordance with Article I.A.198. of the Plan as follows:

$12,714,000    Holders of Convertible Notes

$3,686,000    Holders of General Unsecured Claims

$5,000,000    Holders of Interests

#### b.    Alternatively, Consensual Third-Party Release

---

[12] "Direct Claims" means any claim or Cause of Action held by a Releasing Party against any of the Released Parties (excluding the Debtors) and their respective Related Parties, but only to the extent such claims arise from, relate to, or are connected with, directly or indirectly, in any manner whatsoever, the Debtors, including their respective assets, liabilities, operations, financings, contractual agreements, licenses, and including the governance thereof, and existing on or prior to the Effective Date (including prior to the Petition Date).

[13] "Releasing Parties" means collectively, and in each case in its capacity as such:  (a) the Foris Prepetition Secured Lenders; (b)the Creditors' Committee; (c) the Consenting Convertible Noteholders; (d) the Consenting Contract Counterparties; (e) all Holders of Claims against the Debtors that are bound by the Third-Party Release Settlement; and (f) all persons who hold Interests in Amyris that are bound by the Third-Party Release Settlement.

[14] "Released Parties" means, collectively, and in each case, solely in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c); the DIP Lenders and the DIP Agent; (d) the Foris Prepetition Secured Lenders; (e) the Creditors' Committee; (f) the Consenting Convertible Noteholders, (g) the Ad Hoc Group Professionals; (h) the Consenting Contract Counterparties; and (i) with respect to each of the foregoing Entities in clauses (a) through (e), all Related Parties. For the avoidance of doubt, (i) the Debtors' current and former directors, managers, officers, employees, professionals, and shareholders, in each case, who are not an Excluded Party, shall each be a Released Party; and (ii) no Excluded Party shall be a Released Party.

[15] Plan Art. IX.D., first paragraph.

If the Third-Party Release is not approved by the Court on a mandatory, non-consensual basis, then the Debtors will seek approval of the Third-Party Release of all Direct Claims on a consensual basis, meaning that all Holders of Claims against the Debtors and all persons who hold Interests in Amyris will be bound by the Third-Party Release in favor of the Released Parties, if certain thresholds are met *unless* such creditor or interest holder affirmatively opts out of the Third-Party Release in accordance with the approved solicitation procedures.[16]

If the Third-Party Release is ***not approved on a non-consensual basis***, portions of the Third-Party Release Settlement Amounts will be distributed to certain Holders of Claims or Interests in accordance with Article I.A.198. of the Plan as follows:

$9,264,000     Holders of Convertible Notes, if the Direct Claims Threshold is satisfied as to holders of Direct Claims who are creditors (but only as to holders of Allowed Convertible Notes Claims who do not opt out of the Third-Party Release Settlement)

$2,686,000     Holders of General Unsecured Claims, if the Direct Claims Threshold is satisfied as to holders of Direct Claims who are creditors (but only as to Holders of Allowed General Unsecured Claims who do not opt out of the Third-Party Release Settlement)

$2,500,000     Holders of Interests, if the Direct Claims Threshold is satisfied as to holders of Direct Claims who are holders of any Interests (but only as to Holders of Interests who do not opt out of the Third-Party Release Settlement).

### 2.     Exculpation

The Plan includes a mandatory exculpation of the Exculpated Parties, subject to Court approval.[17]

### 3.     Plan Injunction

The Plan includes a mandatory Plan Injunction[18] enjoining any actions by the holders of Released Claims[19] to enforce or collect upon any Released Claims, and/or to take similar prohibited actions set forth in Plan Art. IX.F.

### 4.     Direct Claims Injunction

Solely as to holders of Direct Claims (and their respective Related Parties), said holders will be bound by a Direct Claims Injunction,[20] enjoining them from enforcing or collecting upon

---

[16] Plan Art. IX.D, third paragraph.

[17] Plan Art. IX.E.

[18] Plan Art. IX.F.

[19] "Released Claims" means any Claim or Interest or Direct Claim that has been released, satisfied, stayed, terminated, discharged, or is subject to compromise and settlement pursuant to the Plan.

[20] Plan Art. IX.G.

any Direct Claims, and/or taking similar prohibited actions set forth in Plan Art. IX.G against the Direct Claims Injunction Parties.[21]

## 2.    BACKGROUND AND CHAPTER 11 CASES

The Debtors were founded in 2003 to create a more stable supply of a key anti-malarial treatment.  Through the Debtors' cutting-edge science, artemisinin—the most effective anti-malarial drug in the world—is now consistently available to treat the deadly disease.  Using the same technological innovations that produced artemisinin, the Debtors have become the world's leading manufacturer of ingredients made with synthetic biology.  The Debtors provide sustainable ingredients that are eco-friendly alternatives to raw material sourced for flavors and fragrances, sweeteners, cosmetics, pharmaceuticals, and other consumer products.

A detailed description of the Debtors' business and facts precipitating the filing of the Debtors' Chapter 11 Cases are set forth in the *Declaration of Han Kieftenbeld in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 18](the "First Day Declaration") and the *Declaration of Han Kieftenbeld in Support of Joint Motion of the Debtors for Order (A) Directing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only, and (B) Applying Certain Order in the Chapter 11 Cases of Amyris, Inc. and Its Affiliated Debtors to the Chapter 11 Cases of Clean Beauty Collaborative, Inc., Clean Beauty 4U Holdings, LLC, and Clean Beauty 4U LLC* [Docket No. 120] (the "Supplemental First Day Declaration").

Through these Chapter 11 Cases, the Debtors are implementing both an operational and balance sheet restructuring, address liquidity challenges, and preserve and maximize value.  In proposing the Plan, the Debtors are centralizing their going-forward operations on their core business: developing molecules, manufacturing them at scale, and commercializing them with partners who are leaders in their markets, including on the basis of reset commercial agreements. Accordingly, the Debtors are exiting their consumer brands businesses, with a view to have these brands continue under new ownership while still leveraging Amyris' cutting-edge science and technology.

### A.    Debtors' History and Formation

Amyris is the world's leading manufacturer of ingredients made with synthetic biology. Through its proprietary fermentation technology, Amyris provides sustainable ingredients that are eco-friendly alternatives to raw material sourced for flavors and fragrances ("F&F"), sweeteners, cosmetics, pharmaceuticals, and other consumer products.  Traditionally, these raw materials were either (a) produced through petrochemistry,[22] which generates high greenhouse gas emissions and is, by definition, nonrenewable or (b) extracted from biological sources,[23] which in many cases

---

[21] "Direct Claims Injunction Parties" means (a) the Reorganized Debtors; (b) the Foris Secured Parties; and (c) the Related Parties of the foregoing parties.

[22] The term "petrochemistry" refers to a branch of chemistry that focuses on how crude oil and natural gas are transformed into raw materials and other products.

[23] For centuries, raw materials have been extracted from plants and animals.  For example, squalene, an adjuvant (a vaccine component that increases efficacy) in the SARS-CoV-2 vaccine, is traditionally harvested from shark livers and santalols—the fragrant component of sandalwood oil—are traditionally extracted from the threatened *Santalum album* species of tropical tree.

LA:4886-9172-0589.39 03703.004
ACTIVE/126081220

can be harmful to the environment, resulting in severe imbalances to the ecosystem. Amyris has developed sustainable and scalable alternatives to these environmentally damaging processes by using microbes (primarily yeast) to transform simple, sustainably grown, plant-based sugars into ingredients that are used in everything from lifesaving vaccines to commonly used consumer products. In addition, Amyris operates a family of consumer brands that utilize the Company's ingredients.

Amyris was founded in 2003 with a foundation grant to create a more stable supply of a key antimalarial treatment, artemisinin. At the time, artemisinin was extracted from the *Artemisia annua* (sweet wormwood) plant, which was in limited supply and subject to drastic price fluctuations. After scientists in the lab of Professor Jay Keasling at the University of California, Berkeley, demonstrated that microbes could be engineered to create a precursor[24] of artemisinin, Keasling and some of his colleagues founded Amyris to produce semi-synthetic artemisinin at an industrial scale utilizing fermentation technology. Through Amyris' cutting-edge science, artemisinin—the most effective anti-malarial drug in the world—is now consistently available to treat the deadly disease.

Amyris' artemisinin project set the tone for the Company's subsequent programs and led to its motto: Make Good, No Compromise. Consistent with its motto, the Company uses sustainable and scalable synthetic biology to produce compounds that are otherwise only found in nature, without adverse impacts to natural resources and the environment. Using the same technological innovations that produced lifesaving semisynthetic artemisinin through sugarcane fermentation, over the past fifteen years, the Company has successfully commercialized sixteen unique products. Thirteen of the Company's unique ingredients are biological products utilized across multiple industries and regulatory landscapes, including squalene (vaccine adjuvant), Reb M (zero calorie sweetener), and patchouli (sustainable woody fragrance); the three other products have been produced through semisynthesis, including squalane (an emollient for skin moisturization). In addition to its core business—the development, commercialization, and manufacture of rare molecules (also referred to as "ingredients") through proprietary fermentation processes—the Company also has developed and launched a family of clean beauty brands that utilize the natural and sustainable ingredients that Amyris produces. The Company sells these clean beauty products through direct-to-consumer e-commerce platforms and a network of retail partners, including Sephora, Target, and Walmart, both in the United States and abroad.

## B.  Material Prepetition Commercial Transactions

### 1.  Givaudan

On February 21, 2023, Amyris and Givaudan SA ("Givaudan") entered into an agreement where Amyris agreed to sell, assign, or license certain of its cosmetic ingredients businesses to Givaudan, including an assignment of certain distribution agreements, a sale of certain trademarks, and a grant of an exclusive, worldwide, irrevocable license to distribute, market and sell Neossance® Squalane emollient, Neossance® Hemisqualane silicone alternative, and CleanScreen™ sun protector in cosmetics actives for $200.0 million in cash at closing and up to

---

[24] A "precursor" refers to a chemical compound preceding another chemical compound in a metabolic pathway (i.e., a linked series of chemical reactions occurring within a cell).

$150.0 million in earn-out payments over three years. The companies also entered into a long-term partnership agreement for the manufacturing of cosmetic ingredients by Amyris for Givaudan. These agreements have proven to not be commercially viable for Amyris and as a result the Plan is predicated upon these agreements being substantially modified.

### 2.   DSM

In 2017, the Company monetized the use of one of its mature molecules in certain fields of use by licensing farnesene to DSM. The Company also sold to DSM its subsidiary, Amyris Brasil Ltda., which owned and operated a biofuel-oriented manufacturing facility in Brotas, Brazil that manufactures farnesene.

On March 31, 2021, the Company entered into a license agreement and asset purchase agreement pursuant to which DSM acquired exclusive rights to the Company's flavors and fragrances product portfolio, which included intellectual property licenses and the assignment of related supply agreements, for upfront consideration of $150 million, and up to $235 million of contingent consideration if certain commercial milestones are achieved between 2022 and 2024. In connection with this transaction, the Company also entered into a 15-year agreement to manufacture certain flavors and fragrances ingredients for DSM for supply to third parties, including Givaudan. These agreements have proven to not be commercially viable for Amyris and as a result the Plan is predicated upon these agreements being substantially modified.

### C.   Debtors' Corporate and Capital Structures

### 1.   Corporate Structure

Amyris was originally incorporated in California in 2003 under the name Amyris Biotechnologies, Inc., before reincorporating in Delaware in 2010 under the name Amyris, Inc. The Company's principal executive offices are located at 5885 Hollis Street, Suite 100, Emeryville, California 94608.

Amyris, Inc. is a Debtor in these Chapter 11 Cases and is the parent company of numerous direct and indirect subsidiaries organized in the United States, Brazil, and Europe. Each of the other Original Debtors is a Delaware entity that is a wholly owned[25] subsidiary of Amyris, Inc. A corporate organizational chart depicting the Company's legal entity structure, including Debtor and non-Debtor subsidiaries and joint ventures, is attached hereto as **Exhibit "B"**.

On June 5, 2023, the Company announced that its Board of Directors had established a Restructuring Committee, made up of three independent directors, to work with management to address cost and capital structure and liquidity issues.

As of the Petition Date, the Board of Directors appointed M. Freddie Reiss, CIRA, CPA, CTP (retired), formerly a senior managing director at FTI Consulting, as an additional independent director and member of the Restructuring Committee.   On August 29, 2023, the Company

---

[25] Amyris, Inc. holds 99% of the membership interests in Debtor Aprinnova, LLC ("Aprinnova"), with the remaining 1% held by Nikko Chemicals Co., Ltd.

announced the appointment of J. Scott White to the Board of Directors and the Restructuring Committee.

As of the Petition Date, the Board of Directors also appointed Philip J. Gund, Senior Managing Director at Ankura Consulting Group, LLC, as the Company's Chief Restructuring Officer. Mr. Gund reports directly to the Restructuring Committee. Mr. Gund has over forty years of professional experience, including thirty-four years working with troubled companies and their creditors, investors, and court-appointed officials, and has successfully advised clients on all aspects of the workout process.

From and after the Effective Date, the members of the Reorganized Debtors' management and Board of Directors will be identified in the Plan Supplement.

### 2. Prepetition Capital Structure

#### a. Secured Debt

##### (i) Foris

*Foris Prepetition Secured Loans*. Pursuant to those certain (i) Amended and Restated Loan and Security Agreement by and among Amyris, Inc., as borrower, Amyris Clean Beauty, Inc. ("Clean Beauty"), Amyris Fuels, LLC ("Amyris Fuels"), and AB Technologies LLC, as guarantors ("AB Technologies," and together with Clean Beauty and Amyris Fuels, the "Subsidiary Guarantors" or "Subsidiary Grantors," as applicable herein), and Foris, as lender, dated as of October 28, 2019, as amended by that certain Omnibus Amendment Agreement, dated as of June 5, 2023, and as further amended, restated, supplemented or otherwise modified from time to time, (ii) Amended and Restated Loan and Security Agreement by and among Amyris, Inc., as borrower, the Subsidiary Guarantors, as guarantors, and Foris, as lender, dated as of September 27, 2022, as amended by that certain Omnibus Amendment Agreement, dated as of June 5, 2023, and as further amended, restated, supplemented or otherwise modified from time to time, (iii) Bridge Loan and Security Agreement by and among Amyris, Inc., as borrower, the Subsidiary Guarantors, as guarantors, and Perrara Ventures, LLC ("Perrara"), as lender, dated as of March 10, 2023, as amended by that certain Omnibus Amendment Agreement, dated as of June 5, 2023, and as further amended, restated, supplemented or otherwise modified from time to time, (iv) Loan and Security Agreement by and among Amyris, Inc., as borrower, the Subsidiary Guarantors, as guarantors, and Anesma Group, LLC ("Anesma"), as lender, dated as of June 5, 2023, (v) Loan and Security Agreement by and among Amyris, Inc., as borrower, the Subsidiary Guarantors, as guarantor, and Anjo Ventures, LLC ("Anjo"), as lender, dated June 29, 2023, and (vi) Loan and Security Agreement by and among Amyris, Inc., as borrower, the Subsidiary Guarantors, as guarantors, and Muirisc, LLC ("Muirisc"), and lender, dated as of August 2, 2023 (all of the foregoing as further amended, supplemented, amended and restated, or otherwise modified prior to the Petition Date, the "Foris Prepetition Secured Loans," and collectively with any other agreements and documents executed or delivered in connection with the Foris Prepetition Secured Loans, including the Foris Security Agreements (as defined herein), the "Foris Prepetition Secured Loan Agreements")), and Foris, Perrara, Anesma, Anjo, and Muirisc (collectively, the "Foris Prepetition Secured Lenders"), provided prepetition term loans to the Company.

As of the Petition Date, the aggregate principal amount outstanding under the Foris Prepetition Secured Loan Agreements is at least $312,100,000 (plus accrued and unpaid nondefault interest, additional fees, costs, expenses, and other obligations as provided under the Foris Prepetition Secured Loan Agreements) (collectively, the "Foris Prepetition Obligations"), which Foris Prepetition Obligations have been guaranteed on a joint and several basis by each of the Subsidiary Guarantors.

*Foris Prepetition Loan Collateral*. In connection with the Foris Prepetition Secured Loan Agreements, Amyris, Inc. and the Subsidiary Grantors, as applicable, entered into various security, patent, copyright, and trademark security agreements (all of the foregoing as further amended, supplemented, amended and restated, or otherwise modified from time to time, the "Foris Security Agreements"), pursuant to which the Foris Prepetition Obligations are secured by first priority security interests in and liens on the "Collateral," as defined in the Foris Security Agreements (the "Prepetition Collateral").

*Foris Cash Collateral*.  Any and all of the Debtors' cash, including the Debtors' cash and other amounts on deposit or maintained in any account or accounts by the Debtors, including any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date, and the proceeds of any of the foregoing is the Foris Prepetition Secured Lenders' cash collateral.

(ii)    DSM

Amyris, Inc., is the borrower under that certain Loan and Security Agreement dated as of October 11, 2022, as amended and restated by that certain Amendment and Restatement Agreement dated as of December 12, 2022 (as further amended, restated, supplemented or otherwise modified from time to time, the "DSM LSA"), by and among Amyris, Inc., certain subsidiaries thereof as guarantors, and DSM Finance B.V. ("DSM BV"), pursuant to which the Company obtained, among other financial accommodations, term loans in three tranches consisting of Tranche 1 with principal obligations of $50,000,000, Tranche 2 with principal obligations of $25,000,000, and Tranche 3 with principal obligations of $25,000,000.  As of the Petition Date, the aggregate outstanding principal amount of Tranches 1 and 2 is approximately $45 million and the aggregate outstanding principal amount of Tranche 3 is approximately $29 million.

Pursuant to that certain Security Agreement dated as of October 11, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "DSM Security Agreement"), by and among Amyris, Inc., and DSM BV, certain of the Company's obligations under the DSM LSA are secured by a lien and security interest in favor of DSM BV in all of Amyris, Inc.'s rights to any earn-out amounts that may become payable from DSM Nutritional Products Ltd. to Amyris, Inc., in accordance with Section 3.5 of the Purchase Agreement (as defined in the DSM Security Agreement) and any and all claims, rights, and interests in any of the above.

Pursuant to that certain Pledge Agreement dated as of December 12, 2022, by and among Amyris, Inc., and DSM BV, Amyris, Inc., certain of the Company's obligations under the DSM LSA are secured by a lien and security interest in favor of DSM BV in Amyris, Inc.'s 69.00% equity interests in Amyris RealSweet, LLC.

### b.    Unsecured Debt

On November 15, 2021, Amyris completed a sale of $600 million aggregate principal amount of 1.50% convertible unsecured senior notes due 2026 (the "Convertible Notes"). The Convertible Notes were issued pursuant to an Indenture, dated as of November 15, 2021 (the "Indenture"), between the Company and U.S. Bank National Association, as trustee ("U.S. Bank"). The Convertible Notes bear interest at a rate of 1.50% per year, payable in cash semiannually in arrears on November 15 and May 15 of each year, beginning on May 15, 2022, and mature on November 15, 2026, unless earlier repurchased, redeemed, or converted in accordance with their terms prior to such date.

The initial purchasers of the Convertible Notes exercised their options to purchase an additional $90 million aggregate principal amount of notes in full, on November 11, 2021, for issuance on November 15, 2021. As a result, as of the Petition Date, the outstanding balance of the Convertible Notes is approximately $690 million.

As of the Petition Date, the Debtors estimate that the total amount of their outstanding trade payables totals approximately $102 million.

### c.    Equity

Amyris became a public company through an initial public offering on the Nasdaq Stock Market on September 28, 2010, where it trades under the symbol AMRS.

As of December 31, 2022, over 30% of Amyris capital stock was beneficially owned by a limited number of stockholders, including Foris and DSM. Furthermore, Foris and other insider stockholders hold some or a combination of convertible preferred stock, warrants, and purchase rights, pursuant to which they may acquire additional shares of common stock and thereby increase their ownership interest in the Company.

At July 10, 2023, there were 182 common stockholders of record (not including beneficial holders of stock held in street names).

### D.    Significant Litigation

### 1.    Securities Class Action

On June 21, 2019, and October 1, 2019, respectively, two separate purported shareholder derivative complaints were filed in the U.S. District Court for the Northern District of California (the "Northern California District Court") (*Bonner v. Doerr, et al.* (Case No. 4:19-cv-03621) and *Carlson v. Doerr, et al.* (Case No. 4:19-cv-06230)), naming the Company, and certain of the Company's current and former officers and directors, as defendants. An additional shareholder derivative complaint (*Kimbrough v. Melo, et al.* (Case No. 4:20-cv-09227)), substantially identical to the Bonner complaint, was filed on December 18, 2020, in the U.S. District Court for the Northern District of California. The derivative lawsuits sought to recover, on the Company's behalf, unspecified damages purportedly sustained by the Company in connection with allegedly misleading statements and omissions made in connection with the Company's securities filings. The derivative lawsuits were later consolidated into one action (the "Derivative Lawsuit").

On June 20, 2022, the Northern California District Court granted the Company's motion to dismiss the Derivative Lawsuit without prejudice. Subsequently, Bonner informed the court that it did not intend to file a second amended complaint. On August 18, 2022, the court issued the judgment in favor of the Company and awarded the Company an immaterial amount in costs. On September 9, 2022, Bonner filed a notice of appeal of the Court's decision, which appeal is pending as of the Petition Date.

### 2.    Lavvan Litigation

On August 23, 2020, Lavvan, Inc. ("Lavvan") brought claims in arbitration against the Company in the ICC International Court of Arbitration (the "ICC") (Case No. 25998/PDP), seeking close to $900 million in damages under that certain Research, Collaboration and License Agreement between Lavvan and Amyris, dated March 18, 2019 (the "RCLA"), and on September 10, 2020, Lavvan filed a complaint against the Company in the U.S. District Court for the Southern District of New York ("SDNY") (Case 1:20-cv-07386-JPO) in which Lavvan asserted claims for patent infringement and misappropriation of trade secrets (the "SDNY Claims"). The SDNY Claims are premised on the same alleged facts and circumstances that support the Arbitration Claims and they seek damages for the same alleged harm  The evidentiary hearing took place in arbitration (the "Lavvan Arbitration") from October 24 – 28, 2022.

On September 11, 2023, the Court entered the *Order Granted Limited Modification of Automatic Stay to Permit Issuance of an Arbitration Award* [Docket No. 230], pursuant to which the Debtors consented to the lifting of the automatic stay to allow the issuance of a decision in the Lavvan Arbitration.

On November 22, 2023, the ICC issued a final decision in the Lavvan Arbitration, in which it found that Amyris had breached both the RCLA and a fiduciary duty owed to Lavvan under New York law. As a result of such breach, the ICC, among other things, (i) ordered Amyris to disgorge to Lavvan all profits earned from the sale, if any, of Collaboration Cannabinoids (as defined in the RCLA), (ii) ordered Amyris to pay to Lavvan $820,458.67 for the costs of the arbitration, and (iii) declared that the Release Condition (related to rights to materials in escrow under the RCLA) had occurred. Furthermore, pursuant to the ICC's decision, Amyris is prohibited from engaging in the manufacture or sale of Collaboration Cannabinoids without Lavvan's express consent, except under certain limited circumstances set forth in the RCLA. The ICC rejected all remaining claims and requests. Because Amyris does not believe it has any profits that would be subject to disgorgement, the Company believes its financial liability to Lavvan on account of claims in this arbitration matter is limited to $820,458.67.

### 3.    Beauty Labs Litigation

On February 22, 2023, Disruptional Ltd. and & Vest Beauty Labs LP, sellers of Beauty Labs International Ltd., a business acquired by the Company on August 31, 2021, filed a complaint against the Company in New York State court, alleging, among other things, a breach of contract related to earnout payments. On March 15, 2023, the Company removed the lawsuit to SDNY.

### E.    Events Leading to the Commencement of the Bankruptcy Cases

### 1.    Financial and Operational Challenges

The Company has incurred operating losses since its inception, thus requiring a continuing need for equity and debt capital to sustain operations.  Over the past two years, total revenues have plunged more than 20%; revenue in 2021 totaled $341.8 million and declined to $269.8 million the following year.  During that same period, the Company faced manufacturing input, freight, and logistics cost increases as well as increased operating expenses, such as brand management and marketing expenses.

Adjusted EBITDA was ($521.0) million in 2022 primarily due to increased operating expenses and higher ingredients cost of goods sold for contract-manufactured intermediate and finished product. Operating expenses included the burden of operating ten consumer brands, heavier spend associated with increasing employee headcount during 2022, and significant consumer brand marketing spend to support brand development and top line growth. Capital expenditures, mostly related to the construction and commissioning of the Barra Bonita fermentation plant was a significant use of cash beginning in 2022.  At the end of 2022, the Company implemented a "Fit-to-Win" restructuring strategy that involved targeted price increases, production, shipping, and unit cost reductions and other cost-reduction strategies.

As part of the need to restructure, the Company retained the Business Recovery Services unit of PricewaterhouseCoopers ("PwC") in April 2023 to work with the Restructuring Committee and management to accelerate improvements and further the Company's "Fit-to-Win" efficiency and cost reduction program.  Additionally, the Company established a Transformation Office, supported by PwC, to oversee various work streams to help deliver the Company's cost reduction targets and to simplify its business portfolio.

These efforts have yielded mixed results.  In May 2023, the Company announced its 2023 first quarter financial results, which showed a reduction in total revenue of $56.1 million as compared to $57.7 million in the first quarter of 2022, a 3% decrease.  However, the Company remains challenged by an overleveraged balance sheet, continuing trade losses, mounting litigation risk, deeply unprofitable contracts, and dwindling trade vendor support.

Notably, Amyris' two core businesses—Technology Access (comprising revenue from ingredient product sales, R&D collaboration programs, and technology licensing) and Consumer (brands and services)—continue to incur significant losses; each of the Company's consumer brands are loss-generating and losses generated in the Technology Access business are principally a result of unfavorable margin economics in certain of the Company's contracts.

### 2.    Key Prepetition Actions

With the support of its advisors, the Company began implementing "Amyris 2.0" prior to the Petition Date, focusing its strategy and go-forward business plan around the Company's core Lab-to-Market™ competencies of research, formulation, and development of ingredients and ingredient applications, commercial scaling, and commercialization of its sustainable ingredients. As such, the Company made the strategic decision to re-focus away from its consumer brands, some of which were shut down prior to the Petition Date.  In July 2023, Amyris engaged Intrepid

Investment Bankers LLP ("Intrepid") to, among other things, market the Company's consumer brands, a process that will continue during these Chapter 11 Cases.

In addition, prior to the Petition Date, the Company implemented aggressive cost-reduction actions, which included the shutdown of several loss-generating consumer brands and two workforce downsizings in June and August 2023. To support these initiatives and the Company's efforts to reorganize, the Company engaged in efforts regarding potential financing, and explored alternative sources of capital, including selling assets, borrowing money from new lenders, and issuing additional equity. These efforts ultimately were not successful.

On June 5, 2023, the Company announced the entry into loan amendments with its principal secured lenders—Foris and DSM—that resulted in a waiver of all existing defaults, and a secured term loan facility with a Foris-affiliate, Anesma, through which Anesma provided the Company with a $50 million loan for working capital and general corporate purposes.

Additionally, (a) on June 29, 2023, the Company announced entry into a secured term loan facility with Foris-affiliate Anjo, through which Anjo provided the Company with a $50 million loan for working capital and general corporate purposes and (b) on August 3, 2023, the Company announced entry into a secured term loan facility with Foris-affiliate Muirisc through which Muirisc provided the Company with a $20 million loan for working capital and general corporate purposes, including to fund separation costs associated with the Company's reductions in force around the date of such loan.

### 3.      Supply Chain and Accounting Investigation

Prior to the commencement of the Chapter 11 Cases, the Company became aware of allegations of potential supply-chain administration irregularities that may have resulted in accounting issues during the third quarter of 2021 through the fourth quarter of 2022. Upon being advised of the allegations, the Audit Committee of the Company's Board of Directors engaged outside legal and forensic experts to undertake an investigation of the alleged irregularities. The investigation was not concluded as of the Petition Date. However, certain individuals that were involved in the alleged irregularities have been separated from the Company and there is no evidence that any of the alleged improper conduct is ongoing.

### 4.      Commencement of the Bankruptcy Cases

On August 9, 2023 (the "Original Petition Date"), each Original Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Pursuant to the *Order Authorizing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only* [Docket No. 50] (the "Original Joint Administration Order"), the chapter 11 cases of the Original Debtors are being jointly administered and are consolidated for procedural purposes.

On August 21, 2023 (the "Supplemental Petition Date"), the Additional Debtors each filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code. Each of the Additional Debtors are direct or indirect subsidiaries of Original Debtor Amyris, Inc. Specifically: (a) CBC is a subsidiary of Original Debtor Amyris Clean Beauty, Inc. ("ACB"), which in turn is

a wholly-owned subsidiary of Original Debtor Amyris, Inc.;[26] (b) CB4U Holdings is a wholly-owned subsidiary of Original Debtor Amyris, Inc.; and (c) CB4U is a subsidiary of CB4U Holdings.[27] In addition, Amyris, Inc. is the manager of CB4U.  CBC and CB4U are joint ventures with brand partners for two of the Company's consumer brands.

On August 23, 2023, the Court entered its *Order (A) Directing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only and (B) Applying Certain Orders in the Chapter 11 Cases of Amyris, Inc. and its Affiliated Debtors to the Chapter 11 Cases of Clean Beauty Collaborative, Inc., Clean Beauty 4U Holdings, LLC, and Clean Beauty 4U LLC* [Docket No. 125], pursuant to which all of the Debtors' cases are being jointly administered together, and making certain relief granted to the Original Debtors applicable to the Additional Debtors.

The Debtors operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in their chapter 11 cases.

### F.    Events During the Chapter 11 Cases

#### 1.    First Day and Cash Collateral Relief

On the Original Petition Date, the Debtors have filed a number of First Day Pleadings seeking orders that grant various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, and expedite a swift and smooth restructuring process.  On August 9, 2023, the Debtors filed the following First Day Pleadings:[28]

- **Joint Administration Motion.** *Motion for Order Directing Joint Administration of Related Chapter 11 Cases for Procedural Purposes Only*.  (The Court ordered joint administration of the Original Debtors' cases on August 11, 2023).

- **Consolidated Matrix Motion.** *Motion for Entry of an Order: (I) Authorizing the Debtors to: (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, and (C) Redact Certain Personally Identifiable information for Individual Creditors; (II) Modifying the Requirement to File a List of All Equity Security Holders of Amyris, Inc. and Modifying Notice Thereto; and (III) Granting Related Relief.*  (August 11, 2023).

- **Cash Management Motion.** *Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Continue Operating Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing*

---

[26] ACB owns 56.5% of CBC.

[27] Debtor Amyris, Inc. indirectly owns 49% of CB4U.

[28] The date the Court approved the First Day Pleading is indicated in parentheses.

*Business Forms, and (D) Granting Related Relief.* (Interim Order: August 11, 2023; Final Order: September 12, 2023).

- **Employee Wage and Benefits Motion.** *Motion for Entry of Interim and Final Orders: (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief.* (Interim Order: August 11, 2023; Final Order: September 8, 2023).

- **Utility Motion.** *Motion for Entry of Interim and Final Orders: (I) Approving Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief.* (Interim Order: August 11, 2023; Final Order: September 11, 2023).

- **Customer Programs Motion.** *Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Honor Certain Prepetition Obligations to Customers and (B) Otherwise Continue Certain Customer Programs in the Ordinary Course of Business and (II) Granting Related Relief.* (Interim Order: August 11, 2023; Final Order: September 8, 2023).

- **Worldwide Stay Motion.** *Motion for Entry of an Order (I) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and Ipso Facto Protections of the Bankruptcy Code, and (II) Approving the Related Form and Manner of Notice.* (August 11, 2023).

- **Stock Transfer Procedures Motion.** *Motion for Entry of Interim and Final Orders Approving Notification and Hearing Procedures for (I) Certain Transfers of and Declarations of Worthlessness With Respect to Common Stock, (II) Certain Transfers of Claims Against Debtors and (II) Granting Related Relief.* (Interim Order: August 11, 2023; Final Order: September 8, 2023).

- **Critical Vendor Motion.** *Motion for Entry of Interim and Final Orders: (I) Authorizing Debtors to Pay Prepetition Claims of Critical Vendors, Foreign Vendors, 503(b)(9) Claimants, and Lien Claimants; (II) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders; (III) Authorizing All Financial Institutions to Honor All Related Payment Requests; and (IV) Granting Related Relief.* (Interim Order: August 11, 2023; Amended Final Order: September 15, 2023).

- **Tax Motion.** *Motion for Entry of Interim and Final Orders: (I) Authorizing the Payment of Certain Taxes and Fees; and (II) Granting Related Relief.* (Interim Order: August 11, 2023; Final Order: September 8, 2023).

- **Insurance Motion.** *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Maintain Their Insurance Policies and Programs,*

*(B) Honor all Insurance Obligations, (C) Renew, Amend, Supplement, Extend, or Purchase and Finance Insurance Policies; (II) Authorizing Continuation of Insurance Premium Financing Agreement; and (III) Granting Related Relief.* (Interim Order: August 11, 2023; Final Order: September 12, 2023).

- **Schedule Extension Motion.** *Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Granting Related Relief.* (September 12, 2023).

- **DIP Financing Motion.** *Motion of the Debtors for Interim and Final Orders (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "DIP Financing Motion"). (Interim Order: August 11, 2023; Second Interim Order: September 19, 2023).

### 2.     Debtors' Retention of Professionals and Personnel

Since the Petition Date, the Debtors have employed the following professionals:[29]

- Pachulski Stang Ziehl & Jones LLP, as counsel for the Debtors (September 11, 2023).

- Fenwick & West LLP, as special corporate counsel for the Debtors. (October 6, 2023).

- Shearman & Sterling LLP, as special mergers and acquisitions and commercial transactions counsel for the Debtors. (September 26, 2023).

- Gordon Rees Scully Mansukhani, LLP, to provide document review and other litigation support services. (December 6, 2023)

- Ankura Consulting Group, LLC, to provide the Debtors with Philip J. Gund, as Chief Restructuring Officer (September 14, 2023).

- PwC US Business Advisory LLP, as financial advisor to the Debtors (September 20, 2023).

- Intrepid Investment Bankers LLC, as investment bankers for the Debtors (September 14, 2023).

- Stretto, Inc., as the Debtors' claims and noticing agent (August 11, 2023), and administrative advisor (September 11, 2023).

---

[29] The date the Court approved the employment of the professional is indicated in parentheses.

- KTBS Law LLP as special counsel on behalf of and at the sole direction of the Independent Director on the Board of Directors of Amyris, Inc., M. Freddie Reiss (September 11, 2023).

- Black Bay Management Corporation and its division, The Michel-Shaked Group, as expert consultant. (December 7, 2023)

### 3. Formation of the Creditors' Committee; Retention of Professionals

On August 27, 2023, the Office of the United States trustee for Region 3, District of Delaware (the "UST"), appointed the Official Committee of Unsecured Creditors (the "Committee") in the Debtors' chapter 11 cases pursuant to section 1102(a)(1) of the Bankruptcy Code. The members of the Creditors' Committee are: (a) Coasn U.S. Inc.; (b) U.S. Bank Trust Company, National Association; (c) Sartorious Stedim North America, Inc.; (d) Hearst Magazine Media, Inc.; (e) Wiley Companies; (f) Park Wynwood, LLC; and (g) Allog Participacoes, Ltda.

The following day, the Creditors' Committee selected White & Case LLP as its lead counsel, and Potter Anderson & Corroon LLP as its Delaware counsel. On August 30, 2023, the Creditors' Committee selected FTI Consulting, Inc., as its financial advisor, and on September 1, 2023, Jefferies LLC as its investment banker.

To date, the Court has authorized the Creditors' Committee's retention of White & Case LLP, Potter Anderson & Corroon LLP and FTI Consulting, Inc., on October 6, 2023, and Jefferies LLC as investment banker, on October 30, 2023.

### 4. Investigations

As described below, the Independent Director, the Creditors' Committee, and the Ad Hoc Noteholder Group each have deeply engaged in a comprehensive investigation of the Debtors' affairs, with which the Debtors fully cooperated.

#### a. The Independent Director Investigation

#### i. Commencement of Investigation

Ancillary to its restructuring, Amyris recognized that there had been allegations of irregularities that may have resulted in accounting irregularities from the third quarter of 2021 through the fourth quarter of 2022 and that there may have been other conduct or misconduct—by commission or omission—that contributed to Amyris's financial distress. To address these issues, effective on the Petition Date, the Board delegated to Mr. Reiss (the "Independent Director") the exclusive power and authority of the Board to investigate the conduct of the Debtors' directors and officers ("D&Os") and the D&Os' affiliates to determine whether any of the Debtors have claims against any current or former D&Os or any of the D&Os' affiliates.

The Independent Director began working on the Independent Director Investigation upon his appointment on the Petition Date and promptly selected KTBS Law LLP ("KTBS") as special counsel for the Debtors to lead the examination and to report its findings to the Independent Director (the "Independent Director Report"). To date, the Independent Director Report has not

been provided to the full Board.  Rather, the Independent Director Report has been shared with the Creditors' Committee under the Creditors' Committee Common Interest Agreement (defined below) and with the other recently appointed independent director (Mr. White).

### ii.      Investigation Focus and Process

The Independent Director focused the Independent Director Investigation on the three-year period preceding the Petition Date and investigated potential claims and estate causes of action against D&Os and affiliates of D&Os for transactions, acts, and omissions during the relevant period.  The selection of the time period to be examined was driven by Delaware law, which applies a three-year statute of limitations to breach-of-fiduciary-duty and fraud claims.[30]  The statute of limitations effectively ceases to run for two years following a bankruptcy filing by virtue of section 108(a) of the Bankruptcy Code.

While the Debtors were not privy to the full extent and details of the Independent Investigation, the Debtors were informed that KTBS conducted numerous formal interviews of the Debtors' current and former directors, officers, and employees, in addition to numerous informal discussions with Steven Fleming of PwC and the Debtors' current internal counsel.  The Debtors gave KTBS access to thousands of documents and internal emails, including documents protected by the Debtors' attorney-client privilege.

### iii.      Independent Director Report

On October 20, 2023, the Independent Director and KTBS finalized the Independent Director Report, summarizing the Independent Investigation to date and the results thereof.  The Independent Director Report comprises 61 pages, supplemented by 455 pages of appendices.  The Independent Director Report has already been shared with the Creditors' Committee.  The Independent Director's and KTBS's investigation has concluded.

### b.      The Creditors' Committee's Investigation

On August 29, 2023, the day after the Creditors' Committee retained counsel, the Debtors provided the Creditors' Committee's advisors with access to a comprehensive data room (the "Committee VDR") containing hundreds of documents, including prepetition debt documents, corporate governance documents, insurance policies, major commercial contracts, operative deal documents with respect to major transactions, and information regarding the Debtors' intellectual property.

Since its formation, the Creditors' Committee has proactively investigated the facts and circumstances leading to these Chapter 11 Cases and potential causes of action against the DIP Lender and Foris Prepetition Secured Lenders, their principals, and the Debtors and their officers and directors.  On September 18, 2023, the Creditors' Committee served forty-seven categories of document requests and thirteen interrogatories on the Debtors (the "Committee 2004 Requests").  Meet and confer sessions were held on September 21 and 26, 2023.  The Creditors' Committee

---

[30] See, e.g., 10 Del. C. § 8106(a); *Genelux Corp. v. Roeder (In re Genelux Corp.)*, 126 A.3d 644, 675 (Del. Ch. 2015) ("Whether a claim is styled as one for fraud or breach of fiduciary duty, among others, the applicable statute of limitations is three years.").

then provided the Debtors with a list of 20 "priority" document requests and initial proposed search terms for electronically stored information (the "Agreed Search Terms"). The Debtors: (a) identified the three custodians of emails (Han Kieftenbeld – Amyris CFO and interim CEO; John Melo – former Amyris CEO; and Kathleen Valiasek – former Amyris Chief Business Officer) (collectively, the "Agreed Custodians"); (b) explained the process for collecting and searching those emails, including the fact that the sole Amyris IT employee able to assist was on vacation from the end of September through October 8; (c) discussed their current knowledge and efforts regarding every document request; and (d) supplemented the Agreed Search Terms with additional terms relating to matters unknown to the Creditors' Committee but potentially relevant to its investigation.

Beginning on September 29, 2023, the Debtors began making formal productions to the Creditors' Committee (in addition to those documents already in the Creditors' Committee VDR) in response to the Creditors' Committee 2004 Requests, including the production of the Agreed Custodians' emails using the Agreed Search Terms. Additionally, subsequently, as discussed below, the Debtors began making formal productions to the Ad Hoc Noteholder Group in response to the Noteholder 2004 Requests. The documents produced included board materials, emails, and other documents responsive to the Creditors' Committee and Noteholder 2004 Requests. The production schedule and volume of production is summarized in the chart below:

| Production No. | Date of Production | No. of Documents | No. of Pages |
|---|---|---|---|
| 1 | September 29, 2023 | 192 | 8,454 |
| 2 | October 6, 2023 | 459 | 6,173 |
| 3 | October 6, 2023 | 328 | 8,721 |
| 4 | October 10, 2023 | 33 | 2,026 |
| 5 | October 13, 2023 | 63 | 9,227 |
| 6 | October 16, 2023 | 1,784 | 9,696 |
| 7 | October 17, 2023 | 587 | 5,894 |
| 8 | October 18, 2023 | 826 | 10,386 |
| 9 | October 19, 2023 | 554 | 4,423 |
| 10 | October 23, 2023 | 1,198 | 12,578 |
| 11 | October 31, 2023 | 1,510 | 5,477 |
| 12 | October 31, 2023 | 684 | 7,054 |
| 13 | November 1, 2023 | 144 | 816 |
| 14 | November 2, 2023 | 296 | 1,072 |
| 15 | November 2, 2023 | 453 | 3,348 |
| 16 | November 2, 2023 | 832 | 6,977 |
| 17 | November 5, 2023 | 820 | 6,431 |
| 18 | November 6, 2023 | 1,408 | 8,024 |
| 19 | November 8, 2023 | 1,234 | 9,649 |
| 20 | November 9, 2023 | 1,817 | 12,387 |
| 21 | November 11, 2023 | 4,574 | 35,891 |
| 22 | November 13, 2023 | 2,075 | 10,776 |
| 23 | November 15, 2023 | 2,502 | 20,825 |
| **TOTAL** | | **24,373** | **206,305** |

LA:4886-9172-0589.39 3703.004
ACTIVE/126081220

The Creditors' Committee has reviewed substantially all of the documents produced by the Debtors.[31]

On October 17, 2023, the Debtors formally responded to the Creditors' Committee's interrogatories. In addition to the Debtors' document productions, Foris has made several document productions to the Creditors' Committee and Ad Hoc Noteholder Group in response to separate discovery requests propounded in connection with the Creditors' Committee's investigation.

To further cooperate, the Debtors transmitted a form of common interest agreement to the Creditors' Committee (the "Committee Common Interest Agreement"), which was executed on October 19, 2023. The Creditors' Committee Common Interest Agreement broadly covers the investigation and potential pursuit of claims (i) belonging to Debtors' bankruptcy estates (including tort and breach of contract claims, and claims under chapter 5 of the Bankruptcy Code) and/or (ii) against any equity holders of the Debtors or any affiliates of the Debtors.

On October 23, 2023, the Debtors provided the Creditors' Committee with a copy of the Independent Director Report, including all appendices.

In connection with the Creditors' Committee Investigation, to date, the Creditors' Committee has taken three depositions: Mr. Panchadsaram on November 6, 2023;[32] Mr. Doerr on November 8, 2023;[33] and Mr. Melo on November 11, 2023[34] (collectively, the "Depositions").

The Creditors' Committee considered several potential causes of action against the Debtors' officers, directors, and employees. Among other things, the Creditors' Committee considered claims for (i) breach of fiduciary duty under Delaware law, including breach of the duty of care and breach of the duty of loyalty; (ii) aiding and abetting breach of fiduciary duty; (iii) breach of contract under applicable state law; (iv) business torts, including tortious interference with prospective contractual and business relations, fraud, and negligent misrepresentation under applicable state law; (v) equitable subordination of debt under 11 U.S.C. § 510; (vi) recharacterization of debt as equity; (vii) preference claims under 11 U.S.C. § 547; (viii) fraudulent transfer claims under 11 U.S.C. § 548; and (ix) fraudulent transfer claims under 11 U.S.C. § 544 and applicable state law.

For each of these claims, the Creditors' Committee reviewed the appropriate statute of limitations and look-back periods. The Creditors' Committee also examined the scope of the directors' and officers' liability under applicable state law and the Debtors' corporate documents, many of which contained exculpation clauses. In tandem with the Creditors' Committee's legal research, the Creditors' Committee analyzed the Debtors' financing arrangements, sale and

---

[31] The Committee believes that the results of its investigation thus far supports entry into the proposed Estate Claims Settlement and Third-Party Release Settlement.

[32] See Docket No. 682.

[33] See Docket No. 681.

[34] See Docket No. 715.

purchase agreements, and other business decisions as identified in the Debtors' court filings, the documents produced by the Debtors, and the Debtors' board materials. The Creditors' Committee's analysis included a robust review of the pertinent documents produced in these chapter 11 cases, including negotiations and communications between transacting parties, the materials presented to the Amyris board, the decision-making processes of the Amyris board and management, financing alternatives presented to the Amyris board, the Debtors' approval process, and proposed transactions that were never completed. Based on this extensive review and analysis, the Creditors' Committee prepared a motion to seek derivative standing and a proposed adversary complaint. After substantial discussion among the Creditors' Committee members and the Creditors' Committee's advisors, the Creditors' Committee determined that the settlement with the Debtors and Foris likely provided better value to the Creditors' Committee and its constituents than the claims that the Creditors' Committee had developed through its investigation.

### c.      Ad Hoc Noteholders' Group Investigation

As evidenced by the *Debtors' Motion to Assume and/or Enter Into Reimbursement Agreements With Professionals for the Ad Hoc Noteholder Group* [Docket No. 148] (the "Reimbursement Motion"), the Debtors' goal—even prior to the filing of the Chapter 11 Cases—was to productively engage with major stakeholders, including their largest creditor constituency, represented by the Ad Hoc Noteholder Group. In furtherance of that goal, on or about August 17, 2023, the Debtors provided the Ad Hoc Noteholder Group Professionals (as defined in the Reimbursement Motion) with access to a comprehensive data room (the "Noteholder VDR") that was substantively identical to the Creditors' Committee VDR.

The Ad Hoc Noteholders' Group has *also* conducted an investigation focused on four principal matters: (i) "whether the Board and the officers considered selling the same brands that are going to be sold as part of the plan earlier;" (ii) "whether the Board and the officers improperly delayed implementing cost cutting measures;" (iii) "whether the Board and officers improperly approved prepetition loans to the Foris lenders;" and (iv) "whether the representations to the investors about the Fit to Win strategy were, in fact, false."[35] Specifically, the Ad Hoc Noteholders' Group investigated potential causes of action against the Debtors, their officers, directors, employees, and professionals, including without limitation claims for (i) breach of fiduciary duty or aiding and abetting breach of fiduciary duty; (ii) recharacterization; (iii) equitable subordination; (iv) fraudulent transfer, including under federal and state law; and (v) common-law fraud. The Ad Hoc Noteholders' Group's investigation as to each potential cause of action considered applicable governing standards under applicable state and federal law, applicable statutes of limitations, the facts available to the Ad Hoc Noteholders' Group through discovery, and applicable requirements to pursue a motion for derivative standing for certain causes of action.

On October 18, 2023, in connection with their investigation, the Ad Hoc Noteholders' Group served thirty requests for production of documents on the Debtors pursuant to Bankruptcy Rule 2004 (the "Noteholder 2004 Requests"). The Debtors met and conferred with the Ad Hoc Noteholders' Group on October 20, 2023, and agreed to produce all nonprivileged documents and communications that had already been (or would in the future be) produced to the Creditors'

---

[35] *Transcript of November 6, 2023 Hearing in In re Amyris, Inc.* (the "Nov. 6 Hr'g Tr.") at 5:9–23.

Committee in response to the Creditors' Committee 2004 Requests. In addition, the Debtors agreed to conduct a limited search of email communications responsive to one Noteholder 2004 Requests for a fourth Agreed Custodian. To streamline discovery, the Debtors encouraged the Ad Hoc Noteholders' Group to coordinate with the Creditors' Committee on any additional requested search terms.

On November 2, 2023, the Debtors agreed to run additional Agreed Search Terms at the Ad Hoc Noteholders' Group and Committee's joint request. The Ad Hoc Noteholders' Group has attended and coordinated with the Creditors' Committee with respect to their participation in each of the Depositions.

To investigate the factual basis for these claims, the Ad Hoc Noteholders' Group also reviewed materials produced in these cases pursuant to prior stakeholders' document requests and interrogatories, as well as publicly available information. Disputes over certain document requests served by the Ad Hoc Noteholders' Group required the Ad Hoc Noteholders' Group to serve a motion to compel discovery from the Foris Lenders pursuant to Bankruptcy Rule 2004, which the Court granted in part in November 2023. Further, in the course of its factual investigation, the Ad Hoc Noteholders' Group deposed certain officers and directors of the Debtors in November 2023. The topics covered by the Ad Hoc Noteholders' Group's investigation included, without limitation:

    i.    the management of the Company;

    ii.    the board of directors' oversight of the Debtors' management;

    iii.    financing transactions entered into, proposed, or considered by the Debtors, including without limitation prepetition financing to the Debtors provided by the Foris Lenders;

    iv.    potential prepetition strategic transactions considered or available to the Debtors, including without limitation the potential sale of consumer brands owned by the Debtors; and

    v.    statements made to investors and the public in connection with certain cost-cutting measures entered into by the Debtors.

The Ad Hoc Noteholders' Group also extensively coordinated with the Creditors' Committee to pursue discovery, analyze potential causes of action, and avoid duplication of effort. After extensive discussion with its members, its professional advisors, and the Committee, the Ad Hoc Group concluded that the settlement with the Debtors and the Foris Prepetition Secured Lenders (including the retention of certain litigation claims to be prosecuted by a litigation trust for the benefit of unsecured creditors) likely provided better value than the potential causes of action that the Ad Hoc Noteholders' Group had investigated.

### d.    Valuation

On December 7, 2023, the Court authorized the Debtors to employ Back Bay Management Corporation and its division The Michel-Shaked Group ("MSG") as an expert consultant, effective

as of October 31, 2023, regarding the valuation of the Debtors and/or certain of the Debtors' or certain affiliates of the Debtors' assets (including intellectual property). In connection with Confirmation, MSG will present its valuation of the Debtors' remaining assets after consummation of the sales of Consumer Brands Businesses. The Debtors believe that the value of their assets are insufficient to satisfy the DIP Facility Claim and Administrative Claims; accordingly, Holders of General Unsecured Claims and Convertible Notes Claims would not receive any distributions absent the transactions and settlements contemplated in the Plan. Also, as set forth in the Liquidation Analysis, after deducting the costs of liquidation and satisfying the DSM RealSweet Secured Claim, the estate would hold only between $26.1 million and $79.6 million, amounts insufficient to satisfy the $202.6 million Superpriority DIP Facility Claim.

### e.     Ad Hoc Cross-Holder Group

Counsel to the Ad Hoc Cross-Holder Group first contacted Debtors' counsel on September 7, 2023. Debtors' counsel provided a form of nondisclosure agreement to counsel to the Ad Hoc Cross-Holder Group on September 16, 2023, stating that the Debtors would enter into such agreement once the Ad Hoc Cross-Holder Group filed a Bankruptcy Rule 2019 statement or identified its members. The Debtors emphasized, however (including at the September 14, 2023 hearing[36]), that while they would provide access to the Noteholder VDR, the Ad Hoc Cross-Holder Group should engage and coordinate with the much larger Ad Hoc Noteholder Group (which has substantially similar interests), as well as with the Creditors' Committee, to avoid overtaxing estate resources.

Counsel to the Ad Hoc Cross-Holder Group returned the nondisclosure agreement to the Debtors on September 28, 2023, and it was entered into on October 1, 2023, whereupon counsel to the Ad Hoc Cross-Holder Group was given access to the Noteholder VDR.[37] **The Ad Hoc Cross-Holder Group has never sought any formal or informal discovery from the Debtors.**

### 5.     Designation of Excluded Parties

Based on the findings of the Independent Director Report and the Creditors' Committee investigation and after consultation with the Creditors' Committee, the Debtors designated John Melo and Eduardo Alvarez as Excluded Parties under the Plan, thereby preserving all Causes of Action of the Debtors and Estates against such parties and any proceeds thereof among the Creditor Trust Assets.

### 6.     Debtors' Schedules and Statement of Financial Affairs

On September 12, 2023, the Court entered its *Order (I) Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Granting Related Relief* [Docket No. 240], authorizing the Debtors to file their Schedules and Statements of Financial Affairs through September 20, 2023, or thereafter without order of the Court upon the advance

---

[36]     *Transcript of September 14, 2023 Hearing in In re Amyris, Inc.* ("Sep. 14 Hr'g Tr.") at 12:23–14:4.

[37]     After the Ad Hoc Cross-Holder Group adopted its present litigation posture, the Debtors withdrew access to the Noteholder VDR on November 1, 2023.

consent of the UST, Committee and DIP Agent.  The Debtors filed their Schedules and Statements of Financial Affairs on September 21, 2023.

## 7.    The Claims Bar Date

On September 27, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9), (II) Setting a Bar Date for the Filing of Proofs of Claim by Governmental Units, (III) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (IV) Approving the Form of and Manner for Filing Proofs of Claim, (V) Approving Notice of Bar Dates, and (VI) Granting Related Relief* [Docket No. 386] (the "Bar Date Motion"), requesting, among other relief, that the Court require proofs of claim be filed in the Debtors' cases no later than November 15, 2023.  The Bar Date Motion is scheduled to be heard by the Court on October 18, 2023.

## 8.    Rejection of Certain Leases/Contracts

On August 11 and 24, 2023, the Debtors filed omnibus motions [Docket Nos. 66 and 133] (the "Initial Omnibus Rejection Motions"), seeking authorization to reject certain various agreements (i.e., service agreements, consulting agreements, severance agreements, a brand collaboration agreement, etc.) and leases of non-residential real property for office and retail locations in various cities (e.g., Miami, New York, Tucson, Arizona) that are either unoccupied or no longer necessary to the Debtors' contemplated go-forward operations.

On September 8, 2023, the Court entered its orders [Docket Nos. 204 and 300] granting the Initial Omnibus Rejection Motions, as amended.

On September 27, 2023, the Debtors filed their third omnibus motion [Docket No. 394], seeking to reject certain agreements, such as service agreements, that they no longer require for their go-forward operations.  A hearing regarding the third omnibus rejection motion is scheduled for October 18, 2023.

## 9.    Meeting of Creditors

The initial meeting of creditors pursuant to section 341(a) of the Bankruptcy Code was conducted on September 18, 2023, and continued to October 6, 2023.

## 10.    Sales of Assets

### a.    De Minimis/Non-Operating Brands Sales

On August 24, 2023, the Debtors filed a motion [Docket No. 132] seeking authorization to establish procedures governing the sales of *de minimis* assets (i.e., non-core assets with a transaction value equal to or less than $500,000) and certain consumer brands the Debtors are no longer operating (*i.e.*, Terasana®. Eco-Fabulous™, OLIKA™, Beauty Labs, Purecane™, and Onda Beauty).  The Court granted the motion by order entered on September 8, 2023 [Docket No. 205].

On September 14, 2023, the Debtors filed the *Notice of Non-Operating Brand Sale (Onda Beauty)* [Docket No. 291], noticing the Debtors' intent to sell certain of its assets associated with the non-operating Onda Beauty brand. The Debtors conducted an auction for the Onda Beauty-related assets on October 6, 2023, and determined that the highest or otherwise best bid was made by Larissa Thompson LLC, which proposed a purchase price of $220,000 plus cure costs.

### b.    Sales of Operating Consumer Brands Assets

On September 18, 2023, the Debtors filed their motion [Docket No. 316] (the "Operating Consumer Brands Sale Procedures Motion") for an order of the Court (i) establishing bid procedures to govern the sales of assets associated with the Debtors' Operating Consumer Brands (i.e., Biossance®, JVN™, Rose Inc. ™, Pipette®, MenoLabs™, Stripes™, and 4U by Tia™);[38] (ii) authorizing the Debtors to enter into stalking horse agreements regarding the sales of Brand Assets; (iii) authorizing the Debtors to offer break-up fees in connection with the stalking horse agreements; and (iv) scheduling one or more auctions and a hearing for approval of any sales of such assets.

On October 16, 2023, the Bankruptcy Court entered the *Order (A) Approving Bid Procedures for the Sale of the Debtors' Brand Assets; (B) Approving Certain Bid Protections In Connection with the Debtors' Entry Into Any Potential Stalking Horse Agreements; (C) Scheduling the Auction and Sale Hearing; (D) Approving the Form and Manner of Notice Thereof; and (E) Granting Related Relief* [Docket No. 553] (the "Bid Procedures Order").

Pursuant to the Bid Procedures Order, the Debtors conducted an auction for the Biossance Brand Assets on November 30, 2023 via Zoom videoconference (the "Biossance Auction"). At the conclusion of the Biossance Auction, the Debtors declared THG Beauty USA LLC ("THG Beauty") as the Successful Bidder for the Biossance Brand Assets, (the "Biossance Successful Bidder") with the highest or otherwise best Bid for the purchase price of $20,000,000, as described on the record of the Auction.

Pursuant to the Bid Procedures Order, the Debtors conducted auctions on December 1, 2023 via Zoom videoconference for each of the MenoLabs Brand Assets (the "MenoLabs Auction"), the Pipette Brand Assets (the "Pipette Auction"), and the 4U Brand Assets (the "4U Auction" and, together with the MenoLabs Auction and the Pipette Auction, the "December 1 Auction"). At the conclusion of the December 1 Auction:

(a)    with respect to the MenoLabs Brand Assets, the Debtors declared Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") as the Successful Bidder for the MenoLabs Brand Assets (the "MenoLabs Successful Bidder") with the highest or otherwise best Bid for the purchase price of $3,000,000, as described on the record of the MenoLabs Auction;

(b)    with respect to the Pipette Brand Assets, the Debtors declared HRB Brands, LLC ("HRB") as the Successful Bidder for the Pipette Brand Assets (the "Pipette

---

[38] The Consumer Brands do not include any of the equity interests, assets or business with respect to Terasana®, EcoFabulous™, OLIKA™, Beauty Labs, Purecane™, and Onda Beauty.

Successful Bidder") with the highest or otherwise best Bid for the purchase price of $1,750,000, as described on the record of the Pipette Auction; and

(c)   with respect to the 4U Brand Assets, the Debtors declared Scent Theory Products, LLC ("Scent Theory") as the Successful Bidder for the 4U Brand Assets (the "4U Successful Bidder" and, together with the Biossance Successful Bidder, the MenoLabs Successful Bidder, and the Pipette Successful Bidder, the "Successful Bidders") with the highest or otherwise best Bid for the purchase price of $600,000, as described on the record of the 4U Auction.

In accordance with the terms of the Bid Procedures Order, the Debtors and the Successful Bidders will finalize and, as applicable, file, the definitive documentation to implement the Successful Bids prior to the Sale Hearing, which hearing will be conducted on December 12, 2023 at 11:00 a.m. (prevailing Eastern Time). As of the date of this Disclosure Statement, the expected Net Proceeds from the Consumer Brand Sales is $25.35 million.

The Debtors continue to speak with Interested Parties regarding the sale of the Brand Assets associated with the JVN, Stripes, and Rose, Inc. Operating Consumer Brands.

## 11.   Procedures for the Assumption, Assumption and Assignment and/or Transfer of Executory Contracts and Unexpired Leases

On September 18, 2023, the Debtors filed their motion [Docket No. 317] (the "Contract and Lease Procedures Motion") for an order of the Court establishing certain procedures relating to the assumption, assumption and assignment, or transfer of executory contracts and unexpired leases, whether in connection with a sale pursuant to the Operating Consumer Brands Sale Procedures Motion (as defined below) or this Plan, including notice of proposed cure amounts.

The Contract and Lease Procedures Motion was approved by order of the Court entered on October 13, 2023.

## 12.   DIP Financing

In order to obtain the funds necessary to effectuate the Debtors' restructuring strategy, contemporaneous with the filing of these Chapter 11 Cases, on August 10, 2023, the Debtors filed the DIP Motion [Docket No. 19]. A copy of the *Senior Secured Super Priority Debtor in Possession Loan Agreement* dated as of August 9, 2023 (the "DIP Credit Agreement") was filed with the Bankruptcy Court the same day. [Docket No. 40-1]. Pursuant to the DIP Credit Agreement, the Debtors would be entitled to borrow up to $190 million from Euagore, LLC (together with the other lenders from time to time party thereto, the "DIP Lenders"), and Euagore, LLC, as Administrative Agent (the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties"). The DIP Secured Parties are affiliates of Foris Ventures, LLC ("Foris") and affiliated entities, which are prepetition lenders.

On August 11, 2023, the Court entered an *Interim Order (I) Authorizing the Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 54] and on September 19, 2023, the

Court entered the *Second Interim Order (I) Authorizing the Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 323] (collectively, the "Interim DIP Orders"), pursuant to which the Debtors have been authorized, on an interim basis, to borrow up to $93 million under the DIP Credit Agreement.

Pursuant to the Interim DIP Orders and the DIP Credit Agreement executed by the Debtors and the DIP Lenders,[39] certain milestones were established, pursuant to which the Debtors were to utilize the first two months of these Chapter 11 Cases to engage with major constituencies in furtherance of developing a consensual plan of reorganization while continuing the process of marketing their noncore consumer brands. In the event such a deal was not able to be reached, the DIP Financing contemplates a toggle, as set forth in the below chart, whereby the Debtors would pivot to a sale of substantially all assets pursuant to section 363 of the Bankruptcy Code.

| Milestone | Proposed Timing | Proposed Outside Date |
| --- | --- | --- |
| Petition Date ("PD") | August 9, 2023 | |
| Entry of Interim DIP Order | PD + 3 business days | August 14, 2023 |
| Plan Support Deadline ("PSD") or Sale Option Event ("STE") | PD + 35 days | September 13, 2023 |
| Entry of Final DIP Order | PD + 36 days | September 14, 2023 |
| Filing of Bid Procedures Motion | STE + 3 days | September 16, 2023 |
| Plan, Disclosure Statement, and Solicitation Procedures Motion Filing Deadline | PSD + 14 days | September 27, 2023 |
| Entry of Bid Procedures Order | STE + 35 days | October 18, 2023 |
| Entry of Disclosure Statement Order | Plan Filing + 37 days | November 3, 2023 |
| Plan Voting Deadline | DS Order + 35 days | December 8, 2023 |
| Entry of Sale Approval Order | STE + 90 days | December 12, 2023 |
| Entry of Confirmation Order | Plan Filing + 82 days | December 18, 2023 |
| Sale Closing Deadline / Effective Date Deadline | December 29, 2023 | |
| DIP Maturity Date | December 31, 2023 | |

---

[39] *Senior Secured Super Priority Debtor in Possession Loan Agreement* dated as of August 9, 2023, as amended by *Amendment No. 1 to Senior Secured Super Priority Debtor in Possession Loan Agreement* dated as of September 13, 2023 (collectively, the "DIP Facility").

The Debtors filed a *Notice of Amendment No. 1 to the Senior Secured Super Priority Debtor in Possession Loan Agreement* with the Court on September 13, 2023 [Docket No. 263], *Notice of Amendment No. 2 to the Senior Secured Super Priority Debtor in Possession Loan Agreement* with the Court on September 28, 2023 [Docket No. 398], *Notice of Service Notice of Filing (I) Revised Proposed Final Order (I) Authorizing the Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief; and (II) Notice of Amendment No. 3 to the Senior Secured Super Priority Debtor in Possession Loan Agreement* with the Court on October 3, 2023 [Docket No. 443], each of the foregoing extending certain case milestones.

On October 12, 2023, the Debtors and the DIP Secured Parties entered into that certain Fourth Amendment to the Senior Secured Super Priority Debtor in Possession Loan Agreement to further amend certain case milestones as follows:

- Deadline for the Court to enter the Final DIP Order:  October 18, 2023

- Deadline to execute Plan Support Agreement and Plan, Disclosure Statement, and Solicitation Procedures Motion Filing Deadline:  October 12, 2023

- Deadline for Entry of Disclosure Statement Order:  November 21, 2023

- Deadline for submission of votes to accept or reject the Chapter 11 Plan:  January 10, 2024

- Deadline for Entry of Confirmation Order:  January 17, 2024

- Deadline for Plan Effective Date:  January 31, 2024

A continued hearing to consider final approval of the DIP Credit Agreement was conducted on October 4, 2023.  A purported secured creditor, Lavvan, Inc., objected to entry of the proposed form of final order, which seeks a determination by the Court that the DIP loans and liens will be senior and priming liens to any obligations that may be owed to Lavvan.  On October 11, 2023, the Court issued a ruling overruling Lavvan's objection and finding in favor of the Debtors and the DIP Secured Parties.  On October 16, 2023, the Court entered a final order approving the DIP Credit Agreement [Docket No. 558].

On October 25, 2023, Lavvan filed a *Challenge-Period Adversary Complaint to Challenge Enforceability, Priority, and Extent of Security Interests and Liens, and for Other Relief* [Docket No. 620] (the "Lavvan Complaint") against Foris Ventures, LLC, "solely to assert a timely challenge to th[e Final DIP] Order," thereby commencing an adversary proceeding bearing Adversary No. 23-50751 (TMH).  The Lavvan Complaint seeks declaratory relief as to one of the Debtors' outstanding obligations to Foris and the subordination of Lavvan's liens to those of Foris, as well as modification of the Final DIP Order inconsistent with the relief Lavvan is seeking.[40]

---

[40] Lavvan Complaint fn. 2 at 1.

On October 20, 2023, Lavvan filed a *Notice of Appeal* [Docket No. 634], thereby appealing the Final DIP Order to the United States District Court for the District of Delaware.

As of the date of this Disclosure Statement, the Debtors and Foris are discussing the parameters of a budget to provide the Debtors with DIP Financing sufficient to sustain their operations through the Effective Date.

On December 12, 2023, the Debtors and the DIP Lenders have entered into the Fifth Amendment to the Senior Secured Super Priority Debtor in Possession Loan Agreement, to further extend certain milestones and waive certain defaults and provide the "Approved Budget" for the Debtors through the Effective Date.

### 13.    Extension of Exclusivity Periods

On December 7, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 853] (the "Exclusivity Extension Motion"), seeking extensions of the periods during which the Debtors have the exclusive rights to file and solicit acceptances of a plan, by 90 and 91 days, through March 6 and May 6, 2024, respectively.  The hearing regarding the Exclusivity Extension Motion is scheduled for January 8, 2024.

### 14.    Lavvan Claims

On November 15, 2023, Lavvan filed Claim No. 663 (amending No. 639) against Amyris as a secured claim in an unliquidated amount (the "Lavvan Arbitration Proof of Claim").  An addendum to the Arbitration Proof of Claim describes the underlying claims as: "Claims under the Research, Collaboration and License Agreement, dated as of March 18, 2019 as asserted in the International Chamber of Commerce International Court of Arbitration, Case No. 25598."

Also on November 15, 2023, Lavvan filed Claim No. 666 (amending No. 641) against Amyris as a secured claim in an unliquidated amount (the "Lavvan SDNY Proof of Claim" and, together with the Lavvan Arbitration Proof of Claim, the "Lavvan Claims").  An addendum to the SDNY Proof of Claim describes the underlying claims as: "Intellectual property claims under the Research, Collaboration and License Agreement dated as of March 18, 2019 as asserted in the United States District Court for the Southern District of New York, Case No. 20-07386-JPO."  No evidence was submitted in support of either claim.

On December 7, 2023, the Debtors filed a *Motion to Estimate Lavvan Intellectual Property Claims* [Docket No. 838] (the "Lavvan Estimation Motion"), pursuant to which the Debtors ask the Court to estimate the amount of the claims asserted in the Lavvan SDNY Proof of Claim at zero.

That same day, the Debtors filed the *Debtors' Objection to Claim Nos. 663 and 666 Filed by Lavvan, Inc.* [Docket No. 839] (the "Lavvan Claim Objection"), seeking to disallow the amounts asserted in the Lavvan Arbitration Proof of Claim to the extent they exceed $820,458.67, the amount of certain arbitration fees awarded to Lavvan by the ICC tribunal in the Lavvan

Arbitration.  Through the Lavvan Claim Objection, the Debtors also object to the claims asserted in the Lavvan SDNY Proof of Claim on the grounds set forth in the Lavvan Estimation Motion.

The Lavvan Estimation Motion and Lavvan Claim Objection are scheduled to be heard by the Court on January 8, 2024.

In the event that Lavvan is determined to have an Allowed Secured Claim, it is the Debtors' position that the maximum amount of such Claim would be $820,458.67 and, by operation of the Lavvan Documents which include a waiver of marshalling and payment and lien subordination, any such Allowed Secured Claim (and any Allowed Unsecured Claim) is subordinated and would only be entitled to potential distribution paid if the Reorganized Debtor has a liquidity event that generates proceeds in an amount sufficient to pay (a) the DIP Facility Claims, (b) the Foris 2018 Loan, (c) the Exit First Lien Facility, and (d) any portion of  the Foris Prepetition Secured Claims that are not converted to New Common Stock under the Plan.[41]  The Debtors cannot currently predict, with certainty, when items (a) through (d) will be paid.  However, the Debtors' financial projections through 2028 do not provide for any such payments and the Plan provides that the Foris 2018 Loan will not be repaid for 10 years.

Lavvan disputes its treatment under the Plan, contends that such treatment is improper  and has indicated that it intends to oppose the Plan.  Both Lavvan and the Debtors reserve all rights with respect thereto.

## 15.    Plan Negotiations

Since the Petition Date, the Debtors participated in arms'-length negotiations with their principal stakeholders in order to develop a structure and path to a successful reorganization.  To that end, the parties formulated the originally-filed Plan, which constituted a settlement by and among Amyris and certain related Company Parties, Consenting Foris Prepetition Secured Lenders, and DIP Secured Parties.  The original Plan was opposed informally by the Creditors' Committee and the Ad Hoc Group.

However, since the filing of the original Plan, the Debtors have cooperated with the Creditors' Committee's investigation and entered into extensive, good-faith negotiations with the Creditors' Committee and Ad Hoc Group in the hope of achieving a consensual plan that would have the support of other stakeholders.  This Plan represents the successful result of those negotiations.

## 3.    SUMMARY OF THE PLAN

### A.    General

The Company has turned to chapter 11 to implement an operational and balance-sheet restructuring and to reorganize its business operations to focus on its core competencies of research and development  and  the  proven  capability  to  commercialize  and  manufacture  sustainable

---

[41] Lavvan disputes its treatment under the Plan and has indicated that it intends to oppose Confirmation of the Plan. Both Lavvan and the Debtors reserve all rights with respect thereto.

ingredients.  Amyris is using the chapter 11 process to reorganize around its Lab-to-Market™ platform with its in-house capability to cost-effectively manufacture ingredients at an industrial scale, which necessitates the renegotiation of certain of the Company's existing supply agreements.

The Plan restructures the Debtors' balance sheet and operations by facilitating Amyris's exit from and sale of its Consumer Brands Businesses and disposes of the proceeds of sale through a "waterfall" of distributions to certain stakeholders through the Plan and satisfying certain claims of other creditors through payments on and after the Effective Date.  The Plan gives the DIP Lender and holders of the Foris Prepetition Secured Claims discretion to satisfy such claims through an allocation of certain net sale proceeds, a rollup into the Exit Facility and the new equity Interests of Reorganized Amyris.

## 1.    Classification and Treatment of Claims and Interests

### a.    Administrative Claims

General Provisions.  Except with respect to the Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code, and except to the extent that a Holder of an Allowed Administrative Claim and the Debtor(s) against which such Allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, or such Holder has been paid by any Debtor on account of such Allowed Administrative Claim prior to the Effective Date, each Holder of such an Allowed Administrative Claim will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (a) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

Except as otherwise provided below in the next paragraph, Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims must do so by the Administrative Claims Bar Date.  Objections to such requests must be Filed and served on the requesting party and the Debtors (if the Debtors are not the objecting party) by the Administrative Claims Objection Bar Date.  Holders of such Claims who do not File and serve such requests by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or the Reorganized Debtors, and such Administrative Claims shall be deemed compromised, settled, and released as of the Effective Date.  After notice and a hearing in accordance with the procedures established by

the Bankruptcy Code, the Bankruptcy Rules, and any prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order that becomes a Final Order of the Bankruptcy Court.

**HOLDERS OF ADMINISTRATIVE CLAIMS FOR UNPAID INVOICES THAT ARISE IN THE ORDINARY COURSE OF THE DEBTORS' BUSINESS AND WHICH ARE NOT DUE AND PAYABLE ON OR BEFORE THE EFFECTIVE DATE SHALL BE PAID IN THE ORDINARY COURSE OF BUSINESS IN ACCORDANCE WITH THE TERMS THEREOF AND NEED NOT FILE ADMINISTRATIVE CLAIMS.**

### b.  DIP Facility Claims

The DIP Facility Claims shall be deemed to be Allowed Claims in the full amount outstanding under the DIP Facility Loan Agreement as of the Effective Date (including any unpaid accrued interest and unpaid fees, expenses, and other obligations under the DIP Facility Loan Agreement as of the Effective Date).  On the Effective Date, in full and complete satisfaction of the DIP Facility Claims (other than the DIP Facility Claims rolled up, converted, exchanged, refinanced or amended and restated, into the Exit First Lien Facility or New Common Stock), the DIP Lender will receive, at the option of the DIP Lender, in its sole discretion, the Net Proceeds remaining after funding the payments required under the Plan (i) to satisfy Allowed Administrative Claims, Allowed Professional Fees, Allowed Priority Tax Claims and U.S. Trustee Fees (subject to the Plan Effective Date funding), (ii) on account of the treatment of Classes 1, 2, 7 and 8, (iii) to provide the funding of the Estate Claims Settlement Cash Consideration, and (iv) the funding of the Third-Party Release Settlement Amounts, which Net Proceeds shall be rolled up, converted, exchanged, refinanced or amended and restated, into: (x) the Exit First Lien Facility and/or (y) 100% of New Common Stock. The DIP Lender may allocate ownership of the New Common Stock among its Affiliates in its sole discretion.  Except as otherwise expressly provided in the DIP Facility Loan Agreement or the DIP Orders or the Exit First Lien Facility, upon the indefeasible payment or satisfaction in full of all Allowed DIP Facility Claims, all commitments under the DIP Facility Loan Agreement shall terminate and all Liens and security interests granted to secure the DIP Facility Claims shall be automatically terminated and of no further force and effect, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

Notwithstanding anything to the contrary in this Plan or the Confirmation Order, the DIP Facility and the DIP Facility Documents shall continue in full force and effect after the Effective Date with respect to (x) any DIP Facility Claims rolled up, converted, exchanged, refinanced, or amended and restated into the Exit First Lien Facility and (y) any contingent or unsatisfied obligations thereunder, as applicable, including, but not limited to, those provisions relating to the rights of the DIP Agent and the DIP Lenders to expense reimbursement, indemnification, and any other similar obligations of the Debtors to the DIP Agent and the DIP Lenders (which rights shall be fully enforceable against the Reorganized Debtors) and any provisions thereof that may survive termination or maturity of the DIP Facility in accordance with the terms thereof.

### c.  Professional Fee Claims

(i)      Final Fee Applications and Payment of Professional Fee
         Claims

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than forty-five days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Court, including the Interim Compensation Order.   The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows, including from the Professional Fee Escrow Account, as soon as reasonably practicable after such Professional Fee Claims are Allowed.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan, subject, however, to the capped amounts set forth in the Plan defined terms Ad Hoc Group Restructuring Expenses and Creditors' Committee Professionals Expenses.

(ii)     Professional Fee Escrow Account

No later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders and any invoices for fees and expenses incurred after the Effective Date in connection with the final fee applications.  Such funds shall not be considered property of the Debtors' Estates. The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court.

(iii)    Professional Fee Amount

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than three days before the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or the Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional; *provided, however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional. The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account; *provided, further*, that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such

estimates; *provided, however*, (x) the amount funded in the Professional Fee Escrow Account on account of the Professional Fee Amount shall not exceed the amount in the Approved Budget for Professional Fees; and (y) shall not exceed the capped amounts set forth in the Plan-defined terms Ad Hoc Group Restructuring Expenses and Convertible Notes Trustee Fees and Expenses.

### d.    Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### e.    Payment of Statutory Fees and Reporting to the U.S. Trustee

All fees due and payable pursuant to 28 U.S.C. § 1930(a) shall be paid by the Debtors, the Reorganized Debtors, or the Disbursing Agent (on behalf of the Reorganized Debtors), as applicable, for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first. All monthly reports shall be filed, and all fees due and payable pursuant to section 1930(a) of title 28 of the United States Code, shall be paid by the Debtors or the Reorganized Debtors (or the Distribution Agent on behalf of the Reorganized Debtors), as applicable, on the Effective Date. Following the Effective Date, the Reorganized Debtors (or the Distribution Agent on behalf of the Reorganized Debtors) shall (a) pay such fees as such fees are assessed and come due for each quarter (including any fraction thereof) and (b) File quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay such quarterly fees to the U.S. Trustee and to file quarterly reports until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

### f.    Ad Hoc Group Restructuring Expenses

If the Ad Hoc Group Acceptance Event has occurred and is continuing, the Ad Hoc Group Restructuring Expenses payable by the Debtors shall constitute Allowed Administrative Claims and shall be paid in full in Cash pursuant to (and subject to) the terms and conditions of the Ad Hoc Group Fee Reimbursement Letter, without the need to file a proof of such Claim and without further order of the Court. The fees and expenses of the Ad Hoc Group payable pursuant to the Ad Hoc Group Fee Reimbursement Letter shall be a cap on the fees and expenses of the Ad Hoc Group Professionals paid by the Debtors (excluding the fees and expenses paid by the Debtors to the Ad Hoc Group Professionals prior to the Effective Date). For the avoidance of doubt, the Ad Hoc Group Restructuring Expenses shall not, in the aggregate amount, exceed $1,700,000.00.

### 2.    Classification and Treatment of Claims and Interests

### a.    Classification of Claims and Interests

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest, or any portion thereof, is classified in a particular Class

only to the extent that any portion of such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent otherwise provided by Law and except to the extent that any portion of the Claim or Interest fits within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors, except as expressly set forth herein.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Foris Prepetition Secured Claims | Impaired | Entitled to Vote |
| Class 4 | DSM RealSweet Secured Claims | Impaired | Entitled to Vote |
| Class 5 | DSM Other Secured Claims | Impaired | Entitled to Vote |
| Class 6 | Lavvan Secured Claim | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 7 | Convertible Note Claims | Impaired | Entitled to Vote |
| Class 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 9 | DSM Contract Claims | Impaired | Entitled to Vote |
| Class 10 | Givaudan Contract Claims | Impaired | Entitled to Vote |
| Class 11 | Intercompany Claims | Impaired | Not Entitled to Vote (Consented to Treatment) |
| Class 12 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 13 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 14 | Amyris Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

b.    **Treatment of Claims and Interests**

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, as applicable, except to the extent different treatment is agreed to in writing by the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date (or, if payment is not then due, in accordance with such Claim's or Interest's terms in the ordinary course of business) or as soon as reasonably practicable thereafter.

(i)      Class 1 – Other Secured Claims

*Classification*:  Class 1 consists of all Allowed Other Secured Claims.

*Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, as determined by the Debtors or the Reorganized Debtors, as applicable, in full and final satisfaction of such Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or the Reorganized Debtors, as applicable:

- payment in full in Cash of its Allowed Other Secured Claim;

- the collateral securing its Allowed Other Secured Claim;

- Reinstatement of its Allowed Other Secured Claim; or

- such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

*Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

(ii)      Class 2 – Other Priority Claims

*Classification*:  Class 2 consists of all Allowed Other Priority Claims.

*Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, as determined by the Debtors or the Reorganized Debtors, as applicable, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor or the Reorganized Debtors, as applicable:

- payment in full in Cash of its Allowed Other Priority Claim; or

- such other treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code.

*Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

(iii)    Class 3 – Foris Prepetition Secured Claims

*Classification*:  Class 3 consists of all Allowed Foris Prepetition Secured Claims.

*Allowance*:  The Foris Prepetition Secured Claims shall be deemed Allowed in the aggregate principal amount of at least $296,000,000 plus at least $16,100,000 of accrued and unpaid interest as of the Petition Date, for a total of at least $312,100,000 as of the Petition Date, plus any other premiums, fees, costs, or other amounts due and owing pursuant to the Foris Prepetition Secured Claims Documents.

*Treatment*:  On the Effective Date, Holders of the Foris Prepetition Secured Claims will receive, at the option of the Foris Prepetition Secured Lenders, in each of their sole discretion, the Net Proceeds remaining after funding the payments required under the Plan (i) to satisfy Allowed Administrative Claims, Allowed Professional Fees, Allowed Priority Tax Claims and U.S. Trustee Fees (subject to Plan Effective Date Funding), (ii) on account of the treatment of Classes 1, 2, 7 and 8, (iii) the funding of the Estate Claims Settlement Cash Consideration, and (iv) the funding of the Third-Party Release Settlement Amounts, which Net Proceeds shall be rolled up, converted, exchanged, refinanced or amended and restated, into: (x) the Exit First Lien Facility and/or (y) 100% of New Common Stock of Reorganized Amyris.

*Voting*:  Class 3 is Impaired under the Plan.  Holders of Allowed Foris Prepetition Secured Claims are entitled to vote to accept or reject the Plan.

*Other*:  Notwithstanding anything to the contrary in this Plan or the Confirmation Order, the Foris Prepetition Secured Claims shall continue in full force and effect after the Effective Date with respect to (x) any Foris Prepetition Secured Claims rolled up, converted, exchanged, refinanced, or amended and restated into the Exit First Lien Facility, or as may be assumed by a buyer in connection with the Other Assets Sale, and (y) any contingent or unsatisfied obligations thereunder, as applicable, including, but not limited to, those provisions relating to the rights of the Foris Prepetition Secured Lenders to expense reimbursement, indemnification, and any other similar obligations of the Debtors to the Foris Prepetition Secured Lenders (which rights shall be fully enforceable against the Reorganized Debtors or the buyer in connection with the Other Assets Sale, as applicable) and any provisions thereof that may survive termination or maturity of the Foris Prepetition Secured Claims.

(iv)    Class 4 – DSM RealSweet Secured Claim

*Classification*:  Class 4 consists of all Allowed DSM RealSweet Secured Claim.

*Treatment*:  On the Effective Date, (i) if DSM votes to accept the Plan, in full and complete satisfaction of the DSM RealSweet Secured Claim, DSM will receive on account of the Allowed DSM RealSweet Secured Claim a cash payment on June 30, 2026 in the amount equal to the principal and accrued and unpaid non-default interest owing as of the Effective Date on account of the DSM RealSweet Secured Claim (with interest accrued thereafter at six percent (6% simple

interest) until the Allowed DSM RealSweet Secured Claim is paid), which obligation will be documented by the DSM Plan Promissory Note issued by Reorganized Amyris and secured by the DSM Plan Promissory Note Pledge Agreement; and (ii) if DSM votes to reject the Plan, DSM will receive in full and complete satisfaction of its Allowed DSM RealSweet Secured Claim, payment in cash on the Effective Date, or as soon as practical thereafter, of the amount of the Allowed RealSweet Secured Claim.

*Voting*:  Class 4 is Impaired under the Plan.  The Holder of the Allowed DSM RealSweet Secured Claim is entitled to vote to accept or reject the Plan.

(v)      Class 5– DSM Other Secured Claims

*Classification*:  Class 5 consists of all Allowed DSM Other Secured Claims.

*Treatment*:  On the Effective Date, in full and complete satisfaction of the DSM Other Secured Claims, DSM's obligation to make earn-out payments to the Debtors under the DSM Agreements will be offset against the DSM Other Secured Claims, and DSM will neither receive nor retain any other property under the Plan on account of the DSM Other Secured Claims.

*Voting*:  Class 5 is Impaired under the Plan.  The Holder of the Allowed DSM Other Secured Claims is entitled to vote to accept or reject the Plan.

(vi)      Class 6– Lavvan Secured Claim

*Classification*:  Class 6 consists of the Lavvan Secured Claim.

*Treatment*:  On the Effective Date,  in full and complete satisfaction of the Lavvan Secured Claim, Lavvan will retain whatever Lien it may have on the Debtors' assets solely to the extent it secures an Allowed Lavvan Secured Claim, and after such time as the Foris Prepetition Secured Lenders and/or the DIP Lender, as applicable, the indefeasible payment in cash in full of the obligations owing under the (i) Foris 2018 Loan, (ii) the DIP Facility Claims, and (iii) such other Foris Prepetition Secured Claims, or other Foris claims, as are determined by the Bankruptcy Court are required under the Lavvan Documents to be indefeasibly paid in cash in full prior to the Allowed Lavvan Secured Claim being paid, thereafter Lavvan will receive payment in cash in full of the Allowed Lavvan Secured Claim, without interest, fees, costs, penalty or premium. The Allowed Lavvan Secured Claim may be prepaid at any time without interest, fees, costs, penalty or premium, The Lavvan Secured Claim shall remain subject to the DIP Orders and the Subordination Agreement between Foris and Lavvan dated May 2, 2019.

If the Allowed Lavvan Claim exceeds the Allowed Lavvan Secured Claim, the difference shall be an Allowed General Unsecured Claim; provided, however, any distribution to be paid to Lavvan on account of such Allowed General Unsecured Claim shall be paid to: (i) the DIP Lender on account of the DIP Facility Claims that have not then been indefeasibly paid in cash in full; (ii) Foris on account of the Foris 2018 Loan Claims that have not then been indefeasibly paid in cash in full; and (iii) such other Foris Prepetition Secured Claims, or other Foris claims, as determined by the Bankruptcy Court are required under the Lavvan Documents to be indefeasibly paid in cash in full prior to the Lavvan Claims being paid that have not then been indefeasibly paid in cash in full, in each cash at the option, and in the sole and absolute discretion, of the DIP Lender,

Foris, and the Foris Prepetition Secured Lenders, respectively. The Lavvan General Unsecured Claim shall remain subject to the DIP Orders and the Subordination Agreement between Foris and Lavvan dated May 2, 2019. At such time as the Allowed Lavvan Secured Claim is satisfied the liens securing the Allowed Lavvan Secured Claim shall automatically terminate and be of no further force and effect and Reorganized Amyris may take all actions necessary to effectuate and implement the same.

*Voting*: Class 6 is Unimpaired under the Plan. The Holder of the Lavvan Secured Claim is deemed to accept the Plan. Such Holder is not entitled to vote to accept or reject the Plan. The Debtors will provide the Holders of the Lavvan Secured Claim with a provisional ballot to vote in this Class and the Court can determine, after briefing, whether the proposed treatment constitutes impairment.

### (vii)    Class 7– Convertible Note Claims

*Classification*: Class 7 consists of all Convertible Note Claims.

*Treatment*: On the Effective Date (or as soon as practicable thereafter), in full and complete satisfaction of the Convertible Note Claims, whether or not Class 7 votes to accept the Plan, each Holder of an Allowed Convertible Note Claim will receive from the Creditor Trust on account of such Allowed Convertible Note Claim, a Pro Rata distribution of the Creditor Trust Interests distributable to Class 7 based upon the Allowed Claims in Class 7 and Class 8. On the Effective Date, the Allowed Convertible Note Claims shall be discharged without further notice to, approval of, or action by any Person or Entity.

*Voting*: Class 7 is Impaired under the Plan. The Holders of the Allowed Convertible Note Claims are entitled to vote to accept or reject the Plan.

*Other:* For the avoidance of doubt, and separate and apart from the treatment of Class 7, Holders of Allowed Class 7 Claims who are also Releasing Parties shall also receive, in exchange for their granting Third-Party Releases, pro rata distributions of the applicable Third-Party Release Settlement Amounts as set forth in Article I.A.198. of the Plan.

### (viii)    Class 8 – General Unsecured Claims

*Classification*: Class 8 consists of all Allowed General Unsecured Claims.

*Treatment*: Holders of Allowed General Unsecured Claims will receive from the Creditor Trust on account of the Allowed General Unsecured Claims in full and complete satisfaction of such Claims, on the Effective Date, (or as soon as practicable thereafter), whether or not Class 8 votes to accept or reject the Plan, a Pro Rata distribution of the Creditor Trust Interests distributable to Class 8 based upon the Allowed Claims in Class 7 and Class 8. On the Effective Date, Allowed General Unsecured Claims shall be discharged without further notice to, approval of, or action by any Person or Entity.

*Voting*: Class 8 is Impaired under the Plan. The Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

*Other:*  For the avoidance of doubt, and separate and apart from the treatment of Class 8, Holders of Allowed Class 8 Claims who are also Releasing Parties shall also receive, in exchange for their granting Third-Party Releases, pro rata distributions of the applicable Third-Party Release Settlement Amounts as set forth in Article I.A.198. of the Plan.

(ix)     Class 9 – DSM Contract Claims

*Classification*:  Class 9 consists of all Allowed DSM Contract Claims.

*Treatment*:  On the Effective Date, (x) ***if DSM votes to accept the Plan***, the DSM Contracts shall be modified as set forth in the Amended DSM Contracts and the DSM Contract Claims shall be allowed in the amount of $0 and DSM shall neither receive nor retain any property under the Plan on account of the DSM Contract Claims except as provided for in the Amended DSM Contracts; or (y) ***if DSM votes to reject the Plan***, the DSM Contracts shall be rejected and any Allowed DSM Contract Claims arising from such rejection shall be treated as a General Unsecured Claim for purposes of distributions under the Plan..

*Voting*:  Class 9 is Impaired under the Plan.  The Holder of the Allowed DSM Contract Claims is entitled to vote to accept or reject the Plan.

(x)     Class 10– Givaudan Contract Claims

*Classification*:  Class 10 consists of all Allowed Givaudan Contract Claims.

*Treatment*:  On the Effective Date, (x) ***if Givaudan votes to accept the Plan***, the Givaudan Contracts shall be modified as set forth in the Amended Givaudan Contract and the Givaudan Contract Claims shall be allowed in the amount of $0 and Givaudan shall neither receive nor retain any property under the Plan on account of the Givaudan Contract Claims except as otherwise provided in the Amended Givaudan Contract; or (y) ***if Givaudan votes to reject the Plan***, the Givaudan Contracts shall be rejected and any Allowed Givaudan Contract Claims arising from such rejection shall be treated as a General Unsecured Claim for purposes of distribution under the Plan and shall receive the treatment provided for General Unsecured Claims.

*Voting*:  Class 10 is Impaired under the Plan.  The Holder of the Allowed Givaudan Contract Claims is entitled to vote to accept or reject the Plan.

(xi)     Class 11 – Intercompany Claims

*Classification*:  Class 11 consists of all Allowed Intercompany Claims.

*Treatment*:  On the Effective Date, such Claims shall be, at the option of the Debtors or the Reorganized Debtors, either:

(i)  Reinstated;

(ii) adjusted, converted to equity, otherwise set off, settled, distributed, or contributed; or

(iii) canceled, released, or discharged without any distribution on account of such Claims.

The Plan and the distributions contemplated thereby constitute a global settlement of any and all Intercompany Claims and Causes of Action by and between any of the Debtors and/or wholly-owned Affiliates of a Debtor that may exist as of the Effective Date. The Plan shall be considered a settlement of the Intercompany Claims pursuant to Bankruptcy Rule 9019.

*Voting*: Class 11 is Impaired under the Plan, but the members thereof (the Debtors, proponents of the Plan, and wholly-owned Affiliates thereof) have agreed to the treatment under the Plan.

(xii)    Class 12 – Section 510(b) Claims

*Classification*: Class 12 consists of all Allowed Section 510(b) Claims.

*Allowance*: Notwithstanding anything to the contrary herein, a Section 510(b) Claim may only become Allowed by Final Order of the Bankruptcy Court.

*Treatment*: In full and final satisfaction of its Allowed Section 510(b) Claim, on the Effective Date, each Holder of an Allowed Section 510(b) Claim will neither receive nor retain any property under the Plan.

*Voting*: Class 12 is Impaired under the Plan. Holders of Allowed Section 510(b) Claims are deemed to reject the Plan.

(xiii)    Class 13 – Intercompany Interests

*Classification*: Class 13 consists of all Allowed Intercompany Interests.

*Treatment*: All Interests of the other Debtors (other than Amyris) shall remain issued and outstanding; except to the extent a Debtor other than Amyris is dissolved, liquidated and wound down under the Plan, in which case, the Interests of such Debtor shall be canceled.

*Voting*: Class 13 is Unimpaired under the Plan. Holders of Intercompany Interests are deemed to accept the Plan.   Such Holders are not entitled to vote to accept or reject the Plan.

(xiv)    Class 14 – Amyris Equity Interests

*Classification*: Class 14 consists of all Amyris Equity Interests.

*Treatment*: The Amyris Equity Interests shall be extinguished, and Holders of such Equity Interests will not receive any distribution on account of such Equity Interests.

*Voting*: Class 14 is Impaired under the Plan. Holders of Amyris Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

### 3.    Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan or the Plan Supplement, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights regarding any Unimpaired Claim, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

### 4.    Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### 5.    Voting Classes, Presumed Acceptance by Non-Voting Classes

If a Class contains Claims or Interests eligible to vote on the Plan and no Holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Holders of such Claims or Interests in such Class shall be deemed to have accepted the Plan.

### 6.    Intercompany Interests

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the prepetition corporate structure for the ultimate benefit of the Holders of New Common Stock, and in exchange for the Debtors' and the Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.  For the avoidance of doubt, to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests immediately prior to the Effective Date.

### 7.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article XI of the Plan to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests or reclassifying Claims to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

### 8.    Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

9.     **Subordinated Claims**

The classification and treatment of Claims under the Plan shall determine the respective contractual, legal, and equitable subordination rights of such Claims, and except to the extent the Plan provides otherwise, any such other rights shall be settled, compromised, and released pursuant to the Plan.  The Lavvan Secured Claim and the Lavvan General Unsecured Claim shall remain subject to the DIP Orders and the Subordination Agreement between Foris and Lavvan dated May 2, 2019.

B.     <u>**Means for Implementation of the Plan**</u>

1.     **General Settlement of Claims and Interests**

As discussed in further detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, Direct Claims and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, Direct Claims and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, within the range of reasonableness and in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and holders of Direct Claims.  Subject to Article VII of the Plan all distributions made to Holders of Allowed Claims and Allowed Interests, as applicable, in any Class are intended to be, and shall be, final.

Certain claims and Causes of Action may exist between one or more of the Debtors and Affiliates that are not wholly-owned by a Debtor (in either or both directions), which claims and Causes of Action (other than any such claims and Causes of Action that are released pursuant to Article IX of the Plan) will be deemed waived for purposes of receiving any Distributions under the Plan, and such Claims that are canceled, released or discharged as determined by the Debtors shall be canceled, released and discharged as to Reorganized Amyris and its Affiliates.  The Plan shall be deemed a motion to approve the good faith compromise and settlement of such claims and Causes of Action pursuant to Bankruptcy Rule 9019.

2.     **Estate Claims Settlement**

In accordance with the Plan Support Agreement, the Plan provides for the Estate Claims Settlement to be approved by the Bankruptcy Court on the Confirmation Date pursuant to Bankruptcy Rule 9019, and, if approved by the Bankruptcy Court, shall be incorporated into the Confirmation Order.

**Each of the Debtors, on its own behalf and as a representative of its Estates, to the fullest extent permitted under applicable law, shall, and shall be deemed to, completely and**

forever release, waive, void and extinguish unconditionally, as against each and all of the Released Parties, any and all Claims, Estate Causes of Action, interests, obligations, suits, judgments, damages, debts, rights, remedies, set offs, and Liabilities of any nature whatsoever, whether liquidated or Unliquidated, fixed or Contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, tort, contract, or otherwise, that are or may be based in whole or part on any act, omission, transaction, event, occurrence, or other circumstance, whether direct or derivative, taking place or existing on or prior to the Effective Date (including prior to the Petition Date) arising from, in connection with, or related to, directly or indirectly, in any manner whatsoever, the Debtors or their operations, assets, liabilities, financings, the Estates, or the Chapter 11 Cases, that may be asserted by or on behalf of such Debtor or its Estate, against any of the Released Parties; *provided*, *however*, that nothing in this section shall operate as a release, waiver, discharge or impairment of any Estate Causes of Action transferred to the Creditor Trust, which are preserved notwithstanding anything to the contrary herein (the "Debtors' Release").

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (a) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions; (b) the rights of any Holder of Allowed Claims to receive distributions under the Plan; (c) any Claims for indemnification that are expressly assumed by the Reorganized Debtors pursuant to the Plan or any document, instrument, or agreement executed to implement the Plan or the Restructuring Transactions; or (d) any obligations arising under business or commercial agreements or arrangements among the Released Parties and any non-Debtor Entity.

The Confirmation Order shall reflect the Bankruptcy Court's approval of the Estate Claims Settlement, pursuant to Bankruptcy Rule 9019, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtors' Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the claims or Causes of Action released by the Debtors' Release; (iii) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Estates asserting any claim or Cause of Action released by the Debtor release against any of the Released Parties.

As consideration for the releases, the DIP Lender and the Foris Prepetition Secured Lenders have agreed in consideration of the Estate Claims Settlement to allocate Net Proceeds, which would otherwise be distributed to them, to fund the payments required under the Plan as follows: (i) to satisfy Allowed Administrative Claims, Allowed Professional Fees, and Allowed Priority Tax Claims, (ii) U.S. Trustee Fees, (iii) on account of the treatment of Classes 1, 2, 7 and 8, (iv) the Ad Hoc Group Restructuring Expenses, and (v) to provide the funding of the Estate Claims Settlement Consideration.

### 3. Third-Party Release Settlement

As set forth herein and in Article IX of the Plan, the Releasing Parties are subject to the Third-Party Release (either non-consensually or consensually) as provided for under the Plan. As consideration for the Third-Party Release, the DIP Lender and the Foris Prepetition Secured Lenders are voluntarily agreeing in connection with the Third-Party Release Settlement to allocate Net Proceeds and assets of the Estates that would otherwise be paid to them to fund the Third-Party Release Settlement Amounts as provided for under Articles IC.A.3. and IX.D of the Plan.

Upon the Effective Date, the Third-Party Release Settlement Amounts that are allocated to holders of Allowed Unsecured Claims, will be administered by the Plan Administrator to fund distributions in accordance with the Plan, after payment of all direct out of pocket administrative, personnel, legal costs and expenses incurred after the Effective Date in making distributions provided for under the Plan. The mechanics for establishing, implementing and administering the Third-Party Release Settlement Amounts that are allocated to holders of Allowed Unsecured Claims will be set forth in the Plan Supplement.

Upon the Effective Date, the Third-Party Release Settlement Amounts that are allocated to holders of Amyris Equity Interests will be administered by the Disbursing Agent, as selected by the Debtors, to fund distributions in accordance with the Plan, after payment of all direct out of pocket administrative, personnel, legal costs and expenses incurred after the Effective Date in making distributions provided for under the Plan. The mechanics for establishing, implementing and administering the Third-Party Release Settlement Amounts that are allocated to holders of Amyris Equity Interests will be set forth in the Plan Supplement.

The distributions to be made under the Plan to holders of Direct Claims on account of the Third-Party Release Settlement shall be the sole source of recovery for any and all such Direct Claims. For the avoidance of doubt, holders of Direct Claims are not entitled to receive distributions or other payment of funds from the Creditor Trust on behalf of, related to, or with respect to, such Direct Claims.

If the Third-Party Releases are not approved by the Bankruptcy Court, each holder of a Direct Claim may voluntarily elect to receive its portion of the Third-Party Release Settlement Amounts to which it is entitled by electing to grant the Third-Party Releases, through the following methods: (x) for (i) holders of Claims who are entitled to submit a ballot to vote on the Plan and vote to accept the Plan, (ii) holders of Claims who are entitled to submit a ballot to vote on the Plan and (a) vote to reject the Plan or (b) abstain from voting on the Plan and, in either case, do not elect to exercise their right to opt out of granting the Third-Party Releases, and (y) for holders of Claims and Interests who are deemed to accept or reject the Plan and are provided with a notice of non-voting status providing them with the right to opt out of granting the Third-Party Releases and do not elect to exercise such right; *provided*, that, as applicable, the Direct Claims Threshold is satisfied.

The Plan Administrator, Disbursing Agent, or Creditor Trust, as applicable, shall make distributions of the Third-Party Release Settlement Amounts to each holder of a Direct Claim who is bound by the Third-Party Release as follows: (a) with respect to holders of Direct Claims who assert General Unsecured Claims against the Debtors, Pro Rata based upon the aggregate amount

of such claims timely asserted against the Debtors (such claims measured as of the Petition Date); (b) with respect to holders of Direct Claims who assert Convertible Notes Claims against the Debtors, Pro Rata based upon the aggregate amount of such Convertible Notes Claims asserted against the Debtors (such claims measured as of the Petition Date on the same basis as such Claims are Allowed for voting purposes), and (c) with respect to holders of Direct Claims who are holders of any Interests, Pro Rata based upon outstanding common stock of Amyris (excluding for purposes of such calculation, any outstanding common stock of Amyris held by any of the Direct Claims Injunction Parties) (such outstanding common stock of Amyris measured as of the Petition Date).

With respect to holders of Direct Claims who are holders of any Interests who do not opt out of the Third-Party Release but do not receive a distribution of the Third-Party Release Settlement Amounts because of the provision in the Plan regarding the minimum distribution amount (Plan Art. VII.D.3), such holders will not be bound by the Third-Party Release.

### 4. Sale of Consumer Brands Businesses and Other Assets and Allocation of Net Proceeds

The Debtors' Consumer Brands Businesses will be sold during the Chapter 11 Cases in accordance with the Bidding Procedures Order, and the Other Assets will be sold in the event of a Sale Option.  Under the Plan, as applicable, Net Proceeds to which the DIP Lender and the Foris Secured Parties are otherwise entitled will be re-allocated for the benefit of Holders of Allowed Claims that are not classified and Holders of Allowed Claims classified in Classes 1, 2, 7 and 8, will be used to fund Cash payments required to be made under the Plan on or after the Effective Date: (i) to satisfy Allowed Administrative Claims, Allowed Professional Fees, Allowed Priority Tax Claims and U.S. Trustee Fees (subject to Plan Effective Date Funding); (ii) on account of the treatment of Classes 1, 2, 7 and 8, (iii) the Ad Hoc Group Restructuring Expenses, and (iv) to fund the Estate Claims Settlement  Cash Consideration.  In addition, Net Proceeds to which the DIP Lender and Foris are otherwise entitled will be re-allocated to fund the Third-Party Release Settlement Amounts, or the Third-Party Release Settlement Amount will be funded from an advance under the Exit First Lien Facility.

### 5. Administrative Consolidation for Voting and Distribution Purposes Only

On the Effective Date, and solely for voting and administrative purposes to facilitate distributions from the Creditor Trust on account of Class 8 General Unsecured Claims:  (a) all General Unsecured Claims shall be deemed merged and treated as liabilities of the Debtors on a consolidated basis; (b) each General Unsecured Claim will be deemed a single Claim and a single obligation of the Debtors; and (c) all General Unsecured Claims based on joint and several liability or a guaranty by a Debtor of the obligations of any other Debtor shall be deemed eliminated and extinguished.  For the avoidance of doubt, for the purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors shall be treated as separate Entities.  Such administrative consolidation is solely for the purpose of facilitating distributions to Holders of Allowed General Unsecured Claims under this Plan and shall not affect the legal and corporate structures of the Reorganized Debtors or the General Unsecured Claims.  Moreover, such administrative consolidation shall not affect any subordination provisions set forth in any

agreement relating to any General Unsecured Claim subordinated in accordance with section 510(b) of the Bankruptcy Code, any contractual rights, or any equitable principles.

### 6.    Restructuring Transactions

On or before the Effective Date, or as soon as reasonably practicable thereafter, the applicable Debtors or the Reorganized Debtors, with the consent of the Foris Secured Parties, shall consummate the Restructuring Transactions and take all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Supplement and that satisfy the requirements of applicable Law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and the Plan Supplement and having other terms for which the applicable Entities may agree; (c) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial Law, including any applicable New Organizational Documents; (d) such other transactions and/or Bankruptcy Court filings that are required to effectuate the Restructuring Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (e) the execution, delivery, and filing of the Exit First Lien Facility Documents, the Amended DSM Contracts, the DSM Plan Promissory Note, the DSM Plan Promissory Note Pledge Agreement, and the Amended Givaudan Contract; and (f) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable Law in connection with the Plan.

The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

### 7.    Reorganized Debtors

On the Effective Date, the New Board shall be appointed, and the Reorganized Debtors shall adopt the New Organizational Documents. The Reorganized Debtors shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan. Cash payments to be made pursuant to the Plan will be made by the Debtors or the Reorganized Debtors. The Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or the Reorganized Debtors, as applicable, to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in

accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

### 8.    Sources of Consideration for Plan Distributions

The Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with (a) Net Proceeds as provided for in the Plan, (b) the New Common Stock, (c) proceeds from the Exit First Lien Facility, and (d) Cash on hand, subject to Plan Effective Date Funding.

### a.    Issuance of New Common Stock

On or prior to the Effective Date, Reorganized Amyris shall take steps to provide that the New Common Stock is issued and/or transferred accordance with the terms of the Plan, the Plan Supplement, the New Organizational Documents, and applicable Law (including applicable securities Laws).  The issuance of the New Common Stock on the Effective Date pursuant to the Plan is authorized without the need for any further corporate action and without any further action by Reorganized Amyris, the Debtors, or the Reorganized Debtors, as applicable, and without any action by the Holders of Claims or Interests or other parties in interest.  All of the New Common Stock issued or authorized to be issued pursuant to the Plan shall, pursuant to the Restructuring Transactions, be duly authorized, validly issued, fully paid, and non-assessable.  Any Entity's acceptance of the New Common Stock shall be deemed to have provided its agreement to the New Organizational Documents, as the same may be amended or modified from time to time following the Effective Date.  The Holders of New Common Stock may allocate the New Common Stock among their Affiliates as designated by the Holders in their sole discretion.

The issuance of the New Common Stock pursuant to and under the Plan will be conducted in reliance upon one or more exemptions from registration under the Securities Act, which will include the exemption provided in section 1145 of the Bankruptcy Code to the fullest extent available.

The issuance of the New Common Stock shall not constitute an invitation or offer to sell, or the solicitation of an invitation or offer to buy, any securities in contravention of any applicable Law in any jurisdiction.

### b.    Capital Raise - Exit First Lien Facility

On the Effective Date, the Reorganized Debtors shall be authorized to enter into the Exit First Lien Facility on the terms set forth in the Exit First Lien Facility Documents.

To the extent not already approved, Confirmation of the Plan shall be deemed approval of the Exit First Lien Facility and the Exit First Lien Facility Documents, as applicable, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Debtors and the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, expenses, and other payments provide for therein and authorization of the Debtors and the Reorganized Debtors to enter into and execute the Exit First Lien Facility Documents and such other documents as may be required to effectuate the treatment afforded by the Exit First Lien Facility.  Execution of the Exit First Lien Facility Documents by the Exit First Lien Facility Agent shall be deemed to bind all Exit First Lien Facility

Lenders as if each such Exit First Lien Facility Lender had executed the applicable Exit First Lien Facility Documents with appropriate authorization.

On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit First Lien Facility Documents, to the extent applicable: (i) shall be deemed to be granted; (ii) shall be legal, binding, automatically perfected, non-avoidable, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit First Lien Facility Documents shall be senior, first priority, priming liens, on all of the assets of the Reorganized Amyris; (iii) shall be deemed automatically perfected on or prior to the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit First Lien Facility Documents; and (iv) shall not be subject to avoidance, recharacterization, or equitable subordination for any purposes whatsoever, shall not be subject to marshalling or any similar doctrine, and shall not constitute preferential transfers, fraudulent transfers, or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy Law.

To the extent applicable, the Reorganized Debtors and the persons and entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other Law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable Law to give notice of such Liens and security interests to third parties.

The outstanding DIP Facility and/or Foris Prepetition Secured Loans that are amended and restated or rolled-over into indebtedness of Reorganized Amyris as part of the Exit First Lien Facility shall be identified by amount and tranche in the Plan Supplement.

### c.      Section 1145 Exemption and DTC Matters

The shares of the New Common Stock being issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local Law in reliance upon either: (a) section 1145 of the Bankruptcy Code (except with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code); or (b) including with respect to an entity that is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code, pursuant to Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act (or another applicable exemption under the Securities Act).

Securities issued in reliance upon section 1145 of the Bankruptcy Code (a) are exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable Law requiring registration prior to the offering, issuance, distribution, or sale of Securities, to the maximum extent possible, (b) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (c) are freely tradable and transferable by any holder thereof that, at the time of transfer, (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within ninety days of such transfer, and (iii) is not an entity that is an "underwriter" (as defined in section 2(a)(11) of

the Securities Act).  The offering, issuance, distribution, and sale of any securities in accordance section 1145 of the Bankruptcy Code shall be made without registration under the Securities Act or any similar federal, state, or local Law in reliance on section 1145(a) of the Bankruptcy Code.

Any shares of the New Common Stock issued in reliance upon the exemption from registration provided by Section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act will be "restricted securities."  Such securities may not be resold, exchanged, assigned, or otherwise transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom and other applicable Law and subject to any restrictions, including any transfer restrictions, in the New Organizational Documents.  The offering, issuance, distribution, and sale of such securities shall be made without registration under the Securities Act or any similar federal, state, or local Law in reliance on section 4(a)(2) of the Securities Act, Regulation D promulgated thereunder, and/or Regulation S under the Securities Act.

It is not expected that any shares of the New Common Stock will be eligible for any depository services, including with respect to DTC, on or about the Effective Date.  Further, it is not intended that the New Common Stock will be listed on a national securities exchange (or a comparable non-U.S. securities exchange) on or about the Effective Date.  Reorganized Amyris will be privately held pursuant to the Plan as provided herein.

Subject to compliance with the Securities Act, Exchange Act and other applicable Law, Parent expects that on the Effective Date that the existing Amyris Equity Interests will be canceled and that the New Common Stock will not be listed or quoted on a national securities exchange or over-the-counter market. As part of the Restructuring Transactions, Parent and/or Reorganized Amyris may, in its sole discretion, use reasonable best efforts: (i) to terminate the effectiveness of the Registration Statements and to remove from registration any securities that remain unsold at the termination of the offering covered by the Registration Statements, (ii) to terminate the registration of the existing common stock of Parent under Section 12 of the Exchange Act and suspend its reporting obligations under Sections 13(a) and 15(d) of the Exchange Act (the "SEC Reporting Suspension") and (iii) to delist Parent's existing common stock, any other Amyris Equity Interests, and the New Common Stock, if applicable, from the OTC Pink Marketplace and any other securities exchange or over-the-counter market. Subject to obtaining the SEC Reporting Suspension, Parent expects that none of Reorganized Amyris or any of its subsidiaries will be subject to public periodic reporting obligations with the SEC or any other entity following the Restructuring Transactions.

Should the Reorganized Debtors elect, on or after the Effective Date, to reflect any ownership of the New Common Stock issued under the Plan through the facilities of DTC (or another similar depository), the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Stock to be issued under the Plan under applicable securities Laws.  DTC (or another similar depository) shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Stock to be issued under the Plan is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated

by the Plan, including, for the avoidance of doubt, whether the New Common Stock to be issued under the Plan is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding any policies, practices, or procedures of DTC, DTC shall cooperate with and take all actions reasonably requested by the Disbursing Agent or the Convertible Notes Trustee to facilitate distributions to Holders of Convertible Notes Claims without requiring that such distributions be characterized as repayments of principal or interest. Neither the Disbursing Agent nor the Convertible Notes Trustee shall be required to provide indemnification or other security to DTC in connection with any distributions to Holders of Convertible Notes Claims through the facilities of DTC.

### 9.      Section 1146 Exemption

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to (a) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock and the Exit First Lien Facility, (b) the Restructuring Transactions, (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means, (d) the making, assignment, or recording of any lease or sublease, (e) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit First Lien Facility or (f) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 10.      Corporate Existence

Except as otherwise provided in the Plan, the Plan Supplement, the Confirmation Order, or any agreement, instrument, or other document incorporated therein, or unless determined by the Debtors prior to the Effective Date to wind-down, dissolve, or liquidate a Debtor, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability

company, partnership, or other form, as the case may be, pursuant to the applicable Law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan or otherwise, in each case, consistent with the Plan, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings, approvals, or consents required under applicable state, provincial, or federal Law).  After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified on the terms therein without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may take such action not inconsistent with the Restructuring Transactions, the Plan Support Agreement or the Plan and as permitted by applicable law and such organizational documents, as the Reorganized Debtors may determine is reasonable and appropriate, including causing any of them to:  (i) be merged into another; (ii) be dissolved and liquidated; (iii) change its legal name; (iv) change its state of incorporation; or (v) close a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter.

## 11.    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan, the Plan Supplement, the Confirmation Order, or any agreement, instrument, or other document incorporated therein, or unless determined by the Debtors prior to the Effective Date to wind-down, dissolve, or liquidate a Debtor on the Effective Date, all property in each Estate, all Causes of Action, and all property of the Estate to revest pursuant to the Plan shall vest in each respective Reorganized Debtor and any entity that may be formed or incorporated by the Debtors or the Reorganized Debtors before, on or after the Effective Date, free and clear of all Liens, Claims, charges, restrictions or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, the Plan Supplement, or the Confirmation Order, each Reorganized Debtor may operate its businesses and may use, acquire, or dispose of property, including transferring any assets to any entities formed or incorporated before, on or after the Effective Date by the Debtors or the Reorganized Debtors, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

## 12.    Cancellation of Existing Securities and Agreements

On the Effective Date, except to the extent otherwise provided in the Plan, the Plan Supplement, or the Confirmation Order, or any agreement, instrument, or other document incorporated therein, and other than as to the DIP Facility Claims and Foris Prepetition Secured Claims rolled up, converted, exchanged, refinanced or amended and restated, into the Exit First Lien Facility or New Common Stock of Reorganized Amyris, all notes, instruments, certificates, credit agreements, indentures, and other documents evidencing Claims or Interests shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, released, discharged, and of no force and effect without any need for further action or approval of the Bankruptcy Court or for a Holder to take further action,

and the Agents and the Convertible Notes Trustee, as applicable, shall be released from all duties thereunder and shall have no further obligation or liability thereunder except as expressly provided in the Plan. Holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan. Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article VII of the Plan, to the extent cancelled pursuant to this paragraph, the Debt Documents shall continue in effect solely to the extent necessary to: (a) permit Holders of Claims under Debt Documents to receive their respective Plan Distributions, if any; (b) permit the Disbursing Agent or the Convertible Notes Trustee, as applicable, to make Plan Distributions on account of the Allowed Claims under the Debt Documents; (c) preserve the Convertible Notes Trustee's rights to compensation and indemnification as against Plan Distributions distributable to the Holders of the Convertible Notes Claims, including to permit the Convertible Notes Trustee to maintain, enforce, and exercise its charging liens against such Plan Distributions; (d) preserve any rights of the Agents and Convertible Notes Trustee (solely as to Plan Distributions) thereunder to maintain, exercise, and enforce any applicable rights of indemnity, reimbursement, or contribution, or subrogation or any other claim or entitlement; (e) permit the Convertible Notes Trustee to enforce any obligation owed to the Convertible Notes Trustee under the Plan; and (f) permit each Agent and Convertible Notes Trustee to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court. Except as provided in the Plan or the Plan Supplement (including Article VII of the Plan) or as may be necessary to effectuate the terms of the Plan, on the Effective Date, the Agents and Trustees, and their respective agents, successors, and assigns, shall  be automatically and fully discharged of all of their duties and obligations associated with the Debt Documents, as applicable.

### 13.    Corporate Action

On the Effective Date, or as soon as reasonably practicable thereafter, except as otherwise provided in the Plan, the Plan Supplement, or the Confirmation Order, all actions contemplated under the Confirmation Order, the Plan and the Plan Supplement shall be deemed authorized and approved in all respects, including:  (a) the hiring of a new chief executive officer and the execution of an employment agreement with the new chief executive officer on terms and conditions acceptable to Foris; (b) discharge of the duties of, and the dissolution of, the then-existing board of directors of Parent and selection of the directors or managers, as applicable, and officers for the Reorganized Debtors, including the appointment of the New Board; (c) the issuance and distribution of the New Common Stock; (d) implementation of the Restructuring Transactions, and performance of all actions and transactions contemplated hereby and thereby; (e) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date); (f) adoption, execution, delivery, and/or filing of the New Organizational Documents; (g) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (h) entry into the Exit First Lien Facility and the execution, delivery, and filing of the Exit First Lien Facility Documents; (i) entry into the Amended DSM Contracts, the DSM Plan Promissory Note, and DSM Plan Promissory Note Pledge Agreement; (j) execution of the Amended Givaudan Contract; (k) the execution of the Creditor Trust Agreement; and (l) all other acts or actions contemplated or reasonably necessary

or appropriate to promptly consummate the Restructuring Transactions (whether to occur before, on, or after the Effective Date).

Except as otherwise provided in the Plan or the Plan Supplement, all matters provided for in the Plan and the Plan Supplement involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Reorganized Debtors, as applicable, in connection with the Plan and the Plan Supplement shall be deemed to have occurred and shall be in effect, without any requirement of further action by the equity holders, members, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable.

On or, as applicable, prior to the Effective Date, except as otherwise provided in the Plan or the Plan Supplement, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan and the Plan Supplement (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Common Stock, the Exit First Lien Facility Documents, the New Organizational Documents, the Amended DSM Contracts, the DSM Plan Promissory Note, the DSM Plan Promissory Note Pledge Agreement, the Amended Givaudan Contract, any other Definitive Documents, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by Article IV.L. of the Plan shall be effective notwithstanding any requirements under non bankruptcy Law.

### 14.    New Organizational Documents

On or as soon as reasonably practicable after the Effective Date, except as otherwise provided in the Plan or the Plan Supplement and subject to local Law requirements, the New Organizational Documents (which shall be consistent with the Plan and the Plan Supplement) shall be automatically adopted or amended as may be necessary to effectuate the transactions contemplated by the Plan. To the extent required under the Plan, the Plan Supplement, or applicable non bankruptcy Law, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable Law of the respective state or country of organization. The New Organizational Documents will (a) authorize the issuance of the New Common Stock and (b) prohibit the issuance of non-voting equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code.

After the Effective Date, each Reorganized Debtor may amend and restate its respective New Organizational Documents as permitted by Laws of the respective states, provinces, or countries of incorporation and the New Organizational Documents.

On the Effective Date, Reorganized Amyris shall enter into and deliver the New Stockholders Agreement with respect to each Holder of New Common Stock, which shall become effective and binding in accordance with their terms and conditions upon the parties thereto without further notice to or order of the Bankruptcy Court, act, or action under applicable Law,

regulation, order, or rule or the vote, consent, authorization, or approval of an Entity (other than the relevant consents required by any Definitive Document). Holders of New Common Stock shall be deemed to have executed the New Stockholders Agreement and be parties thereto, without the need to deliver signature pages thereto.

### 15. Managers and Officers of the Reorganized Debtors

As of the Effective Date, the members for the New Board shall be appointed. The initial members of the New Board of Reorganized Amyris will be identified in the Plan Supplement, to the extent known at the time of filing. Each such member and officer of the Reorganized Debtors (including the new chief executive officer) shall serve from and after the Effective Date pursuant to the terms of any applicable employment agreements and other constituent documents of the Reorganized Debtors, including the New Organizational Documents.

### 16. Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, and their respective officers, directors, members, or managers (or other relevant governing body), are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Exit First Lien Facility entered into, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan or the Plan Supplement.

### 17. Management Incentive Plan

A management incentive plan may be established and grants may be made from time to time to employees, officers, and directors of the Reorganized Debtors at the discretion of the New Board effective as of the Effective Date. The terms and conditions (including, without limitation, with respect to participants, allocation, timing, and the form and structure of the equity-linked awards) shall be determined at the discretion of the New Board after the Effective Date.

### 18. Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, each Reorganized Debtor or the Creditor Trust, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors and their Estates, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date or any other provision of the Plan to the contrary, other than the Released Claims.

**The Reorganized Debtors or the Creditor Trust, as applicable, may pursue such retained Causes of Action, as appropriate. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any retained Cause of Action against it as any indication that the Debtors, the Reorganized Debtors, or the Creditor Trust, as applicable, will not pursue any and all available retained Causes of**

**Action against it.  The Debtors, the Reorganized Debtors, and the Creditor Trust expressly reserve all rights to prosecute any and all retained Causes of Action against any Entity (other than the Causes of Action and Direct Claims released under the Plan and subject to the exculpations contained in the Plan).  Unless any Causes of Action or Direct Claims against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order (and for the avoidance of doubt, any Causes of Action on the Schedule of Retained Causes of Action shall not be expressly relinquished, exculpated, released, compromised, or settled in the Plan), the Reorganized Debtors or the Creditor Trust, as applicable, expressly reserve all retained Causes of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such retained Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.**

The Reorganized Debtors and the Creditor Trust, as applicable, reserve and shall retain such retained Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any retained Causes of Action against any Entity shall vest in the Reorganized Debtors or the Creditor Trust, as applicable.  The applicable Reorganized Debtors or the Creditor Trust, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such retained Causes of Action.  The Reorganized Debtors or the Creditor Trust, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such retained Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court except as otherwise released in this Plan.

## 19.   Sale Option

At the election of the DIP Lenders and the Foris Prepetition Secured Lenders, which may be made in their sole discretion at any time prior to the Confirmation Date, the Debtors shall close a sale of the Other Assets pursuant to the Other Assets Bidding Procedures with the consideration for sale of the Other Assets to be distributed, as part of the Net Proceeds, as provided for in the Plan.  The sale of the Other Assets will be conducted in accordance with the Other Assets Bidding Procedures, with the DIP Lender and the Foris Prepetition Secured Lenders providing an Other Assets Stalking Horse Credit Bid.

## 20.   Convertible Notes Trustee Fees and Expenses

On the Effective Date, subject to the occurrence of the Ad Hoc Group Acceptance Event, without any further notice to, or action, order, or approval of the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, shall distribute Cash to the Convertible Notes Trustee in an amount equal to the Convertible Notes Trustee Fees and Expenses, which shall include an estimate of Convertible Notes Trustee Fees and Expenses to be incurred after the Effective Date related to distributions to be made pursuant to the Plan, without a reduction to recoveries to Holders of the Convertible Notes Claims; provided that the amount of Convertible Notes Trustee Fees and Expenses payable by the Debtors or Reorganized Debtors shall not, in the aggregate amount,

exceed $250,000; provided, further, that the limitations on the Debtors' and Reorganized Debtors' obligations to pay Convertible Notes Trustee Fees and Expenses, including the occurrence of the Ad Hoc Group Acceptance Event and the dollar limitation in the foregoing proviso, shall in no way impair the Convertible Notes Trustee's rights to compensation and indemnification as against Plan Distributions distributable to the Holders of the Convertible Notes Claims, including the Convertible Notes Trustee's right to maintain, enforce, and exercise its charging liens against such Plan Distributions.

### 21.   Lavvan Turnover

Any distribution payable to Lavvan pursuant to Article III.B.8(b) on account of any Lavvan Allowed General Unsecured Claim that is subject to turnover to the DIP Lenders, Foris, or the Foris Prepetition Secured Parties shall be automatically transferred to the Creditor Trust and shall constitute a Creditor Trust Asset, at the sole expense of the Creditor Trust, to holders of Allowed Claims in Classes 7 and 8 other than Lavvan.

### C.   Creditor Trust

### 1.   Creation and Governance of the Creditor Trust

Unless otherwise determined pursuant to the terms of the Plan, on the Effective Date, the Debtors shall transfer, or cause to be transferred, to the Creditor Trust all of their rights, title, and interest in the Creditor Trust Assets, and the Creditor Trustee shall execute the Creditor Trust Agreement and take all steps necessary to establish the Creditor Trust in accordance with the Plan and the Creditor Trust Agreement.  Such transfers shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax.  The Creditor Trust shall be governed by the Creditor Trust Agreement and administered by the Creditor Trustee.

To the extent necessary to the performance of the Creditor Trustee's duties and responsibilities, and subject to the Creditor Trust Agreement, the Debtors or Reorganized Debtors, as applicable, shall share with the Creditor Trustee communications or documents that are subject to the attorney-client privilege, work product protection, or other applicable privilege; the sharing of such information shall not operate as a waiver of any applicable privileges. The parties shall agree on how to document the sharing of the attorney-client privilege such that the privilege is preserved, and in the absence of an agreement the Bankruptcy Court shall decide as set forth in the Confirmation Order or any other order(s).

### 2.   Purpose of the Creditor Trust

The Creditor Trust shall be established for the purpose of liquidating the Creditor Trust Assets, and distributing the proceeds of the Creditor Trust Assets to the Creditor Trust Beneficiaries in accordance with the terms of the Plan and the Creditor Trust Agreement. The Creditor Trust is intended to qualify as a liquidating trust pursuant to Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary and consistent with, the purpose of the Creditor Trust.

### 3.   Creditor Trust Agreement and Funding the Creditor Trust

The Creditor Trust Agreement generally will provide for, among other things: (a) the payment of the Creditor Trust Expenses; (b) the retention of counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; (c) the investment of Cash by the Creditor Trustee within certain limitations, including those specified in the Plan and Creditor Trust Agreement; and (d) the orderly liquidation of the Creditor Trust Assets.

The Creditor Trust Expenses shall be paid from the Creditor Trust Assets in accordance with the Plan and the Creditor Trust Agreement. The Creditor Trustee, on behalf of the Creditor Trust, may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further order of the Bankruptcy Court from the Creditor Trust Assets in accordance with the Plan and the Creditor Trust Agreement.

### 4. Valuation of Assets

Except as otherwise provided in the Creditor Trust Agreement, as soon as reasonably practicable following the establishment of the Creditor Trust, the Creditor Trustee shall determine the value of the assets transferred to the Creditor Trust, based on the good faith determination of the Creditor Trustee, and the Creditor Trustee shall apprise, in writing, the Creditor Trust Beneficiaries of such valuation, from time to time as relevant for tax reporting purposes. The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Creditor Trust, the Creditor Trustee, and the Creditor Trust Beneficiaries) for all applicable U.S. federal, state, and local income tax purposes.

In connection with the preparation of the valuation contemplated by the Plan and the Creditor Trust Agreement, the Creditor Trust shall be entitled to retain such professionals and advisors as the Creditor Trust shall determine to be appropriate or necessary, and the Creditor Trustee shall take such other actions in connection therewith as it determines to be appropriate or necessary. The Creditor Trust shall bear all of the reasonable costs and expenses incurred in connection with determining such value, including the fees and expenses of any professionals retained in connection therewith.

### 5. Creditor Trustee

The Creditor Trustee shall be appointed on the Effective Date. The Creditor Trustee shall be a professional person or a financial institution with experience administering other creditor trusts, and shall be selected by the Creditors' Committee and the Ad Hoc Group.

### 6. Creditor Trust Interests

Creditor Trust Interests shall be passive and shall not have voting, consent, or other shareholder like control rights with respect to the Creditor Trust. The Creditor Trust Interests shall be uncertificated and shall be reflected only on the records of the Creditor Trustee. The Creditor Trust Interests shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of Law.

### 7. Cooperation of the Reorganized Debtors

Subject to Article V.A. of the Plan, the Creditor Trust Agreement shall provide for the Reorganized Debtors' records and information relating to the Creditor Trust Assets or copies thereof to be, to the extent reasonably practicable, transferred to the Creditor Trust, including electronic records or documents, to the extent (a) necessary to liquidate the Creditor Trust Assets and (b) consistent with applicable Law, but shall further provide that any records or information so shared shall continue to be protected by the attorney-client, work product, or common interest privileges.  The transfer of such records and documents to the Creditor Trust shall not waive any applicable privileges (or similar protections) to which such documents, records, information, and work product may have been subject before such transfer to the Creditor Trust.

Except as otherwise provided in the Plan, the Confirmation Order, or the Creditor Trust Agreement, and subject to Article V.A. of the Plan, the Reorganized Debtors, upon reasonable notice, shall reasonably cooperate with the Creditor Trustee in the administration of the Creditor Trust, including by providing reasonable access to pertinent documents, including books and records, to the extent the Reorganized Debtors have such information and/or documents, to the Creditor Trustee sufficient to enable the Creditor Trustee to perform its duties hereunder.  The Reorganized Debtors shall reasonably cooperate with the Creditor Trustee in the administration of the Creditor Trust, including by providing reasonable access to documents and current officers and directors with respect to contesting, settling, compromising, reconciling, and objecting to General Unsecured Claims (at the expense of the Creditor Trust as set forth in the Creditor Trust Agreement).  The Reorganized Debtors shall make reasonable best efforts to retain and transfer all documents relating to the Creditor Trust Assets to the Creditor Trust; *provided* that, in each case, the Creditor Trust agrees upon request to reimburse reasonable and documented out-of-pocket expenses for preservation of documents, copying, or similar expenses.  The collection, review, and preservation of documents for any investigation or litigation by the Creditor Trustee shall be at the expense of the Creditor Trust.

### 8.    United States Federal Income Tax Treatment of the Creditor Trust

For all United States federal income tax purposes, all parties shall treat the transfer of the Creditor Trust Assets to the Creditor Trust for the benefit of the Creditor Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date, including any amounts or other assets subsequently transferred to the Creditor Trust (but only at such time as actually transferred) as (a) a transfer of the Creditor Trust Assets (subject to any obligations relating to such Creditor Trust Assets) to the Creditor Trust Beneficiaries and, to the extent the Creditor Trust Assets are allocable to, or retained on account of, any Disputed Claims (the "Trust Claims Reserve"), followed by (b) the transfer by the Creditor Trust Beneficiaries to the Creditor Trust of the Creditor Trust Assets (other than the Trust Claims Reserve) in exchange for the Creditor Trust Interests. Accordingly, the Creditor Trust Beneficiaries shall be treated for U.S. federal income tax purposes as the grantors and owners of their respective share of the Creditor Trust Assets (other than the Trust Claims Reserve).  The foregoing treatment shall also apply, to the extent permitted by applicable Law, for applicable U.S. state and local income tax purposes.

Subject to contrary definitive guidance from the IRS (as determined by the Creditor Trustee in its reasonable discretion) (including the receipt by the Creditor Trustee of a private letter ruling if the Creditor Trustee so requests, or the receipt of an adverse determination by the IRS upon audit if not contested by the Creditor Trustee) or a court of competent jurisdiction, the Creditor Trustee

may (a) timely elect to treat the Trust Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and (b) to the extent permitted by applicable Law, report consistently with the foregoing for applicable U.S. state and local income tax purposes.  All parties (including, without limitation, the Debtors, the Creditor Trust, the Creditor Trustee, and the Creditor Trust Beneficiaries) shall report for U.S. federal and applicable U.S. state and local income tax purposes consistently with the foregoing.

## 9. Withholding

The Creditor Trustee may deduct and withhold and pay to the appropriate taxing authority all amounts required to be deducted or withheld pursuant to the Tax Code or any provision of any state, local, or non-U.S. tax Law with respect to any Creditor Trust Beneficiaries, including with respect to any payment or distribution to the Creditor Trust Beneficiaries, any amounts received by, collections of, or earnings of the Creditor Trust and any proceeds from the Creditor Trust Assets.  Notwithstanding the above, each Holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such Holder by any governmental authority, including income, withholding and other tax obligations, on account of such distribution or with respect to its ownership of the Creditor Trust Interests.  All such amounts deducted or withheld and timely paid to the appropriate taxing authority shall be treated as amounts distributed to such Creditor Trust Beneficiaries for all purposes of this Agreement, to the extent permitted by applicable Law.  The Creditor Trustee shall be authorized to collect such tax information from the Creditor Trust Beneficiaries (including social security numbers or other tax identification numbers) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order, and the Creditor Trust Agreement and to determine whether any deduction or withholding applies with respect to a payment to such Creditor Trust Beneficiary and the amount of such deduction or withholding.

As a condition to receiving, or being entitled to receive, distributions under the Plan or from the Creditor Trust, all Creditor Trust Beneficiaries may be required to identify themselves to the Creditor Trustee and provide tax information and the specifics of their holdings, to the extent requested by the Creditor Trustee, including an IRS Form W-9 or, in the case of Creditor Trust Beneficiaries that are not U.S. persons for U.S. federal income tax purposes, certification of foreign status on an applicable IRS Form W-8, including all applicable supporting documents.  This identification requirement may, in certain cases, extend to Holders who hold their securities in street name.  The Creditor Trustee may refuse to make a distribution to any Creditor Trust Beneficiary that fails to furnish such information in a timely fashion, until (at a minimum) such information is delivered; provided, however, that upon the delivery of such information by a Creditor Trust Beneficiary, the Creditor Trustee shall make such distribution to which the Creditor Trust Beneficiary is entitled, without interest; provided, further, that if the Creditor Trustee fails to withhold in respect of amounts received or distributable with respect to any such Holder and the Creditor Trustee is later held liable for the amount of such withholding, such Holder shall reimburse the Creditor Trustee for such liability.  If a Creditor Trust Beneficiary fails to comply with such a request for tax information within ninety days, the Creditor Trustee may file a document with the Bankruptcy Court that will provide twenty one days' notice before such distribution may be deemed an Unclaimed Distribution, and shall not be entitled to any subsequent distributions.  In the event that the Creditor Trustee elects to make distributions through an intermediary (such as DTC), the party who would be the withholding agent with respect to

distributions to the Creditor Trust Beneficiary under U.S. federal income tax principles shall be responsible for withholding tax compliance with respect to any such distribution, based on instructions on the character of the income from the Creditor Trustee.

### 10. Dissolution of the Creditor Trust

Except as otherwise provided in the Creditor Trust Agreement, the Creditor Trustee and the Creditor Trust shall be discharged or dissolved, as the case may be, at such time as (a) the Creditor Trustee determines that all Creditor Trust Assets have been liquidated or otherwise disposed of, or the liquidation or other disposition of any remaining Creditor Trust Assets is not likely to yield sufficient additional proceeds to justify further actions with respect to the Creditor Trust Assets and (b) all distributions of Creditor Trust Assets required to be made by the Creditor Trustee have been made, but in no event shall the Creditor Trust be dissolved later than five years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such fifth anniversary (and, in the event of further extension, within the six-month period before the end of the preceding extension), determines that a fixed-period extension (not to exceed three years, together with any prior extensions, without a favorable letter ruling from the IRS or based on advice or an opinion of counsel satisfactory to Creditor Trustee that any further extension would not adversely affect the status of the Creditor Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Creditor Trust Assets.

Upon dissolution of the Creditor Trust, any remaining Creditor Trust Assets shall be distributed to all Creditor Trust Beneficiaries in accordance with the Plan and the Creditor Trust Agreement as appropriate; provided, however, that if the Creditor Trustee reasonably determines that such remaining Creditor Trust Assets are insufficient to render a further distribution practicable, the Creditor Trustee may (i) reserve any amount necessary to dissolve the Creditor Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the Tax Code, (B) exempt from U.S. federal income tax under section 501(a) of the Tax Code, (C) not a "private foundation" as defined in section 509(a) of the Tax Code, and (D) that is unrelated to the Debtors, the Creditor Trust, and any insider of the Creditor Trustee, and (iii) dissolve the Creditor Trust.

### 11. Tax Reporting

The Creditor Trust has been structured to qualify as a "liquidating trust" under section 301.7701-4 of the Treasury Regulations (other than with respect to the Trust Claims Reserve), with the Creditor Trust Beneficiaries treated as the grantors and owners of the Creditor Trust. The "taxable year" of the Creditor Trust shall be the "calendar year" as such terms are defined in section 441 of the Tax Code. The Creditor Trustee shall file tax returns for the Creditor Trust treating the Creditor Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a) to the extent permitted by applicable Law, subject to the treatment of the Trust Claims Reserve. The Creditor Trustee shall also annually send or make available to each Creditor Trust Beneficiary of record, in accordance with applicable Law, a separate statement setting forth such holder's share of items of income, gain, loss, deduction or credit (including the receipts and expenditures of the Creditor Trust) as relevant for U.S. federal income tax purposes and will instruct all such Creditor Trust Beneficiaries to use such information in preparing their U.S. federal income tax returns (including,

for the avoidance of doubt, with respect to withholding tax) or to forward the appropriate information to such Creditor Trust Beneficiary's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns; provided that if the Creditor Trustee elects to make distributions through an intermediary (such as DTC), it shall provide such statement to such intermediaries for them to provide to such Creditor Trust Beneficiaries.

The Creditor Trustee also shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Creditor Trust that are required by any Governmental Unit.

The Creditor Trustee shall be responsible for payment, out of the Creditor Trust Assets, of any taxes imposed on the Creditor Trust or the Creditor Trust Assets, including the Trust Claims Reserve. In the event, and to the extent, any Cash retained on account of a Disputed Claim in the Trust Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, such Disputed Claims, the Creditor Trustee may, in its discretion, (a) sell any non-Cash assets relating to such Claim (including any assets distributable as a result of disallowance of such Claim) to pay such taxes or (b) reimburse the Creditor Trust for the payment of such taxes from any subsequent Cash amounts allocable to, or retained on account of, such taxes from any subsequent Cash amounts allocable to, or retained on account of, such Disputed Claim (including any Cash distributable as a result of disallowance of such Claims).

The Creditor Trustee may request an expedited determination of taxes of the Creditor Trust, including the Trust Claims Reserve, under section 505(b) of the Bankruptcy Code, for all tax returns filed for, or on behalf of, the Creditor Trust for all taxable periods through the dissolution of the Creditor Trust.

## 12. Transferred Privileges

Subject to Article V.A of the Plan in all events, in respect of privileges (if any) transferred to the Creditor Trust under the Creditor Trust Agreement (the "Transferred Privileges"), the Creditor Trust Agreement shall contain terms substantially reflecting the following: subject to Article V.A of the Plan, the Creditor Trust may not waive any Transferred Privileges in respect of records, documents, or information related to the Creditor Trust Assets without first providing to the Reorganized Debtors reasonable advance written notice and an opportunity to protect their respective rights with respect to any subsequent disclosure and the terms of any protective order, confidentiality stipulation, or similar agreement relating to such disclosure. The Reorganized Debtors may not make disclosure in a manner that could effectuate a waiver of any Transferred Privileges in respect of records, documents, or information related to the Creditor Trust Assets without first providing to the Creditor Trustee reasonable advance written notice (in no event less than five Business Days) and an opportunity to protect the Creditor Trust's rights with respect to any subsequent disclosure and the terms of any protective order, confidentiality stipulation, or similar agreement relating to such disclosure. If the Creditor Trustee or the Reorganized Debtors object to an action proposed to be taken by the other with regard to records, documents, or information related to the Creditor Trust Assets that are covered by the Transferred Privilege (or a disclosure that would result in a waiver), the parties shall be permitted to raise the issue promptly with the Bankruptcy Court. The party providing advance written notice may take its proposed

action unless the Bankruptcy Court determines that (a) such action would cause material adverse harm to the other party, or (b) the harm to the objecting party would substantially outweigh the benefit to the party seeking to take the proposed action. The objecting party shall bear the burden of proof. Each of the parties shall bear its own costs and expenses, including attorneys' fees, incurred in connection with such dispute.

### D.    Treatment of Executory Contracts and Unexpired Leases

#### 1.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed rejected by the applicable Reorganized Debtor in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those that: (a) are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) have previously expired or terminated pursuant to their own terms or agreement of the parties thereto; (c) have been previously assumed or rejected by the Debtors pursuant to a Final Order; or (d) are, as of the Effective Date, the subject of (i) a motion to assume that is pending or (ii) an order of the Bankruptcy Court that is not yet a Final Order.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan, or the Schedule of Assumed Executory Contracts and Unexpired Leases or the Schedule of Proposed Cure Amounts, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Notwithstanding anything herein to the contrary, the effective date of the rejection of any such Unexpired Lease shall be the later of (i) the Effective Date and (ii) the date upon which the Debtors notify the landlord in writing (e-mail being sufficient) that they have surrendered the premises to the landlord and returned the keys, key codes, or security codes, as applicable. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, including in accordance with any amendments executed by the Debtors and the counterparties to the applicable Executory Contract or Unexpired Lease during these Chapter 11 Cases and effective upon assumption by the Debtors, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Confirmation Date shall be subject to approval by a Final Order on or after the Confirmation Date in accordance with any applicable terms herein, unless otherwise settled by the applicable Debtors and counterparties.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges,

immunities, options, rights of first refusal, and any other interests. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

To the maximum extent permitted by Law, the transactions contemplated by the Plan shall not constitute a "change of control" or "assignment" (or terms with similar effect) under any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan, or any other transaction, event, or matter that would (A) result in a violation, breach or default under such Executory Contract or Unexpired Lease, (B) increase, accelerate or otherwise alter any obligations, rights or liabilities of the Debtors or the Reorganized Debtors under such Executory Contract or Unexpired Lease, or (C) result in the creation or imposition of a Lien upon any property or asset of the Debtors or the Reorganized Debtors pursuant to the applicable Executory Contract or Unexpired Lease. Any consent or advance notice required under such Executory Contract or Unexpired Lease shall be deemed satisfied by Confirmation.

Notwithstanding anything to the contrary in the Plan, after the Confirmation Date, an Executory Contract or Unexpired Lease on the Schedule of Assumed Contracts and Unexpired Leases as of the Confirmation Date may not be assumed by the applicable Debtor(s) unless the applicable lessor or contract counterparty has (x) consented to such assumption, (y) objected to the rejection of such Executory Contract or Unexpired Lease on the grounds that such Executory Contract or Unexpired Lease should not be rejected and should instead be assumed (and such objection remains outstanding), or (z), in the case of Unexpired Leases, consented to an extension of the time period in which the applicable Debtor(s) must assume or reject such Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code (as extended with the applicable lessor's consent, the "Deferred Deadline"), in which case for purposes of clause (z) the applicable Debtor(s) shall have until the Deferred Deadline to assume such Unexpired Lease, subject to the applicable lessor's right to object to such assumption, or such Unexpired Lease shall be deemed rejected. For any Executory Contract or Unexpired Lease assumed pursuant to this paragraph, all Cure amounts shall be paid on the Effective Date or as soon as reasonably practicable thereafter, unless subject to a dispute with respect to Cure cost, such dispute shall be addressed in accordance with Article VI.D of the Plan.

To the extent any provision of the Bankruptcy Code or the Bankruptcy Rules require the Debtors to assume or reject an Executory Contract or Unexpired Lease by a deadline, including section 365(d) of the Bankruptcy Code, such requirement shall be satisfied if the Debtors make an election, either through the Filing of a motion or identification in the Plan Supplement, to assume or reject such Executory Contract or Unexpired Lease prior to the applicable deadline, regardless of whether or not the Bankruptcy Court has actually ruled on such proposed assumption or rejection prior to such deadline.

## 2. Indemnification Obligations

All indemnification provisions, consistent with applicable Law, in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements,

employment contracts, or otherwise) for current directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, other than with respect to any Excluded Party, shall be Reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on the same terms that existed prior to the Effective Date; provided that nothing herein shall expand any of the Debtors' indemnification obligations in place as of the Petition Date.

Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors, managers, and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors, managers, and officers remain in such positions after the Effective Date.

### 3.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Entry of the Confirmation Order shall constitute a Bankruptcy Court Order approving the rejections, if any, of any Executory Contracts or Unexpired Leases not on the Schedule of Assumed Executory Contracts and Unexpired Leases. Any objection to the rejection of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before fourteen days after the service of notice of rejection on the affected counterparty. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within thirty days after the later of (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection and (b) the effective date of such rejection. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, the Creditor Trust, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** For the avoidance of doubt,

unless otherwise agreed, any property remaining on the premises subject to a rejected Unexpired Lease shall be deemed abandoned by the Debtors or the Reorganized Debtors, as applicable, as of the effective date of the rejection, and the counterparty to such Unexpired Lease shall be authorized to (i) use or dispose of any property left on the premises in its sole and absolute discretion without notice or liability to the Debtors or the Reorganized Debtors, as applicable, or any third party, and (ii) shall be authorized to assert a Claim for any and all damages arising from the abandonment of such property by filing a Claim in accordance with Article VI.C of the Plan.

### 4. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, shall, in accordance with the Schedule of Proposed Cure Amounts, pay all Cure costs relating to Executory Contracts and Unexpired Leases that are being assumed under the Plan. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all objections to any Cures set forth in the Schedule of Proposed Cure Amounts must be Filed with the Bankruptcy Court on or before 14 days after the service of the Schedule of Proposed Cure Amounts on affected counterparties. Any such request that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Debtor or Reorganized Debtor, without the need for any objection by the Debtors or the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure costs shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the applicable Cure costs; *provided, however*, that nothing herein shall prevent the Reorganized Debtors from paying any Cure costs despite the failure of the relevant counterparty to file such request for payment of such Cure costs. The Reorganized Debtors also may settle any disputes related to Cure costs without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Bankruptcy Court on or before 14 days after the service of notice of assumption on affected counterparties. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Confirmation Hearing or at the Debtors' or the Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely Filed, unless otherwise agreed to by the parties or ordered by the Bankruptcy Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or assumption and assignment.

If there is any dispute regarding any Cure costs, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption or assumption and assignment, then payment of any Cure costs shall occur as soon as reasonably practicable after (a) entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment) or (b) as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

If the Bankruptcy Court determines that the Allowed Cure cost with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the Schedule of Proposed Cure Amounts (such greater amount, the "Court-Ordered Cure Cost"), the Debtors shall have the right to (a) pay the Court Ordered Cure Cost as soon as reasonably practicable thereafter and assume such Executory Contract or Unexpired Lease in accordance with the terms herein or (b) remove such Executory Contract or Unexpired Lease from the Schedule of Assumed Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected on the date of entry of the Court-Ordered Cure Cost and in the case of an Unexpired Lease, the Debtors shall, pursuant to section 365(d)(4) of the Bankruptcy Code, immediately surrender the related premises to the lessor unless otherwise agreed with the applicable lessor, subject to the applicable counterparty's right to object to such rejection; *provided* that, after the deadline to assume an Executory Contract or Unexpired Lease set forth in section 365(d) of the Bankruptcy Code, an Executory Contract or Unexpired Lease may only be removed from the Schedule of Assumed Executory Contracts and Unexpired Leases if (i) the applicable counterparty consents to such rejection, (ii) the applicable counterparty objected to the assumption or Cure of such Executory Contract or Unexpired Lease on the grounds that such Executory Contract or Unexpired Lease should not be assumed and should instead be rejected, including alleging an incurable default (and such objection remains outstanding), or (iii) the Court-Ordered Cure Cost is greater than the amount set forth in the Schedule of Proposed Cure Amounts, as set forth at the beginning of this paragraph. Notwithstanding anything to the contrary herein, the Reorganized Debtors and the applicable counterparty shall be entitled to the full benefits of the Executory Contract or Unexpired Lease (including without limitation, any license thereunder) pending the resolution of any Cure dispute.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy related defaults, arising at any time prior to the effective date of assumption, upon the payment of all applicable Cures. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the later of (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such assumption, (ii) the effective date of such assumption, or (iii) the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court; provided, however, that nothing herein shall affect the allowance of Claims or any Cure agreed to by the Debtors in any written agreement amending or modifying any Executory Contract or Unexpired Lease prior to assumption pursuant to the Plan or otherwise.**

### 5. Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases.

### 6. Insurance Policies

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, (a) the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims and (b) such insurance policies and any agreements, documents, or instruments relating thereto shall revest in the Reorganized Debtors.

### 7.    Reservation of Rights

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### 8.    Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### E.    Provisions Concerning Distributions

### 1.    Distributions on Account of Claims or Interests Allowed as of the Effective Date

Unless otherwise provided in the Plan, on or as soon as reasonably practicable after the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VIII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Notwithstanding the foregoing, (a) Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Allowed Priority Tax Claims shall be paid in accordance with Article II.D of the Plan.  To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be paid in full in Cash in

accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non bankruptcy Law or in the ordinary course of business. Thereafter, a Distribution Date shall occur no less frequently than once in every 180-day period, as necessary, in the discretion of the Reorganized Debtors. The timing of distribution(s) to Holders of Allowed General Unsecured Claims shall be determined by the Plan Administrator in its sole discretion.

### 2.    Disbursing Agent

Except as otherwise set forth in Article VII.B of the Plan or the Plan Supplement, all distributions under the Plan shall be made by the applicable Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.

### 3.    Rights and Powers of Disbursing Agent

The Disbursing Agent shall, among other things, implement, administer, and make distributions on account of Allowed Claims, including:

- Making distributions as provided for in the Plan on account of unclassified Allowed Claims and on account of Allowed Claims in Classes 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 and 14 to the extent applicable.

- Making distributions of the Estate Claims Settlement Amount to Holders of Allowed Claims in Class 7 and Class 8;

- Making distributions of the Third-Party Release Settlement Amount to Holders of Claims and Interests who are bound by the Third-Party Release Settlement Agreement; and

- Making all other distributions as provided for in the Plan.

Notwithstanding any provision in the Plan to the contrary, distributions to the Holders of Convertible Notes Claims may be made to or at the direction of the Convertible Notes Trustee, which may act as Disbursing Agent (or direct the Disbursing Agent) for distributions to the Holders of Convertible Notes Claims in accordance with the Plan and the Convertible Notes Documents. The Convertible Notes Trustee may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with the Holders of the Convertible Notes Claims to the extent consistent with the customary practices of DTC; provided, that, under no circumstances will the Convertible Notes Trustee be responsible for making or required to make any distribution under the Plan to Holders of Convertible Notes Claims if such distribution is not eligible to be distributed through the facilities of DTC. Notwithstanding anything to the contrary herein, such distributions shall be subject in all respects to any rights of the Convertible Notes Trustee to assert charging liens against such distributions.

### a.    Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

### b.       Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement Claims (including reasonable attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors, Plan Administrator, or the Creditor Trustee, as applicable.

### 4.       Delivery of Distributions and Undeliverable or Unclaimed Distributions

### a.       Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions is and shall be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. Unless otherwise provided in a Final Order from the Bankruptcy Court, if a Claim, other than one based on a Security that is traded on a recognized securities exchange, is transferred twenty or fewer days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

### b.       Delivery of Distributions in General

Except as otherwise provided herein or in the Plan Supplement, the Disbursing Agent shall make distributions, including to Holders of Allowed Claims and Allowed Interests, as applicable, as of the Distribution Record Date at the address for each such Persons as indicated on the Debtors' records as of the date of any such distribution; provided that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors or the Disbursing Agent, as applicable.

### c.       Minimum Distributions

The Disbursing Agent shall not make any distributions, including to a Holder of an Allowed Claim or Allowed Interest on account of such Allowed Claim or Allowed Interest of Cash, where such distribution is valued, in the reasonable discretion of the applicable Disbursing Agent, at less than $250. When any distribution pursuant to the Plan, as applicable, would otherwise result in the issuance of a number of shares of the New Common Stock that is not a whole number, the actual distribution of shares of the New Common Stock shall be rounded as follows: (i) fractions of one-half or greater shall be rounded to the next higher whole number; and (ii) fractions of less than one-half shall be rounded to the next lower whole number with no further

payment therefor. The total number of authorized shares of the New Common Stock to be distributed under the Plan shall be adjusted as necessary to account for the foregoing rounding. No fractional shares of the New Common Stock shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. Each distribution, including on account of a Claim or Interest, to which these limitations apply shall be discharged pursuant to Article I. of the Plan and its Holder shall be forever barred pursuant to Article IX of the Plan from asserting that Claim or Interest against the Released Parties.

Any amounts owed that are under $250 shall revest in the applicable Reorganized Debtor automatically (and without need for a further order by the Bankruptcy Court).

### 5. Undeliverable and Unclaimed Distributions

If any distribution is returned to the Disbursing Agent as undeliverable, no distribution shall be made unless and until the Disbursing Agent is notified in writing of such Person's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such Person on the next Distribution Date without interest. Except with respect to Third-Party Release Settlement Amounts as provided for in the Plan, undeliverable distributions shall remain in the possession of the Plan Administrator, Reorganized Debtors or the Creditor Trust until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors or is cancelled pursuant to this Article VII, and shall not be supplemented with any interest, dividends, or other accruals of any kind.

Any distribution under the Plan that is an Unclaimed Distribution or remains undeliverable for a period of 180 days after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution or undeliverable distribution shall revest in the Reorganized Debtor, as applicable, automatically (and without need for a further order by the Bankruptcy Court, notwithstanding any applicable federal, provincial, or estate escheat, abandoned, or unclaimed property Laws to the contrary) and, to the extent such Unclaimed Distribution is comprised of the New Common Stock, such New Common Stock shall be cancelled. Upon such revesting, the Claim of the Person or its successors with respect to such property shall be cancelled, released, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property Laws, or any provisions in any document governing the distribution that is an Unclaimed Distribution, to the contrary. The Disbursing Agent shall adjust the distributions of the New Common Stock to reflect any such cancellation.

### 6. Surrender of Cancelled Instruments or Securities

On the Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.K. of the Plan shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non Debtor third parties vis à vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest, which shall continue in effect for purposes of allowing Holders to receive distributions

under the Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

### 7. Manner of Payment

Except as otherwise provided in the Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, all distributions of the New Common Stock to the Holders of the applicable Allowed Claims or Allowed Interests, in each case if any, under the Plan shall be made by the Disbursing Agent on behalf of the Debtors or the Reorganized Debtors, as applicable.

All distributions of Cash, including to the Holders of the applicable Allowed Claims or Allowed Interests, in each case if any, under the Plan shall be made by the Disbursing Agent on behalf of the applicable Debtor or Reorganized Debtor.

At the option of the applicable Disbursing Agent, any Cash payment to be made hereunder may be made by check, Automated Clearing House, or wire transfer or as otherwise required or provided in applicable agreements.

### 8. Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Debtors, the Reorganized Debtors, the Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

### 9. Allocations

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for United States federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

### 10. No Postpetition Interest on Claims

Unless otherwise specifically provided for in the DIP Orders, the Plan, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy Law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period

from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

### 11.    Preservation of Setoffs and Recoupment

Except as expressly provided in the Plan or the Plan Supplement, each Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action (other than Avoidance Actions) that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Reorganized Debtor(s) and the Holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; provided that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or their applicable successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or their applicable successor may possess against the applicable Holder.  In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors, the Reorganized Debtors, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with Article XIII.G. of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

Notwithstanding anything to the contrary herein, nothing in the Plan or the Confirmation Order shall modify the rights, if any, of any counterparty to an Executory Contract or Unexpired Lease to assert any right of setoff or recoupment that such party may have under applicable bankruptcy Law or non-bankruptcy Law, including, but not limited to, the (i) ability, if any, of such parties to setoff or recoup a security deposit held pursuant to the terms of their Unexpired Lease(s) with the Debtors, or any successors to the Debtors, under the Plan, (ii) assertion of rights of setoff or recoupment, if any, in connection with Claims reconciliation, or (iii) assertion of setoff or recoupment as a defense, if any, to any Claim or action by the Debtors, the Reorganized Debtors, or any successors of the Debtors.

### 12.    Claims Paid or Payable by Third Parties

#### a.    Claims Paid by Third Parties

The Debtors, the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim Objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen calendar days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the

Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

### b.        Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim Objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### c.        Applicability of Insurance Policies

Except as otherwise provided in the Plan or the Plan Supplement, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### F.        Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

### 1.        Allowance of Claims

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim or Interest immediately before the Effective Date; *provided, however*, the Plan Administrator or Creditor Trust shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Interest unless and until such Claim or Interest, as applicable, is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim or Interest.

### 2.        Claims Administration Responsibilities

### a.        Claims

With respect to all Classes of Claims, and amounts distributable under the Plan, and except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Plan Administrator or the Creditor Trust, as applicable, shall have the sole authority (solely in relation to Class 8 Claims in the case of the Creditor Trust, and in relation to any other Claims in the case of the Plan Administrator) to:  (a) File and prosecute Claim Objections; (b) settle, compromise, withdraw,

litigate to judgment, or otherwise resolve any and all Claim Objections, regardless of whether such Claims are in a Class or otherwise; (c) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (d) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  After the Effective Date, the Plan Administrator or the Creditor Trust, as applicable, shall resolve Disputed Claims in accordance with their fiduciary duties and pursuant to the terms of the Plan.

### b.      Estimation of Claims

Before, on, or after the Effective Date, the Debtors, the Reorganized Debtors, Plan Administrator or Creditor Trust (as applicable), may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable Law, including pursuant to section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3012, for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim during the pendency of any appeal relating to such objection.

### c.      Disputed Claims Reserve

On or before the Effective Date, the Reorganized Debtors, Plan Administrator, or Creditor Trust (as applicable) shall establish one or more reserves of the applicable consideration for any Claims against any Debtor that are Disputed Claims as of the Distribution Record Date, which reserves shall be administered by the Disbursing Agent.

After the Effective Date, the applicable Disbursing Agent shall hold such consideration in such reserve(s) in trust for the benefit of such Disputed Claims as of the Distribution Record Date, that are ultimately determined to be Allowed after the Distribution Record Date.  The Disbursing Agent shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein, as such Claims are resolved by a Final Order or agreed to by settlement, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article III of the Plan solely to the extent of the amounts available in the applicable reserve(s).

Upon a Disputed Claim becoming disallowed by a Final Order, the applicable amount of the consideration that was in the disputed claims reserve on account of such Disputed Claim shall be canceled by the Reorganized Debtors or the applicable Disbursing Agent.  The Disbursing Agent shall adjust the distributions of the consideration to reflect any such cancellation.

The Debtors may take the position that grantor trust treatment applies in whole or in part to any assets held in a disputed claims reserve.  To the extent such treatment applies to any such account or fund, for all U.S. federal income tax purposes, the beneficiaries of any such account or fund would be treated as grantors and owners thereof, and it is intended, to the extent reasonably practicable, that any such account or fund would be classified as a liquidating trust under section 301.7701-4 of the Treasury Regulations.  Accordingly, subject to the immediately foregoing sentence, if such intended U.S. federal income tax treatment applied, then for U.S. federal income

tax purposes, the beneficiaries of any such account or fund would be treated as if such beneficiaries had received an interest in such account or fund's assets and then contributed such interests to such account or fund. Alternatively, any assets held in the Trust Claims Reserve for certain Disputed Claims may be subject to the tax rules that apply to "disputed ownership funds" under 26 C.F.R. 1.468B–9. To the extent such treatment applies, such assets will be subject to entity-level taxation, and the Reorganized Debtors shall be required to comply with the relevant rules.

### d.       Time to File Objections to Claims

Any objections to Claims or Interests shall be Filed on or before the later of (1) 180 days after the Effective Date and (2) such other period of limitation as may be specifically fixed by the Bankruptcy Court upon a motion by the Debtors or the Reorganized Debtors.

### e.       Disallowance of Claims or Interests

Except as otherwise expressly set forth herein and in the Plan, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

### f.       No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim or Interest is a Disputed Claim or Interest, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest; provided that if only the Allowed amount of an otherwise valid Claim or Interest is Disputed, such Claim or Interest shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount pending resolution of the dispute.

### g.       Distributions After Allowance

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of such date, without any interest to be paid on account of such Claim or Interest.

### h.       Single Satisfaction of Claims

Holders of Allowed Claims or Allowed Interests may assert such Claims against or Interests in the Debtors obligated with respect to such Claims or Interests, and such Claims and Interests shall be entitled to share in the recovery provided for the applicable Claim or Interest against the Debtors based upon the full Allowed amount of such Claims or Interests. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim or Allowed Interest exceed the amount of the Allowed Claim or Allowed Interest.

### G.    Settlement, Release, Injunction, and Related Provisions

#### 1.    Discharge of Claims and Termination of Interests

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the Confirmation Order, any other Definitive Document, or in any contract, instrument, or other agreement or document created or entered into pursuant to the Plan or the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan; *provided, however,* any DIP Facility Claims and/or Foris Prepetition Secured Claims that are rolled up, converted, exchanged, refinanced or amended and restated into the Exit First Lien Facility and/or New Common Stock of Reorganized Amyris shall not be deemed satisfied and discharged and shall continue in full force and effect.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than the Reinstated Claims) and Interests (other than the Intercompany Interests that are Reinstated) subject to the occurrence of the Effective Date.

##### a.    Release of Liens

**Except as otherwise provided herein, in the Exit First Lien Facility Documents, the Plan Supplement, the Confirmation Order, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, and other than as to the DIP Facility Claims and Foris Prepetition Secured Claims rolled up, converted, exchanged, refinanced or amended and restated, into the Exit First Lien Facility, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of**

the Effective Date, except for Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Reorganized Debtors, or any other Holder of a Secured Claim.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, and other security interests.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, or the Exit First Lien Facility Agent, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

b.      Releases by the Debtors

Except as otherwise expressly provided in the Plan or the Confirmation Order, on the Effective Date, for good and valuable consideration, each of the Debtors, on its own behalf and as a representative of its Estates, to the fullest extent permitted under applicable law, shall, and shall be deemed to, completely and forever release, waive, void and extinguish unconditionally, as against each and all of the Released Parties, any and all Claims, Estate Causes of Action, interests, obligations, suits, judgments, damages, debts, rights, remedies, set offs, and Liabilities of any nature whatsoever, whether liquidated or Unliquidated, fixed or Contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, tort, contract, or otherwise, that are or may be based in whole or part on any act, omission, transaction, event, occurrence, or other circumstance, whether direct or derivative, taking place or existing on or prior to the Effective Date (including prior to the Petition Date) arising from, in connection with, or related to, directly or indirectly, in any manner whatsoever, the Debtors or their operations, assets, liabilities, financings, the Estates, or the Chapter 11 Cases, that may be asserted by or on behalf of such Debtor or its Estate, against any of the Released Parties; *provided, however*, that nothing in this section shall operate as a release, waiver, discharge or

impairment of any Estate Causes of Action transferred to the Creditor Trust, which are preserved notwithstanding anything to the contrary in this section.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (a) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions; (b) the rights of any Holder of Allowed Claims to receive distributions under the Plan; (c) any Claims for indemnification that are expressly assumed by the Reorganized Debtors pursuant to the Plan or any document, instrument, or agreement executed to implement the Plan or the Restructuring Transactions; or (d) any obligations arising under business or commercial agreements or arrangements among the Released Parties and any non-Debtor Entity.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (i) in exchange for the good and valuable consideration provided by the Released Parties; (ii) a good faith settlement and compromise of the claims or Causes of Action released by the Debtor Release; (iii) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (iv) fair, equitable and reasonable; (v) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (vi) a bar to any of the Debtors, the Reorganized Debtors, or the Estates asserting any claim or Cause of Action released by the Debtor release against any of the Released Parties.

c.    Third-Party Release by the Releasing Parties

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Releasing Parties shall be deemed to forever release and waive, as against each and all of the Released Parties, any and all Direct Claims, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise that are or may be based in whole or in part upon any act, omission, transaction, event, or other occurrence taking place or existing on or prior to the Effective Date; *provided*, *however*, that nothing in this section shall operate as a release, waiver, discharge or impairment of (i) any Estate Causes of Action or liabilities arising out of actual fraud, willful misconduct, or gross negligence of any such Released Party as determined by a Final Order, or (ii) any Causes of Action transferred to the Creditor Trust, which Causes of Action are preserved notwithstanding anything to the contrary in this section, or (iii) any Excluded Party Direct Claims.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release: (a) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or the Restructuring Transactions, including the Exit First

**Lien Facility Documents; (b) the rights of any Holder of Allowed Claims or Allowed Interests to receive distributions under the Plan; and (c) any obligations arising under business or commercial agreements or arrangements among the Released Parties and any non-Debtor Entity.**

**If the Third-Party Releases are not approved by the Bankruptcy Court, each holder of a Direct Claim may voluntarily elect to receive its portion of the Creditor Trust to which it is entitled by electing to grant the Third-Party Releases, through the following methods: (x) for (i) holders of Claims who are entitled to submit a ballot to vote on the Plan and vote to accept the Plan, (ii) holders of Claims who are entitled to submit a ballot to vote on the Plan and (a) vote to reject the Plan or (b) abstain from voting on the Plan and, in either case, do not elect to exercise their right to opt out of granting the Third-Party Releases, and (y) for holders of Claims and Interests who are deemed to accept or reject the Plan and are provided with a notice of non-voting status providing them with the right to opt out of granting the Third-Party Releases and do not elect to exercise such right; *provided,* that, as applicable, the Direct Claims Threshold is satisfied.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (i) essential to the Confirmation; (ii) given in exchange for the good and valuable consideration provided by the Released Parties, including, without limitation, the Released Parties' contributions to facilitating the Creditor Trust and the Third-Party Release Settlement Amounts and the restructuring and implementing the Plan; (iii) a good faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (iv) in the best interests of the Debtors and their Estates; (v) fair, equitable, and reasonable; (vi) given and made after due notice and opportunity for hearing; and (vii) a bar to any of the Releasing Parties asserting any Direct Claim released pursuant to the Third-Party Release.**

As will be presented in much greater detail in connection with Confirmation Hearing, the Debtors believe that the proposed Third-Party Release meets the standards utilized in the Third Circuit regarding the approval of nonconsensual third-party releases.  In general, the United States Court of Appeals for the Third Circuit has permitted such releases where certain hallmarks are shown -- "fairness, necessity to the reorganization, and specific factual findings to support these conclusions" and "integral to the restructuring of the debtor-creditor relationship."[42]  Courts within the Third Circuit, and elsewhere, have utilized the factors set forth in *In re Master Mortgage*,[43] to "inform the analysis of whether the *Continental* hallmarks have been met."[44]  Specifically, the factors assess "whether (i) there is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (ii) the non-debtor has contributed substantial assets to the reorganization; (iii) the injunction is essential to reorganization such that without it,

---

[42] *See Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000); *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 139 (3d Cir. 2019)(*citing Stern v. Marshall*, 564 U.S. 462, 498 (2011)).

[43] 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994).

[44] *In re Boy Scouts of Am.*, 642 B.R. 504, 597 (Bankr. D. Del. 2022).

there is little likelihood of success; (iv) a substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment and (v) the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction."[45]  The Debtors will present evidence at the Confirmation Hearing that an analysis of these factors strongly favors approval of the Third-Party Release.

### d.    Exculpation

**Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any claims and Causes of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of prepetition transactions (including with respect to the Debt Documents), the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility Documents, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

**The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable Law with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable Law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

### e.    Plan Injunction

**Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, and separate and apart from the Direct Claims Injunction, all Entities who have held, hold, or may hold the Released Claims are permanently enjoined from and after the Effective Date, from taking any of the following actions against, as applicable, the**

---

[45] *Id.* (quoting *Master Mortgage*, 168 B.R. at 935).

Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any Released Claims; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any Released Claims; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the Estates of such Entities on account of or in connection with or with respect to any Released Claims; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the Estates of such Entities on account of or in connection with or with respect to any Released Claims unless such Entity has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article IX.F of the Plan.

### f.    Direct Claims Injunction

#### (i)    General Purposes and Terms

The Confirmation Order shall provide that, as of the Effective Date, and irrespective of whether any such holder has agreed to be bound by the Plan, all holders of Direct Claims and their respective Related Parties will be permanently and forever stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Direct Claim against the Direct Claims Injunction Parties, including all of the following actions (collectively, the "<u>Direct Claims Injunction</u>"):

1. commencing or continuing in any manner, any actions or other proceedings of any kind with respect to any Direct Claims against any of the Direct Claims Injunction Parties or against the property of any of the Direct Claims Injunction Parties;

2. enforcing, levying, attaching, collecting, or otherwise recovering, by any manner or means, from any of the Direct Claims Injunction Parties, or the property of the Direct Claims Injunction Parties, any judgment, award, decree, or order with respect to any Direct Claim

against any of the Direct Claims Injunction Parties, or any other person;

3. creating, perfecting, or enforcing any lien of any kind relating to any Direct Claim against any of the Direct Claims Injunction Parties, or the property of the Direct Claims Injunction Parties; and

4. taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, with respect to any such Direct Claim.

(ii)     Standing of Direct Claim Injunction Parties

**Each of the Direct Claims Injunction Parties shall have standing to seek relief from the Bankruptcy Court or any court of competent jurisdiction for purposes of enforcement of the Direct Claims Injunction or other Injunction or releases under the Plan to the extent that any act occurs or is taken that is contrary to the provisions of, or would interfere with, restrict, defeat, nullify, violate or otherwise limit the protections afforded the Direct Claims Injunction Party through the Direct Claims Injunction.**

## g.     Protections Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## h.     Document Retention

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

## i.     Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (a) such Claim has been adjudicated as non-contingent or (b) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**H.**   **Conditions Precedent to Consummation of the Plan**

    **1.**   **Conditions Precedent to Approval of the Disclosure Statement**

The Creditors Committee and the holders of at least 60% of the outstanding principal amount of the Convertible Notes each executes a joinder to the Plan Support Agreement.

    **2.**   **Conditions Precedent to the Confirmation Date**

It shall be a condition to the Confirmation Date that the following conditions shall have been satisfied:

    a.    the Disclosure Statement Order shall have been entered and shall be in full force and effect and not have been reversed, stayed, modified, or vacated on appeal;

    b.    the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed;

    c.    the Plan Support Agreement shall not have been terminated and shall be in full force and effect;

    d.    the DIP Orders shall be in full force and effect in accordance with the terms thereof, and no event of default (that had not been waived) shall be continuing thereunder or occur as a result of entry of the Confirmation Order;

    e.    the sale of the Sold Assets (including the Other Assets in the event of a Sale Option) shall have been approved by the Bankruptcy Court and the order approving the sale of the Sold Assets (including the Other Assets in the event of a Sale Option) shall be entered and not reversed, stayed, modified or vacated on appeal;

    f.    in the event of a Sale Option, the proceeds of the Sold Assets shall in the aggregate generate cash proceeds in an amount sufficient to fund the Plan Effective Date Funding Amount;

    g.    the amount of the Allowed Lavvan Secured Claim shall be determined by the Bankruptcy Court and such amount shall be acceptable to the DIP Lender and the Foris Prepetition Secured Lenders in their sole and absolute discretion;

    h.    the Debtors shall negotiate modifications to the Lease dated as of March 10, 2008 by and between ES East Associates, LLC and Amyris, Inc. (as from time to time amended, modified, supplemented, restated or amended and restated) for the real property located at 5885 Hollis Street, Emeryville, California that are acceptable to the DIP Lender and the Foris Prepetition Secured Lenders;

    i.    (x) the Allowed Administrative Claims shall not exceed the amounts set forth in the Plan Effective Date Funding Schedule; and (y) the

Plan Effective Date Funding Amount shall not exceed the amount set forth on the Plan Effective Date Funding Schedule; and

j.    the Third-Party Releases, Exculpation, Injunction, and Direct Claims Injunction provisions provided herein shall be approved and the Released Parties and Direct Claims Injunction Parties shall include such persons as is acceptable to the DIP Lender and the Foris Prepetition Secured Lenders and the Debtors in their respective sole and absolute discretion.

### 2.    Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following conditions shall have been satisfied:

a.    the Plan Support Agreement shall not have been terminated and shall be in full force and effect;

b.    the Final DIP Order shall be in full force and effect and not have been reversed, stayed, modified or vacated on appeal;

c.    the Bankruptcy Court shall have entered an order(s) approving the sale of the Sold Assets (including the Other Assets in the event of a Sale Option) and such order(s) shall not have been reversed, stayed, modified or vacated on appeal;

d.    the Bankruptcy Court shall have entered the Confirmation Order in form and substance and Materially Consistent (as defined in the Plan Support Agreement) with the Plan Support Agreement, and the Confirmation Order shall be in full force and effect and not have been reversed, stayed, modified, or vacated on appeal;

e.    the Estate Claims Settlement Order shall have been approved by the Bankruptcy Court and incorporated in the Confirmation Order;

f.    the Definitive Documents shall (i) be on terms Materially Consistent (as defined in the Plan Support Agreement) with the Plan Support Agreement and otherwise approved by the requisite parties thereto consistent with their respective consent and approval rights as set forth in the Plan Support Agreement and (ii) have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties;

g.    all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected and executed, including, without limitation, the closing of the sales of the Consumer Brands Businesses;

h.     each of the Exit Facility and related documentation shall have been executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived (with the consent of the Debtors, the DIP Lender, the Foris Prepetition Secured Lenders, and the Exit Facility Lenders), other than such conditions that relate to the effectiveness of the Plan and related transactions, including payment of fees and expenses;

i.     all fees, expenses, and other amounts payable to the DIP Lender, the Foris Prepetition Secured Lenders and the Consenting Stakeholders as provided for in the Plan and the Plan Support Agreement, and on account of the Convertible Notes Trustee Fees and Expenses shall have been satisfied in full (or provision for such payment made); and

j.     the Debtors, the DIP Lenders and the Foris Prepetition Lenders shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring.

### 3. Waiver of Conditions

Except as otherwise specified in the Plan, any one or more of the conditions to Consummation set forth in Article X of the Plan may be waived only if waived in writing by the Debtors and the DIP Lender and/or the Foris Prepetition Secured Lenders, as applicable, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

### 4. Effect of Failure of Conditions

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, or any other Definitive Document shall: (a) constitute a waiver or release of any Claims by the Debtors, Claims, or Interests; (b) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity; provided that all provisions of the Plan or other any Definitive Document that survive termination thereof shall remain in effect in accordance with the terms thereof.

### 5. Substantial Consummation

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

### I.    <u>Modification and Amendments</u>

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan; provided that any such modification (whether material or immaterial) shall be acceptable in form and substance to Foris, the Creditors' Committee, and the Ad Hoc Group and materially consistent with the Plan Support Agreement.  Subject to those restrictions on modifications set forth in the Plan and the Plan Support Agreement, and the requirements of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

### 1.        Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### a.        Revocation or Withdrawal of Plan

Subject to the Plan Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of such Debtor or any other Entity; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

### b.        Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

i.        allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

ii.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

iii.      resolve any matters related to:  (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article VI of the Plan, the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

iv.      ensure that distributions to Holders of Allowed Claims and Holders of Allowed Interests are accomplished pursuant to the provisions of the Plan;

v.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

vi.      enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan, the Confirmation Order, or the Disclosure Statement;

vii.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

viii.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

ix.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

x.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article IX of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

xi.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII.J. of the Plan;

xii.      enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

xiii.    determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

xiv.    enter an order or final decree concluding or closing the Chapter 11 Cases;

xv.    adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

xvi.    adjudicate any and all matters relating to the Creditor Trust;

xvii.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

xviii.    determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

xix.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

xx.    hear and determine matters concerning U.S. state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

xxi.    hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article IX of the Plan, whether occurring prior to or after the Effective Date;

xxii.    enforce all orders previously entered by the Bankruptcy Court; and

xxiii.    hear any other matter not inconsistent with the Bankruptcy Code.

**J.    Miscellaneous Provisions**

**1.    Immediate Binding Effect**

Subject to <u>Article X.A</u> of the Plan, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and Interests shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or Interest has voted on the Plan.

2.      **SEC Matters**

Notwithstanding any language to the contrary in the Disclosure Statement, Plan and/or Confirmation Order, no provision shall (a) preclude the United States Securities and Exchange Commission ("SEC") from enforcing its police or regulatory powers; or (b) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceeding or investigations against any non-Debtor person or non-Debtor entity in any forum; provided that the foregoing shall not diminish the scope of any exculpation to which any party is entitled under section 1125(e) of the Bankruptcy Code

3.      **Additional Documents**

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan; provided that any and all such agreements and documents shall be in form and substance acceptable to the Debtors and the Foris Secured Parties.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

4.      **Statutory Committee and Cessation of Fee and Expense Payment**

On the Effective Date, the Creditors' Committee and any other statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases, except for purposes of prosecution of requests for payment of Professional Claims for services rendered and reimbursement of expenses on a final basis.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee or any other statutory committees after the Effective Date except with respect to the prosecution of requests for payment of Professional Claims for services rendered and reimbursement of expenses on a final basis.  Notwithstanding the foregoing, the dissolution of the Creditors' Committee shall not prohibit the Creditors' Committee from enforcing and protecting its rights after the Effective Date.

5.      **Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

6.      **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

### 7.    Notices

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**If to Counsel to the Debtors**:

Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor, Wilmington, DE 19801
Attn: Richard M. Pachulski (rpachulski@pszjlaw.com) and
Debra I. Grassgreen, Esq. (dgrassgreen@pszjlaw.com)

**If to Counsel to the DIP Agent, DIP Lenders and Foris Prepetition Secured Lenders**:

Goodwin Procter LLP
620 Eighth Avenue
New York, NY 10018
Attn: Michael H. Goldstein (mgoldstein@goodwinlaw.com)
Alexander Nicas (anicas@goodwinlaw.com)
Debora Hoehne (dhoehne@goodwinlaw.com)

Troutman Pepper Hamilton Sanders LLP
Hercules Plaza, Suite 5100
1313 N. Market Street, P.O. Box 1709
Wilmington, DE 19899
Attn: David M. Fournier (david.fournier@troutman.com)

**If to Counsel to the Creditors' Committee**:

White & Case LLP
111 South Wacker Drive, Suite 5100
Chicago, IL 60606
Attn: Gregory F. Pesce (gpesce@whitecase.com) and
Andrew F. O'Neill (aoneill@whitecase.com)

White & Case LLP
1221 Avenue of the Americas
New York, NY  10020
Attn: John Ramirez (john.ramirez@whitecase.com) and
Andrea Kropp (andrea.kropp@whitecase.com)

Potter Anderson & Corroon LLP
1313 N. Market Street, 6th Floor
Wilmington, DE 19801
Attn: Christopher M. Samis (casmis@potteranderson.com) and
Katelin A. Morales (kmorales@potteranderson.com)

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, an Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

### 8. Term of Injunctions or Stays

**Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.  The Trading Order shall remain enforceable (a) as to transfers through the Effective Date with respect to those persons having "Beneficial Ownership" of "Common Stock" (as such terms are defined in the Trading Order), and (b) as to taking any action that claims any deduction for worthlessness of "Beneficial Ownership" of "Common Stock" by a "50-Percent Shareholder" (as such terms are defined in the Trading Order) for a taxable year ending before the Effective Date.**

**Notwithstanding anything to the contrary herein, the automatic stay imposed by section 362 of the Bankruptcy Code and the injunctions set forth in Article IX.F of the Plan shall remain applicable to Claims that have the benefit of an applicable insurance policy arising prior to the Effective Date up to the amount of the applicable SIR or deductible, which Claims shall be treated as General Unsecured Claims.**

### 9. Entire Agreement

Except as otherwise indicated, the Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 10. Plan Supplement

All exhibits and documents included in the Plan Supplement are an integral part of the Plan and are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and

documents from the Debtors' restructuring website at https://cases.stretto.com/amyris/ or the Bankruptcy Court's website at www.deb.uscourts.gov/bankruptcy. To the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the Plan Supplement document or exhibit shall control (unless stated otherwise in such Plan Supplement document or exhibit or in the Confirmation Order).

### 11. Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the Debtors' or the Reorganized Debtors' consent, as applicable; and (c) nonseverable and mutually dependent.

### 12. Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with section 1125(g) of the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, no such parties nor individuals nor the Reorganized Debtors will have any liability for the violation of any applicable Law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

### 13. Closing of Chapter 11 Cases

On and after the Effective Date, the Debtors or the Reorganized Debtors shall be permitted to close all of the Chapter 11 Cases of the Debtors, except for the Chapter 11 Case of Debtor Amyris, Inc. (or such other Debtor as the Debtors may determine in their sole discretion), a change the corporate name of such Debtor, and thereafter such Debtor's case will remain open following the Effective Date, and all contested matters relating to any of the Debtors, including Claim Objections and any adversary proceedings, shall be administered and heard in the Chapter 11 Case(s) of such Debtor(s), irrespective of whether such Claim(s) were Filed or such adversary proceeding was commenced against a Debtor whose Chapter 11 Case was closed.

When all Disputed Claims have become Allowed or disallowed and all distributions have been made in accordance with the Plan, the Reorganized Debtors shall seek authority to close any remaining Chapter 11 Cases in accordance with the Plan, the Bankruptcy Code and the Bankruptcy Rules.

**4.      VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN**

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that (a) the Plan has classified Claims and Interests in a permissible manner, (b) the Plan complies with applicable provisions of the Bankruptcy Code, (c) the Debtors have complied with applicable provisions of the Bankruptcy Code, (d) the Debtors have proposed the Plan in good faith and not by any means forbidden by law, (e) the disclosure required by Section 1125 of the Bankruptcy Code has been made, (f) the Plan has been accepted by the requisite votes of creditors (except to the extent that cramdown is available under Section 1129(b) of the Bankruptcy Code), (g) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, (h) the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to such holders on account of their Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain in a chapter 7 liquidation, unless the Holder has accepted the Plan, and (i) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date.

### A.      Parties in Interest Entitled to Vote

Pursuant to the Bankruptcy Code, only classes of claims and interests that are "impaired" (as defined in Section 1124 of the Bankruptcy Code) under the plan are entitled to vote to accept or reject the Plan.  A class is impaired if the legal, equitable, or contractual rights to which the claims or equity interests of that class entitled the holders of such claims or equity interests are modified, other than by curing defaults and reinstating the debt.  Classes of claims and interests that are not impaired are not entitled to vote on the plan and are conclusively presumed to have accepted the plan.  In addition, classes of claims and interests that receive no distributions under the plan are not entitled to vote on the plan and are deemed to have rejected the plan.

### B.      Classes Impaired Under the Plan

Under the Plan, Claims in Classes 1, 2 and 13 are unimpaired and, consequently, are presumed to accept the Plan.  Claims in Classes 3 through 10 are Impaired and entitled to vote on the Plan. Holders of Claims in Class 12 and Holders of Interests in Class 14 will receive no distribution, and, accordingly, such holders are deemed to reject the Plan.  The Debtors (or Reorganized Debtors) have discretion regarding the treatment of Intercompany Claims in Class 12 and, as such, certain Claims in such Class may be unimpaired or impaired depending on such treatment.

### C.      Confirmation Standards

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code and that they have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code. Specifically, the Debtors believe that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be disclosed to the Bankruptcy Court, and any such payment: (1) made before the confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after confirmation of the Plan.

- With respect to each Class of Claims, each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code. With respect to each Class of Interests, each Holder of an Impaired Interest has accepted the Plan or will receive or retain under the Plan on account of such Interest property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Each Class of Claims or Interests that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims or Interests pursuant to section 1129(b) of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Holders of Claims specified in section 507(a)(2) will receive, without interest, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holder of such Claim and the Debtors or the Creditor Trustee, as the case may be; (c) with respect to any Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), such fees will be paid as and when due under applicable law.

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that the Creditor Trustee shall pay Holders of Claims specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code the full unpaid amount of such Allowed Claim on the earliest of the following dates: (i) on or as soon as practicable after the Effective Date, (ii) on or as soon as practicable after the date such Claim becomes an Allowed Claim, and (iii) the date such Allowed Claim is payable under applicable non-bankruptcy law.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any "insider," as that term is defined by section 101(31) of the Bankruptcy Code, holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

- The Debtors have paid or the Plan provides for the payment of the required fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

### D.    Liquidation Analysis

In certain circumstances, to be confirmed, the Plan must pass the "Best Interest Of Creditors Test" incorporated in section 1129(a)(7) of the Bankruptcy Code. The test applies to individual creditors and Interest holders (stockholders) that are both (i) in Impaired Classes under the Plan, and (ii) do not vote to accept the Plan. Section 1129(a)(7) of the Bankruptcy Code requires that such Creditors and Interest holders receive or retain an amount under the Plan not less than the amount that such holders would receive or retain if the Debtor were to be liquidated under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate the debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Secured creditors generally are paid first from the sales proceeds of properties securing their liens. If any assets are remaining in the bankruptcy estate after the satisfaction of secured creditors' claims from their collateral, Administrative Claims generally are next to receive payment. Unsecured creditors are paid from any remaining sales proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their Allowed claims in relationship to the total amount of Allowed claims held by all unsecured creditors with the same priority. Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

As set forth in the Liquidation Analysis, attached hereto as **Exhibit "D"**, and discussed in the accompanying notes, the provisions of the Plan satisfy the Best Interests of Creditors Test.

### E.    Feasibility

Under Section 1129(a)(11) of the Bankruptcy Code, the Debtors must show that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further

financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan).

The Debtors believe that the Reorganized Debtors will be able to timely perform all obligations described in the Plan and, therefore, that the Plan is feasible.

As set forth in the projections attached hereto as **Exhibit "E"**, while the Reorganized Debtors' businesses are projected to generate negative cash flow in the first two years after the Effective Date, with the Exit Facility, the Reorganized Debtors believe they will have sufficient resources to meet their obligations under the Plan as they come due.

**HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED TO REVIEW CAREFULLY THE RISK FACTORS INCLUDED IN THIS DISCLOSURE STATEMENT THAT MAY AFFECT THE FINANCIAL FEASIBILITY OF THE PLAN.**

### F.    Acceptance by Impaired Classes

Bankruptcy Code § 1129(b) provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of claims has accepted it. The process by which nonaccepting classes are forced to be bound by the terms of a plan is commonly referred to as "cramdown." The Bankruptcy Court may confirm the Plan at the request of the Debtors notwithstanding the Plan's rejection (or deemed rejection) by impaired Classes as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A class of claims under a plan accepts the plan if the plan is accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims in the class that actually vote on the plan. A class of interests accepts the plan if the plan is accepted by holders of interests that hold at least two-thirds in amount of the allowed interests in the class that actually vote on a plan.

A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan. Solicitation of acceptances from such a class is not required. A class is "impaired" unless (1) the legal, equitable and contractual rights to which a claim or interest in the class entitles the holder are not modified, or (2) the effect of any default is cured and the original terms of the obligation are reinstated.

A plan is fair and equitable as to a class of secured claims that rejects the plan if the plan provides (1)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, at least equal to the value of the holder's interest in the estate's interest in such property; (2) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the

proceeds of the sale, and the treatment of the liens on proceeds under clause (1) or (2) of this paragraph; or (3) for the realization of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides (1) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (2) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of interests that rejects a plan if the plan provides (1) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (2) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.

THE DEBTORS INTEND TO SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE WITH RESPECT TO ANY CLASS THAT IS DEEMED TO HAVE REJECTED THE PLAN. FURTHER, THE DEBTORS WILL REQUEST CONFIRMATION OF THE PLAN UNDER SECTION 1129(B) WITH RESPECT TO ANY IMPAIRED CLASS ENTITLED TO VOTE ON THE PLAN THAT DOES NOT ACCEPT THE PLAN.

### G.    Compliance with the Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Debtors have considered each of these issues in the development of the Plan and believes that the Plan complies with all applicable provisions of the Bankruptcy Code.

## 5.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims the potential for the maximum distribution on account of their claims and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, the only viable alternatives are dismissal of the Chapter 11 Cases or conversion to Chapter 7 of the Bankruptcy Code. For the reasons described herein, neither of these alternatives is preferable to confirmation and consummation of the Plan.

If the Chapter 11 Cases were dismissed, creditors would revert to a "race to the courthouse," the result being that creditors would not receive a fair and equitable distribution of the Debtors' remaining assets. Moreover, as set forth above, the Debtors believe the Plan provides a greater recovery to creditors than would be achieved in a Chapter 7 case. Therefore, a Chapter 7 case is not an attractive or superior alternative to the Plan. Thus, the Plan represents the best available alternative for maximizing returns to creditors.

6. **RISK FACTORS**

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.  ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.

A. **Risks Relating to Confirmation and Consummation of the Plan**

1. **Parties in Interest May Object to Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be confirmed or consummated.

2. **The Debtors May Object to a Claim or Interest**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim or Interest where such Claim or Interest is or may become subject to an objection, counterclaim or other suit by the Debtors.  Thus, any Holder of a Claim or Interest that is or may become subject to an objection may not receive its expected share of the estimated distributions described in this Disclosure Statement.

3. **The Debtors May Fail to Satisfy the Vote Requirement**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims or Interests as those proposed in the Plan.

4. **Plan May Not Be Accepted, Confirmed or Consummated**

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, findings by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes, or the Plan contains other terms disapproved of by the Bankruptcy Court.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.  Section 1127 of the Bankruptcy Code permits the Debtors to modify the Plan at any time before confirmation, but not if such modified Plan fails to meet the requirements for confirmation.  The Debtors may modify the Plan at any time after confirmation of the Plan and before substantial consummation of the Plan if circumstances warrant such modification and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, but not if such modified Plan fails to meet the requirements for confirmation.  The Debtors will comply with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code with respect to the modified Plan.  Any Holder of a Claim or Interest that has accepted or rejected the Plan is deemed to have accepted or rejected, as the case may be, the Plan as modified, unless, within the time fixed by the Bankruptcy Court, such Holder changes its previous acceptance or rejection.

### 5.    The Debtors May Not Be Able to Amend Their Contracts with DSM and Givaudan

Although the Debtors and their advisors, and Foris and its advisors, have been engaged in extensive negotiations since the Petition Date with the Company's key contract counterparties, DSM and Givaudan, with respect to amending their commercial relationships to enable the Debtors to implement a sustainable business plan going forward, the parties may not be able to come to an agreement to amend their respective contracts.  As of the date of this Disclosure Statement, the negotiations with DSM and Givaudan are ongoing and have not concluded.  To the extent the

Debtors, Foris and DSM and Givaudan are not able to reach agreements regarding their respective commercial relationships, the ability of the Debtors to operate their business may be compromised and the value of their assets may be diminished from the perspective of a potential purchaser.

### 6. Non-Consensual Confirmation of the Plan May Be Necessary

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class) ("Accepting § 1129(a)(10) Class") and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. If there is an Accepting § 1129(a)(10) Class, the Debtors believe that the Plan satisfies these other requirements and the Debtors may request such non-consensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, in the event that a voting Class does not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion.

### B. Risks Relating to the Chapter 11 Process

### 1. The Debtors' Exclusivity Period May Terminate

At the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose a plan and prohibits creditors and others from proposing a plan. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' goals.

### 2. Continuation of the Chapter 11 Cases May Harm the Debtors' Estates

A prolonged continuation of the Chapter 11 Cases may adversely affect the Debtors' Estates. So long as the Chapter 11 Cases continue, the Debtors may be required to incur substantial costs for professional fees and other expenses associated with the proceedings.

### 3. The Sales of the Consumer Brands Business Assets May Not Close

Although the Debtors have identified certain Successful Bidders for the Consumer Brands Business Assets, it is possible that the sales transactions with such bidders may not close. In that event, those assets may have to be liquidated which may result in reduced net proceeds to the Estate from the disposition of those assets.

### 4. The Debtors May Default on Their DIP Financing Obligations

The Debtors are obligated under the DIP Orders and the DIP Credit Agreement, and amendments thereto, to meet certain milestones in order to continue to access financial resources necessary to continue to operate their business pending the Effective Date of the Plan. If the Debtors fail to complete the requisite tasks by any such milestones, the DIP Lenders may terminate

the DIP Financing and the Debtors will not be able to continue to operate and pursue confirmation of the Plan.

### 5. The Chapter 11 Cases May Be Converted to Cases Under Chapter 7

If the Court does not confirm the Plan – whether or not the Sale Option is exercised -- a bankruptcy court may determine that it would be in the best interest of creditors and/or the Debtors to convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time and (b) additional administrative expenses involved in the appointment of a chapter 7 trustee.

### C. Risks Relating to Recoveries Under the Plan

The projected distributions set forth in this Disclosure Statement are based upon the Debtors' good-faith estimate of the amount of expenses that will be incurred and total amount of Claims in each Class that will ultimately be Allowed. The actual amount of such expenses could be greater than expected for a variety of reasons, including, for example, greater than anticipated administrative and litigation costs associated with resolving Disputed Claims. Additionally, the actual amount of Allowed Claims in any class could be greater than anticipated, which would impact the distributions to be made to Holders of Claims.

### D. Risks Relating to Projections

The Financial Projections accompanying this Disclosure Statement have been prepared using accounting policies that are consistent with those applied in the Company's historical financial statements.

The Financial Projections are based upon and assume the successful implementation of a Plan. The Financial Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Company, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Company or its advisors. In addition, the assumptions do not take into account the uncertainty and disruption of business that may accompany a restructuring pursuant to the Bankruptcy Code. Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the projection period will likely vary from the projected results. These variations may be material. Accordingly, no definitive representation can be or is being made with respect to the accuracy of the Financial Projections or the ability of the Company to achieve the projected results of operations.

Additional risks, disclaimers and assumptions relating to the business performance and financial condition of the Reorganized Debtors after the Effective Date are discussed as part of the projections attached hereto as **Exhibit "E"**.

### E.    Certain Federal Income Tax Consequences Of The Plan

The following discussion summarizes certain significant United States federal income tax consequences of the Plan to the Debtors and Holders of certain Claims who are "U.S. Holders," as defined below.

This summary is based upon the U.S. Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), regulations promulgated thereunder ("Treasury Regulations"), U.S. judicial decisions, and administrative pronouncements, all as in effect as of the date hereof. All of the preceding authorities are subject to change or different interpretation, possibly with retroactive effect, which may result in U.S. federal income tax consequences different from those discussed below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the U.S. Internal Revenue Service (the "IRS") have been sought or obtained with respect to any tax consequences of the Plan and the discussion below is not binding on the IRS.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from those discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to Holders in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws, including, for example, accrual method U.S. Holders (as defined below) that are required to conform their accrual of income to their "applicable financial statements" pursuant to section 451(b) of the Internal Revenue Code, banks, mutual funds, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, broker-dealers, small business investment companies, persons who are related to the Debtors within the meaning of the Internal Revenue Code or Treasury Regulations, persons using a mark-to-market method of accounting, Holders who are themselves in bankruptcy, real estate investment companies and regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan as part of a hedge, straddle, conversion, or other integrated transaction).  This summary does not discuss any aspect of state, local, non-income tax or non-U.S. taxation, nor does it address the alternative minimum tax or the Medicare contribution tax on net investment income. Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds such Claims as "capital assets" (within the meaning of section 1221 of the Internal Revenue Code, generally for investment purposes).

This summary also assumes that the various debt and other arrangements to which the Debtors are or will be a party will be respected for U.S. federal income tax purposes in accordance with their form. This summary does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Reorganized Amyris, and Holders of Claims described below also may vary depending on the nature of any Restructuring Transactions that the Debtors engage in.  In addition, a significant amount of time may elapse between the date of this Disclosure Statement and the consummation of the Plan. Events occurring after the date of the Disclosure Statement, including changes in law

and changes in administrative positions, could affect the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

## 7. U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS

### A. Federal Income Tax Rules Applicable to the Plan

#### 1. Cancellation of Indebtedness Income and Reduction of Tax Attributes

##### a. Definition and Calculation of Cancellation of Tax Attributes

In general, absent an exception, a U.S. taxpayer must include in gross income the amount of any discharge of indebtedness (cancellation of debt, or "<u>COD</u>") income realized during the taxable year. The amount of COD income generally equals the difference between (a) the "adjusted issue price" of the indebtedness discharged and (b) the sum of (i) the amount of cash and (ii) the fair market value of any other property transferred in satisfaction of such discharged indebtedness.

#### 2. Bankruptcy Exception

A debtor is not required to include any amount of COD income in gross income if such debtor is under the jurisdiction of a court in a title 11 bankruptcy proceeding and the discharge of debt occurs pursuant to that proceeding. Instead, as the price for the exclusion of COD income under the foregoing rule, the Internal Revenue Code requires the debtor to reduce its tax attributes by the amount of COD income which is excluded from gross income, as discussed further in "Attribute Reduction" below.

#### 3. Attribute Reduction

Where a debtor relies on the bankruptcy exception to exclude its COD income from gross income, the debtor is required to reduce its tax attributes to the extent of the excluded COD income. The reduction in tax attributes occurs as of the first day of the taxable year following the taxable year in which the discharge of indebtedness occurs.

As a general rule, tax attributes will be reduced in the following order: (a) net operating losses ("<u>NOLs</u>"), (b) most tax credits, (c) capital loss carryovers, (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject), and (e) foreign tax credit carryovers. For the purpose of attribute reduction, any limitations on the use of NOLs, as discussed below in "Limitations on NOLs and Other Tax Attributes", are disregarded. In the context of a consolidated group of corporations, the Internal Revenue Code provides for a complex ordering mechanism to determine how the tax attributes of one member can be reduced in respect of the COD income of another member.

4.      **Election to Reduce Asset Basis**

With respect to transactions giving rise to COD income, a debtor may elect to reduce the basis of assets that are held by the post-emergence debtor prior to reducing the tax attributes that carryover to the post-emergence debtor.

5.      **Limitation on NOLs and Other Tax Attributes**

a.      **General Limitations**

If a corporation undergoes an "ownership change," Section 382 of the Code generally imposes an annual limitation (the "Section 382 Limitation") on a corporation's use of its NOL carryforwards and carry-forwards of interest expense disallowed under section 163(j) of the Internal Revenue Code.  In addition, section 382 may limit a corporation's use of certain built-in losses recognized within a five-year period following an ownership change if the corporation has a net unrealized built-in-loss in excess of the lesser of (i) 10% of the fair market value of the corporation's assets as of the change date or (ii) $10,000,000 (such NOL carryforwards and recognized built-in losses collectively, "Pre-Change Losses").

The annual Section 382 Limitation on the use of Pre-Change Losses to offset income in any "post change year" is generally equal to the product of (a) the fair market value of the loss corporation's outstanding stock immediately before the ownership change, and (b) the long-term tax-exempt rate in effect for the month in which the Plan becomes effective. The long-term tax-exempt rate is published monthly by the IRS and is intended to reflect current interest rates on long-term tax-exempt debt obligations. Section 383 of the Internal Revenue Code applies a similar limitation to capital loss and tax credits carryforwards.  If a loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change in excess of the lesser of (i) 10% of the fair market value of the corporation's assets or (ii) $10,000,000, any built-in gains recognized (or, according to a current IRS notice, treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its Pre-Change Losses against such recognized built-in gain income in addition to its regular annual allowance.

If, in any year, the amount of Pre-Change Losses used by a corporation to offset income is less than the Section 382 Limitation, any unused limitation may be carried forward for use in future years until their expiration date, thereby increasing the Section 382 Limitation (the amount of Pre-Change Losses which may offset income) in the subsequent taxable year of the corporation.

In general, an "ownership change" occurs for section 382 purposes when the percentage of the corporation's stock owned by certain "5 percent shareholders" increases by more than 50 percentage points in the aggregate over the lowest percentage owned by those shareholders at any time during the applicable "testing period" (generally, the shorter of (a) the 36-month period preceding the testing date and (b) the period of time since the most recent ownership change of the corporation).  A "5 percent shareholder" for this purpose includes, generally, an individual or entity that directly or indirectly owns 5% or more of a corporation's stock at any time during the testing period.  A "5 percent shareholder" also includes one or more groups of shareholders that

individually own less than 5% of the corporation's stock but that are aggregated into a single "5 percent shareholder" for purposes of section 382. Under applicable Treasury Regulations, an "ownership change" with respect to an affiliated group of corporations filing a consolidated return that has consolidated NOLs is generally measured by changes in stock ownership of the parent corporation of the group.

### b.      Special Rules Applicable in Bankruptcy

In bankruptcy, the Section 382 Limitation may be calculated under a special rule (the "Section 382(l)(5) Exception") if the corporation's pre-bankruptcy shareholders and certain holders of debt receive, in respect of their claims, at least 50% of the stock of the reorganized corporation (or of a controlling corporation, if such corporation also is in bankruptcy) pursuant to a confirmed plan of reorganization. If a corporation qualifies for the Section 382(l)(5) Exception, the corporation will not be treated as having undergone an ownership change, and, therefore, the annual Section 382 Limitation will not apply to the corporation's Pre-Change Losses. Instead, the corporation's Pre-Change Losses are required to be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of any ownership change, and the portion of the current taxable year ending on the date of the ownership change, in respect of all debt converted into stock pursuant to the bankruptcy reorganization. Additionally, if the Section 382(l)(5) Exception applies and the reorganized corporation undergoes another ownership change within two years after consummation of the plan of reorganization, then the reorganized corporation's use of any Pre-Change Losses after the subsequent ownership change would be eliminated. A corporation may elect not to apply the Section 382(l)(5) Exception.

If the debtor does not qualify for, or elect not to apply, the Section 382(l)(5) Exception described above, the provisions of section 382(l)(6) applicable to corporations under the jurisdiction of a bankruptcy court would apply in calculating the annual Section 382 limitation (the "Section 382(l)(6) Exception"). Under the Section 382(l)(6) Exception, a corporation in bankruptcy that undergoes an ownership change pursuant to a plan of reorganization values its stock to be used in computing the Section 382 Limitation by taking into account any increase in value resulting from the discharge of creditors' claims in the reorganization (rather than the value without taking into account such increases, as is the case under the general rule for non-bankruptcy ownership changes).

### B.      U.S. Federal Income Tax Consequences of the Plan to the Debtors

For U.S. federal income tax purposes, each of the Debtors is a member of an affiliated group of corporations (or limited liability company disregarded as a separate entity) of which Amyris Inc. is the common parent which files a single consolidated U.S. federal income tax return (the "Tax Group"). The Debtors' analysis of their Tax attributes (taking into account the impact of any previous ownership changes under Section 382) is ongoing, but the Debtors currently estimate that, as of December 31, 2022, the Tax Group had approximately $1.1 billion of federal consolidated NOLs (after taking into account ownership changes prior to the date), in addition to other tax attributes. In addition, the Debtors have incurred additional deductions during 2023 and expect to continue to do so through the Effective Date. The amount of any such NOLs and other tax attributes, including any deductions for payments of Claims under the Plan, remain subject to audit and potential adjustment by the IRS.  Subject to the discussions below regarding the potential

reduction or elimination of NOLs, NOLs arising before 2018 may be carried forward for up to 20 years and used to offset 100 percent of future taxable income in a given year, and NOLs arising in taxable years starting with 2018 may be carried forward indefinitely and used to offset 80 percent of taxable income in a given year thereby, in each case, reducing the Debtors' future aggregate income tax obligations.

### 1.    COD Income of the Debtors

As a result of consummation of the Plan, the Debtors' aggregate outstanding indebtedness will be substantially reduced. Accordingly, the Tax Group expects to realize substantial COD income in connection with the Plan. The exact amount of any COD Income that will be realized by the Tax Group is not determinable until after the consummation of the Plan because the amount of COD Income will depend, in part, on the issue price of the fair market value of other non-cash consideration distributed in respect of the Claims, neither of which can be determined until after the Plan is consummated. As described further below, it is expected that there will be a material reduction of the Debtors' tax attributes, but the exact amount of such reduction cannot be predicted with certainty because the amount of the reduction depends on the amount of the COD income realized and whether the Debtors elects to reduce asset basis instead of tax attributes. The Debtors, moreover, have not made a decision as to whether to make an asset basis reduction election.

### 2.    Exclusion of the Debtors' COD Income under the Bankruptcy Exception

The Debtors expect to rely on the bankruptcy exception to exclude any COD income realized as the discharge of indebtedness would occur pursuant to a title 11 bankruptcy proceeding. The Debtors' tax attributes (and/or asset basis) would be reduced by the amount of COD income realized, but any amount of COD in excess of asset basis and tax attributes would not be subject to U.S. federal income tax. Although it is expected that the Debtors will be required to reduce its tax attributes and/or asset basis, the exact amount of such reductions and which attributes will be affected will not be known until after the Effective Date of the Plan. In addition to NOLs, the Debtors may also be required to reduce other tax attributes and its basis in certain assets, which will have an impact on the Debtors' tax liability going forward. The ordering rules for attribute reduction within a consolidated group are complex.

### 3.    Limitations on NOLs and Other Tax Attributes of the Debtors Post-Emergence

The issuance under the Plan of Reorganized Amyris Common Stock, along with the cancellation of existing stock of the Debtors, is expected to cause an ownership change with respect to the Debtors. As a result, the Debtors' Pre-Change Losses will be subject to the Section 382 Limitation (as described above in "Limitations on NOLs and Other Tax Attributes"), absent the ability to satisfy the requirements of the Section 382(l)(5) Exception. Based on the terms of the Plan that result in the DIP Lender and the Foris Prepetition Lenders holding 100% of the new Interests of the reorganized company, the Debtors expect that the Section 382(l)(5) Exception will be applicable; however, no assurance is given as to the application of the Section 382(l)(5) Exception. In any event, regardless of whether the Debtors take advantage of the 382(l)(5) Exception, the use of their Pre-Change Losses after the Effective Date may be materially and

adversely affected if an "ownership change" within the meaning of section 382 of the Internal Revenue Code were to occur after the Effective Date.

### 4.    Sale of the Consumer Brands Business Assets

The Debtors are currently considering whether it would be in their best interests to undergo a taxable sale and transfer, without recourse and subject to liabilities, of substantially all of the assets owned by its Consumer Brands Businesses either prior to, or after the consummation of the Plan.  Upon any such sale, the Debtors will recognize gain (or loss) upon the sale of the Consumer Brands Business assets in an amount equal to the difference between the money and fair market value of any consideration received and its tax basis in such assets.  Subject to the discussion above about the potential limitations on the Company's NOLs under section 382, the sale of Consumer Brands Business is not expected to result in material federal income tax obligations to the Debtors or Reorganized Amyris.  A sale of the Consumer Brands Business could, however, alter the remaining NOLs and other tax attributes available to the Debtors in the future.

### C.    Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims Entitled to Vote

The following discussion describes certain U.S. federal income tax consequences of the transactions contemplated by the Plan to U.S. Holders (as defined below) of Claims allowed to vote.  This summary does not address the U.S. federal income tax consequences to Holders whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan or Holders that are deemed to reject the Plan.  In addition, this summary does not discuss the tax consequences to the DIP Lenders and Foris Prepetition Secured Lenders on the exchange of their Claims for interests in the Exit First Lien Facility and/or New Common Stock.  The DIP Lenders and Foris Prepetition Secured Lenders should consult their own tax advisors concerning the tax consequences to them of disposing of their Claims in exchange for an interest in the Exit First Lien Facility and/or New Common Stock and the tax consequences of holding or disposing of an interest in Exit First Lien Facility and/or the New Common Stock.

The following discussion also assumes that the Net Proceeds and other consideration received by each Holder is approximately equal to the fair market value of the Claims surrendered in exchange thereof.  Holders should consult their own tax advisors concerning this issue.

"U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the U.S. for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S. or any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (4) a trust (A) if a court within the U.S. is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

In addition, this summary does not discuss the tax consequences to non-U.S. Holders of Claims.  **NON-U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE U.S. FEDERAL AND ON-U.S. INCOME CONSEQUENCES OF**

**THE PLAN TO THEM, INCLUDING BUT NOT LIMITED TO THE POTENTIAL APPLICATION OF TAX TREATIES.**

### 1.    Tax Consequences to U.S. Holders Generally

Subject to the discussion in Section 6 below "Certain Additional Tax Consequences for DSM and Lavvan," U.S. Holders will be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Code. Other than with respect to any amounts received that are attributable to accrued but untaxed interest, the U.S. Holder should recognize gain or loss in an amount equal to the difference, if any, between (a) the sum of (i) the fair market value of the consideration received under the Plan (which, in the case of DSM, may include the fair market of value of its earn-out obligations under the DSM Agreements) and (b) the U.S. Holder's adjusted tax basis in its Claim. The character of any such gain or loss as capital or ordinary will be determined by a number of factors including the tax status of the U.S. Holder, whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim, and the potential application of the accrued interest and market discount rules discussed below. If any such recognized gain or loss is capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.

### 2.    Payments in Respect of Accrued Interest on Claims

A portion of the consideration received by U.S. Holders of the Claims (whether in the form of Net Proceeds or otherwise) may be attributable to accrued but unpaid interest with respect to such Claims. Such amount should be taxable to a U.S. Holder as ordinary interest income if the accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, a U.S. Holder generally should recognize a deductible loss to the extent that any accrued interest was previously included in income and is not paid in full as part of the Plan.

For U.S. federal income tax purposes, the Debtors will allocate all distributions in respect of any Claim first to the principal amount of such Claim, and thereafter to accrued but unpaid interest, pursuant to the Plan. Certain legislative history indicates that an allocation of consideration between principal and interest provided for in a bankruptcy plan of reorganization is binding for U.S. federal income tax purposes. However, no assurance can be given that the IRS will not challenge such allocation. If a distribution with respect to a Claim is allocated entirely to the principal amount of such Claim, a U.S. Holder may be entitled to claim a loss to the extent of any accrued but unpaid interest on the Claim that was previously included in the U.S. Holder's gross income. U.S. Holders of Claims should consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan, as well as the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income.

### 3.    Treatment of Market Discount on a Claim

In the case of a U.S. Holder that acquired its Claim with market discount (i.e., in a transaction establishing a basis less than the adjusted issue price of the Claim on the date of acquisition), any gain recognized on the sale or exchange of such Claim generally will be treated as ordinary income to the extent of the market discount treated as accruing during such U.S.

Holder's holding period for such Claim. Any such market discount is generally the excess of the "revised issue price" of such Claim over such U.S. Holder's initial tax basis in such Claim upon acquisition, if such excess equals or exceeds a statutory de minimis amount. Such market discount is generally treated as accruing during such U.S. Holder's holding period for such Claim on a straight-line basis or, at the election of such U.S. Holder, on a constant yield basis, unless such U.S. Holder has previously elected to include such market discount in income as it accrues. For this purpose, the "revised issue price" of a Claim generally equals its issue price, increased by the amount of OID that has accrued over the term of the Claim. To the extent that Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount with respect to the exchanged debt instrument. U.S. Holders who acquired their Claims other than at original issuance should consult their own tax advisors regarding the possible application of the market discount rules to the Restructuring Transactions.

### 4. Limitations on Use of Capital Losses

A U.S. Holder who recognizes capital losses as a result of consummation of the Plan or upon a subsequent disposition of consideration received in exchange for its Claims, will be subject to limitations on the use of such capital losses. For a non-corporate taxpayer, capital losses may be used to offset any capital gains (without regard to holding periods), and also to offset ordinary income to the extent of the lesser of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. A non-corporate taxpayer may carry over unused capital losses and apply them against future capital gains and, as set forth in the preceding sentence, a portion of such taxpayer's ordinary income for an unlimited number of years. For corporate holders, capital losses may only be used to offset capital gains. A corporate holder that has more capital losses than may be used in a tax year may carry back unused capital losses (other than a foreign expropriation capital loss and other than a capital loss that creates or increases a net operating loss in the carryback year) to the three years preceding the capital loss year, and may carry over unused capital losses for the five years following the capital loss year.

### 5. Tax Consequences in Relation to Creditor Trust

The Creditor Trust will be established on the Effective Date, in accordance with the Plan and the Creditor Trust Agreement, for the benefit of the holders of Allowed Convertible Notes, Holders of Allowed General Unsecured Claims, Holders of Equity Interests and Reorganized Amyris. The tax consequences of the Plan in relation to the trust and the beneficiaries thereof are subject to uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law.

Allocations of taxable income of the Creditor Trust (other than taxable income allocable to the trust's claims reserves) among Holders of Claims will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the trust had distributed all of its assets (valued at their tax book value) to the Holders of the

beneficial interests in the trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the trust. Similarly, taxable loss of the Creditor Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining trust assets.

Subject to definitive guidance from the IRS or a court to the contrary, the trustee may (a) elect to treat any trust assets allocable to, or retained on account of, Disputed Claims (the "Trust Claims Reserve") as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, any Trust Claims Reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the trust assets in such reserves, and all distributions from such reserves will be treated as received by Holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Creditor Trustee and the Holders of beneficial interests in the Creditor Trust) will be required to report for tax purposes consistently with the foregoing.

The Creditor Trust is intended to qualify as a "grantor" trust (i.e., a pass-through entity) for federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a trust under a chapter 11 plan. The trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan and Creditor Trust Agreement, all parties are required to treat the Creditor Trust as a grantor trust of which the Holders of the applicable Allowed Claims are the owners and grantors. While the following discussion assumes that the trust would be so treated for federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Creditor Trust as a grantor trust and there can be no assurance that the IRS would not take a contrary position to the classification of the trust as a grantor trust.

In general, each U.S. Holder who is a beneficiary of the Creditor Trust will include in consideration received under the Plan the fair market value as of the Effective Time of its interest in the Creditor Trust, which will be treated as described above.

After the Effective Date, any amount that a creditor receives as a distribution from the Creditor Trust in respect of its beneficial interest in the trust should not be included, for federal income tax purposes, in the party's amount realized in respect of its Allowed Claim, but should be separately treated as a distribution received in respect of such party's beneficial interest in the trust. In general, a beneficiary's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Creditor Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the beneficiary's holding period in such assets will begin the day following the Effective Date.

For all federal income tax purposes, all parties (including the Creditor Trustee and the Holders of beneficial interests in the trust) will treat the transfer of assets to the trust, in accordance with the terms of the Plan and Creditor Trust Agreement, as a transfer of those assets directly to the Holders of the applicable Allowed Claims followed by the transfer of such assets by such Holders to the trust. Thus, such Holders (and any subsequent Holders of interests in the trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the Creditor Trust for all federal income tax purposes. Accordingly, each Holder of a beneficial interest in the

Creditor Trust will be required to report on its federal income tax return(s) the Holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Creditor Trust, allocated to each Holder in accordance with each such Holder's pro rata share.

The Creditor Trustee will file with the IRS returns for the Creditor Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Creditor Trust will also send to each Holder of a beneficial interest in the Creditor Trust a separate statement setting forth the Holder's share of items of income, gain, loss, deduction or credit and will instruct the Holder to report such items on its federal income tax return.

**The federal income tax reporting obligation of a Holder of a beneficial interest in the Creditor Trust is not dependent upon the Creditor Trust distributing any cash or other proceeds. Therefore, a Holder of a beneficial interest in the Creditor Trust may incur a federal income tax liability in advance of any distribution.**

### 6.      Certain Additional Tax Consequences for DSM and Lavvan

Under the Plan, the DSM RealSweet Secured Claim will be exchanged for the DSM Plan Promissory Note and the Lavvan Secured Claim will be entitled to receive certain amortizing cash payments, subject to interest at the Seven Year Treasury Rate plus an additional two percent. See "Summary of Plan – Treatment of Claims and Interests Above."

It is expected that the foregoing transactions will be treated for U.S. federal income tax purposes as "significant modifications" of the DSM RealSweet Secured Claim and the Lavvan Secured Claim resulting in a deemed exchange of debt instruments under U.S. Treasury Regulations § 1.1001-3. The U.S. federal income tax consequences of such a deemed exchange to Lavvan or DSM will depend, in part, on whether, for U.S. federal income tax purposes, (a) the Claim surrendered constitutes a "security" of Amyris, Inc., and (b) the debt instruments received under the plan constitute a "security" of Reorganized Amyris. **The status of a debt instrument as a "security" is an inherently factual issue and each of Lavvan and DSM should consult their own tax advisors as to whether their Claims or the debt instruments issued under the Plan constitute "securities."** Assuming that the Plan results in such a "significant modification," and either the surrendered Claim or the debt instrument received under the Plan is not a "security" for U.S. federal income tax purposes, then the Holder should be treated as receiving its distribution under the Plan in a taxable exchange under section 1001 of the Code and will recognize gain or loss, as described further in the previous sections of this tax disclosure. However, if each of the surrendered Claim and the new debt instrument issued under the Plan constitutes a "security" for tax purposes, the Plan (if it gives rise to a significant modification) would be treated as a recapitalization. In recapitalization treatment, the Holder should not recognize gain or loss on the exchange of the Claim solely for a new debt instrument of Reorganized Amyris. **The foregoing is not a complete discussion of the consequences to DSM of the receipt of the DSM Plan Promissory Note or to Lavvan from the modification of its Lavvan Secured Claim to provide for a right to receive amortizing cash payments. Both Lavvan and DSM should consult their own tax advisors as to the tax consequences of the Plan to them.**

### 7.      Information Reporting and Backup Withholding

Certain payments ("Reportable Payments") generally are subject to information reporting by the payor to the IRS. Moreover, Reportable Payments are subject to backup withholding (currently at a rate of twenty four percent (24%)) under certain circumstances. Under the backup withholding rules set forth in the Code, a U.S. Holder receiving a payment or distribution of cash or other property pursuant to the Plan, may be subject to backup withholding with respect to such payment or distribution unless it: (i) is an exempt recipient, such as a corporation, and when required, demonstrates this exemption, or (ii) timely provides a correct U.S. taxpayer identification number and makes certain certifications under penalties of perjury. Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against the Holder's U.S. federal income tax liability, and it may obtain a refund of excess amounts withheld under the backup withholding tax rules by timely filing an appropriate claim for refund with the IRS.

## 8.   **RECOMMENDATION**

The Debtors and the Creditors' Committee strongly recommend that all creditors receiving a Ballot vote in favor of the Plan. The Debtors and the Creditors' Committee believe that the Plan is in the best interests of creditors. The Plan as structured, among other things, allows creditors with Allowed Claims to participate in distributions believed to be in excess of those that would otherwise be available were the Chapter 11 Cases dismissed or converted under Chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to creditors.

FOR ALL THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE DEBTORS BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES. THE DEBTORS URGE ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH

ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY JANUARY 18, 2024, at 5:00 P.M., PREVAILING EASTERN TIME, EXCEPT FOR SUBMISSION OF THE CLASS 7 CONVERTIBLE NOTES CLAIMS BALLOTS WHICH MAY ONLY BE SUBMITTED IN ACCORDANCE WITH EXPRESS INSTRUCTIONS SET FORTH IN THE APPLICABLE BENEFICIAL HOLDER BALLOT OR MASTER BALLOT.

Dated:  December 12, 2023

**AMYRIS, INC.**

on behalf of itself and all other Debtors


*/s/*_____

Philip J. Gund
Chief Restructuring Officer