# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC., *et al.*, | Case No. 23-11131 (TMH) |
| Debtors.[1] | (Jointly Administered) |

**Hearing Date Requested: December 20, 2023 at 3:00 p.m. (ET)**
**Objection Deadline Requested: December 19, 2023 at 5:00 p.m. (ET)**

## MOTION FOR (I) AN ORDER (A) APPROVING BID PROCEDURES FOR THE SALE OF THE DEBTORS' LAB-TO-MARKET™ ASSETS; (B) SETTING MINIMUM RESERVE PRICE; (C) SCHEDULING THE AUCTION AND SALE HEARING; (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (E) GRANTING RELATED RELIEF; AND (II) AN ORDER OR ORDERS (A) APPROVING THE SALE OF THE DEBTORS' LAB-TO-MARKET™ ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The above-captioned debtors and debtors in possession (the "Debtors") file this motion (the "Motion") for entry of an order, pursuant to sections 105(a), 363, 365, 503, 507, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), substantially in the proposed form attached hereto as **Exhibit A** (the "Bid Procedures Order"):

    i.     establishing bid procedures (the "Bid Procedures"), substantially in the form attached as Exhibit 1 to the Bid Procedures Order, in connection with the sale or sales (each, a "Sale") of the Debtors' non-consumer brand assets, consisting of the Debtors' Lab-to-Market™ business involving the research, formulation, and development of ingredients and ingredient applications, commercial scaling, and

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

commercialization of its sustainable ingredients, pursuant to section 363 of the Bankruptcy Code, subject to the exercise of the Sale Option;[2]

ii.    scheduling an auction or auctions for a Sale or Sales (each, an "<u>Auction</u>") and approving the form and manner of notice thereof (the "<u>Bid Procedures/Auction Notice</u>");

iii.    setting a hearing for approval of any Sale(s) (the "<u>Sale Hearing</u>"); and

iv.    granting related relief.

In support of this Motion, the Debtors rely upon and refer this Court to the *Declaration of Han Kieftenbeld in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 18] (the "<u>First Day Declaration</u>"),[3] incorporated herein by reference. In further support of the Motion, the Debtors respectfully represent as follows:

## <u>PRELIMINARY STATEMENT</u>

1.    Under the terms of the *Amended & Restated Plan Support Agreement*, dated December 12, 2023, among the Debtors, Foris Prepetition Secured Lenders, DIP Lenders, the Official Committee of Unsecured Creditors (the "<u>Creditors' Committee</u>"), Consenting Noteholders and other parties (the "<u>Plan Support Agreement</u>"), the Debtors are required to initiate a sale process for the Lab-to-Market™ Assets (the "<u>Sale Process</u>") immediately. The Debtors have commenced the sale process. Pursuant to and as provided for in the *Second Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors, as Modified* [Docket No. 892] (the "<u>Plan</u>"), the DIP Lenders and Foris Prepetition Secured Lenders may elect, before Confirmation, for the Debtors to close a sale of the Lab-to-Market™ Assets (the "<u>Sale Option</u>"). By this Motion, the Debtors seek approval of the Bid Procedures and related relief to facilitate the

---

[2]    The "Sale Option" is defined in the Plan (as hereinafter defined) as "the election, to be made by the DIP Lenders and the Foris Prepetition Secured Lenders, at any time prior to the Confirmation Date, for the Debtors to close a sale of the Other Assets pursuant to the Other Assets Bidding Procedures."

[3]    A capitalized term used but not defined herein shall have the meaning ascribed to it in the First Day Declaration or the Plan.

marketing and offer for sale of the Lab-to-Market™ Assets through one or more Sales under section 363 of the Bankruptcy Code. If the Sale Option is exercised, the Debtors will sell all or substantially all of the Lab-to-Market ™ Assets on the terms and conditions set forth in the Bid Procedures Order in connection with the confirmation of the Plan.

2.      With the assistance of their investment banker, Intrepid Investment Bankers LLC ("Intrepid"), and in consultation with their major stakeholders, the Debtors will conduct a robust marketing process to identify one or more parties interested in pursuing a Sale or Sales (each, a "Potential Bidder") of the Debtors' Lab-to-Market™ Assets.

3.      The Bid Procedures provide the formal sale framework designed to elicit value-maximizing bids for the Lab-to-Market™ Assets.  Among other things, the Bid Procedures: (a) establish a timeline for the Sale Process that is reasonable and appropriate under the circumstances of these Chapter 11 Cases; (b) establish the basic rules for submitting bids for the purchase of any or all of the Lab-to-Market™ Assets; (c) establish the Minimum Reserve Price (as defined below) that must be satisfied by the Qualified Bids; and (d) provide major creditor groups with consultation rights at various stages in the process.  The proposed Bid Procedures comply with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and, therefore, should be approved.

4.      Consistent with the Debtors' need to pursue a Sale or Sales as efficiently as possible, the Debtors propose the following key dates and deadlines for the Sale Process:[4]

| Date | Event |
|---|---|
| **December 19, 2023 at 5:00 p.m.** | Bid Procedures Motion Objection Deadline |
| **December 20, 2023 at 3:00 p.m.** | Bid Procedures Hearing |

---

[4]     The Debtors, consistent with their fiduciary duties, in the exercise of their business judgment, and in consultation with the Consultation Parties, reserve the right to modify these dates consistent with the terms of the DIP Facility, Plan Support Agreement and the Plan to achieve a value-maximizing Sale or Sales.

| Date | Event |
|------|-------|
| | |
| **December 22, 2023** | Deadline to File Bid Procedures Notice |
| **January 16, 2024 at 5:00 p.m.** | Deadline to Submit Qualified Bids |
| **January 18, 2024** | Deadline to Designate Qualified Bids and File Auction Notice |
| **January 19, 2024 at 10:00 a.m.** | Sale Auction(s) |
| **January 21, 2024 (Sunday)** | Deadline to File Notice of Successful Bidder(s) and Back-Up Bidder(s) |
| **January 23, 2024 at 5:00 p.m.** | Adequate Assurance Objection Deadline |
| | Deadline to Object to Sale(s) |
| **January 24, 2024** | Sale Hearing |
| **February 9, 2024** | Deadline to Close Transaction(s) |

5.     Accordingly, as discussed in detail herein, the Debtors respectfully request entry of the Bid Procedures Order.

## JURISDICTION AND VENUE

6.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. The Debtors confirm their consent, pursuant to Rule 9013-1(f) of the Local Rules, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.     The statutory predicates for the relief sought herein are sections 105, 363, 365, 503, 507, 1107, and 1108 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006, and 9014, and Local Rules 2002-1(b), 6004-1, and 9006-1.

## BACKGROUND

### A.     General Case Background

9.     On August 9 and August 21, 2023 (as applicable, the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing these Chapter 11 Cases.  The Debtors have continued in the possession of their property and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   A detailed description of the Debtors' business and facts precipitating the filing of the Debtors' Chapter 11 Cases are set forth in the First Day Declaration.

10.     On August 27, 2023, the Office of the United States Trustee (the "U.S. Trustee") appointed the Committee, including the following members:  U.S. Bank Trust Co. NA; Cosan U.S. Inc.; Sartorius Stedim North America Inc.; Hearst Magazine Media Inc.; Wiley Companies; Park Wynwood LLC; and Allog Participacoes Ltda.

11.     The Debtors were founded in 2003 to create a more stable supply of a key anti-malarial treatment.  Through the Debtors' cutting-edge science, artemisinin—the most effective anti-malarial drug in the world—is now consistently available to treat the deadly disease.  Using the same technological innovations that produced artemisinin, the Debtors have become the world's leading manufacturer of ingredients made with synthetic biology.  The Debtors provide sustainable ingredients that are eco-friendly alternatives to raw material sourced for flavors and fragrances, sweeteners, cosmetics, pharmaceuticals, and other consumer products.

12.     In addition, the Debtors operate a family of consumer brands that utilize the Company's ingredients to meet the growing demand for sustainable, effective, and accessible products, including Biossance® (clean beauty skincare), JVN™ (haircare), Rose Inc.™ (clean color cosmetics), Pipette® (clean baby skincare), MenoLabs™ (healthy living and menopause wellness), Stripes™ (menopausal wellness), and 4U by Tia™ (a new clean haircare line) (collectively, the "<u>Operating Consumer Brands</u>").

**B.      <u>The Consumer Brands Sales</u>**

13.     On September 18, 2023, the Debtors filed their motion [Docket No. 316] (the "<u>Operating Consumer Brands Sale Procedures Motion</u>") for an order of the Court (a) establishing bid procedures to govern the sales of assets associated with the Debtors' Operating Consumer Brands; (b) authorizing the Debtors to enter into stalking horse agreements regarding the sales of assets relating to the Operating Consumer Brands; (c) authorizing the Debtors to offer break-up fees in connection with the stalking horse agreements; and (d) scheduling one or more auctions and a hearing for approval of any sales of such assets.

14.     On October 16, 2023, the Bankruptcy Court entered the *Order (A) Approving Bid Procedures for the Sale of the Debtors' Brand Assets; (B) Approving Certain Bid Protections In Connection with the Debtors' Entry Into Any Potential Stalking Horse Agreements; (C) Scheduling the Auction and Sale Hearing; (D) Approving the Form and Manner of Notice Thereof; and (E) Granting Related Relief* [Docket No. 553] (the "<u>Operating Consumer Brands Bid Procedures Order</u>").

15.     Pursuant to the Operating Consumer Brands Bid Procedures Order, the Debtors conducted auctions for various Operating Consumer Brands assets and are in the process of finalizing and documenting the transactions memorializing the sales of such assets.

C.     **The Plan**

16.     On December 12, 2023, the Debtors filed the Plan, which states:

> At the election of the DIP Lenders and the Foris Prepetition Secured Lenders, which may be made in their sole discretion at any time prior to the Confirmation Date, the Debtors shall close a sale of the Other Assets pursuant to the Other Assets Bidding Procedures with the consideration for sale of the Other Assets to be distributed, as part of the Net Proceeds, as provided for in the Plan.  The sale of the Other Assets will be conducted in accordance with the Other Assets Bidding Procedures, with the DIP Lender and the Foris Prepetition Secured Lenders providing an Other Assets Stalking Horse Credit Bid.

Plan § IV.R. at 46.[5]  The Plan defines "Other Assets" as "all of the assets of the Debtors' Estates excluding:  (a) the Consumer Brands (and the proceeds of the sale thereof); (b) the Estate Claims Settlement Consideration; and (c) Third-Party Release Settlement Amounts."  Id. § I.A.145. at 15. The Other Assets largely consist of the Debtors' Lab-to-Market™ Assets.

17.     Also, the Plan provides that one of the conditions to Confirmation is that, "in the event of a Sale Option, the proceeds of the Sold Assets shall in the aggregate generate cash Net Proceeds in an amount necessary to fund the Plan Effective Date Funding Amount.  *Id.* § X.B.6. at 70.

D.     **The Debtors' Lab-to-Market™ Assets**

18.     The core asset of the Company, other than its remarkable and world class scientists, is its unique fermentation-based Lab-to-Market technology platform. This suite of technology creates a portfolio connection between the Company's proprietary science and formulation expertise and its manufacturing capability at industrial scale.  This unique technology platform offers advantages to traditional methods of sourcing similar ingredients (such as petrochemistry,

---

[5]     For purposes of the Bidding Procedures, the Plan, and the Plan Support Agreement, the Minimum Reserve Price shall in the aggregate be deemed to be, and shall be, the Other Assets Stalking Horse Credit Bid provided by the DIP Lenders and the Foris Prepetition Secured Lenders.

unsustainable agricultural practices, and extraction from organisms). These advantages include but are not limited to renewable and ethical sourcing of raw materials, less resource-intensive production, minimal impact on sensitive ecosystems, enhanced purity and safety profile, less vulnerability to climate disruption, and improved supply chain resilience.

19. In order to bring together biology and engineering to produce sustainable materials that are scarce or endangered in nature, the Company leverages state-of-the-art machine learning, robotics, and artificial intelligence, which enable our technology platform to rapidly bring new innovation to market. For example, Amyris is able to design, build, and analyze thousands of strains in a single experiment through the use of artificial intelligence and robotics automation, thereby enabling the Company to test thousands of hypotheses simultaneously. The Company's Lab-to-Market™ platform is supported by the Company's state-of-the-art infrastructure, which includes industry-leading strain engineering and lab automation located in Emeryville, California; pilot-scale production facilities in Emeryville and Campinas, Brazil; a demonstration-scale facility in Campinas; commercial scale production facilities in Leland, North Carolina and the State of Sao Paolo, Brazil.

20. The Lab-to-Market™ Assets that are the subject of this Motion and proposed sale process, include substantially all of the Debtors' assets related to its Lab-to-Market™ platform, including its (a) intellectual property, (b) laboratories, and (c) commercial manufacturing interests, including a chemical plant in Leland, North Carolina and the Company's interest in Amyris RealSweet LLC, which entity indirectly owns the manufacturing facility in Barra Bonita, Brazil.

### 1. <u>Intellectual Property</u>

21.     The Company protects its proprietary technologies by, among other methods, filing for patent applications on inventions that are important to the development and conduct of its business with the U.S. Patent and Trademark Office and its foreign counterparts.

22.     As of the Petition Date, the Company had 731 issued U.S. and foreign patents and 393 pending U.S. and foreign patent applications that are owned or co-owned by or licensed to Amyris.

23.     The Company's patent portfolio generally covers (a) recombinant host cell strains that have been developed for producing target molecules of interest at high yield and productivities, (b) genetic editing techniques for producing the strains, (c) fermentation techniques for culturing the host cells for optimal production of target molecules, (d) downstream purification processes to purify the target molecules from the fermentation broth, and (e) formulations and blends of Amyris ingredients for use in personal care, industrial, and other applications.

### 2. <u>Leland Plant</u>

24.     The Company converts farnesene (manufactured in Brazil) into Squalane at its chemical plant in Leland, North Carolina. Opened in 2008 and situated on over 23 acres, the Leland, North Carolina-based commercial-scale production facility has the ability to produce 3,200 metric tons of squalane per year.

### 3. <u>Amyris RealSweet and Barra Bonita Plant</u>

25.     In June 2021, the Company entered into an intellectual property license agreement with PureCircle Limited ("<u>PureCircle</u>"), a subsidiary of Ingredion Incorporated ("<u>Ingredion</u>"), whereby Amyris (a) granted certain intellectual property licenses to PureCircle to make, have made, commercialize, and advance the development of sustainably sourced, zero-calorie, nature-

based sweeteners and potentially other types of fermentation-based ingredients, as the exclusive global business-to-business commercialization partner for the Company's sugar reduction technology, (b) entered into a product supply and profit sharing agreement to provide manufacturing services and products to PureCircle, and (c) assigned and transferred certain customer contracts to PureCircle related to the sale and distribution of Reb M (the "PureCircle Transaction").

26.     In connection with the PureCircle Transaction, Ingredion purchased a 31% minority membership interest in Amyris RealSweet LLC ("Amyris RealSweet") pursuant to a Membership Interest Purchase Agreement (the "RealSweet Purchase Agreement")

27.     Under the terms of the RealSweet Purchase Agreement, Amyris funded the construction costs related to a new precision fermentation facility in Barra Bonita, Brazil (the "Barra Bonita Plant") in the aggregate amount of approximately $150 million.

28.     Amyris RealSweet indirectly owns the Barra Bonita Plant, which is currently operational and producing Reb M for PureCircle, as well as other ingredients for DSM and its customers.

## E.     The Marketing Process

29.     The Debtors' Sale Process is being managed by their investment banker, Intrepid. Intrepid was retained by the Debtors in July 2023 to, among other things, assist the Debtors in marketing their assets.  To that end, Intrepid has populated a digital data room (the "Data Room") for prospective purchasers interested in purchasing all or any portion of the Debtors' Lab-to-Market™ Assets.  In addition, Intrepid has compiled a list of prospective buyers, prepared a confidentiality agreement to be executed by interested parties, and has commenced its outreach. In certain instances, to protect sensitive, proprietary, commercial information, interested parties

will only be able to access diligence via "clean room procedures". Intrepid anticipates distributing a bid process letter following the entry of the Bid Procedures Order.

## **RELIEF REQUESTED**

### A.    **Bid Procedures Order**

30.    By this Motion, the Debtors seek the entry of the Bid Procedures Order: (a) approving the Bid Procedures, which includes the Minimum Reserve Price; (b) approving various forms and the manner of notice thereof; (c) scheduling the Auction and a Sale Hearing; and (d) granting related relief.   The Bid Procedures proposed herein are consistent with the procedures previously approved by the Court for the sale of the Operating Consumer Brands assets.

31.    Additionally, by this Motion, the Debtors further request that, at the Sale Hearing, the Court enter an order or orders approving the Sale(s) of the Lab-to-Market™ Assets free and clear of all Encumbrances.[6]

---

[6]    As used herein, "Encumbrance" and "Encumbrances" include all of the following, in each case, to the extent against or with respect to the Debtors, or in, on, or against, or with respect to any of the Lab-to-Market™ Assets: liens (including as defined in section 101(37) of the Bankruptcy Code, and whether consensual, statutory, possessory, judicial, or otherwise), claims (as defined in section 101(5) of the Bankruptcy Code) ("Claims"), debts (as defined in section 101(12) of the Bankruptcy Code), encumbrances, obligations, liabilities, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, or interests of any kind or nature whatsoever, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to, on, or subsequent to, the commencement of these Chapter 11 Cases, and in each case, whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to: (i) mortgages, security deeds, deeds of trust, pledges, charges, security interests, levies, hypothecations, encumbrances, easements, servitudes, leases, subleases, licenses, rights-of-way, encroachments, restrictive covenants, restrictions on transferability, voting, sale, transfer or other similar restrictions, rights of setoff (except for setoffs validly exercised before the Petition Date, or preserved in a timely filed proof of claim or motion filed with the Court), rights of use or possession, conditional sale arrangements, deferred purchase price obligations, profit sharing interest, or any similar rights; (ii) all Claims, including, without limitation, all rights or causes of action (whether in law or equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff (except for setoffs validly exercised before the Petition Date, or preserved in a timely filed proof of claim or motion filed with the Court), indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other Person, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, or otherwise; (iii) all debts, liabilities, obligations, contractual rights and claims, including labor, employment, and pension claims; (iv) any rights that purport to give any party a right or

11

## B.  Bid Procedures

32.    To maximize the value of their Lab-to-Market™ Assets for the benefit of the Debtors' estates and creditors, the Debtors seek to implement a competitive bidding process for one or more Sales.  As described more fully in the Bid Procedures and the Bid Procedures Order, the Debtors seek approval, upon the exercise of the Sale Option, to sell the Lab-to-Market™ Assets to one or more Qualified Bidders (as defined below) that is at or above the Minimum Reserve Price, and makes the highest or otherwise best offers for the Lab-to-Market™ Assets relative to the Plan.  The Debtors request that bids for the Lab-to-Market™ Assets be governed by the Bid Procedures and Bid Procedures Order, which, among other things, collectively establish:

    a.    the requirements that an Interested Party must satisfy to be entitled to participate in the bidding process and become a Potential Bidder;

---

option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtors' or the Successful Bidder(s)' interest in the Lab-to-Market™ Assets, or any similar rights; (v) any rights under labor or employment agreements; (vi) any rights under pension, multiemployer plan (as such term is defined in section 3(37) or section 4001(a)(3) of the Employment Retirement Income Security Act of 1974 (as amended, "ERISA")), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (vii) any other employee claims related to worker's compensation, occupation disease, or unemployment or temporary disability, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and the Age Discrimination in Employment Act, each as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code of any similar state law, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (l) the WARN Act (29 U.S.C. §§ 2101, et seq.) or any state or other laws of similar effect; (viii) any bulk sales or similar law; (ix) any tax statutes or ordinances or other laws of similar effect, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Lab-to-Market™ Assets before the closing of a Sale; (x) any unexpired and executory contract or unexpired lease to which the Debtors are a party that is not an Transferred Contract; (xi) any other excluded liabilities under the Purchase Agreement; and (xii) Encumbrances arising under or in connection with any acts, or failures to act, of the Debtors or any of their predecessors, affiliates, or subsidiaries, including, but not limited to, Encumbrances arising under any doctrines of successor liability (to the greatest extent permitted by applicable law), or transferee or vicarious liability, violation of the Securities Act, the Exchange Act, or other applicable securities laws or regulations, breach of fiduciary duty, or aiding or abetting breach of fiduciary duty, or any similar theories under applicable law or otherwise.

b.     the requirements for Potential Bidders to submit bids and the method and criteria by which such bids become Qualified Bids;

c.     the Minimum Reserve Price, as a Qualified Bid requirement;

d.     the deadline by which bids must be submitted;

e.     certain procedures related to the assumption and assignment or transfer of executory contracts and unexpired leases; and

f.     various other matters relating to the Sale Process, including the Auction, designation of Successful Bidder(s), and Sale Hearing.

33.    After submission of all Qualified Bids, the Debtors, after consultation with the Consultation Parties[7] and subject to the exercise of the Sale Option, will select the highest or otherwise best Qualified Bid(s) for one or more of the Lab-to-Market™ Assets or all or substantially all of the Lab-to-Market™ Assets (a Baseline Bid, as defined below).  In no event shall any Qualified Bidder be entitled to any Bid Protections.

34.    The Bid Procedures contain the following provisions, some of which are required to be highlighted pursuant to Local Rule 6004-1(c) and which are more fully described in the Bid Procedures and the Bid Procedures Order:[8]

(a)    **Provisions Governing Qualification of Bidders**.  To participate in the bidding process and receive due diligence information, including full access to the Data

---

[7]    The Creditors' Committee, the Ad Hoc Group of Noteholders, the DIP Lenders and the Foris Prepetition Secured Lenders shall be consultation parties ("Consultation Parties"); *provided* that the Debtors shall only consult with the DIP Lenders and the Foris Prepetition Secured Lenders when such consultation includes the Creditors' Committee and the Ad Hoc Group of Noteholders; *provided further* in connection with determining if a Bid is a Qualified Bid if the Debtors determine that it is necessary and appropriate for the Sale Process to not consult with the DIP Lenders and the Foris Prepetition Secured Lenders as to a specific non-economic issue or aspect of a Bid because of such Qualified Bidder's confidential, proprietary business concerns regarding such identified specific issue or specific aspect of such Qualified Bidders' Bid, the Debtors shall notify the DIP Lenders and the Foris Prepetition Secured Lenders that it is not consulting with the DIP Lenders and the Foris Prepetition Secured Lenders with respect to certain confidential issues or aspects of such Bid in accordance with the provisions hereof; *provided, further, however*, subject to the foregoing, if any such Bid is determined to be a Qualified Bid then at such time the Debtors shall consult with the DIP Lenders and the Foris Prepetition Secured Lenders as to all aspects of such Qualified Bid.

[8]    These provisions are excerpted from the Bid Procedures.  However, to the extent any inconsistencies between this summary and the Bid Procedures exist, the Bid Procedures shall govern.

Room and additional non-public information regarding the Debtors (the "Diligence Materials"), parties (each, an "Interested Party") must deliver or have previously delivered to the Debtors, determined by the Debtors in their sole discretion, the following documents (collectively, the "Preliminary Bid Documents"): (a) an executed confidentiality agreement using the Debtors' form, as may be amended, on terms reasonably acceptable to the Debtors, to the extent not already executed (a "Confidentiality Agreement"); (b) a statement and/or other factual support demonstrating to the Debtors' satisfaction in the exercise of their reasonable business judgment that the Interested Party has a *bona fide* interest in purchasing all or any portion of the Lab-to-Market™ Assets; (c) preliminary proof by the Interested Party of its financial capacity to close its proposed Sale Transaction(s), which may include verbal or written representations of an Interested Party's financial wherewithal or financial statements of, or verified financial commitments obtained by, the Interested Party (or, if the Interested Party is an entity formed for the purpose of acquiring all or any portion of the Lab-to-Market™ Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors (including in consultation with their advisors), and (d) a statement of willingness to abide by the "clean room procedures".

(b)     **Qualified Bid of DIP Lenders and Foris Prepetition Secured Lenders**  The DIP Lenders and Foris Prepetition Secured Lenders are Qualified Bidders (the "Stalking Horse Bidder") for purposes of the Bid Procedures as the Plan and PSA are deemed to be a Qualified Bid for purposes of the Bid Procedures.  Such Qualified Bid constitutes the "Other Assets Stalking Horse Credit Bid" set forth in the Plan.  The Qualified Bid of the DIP Lenders and Foris Prepetition Secured Lenders need not comply with the requirements set forth in paragraph 34(e) below.

(c)     **Minimum Reserve Price**.  A Qualified Bid must provide a cash purchase price ("Cash Consideration") that equals or exceeds $255,844,922, which consists of the sum of (i) the outstanding principal and interest due and payable on the DIP Facility as of the Effective Date (estimated to be $197,644,922 as of February 9, 2024, of which $591,161 consists of accrued and unpaid interest outstanding); and (ii) the amount of Plan Effective Date Funding Schedule (which is $58,200,000) (collectively, the "Minimum Reserve Price").

(d)     **Implementation Through Plan**.  A Successful Bid(s) shall be implemented in connection with confirmation of the Plan.

(e)     **Provisions Governing Qualified Bids**

    (i)     Purpose and Identity of Assets to be Purchased.  Each Bidder must state that the Bid includes an offer by the Bidder to effectuate a Sale Transaction and identify with specificity which Lab-to-Market™ Assets are included in the Bid.

    (ii)     Good Faith Deposit.  Each Bid must be accompanied by a cash deposit (the "Good Faith Deposit") in the form of a wire transfer, certified check, or cash

payable to the order of counsel pursuant to instructions to be provided by Debtors equal to 10% of the Bidder's proposed Purchase Price (as defined herein), which will be held in a non-interest bearing escrow or trust account; *provided however*, that the Stalking Horse Bidder shall not be required to post a Good Faith Deposit.

(iii)     <u>Purchase Price</u>.  Each Bid must clearly set forth the Cash Consideration and identify any non-Cash Consideration included in such Bid (together with the Cash Consideration, the "<u>Purchase Price</u>") including, without limitation, which executory contracts and unexpired leases the Bidder expects the Debtors to assume and assign to the Bidder (the "<u>Transferred Contracts</u>") and which liabilities, if any, of the Debtors the Bidder is agreeing to assume (the "<u>Assumed Liabilities</u>").  The Purchase Price associated with each Bid may include only cash and/or other consideration acceptable to the Debtors after consultation with the Consultation Parties; *provided, however*, in order for one or more Bids to qualify as a "<u>Topping Bid</u>," it or they collectively must provide for Cash Consideration at Closing (as defined herein) that is equal to or in excess of the Minimum Reserve Price.

(iv)     <u>Binding and Irrevocable</u>.  Each Bid must include a signed writing stating that it is binding and irrevocable until the selection of the Successful Bidder, provided that if such Bidder is selected as the Successful Bidder or the Back-Up Bidder, its offer shall remain irrevocable until the closing of the Sale with the Successful Bidder or, as applicable, the Back-Up Bidder (the "<u>Closing</u>").

(v)     <u>Contemplated Transaction Documents</u>.  Each Bid must include an executed Purchase Agreement marked against the Form APA pursuant to which the Qualified Bidder proposes to effectuate the contemplated Sale Transaction including: (i) a redlined copy of the Purchase Agreement marked to show all changes requested by the Qualified Bidder against the Form APA; (ii) specification of the proposed Purchase Price; and (iii) any changes to any exhibits or schedules to the Purchase Agreement (collectively, the "<u>Contemplated Transaction Documents</u>").  The terms and conditions of the Contemplated Transaction Documents must be, in the aggregate, not materially more burdensome to the Debtors than the provisions contained in the Form APA.  A Bid must identify with particularity each and every condition to Closing and all Transferred Contracts pursuant to the Contemplated Transaction Documents.  All Bids must provide that all Cure Amounts (as defined herein) will be paid by such Bidder.  ***The Contemplated Transaction Documents must include a commitment to close by no later than February 9, 2024***.  A Bid shall contain a detailed description of how the Potential Bidder intends to treat current employees of the Debtors.

(vi)     <u>Contingencies</u>.  A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or completion of due diligence, but

may be subject to the accuracy in all material respects at Closing of representations and warranties at or before Closing or the satisfaction in all material respects of customary representations and warranties for transactions of similar size and nature at or before Closing or the satisfaction in all material respects of customary conditions for transactions of similar size and nature at or before Closing. A Bid must disclose any governmental approvals identified by the Potential Bidder other than as set forth in the Contemplated Transaction Documents that may impact the evaluation of such Bid.

(vii) <u>No Collusion</u>. Each Bid must include a representation that the Bidder has not engaged in any collusion with respect to its Bid submission (though Potential Bidders are permitted to make joint bids) and that the Bidder will not engage in any collusion with respect to any Bids, the Auction, or the Sale Process.

(viii) <u>Authorization to Bid and Identity of Bidder</u>. Each Bid must include evidence of authorization and approval from such Potential Bidder's board of directors (or comparable governing body, or a statement as to why such approval is unnecessary) with respect to the submission, execution, delivery, and closing of the Contemplated Transaction Documents. A Bid must also fully disclose the identity of the entity that is submitting the Bid, including the identity of the ultimate beneficial owners of the Bidder and the identity of any person or entity providing debt or equity financing for the Bid.

(ix) <u>Financing Sources</u>. Each Bid must include written evidence that demonstrates the Potential Bidder has the necessary financial ability to close the contemplated Sale Transaction and provide adequate assurance of future performance under all Transferred Contracts. Such information may include, *inter alia*, the following:

a. the Potential Bidder's current financial statements (audited, if they exist);

b. contact names, telephone numbers, and e-mail addresses for verification of financing sources;

c. evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated Sale Transaction (including confirmation that the funding of such commitments is not subject to any contingency); and

d. any other form of financial disclosure of credit-quality support information acceptable to the Debtors demonstrating that such Potential Bidder has the ability to close the contemplated Sale Transaction.

(x)     <u>Adequate Assurance of Future Performance</u>.  Each Bid must demonstrate, in the Debtors' reasonable business judgment and after consultation with the Consultation Parties, that the potential Bidder can provide adequate assurance of future performance to the applicable counterparty under all Transferred Contracts as required by section 365 of the Bankruptcy Code.

(xi)    <u>No Fees Payable to Qualified Bidder</u>.  A Bidder may not request any break-up fee, termination fee, expense reimbursement, or any similar type of payment.  Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code relating in any way to the submission of its Bid, compliance with the Bid Procedures, or participation in the Sale Process.

(xii)   <u>Non-Reliance</u>.  A Bid must include an acknowledgement and representation of the Potential Bidder that it has had an opportunity to conduct any and all due diligence regarding the Lab-to-Market™ Assets (as applicable to its Bid) and Assumed Liabilities prior to making its Bid, that it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Lab-to-Market™ Assets in making its Bid, and that it did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Lab-to-Market™ Assets, the financial performance of the Lab-to-Market™ Assets or, as applicable, the physical condition of the Lab-to-Market™ Assets, the Assumed Liabilities, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Contemplated Transaction Documents.

(xiii)  <u>As Is, Where Is</u>.  A Bid must include an acknowledgement and representation of the Potential Bidder that it understands that any Sale Transaction shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents, or their estates except to the extent set forth in the Purchase Agreement of the Successful Bidder.

(f)     **Right to Credit Bid**.  At the Auction, if any, a Qualified Bidder who has a valid and perfected lien[9] on any Lab-to-Market™ Assets (a "<u>Secured Party</u>") shall be permitted to submit a credit bid for all or a portion of the assets subject to such lien, up to the amount of such Secured Party's claims (a "<u>Credit Bid</u>"), to the extent

---

[9]     Any credit bid by the holder of a junior lien must include a cash component sufficient to indefeasibly pay in full, in cash all claims and obligations of the holder of all liens senior to such junior lien.

For the avoidance of doubt, the Debtors dispute the nature, extent, priority, and validity of any lien and security interest asserted by Lavvan, Inc. ("<u>Lavvan</u>") against Amyris, Inc.  The Debtors reserve all rights against Lavvan, including, but not limited to, the right to challenge any request by Lavvan to credit bid pursuant to section 363(k) of the Bankruptcy Code.  Nothing herein should be construed or implied as any agreement of or consent by the Debtors to Lavvan's ability to credit bid, nor a waiver of any of the Debtors' rights under the Bankruptcy Code or applicable law.

permitted under section 363(k) of the Bankruptcy Code; *provided, however*, that any Secured Party, other than the Foris Prepetition Secured Lenders and the DIP Lenders, that intends to participate in the Auction with a Bid that includes a Credit Bid shall, as a condition to such participation, (i) notify the Debtors at least five (5) calendar days prior to the Bid Deadline that it intends to submit a Credit Bid, and (ii) provide all documentation requested by the Debtors to establish the lien, claims, and encumbered assets that will be the subject of the Secured Party's potential Credit Bid.

(g)     **Provisions Governing the Auction**.  After the receipt and review of all Qualified Bids, the Debtors shall make a determination, after consultation with the Consultation Parties and subject to the exercise of the Sale Option, whether to accept the highest or best Qualified Bid(s) for all or any portion of the Lab-to-Market™ Assets.

To the extent the Debtors receive multiple Qualified Bids and determine to proceed to Auction, the Debtors, after consultation with the Consultation Parties and subject to the exercise of the Sale Option, shall determine which Qualified Bid(s) represent the then highest or otherwise best Bid(s) for all or any subset of the Lab-to-Market™ Assets, as applicable (the "Baseline Bid(s)").  The determination of which Qualified Bid(s) constitute the Baseline Bid(s) and which Qualified Bid(s) constitute the Successful Bid(s) (as defined herein) shall take into account any factors the Debtors, after consultation with the Consultation Parties and subject to the exercise of the Sale Option, reasonably deem relevant to the value of the Qualified Bid(s) to their estates, including, *inter alia*: (a) the amount and nature of the consideration; (b) the certainty of closing; (c) the net economic effect of any changes to the value to be received by the Debtors' creditors from the proposed Sale Transaction(s); (d) the allocation of the Purchase Price between or among Lab-to-Market™ Assets; (e) tax consequences of such Qualified Bid(s); and (f) any other quantitative or qualitative criteria available to assess such Bid (collectively, the "Bid Assessment Criteria").  For the avoidance of doubt, the Baseline Bid(s) must not be less than the Minimum Reserve Price.

On or before ***December 22, 2023***, the Debtors shall file a notice on the Court's docket (an "Auction Notice") providing (i) notice of the location of the Auction or whether the Debtor's intend to proceed with the Auction telephonically or by video conference; and (ii) notice of whether the Debtors believe, in the exercise of their business judgment and after consultation with the Consultation Parties, that the Auction should be held in two or more parts over multiple days so as to maximize value for the estates.

Unless otherwise designated by the Debtors, after consultation with the Consultation Parties, the Auction shall commence at ***10:00 a.m. (Eastern Time) on January 19, 2024,*** at a location to be designated in the Auction Notice.  In the Debtors' discretion, the Auction may be held telephonically or by video conference.

The Auction shall be conducted according to the following procedures:

(i)     *Participation at the Auction*. Only the Stalking Horse Bidder(s) and Qualified Bidders that have submitted Qualified Bids are eligible to participate at the Auction.  Only the authorized representatives and professional advisors of each of the Qualified Bidders, the Stalking Horse Bidder(s), the Debtors, the Consultation Parties, and the United States Trustee for the District of Delaware shall be permitted to attend the Auction.

Except as otherwise set forth herein, the Debtors, after consultation with the Consultation Parties, may conduct the Auction in the manner they determine will result in the highest or best offer(s) for the Lab-to-Market™ Assets in accordance with the Bid Procedures, including sequencing the sale of any Lab-to-Market™ Assets.

In the event, after the conclusion of the Auction, that certain discrete Lab-to-Market™ Assets which are not included in the Successful Bid(s) have not been sold (the "Unsold Assets"), the Debtors may, in the exercise of their business judgment and after consultation with the Consultation Parties, resume an auction for the sale of the Unsold Assets, on such bid procedures as may be implemented by the Debtors after consultation with the Consultation Parties.

(ii)    *The Debtors Shall Conduct the Auction*.  The Debtors and their professionals shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of any Baseline Bid(s).  All Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders.  The Debtors reserve the right to conduct the Auction, after consultation with the Consultation Parties, in the manner designed to maximize value based upon the nature and extent of the Qualified Bids received in accordance with the Bid Procedures, the Bid Procedures Order, the Bankruptcy Code, and any other order of the Court entered in connection herewith and disclosed to each Qualified Bidder.  The Debtors shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid(s), all Overbids, and the Successful Bid(s).  Pursuant to Local Rule 6004-1, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the Sale Process, the Bid Procedures, the Auction, or the proposed Sale Transaction(s).

(iii)   *Terms of Overbids*.  An "Overbid" is any Bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the applicable Baseline Bid(s) that satisfies the following conditions:

a.    Minimum Increment.  During the Auction, bidding shall begin with the Baseline Bid.  Due to the potential combinations of Lab-to-Market™ Assets that may be included in any Bid, the Debtors reserve all rights with respect to the comparison of Qualified Bids and the determination

of the Baseline Bid(s) subject to the exercise of the Sale Option and the rights of the Consultation Parties as provided for herein. The initial Overbid after the Baseline Bid (the "Initial Overbid") shall be made in an increment announced on the record prior to the start of the Auction (the "Minimum Increment"). Any Overbids subsequent to the Initial Overbid shall be made in increments of at least the applicable Minimum Increment.

Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless the Debtors, after consultation with the Consultation Parties, accept a higher Qualified Bid as an Overbid.

b. <u>Consideration of Overbids</u>. Subject to compliance with the terms of the DIP Orders, the Debtors reserve the right, after consultation with the Consultation Parties, to make one or more adjournments in the Auction to, among other things: facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in the exercise of their business judgment and after consultation with the Consultation Parties, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Sale Transaction at the prevailing Overbid amount.

c. <u>Closing Evidence</u>. To the extent not previously provided on or before the Bid Deadline, a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, evidence reasonably acceptable to the Debtors, after consultation with the Consultation Parties, demonstrating such Qualified Bidder's ability to close the Sale Transaction proposed by such Overbid.

(iv) *Additional Procedures*. The Debtors, after consultation with the Consultation Parties, may (a) determine which Qualified Bid or Qualified Bids, if any, is the highest or best offer for all Lab-to-Market™ Assets or any of the Lab-to-Market™ Assets and (b) reject at any time before entry of an order of the Court approving a Sale Transaction of all or any portion of the Lab-to-Market™ Assets pursuant to a Qualified Bid, any Bid that is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the Bid Procedures Order; or (iii) contrary to the best interest of the Debtors, their estates, and their creditors.

(v) *Consent to Jurisdiction as Condition to Bidding*. All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Court and to have waived any right to a jury trial in connection with any disputes relating to the Sale Process, the Auction, the Bid Procedures, and

the construction and enforcement of each Qualified Bidder's Contemplated Transaction Documents, as applicable.

(vi) *Closing the Auction*. The Auction shall continue until there is only one Qualified Bid for all of the Lab-to-Market™ Assets or for one or more of the Lab-to-Market™ Assets (or multiple, non-overlapping Qualified Bids for any subsets of the Lab-to-Market™ Assets if there is no single Qualified Bid for all the Lab-to-Market™ Assets) that the Debtors determine, in the exercise of their business judgment and after consultation with the Consultation Parties, is the highest or otherwise best Qualified Bid(s) (such Qualified Bid(s), the "Successful Bid(s)", and such Qualified Bidder(s), the "Successful Bidder(s)"), and that further bidding is unlikely to result in a higher or otherwise better Qualified Bid, at which point, the Auction will be closed. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction. In selecting the Successful Bid, the Debtors, after consultation with the Consultation Parties, may consider all factors relevant to the sale of the Lab-to-Market™ Assets, including the Bid Assessment Criteria. To the extent the Qualified Bid from the DIP Lenders and the Foris Prepetition Secured Lenders is not the Successful Bid, it shall be deemed to be the Back-Up Bid.

Upon the closing of the Auction, the Debtors, after consultation with the Consultation Parties and subject to the exercise of the Sale Option, shall identify the Successful Bidder(s) and the Successful Bid(s) and the Back-Up Bidder(s) and Back-Up Bid(s) as soon as reasonably practicable which highest or best offer will provide the greatest amount of net value to the Debtors, and advise the Qualified Bidders of such determination. Due to the potential combinations of Lab-to-Market™ Assets that may be included in any Bid, the Debtors reserve all rights with respect to the comparison of Qualified Bids and the determination of the Successful Bidder(s) and Back-Up Bidder(s) (as defined herein).

The Qualified Bidder with the second highest or otherwise best Bid at the Auction, as determined by the Debtors after consultation with the Consultation Parties, shall be required to serve as the back-up bidder (the "Back-Up Bidder(s)"). The identity of the Back-Up Bidder(s) and the amount and material terms of the final Bid of the Back-Up Bidder(s) (the "Back-Up Bid(s)") shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the Successful Bid(s). Any Back-Up Bidder shall keep its Back-Up Bid open and irrevocable until the Closing of the Sale Transaction with the Successful Bidder. The Good Faith Deposit of the Back-Up Bidder(s) shall be returned by the Debtors within three (3) days after Closing.

Within one (1) business day after the close of the Auction, the Successful Bidder(s) shall supplement the Successful Bidder(s)' Good Faith Deposit(s)

such that the Good Faith Deposit(s) shall be equal to an amount that is ten percent (10%) of the Purchase Price of the Successful Bid(s).

The Debtors shall not consider any Bids or Overbids submitted after the closing of the Auction and any and all such Bids and Overbids shall be deemed untimely.

As stated above, the Successful Bid(s) of the Successful Bidder(s) and the Back-Up Bid(s) of the Back-Up Bidder(s), respectively, must be irrevocable until Closing.

## C. <u>Procedures Related to the Assumption and Assignment or Transfer of Contracts</u>

35. With respect to (a) the Debtors' identification and notice of executory contracts and unexpired leases that may be assumed, assumed and assigned, or transferred by the Debtors pursuant to a plan or sale (the "<u>Potential Assumed/Assigned Contracts</u>") and the amount, if any, the Debtors believe is necessary to cure all monetary defaults under such Potential Assumed/Assigned Contracts pursuant to section 365 of the Bankruptcy Code (the "<u>Cure Amounts</u>"); and (b) the procedures and deadlines for the non-Debtor counterparties to such Potential Assumed/Assigned Contracts (the "<u>Contract Counterparties</u>") to object to the Cure Amounts and/or the assumption, assumption and assignment, or transfer of their Potential Assumed/Assigned Contracts (a "<u>Contract Objection</u>"), to the extent a Potential Assumed/Assigned Contract is a Transferred Contract pursuant to a proposed Sale of Lab-to-Market™ Assets, the Debtors request that any Contract Objections be heard at (a) the Sale Hearing or (b) on such other date subsequent to the Sale Hearing as the Court may designate prior to, during, or after the Sale Hearing (the "<u>Cure/Assignment Hearing</u>"). Any Additional Contract Objections (as defined in the Contract and Lease Procedures) will be resolved at a hearing to be held by the Court (a) on or before seven (7) calendar days from the timely filing of the Additional Contract Objection; (b) at the Cure/Assignment Hearing; or (c) such other date designated by the Court.

36.     Upon determination of the Successful Bid(s), on or before ***January 21, 2024***, the Debtors will file a Notice of Successful Bidder with the Court.  Any Contract Counterparty to a Transferred Contract seeking additional assurance of future performance than that provided by the Successful Bidder(s) (the "Adequate Assurance Objection") should immediately contact Steven W. Golden (sgolden@pszjlaw.com) and the applicable Successful Bidder to attempt to resolve any Adequate Assurance Objection.  All Adequate Assurance Objections must be filed and served on the Notice Parties (as defined in the Bid Procedures) and the applicable Successful Bidder no later than **January 23, 2024, at 5:00 p.m. (prevailing Eastern Time)**.  To the extent the parties are unable to consensually resolve the Adequate Assurance Objection prior to Closing, the Court will set a hearing on the Adequate Assurance Objection to determine whether terms of the Successful Bid are compliant with section 365 of the Bankruptcy Code in providing adequate assurance of future performance to the Contract Counterparty of the applicable Transferred Contract, which may be at the Sale Hearing.  The Debtors intend to cooperate with Contract Counterparties to Transferred Contracts to attempt to reconcile any Adequate Assurance Objection.

37.     At the Sale Hearing, (a) the Successful Bidder(s) shall present evidence necessary to demonstrate adequate assurance of future performance by the Successful Bidder(s) with respect to the Transferred Contracts and (b) the Debtors will request entry of an order approving the assumption and assignment of any or all Potential Assumed/Assigned Contracts to be assumed by the applicable Debtors and assigned to the Successful Bidder(s).  For the foregoing reasons, the Debtors believe that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

## D.    Scheduling and Notice

38.    Pursuant to the terms of the Plan Support Agreement and the DIP Facility, the Debtors are required to (i) obtain entry of the Bid Procedures Order by no later than **December 20, 2023**, and (ii) obtain entry of an order approving the Sale(s), no later than **January 25, 2024**. In addition, the terms of the DIP Facility requires that the Closing occur no later than **February 9, 2024**.

39.    Given the marketing and diligence period  to be established by the Bid Procedures, the proposed timeline is sufficient to complete a fair and open sale process that will maximize the value received for the Lab-to-Market™ Assets while complying with the milestones established by the DIP Facility.  The proposed timeline will provide all Potential Bidders with sufficient time to perform due diligence given that the process is well understood at this juncture and all relevant materials are readily available.   Thus, the schedule proposed above will allow for the consummation of the Sale Transactions(s) as quickly as possible and in a manner designed to maximize the value received for the Lab-to-Market™ Assets.

40.    **Notice of Motion**.  On the date the notice of this Motion is filed or as soon as is practicable thereafter, the Debtors will cause this Motion and all exhibits hereto, the Bid Procedures, and a copy of the proposed Bid Procedures Order, to be served upon (a) the Office of the U.S. Trustee for the District of Delaware, 844 King Street, Suite 2207, Lock Box 35, Wilmington, Delaware, 19801, Attn: John Schanne, Esq. (John.Schanne@usdoj.gov); (b) counsel to the Committee, White & Case LLP, 1221 Avenue of the Americas, New York, NY 10020-1095; Attn: Gregory Pesce, Esq. (gregory.pesce@whitecase.com), Andrew O'Neill, Esq. (aoneill@whitecase.com), and John Ramirez, Esq. (john.ramirez@whitecase.com); and co-counsel to the Committee, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor,

Wilmington, DE 19801; Attn: Christopher M. Samis, Esq. (csamis@potteranderson.com), Katelin A. Morales, Esq. (kmorales@potteranderson.com), Sameen Rizvi, Esq. (srizvi@potteranderson.com); (c) counsel to the DIP Lenders, DIP Agent and the Foris Prepetition Secured Lenders, Goodwin Procter LLP, 620 Eighth Avenue, New York, NY 10018, Attn: Michael H. Goldstein, Esq. (mgoldstein@goodwinlaw.com), Alexander J. Nicas, Esq. (anicas@goodwinlaw.com), and Debora A. Hoehne, Esq. (dhoehne@goodwinlaw.com); (d) co-counsel to the DIP Lenders, the DIP Agent and the Foris Prepetition Secured Lenders, Troutman Pepper Hamilton Sanders LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899; Attn: David M. Fournier, Esq. (david.fournier@troutman.com); (e) counsel for the Ad Hoc Noteholder Group, Paul Hastings LLP, 1999 Avenue of the Stars, Twenty-Seventh Floor, Century City, CA 90067, Attn.: Frank Merola, Esq. (frankmerola@paulhastings.com); Paul Hastings LLP, 200 Park Avenue, New York, NY 10166, Attn.: John F. Storz, Esq. (johnstorz@paulhastings.com); and Blank Rome, 1201 N. Market Street, Suite 800, Wilmington, DE 19801, Attn.: Stanley B. Tarr, Esq. (stanley.tarr@blankrome.com); (f) the United States Attorney's Office for the District of Delaware; (g) the state attorneys general for all states in which the Debtors conduct business; (h) the Securities Exchange Commission; (i) all parties reasonably known to the Debtors that assert liens, claims, and encumbrances, and other interests with respect to the Lab-to-Market™ Assets; (j) all entities known to have expressed an interest in bidding on the Lab-to-Market™ Assets; (k) the Internal Revenue Service, the Securities and Exchange Commission, and any other federal, state or local governmental agency to the extent required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or order of the Court; and (l) any party that requests service pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").

41.     **Notice of Bid Procedures**. Within two (2) calendar days of the entry of the Bid Procedures Order, or as soon thereafter as practicable, the Debtors shall cause to be served, by first-class mail, postage prepaid, a notice (the "Bid Procedures Notice") setting forth, among other things, the dates established for submission of Qualified Bids, the Auction, and the Sale Hearing, substantially in the form attached to the Bid Procedures Order as Exhibit 2, upon the Sale Notice Parties and all of the Debtors' known creditors.

42.     **Notice of Successful Bidder(s)**.  Following the Auction but not later than **January 21, 2024,** subject to the exercise of the Sale Option, the Debtors will promptly file with the Court a notice (the "Notice of Successful Bidder"), that will inform the Court of the results of the Auction.  The Notice of Successful Bidder will identify, among other things: (a) the Successful Bidder(s) as the proposed purchaser(s) of the Lab-to-Market™ Assets; (b) the amount and form of consideration to be paid by the Successful Bidder(s) for the Lab-to-Market™ Assets; (c) the liabilities to be assumed by the Successful Bidder(s); and (d) the Potential Assumed/Assigned Contracts to be assumed by the Debtors and assigned to the Successful Bidder(s), or the Debtors' rights and interests therein sold and transferred to the Successful Bidder(s), as the case may be, in connection with the Sale Transaction(s) (*i.e.*, the Transferred Contracts).[10]   The Notice of Successful Bidder will also include similar information relating to the Back-Up Bidder(s) and the Back-Up Bid(s).  In addition, the Debtors will attach to the Notice of Successful Bidder: (a) the Sale Order(s) approving the Sale(s) to the Successful Bidder(s); (b) a copy of the Purchase Agreement(s) entered into by the Debtors and the Successful Bidder(s) following the Auction; and (c) any additional information or documentation relevant to the Successful Bid(s).  The Debtors

---

[10]   For the avoidance of doubt, the identification of the Transferred Contracts in the Notice of Successful Bidder may be accomplished through the attachment of any relevant schedule(s) to the Purchase Agreement(s) attached to such notice.

will file the Notice of Successful Bidder on the docket for these Chapter 11 Cases as promptly as is reasonably practicable prior to the Sale Hearing but will not be required to serve the same on any parties-in-interest in these Chapter 11 Cases.

**E.    Sale Order**

43.    To ensure the Debtors are in compliance with the terms of the DIP Facility, the Debtors request that this Court set the Sale Hearing at the same time as the hearing regarding Confirmation of the Plan, currently scheduled for **January 24, 2024, at 10:00 a.m.** (prevailing Eastern Time).  At the Sale Hearing, if the Sale Option is exercised, the Debtors intend to seek the entry of the Sale Order, which may be connection with confirmation of the Plan: (a) approving the Sale(s) free and clear of all Encumbrances, and (b) authorizing the assumption and assignment or transfer of the Transferred Contracts, among other things.[11]  Pursuant to the Sale Order, the Debtors will sell any Lab-to-Market™ Assets that are the subject of a Sale Transaction free and clear of all Encumbrances to the fullest extent possible pursuant to section 363(f) of the Bankruptcy Code (except for those Assumed Liabilities and obligations expressly assumed by the Successful Bidder(s)), and the Successful Bidder(s) will be protected from liability for and cannot be pursued for any claims owed by the Debtors, except as otherwise agreed by the Successful Bidder(s) and the Debtors or as set forth in the Sale Order.  In addition, the Sale Order will have findings that the Sale(s) is not a fraudulent conveyance.  The Bid Procedures provide proper and adequate notice for these and the other terms and conditions of the bidding, Auction, and Sale Processes.

---

[11]    To the extent the Debtors seek to consummate more than one Sale Transaction, the Debtors reserve the right to seek the entry of multiple Sale Orders in accordance with these procedures.

## BASIS FOR RELIEF REQUESTED

**A.  Approval of the Sale(s) Is Warranted Under Section 363(b) of
the Bankruptcy Code and the Bid Procedures Are Appropriate and
in the Best Interests of the Debtors' Estates and their Creditors**

44.    Section 363(b)(1) of the Bankruptcy Code provides that the "trustee, after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate. . . . "[12] Section 105(a) of the Bankruptcy Code further provides, in relevant part, that "[t]he

court may issue any order, process, or judgment that is necessary or appropriate to carry out the

provisions of this title."

45.    A debtor may be authorized to sell assets outside of the ordinary course of business

pursuant to section 363 of the Bankruptcy Code if it demonstrates a sound business purpose for

doing so.[13]

46.    Indeed, the paramount goal of a chapter 11 process is to maximize the proceeds

received by the estate.[14] To that end, courts have recognized that procedures intended to enhance

competitive bidding are consistent with the goal of maximizing the value received by the estate of

---

[12]    11 U.S.C. § 363(b)(1).

[13]    *See In re Fed. Mogul Glob., Inc.*, 293 B.R. 124, 126 (D. Del . 2003) (finding that a court should approve a debtor's
use of assets outside ordinary course of business if debtor can demonstrate a sound business justification for
proposed transaction); *see also In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 154 (Bankr. D. Del. 1999)
(finding that the debtor's sound business purpose justified its sale of the assets outside of the ordinary course of
business).

[14]    *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997)
("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *In re Abbotts
Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149 (3d Cir. 1986) (noting the fairness and reasonableness of prices);
*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650,
659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . debtor's duty . . . is to
obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bag Co. v. Champion
Intl Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)); *In re Summit Glob.
Logistics, Inc.*, No. 08-11566, 2008 Bankr. LEXIS 896, at *43 (Bankr. D.N.J. Mar. 26, 2008) (describing a
proposed transaction as one that "maximize[d] value and return to interested parties.").

a debtor and therefore are appropriate.[15]  With this in mind, courts have deferred to a debtor's business judgment in the context of bidding and auction procedures.[16]

47.    In exercising its fiduciary duties and in the sound exercise of their business judgment, the Debtors have determined that the Bid Procedures encourage competing bids that will facilitate maximizing creditor recoveries and that will ensure the value received for their Lab-to-Market™ Assets is the highest or best the market can generate.

48.    The Bid Procedures provide a framework to facilitate and entertain bids for the purchase of any or all of the Debtors' Lab-to-Market™ Assets and, if multiple bids are received, to conduct an Auction in an orderly yet competitive fashion, thereby encouraging bids that maximize the value realized from a Sale of the Lab-to-Market™ Assets.  In particular, the Bid Procedures contemplate an open and fair auction process with minimum barriers to entry and provide Bidders with sufficient time to perform due diligence and to acquire the information necessary to submit a timely and well-informed bid.

49.    The Bid Procedures provide the Debtors with an adequate opportunity to consider competing bids and, subject to the exercise of the Sale Option, select the highest or best offer(s) for the purchase of any or all of the Debtors' Lab-to-Market™ Assets.  The Debtors therefore

---

[15]    *See, e.g., In re Dura Auto. Sys.*, 379 B.R. 257, 263 (Bankr. D. Del. 2017); *Integrated Res.*, 147 B.R. at 659 (providing that such procedures "encourage bidding and to maximize the value of the debtor's assets."); *In re Fin. News Network Inc.*, 126 B.R. 152, 156 (S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate.").

[16]    *See, e.g., In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [Debtor] to show that a sound business purpose justifies such actions.' If the [Debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale." (quoting *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Trans World Airlines Inc.*, No. 01-0056, 2001 Bankr. LEXIS 980, at *29 (Bankr. D. Del. Apr. 2, 2001) ("It is not the function of a bankruptcy court to independently exercise a business judgment as to which proposal among competing proposals should be adopted by the debtor in effecting a § 363(b) sale.").

believe that submitting the purchase of their Lab-to-Market™ Assets to a market-based test will facilitate the resolution of these cases on the terms set forth in the Plan.

50. Similar bidding, auction, and notice procedures have been previously approved by this Court in other chapter 11 cases. *See, e.g.*, *In re PhaseBio Pharms., Inc.*, No. 22-10995 (LSS) (Bankr. D. Del. Nov. 28, 2022); *In re Genapsys, Inc.*, No. 22-10621 (BLS) (Bankr. D. Del. Aug. 17, 2022); *In re SanityDesk, Inc.*, No. 22-10527 (JTD) (Bankr. D. Del. Aug. 3, 2022); *In re Enjoy Tech., Inc.*, No. 22-10580 (JKS) (Bankr. D. Del. July 26, 2022); *In re Hamon Holdings Corp.*, No. 22-10375 (JTD) (Bankr. D. Del. July 13, 2022); *In re Healthe, Inc.*, No. 21-11567 (MFW) (Bankr. D. Del. Mar. 21, 2022); *In re Wardman Hotel Owner, L.L.C.*, No. 21-10023 (JTD) (Bankr. D. Del. June 15, 2021); *In re MobiTV, Inc.*, No. 21-10457 (LSS) (Bankr. D. Del. Apr. 7, 2021); *In re EHT US1, Inc.*, No. 21-10036 (CSS) (Bankr. D. Del. Mar. 24, 2021); *In re RTI Holding Co., LLC*, No. 20-12456 (JTD) (Bankr. D. Del. Nov. 20, 2020); *In re BL Rests. Holding, LLC*, No. 20-10156 (MFW) (Bankr. D. Del. Feb. 28, 2020); *In re Forever 21, Inc.*, No. 19-12122 (KG) (Bankr. D. Del. Feb. 4, 2020).[17]

51. In sum, the Debtors believe that the proposed Bid Procedures create an appropriate framework for expeditiously considering an alternative transaction to the reorganization of the Debtors through the Plan by soliciting the best and highest offers for their Lab-to-Market™ Assets. Accordingly, the proposed Bid Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances.

---

[17] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request of the Debtors' counsel.

**B.    The Purchased Assets Should be Sold Free and Clear of Liens, Claims, and Encumbrances Pursuant to Section 363(f) of the Bankruptcy Code**

52.    In the interest of attracting the best offers, the Debtors request authorization to sell their Lab-to-Market™ Assets free and clear of any and all Encumbrances in accordance with section 363(f) of the Bankruptcy Code, with any such Encumbrances attaching to the proceeds of the Sale(s) of the Lab-to-Market™ Assets and distributed as provided for in a further order of the Bankruptcy Court.

53.    Under section 363(f) of the Bankruptcy Code, a debtor may sell estate property free and clear of liens, claims, encumbrances, and other interests if one of the following conditions is satisfied: (a) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (b) such entity consents; (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (d) such interest is in bona fide dispute; or (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.[18]  Because section 363(f) of the Bankruptcy Code is written in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of liens, claims, encumbrances, and other interests.[19]

54.    Furthermore, section 105(a) of the Bankruptcy Code grants the court broad discretionary powers, providing that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  This equitable power may be utilized to effectuate the provisions of section 363(f).[20]

---

[18]    11 U.S.C. § 363(f).

[19]    *See, e.g.*, *In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992).

[20]    *See, e.g., In re Trans World Airlines, Inc.*, 2001 Bankr. LEXIS 723, at *18–19 (Bankr. D. Del. Mar. 27, 2001) (highlighting bankruptcy courts' equitable authority to authorize sale of estate assets free and clear).

55. The Debtors will demonstrate at the Sale Hearing that the Sale(s) satisfies the requirements of section 363(f). Accordingly, the Debtors request authorization to sell their Lab-to-Market™ Assets free and clear of all Encumbrances.

## C. Successful Bidders Should Be Entitled to the Protections of Section 363(m) of the Bankruptcy Code

56. Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.[21] As noted above, any Purchase Agreement executed by a Successful Bidder will have been negotiated at arm's-length and in good faith in accordance with the Bid Procedures and Bid Procedures Order, with each of the parties represented by its own advisors and counsel. Accordingly, the Debtors request that the Sale Order include a provision that any Successful Bidder(s) for the Debtors' Lab-to-Market™ Assets is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtors maintain that providing the Successful Bidders with such protection will ensure that the maximum price will be received by the Debtors for the Lab-to-Market™ Assets.

## D. Assumption and Assignment or Transfer of Certain Executory Contracts and Unexpired Leases Should be Authorized

57. To enhance the value of the Debtors' estates, the Debtors request authority under section 365 of the Bankruptcy Code to assume and assign or transfer the Transferred Contracts to the Successful Bidder(s). The Debtors further request that the Sale Order provide that the Transferred Contracts will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder(s) notwithstanding any provisions in such assigned contracts and/or leases,

---

[21] *See, e.g., In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986); *Miami Ctr. Ltd. P'ship v. Bank of New York*, 838 F.2d 1547, 1554 (11th Cir. 1988); *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985).

including those described in sections 365(b)(2), (f)(1), and (f)(3) of the Bankruptcy Code, that prohibit such assignments.

58.     A debtor may, subject to court approval, assume and assign executory contracts and unexpired leases under section 365(a) of the Bankruptcy Code.  Courts routinely approve motions to assume and assign executory contracts or unexpired leases upon a showing that a debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment.[22]  The assumption and assignment of the Transferred Contracts related to the Lab-to-Market™ Assets is an integral component of any Sale, without which a Sale would not be a viable option.

59.     Section 365(b)(1) of the Bankruptcy Code requires that, if there has been a default in a debtor's unexpired lease or executory contract, other than certain nonmonetary defaults as set forth in the statute, such unexpired lease or executory contract may not be assumed unless, at the time of the assumption, (a) such default is cured or there is adequate assurance that such default will be cured, (b) compensation or adequate assurance of compensation is provided for any actual pecuniary loss resulting from such default, and (c) adequate assurance of future performance under the lease is provided.[23]  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case but should be given "practical, pragmatic construction."[24]

60.     As set forth above, the Debtors will send a Cure Notice and Additional Cure Notice, as applicable, to all Contract Counterparties to the Potential Assumed/Assigned Contracts notifying such Contract Counterparties of the potential assumption, assumption and assignment,

---

[22]   *In re Fleming Co. Inc.*, 499 F.3d 300, 305 (3d Cir. 2007).

[23]   11 U.S.C. § 365(b)(1).

[24]   *EBG Midtown South Corp. v. McLaren/Hart Env. Eng' g Corp.* (*In re Sanshoe Worldwide*), 139 B.R. 585, 593 (S.D.N.Y. 1992); *see also In re Fleming Co. Inc.*, 499 F.3d at 305; *Cinicola v. Scharffeberger*, 248 F.3d 110, 120 (3d Cir. 2001).

or transfer of such contract and/or lease, including pursuant to a Sale of Lab-to-Market™ Assets. The Cure Notice and Additional Cure Notice, as applicable, will also set forth the Cure Amount, if any, owing for all such contracts and/or leases according to the Debtors' books and records.

61.     Contract Counterparties to Potential Assumed/Assigned Contracts will be given sufficient time (as set forth herein and in the Contract and Lease Procedures Motion) to object to the proposed Cure Amounts, if any, set forth in the Cure Notice.  If no objection is filed with regard to a particular Cure Amount and the Potential Assumed/Assigned Contract is a Transferred Contract pursuant to a proposed Sale of Lab-to-Market™ Assets, such Cure Amount shall be binding on the Debtors, the Successful Bidder(s), and the applicable Contract Counterparty.  The payment of the Cure Amounts specified in the Cure Notice or Additional Cure Notice (or a different amount, either agreed to by the Debtors or resolved by this Court as a result of a timely-filed objection by the relevant Contract Counterparty) will be in full and final satisfaction of all obligations to cure defaults and compensate the Contract Counterparties for any pecuniary losses under the applicable Transferred Contracts pursuant to section 365(b)(1) of the Bankruptcy Code, unless the Debtors determine, before the Sale Hearing, that a particular lease or contract is not executory or unexpired, and does not need to be cured to transfer the Lab-to-Market™ Assets to the relevant Successful Bidder.

62.     Section 365(f) of the Bankruptcy Code states that a debtor may assign its unexpired leases and executory contracts if, *inter alia,* the assignee provides "adequate assurance of future performance."[25]  If necessary, the Successful Bidder(s) must submit, among other things, written evidence of the ability to provide adequate assurance of future performance under the applicable contracts or leases as set forth above and in the Bid Procedures Order.  The affected Contract

---

[25]    11 U.S.C. § 365(f)(2)(B).

Counterparties will also be able to challenge the ability of the Successful Bidder(s) to provide adequate assurance as provided in the Bid Procedures Order.

63.     Any assumption and assignment or transfer of the Transferred Contracts will be subject to all of the provisions of such contract and/or lease, to the extent required by applicable law and in accordance with applicable provisions of the Bankruptcy Code. The Bid Procedures are designed to ensure that any Successful Bidder(s) is financially able and prepared to undertake all of the relevant obligations under the Transferred Contracts. The Debtors, together with the relevant Successful Bidder, will establish, as necessary, at the Sale Hearing, the requisite adequate assurance of future performance pursuant to section 365 of the Bankruptcy Code with respect to the potential assumption and assignment or transfer of the applicable Transferred Contracts. Consequently, assumption and assignment of the Transferred Contracts in connection with the Sale(s) is appropriate under the circumstances.

**E.      The Proposed Notices Are Appropriate Under Bankruptcy Rule 2002**

64.     The notices contemplated by the Bid Procedures give notice of the proposed Sale Process including a disclosure of the time, place, and methodology of the Auction, the terms and conditions for being a Qualified Bidder, the necessary terms to be included in any proposed Sale Transaction(s), and the deadline for filing any objections to the Sale Process or any part thereof. The Debtors submit that the notice procedures comply with Bankruptcy Rule 2002 and include information regarding the Bid Procedures necessary to enable interested Bidders to participate in the Auction and constitute good and adequate notice of the Bid Procedures and the other components of the Sale Process. Therefore, the Debtors respectfully request that this Court approve the proposed notice procedures.

## F.    Relief from Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

65.    Under Bankruptcy Rule 6004(h), unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen (14) days after entry of the order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented.[26] Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for fourteen (14) days, unless the court orders otherwise.

66.    To preserve the value of the Debtors' estates and limit the costs of administering and preserving the Lab-to-Market™ Assets, it is critical that the Debtors close the Sale(s) of the Lab-to-Market™ Assets as soon as possible after all closing conditions have been met or waived. Accordingly, the Debtors hereby request that the Court waive the fourteen (14) day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## NO PRIOR REQUEST

67.    No prior request for the relief sought in this Motion has been made to this or any other court.

## NOTICE

68.    The Debtors will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware, 844 King Street, Suite 2207, Lock Box 35, Wilmington, Delaware, 19801, Attn: John Schanne, Esq. (John.Schanne@usdoj.gov); (b) counsel to the Committee, White & Case LLP, 1221 Avenue of the Americas, New York, NY 10020-1095; Attn: Gregory Pesce, Esq. (gregory.pesce@whitecase.com), Andrew O'Neill, Esq. (aoneill@whitecase.com), and John

---

[26]    *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

Ramirez, Esq. (john.ramirez@whitecase.com); and co-counsel to the Committee, Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, DE 19801; Attn: Christopher M. Samis, Esq. (csamis@potteranderson.com), Katelin A. Morales, Esq. (kmorales@potteranderson.com), Sameen Rizvi, Esq. (srizvi@potteranderson.com); (c) counsel to the DIP Lenders, DIP Agent and the Foris Prepetition Secured Lenders, Goodwin Procter LLP, 620 Eighth Avenue, New York, NY 10018, Attn: Michael H. Goldstein, Esq. (mgoldstein@goodwinlaw.com), Alexander J. Nicas, Esq. (anicas@goodwinlaw.com), and Debora A. Hoehne, Esq. (dhoehne@goodwinlaw.com); (d) co-counsel to the DIP Lenders, the DIP Agent and the Foris Prepetition Secured Lenders, Troutman Pepper Hamilton Sanders LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, P.O. Box 1709, Wilmington, DE 19899; Attn: David M. Fournier, Esq. (david.fournier@troutman.com); (e); counsel for the Ad Hoc Noteholder Group, Paul Hastings LLP, 1999 Avenue of the Stars, Twenty-Seventh Floor, Century City, CA 90067, Attn.: Frank Merola, Esq. (frankmerola@paulhastings.com); Paul Hastings LLP, 200 Park Avenue, New York, NY 10166, Attn.: John F. Storz, Esq. (johnstorz@paulhastings.com); and Blank Rome, 1201 N. Market Street, Suite 800, Wilmington, DE 19801, Attn.: Stanley B. Tarr, Esq. (stanley.tarr@blankrome.com); (f) the United States Attorney's Office for the District of Delaware; (g) the state attorneys general for all states in which the Debtors conduct business; (h) the Securities Exchange Commission; (g) all parties reasonably known to the Debtors that assert liens, claims, and encumbrances, and other interests with respect to the Assets; (h) all entities known to have expressed an interest in bidding on the Assets; (j) the Internal Revenue Service, the Securities and Exchange Commission, and any other federal, state or local governmental agency to the extent required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or order of the Court; and (i) any party that requests service pursuant to Bankruptcy Rule 2002.

**WHEREFORE**, the Debtors respectfully request that the Court enter the Bid Procedures Order, granting the relief requested herein, and such other and further relief as this Court deems appropriate.

Dated: December 14, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ James E. O'Neill*

Richard M. Pachulski (admitted *pro hac vice*)
Debra I. Grassgreen (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
Jason H. Rosell (admitted *pro hac vice*)
Steven W. Golden (DE Bar No. 6807)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
rpachulski@pszjlaw.com
dgrassgreen@pszjlaw.com
joneill@pszjlaw.com
jrosell@pszjlaw.com
sgolden@pszjlaw.com

*Counsel to the Debtors and Debtors in Possession*

**EXHIBIT A**

**(Proposed Bid Procedures Order)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC., *et al.*, | Case No. 23-11131 (TMH) |
| Debtors. [1] | (Jointly Administered) |
|  | **Related to Docket No.** |

## ORDER (A) APPROVING BID PROCEDURES FOR THE SALE OF THE DEBTORS' LAB-TO-MARKET™ ASSETS; (B) SETTING MINIMUM RESERVE PRICE; (C) SCHEDULING THE AUCTION AND SALE HEARING; (D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (E) GRANTING RELATED RELIEF

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), for the entry of an order pursuant to sections 105(a), 363, 365, 503, 507, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to establish certain sales procedures which will culminate in a sale or sales of certain of the Debtors assets, all as more fully set forth in the Motion; and upon consideration of the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012; and this Court having found that this is a core

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/Amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

[2] A capitalized term used but not defined herein have the meaning ascribed to it in the Motion.

proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**[3]

A.     The Debtors have articulated good and sufficient reasons for, and the best interests of their estates and stakeholders will be served by, the Court scheduling or fixing dates pursuant to this order (this "Order") for, among other things, the (i) Bid Deadline; (ii) Sale Objection Deadline; (iii) Auction; and (iv) Sale Hearing, each as defined below.

B.     The Bid Procedures are fair, reasonable, and appropriate and represent the best available method for maximizing value for the benefit of the Debtors' estates.

C.     The Bid Procedures were negotiated at arm's length, in good faith, and without collusion. The Bid Procedures balance the Debtors' interests in emerging expeditiously from these Chapter 11 Cases while preserving the opportunity to attract value-maximizing proposals beneficial to the Debtors' estates, their creditors, and other parties in interest.

D.     The Bid Procedures Notice, Stalking Horse Notice, Auction Notice, and Notice of

---

[3]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

ACTIVE/126608063.6

Successful Bidder are reasonably calculated to provide the Sale Notice Parties, the Contract Counterparties, and other interested parties with proper notice of the (i) Bid Procedures; (ii) Auction; (iii) Sale Hearing; and (iv) Sale(s).

E. The Motion and the Bid Procedures comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

F. Due, sufficient, and adequate notice of the relief granted herein has been given to all parties in interest.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. The Motion is granted as set forth herein.

2. All formal and informal objections, if any, to the relief requested in the Motion that have not been withdrawn, waived, or settled are overruled on the merits.

3. The Bid Procedures, which are attached hereto as **Exhibit 1** and incorporated herein by reference, are hereby approved in all respects and shall govern all Bidders and Bids, including those that may be submitted by Qualified Bidders at the Auction.

4. Bidders seeking to submit Bids for the Lab-to-Market™ Assets must do so in accordance with the terms of the Bid Procedures and this Order.

5. The deadline for all Potential Bidders to submit a Qualified Bid (other than any of the Secured Parties' deemed Qualified Bid(s)) is **January 16, 2024, at 5:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"), as set forth in the Bid Procedures.

6. By **January 18, 2024**, the Debtors shall file a notice on the Court's docket (an "Auction Notice") providing (a) notice of the location of the Auction or whether the Debtors' intend to proceed with the Auction telephonically or bv video conference; and (b) notice of whether the Debtors believe, in the exercise of their business judgment and after consultation with the

Consultation Parties, that the Auction should be held in two or more parts over multiple days so as to maximize value for the estates.

7. As set forth in the Bid Procedures, if at least one Qualified Bid is received by the Bid Deadline (in addition to any of the Secured Parties' deemed Qualified Bid), the Debtors will hold the Auction beginning on **January 19, 2024, at 10:00 a.m. (prevailing Eastern Time),** in accordance with the Bid Procedures at the location or in the manner designated by the Debtors in the Auction Notice.

8. On or before **January 21, 2024**, the Debtors will file with the Court and serve on the Notice Parties (as defined below) <u>and</u> on all non-Debtor counterparties to Transferred Contracts (as defined below) included in the Successful Bid(s), the Notice of Successful Bidder.  With respect to any Sale Transaction, a filed Notice of Successful Bidder shall include, as exhibits, (a) a copy of the Purchase Agreement; (b) a copy of the proposed Sale Order; and (c) identification of the Transferred Contracts for such Sale Transaction (which may be in the form of an exhibit or schedule to the Purchase Agreement).[4]

9. Any Contract Counterparty to a Transferred Contract that objects to a Successful Bidder's provision of additional assurance of future performance (the "<u>Adequate Assurance Objection</u>") must file such Adequate Assurance Objection on or before **January 23, 2024, at 5:00 p.m. (prevailing Eastern Time),** and serve such objection on the Notice Parties and the applicable Successful Bidder.  To the extent the parties are unable to resolve an Adequate Assurance Objection, the Court will set a hearing, which may be at the Sale Hearing, on the Adequate Assurance Objection to determine whether terms of the Successful Bid are compliant

---

[4] The Debtors may, in their discretion, serve a Notice of Successful Bidder by U.S. Mail without attached copies of a Purchase Agreement and/or proposed Sale Order; *provided, however,* that any such Notice of Successful Bidder must identify where parties receiving such notice may access such documents free of charge.

ACTIVE/126608063.6

with section 365 of the Bankruptcy Code in providing adequate assurance of future performance to the Contract Counterparty of the applicable Transferred Contract.

10. Any Secured Party shall be entitled to credit bid some or all of its claims pursuant to section 363(k) of the Bankruptcy Code. Any credit bid by the DIP Agent and/or the Foris Prepetition Secured Lenders shall automatically be deemed a Qualified Bid.

11. The DIP Lenders and the Foris Prepetition Secured Lenders' Qualified Bid for the Lab-to-Market™ Assets constitutes the Other Assets Stalking Horse Credit Bid under the Plan.

12. Following the conclusion of the Auction, and subject to compliance with the terms of the DIP Order, the Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing or by filing a notice on the Court's docket. At the Sale Hearing, the Debtors shall present the Successful Bid(s) to the Court for approval.

13. The Debtors are hereby authorized to conduct the Sale(s) without the necessity of complying with any state or local transfer laws or requirements.

14. The Bid Procedures Notice substantially in the forms attached to this Order as Exhibit 2 is approved in all respects. Other than with respect to the Notice of Successful Bidder, no other or further notice of the Bid Procedures, the Sale Hearing, relevant objection or other deadlines, or the Sale(s) is required.

15. To be considered, any objection to the Sale(s) must: (a) comply with the Bankruptcy Rules and the Local Rules; (b) be made in writing and filed with the Court; and (c) be filed on or before **January 23, 2024, at 5:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline").

16. The failure of any objecting person or entity to timely file an objection prior to the Sale Objection Deadline shall be a bar to the assertion at the Sale Hearing or thereafter of any

ACTIVE/126608063.6

objection to the relief requested by the Debtors, or the consummation and performance of the Sale(s) of the Lab-to-Market™ Assets to the Successful Bidder(s), including the transfer of the Lab-to-Market™ Assets free and clear of all Encumbrances (with the same to attach to the cash proceeds of the Sale(s) to the same extent and with the same order of priority, validity, force, and effect which they previously had against the Lab-to-Market™ Assets, subject to the rights and defenses of the Debtors and the Debtors' estates with respect thereto), and the Debtors' assumption and assignment or transfer of the Transferred Contracts to the Successful Bidder(s).

17.  No Qualified Bidder or any other person or entity shall be entitled to any expense reimbursement, break-up fee, termination, or other similar fee or payment in connection with the Sale(s).

18.  Notwithstanding the possible applicability of Bankruptcy Rules 6004(h) or 6006(d), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

19.  The Debtors are authorized and empowered to execute and deliver such documents, and to take and perform all actions necessary to implement and effectuate the relief granted in this Order.

20.  All persons and entities that participate in the Sale Process and/or the Auction(s) shall be deemed to have knowingly and voluntarily submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Bid Procedures, the Sale Process, and the Auction(s).

21.  To the extent of any inconsistences between the Bid Procedures and this Order, this Order shall govern.

22.  The Court shall retain jurisdiction over any matter or dispute arising from or relating to the Bid Procedures or this Order.

ACTIVE/126608063.6