# EXHIBIT 2

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**AMYRIS, INC. AND AMYRIS CLEAN BEAUTY INC.,**

**AS SELLER**

**AND**

**SAKANA, LLC**

**AS BUYER**

**DATED AS OF DECEMBER [●], 2023**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ....................................................................................... 2
    1.1       Definitions................................................................................................. 2

ARTICLE II PURCHASE AND SALE ...................................................................... 7
    2.1       Purchased Assets ...................................................................................... 7
    2.2       Excluded Assets ....................................................................................... 9
    2.3       Nonassignable Assets; Deemed Consent; Additional Excluded Assets ........ 10
    2.4       Liabilities .............................................................................................. 11
    2.5       Purchase Price ........................................................................................ 12
    2.6       Withholding ........................................................................................... 12

ARTICLE III CLOSING; PAYMENT OF PURCHASE PRICE ............................. 12
    3.1       Closing .................................................................................................. 12
    3.2       Closing Deliveries ................................................................................. 13

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER ............... 14
    4.1       Existence and Power .............................................................................. 14
    4.2       Authorization ......................................................................................... 14
    4.3       Enforceability ........................................................................................ 14
    4.4       Noncontravention ................................................................................... 15
    4.5       Proceedings ........................................................................................... 15
    4.6       Brokers .................................................................................................. 15
    4.7       Compliance with Laws .......................................................................... 15
    4.8       Title ...................................................................................................... 15
    4.9       Intellectual Property .............................................................................. 15
    4.10     Inventory ............................................................................................... 16

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ................ 16
    5.1       Existence and Power .............................................................................. 16
    5.2       Authorization ......................................................................................... 16
    5.3       Enforceability ........................................................................................ 16
    5.4       Governmental and Third Party Authorizations ...................................... 16
    5.5       Noncontravention ................................................................................... 17
    5.6       Brokers .................................................................................................. 17
    5.7       Proceedings ........................................................................................... 17
    5.8       Financial Capability ............................................................................... 17
    5.9       Solvency ................................................................................................ 17
    5.10     Independent Investigation ...................................................................... 18
    5.11     Exclusivity of Representations and Warranties ...................................... 18

ARTICLE VI PRE-CLOSING COVENANTS ......................................................... 18
    6.1       Conduct of Business .............................................................................. 18
    6.2       Pre-Closing Access to Information ......................................................... 19
    6.3       Supplemental Disclosure ....................................................................... 20
    6.4       Efforts to Close ...................................................................................... 20
    6.5       Other Business Relations ....................................................................... 20

| 6.6 | Bankruptcy Matters | 21 |
|------|------|------|
| 6.7 | Access to Books and Records | 21 |
| 6.8 | [Reserved] | 22 |
| 6.9 | Cross Border Agreements | 22 |

**ARTICLE VII COVENANTS AND OTHER AGREEMENT OF BUYER AND SELLERS** .......... 22

| 7.1 | Public Announcements | 22 |
|------|------|------|
| 7.2 | Tax Matters | 23 |
| 7.3 | Confidentiality | 23 |
| 7.4 | Mutual Release. | 24 |
| 7.5 | Further Assurances; Wrong Pockets. | 25 |

**ARTICLE VIII CONDITIONS TO CLOSING** .......... 25

| 8.1 | Conditions to Obligations of Buyer | 25 |
|------|------|------|
| 8.2 | Conditions to Obligations of Seller | 26 |
| 8.3 | Frustration of Closing Conditions | 26 |
| 8.4 | Waiver of Conditions | 26 |

**ARTICLE IX TERMINATION** .......... 26

| 9.1 | Termination | 26 |
|------|------|------|
| 9.2 | Effect of Termination | 28 |

**ARTICLE X SURVIVAL AND RELEASE** .......... 28

| 10.1 | Survival | 28 |
|------|------|------|

**ARTICLE XI MISCELLANEOUS** .......... 29

| 11.1 | Notices | 29 |
|------|------|------|
| 11.2 | Amendments and Waivers | 30 |
| 11.3 | Expenses | 30 |
| 11.4 | Successors and Assigns | 30 |
| 11.5 | Governing Law | 30 |
| 11.6 | Consent to Jurisdiction; Service of Process; Waiver of Jury Trial | 31 |
| 11.7 | Counterparts | 31 |
| 11.8 | No Third Party Beneficiaries | 32 |
| 11.9 | Entire Agreement | 32 |
| 11.10 | Disclosure Schedules | 32 |
| 11.11 | Captions | 32 |
| 11.12 | Remedies | 32 |
| 11.13 | Severability | 33 |
| 11.14 | Interpretation | 33 |
| 11.15 | Prevailing Party | 34 |
| 11.16 | Further Assurances | 34 |
| 11.17 | Personally Identifiable Information | 34 |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement"), dated as of December 13, 2023, is entered into by and among Amyris, Inc. and Amyris Clean Beauty, Inc. (together, "Seller"), each a debtor and debtor-in-possession in Case No. 23-11131 (TMH) (Jointly Administered) (the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and Sakana, LLC, or an entity designated by Sakana, LLC prior to Closing ("Buyer"). Seller and Buyer are referred to herein as the "Parties". Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in Article I.

## RECITALS

A.      Seller is in the business of manufacturing, distributing, and selling at retail and direct to consumers certain products under the brand name STRIPES (the "Business").

B.      Seller has filed its *Motion for (I) an Order (A) Approving Bid Procedures for the Sale of the Debtors' Brand Assets; (B) Approving Certain Bid Protections in Connection With the Debtors' Entry Into any Potential Stalking Horse Agreements; (C) Scheduling the Auction and Sale Hearing; (D) Approving the Form and Manner of Notice Thereof; and (E) Granting Related Relief; and (II) an Order or Orders (A) Approving the Sale of the Debtors' Brand Assets Free and Clear of All Encumbrances; and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases* [Docket No. 316] (the "Motion").

C.      Seller has obtained that certain *Order Approving (a) Bid Procedures for the Sale of the Debtors' Brand Assets; (B) Approving Certain Bid Protections in Connection with the Debtors' Entry into any Potential Stalking Horse Agreement; (C) Scheduling the Auction and Sale Hearing; (D) Approving the Form and Manner of Notice Thereof; and (E) Granting Related Relief*, by the Bankruptcy Court, which was entered in the Bankruptcy Case on October 16, 2023, as document No. 553 (the "Procedures Order"). Consistent with the Procedures Order, this Agreement is subject to higher and better bids for the Purchased Assets (as defined in Section 1.1 hereof), all as more particularly set forth in the Procedures Order.

D.      Seller desires to sell to Buyer, pursuant to section 363(f) of the Bankruptcy Code (as defined in Section 1.1) and with the approval of the Bankruptcy Court, certain of the assets of Seller previously used, currently used, or anticipated to be used exclusively in connection with or arising out of the operation of the Business, and Buyer desires to purchase such assets from Seller, all on the terms and conditions and as more particularly set forth in this Agreement.

## AGREEMENTS

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1    **Definitions**.  When used in this Agreement, the following terms shall have the meanings assigned to them in this Section 1.1.

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly (through one or more intermediaries) controlling, controlled by or under common control with such specified Person.  For purposes of this definition, the terms "controlling," "controlled by," or "under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, or the power to elect more than fifty percent (50%) of the directors, managers, general partners, or persons exercising similar authority with respect to such Person.

"Agreed Statement" has the meaning set forth in Section 7.1.

"Agreement" has the meaning set forth in the Preamble hereto.

"Ancillary Documents" means any agreements, instruments and documents delivered at the Closing pursuant to this Agreement.

"Approval Order" has the meaning set forth in Section 6.6(a).

"Assigned Contracts" has the meaning set forth in Section 2.1(c).

"Assumed Liabilities" has the meaning set forth in Section 2.4(a).

"Bankruptcy Case" has the meaning ascribed to such term in the Recitals.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Benefit Plan" means: (a) any material Employee Plan and (b) any material employment, severance or similar contract or arrangement (whether or not written) or agreement, arrangement, plan or policy (whether or not written) providing any compensation or benefits to any Employee (including any agreement, arrangement, plan or policy making available bonuses, equity awards, or deferred compensation) other than an Employee Plan, to which Seller has Liability.

"Bill of Sale" has the meaning set forth in Section 3.2(b)(i).

"Books and Records" means all of the books and records, in all formats (both tangible and intangible), used or maintained by or on behalf of Seller in connection with or otherwise related to the Business, including (a) executed copies of all of the written Assigned Contracts, (b) all equipment, product and other warranties pertaining to the Purchased Assets, (c) all technical information and any data, maps, computer files, diagrams, blueprints and schematics, (d) all filings

made with or records required to be kept by any Governmental Authority (including all backup information on which such filings are based), (e) all research and development reports, (f) all equipment and operating logs, (g) all financial and accounting records, and (h) all creative, promotional or advertising materials.

"Breakup Fee" has the meaning set forth in Section 9.2(b).

"Brand Agreement" means that certain agreement between Amyris, Inc. and Sakana, LLC dated May 25, 2022 titled "Stripes Brand Agreement".

"Business" has the meaning set forth in the Recitals.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks located in New York, New York are authorized or required by Law to close.

"Buyer" has the meaning set forth in the Preamble hereto.

"Buyer Closing Certificate" has the meaning set forth in Section 8.2(c).

"Charges" has the meaning set forth in Section 7.2(a).

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"Code" means the Internal Revenue Code of 1986, as amended, and regulations promulgated thereunder.

"Confidential Information" means all confidential, proprietary or non-public information disclosed by Seller to Buyer prior to the Closing, including but not limited to, the information set forth on the Seller Disclosure Schedules.

"Contract" means any written and legally binding agreement, contract, commitment or arrangement.

"Contract Assignments" has the meaning set forth in Section 3.2(b)(ii).

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions or variants thereof or related or associate epidemics, pandemics or diseases existing prior to the Closing Date.

"Deposit" has the meaning set forth in Section 3.2(a)(i).

"Encumbrances" has the meaning ascribed to it in the Motion.

"Employee" means any employee of Seller (whether salaried or hourly, and full-time or part-time), whether or not actively employed on the date hereof, including employees on vacation and leave of absence, including maternity, family, sick, military or disability leave.

"Employee Plan" means any "employee benefit plan," as defined in Section 3(3) of ERISA, that: (a) is subject to Title I of ERISA; (b) is maintained, administered or contributed to by Seller, or Seller with regard to any employee of Seller; and (c) covers any Employee.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and regulations promulgated thereunder.

"Excluded Assets" has the meaning set forth in Section 2.2.

"GAAP" means United States generally accepted accounting principles, consistently applied, as in effect when applied by Seller.

"Good Funds" is defined in Section 3.1 hereof.

"General Enforceability Exceptions" means general principles of equity and by bankruptcy, insolvency or similar Laws and general equitable principles affecting the rights of creditors generally.

"Governmental Entity" means (i) any nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature, foreign or domestic, (ii) any federal, state, local, municipal, or other government of the foregoing, (iii) any governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal) or (iv) anybody (including any international or multinational body) exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"Intellectual Property" means: (a) trademarks, service marks, trade names, corporate names, and other indicia of source of origin, including all common law rights thereto and all goodwill associated therewith and registrations and pending applications for registration thereof; (b) works of authorship, copyrights, and all applications and registrations thereof; (c) domain name registrations, domain names and URLs; (d) trade secrets, know-how, confidential or proprietary technical, business and other information, including processes, techniques, methods, formulae, designs, product specifications, algorithms, supplier information, prospect lists, customer lists, mailing lists, projections, analyses, market studies and similar proprietary items that are in Seller's possession, and all rights therein and thereto; (e) patents, inventions (whether patentable or unpatentable, and whether or not reduced to practice), invention disclosures, mask works, circuit designs and other designs, industrial design rights, discoveries, ideas, developments, data, database, and software; (g) all other proprietary and intangible rights; (f) all copies and tangible embodiments thereof (in whatever form or medium); and (g) social media accounts, including but not limited to the accounts of the Seller with Instagram, Twitter, Facebook, TikTok and any other social media sites, applications or platforms, and any and all handle names and direct links to each of such accounts and any and all content posted on or related to such accounts.

"Inventory" has the meaning set forth in Section 2.1(b).

"Law" means any statute, law, ordinance, code, rule or regulation of any Governmental Entity.

"<u>Liability(ies)</u>" means with respect to any Person, any direct or indirect liabilities, obligations, commitments, indebtedness, claim, loss, damage, deficiency, assessment, fine, penalty, or responsibility of such Person of any kind or nature, whether fixed or unfixed, choate or inchoate, liquidated or unliquidated, secured or unsecured, asserted or unasserted, due or to become due, accrued or unaccrued, vested or unvested, executory, determined, determinable, absolute, known or unknown, contingent or otherwise, regardless of whether or not the same is required to be accrued on any financial statements of such Person.

"<u>Lien</u>" means, with respect to any property or asset, any mortgage, lien, pledge, security interest, hypothecation, charge or any other similar encumbrance in respect of such property or asset.  For the avoidance of doubt, "Lien" shall exclude any restrictions on transfer under securities Laws, this Agreement, any Ancillary Documents and any terms and conditions of any Organizational Document of Seller.

"<u>Material Adverse Effect</u>" means any change, event, development, or effect that (a) has a material adverse effect on the business, assets, liabilities, financial condition or results of operations of the Business, taken as a whole or (b) materially impairs or delays the ability of Seller to consummate the transactions contemplated hereby; *provided that* none of the following shall be taken into account (either alone or in combination) in determining whether there is or has been a Material Adverse Effect: any adverse change, event, circumstance, or development arising from or relating to: (i) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of the Buyer; (ii) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with Seller; (iii) any failure of Seller to meet any internal or published projections, forecasts or revenue or earnings predictions (but not the underlying causes of such failure unless such underlying causes would otherwise be excepted from this definition); (iv) a decline or worsening of general economic or political conditions; (v) conditions generally affecting the industries in which Seller is conducted; (vi) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (vii) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (viii) any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof; (ix) any natural or man-made disaster or acts of God; or (x) any epidemics, pandemics, disease outbreaks, or other public health emergencies including, without limitation, the SARS-COV-2 virus or the related COVID-19 pandemic; *provided that* in the cases of clauses (i) through (x) above, such change, event, development, or effect shall only be excluded in determining whether a Material Adverse Effect has occurred only to the extent  such change, event, development, or effect does not impact Seller and/or the Business materially and disproportionately relative to the impact that such change, event, development, or effect generally has upon other Persons operating in the same or substantially similar industries or markets as Seller and/or the Business (or applicable segments or portions of such industries or markets). For the avoidance of doubt, neither the filing of the Bankruptcy Case or any actions taken in furtherance of the Bankruptcy Case or the transactions contemplated by this Agreement, nor the consequences or effects of or changes or developments arising from the filing or any such actions shall be deemed to be or to give rise to a Material Adverse Effect for purposes of this Agreement.

"Motion" has the meaning set forth in the recitals.

"Nonassignable Asset" has the meaning set forth in Section 2.3.

"Order" means any award, injunction, judgment, decree, order, ruling, subpoena or verdict or other decision issued, promulgated or entered by any Governmental Entity of competent jurisdiction.

"Ordinary Course of Business" means, with respect to Seller, the ordinary course of business consistent with its past custom and practice, subject to changes in operations resulting from Seller operating as a distressed business, and subject to changes resulting from the filing and/or pendency of the Bankruptcy Case or the requirements of any debtor-in-possession financing in the Bankruptcy Case.

"Organizational Documents" means, with respect to any entity, as applicable, the certificate of incorporation, articles of incorporation, bylaws, articles of organization, partnership agreement, limited liability company agreement, formation agreement, joint venture agreement and other similar organizational documents of such entity (in each case, as amended through the date of this Agreement).

"Outside Date" has the meaning set forth in Section 9.1(d).

"Parties" has the meaning set forth in the Preamble hereto.

"Permit" means any authorization, approval, consent, certificate, governmental license, registration, variance, exemption, waiver, permit or franchise of or from any Governmental Entity.

"Person" means an individual, a corporation, a partnership, a limited liability company, a trust, an unincorporated association, a Governmental Entity, or any other entity or body.

"Personally Identifiable Information" means any information that, alone or in combination with other information, identifies or permits the identification of, or contact with, any individual, including, without limitation, an individual's name, address, date of birth, telephone number, e-mail address, IP address, mobile device identifier, geolocation, photograph, social security number or tax identification number, credit card number, bank information, or biometric identifiers.

"Petition Date" means the date upon which the Bankruptcy Case was commenced.

"Proceeding" means any suit, litigation, arbitration or other dispute resolution proceeding before any Governmental Entity.

"Procedures Order" is defined in the Recitals above.

"Promotional Materials" has the meaning set forth in Section 2.1(a).

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchase Price" has the meaning set forth in Section 2.5.

"Representatives" of any Person shall mean the directors, managers, officers, employees, consultants, financial advisors, counsel, accountants and other representatives and agents of such Person and any successors in interest thereto.

"Retained Liabilities" has the meaning set forth in Section 2.4(b).

"Sale Motion" has the meaning set forth in Section 6.6(a).

"Schedule Supplement" has the meaning set forth in Section 6.3.

"Seller" has the meaning set forth in the Preamble hereto.

"Seller Closing Certificate" has the meaning set forth in Section 8.1(d).

"Seller Closing Notice" has the meaning set forth in Section 9.1(f).

"Seller Disclosure Schedules" means the disclosure schedules delivered by Seller concurrently with the execution and delivery of this Agreement.

"Seller's Knowledge" or any similar phrase means the actual, current knowledge of Deb Millard. For the avoidance of doubt, none of such individuals shall have any personal liability or obligations regarding such knowledge.

"Tax" or "Taxes" means all U.S. federal, state, provincial, local and foreign income, profits, franchise, license, gross receipts, occupation, premium, windfall profits, environmental, customs, duties, capital stock, severance, stamp, payroll, sales, employment, unemployment, disability, use, ad valorem, recapture, unclaimed property, escheat, personal and real property, withholding, excise, production, transfer, alternative minimum, registration, value added, occupancy, estimated and other taxes, charges, fees, levies, or other like assessments, including any interest, penalty, or addition thereto, whether disputed or not.

"Tax Returns" any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Transition Services Agreement" has the meaning set forth in Section 3.2(b)(vi).

"Transfer Taxes" means sales, use, transfer, real property transfer, recording, documentary, stamp, registration and stock transfer Taxes and any similar Taxes.

"U.S." or "United States" means the United States of America.

## ARTICLE II
## PURCHASE AND SALE

2.1    **Purchased Assets**. Upon the terms and subject to the conditions of this Agreement, at the Closing, Seller shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall

purchase from Seller, free and clear to the extent provided in the Approval Order of all Liens, claims, or other Encumbrances, all of Seller's right, title and interest in and to only the following-described assets of Seller owned or held for use or used in the Business, wherever located (collectively, the "Purchased Assets"), but excluding all of the Excluded Assets, and upon the Closing the Purchased Assets, including the Assigned Contracts, shall be transferred to the Buyer in accordance with this Agreement, and such transfer shall be free and clear of all Encumbrances (other than Assumed Liabilities) of any Person, including, without limitation, all such Encumbrances specifically enumerated in the Approval Order, whether arising by agreement, by statute, or otherwise and whether occurring or arising before, on, or after the Petition Date, whether known or unknown, occurring or arising prior to such transfer, with all such Encumbrances (other than Assumed Liabilities) attaching to the proceeds (both cash and non-cash) of the sale of the Purchased Assets attributable to such Encumbrances subject to the terms of such Encumbrance with the same validity, force, and effect and in the same priority, that such Encumbrances had against the Purchased Assets immediately prior to Closing, subject to any claims and defenses that Sellers or the Debtors may possess with respect thereto:

(a)     all informational, marketing and promotional materials, and other printed or written materials, including, but not limited to branded content including, packaging, designs, (AI files), brand books and design files, all digital content and assets (including photos, whether or not published or retouched), and all accounts and related content, which materials relate exclusively to the Business;

(b)     all processed or finished goods, work in process, raw material inventory, and all packaging, in each case, to the extent the same are both (i) held by Seller exclusively for sale or use in the manufacturing process or in the operation of the Business and (ii) listed or described on Schedule 2.1(b), but subject in all cases to updating by Seller prior to the Closing to reflect activity in the Business occurring during the period following mutual execution and delivery of this Agreement (collectively "Inventory");

(c)     all of Seller's rights under the Contracts identified on Schedule 2.1(c), which Schedule may be updated by Buyer at any time until the date that is three Business Days prior to the Closing with additional Contracts that relate exclusively to the Business; provided, that any such Contracts added to Schedule 2.1(c) following the date hereof shall not increase the Purchase Price (collectively, the "Assigned Contracts"), subject to the provisions of Section 2.3;

(d)     all of Seller's rights relating to those deposits and prepayments with respect to the Assigned Contracts, but subject in all cases to updating by Seller prior to the Closing to reflect activity in the Business or changes to such amounts occurring during the period following mutual execution and delivery of this Agreement;

(e)     those Permits which both relate exclusively to the Business and are specifically listed or described on Schedule 2.1(e), but in each case, only to the extent transferrable and assignable;

(f)     all warranties (express and implied) relating exclusively to the Purchased Assets that continue in effect with respect to any Purchased Asset (including, without limitation,

warranties provided for under any Assigned Contract), but, in each case, only to the extent assignable;

(g)     such Intellectual Property as is both used exclusively in connection with the Business and listed or described on Schedule 2.1(g), including, without limitation, formulas used in the Business as currently conducted, customer lists and email content and designs, the goodwill of the Business, remedies against infringements thereof, and rights to protection of interests therein, and the right to conduct the Business under the Laws of all jurisdictions under the name "Stripes";

(h)     all accounts receivable (whether current or non-current) of Seller and all rights and causes of action pertaining to the collection of the foregoing solely to the extent relating to the Business;

(i)     all claims, counterclaims, cross claims and defenses, choses-in-action, and rights relating to deposits and prepaid expenses, warranties, refunds, rights of recovery, rights of set-off and rights of recoupment, in each case, that relate exclusively to the Business;

(j)     all Books and Records, to the extent relating exclusively to the Business; and

(k)     all tangible property set forth on Schedule 2.1(k).

**2.2     Excluded Assets**.  Notwithstanding anything herein to the contrary, from and after the Closing, Seller shall retain all of its right, title and interest in and to, and there shall be excluded from the sale, conveyance, assignment or transfer to Buyer hereunder, and the Purchased Assets shall not include any asset or property whatsoever not specifically included therein pursuant to Section 2.1 above, which excluded assets and properties shall include the following assets and properties (such retained assets and properties being collectively referred to herein as the "Excluded Assets"):

(a)     all cash and cash equivalents (including bank account balances, certificates of deposit and other time deposits and petty cash) and marketable and other securities;

(b)     all of Seller's rights under this Agreement and each Ancillary Agreement;

(c)     all accounts and notes receivable (whether current or non-current) of Seller and all rights and causes of action pertaining to the collection of the foregoing (to the extent not related to the Business);

(d)     all cash deposits and prepaid items relating to or arising in connection with the operation of the Business, other than those described in Section 2.1(d);

(e)     all of the equity interests in Seller and its subsidiaries or other Affiliates;

(f)     all Benefit Plans (including all trusts, insurance policies and administration service Contracts related thereto), and all assets in respect of any Benefit Plan;

(g)     any Contracts between Seller, on the one hand, and any of its Affiliates, on the other hand, other than any specifically set forth on Schedule 2.1(c) (as the same may be modified and amended pursuant to Section 2.3 hereof), and any accounts or notes receivable due from any Affiliate of Seller;

(h)     any Contract to which Seller is a party that (i) is not an Assigned Contract or (ii) is an Assigned Contract but is not assumable and assignable pursuant to the terms thereof or as a matter of applicable law (including, without limitation, any Assigned Contract with respect to which any consent requirement in favor of the counter-party thereto is not satisfied and may not be overridden pursuant to Section 365 of the Bankruptcy Code) (collectively, "Excluded Contracts");

(i)     the organizational documents, minute books, member ledger, books of account or other records having to do with the limited liability company organization of Seller, and all employee related files or records;

(j)     all Tax assets (including Tax refunds and prepayments) and Tax Returns of Seller or any of its Affiliates for any period including, with respect to the Purchased Assets or the Business, for taxable periods ending on or prior to the Closing Date;

(k)     any Books and Records which Seller is required by applicable Law to retain;

(l)     all insurance policies of Seller, and all benefits, rights and claims and proceeds thereunder;

(m)     all refunds for prepaid insurance premiums or insurance prepayments;

(n)     all claims or causes of action of Seller, including all preference or avoidance claims and actions of Seller;

(o)     any personal property belonging to a third party that is held by Seller pursuant to any Contract which is not an Assigned Contract or, in any event, where Buyer does not assume the underlying Contract relating to any such personal property at the Closing;

(p)     any software or other item of intangible property (including Intellectual Property) held by Seller pursuant to any license or other Contract which is not an Assigned Contract or, in any event, where Buyer does not assume the underlying license or other Contract relating to any such intangible personal property at the Closing; and

(q)     any assets specifically set forth or described on Schedule 2.2(p).

**2.3     Nonassignable Assets; Deemed Consent; Additional Excluded Assets**.

(a)     **Nonassignable Assets**.  Nothing in this Agreement, the Bill of Sale or the Contract Assignments or the consummation of the transactions contemplated hereby or thereby shall be construed as an attempt or agreement to assign or transfer any Purchased Asset (including any Assigned Contract or Permit) to Buyer which by its terms or by Law is not assignable or transferable without a consent or is cancelable by a third party in the event of an assignment or

transfer (a "<u>Nonassignable Asset</u>"), unless and until such consent shall have been obtained (including by virtue of the effect of the Approval Order rendering certain consents to be unnecessary) or Law satisfied.  Seller and Buyer shall use diligent and commercially reasonable efforts to obtain any consent that may be required and satisfy any Law necessary to the assignment or transfer of a Nonassignable Asset to Buyer, and Seller shall take all such commercially reasonable actions as may be necessary to effect the assignment or transfer of the Nonassignable Asset (provided, for the avoidance of doubt, Seller shall not be required to make such or similar efforts with respect to the transfer of any customer lists that may be included among the Purchased Assets).  Unless and until any such consent that may be required is obtained or Law satisfied, Seller shall establish an arrangement reasonably satisfactory to Buyer under which Buyer would obtain the claims, rights and benefits and assume the corresponding liabilities and obligations under such Nonassignable Asset (including by means of any subcontracting, sublicensing or subleasing arrangement) or under which Seller would enforce for the benefit of Buyer, with Buyer assuming and agreeing to pay Seller's obligations and reasonable expenses, any and all claims, rights and benefits of Seller against a third party thereto.  Seller shall promptly pay over to Buyer all payments received by such Seller in respect of all Nonassignable Assets.  If and when the applicable consents or approvals, the absence of which caused the deferral of transfer of any Nonassignable Asset pursuant to this Section, are obtained, the transfer of the applicable Nonassignable Asset to Buyer shall automatically and without further action be effected in accordance with the terms of this Agreement

(b)     **Deemed Consent**.  As part of the Sale Motion (or, as necessary in one or more separate motions), Seller shall request that by providing adequate notice of its intent to assume and assign any Assigned Contract, if any, the Bankruptcy Court shall deem any non-debtor party to such Assigned Contract that does not file an objection with the Bankruptcy Court during the applicable notice period to have given any required consent to the assumption of the Assigned Contract by Seller and assignment to Buyer if, and to the extent that, pursuant to the Approval Order or other order of the Bankruptcy Court, Seller is authorized to assume and assign such Assigned Contract to Buyer and Buyer is authorized to accept such Assigned Contract pursuant to Section 365 of the Bankruptcy Code.

(c)     **Additional Excluded Assets**. Notwithstanding any other provision of this Agreement to the contrary, until three (3) Business Days prior to the Closing, Buyer will have the right, in its sole and absolute discretion, to provide written notice to Seller of Buyer's election to designate any right, property, interest, Contract or other asset (or portion thereof) as an Excluded Asset (including any such asset that was immediately prior to such designation an Purchased Asset), and upon such designation such asset will constitute an Excluded Asset for all purpose of this Agreement.  If Buyer exercises its rights in this Section to designate any right, property, interest, Contract, or other asset (or portion thereof) as an Excluded Asset, then the Parties acknowledge and agree that there will be no increase or reduction in (and such designation shall not otherwise affect) the Purchase Price, except as relates to any change in the Assumed Liabilities, as a result of such designation or change in designation, nor will there be any delay of the Closing.

**2.4     <u>Liabilities</u>**.

(a)     Subject to the terms and conditions of this Agreement, at the Closing, Buyer shall assume and agree to perform, pursuant to the Bill of Sale and the Contract Assignments, as applicable, the following Liabilities of Seller (collectively, the "Assumed Liabilities"):

(i)     all Liabilities arising under the Assigned Contracts from and after the Closing;

(ii)     all Liabilities arising on or after the Closing Date with respect to the Purchased Assets; and

(iii)     all cure obligations that are required to be paid pursuant to the Approval Order as a condition to Buyer's assumption of the Assigned Contracts.

(b)     Except for the Assumed Liabilities described in Section 2.4(a), Buyer shall not assume, nor be obligated to pay, perform, satisfy or discharge, any Liability of Seller or any Affiliate of Seller (collectively, such Liabilities other than Assumed Liabilities, the "Retained Liabilities").

**2.5**     **Purchase Price**. Subject to the provisions of this Agreement, the aggregate consideration to be paid by Buyer to Seller for the Purchased Assets shall be FIVE HUNDRED THOUSAND United States Dollars ($500,000.00) (the "Purchase Price"), consisting of cash in the amount of Three Hundred and Fifty Thousand Dollars ($350,000.00) and a waiver by Buyer of its claim of thirty percent (30%) of the proceeds of sale based on its thirty percent (30%) ownership interest in the Business (as defined in the Brand Agreement) pursuant to the terms of the Brand Agreement, plus the assumption of the Assumed Liabilities.  The cash portion of the Purchase Price shall be paid as and when and otherwise in accordance with the provisions of Section 3.2(a).

**2.6**     **Withholding**.  Notwithstanding any provision hereof to the contrary, each of Buyer, Seller, and any of their Affiliates shall be entitled to deduct and withhold from any consideration otherwise payable under the terms of this Agreement such amounts as it is required to deduct and withhold pursuant to any provision of Law, including those related to or regarding Taxes; *provided that* no such withholding shall apply to any payments to Seller hereunder unless Buyer has provided Seller with at least five (5) days' advance written notice of Buyer's intent to withhold and Buyer reasonably cooperates with Seller to minimize or eliminate such withholding. To the extent that amounts are so deducted and withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

### ARTICLE III
### CLOSING; PAYMENT OF PURCHASE PRICE

**3.1**     **Closing**.  Unless this Agreement shall have been terminated in accordance with Section 9.1, the Parties shall consummate the transactions contemplated by this Agreement (the "Closing"), as promptly as practicable but in no event later than three (3) Business Days after the date on which all conditions set forth in Article VIII (except those conditions that are to be satisfied at Closing) have been satisfied (or waived by the Party entitled to the benefit of the same), with such Closing to occur at 10:00 a.m., Eastern Time, or at such other place, date and time as the

Parties shall mutually agree in writing (the date on which the Closing occurs, the "Closing Date"). The Closing shall take place via wire transfer of immediately available good funds of the U.S. ("Good Funds") and electronic exchange of executed documents and other closing deliveries via email on the Closing Date.

**3.2    Closing Deliveries**.

(a)    Payment of Purchase Price.

(i)    Concurrently with the mutual execution and delivery of this Agreement, Buyer shall deliver to counsel for Seller, Pachulski Stang Ziehl & Jones LLP, an amount equal to THIRTY-FIVE THOUSAND United States Dollars ($35,000.00) (the "Deposit") by wire transfer of Good Funds, which such counsel shall hold in a trust account subject to the terms hereof concurrently with the mutual execution and delivery of this Agreement. The Deposit shall be held by Seller's counsel and released as follows: (1) at the Closing, the Deposit shall be credited and applied toward payment of the Purchase Price (and paid to Seller); (2) if Seller terminates this Agreement prior to Closing pursuant to Section 9.1(c) or Section 9.1(f) (each, a "Buyer Default Termination"), then the Deposit shall become nonrefundable and shall be paid to Seller for Seller's own account; and (3) if this Agreement is terminated prior to Closing for any reason other than a Buyer Default Termination, then the Deposit shall be promptly returned to Buyer. The Parties agree that the payment of the Deposit to Seller as a result of a Buyer Default Termination shall be the sole and exclusive remedy with respect to a Buyer Default Termination.

(ii)    At the Closing, Buyer shall authorize Seller's counsel in writing to deliver the Deposit to Seller, as provided in Section 3.2(a)(i)(1).

(iii)    At the Closing, Buyer shall pay and deliver to Seller, by wire transfer of Good Funds to one or more accounts designated by Seller, an amount equal to THREE HUNDRED AND FIFTEEN United States Dollars ($315,000.00) (which amount represents the cash portion of the Purchase Price minus the amount of the Deposit).

(b)    Deliveries by Seller at the Closing.  At the Closing, Seller shall deliver to Buyer the following:

(i)    a Bill of Sale, Assignment and Assumption Agreement or similar document, in form and content reasonably acceptable to Buyer and Seller (the "Bill of Sale"), duly executed by Seller;

(ii)    one or more Assignment and Assumption Agreements or similar documents, in form and content reasonably acceptable to Buyer and Seller, with respect to the Assigned Contracts (collectively, the "Contract Assignments"), duly executed by Seller;

(iii)    an Assignment of Trademarks and Domain Names, as well as of any other Intellectual Property that is a Purchased Asset, in form and content reasonably acceptable to Buyer and Seller, duly executed by Seller;

(iv)    the Seller Closing Certificate;

(v)     a properly completed and duly executed IRS Form W-9 by Seller; and

(vi)    a transition services agreement in form and content reasonably acceptable to Buyer and Seller relating to services to be rendered by Seller to Buyer on the terms set forth therein following the Closing (the "Transition Services Agreement").

(c)     Deliveries by Buyer at the Closing.  At the Closing, Buyer shall deliver to Seller the following:

(i)     the Bill of Sale, duly executed by Buyer;

(ii)    the Contract Assignments, if any, duly executed by Buyer;

(iii)   the Buyer Closing Certificate; and

(iv)    the Transition Services Agreement.

### ARTICLE IV
### REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the Seller Disclosure Schedules, which exceptions or disclosures set forth therein will be deemed to be a part of the representations and warranties made hereunder, Seller hereby represents and warrants to Buyer as follows:

**4.1     Existence and Power**.  Each entity comprising part of Seller is an entity that is duly organized, validly existing, and in good standing under the Laws of the state where organized. Seller has all requisite entity power and authority required to own, lease, or, subject to the provisions of the Bankruptcy Code applicable to debtors in possession, operate the properties and assets now owned, leased or operated by it and to carry on its business as presently conducted. Seller is duly qualified to transact business and is in good standing (or the equivalent thereof, if applicable) to transact business in each jurisdiction in which the nature of the business currently conducted by it requires such qualification.

**4.2     Authorization**.  Subject to entry of the Approval Order, Seller has all requisite power and authority to execute and deliver, and to perform its obligations under, this Agreement and each Ancillary Document to which Seller is a party.  The execution, delivery and performance by Seller of this Agreement and such Ancillary Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of Seller.

**4.3     Enforceability**.  This Agreement has been duly executed and delivered by Seller. Upon entry of the Approval Order, this Agreement shall constitute (and each Ancillary Document to which Seller is or will be a party will constitute at or prior to the Closing) a valid and legally binding obligation of Seller, enforceable against Seller in accordance with its terms, assuming that this Agreement and such Ancillary Documents, where applicable, have been duly executed by the other parties thereto, except as enforcement may be limited by General Enforceability Exceptions.

**4.4**   **Noncontravention**.  Subject to entry of the Approval Order, the execution, delivery and performance by the Company of this Agreement or any Ancillary Documents, and the consummation of the transactions contemplated hereby will not (a) violate or conflict with the Organizational Documents of Seller, (b) violate any Law or any Order, in each case applicable to Seller, (c) constitute a default under, or give rise to termination, cancellation or acceleration of any right or obligation of Seller under, or to a loss of any benefit to which Seller is entitled under any Assigned Contract binding upon Seller, or (d) result in the creation or imposition of any Lien on any asset of Seller.  Except for the Approval Order and as may be required under state securities Laws, no permit, consent, approval or authorization of, notice or declaration to, or filing or registration with any Governmental Entity is required to be made or obtained by Seller in connection with the consummation of the transactions contemplated by this Agreement or any Ancillary Document.

**4.5**   **Proceedings**.  There are no Proceedings (other than the Bankruptcy Case) pending or, to Seller's Knowledge, threatened in writing by or against Seller that seek or otherwise are reasonably expected to (x) materially adversely affect the ability of Seller to consummate the transactions contemplated by this Agreement and the Ancillary Documents or (y) prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

**4.6**   **Brokers**.  Except for Intrepid Investment Bankers LLP (whose fees shall be paid by Seller pursuant to a separate agreement), no broker, finder, financial advisor or other intermediary is or will be entitled to any fee or commission from Seller in connection with the transactions contemplated by this Agreement.

**4.7**   **Compliance with Laws**. The Business is currently being, and for the past three (3) years has been, conducted in compliance, in all material respects, with all applicable Laws. Seller has not received any written notice of any actual or alleged material non-compliance or violation of any Laws in connection with the ownership of the Purchased Assets or the operation of the Business.

**4.8**   **Title**.  Seller is the sole and exclusive owner or licensee, as applicable, of all right, title and interest in and to all Purchased Assets, subject to the Brand Agreement, and holds all of its right, title and interest in and to all Purchased Assets free and clear of any Lien other than Permitted Liens.

**4.9**   **Intellectual Property**.  Section 4.9(a) of the Seller Disclosure Schedules sets forth a correct and complete list of all Intellectual Property included in the Purchased Assets (the "Purchased Intellectual Property") which is registered or the subject of an application for registration, including all registered trademarks, copyright registrations, domain names, and all applications therefor, indicating, for each such item of Intellectual Property, the owner, registration, patent or application number (as applicable), the applicable filing jurisdiction in which such item is applied for, issued or registered, the respective issuance registration or application of such item and the date of application or issuance or registration of such item. All such Intellectual Property is subsisting, valid and enforceable.

(b)        Seller or its Affiliates own, all right, title and interest in and to, free and clear of all Liens (other than Permitted Liens), or has a valid right to use, all of the Purchased Intellectual Property.

(c)        As of the date hereof, no claims or, actions or Proceedings are pending or, to Seller's Knowledge, threatened in writing, (i) of infringement, misappropriation or other violation of the Purchased Intellectual Property of any Person against Seller or its Affiliates in respect of the conduct of the Business by Seller or its Affiliates as presently conducted, or (ii) challenging the ownership, validity, enforceability or use of any Purchased Intellectual Property.

(d)        Seller has taken all measures in accordance with standard industry practice to maintain the secrecy of any of the material Purchased Intellectual Property that it considers to be trade secrets or confidential information.

(e)        Other than the Purchased Assets, neither Seller nor any of its Affiliates owns or otherwise has any right, title or interest in or to any Intellectual Property necessary for any exploitation, development or commercialization of the Products.

**4.10    Inventory**.  The Inventory included in the Purchased Assets is of a quality useable or salable (as applicable) in the Ordinary Course of Business, and is not subject to any consignment or conditional sales arrangements or other similar arrangements.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby represents and warrants to Seller as follows:

**5.1    Existence and Power**.  Buyer is an entity duly organized, validly existing, and in good standing under the Laws of the state where organized.

**5.2    Authorization**.  Buyer has all requisite power and authority to execute and deliver, and to perform its obligations under, this Agreement and each Ancillary Document to which Buyer is a party or subject.  The execution, delivery, and performance by Buyer of this Agreement and such Ancillary Documents and the consummation of the transactions contemplated hereby and thereby (a) are within Buyer's powers and (b) have been duly authorized by all necessary action on the part of Buyer.

**5.3    Enforceability**.  This Agreement has been duly executed and delivered by Buyer. This Agreement constitutes (and each Ancillary Document to which Buyer is or will be a party will constitute at or prior to the Closing) a valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms, assuming that this Agreement and such Ancillary Documents, where applicable, have been duly executed by the other parties thereto, except as enforcement may be limited by General Enforceability Exceptions.

**5.4    Governmental and Third Party Authorizations**.  No consent, approval or authorization of, declaration to, or filing or registration with, any Governmental Entity or any other Person is required to be made or obtained in connection with the execution, delivery and

performance by Buyer of this Agreement or any Ancillary Document or the consummation by Buyer of the transactions contemplated by this Agreement or any Ancillary Document.

5.5   **Noncontravention**.  The execution, delivery and performance by Buyer of this Agreement or any Ancillary Documents, and the consummation of the transactions contemplated hereby and thereby, will not (a) violate the Organizational Documents of Buyer, (b) violate any Law or Order, in each case applicable to Buyer, or (c) constitute a default under, or give rise to termination, cancellation or acceleration of any right or obligation of Buyer or to a loss of any benefit to which Buyer is entitled, under any contract, agreement, instrument, commitment or arrangement binding upon Buyer.

5.6   **Brokers**.  Except for any whose fee or commission would be borne and paid separately by Buyer and at Buyer's sole cost, no investment banker, broker, finder or other intermediary is or will be entitled to any fee or commission from Buyer or any of its Affiliates in connection with the transactions contemplated by this Agreement or any of the Ancillary Documents.

5.7   **Proceedings**.  There are no Proceedings pending or, to the knowledge of Buyer, threatened against Buyer or any of its Affiliates that seek or otherwise are reasonably expected to (x) materially adversely affect the ability of Buyer to consummate the transactions contemplated by this Agreement and the Ancillary Documents or (y) prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

5.8   **Financial Capability**.

(a)   Sufficient Funds.  Buyer has, and will have on the Closing Date, unrestricted funds available sufficient to (i) consummate the transactions contemplated by this Agreement, including to make all payments at the Closing contemplated by Section 3.2(a), including payment of the Purchase Price; and (ii) pay all costs and expenses and other amounts required to be paid by Buyer in connection with the Closing or otherwise.  Buyer has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform all of its obligations hereunder, and Buyer has not incurred any Liability or restriction of any kind that would impair or adversely affect such resources and capabilities.

(b)   Obligations Not Conditioned on Financings.  In no event shall the receipt or availability of any funds by Buyer or any Affiliate or any other financing be a condition to any of Buyer's obligations under this Agreement.  Buyer understands and acknowledges and agrees that under the terms of this Agreement, Buyer's obligation to consummate the transactions contemplated by this Agreement is not in any way contingent upon or otherwise subject to Buyer's consummation of any financing arrangements, Buyer's obtaining any financing, or the availability, grant, provision or extension of any financing (whether equity, debt or otherwise) or similar accommodation to Buyer.

5.9   **Solvency**.  Buyer is solvent (a) as of the date of this Agreement and (b) at and immediately after the Closing, after giving effect to the transactions contemplated hereby (including the payment of the Purchase Price and all other amounts required to be paid, borrowed

or refinanced in connection with the consummation of the transactions contemplated by this Agreement and all related fees and expenses).

**5.10    Independent Investigation**.    Buyer has conducted its own independent investigation, review and analysis of Seller, the Business, the Purchased Assets and the Assumed Liabilities, and acknowledges that it has been provided adequate access to the personnel, properties, premises, and other documents and data of Seller for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and consummate the transactions contemplated by this Agreement, Buyer has relied solely upon its own investigation and the express representations and warranties of Seller set forth in Article IV of this Agreement (including related portions of the Seller Disclosure Schedules); and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Business, the Purchased Assets or the Assumed Liabilities, except as expressly set forth in Article IV of this Agreement.  Buyer will accept the Purchased Assets at the Closing "AS IS, "WHERE IS," and "WITH ALL FAULTS." In connection with Buyer's investigation of Seller, Buyer and its Affiliates may have received from or on behalf of Seller certain estimates, projections, forecasts and plans, including projected statements of operating revenues and income from operations of Seller and certain business plan information of Seller.  Buyer acknowledges that there are uncertainties inherent in attempting to make any such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and that Buyer shall have no claim against Seller or any of its Affiliates or any Representatives of any of the foregoing with respect thereto.

**5.11    Exclusivity of Representations and Warranties** Except as set forth in this Article V, neither Buyer nor any other Person is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating to Buyer or its Affiliates, and Buyer hereby disclaim any such other representations or warranties.

## ARTICLE VI
## PRE-CLOSING COVENANTS

**6.1    Conduct of Business**.  Subject to the requirements of the Bankruptcy Code and Seller's status as a debtor in possession and as Buyer may otherwise consent to in writing (which consent shall not be unreasonably withheld, conditioned or delayed), from the date hereof through the Closing:

(a)    Seller shall use commercially reasonable efforts:

(i)    to continue to operate the Business in the Ordinary Course of Business;

(ii)    to perform all of its obligations under all Assigned Contracts, if any (but, specifically excluding the obligation to pay any cure amounts owing to the counterparties thereto);

(iii)     to maintain its Books and Records in accordance with past practice; and

(iv)     to comply in all material respects with all applicable Laws; and

(b)     Seller shall not:

(i)     sell, lease, transfer, or assign any of the Purchased Assets, other than Inventory in the Ordinary Course of Business (provided, that the Seller shall not offer discounts, rebates, or product return, credit or refund rights not typically offered by the Seller during a commercially reasonable period of time);

(ii)     terminate any Assigned Contract (other than upon any expiration of the term of any Assigned Contract), materially amend any Assigned Contract, or enter into any Contract that would be an Assigned Contract if such Contract was in effect on the date hereof, in each case, other than in the Ordinary Course of Business; or

(iii)     agree to do any of the foregoing.

(c)     The provisions of this Section 6.1 are not intended to be, nor will they be construed as, an endeavor on the part of Seller or Buyer to implement the transactions contemplated hereunder prior to the Closing (and satisfaction of the conditions in Article VIII), and the Parties agree that Buyer will not prior to the Closing be entitled to exercise any control over the business or affairs of Seller.

**6.2     Pre-Closing Access to Information.**

(a)     From and after the date hereof until the earlier of the Closing Date or the termination of this Agreement in accordance with its terms, upon reasonable notice, and subject to restrictions contained in any confidentiality agreements to which Seller is subject, Seller shall provide to Buyer and its authorized Representatives during regular business hours reasonable access to all books and records of and documents and other information regarding the Business (in a manner so as to not unreasonably interfere with the normal business operations of Seller or the Business).  Notwithstanding anything to the contrary set forth in this Agreement, during the period from the date hereof until the Closing, neither Seller nor any of its Affiliates (including Seller) shall be required to disclose to Buyer or any of its Representatives (i) any information (A) if doing so would violate any Contract, fiduciary duty or Law to which Seller or any of its Affiliates (including Seller) is a party or is subject, (B) if Seller reasonably determined upon the advice of counsel that doing so could result in the loss of the ability to successfully assert attorney-client and work product privileges, (C) if Seller or any of its Affiliates, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation and such information is reasonably pertinent thereto, or (D) if Seller reasonably determines that such information should not be disclosed due to its competitively sensitive nature or (ii) any information relating to Taxes or Tax Returns other than information relating to Seller; provided, that Seller will use commercially reasonable efforts (and/or instruct its Affiliates) to provide Buyer and its Representatives any information listed in clause (i) or (ii) if so requested by Buyer and/or its Representatives. For the avoidance of all doubt, nothing in this Section 6.1(a) shall be deemed to give rise to a contingency or condition to Buyer's obligations (or any similar right) regarding

Buyer's satisfaction with any information of any kind to which Buyer is given access or the right to prepare, evaluate or obtain prior to the Closing Date.

(b)     All information disclosed pursuant to Section 6.2(a), together with the terms of this Agreement and the information disclosed on Seller Disclosure Schedules, shall be treated as Confidential Information under Section 7.3.

**6.3     Supplemental Disclosure**.  From time to time prior to the Closing, Seller shall have the right (but not the obligation) to supplement or amend the Seller Disclosure Schedules with respect to any matter arising after the date hereof or, with respect to representations and warranties qualified by Seller's Knowledge, of which Seller becomes aware after the date hereof (each a "Schedule Supplement"), and Seller shall provide to Buyer each such Schedule Supplement automatically and each such Schedule Supplement may be deemed to be incorporated into and to supplement and amend the Seller Disclosure Schedules if, and only if, Buyer does not object to such incorporation. Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of termination rights contained in this Agreement or of determining whether or not the conditions in Article VIII have been met.

**6.4     Efforts to Close**.

(a)     Subject to the terms of this Agreement, each of Buyer and Seller shall use their respective commercially reasonable efforts to cause the conditions to Closing to be satisfied and the Closing to occur as promptly as reasonably practicable.

(b)     In the event any Proceeding by any Governmental Entity or other Person is commenced which challenges the validity or legality of the transactions contemplated hereby or seeks damages in connection therewith, the Parties agree to cooperate and use commercially reasonable efforts to defend against such Proceeding and, if an injunction or other order is issued in any such action, suit or other proceeding, the Parties agree to take commercially reasonable actions to have such injunction or other order lifted, in order to expeditiously consummate the consummation of the transactions contemplated by this Agreement prior to the Outside Date; *provided that* nothing in this Section 6.4(b) shall be deemed to extend or otherwise affect the Outside Date or the Parties' rights in connection therewith.

(c)     Buyer expressly acknowledges and agrees that Seller and its Affiliates have no responsibility for or in connection with any financing (whether equity, debt, or otherwise) that Buyer may seek to raise in connection with the consummation of the transactions contemplated by this Agreement.

**6.5     Other Business Relations**.  During the period from the date of this Agreement until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Buyer hereby agrees that it is not authorized to and shall not (and shall not permit any of its Representatives or Affiliates to, other than in the Ordinary Course of Business) contact any employee, customer, supplier, distributor or other material business relation of Seller, regarding Seller, its business or the transactions contemplated by this Agreement without the prior written (including by e-mail) consent of Seller, which consent shall not be unreasonably withheld.

**6.6**    **Bankruptcy Matters**.

(a)    Approval Order. In accordance with the Procedures Order, Seller shall seek an order from the Bankruptcy Court authorizing and approving this Agreement and the transaction contemplated herein, which order shall be substantially in the form and content attached as Exhibit "A" hereto (the "Approval Order"). If requested by Seller or the Bankruptcy Court, Buyer shall provide adequate assurance of future performance (satisfactory to the Bankruptcy Court) to the counterparties to the Assigned Contracts. Seller shall use commercially reasonable efforts to obtain the Approval Order and, without limiting Buyer's obligations under the immediately preceding sentence, Buyer shall reasonably cooperate, if requested by Seller, in such efforts. If the Bankruptcy Court refuses to issue the Approval Order, then Buyer or Seller may terminate this Agreement in accordance with Section 9.1(h). In the event that Buyer is designated as a Backup Bidder (as defined in the Procedures Order) at the Auction, this Agreement shall remain open for acceptance by Seller for a period of fifteen (15) days following the Outside Date.

(b)    Procedures Order. The transaction contemplated by this Agreement shall be conducted in all respects in accordance with the process and procedures established in and the provisions of the Procedures Order and Buyer agrees to be bound by the Procedures Order and the obligations thereunder, including in connection with, among other things, bidding, overbidding, the sale auction, refraining from collusion, return of deposits, and standing as a backup bidder for the Purchased Assets shall be as established and determined in accordance with the Procedures Order.

(c)    Competing Bids. Until conduct of the Auction (as defined in the Procedures Order), this Agreement and the transactions contemplated hereby are subject to Sellers' right and ability to consider higher or better competing bids with respect to the Business and the Purchased Assets in accordance with the Procedures Order. In furtherance thereof, Seller shall have the right to, and may cause its Representatives and Affiliates to, (a) initiate contact with, solicit or encourage submission of any inquiries, proposals, offers or bids by, and negotiate with, any Person (in addition to Buyer and its Affiliates) in connection with any sale or other disposition of the Purchased Assets and (b) respond to any request for information or due diligence inquiry, or make management available for such purposes, to any such Person.

**6.7**    **Access to Books and Records**. After the Closing, Buyer and Seller shall use reasonable efforts to maintain until the fifth (5th) anniversary of the Closing Date all Books and Records relating to Seller or any of their assets or liabilities prior to the Closing in the manner such Books and Records are maintained immediately prior to the Closing Date in all material respects. For a period of five (5) years following the Closing, (a) Seller or any of its Representatives, upon reasonable notice, shall have access during normal business hours to examine, inspect and copy such Books and Records, and (b) Buyer shall provide Seller and its Representatives with, or cause to be provided to Seller and its Representatives, such Books and Records as Seller or its Representatives shall reasonably request in connection with any Proceeding to which Seller is a party (including, without limitation, in connection with Seller's (or its successor's) administration of the Bankruptcy Case) or in connection with the requirements of any Laws applicable to Seller. Seller and its Representatives shall have the right to make copies of such Books and Records at Seller's sole cost. Buyer may require Seller and its Representatives to execute a non-disclosure agreement prior to providing access to Books and Records.

**6.8**    **[Reserved]**

**6.9**    **Cross Border Agreements**. Given that the transactions contemplated herein involve the conveyance, transfer or assignment of non-U.S. assets and Seller and/or Buyer reasonably deems it necessary or appropriate to enter into short-form acquisition agreements, additional Intellectual Property assignment agreements, or other similar agreements or instruments (collectively, the "Non-U.S. Transfer Agreements") to effect the assignment or transfer of the applicable Purchased Assets or the assumption of the applicable Assumed Liabilities pursuant to applicable non-U.S. local Law, the Buyer and the Seller shall enter into the Non-U.S. Transfer Agreements on a case-by-case basis as reasonably determined by such Parties. Each Non-U.S. Transfer Agreement shall be consistent with the terms of this Agreement, except to the extent modifications to such Non-U.S. Transfer Agreement are required by applicable Law (including any non-U.S. Law and all employment Laws applicable to the transactions contemplated herein) in order to consummate such transactions. Where such modifications are required, the Parties covenant and agree to give effect to the intent and terms hereof to the fullest extent permissible by applicable Law (and that any claims for breach under any Non-U.S. Transfer Agreement shall be brought under Section 11.6 of this Agreement and each Party agrees not to, and to cause its Subsidiaries and their respective successors and assigns not to, bring any claims, actions or proceedings under, arising out of or relating to such Non-U.S. Transfer Agreement against the other parties to such Non-U.S. Transfer Agreement). The Parties covenant and agree to ensure that any signatures to the Non-U.S. Transfer Agreements are notarized and/or apostilled where required pursuant to applicable Law, to effect the legal assignment of the applicable Purchased Assets or the assumption of the applicable Assumed Liabilities pursuant to the applicable non-U.S. local Law.  Each Non-U.S. Transfer Agreement shall (a) be in a form reasonably acceptable to the Parties, (b) shall serve purely to effect the transfer of the applicable Purchased Assets, or the assumption of the applicable Assumed Liabilities pursuant to the applicable non-U.S. local Law, and (c) shall not have any effect on the value being given or received by the Buyer and the Seller, or the terms and conditions of the transactions contemplated herein, including the Allocation, or in any way modify, amend, or constitute a waiver of, any provision of this Agreement or any other Ancillary Document. For the avoidance of doubt, no Non-U.S. Transfer Agreement shall contain any representations, warranties or covenants other than those which are either (i) required to effect the transfer of the applicable Purchased Assets, or the assumption of the applicable Assumed Liabilities or (ii) mutually agreed upon by the Buyer and the Seller.

## ARTICLE VII
## COVENANTS AND OTHER AGREEMENT OF BUYER AND SELLERS

**7.1**    **Public Announcements**.  Neither Buyer nor Seller shall, nor shall any of their respective controlled Affiliates, without the prior written approval of both Buyer and Seller, issue any press release or otherwise make any public statement with respect to this Agreement or the transactions contemplated by this Agreement, which shall not be unreasonably withheld or delayed (any such press release or public statement so approved by the Parties, an "Agreed Statement"), *provided that* such restrictions on press releases and public statements shall not apply to (i) any disclosure as may be required by applicable Law or by obligations pursuant to any listing agreement with any national securities exchange or stock market or the terms of any financing agreement or arrangement, in which case the Party required to make the release or announcement shall use commercially reasonable efforts to allow the other Party reasonable time to comment on

such release or announcement in advance of such issuance, (ii) any disclosure made in connection with the enforcement of any right or remedy relating to this Agreement or the Ancillary Documents or the transactions contemplated hereby or thereby, (iii) any disclosure that is consistent with (and does not reveal any information beyond what is already included in) a prior Agreed Statement, or (iv) any disclosure or statement made in the Bankruptcy Case that is required in connection with the filing of the Bankruptcy Case or appropriate in the furtherance of such filing, the administration of the Bankruptcy Case, or the transactions contemplated herein (including, without limitation, the Sale Motion).  After the Closing, the provisions of this <u>Section 7.1</u> will not preclude Buyer from issuing any press releases or similar announcements of the transactions contemplated by this Agreement (after giving Seller a reasonable opportunity to comment on the same) so long as such press release or announcement does not include the Purchase Price or any other material terms of this Agreement or the transactions contemplated hereby.  Notwithstanding the provisions of this <u>Section 7.1</u>, on and after the Closing Date, Buyer and its respective Affiliates shall be permitted (a) to disclose to their respective and prospective members, limited partners, and stockholders (who may disclose to their direct and indirect investors) the fact that the Closing has occurred, the consideration paid hereunder, other items directly relating to such consideration, and other types of information that are customary for private equity funds to provide to their respective and prospective members, limited partners, and stockholders and (b) to disclose in connection with normal fund raising and related marketing or informational or reporting activities of the Buyer or any respective Affiliate, including on their websites and in their marketing materials, any such information permitted to be disclosed pursuant to this <u>Section 7.1</u> and any information previously provided as part of a press release, public announcement, or disclosure issued or made with the prior written consent of the Seller.

      **7.2**    <u>**Tax Matters**</u>.

      (a)    Prorations. Personal property, ad valorem, use and intangible taxes and assessments, common area maintenance charges, utility charges and rental payments with respect to the Purchased Assets, as applicable (collectively, "Charges") shall be prorated on a per diem basis and apportioned on a calendar year basis between Seller, on the one hand, and Buyer, on the other hand, as of the date of the Closing.  Seller shall be liable for that portion of such Charges relating to, or arising in respect of, periods on or prior to the Closing Date, and Buyer shall be liable for that portion of such Charges relating to, or arising in respect of, any period after the Closing Date.

      (b)    Transfer Taxes. Buyer and Seller shall each pay fifty percent (50%) of all Transfer Taxes arising out of or in connection with the transactions contemplated by this Agreement.  Buyer shall file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes and if required by applicable Law, Seller shall join in the execution of any such Tax Returns and other documentation.

      **7.3**    <u>**Confidentiality**</u>.

      (a)    Seller acknowledges that, in the course of Seller's operation and ownership of the Business, Seller may have become aware of Confidential Information and documents of the Business, and that communication of such information to third parties after Closing, could be detrimental to the Business.  Seller covenants that all such information and documents to the extent

related to the Purchased Assets and/or the Business shall be maintained in confidence and shall not be disclosed or used by the Seller or its Affiliates and representatives without Buyer's prior written consent, unless such information (i) is otherwise publicly available through no fault of Seller or its Affiliates and representatives, (ii) is lawfully acquired by Seller, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information or (iii) is required to be disclosed pursuant to judicial order, regulation or Law or in any Proceeding; provided, however, that the foregoing shall not apply to any information that relates in any way to an Excluded Asset.  If Seller becomes legally compelled (by oral questions, interrogatories, requests for information or documents, subpoena, civil or criminal investigative demands, or similar process) or is required by a Governmental Entity to make any disclosure with respect to the Business that is prohibited by this Section 7.3(a), Seller will provide Buyer with prompt notice (to the extent such notice is not prohibited by Law) of such requirement so that the Buyer may seek an appropriate protective order or other appropriate remedy.  Subject to the foregoing, the Seller may furnish that portion (and only that portion) of such information that such Seller is legally compelled or is otherwise required to disclose.

(b)      Buyer acknowledges that, in the course of the negotiation and performance of this Agreement and its operation of the Business, it may become aware of Confidential Information and documents of the Seller and/or the Excluded Assets, and that its use after Closing of such Confidential Information and documents, or communication of such information to third parties, could be detrimental to the Seller.  The Buyer covenants that all such information and documents to the extent related to the Excluded Assets shall be maintained in confidence and shall not be disclosed or used by the Buyer or its Affiliates and Representatives without the Seller's prior written consent, unless such information is (i) otherwise publicly available through no fault of the Buyer or its Affiliates and Representatives, (ii) is lawfully acquired by Buyer, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information or (iii) required to be disclosed pursuant to judicial order, regulation or law; provided, however, that the foregoing shall not apply to any information that relates in any way to a Purchased Asset or the Business.  If the Buyer becomes legally compelled (by oral questions, interrogatories, requests for information or documents, subpoena, civil or criminal investigative demands, or similar process) or is required by a Governmental Entity to make any disclosure with respect to the Excluded Assets that is prohibited by this Section 7.3(b), the Buyer will provide the Seller with prompt notice (to the extent such notice is not prohibited by law) of such requirement so that the Seller may seek an appropriate protective order or other appropriate remedy.  Subject to the foregoing, the Buyer may furnish that portion (and only that portion) of such information that the Buyer is legally compelled or is otherwise required to disclose.

**7.4**      **Mutual Release**. Effective upon the Closing (i) Seller and its Affiliates release and forever discharge Buyer, its Affiliates, successors, and assigns ("Buyer Releasees") from any and all claims or causes of action Seller or its Affiliates may have against any Buyer Releasee, including all preference and avoidance claims and actions, inclusive of, without limitation, any and all such claims and actions arising under Chapter 5 of the Bankruptcy Code, but excluding any claims under this Agreement, and (ii) Buyer and its Affiliates release and forever discharge Seller, its Affiliates, successors, and assigns ("Seller Releasees") from any and all claims or causes of action Buyer or its Affiliates may have against any Seller Releasee, but excluding (a) any claims under this Agreement, and (b) any claim entitled to priority as an administrative expense pursuant

to section 503(b)(1) of the Bankruptcy Code, including, but not limited to, any and all claims arising under that certain Chief Creative Officer Consulting Agreement between Amyris, Inc. and Naomi Watts, dated as of May 25, 2022.

**7.5**    **Further Assurances; Wrong Pockets**. Each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions (at no material cost or expense to the Party to whom the request is directed) as may be reasonably required to carry out the provisions hereof and give effect to the Transactions; provided that Buyer shall not be required by this Section 7.4 to initiate or join in any Proceeding.  After the Closing, Seller shall promptly (and shall cause its Affiliates to promptly) transfer or deliver to Buyer any property that Seller or its Affiliates may have or receive in respect of any item that constitutes part of the Purchased Assets or relates to the Assumed Liabilities.

**ARTICLE VIII**
**CONDITIONS TO CLOSING**

**8.1**    **Conditions to Obligations of Buyer**.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Buyer in writing and in Buyer's sole discretion) of the following conditions:

(a)    The representations and warranties of Seller contained in Article IV of this Agreement shall be true and correct in all material respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)    Seller shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Seller, on or prior to the Closing Date.

(c)    No event or events shall have occurred since the date of this Agreement which individually or in the aggregate has resulted in, or is reasonably likely to result in, a Material Adverse Effect.

(d)    Buyer shall have received a certificate, dated as of the Closing Date and signed by an authorized officer of Seller, to the effect that the conditions set forth in Sections 8.1(a), 8.1(b) and 8.1(c) have been satisfied (the "Seller Closing Certificate").

(e)    No temporary restraining order, preliminary or permanent injunction or other Order preventing the consummation of the transactions contemplated by this Agreement shall be in effect, and there shall be no proceeding brought by any Governmental Entity pending before any court of competent jurisdiction seeking such an Order.

(f)    The Bankruptcy Court shall have entered the Approval Order in accordance with Section 6.6(a), and the Approval Order shall be unstayed and in full force and effect as of the Closing Date.

(g)    Seller has made or is prepared to immediately make all of the deliveries required by Section 3.2(b).

**8.2    <u>Conditions to Obligations of Seller</u>**.  The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Seller, in writing and in Seller's sole discretion) of the following conditions:

(a)    The representations and warranties of Buyer set forth in Article V of this Agreement shall be true and correct in all respects as of the Closing Date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure of such representations and warranties to be true and correct would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

(b)    Buyer shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

(c)    Seller shall have received a certificate dated as of the Closing Date by an authorized officer of Buyer to the effect that the conditions set forth in Sections 8.2(a) and 8.2(b) have been satisfied (the "Buyer Closing Certificate").

(d)    No temporary restraining order, preliminary or permanent injunction or other Order preventing the consummation of the transactions contemplated by this Agreement shall be in effect, and there shall be no proceeding brought by any Governmental Entity pending before any court of competent jurisdiction seeking such an Order.

(e)    The Bankruptcy Court shall have entered the Approval Order in accordance with Section 6.6(a), and the Approval Order shall be unstayed and in full force and effect as of the Closing Date.

(f)    Buyer has made or is prepared to immediately make all of the deliveries required by Sections 3.2(a) and 3.2(c).

**8.3    <u>Frustration of Closing Conditions</u>**.  No Party may rely on or assert the failure of any condition set forth in this <u>Article VIII</u>, as the case may be, if such failure results from or was caused primarily by such Party's failure to comply with any provision of this Agreement.

**8.4    <u>Waiver of Conditions</u>**.  All conditions set forth in this <u>Article VIII</u> will be deemed to have been satisfied or waived from and after the Closing.

**ARTICLE IX**
**<u>TERMINATION</u>**

**9.1    <u>Termination</u>**.    This Agreement may be terminated, and the transactions contemplated herein may be abandoned, prior to the Closing solely as follows; *provided that* any Party desiring to terminate this Agreement pursuant to this <u>Section 9.1</u> shall give written notice of such termination to the other Parties to this Agreement:

(a)      by the mutual written consent of Seller and Buyer;

(b)      by Buyer, if any of the representations or warranties of Seller set forth in Article IV shall not be true and correct such that the condition to Closing set forth in Section 8.1(a) would not be satisfied and the breach or breaches causing such representations or warranties not to be true and correct is not cured within five (5) days after written notice thereof is delivered from Buyer to Seller; *provided that* Buyer shall not have the right to terminate this Agreement pursuant to this Section 9.1(b) if Buyer is then in material violation or breach of any of its covenants, obligations, representations or warranties set forth in this Agreement and such violation or breach would give rise to the failure of a condition set forth in Section 8.2(a) or Section 8.2(b);

(c)      by Seller, if any of the representations or warranties of Buyer set forth in Article V shall not be true and correct such that the condition to Closing set forth in Section 8.2(a) would not be satisfied and the breach or breaches causing such representations or warranties not to be true and correct is not cured within five (5) days after written notice thereof is delivered from Seller to Buyer; *provided that* Seller shall not have the right to terminate this Agreement pursuant to this Section 9.1(c) if Seller is then in material violation or breach of any of its covenants, obligations, representations or warranties set forth in this Agreement and such violation or breach would give rise to the failure of a condition set forth in Section 8.1(a) or Section 8.1(b);

(d)      by either Seller or Buyer if the Closing shall not have occurred on or before 5:00 p.m. Eastern Time on December 31, 2023 (the "Outside Date"); *provided that* the right to terminate this Agreement pursuant to this Section 9.1(d) shall not be available to any party whose action or failure to act has been the primary cause of, or resulted in, the failure of the Closing to occur on or before the Outside Date and such action or failure to act constitutes a breach of this Agreement;

(e)      by either Buyer or by Seller, if any Governmental Entity shall have issued an Order or taken any other action permanently enjoining, restraining or otherwise prohibiting the Closing and such Order or other action shall have become final and nonappealable; *provided that* such Order, injunction, restraint or prohibition shall not have been principally caused by the breach in any material respect by the Party seeking to terminate this Agreement pursuant to this Section 9.1(e) of such Party's covenants or agreements under this Agreement;

(f)      by Seller, if all of the conditions set forth in Section 9.2 (not including conditions which are to be satisfied by actions taken at the Closing; *provided that* such conditions shall have been capable of being satisfied as of the date of termination of this Agreement) have been satisfied or validly waived by Buyer, Seller has given notice to Buyer in writing that Seller is prepared to consummate the transactions contemplated by this Agreement (a "Seller Closing Notice"), and Buyer fails to consummate the transactions contemplated by this Agreement on the date the Closing should have occurred pursuant to Section 3.1, or, if later, on the third (3rd) Business Day immediately following the date of delivery of such Seller Closing Notice;

(g)      by Buyer, if all of the conditions set forth in Section 8.1 (not including conditions which are to be satisfied by actions taken at or immediately prior to the Closing; *provided that* such conditions shall have been capable of being satisfied as of the date of termination of this Agreement) have been satisfied or validly waived by Seller, Buyer has given

notice to Seller in writing that Buyer is prepared to consummate the transactions contemplated by this Agreement (a "Buyer Closing Notice"), and Seller fails to consummate the transactions contemplated by this Agreement on the date the Closing should have occurred pursuant to Section 3.1, or, if later, on the third (3rd) Business Day following the date of delivery of such Buyer Closing Notice;

(h)     by Buyer if Buyer has not been identified as the Successful Bidder or the Backup Bidder at the Auction; or

(i)     by Seller or Buyer, if the Bankruptcy Court does not issue the Approval Order in accordance with Section 6.6(a), subject to this Agreement becoming a "back-up" bid under certain circumstances consistent with the requirements of the Procedures Order.

**9.2     Effect of Termination**.

(a)     In the event of the termination of this Agreement pursuant to Section 9.1, this entire Agreement shall forthwith become void (and there shall be no liability or obligation on the part of Buyer, Seller or its officers, directors or equity holders) with the exception of (i) the provisions of Section 3.2(a)(i), Section 6.2(b), Section 9.1, this Section 9.2 and Article XI, together with all applicable defined terms set forth in Article I, each of which provisions shall survive such termination and remain valid and binding obligations of the Parties and (ii) any liability of any Party for any breach of this Agreement prior to such termination. For the avoidance of doubt, the Confidentiality Agreement shall survive any termination of this Agreement in accordance with its terms and shall automatically be extended until such date that is two (2) years following the date of termination of this Agreement, and nothing in this Article IX shall be construed to discharge or relieve any party to the Confidentiality Agreement of its obligations thereunder.

**ARTICLE X**
**SURVIVAL AND RELEASE**

**10.1     Survival**.  The representations and warranties of Seller and, except as provided in the last sentence of this Section 10.1, the covenants and agreements of Seller contained in this Agreement and in any certificate delivered pursuant to this Agreement shall terminate and cease to be of any further force or effect whatsoever upon the Closing.  Seller shall have no liability after the Closing for any inaccuracy in or breach of such representations and warranties.  None of Buyer, Seller or any of their Affiliates or their respective Representatives shall have recourse against Seller under this Agreement following the Closing for any breach of or inaccuracy in any such representation or warranty or any breach or nonfulfillment of covenant, condition or agreement required to be performed or fulfilled prior to the Closing.  The representations and warranties of Buyer and, except as provided in the last sentence of this Section 10.1, the covenants and agreements of Buyer contained in this Agreement and in any certificate delivered pursuant to this Agreement shall terminate and cease to be of any further force or effect whatsoever upon the Closing.  Buyer shall have no liability after the Closing for any inaccuracy in or breach of such representations and warranties.  None of Seller or any of its Affiliates or Representatives shall have recourse against Buyer under this Agreement following the Closing for any breach of or inaccuracy in any such representation or warranty or any breach or nonfulfillment of covenant, condition or agreement required to be performed or fulfilled prior to the Closing.  Only the

covenants and agreements that by their terms survive the Closing (or that contemplate action or impose obligations after the Closing) shall so survive the Closing in accordance with their respective terms.  Notwithstanding anything in this <u>Section 10.1</u> to the contrary, in no event shall the survival periods set forth above apply with respect to Fraud.  In the event of any breach of a representation or warranty by a Party that constitutes Fraud, such Party's liability for breach of such representation or warranty shall survive the Closing and continue in full force and effect until the expiration of any statute of limitations applicable thereto.  "Fraud" means actual (and not constructive) common law fraud as determined under the Laws of the State of Delaware.

**ARTICLE XI**
**<u>MISCELLANEOUS</u>**

     **11.1**   **<u>Notices</u>**.   Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given:  (a) on the date established by the sender as having been delivered personally, (b) on the date delivered by a private courier as established by the sender by evidence obtained from the courier, (c) on the date delivered by email (if sent prior to 5:00 p.m.  New York City time, or if sent later, then on the next Business Day), or (d) on the fifth Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications, to be valid, must be addressed as follows:

        If to Buyer, to:

           Sakana, LLC
           c/o Steve Warren, Esq.
           Hanson Jacobsen Teller Hoberman Newman Warren Richman Rush
           Kaller Gellman Meigs & Fox
           450 N. Roxbury Drive, 8th Floor
           Beverly Hills, CA 90210
           Email: sw@hjth.com

        With a required copy (which shall not constitute notice) to:

           Rosen & Associates, P.C.
           P.O. Box 7560
           Wilmington, DE 19803
           Email:  cmccabe@rosenpc.com

           and

           Rosen & Associates, P.C.
           P.O. Box 1274
           Shelter Island Heights, NY 11965
           Email: srosen@rosenpc.com

If to Seller, to:

> 5885 Hollis Street, Suite 100
> Emeryville, CA 94608
> Attn: General Counsel
> Email: generalcounsel@amyris.com

With a required copy (which shall not constitute notice) to:

> Pachulski Stang Ziehl & Jones LLP
> One Sansome Street, Suite 3430
> San Francisco, CA  94104
> Attn: Debra I. Grassgreen, Jason Rosell and Steven Golden
> E-mail: dgrassgreen@pszjlaw.com; jrosell@pszjlaw.com; and
> sgolden@pszjlaw.com

or to such other address or to the attention of such Person or Persons as the recipient Party has specified by prior written notice to the other Parties hereto.

**11.2    Amendments and Waivers**.  Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and is duly executed, in the case of an amendment, by each Party to this Agreement, or in the case of a waiver, by the Party against whom the waiver is to be effective.  No failure or delay by any Party in exercising any right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.

**11.3    Expenses**.  Except as otherwise provided in this Agreement, each Party shall bear its own costs and expenses in connection with the negotiation, documentation and consummation of the transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of third parties, whether or not the transactions contemplated by this Agreement are consummated.

**11.4    Successors and Assigns**.  This Agreement may not be assigned by any Party (whether by operation of law or otherwise) without the prior written consent of the other Party(ies); provided, however, that Buyer may (i) assign any or all of its rights and interests hereunder to one or more of its Affiliates; and/or (ii) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases the Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder).  Subject to the foregoing, all of the terms and provisions of this Agreement shall inure to the benefit of and be binding upon the Parties and their respective permitted successors and assigns.  Any attempted or purported assignment that is not in strict accordance with the terms of this Section 11.4 shall be void ab initio.

**11.5    Governing Law**.  This Agreement and the exhibits and schedules hereto shall be governed by and interpreted and enforced in accordance with the Laws of the State of Delaware,

without giving effect to any choice of Law or conflict of Laws rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

**11.6    Consent to Jurisdiction; Service of Process; Waiver of Jury Trial**. Any suit, action or other proceeding arising out of or relating to this Agreement or any transaction contemplated hereby shall be brought exclusively in the shall be brought exclusively in the Bankruptcy Court. Each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court for the purpose of any such suit, action or other proceeding. A final judgment in any such suit, action or other proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each Party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in such court, and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Each Party further agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's respective address set forth herein shall be effective service of process for any such action, suit or proceeding. Nothing in this Section 11.6, however, shall affect the right of any Party to serve legal process in any other manner permitted by Law. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.

**11.7    Counterparts**.

(a)    This Agreement may be executed in counterparts, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Party. The Parties agree that the delivery of this Agreement, the Ancillary Documents and any other agreements and documents at the Closing may be effected by means of an exchange of facsimile signatures or other electronic delivery. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or scanned pages shall be effective as delivery of a manually executed counterpart to this Agreement.

(b)    No Party shall raise the use of a facsimile machine or electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic transmission as a defense to the formation or enforceability of this Agreement and each Party forever waives any such defense. The words "execution," "executed", "signed," "signature," and words of like import in this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf," "tif" or "jpg") and other electronic signatures (including, without limitation, SignNow and DocuSign).

**11.8** **No Third Party Beneficiaries**.  No provision of this Agreement is intended to or shall confer upon any Person other than the Parties any rights or remedies of any nature whatsoever under or by reason of this Agreement.

**11.9** **Entire Agreement**.  This Agreement, the Ancillary Documents, schedules, including the Seller Disclosure Schedules and the other documents, instruments and agreements specifically referred to herein or therein or delivered pursuant hereto or thereto, together with the Confidentiality Agreement, set forth the entire understanding of the Parties with respect to the subject matter hereof and the transactions contemplated hereby.  All schedules, including any Seller Disclosure Schedule, referred to herein are intended to be and hereby are specifically made a part of this Agreement and incorporated by reference herein.  Any and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement.

**11.10** **Disclosure Schedules**.  Except as otherwise provided in the Seller Disclosure Schedules, all capitalized terms therein shall have the meanings assigned to them in this Agreement.  Matters reflected in the Seller Disclosure Schedules are not necessarily limited to matters required by this Agreement to be disclosed.  No disclosure made in the Seller Disclosure Schedules shall constitute an admission or determination that any fact or matter so disclosed is material, has had or could reasonably be expected to have a Material Adverse Effect, meets a dollar or other threshold set forth in this Agreement or would otherwise be required to be disclosed, and no Person shall use the fact of the setting of a threshold or the inclusion of such facts or matters in any dispute or controversy as to whether any obligation, amount, fact or matter is or is not material for purposes of this Agreement.  Information disclosed in any Seller Disclosure Schedule delivered will qualify any representation and warranty in this Agreement to the extent that a reasonable buyer would infer, based solely on the face of the applicable disclosure, the relevance or applicability of the information disclosed to any such representation or warranty, notwithstanding the absence of a reference or cross-reference to such representation or warranty on any such Seller Disclosure Schedule or Seller Disclosure Schedule or the absence of a reference or cross reference to such Seller Disclosure Schedule in such representation or warranty.  No disclosure in the Seller Disclosure Schedules relating to any possible breach or violation of any agreement or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

**11.11** **Captions**.  All captions and section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

**11.12** **Remedies**.  Buyer agrees that irreparable damage would occur in the event that Buyer fails to perform any of the provisions of this Agreement in accordance with their specific terms.  Accordingly, Seller shall be entitled to pursue specific performance of the terms hereof, including an injunction or injunctions to prevent breaches of this Agreement by Buyer and to enforce specifically the terms and provisions of this Agreement, this being in addition to any other remedy to which Seller is entitled at law or in equity.  Buyer hereby further waives (a) any defense in any action for specific performance that a remedy at law would be adequate and (b) any requirement under any law to post security as a prerequisite to obtaining equitable relief.

**11.13**  **Severability**.  Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Upon such determination that any term or other provision of this Agreement is invalid, illegal or unenforceable under applicable Law, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

**11.14**  **Interpretation**.  The Parties have participated jointly in the negotiation and drafting of this Agreement, and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any Party by virtue of the authorship of this Agreement shall not apply to the construction and interpretation hereof.  The Parties agree that any drafts of this Agreement or any Ancillary Document prior to the final fully executed drafts shall not be used for purposes of interpreting any provision thereof, and each of the Parties agrees that no Party or any Affiliate thereof shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any Proceeding among any of the foregoing.  For the purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires:  (a) the meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term and vice versa, and words denoting either gender shall include both genders as the context requires; (b) where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning; (c) the terms "hereof," "herein," "hereunder," "hereby" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement (including any exhibit or schedule hereto) as a whole and not to any particular provision of this Agreement; (d) when a reference is made in this Agreement to an Article, Section, paragraph, Exhibit or Schedule, such reference is to an Article, Section, paragraph, Exhibit or Schedule to this Agreement (provided that references to "Schedules" herein shall be deemed to refer to the applicable schedule of the Seller Disclosure Schedule or the Seller Disclosure Schedule), unless otherwise specified; (e) the word "include," "includes," and "including" when used in this Agreement shall be deemed to be followed by the words "but not limited to," unless otherwise specified; (f) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if" and (g) all accounting terms used and not defined herein have the respective meanings given to them under GAAP.  All dollar or "$" amounts set forth in this Agreement shall refer to U.S. dollars unless explicitly indicated otherwise.  Time is of the essence for each and every provision of this Agreement.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" mean "to but excluding" and the word "through" means "to and including".  Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a day that is not a Business Day, the Party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day that is a Business Day.  Any reference in this Agreement to "made available" means a document or other information that was provided or made available to Buyer and its Representatives in Seller's electronic or virtual data rooms, management presentations or in any other form.

     **11.15    Prevailing Party**.    In the event of any Proceeding in connection with this Agreement or any Ancillary Document, the prevailing Party in any such Proceeding shall be entitled to recover from the other Party its costs and expenses, including, without limitation, reasonable legal fees and expenses.

     **11.16    Further Assurances**.    Following the Closing, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions (at no material cost or expense to the Party to whom the request is directed) as may be reasonably required to carry out the provisions hereof and give effect to the Closing transactions contemplated by this Agreement; *provided that* neither Party shall be required by this <u>Section 11.16</u> to initiate or join in any Proceeding.    After the Closing, Seller shall promptly transfer or deliver to Buyer cash, checks (which shall be properly endorsed) or other property that Seller may receive in respect of any item that constitutes part of the Purchased Assets or relates to the Assumed Liabilities.    After the Closing, Buyer shall promptly transfer or deliver to Seller cash, checks (which shall be properly endorsed) or other property that Buyer may receive in respect of any item that is an Excluded Asset or relates to the Retained Liabilities.

     **11.17    Personally Identifiable Information**.    Buyer shall honor and observe any and all written policies of Seller in effect on the date the Case was commenced restricting or regarding the transfer of Personally Identifiable Information and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code; provided that, however, nothing herein shall prohibit or hinder the ability of Buyer to amend, restate, revoke or change any written policies with regarding to personally identifiable information from and after the Closing.

*   *   *   *

[Signature page follows]

-34-

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed on its behalf as of the date first above written.

**SELLER:**

**AMYRIS, INC. and AMYRIS CLEAN BEAUTY, INC., Chapter 11 Debtor and Debtor in Possession**

By: _____
    Name: _____
    Title: _____

**BUYER:**

**SAKANA, LLC**

By: _/s/_____
    Name:  Naomi Watts
    Title: Managing Member

## SCHEDULES AND EXHIBIT "A"

## [Intentionally Omitted]