**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>AMYRIS, INC. et al,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-11131 (TMH) (Jointly Administered)<br><br>Re: Docket Nos. 917 |

**LIMITED OBJECTION OF AD HOC CROSS-HOLDER GROUP
TO DEBTORS' MOTION FOR (I) AN ORDER (A) APPROVING
THE BID PROCEDURES FOR THE SALE OF THE DEBTORS'
LAB-TO-MARKET ASSETS; (B) SETTING MINIMUM RESERVE
PRICE; (C) SCHEDULING THE AUCTION AND SALE HEARING;
(D) APPROVING THE FORM AND MANNER OF NOTICE THEREOF;
AND (E) GRANTING RELATED RELIEF; AND (II) AN ORDER OR ORDERS
(A) APPROVING THE SALE OF THE DEBTORS' LAB-TO-MARKET ASSETS FREE
AND CLEAR OF ALL ENCUMBRANCES; AND (B) APPROVING THE ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

The ad hoc group (the "Ad Hoc Cross-Holder Group") of certain unaffiliated (a) holders of notes or other indebtedness issued under that certain Indenture, dated as of November 15, 2021 pursuant to which Amyris, Inc. issued certain 1.50% Convertible Senior Notes Due 2026 and/or (b) shareholders of Amyris, Inc., as identified on that certain *Verified Statement of Ad Hoc Cross-Holder Group Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure* [Docket No. 397], as the same may be amended or supplemented from time to time, by and through its undersigned counsel, hereby files this Limited Objection (the "Objection") the Debtors' *Motion for (I) An Order (A) Approving Bid Procedures for the Sale of the Debtors'*

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/amyris. The location of Debtor Amyris, Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

*Lab-to-Market Assets; (B) Setting Minimum Reserve Price; (C) Scheduling the Auction and Sale Hearing; (D) Approving the Form and Manner of Notice Thereof; and (E) Granting Related Relief; and (II) An Order or Orders (A) Approving the Sale of the Debtors' Lab-to-Market Assets Free and Clear of All Encumbrances; and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases* [Docket No. 917] (the "Lab-to-Market Sale Motion")[2] filed in the above-captioned cases jointly administered under Case No. 23-11131 (the "Chapter 11 Cases") and in support thereof states as follows:

## PRELIMINARY STATEMENT

1. The Ad Hoc Cross-Holder Group does not object to the sale of the Lab-to-Market Assets. The Ad Hoc Cross-Holder Group has advocated for marketing these assets since the Chapter 11 Cases' inception, as they represent the heart of the Debtors' value. It is for this very reason that it is critical that any Sale Process not be needlessly rushed and the value realized by the Debtors' stakeholders compromised. The Debtors' proposed timeline, which contemplates a marketing process of three and a half weeks and held over the holidays, cannot possibly maximize the Lab-to-Market Assets' value, nor will it be taken seriously. The Lab-to-Market assets were not marketed prepetition or over the last few months and the Debtors provide no information about any efforts undertaken since last week when they belatedly decided to commence the process. Even in the best circumstances, three and a half weeks would not give the Debtors' professionals an opportunity to meaningfully market the Lab-to-Market Assets or allow interested parties to complete their necessary due diligence. That the proposal is to run this process *over the holidays* virtually assures that buyer interest and engagement will be at its lowest possible point.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lab-to-Market Sale Motion, and if not there, then the definitions provided in the Debtors' Plan (as defined below).

2

2. Further complicating matters, the Debtors' Lab-to-Market Assets for sale include over 700 patents (many for sophisticated and highly specialized processes and materials), another almost 400 pending patents, equity interests in an industrial manufacturing facility located in Brazil, a 23-acre chemical plant in North Carolina, and other assets involving highly complicated and cutting-edge scientific advancements. The Debtors fail to demonstrate how any single potential purchaser or group of purchasers could reasonably diligence this kind of a complex international operation with highly nuanced intellectual property spanning numerous industries in just a few weeks over the holidays. They do not cite a single case where a Court permitted such relief under similar circumstances.

3. The Debtors have offered no justification for such an expedited timeline, other than referencing the insider imposed DIP Facility milestone requiring that a sale close by February 9, 2024. Instead, the Debtors have moved to extend the Exclusive Period for another 90 days, through March 6, 2024, asserting that the Chapter 11 Cases have only been pending for "a short time," that "no pressure would result from the requested extension of the Exclusive Periods," and that "[a]ll stakeholders will benefit from such continued stability and predictability." *See* Exclusive Period Motion at ¶ 20. If the Debtors have asked for exclusivity to extend though March, it is difficult to understand how they can simultaneously claim they cannot employ a similar timeline for a sale so that it can maximize value.

4. It should not be lost on the Court that these Debtors have been in chapter 11 for four months with a retained investment banker. At the direction of the insider Foris Prepetition Secured Parties and Doerr, the Debtors *elected to wait until now* before commencing a marketing process for the Lab-to-Market assets. The fact that the Debtors and Foris have made numerous missteps during these cases and engaged in questionable decision-making (at best) to

significantly delay this sale process does not entitle them to demand unreasonable and extraordinary deadlines and restrictions that jeopardize value-maximizing transactions. Such an imposition only heightens the concern that this process is not meant to be a legitimate one designed to maximize value and rather confirms the narrative that it is merely a façade to hand over the valuable Lab-to-Market Assets to Foris as contemplated from the first day of these cases. A second failed marketing process on the heels of the Consumer Brands sale would only exacerbate the Debtors' failed restructuring efforts thus far.

5. The Lab-to-Market Sale Motion has other issues as well, such as the lack of a clear process for marketing and selling the Lab-to-Market Assets to strategic buyers who might collectively recognize more value to the Debtors' estates than a single buyer for all assets. The nature of the Lab-to-Market Assets means that certain "bundles" of Lab-to-Market Assets, such as related intellectual property rights and their associated assets, could mean that the sum of the assets is less than its parts.[3] Potential bidders may be deterred from bidding on assets they otherwise desire if they believe only all-assets bids will be selected as the best and highest. Modifying the Bid Procedures to make clear that bids by lot can still qualify as a winning bid as long as the sum total of all bids exceeds the Minimum Reserve Price will ensure that the highest price for the Lab-to-Market Assets is realized.

6. The Ad Hoc Cross-Holder Group reached out to the Debtors to raise these concerns in advance of filing this Limited Objection. If a resolution cannot be reached, this propose sale process must be modified to include a reasonable timeline and framework to

---

[3] For example, given the nature of the assets, there are likely fewer potential bidders who will be interested in the entirety of Amyris' Lab-to-Market Assets because of the high degree of alignment that would be required between their business and Amyris. On the other hand, there may be interest in Squalene as an adjuvant from pharmaceutical companies and interest in Farnesene from the oil and gas industry. Other bidders may only be interested in operations in Brazil, agnostic about industry. The Debtors should be exploring all options in accordance with their fiduciary duties.

maximize possible return to all interested parties.  Otherwise, the process is a futile one that should be seen for what is set up to do – whitewash the Debtors' attempts to hand over this company to insiders without a legitimate market test.

## **LIMITED OBJECTION**

7. The Ad Hoc Cross-Holder Group does not object to the concept of selling the Lab-to-Market Assets.  However, the process outlined in the Lab-to-Market Sale Motion jeopardizes the value the Debtors' estates could realize from any sale.  These infirmities can be remedied, but they must be addressed now, at the start of the process, in order to maximize value and avoid a repeat of the Consumer Brands sale, which dramatically underperformed and thrust these Chapter 11 Cases into turmoil.

8. The goal of a sale in bankruptcy should be to maximize proceeds for a debtor's estate and creditors. To effectuate this goal, bankruptcy courts are provided discretion and latitude in conducting a sale.  Courts have consistently held that bid procedures must be crafted to facilitate an open and fair public sale designed to maximize value for all creditors. *See In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 552 (Bankr. S.D.N.Y. 1997) (stating that the sale process should follow "an intensive effort to drum up the best price obtainable for the creditors" and it cannot be aimed "to cut off other possible sales"). The Bidding Procedures should be designed to do just that but, instead, are here designed to chill bidding and funnel the Debtors Lab-to-Market assets quickly through bankruptcy to the detriment of all creditors other than the Debtors' insiders

### A. The Sale Timeline Is Unreasonable and Must Be Extended

9. The most pressing issue with the Lab-to-Market Sale Motion is its proposed timeline.  The motion seeks to establish the following dates and deadlines:

| Date | Event |
|---|---|
| **December 19, 2023 at 5:00 p.m.** | Bid Procedures Motion Objection Deadline |
| **December 20, 2023 at 3:00 p.m.** | Bid Procedures Hearing |
| **December 22, 2023** | Deadline to File Bid Procedures Notice |
| **January 16, 2024 at 5:00 p.m.** | Deadline to Submit Qualified Bids |
| **January 18, 2024** | Deadline to Designate Qualified Bids and File Auction Notice |
| **January 19, 2024 at 10:00 a.m.** | Sale Auction(s) |
| **January 21, 2024** | Deadline to File Notice of Successful Bidder(s) and Back-Up Bidder(s) |
| **January 23, 2024 at 5:00 p.m.** | Adequate Assurance Objection Deadline |
| **January 23, 2024 at 5:00 p.m.** | Deadline to Object to Sale(s) |
| **January 24, 2024** | Sale Hearing |
| **February 9, 2024** | Deadline to Close Transaction(s) |

10. This timeline proposes to serve the Bid Procedures Notice on December 22, 2023, three days before Christmas, with a deadline to submit bids of January 16, 2023. Even including the week of the holidays from December 24 to January 1, this would result in a total span of only 25 days from notice to bid submission. It is extremely unlikely that any interested buyer would have adequate time to familiarize itself with the bidding procedures, identify and value the assets, receive access to diligence materials, complete their diligence process, and submit a bid within 25 days.

11. When factoring in that many potential bidders will be either altogether unavailable or else working with reduced capacity and manpower from December 24 to January 1, this effectively results in the entire bid timeline being reduced to 18 days. A significant number of potential bidders may simply never engage in this process given the truncated timeline and its position over the holiday season. The Debtors' estates cannot afford to lose their interest and chill bidding in this manner; the sale of the Lab-to-Market Assets must not begin behind the 8-ball.

12. No reason is given for the expedited timeline except for the fact that the DIP

6

Financing requires that any sale close on or before February 9, 2024. The Debtors' proposed Sale Hearing is also set to coincide with the Debtors' proposed confirmation hearing for their *Second Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors, as Modified* [Docket No. 892] (the "Plan"), which presumably also factors into the Debtors' decision.[4] Neither of these reasons justifies the unreasonably short bidding procedures timeline, especially not when the Lab-to-Market Assets include all of the Debtors' intellectual property, essentially its crown jewels. To give them away for less than they are actually worth in the interests of expediency is unjustifiable, particularly in a case such as this where distributions are expected to be marginal and every cent counts.[5]

13. The Debtors cite a number of cases in support of their proposed timeline, but upon examination, each cited case involved either extensive prepetition marketing processes, extensive post-petition marketing processes prior to filing the relevant bid procedures motion, the involvement of a stalking horse bidder, or some combination of the three. Here, the Debtors' investment banker has *not* been marketing the Lab-to-Market Assets; instead, they were retained with the purpose of marketing the Consumer Brands Assets, and the First Day Declaration only ever mentions their marketing of the Consumer Brands Assets. *See* First Day Declaration at paragraph 63 ("In July 2023, Amyris engaged Intrepid Investment Bankers LLP to, among other things, market the Company's **consumer brands**, a process that will continue during these Chapter 11 Cases.") (emphasis added).

14. Likewise, the Lab-to-Market Sale Motion itself never describes any marketing

---

[4] The fact that the Debtors are expecting creditors to vote prior to knowing the results of the sale represents a separate but related issue with the Plan's confirmation timeline.

[5] Holders of Convertible Note Claims and General Unsecured Claims are projected to recover between 5.8% and 7.5% by the Debtors' estimates. *See Disclosure Statement with Respect to Second Amended Joint Chapter 11 plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors, as Modified* [Docket No. 893] at p. 9.

7

process for the Lab-to-Market Assets, except to say that Intrepid has populated a data room in connection with a possible sale. While the Consumer Brands may (or may not) have been marketed for a period of months prior to their sale, there is no suggestion, assertion, or evidence that the same is true with respect to the Lab-to-Market Assets, despite the Ad Hoc Cross-Holder Group's repeated calls to do so. The fact that the Debtors neglected to market these assets properly in the past does not mean that creditors and other stakeholders should now be prejudiced by allowing an improperly rushed sale process. To do so would seemingly benefit nobody except the Foris Prepetition Secured Lenders and John Doerr, who will have the Lab-to-Market Assets fall to them without any legitimate market testing to compete with.

15. The Debtors themselves acknowledge that these cases are still developing and that there is no urgency to confirm a plan. They filed their *Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [Docket No. 853] (the "Exclusive Period Motion") on December 7, 2023. The Exclusive Period Motion seeks to extend the Debtors' time to file and solicit a plan through May 6, 2024, without prejudice to the Debtors' rights to seek further extension. The Debtors' request for such relief is inconsistent with the notion that the Lab-to-Market Assets must be sold as soon as possible and the deadlines be kept hard and fast.

16. The Lab-to-Market Assets are complex and include over 700 patents (many for sophisticated and highly specialized processes and materials), another almost 400 pending patents, equity interests in an industrial manufacturing facility located in Brazil, a 23-acre chemical plant in North Carolina, and other assets involving highly complicated and cutting-edge scientific advancements. In a very real sense, the Lab-to-Market Assets are Amyris—they

represent the realization of what the company was formed to do, and the culmination of years of funding and research. These assets are highly technical and require the support of specialized knowledge in order to be fully understood and valued. Any interested buyer will need adequate time to get up to speed on what it is they are bidding on (including any contracts or agreement that they may need to have assumed and assigned to them in connection therewith) and complete their diligence process. The current Bid Procedures timeline simply makes that impossible. It must be extended in order to give interested buyers time after the holiday season to become involved, and adequate time to complete their diligence and form a picture of their value.

### B. The Bidding Procedures Should Be Modified to Clarify That Bids May Be Made By Lots Rather Than Only All-Assets Bids

17. Bidding procedures should be designed to foster open and competitive bidding to maximize value. *See In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) ("Structured bid procedures should provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective bidders' interests."). As outlined above, the Bid Procedures provide that a "Qualified Bid" must meet the Minimum Reserve Price. This conveys, if not confirms outright, that the Debtors will only entertain bids for all of the Lab-to-Market Assets as Qualified Bids, which does the opposite of fostering competitive bidding.[6] The Bidding Procedures mention that a Qualified Bid must "identify with specificity which Lab-to-Market Assets are included in the Bid," but provides no explicit provisions or guidelines for joint bids (besides a single parenthetical saying that bidders may make joint bids), bidding by lots, or any other procedure for aggregating the Minimum Reserve Price. The Bid Procedures must be

---

[6] There is also some ambiguity as to whether Intrepid's fee structure is aligned with achieving a value maximizing transaction. It appears Intrepid will receive a second Sale Transaction Fee from the consummation of any sale of the Lab-to-Market Assets and the Ad Hoc Cross-Holder Group has requested confirmation on the fee structure. To the extent any sale fee and a value maximizing transaction are not aligned, the Ad Hoc Cross-Holder Group reserves all rights.

9

modified to make clear that bids may still be Qualified Bids if they are for less than the Minimum Reserve Price and for less than all of the Lab-to-Market Assets, as long as the aggregate of all Qualified Bids clears the Minimum Reserve Price.

18. There are likely to be only a handful of potential bidders who will be interested in the entirety of Amyris' Lab-To-Market assets because of the high degree of alignment that would be required between such bidder's business and Amyris's own in order to make effective use of the entire portfolio. Conversely, there is likely to be a far larger universe of potential bidders who will only be interested in a subset of Amyris's Lab-to-Market assets, such as certain components of intellectual property and operations; for example, bidders with a pharmaceutical background would likely be more interested in squalene-related assets, oil and gas bidders may be more interested in Farnesene-related assets, while others may be interested only in the assets and operations occurring in Brazil, agnostic of industry. In short, marketing the Lab-to-Market assets individually (or in lots) may very well result in sums greater than marketing them altogether.

19. Accordingly, in order for a Sale Process to be effective, it will be important that bidders be able to bid on sensible and clearly-defined subsets of the Lab-to-Market assets.[7] Such subdivisions are likely to be complex, requiring separating the Debtors' patent portfolio into subsets, and further dividing those subsets along "field of use" lines, and considering how those intellectual property assets interact with the Debtors' physical assets and, perhaps most importantly, the Debtors' employees who ultimately make the operations run.[8] The Sale Process must not put limits on potential bidders' ability to bid on what is most valuable to them, so long

---

[7] *See, e.g.*, *In re Yellow Corporation*, Case No. 23-11069, at Docket No. 1268 (Dec. 4, 2023), where allowing bidding on less than all of the assets by multiple bidders resulted in multiple successful bidders and aggregate consideration to the estate of over $400 million in excess of the original all-assets stalking horse bid.

as the procedures are sensible and the Minimum Reserve Price is met by the aggregate of all Qualified Bids.

20. The existing Bid Procedures do not need to be heavily modified in order to make these adjustments, nor will their inclusion represent a radical shift in the existing Bid Procedures. No stakeholder would be prejudiced by allowing these bidding modifications, as the DIP Lender and Foris Prepetition Secured Lenders would still be protected by requiring that the Minimum Reserve Price be met. Giving bidders the latitude to bid on assets that are most valuable to them will not result in any loss in consideration to the Debtors, and nothing would prohibit bidders from making all-assets bids or the Debtors from ultimately making determinations about what constitutes a highest and best offer. If the Minimum Reserve Price is not met, the DIP Lender could exercise its right to credit bid regardless of how the bids are made. Accordingly, allowing the bidding by lots and subsets could only potentially increase the proceeds of the sale, without possibly lowering the floor.

## **RESERVATION OF RIGHTS**

21. The Ad Hoc Cross-Holder Group reserves its rights to supplement or amend this Objection to further address or object to the Lab-to-Market Sale Motion, the Bid Procedures, any Sale, and any related matter and to respond to any response or objection either by further submissions to this Court, at oral argument, or by testimony to be presented at any hearing.

## **CONCLUSION**

22. For the above reasons, the Ad Hoc Cross-Holder Group respectfully asks that the Court require the Debtors to make the modifications requested herein as a condition to granting the Lab-to-Market Sale Motion.

---

[8] As outlined above, the sheer complexity of the Debtors' Lab-to-Market assets and operations necessitates giving bidders adequate time to be able to make these difficult determinations, which the current Sale Process fails to do.

Dated: December 18, 2023
Wilmington, Delaware

**WOMBLE BOND DICKINSON LLP**

By: */s/ Matthew P. Ward*
Matthew P. Ward (DE Bar No. 4471)
Morgan L. Patterson (DE Bar No. 5388)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
Email: matthew.ward@wbd-us.com
Email: morgan.patterson@wbd-us.com

**ARENTFOX SCHIFF LLP**

By: */s/ Andrew I. Silfen*
Andrew I. Silfen (*Pro Hac Vice*)
Beth M. Brownstein (*Pro Hac Vice*)
1301 Avenue of the Americas
42nd Floor
New York, New York 10019
Telephone: (212) 484-3900
Facsimile: (212) 484-3990
Andrew.Silfen@afslaw.com
Beth.Brownstein@afslaw.com

and

**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON P.A.**

By: */s/ Eric J. Silver*
Eric J. Silver (*Pro Hac Vice*)
150 W. Flagler St, Suite 2200
Miami, FL 33130
Telephone: (302) 789-3200
Facsimile: (305) 789-2688
esilver@stearnsweaver.com