# EXHIBIT A

*EXECUTION VERSION*

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**AMYRIS, INC. AND AMYRIS CLEAN BEAUTY, INC.,**

**AS SELLERS**

**AND**

**DR. REDDY'S LABORATORIES, INC.,**

**AS BUYER**

**DATED AS OF DECEMBER 12, 2023**

ARTICLE I DEFINITIONS ............................................................................................... 1
    1.1     **Definitions** ........................................................................................... 1

ARTICLE II PURCHASE AND SALE ............................................................................ 9
    2.1     **Purchased Assets** ............................................................................... 9
    2.2     **Excluded Assets** .............................................................................. 10
    2.3     **Nonassignable Assets; Deemed Consent; Additional Excluded Assets; Additional Assigned Contracts** .............................. 12
    2.4     **Liabilities.** ......................................................................................... 13
    2.5     **Purchase Price** ................................................................................ 14
    2.6     **Withholding** .................................................................................... 14

ARTICLE III CLOSING; PAYMENT OF PURCHASE PRICE ................................ 14
    3.1     **Closing** ............................................................................................. 14
    3.2     **Closing Deliveries** .......................................................................... 14

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER ............. 16
    4.1     **Existence and Power** ...................................................................... 16
    4.2     **Authorization** ................................................................................. 16
    4.3     **Enforceability** ................................................................................ 16
    4.4     **Noncontravention** .......................................................................... 16
    4.5     **Proceedings** .................................................................................... 17
    4.6     **Brokers** ........................................................................................... 17
    4.7     **Compliance with Laws** .................................................................. 17
    4.8     **Title; Sufficiency of Assets** ........................................................... 17
    4.9     **Employee Benefits** ......................................................................... 17
    4.10    **Employment** ................................................................................... 18
    4.11    **Intellectual Property** ..................................................................... 18
    4.12    **Exclusivity of Representations and Warranties** .......................... 19

ARTICLE V REPRESENTATIONS AND WARRANTIES OF BUYER ............... 19
    5.1     **Existence and Power** ...................................................................... 20
    5.2     **Authorization** ................................................................................. 20
    5.3     **Enforceability** ................................................................................ 20
    5.4     **Governmental and Third Party Authorizations** ........................ 20
    5.5     **Noncontravention** .......................................................................... 20
    5.6     **Brokers** ........................................................................................... 20
    5.7     **Proceedings** .................................................................................... 20
    5.8     **Financial Capability** ...................................................................... 20
    5.9     **Solvency** ......................................................................................... 21
    5.10    **Independent Investigation** ............................................................ 21
    5.11    **Exclusivity of Representations and Warranties** .......................... 21

ARTICLE VI PRE-CLOSING COVENANTS ............................................................ 22
    6.1     **Conduct of Business** ....................................................................... 22
    6.2     **Pre-Closing Access to Information** ................................................ 23
    6.3     **Supplemental Disclosure** .............................................................. 23
    6.4     **Efforts to Close** .............................................................................. 24

6.5       **Other Business Relations**................................................................ 24
6.6       **Bankruptcy Matters**..................................................................... 24
6.7       **Access to Books and Records** ..................................................... 25
6.8       **Employee Matters** ........................................................................ 25
6.9       **Cross Border Agreements** ............................................................ 27
6.10      **Transition Services Agreement** .................................................... 27
6.11      **Mobile App Shutdown** ................................................................. 28

ARTICLE VII COVENANTS OF BUYER AND SELLERS ................................ 28
7.1       **Public Announcements** ................................................................. 28
7.2       **Tax Matters** ................................................................................... 28
7.3       **Wrong Pockets** ............................................................................. 29

ARTICLE VIII CONDITIONS TO CLOSING ................................................... 29
8.1       **Conditions to Obligations of Buyer** ............................................ 29
8.2       **Conditions to Obligations of Seller** ............................................ 30
8.3       **Frustration of Closing Conditions** .............................................. 31
8.4       **Waiver of Conditions** ................................................................... 31

ARTICLE IX TERMINATION ........................................................................... 31
9.1       **Termination** ................................................................................... 31
9.2       **Effect of Termination** ................................................................... 32

ARTICLE X SURVIVAL AND RELEASE ......................................................... 33
10.1      **Survival** ......................................................................................... 33

ARTICLE XI MISCELLANEOUS ...................................................................... 33
11.1      **Notices** .......................................................................................... 33
11.2      **Amendments and Waivers** ........................................................... 35
11.3      **Expenses** ....................................................................................... 35
11.4      **Successors and Assigns** ............................................................... 35
11.5      **Governing Law** ............................................................................. 35
11.6      **Consent to Jurisdiction; Service of Process; Waiver of Jury Trial** ........ 35
11.7      **Counterparts** ................................................................................. 36
11.8      **No Third Party Beneficiaries** ...................................................... 36
11.9      **Entire Agreement** ......................................................................... 36
11.10     **Disclosure Schedules** ................................................................... 37
11.11     **Captions** ........................................................................................ 37
11.12     **Remedies** ....................................................................................... 37
11.13     **Severability** ................................................................................... 37
11.14     **Interpretation** ............................................................................... 37
11.15     **Prevailing Party** ........................................................................... 38
11.16     **Further Assurances** ...................................................................... 38
11.17     **Personally Identifiable Information** ............................................ 39

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement"), dated as of December 29, 2023, is entered into by and among Amyris, Inc. and Amyris Clean Beauty, Inc. (together, the "Sellers", and each individually, a "Seller"), each a debtor and debtor-in-possession in Case No. 23-11131 (TMH) (Jointly Administered) (the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court")  and Dr. Reddy's Laboratories, Inc., a New Jersey corporation, with its principal place of business located at 107 College Road East, Princeton, NJ 08540 ("Buyer"). Sellers and Buyer are referred to herein as the "Parties". Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in Article I.

## RECITALS

A.     Sellers are in the business of manufacturing, distributing, and selling at retail and direct to consumers certain products under the brand name MenoLabs, including MenoFit™, MenoGlow™, Happy Fiber™, Well Rested™, Athena's Shield™, Goddess Glow™, Keep Glowing Gorgeous and such other trademarks, whether or not registered, set forth on Schedule 2.1(g) hereto (the "Business", and each such product, a "Product").

B.     Sellers have obtained that certain *Order Approving (a) Bid Procedures; (b) the Form and Manner of Notice; (c) the Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases; and (d) Granting Related Relief* by the Bankruptcy Court, which was entered in the Bankruptcy Case on October 16, 2023, as document No. 553 (the "Procedures Order"). Consistent with the Procedures Order, this Agreement is subject to higher and better bids for the Purchased Assets (as defined in Section 1.1 hereof), all as more particularly set forth in the Procedures Order.

E.     Sellers desire to sell to Buyer, pursuant to section 363(f) of the Bankruptcy Code (as defined in Section 1.1) and with the approval of the Bankruptcy Court, certain of the assets of Sellers used exclusively in connection with or arising out of the operation of the Business, and Buyer desires to purchase such assets from Sellers, all on the terms and conditions and as more particularly set forth in this Agreement.

## AGREEMENTS

NOW, THEREFORE, in consideration of the foregoing premises and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     **Definitions**.  When used in this Agreement, the following terms shall have the meanings assigned to them in this Section 1.1.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person directly or indirectly (through one or more intermediaries) controlling, controlled by or under common control with such specified Person.  For purposes of this definition, the terms "controlling," "controlled by," or "under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, or the power to elect more than fifty percent (50%) of the directors, managers, general partners, or persons exercising similar authority with respect to such Person.

"<u>Agreed Statement</u>" has the meaning set forth in <u>Section 7.1</u>.

"<u>Agreement</u>" has the meaning set forth in the Preamble hereto.

"<u>Allocation</u>" has the meaning set forth in <u>Section 7.2(c)</u>.

"<u>Ancillary Documents</u>" means any agreements, instruments and documents delivered at the Closing pursuant to this Agreement.

"<u>Approval Order</u>" has the meaning set forth in <u>Section 6.6(a)</u>.

"<u>Assigned Contracts</u>" has the meaning set forth in <u>Section 2.1(c)</u>.

"<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.4(a)</u>.

"<u>Backup Bidder</u>" has the meaning set forth in <u>Section 6.6(a)</u>.

"<u>Bankruptcy Case</u>" has the meaning ascribed to such term in the Recitals.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended from time to time.

"<u>Bankruptcy Court</u>" has the meaning set forth in the Recitals.

"<u>Benefit Plan</u>" means: (a) any Employee Plan and (b) any employment, severance or similar contract or arrangement (whether or not written) or any other agreement, arrangement, scheme, fund, plan or policy (whether or not written) providing any compensation or benefits to any Employee (including any agreement, arrangement, scheme, fund, plan or policy making available bonuses, equity awards, or deferred compensation) other than an Employee Plan, which a Seller sponsors or sponsored, maintains or maintained, contributes to or contributed to, or to which a Seller has or may reasonably have any Liability.

"<u>Bill of Sale</u>" has the meaning set forth in <u>Section 3.2(b)(i)</u>.

"<u>Books and Records</u>" means all of the books and records, in all formats (both tangible and intangible), used or maintained by or on behalf of Sellers in connection with or otherwise related to the Business, including (a) executed copies of all of the written Assigned Contracts, (b) all equipment, product and other warranties pertaining to the Purchased Assets, (c) all technical information and any data, maps, computer files, diagrams, blueprints and schematics, (d) all filings

made with or records required to be kept by any Governmental Authority (including all backup information on which such filings are based), (e) all research and development reports, (f) all equipment and operating logs, (g) all financial and accounting records, (i) all employment records with respect to Transferred Employees, and (h) all creative, promotional or advertising materials.

"Business" has the meaning set forth in the Recitals.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks located in New York, New York are authorized or required by Law to close.

"Buyer" has the meaning set forth in the Preamble hereto.

"Buyer Benefit Plan" has the meaning set forth in Section 6.8(b).

"Buyer Closing Certificate" has the meaning set forth in Section 8.2(c).

"Buyer Paid Cure Costs" means the Cure Costs with respect to the Assigned Contracts; provided that in no event shall the Cure Costs with respect to all Assigned Contracts exceed One Hundred Thousand Dollars ($100,000) in the aggregate.

"Charges" has the meaning set forth in Section 7.2(a).

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"Code" means the Internal Revenue Code of 1986, as amended, and regulations promulgated thereunder.

"Confidentiality Agreement" means that certain Confidentiality Agreement, dated as of September 5, 2023, by and between Amyris, Inc. and Buyer.

"Consent" means any approval, consent, ratification, permission, waiver, prior notice or authorization, or a Final Order of the Bankruptcy Court that deems or renders unnecessary the same.

"Contract" means any legally binding agreement, contract, obligation, lease, sublease, license, sublicense, regulatory license, undertaking, engagement, sales order, purchase order, instrument, arrangement or other legally binding commitment, and any amendments, modifications or supplements thereto.

"Contract Assignments" has the meaning set forth in Section 3.2(b)(ii).

"COVID-19" means SARS-CoV-2 or COVID-19, and any evolutions or variants thereof or related or associate epidemics, pandemics or diseases existing prior to the Closing Date.

"Cure Costs" shall mean the Liabilities and obligations that must be paid or otherwise satisfied to cure all of Sellers' defaults under the Assigned Contracts necessary for the assumption

thereof by and assignment to Buyer pursuant to Section 365 of the Bankruptcy Code, as provided herein.

"Deposit" has the meaning set forth in Section 3.2(a)(i).

"Employee" means any employee of a Seller (whether salaried or hourly, and full-time or part-time), whether or not actively employed on the date hereof, including employees on vacation and leave of absence, including maternity, family, sick, military or disability leave.

"Employee Plan" means any "employee benefit plan," as defined in Section 3(3) of ERISA, that: (a) is sponsored, maintained, administered or contributed to by a Seller, or a Seller with regard to any employee of a Seller and (b) covers any Employee.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and regulations promulgated thereunder.

"ERISA Affiliate" means any entity, trade or business, whether or not incorporated, that is a member of the group described in Section 414(b), (c), or (m) of the Code that includes a Seller.

"Excluded Assets" has the meaning set forth in Section 2.2.

"GAAP" means United States generally accepted accounting principles, consistently applied, as in effect when applied by Sellers.

"General Enforceability Exceptions" means general principles of equity and by bankruptcy, insolvency or similar Laws and general equitable principles affecting the rights of creditors generally.

"Good Funds" is defined in Section 3.1 hereof.

"Goodwill" means the goodwill, custom and connection of Sellers in relation to the Products and Business, together with the exclusive right for the Buyer to carry on the Business under the Purchased Intellectual Property and respectively to represent itself as carrying on the Business in succession to the Sellers.

"Governmental Entity" means (i) any nation, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature, foreign or domestic, (ii) any federal, state, local, municipal, or other government of the foregoing, (iii) any governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal) or (iv) anybody (including any international or multinational body) exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"Intellectual Property" means all intellectual property rights and other property rights in any jurisdiction throughout the world, including: (a) trademarks,  trade dress and logos, slogans, service marks, trade names, corporate and business names, and other indicia of source of origin, including all common law rights thereto and registrations and pending applications for registration

thereof, in each case, whether or not registered; (b) works of authorship, copyrights (whether or not registered), and all applications and registrations thereof; (c) domain names, domain name registrations, social media accounts (including YouTube and any other similar accounts), website names, world wide web addresses and virtual storefronts; (d) Know-How, confidential or proprietary technical, business and other information, including processes, techniques, methods, formulae, designs, product specifications, algorithms, supplier information, prospect lists, customer lists, projections, analyses, market studies and similar proprietary items that are in a Seller's possession, and all rights therein and thereto; (e) inventions (whether patentable or unpatentable, and whether or not reduced to practice), invention disclosures, mask works, circuit designs and other designs, industrial design rights, discoveries, ideas, developments, data, software, modules, routines, algorithms, schematics and architecture, whether in source code or executable code form; (f) all other proprietary and intangible rights; (g) all copies and tangible embodiments thereof (in whatever form or medium); and (h) any Goodwill associated with any of the foregoing.

"Inventory" has the meaning set forth in Section 2.1(b).

"Know-How" means any and all trade secrets, know-how, information, data, specifications, processes, methods, formulae, techniques, schematics, drawings, utility models, designs, technology, inventions (whether or not patented or patentable), discoveries and improvements, including manufacturing information and processes, assays, engineering and other manuals and drawings, standard operating procedures, regulatory, chemical, pharmacological, toxicological, pharmaceutical, physical and analytical, safety, quality assurance, quality control and clinical data, technical information and research records.

"Law" means any (i) applicable national, supranational, domestic or foreign, federal, state, provincial or local statute, law (including the common law), treaty, statute, code, constitution, ordinance, Order, decree, rule, administrative interpretation, regulation, or by-law, and (ii) any other policy, guideline, code of practice, notice, protocol or requirement having the force of law of any Governmental Entity, in each case as in effect from time to time.

"Leased Real Property" means any real property held by a Seller pursuant to a real property lease or similar real property agreement relating to the Business.

"Liability(ies)" means with respect to any Person, any direct or indirect liabilities, obligations, commitments, indebtedness, claim, loss, damage, deficiency, assessment, fine, penalty, or responsibility of such Person of any kind or nature, whether fixed or unfixed, choate or inchoate, liquidated or unliquidated, secured or unsecured, asserted or unasserted, due or to become due, accrued or unaccrued, vested or unvested, executory, determined, determinable, absolute, known or unknown, contingent or otherwise, regardless of whether or not the same is required to be accrued on any financial statements of such Person.

"Lien" means, with respect to any property or asset, any mortgage, easement, deed of trust, lien (statutory or otherwise), pledge, claim (as defined in section 101(5) of the Bankruptcy Code), security interest, equitable interest, hypothecation, charge, license, sublicense, restriction, claim of ownership, lease, sublease, option, successor liability, right of use or possession, community property interest, preference, encroachment, restrictive covenant, covenant not to sue, right of first

offer or refusal, right to use, right of way, right of setoff, title defect or any other similar adverse encumbrance in respect of such property or asset, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership (including, without limitation, any interest within the meaning of section 363(f) of the Bankruptcy Code).  For the avoidance of doubt, "Lien" shall exclude any restrictions on transfer under securities Laws, this Agreement, any Ancillary Documents and any terms and conditions of any Organizational Document of a Seller.

"Material Adverse Effect" means any change, event, development, state of facts, circumstance, condition or effect that, individually or in the aggregate, has a material adverse effect on the Business, assets (including the Purchased Assets), liabilities (including the Assumed Liabilities), financial condition or results of operations of Sellers, taken as a whole; *provided that* none of the following shall be taken into account (either alone or in combination) in determining whether there is or has been a Material Adverse Effect: any change, event, development, state of facts, circumstance, condition or effect arising from or relating to: (a) any action required or permitted by this Agreement or any action taken (or omitted to be taken) with the written consent of or at the written request of the Buyer; (b) any matter of which Buyer is aware on the date hereof, (c) the announcement, pendency or completion of the transactions contemplated by this Agreement; (d) any failure of Sellers to meet any internal or published projections, forecasts or revenue or earnings predictions; (e) general economic or political conditions, (f) conditions generally affecting the industries in which the Business is conducted; (g) any changes in financial, banking or securities markets in general, including any disruption thereof and any decline in the price of any security or any market index or any change in prevailing interest rates; (h) acts of war (whether or not declared), armed hostilities or terrorism, or the escalation or worsening thereof; (i) any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof; (j) any natural or man-made disaster or acts of God; or (k) any epidemics, pandemics, disease outbreaks, or other public health emergencies, including, without limitation, the SARS-COV-2 virus or the related COVID-19 pandemic; *provided that* in the cases of clauses (a) through (j) above, such change, event, development, or effect shall only be considered in determining whether a Material Adverse Effect has occurred if such change, event, development, or effect impacts Sellers materially and disproportionately to the impact that such change, event, development, or effect generally has upon other Persons operating in the same or substantially similar industries or markets as the Business. For the avoidance of doubt, neither the filing of the Bankruptcy Case or any actions taken in furtherance of the Bankruptcy Case or the transactions contemplated by this Agreement, nor the consequences or effects of or changes or developments arising from the filing or any such actions shall be deemed to be or to give rise to a Material Adverse Effect for purposes of this Agreement.

"Mobile App" has the meaning set forth in Section 2.1(h).

"Nonassignable Asset" has the meaning set forth in Section 2.3.

"Order" means any award, injunction, judgment, decree, order, ruling, subpoena or verdict or other decision issued, promulgated or entered by any Governmental Entity of competent jurisdiction.

"Ordinary Course of Business" means, with respect to Sellers, the ordinary course of business consistent with its past custom and practice, subject to reasonable changes in operations

resulting from Sellers operating as a distressed business, and subject to changes resulting from the filing and/or pendency of the Bankruptcy Case or the requirements of any debtor-in-possession financing in the Bankruptcy Case.

"<u>Organizational Documents</u>" means, with respect to any entity, as applicable, the certificate of incorporation, articles of incorporation, bylaws, articles of organization, partnership agreement, limited liability company agreement, formation agreement, joint venture agreement and other similar organizational documents of such entity (in each case, as amended through the date of this Agreement).

"<u>Outside Date</u>" has the meaning set forth in <u>Section 9.1(d)</u>.

"<u>Owned Intellectual Property</u>" means all Intellectual Property owned by Sellers or any of their Affiliates and included in the Purchased Intellectual Property.

"<u>Parties</u>" has the meaning set forth in the Preamble hereto.

"<u>Permit</u>" means any authorization, approval, Consent, certificate, certification, governmental license, registration, variance, exemption, waiver, Order, permit or franchise of or from any Governmental Entity.

"<u>Permitted Liens</u>" means: (a) Liens for Taxes that are not yet due and payable or that are being contested in good faith by appropriate proceedings, in each case, solely to the extent set forth on a Seller's financial statements in accordance with GAAP (which, for clarity, shall remain the obligation of Sellers); (b) Liens that will be released prior to or as of the Closing; (c) any non-exclusive license granted to customers, vendors or suppliers in the Ordinary Course of Business; and (d)[1] Liens set forth on <u>Schedule 1.1(b)</u>[2], which shall include all Liens provided in the foregoing clauses (a) through (c).

"<u>Person</u>" means an individual, a corporation, a partnership, a limited liability company, a trust, an unincorporated association, a Governmental Entity, or any other entity or body.

"<u>Personally Identifiable Information</u>" means any information that, alone or in combination with other information, identifies or permits the identification of, or contact with, any individual, including, without limitation, an individual's name, address, date of birth, telephone number, e-mail address, IP address, mobile device identifier, geolocation, photograph, social security number or tax identification number, credit card number, bank information, or biometric identifiers.

"<u>Proceeding</u>" means any claim, action, audit, investigation, suit (whether civil, criminal, administrative, or investigative or appellate proceeding), litigation, notice of violation, hearing, proceeding, arbitration or other dispute resolution proceeding before any Governmental Entity.

"<u>Procedures Order</u>" is defined in the Recitals above.

---

[1] <u>Note to Seller</u>: As Buyer is not contemplating taking on any leases, we have removed liens relating to real property.
[2] <u>Note to Seller</u>: Buyer requests that all Liens falling under the definition of Permitted Liens be schedule on 1.1(b).

"<u>Product</u>" has the meaning set forth in the Recitals.

"<u>Promotional Materials</u>" has the meaning set forth in <u>Section 2.1(a)</u>.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.5</u>.

"<u>Purchased Assets</u>" has the meaning set forth in <u>Section 2.1</u>.

"<u>Purchased Intellectual Property</u>" has the meaning set forth in <u>Section 2.1(g)</u>.

"<u>Representatives</u>" of any Person shall mean the directors, managers, officers, employees, consultants, financial advisors, counsel, accountants and other representatives and agents of such Person and any successors in interest thereto.

"<u>Retained Liabilities</u>" has the meaning set forth in <u>Section 2.4(b)</u>.

"<u>Sale Hearing</u>" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"<u>Sale Motion</u>" means the motion seeking, among other things, (i) authority for Sellers to enter into this Agreement, (ii) entry of the Procedures Order, and (iii) scheduling the Sale Hearing, dated September 18, 2023 [Docket No. 316].

"<u>Schedule Supplement</u>" has the meaning set forth in <u>Section 6.3</u>.

"<u>Seller</u>" and "<u>Sellers</u>" has the meaning set forth in the Preamble hereto.

"<u>Seller Paid Cure Costs</u>" means all Cure Costs that are not Buyer Paid Cure Costs.

"<u>Sellers Closing Certificate</u>" has the meaning set forth in <u>Section 8.1(c)</u>.

"<u>Sellers Closing Notice</u>" has the meaning set forth in <u>Section 9.1(f)</u>.

"<u>Sellers Disclosure Schedules</u>" means the disclosure schedules delivered by Seller concurrently with the execution and delivery of this Agreement.

"<u>Sellers' Knowledge</u>" or any similar phrase means the actual, current knowledge of Deb Millard, Victoria Ruter, Aimee Kramer, Sureepoul (Suree) Pattumma, and Rachel Hodges.  For the avoidance of doubt, none of such individuals shall have any personal liability or obligations regarding such knowledge.

"<u>Successful Bidder</u>" has the meaning set forth in <u>Section 6.6(a)</u>.

"<u>Tax</u>" or "<u>Taxes</u>" means all U.S. federal, state, provincial, local and foreign income, profits, franchise, license, gross receipts, occupation, premium, windfall profits, environmental, customs, duties, capital stock, severance, stamp, payroll, sales, employment, unemployment, disability, use, ad valorem, recapture, unclaimed property, escheat, personal and real property, withholding, excise, production, transfer, alternative minimum, registration, value added,

occupancy, estimated and other taxes, charges, fees, levies, or other like assessments, including any interest, penalty, or addition thereto, whether disputed or not.

"<u>Tax Returns</u>" any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"<u>Transfer Taxes</u>" means sales, use, transfer, real property transfer, recording, documentary, stamp, registration and stock transfer Taxes and any similar Taxes.

"<u>Transition Services Agreement</u>" is defined in <u>Section 6.10</u> below.

"<u>U.S.</u>" or "<u>United States</u>" means the United States of America.

## ARTICLE II
## PURCHASE AND SALE

2.1    **Purchased Assets**.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Sellers shall sell, transfer, assign, convey and deliver to Buyer (or its designated Affiliates), and Buyer (or its designated Affiliates) shall purchase from Sellers, free and clear to the extent provided in the Approval Order of all Liens (other than Permitted Liens), all of Sellers' right, title and interest in and to only the following-described assets of Sellers owned or held for use or used in the Business, wherever located (collectively, the "<u>Purchased Assets</u>"), but excluding all of the Excluded Assets:

(a)    all informational, marketing and promotional materials which relate exclusively to the Business, including, for clarity, all master files associated therewith (collectively, the "<u>Promotional Materials</u>");

(b)    all finished goods, work in process, labels, packaging materials and raw material inventory to the extent the same are held by Sellers or a third-party service provider exclusively for sale or use in the manufacturing process or in the operation of the Business, as listed or described on <u>Schedule 2.1(b)</u> (collectively, the "<u>Inventory</u>"), but subject in all cases to updating by Sellers at least two (2) Business Days prior to the Closing to reflect activity in the Business occurring during the period following mutual execution and delivery of this Agreement, and subject to Buyer's consent, such consent not to be unreasonably withheld;

(c)    all of each Seller's rights and interests, under the Contracts identified on <u>Schedule 2.1(c)</u> (collectively, the "<u>Assigned Contracts</u>"), which Schedule may be modified from the date hereof through three (3) Business Days prior to the Closing, subject to and in accordance with the provisions of <u>Section 2.3</u>;

(d)    all of each Seller's rights and interests relating to those deposits, credits, prepaid charges and expenses, deferred charges, and prepayments with respect to the Assigned Contracts, and all other prepaid items of the Business listed on <u>Schedule 2.1(d)</u>,[3] but subject in all cases to updating by Sellers at least two (2) Business Days prior to the Closing to reflect activity

---

[3] <u>Note to Seller</u>: Buyer would expect to see the entire prepayment with Arizona Custom Blends listed on this schedule.

in the Business or changes to such amounts occurring during the period following mutual execution and delivery of this Agreement, and subject to Buyer's consent, such consent not to be unreasonably withheld;

(e)    those Permits which relate exclusively to the Business, including those listed or described on Schedule 2.1(e);

(f)    all warranties (express and implied) relating exclusively to the Purchased Assets that continue in effect with respect to any Purchased Asset (including, without limitation, warranties provided for under any Assigned Contract);

(g)    such Intellectual Property as is exclusively used in connection with the Business or listed or described on Schedule 2.1(g)[4] hereto, but in all cases only to the extent of each Seller's interest therein, including without limitation, the Goodwill of the Business (collectively, the "Purchased Intellectual Property");

(h)    all of each Sellers' rights and interests to the MenoLife App (Android and iOS), including the information contained therein and generated thereby, and the related source code and executable code (the "Mobile App") and any other related products or services, including those listed or described on Schedule 2.1(h);

(i)    all Books and Records, to the extent relating exclusively to the Business;

(j)    any personal property held by Sellers at any Leased Real Property for use in connection with the Business, including, but not limited to, furniture and equipment unless otherwise excluded by Buyer prior to Closing, in its sole discretion; and

(k)    any other assets related to or used in the Business set forth on Schedule 2.1(k).

2.2    **Excluded Assets**.  Notwithstanding anything herein to the contrary, from and after the Closing, Sellers shall retain all of its right, title and interest in and to, and there shall be excluded from the sale, conveyance, assignment or transfer to Buyer hereunder, and the Purchased Assets shall not include any asset or property whatsoever not specifically included therein pursuant to Section 2.1 above, which excluded assets and properties shall include the following assets and properties (such retained assets and properties being collectively referred to herein as the "Excluded Assets"):

(a)    all cash and cash equivalents (including bank account balances, certificates of deposit and other time deposits and petty cash) and marketable and other securities;

(b)    all rights of each Seller under this Agreement and each Ancillary Agreement;

---

[4] Note to Seller: Schedule to include Amazon and Shopify storefronts and any other virtual storefronts operated by Seller.

(c)     all accounts and notes receivable (whether current or non-current) of each Seller and all rights and causes of action pertaining to the collection of the foregoing (whether or not arising out of the operation of the Business);

(d)     all cash deposits and prepaid items relating to or arising in connection with the operation of the Business, other than those described in Section 2.1(d);

(e)     all of the equity interests in each Seller and their subsidiaries or other Affiliates;

(f)     all Benefit Plans (including all trusts, insurance policies and administration service Contracts related thereto), all assets in respect of any Benefit Plan and any employment agreements of any Seller employee, including the Identified Employees;

(g)     any Contracts between a Seller, on the one hand, and any of their Affiliates, on the other hand, other than any specifically set forth on Schedule 2.1(c) (as the same may be modified and amended pursuant to Section 2.3 hereof), and any accounts or notes receivable due from any Affiliate of a Seller;

(h)     any Contract to which a Seller is a party that (i) is not an Assigned Contract or (ii) is an Assigned Contract but is not assumable and assignable pursuant to the terms thereof or as a matter of applicable law (including, without limitation, any Assigned Contract with respect to which any Consent requirement in favor of the counter-party thereto is not satisfied and may not be overridden pursuant to Section 365 of the Bankruptcy Code);

(i)     the organizational documents, minute books, member ledger, books of account or other records having to do with the incorporation of each Seller, and all employee related files or records, other than records related to Transferred Employees;

(j)     all Tax assets (including Tax refunds and prepayments) and Tax Returns of each Seller or any of its Affiliates for any period including, with respect to the Purchased Assets or the Business, for taxable periods ending on or prior to the Closing Date;

(k)     any Books and Records which Sellers are required by applicable Law to retain;

(l)     all insurance policies of Sellers, and all benefits, rights and claims and proceeds thereunder;

(m)     all refunds for prepaid insurance premiums or insurance prepayments;

(n)     all claims or causes of action of each Seller, including all preference or avoidance claims and actions of each Seller, including, without limitation, any such claims and actions arising under Sections 544, 547, 548, 549, and 550 of the Bankruptcy Code;

(o)     any personal property held by Sellers not assigned to Buyer pursuant to Section 2.1(j);

(p)    any software or other item of intangible property (including Intellectual Property) held by Sellers pursuant to any license or other Contract which is not an Assigned Contract or, in any event, where Buyer does not assume the underlying license or other Contract relating to any such intangible personal property at the Closing, or, for clarity, which is not Purchased Intellectual Property; and

(q)    any assets specifically set forth or described on <u>Schedule 2.2(q)</u>.

2.3    <u>**Nonassignable Assets; Deemed Consent; Additional Excluded Assets; Additional Assigned Contracts.**</u>

(a)    <u>Nonassignable Assets</u>.  Nothing in this Agreement, the Bill of Sale or the Contract Assignments or the consummation of the transactions contemplated hereby or thereby shall be construed as an attempt or agreement to assign or transfer any Purchased Asset (including any Assigned Contract or Permit) to Buyer which by its terms or by Law is not assignable or transferable without a Consent or is cancelable by a third party in the event of an assignment or transfer (a "<u>Nonassignable Asset</u>"), unless and until such Consent shall have been obtained (including by virtue of the effect of the Approval Order rendering certain Consents to be unnecessary) or Law satisfied.  Sellers and Buyer shall use diligent and commercially reasonable efforts to obtain any Consent that may be required and satisfy any Law necessary to the assignment or transfer of a Nonassignable Asset to Buyer, and Sellers shall take all such commercially reasonable efforts as may be necessary to effect the assignment or transfer of the Nonassignable Asset.  Unless and until any such Consent that may be required is obtained or Law satisfied, Sellers shall establish an arrangement reasonably satisfactory to Buyer under which Buyer would obtain the claims, rights and benefits and assume the corresponding liabilities and obligations under such Nonassignable Asset (including by means of any subcontracting, sublicensing or subleasing arrangement) or under which Sellers would enforce for the benefit of Buyer, with Buyer assuming and agreeing to pay Sellers' reasonable and documented expenses, any and all claims, rights and benefits of Sellers against a third party thereto.  Sellers shall promptly pay over to Buyer all payments received by such Seller in respect of all Nonassignable Assets.  If and when the applicable Consents or approvals, the absence of which caused the deferral of transfer of any Nonassignable Asset pursuant to this Section, are obtained, the transfer of the applicable Nonassignable Asset to Buyer shall automatically and without further action be effected in accordance with the terms of this Agreement.

(b)    <u>Deemed Consent</u>.  As part of the Sale Motion (or, as necessary in one or more separate motions), Sellers shall request that by providing adequate notice of its intent to assume and assign any Assigned Contract, if any, the Bankruptcy Court shall deem any non-debtor party to such Assigned Contract that does not file an objection with the Bankruptcy Court during the applicable notice period to have given any required Consent to the assumption of the Assigned Contract by Sellers and assignment to Buyer if, and to the extent that, pursuant to the Approval Order or other order of the Bankruptcy Court, Sellers are authorized to assume and assign such Assigned Contract to Buyer and Buyer is authorized to accept such Assigned Contract pursuant to Section 365 of the Bankruptcy Code.

(c)    <u>Additional Excluded Assets</u>. Notwithstanding any other provision of this Agreement to the contrary, until three (3) Business Days prior to the Closing, Buyer will have the

right, in its sole and absolute discretion, to provide written notice to Sellers of Buyer's election to designate any right, property, interest, Contract or other asset (or portion thereof) as an Excluded Asset (including any such asset that was immediately prior to such designation an Purchased Asset), and upon such designation such asset will constitute an Excluded Asset for all purpose of this Agreement.  If Buyer exercises its rights in this Section to designate any right, property, interest, Contract, or other asset (or portion thereof) as an Excluded Asset, then the Parties acknowledge and agree that there will be no increase or reduction in (and such designation shall not otherwise affect) the Purchase Price, except as relates to any change in the Assumed Liabilities, as a result of such designation or change in designation, nor will there be any delay of the Closing.

(d)    If, at any time prior to the date that is three (3) Business Days prior to the Closing (the "Contract Assessment Period"), Buyer desires to acquire any Contract exclusively related to the Purchased Assets or the Business to which a Seller is a party (any such Contract, a "Previously Omitted Contract"), Buyer shall deliver a written notice to Sellers designating such Previously Omitted Contract as an Assigned Contract. Buyer shall have the right at any time during the Contract Assessment Period to designate a Previously Omitted Contract as a Purchased Contract. If Buyer designates a Previously Omitted Contract as an Assigned Contract, (i) Schedule 2.1(c) shall be automatically deemed amended to include such Previously Omitted Contract, (ii) Sellers shall deliver to Buyer an updated Schedule 2.1(c), which shall include the true and complete Cure Cost (including a breakdown of the Buyer Paid Cure Costs and Seller Paid Cure Costs) for any such Previously Omitted Contract, and (iii) to the extent not previously served, Sellers shall serve a notice (the "Previously Omitted Contract Notice") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Costs with respect to such Previously Omitted Contract and such Seller's intention to assume and assign such Previously Omitted Contract in accordance with this Section 2.3(d). The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with fourteen (14) calendar days to object, in writing to Sellers and Buyer, to the Cure Costs, the proposed adequate assurance of future performance by Buyer or the assumption of its Contract. If the counterparties, Sellers, and Buyer are unable to reach a consensual resolution with respect to the objection prior to the Closing, Sellers will seek an expedited hearing before the Bankruptcy Court to determine the Cure Costs and approve the assumption and shall diligently prosecute such motion. Sellers shall use commercially reasonable efforts to obtain an Order of the Bankruptcy Court fixing the Cure Costs and approving the assumption and assignment of the Previously Omitted Contract.

2.4    **Liabilities.**

(a)    Subject to the terms and conditions of this Agreement, at the Closing, Buyer shall assume and agree to perform, pursuant to the Bill of Sale and the Contract Assignments, as applicable, the following Liabilities of Sellers (collectively, the "Assumed Liabilities"):

(i)    all Liabilities arising under the Assigned Contracts from and after the Closing;

(ii)    all Liabilities arising from the Purchased Assets or Buyer's operation of the Business, in each case solely to the extent such Liabilities relate to or arise after the period beginning on or after the Closing;

(iii)    the Buyer Paid Cure Costs;

(iv)    obligations to customers of Sellers for refunds, rebates, returns and discounts arising after the Closing; and

(v)    any product liability or warranty claims with respect to Products sold by Buyer after the Closing.

(b)    Except for the Assumed Liabilities described in Section 2.4(a) and notwithstanding anything to the contrary contained in this Agreement or any Ancillary Document, Buyer shall not assume, nor be obligated to pay, perform, satisfy or discharge, any claims, interests, obligations and/or Liability of each Seller or any Affiliate of Sellers, including the Seller Paid Cure Costs (collectively, such Liabilities other than Assumed Liabilities, the "Retained Liabilities"). For greater certainty, the Retained Liabilities shall remain the sole obligation and responsibility of Sellers and their Affiliates.

2.5    **Purchase Price**.  Subject to the provisions of this Agreement, the aggregate consideration to be paid by Buyer to Sellers for the Purchased Assets shall be $3,000,000 (the "Purchase Price"), plus the assumption of the Assumed Liabilities.  The cash portion of the Purchase Price shall be paid as and when and otherwise in accordance with the provisions of Section 3.2(a).

2.6    **Withholding**.  Notwithstanding any provision hereof to the contrary, each of Buyer, Sellers, and any of their Affiliates shall be entitled to deduct and withhold from any consideration otherwise payable under the terms of this Agreement such amounts as it is required to deduct and withhold pursuant to any provision of Law, including those related to or regarding Taxes; *provided that* no such withholding shall apply to any payments to Sellers hereunder unless Buyer has provided Sellers with at least ten (10) days' advance written notice of Buyer's intent to withhold and Buyer reasonably cooperates with Sellers to minimize or eliminate such withholding. To the extent that amounts are so deducted and withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

## ARTICLE III
## CLOSING; PAYMENT OF PURCHASE PRICE

3.1    **Closing**.  Unless this Agreement shall have been terminated in accordance with Section 9.1, the Parties shall consummate the transactions contemplated by this Agreement (the "Closing"), as promptly as practicable but in no event later than three (3) Business Days after the date on which all conditions set forth in Article VIII (except those conditions that are to be satisfied at Closing) have been satisfied (or waived by the Party entitled to the benefit of the same), with such Closing to occur at 10:00 a.m., Eastern Time, or at such other place, date and time as the Parties shall mutually agree in writing (the date on which the Closing occurs, the "Closing Date"). The Closing shall take place via wire transfer of immediately available good funds of the U.S. ("Good Funds") and electronic exchange of executed documents and other closing deliveries via email on the Closing Date.

3.2    **Closing Deliveries**.

(a)    <u>Payment of Purchase Price</u>.

(i)    Concurrently with the mutual execution and delivery of this Agreement, Buyer shall deliver to counsel for Sellers, Pachulski Stang Ziehl & Jones LLP, an amount equal to $300,000 (the "<u>Deposit</u>") by wire transfer of Good Funds, which such counsel shall hold in a trust account subject to the terms hereof concurrently with the mutual execution and delivery of this Agreement. The Deposit shall be held by Sellers' counsel and released as follows: (1) at the Closing, the Deposit shall be credited and applied toward payment of the Purchase Price (and paid to Sellers); (2) if Sellers terminate this Agreement prior to Closing pursuant to <u>Section 9.1(c)</u> or <u>Section 9.1(f)</u> (each, a "<u>Buyer Default Termination</u>"), then the Deposit shall become nonrefundable and shall be paid to Sellers for Sellers' own account; and (3) if this Agreement is terminated by Sellers or Buyer prior to Closing for any reason other than a Buyer Default Termination, then the Deposit shall be returned to Buyer. The Parties agree that the payment of the Deposit to Sellers as a result of a Buyer Default Termination shall not be the sole and exclusive remedy with respect to a Buyer Default Termination, but rather shall serve as setoff for any claim of breach or payment due to Sellers for breach by Buyer of this Agreement.

(ii)    At the Closing, Buyer shall authorize Sellers' counsel in writing to deliver the Deposit to Sellers, as provided in <u>Section 3.2(a)(i)(1)</u>.

(iii)    At the Closing, Buyer shall pay and deliver to Sellers, by wire transfer of Good Funds to one or more accounts designated by Sellers, an amount equal to $2,700,000 (which amount represents the cash portion of the Purchase Price <u>minus</u> the amount of the Deposit).

(b)    <u>Deliveries by Sellers at the Closing</u>. At the Closing, Sellers shall deliver to Buyer the following:

(i)    a Bill of Sale, Assignment and Assumption Agreement or similar document, in form and content reasonably acceptable to Buyer and Sellers (the "<u>Bill of Sale</u>"), duly executed by Sellers;

(ii)    one or more valid Assignment and Assumption Agreements or similar documents, in form and content reasonably acceptable to Buyer and Sellers, with respect to the Assigned Contracts, including, without limitation, an assignment of any real property leases included among the Assigned Contracts (collectively, the "<u>Contract Assignments</u>"), duly executed by Sellers and, if necessary, the respective counterparty, permitting Buyer and its Affiliates and sublicensees to utilize all rights and licenses under such Assigned Contracts;

(iii)    an Assignment of Trademarks and Domain Names, in form and content reasonably acceptable to Buyer and Sellers, duly executed by Sellers;

(iv)    the Sellers Closing Certificate;

(v)    a properly completed and duly executed IRS Form W-9 by each Seller;

(vi)    a true and complete copy of the Approval Order; and

(vii)    the Transition Services Agreement.

(c)    <u>Deliveries by Buyer at the Closing</u>.  At the Closing, Buyer shall deliver to Sellers the following:

(i)    the Bill of Sale, duly executed by Buyer;

(ii)    the Contract Assignments, duly executed by Buyer;

(iii)    the Buyer Closing Certificate; and

(iv)    the Transition Services Agreement.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF SELLERS**

Except as set forth in the Sellers Disclosure Schedules, which exceptions or disclosures set forth therein will be deemed to be a part of the representations and warranties made hereunder, hereby represents and warrants to Buyer as follows:

4.1    **Existence and Power**.  Each entity comprising part of each Seller is an entity that is duly organized, validly existing, and in good standing under the Laws of the state where organized.  Each Seller has all requisite entity power and authority required to own, lease, or, subject to the provisions of the Bankruptcy Code applicable to debtors in possession, operate the properties and assets now owned, leased or operated by it and to carry on its business as presently conducted.  Each Seller is duly qualified to transact business and is in good standing (or the equivalent thereof, if applicable) to transact business in each jurisdiction in which the nature of the business currently conducted by it requires such qualification.

4.2    **Authorization**.  Subject to entry of the Approval Order, each Seller has all requisite power and authority to execute and deliver, and to perform its obligations under, this Agreement and each Ancillary Document to which such Seller is a party.  The execution, delivery and performance by each Seller of this Agreement and such Ancillary Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of such Seller.

4.3    **Enforceability**.  This Agreement has been duly executed and delivered by each Seller. Upon entry of the Approval Order, this Agreement shall constitute (and each Ancillary Document to which such Seller is or will be a party will constitute at or prior to the Closing) a valid and legally binding obligation of each Seller, enforceable against such Seller in accordance with its terms, assuming that this Agreement and such Ancillary Documents, where applicable, have been duly executed by the other parties thereto, except as enforcement may be limited by General Enforceability Exceptions.

4.4    **Noncontravention**.  Subject to entry of the Approval Order, the execution, delivery and performance by the Company of this Agreement or any Ancillary Documents, and the consummation of the transactions contemplated hereby will not (a) violate or conflict with the Organizational Documents of each Seller, (b) violate any Law or any Order, in each case applicable

to Sellers, (c) constitute a default under, or give rise to termination, cancellation or acceleration of any right or obligation of each Seller under, or to a loss of any benefit to which such Seller is entitled under any Assigned Contract binding upon a Seller, or (d) result in the creation or imposition of any Lien (other than Permitted Liens) on any asset of Sellers.  Except for the Approval Order and as may be required under state securities Laws, no permit, Consent, approval or authorization of, notice or declaration to, or filing or registration with any Governmental Entity is required to be made or obtained by Sellers in connection with the consummation of the transactions contemplated by this Agreement or any Ancillary Document.

4.5    **Proceedings**.  There are no Proceedings (other than the Bankruptcy Case) pending or, to Sellers' Knowledge, threatened in writing by or against a Seller that seek or otherwise are reasonably expected to (x) materially adversely affect the ability of a Seller to consummate the transactions contemplated by this Agreement and the Ancillary Documents or (y) prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

4.6    **Brokers**.  Except for Intrepid Investment Bankers LLP (whose fees shall be paid by Sellers pursuant to a separate agreement), no broker, finder, financial advisor or other intermediary is or will be entitled to any fee or commission from Sellers in connection with the transactions contemplated by this Agreement.

4.7    **Compliance with Laws**. The Business is currently being, and for the past three (3) years has been, conducted in compliance, in all material respects, with all applicable Laws. No Seller has received any written notice of any actual or alleged material non-compliance or violation of any Laws in connection with the ownership of the Purchased Assets or the operation of the Business.

4.8    **Title; Sufficiency of Assets**.  Each Seller is the sole and exclusive owner or licensee, as applicable, of all right, title and interest in and to all Purchased Assets and holds all of its right, title and interest in and to all Purchased Assets free and clear of any Lien other than Permitted Liens.  Other than the Purchased Assets, and any services to be provided under the Transition Services Agreement, neither Sellers nor any of their Affiliates (a) owns, controls or has any right to use any other tangible or intangible assets that relate to any Product or the Business or (b) is a party to any contract or other agreement relating to any Product or the Business.

4.9    **Employee Benefits**.  Each Benefit Plan material to the Business is set forth on Section 4.9 of the Sellers Disclosure Schedules.  Each such Benefit Plan is in compliance in all material respects with its terms and with ERISA, the Code and other applicable Laws, and with all other agreements and instruments applicable to any Benefit Plan.  No violation of ERISA has at any time occurred in connection with the administration of any of such Benefit Plans, and there are no actions, suits, or claims (other than routine, non-contested claims for benefits) pending or threatened against the Benefit Plans, or any administrator or fiduciary thereof, which could result in any Liability.  Each pension plan (as defined in Section 3(2) of ERISA) of each Seller (if any) has, in operation, been qualified under the Code from the effective date of such pension plan and there have been no amendments or other developments since the effective date of such pension plan which would cause the loss of such qualified status.  Neither Seller nor any of their ERISA Affiliates, either currently or at any time in the past, maintains or maintained, contributes or contributed to, sponsors or sponsored or otherwise has or has had any Liability with respect to (i)

a multiemployer plan as defined in Section 3(37) of ERISA, or (ii) a pension plan subject to Title IV of ERISA or Sections 412 or 430 of the Code.  Neither Seller nor any ERISA Affiliate of each Seller provides, nor have they at any time provided, coverage under any welfare plan (as defined in Section 3(1) of ERISA) to any of their former employees, other than any continuation or conversion coverage.  The execution and performance of this Agreement will not (i) constitute a stated triggering event under any Benefit Plan that will result in any payment (whether of severance pay or otherwise) becoming due to any employee of the Sellers, (ii) accelerate the time of payment or vesting or increase the amount of compensation due under any Benefit Plan, (iii) cause any individual to accrue or receive additional benefits, service or accelerated rights to payment of benefits under any Benefit Plan, or (iv) directly or indirectly cause the each Seller or any ERISA Affiliate of such Seller to transfer or set aside any assets to fund or otherwise provide for benefits for any individual.  There are no contracts or arrangements providing for payments that could subject any Person to Liability for Tax under Section 4999 of the Code or cause the loss of a deduction to Seller under Section 280G of the Code as a result of the consummation of the transactions contemplated under this Agreement.

4.10    **Employment**. Neither Seller is a party to or bound by any collective bargaining agreement or any similar agreement with a union, works council or other labor organization. Neither Seller has any knowledge of any organizational effort presently being made or threatened by or on behalf of any labor union with respect to employees of such Seller.  There is no strike, labor dispute, slow down or work stoppage pending against a Seller or, to the Sellers' Knowledge, threatened against such Seller.  Each Seller has complied in all material respects with all applicable Laws relating to labor, labor relations or employment, including, without limitation, any provisions thereof relating to equal employment opportunity, wages, hours, worker classification, overtime regulation, employee safety and health, immigration control, drug testing, termination pay, vacation pay, fringe benefits, collective bargaining and the payment and/or accrual of the same and all Taxes, insurance and all other costs and expenses applicable thereto, and neither Seller is liable for any arrearage, or any Taxes, costs or penalties for failure to comply with any of the foregoing.  Within the past three years, there have not been any allegations, charges or complaints concerning employment discrimination, wage payment, overtime obligations or other issues pertaining to unlawful employment practices pending against a Seller or, to the Sellers' Knowledge, threatened, with respect to the Business, nor does either Seller know of any basis for any such allegation, charge or complaint.

4.11    **Intellectual Property**.

(a)    Section 4.11(a) of the Sellers Disclosure Schedules sets forth a correct and complete list of all Purchased Intellectual Property which is Owned Intellectual Property and registered or the subject of an application for registration, including the Mobile App and all registered trademarks, copyright registrations, domain names, and all applications therefor, indicating, for each such item of Purchased Intellectual Property, the owner, registration, patent or application number (as applicable), the applicable filing jurisdiction in which such item is applied for, issued or registered, the respective issuance registration or application of such item and the date of application or issuance or registration of such item. All Purchased Intellectual Property is subsisting, valid and enforceable.

(b)      Sellers or their Affiliates own, all right, title and interest in and to, free and clear of all Liens (other than Permitted Liens) all Owned Intellectual Property, or has a valid right to use, all other Purchased Intellectual Property, including the Mobile App.

(c)      As of the date hereof, no claims or, actions or Proceedings are pending or, to Sellers' Knowledge, threatened in writing, (i) of infringement, misappropriation or other violation of the Purchased Intellectual Property of any Person against a Seller or its Affiliates in respect of the conduct of the Business by each Seller or its Affiliates as presently conducted, or (ii) challenging the ownership, validity, enforceability or use of any Purchased Intellectual Property.

(d)      As of the date hereof, to Sellers' Knowledge, no Person is infringing, misappropriating or otherwise violating any Owned Intellectual Property, and no such claims have been asserted or threatened against any Person by a Seller, or to Sellers' Knowledge, any other Person.

(e)      Each Seller has taken all measures in accordance with standard industry practice to maintain the secrecy of any of the material Purchased Intellectual Property that it considers to be trade secrets or confidential information.

(f)      Neither Seller is a party to any Contract or subject to any Order that materially limits or restricts any of the Owned Intellectual Property, other than normal and routine off-the-shelf software license agreements. The consummation of the transactions contemplated by this Agreement will not impair any rights in or to any Owned Intellectual Property, or grant to any Person any rights in or to any Owned Intellectual Property.

(g)      Other than the Purchased Assets, neither Sellers nor any of their Affiliates owns or otherwise has any right, title or interest in or to any Intellectual Property necessary for any exploitation, development or commercialization of the Products.

4.12    **Exclusivity of Representations and Warranties**.   Except as set forth in this Article IV, neither Sellers nor any other Person is making any representation or warranty of any kind or nature whatsoever, oral or written, express or implied, relating to Sellers, the Purchased Assets or the Business (including any relating to financial condition, results of operations, assets or liabilities of Sellers), and Sellers hereby disclaims any such other representations or warranties. Without limiting the generality of the foregoing, neither Sellers nor any other Person on behalf of Sellers has made or makes, and Sellers hereby expressly disclaims, any representation or warranty, whether express or implied, with respect to any projections, forecasts, estimates or budgets provided to or made available to Buyer, its Affiliates or any of their respective Representatives (including the reasonableness of the assumptions underlying any of the foregoing).

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers as follows:

5.1    **Existence and Power**.  Buyer is an entity duly organized, validly existing, and in good standing under the Laws of the state where organized.

5.2    **Authorization**.  Buyer has all requisite power and authority to execute and deliver, and to perform its obligations under, this Agreement and each Ancillary Document to which Buyer is a party or subject.  The execution, delivery, and performance by Buyer of this Agreement and such Ancillary Documents and the consummation of the transactions contemplated hereby and thereby (a) are within Buyer's powers and (b) have been duly authorized by all necessary action on the part of Buyer.

5.3    **Enforceability**.  This Agreement has been duly executed and delivered by Buyer. This Agreement constitutes (and each Ancillary Document to which Buyer is or will be a party will constitute at or prior to the Closing) a valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms, assuming that this Agreement and such Ancillary Documents, where applicable, have been duly executed by the other parties thereto, except as enforcement may be limited by General Enforceability Exceptions.

5.4    **Governmental and Third Party Authorizations**. No Consent, approval or authorization of, declaration to or filing or registration with, any Governmental Entity or any other Person is required to be made or obtained in connection with the execution, delivery and performance by Buyer of this Agreement or any Ancillary Document or the consummation by Buyer of the transactions contemplated by this Agreement or any Ancillary Document.

5.5    **Noncontravention**.  The execution, delivery and performance by Buyer of this Agreement or any Ancillary Documents, and the consummation of the transactions contemplated hereby and thereby, will not (a) violate the Organizational Documents of Buyer, (b) violate any Law or Order, in each case applicable to Buyer, or (c) constitute a default under, or give rise to termination, cancellation or acceleration of any right or obligation of Buyer or to a loss of any benefit to which Buyer is entitled, under any contract, agreement, instrument, commitment or arrangement binding upon Buyer.

5.6    **Brokers**.  Except for any whose fee or commission would be borne and paid separately by Buyer and at Buyer's sole cost, no investment banker, broker, finder or other intermediary is or will be entitled to any fee or commission from Buyer or any of its Affiliates in connection with the transactions contemplated by this Agreement or any of the Ancillary Documents.

5.7    **Proceedings**.  There are no Proceedings pending or, to the knowledge of Buyer, threatened against Buyer or any of its Affiliates that seek or otherwise are reasonably expected to (x) materially adversely affect the ability of Buyer to consummate the transactions contemplated by this Agreement and the Ancillary Documents or (y) prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.

5.8    **Financial Capability**.

(a)    Sufficient Funds.  Buyer has, and will have on the Closing Date, unrestricted funds available sufficient to (i) consummate the transactions contemplated by this Agreement, including to make all payments at the Closing contemplated by Section 3.2(a), including payment

of the Purchase Price; and (ii) pay all costs and expenses and other amounts required to be paid by Buyer in connection with the Closing.  Buyer has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform all of its obligations hereunder, and Buyer has not incurred any Liability or restriction of any kind that would materially impair or materially adversely affect such resources and capabilities.

(b)      Obligations Not Conditioned on Financings.  In no event shall the receipt or availability of any funds by Buyer or any Affiliate or any other financing be a condition to any of Buyer's obligations under this Agreement.  Buyer understands and acknowledges and agrees that under the terms of this Agreement, Buyer's obligation to consummate the transactions contemplated by this Agreement is not in any way contingent upon or otherwise subject to Buyer's consummation of any financing arrangements, Buyer's obtaining any financing, or the availability, grant, provision or extension of any financing (whether equity, debt or otherwise) or similar accommodation to Buyer.

5.9      **Solvency**.  Buyer is solvent (a) as of the date of this Agreement and (b) at and immediately after the Closing, after giving effect to the transactions contemplated hereby (including the payment of the Purchase Price and all other amounts required to be paid, borrowed or refinanced in connection with the consummation of the transactions contemplated by this Agreement and all related fees and expenses of Buyer).

5.10      **Independent Investigation**.    Buyer has conducted its own independent investigation, review and analysis of Sellers, the Business, the Purchased Assets and the Assumed Liabilities, and acknowledges that it has been provided adequate access to the personnel, properties, premises, and other documents and data of Sellers for such purpose. Buyer acknowledges and agrees that: (a) in making its decision to enter into this Agreement and consummate the transactions contemplated by this Agreement, Buyer has relied solely upon its own investigation and the express representations and warranties of Sellers set forth in Article IV of this Agreement (including related portions of the Sellers Disclosure Schedules); and (b) neither Sellers nor any other Person has made any representation or warranty as to Sellers, the Business, the Purchased Assets or the Assumed Liabilities, except as expressly set forth in Article IV of this Agreement.  Except as otherwise provided in this Agreement, Buyer will accept the Purchased Assets at the Closing "AS IS, "WHERE IS," and "WITH ALL FAULTS." In connection with Buyer's investigation of Sellers, Buyer and its Affiliates may have received from or on behalf of Sellers certain estimates, projections, forecasts and plans, including projected statements of operating revenues and income from operations of Sellers and certain business plan information of Sellers. Buyer acknowledges that there are uncertainties inherent in attempting to make any such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections and forecasts), and that Buyer shall have no claim against Sellers or any of their Affiliates or any Representatives of any of the foregoing with respect thereto.

5.11      **Exclusivity of Representations and Warranties** Except as set forth in this Article V, neither Buyer nor any other Person is making any representation or warranty of any kind or

nature whatsoever, oral or written, express or implied, relating to Buyer or its Affiliates, and Buyer hereby disclaim any such other representations or warranties.

**ARTICLE VI**
**PRE-CLOSING COVENANTS**

6.1 **Conduct of Business**. Subject to the requirements of the Bankruptcy Code and as Buyer may otherwise consent to in writing (which consent shall not be unreasonably withheld, conditioned or delayed), from the date hereof through the Closing or the earlier termination of this Agreement:

(a) Sellers shall:

(i) continue to operate the Business in the Ordinary Course of Business;

(ii) perform all of their obligations under all Assigned Contracts, including the obligation to pay the Seller Paid Cure Costs (but, specifically excluding the obligation to pay the Buyer Paid Cure Costs);

(iii) maintain their Books and Records in the Ordinary Course of Business; and

(iv) comply in all material respects with all applicable Laws; and

(b) Sellers shall not:

(i) sell, lease, transfer, or assign any of the Purchased Assets, other than selling Inventory in the Ordinary Course of Business;

(ii) make any material change to the compensation of any of their directors, managers, Employees, or officers;

(iii) enter into, amend, or terminate any employment Contract, Benefit Plan or collective bargaining agreement;

(iv) terminate any Assigned Contract (other than upon any expiration of the term of any Assigned Contract), materially amend any Assigned Contract, or enter into any Contract that would be an Assigned Contract if such Contract was in effect on the date hereof, in each case;

(v) cancel, compromise, release or waive any material right of each Seller or any of their Affiliates related to the Purchased Assets; or

(vi) agree to do any of the foregoing.

(c) The provisions of this Section 6.1 are not intended to be, nor will they be construed as, an endeavor on the part of Sellers or Buyer to implement the transactions contemplated hereunder prior to the Closing (and satisfaction of the conditions in Article VIII) and

the Parties agree that Buyer will not, prior to the Closing, be entitled to exercise any control over the Business or affairs of Sellers.

6.2    **Pre-Closing Access to Information**.

(a)    From and after the date hereof until the earlier of the Closing Date or the termination of this Agreement in accordance with its terms, upon reasonable notice, and subject to restrictions contained in any confidentiality agreements to which Sellers are subject, Sellers shall provide to Buyer and its authorized Representatives during regular business hours reasonable access to all books and records of and documents and other information exclusively regarding the Business (in a manner so as to not unreasonably interfere with the normal business operations of Sellers or the Business).  Notwithstanding anything to the contrary set forth in this Agreement, during the period from the date hereof until the Closing, neither Sellers nor any of their Affiliates (including Sellers) shall be required to disclose to Buyer or any of its Representatives any information (A) if doing so would violate any Contract, fiduciary duty or Law to which Sellers or any of their Affiliates (including Sellers) is a party or is subject, (B) if Sellers reasonably determined upon the advice of counsel that doing so could result in the loss of the ability to successfully assert attorney-client and work product privileges, (C) if Sellers or any of their Affiliates, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation and such information is reasonably pertinent thereto, or (D) if Sellers reasonably determine that such information should not be disclosed due to its competitively sensitive nature. For the avoidance of all doubt, nothing in this Section 6.2(a) shall be deemed to give rise to a contingency or condition to Buyer's obligations (or any similar right) regarding Buyer's satisfaction with any information of any kind to which Buyer is given access or the right to prepare, evaluate or obtain prior to the Closing Date.

(b)    All information disclosed pursuant to Section 6.2(a), together with the terms of this Agreement and the information disclosed on the Sellers Disclosure Schedules, shall be treated as "Confidential Information" pursuant to the terms of the Confidentiality Agreement, the provisions of which are by this reference hereby incorporated herein.

6.3    **Supplemental Disclosure**.  From time to time prior to the Closing, Sellers shall have the right (but not the obligation) to supplement or amend the Sellers Disclosure Schedules with respect to any matter arising after the date hereof or, with respect to representations and warranties qualified by Sellers' Knowledge, of which Sellers become aware after the date hereof (each a "Schedule Supplement"), and each such Schedule Supplement shall automatically be deemed to be incorporated into and to supplement and amend the Sellers Disclosure Schedules. Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of termination rights contained in this Agreement or of determining whether or not the conditions in Article VIII have been met; *provided that* if as a result of matters disclosed in such Schedule Supplement, Buyer has the right to (pursuant to Section 9.1), but does not elect to, terminate this Agreement within five (5) Business Days of its receipt of such Schedule Supplement, then Buyer shall conclusively be deemed to have waived all conditions to its obligations hereunder or rights to terminate this Agreement with respect to the matters disclosed therein under Section 8.1 and Section 9.1 or otherwise.

6.4    **Efforts to Close**.

(a)    Subject to the terms of this Agreement, each of Buyer and Sellers shall use their respective commercially reasonable efforts to cause the conditions to Closing to be satisfied and the Closing to occur as promptly as reasonably practicable.

(b)    In the event any Proceeding by any Governmental Entity or other Person is commenced which challenges the validity or legality of the transactions contemplated hereby or seeks damages in connection therewith, the Parties agree to cooperate and use reasonable efforts to defend against such Proceeding and, if an injunction or other order is issued in any such action, suit or other proceeding, the Parties agree to take reasonable actions to have such injunction or other order lifted, in order to expeditiously consummate the consummation of the transactions contemplated by this Agreement prior to the Outside Date; *provided that* nothing in this Section 6.4(b) shall be deemed to extend or otherwise affect the Outside Date or the Parties' rights in connection therewith.

(c)    Buyer expressly acknowledges and agrees that Sellers and their Affiliates have no responsibility for or in connection with any financing (whether equity, debt, or otherwise) that Buyer may seek to raise in connection with the consummation of the transactions contemplated by this Agreement.

6.5    **Other Business Relations**.  Except as provided in Section 6.2, during the period from the date of this Agreement until the earlier of the Closing or the termination of this Agreement in accordance with its terms, Buyer hereby agrees that it is not authorized to and shall not (and shall not permit any of its Representatives or Affiliates to) contact any employee, customer, supplier, distributor or other material business relation of Sellers, regarding Sellers, their business or the transactions contemplated by this Agreement without the prior written (including by e-mail) consent of Sellers (which consent shall not be unreasonably withheld, conditioned or delayed).

6.6    **Bankruptcy Matters**.

(a)    Approval Order. In accordance with the Procedures Order, Sellers shall seek an order from the Bankruptcy Court authorizing and approving pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, inter alia, this Agreement and the transaction contemplated herein, which order shall be in form and content acceptable to Buyer and Sellers (the "Approval Order"). If requested by Sellers or the Bankruptcy Court, Buyer shall provide adequate assurance of future performance (satisfactory to the Bankruptcy Court) to the counterparties to the Assigned Contracts. Sellers shall use commercially reasonable efforts to obtain the Approval Order and, without limiting Buyer's obligations under the immediately preceding sentence, Buyer shall reasonably cooperate, if requested by Sellers, in such efforts.  If the Bankruptcy Court refuses to issue the Approval Order, then Buyer or Sellers may terminate this Agreement in accordance with Section 9.1(h).  In the event that a third party is approved by the Bankruptcy Court as the purchaser of the Purchased Assets (the "Successful Bidder") and Buyer's bid is the next highest bidder (the "Backup Bidder"), notwithstanding anything to the contrary in this Agreement, this Agreement shall not terminate, but rather shall become a "back-up bid" which shall remain open for acceptance by Sellers until the earlier of (i) the first Business Day after the closing of a transaction with the Successful Bidder or (ii) fifteen (15) days following the Outside Date.

(b)    Procedures Order. The transaction contemplated by this Agreement shall be conducted in all respects in accordance with the process and procedures established in and the provisions of the Procedures Order and Buyer agrees to be bound by the Procedures Order and the obligations thereunder, including in connection with, among other things, bidding, overbidding, the sale auction, refraining from collusion, return of deposits, and standing as the Backup Bidder for the Purchased Assets shall be as established and determined in accordance with the Procedures Order.

(c)    Competing Bids.  This Agreement and the transactions contemplated hereby are subject to Sellers' right and ability to consider higher or better competing bids with respect to the Business and the Purchased Assets in accordance with the Procedures Order.  In furtherance thereof, Sellers shall have the right to, and may cause their Representatives and Affiliates to, (a) initiate contact with, solicit or encourage submission of any inquiries, proposals, offers or bids by, and negotiate with, any Person (in addition to Buyer and its Affiliates) in connection with any sale or other disposition of the Purchased Assets and (b) respond to any request for information or due diligence inquiry, or make management available for such purposes, to any such Person.

6.7    **Access to Books and Records**.  After the Closing, Buyer and Sellers shall use reasonable efforts to maintain until the fifth (5th) anniversary of the Closing Date all Books and Records relating to Sellers or any of their assets or liabilities prior to the Closing, whether or not such Books and Records were included in the Purchased Assets, in the manner such Books and Records are maintained immediately prior to the Closing Date in all material respects.  For a period of five (5) years following the Closing, (a) Sellers or any of their Representatives, upon reasonable notice, shall have access during normal business hours to examine, inspect and copy such Books and Records, and (b) Buyer shall provide Sellers and their Representatives with, or cause to be provided to Sellers and their Representatives, such Books and Records as Sellers or their Representatives shall reasonably request in connection with any Proceeding to which a Seller is a party (including, without limitation, in connection with Sellers' (or their successor's) administration of the Bankruptcy Case) or in connection with the requirements of any Laws applicable to a Seller.  Sellers and their Representatives shall have the right to make copies of such Books and Records at Sellers' sole cost.  Buyer may require Sellers and their Representatives to execute a non-disclosure agreement prior to providing access to Books and Records.

6.8    **Employee Matters**.

(a)    Effective as of immediately before the Closing, Buyer shall offer (or cause its Affiliates to offer) employment, on such terms of employment as Buyer may reasonably determine, to not less than ninety percent (90%) of the employees of Sellers listed on Schedule 6.8(a) (collectively, the "Identified Employees").  All Identified Employees who accept such offers of employment with Buyer are hereinafter referred to as the "Transferred Employees" and such acceptance of offers shall be effective immediately after the Closing.   Notwithstanding the foregoing or anything else to the contrary in this Section 6.8 or any other provision of this Agreement, Buyer (i) shall not communicate with or solicit to hire (in each case, directly or indirectly) any of the Identified Employees or other employees of Sellers prior to the date which is ten (10) Business Days prior to the anticipated Closing Date, and (ii) shall not, without first obtaining Sellers' written consent (which consent Sellers may grant or withhold in their sole discretion) communicate with or solicit to hire (in each case, directly or indirectly) any of the

Identified Employees or other employees of Sellers who do not become Transferred Employees at the Closing during the period commencing on the Closing Date and ending on February 15, 2024. All communications (including, without limitation, interviews and offers of employment) by or on behalf of Buyer with the Identified Employees or other employees of Sellers shall be undertaken, conducted or made only as and when permitted by this <u>Section 6.8</u> and in accordance with the Confidentiality Agreement (with all discussions had and information of any type or nature obtained through such communications and interviews with any Identified Employee or other employees of Sellers being conclusively deemed to be confidential and subject to the use and disclosure restrictions set forth in the Confidentiality Agreement) and with all applicable Laws.

(b)    Buyer shall, or shall cause its Affiliates to, take commercially reasonable action to credit Transferred Employees for service earned on and prior to the Closing Date with Sellers and their Affiliates or any of their respective predecessors, to the extent that service is relevant for purposes of eligibility and vesting, but not for accrual of benefits (other than for the calculation of vacation, sick days or other paid time off ) under any employee benefit plan, program, policy, practice or arrangement maintained by Buyer and its Affiliates for such Transferred Employees (each a "<u>Buyer Benefit Plan</u>"); *provided that* nothing herein shall result in a duplication of benefits.

(c)    For purposes of each Buyer Benefit Plan, Buyer shall take commercially reasonable action to cause all preexisting condition exclusions of such Buyer Benefit Plan to be waived for each Transferred Employee and his or her covered dependents to the extent waived under any comparable Benefit Plan.  With respect to any Buyer Benefit Plan that provides group health benefits, Buyer shall take commercially reasonable action to cause any eligible expenses incurred by a Transferred Employee and his or her covered dependents during the portion of the plan year of any such  Benefit Plan ending on the date such Transferred Employee's participation in the corresponding Buyer Benefit Plan begins to be taken into account under the Buyer Benefit Plan for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such Transferred Employee and his or her covered dependents for the applicable plan year as if such amounts had been paid in accordance with such Buyer Benefit Plan.

(d)    Nothing contained herein is intended to or shall (i) confer upon any Transferred Employee any separate right to employment or continued employment with Sellers, Buyer or any of their respective Affiliates or any benefits under any applicable Benefit Plan or Buyer Benefit Plan, or (ii) create any third-party beneficiary rights or other rights of any kind with respect to any Person other than the Parties to this Agreement.

(e)    The provisions of this <u>Section 6.8</u> are for the sole benefit of the Parties and nothing herein, express or implied, is intended or shall be construed to (i) constitute the establishment or adoption of or an amendment to any employee benefit plan for purposes of ERISA or otherwise be treated as an amendment or modification of any Benefit Plan or other compensation or benefit plan, agreement or arrangement, (ii) limit the right of Sellers, Buyer or any of their respective Affiliates to amend, terminate or otherwise modify any Benefit Plan or other compensation or benefit plan, agreement or arrangement, (iii) prevent or restrict in any way the right of Buyer or any of its Affiliates to terminate, reassign, promote or demote any of the Employees after the Closing or to change the title, powers, duties, responsibilities, functions, locations or terms and conditions of employment of such Employees, or (iv) confer upon or give

any Person, other than the Parties and their respective permitted successors and assigns, any legal or equitable third-party beneficiary or other rights or remedies with respect to the matters provided for in this <u>Section 6.8</u>, under or by reason of any provision of this Agreement.

6.9    **Cross Border Agreements**.  To the extent that are any transactions contemplated herein which involve the conveyance, transfer or assignment of non-U.S. assets and Sellers and/or Buyer reasonably deems it necessary or appropriate to enter into short-form acquisition agreements, additional Intellectual Property assignment agreements, or other similar agreements or instruments (collectively, the "<u>Non-U.S. Transfer Agreements</u>") to effect the assignment or transfer of the applicable Purchased Assets, the assumption of the applicable Assumed Liabilities or the transition of non-U.S. employees pursuant to applicable non-U.S. local Law, the Buyer and Sellers shall enter into the Non-U.S. Transfer Agreements on a case-by-case basis as reasonably determined by such Parties. Each Non-U.S. Transfer Agreement shall be consistent with the terms of this Agreement, except to the extent modifications to such Non-U.S. Transfer Agreement are required by applicable Law (including any non-U.S. Law and all employment Laws applicable to the transactions contemplated herein) in order to consummate such transactions. Where such modifications are required, the Parties covenant and agree to give effect to the intent and terms hereof to the fullest extent permissible by applicable Law (and that any claims for breach under any Non-U.S. Transfer Agreement shall be brought under <u>Section 11.6</u> of this Agreement and each Party agrees not to, and to cause its Subsidiaries and their respective successors and assigns not to, bring any claims, actions or proceedings under, arising out of or relating to such Non-U.S. Transfer Agreement against the other parties to such Non-U.S. Transfer Agreement). The Parties covenant and agree to ensure that any signatures to the Non-U.S. Transfer Agreements are notarized and/or apostilled where required pursuant to applicable Law, to effect the legal assignment of the applicable Purchased Assets or the assumption of the applicable Assumed Liabilities pursuant to the applicable non-U.S. local Law.  Each Non-U.S. Transfer Agreement shall (a) be in a form reasonably acceptable to the Parties, (b) shall serve purely to effect the transfer of the applicable Purchased Assets, the assumption of the applicable Assumed Liabilities pursuant to the applicable non-U.S. local Law, or the transition of non-US employees, and (c) shall not have any effect on the value being given or received by the Buyer and Sellers, or the terms and conditions of the transactions contemplated herein, including the Allocation, or in any way modify, amend, or constitute a waiver of, any provision of this Agreement or any other Ancillary Document. For the avoidance of doubt, no Non-U.S. Transfer Agreement shall contain any representations, warranties or covenants other than those which are either (i) required to effect the transfer of the applicable Purchased Assets, the assumption of the applicable Assumed Liabilities or transition the applicable non-U.S. employees pursuant to the applicable non-U.S. local Law or (ii) mutually agreed upon by the Buyer and the Sellers.

6.10    **Transition Services Agreement**.  Buyer and Sellers shall negotiate in good faith to enter into a transition services agreement in form and substance reasonably acceptable to Buyer and Sellers (the "<u>Transition Services Agreement</u>"), to be effective as of the Closing, whereby Sellers will agree to provide Buyer with certain transition assistance services, at Buyer's sole cost and expense, to allow Buyer to obtain services under certain Contracts of Sellers related to the Business to be identified by Buyer and such other services needed to transition the Purchased Assets from Sellers to Buyer, for the period beginning on the Closing Date and continuing until the later of (i) forty-five days (45) following the Closing Date and (ii) the effective date of the Sellers' and their Affiliates' Chapter 11 plan of reorganization, or such other period as agreed by

the Parties on the schedules to the Transition Services Agreement, and for which Sellers' reasonable out of pocket costs, employee expenses and third party costs incurred by Sellers at Buyer's direction, shall be reimbursed by Buyer.

6.11    **Mobile App Shutdown**.  No later than two (2) Business days prior the Closing Date, Buyer shall have the right to request that Sellers (i) remove the Mobile App from all mobile application stores where the Mobile App is available for download and/or (ii) temporary disable access to the Mobile App for all users of the Mobile App; provided, that Buyer and Sellers shall cooperate on the most appropriate method for removing and disabling such downloads and access. In no event shall Sellers take the actions provided in this Section 6.11 unless requested to do so by Buyer in writing. Buyer shall have the right to waive the obligations of Sellers set forth in this Section 6.11, in its sole discretion, unless such request for removal is not delivered at least two (2) Business Days prior to the Closing Date, in which case, this covenant shall be of no further force and effect.

## ARTICLE VII
## COVENANTS OF BUYER AND SELLERS

7.1    **Public Announcements**.  Neither Buyer nor Sellers shall, nor shall any of their respective controlled Affiliates (including, with respect to Sellers prior to the Closing, and Buyer after Closing, Sellers), without the prior written approval of both Buyer and Sellers, issue any press release or otherwise make any public statement with respect to this Agreement or the transactions contemplated by this Agreement (any such press release or public statement so approved by the Parties, an "Agreed Statement"), *provided that* such restrictions on press releases and public statements shall not apply to (i) any disclosure as may be required by applicable Law or by obligations pursuant to any listing agreement with any national securities exchange or stock market, in which case the Party required to make the release or announcement shall allow the other Party reasonable time to comment on such release or announcement in advance of such issuance, (ii) any disclosure made in connection with the enforcement of any right or remedy relating to this Agreement or the Ancillary Documents or the transactions contemplated hereby or thereby, (iii) any disclosure that is consistent with (and does not reveal any information beyond what is already included in) a prior Agreed Statement, or (iv) any disclosure or statement made in the Bankruptcy Case that is required in connection with the filing of the Bankruptcy Case or appropriate in the furtherance of such filing, the administration of the Bankruptcy Case, or the transactions contemplated herein (including, without limitation, the Sale Motion).

7.2    **Tax Matters**

(a)    Prorations. Personal property, ad valorem, use and intangible taxes and assessments, common area maintenance charges, utility charges and rental payments with respect to the Purchased Assets (collectively, "Charges") shall be prorated on a per diem basis and apportioned on a calendar year basis between Sellers, on the one hand, and Buyer, on the other hand, as of the date of the Closing.  Sellers shall be liable for that portion of such Charges relating to, or arising in respect of, periods on or prior to the Closing Date, and Buyer shall be liable for that portion of such Charges relating to, or arising in respect of, any period after the Closing Date.

(b)    <u>Transfer Taxes</u>. Buyer shall pay all Transfer Taxes arising out of or in connection with the transactions contemplated by this Agreement. Buyer shall file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes and if required by applicable Law, Sellers shall join in the execution of any such Tax Returns and other documentation.

(c)    <u>Allocation of Purchase Price</u>. The Purchase Price and other items required to be included under shall be allocated among the Purchased Assets by Buyer. No later than 30 days following the Closing, Buyer shall prepare and provide to Sellers a proposed allocation (the "<u>Allocation</u>") for Sellers' review. Sellers shall have 30 days to review the Allocation. If Sellers do not notify Buyer in writing of any objections within such 30-day period or if Sellers and Buyer resolve all such objections, none of the Parties, nor any of their respective Affiliates, shall take any position (whether in financial statements, audits, tax returns or otherwise) which is inconsistent with the Allocation, unless required to do so by applicable Law. If prior to the end of such 30-day period, Buyer and Sellers are unable to so agree on the Allocation then such Allocation shall not be binding on the Parties. Sellers shall timely and properly prepare, execute, file and deliver all documents, forms and other information as Buyer may reasonably request to prepare the Allocation. In the event that the Allocation is binding on the Parties, (i) in case of any adjustment to the Purchase Price, requiring an amendment to the Allocation, Buyer shall prepare and deliver such amended Allocation to Sellers, which shall be prepared in a manner consistent with the Allocation, and (ii) if the Allocation is disputed by any Governmental Entity, the Party receiving notice of such dispute shall promptly notify the other Party.

7.3    **Wrong Pockets**. Without limiting Section 11.16, if either Buyer or Sellers becomes aware that any of the Purchased Assets, or any other asset exclusively related to the Business that was not previously identified as a Purchased Asset, has not been transferred to Buyer or that any of the Excluded Assets has been transferred to Buyer, it shall promptly notify the other and the Parties shall, as soon as reasonably practicable, ensure that such property is transferred, at the expense of Sellers and with any necessary prior third-party Consent or approval, to (a) Buyer, in the case of any Purchased Asset, or such other asset exclusively related to the Business that was not previously identified as a Purchased Asset but that Buyer or Sellers becomes aware of, that was not transferred to Buyer at the Closing; or (b) Sellers, in the case of any Excluded Asset that was transferred to Buyer at the Closing.

**ARTICLE VIII**
**<u>CONDITIONS TO CLOSING</u>**

8.1    **<u>Conditions to Obligations of Buyer</u>**. The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Buyer in writing and in Buyer's sole discretion) of the following conditions:

(a)    The representations and warranties of Sellers contained in <u>Article IV</u> of this Agreement shall be true and correct in all respects as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure of such representations and warranties to be true and correct would not have a Material Adverse Effect.

(b)     Each Seller shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by such Seller, on or prior to the Closing Date.

(c)     Buyer shall have received a certificate, dated as of the Closing Date and signed by an authorized officer of each Seller, to the effect that the conditions set forth in <u>Sections 8.1(a)</u> and <u>8.1(b)</u> have been satisfied (the "<u>Sellers Closing Certificate</u>").

(d)     Since the date of this Agreement, there shall not have occurred any event, change, occurrence or effect that, individually or together with all other events, changes, occurrences or effects, has had, or would reasonably be expected to have, a Material Adverse Effect on the Purchased Assets or Assumed Liabilities.

(e)     No temporary restraining order, preliminary or permanent injunction or other Order preventing the consummation of the transactions contemplated by this Agreement shall be in effect, there shall be no proceeding brought by any Governmental Entity pending before any court of competent jurisdiction seeking such an Order and there must not be in effect any applicable Law that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement.

(f)     The Bankruptcy Court shall have entered the Approval Order in accordance with <u>Section 6.6(a)</u>, and the Approval Order shall be unstayed and in full force and effect as of the Closing Date.

(g)     Each Seller has made or is prepared to immediately make all of the deliveries required by <u>Section 3.2(b)</u>.

8.2     <u>**Conditions to Obligations of Sellers**</u>.  The obligation of Sellers to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Sellers, in writing and in Sellers' sole discretion) of the following conditions:

(a)     The representations and warranties of Buyer set forth in <u>Article V</u> of this Agreement shall be true and correct in all respects as of the Closing Date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure of such representations and warranties to be true and correct would not have a material adverse effect on Buyer's ability to consummate the transactions contemplated hereby.

(b)     Buyer shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date.

(c)     Sellers shall have received a certificate dated as of the Closing Date by an authorized officer of Buyer to the effect that the conditions set forth in <u>Sections 8.2(a)</u> and <u>8.2(b)</u> have been satisfied (the "<u>Buyer Closing Certificate</u>").

(d)     No temporary restraining order, preliminary or permanent injunction or other Order preventing the consummation of the transactions contemplated by this Agreement

shall be in effect, there shall be no proceeding brought by any Governmental Entity pending before any court of competent jurisdiction seeking such an Order and there must not be in effect any applicable Law that would prohibit or make illegal the consummation of the transactions contemplated by this Agreement.

(e)    The Bankruptcy Court shall have entered the Approval Order in accordance with Section 6.6(a), and the Approval Order shall be unstayed and in full force and effect as of the Closing Date.

(f)    Buyer has made or is prepared to immediately make all of the deliveries required by Sections 3.2(a) and 3.2(c).

8.3    **Frustration of Closing Conditions**.  No Party may rely on or assert the failure of any condition set forth in this Article VIII, as the case may be, if such failure results from or was caused primarily by such Party's failure to comply with any provision of this Agreement.

8.4    **Waiver of Conditions**.  All conditions set forth in this Article VIII will be deemed to have been satisfied or waived from and after the Closing.

**ARTICLE IX**
**TERMINATION**

9.1    **Termination**.    This Agreement may be terminated, and the transactions contemplated herein may be abandoned, prior to the Closing solely as follows; *provided that* any Party desiring to terminate this Agreement pursuant to this Section 9.1 shall give written notice of such termination to the other Parties to this Agreement:

(a)    by the mutual written consent of Sellers and Buyer;

(b)    by Buyer, if any of the representations or warranties of Sellers set forth in Article IV shall not be true and correct such that the condition to Closing set forth in Section 8.1(a) would not be satisfied and the breach or breaches causing such representations or warranties not to be true and correct is not cured within five (5) days after written notice thereof is delivered from Buyer to Sellers; *provided that* Buyer shall not have the right to terminate this Agreement pursuant to this Section 9.1(b) if Buyer is then in material violation or breach of any of its covenants, obligations, representations or warranties set forth in this Agreement and such violation or breach would give rise to the failure of a condition set forth in Section 8.2(a) or Section 8.2(b);

(c)    by Sellers, if any of the representations or warranties of Buyer set forth in Article V shall not be true and correct such that the condition to Closing set forth in Section 8.2(a) would not be satisfied and the breach or breaches causing such representations or warranties not to be true and correct is not cured within five (5) days after written notice thereof is delivered from Sellers to Buyer; *provided that* Sellers shall not have the right to terminate this Agreement pursuant to this Section 9.1(c) if Sellers are then in material violation or breach of any of its covenants, obligations, representations or warranties set forth in this Agreement and such violation or breach would give rise to the failure of a condition set forth in Section 8.1(a) or Section 8.1(b);

(d)     by either Sellers or by Buyer if the Closing shall not have occurred on or before December 29, 2023 (the "Outside Date"); *provided that* Sellers or Buyer shall not have the right to terminate this Agreement pursuant to this Section 9.1(d) if the failure of the Closing to occur by the Outside Date results from or was caused by the failure of such terminating Party to comply with any provisions of this Agreement;

(e)     by either Buyer or by Sellers, if any Governmental Entity shall have issued an Order or taken any other action permanently enjoining, restraining or otherwise prohibiting the Closing and such Order or other action shall have become final and nonappealable; *provided that* the Party seeking to terminate this Agreement pursuant to this Section 9.1(e) shall have used reasonable efforts to remove such Order, injunction, restraint or prohibition, and such Order, injunction, restraint or prohibition shall not have been principally caused by the breach by such Party of its covenants or agreements under this Agreement;

(f)     by Sellers, if all of the conditions set forth in Section 8.2 (not including conditions which are to be satisfied by actions taken at the Closing; *provided that* such conditions shall have been capable of being satisfied as of the date of termination of this Agreement) have been satisfied or validly waived by Buyer, Sellers have given notice to Buyer in writing that Sellers are prepared to consummate the transactions contemplated by this Agreement (a "Sellers Closing Notice"), and Buyer fails to consummate the transactions contemplated by this Agreement on the date the Closing should have occurred pursuant to Section 3.1, or, if later, on the third (3rd) Business Day immediately following the date of delivery of such Sellers Closing Notice;

(g)     by Buyer, if all of the conditions set forth in Section 8.1 (not including conditions which are to be satisfied by actions taken at the Closing; *provided that* such conditions shall have been capable of being satisfied as of the date of termination of this Agreement) have been satisfied or validly waived by Sellers, Buyer has given notice to Sellers in writing that Buyer is prepared to consummate the transactions contemplated by this Agreement (a "Buyer Closing Notice"), and Sellers fail to consummate the transactions contemplated by this Agreement on the date the Closing should have occurred pursuant to Section 3.1, or, if later, on the third (3rd) Business Day following the date of delivery of such Buyer Closing Notice;

(h)     by Sellers or Buyer, if the Bankruptcy Court does not issue the Approval Order in accordance with Section 6.6(a), subject to this Agreement becoming a "back-up" bid under certain circumstances consistent with the requirements of the Procedures Order;

(i)     by Buyer, if Sellers withdraw or seek authority to withdraw the Sale Motion;

(j)     by Buyer, if (i) the Procedures Order is (x) amended, modified or supplemented without Buyer's prior written consent or (y) voided, reversed or vacated or is subject to a stay, or (ii) following entry by the Bankruptcy Court of the Approval Order, the Approval Order is (x) amended, modified or supplemented without Buyer's prior written consent or (y) voided, reversed or vacated or is subject to a stay;

9.2     **Effect of Termination**. Effect of Termination.  In the event of the termination of this Agreement pursuant to Section 9.1, this entire Agreement shall forthwith become void (and there shall be no liability or obligation on the part of Buyer, Sellers or their officers, directors or

equity holders) with the exception of (i) the provisions of Section 3.2(a)(i), Section 6.2(b), Section 9.1, this Section 9.2 and Article XI, together with all applicable defined terms set forth in Article I, each of which provisions shall survive such termination and remain valid and binding obligations of the Parties and (ii) any liability of any Party for any breach of this Agreement prior to such termination.  For the avoidance of doubt, the Confidentiality Agreement shall survive any termination of this Agreement in accordance with its terms and shall automatically be extended until such date that is two (2) years following the date of termination of this Agreement, and nothing in this Article IX shall be construed to discharge or relieve any party to the Confidentiality Agreement of its obligations thereunder.

## ARTICLE X
## SURVIVAL AND RELEASE

10.1    **Survival**.  The representations and warranties of Sellers and Buyer and, except as provided in the last sentence of this Section 10.1, the covenants and agreements of Sellers and Buyer contained in this Agreement and in any certificate delivered pursuant to this Agreement shall terminate and cease to be of any further force or effect whatsoever upon the Closing.  Sellers and Buyer shall have no liability after the Closing for any inaccuracy in or breach of such representations and warranties.  None of Buyer, Sellers or any of their Affiliates or their respective Representatives shall have recourse against the other Party under this Agreement following the Closing for any breach of or inaccuracy in any such representation or warranty or any breach or nonfulfillment of covenant, condition or agreement required to be performed or fulfilled prior to the Closing.  Notwithstanding the foregoing, the covenants and agreements that by their terms survive the Closing (or that contemplate action or impose obligations after the Closing) shall so survive the Closing in accordance with their respective terms.

## ARTICLE XI
## MISCELLANEOUS

11.1    **Notices**.    Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given:  (a) on the date established by the sender as having been delivered personally, (b) on the date delivered by a private courier as established by the sender by evidence obtained from the courier, (c) on the date delivered by email (if sent prior to 5:00 p.m.  New York City time, or if sent later, then on the next Business Day), or (d) on the fifth Business Day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications, to be valid, must be addressed as follows:

If to Buyer, to:

Dr. Reddy's Laboratories, Inc.
107 College Road East
Princeton, New Jersey 08540
Attn: CEO – North America
Email: Mkikuchi@drreddys.com

and

Dr. Reddy's Laboratories, Inc.
107 College Road East
Princeton, New Jersey 08540
Attn: Head of Business Development
Email: amukhopadhyay@drreddys.com

and

Dr. Reddy's Laboratories, Inc.
107 College Road East
Princeton, New Jersey 08540
Attn: Legal Affairs
Email: Bdixon@drreddys.com;
Vbrill@drreddys.com;vivekmittal@drreddys.com

With a required copy (which shall not constitute notice) to:

Arnold & Porter Kaye Scholer LLP
250 W 55th Street
New York, NY 10019
Attn: Benjamin Mintz; Niket Rele; Betty Yan
Email: benjamin.mintz@arnoldporter.com; niket.rele@arnoldporter.com;
betty.yan@arnoldporter.com

If to Sellers, to:

Amyris Clean Beauty, Inc.
5885 Hollis Street, Suite 100
Emeryville, CA 94608
Attn:  General Counsel
Email: generalcounsel@amyris.com

With a required copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
One Sansome Street, Suite 3430
San Francisco, CA  94104
Attn: Debra I. Grassgreen, Jason Rosell and Steven Golden
E-mail: dgrassgreen@pszjlaw.com; jrosell@pszjlaw.com; and
sgolden@pszjlaw.com

or to such other address or to the attention of such Person or Persons as the recipient Party has specified by prior written notice to the other Parties hereto.

11.2   **Amendments and Waivers**.  Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and is duly executed, in the case of an amendment, by each Party to this Agreement, or in the case of a waiver, by the Party against whom the waiver is to be effective.  No failure or delay by any Party in exercising any right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.

11.3   **Expenses**.  Except as otherwise provided in this Agreement, each Party shall bear its own costs and expenses in connection with the negotiation, documentation and consummation of the transactions contemplated by this Agreement, including all legal, accounting, financial advisory, consulting and all other fees and expenses of third parties, whether or not the transactions contemplated by this Agreement are consummated.

11.4   **Successors and Assigns**.  This Agreement may not be assigned by any Party (whether by operation of law or otherwise) without the prior written consent of the other Party(ies); provided, however, that Buyer may assign this Agreement or any of its rights or obligations hereunder without Sellers' consent to (i) an Affiliate so long as Buyer remains liable for the obligations to Sellers hereunder or (ii) an acquiror of all or substantially all of the Business.  Subject to the foregoing, all of the terms and provisions of this Agreement shall inure to the benefit of and be binding upon the Parties and their respective permitted successors and assigns.  Any attempted or purported assignment that is not in strict accordance with the terms of this <u>Section 11.4</u> shall be void <u>ab initio</u>.

11.5   **Governing Law**.  This Agreement and the exhibits and schedules hereto shall be governed by and interpreted and enforced in accordance with the Laws of the State of Delaware, without giving effect to any choice of Law or conflict of Laws rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, except to the extent that the laws of such state are superseded by the Bankruptcy Code and orders of the Bankruptcy Court.

11.6   **Consent to Jurisdiction; Service of Process; Waiver of Jury Trial**.  Any suit, action or other proceeding arising out of or relating to this Agreement or any transaction contemplated hereby shall be brought exclusively in the shall be brought exclusively in the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken.  Each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken for the purpose of any such suit, action or other proceeding.  A final judgment in any such suit, action or other proceeding may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Each Party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in such court, and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.  Each Party further agrees that service of any process, summons, notice or document by U.S. registered mail to such Party's

respective address set forth herein shall be effective service of process for any such action, suit or proceeding. Nothing in this Section 11.6, however, shall affect the right of any Party to serve legal process in any other manner permitted by Law. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF.

11.7    **Counterparts**.

(a)    This Agreement may be executed in counterparts, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This Agreement shall become effective when each Party shall have received a counterpart hereof signed by the other Party. The Parties agree that the delivery of this Agreement, the Ancillary Documents and any other agreements and documents at the Closing may be effected by means of an exchange of facsimile signatures or other electronic delivery. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or scanned pages shall be effective as delivery of a manually executed counterpart to this Agreement.

(b)    No Party shall raise the use of a facsimile machine or electronic transmission to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic transmission as a defense to the formation or enforceability of this Agreement and each Party forever waives any such defense. The words "execution," "executed", "signed," "signature," and words of like import in this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf," "tif" or "jpg") and other electronic signatures (including, without limitation, SignNow and DocuSign).

11.8    **No Third Party Beneficiaries**. No provision of this Agreement is intended to or shall confer upon any Person other than the Parties any rights or remedies of any nature whatsoever under or by reason of this Agreement.

11.9    **Entire Agreement**. This Agreement, the Ancillary Documents, schedules, including the Sellers Disclosure Schedules and the other documents, instruments and agreements specifically referred to herein or therein or delivered pursuant hereto or thereto, together with the Confidentiality Agreement, set forth the entire understanding of the Parties with respect to the subject matter hereof and the transactions contemplated hereby. All schedules, including any Sellers Disclosure Schedule, referred to herein are intended to be and hereby are specifically made a part of this Agreement and incorporated by reference herein. Any and all previous agreements and understandings between or among the Parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement, except for the Confidentiality Agreement which shall continue in full force and effect in accordance with its terms.

11.10  **Disclosure Schedules**.  Except as otherwise provided in the Sellers Disclosure Schedules, all capitalized terms therein shall have the meanings assigned to them in this Agreement.  Matters reflected in the Sellers Disclosure Schedules are not necessarily limited to matters required by this Agreement to be disclosed.  No disclosure made in the Sellers Disclosure Schedules shall constitute an admission or determination that any fact or matter so disclosed is material, has had or could reasonably be expected to have a Material Adverse Effect, meets a dollar or other threshold set forth in this Agreement or would otherwise be required to be disclosed, and no Person shall use the fact of the setting of a threshold or the inclusion of such facts or matters in any dispute or controversy as to whether any obligation, amount, fact or matter is or is not material for purposes of this Agreement.  Information disclosed in any Sellers Disclosure Schedule delivered will qualify any representation and warranty in this Agreement to the extent that a reasonable buyer would infer, based solely on the face of the applicable disclosure, the relevance or applicability of the information disclosed to any such representation or warranty, notwithstanding the absence of a reference or cross-reference to such representation or warranty on any such Sellers Disclosure Schedule or Sellers Disclosure Schedule or the absence of a reference or cross reference to such Sellers Disclosure Schedule in such representation or warranty.  No disclosure in the Sellers Disclosure Schedules relating to any possible breach or violation of any agreement or Law shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

11.11  **Captions**.  All captions and section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement.

11.12  **Remedies**  The Parties agree that irreparable damage would occur in the event that either Party fails to perform any of the provisions of this Agreement in accordance with their specific terms.  Accordingly, the Parties shall be entitled to pursue specific performance of the terms hereof, including an injunction or injunctions to prevent breaches of this Agreement by the breaching Party and to enforce specifically the terms and provisions of this Agreement, this being in addition to any other remedy to which the non-breaching Party is entitled at law or in equity.  The Parties hereby further waive (a) any defense in any action for specific performance that a remedy at law would be adequate and (b) any requirement under any law to post security as a prerequisite to obtaining equitable relief.

11.13  **Severability**.  Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Upon such determination that any term or other provision of this Agreement is invalid, illegal or unenforceable under applicable Law, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

11.14  **Interpretation**.  The Parties have participated jointly in the negotiation and drafting of this Agreement, and any rule of construction or interpretation otherwise requiring this Agreement to be construed or interpreted against any Party by virtue of the authorship of this

Agreement shall not apply to the construction and interpretation hereof.  The Parties agree that any drafts of this Agreement or any Ancillary Document prior to the final fully executed drafts shall not be used for purposes of interpreting any provision thereof, and each of the Parties agrees that no Party or any Affiliate thereof shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any Proceeding among any of the foregoing.  For the purposes of this Agreement, except as otherwise expressly provided herein or unless the context otherwise requires:  (a) the meaning assigned to each term defined herein shall be equally applicable to both the singular and the plural forms of such term and vice versa, and words denoting either gender shall include both genders as the context requires; (b) where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning; (c) the terms "hereof," "herein," "hereunder," "hereby" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement (including any exhibit or schedule hereto) as a whole and not to any particular provision of this Agreement; (d) when a reference is made in this Agreement to an Article, Section, paragraph, Exhibit or Schedule, such reference is to an Article, Section, paragraph, Exhibit or Schedule to this Agreement (provided that references to "Schedules" herein shall be deemed to refer to the applicable schedule of the Sellers Disclosure Schedule or the Sellers Disclosure Schedule), unless otherwise specified; (e) the word "include," "includes," and "including" when used in this Agreement shall be deemed to be followed by the words "but not limited to," unless otherwise specified; (f) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if" and (g) all accounting terms used and not defined herein have the respective meanings given to them under GAAP.  All dollar or "$" amounts set forth in this Agreement shall refer to U.S. dollars unless explicitly indicated otherwise.  Time is of the essence for each and every provision of this Agreement.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" mean "to but excluding" and the word "through" means "to and including".  Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a day that is not a Business Day, the Party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day that is a Business Day.  Any reference in this Agreement to "made available" means a document or other information that was provided or made available to Buyer and its Representatives in Sellers' electronic or virtual data rooms, management presentations or in any other form.

11.15  **Prevailing Party**.  In the event of any Proceeding in connection with this Agreement or any Ancillary Document, the prevailing Party in any such Proceeding shall be entitled to recover from the other Party its costs and expenses, including, without limitation, reasonable legal fees and expenses.

11.16  **Further Assurances**.  Following the Closing, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances, and take such further actions (at no material cost or expense to the Party to whom the request is directed) as may be reasonably required to carry out the provisions hereof and give effect to the Closing transactions contemplated by this Agreement; *provided that* neither Party shall be required by this Section 11.16 to initiate or join in any Proceeding.  After the Closing, Sellers shall promptly, but in no event no later than 30 days after receipt, transfer or deliver to Buyer cash, checks (which shall be properly endorsed) or other property that Sellers may

receive in respect of any item that constitutes part of the Purchased Assets or relates to the Assumed Liabilities.  After the Closing, Buyer shall promptly, but in no event no later than 30 days after receipt, transfer or deliver to Sellers cash, checks (which shall be properly endorsed) or other property that Buyer may receive in respect of any item that is an Excluded Asset or relates to the Retained Liabilities.

11.17    **Personally Identifiable Information**.  Buyer shall honor and observe all material terms of the written policies of Sellers in effect on the date the Case was commenced restricting or regarding the transfer of Personally Identifiable Information that is among the Purchased Assets, which policies are identified on <u>Schedule 11.17</u> and a copy of each of which has been provided to Buyer, and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

*    *    *    *

[Signature page follows]

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed on its behalf as of the date first above written.

**SELLERS:**

**Amyris, Inc.,**
**Chapter 11 Debtor and Debtor in Possession**

By: _Han Kieftenbeld_
A144E0E76B6E45A...

Name: Han Kieftenbeld
Title: Interim CEO and CFO


**Amyris Clean Beauty, Inc.,**
**Chapter 11 Debtor and Debtor in Possession**

By: _Han Kieftenbeld_
A144E0E76B6E45A...

Name: Han Kieftenbeld
Title: Chief Financial Officer

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be duly executed on its behalf as of the date first above written.

**BUYER:**

**DR. REDDY'S LABORATORIES, INC.**

By: _____

　　Name:  Marc Kikuchi

　　Title:  CEO – North America

*Legal*
*BSD*
*VMB*

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**SCHEDULES AND EXHIBIT "A"**

## **Schedule 1.1(b) – Permitted Liens**

None.

## Schedule 2.1(b) – Inventory (as of October 31, 2023)

| SKU | Material Description | Location | Department | Legal Entity | Ending Inv Qty On-hand | Asset Account: Number | Asset Account: Name | Inventory Type |
|---|---|---|---|---|---|---|---|---|
| MENOFITLITE | MenoFit Lite (Walmart) | MenoLabs Warehouse | | AMYRIS CLEAN BEAUTY, INC. | 3,440 | | | Finished Goods |
| WELLRESTEDWM | Well Rested (Walmart) | MenoLabs Warehouse | | AMYRIS CLEAN BEAUTY, INC. | 3,562 | | | Finished Goods |
| GODDESSGLOWv2 | Goddess Glow (Walmart) | MenoLabs Warehouse | | AMYRIS CLEAN BEAUTY, INC. | 7,987 | | | Finished Goods |
| GODDESSGLOW | Goddess Glow Collagen | MenoLabs Warehouse | | AMYRIS CLEAN BEAUTY, INC. | 13,388 | | | Finished Goods |
| HAPPYFIBERv2 | Happy Fiber (Walmart) | MenoLabs Warehouse | | AMYRIS CLEAN BEAUTY, INC. | 14,105 | | | Finished Goods |
| WELLRESTED | Well Rested Sleep Supplement | MenoLabs Warehouse | | AMYRIS CLEAN BEAUTY, INC. | 16,571 | | | Finished Goods |
| MENOGLOW | MenoGlow Probiotic | MenoLabs Warehouse | | AMYRIS CLEAN BEAUTY, INC. | 17,070 | | | Finished Goods |
| ATHENASSHIELD | Athena's Shield (DIM) | MenoLabs Warehouse | | AMYRIS CLEAN BEAUTY, INC. | 29,214 | | | Finished Goods |
| HAPPYFIBER | Happy Fiber | MenoLabs Warehouse | | AMYRIS CLEAN BEAUTY, INC. | 41,081 | | | Finished Goods |
| MENOFIT | MenoFit Probiotic | MenoLabs Warehouse | | AMYRIS CLEAN BEAUTY, INC. | 106,220 | | | Finished Goods |
| KEEPGLOWING | Keep Glowing Gorgeous | MenoLabs Warehouse | | AMYRIS CLEAN BEAUTY, INC. | 254,552 | | | Finished Goods |
| 2001020 | Tension Relief Bulk - Formula No. BK-21-0067 | GS Cosmetics | 13717 - Menolabs Manufacturing | AMYRIS CLEAN BEAUTY, INC. | 934 | 140310 | Inventory-WIP Autopost | WIP |

**<u>Schedule 2.1(c) – Assigned Contracts</u>**

1.  Brand Partner Supply Agreement, dated as of August 1, 2023, by and between MenoLabs, LLC and Grove Collaborative, Inc., [and any related purchase orders].

2.  Standard Vendor Agreement, dated as of December 31, 2021, by and between MenoLabs, LLC and The Kroger Co., [and any related purchase orders].

3.  Digital Merchandising, dated as of November 15, 2021, by and between MenoLabs, LLC and The Kroger Co., [and any related purchase orders].

## **Schedule 2.1(d) – Deposits, Credits, and Prepayments**

Any deposit or prepayment held by Arizona Custom Blends.

## **Schedule 2.1(e) – Permits**

None.

**<u>Schedule 2.1(g) – Purchased Intellectual Property</u>**

**Trademarks**

| Title | Image | Country | International Classes | Goods and Services | Official No. | Application No. | Application Date | Registration No. | Registration Date | Status |
|---|---|---|---|---|---|---|---|---|---|---|
| ATHENA'S SHIELD | | United States | 05 | 05 - Dietary supplements | | 97/560,343 | 08/23/2022 | | | Suspended |
| DIM (Logo) |  | United States | 05 | 05 - Dietary and nutritional supplements | | 90/366,121 | 12/08/2020 | 6,714,342 | 04/26/2022 | Registered |
| FRESH START | | N/A | N/A | N/A | | N/A | N/A | N/A | N/A | Unregistered |
| GODDESS GLOW BEAUTY COLLAGEN | | United States | 05 | 05 - Nutritional supplements containing collagen | | 90/394,455 | 12/18/2020 | 6,599,210 | 12/21/2021 | Registered |
| GODDESS GLOW BEAUTY COLLAGEN (Logo) |  | United States | 05 | 05 - Nutritional supplements | | 90/398,746 | 12/21/2020 | 6,599,216 | 12/21/2021 | Registered |
| HAPPY FIBER | | United States | 05 | 05 - Dietary and nutritional supplements | | 90/189,559 | 09/17/2020 | 6,577,827 | 11/30/2021 | Registered |
| HAPPY FIBER | | United States | 05 | 05 - Dietary and nutritional supplements | | 90/189,559 | 09/17/2020 | 6,577,827 | 11/30/2021 | Registered |
| HAPPY FIBER (Logo) |  | United States | 05 | 05 - Dietary and nutritional supplements | | 90/352,195 | 12/01/2020 | 6,599,177 | 12/21/2021 | Registered |
| KEEP GLOWING GORGEOUS | | N/A | N/A | N/A | | N/A | N/A | N/A | N/A | Unregistered |
| MENOCHILL | | United States | 05 | 05 - Nutritional supplements | | 88/648,188 | 10/09/2019 | 6,103,708 | 07/14/2020 | Registered |
| MENOFIT | | Australia | 05 | 05 - Nutritional supplements | | IR1534848 | 05/06/2022 | IR1534848 | 01/05/2021 | Registered |
| MENOFIT | | Canada | 05 | 05 - Nutritional supplements for general health and well-being | | IR1534848 | 05/06/2022 | IR1534848 | 09/21/2022 | Registered |
| MENOFIT | | China | 05 | 05 - Nutritional supplements | | IR1534848 | 05/06/2022 | | | Abandoned |
| MENOFIT | | EU | 05 | 05 - Nutritional supplements | | IR1534848 | 05/06/2022 | IR1534848 | 10/29/2020 | Registered |
| MENOFIT | | India | 05 | 05 - Nutritional supplements | | IR1534848 | 05/06/2022 | | | Abandoned |
| MENOFIT | | Mexico | 05 | 05 - Nutritional supplements | | IR1534848 | 05/06/2022 | IR1534848 | 09/20/2021 | Registered |
| MENOFIT | | New Zealand | 05 | 05 - Nutritional supplements | | IR1534848 | 05/06/2022 | IR1534848 | 03/02/2021 | Registered |
| MENOFIT | | UK | 05 | 05 - Nutritional supplements | | IR1534848 | 05/06/2022 | IR1534848 | 09/09/2020 | Registered |
| MENOFIT | | UK | 05 | 05 - Nutritional supplements | | UK00801534848 | 05/06/2022 | UK00801534848 | 10/29/2020 | Registered |
| MENOFIT | | United States | 05 | 05 - Nutritional supplements | | 88/648,114 | 10/09/2019 | 6,103,706 | 07/14/2020 | Registered |
| MENOFIT | | WIPO | 05 | 05 - Nutritional supplements | | IR1534848 | 05/06/2022 | IR1534848 | 05/06/2022 | Registered |
| MENOFIT (Logo) |  | United States | 05 | 05 - Nutritional supplements | | 90/352,152 | 12/01/2020 | 6,477,605 | 09/07/2021 | Registered |
| MENOGLOW | | United States | 05 | 05 - Nutritional supplements | | 88/648,068 | 10/09/2019 | 6,103,704 | 07/14/2020 | Registered |
| MENOGLOW (Logo) |  | United States | 05 | 05 - Nutritional supplements | | 90/352,076 | 12/01/2020 | 6,477,598 | 09/07/2021 | Registered |
| MENOGUARD | | United States | 05 | 05 - Nutritional supplements | | 88/648,165 | 10/09/2019 | 6,103,707 | 07/14/2020 | Registered |
| MENOLABS | | United States | 05 | 05 - Nutritional supplements | | 88/648,011 | 10/09/2019 | 6,149,323 | 09/08/2020 | Registered |
| MENOLIFE | | United States | 09 | 09 - Downloadable mobile applications for delivering educational content for women in perimenopause and menopause | | 88/648,220 | 10/09/2019 | 6,103,709 | 07/14/2020 | Registered |
| VIVA VOLUME | | United States | 05 | Dietary supplements. | 98/075673 | 98/075673 | 7/7/2023 | | | Pending |
| WELL RESTED | | Australia | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | | | Pending/Drop |
| WELL RESTED | | Canada | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | | | Pending |
| WELL RESTED | | China | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | | | Abandoned |
| WELL RESTED | | EU | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | | | Abandoned |
| WELL RESTED | | India | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | | | Pending |
| WELL RESTED | | ITALY | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | | | Pending |
| WELL RESTED | | Mexico | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | IR1670696 | 02/14/2023 | Registered |
| WELL RESTED | | New Zealand | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | | | Pending |
| WELL RESTED | | UK | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | | | Abandoned |
| WELL RESTED | | United States | 05 | 05 - Natural sleep aid preparations | | 97/165,117 | 12/09/2021 | 6,948,089 | 01/10/2023 | Registered |
| WELL RESTED | | WIPO | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | IR1670696 | 06/09/2022 | Registered |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| WELL RESTED BY MENOLABS | UK | 05 | 05 - Dietary supplements | UK00003829064 | 09/13/2022 | UK00003829064 | 01/27/2023 | Registered |
| WELL RESTED BY MENOLABS | United States | 05 | 05 - Natural sleep aid preparations | 90/189,589 | 09/17/2020 | 6,834,623 | 08/30/2022 | Registered |
| WELL RESTED BY MENOLABS (Logo) | United States | 05 | 05 - Natural sleep aid preparations | 90/352,230 | 12/01/2020 | 6,714,298 | 04/26/2022 | Registered |



## Domain Names

menoadvisors.com
menoadvisors.live
menoadvisors.org
menochill.com
meno-chill.com
menoclinic.org
menofit.co
meno-fit.com
menofit.net
menoguard.com
menoinstitute.com
menolabs.com
menolife.app
menolife.com
menolife.org
myvipbottle.com

## Domain Names

Amazon Storefront (Seller ID for US Seller Central account: A113DG75J779LD)
MenoLabs Storefront (through Shopify)

## Social Media
**Facebook active**

· https://www.facebook.com/MENOLABS
· https://www.facebook.com/groups/2032549950181033
· https://www.facebook.com/MenoFit

**Facebook inactive:**

· MenoGlow - https://www.facebook.com/profile.php?id=100027948986710
· MenoChill- https://www.facebook.com/profile.php?id=100063549161135
· MenoGuard - https://www.facebook.com/menoguard
· MenoLife - https://www.facebook.com/profile.php?id=100063593081257

**Instagram**
• https://www.instagram.com/menolabs/

**TikTok**
• https://www.tiktok.com/@menolabs?lang=en

**Pinterest**
• https://www.pinterest.com/menolabs/

**Twitter**
• https://twitter.com/MenoLabs

## **Schedule 2.1(h) – MenoLife App**

None.

## **Schedule 2.1(k) – Other Purchased Assets**

None.

## **Schedule 2.2(g) – Other Excluded Assets**

None.

## **Schedule 4.9 – Material Benefit Plans**

Amyris Inc. 401(k) Plan

**<u>Schedule 4.11(a) – Owned Intellectual Property</u>**

**Trademarks**

| Title | Image | Country | International Classes | Goods and Services | Official No. | Application No. | Application Date | Registration No. | Registration Date | Status |
|---|---|---|---|---|---|---|---|---|---|---|
| ATHENA'S SHIELD | | United States | 05 | 05 - Dietary supplements | | 97/560,343 | 08/23/2022 | | | Suspended |
| DIM (Logo) |  | United States | 05 | Dietary and nutritional supplements | | 90/366,121 | 12/08/2020 | 6,714,342 | 04/26/2022 | Registered |
| FRESH START | | N/A | N/A | N/A | | N/A | N/A | N/A | N/A | Unregistered |
| GODDESS GLOW BEAUTY COLLAGEN | | United States | 05 | 05 - Nutritional supplements containing collagen | | 90/394,455 | 12/18/2020 | 6,599,210 | 12/21/2021 | Registered |
| GODDESS GLOW BEAUTY COLLAGEN (Logo) |  | United States | 05 | 05 - Nutritional supplements | | 90/398,746 | 12/21/2020 | 6,599,216 | 12/21/2021 | Registered |
| HAPPY FIBER | | United States | 05 | 05 - Dietary and nutritional supplements | | 90/189,559 | 09/17/2020 | 6,577,827 | 11/30/2021 | Registered |
| HAPPY FIBER | | United States | 05 | 05 - Dietary and nutritional supplements | | 90/189,559 | 09/17/2020 | 6,577,827 | 11/30/2021 | Registered |
| HAPPY FIBER (Logo) |  | United States | 05 | 05 - Dietary and nutritional supplements | | 90/352,195 | 12/01/2020 | 6,599,177 | 12/21/2021 | Registered |
| KEEP GLOWING GORGEOUS | | N/A | N/A | N/A | | N/A | N/A | N/A | N/A | Unregistered |
| MENOCHILL | | United States | 05 | 05 - Nutritional supplements | | 88/648,188 | 10/09/2019 | 6,103,708 | 07/14/2020 | Registered |
| MENOFIT | | Australia | 05 | 05 - Nutritional supplements | | IR1534848 | 05/06/2022 | IR1534848 | 01/05/2021 | Registered |
| MENOFIT | | Canada | 05 | 05 - Nutritional supplements for general health and well-being | | IR1534848 | 05/06/2022 | IR1534848 | 09/21/2022 | Registered |
| MENOFIT | | China | 05 | 05 - Nutritional supplements | | IR1534848 | 05/06/2022 | | | Abandoned |
| MENOFIT | | EU | 05 | 05 - Nutritional supplements | | IR1534848 | 05/06/2022 | IR1534848 | 10/29/2020 | Registered |
| MENOFIT | | India | 05 | 05 - Nutritional supplements | | IR1534848 | 05/06/2022 | | | Abandoned |
| MENOFIT | | Mexico | 05 | 05 - Nutritional supplements | | IR1534848 | 05/06/2022 | IR1534848 | 09/20/2021 | Registered |
| MENOFIT | | New Zealand | 05 | 05 - Nutritional supplements | | IR1534848 | 05/06/2022 | IR1534848 | 03/02/2021 | Registered |
| MENOFIT | | UK | 05 | 05 - Nutritional supplements | | IR1534848 | 05/06/2022 | IR1534848 | 09/09/2020 | Registered |
| MENOFIT | | UK | 05 | 05 - Nutritional supplements | | UK00801534848 | 05/06/2022 | UK00801534848 | 10/29/2020 | Registered |
| MENOFIT | | United States | 05 | 05 - Nutritional supplements | | 88/648,114 | 10/09/2019 | 6,103,706 | 07/14/2020 | Registered |
| MENOFIT | | WIPO | 05 | 05 - Nutritional supplements | | IR1534848 | 05/06/2022 | IR1534848 | 05/06/2022 | Registered |
| MENOFIT (Logo) |  | United States | 05 | 05 - Nutritional supplements | | 90/352,152 | 12/01/2020 | 6,477,605 | 09/07/2021 | Registered |
| MENOGLOW | | United States | 05 | 05 - Nutritional supplements | | 88/648,068 | 10/09/2019 | 6,103,704 | 07/14/2020 | Registered |
| MENOGLOW (Logo) |  | United States | 05 | 05 - Nutritional supplements | | 90/352,076 | 12/01/2020 | 6,477,598 | 09/07/2021 | Registered |
| MENOGUARD | | United States | 05 | 05 - Nutritional supplements | | 88/648,165 | 10/09/2019 | 6,103,707 | 07/14/2020 | Registered |
| MENOLABS | | United States | 05 | 05 - Nutritional supplements | | 88/648,011 | 10/09/2019 | 6,149,323 | 09/08/2020 | Registered |
| MENOLIFE | | United States | 09 | 09 - Downloadable mobile applications for delivering educational content for women in perimenopause and menopause | | 88/648,220 | 10/09/2019 | 6,103,709 | 07/14/2020 | Registered |
| VIVA VOLUME | | United States | 05 | Dietary supplements. | 98/075673 | 98/075673 | 7/7/2023 | | | Pending |
| WELL RESTED | | Australia | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | | | Pending/Drop |
| WELL RESTED | | Canada | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | | | Pending |
| WELL RESTED | | China | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | | | Abandoned |
| WELL RESTED | | EU | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | | | Abandoned |
| WELL RESTED | | India | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | | | Pending |
| WELL RESTED | | ITALY | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | | | Pending |
| WELL RESTED | | Mexico | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | IR1670696 | 02/14/2023 | Registered |
| WELL RESTED | | New Zealand | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | | | Pending |
| WELL RESTED | | UK | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | | | Abandoned |
| WELL RESTED | | United States | 05 | 05 - Natural sleep aid preparations | | 97/165,117 | 12/09/2021 | 6,948,089 | 01/10/2023 | Registered |
| WELL RESTED | | WIPO | 05 | 05 - Natural sleep aid preparations | | IR1670696 | 06/09/2022 | IR1670696 | 06/09/2022 | Registered |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| WELL RESTED BY MENOLABS | UK | 05 | 05 - Dietary supplements | UK00003829064 | 09/13/2022 | UK00003829064 | 01/27/2023 | Registered |
| WELL RESTED BY MENOLABS | United States | 05 | 05 - Natural sleep aid preparations | 90/189,589 | 09/17/2020 | 6,834,623 | 08/30/2022 | Registered |
| WELL RESTED BY MENOLABS (Logo) | United States | 05 | 05 - Natural sleep aid preparations | 90/352,230 | 12/01/2020 | 6,714,298 | 04/26/2022 | Registered |



## Domain Names

menoadvisors.com
menoadvisors.live
menoadvisors.org
menochill.com
meno-chill.com
menoclinic.org
menofit.co
meno-fit.com
menofit.net
menoguard.com
menoinstitute.com
menolabs.com
menolife.app
menolife.com
menolife.org
myvipbottle.com

## Domain Names

Amazon Storefront (Seller ID for US Seller Central account: A113DG75J779LD)
MenoLabs Storefront (through Shopify)

## Social Media

**Facebook active**

·     https://www.facebook.com/MENOLABS
·     https://www.facebook.com/groups/2032549950181033
·     https://www.facebook.com/MenoFit

**Facebook inactive:**

·     MenoGlow - https://www.facebook.com/profile.php?id=100027948986710
·     MenoChill- https://www.facebook.com/profile.php?id=100063549161135
·     MenoGuard - https://www.facebook.com/menoguard
·     MenoLife - https://www.facebook.com/profile.php?id=100063593081257

**Instagram**

•     https://www.instagram.com/menolabs/

**TikTok**

•     https://www.tiktok.com/@menolabs?lang=en

**Pinterest**

•     https://www.pinterest.com/menolabs/

**Twitter**

•     https://twitter.com/MenoLabs

## Schedule 6.8(a) – Identified Employees

| Last Name | First Name |
|-----------|------------|
| Ruter | Victoria |
| Kramer | Aimee |
| Pattumma | Sureepoul |
| Hodges | Rachel |
| Rao | Natasha |
| Cruz | Gabrielle |
| Campos | Anna |
| Ochoa | Alyssa |
| Larsen | Sierra |

## <u>Schedule 11.17 – Privacy Policies</u>

MENOLABS PRIVACY POLICY

Effective Date: July 18, 2023

Introduction: What Our Privacy Policy Covers

Welcome to the Menolabs Privacy Policy. This Privacy Policy explains our practices regarding our collection, use and disclosure of information about you or other individuals, or information that could identify you or other individuals, through our store, companion mobile apps, or related services and communications (collectively, the "Store" or the "Site"). We refer to this information throughout this privacy policy as "Personal Information." Personal Information does not include information that has been de-identified or aggregated such that an individual can no longer be identified.

The Menolabs Site is owned and operated by Amyris Clean Beauty, Inc. or any affiliate, which will also be referred to herein as, "Amyris", "our", "we", "us". The data controller of your Personal Information is Amyris, Inc.

Amyris' registered office is located at 5885 Hollis Street, Suite 100, Emeryville, CA 94608, United States.

1.      OUR VALUES

Transparency. We want you to know what and how information is collected when you interact with our Store.

Choice. We will offer you choices about how your information can be used and shared by us and our trusted business partners.  Certain Stores, Sites or features may ask for you to affirmatively "opt-in" to this Privacy Policy, however, except for those countries where the GDPR applies continued use of the Site, Store or feature is considered your agreement to the terms and conditions of this Privacy Policy. Additionally, when applicable, certain features may allow users to choose an alternative version of the Site with revised functionality that can further limit information sharing.

Data Integrity. We will take reasonable precautions to protect information we collect about you via the Store using adequate security measures and ongoing checks of our data storage infrastructure.

2.      PERSONAL INFORMATION WE COLLECT

We collect the following information when you use the Store for the purposes, and relying on the legal basis, described below:

Account Information. We collect Personal Information when you create an account with us, make purchases, or sign up for a recurring subscription. To create an account, you will need to provide

us with your name, email address and a password or agree to communicate the same by signing in using an authorized third-party website. Once you create an account, you have the option to add one or more addresses to your account address to expedite the checkout process for purchases you make through the Amyris Store. If you reside in the United States, you may also elect to provide us with your telephone number to receive SMS messages from us. Our Terms of Service contain further information about how we would use your telephone number in these circumstances. You can update or delete any of the addresses you add to your account.

Purchase Information. When you buy one of our products through the Store, we will need to collect your shipping and billing address to fulfill your order. To complete your purchase, you will need to provide either a credit card or use one of our payment partners, such as PayPal, Amazon Pay, or Afterpay.

As part of processing a return, fraud prevention or for other legitimate purposes (including for compliance with legal obligations), you may be asked to provide government issued identification numbers, such as driver's license number.

Rewards Program. If you create, or have already created an account with us, you may be eligible to participate in certain rewards program ("Rewards Program"), which will provide you with access to rewards, based on your annual spend in our Store. We will use your Personal Information (including your name, email address, details of your purchases and how much you spend in our Store) and other information in our legitimate interests to administer our Rewards Program, including to monitor your expenditure with our Store, to provide you with rewards and to enable you to redeem them and to communicate with you about the Rewards Program. If you do not want to take part on our Rewards Program, you can opt-out and withdraw your consent at any time by contacting us using the details provided below or as specified in the Rewards Program Terms and Conditions. You will also have the option to provide us with your birthday, to receive a birthday gift if you make a qualifying purchase in that month.

Communications with Us. We will collect your name and email address when you interact with us in connection with our marketing offers or when you ask to learn more about our brand (e.g. when you provide your email address to receive additional information or benefits) or to receive marketing promotions, information about Amyris events near you, or other news about Amyris or when you submit unsolicited suggestions, feedback or other materials (which may include your name, photos, videos or other items including your personal information). We also collect your information when you contact customer service. Customer service communications may also include chat bots, or other artificial intelligence tools to better serve our customer's needs. We use this information to store and respond to your inquiries, customer service matters, or to let you know about our products and services, including our Rewards Programs.  Customer service communications may also be recorded for quality assurance and customer service purposes, and by accepting this Privacy Policy you affirmatively consent to the recording and collection of Personal Information while interacting with customer service.

Product Reviews on the Site. You may submit product reviews to appear on the Site. If you submit a review, we will collect your first name and last initial, email address and any information you choose to submit in your review. Although we will not display your email address, your first name,

last initial and review will be publicly available through the Store. Please be mindful not to post information if you aren't comfortable with it being public.

Registration for Contests and Sweepstakes. Occasionally, we may run contests or sweepstakes. We may ask those who enter in the contests or sweepstakes to provide Personal Information (e.g., an e-mail address). If you participate in a contest or sweepstake, your Personal Information may be used to reach you about the contest or sweepstakes, to comply with legal reporting requirements and for other marketing and business purposes.

Surveys. We may contact you to participate in surveys. If you do decide to participate, you may be asked to provide certain information which may include Personal Information. All information collected from your participation in our surveys is provided by you voluntarily and we may use your survey responses for other marketing and business purposes.

Interaction with Us on Third Party Services (e.g., Social Media). We have pages on several popular social media sites, and we also include social media features, such as the Facebook "Like", or "Share" button and widgets and links to various social media platforms on our website. When you use these tools on our Site or when you post on our social media pages, we may receive Personal Information about you, including your name, email address, and other contact information associated with your social media account which may be used for things including but not limited to on-platform optimization and reporting. The information we receive is dependent upon your privacy settings with the social network and is subject to this Privacy Policy. Information you post on a third-party social media (or other) site is subject to such site's privacy policy. We encourage you to always review and, if necessary, adjust your privacy settings on third party websites before linking or connecting them to our website. We do not control the third-party websites' information practices, so please review their statement and your settings on the third party's site carefully to protect your information.

For the processing operations carried out jointly for the purpose of on-platform optimization and reporting, as well as for advertising purposes, we and Facebook Ireland Limited ("Facebook") act as joint controllers and, to this end, we have entered into a joint controllership agreement that sets out our respective responsibilities regarding compliance with our obligations under the Regulation (EU) 2016/679 ("GDPR") (available at this link). According to this agreement, we are responsible for providing you with the information referred to in Articles 13 and 14 GDPR, while Facebook is responsible for responding to your requests to exercise your rights under Articles 15-20 GDPR with respect to the personal data stored by Facebook as a result of the processing. In any case, you may exercise your rights with reference to the data processing carried out with Facebook also directly to Facebook.

Further information on how Facebook processes personal data, including the legal basis Facebook relies on and the ways to exercise data subject rights against Facebook, can be found in Facebook's Data Policy at https://www.facebook.com/about/privacy.

Security. Server logs may be reviewed for security purposes – e.g., to detect unauthorized activity on the Store.

Merger, Sale, or Other Asset Transfers. If we are involved in a merger, acquisition, financing due diligence, reorganization, bankruptcy, receivership, sale of company assets, or transition of service to another provider, then your information may be processed also in the context of such transactions and for the purpose of executing the transactions. In connection with any such transactions, we will require that any counterparty to the transaction maintain the same standards employed by Menolabs Privacy Policy with respect to your personal information.

Your Referrals. If you use our "Refer a Friend" program or other referral programs to send promotional messages to one or more of your contacts, we will collect the recipient's email address and use it solely to send the referral message. We will let the recipient know we sent the referral at your request and that we received his/her email address from you. The person you referred may contact us at privacy@amyris.com to request that we remove this information from our database; nevertheless, we recommend that you inform the referred person prior to the communication of his/her data to us and that you refrain from communicating his/her data to us in case he/she does not want you to proceed.

Browsing Information. We collect certain information about your use of the Site, including the areas or web pages you viewed on our Site, the Amyris products you viewed or purchased, your IP address, details about your browser or device, and other information about your browsing behavior (collectively, "browsing information"). We use browsing information to improve the design and content of our Site, to suggest content and products that we think may be relevant to you, and to help us learn things like what pages are most attractive to our visitors, what promotions visitors like to see, and to measure the success of our advertising campaigns. We collect browsing information and allow third parties to collect such information through cookies, pixel tags, web beacons, local storage, and other tracking technologies (collectively, "Technologies") as further described below.

Information from Other Sources. We may receive information about you from other sources, including through third-party services and organizations to supplement information provided by you for the purposes of tailoring content and products that we think may be relevant to you.

Access to Camera, Video Chat, and Photo Collection. With your consent you may wish to take advantage of Store features that utilize the camera on your personal device to capture photos or conduct a live video chat with customer service or a beauty advisor.  Amyris may collect your image or a video for the purpose of executing these services described in the Store feature. Your image will not be shared publicly, except where you choose to use your device's share capabilities to share a specific image. Images may be retained and used for other internal Amyris purposes, such as user-facing value-add features (e.g. seeing your progress over time), improving features and services (such as through analytics, research and development), and other direct marketing efforts related to your specific use of the Store feature. When you permit access the audio and visual aspects of your personal device for the purposes of a live video chat you may be redirected to a third-party website that supports this video chat function.  Please note, as with any access to a third-party website, the privacy policy of that site will apply when you are redirected to another website.

Legal basis for processing. The above processing activities will be carried out only when one or more of the following legal bases apply:

- the processing is necessary for the performance of a contract to which you are party or in order to take steps at your request prior to entering into a contract (e.g. "Account information", "Purchase information", "Rewards Program", "Communications with Us", "Product Reviews on the Site", "Registration for Contests and Sweepstakes");
- you have provided your consent to one or more processing activities (e.g. "Rewards Program", "Survey", "Interaction with Us on Third Party Services", "Browsing Information" – when consent is required –, "Information from Other Sources", "Access to Camera, Video Chat, and Photo Collection");
- the processing is necessary for compliance with a legal obligation to which we are subject (e.g. "Purchase information", "Registration for Contests and Sweepstakes", "Security");
- the processing is necessary for the purposes of our legitimate interests (e.g. "Purchase information", "Rewards Program", "Surveys", "Interaction with Us on Third Party Services", "Security", "Merger, Sale, or Other Asset Transfers", "Your Referrals", "Access to Camera, Video Chat, and Photo Collection"). Details on the legitimate interests pursued by us are available upon request, to be forwarded at the contact details stated in this Privacy Policy.

When the processing is based on your consent, you are free to decide on whether or not to grant your consent and you will be entitled to withdraw the consent at any time, as described in this Privacy Policy.

When the processing is based on our legitimate interest, you will be entitled to exercise your right to opt-out or object to the processing at any time, as described in this Privacy Policy.

3.      COOKIES, WEB TECHNOLOGIES, AND ANALYTICS INFORMATION.

Like many websites, our Store uses automated data collection Technologies, including cookies, to collect certain information. We, as well as third parties, use these Technologies as follows:

Cookies and Web Technologies (the "Technologies"). A "cookie" is a small text file that identifies your computer or device. When you visit our Store, unique cookies are placed on your browser. A web beacon is a technology with a unique identifier that is typically contained in a small graphic file in a web page or in an email. We may use these Technologies to identify that you've logged into the Store, to hold selected products in your shopping cart when you navigate away from the order page, to suggest content and products that we think may be relevant to you, and to monitor aggregate usage of our Store. We also use these Technologies to measure the effectiveness of our advertising campaigns and to improve our Store by recognizing which pages are visited and whether those visits result in purchases.

More in details, the Technologies installed on the Store include:

- **Strictly Necessary Technologies**, which are necessary for the Store to function and cannot be switched off in our systems. They are usually only set in response to actions made by you which amount to a request for services, such as setting your privacy preferences, logging in or filling in forms. You can set your browser to block or alert you about these Technologies, but some parts of the site will not then work. These Technologies do not store any personally identifiable information.

- **Performance Technologies**, which allow us to count visits and traffic sources so we can measure and improve the performance of our Store. They help us to know which pages are the most and least popular and see how visitors move around the site. All information these Technologies collect is aggregated and therefore anonymous. If you do not allow these Technologies we will not know when you have visited our site, and will not be able to monitor its performance.
- **Functional Technologies**, which enable the Store to provide enhanced functionality and personalization. They may be set by us or by third party providers whose services we have added to our pages. If you do not allow these Technologies then some or all of these services may not function properly.
- **Targeting Technologies**, which may be set through our Store by our advertising partners. They may be used by those companies to build a profile of your interests and show you relevant adverting on other sites. They may store directly Personal Information, and are based on uniquely identifying your browser and internet device. If you do not allow these Technologies, you will not experience targeted advertising.

You can change your cookies settings for the majority of cookies used on our website through our cookie preference center.

Where we allow third parties to drop cookies, we do not necessarily have absolute control over those cookies or the data collected.  To make any requests related to the third parties that may drop cookies on the Store, you may also contact us at privacy@amyris.com.

Interest-Based Advertising. So that we can better target our advertising to individuals' interests, we work with advertising partners who may use Technologies, including cookies to gather browsing Information about you when you use our Store. Section 6 'Choices Regarding Your Information' below contains further information about these activities.

Analytics. We may also use Google Analytics, Hotjar, Lucky Orange, TikTok, Meta, Pinterest, and other service providers to collect information regarding visitor behavior and visitor demographics on our Store. For more information about Google Analytics, please visit www.google.com/policies/privacy/partners/. You can opt out of Google's processing of data generated by your use of the Store by visiting http://tools.google.com/dlpage/gaoptout.

4.    HOW WE USE THE INFORMATION WE COLLECT

We use information we collect for the following purposes:

We use information collected to provide and operate Amyris, to facilitate your online shopping, to enable purchases and process payments, to operate the Site features, to communicate with you (e.g., for customer support), to administer our Rewards Program, to implement your requests (e.g., referrals), on-platform optimization and reporting, to improve customer experience through personalization of products and their application, and to tailor and send you marketing materials.

We use your browsing and other information to help us analyze our Store and offerings.

We use your browsing, shopping, and other information to enhance your use of our Store and provide you with interest-based advertising.

We may use your email address to contact you about your account, and any relevant information about the Store (e.g., security updates or issues, etc.).

We may use information you post in public areas to provide you with an interactive social media experience that brings aspects of your social networking community into your Store experience.

We may use information we collect for our own and our affiliate companies' legitimate interests, such as direct marketing, research (including marketing research), network and information security, to detect security incidents, and to investigate, prevent, or take action regarding possible malicious, deceptive, fraudulent, or illegal activity, including attempts to manipulate or violate our policies, procedures, and terms and conditions.

We may use the information we collect for any other purpose that was disclosed to you at the time it was collected or for other purposes where these are not incompatible with the disclosed purposes or where we otherwise have your consent.

5.      INFORMATION WE SHARE

We may share your information as described in this Privacy Policy or with your permission.

Trusted Service Providers. We may share your Personal Information with third-party service providers we engage to help us administer and operate the Store (including our Rewards Program), to process and fulfill your orders, and to communicate with you. The types of vendors to whom we entrust Personal Information include: (i) IT services, including hosting our Store and the provider of our Rewards Program platform; (ii) communications service providers who help us send newsletters and other marketing emails and SMS messages; (iii) payment processing and order fulfillment services; and (iv) providers of customer support services. These service providers have access to your Personal Information only for the purpose of performing services on our behalf. Brand will not purchase consent, or sell, rent or share consent to opt-in to the brand's mobile SMS/texting program.

Business Partners and Affiliates. We may share Personal Information with companies that are under common ownership or control with us (e.g., Amyris subsidiaries or parent companies) to provide you with a product or service that you have requested or that we believe may be of interest to you or similar purpose as described herein. We require our affiliates not to use Personal Information for any other purpose other than the purpose as directed.

Marketing – Interest-Based Advertising and Third-Party Marketing. As described above, we may allow Third-Party advertising partners to use web Technologies to collect information about your browsing Information for interest-based advertising. You may opt-out and withdraw your consent to such sharing at no cost by following the instructions below.

Use of Affiliate Marketing Partners – When you access this Amyris website from an affiliate marketing network, affiliate advertiser, or other third-party advertising network they may collect Personal Information through cookies or other means when you interact with our digital property,

including IP addresses, digital identifiers, information about your web browsing, app usage, and other ways you interact with our properties and ads for a variety of purposes, such as personalization of offers or advertisements, analytics about how you engage with websites or ads and other commercial purposes. For more information about the collection and use of your data and your rights with respect to these affiliate networks, please locate the privacy policy for the affiliate marketing website you used to access the Amyris website.

Disclosures to Protect Us or Others (e.g., as Required by Law and Similar Disclosures). We or our service providers may access, preserve, and disclose your Personal Information if we believe doing so is required or appropriate: (i) to comply with law enforcement or national security requests and legal process, such as a court order or subpoena; (ii) to respond to your requests; (iii) to protect yours', ours' or others' rights, property, or safety; (iv) to enforce our policies or contracts; (v) to collect amounts owed to us; (vi) when we believe disclosure is necessary or appropriate to prevent physical harm or financial loss or in connection with an investigation or prosecution of suspected or actual illegal activity; or (vii) if we, in good faith, believe that disclosure is otherwise necessary or advisable (subject to applicable privacy laws) or (viii) as otherwise may be required or permitted by applicable U.S., Canadian, or other law or legal process, which may include lawful access by US or foreign courts, law enforcement or other government authorities.

In addition, from time to time, server logs may be reviewed for security purposes – e.g., to detect unauthorized activity on the Store. In such cases, server log data containing IP addresses may be shared with law enforcement bodies in order that they may identify users in connection with their investigation of the unauthorized activities.

Merger, Sale, or Other Asset Transfers. If we are involved in a merger, acquisition, financing due diligence, reorganization, bankruptcy, receivership, sale of company assets, or transition of service to another provider, then your information may be sold or transferred as part of such a transaction as permitted by law and/or contract. In such event, we will require the transferee to use Personal Information in a manner that is consistent with the Privacy Policy in effect at the time such Personal Information was collected.

All the entities above will act, as the case may be, as autonomous data controllers or data processors and, in the latter case, in accordance with the instructions provided by us also through execution of a data processing agreement as required by the applicable law. For more information on the entities to which your Personal Information may be communicated (including the updated list of such entities), please contact us at the contact details provided in this privacy policy.

6.      CHOICES REGARDING YOUR INFORMATION

Your Personal Information

With your Personal Information, such as information you give us to fulfill an order or to participate in a contest or sign up for an online offer, we will always allow you to change or correct your information and the choice of not receiving marketing from us. There are different ways you can control our use of any submitted Personal Information in connection with promotional communications.

You will have the option when you set up an account or click on "Sign In" from any page on the Site, to access, correct or update your choices and settings.

You do not have to provide us with your Personal Information, but if you do not provide us with certain information, we will not be able to provide you with the products or services that you have requested or deal properly with any enquiries or complaints raised by you. Information that are necessary are clearly marked on the Store.

If you receive email marketing communications from us and want to opt out of receiving such communications in the future, you can opt out and withdraw your consent by clicking a link at the bottom of the promotional email that will allow you to unsubscribe or by contacting us using the details below. You may not opt-out of receiving non-promotional messages regarding your account, such as technical notices, purchase confirmations, or shipping information, as these are communications necessary for us to comply with legal obligations and to perform our contract with you and/or reply to your requests.

If you have any difficulty managing your communication preferences, please email privacy@amyris.com.

Interest-Based Advertising

Our systems do not recognize browser "Do Not Track" signals. However, you may stop or restrict the placement of Technologies on your device or remove them by adjusting your preferences as your browser or device permits. The online advertising industry also provides websites from which you may opt out of receiving targeted ads from data partners and other advertising partners that participate in self-regulatory programs. You can access these, and also learn more about targeted advertising and consumer choice and privacy, at www.networkadvertising.org/managing/opt_out.asp, http://www.youronlinechoices.eu/, https://youradchoices.ca/choices/, and www.aboutads.info/choices/. Please note however that in most cases opting out drops an "opt-out cookie" on your browser. As a result, if you delete cookies or use a different computer or browser, you'll need to renew your opt-out choice.

To separately make choices for mobile apps on a mobile device, you can download DAA's AppChoices application from your device's app store. Alternatively, for some devices you may use your device's platform controls in your settings to exercise choice.

You may also exercise control over presentation of personalised adverts on social media platforms that we allow to deploy Technologies on the Site and see for more information on how these social media platforms use your information, by visiting:

- Facebook: https://en-gb.facebook.com/privacy/explanation
- Instagram: https://help.instagram.com/519522125107875
- Twitter: https://twitter.com/en/privacy
- YouTube: https://policies.google.com/privacy

If you would like to control the use of information about you collected by Facebook from third

party websites you can visit Facebook's 'Off-Facebook' privacy settings here: https://en-gb.facebook.com/off-facebook-activity

Please note that, in limited circumstances, you may see Amyris advertisements on other sites even if you have not provided us with your consent to cookie placement. This is because we purchase advertising space on other sites based on the types of users visiting those sites. You may see an Amyris advertisement if you happen to fall within the category of users identified to be displayed the advertisement.

Right of Access, Rectification, Erasure, Restriction and Portability

In accordance with applicable law, you may have the right to: (i) request confirmation of whether we are processing your Personal Information; (ii) obtain access to or a copy of your Personal Information; (iii) receive an electronic copy of Personal Information that you have provided to us, or ask us to send that information to another company (the "right of data portability"); (iv) restrict our uses of your Personal Information; (v) seek correction or amendment of inaccurate, untrue, incomplete, or improperly processed Personal Information; and (vi) request erasure of Personal Information held about you by Amyris, subject to certain exceptions prescribed by law; and (vii) withdraw your consent you have provided to our use of your Personal Information. Where you withdraw your consent, we will stop using your data for the specific purpose, unless we have an alternative legal basis to use it. Where applicable law allows, a small administrative fee may be requested for obtaining copies of Personal Information.

Right to Object

In accordance with applicable law, where we are processing your Personal Information on the basis of our legitimate interests, you can ask us to stop processing it and we must do so unless there is an overriding legitimate reason to continue processing it or the processing is needed for the establishment, exercise or defense of legal claims.

These rights vary depending on where you reside and Amyris will make reasonable efforts to honor your request, even if your country or state does not require us to do so. If you ask us to delete or stop using your Personal Information, we may not be able to honor that request if the information is required to process your payments or returns; fulfill your order; or comply with tax, audit, regulatory requirements or other exceptions prescribed by law. We will process such requests in accordance with applicable laws. To protect your privacy, where necessary, Amyris will take steps to verify your identity such as requesting a copy of your government issued identification before fulfilling your request.

To submit a request to access, correct, opt-out of sharing, or delete your Personal Information, as well as to exercise any other rights provided under the appliable laws and regulations, you may also contact us to make any requests related to your Personal Information at privacy@amyris.com. Any consumer exercising its rights under this Privacy Policy will not be discriminated against by Amyris.

California Privacy Notices

California law permits users who are California residents to request and obtain from us once a year, free of charge, a list of the third parties to whom we have disclosed their Personal Information (if any) for their direct marketing purposes in the prior calendar year, as well as the type of Personal Information disclosed to those parties.  California consumers also have the right to (i) correct or rectify inaccurate Personal Information, (ii) opt-out of the sharing of Personal Information by contacting privacy@amyris.com, or (iii) request limits on the use and disclosure of sensitive Personal Information, if any is collected.  Except as otherwise provided in this Privacy Policy, Amyris does not share Personal Information with third parties for their own marketing purposes. Amyris does not hold Personal Information for longer than is reasonably necessary.

Amyris does not sell Personal Information about its customers who reside in California or in any other jurisdiction.

In addition, if you are a California resident under 18 years old and a registered user of the Store, you can request that we remove content or information that you have posted to our Store. Please note that responding to your request may not ensure complete or comprehensive removal from the Store (e.g., if the content or information has been reposted by another user). To request removal of content or information, please contact us at the email below.

Children

Our Store is not directed to individuals under the age of 13, 16, or in certain jurisdictions, under 18 ("Children" or a "Child"), and we do not knowingly collect Personal Information from Children. If we become aware that we have inadvertently received Personal Information from a Child, we will delete such information from our records.

Links

Our Store may contain links to other websites. A link to a third party's website does not mean that we endorse it or that we are affiliated with it. We do not exercise control over third-party websites. Please be aware that this Privacy Policy does not cover information that you submit on other websites. You access such third-party websites or content at your own risk. For example, if you share or post something on Facebook, Instagram, Twitter, or Pinterest, the information in your post is governed by the privacy policies on those social media websites, and may be used for platform optimization and reporting to Amyris. You should always read the Privacy Policy of a third-party website before providing any information to the website.

Account Deletion

If you no longer wish to be registered at Menolabs.com you may delete your Personal Information within your Account Settings. Once you submit your request, we will send an email to the email address linked to your Amyris account detailing our account deletion policy and requesting that you to confirm your deletion request. When your account is deleted, we may continue to store some Personal Information in archives, backups, and for our legitimate purposes as described in and consistent with this Privacy Policy, subject to applicable privacy laws, and as otherwise required to meet our legal obligations.

7.      DATA INTEGRITY

Safeguarding Your Personal Information

We maintain physical, technical, and administrative safeguards to protect the confidentiality and security of information transmitted to us. However, no data transmission over the Internet or other network can be guaranteed to be 100% secure. As a result, while we strive to protect information transmitted on or through our Store also by implementing adequate security measures as required by the applicable laws, we cannot and do not guarantee the security of any information you transmit on or through our Store, and you do so at your own risk. To the fullest extent permitted by applicable law, we do not accept liability for unintentional disclosure.

When you register for the Store, we ask you to set up a password that you can use to access your information. If you want to cancel your password or change it, or something happens to your password, click on "Sign In" from any page on our Store, so you can access, correct or update your choices and settings from within your account.

We use Secure Socket Layer (SSL) and/or Transport Layer Security (TLS) or similar industry standard technology to encrypt transmissions of sensitive information from your computer to our servers. However, when you communicate with customer service via email on our website, these communications may be handled via unsecured transmissions or by third party service providers. Please be aware that information provided (such as email address, payment information, etc.) may be accessible to others. For that reason, we ask that you protect yourself and not share sensitive information via these communication channels.

Data Retention

Amyris retains the Personal Information we receive as described in this Privacy Policy for as long as you use our Store or as necessary to fulfill the purpose(s) for which it was collected, operate our Store, resolve disputes, establish legal defenses, prevent fraud, conduct audits, pursue legitimate business purposes, enforce our agreements (including our Terms of Service), and comply with applicable laws.

For further information about how long we retain your Personal Information, please contact us using the details provided in this Privacy Policy.

International Data Transfers

The information processed by us may be transferred, processed, and stored anywhere in the world, including but not limited to, Brazil, the United States, the European Union or other countries in order to provide and operate the Store. Personal Information may be stored in the cloud, on our servers, on the servers of our affiliates or the servers of our service providers. If you are located in the European Economic Area or UK, your Personal Information will be transferred only when a level of protection essentially equivalent to that guaranteed within the European Economic Area or UK (as applicable) is granted (e.g. in case the country of destination of the Personal Information is an "adequate country" pursuant to a European Commission or UK government adequacy decision; or when the standard contractual clauses adopted by the European Commission or approved by the Information Commissioner's Office (ICO) in the UK have been executed and additional safeguards have been implemented).

By using the Store, you are agreeing to the collection, use, transfer, and disclosure of your Personal Information, browsing information, and that communications will be governed by any applicable laws, including the ones applicable in the United States. Use of the Brazilian Store (including the collection, use, transfer, and disclosure of your Personal Information, browsing information, and communications) will be governed by the laws of Brazil.

Supervisory Authority

If you are in the European Economic Area, you have the right to lodge a complaint with a privacy authority, in particular in the Member State of your habitual residence, place of work or place of the alleged infringement if you believe our processing of your Personal Information violates applicable law.

If you are in the United Kingdom, you have the right to lodge a complaint with the Information Commissioner's Office (ICO) if you believe our processing of your Personal Information violates applicable law.

If you are located in Brazil, the Brazilian General Data Protection Law (Law No. 13,709/2018) or ("LGPD") and its subsequent amendments may be applicable to you. The LGPD guarantees specific rights and Amyris complies and respects such rights in accordance with the LGPD. If you have any questions concerning our privacy practices in Brazil, please contact privacidade@amyris.com or send a message through our website's Contact Us page.

Contact Us

If you have any questions about our privacy or security practices, or if you would like to exercise any of your privacy rights (e.g. request access to or correction of your Personal Information), you can contact us at privacy@amyris.com. You may also write to us at the following address:

Amyris, Inc.

Attn: Privacy Team

5885 Hollis St #100, Emeryville, CA 94608

Re: Amyris Privacy Policy

If we need, or are required, to contact you concerning any event that involves your Personal Information we may do so by e-mail, telephone, or mail, at the email or mail supplied by you when opening an account at the Store or if applicable, at the telephone number you may have provided when signing up to receive SMS messages.

Updates to the Privacy Policy

Amyris wants to offer you the best possible internet experience; consequently, additional functions, features, products, or services are incorporated into the Store from time to time.

This, and our commitment to protecting the privacy of your Personal Information, may result in periodic changes to this Privacy Policy. As a result, please remember to refer to this Privacy Policy regularly.

If we modify this Privacy Policy, we will post the revised Privacy Policy on the Store. We will also post a notice on this website or send an email describing the changes if the revised Privacy Policy changes in any material way. You should in any event check the Store regularly to see if any recent changes to this Privacy Policy have occurred. Changes will go into effect on the date mentioned in the notice posted on this website or in the email sent by us, which will also be stated as the last updated date shown in the Privacy Policy. By continuing to use our Store, except for those countries where the GDPR applies you are agreeing to all updated versions of the Privacy Policy