# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC., *et al.*, | Case No. 23-11131 (TMH) |
| Debtors.[1] | (Jointly Administered) |
| | Related Docket No. 839 |

## DEBTORS' REPLY IN SUPPORT OF OBJECTION TO
## CLAIM NOS. 663 AND 666 FILED BY LAVVAN, INC.

### PRELIMINARY STATEMENT

1. In their Objection to Claim Nos. 663 and 666 (the "Objection"),[2] the Debtors established that: (i) the Arbitration Ruling caps Lavvan's Arbitration Claims in the amount of the Cost Award; (ii) Lavvan's SDNY Claims should be disallowed in their entirety, for the reasons described in the Estimation Motion;[3] (iii) no Lavvan Claims other than the Cost Award could ever be secured claims pursuant to the terms of the Security Agreement; and (iv) any Lavvan Claims that are secured claims cannot exceed the value of the limited property in which Amyris granted Lavvan a security interest; *i.e.,* certain intellectual property that was subject to the license of cannabinoids documented in the RCL Agreement.

2. Lavvan's Response to the Objection [Dkt. No. 1012] (the "Response") makes clear that most of the relevant issues are not in dispute. "Lavvan agrees that with respect to the

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

[2] Capitalized terms used and not defined herein shall have the meanings ascribed thereto in the Objection.

[3] This issue is addressed separately in the Debtors' Reply in support of the Estimation Motion.

Arbitration Claim, the Tribunal's Final Award controls the amount of that claim," and that such claim cannot exceed the Cost Award and any Disgorgement Award. Response, ¶30. Lavvan asserts, however, that the Disgorgement Award is unknown because the Debtors failed to provide evidence that they made no profits on sales of cannabinoids. That is not true. The Debtors submitted the Kieftenbeld Declaration in support of the Objection, which states clearly that Amyris made no profit that would be subject to the Disgorgement Award. Furthermore, the Debtors have provided Lavvan with the business records that demonstrate that there simply are no profits to be disgorged. Thus, the Arbitration Claim is capped in the amount of the Cost Award.

3. The parties also agree that "[t]he words of the Security Agreement are clear," that Lavvan may only assert a secured claim for obligations "under" the RCL Agreement, and that the only relevant question is, therefore, "whether an obligation exists under the agreement." Response, ¶¶36, 41. Lavvan contends – without citing any relevant authority – that *all* of its asserted claims constitute obligations "under the RCL Agreement" because none would exist "but for" the existence of the RCL Agreement. Lavvan's attempt to rewrite the Security Agreement should be rejected.

4. The Security Agreement does not say that any claim, cause of action, or remedy that exists "because of" the RCL Agreement is a Secured Obligation. Nor does the Security Agreement say that any claim "related to" the RCL Agreement would be secured or that "any claim at all" would be secured. Instead, only "obligations under" the RCL Agreement may be secured and the plain meaning of the word "under" in this context means obligations that are "created by," "subject to," or "governed by" the RCL Agreement. Lavvan's independent tort

claims, including those governed by federal statutes that afford special protections to holders of intellectual property and provide remedies that are uniquely available under those federal statutes, are not obligations that are due "under" the RCL Agreement and they are therefore not Secured Obligations under the Security Agreement. Lavvan conflates the existence of a commercial relationship between the parties, which theoretically might give rise to many rights and duties under generally applicable law, with the grant of a security interest, which is designed to provide collateral security for a narrower subset of obligations called for by the contract itself.

5.  Finally, Lavvan agrees that Amyris only granted a security interest in certain intellectual property that was subject to Amyris's "Control," as that term was defined in the Security Agreement. Lavvan also agrees that "[f]or Amyris to 'Control' the intellectual property that it was licensing, it needed to have enough of a right in that property to theoretically grant a license." *Id.,* ¶56. However, Lavvan argues that "Control" assumed a wildly different (and limitless) meaning for purposes of defining the scope of the collateral granted by Amyris under the Security Agreement. Yet, the meaning of "Control," as defined in the Security Agreement, is anchored by reference to the licenses granted or to be granted in the RCL Agreement. Thus, the collateral covered by the Security Agreement and the intellectual property as to which Lavvan has a license are coextensive. Lavvan's argument that the security interest covers a broader universe than its license renders the language of the parties' agreement meaningless and should be rejected for the reasons discussed below.

## ARGUMENT

### A. The Arbitration Claim Is Capped In The Amount Of The Cost Award

6.  Lavvan agrees that its Arbitration Claim consists only of (i) the Cost Award, and (ii) any Disgorgement Award.  Response, ¶30.  There is no dispute as to the Cost Award.  *Id.*, ¶31.  Lavvan contends that the amount of the Disgorgement Award remains unknown, however, because the Debtors allegedly "have not met their burden to produce evidence" that the Debtors made no profits from sales of cannabinoids.  *Id.*, ¶31-32.

7.  Remarkably, Lavvan makes no mention in its Response to the sworn declaration of Han Kieftenbeld that was filed in support of the Objection.  Mr. Kieftenbeld stated in his declaration that (i) Amyris generated aggregate revenues from all known sales of cannabinoids of less than $2.3 million; (ii) the direct cost to Amyris of producing cannabinoids was at least $5.2 million (which figure excludes any allocation of indirect costs such as sales, general and administrative costs); and (iii) Amyris made no profits on known sales of cannabinoids.  *See* Kieftenbeld Declaration, ¶¶ 17-19.  The Kieftenbeld Declaration constitutes clear and unambiguous evidence that Amyris made no profits on sales of cannabinoids.

8.  The Debtors have provided to Lavvan the business records that support the figures described in the Kieftenbeld Declaration.  In short, the Debtors have provided sufficient evidence to support capping the Arbitration Claim in the amount of the Cost Award.  Lavvan has failed to carry its burden to establish a claim in a greater amount by presenting any evidence to the contrary.

B.  **The Lavvan Claims Are Not Secured Obligations**

9.      Lavvan acknowledges that its asserted claims cannot be secured unless those claims constitute "Secured Obligations," as defined in the Security Agreement; *i.e.,* "obligations of [Amyris] to [Lavvan] **under** the RCL Agreement." Security Agreement, §1.01 (emphasis added). As Lavvan states in its Response, the only question is whether Lavvan's claims – causes of action asserted under federal statutes for patent infringement and trade misappropriation, along with any claim for the Disgorgement Award, an "equitable remedy" arising from an independent cause of action for breach of fiduciary duty – constitute obligations "under the RCL Agreement." Response, ¶41. They do not.

10.     As set forth in the Objection, the phrase "under an agreement" or "under the terms of the contract" mean "subject to" and/or "created by" the agreement. *See* Objection, ¶¶36-42. In its Response, however, Lavvan argues that the word "under" should mean "because of," such that the phrase "obligations under the RCL Agreement" would instead read "obligations because of the RCL Agreement." *See* Response, ¶36. *Lavvan does not cite a single case in support of that construction*. According to Lavvan's favored construction, the Security Agreement would secure any obligation, claim for relief, or remedy of any kind pursued by Lavvan against Amyris having anything to do with the parties' transactions or commercial relationship, because no such obligation, claim for relief, or remedy would exist "but for" the RCL Agreement. *See* Response, ¶23 ("But for the RCL Agreement and the obligations it created, the SDNY Action would not exist."). If that had been the parties' intent, they would have defined "Secured Obligations" simply to include any and all obligations owing by Amyris to Lavvan. Period. That is not what the

Security Agreement says and Lavvan cannot now rewrite the Security Agreement to artificially elevate its rights over those of other creditors.

11. The Supreme Court has held that the word "under" means "'subject to' or 'governed by.'" *See Ardestani v. INS*, 502 U.S. 129, 135, 112 S. Ct. 515, 519 (1991) ("no creative reading is possible – 'under' means 'subject [or pursuant] to' or 'by reason of the authority of'") (quoting *St. Louis Fuel & Supply Co.* v. *FERC*, 281 U.S. App. D.C. 329, 333, 890 F.2d 446, 450 (1989)). In reference to a statute, the Supreme Court recognized that the "plain and ordinary meaning" of the word "under" means "governed by" the referenced statute, and that "[t]he strong presumption that the plain language of the statute expresses congressional intent is rebutted only in rare and exceptional circumstances, when a contrary legislative intent is clearly expressed." *Id.* (citations and internal quotations omitted); *Cf. Gunn v. Minton*, 568 U.S. 251, 257 (2013) (holding, for purposes of federal courts' exclusive jurisdiction over patent cases, "a case arises **under** federal law when federal law **creates** the cause of action asserted.") (emphasis added).

12. Similarly, courts in the Third Circuit routinely interpret contract provisions – such as choice-of-law provisions – that are phrased as applying to a particular agreement to apply only to claims **under that agreement**, and not to free-orbiting tort claims that relate to the agreement. *See, e.g., Black Box Corp. v. Markham*, 127 Fed. Appx. 22, 25 (3d Cir. 2005) (holding that choice of law provision "by its own terms, is narrowly drafted to encompass only the underlying merger agreement itself, and not necessarily the entire relationship between [the parties]. Indeed, several courts have construed similarly worded choice of law provisions in a manner that limits their application to the underlying agreement itself, and not to related fraud or non-contractual claims.")

(citations omitted); *see also Chatham Asset Mgmt., LLC v. Adviser Compliance Assocs., LLC*, Civil Action No. 23-2677, 2023 U.S. Dist. LEXIS 213899, at *9 (D. N.J. Dec. 1, 2023) (following *Markham* and stating: "Although this holding 'is non-precedential, it is instructive,' as courts in this District have consistently interpreted substantially similar choice of law clauses to encompass only underlying agreements, not other non-contractual claims. Plainly, Delaware law does not apply to the remaining claims.") (citations omitted).

13. The only case cited in the Response relevant to this issue is *Unwired Planet, Inc. v. Microsoft Corp.*, 193 F. Supp.3d 336, 342 (D. Del. 2016), which Lavvan quotes for the unremarkable statement that "[t]he word 'under' has many definitions and 'must draw its meaning from its context.'" Response, ¶36. The Debtors agree that the word "under" must be understood in context.[4] In this context, "the plain and ordinary meaning of 'under' as it appears in the [RCL Agreement] is that [obligations] must be governed by [the RCL Agreement]." *See Ardestani*, 502 U.S. at 135.

14. Tellingly, Lavvan did not respond to the argument made in the Objection that the parties repeatedly (and intentionally) used the narrower phrase "under" and the broader phrase "in connection with" throughout the RCL Agreement and the Security Agreement, and that the use of the narrower formulation in the definition of "Secured Obligations" must, therefore, be given meaning. Lavvan also fails to distinguish *Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*, No. 1:17-cv-8987-GHW, 2022 U.S. Dist. LEXIS 25036, at *1 (S.D.N.Y. Feb. 9, 2022), which is

---

[4] For example, the word "under" is often used to mean "beneath something," *see* https://www.merriam-webster.com/dictionary/under, but that definition is obviously not applicable here.

quoted in the Objection. Lavvan contends that *Flatiron* is not persuasive because the court in that case considered a fee shifting statute that was to be "strictly construed." Response, ¶44. However, the court's decision in *Flatiron* turned on the "plain meaning" of the word "under," as used in a contract, and the court disregarded arguments – like those made by Lavvan – that the "unambiguous" language of the agreement should be modified to "add words to the contractual language that do not appear in it." *Id.* at *24-25.

15. Lavvan's patent infringement and trade misappropriation claims are not obligations "under" the RCL Agreement simply because they are in some way related to the transactions contemplated by the RCL Agreement. *See* Response, ¶39. The SDNY Claims are independent causes of action that arise "under" federal statutes. Indeed, Count One of Lavvan's SDNY Complaint is titled "TRADE SECRET MISAPPROPRIATION ***UNDER THE DEFEND TRADE SECRETS ACT***." Response, Ex. E (SDNY Complaint at 75) (emphasis added); *see also id*. at 77 ("COUNT TWO – PATENT INFRINGEMENT (35 U.S.C. 271 (a)"); *id*. at 85 (seeking relief under "18 U.S.C. 1831 et seq." and "35 U.S.C. 284"). Similarly, Lavvan alleges in the SDNY Complaint that it "has standing to sue for patent infringement ***under federal patent law***, because it is an exclusive licensee." *Id.* ¶246 (emphasis added).

16. Lavvan asserts Amyris "violated" those federal statutes and Lavvan is pursuing remedies that are created uniquely by those federal statutes; *i.e.,* the SDNY Claims are created by and subject to the very federal statutes that Lavvan claims Amyris violated, not the RCL Agreement. *See, e.g.,* Response, Ex. E (SDNY Complaint ¶241-42) ("Pursuant to federal patent law, 'whoever without authority makes, uses, offers to sell, or sells any patented invention, within

the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a). ***Amyris has violated this provision*** with respect to the Patents.") (emphasis added).

17. Indeed, the Supreme Court has explained that claims for patent infringement "arise under" federal law because such claims are authorized by federal statute. *See Gunn*, 568 U.S. at 257 (plaintiff's "original patent infringement suit . . . arose under federal law . . . because it was authorized by 35 U.S.C. §§ 271, 281."); *id.* at 258 (distinguishing patent infringement claim from any claim that "finds its origins in state rather than federal law"). Likewise, any claim under the federal Defend Trade Secrets Act arises under Title 18 of the U.S. Code, not a private contract.

18. The SDNY Claims are not simply a different "label" to enforce an obligation under the RCL Agreement; they are "separate and distinct IP-based claims" that create entirely different obligations in favor of holders of intellectual property rights. Response ¶21.[5] Lavvan is not seeking through those claims to enforce obligations under the RCL Agreement, but to enforce its alleged intellectual property rights as protected under intellectual property law and the independent obligations that allegedly flow from the violation of those federal rights upon Amyris.[6]

---

[5] Lavvan mistakenly concludes that its SDNY Claims are Secured Obligations because "[t]hey arise from Amyris's breach of the secured obligations regarding Lavvan's intellectual property rights reflected in the RCL Agreement." Response ¶39. That argument is entirely circular. Lavvan has already litigated in the Arbitration all alleged breaches of Amyris's obligations under the RCL Agreement – including breaches of the exclusivity provisions cited in the Response – and the Tribunal awarded no damages to Lavvan on those claims. That Lavvan may have *standing* to pursue independent causes of action arising under federal statute by virtue of rights it holds under intellectual property bestowed by the RCL Agreement does not transform those causes of action into obligations under the RCL Agreement itself.

[6] The Debtors do not contend, as Lavvan appears to believe, that "a breach of contract cause of action" constitutes the only obligations "under" the RCL Agreement. Response, ¶34. The Security Agreement provides that the only obligations that are secured are obligations "under" the RCL Agreement. While contractual obligations actually owing under the RCL Agreement might well be the subject of an action for breach of contract, the Secured Obligations do not include any other claim, cause of action, or remedy, even if somehow related to the RCL Agreement. As noted in the Objection, the Debtors do not dispute that the Cost Award – which is not a

19. The Disgorgement Award – an "equitable remedy" imposed by the Tribunal on Lavvan's tort claim for breach of fiduciary duty – is also not an obligation under the RCL Agreement because that claim was not created by the RCL Agreement. Notably, Lavvan did not argue to the contrary in its Response. As stated in the Objection, Lavvan previously conceded that its tort claims were "independent of the contract itself." Objection ¶38. Indeed, when it granted relief to Lavvan, the Tribunal accepted "Lavvan['s] claims that the fiduciary duties arose not directly out of the RCL Agreement, but by the nature of the Parties' relationship as joint venturers." Arbitration Ruling ¶358. Lavvan would, therefore, be precluded from now arguing to the contrary.

20. Notably, the only cases Lavvan cites to support its argument that the term "under" should be interpreted broadly to include tort claims are decisions construing forum selection clauses. *See* Response, ¶43. However, those cases were decided on policy grounds that are inapplicable here and they have been held inapposite in other contexts. For example, in holding that a choice-of-law provision did not apply to non-contract claims, the court in *Estate of Lester Cotton v. Senior Planning Servs.* explained:

> *Crescent*, on which Plaintiff relies, is not controlling. As an initial matter, the language utilized in the Fee Agreement differs significantly from the contractual language at issue in that case. . . . It is abundantly clear that in *Crescent* the Third Circuit was tasked with determining whether a forum selection clause, not a choice-of-law provision, in a contract was sufficiently broad to govern the plaintiff's RICO, fraud, and tortious interference claims. The Third Circuit found that the non-contractual claims were governed by the forum selection clause because "pleading alternate non-contractual theories is not alone enough to avoid a forum selection clause if the claims asserted arise out of the contractual relation and implicate the contract's terms." In that

---

breach of contract cause of action – may be a Secured Obligation, because that obligation was created by, is due and owing directly pursuant to, and is based upon Lavvan seeking to enforce a provision of the RCL Agreement. The same is not true of any of Lavvan's other claims, none of which is governed by or seeks to enforce an obligation imposed by the RCL Agreement.

> regard, the *Crescent* court's analysis stemmed from the concern that plaintiffs might plead tort claims, in an attempt to circumvent a contract's forum selection clause provision, or force defendants to defend claims in different forums. *See id.* at 945 ("the narrow interpretation suggested by Crescent would permit avoiding a forum selection clause by simply pleading non-contractual claims in cases involving the terms of a contract containing the parties' choice of forum. Adopting it runs counter to the law favoring forum selection clauses.") These concerns are absent in the context of a choice of law provision. Accordingly, I do not find *Crescent*'s reasoning persuasive in the context of a choice of law provision. . . .

Civil Action No. 19-8921 (FLW), 2020 U.S. Dist. LEXIS 223567, at *33-34 (D. N.J. Nov. 30, 2020) (citing *Crescent International, Inc. v. Avatar Communities, Inc.*, 857 F.2d 943 (3d Cir. 1988)) (most internal citations omitted).

21. The policy concerns at issue in the forum selection cases cited by Lavvan are likewise not present here. The parties here agreed by contract that only certain obligations would be secured. There is no policy that favors interpreting a security agreement broadly in favor of the secured party. There is also no concern that Amyris might evade the Security Agreement by unilaterally choosing to "label" certain obligations in different ways, as Lavvan suggests. *See* Response, ¶42. The "obligations under the RCL Agreement" are duties imposed by the RCL Agreement that Lavvan seeks to enforce under the RCL Agreement. Those obligations do not include causes of action brought by Lavvan to enforce its alleged intellectual property rights under federal statutes, in which Lavvan seeks remedies that are available only under federal statute.

22. Finally, Lavvan's suggestion that the RCL Agreement's limitation of liability and dispute resolution provisions run counter to the Debtors' position is misplaced. *See* Response, ¶46. Pursuant to Section 13 of the RCL Agreement, Lavvan waived the right to various damages, whether arising in contract, tort, or otherwise. RCL Agreement, §13. But, a contractual damages

waiver that applies to tort claims does not transform any such tort claims into obligations "under" the contract for purposes of the grant of a security interest under the separate Security Agreement. Similarly, the parties' agreement to initiate disputes concerning intellectual property in a court, rather than in arbitration, does not convert such free-standing claims or remedies pursued in any such forum into negotiated obligations "under" the RCL Agreement.

### C. Lavvan Was Only Granted A Lien On The Licensed Intellectual Property

23. The parties agree that Lavvan's lien does not extend beyond "Amyris Background IP," "Amyris Platform Improvement IP," and "Amyris Additional IP Collateral," as those terms are defined in the Security Agreement. Response, ¶48. Although Lavvan attempts to inject a factual dispute concerning the existence of Amyris Platform Improvement IP and Amyris Additional IP Collateral, none ever existed and Lavvan has failed to identify any such property.[7] Lavvan also does not dispute that it has no lien on any property of any Debtor other than Amyris.

24. Lavvan acknowledges that its rights in "Amyris Background IP" are limited by the defined term "Controlled," and that the term "Control" is defined to refer to Intellectual Property Collateral as to which Amyris had "the rights necessary to grant the rights and licenses granted or to be granted in the RCL Agreement as to such Intellectual Property Collateral, whether by ownership or otherwise." Response, ¶54. As Lavvan states: "For Amyris to 'Control' the intellectual property that it was licensing, it needed to have enough of a right in that property to

---

[7] It should be undisputed that the RCL Agreement was never amended to provide for any additional property to fall within the scope of the definition of Amyris Background IP or Amyris Platform Improvement IP. There is, therefore, no "Amyris Additional IP Collateral." As further represented in the Objection, no Intellectual Property is known to exist that was conceived, reduced to practice, obtained or developed in connection with the RCL Agreement after March 18, 2019 other than Amyris Cannabinoid Foreground IP. There is, therefore, no "Amyris Platform Improvement IP."

theoretically grant a license." Response, ¶56. There is also no dispute that the parties' license was limited to cannabinoids. *Id.* at ¶57.

25. As described in the Objection, the term "Control" limits the scope of the collateral to property that was the subject of the license of cannabinoids under the RCL Agreement.[8] However, Lavvan argues that the phrase "the Grantor has the rights necessary to grant the rights and licenses granted or to be granted in the RCL Agreement as to such Intellectual Property Collateral" includes *all* intellectual property as to which Amyris held an interest "so as to be able to grant a lien." Response, ¶56. That argument is entirely circular, illogical, and at odds with the terms of the parties' agreement.

26. The word "Control" is used in the Security Agreement to limit the scope of the collateral. For example, the term "Amyris Background IP" is defined to mean "all Background IP Controlled by the Grantor and/or its Affiliates." Lavvan would have the Court read the word "Controlled" simply to mean "owned," ignoring entirely the following phrase from the definition of that term: "the rights necessary to grant the rights and licenses granted or to be granted in the RCL Agreement as to such Intellectual Property Collateral." Again, Lavvan cannot rewrite the language of the parties' agreements to suit its position. By Lavvan's logic, any intellectual property owned by Amyris, whether or not tethered to the field of synthetic biology, would be swept up into Lavvan's lien – an absurd notion.

---

[8] Although Lavvan disregards the simultaneous expression of Amyris's intent in the Consent and Waiver dated May 2, 2019, that agreement accurately summarizes the extent of the grant documented in the Security Agreement.

27. The term "Control" was not defined to create or acknowledge some independent representation that Amyris must hold an interest in property sufficient to grant a lien, as Lavvan asserts. It is, of course, black letter law under the UCC that a debtor can only grant a security interest in property that it holds rights to. Indeed, the Security Agreement devotes an entire section to such representations. For example, Amyris expressly represented and warranted that it: "owns, or holds its other applicable right, title, or interest in, the Intellectual Property Collateral free and clear of any liens. . . ." Security Agreement, §3.03. Amyris further represented that the Security Agreement creates a valid and enforceable security interest in the Intellectual Property Collateral securing the Secured Obligations.[9] These provisions required Amyris to own and grant a lien in the Intellectual Property Collateral. The parties did not bury any similar or duplicative requirement in the definition of "Control," as Lavvan would have the Court read the definition.

28. The phrase "rights and licenses granted or to be granted in the RCL Agreement" refers to the intellectual property licensed in the RCL Agreement.[10] Throughout the RCL

---

[9] Section 3.04 provides:

Subject to Permitted Liens, to the knowledge of the Grantor, (i) this Security Agreement creates a valid security interest in the Intellectual Property Collateral securing the Secured Obligations; and (ii) upon the timely filing and recordation of appropriate financing statements and/or security agreements in the Office of the Secretary of State of Delaware, the United States Patent and Trademark Office and the United States Copyright Office, together with the payment of all applicable filing and recordation fees associated therewith, in the manner specified by such office and in accordance with its rules and regulations, and the taking of all other actions required under the laws of Delaware with respect to the perfection of a security interest in intangible property, all filings, registrations and recordings presently necessary to create and perfect the security interest granted to the Secured Party in the Intellectual Property Collateral will have been taken.

[10] *See, e.g.,* RCL Agreement, §§1.68 (defining "Intellectual Property" to mean "all worldwide intellectual property and industrial ***property rights and rights in*** proprietary and/or confidential information, whether registered or unregistered, including all (A) ***Patent Rights***, (B) trademarks, trademark rights, service marks, ***service mark rights***, corporate names, trade names, ***trade name rights***, domain names, logos, slogans, trade dress, ***design rights***, and other similar designations of source or origin, together with the goodwill symbolized by and of the foregoing, (C) trade secrets and all other confidential information, ideas, Know-How, inventions, proprietary processes, formulae, models, and other methodologies, (D) copyrights and copyright registrations, (E) computer programs (whether in object code, subject code or other form), designs, design registrations, algorithms, internet domain names (and registrations and applications therefor), databases, ***database rights***,

Agreement, the parties used the word "right" interchangeably with the word "license."[11] Thus, the phrase "the rights necessary to grant the *rights and licenses* granted or to be granted in the RCL Agreement as to such Intellectual Property Collateral," refers to the property rights licensed under the RCL Agreement. That phrase cannot be read, as Lavvan contends, to refer to some independent right to grant a lien on all intellectual property, which would render the phrase entirely meaningless. Moreover, Amyris did not "grant" any security interests "in the RCL Agreement." Amyris granted those interests "in the Security Agreement" and the Security Agreement limited the scope of the collateral to property that was "Controlled" by Amyris, which in turn is tethered to the licenses granted under the RCL Agreement.

29. Therefore, Lavvan's security interest does not extend to any property other than the intellectual property licensed in the RCL Agreement.

## CONCLUSION

WHEREFORE, for the reasons set forth herein and in the Objection, the Debtors respectfully request that the Court enter the Proposed Order, substantially in the form attached as **Exhibit A** to the Objection, granting the relief requested and such other and further relief as is just and proper.

---

compilations and data, technology supporting the foregoing, and all related documentation, (F) licenses to any of the foregoing, and (G) all applications and registrations of the foregoing, and (H) *all other similar proprietary rights*.") (emphasis added).

[11] *See, e.g.,* RCL Agreement §§1.112 (defining "Sublicense" to mean "*a sublicense, grant of rights to, or other similar permission* to use all or some of the Amyris IP granted from Lavvan or any of its Affiliates or from any of their respective Sublicensees."); 5.5 (". . . .Amyris will prosecute the Patent Rights covering the Amyris IP in a commercially reasonable manner and as necessary for Lavvan's exercise of *its licensed rights hereunder* . . . ."); 5.12.1(d) ("The Amyris SPE shall grant to Lavvan *license rights* in the Amyris Cannabinoid Foreground IP on the terms set forth in Section 5.6 and Section 5.7 hereof"); 5.12.2(c) (requiring Permitted Senior Lenders to "honor the licenses granted to Lavvan in the Amyris Platform Improvement IP and Amyris Background IP hereunder notwithstanding such exercise and any related transfer of assignment, as if such exercise, transfer, and assignment, as applicable, were subject to *such license rights*.") (emphasis added).

Dated: January 5, 2024

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ James E. O'Neill*

Richard M. Pachulski (admitted *pro hac vice*)
Debra I. Grassgreen (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
Jason H. Rosell (admitted *pro hac vice*)
Steven W. Golden (DE Bar No. 6807)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:  rpachulski@pszjlaw.com
 dgrassgreen@pszjlaw.com
 joneill@pszjlaw.com
 jrosell@pszjlaw.com
 sgolden@pszjlaw.com

*Counsel to the Debtors and Debtors in Possession*