**EXHIBIT G**

**(DSM PLAN PROMISSORY NOTE PLEDGE AGREEMENT)**

*(Form of Agreement – Subject to Amendment and Conforming Modifications and DSM Review)*

*Goodwin Draft 1/8/2024*

AMENDED AND RESTATED PLEDGE AGREEMENT

between

Amyris, Inc.

and

DSM Finance B.V., in its capacity as lender

Dated as of January [  ], 2024

# TABLE OF CONTENTS

**Page**

SECTION 1. DEFINED TERMS ................................................................................................ 1

    **1.1**    **Definitions** .......................................................................................................... 1
    **1.2**    **Other Definitional Provisions** ......................................................................... 3

SECTION 2. GRANT OF SECURITY INTEREST; CONTINUING LIABILITY UNDER
PLEDGE COLLATERAL ......................................................................................................... 4

SECTION 3. REPRESENTATIONS AND WARRANTIES ..................................................... 5

    **3.1**    **[Reserved].** ......................................................................................................... 5
    **3.2**    **Title; No Other Liens** ....................................................................................... 5
    **3.3**    **Valid, Perfected First Priority Liens** .............................................................. 5
    **3.4**    **Name; Jurisdiction of Organization, Etc** ....................................................... 5
    **3.5**    **Pledged Equity Interests** .................................................................................. 6

SECTION 4. COVENANTS ....................................................................................................... 6

    **4.1**    **[Reserved]** ......................................................................................................... 6
    **4.2**    **Delivery and Control of Pledged Equity Interests.** ......................................... 6
    **4.3**    **Maintenance of Perfected Security Interest; Further Documentation** ........... 7
    **4.4**    **Changes in Locations, Name, Jurisdiction of Incorporation, Etc** .................. 7
    **4.5**    **Notices** ............................................................................................................... 7
    **4.6**    **Pledged Equity Interests** .................................................................................. 7
    **4.7**    **Voting and Other Rights with Respect to Pledged Equity Interests.** ............. 8

SECTION 5. REMEDIAL PROVISIONS ................................................................................. 9

    **5.1**    **Proceeds to be Turned Over To Lender** .......................................................... 9
    **5.2**    **Application of Proceeds** .................................................................................... 9
    **5.3**    **Code and Other Remedies** .............................................................................. 10
    **5.4**    **Effect of Securities Laws** ............................................................................... 11
    **5.5**    **Deficiency** ....................................................................................................... 12

SECTION 6. POWER OF ATTORNEY AND FURTHER ASSURANCES ............................ 12

    **6.1**    **Lender's Appointment as Attorney-in-Fact, Etc** ......................................... 12
    **6.2**    **Authorization of Financing Statements** ........................................................ 13
    **6.3**    **Further Assurances** ........................................................................................ 14

SECTION 7. LIEN ABSOLUTE; WAIVER OF SURETYSHIP DEFENSES .......................... 14

    **7.1**    **Lien Absolute, Waivers** ................................................................................. 14

SECTION 8. THE LENDER ..................................................................................................... 16

    **8.1**    **[Reserved]** ....................................................................................................... 16
    **8.2**    **Duty of Lender** ............................................................................................... 16
    **8.3**    **[Reserved]** ....................................................................................................... 16
    **8.4**    **Delegation of Duties** ...................................................................................... 16

i

SECTION 9. MISCELLANEOUS ............................................................................. 17

| | | |
|---|---|---|
| **9.1** | **Amendments in Writing** .................................................................... 17 |
| **9.2** | **Notices** ................................................................................................ 17 |
| **9.3** | **No Waiver by Course of Conduct; Cumulative Remedies** ............. 17 |
| **9.4** | **Enforcement Expenses; Indemnification** ........................................ 17 |
| **9.5** | **Successors and Assigns** ...................................................................... 18 |
| **9.6** | **Set-Off** ................................................................................................. 18 |
| **9.7** | **Counterparts** ....................................................................................... 18 |
| **9.8** | **Severability** ......................................................................................... 18 |
| **9.9** | **Integration/Conflict** .......................................................................... 19 |
| **9.10** | **GOVERNING LAW AND VENUE** ...................................................... 19 |
| **9.11** | **Arbitration** .......................................................................................... 19 |
| **9.12** | **Acknowledgments** .............................................................................. 19 |
| **9.13** | **Releases** ............................................................................................... 20 |

SCHEDULE 1 DESCRIPTION OF PLEDGED EQUITY INTERESTS ................................... 1-1
SCHEDULE 2 FILINGS AND OTHER ACTIONS REQUIRED TO PERFECT SECURITY
    INTERESTS ................................................................................................ 2-1
SCHEDULE 3 PLEDGOR'S EXACT LEGAL NAME, LOCATION OF JURISDICTION OF
    ORGANIZATION AND CHIEF EXECUTIVE OFFICE ............................................. 3-1
SCHEDULE 4 NOTICE ADDRESS OF THE PLEDGOR ...................................................... 4-1

ACTIVE/126951704.6

AMENDED AND RESTATED PLEDGE AGREEMENT, dated as of January [ ], 2024 between AMYRIS, INC., a Delaware corporation (together with its successors and assigns, the "**Pledgor**"), and DSM FINANCE B.V., a Netherlands private company with limited liability, in its capacity as lender (in such capacity and together with its successors and permitted assigns, the "**Lender**").

Reference is hereby made to that certain Secured Promissory Note, dated as of the date hereof (as may be further amended, restated, amended and restated, supplemented or otherwise modified or replaced from time to time, the "**Note**"), by and between, among others, the Pledgor and the Lender, in its capacity as lender.

WHEREAS, the Note records certain extensions of credit made to the Pledgor upon the terms and subject to the conditions set forth therein.

NOW, THEREFORE, in consideration of the premises and to induce the Lender to accept the Note and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Pledgor hereby agrees with the Lender as follows:

## SECTION 1.  DEFINED TERMS

**1.1**     **Definitions**. (a) Unless otherwise defined herein, terms defined in the Note and used herein shall have the meanings given to them in the Note, and the following terms which are defined in the UCC are used herein as so defined (and if defined in more than one article of the UCC shall have the meaning specified in Article 9 thereof): Certificated Security, Securities Account, Supporting Obligations and Uncertificated Security.

(b)     The following terms shall have the following meanings:

"**Additional Pledged Equity Interests**" shall mean all Equity Interests in the Issuer acquired by the Pledgor after the Effective Date.

"**Affiliate**" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and under "common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"**Agreement**" shall mean this Pledge Agreement, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Collateral Account**" shall mean any collateral account established by the Lender as provided in Section 5.1.

"**Company LLC Agreement**" shall mean that certain limited liability company agreement of the Issuer dated [              ].

ACTIVE/126951704.6

"**Default**" means any event which, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

"**DIP Loan Agreement**" means that certain Senior Secured Super Priority Debtor in Possession Facility Agreement dated August 9, 2023 made between, among others, the Pledgor and Euagore, LLC in its capacity as lender and administrative agent.

"**Discharge of the Secured Pledge Obligations**" shall mean and shall have occurred when all Secured Pledge Obligations shall have been indefeasibly paid in full (other than any Surviving Obligations).

"**Equity Interests**" shall mean, with respect to any Person, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents, including membership interests (however designated, whether voting or non-voting) of the equity of such Person, including, if such person is a partnership, partnership interests (whether general or limited), if such Person is a limited liability company, membership interests, and, if such Person is a trust, all beneficial interests therein, and shall also include any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of property of, such corporation, partnership, limited liability company or trust, whether outstanding on the date hereof or issued on or after the date hereof.

"**Initial Pledged Equity Interests**" shall mean all Equity Interests in the Issuer owned by the Pledgor as of the Effective Date, including the Equity Interests listed on <u>Schedule 1</u> hereto.

"**Issuer**" shall mean Amyris RealSweet, LLC, a Delaware limited liability company.

"**Lender**" shall have the meaning set forth in the preamble hereto.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, assignment for security, security interest, encumbrance, levy, lien or charge of any kind, whether voluntarily incurred or arising by operation of law or otherwise, against any property, any conditional sale or other title retention agreement, and any lease in the nature of a security interest.

"**Note**" shall have the meaning set forth in the preamble hereto.

"**Parties**" means the parties to this Agreement and "**Party**" means any of them.

"**Pledge Collateral**" shall have the meaning set forth in Section 2.

"**Pledged Equity Interests**" shall mean the Initial Pledged Equity Interests and any Additional Pledged Equity Interests.

"**Pledgor**" shall have the meaning set forth in the preamble hereto.

2

"**Proceeds**" shall mean all "proceeds" as such term is defined in Section 9-102(a)(64) of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Pledged Equity Interests, collections thereon and distributions or payments with respect thereto.

"**Secured Pledge Obligations**" shall mean all Secured Obligations, as defined in the Note.

"**Securities Act**" shall mean the Securities Act of 1933, as amended.

"**Subsidiary**" of any Person means an entity, whether corporate, partnership, limited liability company, joint venture or otherwise, in which such Person owns or controls 50.1% or more of the outstanding voting securities.

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York; **provided**, **however**, that in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of, or remedies with respect to, any Pledge Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions hereof relating to such perfection, priority or remedies.

**1.2** **Other Definitional Provisions**. (a) The words "hereof", "herein", "hereto" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The words "Section," "Schedule," "Exhibit" and "Annex" are to this Agreement unless otherwise specified and references to any Schedule, Exhibit or Annex shall mean such Schedule, Exhibit or Annex as amended or supplemented from time to time in accordance with this Agreement.

(b)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(c)    The expressions "payment in full," "paid in full" and any other similar terms or phrases when used herein shall mean payment in cash in immediately available funds.

(d)    The use herein of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.

(e)    All references herein to provisions of the UCC shall include all successor provisions under any subsequent version or amendment to any Article of the UCC.

ACTIVE/126951704.6

(f)     Section heading and the table of contents used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

## SECTION 2.  GRANT OF SECURITY INTEREST; CONTINUING LIABILITY UNDER PLEDGE COLLATERAL

(a)     The Pledgor hereby assigns and transfers to the Lender, and hereby grants to the Lender a security interest in, all of the following property, in each case, wherever located and now owned or at any time hereafter acquired by the Pledgor or in which the Pledgor now has or at any time in the future may acquire any right, title or interest (collectively, the "**Pledge Collateral**"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Secured Pledge Obligations:

(i)     all Pledged Equity Interests;

(ii)     the certificates, if any, representing such Pledged Equity Interests and any interest of the Pledgor on the books and records of the Issuer and any securities entitlements relating thereto and all dividends, distributions, cash warrants, rights, options, instruments, securities and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Pledged Equity Interests and any other warrant, right or option or other agreement to acquire any of the foregoing, all management rights, all voting rights, any interest in any capital account of a member in such limited liability company, all rights as and to become a shareholder, member or partner of the Issuer, as applicable, all rights of the Pledgor under any shareholder or voting trust agreement or similar agreement in respect of the Issuer, all of the Pledgor's right, title and interest as a member to any and all assets or properties of the Issuer, and all other rights, powers, privileges, interests, claims and other property in any manner arising out of or relating to any of the foregoing;

(iii)     all Collateral Accounts;

(iv)     all books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks and other electronic storage media and related data processing software and similar items that at any time evidence or contain information relating to any of the Pledge Collateral or are otherwise reasonably necessary in the collection thereof or realization thereupon; and

(v)     to the extent not otherwise included, all Proceeds of any and all of the foregoing.

(b)     Notwithstanding anything herein to the contrary, (i) the Pledgor shall remain liable for all obligations under the Pledge Collateral and nothing contained herein is intended or shall be a delegation of duties to the Lender, and (ii) the Pledgor shall remain liable under each of the agreements included in the Pledge Collateral, including, without limitation, any agreements relating to Pledged Equity Interests, to perform all of the obligations undertaken by it

4

thereunder all in accordance with and pursuant to the terms and provisions thereof and the Lender shall not have any obligation or liability under any of such agreements by reason of or arising out of this Agreement or any other document related thereto nor shall the Lender have any obligation to make any inquiry as to the nature or sufficiency of any payment received by it or have any obligation to take any action to collect or enforce any rights under any agreement included in the Pledge Collateral, including, without limitation, any agreements relating to any Pledged Equity Interests.

### SECTION 3.  REPRESENTATIONS AND WARRANTIES

To induce the Lender to accept the Note, the Pledgor hereby represents and warrants to the Lender on the date hereof that:

**3.1**    [**Reserved**].

**3.2**    **Title; No Other Liens**. Other than Liens (a) in favor of the Lender, and (b) entered into in connection with the DIP Loan Agreement, the Pledgor owns each item of the Pledge Collateral free and clear of any and all Liens or claims, including, without limitation, liens arising as a result of the Pledgor becoming bound (as a result of merger or otherwise) as Pledgor under a security agreement or pledge agreement entered into by another Person. No financing statement or other public notice with respect to all or any part of the Pledge Collateral is on file or of record in any public office, except such as have been filed in favor of the Lender.

**3.3**    **Valid, Perfected First Priority Liens**. The security interests granted by the Pledgor pursuant to this Agreement constitute a legal and valid security interest in favor of the Lender securing the payment and performance of the Pledgor's Secured Pledge Obligations and, upon completion of the filings and other actions specified on Schedule 2 (all of which, in the case of all filings and other documents referred to on said Schedule, have been delivered to the Lender in duly completed and duly executed form, as applicable, and may be filed by the Lender at any time) and payment of all filing fees, will constitute fully perfected security interests in all of the Pledge Collateral, prior to all other Liens on the Pledge Collateral other than Liens (a) in favor of the Lender, and (b) entered into in connection with the DIP Loan Agreement. Without limiting the foregoing, the Pledgor has taken all actions necessary, including without limitation those specified in Section 4.2 to establish the Lender's "control" (within the meanings of Sections 8-106 and 9-106 of the UCC) over any portion of the Pledge Collateral constituting Certificated Securities or Uncertificated Securities.

**3.4**    **Name; Jurisdiction of Organization, Etc.** The Pledgor's exact legal name (as indicated on the public record of the Pledgor's jurisdiction of formation or organization), jurisdiction of organization, organizational identification number, if any, and the location of the Pledgor's chief executive office or sole place of business are specified on Schedule 3. The Pledgor is organized solely under the law of the jurisdiction so specified and has not filed any certificates of domestication, transfer or continuance in any other jurisdiction. Except as specified on Schedule 3, the Pledgor has not changed its name, jurisdiction of organization, chief executive office or sole place of business (if applicable) or its corporate structure in any way (e.g. by merger, consolidation, change in corporate form or otherwise) within the past five years. The Pledgor is not a transmitting utility as defined in UCC § 9-102(a)(80).

5

**3.5** **Pledged Equity Interests**. (a) **Schedule 1** hereto sets forth all of the Initial Pledged Equity Interests owned by the Pledgor and such Initial Pledged Equity Interests constitute 69.0% of the issued and outstanding percentage of limited liability company interests of the Issuer.

(b)     All of the shares of the Pledged Equity Interests have been duly and validly issued and are fully paid and nonassessable. The Pledgor is not in default of its obligations under the Company LLC Agreement or any other organizational document of the Issuer.

(c)     The Company LLC Agreement and the certificates evidencing the Pledged Equity Interests expressly provide the related Pledged Equity Interests are securities governed by the Uniform Commercial Code of the State of Delaware and each other applicable jurisdiction. None of the Pledged Equity Interests are credited to any Securities Account.

(d)     No consent, approval or authorization of any Person is required for the pledge by the Pledgor of the Pledged Equity Interests pursuant to this Agreement or for the execution, delivery or performance of this Agreement by the Pledgor, whether under the Company LLC Agreement, other organizational documents of the Issuer or otherwise, except such as have been obtained and are in full force and effect as of the Effective Date.

(e)     There are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any Pledged Equity Interests.

The Company LLC Agreement includes language substantially the same as the provisions set forth in Exhibit A hereto.

## SECTION 4.  COVENANTS

The Pledgor covenants and agrees with the Lender that, from and after the date of this Agreement until the Discharge of the Secured Pledge Obligations:

**4.1** **[Reserved]**

**4.2** **Delivery and Control of Pledged Equity Interests**.

(a)     If any of the Pledge Collateral is or shall become evidenced or represented by any Certificated Security, such Certificated Security shall be immediately delivered to the Lender, duly endorsed in a manner satisfactory to the Lender, to be held as Pledge Collateral pursuant to this Agreement.

(b)     If any of the Pledge Collateral is or shall become evidenced or represented by an Uncertificated Security, the Pledgor shall immediately cause the Issuer either (i) to register the Lender as the registered owner of such Uncertificated Security, upon original issue or registration of transfer or (ii) to agree in writing with the Pledgor and the Lender that the Issuer will comply with instructions with respect to such Uncertificated Security originated by the Lender without further consent of the Pledgor, such agreement to be in form and substance satisfactory to the Lender.

6

(c)      In addition to and not in lieu of the foregoing, the Pledgor shall take such additional actions, including, without limitation, causing the Issuer to register the pledge on its books and records, as may be necessary or advisable or as may be requested by the Lender, under the laws of the jurisdiction of Issuer's organization to insure the validity, perfection and priority of the security interest of the Lender.

### 4.3      <u>Maintenance of Perfected Security Interest; Further Documentation</u>.

(a)      The Pledgor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in Section 3.3 and shall defend such security interest against the claims and demands of all Persons whomsoever.

(b)      The Pledgor shall furnish to the Lender from time to time statements and schedules further identifying and describing the Pledge Collateral and such other reports in connection with the assets and property of the Pledgor as the Lender may request, all in reasonable detail.

(c)      At any time and from time to time, upon the written request of the Lender, and at the sole expense of the Pledgor, the Pledgor shall promptly and duly authorize, execute and deliver, and have recorded, such further instruments and documents and take such further actions as the Lender may request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including, without limitation, the filing of any financing or continuation statements under the UCC (or other similar laws) in effect in any jurisdiction with respect to the security interests created hereby.

### 4.4      <u>Changes in Locations, Name, Jurisdiction of Incorporation, Etc.</u> The Pledgor will not, except upon 15 days' prior written notice to the Lender and delivery to the Lender of duly authorized and, where required, executed copies of all additional financing statements and other documents requested by the Lender to maintain the validity, perfection and priority of the security interests provided for herein:

(i)      change its legal name, jurisdiction of organization or the location of its chief executive office or sole place of business, if applicable, from that referred to in Section 3.4; or

(ii)      change its legal name, identity or structure to such an extent that any financing statement filed by the Lender in connection with this Agreement would become misleading.

### 4.5      <u>Notices</u>. The Pledgor will advise the Lender promptly, in reasonable detail, of (a) any Lien on any of the Pledge Collateral (other than the Liens (i) granted to Lender pursuant to this Agreement, and (ii) entered into in connection with the DIP Loan Agreement), and (b) the occurrence of any other event which could reasonably be expected to have a material adverse effect on the security interests created hereby.

### 4.6      <u>Pledged Equity Interests</u>.

7

(a)      If the Pledgor shall become entitled to receive or shall receive any stock or other ownership certificate (including, without limitation, any certificate representing a stock dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), or option or rights in respect of the capital stock or other Pledged Equity Interest of any Issuer, whether in addition to, in substitution of, as a conversion of, or in exchange for, any shares of or other ownership interests in the Pledged Equity Interests, or otherwise in respect thereof, the Pledgor shall accept the same as the agent of the Lender, hold the same in trust for the Lender and deliver the same forthwith to the Lender in the exact form received, duly endorsed by the Pledgor to the Lender, if required, together with an undated stock power covering such certificate duly executed in blank by the Pledgor and with, if the Lender so requests, signature guaranteed, to be held by the Lender, subject to the terms hereof, as additional collateral security for the Secured Pledge Obligations. If an Event of Default shall have occurred and be continuing, any sums paid upon or in respect of the Pledged Equity Interests upon the liquidation or dissolution of the Issuer shall be paid over to the Lender to be held by it hereunder as additional collateral security for the Secured Pledge Obligations, and in case any distribution of capital shall be made on or in respect of the Pledged Equity Interests or any property shall be distributed upon or with respect to the Pledged Equity Interests pursuant to the recapitalization or reclassification of the capital of any Issuer or pursuant to the reorganization thereof, the property so distributed shall be delivered to the Lender to be held by it hereunder as additional collateral security for the Secured Pledge Obligations. If an Event of Default shall have occurred and be continuing and any sums of money or property so paid or distributed in respect of the Pledged Equity Interests shall be received by the Pledgor, the Pledgor shall, until such money or property is paid or delivered to the Lender, hold such money or property in trust for the Lender, segregated from other funds of the Pledgor, as additional collateral security for the Secured Pledge Obligations.

(b)      Without the prior written consent of the Lender, the Pledgor will not (i) vote to enable, or take any other action to permit, the Issuer to amend the Company LLC Agreement or any other organizational documents of the Issuer in any manner that changes the rights of the Pledgor with respect to any Pledged Equity Interests or affects the validity, perfection or priority of the Lender's security interest therein, (ii) permit the Issuer to issue any additional Equity Interests of any nature or issue securities convertible into Equity Interests of Issuer or grant the right of purchase or exchange for any Equity Interests of the Issuer, (iii) enter into any agreement or undertaking restricting the right or ability of the Pledgor or the Lender to sell, assign or transfer any of the Pledged Equity Interests or Proceeds thereof or any interest therein or (iv) cause or permit the Issuer of any Pledged Equity Interests which are not securities (for purposes of the UCC) on the date hereof to elect or otherwise take any action to cause such Pledged Equity Interests to be treated as securities for purposes of the UCC; **provided**, **however**, that notwithstanding the foregoing, if the Issuer takes any such action in violation of the foregoing in this clause (iv), the Pledgor shall promptly notify the Lender in writing of any such election or action and, in such event, shall take all steps necessary or advisable to establish the Lender's "control" thereof.

### 4.7    <u>Voting and Other Rights with Respect to Pledged Equity Interests</u>.

Unless an Event of Default shall have occurred and be continuing, the Pledgor shall be permitted to receive all cash and non-cash dividends and distributions paid in respect of the

Pledged Equity Interests in the ordinary course of business of the Issuer and to exercise all voting and limited liability company rights with respect to the Pledged Equity Interests; **provided**, **however**, that, without the prior written consent of the Lender, no vote shall be cast or other ownership right exercised or other action taken which could reasonably be expected to impair the Pledge Collateral or be inconsistent with or result in any violation of any provision of any Note Document.

If an Event of Default shall occur and be continuing: (i) all rights of the Pledgor to exercise or refrain from exercising the voting and other consensual rights with respect to Pledged Equity Interests which it would otherwise be entitled to exercise shall cease and all such rights shall thereupon become vested in the Lender who shall thereupon have the sole right, but shall be under no obligation, to exercise or refrain from exercising such voting and other consensual rights and (ii) the Lender shall have the right, without notice to the Pledgor, to transfer all or any portion of the Pledged Equity Interests to its name or the name of its nominee or agent. In addition, the Lender shall have the right at any time, without notice to the Pledgor, to exchange any certificates or instruments representing any Pledged Equity Interests for certificates or instruments of smaller or larger denominations. In order to permit the Lender to exercise the voting and other consensual rights which it may be entitled to exercise pursuant hereto and to receive all dividends and other distributions which it may be entitled to receive hereunder, the Pledgor shall promptly execute and deliver (or cause to be executed and delivered) to the Lender all proxies, dividend payment orders and other instruments as the Lender may from time to time request following the occurrence and during the continuance of an Event of Default and the Pledgor acknowledges that the Lender may utilize the power of attorney set forth herein.

The Pledgor hereby authorizes and instructs the Issuer to (i) comply with any instruction received by it from the Lender in writing that (x) states that an Event of Default has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from the Pledgor, and the Pledgor agrees that the Issuer shall be fully protected in so complying, and (ii) unless otherwise expressly permitted hereby, pay any dividends or other payments with respect to the Pledged Equity Interests directly to the Lender.

### SECTION 5.  REMEDIAL PROVISIONS

**5.1**     **Proceeds to be Turned Over To Lender**. If an Event of Default shall occur and be continuing, all Proceeds received by the Pledgor consisting of cash, Cash Equivalents, checks and other near-cash items shall be held by the Pledgor in trust for the Lender, segregated from other funds of the Pledgor, and shall, forthwith upon receipt by the Pledgor, be turned over to the Lender in the exact form received by the Pledgor (duly endorsed by the Pledgor to the Lender, if required). All Proceeds received by the Lender hereunder shall be held by the Lender in a Collateral Account maintained under its sole dominion and control. All Proceeds while held by the Lender in a Collateral Account (or by the Pledgor in trust for the Lender) shall continue to be held as collateral security for all the Secured Pledge Obligations and shall not constitute payment thereof until applied as provided in Section 5.2.

**5.2**     **Application of Proceeds**. Subject to Section 5.2(b) below, at such intervals as may be agreed upon by the Pledgor and the Lender, or, if an Event of Default shall have occurred and be continuing, at any time at the Lender's election, the Lender may, notwithstanding the

ACTIVE/126951704.6

provisions of Section 4 of the Note, apply all or any part of the Pledge Collateral and/or net Proceeds thereof (after deducting fees and expenses as provided in Section 5.3) realized through the exercise by the Lender of its remedies hereunder, whether or not held in any Collateral Account, in payment of the Secured Pledge Obligations. The Lender shall apply any such Pledge Collateral or Proceeds to be applied in the following order:

> (i)      first, to the Lender in an amount sufficient to pay in full costs and professionals' and advisors' fees and expenses as described in Section 9.4;

> (ii)     second, to the Lender in an amount equal the then unpaid amount of the Secured Pledge Obligations (including principal and accrued uncapitalized interest), in such order and priority as the Lender may choose in its sole discretion; and

> (iii)    finally, after the Discharge of the Secured Pledge Obligations, to any creditor holding a junior Lien on the Pledged Collateral, or to such Obligor or its representatives or as a court of competent jurisdiction may direct.

Any Proceeds not applied shall be held by the Lender as Pledge Collateral.

### 5.3    <u>Code and Other Remedies</u>.

(a)      If an Event of Default shall occur and be continuing, the Lender may exercise, in addition to all other rights and remedies granted to them in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Secured Pledge Obligations, all rights and remedies of a secured party under the UCC (whether or not the UCC applies to the affected Pledge Collateral) and all rights under any other applicable law or in equity. Without limiting the generality of the foregoing, the Lender, without demand of performance or other demand, defense, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon the Pledgor or any other Person (all and each of which demands, presentments, protests, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Pledge Collateral, or any part thereof, and/or may forthwith sell, lease, license, assign, give option or options to purchase, or otherwise dispose of and deliver the Pledge Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Lender, on the internet or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk. The Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Pledge Collateral so sold or to become the licensor of all or any such Pledge Collateral, free of any right or equity of redemption in the Pledgor, which right or equity is hereby waived and released. For purposes of bidding and making settlement or payment of the purchase price for all or a portion of the Pledge Collateral sold at any such sale made in accordance with the UCC or other applicable laws, including, without limitation, the Bankruptcy Code, the Lender shall be entitled to credit bid and use and apply the Secured Pledge Obligations (or any portion thereof) as a credit on account of the purchase price for any Pledge Collateral payable by the Lender at such sale, such amount to be apportioned ratably to the Secured Pledge Obligations of the Lender in accordance with their pro rata share of such Secured Pledge

10

Obligations. Each purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of the Pledgor, and the Pledgor hereby waives (to the extent permitted by applicable law) all rights of redemption, stay and/or appraisal which it now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted. The Pledgor agrees that, to the extent notice of sale shall be required by law, at least 10 days' notice to the Pledgor of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Lender shall not be obligated to make any sale of Pledge Collateral regardless of notice of sale having been given. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. The Lender may sell the Pledge Collateral without giving any warranties as to the Pledge Collateral. The Lender may specifically disclaim or modify any warranties of title or the like. The foregoing will not be considered to adversely affect the commercial reasonableness of any sale of the Pledge Collateral. The Pledgor agrees that it would not be commercially unreasonable for the Lender to dispose of the Pledge Collateral or any portion thereof by using Internet sites that provide for the auction of assets of the types included in the Pledge Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets. The Pledgor hereby waives any claims against the Lender arising by reason of the fact that the price at which any Pledge Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale, even if the Lender accepts the first offer received and does not offer such Pledge Collateral to more than one offeree. The Pledgor further agrees, at the Lender's request, to assemble the Pledge Collateral and make it available to the Lender at places which the Lender shall reasonably select, whether at the Pledgor's premises or elsewhere. The Lender shall have the right to enter onto the property where any Pledge Collateral is located without any obligation to pay rent and take possession thereof with or without judicial process. The Lender shall have no obligation to marshal any of the Pledge Collateral.

(b)    The Lender shall deduct from such Proceeds all reasonable costs and expenses of every kind incurred in connection with the exercise of its rights and remedies against the Pledge Collateral or incidental to the care or safekeeping of any of the Pledge Collateral or in any way relating to the Pledge Collateral or the rights of the Lender hereunder, including, without limitation, reasonable documented out-of-pocket attorneys' fees and disbursements. Any net Proceeds remaining after such deductions shall be applied or retained by the Lender in accordance with Section 5.2. Only after such application and after the payment by the Lender of any other amount required by any provision of law, including, without limitation, Section 9-615(a) of the UCC, need the Lender account for the surplus, if any, to the Pledgor. If the Lender sells any of the Pledge Collateral upon credit, the Pledgor will be credited only with payments actually made by the purchaser and received by the Lender. In the event the purchaser fails to pay for the Pledge Collateral, the Lender may resell the Pledge Collateral and the Pledgor shall be credited with proceeds of the sale. To the extent permitted by applicable law, the Pledgor waives all claims, damages and demands it may acquire against the Lender arising out of the exercise by it or them of any rights hereunder.

**5.4    Effect of Securities Laws**. The Pledgor recognizes that the Lender may be unable to effect a public sale of any or all of the Pledged Equity Interests by reason of certain prohibitions contained in the Securities Act and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers

11

which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. The Pledgor acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner. The Lender shall be under no obligation to delay a sale of any of the Pledged Equity Interests for the period of time necessary to permit the Issuer thereof to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if the Issuer would agree to do so.

5.5    **Deficiency**. The Pledgor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Pledge Collateral are insufficient to pay its Secured Pledge Obligations and the fees and disbursements of any attorneys employed by the Lender to collect such deficiency.

### SECTION 6.  POWER OF ATTORNEY AND FURTHER ASSURANCES

6.1    **Lender's Appointment as Attorney-in-Fact, Etc.**

(a)    The Pledgor hereby irrevocably constitutes and appoints the Lender and any officer or agent thereof, with full power of substitution, as its true and lawful proxy and attorney-in-fact with full irrevocable power and authority in the place and stead of the Pledgor and in the name of the Pledgor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, the Pledgor hereby gives the Lender the power and right, on behalf of the Pledgor, without notice to or assent by the Pledgor, to do any or all of the following:

(i)    in the name of the Pledgor or its own name, or otherwise, take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys with respect to any Pledge Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Lender for the purpose of collecting any and all such moneys due with respect to any other Pledge Collateral whenever payable;

(ii)    pay or discharge taxes and Liens levied or placed on or threatened against the Pledge Collateral, effect any repairs or purchase any insurance called for by the terms of the Note Documents and pay all or any part of the premiums therefor and the costs thereof;

(iii)    execute, in connection with any sale provided for in Section 5.3 or 5.4, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Pledge Collateral; and

(iv)    (1) direct any party liable for any payment under any of the Pledge Collateral to make payment of any and all moneys due or to become due thereunder directly to the Lender or as the Lender shall direct; (2) ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Pledge Collateral; (3) sign and endorse

12

any assignments, verifications, notices and other documents in connection with any of the Pledge Collateral; (4) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Pledge Collateral or any portion thereof and to enforce any other right in respect of any Pledge Collateral; (5) defend any suit, action or proceeding brought against the Pledgor with respect to any Pledge Collateral; (6) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Lender may deem appropriate; and (7) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Pledge Collateral as fully and completely as though the Lender were the absolute owner thereof for all purposes, and do, at the Lender's option and the Pledgor's expense, at any time, or from time to time, all acts and things which the Lender deems necessary to protect, preserve or realize upon the Pledge Collateral and the Lender's security interests therein and to effect the intent of this Agreement, all as fully and effectively as the Pledgor might do.

Anything in this Section 6.1(a) to the contrary notwithstanding, the Lender agrees that, except as provided in Section 6.1(b), it will not exercise any rights under the power of attorney provided for in this Section 6.1(a) unless an Event of Default shall have occurred and be continuing.

(b)     If the Pledgor fails to perform or comply with any of its agreements contained herein, the Lender, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement; **provided**, **however**, that unless an Event of Default has occurred and is continuing or would reasonably be expected to occur, the Lender shall not exercise this power without first making demand on the Pledgor and the Pledgor failing to promptly comply therewith.

(c)     The expenses of the Lender incurred in connection with actions undertaken as provided in this Section 6.1, together with interest thereon at a rate per annum equal to the rate per annum at which interest would then be payable under the Note, from the date of payment by the Lender to the date reimbursed by the Pledgor, shall be payable by the Pledgor to the Lender on demand.

(d)     The Pledgor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until a Discharge of the Secured Pledge Obligations.

**6.2     Authorization of Financing Statements.** The Pledgor acknowledges that pursuant to Section 9-509(b) of the UCC and any other applicable law, the Lender is authorized to file or record financing or continuation statements, and amendments thereto, and other filing or recording documents or instruments with respect to the Pledge Collateral in such form and in such offices as the Lender reasonably determines appropriate to perfect or maintain the perfection of the security interests of the Lender under this Agreement. The Pledgor agrees that such financing statements may describe the collateral in the same manner as described in the Note Documents or such other description as the Lender, in its sole judgment, determines is necessary or advisable. A photographic or other reproduction of this Agreement shall be sufficient as a financing statement

13

or other filing or recording document or instrument for filing or recording in any jurisdiction. Lender agrees that, except following the occurrence and during the continuance of an Event of Default, it shall provide reasonable notice to the Pledgor prior to the filing or recording of any documents or instruments with respect to the Pledge Collateral authorized under this Section 6.2.

      **6.3**      **Further Assurances**. The Pledgor agrees that from time to time, at the expense of the Pledgor, it shall promptly execute and deliver all further instruments and documents and take all further action that may be necessary or desirable, or that the Lender may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Lender to exercise and enforce its rights and remedies hereunder in respect of any Pledge Collateral. Without limiting the generality of the foregoing, the Pledgor shall:

      (i)      file such financing or continuation statements, or amendments thereto and execute and deliver such other agreements, instruments, endorsements, powers of attorney or notices, as may be necessary or desirable, or as the Lender may reasonably request, in order to effect, reflect, perfect and preserve the security interests granted or purported to be granted hereby;

      (ii)      at the Lender's request, appear in and defend any action or proceeding that may affect the Pledgor's title to or the Lender's interest in all or any part of the Pledge Collateral; and

      (iii)      furnish the Lender with such information regarding the Pledge Collateral, including, without limitation, the location thereof, as the Lender may reasonably request from time to time.

## SECTION 7.  LIEN ABSOLUTE; WAIVER OF SURETYSHIP DEFENSES

      **7.1**      **Lien Absolute, Waivers**.

      (a)      All rights of Lender hereunder, and all obligations of the Pledgor hereunder, shall be absolute and unconditional irrespective of, shall not be affected by, and shall remain in full force and effect without regard to, and hereby waives all, rights, claims or defenses that it might otherwise have (now or in the future) with respect to, in each case, each of the following (whether or not the Pledgor has knowledge thereof):

      (i)      the validity or enforceability of any Note Document, any of the Secured Pledge Obligations or any guarantee or right of offset with respect thereto at any time or from time to time held by the Lender;

      (ii)      any renewal, extension or acceleration of, or any increase in the amount of the Secured Pledge Obligations, or any amendment, supplement, modification or waiver of, or any consent to departure from, the Note Documents;

      (iii)      any failure or omission to assert or enforce or agreement or election not to assert or enforce, delay in enforcement, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand

14

or any right, power or remedy (whether arising under any Note Documents, at law, in equity or otherwise) with respect to the Secured Pledge Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Secured Pledge Obligations;

(iv)    any change, reorganization or termination of the corporate structure or existence of the Pledgor or any of its Subsidiaries and any corresponding restructuring of the Secured Pledge Obligations;

(v)    any settlement, compromise, release, or discharge of, or acceptance or refusal of any offer of payment or performance with respect to, or any substitutions for, the Secured Pledge Obligations or any subordination of the Secured Pledge Obligations to any other obligations;

(vi)    the validity, perfection, non-perfection or lapse in perfection, priority or avoidance of any security interest or lien, the release of any or all collateral securing, or purporting to secure, the Secured Pledge Obligations or any other impairment of such collateral;

(vii)    any exercise of remedies with respect to any security for the Secured Pledge Obligations (including, without limitation, any collateral, including the Pledge Collateral securing or purporting to secure any of the Secured Pledge Obligations) at such time and in such order and in such manner as the Lender may decide and whether or not every aspect thereof is commercially reasonable and whether or not such action constitutes an election of remedies and even if such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy that the Pledgor would otherwise have and without limiting the generality of the foregoing or any other provisions hereof, the Pledgor hereby expressly waives any and all benefits which might otherwise be available to the Pledgor under applicable law; and

(viii)    any other circumstance whatsoever which may or might in any manner or to any extent vary the risk of the Pledgor as an obligor in respect of the Secured Pledge Obligations or which constitutes, or might be construed to constitute, an equitable or legal discharge of the Pledgor for the Secured Pledge Obligations, or of the Pledgor under the guarantee contained in this Section 2 or of any security interest granted by the Pledgor, whether in a Bankruptcy Proceeding or in any other instance.

(b)    In addition, the Pledgor further waives any and all other defenses, set-offs or counterclaims (other than a defense of payment or performance in full hereunder) which may at any time be available to or be asserted by it, the Pledgor or any Person against the Lender, including, without limitation, failure of consideration, breach of warranty, statute of frauds, statute of limitations, accord and satisfaction and usury.

(c)    The Pledgor waives diligence, presentment, protest, marshaling, demand for payment, notice of dishonor, notice of default and notice of nonpayment to or upon  the Pledgor or any other Borrower with respect to the Secured Pledge Obligations. Except for notices provided for herein, the Pledgor hereby waives notice (to the extent permitted by applicable law) of any

ACTIVE/126951704.6

kind in connection with this Agreement or any collateral securing the Secured Pledge Obligations, including, without limitation, the Pledge Collateral. When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against the Pledgor, Lender may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against the Pledgor or any other Person or against any collateral security or guarantee for the Secured Pledge Obligations or any right of offset with respect thereto, and any failure by Lender to make any such demand, to pursue such other rights or remedies or to collect any payments from the Pledgor or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of the Pledgor or any other Person or any such collateral security, guarantee or right of offset, shall not relieve the Pledgor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the Lender against the Pledgor. For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

### SECTION 8.  THE LENDER

8.1    **[Reserved]**.

8.2    **Duty of Lender**. The Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Pledge Collateral in its possession, under Section 9-207 of the UCC or otherwise, shall be to deal with it in the same manner as the Lender deals with similar property for its own account. Neither the Lender nor any of its respective officers, directors, partners, employees, agents, attorneys or other advisors, attorneys-in-fact or affiliates shall be liable for failure to demand, collect or realize upon any of the Pledge Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Pledge Collateral upon the request of the Pledgor or any other Person or to take any other action whatsoever with regard to the Pledge Collateral or any part thereof. The powers conferred on the Lender hereunder are solely to protect its interests in the Pledge Collateral and shall not impose any duty upon the Lender to exercise any such powers. The Lender shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, partners, employees, agents, attorneys and other advisors, attorneys-in-fact or affiliates shall be responsible to the Pledgor for any act or failure to act hereunder, except to the extent that any such act or failure to act is found by a final and non-appealable decision of a court of competent jurisdiction to have resulted solely and proximately from their own gross negligence or willful misconduct in breach of a duty owed to the Pledgor.

8.3    **[Reserved]**.

8.4    **Delegation of Duties**. The Lender may perform any and all of its duties and exercise its rights and powers under this Agreement  by or through any one or more sub-agents appointed by the Lender. The Lender and any such sub- agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. All of the rights, benefits, and privileges (including the exculpatory and indemnification provisions) of this Article 8 shall apply to any such sub-agent and to any of the Affiliates of the Lender and any such sub-agents, and shall apply to their respective activities as if such sub-agent and Affiliates were named herein in connection with the transactions contemplated hereby and by the Note Documents. Notwithstanding anything herein to the contrary, each sub-agent appointed by the Lender or

16

Affiliate of the Lender or Affiliate of any such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory rights and rights to indemnification) and shall have all of the rights and benefits of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of the Borrowers and the Lender, and such rights, benefits and privileges (including exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent or Affiliate acting in such capacity.

## SECTION 9.  MISCELLANEOUS

**9.1**      **Amendments in Writing**. None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except by a written instrument executed by the Pledgor and the Lender, **provided** that any provision of this Agreement imposing obligations on the Pledgor may be waived by the Lender in a written instrument executed by the Lender.

**9.2**      **Notices**. All notices, requests and demands to or upon the Lender or the Pledgor hereunder shall be effected in the manner provided for in Section 8(f) of the Note.

**9.3**      **No Waiver by Course of Conduct; Cumulative Remedies**. The Lender shall not by any act (except by a written instrument pursuant to Section 9.1), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. No failure to exercise, nor any delay in exercising, on the part of the Lender, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by the Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which the Lender would otherwise have on any future occasion. The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

**9.4**      **Enforcement Expenses; Indemnification**.

(a)      The Pledgor agrees to pay or reimburse the Lender for all its costs and expenses incurred in collecting against the Pledgor or otherwise enforcing or preserving any rights under any Note Documents, including, without limitation, the fees and disbursements of counsel to the Lender.

(b)      The Pledgor agrees to pay, and to save the Lender harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Pledge Collateral or in connection with any of the transactions contemplated by this Agreement.

(c)      The Pledgor agrees to pay, and to save the Lender, harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement ("**Liabilities**") excluding, in all

17

cases, Liabilities to the extent resulting solely from the Lender's gross negligence or willful misconduct, as determined by a court of competent jurisdiction pursuant to a final, non-appealable judgment.

(d)      [reserved].

(e)      The agreements in this Section shall survive the Discharge of the Secured Pledge Obligations and all other amounts payable under the Note Documents.

**9.5      Successors and Assigns**. This Agreement shall be binding upon the successors and assigns of the Pledgor and shall inure to the benefit of the Lender and its successors and permitted assigns; **provided** that the Pledgor may not assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the Lender and any such assignment, transfer or delegation without such consent shall be null and void.

**9.6      Set-Off**. The Pledgor hereby irrevocably authorizes the Lender at any time and from time to time while an Event of Default pursuant to Sections 7(a), 7 (e) or 7(f) of the Note shall have occurred and be continuing, without notice to the Pledgor, any such notice being expressly waived by the Pledgor, to set-off and appropriate and apply any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such party to or for the credit or the account of the Pledgor, or any part thereof in such amounts as the Lender may elect, against and on account of the obligations and liabilities of the Pledgor to the Lender hereunder and claims of every nature and description of the Lender against the Pledgor, in any currency, whether arising hereunder, under any Note Document or otherwise, as the Lender may elect, whether or not the Lender has made any demand for payment and although such obligations, liabilities and claims may be contingent or unmatured. If the Lender exercises any right of set-off shall notify the Pledgor promptly of any such set-off and the application made by the Lender of the proceeds thereof, **provided** that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Lender under this Section are in addition to other rights and remedies (including, without limitation, other rights of set-off) which the Lender may have.

**9.7      Counterparts**. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by electronic imaging means), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by electronic transmission (e.g. "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart hereof.

**9.8      Severability**. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. The parties hereto shall endeavor in good-faith negotiations to replace any invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

ACTIVE/126951704.6

   **9.9** **Integration/Conflict**. This Agreement and the other Note Documents represent the entire agreement of the Pledgor , the Lender with respect to the subject matter hereof and thereof, and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof. There are no promises, undertakings, representations or warranties by the Lender relative to the subject matter hereof and thereof not expressly set forth or referred to herein or therein.

   **9.10** **GOVERNING LAW AND VENUE**. THIS AGREEMENT AND ANY AND ALL ACTIONS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO THE CONFLICTS OF LAW PROVISIONS OF THE STATE OF NEW YORK. THE PLEDGOR HERBY IRREVOCABLY WAIVES ANY OBJECTION IT WOULD MAKE NOW OR HEREAFTER FOR THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT BROUGHT IN THE STATE COURTS AND THE FEDERAL COURTS OF THE UNITED STATES SITTING IN NEW YORK COUNTY, NEW YORK, AND HEREBY IRREVOCABLY WAIVES ANY CLAIM THAT SUCH SUIT, ACTION, OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

   **9.11** **Arbitration**. Any dispute, controversy or claim arising out of or relating to this Agreement or the subject matter hereof or thereof, including, but not limited to, any contractual, pre-contractual or noncontractual rights, obligations or liabilities and any question or dispute regarding the existence, validity, formation, effect, interpretation, performance, breach, termination or invalidity hereof or thereof (a "**Dispute**"), shall be finally settled by arbitration. Any arbitration initiated in connection with this Section 9.11 shall be conducted by the New York office of the American Arbitration Association ("**AAA**") in accordance with AAA Commercial Rules in effect at the time of applying for arbitration ("**AAA Rules**"), except as the AAA Rules conflict with the provisions of this Section 9.11, in which event the provisions of this Section 9.11 shall control. The arbitration tribunal shall consist of three (3) arbitrators, one (1) to be appointed by the claimant, one (1) to be appointed by the respondent and the two (2) arbitrators so appointed shall jointly appoint the third arbitrator. The tribunal shall decide any dispute submitted by the Parties strictly in accordance with the substantive law of the state of New York and shall not apply any other substantive law. Subject to the agreement of the tribunal, any Dispute(s) which arise subsequent to the commencement of arbitration of any existing Dispute(s) shall be resolved by the tribunal already appointed to hear the existing Dispute(s). The arbitration award shall be final, conclusive and binding on each party as from the date rendered. Judgment upon any arbitration award may be entered and enforced in any court having jurisdiction over a party or any of its assets.

   **9.12** **Acknowledgments**. The Pledgor hereby acknowledges that:

   (a) it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Note Documents to which it is a party;

   (b) the Lender has no fiduciary relationship with or duty to the Pledgor arising out of or in connection with this Agreement or any of the other Note Documents, and the relationship between the Pledgor, on the one hand, and the Lender, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)     no joint venture is created hereby or by the other Note Documents or otherwise exists by virtue of the transactions contemplated hereby among the Pledgor and the Lender.

### 9.13   **Releases**.

(a)     At such time as there has been a Discharge of the Secured Pledge Obligations, the Pledge Collateral shall be released from the Liens created hereby, and this Agreement and all obligations (other than those expressly stated to survive such termination) of the Lender and the Pledgor hereunder shall terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Pledge Collateral shall revert to the Pledgor. At the request and sole expense of the Pledgor following any such termination, the Lender shall deliver to the Pledgor any Pledge Collateral held by the Lender hereunder, and execute and deliver to the Pledgor such documents as the Pledgor shall reasonably request to evidence such termination.

(b)     The Pledgor acknowledges that it is not authorized to file any financing statement or amendment or termination statement with respect to any financing statement originally filed in connection herewith without the prior written consent of the Lender, subject to the Pledgor's rights under Section 9-509(d)(2) of the UCC.

ACTIVE/126951704.6

IN WITNESS WHEREOF, each of the undersigned has caused this Pledge Agreement to be duly executed and delivered as of the date first above written.

**PLEDGOR:**

**AMYRIS, INC.**


By:_____
    Name:
    Title:


**LENDER:**

**DSM FINANCE B.V.**


By:_____
    Name:
    Title:

[Signature Page to Amended and Restated Pledge Agreement]

IN WITNESS WHEREOF, each of the undersigned has caused this Amended and Restated Pledge Agreement to be duly executed and delivered as of the date first above written.

**PLEDGOR:**

**AMYRIS, INC.**


By:_____
    Name:
    Title:


**LENDER:**

**DSM FINANCE B.V.**


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:

[Signature Page to Amended and Restated Pledge Agreement]

<u>Schedule 1</u>

**DESCRIPTION OF PLEDGED EQUITY INTERESTS**

| Pledgor | Issuer | Certificated (Y/N) | Certificate No. (if any) | No. of Pledged Units | % of Outstanding LLC Interests of the Issuer |
|---|---|---|---|---|---|
| Amyris, Inc. | Amyris RealSweet, LLC | N | N/A | 63,480,000 | 69.00% |

Schedule 1-1

<u>Schedule 2</u>

**FILINGS AND OTHER ACTIONS
REQUIRED TO PERFECT SECURITY INTERESTS**

**<u>Uniform Commercial Code Filings</u>**

Delaware

**<u>Actions with respect to Pledged Equity Interests</u>**

Physical delivery of stock certificate and related stock power of Issuer to the Lender (if applicable).

Schedule 2-1

<u>Schedule 3</u>

**PLEDGOR'S EXACT LEGAL NAME, LOCATION OF JURISDICTION OF ORGANIZATION AND CHIEF EXECUTIVE OFFICE**

| Exact Legal Name | Jurisdiction of Organization | Organizational I.D. | Chief Executive Office or Sole Place of Business |
|---|---|---|---|
| Amyris, Inc. | Delaware | 4768633 | 5885 Hollis Street, Suite 100, Emeryville, CA 94608 |

Schedule 3-1

<u>Schedule 4</u>

**NOTICE ADDRESS OF THE PLEDGOR**

AMYRIS, INC.
Attention: Chief Legal Officer
5885 Hollis Street, Suite 100
Emeryville, CA 94608
Phone: (510) 450 0761
Email: chieflegalofficer@amyris.com

with a copy (which shall not constitute notice) to:

GOODWIN PROCTER LLP
Three Embarcadero Center 28th floor,
San Francisco, CA 94111
Attn: Jon Novotny
Phone:  (415) 733 6181
Email: jnovotny@goodwinlaw.com

Schedule 4-1

Exhibit A to Pledge Agreement

INSERT TO LLC/PARTNERSHIP AGREEMENT

Section [ ˅ ]. Pledgee's Rights;.

Subdivision 1. Notwithstanding anything contained herein to the contrary, each [Member/Partner] shall be permitted to pledge or hypothecate any or all of its [Units/Partnership Interests], including all Interests, economic rights, control rights and status rights as a [Member/Partner], to any lender to the Company or an affiliate of the Company or any agent acting on such lender's behalf, and any transfer of such [Units/Partnership Interests] pursuant to any such lender's (or agent's) exercise of remedies in connection with any such pledge or hypothecation shall be permitted under this Agreement with no further action or approval required hereunder. Notwithstanding anything contained herein to the contrary, upon a default under the financing giving rise to any pledge or hypothecation of [Units/Partnership Interests], the lender (or agent) shall have the right, as set forth in the applicable pledge or hypothecation agreement, and without further approval of any [Member/Partner] and without becoming a [Member/Partner], to exercise the membership/partnership voting rights of the [Member/Partner] granting such pledge or hypothecation. Notwithstanding anything contained herein to the contrary, and without complying with any other procedures set forth in this Agreement, upon the exercise of remedies in connection with a pledge or hypothecation, (a) the lender (or agent) or transferee of such lender (or agent), as the case may be, shall become a [Member/Partner] under this Agreement and shall succeed to all of the rights and powers, including the right to participate in the management of the business and affairs of the [Company/Partnership], and shall be bound by all of the obligations, of a [Member/Partner] under this Agreement without taking any further action on the part of such lender (or agent) or transferee, as the case may be, and (b) following such exercise of remedies, the pledging [Member/Partner] shall cease to be a [Member/Partner] and shall have no further rights or powers under this Agreement. The execution and delivery of this Agreement by a [Member/Partner] shall constitute any necessary approval of such [Member/Partner] under the Act to the foregoing provisions of this Section [ ˅ ]. This Section [ ˅ ] may not be amended or modified so long as any of the [Units/Partnership Interests] is subject to a pledge or hypothecation without the pledgee's (or the Transferee of such pledgee's) prior written consent. Each recipient of a pledge or hypothecation of the [Units/Partnership Interests] shall be a third party beneficiary of the provisions of this Section [ ˅ ].

ACTIVE/126951704.6