# <u>EXHIBIT I</u>

**(EXIT FIRST LIEN FACILITY DOCUMENTS)**

*(Form of Agreement – Subject to Amendment and Conforming Modifications)*

## SECOND AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

This SECOND AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT is made and dated as of [January][      ], 2024, and is entered into by and among AMYRIS, INC., a Delaware corporation (the "Parent"), each of the Subsidiaries of the Parent set out in Part 1 of Schedule 1 to this Agreement (together with the Parent, each, a "Borrower" and collectively, the "Borrowers"), the Subsidiaries of the Parent set out in Part 2 of Schedule 1 to this Agreement (and such other Subsidiaries of the Parent that are guarantors, each, a "Guarantor" and collectively, the "Guarantors" and, together with the Borrowers, each an "Obligor" and collectively, the "Obligors") and FORIS VENTURES, LLC a Delaware limited liability company, in its capacity as lender (the "Lender").

## RECITALS

A.    The Lender, as the successor in interest to GACP Finance Co., LLC,  extended credit to Borrower pursuant to that certain Loan and Security Agreement, dated as of June 29, 2018, as modified by that certain First Modification Agreement, effective as of June 29, 2018 and as amended pursuant to that certain Amendment No 1 to Loan Agreement, effective as of August 24, 2018, that certain Amendment No 2 to Loan Agreement, effective as of September 30, 2018, that certain Amendment No 3 to Loan Agreement, effective as of December 14, 2018 and that certain Amendment No 4 to Loan Agreement, effective as of April 4, 2019, that certain Amendment No 5 to Loan Agreement and Waiver, effective as of August 14, 2019 , and that certain Amendment No 6 to Loan Agreement, effective as of October 10, 2019 , and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time up until immediately before the Effective Date, the "Original Loan Agreement").

B.    The Original Loan Agreement was amended and restated pursuant to the Amended and Restated Loan and Security Agreement dated as of October 28, 2019 among the Borrowers, the Guarantors and the Lender (the "First Amended and Restated Loan Agreement", and the Original Loan Agreement, as so amended and restated by the First Amended and Restated Loan Agreement, and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time up until immediately before the effectiveness of this Agreement, the "Existing Loan Agreement").

C. On June 4, 2020, Amyris entered into Amendment No. 1 to the First Amended and Restated Loan Agreement and on June 30, 2022, Amyris entered into Amendment No. 2 to the First Amended and Restated Loan Agreement.

D.    On August 9, 2023 (the "Petition Date"), the Parent and certain of the Parent's Subsidiaries (each, a "Debtor" and collectively, the "Debtors") filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under chapter 11 of the Bankruptcy Code (each case of the Parent and each other Debtor, a "Case" and collectively, the "Cases") and have continued in the possession of their assets and the management of their business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

E.     In connection with the Cases, the Debtors and certain creditor parties entered into an Amended and Restated Plan Support Agreement on December 12, 2023, which provides for the implementation of a restructuring involving the Debtors on the terms set forth in the Second Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors, as Modified (including all annexes, exhibits, schedules and supplements thereto, in each case, as may be amended, modified or supplemented from time to time so long as such amendments are in form and substance acceptable to the Required Lenders, the "Chapter 11 Plan"), which was filed with the Bankruptcy Court on December 12, 2023.

1

F.       On August 9, 2023, the Parent, Amyris Clean Beauty, Inc., and Aprinnova, LLC, in their capacity as borrowers (collectively, the "DIP Borrowers"), Euagore, LLC, in its capacity as lender (the "DIP Lender"), and Euagore, LLC, in its capacity as administrative agent (the "DIP Agent"), entered into that certain Senior Secured Super Priority Debtor in Possession Loan Agreement (as the same may from time to time be amended, modified, supplemented or restated, the "DIP Loan Agreement"), whereby the DIP Lender agreed to provide a super priority multiple-draw senior secured debtor-in-possession term loan credit facility in the aggregate principal amount of up to $190 million (the "DIP Loans"), subject to and in accordance with the terms and conditions set forth in the DIP Loan Agreement (the "DIP Facility").

G.       On October 16, 2023, the DIP Facility was approved by the Bankruptcy Court pursuant to the *Final Order (I) Authorizing the Debtors (A) to Obtain Postpetition Financing and (B) to Utilize Cash Collateral (II) Granting Adequate Protection to Prepetition Secured Lenders, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 558], which granted, among other things, the DIP Agent, for itself and the for the benefit of the DIP Lender, a valid, binding, continuing, enforceable, non-avoidable, automatically and properly perfected, first priority priming senior security interest in and lien upon the certain collateral (including the Collateral) to secure the DIP Borrowers' obligations under the DIP Loan Agreement.

H.       As of the date hereof immediately before the Effective Date, loans with an aggregate principal amount of $[52,983,029.40] ("Original Advances") and accrued but unpaid interest of $[17,463,750.21] ("Accrued Interest") were outstanding under the Existing Loan Agreement (such amount, after giving effect to  payment in kind of the Accrued Interest in accordance with this Agreement, in aggregate, the "Original Loan").

I.       Pursuant to the Chapter 11 Plan, the Borrowers, the Guarantors and the Lender are entering into this Agreement pursuant to which the Lender shall make available to the Borrowers additional loans in an aggregate principal amount not to exceed $145,000,000 (the "Exit Advances").

J. The Lender and Borrowers have agreed to (1) certain further amendments to the Existing Loan Agreement, which amendments are reflected herein, and (2) restate the terms of the Existing Loan Agreement for ease of reference.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and undertakings contained in this Agreement, the parties to this Agreement agree as follows:

## SECTION 1. AMENDMENT AND RESTATEMENT; DEFINITIONS AND RULES OF CONSTRUCTION

1.1 On the Effective Date, the Existing Loan Agreement shall be amended and restated in its entirety by this Agreement and the Existing Loan Agreement and the Original Loans are hereby reaffirmed in all respects.  Except as a result of the Cases, the amendments and restatements set forth herein shall not cure any breach thereof or any default or "Event of Default" existing prior to the Effective Date. This Agreement is not in any way intended to constitute a novation of the obligations and liabilities existing under the Existing Credit Agreement or evidence payment of all or any portion of such obligations and liabilities thereunder or impair or affect the liens and/or security interests granted, pledged or assigned by the Borrowers to the Lender in accordance with the terms of the Existing Loan Agreement and the various other Security Documents. Each Obligor hereby (i) agrees that the terms and provisions hereof shall not affect in any way any payment, performance, observance or other obligations or liabilities of such Obligor

ACTIVE/126640070

under the Existing Loan Agreement, all of which obligations and liabilities are hereby ratified, confirmed and reaffirmed in all respects (and which shall be applicable to all Secured Obligations), and (ii) to the extent such Obligor has granted Liens on any of its properties or assets pursuant to the Existing Loan Agreement or any other Loan Document to secure the payment, performance and/or observance of all or any part of the Secured Obligations or any such Loan Document, acknowledges, ratifies, confirms and reaffirms such grant of Liens, and acknowledges and agrees that all of such Liens are intended and shall be deemed and construed to secure to the fullest extent set forth therein all now existing and hereafter arising Secured Obligations, as hereafter amended, restated, amended and restated, supplemented and otherwise modified and in effect from time to time.  To the extent that any provision of this Agreement conflict with the terms of the Existing Loan Agreement or any such Loan Documents, the terms of this Agreement shall control.

The terms and conditions of this Agreement and the Lender's rights and remedies under this Agreement and the other Loan Documents shall apply to all of the Secured Obligations incurred under the Existing Loan Agreement.

On and after the Effective Date, (i) all references to the Existing Loan Agreement (or to any amendment or any amendment and restatement thereof) in the other Loan Documents (other than this Agreement) shall be deemed to refer to the Existing Loan Agreement, as amended and restated hereby, (ii) all references to any section (or subsection) of the Existing Loan Agreement in any other Loan Document (but not in this Agreement) shall be amended to become, mutatis mutandis, references to the corresponding provisions of this Agreement, and (iii) except as the context otherwise provides, on or after the Effective Date, all references to this Agreement herein (including for purposes of indemnification and reimbursement of fees) shall be deemed to be references to the Existing Loan Agreement, as amended and restated hereby.

This amendment and restatement is limited as written and is not a consent to any other amendment, restatement or waiver, whether or not similar and, except as expressly provided herein or in any other Loan Document, all terms and conditions of the other Loan Documents remain in full force and effect unless otherwise specifically amended hereby or in any other Loan Document.

1.2 As used in this Agreement (including the recitals hereof), the terms listed in this <u>Section 1.2</u> shall have the respective meanings set forth in this <u>Section 1.2</u>:

"<u>Account Control Agreement(s)</u>" means any agreement entered into by and among the Lender, any Borrower and a third party bank or other institution in which any Obligor maintains a Deposit Account or an account holding Investment Property and which grants the Lender a perfected security interest in the subject account or accounts.

"<u>Accrued Interest</u>" has the meaning given to it in the Recitals.

"<u>Advance(s)</u>" means the Original Advances and Exit Advances.

"<u>Advance Date</u>" means the funding date of any Advance.

"<u>Advance Request</u>" means a request for an Advance submitted by a Borrower to the Lender in substantially the form of <u>Exhibit A</u>.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and under "common control with"), as used with respect to any Person, shall mean the

ACTIVE/126640070

possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise.

"<u>Agreement</u>" means this Second Amended and Restated Loan and Security Agreement, as amended, supplemented, or otherwise duly modified and in effect from time to time.

"<u>Anti-Terrorism Order</u>" means Executive Order No. 13,224 as of September 24, 2001, Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism, 66 U.S. Fed. Reg. 49,079 (2001), as amended.

"<u>Asset Sale</u>" means a sale, assignment, conveyance, exclusive license (as licensor), transfer or other disposition to, or any exchange of property with, any Person (other than another member of the Parent or its consolidated Subsidiaries), in one transaction or a series of transactions, of all or any part of any Parent's or a consolidated Subsidiary's businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, created, leased or licensed, other than (i) dispositions of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business; (ii) dispositions of inventory sold, and Permitted Intellectual Property Licenses; (iii) dispositions of Cash or Cash Equivalents to the extent not otherwise prohibited by this Agreement; and (iv) dispositions of accounts or payment intangibles (each as defined in the UCC) resulting from the compromise or settlement thereof in the ordinary course of business for less than the full amount thereof.

"<u>Assignee</u>" has the meaning set forth in <u>Section 10.13</u>.

"<u>Available Exit Commitment</u>" means, at any time, an amount equal to the aggregate Exit Loan Commitment minus the aggregate initial principal amount of all Exit Advances made immediately before such time.

"<u>Availability Period</u>" means the period from the Effective Date through [the Original Advance Maturity Date].

"<u>Bankruptcy Code</u>" means the federal Bankruptcy Reform Act of 1978 (11 U.S.C. Sections 101 et seq.).

"<u>Bankruptcy Court</u>" shall mean the United States Bankruptcy Court for the District of Delaware or any other court having jurisdiction over the Cases from time to time.

"<u>Bankruptcy Law</u>" means each of (i) the Bankruptcy Code, (ii) any domestic or foreign law relating to liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, administration, insolvency, reorganization, debt adjustment, receivership or similar debtor relief from time to time in effect and affecting the rights of creditors generally (including without limitation any plan of arrangement provisions of applicable corporation statutes), and (iii) any order made by a court of competent jurisdiction in respect of any of the foregoing.

"<u>Board of Directors</u>" means with respect to (i) any corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board, (ii) a partnership, the board of directors or managing member or members, as applicable, of the general partner of the partnership, (iii) a limited liability company, the managing member or members or any controlling committee or board of directors of such company or the sole member or the managing member thereof, and (iv) any other Person, the board or committee of such Person serving a similar function.

"<u>Borrowers</u>" has the meaning given to it in the preamble to this Agreement.

ACTIVE/126640070

"Borrower Products" means all products, software, service offerings, technical data or technology currently being designed, manufactured or sold by any Obligor or which any Obligor intends to sell, license, or distribute in the future including any products or service offerings under development, collectively, together with all products, software, service offerings, technical data or technology that have been sold, licensed or distributed by any Obligor since their respective incorporations.

"Business Day" means any day other than Saturday, Sunday and any other day on which banking institutions in the State of California are closed for business.

"Capital Stock" means: (i) in the case of a corporation, corporate stock or shares; (ii) in the case of an association or business entity other than a corporation, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock; (iii) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); and (iv) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"Case" and "Cases" has the meaning given to it in the Recitals.

"Cash" means all cash and liquid funds.

"Cash Equivalents" means, as of any date of determination, any of the following: (i) marketable securities (a) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government, or (b) issued by any agency of the United States, the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from Standard & Poor's Corporation or at least P-1 from Moody's Investors Service; (iii) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from Standard & Poor's Corporation or at least P-1 from Moody's Investors Service; (iv) certificates of deposit or bankers' acceptances maturing within one year after such date and issued or accepted by the Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary federal banking regulator), and (b) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and (v) shares of any money market mutual fund that (a) has substantially all of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (b) has net assets of not less than $500,000,000, and (c) has the highest rating obtainable from either Standard & Poor's Corporation or Moody's Investors Service.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (42 U.S.C. §§ 9601 et seq.), as amended from time to time.

"Change in Control" means, except as expressly contemplated by, and a result of the transactions set forth in, the Chapter 11 Plan, (i) any reorganization, recapitalization, consolidation or merger (or similar transaction or series of related transactions) of the Parent, sale or exchange of outstanding Capital Stock (or similar transaction or series of related transactions) of the Parent in which the holders of the Parent's outstanding Capital Stock immediately before consummation of such transaction or series of related transactions do not, immediately after consummation of such transaction or series of related transactions, directly or indirectly, retain shares representing more than 50% of the voting power of the surviving entity

5

of such transaction or series of related transactions, in each case without regard to whether the Parent is the surviving entity, or (ii) the Parent fails to own, directly or indirectly rate 100% of the Capital Stock of any of its Subsidiaries.

"Claims" has the meaning set forth in Section 10.10.

"Closing Date" means October 28, 2019 .

"Collateral" means the property described in Section 3.1 and shall include all present and after acquired assets and property, whether real, personal, tangible, intangible or mixed of the Obligors, wherever located, on which Liens are or are purported to be granted pursuant to the Security Documents to secure the payment and performance of the Secured Obligations.

"Collateral IP" means all Intellectual Property other than Excluded Intellectual Property.

"Confidential Information" has the meaning set forth in Section 10.12.

"Contingent Obligation" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to (i) any Indebtedness or other obligations of another Person, including any such obligation directly or indirectly guaranteed, endorsed, co-made or discounted or sold with recourse by that Person, or in respect of which that Person is otherwise directly or indirectly liable; (ii) any obligations with respect to undrawn letters of credit, corporate credit cards or merchant services issued for the account of that Person; and (iii) all obligations arising under any interest rate, currency or commodity swap agreement, interest rate cap agreement, interest rate collar agreement, or other agreement or arrangement designated to protect a Person against fluctuation in interest rates, currency exchange rates or commodity prices; provided, however, that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith; provided, however, that such amount shall not in any event exceed the maximum amount of the obligations under the guarantee or other support arrangement.

"Copyright License" means any written agreement granting (i) any right to exploit any Copyright, now owned or hereafter acquired by any Group Member or in which any Group Member now holds or hereafter acquires any interest, (ii) an immunity from suit under any Copyright, or (iii) an option to any of the foregoing.

"Copyrights" means all copyrights, whether registered or unregistered and published or unpublished, including copyrights in software, internet web sites, databases and the content thereof, held pursuant to the laws of the United States, any State thereof, or of any other country.

"Debt Transaction" means, with respect to Parent or any consolidated Subsidiary, any sale, issuance, placement, assumption or guaranty of funded Indebtedness (other than pursuant to this Agreement), whether or not evidenced by a promissory note or other written evidence of Indebtedness, other than Permitted Indebtedness.

"Debtor" and "Debtors" has the meaning given to it in the Recitals.

"Default" means any event which, with the passage of time or notice or both, would, unless cured or waived hereunder, become an Event of Default.

ACTIVE/126640070

"Deposit Accounts" means any "deposit accounts," as such term is defined in the UCC, and includes any checking account, savings account, or certificate of deposit.

"DIP Agent" has the meaning given to it in the Recitals.

"DIP Borrowers" has the meaning given to it in the Recitals.

"DIP Collateral" has the meaning given to it in Section 3.6.

"DIP Facility" has the meaning given to it in the Recitals.

"DIP Loan Agreement" has the meaning given to it in the Recitals.

"DIP Loan Documents" has the meaning given "Loan Documents" in the DIP Loan Agreement.

"DIP Loans" has the meaning given to it in the Recitals.

"DIP Lender" has the meaning given to it in the Recitals.

"DIP Obligations" has the meaning given to it in Section 3.6.

"Disqualified Stock" means, with respect to any Person, any Capital Stock that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable at the option of the holder) or upon the happening of any event: (i) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise; (ii) is convertible or exchangeable for Indebtedness or Disqualified Stock (excluding Capital Stock convertible or exchangeable solely at the option of the issuer or a Subsidiary; provided, that any such conversion or exchange will be deemed an incurrence of Indebtedness or Disqualified Stock, as applicable); or (iii) is redeemable at the option of the holder thereof, in whole or in part, in the case of each of clauses (i), (ii) and (iii), no earlier than the 91st day after the Original Advance Maturity Date.

"Dollars" and "$" means the lawful currency for the time being of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is not a Foreign Subsidiary.

"DSM" means DSM Finance B.V., a company incorporated under the laws of the Netherlands.

"DSM Collateral" means the "Pledge Collateral" as defined in the DSM Pledge Agreement.

"DSM Note" means that certain Note between the Parent and DSM, dated on or about the Effective Date.

"DSM Note Documents" means the DSM Note, the DSM Pledge Agreement and any other agreement or arrangement entered into in connection with the DSM Note or the DSM Pledge Agreement, as the same may from time to time be amended, modified, supplemented or restated.

"DSM Pledge Agreement" means that certain Amended and Restated Pledge Agreement over certain interests held by the Parent in Amyris RealSweet, LLC, made between the Parent and DSM and originally dated December 12, 2022, as amended and restated on or about the Effective Date.

"Effective Date" has the meaning given to it in Section 4.

ACTIVE/126640070

"Environmental Laws" means all applicable federal, state, local and foreign Laws, statutes, ordinances, codes, rules, legally binding standards and regulations, now or hereafter in effect, and in each case as amended or supplemented from time to time, and any applicable non-appealable judicial or administrative interpretation thereof, including any applicable legally binding judicial or administrative order, consent decree or judgment, imposing liability or standards of conduct for or relating to the regulation and protection of human health and safety (to the extent related to exposure to Hazardous Materials), the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation).

"Environmental Liabilities" means, with respect to any Person, all liabilities, obligations, costs, losses, damages, fine, penalties and expenses (including all fees, disbursements and expenses of counsel, experts and consultants), incurred as a result of or related to any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, arising under or related to any Environmental Laws or permits, or in connection with any Release or threatened Release or presence of a Hazardous Material whether on, at, in, under, from or about or in the vicinity of any real or personal property.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"ERISA Affiliate" means, with respect to each Group Member, any trade or business (whether or not incorporated) which, together with such Group Member, is treated as a single employer within the meaning of Sections 414(b) or (c) of the IRC (or, solely for purposes of Section 302 of ERISA or Sections 412 and 430 of the IRC, Section 414(m) or (o) of the IRC).

"ERISA Plan" means, at any time, an employee benefit plan, as defined in Section 3(3) of ERISA, which any Group Member maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any such Person (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be an employee benefit plan of such Person).

"Event of Default" has the meaning set forth in Section 8.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time.

"Excluded Intellectual Property" means [(a) all Intellectual Property that (i) constitutes "AMYRIS Licensed IP" as defined in the License Agreement regarding Diesel Fuel in the EU, dated as of March 21, 2016, as amended, by and among the Parent and Total Raffinage Chimie S.A., as assignee of Total Energies Nouvelles Activités USA, but solely to the extent of the field of use granted in such agreement, (ii) constitutes "AMYRIS Licensed IP" as defined in the Amended & Restated Jet Fuel License Agreement, dated as of March 21, 2016, as amended, by and among the Parent and Total Amyris BioSolutions B.V., but solely to the extent of the field of use granted in such agreement and (iii) is subject to the Farnesene Intellectual Property License, dated as of November 14, 2017, by and between DSM Nutritional Products Ltd. and Parent, but solely to the extent of the field of use granted in such license and solely for the purposes of manufacturing Vitamin E, and in each case of clauses (i) and (ii), as such agreements were in effect as of June 29, 2018, and in the case of clause (iii), as such agreement existed as of December 14, 2018; (b) United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal law.][1]

---

[1] NTD: Subject to review.

8

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the Lender or required to be withheld or deducted from a payment to the Lender, (i) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (a) imposed as a result of the Lender being organized under the laws of, or having its principal office or, in the case of the Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (b) imposed as a result of a present or former connection between the Lender and the jurisdiction imposing such Tax (other than connections arising from the Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Advance or Loan Document), (ii) in the case of the Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of the Lender with respect to an applicable interest in any Advance or commitment pursuant to a law in effect on the date on which (a) the Lender acquires such interest in any Advance or commitment or (b) the Lender changes its lending office, except, in each case, to the extent that, pursuant to Section 7.10, amounts with respect to such Taxes were payable either to the Lender's assignor immediately before the Lender became a party hereto or to the Lender immediately before it changed its lending office, and (iii) imposed as a result of a failure by the Lender, upon prior written request therefor, to provide the Obligors with a duly executed IRS Form W-9 or appropriate IRS From W-8.

"Existing Loan Agreement" has the meaning given to it in the Recitals.

"Exit Advances" has the meaning given to it in the Recitals.

"Exit Loan" means the aggregate Exit Advances made under this Agreement.

"Exit Loan Commitment" means the commitment of the Lender on any date to make Exit Advances, in each case in accordance with the terms of this Agreement. The amount of the Lender's Exit Loan Commitment as of the Effective Date is $[145],000,000.

"Exit Loan Maturity Date" means [                ].

"Financial Statements" means the financial statements and reports described in Sections 7.1(b) and (c).

"Foreign Government Scheme or Arrangement" has the meaning set forth in Section 5.23(c).

"Foreign Plan" has the meaning set forth in Section 5.23(c).

"Foreign Subsidiary" means any Subsidiary other than a Subsidiary organized or formed under the laws of any state within the United States or the District of Columbia.

"GAAP" means generally accepted accounting principles in the United States of America, as in effect from time to time; provided, that the definitions set forth in this Agreement and any financial calculations required by the Loan Documents shall be computed to exclude any change to lease accounting rules from those in effect pursuant to Financial Accounting Standards Board Accounting Standards Codification 840 (Leases) and other related lease accounting guidance as in effect on the Effective Date .

9

"<u>Governmental Approval</u>" means any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Authority.

"<u>Governmental Authority</u>" means any nation or government, any state or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"<u>Group Members</u>" means the Obligors and their respective Subsidiaries from time to time and "<u>Group Member</u>" means any of them.

"<u>Hazardous Material</u>" means hazardous waste, hazardous substance, pollutant, contaminant, toxic substance, oil, hazardous material, chemical or other similar substance to the extent each of the foregoing is regulated by any Environmental Law.

"<u>Indebtedness</u>" means indebtedness of any kind, including without limitation (i) all indebtedness for borrowed money or the deferred purchase price of property or services, including reimbursement and other obligations with respect to surety bonds and letters of credit, (ii) all obligations evidenced by notes, bonds, debentures or similar instruments, (iii) all capital lease obligations, (iv) all Contingent Obligations, and (v) Disqualified Stock.

"<u>Indemnified Taxes</u>" means (i) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Obligor under any Loan Document and (ii) to the extent not otherwise described in (i), Other Taxes.

"<u>Insolvency Proceeding</u>" is any proceeding by or against any Person under the United States Bankruptcy Code, or any other bankruptcy or insolvency law, including assignments for the benefit of creditors, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"<u>Intellectual Property</u>" means all of each Group Members' (i) rights anywhere in the world in and to Copyrights; Trademarks; Patents; Licenses; trade secrets, confidential and proprietary information, including know-how, manufacturing and production processes and techniques, research and development information, databases and data, customer and supplier lists and information; inventions; mask works; domain names and social media identifiers; all other intellectual and industrial property rights of any type; and the rights to sue for past, present and future infringement, misappropriation or other violation of any of the foregoing and any harm to the goodwill associated therewith, and (ii) all tangible embodiments of the foregoing.

"<u>Interest Rate</u>" means a rate of interest equal to [six] per cent. per annum.

"<u>Investment</u>" means any beneficial ownership (including stock, partnership or limited liability company interests) of or in any Person, or any loan, advance or capital contribution to any Person or the acquisition of all, or substantially all, of the assets or a business line or division of another Person or the purchase of any assets of another Person for greater than the fair market value of such assets to solely the extent of the amount in excess of the fair market value.

"<u>Involuntary Disposition</u>" means the receipt by Parent or any consolidated Subsidiary of any cash insurance proceeds or condemnation awards payable by reason of theft, loss, physical destruction or damage, taking or similar event with respect to any of its real or personal property.

ACTIVE/126640070

"<u>IP Security Agreement</u>" means each certain Intellectual Property Security Agreement entered into between an Obligor and the Lender in accordance with this Agreement.

"<u>IRC</u>" means the Internal Revenue Code of 1986, as amended, and any successor thereto (unless otherwise specified therein).

"<u>IRS</u>" means the Internal Revenue Service, or any successor thereto.

"<u>Joinder Agreements</u>" means for each Subsidiary that is required to be a Guarantor, a completed and executed Joinder Agreement in substantially the form attached hereto as <u>Exhibit H</u>.

"<u>Lavvan</u>" means Lavvan, Inc., a Delaware corporation

"<u>Lavvan Lien</u>" means the liens over certain Collateral under the Lavvan Pledge.

"<u>Lavvan Documents</u>" means the Lavvan Pledge, the Lavvan RCL Agreement and any other agreement or arrangement entered into in connection with the Lavvan Pledge or the Lavvan RCL Agreement.

"<u>Lavvan Pledge</u>" means that certain pledge agreement dated May 2, 2019, between the Parent and Lavvan.

"<u>Lavvan RCL Agreement</u>" means that certain Research, Collaboration and License Security Agreement between Parent and Lavvan dated as of March 18, 2019.

"<u>Laws</u>" means any federal, state, local and foreign statute, law, treaty, judicial decision, regulation, guidance, guideline, ordinance, rule, judgment, order, decree, code, injunction, permit, concession, grant, franchise, governmental (or quasi-governmental) agreement, governmental (or quasi-governmental) restriction or determination of an arbitrator, court or other Governmental Authority (whether or not having the force of law), whether now or hereafter in effect.

"<u>Lender</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Leland Property</u>" means the commercial scale production facility located in Leland, North Carolina.

"<u>License</u>" means any Copyright License, Patent License, Trademark License or other license of rights or interests.

"<u>Lien</u>" means any mortgage, deed of trust, pledge, hypothecation, assignment for security, security interest, encumbrance, levy, lien or charge of any kind, whether voluntarily incurred or arising by operation of law or otherwise, against any property, any conditional sale or other title retention agreement, and any lease in the nature of a security interest; provided, that for the avoidance of doubt, licenses, strain escrows and similar provisions in collaboration agreements, research and development agreements that do not create or purport to create a security interest, encumbrance, levy, lien or charge of any kind shall not be deemed to be Liens for purposes of this Agreement.

"<u>Litigation</u>" has the meaning set forth in <u>Section 5.5</u>.

"<u>Loan</u>" means the aggregate of the Original Loan and Exit Loan.

11

"Loan Documents" means this Agreement, the Notes (if any), the Account Control Agreements, the Joinder Agreements, the IP Security Agreements, each Security Document, each Mortgage, all UCC financing statements, and any other documents executed or delivered in connection with the Secured Obligations or the transactions contemplated hereby, as the same may from time to time be amended, modified, supplemented or restated.

"Material Adverse Effect" means a material adverse effect upon: (i) the business, operations, properties, assets, or condition (financial or otherwise) of any of the Obligors; or (ii) the ability of any of the Obligors to perform the Secured Obligations in accordance with the terms of the Loan Documents, or the ability of the Lender to enforce any of its rights or remedies with respect to the Secured Obligations; or (iii) the Collateral or the Lender's Liens on the Collateral or the priority of such Liens.

"Maximum Rate" has the meaning set forth in Section 2.2.

"Mortgage" means any mortgage, deed of trust or other agreement which conveys or evidences a Lien in favor of the Lender on Real Estate of an Obligor.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, and to which any Group Member or any ERISA Affiliate is making, is obligated to make, has made or been obligated to make, contributions on behalf of participants who are or were employed by any of them.

"Net Cash Proceeds" means the aggregate proceeds paid in Cash or Cash Equivalents received by Parent or any of its consolidated Subsidiaries in connection with any Asset Sale or Debt Transaction, net of (i) direct costs incurred in connection therewith (including legal, accounting and investment banking fees and expenses, sales commissions and underwriting discounts), (ii) estimated or other taxes paid or payable (including sales, use or other transactional taxes and any net marginal increase in income taxes) as a result thereof, (iii) the amount to retire any Indebtedness secured by a Permitted Lien on the related property, and (iv) amounts which are required to be placed in escrow unless and until such amounts are released to the Parent or one or more of its consolidated Subsidiaries. For purposes hereof, "Net Cash Proceeds" includes any Cash or Cash Equivalents received upon the disposition of any non-cash consideration received by Parent or any of its consolidated Subsidiaries in any Asset Sale or Debt Transaction.

"Note" means each note issued which may be issued hereunder in accordance with Section 2.7.

"Obligor" has the meaning given to it in the preamble to this Agreement.

"OFAC" has the meaning set forth in Section 5.20(a).

"Original Advances" has the meaning given to it in the Recitals.

"Original Advance Maturity Date" means [            ].

"Original Loan" has the meaning given to it in the Recitals.

"Original Loan Agreement" has the meaning given to it in the Recitals.

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

12

"Parent" has the meaning set forth in the preamble to this Agreement.

"Patent License" means any written agreement in which any Group Member now holds or hereafter acquires any interest that (i) grants any right with respect to any invention or any Patent, (ii) agrees to refrain from asserting or grants immunity from suit under any Patent or invention, or (iii) grants an option to any of the foregoing.

"Patents" means all letters patent, or rights corresponding thereto, in the United States or in any other country, all applications (including provisional, continuation (in-whole or in-part), and divisional applications) for the foregoing and any other pre-grant variations thereof, and all reissues, reexaminations, reviews, renewals, extensions and other post-grant variations thereof in the United States or any other country.

"Permitted Indebtedness" means (i) Indebtedness of the Obligors in favor of the Lender arising under the Loan Documents; (ii) Indebtedness existing on, or committed for but not yet outstanding as of the Effective Date which is disclosed in Schedule 1A; (iii) Indebtedness of up to $[     ] outstanding at any time secured by a Lien described in clause (vii) of the defined term "Permitted Liens," provided such Indebtedness does not exceed the cost of the Equipment and related expenses financed with such Indebtedness; (iv) Indebtedness to trade creditors incurred in the ordinary course of business due within 90 days; (v) Indebtedness that also constitutes a Permitted Investment; (vi) [reserved]; (vii) [reserved]; (viii) [reserved]; (ix) [reserved]; (x) [reserved]; (xi) Contingent Obligations that are guarantees of Indebtedness described in clauses (i) through (x) or other obligations of others that do not otherwise constitute Indebtedness; and (xii) extensions, refinancings and renewals of (A) the DSM Note with the prior written consent of the Lender, or (B) extensions, refinancings and renewals of any items of Permitted Indebtedness (other than the DSM Note), provided, that the principal amount is not increased or the terms modified to impose materially more burdensome terms upon any Group Member.

"Permitted Intellectual Property Licenses" means (i) licenses of Intellectual Property rights granted by any Group Member that are in existence at the Effective Date and described in Schedule [     ],    and (ii) non-perpetual licenses of Intellectual Property rights granted by any Group Member in the ordinary course of business on arm's length terms consisting of the licensing of technology, the development of technology or the providing of technical support which may include licenses with unlimited renewal options solely to the extent such options require mutual consent for renewal or are subject to financial or other conditions as to the ability of licensee to perform under the license; provided such license was not entered into during the continuance of an Event of Default.

"Permitted Investment" means: (i) Investments existing on the Effective Date which are disclosed in Schedule 1B; (ii) (a) marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one year from the date of acquisition thereof, (b) commercial paper maturing no more than one year from the date of creation thereof and currently having a rating of at least A-2 or P-2 from either Standard & Poor's Corporation or Moody's Investors Service, (c) certificates of deposit issued by any bank with assets of at least $500,000,000 maturing no more than one year from the date of investment therein, and (d) money market accounts; (iii) [reserved]; (iv) Investments (other than between Group Members) accepted in connection with Permitted Transfers; (v) Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of the Group Members' business; (vi) Investments (other than between Group Members) consisting of notes receivable of, or prepaid royalties and other credit extensions, to customers and suppliers in the ordinary course of business and consistent with past practice; (vii) [reserved]; (viii) [reserved]; (ix) Investments in Obligors which are Domestic Subsidiaries; [(x) Investments by Parent or any Domestic Subsidiary in any Foreign Subsidiaries which (A)

13

is not an Obligor in an aggregate amount which, when aggregated with Permitted Transfers under clause (vi)(A) of that definition, do not exceed $[                    ] (or its equivalent in other currencies) in any fiscal year of Parent, and (B) is an Obligor in an aggregate amount which, when aggregated with Permitted Transfers under clause (vi)(B) of that definition, do not exceed $[                    ] (or its equivalent in other currencies) in any fiscal year of Parent][2]; (xi) [reserved]; (xii) [reserved]; (xiii) Permitted Intellectual Property Licenses; and (xiv) additional Investments that do not exceed $250,000 (or its equivalent in other currencies) in the aggregate at any time outstanding.

"Permitted Liens" means any and all of the following: (i) Liens in favor of the Lender; (ii) Liens existing or pending on the Effective Date which are disclosed in Schedule 1C[3]; (iii) Liens for taxes, fees, assessments or other governmental charges or levies assessed against any Group Member, either not delinquent or being contested in good faith by appropriate proceedings; provided, that such Group Member maintains adequate reserves therefor in accordance with GAAP; (iv) Liens securing claims or demands of materialmen, artisans, mechanics, carriers, warehousemen, landlords and other like Persons arising in the ordinary course of business; provided, that the payment thereof is not yet required; (v) Liens arising from judgments, decrees or attachments in circumstances which do not constitute an Event of Default hereunder; (vi) the following deposits, to the extent made in the ordinary course of business: deposits under workers' compensation, unemployment insurance, social security and other similar laws, or to secure the performance of bids, tenders or contracts (other than for the repayment of borrowed money) or to secure indemnity, performance or other similar bonds for the performance of bids, tenders or contracts (other than for the repayment of borrowed money) or to secure statutory obligations (other than Liens arising under ERISA or environmental Liens) or surety or appeal bonds, or to secure indemnity, performance or other similar bonds; (vii) Liens on Equipment or software or other intellectual property constituting purchase money Liens and Liens in connection with capital leases securing Indebtedness permitted in clause (iii) of "Permitted Indebtedness"; (viii) [reserved]; (ix) leasehold interests in leases or subleases and licenses granted in the ordinary course of a Group Member's business and not interfering in any material respect with the business of the licensor; (x) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of custom duties that are promptly paid on or before the date they become due; (xi) [reserved]; (xii) statutory and common law rights of set-off and other similar rights as to deposits of cash and securities in favor of banks, other depository institutions and brokerage firms; (xiii) easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business so long as they do not materially impair the value or marketability of the related property; (xiv) Liens on Cash or Cash equivalents securing obligations permitted under clause (iv) and (vii) of the definition of Permitted Indebtedness; (xv) [reserved]; (xvi) [reserved]; (xvii) [reserved]; and (xviii) Liens incurred in connection with the extension, renewal or refinancing of the Indebtedness secured by Liens of the type described in clauses (i) through (xvii) above; provided, that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the Indebtedness being extended, renewed or refinanced (as may have been reduced by any payment thereon) does not increase.

"Permitted Transfers" means (i) dispositions of inventory sold, and Permitted Intellectual Property Licenses, in each case, in the ordinary course of business, (ii) [reserved], (iii) dispositions of worn-out, obsolete or surplus property at fair market value in the ordinary course of business; (iv) dispositions of accounts or payment intangibles (each as defined in the UCC) resulting from the compromise or settlement thereof in the ordinary course of business for less than the full amount thereof; [(v) Transfers to any Obligor which is a Domestic Subsidiary, (vi) Transfers from Parent or any Obligor which is a Domestic Subsidiary to any Foreign Subsidiary which (A) is not an Obligor in an aggregate amount which, when aggregated with Permitted Investments under clause (xi)(A) of that definition, do not exceed $[                    ] (or its

---

[2] NTD: subject to confirmation of obligor structure.
[3] NTD: schedule to include DSM, Lavvan and DIP liens.

ACTIVE/126640070

equivalent in other currencies) in any fiscal year of Parent, and (B) is an Obligor in an aggregate amount which, when aggregate with Permitted Investments under clause (xi)(B) of that definition, do not exceed $[                    ] (or its equivalent in other currencies) in any fiscal year of Parent, (vii) Transfers between Subsidiaries which are not Obligors;][4] and (viii) so long as no Default or Event of Default has occurred and is continuing, other Transfers of assets which have a fair market value of not more than $250,000 (or its equivalent in other currencies) in the aggregate in any fiscal year.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, other entity or government.

"Petition Date" has the meaning given to it in the Recitals

"Plan" means, at any time, an employee benefit plan, as defined in Section 3(3) of ERISA, which any Obligor or any of its Subsidiaries maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any such Person (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be an employee benefit plan of such Person).

"Pledged Equity" has the meaning given to it in the Security Agreement.

"Projections" means the financial projections, estimates and information of a general economic nature prepared by or on behalf of the Parent or any of its representatives,

"Qualified Plan" means a Plan which is intended to be tax-qualified under Section 401(a) of the IRC.

"Real Estate" means all of the real property owned, leased, subleased or used by any Person.

"Real Estate Deliverables" means in respect of any Real Estate mortgaged and pledged to secure the Secured Obligations (including the Leland Facility): (i) a Mortgage in form and substance reasonably satisfactory to the Lender, (ii) evidence that a counterpart of such Mortgage has been recorded in the place necessary, in the Lender's reasonable judgment, to create a valid and enforceable Lien in favor of the Lender, subject to Permitted Liens; (iii) a mortgagee's title policy; (iv) a survey prepared and certified to the Lender by a surveyor reasonably acceptable to the Lender; (v) an opinion of counsel in the state in which such Real Estate is located in form and substance and from counsel reasonably satisfactory to the Lender; (vi) if any such parcel of Real Estate is determined by the Lender to be in a flood zone, a flood notification form signed by the Obligors and evidence that flood insurance is in place for the building and contents, all in form and substance satisfactory to the Lender; and (vii) such other information, documentation, and certifications with respect to the Real Estate as may be reasonably required by the Lender; *provided* that the Lender may waive any of the foregoing (i) through (vii) in its sole discretion.

"Release" means any release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material into or through the environment.

"Sanctioned Person" means any individual, entity or other Person that (a) is listed on any applicable sanctions-related list of designated or restricted persons, including without limitation Persons identified on OFAC's Specially Designated Nationals and Blocked Persons List and Persons who are blocked pursuant to Section 1 of the Anti-Terrorism Order; (b) is located, organized or resident in a country or territory which itself is subject to comprehensive economic and trade sanctions (currently, Cuba, Iran, North Korea, Syria,

---

[4] NTD: subject to review depending on obligor structure.

ACTIVE/126640070

the Crimea region of Ukraine and the so-called Donetsk People's Republic (DNR) and Luhansk People's Republic (LNR) regions of Ukraine) (each, a "Sanctioned Region"); (c) is, or is a representative, instrumentality or part of, the government of any Sanctioned Region or of Venezuela; or (d) is owned or controlled by, or acting or purporting to act, directly or indirectly, for, on behalf of or for the benefit of any Person described in clauses (a)-(c).

"SEC" means the United States Securities and Exchange Commission.

"Secured Obligations" means all of the Obligors' obligations and liabilities under this Agreement and any Loan Document, whether the same are secured or unsecured, including unpaid principal of and interest on (including interest accruing after the maturity of the Advances and interest, fees, costs, expenses and indemnities accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to any Obligor, whether or not a claim for post-filing or post-petition interest, fees, costs, expenses or indemnities is allowed or allowable in such proceeding) the Advances and all other obligations and liabilities of any Obligor to the Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, any Loan Document, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses or otherwise and including any obligation to pay any amount whether arising by reason of an extension of credit, loan, guaranty, indemnification or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now existing or hereafter arising and however acquired (whether or not accruing after the filing of any case under the Bankruptcy Code and whether or not a claim for post-filing or post-petition interest, fees and charges is allowed or allowable in any such proceeding).

"Securities Act" means the Securities Act of 1933, as amended from time to time.

"Security Agreement" means that certain Security Agreement dated on or about the Effective Date made between the Lender and certain of the Obligors.

"Security Documents" means each Security Agreement, the Account Control Agreements all Mortgages and all other deeds of trust, security agreements, pledge agreements, assignments, control agreements, financing statements and other documents as shall from time to time secure or relate to the Secured Obligations or any other obligation arising under any Loan Document or any part thereof, in each case, executed by any Obligor or any Subsidiary.

"S&P" means Standard & Poor's Rating Services and any successor entity thereof.

"Subsidiary" means an entity, whether corporate, partnership, limited liability company, joint venture or otherwise, in which any Group Member owns or controls 50.1% or more of the outstanding voting securities, including each entity listed on Schedule 1 hereto. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrowers.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Trademark License" means any written agreement (i) granting any right to use any Trademark, now owned or hereafter acquired by any Group Member or in which any Group Member now holds or hereafter acquires any interest, (ii) agreeing to refrain from asserting or granting immunity under any Trademark, (iii) to coexist, or (iv) granting an option to any of the foregoing.

16

"<u>Trademarks</u>" means all trademarks, service marks, domain names, trade names, business names, corporate names, trade dress, logos, designs, slogans, or other indicia of source or origin, whether registered, common law or otherwise, and any applications, recordings, renewals and other post-grant variations of any of the foregoing in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, together, in each case, with the goodwill associated therewith or symbolized thereby.

"<u>Transfer</u>" is defined in Section 7.8.

"<u>UCC</u>" means the Uniform Commercial Code as the same is, from time to time, in effect in the State of California; provided, that to the extent that the UCC is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the UCC , the definition of such term contained in Article or Division 9 shall govern; *provided further*, if, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, the Lender's Lien on any Collateral is governed by the Uniform Commercial Code as the same is, from time to time, in effect in a jurisdiction other than the State of California, then the term "UCC" shall mean the Uniform Commercial Code as in effect, from time to time, in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"<u>USA Patriot Act</u>" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001), as amended, and the rules and regulations promulgated thereunder from time to time in effect.

Unless otherwise specified, all references in this Agreement or any Annex or Schedule hereto to a "Section," "subsection," "Exhibit," "Annex," or "Schedule" shall refer to the corresponding Section, subsection, Exhibit, Annex, or Schedule in or to this Agreement. Unless otherwise specifically provided herein, any accounting term used in this Agreement or the other Loan Documents shall have the meaning customarily given such term in accordance with GAAP, and all financial computations hereunder shall be computed in accordance with GAAP, consistently applied. Unless otherwise defined herein or in the other Loan Documents, terms that are used herein or in the other Loan Documents and defined in the UCC shall have the meanings given to them in the UCC.

## SECTION 2. THE LOAN

2.1 [Reserved].

2.2 <u>Loan</u>.

(a) <u>Original Advances</u>. As of the Effective Date, there are outstanding under this Agreement and the Borrower owes to Lender Original Advances in a principal amount of [Fifty Two Million, Nine Hundred Eighty Three Thousand Twenty Nine Dollars Forty cents] ($[52,983,029.40]). Portions of the Original Advances prepaid or repaid may not be reborrowed. The Original Loan and the Original Advances are hereby reaffirmed in all respects and remain outstanding and are due and payable in accordance with this Agreement.

(b) <u>Exit Advances</u>. Subject to the terms and conditions of this Agreement and in addition to the Original Loan, the Lender agrees to make advances to the Borrowers up to an aggregate amount not in excess of the Exit Loan Commitment (each, a "<u>Exit Advance</u>"), each in a minimum amount of $20,000,000 and integral multiple of $500,000 or, if less, the Available Exit Commitment.  Any Exit Advance shall become effective and shall be an Exit Advance as of the

17

applicable Advance Date. Any part of the Available Exit Commitment which is not borrowed on or before the end of the Availability Period will be immediately cancelled in full and shall not be available to be borrowed. The aggregate amount of all Exit Advances must not exceed the aggregate Exit Loan Commitment and no Exit Advance may exceed the then Available Exit Commitment. Exit Advances borrowed and subsequently repaid or prepaid may not be reborrowed. The Exit Loan Commitment shall automatically and permanently be reduced by the amount of each Exit Advance. Any Exit Advance shall become effective and shall be an Exit Advance as of the applicable Advance Date; provided that each of the conditions set forth in Sections 4.1 and 4.2 shall be satisfied.

(c) Advance Request. To obtain any Exit Advance, the Borrowers shall complete, sign and deliver an Advance Request to the Lender, specifying the date on which the Borrowers propose that the applicable Exit Advance shall be effective, which shall be a date not less than 5 Business Days after the date on which such Advance Request is delivered to the Lender. The Lender shall fund such Exit Advance in the manner requested by such Advance Request provided that each of the conditions precedent to such Exit Advance is satisfied or waived as of the applicable Advance Date for such Exit Advance.

(d) Interest. With effect from the Effective Date (i) Accrued Interest shall be added to the outstanding principal amount of the Original Loan, shall be capitalized, shall be deemed, for all purposes, to be principal and shall thereafter bear interest thereon, and (ii) all Advances (including Original Advances) will bear interest at the Interest Rate. The principal balance of each Advance shall bear interest thereon from the applicable Advance Date at the Interest Rate based on a year consisting of 360 days, with interest computed daily based on the actual number of days elapsed. The Borrowers will pay interest in kind on each Advance on the first Business Day of each calendar month (each, an "Interest Payment Date"), beginning with the calendar month first starting after the Advance Date for that Advance. Interest when due shall be capitalized ("Capitalized Interest") on the Interest Payment Date on which it was due *provided* that, notwithstanding the foregoing or anything else to the contrary in this Agreement, all Capitalized Interest not otherwise paid to the Lender under this Agreement shall be due and paid in cash to the Lender on the Exit Advance Maturity Date (in relation to Capitalized Interest on Exit Advances) and on the Original Advance Maturity Date (in relation to Capitalized Interest on Original Advances). Capitalized Interest shall be added to principal amounts of each Advance automatically on each Interest Payment Date, shall be deemed, for all purposes, to be principal and shall thereafter bear interest thereon. Interest at the Interest Rate shall begin to accrue on the Capitalized Interest beginning on and including the date on which such Capitalized Interest is capitalized (and added to the principal amount of each Advance) and at all times thereafter as provided in this Section 2.2 until the principal amount of each Advance which includes such Capitalized Interest has been paid in full in cash. In computing interest, the date of the making of any Advance shall be included and the date of payment shall be excluded. A certificate as to the amount of Capitalized Interest delivered to the Borrowers by the Lender shall be conclusive absent manifest error.

(e) Payment. All Original Advances outstanding and all accrued but unpaid interest on the principal amount to be paid and all fees and expenses payable hereunder shall be due and payable on the Original Advance Maturity Date. All Exit Advances outstanding and all accrued but unpaid interest on the principal amount to be paid and all fees and expenses payable hereunder shall be due and payable on the Exit Advance Maturity Date.

2.3 Maximum Interest. Notwithstanding any provision in this Agreement or any other Loan Document, it is the parties' intent not to contract for, charge or receive interest at a rate that is greater than the maximum rate permissible by law that a court of competent jurisdiction shall deem applicable hereto

18

(the "Maximum Rate"). If the Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal amount of the Advances or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by the Lender exceeds the Maximum Rate, the Lender may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Secured Obligations.

2.4 Default Interest.  Upon the occurrence and during the continuation of an Event of Default hereunder, all outstanding Advances, including principal and Capitalized Interest thereon, shall bear interest at a rate per annum equal to the Interest Rate plus 2.0% per annum. If any interest is not paid when due hereunder, delinquent interest shall be added to principal and shall bear interest, compounded at the rate set forth in this Section 2.4.

2.5 Payments. Except with respect to the capitalization of Capitalized Interest in accordance with Section 2.2, all payments (including prepayments) to be made by an Obligor under any Loan Document shall be made to the Lender by wire transfer in immediately available funds in Dollars, without setoff, counterclaim, or deduction, before 12:00 p.m. on the date when due.  Payments of principal and/or interest received after 12:00 p.m. are considered received at the opening of business on the next Business Day. When a payment is due on a day that is not a Business Day, the payment shall be due the next Business Day, and additional fees or interest, as applicable, shall continue to accrue until paid.  If at any time insufficient funds are received by and available to the Lender to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, and (ii) second, toward payment of principal then due hereunder.

2.6 Prepayment.

(a) Optional Prepayment. At its option upon at least five Business Days prior notice to the Lender, the Borrowers may prepay all, but not less than all, of the entire principal balance of the Loan in accordance with this Section 2.6, together with all accrued and unpaid interest thereon.

(b) Mandatory Prepayments.

(i) Asset Sales. The Borrowers shall prepay the Advances, together with accrued and unpaid interest on the principal amount thereof and all fees and expenses payable hereunder no later than the fifth Business Day following receipt of Net Cash Proceeds by or on behalf of the Parent or any of its Subsidiaries in respect of any Asset Sale.

(ii) Involuntary Dispositions. The Borrowers shall prepay the Advances, together with accrued and unpaid interest on the principal amount thereof and all fees and expenses payable hereunder no later than the fifth Business Day following receipt of Net Cash Proceeds, in an amount equal to 100% of the Net Cash Proceeds received from any Involuntary Disposition.

(iii) Debt Transactions. The Borrowers shall prepay the Advances, together with accrued and unpaid interest on the principal amount thereof and all fees and expenses payable hereunder  no later than the fifth Business Day following receipt of Net Cash Proceeds, in an amount equal to 100% of the Net Cash Proceeds from any Debt Transactions.

ACTIVE/126640070

(iv) <u>Change in Control</u>. The Borrowers shall prepay the outstanding amount of all the Secured Obligations through the prepayment date upon and concurrently with the occurrence of a Change in Control.

(v) <u>Application of payments</u>. Amounts to be applied in connection with prepayments made pursuant to this <u>Section 2.6</u> shall be applied: (A) <u>first</u>, to the prepayment of Exit Advances until all Exit Advances have been repaid in full, (B) <u>second</u>, to the extent of any residual amount of such prepayment, if no Exit Advances remain outstanding, to the prepayment of Original Advances.

2.7 <u>Notes</u>. This Agreement evidences the obligation of the Borrowers to repay the Advances and is being executed as a noteless credit agreement. If so requested by the Lender by written notice to the Borrowers, then the Borrowers shall execute and deliver to the Lender (and/or, if applicable and if so specified in such notice, to any Person who is an assignee of the Lender pursuant to <u>Section 10.13</u>) (promptly after the Borrowers' receipt of such notice) a Note or Notes to evidence the Loan.

2.8 <u>Increased Costs</u>. If any change in law shall:  (i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or advances, loans or other credit extended or participated in by, the Lender, (ii) subject the Lender to any Taxes on its loans, loan principal, letters of credit, commitment, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, or (iii) impose on the Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or any Advance and the result of any of the foregoing shall be to increase the cost to the Lender of making, converting to, continuing or maintaining any Advance (or of maintaining its obligation to make any such Advance), or to reduce the amount of any sum received or receivable by the Lender hereunder (whether of principal, interest or any other amount) then, upon written request of the Lender, Obligors shall promptly pay to the Lender such additional amount or amounts as will compensate the Lender for such additional costs incurred or reduction suffered.  Failure or delay on the part of the Lender to demand compensation pursuant to this <u>Section 2.8</u> shall not constitute a waiver of the Lender's right to demand such compensation.  A certificate as to any additional amounts payable pursuant to this <u>Section 2.8</u> submitted to the Parent shall be conclusive in the absence of demonstrable error.  The obligations of the Obligors arising pursuant to this <u>Section 2.8</u> shall survive the discharge of the Secured Obligations.

## SECTION 3. SECURITY INTEREST

3.1 <u>Security</u>. As security for the prompt, complete and indefeasible payment when due (whether on the payment dates or otherwise) of all the Secured Obligations, each Obligor grants to the Lender, for its benefit, a security interest in all of such Obligor's right, title, and interest in and to the following personal property whether now owned or hereafter acquired or in which such Obligor now has or at any time in the future may acquire any right, title or interest (collectively, the "<u>Collateral</u>"): (a) Receivables; (b) Equipment; (c) Fixtures; (d) General Intangibles; (e) Inventory; (f) Investment Property; (g) Deposit Accounts; (h) Cash; (i) Cash Equivalents (j) Goods; (k) Collateral IP; (l) all Real Estate described in Section 3.4 (including the Leland Property); and (l) all other tangible and intangible personal property of such Obligor whether now or hereafter owned or existing, leased, consigned by or to, or acquired by, such Obligor and wherever located, and any of such Obligor's property in the possession or under the control of the Lender; and, to the extent not otherwise included, all Proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of each of the foregoing.

3.2 <u>Excluded Collateral</u>. Notwithstanding the broad grant of the security interest set forth in <u>Section 3.1</u>, above, the Collateral shall not include (i) more than 65% of the presently existing and hereafter arising issued and outstanding shares of voting Capital Stock owned by any Obligor of any Foreign Subsidiary that

is a "controlled foreign corporation" within the meaning of Section 957 of the IRC if, and only for so long as, a security interest in such voting Capital Stock in excess of 65% could reasonably be expected to result in material adverse U.S. federal income tax consequences under Section 956 of the IRC as reasonably determined by the Parent in consultation with the Lender, (ii) any Excluded Intellectual Property, and (iii) the DSM Collateral.

3.3 <u>Mortgage</u>. Upon the request of the Lender, each Obligor shall execute and deliver to the Lender, as soon as reasonably practicable following such request but in any event within 60 days following such request (as extended by the Lender), a Mortgage in recordable form with respect to any Real Estate constituting Collateral owned by such Obligor and identified by the Lender in form and substance reasonably satisfactory to the Lender, and, with respect to each Mortgage, the Real Estate Deliverables as requested by the Lender.  The Obligors covenant and agree that within 60 days of the Effective Date, the Obligors shall deliver to the Lender a Mortgage and the Real Estate Deliverables with respect to the Leland Facility, in each case in form and substance satisfactory to the Lender.

3.5 <u>Financing Statements</u>.  Each Obligor hereby authorizes the Lender to file financing statements, without notice to such Obligor, with all jurisdictions deemed necessary or appropriate by the Lender to perfect or protect its interests or rights hereunder.  Such financing statements may indicate the Collateral as "all assets of the Debtor" or words of similar effect.

3.6 <u>Subordination</u>.  Notwithstanding the date, time, method, manner, or order of grant, attachment, or perfection of any Liens in (A) the Collateral securing the Secured Obligations, or (B) the Collateral ("DIP Collateral") securing the Secured Obligations (under and as defined in the DIP Loan Agreement, "<u>DIP Obligations</u>") and notwithstanding any contrary provision of the UCC or any other applicable law, the Loan Documents, the DIP Loan Documents or any defect or deficiencies in, or failure to attach or perfect, the Liens securing the DIP Obligations:

(a)    any Lien with respect to the DIP Collateral securing any DIP Obligations, whether such Lien is now or hereafter held by or on behalf of, or created for the benefit of, the DIP Agent or the DIP Lender or any agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, operation of law, subrogation, or otherwise, shall be senior in all respects and priority to any Lien with respect to the Collateral securing any Secured Obligations; and

(b)    any Lien with respect to the Collateral securing any Secured Obligations, whether such Lien is now or hereafter held by or on behalf of, or created for the benefit of, the Lender or any agent or trustee therefor, regardless of how or when acquired, whether by grant, possession, statute, operation of law, subrogation, or otherwise, shall be junior and subordinate in all respects to all Liens with respect to the DIP Collateral securing any DIP Obligations.

## SECTION 4. CONDITIONS PRECEDENT TO AMENDMENT AND RESTATEMENT AND EXIT ADVANCES

4.1 <u>Amendment and Restatement</u>: The Effective Date will occur on the date on which the Lender has received or waived receipt of the documents and other evidence set out in Schedule 4, in form and substance satisfactory to it.

4.2 <u>Exit Advances</u>. The agreement of the Lender to make any Advance requested to be made by it hereunder on any date  is subject to the satisfaction of the following conditions precedent :

ACTIVE/126640070

(a) the Lender shall have received (i) an Advance Request for the Advance as required by Section 2.2(b), duly executed by Parent's Chief Financial Officer, and (ii) any other documents the Lender may reasonably request;

(b) each of the representations and warranties set forth in this Agreement shall be true and correct in all material respects on and as of the date of such Advance Request and the Advance Date (except to the extent such representation and warranty expressly relates to an earlier date, in which case such representation and warranty shall have been true and correct in all material respects as of such earlier date), except that any representations and warranties subject to "materiality", "Material Adverse Effect" or similar materiality qualifiers shall be true and correct in all respects as of the date of such extension of credit (except to the extent any such representation and warranty expressly relates to an earlier date, in which case such representation and warranty shall have been true and correct as of such earlier date). Each Advance Request shall be deemed to constitute a representation and warranty by the Obligors on the applicable Advance Date as to the matters specified in this paragraph (b) and Section 4.2(c) and as to the matters set forth in the Advance Request;

(c) the Obligors shall be in compliance with all the terms and provisions set forth herein and in each other Loan Document on their part to be observed or performed, and at the time of and immediately after giving effect to such Advance no Event of Default shall have occurred and be continuing;

(d) [reserved];

(e) as of the date of such Advance Request and the Advance Date, no event that has had or could reasonably be expected to have a Material Adverse Effect has occurred and is continuing; and

(f) each Advance shall be used in full for the Borrowers' general working capital purposes.

4.3 No Default. As of the Effective Date, (i) no fact or condition exists that would (or would, with the passage of time, the giving of notice, or both) constitute an Event of Default and (ii) no event that has had or could reasonably be expected to have a Material Adverse Effect has occurred and is continuing.

## SECTION 5. REPRESENTATIONS AND WARRANTIES

To induce the Lender to make Advances, the Obligors, jointly and severally, represent and warrant to the Lender that as of the Effective Date, the date of each Advance Request and the date of each Advance:

5.1 Corporate Status; Compliance with Law. Each of Parent and its Subsidiaries (a) is a corporation, partnership, limited partnership or limited liability company duly organized, validly existing and in good standing under the laws of the its applicable jurisdiction of incorporation or formation; (b) is duly qualified to conduct business and is in good standing in all jurisdictions in which the nature of its business or its ownership or lease of properties require such qualifications and where the failure to be qualified would reasonably be expected to have a Material Adverse Effect; (c) has the requisite corporate, partnership or company power and authority to conduct its business as now and proposed to be conducted and the legal right to own, pledge, mortgage or otherwise encumber and operate its properties, except, in each case, to the extent the failure to have such right would not reasonably be expected to have a Material Adverse Effect; (d) has (and is not in default under any of the following) all material licenses, permits, certifications, consents or approvals from or by, and has made all material filings with, and has given all material notices to, all Governmental Authorities having jurisdiction, to the extent required for such ownership, operation

22

and conduct, except where the failure to satisfy the foregoing, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect; (e) is not in default under any material license, permit, certification or approval requirement of any Governmental Authority, except where such default, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect; (f) is in compliance with its applicable organizational documents in all material respects; and (g) is in compliance with all Laws except where failure to comply could not reasonably be expected to have a Material Adverse Effect. Parent's and each Guarantor's present names, former names (if any), locations, place of incorporation or formation, tax identification number, organizational identification number and other information are correctly set forth in <u>Exhibit C</u>, as may be updated by Parent in a written notice provided to the Lender after the Effective Date.

5.2 <u>Collateral</u>. The Obligors own the Collateral and the Excluded Intellectual Property, free of all Liens, except for Permitted Liens. The Obligors have the power and authority to grant to the Lender a Lien in the Collateral as security for the Secured Obligations.

5.3 <u>Organizational Power, Authorization, Enforceable Obligations, Consents</u>. The execution, delivery and performance of this Agreement and all other Loan Documents and in the case of the Borrowers, the borrowing of Advances, (i) are within such Person's corporate, partnership, limited partnership or limited liability company power and do not contravene any provision of such Person's organizational documents; (ii) have been duly authorized by all necessary or proper action of each Obligor; (iii) will not result in the creation or imposition of any Lien upon the Collateral, other than Permitted Liens; (iv) do not violate (A) any Laws or regulations to which any Obligor or its Subsidiaries are subject, the violation of which would be reasonably expected to have a Material Adverse Effect or (B) any order, injunction, judgment, decree or writ of any Governmental Authority to which any Obligor or its Subsidiaries are subject; (v) do not conflict with, or result in the breach or termination of, constitute a default under or accelerate or permit the acceleration of any performance required by, any indenture mortgage, deed of trust, lease or agreement or other instrument, in each case, in respect of material Indebtedness to which any Obligor or its Subsidiaries is a party or by which any Obligor or its Subsidiaries or any of its property is bound; and (vi) do not violate any contract or agreement or require the consent or approval of any other Person or Governmental Authority which has not already been obtained. The individual or individuals executing the Loan Documents are duly authorized to do so. Each Loan Document has been duly executed and delivered on behalf of each Obligor party thereto. Each Loan Document upon execution will constitute, a legal, valid and binding obligation of each Obligor party thereto, enforceable against each such Obligor in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

5.4 <u>Material Adverse Effect</u>. No event, change, condition, development, effect, circumstance, matter or other occurrence, individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect has occurred and is continuing since the Effective Date. The Obligors are not aware of any event or circumstance likely to occur that, individually or in the aggregate, is reasonably expected to have a Material Adverse Effect. No transfer of property is being made by any Obligor and no obligation is being incurred by any Obligor in connection with the transactions contemplated by any Loan Documents with the intent to hinder, delay, or defraud either present or future creditors of such Obligor.

5.5 <u>Actions Before Governmental Authorities</u>. Except as described on <u>Schedule 5.5</u>, there are no actions, investigations, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of the Obligors, threatened against or affecting any Obligor, its Subsidiaries or their respective property, before any Governmental Authority or before any arbitrator or panel of arbitrators (collectively, "<u>Litigation</u>"), other than Litigation commenced after the Effective Date

ACTIVE/126640070

that would not likely be expected to result in damages of in excess of $250,000 (or its equivalent in other currencies) and which is not covered by insurance for which a claim has been made. There is no Litigation pending or, to the knowledge of any Obligor, threatened (a) with respect to any of the Loan Documents or any of the transactions contemplated thereby, or (b) which would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.6 <u>Laws</u>. No Obligor nor its Subsidiaries is in violation of any Law, or in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default is reasonably expected to have a Material Adverse Effect. Except as described on <u>Schedule 5.6</u>, no Obligor nor its Subsidiaries is in default in any material respect under any provision of any agreement or instrument evidencing Indebtedness, or any other material agreement to which an Obligor is party or by which it is bound.

5.7 <u>Information Correct and Current</u>. No information contained in this Agreement, any of the other Loan Documents, any Financial Statements or any other written materials from time to time delivered hereunder or any written statement furnished by or on behalf of any Obligor or any of its Subsidiaries to the Lender in connection with any Loan Document or included therein or delivered pursuant thereto contained, contains or will contain any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading at the time such statement was made or deemed made. .

5.8 <u>Tax Matters</u>. Except as described on <u>Schedule 5.8</u>, each Obligor and each of its Subsidiaries have (a) filed all federal, state and material local Tax returns that are required to be filed, (b) duly paid or fully reserved for all Taxes or installments thereof (including any interest or penalties) as and when due, which have or may become due pursuant to such returns other than those being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP, and (c) paid or fully reserved for any Tax assessment received by any Group Member for the three years preceding the Closing Date, if any (including any Taxes being contested in good faith and by appropriate proceedings). As of the Effective Date and except as set forth on <u>Schedule 5.8</u>, there is no action, suit, proceeding, investigation, audit or claim now pending or threatened by any Governmental Authority regarding any Taxes relating to each Obligor and any of their Subsidiaries.

5.9 <u>Intellectual Property</u>.

(a) <u>Disclosure; Title</u>. <u>Exhibit D</u> contains a true and correct list of each item of issued, registered, or application for issue or registration of, Intellectual Property, specifying for each (i) title or mark, (ii) jurisdiction, (iii) application or serial number and date, (iv) registration or issue number and date, (v) registered owner, and (vi) beneficial owner if different from registered owner. Except as otherwise specified on <u>Exhibit D</u>, an Obligor is the sole owner of each item of Intellectual Property listed thereon that has an "Amyris Ref" starting with "AM-", and for each other item of Intellectual Property listed thereon, an Obligor has the right to exploit (or exclude others from exploiting) such item under the terms of a License between such Obligor and the applicable Patent owner or co-owner specified in the "Notes" to the Patent schedule on Exhibit D. Except as described on <u>Exhibit D</u>, to the best of each Obligor's knowledge, each of the registered or issued Copyrights, Trademarks and Patents that are required to be listed on <u>Exhibit D</u> is valid and enforceable, and no such Copyright, Trademark or Patent, or any application for registration of the foregoing, has terminated, lapsed, expired or been cancelled or abandoned. All Copyrights, Trademarks and Patents required to be listed on <u>Exhibit D</u> have been prosecuted in accordance with all applicable Laws. To the best of each Obligor's knowledge, all actions required to record each owner throughout the entire chain of title, of each item of Intellectual Property required to be listed

on Exhibit D, with each applicable Governmental Authority up through the Effective Date have been taken, including payment of all costs, fees, Taxes and expenses associated therewith.

(b) Infringement. Except as described on Schedule 5.9(b), (i) to the best of each Obligor's knowledge, none of the Intellectual Property that is owned or exclusively licensed to an Obligor is invalid or unenforceable, in whole or in part, and (ii) no Litigation has been asserted or initiated against and no notice has been received by any Obligor that alleges any exploitation of the Intellectual Property, or the conduct of any Obligor's business infringes, misappropriates, dilutes or otherwise violates the rights of any third party. No other Person's trade secrets and Copyrights, and to the best of each Obligor's knowledge no other Person's other intellectual or industrial property rights, are infringed, misappropriated, diluted or otherwise violated by any Obligor's exploitation of the Intellectual Property or the use, making, development, production, sale, offering for sale, importation or exportation of any Borrower Product. No Obligor has asserted or initiated any Litigation or sent any notice that alleges that any Intellectual Property is being infringed, misappropriated, diluted or otherwise violated.

(c) Trade Secrets. To the best of each Obligor's knowledge, no trade secret or confidential or proprietary information has been used, divulged, disclosed or appropriated to the detriment of any Obligor for the benefit of any Person other than an Obligor. The Intellectual Property has been protected with adequate safeguards and security to maintain any trade secrets, and the confidentiality of any confidential or proprietary information. Each employee and contractor of each Obligor, or any other Person who has developed Intellectual Property, has entered into written employment agreements, non-disclosure agreements, assignment of inventions agreements or similar agreements or contracts, as applicable, requiring such individuals to safeguard and protect trade secrets and confidential or proprietary information that is Intellectual Property and assign Intellectual Property created or conceived by such individual to the applicable Obligor. To the best of each Obligor's knowledge, no such employee, contractor or other Person is in material breach of any such agreement or contract.

(d) Licenses. Exhibit D includes a true, correct and complete list of each (i) material License under which an Obligor receives a right in or to Intellectual Property from any other Person, including each License relating to each item of Intellectual Property listed on Exhibit D that is owned or co-owned by any other Person (other than shrink-wrap licenses for non-customized off-the-shelf software costing less than $500,000 (or its equivalent in other currencies) in aggregate for all Group Companies per annum), and (ii) License pursuant to which an  Obligor grants a right in or to Intellectual Property to any other Person on an exclusive basis. The Licenses on Exhibit D and all other material Licenses are valid and binding and in full force and effect and represents the entire agreement between the respective parties thereto with respect to the subject matter thereof. Each such License will not cease to be valid and binding and in full force and effect on terms identical to those currently in effect as a result of the rights and interest granted herein, nor will the grant of such rights and interest constitute a breach or default under any such License or otherwise give any party thereto a right to terminate such License. No Obligor is in material breach of, nor has any Obligor failed to perform any material obligations under, any such License and, to each Obligor's knowledge, each other party to any such License is not in material breach thereof or has failed to perform any material obligations thereunder. No Obligor has received any notice of a breach or default under any such License which breach or default has not been cured.

(e) Sufficiency of IP. Except as described on Schedule 5.9(e), each Obligor has, or in the case of any proposed business, will own or have licensed to it, all material intellectual property rights necessary for the operation or conduct of its respective business as currently conducted and proposed to be conducted. Without limiting the generality of the foregoing, and in the case of

25

Licenses, except for restrictions that are unenforceable under Division 9 of the UCC, each Obligor has the right, to the extent required to operate its business, to freely transfer or license (except as restricted by Permitted Intellectual Property Licenses) or assign Intellectual Property without condition, restriction or payment of any kind (other than license payments in the ordinary course of business) to any third party, and each Obligor owns or has the right to use, pursuant to valid licenses, all software development tools, library functions, compilers and all other third-party software and other items that are used in the design, development, promotion, sale, license, manufacture, import, export, use or distribution of such Obligor's Borrower Products.

(f) Litigation. Except as described on Schedule 5.9(f), no Intellectual Property owned by an Obligor and no Borrower Product has been or is subject to any actual or, to the knowledge of any Obligor, threatened Litigation, proceeding (including any proceeding in the United States Patent and Trademark Office or any corresponding foreign office or agency) or outstanding decree, order, judgment, settlement agreement or stipulation that restricts in any material respect such Obligor's use, transfer or licensing thereof or that may affect the validity, use or enforceability thereof. There is no decree, order, judgment, agreement, stipulation, arbitral award or other provision entered into in connection with any Litigation or proceeding that obligates any Obligor to grant licenses or ownership interest in any future Intellectual Property necessary to the operation or conduct of the business of such Obligor or embodied by any Borrower Product. Except as described on Schedule 5.9(f), no Obligor has received any written notice or claim, or, to the knowledge of Obligor, oral notice or claim, challenging or questioning any Obligor's ownership in any Intellectual Property (or written notice of any claim challenging or questioning the ownership in any licensed Intellectual Property of the owner thereof) or suggesting that any third party has any claim of legal or beneficial ownership with respect thereto nor, to any Obligor's knowledge, is there a reasonable basis for any such claim.

5.10 Financial Accounts. Exhibit E, as may be updated by the Parent in a written notice provided to the Lender after the Effective Date, is a true, correct and complete list of (a) all banks and other financial institutions at which any Obligor maintains Deposit Accounts, and (b) all institutions at which any Obligor maintains an account holding Investment Property, and such exhibit correctly identifies the name, address and telephone number of each bank or other institution, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor.

5.11 Employee Loans. The Obligors have no outstanding loans to any employee, officer or director of any Obligor nor has any Obligor guaranteed the payment of any loan made to an employee, officer or director of any Obligor by a third party.

5.12 Capitalization and Subsidiaries. The Obligors' capitalization as of the Effective Date is set forth on Schedule 5.12(a) . The Obligors do not own any stock, partnership interest or other securities of any Person, except for Permitted Investments. Attached as Schedule 5.12(b), as may be updated by the Parent in a written notice provided after the Effective Date, is a true, correct and complete list of each Subsidiary.

5.13 Financial Statements.

(a) Except as set forth on Schedule 5.13, all Financial Statements of the Obligors which are referenced below have been prepared in accordance with GAAP consistently applied throughout the periods covered (except as disclosed therein and except, with respect to unaudited Financial Statements, for the absence of footnotes and subject to normal year-end adjustments) and present fairly in all material respects the financial position of the Persons covered thereby as at the dates thereof and the results of their operations and cash flows for the periods then ended.

ACTIVE/126640070

(b)     The Projections that have been made available to the Lender in connection with this Agreement or the other transactions contemplated hereby (i) have been prepared in good faith based upon assumptions believed by the Parent to be reasonable as of the date thereof (it being understood that actual results may vary materially from such projections and estimates), as of the date such projections and estimates were furnished to the Lenders and as of the Effective Date, and (ii) as of the Effective Date, have not been modified in any material respect by the Parent.

5.14  Ownership of Property. The Real Estate listed on Schedule 5.14(a) constitutes, as of the Effective Date, all of the real property owned, leased or subleased by the Obligors and their Subsidiaries. The Obligors and their Subsidiaries own good and marketable fee simple title to all of its owned Real Estate, and valid leasehold interests in all of its leased Real Estate. The Obligors and their Subsidiaries also have good and marketable title to, or valid leasehold interests in or rights to use, all of their personal properties and assets and all material permits required to have been issued or appropriate to enable the Real Estate to be lawfully occupied and used for all of the purposes for which it is currently occupied and used have been lawfully issued and are in full force and effect, in each case, except to the extent such failure to have such title, interests or rights or the failure of such permits to have been issued or in full force and effect would not reasonably be expected to have a Material Adverse Effect.

5.15  Labor Matters. As of the Effective Date, no Obligor is subject to any labor or collective bargaining agreement. There are no existing or, to the knowledge of the Obligors, threatened strikes, lockouts or other labor disputes involving an Obligor or any of its Subsidiaries that singly or in the aggregate could reasonably be expected to have a Material Adverse Effect. Except for violations that could not reasonably be expected to have a Material Adverse Effect, no Obligor or any Subsidiary is in violation of any Law relating to payment of wages or employee hours worked.

5.16  Government Regulation. No Obligor nor any Subsidiary of any Obligor is required to register as an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended. No Obligor nor any Subsidiary of any Obligor is engaged or  will engage, principally or as one of its important activities, in the business of "buying" or "carrying" "margin stock" (within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect) or extending credit for the purpose of purchasing or carrying margin stock.  No part of the proceeds of any Advance will be used for buying or carrying any such margin stock or for extending credit to others for the purpose of purchasing or carrying margin stock in violation of Regulations T, U or X in effect from time to time of the Board of Governors of the Federal Reserve System of the United States (or any successor).

5.17  Brokers. No broker or finder acting on behalf of the Obligors or any of their Subsidiaries brought about the obtaining, making or closing of the Loan and none of the Obligors or their Subsidiaries has any obligation to any Person in respect of any finder's or brokerage fees in connection therewith.

5.18  Environmental Matters. The on-going operations of the Obligors and each of their Subsidiaries comply in all respects with all Environmental Laws, except such non-compliance would not reasonably be expected to have a Material Adverse Effect. The Obligors and each of their Subsidiaries have obtained, and maintained in good standing, all licenses, permits, authorizations and registrations required under any Environmental Law and necessary for their respective ordinary course operations, and the Obligors and each of their Subsidiaries are in compliance with all material terms and conditions thereof, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect. Except as would not reasonably be expected to have a Material Adverse Effect: (i) no Obligor nor any of its properties or operations is subject to any outstanding written order from or agreement with any Governmental Authority, nor subject to any proceeding, with respect to any Environmental Law or Hazardous Material; (ii) there are no conditions or circumstances involving environmental contamination by Hazardous Materials existing

27

with respect to any property, or arising from operations prior to the Effective Date, of any Obligors or any of its Subsidiaries; and (iii) none of the Obligors nor any of their Subsidiaries has any underground storage tanks that are not properly registered or permitted under applicable Environmental Laws or that are leaking or disposing of Hazardous Materials.

5.19 <u>Insurance</u>. <u>Schedule 5.19</u> lists all insurance policies required to be maintained under <u>Section 6.1</u>. None of the Obligors  nor any of their Subsidiaries is in default of any payment obligation under any such insurance policies (after giving effect to all notice and cure periods).

5.20 <u>Foreign Assets Control Regulations, Etc.</u>

(a) None of (i) the making of any Advance, (ii) the Borrowers' use of the proceeds thereof, (iii) the execution, delivery and performance of this Agreement or (iv) the consummation of any transaction contemplated hereby, or the fulfillment of the terms hereof or thereof, will result in a violation by any Person, including without limitation the Lender of any of the foreign assets control regulations of the United States Treasury Department's Office of Foreign Assets Control ("<u>OFAC</u>") (31 CFR, Subtitle B, Chapter V, as amended), other economic and trade sanctions laws and regulations administered or enforced by OFAC, the U.S. State Department or any other applicable governmental authority or any enabling legislation or executive order relating thereto.

(b) None of the Obligors, any of their Subsidiaries, nor any controlled Affiliate of the Obligors or any of their Subsidiaries (i) is a Sanctioned Person or (ii) engages in, or has in the past five (5) years engaged in, any dealings or transactions with any Sanctioned Person. Each of the Obligors and their Subsidiaries and Controlled Affiliates are in compliance, in all material respects, with the economic and trade sanctions administered by OFAC and the U.S. State Department, the Bank Secrecy Act, as amended by the USA Patriot Act, and all other applicable sanctions or anti-money laundering laws and regulations.

(c) No part of the proceeds from any Advance will be used, directly or indirectly, for any payment, or offer or promise of any payment or anything else of value, to any governmental official or employee of a government authority, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity for or on behalf of a governmental authority, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010 or any other applicable anti-corruption or anti-bribery law.

5.21 <u>ERISA</u>.

(a) Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect: (i) each Qualified Plan has been determined by the IRS to qualify under Section 401 of the IRC, and the trusts created thereunder have been determined to be exempt from Tax under the provisions of Section 501 of the IRC, and, to the knowledge of the Obligors, nothing has occurred which would reasonably be expected to cause the loss of such qualification or tax-exempt status; (ii) each ERISA Plan is in compliance with the applicable provisions of ERISA and the IRC, including the filing of reports required under the IRC or ERISA; (iii) no Obligor or any ERISA Affiliate has failed to make any contribution or pay any amount due as required by either Section 412 of the IRC or Section 302 of ERISA or the terms of any such Plan; (iv) no Obligor or, to the knowledge of the Obligors, any ERISA Affiliate has engaged in a prohibited transaction, as defined in Section 4975 of the IRC, in connection with any ERISA Plan, which would subject any such Person to a material Tax on prohibited transactions imposed by Section 4975 of the IRC; and (v) the Obligors do not reasonably anticipate assessed penalties under IRC 4980H.

ACTIVE/126640070

5.22 <u>Security Documents</u>

(a)  (i) This Agreement and each Security Documents is effective to create in favor of the Lender a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof (subject to (x) applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law and (y) any filings, notices and registrations and other perfection requirements necessary to create or perfect the Liens on the Collateral granted by such Obligors in favor of the Lender (which filings or recordings shall be made to the extent required by any Security Document)) and (ii) in the case of the Pledged Equity, if any, that are securities represented by stock certificates or otherwise constituting certificated securities within the meaning of Section 8-102(a)(4) of the New York UCC or the corresponding code or statute of any other applicable jurisdiction ("<u>Certificated Securities</u>"), when certificates representing such Pledged Equity are delivered to the Lender, and in the case of the other Collateral constituting personal property described in the Security Agreement, when financing statements and other filings specified on <u>Schedule 3</u> of the Security Agreement in appropriate form are filed in the offices specified on <u>Schedule 3</u> of the Security Agreement, the Lender shall have a fully perfected Lien on, and security interest in, all right, title and interest of such Obligors in such Collateral and the proceeds thereof, as security for the Secured Obligations, in each case prior and superior in right to any other Person (except, in the case of Collateral other than Pledged Equity, Permitted Liens provided that in this Section 5.22, "Permitted Liens" shall not include the Lavvan Lien) subject to, in each case, applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(b)  Upon the execution and delivery of any Mortgage to be executed and delivered pursuant to this Agreement, such Mortgage shall be effective to create in favor of the Lender a legal, valid and enforceable Lien on the Real Estate described in such Mortgage and proceeds thereof, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law) and the implied covenants of good faith and fair dealing; and when such Mortgage is filed in the appropriate recording office and all relevant mortgage taxes and recording charges are duly paid, such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the applicable Obligor in such Real Estate and the proceeds thereof, as security for the Secured Obligations, in each case subject only to Permitted Liens.

## SECTION 6. INSURANCE; INDEMNIFICATION

6.1 <u>Coverage</u>. The Obligors shall cause to be carried and maintained (a) commercial general liability insurance against risks customarily insured against in each Group Member's line of business, including the risks of bodily injury, including death, property damage, personal injury, advertising injury, and contractual liability per the terms of the indemnification agreement found in <u>Section 6.3</u>, (b) a minimum of $2,000,000[5] of commercial general liability insurance for each occurrence, (c) a minimum of $2,000,000 of directors' and officers' insurance for each occurrence and $5,000,000 in the aggregate, and (d) insurance upon the Collateral, insuring against all risks of physical loss or damage howsoever caused, in an amount not less than the full replacement cost of the Collateral, provided, that such insurance may be subject to standard exceptions and deductibles.

---

[5] NTD: all amounts to be confirmed.

6.2 <u>Certificates</u>. The Obligors shall deliver to the Lender certificates of insurance that shall (a) evidence the Obligors' compliance with its insurance obligations in <u>Section 6.1</u> and the obligations contained in this <u>Section 6.2</u> as soon as reasonably practicable following written request by Lender, (b) state the Lender is an additional insured for commercial general liability, a designated payee for any key man life insurance policy, a lender's loss payee for all risk property damage insurance, subject to the insurer's approval, and a lender's loss payee for property insurance and additional insured for liability insurance for any future insurance that the Obligors may acquire from such insurer, (c) attach additional insured endorsements for liability and lender's loss payable endorsements for all risk property damage insurance, and (d) provide for a minimum of 30 days' advance written notice to the Lender of cancellation or any other change adverse to the Lender's interests. Any failure of the Lender to scrutinize such insurance certificates for compliance is not a waiver of any of the Lender's rights, all of which are reserved.

6.3 <u>Indemnity</u>. The Obligors agree to indemnify and hold the Lender and its officers, directors, employees, agents, in-house attorneys, representatives and shareholders (each, an "<u>Indemnified Person</u>") harmless from and against any and all claims, costs, expenses, damages and liabilities (including such claims, costs, expenses, damages and liabilities based on liability in tort, including strict liability in tort), including reasonable attorneys' fees and disbursements and other costs of investigation or defense (including those incurred upon any appeal) (collectively, "<u>Liabilities</u>"), that may be instituted or asserted against or incurred by such Indemnified Person arising out of, in connection with, or as a result of (a) the execution and delivery of this Agreement and the Loan Documents, (b) credit having been extended, suspended or terminated under this Agreement and the other Loan Documents, (c) the administration of such credit, (d) the use of proceeds of the Loan, (e) the disposition or utilization of the Collateral, (f) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnified Person is a party thereto (and regardless of whether such matter is initiated by a third party or by any Obligor or any of their respective Affiliates) excluding, in all cases, Liabilities to the extent resulting solely from any Indemnified Person's gross negligence or willful misconduct, as determined by a court of competent jurisdiction pursuant to a final, non-appealable judgment, (g) any Environmental Liability related in any way to any Obligor, (h) any actual or reasonably likely prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by a Obligor , and regardless of whether any Indemnitee is a party thereto, (i) default by any Borrower in making a borrowing of, conversion into or continuation of an Advance after a Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (j) default by any Borrower in making any prepayment of the Advances after a Borrower has given a notice thereof in accordance with the provisions of this Agreement, or (k) the making of a prepayment of an Advance on a day that is not the last day of an Interest Period with respect thereto. The Obligors agree to pay, and to save the Lender harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all excise, sales or other similar taxes (excluding taxes imposed on or measured by the net income of the Lender) that may be payable or determined to be payable with respect to any of the Collateral or this Agreement.  To the fullest extent permitted by applicable law, no Obligor shall assert, and each Obligor hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) or any loss of profits arising out of, in connection with, or as a result of, any Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Advance, or the use of the proceeds thereof.  No Indemnified Person shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with the Loan Documents or the transactions contemplated hereby or thereby.  This <u>Section 6.3</u> shall survive the termination of this Agreement and the repayment of all Secured Obligations until all statutes of limitation with respect to the claims, losses, and expenses for which indemnity is given shall have run.

ACTIVE/126640070

## SECTION 7. COVENANTS OF THE OBLIGORS

As long as any Secured Obligations (other than inchoate indemnity obligations) are outstanding, the Obligors agree as follows:

7.1 <u>Financial Reports</u>. The Obligors shall furnish to the Lender the financial statements and reports listed hereinafter :

(a) [reserved];

(b) as soon as practicable (and in any event within 45 days) after the end of each calendar quarter, unaudited interim and year-to-date financial statements as of the end of such calendar quarter (prepared on a consolidated and consolidating basis, if applicable), including balance sheet and related statements of income and cash flows accompanied by a report detailing any material contingencies (including the commencement of material litigation by or against any Obligor of the type described in <u>Section 7.20(b)</u>) or any other occurrence that would reasonably be expected to have a Material Adverse Effect, certified by the Parent's Chief Executive Officer or Chief Financial Officer to the effect that they have been prepared in accordance with GAAP, except (i) for the absence of footnotes, and (ii) that they are subject to normal year-end adjustments;

(c) as soon as practicable (and in any event within 120 days after the end of each fiscal year, audited financial statements as of the end of such year (prepared on a consolidated and consolidating basis, if applicable), including balance sheet and related statements of income and cash flows, and setting forth in comparative form the corresponding figures for the preceding fiscal year, certified by a firm of independent certified public accountants selected by the Parent and reasonably acceptable to the Lender, accompanied by any management report from such accountants;

(d) [reserved];

(e) as soon as practicable (and in any event within 30 days) after the end of each calendar quarter, a Compliance Certificate in the form of <u>Exhibit G</u>;

(f) promptly after the sending or filing thereof, as the case may be, copies of any proxy statements, financial statements or reports that the Obligors have made available to its equity holders and copies of any regular, periodic and special reports or registration statements that the Obligors file with the Securities and Exchange Commission or any Governmental Authority that may be substituted therefor, or any national securities exchange; and

(g) at the Lender's request, at the same time as it gives to its directors, copies of all materials (other than minutes) that any Obligor provides to its directors in connection with meetings of the Board of Directors and that are relevant to the Lender in its capacity as such; provided, however, that such Obligor shall not be required to provide the materials described in this <u>Section 7.1(g)</u> to the extent the information is privileged or pertains to confidential information of any third parties.

The Obligors shall not make any change in their (a) accounting policies or reporting practices, except as required by GAAP, or (b) fiscal years or fiscal quarters. The fiscal year of the Obligors shall end on December 31. The Lender hereby acknowledges and agrees that the materials described in this <u>Section 7.1</u> will contain material non-public and confidential information of the Obligors and their Affiliates and the Lender and its Affiliates and representatives shall abide by all confidentiality terms applicable under this Agreement and any confidentiality and nondisclosure agreements among the parties hereto.

31

Each executed Compliance Certificate may be sent via e-mail to provided, that if e-mail is not available or sending the Compliance Certificate via e-mail is not possible, it shall be mailed to the Lender at 751 Laurel Street #717, San Carlos, CA 94070 (Attention: Barbara Hager). All Financial Statements required to be delivered pursuant to clauses (b) and (c) shall be sent via e-mail to provided, that if email is not available or sending such Financial Statements via e-mail is not possible, they shall be mailed to the Lender at 751 Laurel Street #717, San Carlos, CA 94070 (Attention: Barbara Hager). Notwithstanding the foregoing, the filing of any financial statements or reports required to be furnished pursuant to this Section 7.1 pursuant to the SEC's "EDGAR" system (or any successor electronic filing system) shall be deemed to constitute "furnishing" such documents to the Lender for purposes of this Section 7.1.

7.2  Management Rights and Inspections. The Obligors shall permit any representative that the Lender authorizes, including such representative's attorneys and accountants, to meet with any member of management of any Obligor, meet with each Obligor's independent certified public accountants to the extent permitted by the internal policies of such independent certified public accountants upon reasonable notice and at such reasonable times during normal business hours, conduct site visits and inspect the Collateral, provided, that so long as no Default or Event of Default has occurred and is continuing, the Borrowers shall not be responsible for paying the expenses of the Lender for more than one site visit, inspection, management meeting and examination in any six-month period; provided such cost restriction shall not be deemed a restriction on the number of site visits, inspections, management meetings and examinations the Lender may require. In addition, the Obligors will, upon request by the Lender, have an independent appraiser reasonably satisfactory to the Lender provide an appraisal of the Obligor's Intellectual Property or such subset thereof as determined by the Lender; provided, that so long as no Default or Event of Default has occurred and is continuing, the Borrowers shall not be responsible for paying the expenses for more than one appraisal in any one-year period; provided, further, that such cost restriction shall not be deemed a restriction on the number of appraisals the Lender may require. In addition, the Obligors shall permit any representative that the Lender authorizes, including such representative's attorneys and accountants, to examine and make copies and abstracts of the books of account and records of the Obligors or any Subsidiary applicable to the Loan Documents or the Collateral at reasonable times and upon reasonable notice during normal business hours. In addition, any such representative shall have the right to meet with management and officers of the Obligors or any Subsidiary to discuss such books of account and records at reasonable times and upon reasonable notice during normal business hours. In addition, the Lender shall be entitled at reasonable times and intervals to consult with and advise the management and officers of the Borrowers or any Subsidiary concerning significant business issues affecting the Obligors. Such consultations shall not unreasonably interfere with the Obligors' business operations. Except as expressly provided herein, any and all visits, inspections, examinations and appraisals made while any Event of Default is continuing shall be at Obligors' sole cost and expense. The parties intend that the rights granted to the Lender shall constitute "management rights" within the meaning of 29 C.F.R. Section 2510.3-101(d)(3)(ii), but that any advice, recommendations or participation by the Lender with respect to any business issues shall not be deemed to give the Lender, nor be deemed an exercise by the Lender of, control over any Obligor's management or policies.

7.3  Further Assurances. The Obligors shall from time to time (a) execute, deliver and file, alone or with the Lender, any financing statements, security agreements, collateral assignments, notices, control agreements, or other documents to perfect or give the highest priority to the Lender's Lien on the Collateral (other than the Liens set forth in clauses (ii), (iii), (iv), (v), (vi), (vii), (x), (xii), (xiii) or (xiv) of the definition of Permitted Liens), and (b) procure any instruments or documents as may be requested by the Lender, and take all further action that may be necessary or desirable, or that the Lender may reasonably request, to perfect and protect the Liens granted hereby and thereby. In addition, and for such purposes only, the Obligors hereby authorize the Lender to execute and deliver on behalf of the Obligors and to file such financing statements, collateral assignments, notices, control agreements, security agreements and other documents without the signature of an Obligor either in the Lender's name or in the name of the Lender as

32

agent and attorney-in-fact for such Obligor. The Obligors shall protect and defend such Obligor's title to the Collateral and the Lender's Lien thereon against all Persons claiming any interest adverse to any Obligor or the Lender other than Permitted Liens.

7.4 <u>Indebtedness; Amendments</u>. The Obligors shall not and shall not permit any Subsidiary to: (a) create, incur, assume, guarantee or be or remain liable with respect to any Indebtedness, other than Permitted Indebtedness; (b) pay any principal, fees or interest on any Indebtedness other than (i) payments as they fall due under the DIP Loan Agreement, and (i) scheduled or mandatory payments of principal, fees and interest when due on Permitted Indebtedness (other than the DIP Loan Agreement) in accordance with the terms of such Indebtedness as at the Effective Date, subject to any amendments permitted by this Agreement; (c) waive any provision of, amend, restate, reform, supplement or otherwise modify (x) any documents or notes evidencing any Indebtedness (other than the Loan Documents or, subject to clause (y), the DSM Note Documents) in any manner which imposes materially more burdensome terms upon any Obligor or its Subsidiaries than exist with respect to such Indebtedness prior to such amendment or modification, (y) the DSM Note Documents from the form delivered to the Lender under Section 4.1, without the prior written consent of the Lender, or (z) the Lavvan Documents from the form delivered to the Lender under Section 4.1, without the prior written consent of the Lender, or (d) consent to any transfer or assignment of any of DSM's rights or obligations under the DSM Note Documents without the prior written consent of the Lender.

7.5 <u>Collateral; Liens Generally</u>.

(a) The Obligors shall at all times keep the Collateral free and clear from any legal process or Liens whatsoever (except for Permitted Liens), and shall give the Lender prompt written notice of any legal process affecting the Collateral or any Liens. The Obligors shall protect and defend their title to the Collateral from and against all Persons claiming any interest adverse to such Obligor, and the Obligors shall at all times  keep their rights in the Collateral free and clear from any legal process or Liens whatsoever (except for Permitted Liens), and shall give the Lender prompt written notice of any legal process affecting such rights in the Collateral.

(b) The Obligors shall not, and shall not permit any of their Subsidiaries to, (i) create, incur, assume or permit to exist any Lien or legal process on any of its properties or assets, whether now owned or acquired after the date of this Agreement, other than Permitted Liens or (ii) become a party to any agreement, note, indenture or instrument, or take any other action, which would prohibit the creation of a Lien on any of its properties or other assets in favor of the Lender as additional collateral for the Secured Obligations, other than (A) the DIP Loan Documents , and (B) the DSM Security Agreement and the Lavvan Pledge, each in the form delivered to the Lender under Section 4.1.

(c) The Obligors shall, and shall cause its Subsidiaries to (i) keep, the Excluded Intellectual Property free and clear or any legal process or Liens (except for Permitted Liens and the agreements and licenses referenced in the definition of Excluded Intellectual Property and the other rights granted thereunder to the other parties thereto), and (ii) protect and defend such Obligor's or such Subsidiary's title to the Excluded Intellectual Property from and against all Persons claiming any interest adverse to such Obligor or such Subsidiary.

7.6 <u>Investments</u>. No Obligor shall directly or indirectly acquire or own, or make any Investment in or to any Person, or permit any of its Subsidiaries so to do, other than Permitted Investments.

ACTIVE/126640070

7.7 <u>Distributions</u>. The Obligors shall not, and shall not allow any Subsidiary to, (a) repurchase or redeem any class of stock or other equity interest other than pursuant to employee, director or consultant repurchase plans or other similar agreements or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition or (b) declare or pay any cash dividend or make a cash distribution on any class of stock or other equity interest, except that a Subsidiary may pay dividends or make distributions to any Obligor [(or, in the case of a Foreign Subsidiary that is not an Obligor, a parent company that is a direct or indirect wholly owned Subsidiary of any Obligor)], or (c) lend money to any employees, officers or directors, or guarantee the payment of any such loans granted by a third party, or (d) waive, release or forgive any Indebtedness owed by any employees, officers or directors. Notwithstanding the foregoing, for as long as an Obligor (or any Subsidiary) is a member of a group obligated to pay taxes on a consolidated or similar basis, such Obligor (or any Subsidiary) may pay dividends or make distributions in an amount sufficient to allow the parent of such group to pay taxes attributable to such Obligor (or Subsidiary).

7.8 <u>Transfers</u>. Except for Permitted Transfers, Permitted Investments and Permitted Liens, the Obligors shall not, and shall not allow any Subsidiary to, voluntarily or involuntarily make any transfer, sell, lease, license, lend, dispose of or in any other manner convey (each, a "<u>Transfer</u>") any equitable, beneficial or legal interest in any of their assets.

7.9 <u>Mergers or Acquisitions</u>. No Obligor shall merge or consolidate, or permit any of its Subsidiaries to (a) amalgamate, liquidate, wind up, dissolve itself (or suffer any liquidation or dissolution), merge or consolidate, with or into any other business organization (other than mergers or consolidations of (i) a Subsidiary which is not an Obligor into another Subsidiary which is not an Obligor or into an Obligor which is not a Foreign Subsidiary, (ii) an Obligor which is a Domestic Subsidiary into another Obligor which is a Domestic Subsidiary, or (b) acquire, or permit any of its Subsidiaries to acquire, all or substantially all of the Capital Stock or property of another Person (except in connection with a transaction described in Section 7.9(a)), in each case without the prior written consent of the Lender.

7.10 <u>Taxes</u>.

(a) Each Obligor and its Subsidiaries shall pay when due all Taxes, fees or other charges of any nature whatsoever (together with any related interest or penalties) now or hereafter imposed or assessed against (i) the Lender and related to, or in connection with, any of the transactions contemplated hereby or by other Loan Documents (other than taxes imposed on or measured by the net income of the Lender), subject to reasonable notification thereof by the Lender, and (ii) such Obligor or the Collateral or upon such Obligor's ownership, possession, use, operation or disposition thereof or upon such Obligor's rents, receipts or earnings arising therefrom. Each Obligor shall and shall procure that each of its Subsidiaries shall file on or before the due date therefor all personal property tax returns in respect of the Collateral. Notwithstanding the foregoing, each Obligor may contest, in good faith and by appropriate proceedings, Taxes for which such Obligor maintains adequate reserves therefor in accordance with GAAP.

(b) Any payments by or on account of any obligation of any Obligor under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by such Obligor shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional

34

sums payable under this <u>Section 7.10</u>) the applicable recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made. Each Obligor shall timely pay to the relevant Governmental Authority in accordance with applicable law any Other Taxes. Each Obligor shall indemnify the Lender within ten days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 7.10</u>) payable or paid by the Lender or required to be withheld or deducted from a payment to the Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Obligors by the Lender shall be conclusive absent manifest error.

7.11 <u>Corporate Changes; Maintenance and Conduct of Business; Capital Structure</u>.

(a) No Obligor shall change its corporate name, legal form or jurisdiction of formation without at least 20 days' prior written notice to the Lender. No Obligor shall relocate its chief executive office or its principal place of business unless: (i) it has provided prior written notice to the Lender; and (ii) such relocation shall be within the continental United States.

(b) No Obligor shall relocate any item of Collateral (other than (x) sales of Inventory in the ordinary course of business, (y) relocations of Equipment having an aggregate value for all Obligors of up to $150,000 (or its equivalent in other currencies) in any fiscal year, and (z) relocations of Collateral from a location described on <u>Exhibit C</u> to another location described on <u>Exhibit C</u>) unless (i) it has provided prompt written notice to the Lender, (ii) such relocation is within the continental United States and, (iii) if such relocation is to a third party bailee, it has delivered a bailee agreement in form and substance reasonably acceptable to the Lender.

(c) Each Obligor shall, and shall cause its Subsidiaries to maintain, preserve and protect, in all material respects, all of its material tangible assets and properties used or useful in the conduct of its business, and keep the same in good repair, working order and condition in all material respects (taking into condition ordinary wear and tear, casualty and condemnation) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto).

(d) Without the prior written consent of the Lender, no Obligor shall, and shall not permit any of its Subsidiaries to, engage in any business other than the businesses currently engaged in by it and any business or business activities reasonably incidental or related thereto, or any business or activity that is reasonably similar, complementary thereto or a reasonable extension thereof.

(e) No Obligor shall make any change in its capital structure without providing the Lender at least five Business Days' prior written notice.

(f)     Each Obligor will maintain, and will procure that each of its Subsidiaries maintains, its legal existence and good standing in their respective jurisdictions of formation and maintain qualification in each jurisdiction in which the failure to so qualify would reasonably be expected to have a material adverse effect on such Obligor's business or results of operations.

7.12 <u>Deposit Accounts</u>. No Obligor shall maintain any Deposit Accounts, or accounts holding Investment Property, except with respect to which the Lender has an Account Control Agreement at the Effective Date or in accordance with Section 7.19.

ACTIVE/126640070

7.13 Subsidiaries. The Obligors shall notify the Lender of each Subsidiary formed or incorporated subsequent to the Effective Date, and, within 30 days of such formation or incorporation, shall cause any such Subsidiary to execute and deliver to the Lender a Joinder Agreement and such other documentation as the Lender may require.

7.14 Notification of Default or Event of Default. The Obligors shall notify the Lender immediately in writing via email and by telephone pursuant to Section 10.2 after any Obligor acquires knowledge of any breach or Default in the performance of any covenant or Secured Obligation under this Agreement, any Loan Document or any other agreement between any Obligor and the Lender, or the occurrence of any Event of Default.

7.15 [RESERVED]

7.16 [RESERVED].

7.17 [RESERVED]

7.18 [RESERVED]

7.19 Post-Closing. The Obligors shall deliver to the Lender the documents and other evidence set out in Schedule 7.19 on or before the dates set out in such Schedule, in each case in form and substance satisfactory to the Lender.

7.20 Books and Records. Each Obligor shall, and shall cause each of its Subsidiaries to, keep adequate books and records with respect to its material business activities in which proper entries, reflecting all bona fide material financial transactions, are made in accordance with GAAP in all material respects (it being understood and agreed that any Subsidiary may maintain its individual books and records in conformity with local standards or customs and that such maintenance shall not constitute a breach of the representations, warranties or covenants hereunder).

7.21 Compliance with Laws and Organizational Documents; Maintenance of Licenses. Without limiting any other provision of this Agreement, each Obligor shall, and shall cause each of its Subsidiaries to, (a) comply in all respects with all Laws applicable to it except to the extent that the failure to comply, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect and comply in all material respects with the terms of all organizational documents applicable to it, (b) obtain and maintain all material licenses, permits, certifications, franchises, consents and governmental authorizations and approvals necessary to own its property and to conduct its business as conducted on the Effective Date, except to the extent failure to obtain and maintain, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect, (c) preserve, renew and keep in full force and effect its organizational existence (d) take all reasonable action to maintain or obtain all Governmental Approvals and all other rights, privileges and franchises necessary or desirable in the normal conduct of its business or necessary for the performance by such Person of its Secured Obligations under any Loan Document, except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; (e) comply with all Governmental Approvals, and any term, condition, rule, filing or fee obligation, or other requirement related thereto, except to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect and the terms of all organizational documents applicable to it; (f) conduct its business in compliance with the economic and trade sanctions administered by OFAC, the U.S. State Department and any other applicable governmental authority, the FCPA and all other applicable anti-corruption laws, and maintain policies and procedures reasonably designed to promote and achieve compliance with such laws; and (g) not amend or permit any amendments to its organizational documents, if such amendment would impair the rights and remedies available to the Lender under the

36

Loan Documents or the Liens contemplated thereby, or otherwise be materially adverse to the interests of the Lender.

7.22 <u>Intellectual Property</u>.

(a) Subject to the following sentence, with respect to each item of its Intellectual Property, each Obligor agrees to take, at its expense, all commercially reasonable steps requested by the Lender, including in the U.S. Patent and Trademark Office, the U.S. Copyright Office and any other Governmental Authority, to (i) maintain each validity and enforceability of each issued or registered item of Intellectual Property that exists at or after the Effective Date and maintain the Intellectual Property in full force and effect, and (ii) pursue the issuance, registration and maintenance of each Patent, Trademark, or Copyright registration or application, now or hereafter included in such Intellectual Property. No Obligor will, without the written consent of the Lender, allow any lapse, abandonment, cancellation, non-renewal or discontinuance of use or maintenance of intellectual property (or rights relating thereto) of any Obligor , or abandon any right to file an application for Patent, Trademark registration, or Copyright registration, other than any lapse, abandonment, cancellation, non-renewal or discontinuance of use or maintenance of intellectual property (or rights relating thereto) of any Obligor that (i) such Obligor determines in good faith is no longer desirable in the conduct of its business and (ii) is not materially disadvantageous to the interests of the Lender.

(b) Each Obligor agrees to promptly notify the Lender if it becomes aware (i) that any item of the Intellectual Property, that is the subject of an issued Patent, registered Copyright or Trademark, or an application for any of the foregoing, may have become abandoned, been placed in the public domain, or been deemed invalid or unenforceable, (ii) of any adverse determination or development regarding its ownership of any of the Intellectual Property or its right to register the same or to keep and maintain and enforce the same, or (iii) of any adverse determination or the institution of any proceeding (including, without limitation, the institution of any proceeding in the U.S. Patent and Trademark Office or any court) regarding any item of the Intellectual Property, in each case of clauses (i), (ii) and (iii) above, unless the applicable Obligor shall have determined that such event would not be reasonably likely to materially adversely affect the rights or benefits of the Lender.

(c) In the event that an Obligor becomes aware that any item of the Intellectual Property that is owned by or exclusively licensed to any Obligor is being infringed or misappropriated by a third party, the Obligor that owns or is exclusively licensed such item of Intellectual Property shall take such actions (if any), at its expense, as such Obligor deems reasonable and appropriate under the circumstances to protect or enforce such Intellectual Property, including, without limitation, suing for infringement or misappropriation and for an injunction against such infringement or misappropriation.

(d) Each Obligor will use proper statutory notice in connection with its use of each item of its Intellectual Property. No Obligor will, do or permit any act or knowingly omit to do any act whereby any of its Intellectual Property may lapse or become invalid or unenforceable or be placed in the public domain other than any lapse, invalidity or unenforceability of intellectual property (or rights relating thereto) of any Obligor that (i) such Obligor determines in good faith is no longer desirable in the conduct of its business and (ii) is not materially disadvantageous to the interests of the Lender.

(e) Each Obligor will take all steps which it deems reasonable and appropriate under the circumstances to preserve and protect each item of its Intellectual Property, including, without

ACTIVE/126640070

limitation, maintaining the quality of any and all products or services used or provided in connection with any of the Trademarks, consistent with the quality of the products and services as of the Effective Date, and taking all steps necessary to ensure that all licensed users of any of the Trademarks use such consistent standards of quality.

(f) With respect to its Collateral IP as at the Effective Date, each Obligor agrees to execute or otherwise authenticate an IP Security Agreement for recording the security interest granted hereunder to the Lender in such Collateral IP with the U.S. Patent and Trademark Office, the U.S. Copyright Office and any other Governmental Authorities necessary to perfect the security interest hereunder in such Intellectual Property. Each Obligor will record such IP Security Agreement with the U.S. Patent and Trademark Office, the U.S. Copyright Office and any other Governmental Authorities, as applicable, within 15 days of the Effective Date.

(g) Each Obligor agrees that should it obtain an ownership interest in any item of the type that falls within the definition of Collateral IP that is not on the Effective Date  a part of the Collateral IP ("After-Acquired Intellectual Property") (i) the provisions of this Agreement will automatically apply thereto, and (ii) any such After-Acquired Intellectual Property and, in the case of Trademarks, the goodwill symbolized thereby, shall automatically become part of the Collateral IP subject to the terms and conditions of this Agreement and the Security Documents with respect thereto. Within 15 days after the end of each fiscal quarter, each Obligor shall (A) give written notice to the Lender identifying the After-Acquired Intellectual Property acquired during such fiscal quarter, and (B) execute and deliver to the Lender , or otherwise authenticate, an IP Security Agreement substantially in the form of the IP Security Agreement delivered on the Effective Date or otherwise in form and substance satisfactory to the Lender covering such After-Acquired Intellectual Property and such IP Security Agreement shall be recorded by each applicable Obligor with the U.S. Patent and Trademark Office, the U.S. Copyright Office and any other governmental authorities necessary to perfect the Lender's Lien under the Security Documents in such After-Acquired Intellectual Property where such recording will be within 15 days after notice from the Lender of its satisfaction with such IP Security Agreement .

7.23 <u>Environmental Matters; Hazardous Material</u>. Each Obligor shall and shall procure that each of its Subsidiaries shall (a) comply with all applicable Environmental Laws, and obtain and comply with and maintain any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws, except for any such non-compliance or failure to obtain that could not reasonably be expected to result in a Material Adverse Effect, (b) conduct its operations and keep and maintain all Real Estate in compliance with all Environmental Laws, other than noncompliance which could not reasonably be expected to have a Material Adverse Effect; (c) promptly take any and all actions necessary to cure any violation of applicable Environmental Laws by such Obligor or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect, and (d) notify the Lender promptly after such Obligor becomes aware of any violation of Environmental Laws which is reasonably likely to have a Material Adverse Effect.

7.24 <u>Lender Calls</u>. At the reasonable request of the Lender, the Obligors shall participate in monthly conference calls with the Lender, such calls to be held at such time as may be agreed to by the Obligors and the Lender.

7.25 <u>Other Reports</u>. The Obligors shall deliver or cause to be delivered to the Lender, the following:

(a) [other than any Litigation by Lavvan or any of its Affiliates, successors or assigns under the Lavvan Documents,] promptly after any officer of any Obligor obtains knowledge of the commencement of any of the following, written notice in reasonable detail of any Litigation

ACTIVE/126640070

commenced or threatened in writing against such Obligor or any Subsidiary of such Obligor that (i) would reasonably be expected to result in damages in excess of $500,000 (or its equivalent in other currencies), (ii) seeks material injunctive relief, where such relief could reasonably be expected to have a Material Adverse Effect, or (iii) alleges criminal misconduct of an Obligor or any of its Subsidiaries, which alleged misconduct could reasonably be expected to have a Material Adverse Effect;

(b) promptly after any officer of any Obligor obtains knowledge of the receipt by any Obligor of any written notice of violation of or potential liability or similar written notice under any applicable Law or other development, occurrence or violation that would reasonably be expected either to result in liabilities in excess of $500,000 (or its equivalent in other currencies) or have a Material Adverse Effect; and

(c) [reserved]

(d) such reports, notices or other documentation required to be provided pursuant to Section 7.23(c) and copies of all environmental reports, reviews and audits in a Obligor's possession pertaining to actual or potential Environmental Liabilities that would reasonably be expected to have a Material Adverse Effect on any Obligor or its Subsidiaries.

7.26  No Speculative Transactions. Each Obligor shall not, and shall not permit any of its Subsidiaries to, engage in any transaction involving commodity options, futures contracts or similar transactions, other than foreign currency exchange hedging transactions in the ordinary course of business consistent with past practice.

## SECTION 8. EVENTS OF DEFAULT

Any one or more of the following events shall be an Event of Default:

8.1  Payments. Any Obligor fails to (a) pay any amount of principal or interest on any Advance on its due date, or (b) pay any other amount due under this Agreement or any of the other Loan Documents on or prior to the third Business Day after its due date whether scheduled, upon acceleration or otherwise; or

8.2  Covenants. Any Obligor breaches or defaults in the performance of any covenant or Secured Obligation under this Agreement, or any of the other Loan Documents or any other agreement between any Obligor and the Lender, and such default continues for more than five Business Days; or

8.3  Representations. Any representation or warranty made by any Obligor in any Loan Document shall have been untrue or incorrect in any material respect when made or deemed made; or

8.4  Insolvency. Other than in relation to the Cases (i)  any Group Member shall commence any case, proceeding or other action (A) under any Bankruptcy Law, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator, judicial manager or other similar official for it or for all or any substantial part of its assets, or any Group Member shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against any Group Member any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) there shall be commenced against any Group Member any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar

ACTIVE/126640070

process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) any Group Member shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clauses (i), (ii), or (iii) above; or (v) any Group Member shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due, subject to applicable grace periods, if any; or

8.5 <u>Attachments; Judgments</u>. If (i) any portion of any Group Member's assets are attached or seized, or a levy is filed against any such assets, or a judgment or judgments is/are entered for the payment of money, individually or in the aggregate, of at least $250,000 (or its equivalent in other currencies) , or any Group Member is enjoined or in any way prevented by court order from conducting any part of its business; or (ii) there shall be commenced against any Group Member any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged or stayed or bonded pending appeal within 60 days from the entry thereof; or (iii) any court order enjoins, restrains or prevents a Group Member from conducting all or any material part of its business; or

8.6 <u>Other Obligations</u>. The occurrence of any default or breach under any agreement or obligation of any Group Member involving any Indebtedness in excess of $500,000 (or its equivalent in other currencies) other than the Loan Documents, or receipt of written notice of the occurrence of any default or breach under any other agreement or obligation of any Group Member with annual payments or receipts in excess of $500,000 (or its equivalent in other currencies), which, in the case of such default or breach, is not cured within any applicable grace or cure period; or

8.7 <u>Loan Documents</u>. (a) If (i) the guaranty set forth in <u>Section 11</u> ceases to be in full force and effect for any reason whatsoever, including, without limitation, a determination by any Governmental Authority that this Agreement is invalid, void or unenforceable, (ii) any Obligor or any Person acting on behalf of such Obligor shall contest in any manner the validity, binding nature or enforceability of this Agreement, or (iii) the obligations of any Obligor under any Loan Document are not or cease to be (or any Person shall assert that they are not) legal, valid, binding and enforceable in accordance with the terms of such Loan Document, or (b) if any Security Document shall cease to be in full force and effect or any Person shall so assert or any security interest purported to be created by any Loan Document shall cease to be, or shall be asserted in writing by any Obligor not to be, a valid, perfected, security interest in any material portion of the Collateral covered thereby; or

8.8 <u>Change in Control</u>. The occurrence of any Change in Control without the prior written approval of the Lender; or

8.9 <u>Invalidity</u>. Any material provision of any Loan Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or any Obligor or Subsidiary of an Obligor shall challenge in writing the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any security interest created under any Loan Document shall cease to be a valid and perfected first priority (subject only to Permitted Encumbrances) security interest or Lien (except as otherwise permitted herein or therein) in any material portion of the Collateral purported to be covered thereby, except to the extent that any such loss of perfection or priority results from any action or inaction of the Lender; or

8.10 <u>Subordination Provisions</u>. If (a) any provision of any subordination or intercreditor agreement, document or instrument governing any Subordinated Indebtedness or any Indebtedness that is secured by

ACTIVE/126640070

Liens that have been contractually subordinated to the Liens securing the Secured Obligations (together, "Subordination Arrangements") shall for any reason be revoked or invalidated, or otherwise cease to be in full force and effect (other than in accordance with the express terms thereof), or (b) any Person shall contest in any manner the validity or enforceability thereof or such Person shall deny that it has any further liability or obligation thereunder, or (c) any party to any Subordination Arrangements (other than the Lender) shall fail to comply with the provisions of, does not perform its obligations under, any such Subordination Arrangements.

## SECTION 9. REMEDIES

9.1 <u>General</u>. Upon and during the continuance of any one or more Events of Default, (i) the Lender may, at its option, accelerate and demand payment of all or any part of the Secured Obligations and declare them to be immediately due and payable (provided, that upon the occurrence of an Event of Default of the type described in <u>Section 8.4</u>, all of the Secured Obligations shall automatically be accelerated and made due and payable, in each case without any further notice or act), (ii) the Lender may, at its option, sign and file in any Obligor's name any and all collateral assignments, notices, control agreements, security agreements and other documents it deems necessary or appropriate to perfect or protect the repayment of the Secured Obligations, and in furtherance thereof, each Obligor hereby grants the Lender an irrevocable power of attorney coupled with an interest, and (iii) the Lender may notify any of the Obligors' account debtors to make payment directly to the Lender, compromise the amount of any such account on such Obligor's behalf and endorse the Lender's name without recourse on any such payment for deposit directly to the Lender's account. The Lender may exercise all rights and remedies with respect to the Collateral under the Loan Documents or otherwise available to it under the UCC and other applicable law, including the right to release, hold, sell, lease, liquidate, collect, realize upon, or otherwise dispose of all or any part of the Collateral and the right to occupy, utilize, process and commingle the Collateral. All of the Lender's rights and remedies shall be cumulative and not exclusive.

9.2 <u>Collection; Foreclosure</u>. Upon the occurrence and during the continuance of any Event of Default, the Lender may at any time or from time to time, apply, collect, liquidate, sell in one or more sales, lease or otherwise dispose of, any or all of the Collateral, in its then condition or following any commercially reasonable preparation or processing, in such order as the Lender may elect. Any such sale may be made either at public or private sale at its place of business or elsewhere. The Obligors agree that any such public or private sale may occur upon ten calendar days' prior written notice to the Obligors. The Lender may require the Obligors to assemble the Collateral and make it available to the Lender at a place designated by the Lender that is reasonably convenient to the Lender and the Obligors. The proceeds of any sale, disposition or other realization upon all or any part of the Collateral shall be applied by the Lender in the following order of priorities:

(a) First, to the Lender in an amount sufficient to pay in full costs and professionals' and advisors' fees and expenses as described in <u>Section 10.11</u>;

(b) Second, to the Lender in an amount equal the then unpaid amount of the Secured Obligations (including principal, interest, and any Default interest payable pursuant to <u>Section 2.3</u>), in such order and priority as the Lender may choose in its sole discretion; and

(c) Finally, after the full, final, and indefeasible payment in Cash of all of the Secured Obligations, to any creditor holding a junior Lien on the Collateral, or to such Obligor or its representatives or as a court of competent jurisdiction may direct.

The Lender shall be deemed to have acted reasonably in the custody, preservation and disposition of any of the Collateral if it complies with the obligations of a secured party under the UCC.

41

9.3 <u>No Waiver</u>. The Lender shall be under no obligation to marshal any of the Collateral for the benefit of any Obligor or any other Person, and the Obligors expressly waive all rights, if any, to seek to require the Lender to marshal any Collateral.

9.4 <u>Cumulative Remedies</u>. The rights, powers and remedies of the Lender hereunder shall be in addition to all rights, powers and remedies given by statute or rule of law and are cumulative. The exercise of any one or more of the rights, powers and remedies provided herein shall not be construed as a waiver of or election of remedies with respect to any other rights, powers and remedies of the Lender.

## SECTION 10. MISCELLANEOUS

10.1 <u>Severability</u>. Whenever possible, each provision of the Loan Documents shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Loan Documents shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent and duration of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of the Loan Documents.

10.2 <u>Notice</u>. Except as otherwise provided herein, any notice, demand, request, consent, approval, declaration, service of process or other communication (including the delivery of Financial Statements) that is required, contemplated, or permitted under the Loan Documents or with respect to the subject matter hereof shall be in writing, and may be personally served or sent by electronic mail or United States mail or courier service and shall be deemed to have been given (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (c) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address or email address indicated below, in each case addressed to the party to be notified as follows (or to such other address as a party to this Agreement may notify the other parties in writing from time to time):

      (a)      If to the Lender:

> FORIS VENTURES, LLC
> Attention: Barbara Hager
> 751 Laurel Street #717
> San Carlos, CA 94070
> Email: [          ]

> With a copy (which shall not constitute notice) to:

> GOODWIN PROCTER LLP
> Attention: Jon Novotny
> Three Embarcadero Center
> 28th Floor
> 4824-3758-6580
> San Francisco, CA 94111
> Email: jnovotny@goodwinlaw.com

42

(b)      If to the Obligors:

AMYRIS, INC.
Attention: General Counsel
5885 Hollis Street, Suite 100
Emeryville, CA 94608
Attn: General Counsel
Phone: (510) 450-0761
Email: generalcounsel@amyris.com

with a copy (which shall not constitute notice) to each of:

Pachulski Stang Ziehl & Jones LLP
One Sansome Street, Suite 3430
San Francisco, CA 94104
Attn: Debra I. Grassgreen
Email: dgrassgreen@pszjlaw.com

and:
Fenwick & West LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041
Attn: David Michaels
Phone: 650-988-8500
Email: dmichaels@fenwick.com

or to such other address as each party may designate for itself by like notice.

10.3 <u>Entire Agreement; Amendments</u>.

(a) This Agreement and the other Loan Documents constitute the entire agreement and understanding of the parties hereto in respect of the subject matter hereof and thereof, and supersede and replace in their entirety any prior proposals, term sheets, non-disclosure or confidentiality agreements, letters, negotiations or other documents or agreements, whether written or oral, with respect to the subject matter hereof or thereof.

(b) No amendment or waiver of, or supplement or other modification to, any Loan Document (other than any landlord, bailee or mortgagee agreement) or any provision thereof, shall be effective unless the same shall be in writing and signed by the Obligors and the Lender, and then such waiver shall be effective only in the specific instance and for the specific purpose for which given.

10.4 <u>No Strict Construction</u>. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

10.5 <u>No Waiver</u>. The powers conferred upon the Lender by this Agreement are solely to protect its rights hereunder and under the other Loan Documents and its interest in the Collateral and shall not impose

43

any duty upon the Lender to exercise any such powers. No omission or delay by the Lender at any time to enforce any right or remedy reserved to it, or to require performance of any of the terms, covenants or provisions hereof by the Obligors at any time designated, shall be a waiver of any such right or remedy to which the Lender is entitled, nor shall it in any way affect the right of the Lender to enforce such provisions thereafter.

10.6 <u>Survival</u>. All agreements, representations and warranties contained in this Agreement and the other Loan Documents or in any document delivered pursuant hereto or thereto shall be for the benefit of the Lender and shall survive the execution and delivery of this Agreement and the expiration or other termination of this Agreement.

10.7 <u>Successors and Assigns</u>. The provisions of this Agreement and the other Loan Documents shall inure to the benefit of and be binding on the Obligors and their permitted assigns (if any). The Obligors shall not assign any obligations under this Agreement or any of the other Loan Documents without the Lender's express prior written consent, and any such attempted assignment shall be void and of no effect. The Lender may assign, transfer, or endorse its rights hereunder and under the other Loan Documents without prior notice to the Obligors (except that the Lender shall notify the Obligors of an assignment for the limited purpose of recording such assignment in the Register in accordance with <u>Section 10.13</u>), and all of such rights shall inure to the benefit of Lender's successors and permitted assigns.

10.8 <u>Governing Law</u>. This Agreement and the other Loan Documents have been negotiated and delivered to the Lender in the State of California, and shall have been accepted by the Lender in the State of California. Payment to the Lender by the Obligors of the Secured Obligations is due in the State of California. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of California, excluding conflict of laws principles that would cause the application of laws of any other jurisdiction.

10.9 <u>Consent to Jurisdiction and Venue</u>. All judicial proceedings (to the extent that the reference requirement of <u>Section 10.10</u> is not applicable) arising in or under or related to this Agreement or any of the other Loan Documents shall be brought in the courts of the State of California. By execution and delivery of this Agreement, each party hereto generally and unconditionally: (a) consents to nonexclusive personal jurisdiction in Santa Clara County, State of California; (b) waives any objection as to jurisdiction or venue in Santa Clara County, State of California; (c) agrees not to assert any defense based on lack of jurisdiction or venue in the aforesaid courts; and (d) irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement or the other Loan Documents. Service of process on any party hereto in any action arising out of or relating to this Agreement shall be effective if given in accordance with the requirements for notice set forth in <u>Section 10.2</u>, and shall be deemed effective and received as set forth in <u>Section 10.2</u>. Nothing herein shall affect the right to serve process in any other manner permitted by law or shall limit the right of either party to bring proceedings in the courts of any other jurisdiction.

10.10 <u>Mutual Waiver of Jury Trial / Judicial Reference</u>.

(a) Because disputes arising in connection with complex financial transactions are most quickly and economically resolved by an experienced and expert Person and the parties wish applicable state and federal laws to apply (rather than arbitration rules), the parties desire that their disputes be resolved by a judge applying such applicable laws. EACH OF THE OBLIGORS AND THE LENDER SPECIFICALLY WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY OF ANY CAUSE OF ACTION, CLAIM, CROSS-CLAIM, COUNTERCLAIM, THIRD PARTY CLAIM OR ANY OTHER CLAIM (COLLECTIVELY, "CLAIMS") ASSERTED BY ANY OBLIGOR AGAINST THE LENDER OR ITS ASSIGNEES OR BY THE LENDER OR ITS

44

ASSIGNEES AGAINST ANY OBLIGOR. This waiver extends to all such Claims, including Claims that involve Persons other than the Obligors and the Lender; Claims that arise out of or are in any way connected to the relationship between any Obligor and the Lender; and any Claims for damages, breach of contract, tort, specific performance, or any equitable or legal relief of any kind, arising out of this Agreement, or any other Loan Document.

(b) If the waiver of jury trial set forth in Section 10.10(a) is ineffective or unenforceable, the parties agree that all Claims shall be resolved by reference to a private judge sitting without a jury, pursuant to Code of Civil Procedure Section 638, before a mutually acceptable referee or, if the parties cannot agree, a referee selected by the Presiding Judge of the Santa Clara County, California. Such proceeding shall be conducted in Santa Clara County, California, with California rules of evidence and discovery applicable to such proceeding.

(c) In the event Claims are to be resolved by judicial reference, either party may seek from a court identified in Section 10.9, any prejudgment order, writ or other relief and have such prejudgment order, writ or other relief enforced to the fullest extent permitted by law notwithstanding that all Claims are otherwise subject to resolution by judicial reference.

10.11 Professional Fees. The Obligors promise to pay the Lender's fees and expenses necessary to finalize the loan documentation, including but not limited to reasonable attorneys' fees, UCC searches, filing costs, and other miscellaneous expenses, all as set forth on a summary invoice provided to the Obligors. In addition, the Obligors promise to pay any and all reasonable attorneys' and other professionals' fees and expenses incurred by the Lender after the Effective Date in connection with or related to: (a) the Loan; (b) the administration, syndication, distribution, collection, or enforcement of the Loan; (c) the amendment or modification of the Loan Documents; (d) any waiver, consent, release, or termination under the Loan Documents; (e) the enforcement, collection or protection of the Lender's rights in connection with this Agreement and the Loan Documents, including the protection, preservation, audit, field exam, sale, lease, liquidation, or disposition of Collateral or the exercise of remedies with respect to the Collateral; (f) any legal, litigation, administrative, arbitration, or out of court proceeding in connection with or related to the Obligors or the Collateral, and any appeal or review thereof; (g) any bankruptcy, restructuring, reorganization, assignment for the benefit of creditors, workout, foreclosure, or other action related to the Obligors, the Collateral, the Loan Documents, including representing the Lender in any adversary proceeding or contested matter commenced or continued by or on behalf of any Obligor's estate, and any appeal or review thereof.

10.12 Confidentiality. The Lender acknowledges that certain items of Collateral and information provided to the Lender by the Obligors are confidential and proprietary information of the Obligors, if and to the extent such information either (x) is marked as confidential by a Obligor at the time of disclosure, or (y) should reasonably be understood to be confidential (the "Confidential Information"). Accordingly, the Lender agrees that any Confidential Information it may obtain pursuant to Section 7.1, in the course of acquiring, administering, or perfecting the Lender's security interest in the Collateral or otherwise shall not be disclosed to any other Person or entity in any manner whatsoever, in whole or in part, without the prior written consent of the Obligors, except that the Lender may disclose any such information: (a) to its directors, officers, employees, accountants, counsel and other professional advisors and to its Affiliates if the Lender in its sole discretion determines that any such party should have access to such information in connection with such party's responsibilities in connection with the Loan or this Agreement and, provided, that such recipient of such Confidential Information either (i) agrees to be bound by the confidentiality provisions of this paragraph or (ii) is otherwise subject to confidentiality restrictions that reasonably protect against the disclosure of Confidential Information; (b) if such information is generally available to the public (other than as a result of the Lender's breach of its obligations under this Section 10.12); (c) if required or appropriate in any report, statement or testimony submitted to any Governmental Authority

having or claiming to have jurisdiction over the Lender; (d) if required or appropriate in response to any summons or subpoena or in connection with any litigation, to the extent permitted or deemed advisable by the Lender's counsel; (e) to comply with any legal requirement or law applicable to the Lender; (f) to the extent reasonably necessary in connection with the exercise of any right or remedy under any Loan Document, including the Lender's sale, lease, or other disposition of Collateral after a Default; (g) to any participant or assignee of the Lender or any prospective participant or assignee; provided, that such participant or assignee or prospective participant or assignee agrees in writing to be bound by this Section prior to disclosure; or (h) otherwise with the prior consent of the Obligors; provided, that any disclosure made in violation of this Agreement shall not affect the obligations of each Obligor or any of its Affiliates under this Agreement or the other Loan Documents.

10.13 <u>Assignment of Rights</u>. The Obligors acknowledge and understand that the Lender may sell and assign all or part of its interest hereunder and under the Loan Documents to any Person or entity (an "<u>Assignee</u>"), subject to the restrictions set forth in <u>Section 10.7</u>. After such a permitted assignment the term "<u>Lender</u>" as used in the Loan Documents shall mean and include such Assignee, and such Assignee shall be vested with all rights, powers and remedies of the Lender hereunder with respect to the interest so assigned; but with respect to any such interest not so transferred, the Lender shall retain all rights, powers and remedies hereby given. No such assignment by the Lender shall relieve any Obligor of any of its obligations hereunder. The Lender agrees that in the event of any transfer by it of the Note(s) (if any), it will endorse thereon a notation as to the portion of the principal of the Note(s), which shall have been paid at the time of such transfer and as to the date to which interest shall have been last paid thereon. The Obligors shall maintain a register (the "<u>Register</u>") for the recordation of the name and address of the Lender and the principal amount of and stated interest on the amount owing to the Lender pursuant to the terms hereof from time to time. The entries in the Register shall be conclusive absent manifest error, and the Obligors and the Lender shall treat each person or entity whose name is recorded in the Register as the Lender for all purposes of this Agreement. In the event that the Lender sells a participation interest in any Loan, the Lender shall maintain a similar register. The parties shall take any other action necessary from time to time to establish that this Loan (and any Note(s) evidence the Loan) and the amounts otherwise owing hereunder are in registered form under section 5f.103-1(c) of the Treasury Regulations.

10.14 <u>Revival of Secured Obligations</u>. This Agreement and the Loan Documents shall remain in full force and effect and continue to be effective if any petition is filed by or against any Obligor for liquidation or reorganization, if any Obligor becomes insolvent or makes an assignment for the benefit of creditors, if a receiver or trustee is appointed for all or any significant part of any Obligor's assets, or if any payment or transfer of Collateral is recovered from the Lender. The Loan Documents and the Secured Obligations and Collateral security shall continue to be effective, or shall be revived or reinstated, as the case may be, if at any time payment and performance of the Secured Obligations or any transfer of Collateral to the Lender, or any part thereof is rescinded, avoided or avoidable, reduced in amount, or must otherwise be restored or returned by, or is recovered from, the Lender or by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment, performance, or transfer of Collateral had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, avoided, avoidable, restored, returned, or recovered, the Loan Documents and the Secured Obligations shall be deemed, without any further action or documentation, to have been revived and reinstated except to the extent of the full, final, and indefeasible payment to the Lender in Cash.

10.15 <u>Counterparts</u>. This Agreement and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts, and by different parties hereto in separate counterparts, each of which when so delivered shall be deemed an original, but all of which counterparts shall constitute but one and the same instrument.

ACTIVE/126640070

10.16 <u>No Third-Party Beneficiaries</u>. No provisions of the Loan Documents are intended, nor will be interpreted, to provide or create any third-party beneficiary rights or any other rights of any kind in any Person other than the Lender and the Obligors unless specifically provided otherwise herein, and, except as otherwise so provided, all provisions of the Loan Documents will be personal and solely between the Lender and the Obligors.

10.17 <u>Joinder</u>. With effect from the Effective Date:

(a) each of [            ] and [            ] (the "<u>New Borrowers</u>") agrees (i) to be bound as a Borrower under the terms and provisions of this Agreement to the same extent as each of the Borrowers party to the Original Loan Agreement before the Effective Date (the "<u>Original Borrowers</u>") and (ii) that it shall comply with and be subject to all the terms, conditions, covenants, agreements and obligations set forth in this Agreement.  Each of the Original Borrower agrees, as of the Effective Date  that each reference in this Agreement to a "Borrower" shall also mean and be a reference to each of the Original Borrowers and the New Borrowers; and

(b) each of [            ] and [            ] (the "<u>New Guarantors</u>") agrees (i) to be bound as a Guarantor under the terms and provisions of this Agreement to the same extent as each of the Guarantors party to the Original Loan Agreement before the Effective Date (the "<u>Original Guarantors</u>") and (ii) that it shall comply with and be subject to all the terms, conditions, covenants, agreements and obligations set forth in this Agreement.  Each of the Original Guarantors agrees, as of the Effective Date  that each reference in this Agreement to a "Guarantor" shall also mean and be a reference to each of the Original Guarantors and the New Guarantors.

10.18 <u>Publicity</u>.

(a) So long as the Lender provides the Obligors prior written notice and a reasonable opportunity to review, the Obligors consent to the publication and use by the Lender and any of its member businesses and Affiliates of (i) the Obligors' names (including a brief description of the relationship between the Obligors and the Lender) and logo and a hyperlink to the Obligors' web sites, separately or together, in written and oral presentations, advertising, promotional and marketing materials, client lists, public relations materials or on its web site (together, the "<u>Lender Publicity Materials</u>"); (ii) the names of officers of the Obligors in the Lender Publicity Materials; and (iii) the Obligors' names, trademarks or servicemarks in any news release concerning the Lender.

(b) No Obligor nor any of its member businesses and Affiliates shall, without the Lender's consent (which shall not be unreasonably withheld or delayed), publicize or use (i) the Lender's name (including a brief description of the relationship between such Obligor and the Lender), logo or hyperlink to the Lender's web site, separately or together, in written and oral presentations, advertising, promotional and marketing materials, client lists, public relations materials or on its web site (together, the "<u>Obligor Publicity Materials</u>"); (ii) the names of officers of the Lender in the Obligor Publicity Materials; and (iii) the Lender's name, trademarks, servicemarks in any news release concerning such Obligor, provided, however, that this provision shall not restrict such Obligor from disclosing or using any such information as required by applicable law or regulation.

10.19.  <u>Electronic Signatures</u>.  The words "execution," "signed," "signature" and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and

ACTIVE/126640070

as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

10.20.  Protective Payments.  If an Obligor fails to timely obtain the insurance called for by this Agreement or fails to pay any premium thereon or fails to timely pay any other amount which an Obligor is obligated to pay under any Loan Document or which may be required to preserve the Collateral, the Lender may obtain such insurance or make such payment, and all amounts so paid by the Lender are expenses of the Lender and immediately due and payable, bearing interest at the then highest rate applicable to the Secured Obligations, and secured by the Collateral.  The Lender will make reasonable efforts to provide the Obligors with notice of the Lender obtaining such insurance at the time it is obtained or within a reasonable time thereafter.  No payments by the Lender are deemed an agreement to make similar payments in the future or the Lender's waiver of any Event of Default.

10.21.  Set off.  Upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, without prior notice to any Obligor, any such notice being expressly waived by the Obligors, to the fullest extent permitted by applicable law, to set off and apply any and all deposits, in any currency, at any time held or owing, and any other credits, indebtedness, claims or obligations, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Lender to or for the credit or the account of any Obligor against any and all of the Secured Obligations of the Obligors now or hereafter existing under the Loan Documents to the Lender that are then due and payable, irrespective of whether or not the Lenders shall have made any demand under any Loan Document and although such obligations of the Obligors may be contingent or unmatured.  The rights of the Lender under this Section 10.21 are in addition to other rights and remedies (including other rights of set-off) which the Lender may have.

10.22  Additional Waivers.

(a)  The Secured Obligations are the joint and several obligation of each Obligor.  To the fullest extent permitted by applicable law, the Secured Obligations of each Obligor shall not be affected by (i) the failure of the Lender to assert any claim or demand or to enforce or exercise any right or remedy against any other Obligor under the provisions of any Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, any Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Lender.

(b)  The Secured Obligations of each Obligor shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise of any of the Secured Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Secured Obligations or otherwise.  Without limiting the generality of the foregoing, the Secured Obligations of each Obligor hereunder shall not be discharged or impaired or otherwise affected by the failure of the Lender to assert any claim or demand or to enforce any remedy under any Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Secured Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Obligor or that would otherwise operate as a discharge of any Obligor as a matter of law or equity.

(c)  To the fullest extent permitted by applicable law, each Obligor waives any defense based on or arising out of any defense of any other Obligor or the unenforceability of the Secured Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Obligor.  The Lender, at its election, foreclose on any security held by one or more of them by one or more judicial or

48

non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Secured Obligations, make any other accommodation with any other Obligor, or exercise any other right or remedy available to them against any other Obligor, without affecting or impairing in any way the liability of any Obligor hereunder. Each Obligor waives any defense arising out of any such election even though such election operates, pursuant to applicable law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Obligor against any other Obligor, as the case may be, or any security.

10.23. Time. Unless otherwise specified, a reference to time in any Loan Document is reference to Pacific Standard time.

## SECTION 11. GUARANTY; WAIVERS.

11.1 Guaranty. Each Guarantor unconditionally and irrevocably guarantees to the Lender the full and prompt payment when due (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise) and performance of the Secured Obligations (the "Guaranteed Obligations"). The Guaranteed Obligations include interest that, but for a proceeding under any Insolvency Proceeding, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against any Obligor for such interest in any such proceeding.

11.2 Separate Obligation. Each Guarantor acknowledges and agrees that: (i) the Guaranteed Obligations are separate and distinct from any Indebtedness arising under or in connection with any other document, including under any provision of this Agreement other than this Section 11, executed at any time by such Guarantor in favor of the Lender; and (ii) such Guarantor shall pay and perform all of the Guaranteed Obligations as required under this Section 11, and the Lender may enforce any and all of its rights and remedies hereunder, without regard to any other document, including any provision of this Agreement other than this Section 11, at any time executed by such Guarantor in favor of the Lender, irrespective of whether any such other document, or any provision thereof or hereof, shall for any reason become unenforceable or any of the Indebtedness thereunder shall have been discharged, whether by performance, avoidance or otherwise. Each Guarantor acknowledges that, in providing benefits to the Obligors and the Lender are relying upon the enforceability of this Section 11 and the Guaranteed Obligations as separate and distinct Indebtedness of such Guarantor, and each Guarantor agrees that Lender would be denied the full benefit of its bargain if at any time this Section 11 or the Guaranteed Obligations were treated any differently. The fact that the guaranty is set forth in this Agreement rather than in a separate guaranty document is for the convenience of the Obligors and Guarantors and shall in no way impair or adversely affect the rights or benefits of the Lender under this Section 11. Each Guarantor agrees to execute and deliver a separate document, immediately upon request at any time of the Lender, evidencing such Guarantor's obligations under this Section 11. Upon the occurrence of any Event of Default, a separate action or actions may be brought against such Guarantor, whether or not the Obligors, any other Guarantor or any other Person is joined therein or a separate action or actions are brought against any Obligor, any such other Guarantor or any such other Person.

11.3 Limitation of Guaranty. To the extent that any court of competent jurisdiction shall impose by final judgment under applicable Laws (including sections 544 and 548 of the Bankruptcy Code) any limitations on the amount of any Guarantor's liability with respect to the Guaranteed Obligations that the Lender can enforce under this Section 11, the Lender by its acceptance hereof accepts such limitation on the amount of such Guarantor's liability hereunder to the extent needed to make this Section 11 fully enforceable and nonavoidable.

11.4 Liability of Guarantors. The liability of any Guarantor under this Section 11 shall be irrevocable, absolute, independent and unconditional, and shall not be affected by any circumstance that

ACTIVE/126640070

might constitute a discharge of a surety or guarantor other than the indefeasible payment and performance in full of all Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a) such Guarantor's liability hereunder shall be the immediate, direct, and primary obligation of such Guarantor and shall not be contingent upon the Lender's exercise or enforcement of any remedy it may have against any Obligor or any other Person, or against any collateral or other security for any Guaranteed Obligations;

(b) this Guaranty is a guaranty of payment when due and not merely of collectability;

(c) the Lender may enforce this Section 11 upon the occurrence of an Event of Default notwithstanding the existence of any dispute between the Lender, on the one hand, and any Obligor or any other Person, on the other hand, with respect to the existence of such Event of Default;

(d) such Guarantor's payment of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge such Guarantor's liability for any portion of the Guaranteed Obligations remaining unsatisfied; and

(e) such Guarantor's liability with respect to the Guaranteed Obligations shall remain in full force and effect without regard to, and shall not be impaired or affected by, nor shall such Guarantor be exonerated or discharged by, any of the following events:

(i) any proceeding under any Insolvency Proceeding;

(ii) any limitation, discharge, or cessation of the liability of any Obligor or any other Person for any Guaranteed Obligations due to any statute, regulation or rule of law, or any invalidity or unenforceability in whole or in part of any of the Guaranteed Obligations or the Loan Documents;

(iii) any merger, acquisition, consolidation or change in structure of any Obligor or any Guarantor or any other guarantor or Person, or any sale, lease, transfer or other disposition of any or all of the assets or shares of any Obligor or any other Person;

(iv) any assignment or other transfer, in whole or in part, of Lender's interests in and rights under this Agreement (including this Section 11) or the other Loan Documents;

(v) any claim, defense, counterclaim or setoff, other than that of prior performance, that any Obligor, such Guarantor, any other Guarantor or any other Person may have or assert, including any defense of incapacity or lack of corporate or other authority to execute any of the Loan Documents;

(vi) the Lender's amendment, modification, renewal, extension, cancellation or surrender of any Loan Document or any Guaranteed Obligations;

(vii) the Lender's exercise or non-exercise of any power, right or remedy with respect to any Guaranteed Obligations or any collateral;

(viii) the Lender's vote, claim, distribution, election, acceptance, action or inaction in any proceeding under any Bankruptcy Law; or

ACTIVE/126640070

(ix) any other guaranty, whether by such Guarantor or any other Person, of all or any part of the Guaranteed Obligations or any other Indebtedness, obligations or liabilities of Obligor to the Lender.

11.5 <u>Consents of Guarantors</u>. Each Guarantor hereby unconditionally consents and agrees that, without notice to or further assent from such Guarantor:

(a) the principal amount of the Guaranteed Obligations may be increased or decreased and additional Indebtedness or obligations of the Obligors under the Loan Documents may be incurred and the time, manner, place or terms of any payment under any Loan Document may be extended or changed, by one or more amendments, modifications, renewals or extensions of any Loan Document or otherwise;

(b) the time for any Obligor's (or any other Person's) performance of or compliance with any term, covenant or agreement on its part to be performed or observed under any Loan Document may be extended, or such performance or compliance waived, or failure in or departure from such performance or compliance consented to, all in such manner and upon such terms as the Lender (as applicable under the relevant Loan Documents) may deem proper;

(c) the Lender may request and accept other guaranties and may take and hold security as collateral for the Guaranteed Obligations, and may, from time to time, in whole or in part, exchange, sell, surrender, release, subordinate, modify, waive, rescind, compromise or extend such other guaranties or security and may permit or consent to any such action or the result of any such action, and may apply such security and direct the order or manner of sale thereof; and

(d) the Lender may exercise, or waive or otherwise refrain from exercising, any other right, remedy, power or privilege even if the exercise thereof affects or eliminates any right of subrogation or any other right of such Guarantor against the Obligors.

11.6 <u>Guarantor's Waivers</u>. Each Guarantor waives and agrees not to assert:

(a) any right to require the Lender to proceed against any Obligor, any other Guarantor or any other Person, or to pursue any other right, remedy, power or privilege of the Lender whatsoever;

(b) the defense of the statute of limitations in any action hereunder or for the collection or performance of the Guaranteed Obligations;

(c) any defense arising by reason of any lack of corporate or other authority or any other defense of any Obligor, such Guarantor or any other Person;

(d) any defense based upon the Lender's errors or omissions in the administration of the Guaranteed Obligations;

(e) any rights to set offs and counterclaims;

(f) without limiting the generality of the foregoing, to the fullest extent permitted by law, any defenses or benefits that may be derived from or afforded by applicable laws limiting the liability of or exonerating guarantors or sureties, or that may conflict with the terms of this <u>Section 11</u>; and

51

(g) any and all notice of the acceptance of this guaranty, and any and all notice of the creation, renewal, modification, extension or accrual of the Guaranteed Obligations, or the reliance by the Lender upon this Guaranty, or the exercise of any right, power or privilege hereunder.

The Guaranteed Obligations shall conclusively be deemed to have been created, contracted, incurred and permitted to exist in reliance upon this Guaranty. Each Guarantor waives promptness, diligence, presentment, protest, demand for payment, notice of Default, dishonor or nonpayment and all other notices to or upon any Obligor, each Guarantor or any other Person with respect to the Guaranteed Obligations.

11.7 <u>Financial Condition of Obligor</u>. No Guarantor shall have any right to require the Lender to obtain or disclose any information with respect to: (i) the financial condition or character of any Obligor or the ability of any Obligor to pay and perform the Guaranteed Obligations; (ii) the Guaranteed Obligations; (iii) any collateral or other security for any or all of the Guaranteed Obligations; (iv) the existence or nonexistence of any other guarantees of all or any part of the Guaranteed Obligations; (v) any action or inaction on the part of the Lender or any other Person; (vi) or any other matter, fact or occurrence whatsoever. Each Guarantor hereby acknowledges that it has undertaken its own independent investigation of the financial condition of the Obligors and all other matters pertaining to this Guaranty and further acknowledges that it is not relying in any manner upon any representation or statement of the Lender with respect thereto.

11.8 <u>Subrogation</u>. Until the Guaranteed Obligations shall be satisfied in full and the Exit Loan Commitment shall be terminated, each Guarantor shall not have, and shall not directly or indirectly exercise: (i) any rights that it may acquire by way of subrogation under this <u>Section 11</u>, by any payment hereunder or otherwise; (ii) any rights of contribution, indemnification, reimbursement or similar suretyship claims arising out of this <u>Section 11</u>; or (iii) any other right that it might otherwise have or acquire (in any way whatsoever) that could entitle it at any time to share or participate in any right, remedy or security of the Lender as against any Obligor or other Guarantors or any other Person, whether in connection with this <u>Section 11</u>, any of the other Loan Documents or otherwise. If any amount shall be paid to any Guarantor on account of the foregoing rights at any time when all the Guaranteed Obligations shall not have been paid in full, such amount shall be held in trust for the benefit of the Lender and shall forthwith be paid to the Lender to be credited and applied to the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms of the Loan Documents.

11.9 <u>Subordination</u>. All payments on account of all Indebtedness, liabilities and other obligations of any Obligor to any Guarantor, whether now existing or hereafter arising, and whether due or to become due, absolute or contingent, liquidated or unliquidated, determined or undetermined (the "<u>Guarantor Subordinated Indebtedness</u>") shall be subject, subordinate and junior in right of payment and exercise of remedies, to the extent and in the manner set forth herein, to the prior payment in full in Cash or Cash Equivalents of the Guaranteed Obligations. As long as any of the Guaranteed Obligations (other than unasserted contingent indemnification obligations) shall remain outstanding and unpaid, each Guarantor shall not accept or receive any payment or distribution by or on behalf of any Obligor or any other Guarantor, directly or indirectly, or assets of any Obligor or any other Guarantor, of any kind or character, whether in cash, property or securities, including on account of the purchase, redemption or other acquisition of Guarantor Subordinated Indebtedness, as a result of any collection, sale or other disposition of collateral, or by setoff, exchange or in any other manner, for or on account of the Guarantor Subordinated Indebtedness ("<u>Guarantor Subordinated Indebtedness Payments</u>"), except that, so long as an Event of Default does not then exist, any Guarantor shall be entitled to accept and receive payments on its Guarantor Subordinated Indebtedness, in accordance with past business practices of such Guarantor and Obligor (or any other applicable Guarantor) and not in contravention of any law or the terms of the Loan Documents.

ACTIVE/126640070

If any Guarantor Subordinated Indebtedness Payments shall be received in contravention of this <u>Section 11</u>, such Guarantor Subordinated Indebtedness Payments shall be held in trust for the benefit of the Lender and shall be paid over or delivered to the Lender for application to the payment in full in Cash or Cash Equivalents of all Guaranteed Obligations remaining unpaid to the extent necessary to give effect to this <u>Section 11</u> after giving effect to any concurrent payments or distributions to the Lender in respect of the Guaranteed Obligations.

11.10   <u>Continuing Guaranty</u>. This Guaranty is a continuing guaranty and agreement of subordination and shall continue in effect and be binding upon each Guarantor until termination of the Exit Loan Commitment and payment and performance in full of the Guaranteed Obligations, including Guaranteed Obligations which may exist continuously or which may arise from time to time under successive transactions, and each Guarantor expressly acknowledges that this guaranty shall remain in full force and effect notwithstanding that there may be periods in which no Guaranteed Obligations exist. This Guaranty shall continue in effect and be binding upon each Guarantor until actual receipt by the Lender of written notice from such Guarantor of its intention to discontinue this Guaranty as to future transactions (which notice shall not be effective until noon on the day that is five Business Days following such receipt); provided, that no revocation or termination of this guaranty shall affect in any way any rights of the Lender hereunder with respect to any Guaranteed Obligations arising or outstanding on the date of receipt of such notice, including any subsequent continuation, extension, or renewal thereof, or change in the terms or conditions thereof, or any Guaranteed Obligations made or created after such date to the extent made or created pursuant to a legally binding commitment of the Lender in existence as of the date of such revocation (collectively, "<u>Existing Guaranteed Obligations</u>"), and the sole effect of such notice shall be to exclude from this Guaranty Guaranteed Obligations thereafter arising which are unconnected to any Existing Guaranteed Obligations.

11.11 <u>Reinstatement</u>. This Guaranty shall continue to be effective or shall be reinstated and revived, as the case may be, if, for any reason, any payment of the Guaranteed Obligations by or on behalf of the Obligors (or receipt of any proceeds of collateral) shall be rescinded, invalidated, declared to be fraudulent or preferential, set aside, voided or otherwise required to be repaid to any Obligor, its estate, trustee, receiver or any other Person (including under any Bankruptcy Law), or must otherwise be restored by the Lender, whether as a result of proceedings under any bankruptcy law or otherwise. All losses, damages, costs and expenses that the Lender may suffer or incur as a result of any voided or otherwise set aside payments shall be specifically covered by the indemnity in favor of the Lender contained in <u>Section 11</u>.

11.12 <u>Substantial Benefits</u>. The Loan provided to or for the benefit of the Obligors hereunder by the Lender has been and is to be contemporaneously used for the benefit of the Obligors and each Guarantor and their respective Subsidiaries. It is the position, intent and expectation of the parties that the Obligors and each Guarantor have derived and will derive significant and substantial benefits from the Loan to be made available by the Lender under the Loan Documents. Each Guarantor has received at least "reasonably equivalent value" (as such phrase is used in Section 548 of the Bankruptcy Code and in comparable provisions of other applicable Laws) and more than sufficient consideration to support its obligations hereunder in respect of the Guaranteed Obligations. Immediately prior to and after and giving effect to the incurrence of each Subsidiary Guarantor's obligations under this Guaranty, such Guarantor will be solvent and will not be subject to any Insolvency Proceedings.

11.13 <u>KNOWING AND EXPLICIT WAIVERS</u>. EACH GUARANTOR ACKNOWLEDGES THAT IT EITHER HAS OBTAINED THE ADVICE OF LEGAL COUNSEL OR HAS HAD THE OPPORTUNITY TO OBTAIN SUCH ADVICE IN CONNECTION WITH THE TERMS AND PROVISIONS OF THIS <u>SECTION 11</u>. EACH GUARANTOR ACKNOWLEDGES AND AGREES THAT EACH OF THE WAIVERS AND CONSENTS SET FORTH HEREIN IS MADE WITH FULL KNOWLEDGE OF ITS SIGNIFICANCE AND CONSEQUENCES, THAT ALL SUCH WAIVERS AND

CONSENTS HEREIN ARE EXPLICIT AND KNOWING AND THAT EACH GUARANTOR EXPECTS SUCH WAIVERS AND CONSENTS TO BE FULLY ENFORCEABLE.

If, while any Guarantor Subordinated Indebtedness is outstanding, any proceeding under any Bankruptcy Law is commenced by or against any Obligor or its property, the Lender is hereby irrevocably authorized and empowered (in the name of such Obligor or in the name of any Guarantor or otherwise), but shall have no obligation, to demand, sue for, collect and receive every payment or distribution in respect of all Guarantor Subordinated Indebtedness and give acquittances therefor and to file claims and proofs of claim and take such other action (including voting the Guarantor Subordinated Indebtedness) as it may deem necessary or advisable for the exercise or enforcement of any of the rights or interests of Lender; and each Guarantor shall promptly take such action as Lender may reasonably request: (A) to collect the Guarantor Subordinated Indebtedness for the account of such Obligor and any Guarantor and to file appropriate claims or proofs of claim in respect of the Guarantor Subordinated Indebtedness; (B) to execute and deliver to the Lender such powers of attorney, assignments and other instruments as it may request to enable it to enforce any and all claims with respect to the Guarantor Subordinated Indebtedness; and (C) to collect and receive any and all Guarantor Subordinated Indebtedness Payments.

11.14 Any payment on account of an amount that is payable hereunder or under any other Loan Document must be made in United States Dollars.

(SIGNATURES TO FOLLOW)

54

IN WITNESS WHEREOF, the Obligors and the Lender have duly executed and delivered this Amended and Restated Loan and Security Agreement as of the day and year first above written.

**<u>BORROWE</u>**
**<u>RS</u>**[6]:

**AMYRIS, INC.**, a Delaware corporation

By: _____ Name:
Title:

---

[6] NTD: borrowers and guarantors to be confirmed.

**[SIGNATURE PAGE TO A&R LOAN AND SECURITY AGREEMENT]**