**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Amyris, Inc., *et al.*,<br><br>                Debtors. | Chapter 11<br><br>Case No. 23-11131 (TMH)<br><br>(Jointly Administered)<br><br>**Hearing Date:  1/24/24 at 10:00 a.m.**<br>**Obj. Deadline:  1/18/24 at 5:00 p.m.**<br><br>**Related Docket No.  892** |

**OBJECTION OF THE UNITED STATES TRUSTEE TO CONFIRMATION OF
SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**

Andrew R. Vara, United States Trustee for Regions 3 and 9 ("U.S. Trustee"), hereby files this objection (the "Objection") to confirmation of the *Second Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors, as Modified* (D.I. 892) (the "Plan").  In support of this Objection, the U.S. Trustee states:

**PRELIMINARY STATEMENT**

1.      The Plan leads with a request for approval of non-consensual third-party releases, with the "fall back" of seeking approval of the releases on a consensual basis.  The Plan is substantially the same in either scenario, with the only substantive difference being *de minimis* additional cash consideration if the releases are approved on a non-consensual basis.  The non-consensual releases, therefore, are not necessary to reorganization here because the Plan provides expressly that it can be confirmed *without* approval of the non-consensual releases.  The Debtors thus cannot meet their burden of satisfying the exacting standards for the extraordinary relief of non-consensual releases.

2.      Even the purported "consensual" third-party releases are not being consented to by certain categories of creditors.  The Plan extinguishes direct claims against non-debtor parties

held by other non-debtor parties without their affirmative consent, including claims held by:
(i) unimpaired claimants, unless they file an opt out; (ii) all parties who vote to accept the Plan;
(iii) all parties who reject the Plan, unless they also check an opt-out box; (iv) all parties that are
entitled to vote but do not do so, unless they return a ballot with the opt-out box checked; and
(v) parties that are impaired and deemed to reject unless they file an opt out.  The opt-out
mechanism provides for negative, rather than affirmative, consent.  Affirmative consent is
required.   The Plan should not be confirmed absent modification of the "consensual" third-party
release provisions to ensure all third-party releases are, in fact, consensual.

3. The third-party releases and exculpation are also both impermissibly broad.  The
third-party releases include an overly expansive list of parties being released, including parties
that are not yet in existence.  The proposed exculpation covers parties that are not estate
fiduciaries in contravention of Third Circuit law.

4. For the reasons set forth above and as more fully set forth below, the U.S.
Trustee requests that confirmation be denied.

## JURISDICTION & STANDING

5. Under (i) 28 U.S.C. § 1334, (ii) applicable order(s) of the United States District
Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and (iii) 28 U.S.C.
§ 157(b)(2), this Court has jurisdiction to hear and determine confirmation of the Plan and this
Objection.

6. Pursuant to 28 U.S.C. § 586(a)(3), the U.S. Trustee is charged with administrative
oversight of the bankruptcy system in this District.  Such oversight is part of the U.S. Trustee's
overarching responsibility to enforce the laws as written by Congress and interpreted by the
courts.  *See United States Trustee v. Columbia Gas Systems, Inc. (In re Columbia Gas Systems,*

*Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307 which goes beyond mere pecuniary interest); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

7.      Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee is charged with "monitoring plans and disclosure statements filed in cases under chapter 11 of title 11 and filing with the court, in connection with hearings under sections 1125 and 1128 of such title, comments with respect to such plans and disclosure statements." 28 U.S.C. § 586(a)(3)(B).

8.      Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on the Plan and the issues raised in this Objection.

## FACTUAL BACKGROUND

9.      On August 9 and August 21, 2023 (as applicable, the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code which initiated the Chapter 11 Cases.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

10.     On August 27, 2023, the U.S. Trustee appointed the committee of unsecured creditors (the "Committee") pursuant to Bankruptcy Code section 1102(a)(1).  The Committee members are: (i) Cosan U.S. Inc., (ii) U.S. Bank Trust Company, National Association as Trustee ("U.S. Bank"), (iii) Sartorius Stedim North America, Inc., (iv) Hearst Magazine Media, Inc., (v) Wiley Companies, (vi) Park Wynwood, LLC, and (vii) Allog Participacoes, Ltda.

11.     On August 25, 2023, the Debtors filed the *Motion Of Debtors For Entry Of An Order (i) Approving The Combined Disclosure Statement And Plan On An Interim Basis For Solicitation Purposes Only; (ii) Establishing Procedures For Solicitation And Tabulation Of*

3

*Votes To Accept Or Reject The Combined Disclosure Statement And Plan; (iii) Approving The Form Of Ballot And Solicitation Packages; (iv) Establishing The Voting Record Date; (v) Scheduling A Combined Hearing For Final Approval Of The Adequacy Of Disclosures In, And Confirmation Of, The Combined Disclosure Statement And Plan; And (vi) Granting Related Relief* (D.I. 298) (the "Solicitation Procedures Motion").

12.     On November 16, 2023, the U.S. Trustee field the *United States Trustee's Objection to the Solicitation Procedures Motion* (D.I. 742) (the "Disclosure Statement Objection"). Pursuant to the Disclosure Statement Objection, the U.S. Trustee asserted, among other things, that solicitation of the Plan should not occur due to the inclusion of the non-consensual third-party releases.

13.     On December 23, 2023, the Debtors filed the amended Plan and *Disclosure Statement with Respect to the Plan* (D.I. 893) (the "Disclosure Statement").

14.     On December 13, 2023, the Court entered the order approving the Solicitation Procedures Motion (D.I. 897) (the "Disclosure Statement Order"),[1] pursuant to which the Court, among other things, approved solicitation of the Plan and set the hearing date for confirmation of the proposed Plan, which is scheduled to be held on January 24, 2024 at 10:00 a.m. (Eastern Time).

---

[1] Capitalized terms used herein and not otherwise defined are defined as set forth in the Disclosure Statement Order.

**The Third-Party Release Provisions**

15.    At the Confirmation Hearing, the Debtors will seek approval of the Third-Party Release based upon the governing standard for approval of non-**consensual** third-party releases.[2] If the Third-Party Release is **not** approved on a non-consensual basis, the Debtors will seek approval of the Third-Party Release on a consensual basis.[3]  Holders of Allowed Claims who are also Releasing Parties shall also receive, in exchange for their granting Third-Party Releases, pro rata distributions of the applicable Third-Party Release Settlement Amounts as set forth in Article I.A.198 of the Plan.  If the Third-Party Releases are approved on a *consensual basis*, the Third-Party Settlement Amounts will be (i) $9,264,000 for Holders of Convertible Notes, (ii) $2,686,000 for Holders of General Unsecured Claims, and (iii) $2,500,000 for Holders of Interests.  If the Third-Party Releases are approved on a *non-consensual basis*, the Third-Party Settlement Amounts will be (i) $12,714,000 for Holders of Convertible Notes,[4] (ii) $3,686,000 for Holders of General Unsecured Claims,[5] and (iii) $5,000,000 for Holders of Interests.  Plan, Article I.A.198.

---

[2] *See e.g.*, Disclosure Stmt., p. 4 ("The Debtors will seek approval of the Third-Party Release based upon the governing standard for approval of non-consensual third party releases.")

[3] *See e.g.*, *id.* ("In the event the Bankruptcy Court does not approve the Third-Party Release on a nonconsensual basis, the Third-Party Release shall be deemed a settlement offer to the holders of Direct Claims on the terms set forth in the Plan[.]")

[4] The Debtors estimate an Allowed amount of $690,000,000 in Convertible Note Claims.  The additional $3,450,000 in consideration for non-consensual releases results in an additional distribution of approximately 0.5% (*i.e.,* less than 1%).  Disclosure Stmt., p. 9.

[5] The Debtors estimate an Allowed amount of $200,000,000 in General Unsecured Claims.  The additional $1,000,000 in consideration for non-consensual releases results in an additional distribution of approximately 0.5% (*i.e.,* less than 1%).  Disclosure Stmt., p. 9.

16.     The Plan defines "Third-Party Release" as follows:

"Third-Party Release" means the release of Direct Claims deemed given by each of the Releasing Parties to the Released Parties in consideration for the distributions to be made as set forth in Article IX.D of the Plan.

Plan, Article I.A.196.

17.     The Plan defines "Releasing Parties" as follows:

"Releasing Parties" means collectively, and in each case in its capacity as such: (a) the Foris Prepetition Secured Lenders; (b) the Creditors' Committee; (c) the Consenting Convertible Noteholders; (d) the Consenting Contract Counterparties; (e) all Holders of Claims against the Debtors that are bound by the Third-Party Release Settlement; and (f) all persons who hold Interests in Amyris that are bound by the Third-Party Release Settlement.

Plan, Article I.A.175.

18.     The Plan defines "Direct Claims" as follows:

"Direct Claims" means any Cause of Action held by a Releasing Party against any of the Released Parties (excluding the Debtors) and their respective Related Parties, but only to the extent such claims arise from, relate to, or are connected with, directly or indirectly, in any manner whatsoever, the Debtors, including their respective assets, liabilities, operations, financings, contractual agreements, licenses, and including the governance thereof, and existing on or prior to the Effective Date (including prior to the Petition Date).

Plan, Article I.A.72.

19.     The Plan defines the recoveries in connection with the Third-Party Release under the definition of the "Third-Party Release Settlement Amounts", which also reflects that an opt-out procedure is used to measure "consent."

"Third-Party Release Settlement Amounts" means, as applicable, the following amounts allocated from the Net Proceeds or other assets of the Estates that would otherwise be paid to the DIP Lenders and the Foris Prepetition Secured Lenders, as applicable:

(A) (i) $12,714,000, consisting of that portion of the Third-Party Release Settlement Amounts to be distributed to the Holders of Convertible Notes, if the Third-Party Release Settlement is approved on a non-consensual basis; or (ii) $9,264,000, consisting of that portion of the Third-Party Release Settlement Amounts to be

6

distributed to the Holders of Convertible Notes if the Third-Party Release Settlement is not approved on a non-consensual basis and the Direct Claims Threshold is satisfied as to holders of Direct Claims who are creditors (**but only as to holders of Allowed Convertible Notes Claims who do not opt out of the Third-Party Release Settlement**);

(B) (i) $3,686,000, consisting of that portion of the Third-Party Release Settlement Amounts distributed to the Holders of General Unsecured Claims, if the Third-Party Release Settlement is approved on a non-consensual basis; or (ii) $2,686,000 consisting of that portion of the Third-Party Release Settlement Amounts distributed to the Holders of General Unsecured Claims if the Third-Party Release Settlement is not approved on a non-consensual basis and the Direct Claims Threshold is satisfied as to holders of Direct Claims who are creditors (**but only as to Holders of Allowed General Unsecured Claims who do not opt out of the Third-Party Release Settlement**);

(C) (i) $5,000,000 consisting of that portion of the Third-Party Release Settlement Amounts distributed to the Holders of Interests as of the Voting Record Date, if the Third-Party Release Settlement is approved on a non-consensual basis; or (ii) $2,500,000 consisting of that portion of the Third-Party Release Settlement Amounts distributed to the Holders of Interests as of the Voting Record Date if the Third-Party Release Settlement is not approved on a non-consensual basis and the Direct Claims Threshold is satisfied as to holders of Direct Claims who are holders of any Interests (**but only as to Holders of Interests who do not opt out of the Third-Party Release Settlement**).

Plan, Article I.A.198 (emphasis added).

20.     The Plan defines the opt-out process as follows:

If the Third-Party Releases are not approved by the Bankruptcy Court, each holder of a Direct Claim may voluntarily elect to receive its portion of the Third-Party Release Settlement Amounts to which it is entitled by electing to grant the Third-Party Releases, through the following methods: (x) for (i) holders of Claims who are entitled to submit a ballot to vote on the Plan and vote to accept the Plan, (ii) holders of Claims who are entitled to submit a ballot to vote on the Plan and (a) vote to reject the Plan or (b) abstain from voting on the Plan and, in either case, do not elect to exercise their right to opt out of granting the Third-Party Releases, and (y) for holders of Claims and Interests who are deemed to accept or reject the Plan and are provided with a notice of non-voting status providing them with the right to opt out of granting the Third-Party Releases and do not elect to exercise such right; provided, that, as applicable, the Direct Claims Threshold is satisfied.

Plan, Article IV.A.3.

21.     The Plan defines "Released Parties" as follows:

"Released Parties" means, collectively, and in each case, solely in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c); the DIP Lenders and the DIP Agent; (d) the Foris Prepetition Secured Lenders; (e) the Creditors' Committee; (f) the Consenting Convertible Noteholders, (g) the Ad Hoc Group Professionals; (h) the Consenting Contract Counterparties; and (i) **with respect to each of the foregoing Entities in clauses (a) through (e), all Related Parties**. For the avoidance of doubt, (i) the Debtors' current and former directors, managers, officers, employees, professionals, and shareholders, in each case, who are not an Excluded Party, shall each be a Released Party; and (ii) no Excluded Party shall be a Released Party.

Plan, Article I.A.174 (emphasis added).

22.     The Plan definition of "Related Parties" is expansive:

"Related Party" means, collectively, with respect to any Entity, in each case in its capacity as such with respect to such Entity, such Entity's current and former directors, managers, officers, shareholders, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, assigns (whether by operation of Law or otherwise), subsidiaries, current, former, and future associated entities, managed or advised entities, accounts, or funds, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, fiduciaries, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, restructuring advisors, and other professionals and advisors, and any such person's or Entity's respective predecessors, successors, assigns, heirs, executors, estates, and nominees.

Plan, Article I.A.172

23.     The Plan defines "Exculpated Parties"" as follows:

"Exculpated Parties" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) **the Foris Secured Parties; (c) all Consenting Convertible Noteholders; (d) the Ad Hoc Group Professionals; (e) the Creditors' Committee; and (f) the Related Parties of each of the foregoing parties.**

Plan, Article I.A.101 (emphasis added).

**ARGUMENT**

**A.  The Plan Does Not Meet the Requirements for Non-Consensual Releases.**

24.      In *Continental*, 203 F.3d 203 (3d Cir. 2000), the Third Circuit surveyed cases from various circuits as to when, if ever, a non-consensual third-party release is permissible.  The Court acknowledged that some Circuits do not allow such non-consensual releases under any circumstances.  *Id.* at 212.  Other circuits, the Court found, "have adopted a more flexible approach, albeit in the context of extraordinary cases."  *Id.* at 212-13 (citing Second Circuit cases where releases were upheld for "widespread claims against co-liable parties" and a Fourth Circuit mass tort case).  "A central focus of these three reorganizations was the global settlement of massive liabilities against the debtors and co-liable parties.  Substantial debtor co-liable parties provided compensation to claimants in exchange for the release of their liabilities and made these reorganizations feasible."  *Id.* at 213; *see also In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005) (noting a third-party release may be granted "only in rare cases").

25.      The Third Circuit in *Continental Airlines* ultimately determined that the proposed releases in that case, which enjoined shareholder lawsuits against debtors' directors and officers, did "not pass muster under even the most flexible test for the validity of non-debtor releases."  *Continental*, 203 F.3d at 214.  Therefore, the Court determined that it "need not speculate on whether there are circumstances under which we might validate a non-consensual release that is both necessary and given in exchange for fair consideration."  *Id.* at 214 n. 11 (emphasis added).  However, the Court did describe the "hallmarks of permissible non-consensual releases" to be "fairness, necessity to the reorganization, and special factual findings to support these conclusions."  *Id.* at 214.

26.     The Third Circuit Court of Appeals referenced *Continental* in *In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126 (3d Cir. 2019), as one of the precedents, along with *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011), regarding nonconsensual third-party releases.  The Third Circuit indicated that these decisions "set forth *exacting standards* that must be satisfied if such releases and injunctions are to be permitted."   945 F.3d at 139 (emphasis added).

27.     In *In re Genesis Health Ventures, Inc.*, 266 B.R. 591 (Bankr. D. Del. 2001), the Court held that a clause in the plan which released claims of any creditors or equity holders against the senior lenders for any act or omission in connection with the bankruptcy cases and reorganization process required factual showings under *Continental* – namely, that the releases were necessary for the reorganization and were given in exchange for fair consideration.  *Id.* at 607.  The Court elaborated that "necessity" under *Continental* requires a showing: (a) that the success of the debtors' reorganization bears a relationship to the release of the non-consensual non-debtor parties <u>and</u> (b) that the non-debtor parties being released from liability have provided "a critical financial contribution to the debtors' plan" in exchange for the receipt of the release.  *Id.* at 607.  A financial contribution is considered "critical" if without the contribution, the debtors' plan would be infeasible.  *Id.*  Fairness of a release is determined by examining whether non-consenting non-debtors are receiving reasonable consideration in exchange for the release.  *Id.* at 608; *see also In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (applying same factors).

28.     The *Genesis* Court found that the senior lenders had made a financial contribution to the plan, which allowed the debtors to make the 7.34% distribution to the unsecured creditors, who otherwise would be "out of the money."  *Id.* at 608.  Ultimately, though, the Court found that

10

such contribution was not enough, because "even if the threshold *Continental* criteria of fairness and necessity for approval of non-consensual third-party releases were marginally satisfied by these facts … [the] financial restructuring plan under consideration here would not present the *extraordinary circumstances* required to meet even the most flexible test for third party releases." *Id.* (emphasis added).

29.    In the current cases, there is nothing in the record to indicate the presence of "extraordinary circumstances" -- the high threshold necessary for approval of non-consensual third-party releases -- with respect to each of the non-debtor parties that would be the recipients of these non-consensual releases.  If the proposed Third-Party Releases are approved, they will release, among others, the DIP Lenders and the DIP Agent, Foris Prepetition Secured Lenders, Consenting Convertible Noteholders, the Consenting Contract Counterparties, and parties related to these entities.  Moreover, the anticipated distribution percentages here are even less than in *Genesis*, where the Court did not approve the non-consensual releases.

30.    As to the first *Continental* requirement, the Debtors readily admit that the non-consensual release is not of "necessity to the reorganization."  The Plan expressly contemplates that it can be confirmed without approval of the non-consensual releases.  That the Plan allows for fallback approval of the third-party releases on a *consensual* basis demonstrates that the non-consensual releases are *not* in fact necessary.  The success of the Debtors' reorganization is not contingent upon approval of non-consensual releases, as the Plan can be confirmed without approval thereof.  Because the Plan provides expressly that it can be confirmed *without* approval of the non-consensual releases, *ipso facto* the non-consensual releases are not necessary.

31.    As to the second *Continental* requirement, that the releases be given "in exchange for fair consideration," there is no showing that the consideration for the non-consensual release

is critical (*i.e.*, without it the Plan would be infeasible) or that affected parties are receiving reasonable consideration in exchange for giving the release.  By way of example, the Holders of General Unsecured Claims will receive consideration of $2,686,000 if the Third-Party Settlement Releases are approved on a ***consensual*** basis.  Plan, Article I.A.198.  Holders of General Unsecured Claims will receive consideration of $3,686,000 if the Third-Party Settlement Releases are approved on a ***non-consensual*** basis.  *Id.*  Thus, the total consideration to the class of General Unsecured Claims for a non-consensual release is an extra $1,000,000.  The Debtors provide an estimated Allowed amount of $200,000,000 in General Unsecured Claims.  *See* Disclosure Statement, p. 9.  By extension, Holders of General Unsecured Claims will receive an additional 0.5% distribution (*i.e.,* less than 1%) as consideration for non-consensual releases.  Other than the *de minimis* additional cash, the remainder of the Plan remains the same if the non-consensual releases are not approved.  The Debtors therefore have not carried their burden of demonstrating that a non-consensual Third-Party Release is critical to their reorganization efforts or is given in exchange for fair consideration.

32.     The Debtors have the burden of establishing whether the *Continental/Genesis* factors have been met for each of the non-debtor Released Parties who are the intended beneficiaries of the non-consensual third-party releases, including whether the third-party releases are "both necessary and given in exchange for fair consideration."  *Continental,* 203 F.3d at 214, n. 11.  The Debtors have not carried that burden and the non-consensual third-party releases should not be approved.

**B. The "Consensual" Releases Are Not Consensual.**

33.     Even the "consensual" versions of the releases do not sufficiently demonstrate consent.  Rather than seeking affirmative consent, the Debtors seek a finding of consent through silence.  In short, the Debtors seek a finding of "consent" where a party fails to opt out rather than provide an affirmative manifestation of consent.

34.     The releases would be imposed on (i) unimpaired claimants, unless they file an opt out; (ii) all parties who vote to accept the Plan; (iii) all parties who reject the Plan, unless they also check an opt out box; (iv) all parties that are entitled to vote but do not do so, unless they return a ballot with the opt out box checked; and (v) parties that are impaired and deemed to reject unless they file an opt out.  *See* Article IV.A.3.

35.     These releases are not predicated on the affected parties' affirmative consent and, thus, are non-consensual.  *See In re Washington Mutual, Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) (holding that an "opt out mechanism is not sufficient to support the third party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place).  Failing to return a ballot is not a sufficient manifestation of consent to a third-party release."); *In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004) (holding that the "Trustee (and the Court) do not have the power to grant a release of the Noteholders on behalf of third parties," and that such release must be based on consent of the releasing party); *Emerge Energy Servs. LP*, Case No. 19-11563, 2019 Bankr. LEXIS 3717, *52 (Bankr. D. Del., Dec. 5, 2019) (consent to give third-party releases cannot be inferred "by the failure of a creditor or equity holder to return a ballot or Opt-Out Form"); *see also Joel Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 688 (E.D. Va. 2022) (holding that "the Bankruptcy Court erred both factually and legally in finding the Third-Party Releases to be consensual.  Failure to opt

13

out, without more, cannot form the basis of consent to the release of a claim."); *In re SunEdison, Inc.*, 576 B.R. 453 (Bankr. S.D.N.Y. 2017) (under principles of New York contract law, a creditor could not be deemed to consent to third-party releases merely by failing to object to the plan, ***even when the disclosure statement made it clear that such a consequence would result***); *In re Chassix Holdings*, 533 B.R. 64, 79-80 (Bankr. S.D.N.Y. 2015) (limiting third party releases to those who voted to accept the plan, or affirmatively elected to provide releases; consent would not be deemed from creditors who failed to return a ballot, or from unimpaired creditors).

36.     Although not all decisions from this District have required affirmative consent for third-party releases, those decision are not binding on the Court here.  In *In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013), the Court reached a different conclusion than that of *Emerge*, *Washington Mutual*, and the other cases cited above, concerning the need for affirmative consent to third party releases.  And in *In re Spansion, Inc.*, 426 B.R. 114 (Bankr. D. Del. 2010), the Court held that affirmative consent was not required, but only as to releases being given by unimpaired classes who were "being paid in full."  *Id.* at 144.

37.     In *In re Mallinckrodt PLC*, 639 B.R. 837 (Bankr. D. Del. 2022), the Court allowed third-party releases to be imposed on mass tort claimants without the opportunity to opt out, as well as on certain other classes of creditors and equity holders who were provided the ability to opt out, holding that the imposition of such releases was permissible under *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000), because of the mass tort context of the case.  *See id.* at 873, 881; *see also In re Boy Scouts of America and Delaware BSA, LLC*, 642 B.R. 504, 674, 678 (Bankr. D. Del. 2022) (approving an opt out process for third-party releases in a mass tort case but noting that the definition of parties giving such releases did not include any "claimant who abstains from voting").  However, here, the Debtors' cases are not mass tort

14

cases. The Debtors core business is the development, commercialization, and manufacture of

rare molecules through proprietary fermentation processes, with a non-core business of clean

beauty brands that utilize the natural and sustainable ingredients that the Debtors produce, and

the Debtors filed due to an inability to meet their capital requirements and to focus their strategy

and go-forward business plan around the Debtors' core competencies of research, formulation,

and development of ingredients and ingredient applications, commercial scaling, and

commercialization of its sustainable ingredients. Cases that have imposed third-party releases in

the mass tort context therefore are inapposite.

38.     Requiring affirmative consent from creditors to release their direct claims against

non-debtors is the only way to find true consent, rather than consent assumed by silence, as

silence could be caused by factors such as "carelessness, inattentiveness, or mistake," as

recognized by this Court in *Emerge*, 2019 Bankr. LEXIS 3717 at \*53.

39.     A failure to opt out or object is not affirmative consent to the third-party releases.

*See In re Washington Mut.*, 442 B.R. at 355 (holding that opt out was "not sufficient to support

the third party releases . . . particularly with respect to parties who do not return a ballot (or are

not entitled to vote in the first place).").  Consequently, imposing third-party releases on the

affected parties is non-consensual.

40.     Under the proposed Plan, parties that are deemed to accept or reject the Plan are

deemed to consent to the releases through silence and are required to return an opt-out form

despite the inability to vote.  These parties release through inaction.  The Plan places the

obligation on them to demonstrate their lack of consent, or opposition.  There can be a variety of

reasons for a failure to return an opt out, including the failure to receive the form.  Yet silence is

deemed consent.

41.     Parties that fail to vote are deemed to consent, notwithstanding that "inaction" is not a sufficient manifestation of consent to support a release.  Silence is deemed acceptance as to parties that do not vote, without any showing that the parties received the ballots, or if they received them, that they read and understood them.  Consent requires the receipt and comprehension of information.  Inaction is not a sufficient manifestation of consent to support a release.

42.     Parties that reject the Plan must take additional action, notwithstanding that rejection is affirmative manifestation of non-consent to the Plan and the terms set forth therein (such as the third-party releases).  Express and affirmative rejection of the Plan should not be interpreted as consent to the third-party releases contained therein.

43.     Parties that accept the Plan appear unable to opt out and must retain counsel to object to the releases.  "Consent" to the Third-Party Releases will be found where "holders of Claims who are entitled to submit a ballot to vote on the Plan and vote to accept the Plan."  Plan, Article IV.A.3.  There is no mention of the ability to opt out if a voter accepts the Plan.  *Id.* Forcing entities to bear the cost of demonstrating their disapproval of third-party releases – which cost may include the expense of employing counsel – is coercive; the failure of such entities to object does not constitute consent to the third-party releases.

44.     None of the parties have provided consent consistent with *Washington Mutual, Coram* and the other cases cited within this Objection that required affirmative consent for a third-party release to be deemed consensual.

**C.  The Released Parties are Too Expansive.**

45.    The extent of the third-party releases is also too expansive.  The Releasing Parties

release the Released Parties, which includes their Related Partes.  The parties released therefore

include the Released Parties'

> current and former directors, managers, officers, shareholders, investment committee
> members, special committee members, equity holders (regardless of whether such
> interests are held directly or indirectly), affiliated investment funds or investment
> vehicles, predecessors, participants, successors, assigns (whether by operation of Law or
> otherwise), subsidiaries, current, former, and future associated entities, managed or
> advised entities, accounts, or funds, Affiliates, partners, limited partners, general partners,
> principals, members, management companies, fund advisors or managers, fiduciaries,
> employees, agents, trustees, advisory board members, financial advisors, attorneys,
> accountants, investment bankers, consultants, other representatives, restructuring
> advisors, and other professionals and advisors, and any such person's or Entity's
> respective predecessors, successors, assigns, heirs, executors, estates, and nominees.

Plan, Article I.A.174.

46.    The list is so expansive that the identity of the parties being released is

unknowable.  *See e.g.,* the release of "*future* associated entities."  The list also includes such

broad and vaguely defined terms as "agents," "consultants," "other representatives," and "other

professionals and advisors."  Parties simply cannot consent to a release of unknown and

unknowable parties.

47.    The Released Parties includes the Reorganized Debtors.  As with future

associated entities, the Plan cannot release a party that does not yet exist.

48.    The Released Parties list also impermissibly includes the Debtors and Creditors'

Committee, both of which are estate fiduciaries.  As recognized by this Court in *Washington

Mutual*, parties who are fiduciaries of the estate are receiving exculpations, and therefore receipt

by such parties of releases are "unnecessary, duplicative and exceed the limits of what they are

entitled to receive" under the exculpations.  *Washington Mutual*, 442 B.R. at 350.

**D**.      **The Defined Term "Exculpated Parties" Is Too Expansive**

49.      The Exculpated Parties provision includes persons and entities that are not estate

fiduciaries and, therefore, are not entitled to exculpation.  *See Washington Mut.*, 442 B.R. at 350-

51 (exculpation limited to estate fiduciaries who have served during the chapter 11 proceeding,

meaning estate professionals, the Committee and their members, and the debtor's D&Os); *see*

*also In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (the creditors' committee, its

members and estate professionals may be exculpated under a plan for their actions in the

bankruptcy case, except for willful misconduct or gross negligence).  The Exculpated Parties list

must be limited to the (i) Debtors, (ii) Creditors' Committee and its members (solely in their

capacity as members of the Committee); and (iii) the Debtors' officers, directors, and employees

who served in a fiduciary capacity during these chapter 11 cases.

<u>CONCLUSION</u>

WHEREFORE the U.S. Trustee requests that this Court enter an order (i) denying

confirmation of the Plan in its present form and (ii) granting such other relief that the Court

deems just and proper.

Dated:  January 18, 2024          Respectfully submitted,
        Wilmington, DE

                                  **ANDREW R. VARA**
                                  **UNITED STATES TRUSTEE,**
                                  **REGIONS 3 & 9**

                                  By:  */s/ John Schanne*
                                  John Schanne, Trial Attorney
                                  Office of the United States Trustee
                                  J. Caleb Boggs Federal Building
                                  844 King Street, Suite 2207, Lockbox 35
                                  Wilmington, DE 19801
                                  (202) 934-4154(Phone)
                                  (302) 573-6497 (Fax)
                                  john.schanne@usdoj.gov