## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC., *et al.*, | Case No. 23-11131 (TMH) |
| Debtors[1]. | (Jointly Administered.) |
| | **Related Dkt. Nos. 892, 893, 897 & 1112** |

### OBJECTION OF 10-11 CLERKENWELL GREEN LIMITED TO  CONFIRMATION OF SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF AMYRIS, INC. AND ITS AFFILIATED DEBTORS, AS MODIFIED

10-11 Clerkenwell Green Limited (**"Clerkenwell"**), as holder of certain claims against Amyris, Inc., one of the debtors and debtors-in-possession in the above captioned jointly administered proceeding (the "**Debtor**"), by and through its undersigned counsel, hereby objects (this "**Objection**"), to confirmation of the *Second Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors, as Modified* [D.I. 892] (as amended or modified from time to time, the "**Plan**"). In support hereof, Clerkenwell respectfully states as follows.[2]

### PRELIMINARY STATEMENT

1.      Clerkenwell is the owner and landlord of the building located at 10-11 Clerkenwell Green, London, England. Both pre-petition and post-petition, the building has been occupied by the Debtor 's subsidiaries, Amyris UK Trading Limited, Beauty Labs International Limited, and

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Amyris.  The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

[2] Capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Plan and Disclosure Statement.

MG Empower Limited ("**MG**")[3] pursuant to a lease dated February 15, 2022, among Clerkenwell, MG, and the Debtor (the "**Lease**"). As part of the Lease, Debtor provided Clerkenwell with a guarantee of all obligations of MG under the Lease ("**Guarantee**"). In light of the Guarantee, Clerkenwell timely filed a proof of claim for a general unsecured claim in the amount of $15,722,174, the maximum amount which could be owed pursuant to the Guarantee [Claims Docket No. 531] (the "**POC**").

2.      On December 26, 2023, MG failed to pay its rent when due, giving rise to a claim pursuant to the Guarantee. Accordingly, since this claim occurred post-petition, Clerkenwell now has an administrative claim in the amount of $397,388.08 for the unpaid rent. *See Fin. of Am. LLC v. Mortg. Winddown LLC (In re Ditech Holding Corp)*, 630 F. Supp. 3d 554 (S.D.N.Y. 2022). In January 2024, Clerkenwell forfeited the lease[4] in accordance with British law. As a result of the post-petition forfeiture, Clerkenwell has an additional administrative claim against the Debtor of approximately $2,500,000.

3.      Despite filing a timely proof of claim, Clerkenwell was not served with the *Notice of (A) Hearing to Consider Confirmation of Debtors' Chapter 11 Plan; (B) Deadline for Voting to Accept or Reject Plan; (C) Debtors' Releases and Third-Party Released Opt Out Election; and (E) (*sic*)Related Matters,* nor with the *Notice of Filing of Revised Order (I) Approving the Second Amended Disclosure Statement; (II) Scheduling Confirmation Hearing; (III) Approving Form and Manner of Notice of Confirmation Hearing; (IV Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan, Including (A) Approving Form and Content of*

---

[3] Clerkenwell believes that MG was sold by the Debtor shortly before the filing; however, on the current organization chart attached as an exhibit to the Plan, it is shown as a subsidiary. MG is still in the building; whereas, Amyris UK Trading Limited and Beauty Labs International Limited relocated at some point during the Debtor's chapter 11 case.

[4] Forfeiture is a procedure pursuant to British law by which the landlord can terminate the lease for breach and peaceably retake possession of the building, changing the locks thereon. The remainder of the lease payments become immediately due and payable.

Solicitation Materials; (B) Establishing Record Date and Approving Procedures for Distribution of Solicitation Materials; (C) Approving Forms of Ballots; (D) Establishing Voting Deadline for Receipt of Ballots and (E) Approving Procedures for Vote Tabulation's; (V) Approving Form and Manner of Notice of Plan Releases; (VI) Establishing Voting Deadline for Filing Objections to Confirmation of Plan; and (VII) Granting Related Relief* [D.I. 854]. *See* Affidavits of Service, [D.I. 1049 and 898, respectively]. Similarly, although there is no certificate of service one can find concerning ballots, Clerkenwell has no record of receiving a ballot nor any notice of how to opt out of the onerous third-party releases proposed in the Plan. Clerkenwell suspects it is not the only party who is puzzling over how to opt out of the third-party releases, as this mechanism appears deliberately vague in the Plan.

4.      Indeed, although Clerkenwell did not get timely notice of the Plan, once it discovered an amended plan had been filed and reviewed same, it was struck by what appeared to be the deliberate opacity of the Plan. Not only can one not tell how to opt out of the third-party non-consensual releases if one did not receive a ballot, but also, there is very little information on significant points in the Plan. Neither the Plan nor the disclosure statement has so much as a summary of significant documents. The real guts of the Plan are contained, instead, in the Plan Supplement, which is hundreds of pages of dense material which was only filed nine days ago. *See* D.I. 1112.  One cannot look at the Plan and Disclosure Statement and understand how the Plan is being funded, nor are there meaningful projections or a Sources and Uses table to help with this. Throughout the Plan, information is either missing or obfuscated. For example, in order to determine the amount of funding necessary at confirmation, one first has to look at the definition of "Plan Effective Date Funding Schedule" in the Plan. This in turn, sends one to the definition of "Approved Budget", which in turn sends one to the debtor-in-possession financing documents,

where one has to wade through five amendments before finding the Plan Effective Date Funding Schedule. It would have been a lot easier to simply say the docket number where the Schedule could be found, or reproduce it. But this is typical of the difficulty in trying to understand the Plan. As a result of information being so scarce and opaque, the Debtors have failed to carry their burden of establishing that the plan is feasible and not likely to be followed by the need for further reorganization, and the Plan cannot be confirmed unless and until this is remedied.

5.    The Plan also includes exceptionally broad nonconsensual third-party releases which should not be approved. As shown below, not only are they impermissible as a matter of law, but these particular releases and accompanying injunctions and exculpation provisions are exceptionally broad. In the case of Clerkenwell, one could argue that these provisions prevent Clerkenwell from calling on its guarantee post-Confirmation, even though, the law is clear that a guarantee rides through the confirmation of a plan. *See, Reinhart Foodservice LLC v Schlundt*, 646 B.R. 478, 487 (E.D. Wis. 2022), *appeal dismissed*, 2023 U.S. App. LEXIS 31468 (7th Cir. Apr. 17, 2023). For its part, Clerkenwell may well have causes of action against principles of MG who are no longer with the Debtor and which causes of action would not affect the Debtors, but such parties are all arguably released without Clerkenwell's consent as "Related Parties" due to the broad definitions contained in the Plan. These provisions are clearly unacceptable.

6.    The Debtors also wish to get all of the benefits of substantive consolidation without actually substantively consolidating. This is impermissible as a matter of law.

7.    Plan proponents bear the burden of proving to the Court, by a preponderance of the evidence standard, that a proposed plan satisfies every applicable confirmation requirement under Bankruptcy Code sections 1129(a) and (b). *See, e.g., In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006); *In re Exide Techs.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003). This burden

is a heavy one, and requires careful consideration of each of the relevant inquiries articulated by Bankruptcy Code section 1129. *See In re Vita Corp.*, 380 B.R. 525, 528 (C.D. Ill. 2008). This is especially so where, as here, the debtor acts as the plan proponent. *See, e.g., Everett v. Perez (In re Perez),* 30 F.3d 1209, 1214 n.5 (9th Cir. 1994) ("The burden of proposing a plan that satisfies the requirement of the code always falls on the party proposing it, but it falls particularly heavily on the debtor-in-possession or trustee since they stand in a fiduciary relationship to the estate's creditors.")

8.      As discussed more fully below, the Debtors cannot satisfy these burdens. Accordingly, the Court should not approve the Plan.

## ARGUMENT

## I.      Debtors Have Failed to Demonstrate that the Plan is Feasible.

### A.      There is Insufficient Information for the Court to Make a Finding that the Plan is Feasible.

9.      Bankruptcy Code §1129(a)(11) requires this Court to find that a plan is feasible. Specifically, this Court must determine that: "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. §1129(a)(11). The Debtors have utterly failed to demonstrate feasibility.

10.      Neither the Plan nor the Disclosure Statement indicates how the payments due under the Plan on the Effective Date are to be funded. Originally, it was proposed that it would be funded by the Net Proceeds from sales of the Debtors' assets, and this is what the Plan provides. However, since the gross proceeds from the sales are substantially less than the amounts necessary to fund the Plan, one is left to wonder where the money is coming from. There is no Sources and Uses table provided in the Plan or Disclosure Statement as would be typical to allow one to

determine that there is sufficient funds on hand to fund the plan payments. Creditors and this Court are left in the dark as to where the tens of millions of dollars of funding for payments due on the Effective Date are coming from. The Disclosure Statement provides only that "the Debtors and the Reorganized Debtors, as applicable, shall fund distributions under the Plan with (a) Net Proceeds as provided for in the Plan, (b) the New Common Stock, (c) proceeds from the Exit First Lien Facility, and (d) Cash on hand, subject to Plan Effective Date Funding." Disclosure statement and §3.B.8 [D. I. 893]. One must therefore assume that the difference between the sale proceeds and what is needed will come from the Exit First Lien Facility (the "**Exit Facility**"), or from cash on hand. The problem with this is that the cash available from the Exit Facility cannot exceed $27,400,000, Plan at §I.A.158, and the cash on hand is projected to be negative. *See* Plan Effective Date Funding Schedule [Docket No. 900-1]. Given all the payments discussed in the Plan, this would seem to leave a substantial shortfall. One is left to wonder if the Exit Facility is used to fund plan payments, which would require it to be in excess of $27,400,000 in violation of the Plan, will there be sufficient funds left in the Facility to fund operations? The Plan as written seems to assume that the sale proceeds will pay for the plan payments, and the Exit Facility will be available for operations. Nor can one determine from the Plan whether, if more of the Exit Facility is used for plan payments than anticipated (which would require a waiver of one of the Plan's preconditions to confirmation), will there be sufficient working capital for the Debtor to achieve its projected income? There is no telling from the information provided.

11.     In fairness, the Debtors are not required to guarantee that the Plan will succeed. "Thus, the court 'only must find that the plan presents a workable scheme or organization and operation from which there may be reasonable expectation of success.'" *In re Mallinckrodt PLC,* 639 B.R. 837, 894 (Bankr. D. Del. 2022) (quoting *In re W. R. Grace & Co.*, 475 B.R. 34, 115 (D.

Del. 2012). But in the instant case, the Debtors have presented no scheme whatsoever. There is no business plan or discussion of future operations. The so-called financial projections are so summary and incomplete as to be risible. They do not show how the Exit Facility is to be used, nor do they show any debt service. They are so conclusory that one cannot test them to determine whether or not they are feasible, especially in the absence of any accompanying business plan. Although the Debtors tell us that the projections "reflect numerous assumptions" and "were prepared using multiple sources of detailed information on the Company's operations", the Debtors failed to provide any of the numerous assumptions or detailed information. Perhaps most significantly, what little information there is shows a shortfall in the operating funds in year one of $88 million, and a shortfall in year two of $27 million *before debt service*. No explanation is offered as to how the Debtors can survive such extreme shortfalls. Based on the paltry information provided, and the absence of any business plan or workable scheme whatsoever, this Court simply cannot conclude that the Plan is feasible or not likely to be followed by a need for further reorganization.

12.     The *Mallinckrodt* case gives several relevant factors for the court to consider in deciding whether a plan is feasible. These include the adequacy of the debtor's capital structure, the earning power of the business, general economic conditions, the ability of management, the probability of the continuation of the same management, and any other related matters which bear on the prospect of a sufficiently successful operation. *Mallinckrodt*, 639 B.R. at 894 (quoting *In re Trigona*, 2009 Bankr. LEXIS 5545, at *9 (Bankr. W.D. Pa. Jul. 24, 2009)). Looking at these factors, one can see that this Court has **no basis whatsoever** for making a determination that the Plan is feasible. Although the Disclosure Statement provides some limited information on the Debtors' prepetition capital structure, the Debtors' post-Confirmation capital structure is not

addressed at all, and is indeed difficult to discern from the limited information in the Plan and Disclosure Statement. Similarly, no information is provided as to the earning power of the business, nor economic conditions. Nor can this Court take into consideration the ability of management, since management is not identified. Neither the officers nor the new CEO are identified in the Plan or Disclosure Statement. *See* Disclosure Statement, section 3. B. 15. [D.I. 893]. As to the directors, the Plan Supplement identifies board members only "*to the extent known*". *See* Plan Supplement, Exhibit O [D.I. 1112]. It is notable that this lack of information violates Bankruptcy Code § 1129(a)(5)(A)(i), which requires the plan proponent to disclose the identity and affiliations of any individual proposed to serve after confirmation of the plan as a director or officer. As to the probability of the continuation of the same management, that is not discussed other than to refer to a potential new CEO, without identifying such person. In short, this Court simply has not been provided with sufficient information to make a determination that the plan is feasible and not likely to be followed by a need for further reorganization. What little information has been provided raises more questions than it answers.

**B. The Debtors Have Not Shown that They Can Pay Administrative Claims.**

13. As an administrative claimant, Clerkenwell is particularly concerned that the Plan is not feasible because it fails to comply with Bankruptcy Code § 1129(a)(9)(A), which requires all administrative claims to be paid in full on the Effective Date. One notes at the outset that the Administrative Claims Bar date is not until 30 days after Plan confirmation. Accordingly, it is impossible to know at this date the amount of the administrative claims, and thus whether the Debtors have sufficient means to pay such claims. In this regard, it is important to note that a precondition to confirmation of the Plan is that Allowed Administrative Claims shall not exceed the amount set forth in the Plan Effective Date Funding Schedule, which is $58,200,000. *See* Plan

§ I. A. 159 [D.I. 893-1]. Currently, the Plan Effective Date Funding Schedule is at the very max of $58.2 million, but there are items missing. *See* Plan Effective Date Funding Schedule [D.I. 900–1. For example, the administrative claim of Clerkenwell, which is approximately $2.5 million, is not included in the administrative claims budget. While the Debtor has indicated it will object to Clerkenwell's claim, it cannot just assume it will succeed and not provide any ability to pay such administrative claim. For this reason alone, the Plan cannot be confirmed because it will not meet its precondition to confirmation of not exceeding the amount set forth in the Plan Effective Date Funding Schedule. Clerkenwell aside, under the current Plan, Debtors have no ability to pay any administrative claim not anticipated in the Plan Effective Date Funding Schedule. Plan, *id.* Thus, if even one administrative claim comes out of the woodwork unexpectedly, the Debtors will have no ability to pay it, thus violating Bankruptcy Code § 1129(a)(9)(A). And it is highly likely, since the Administrative Claims Bar Date is not until 30 days after the Effective Date, that there will be some unexpected claims, not the least of which is Clerkenwell's administrative claims totaling approximately $2.5 million. Since the Debtors, who do not even know the final amount of allowed administrative claims, cannot demonstrate the ability to pay those claims, the Plan is simply not feasible.

## II.     The Plan Impermissibly Provides for Non-Consensual Releases.

14.     Clerkenwell joins and adopts the (i) *Objection of the United States Trustee to Confirmation of Second Amended Joint Chapter 11 Plan of Reorganization* (the "**US Trustee Objection**") [D.I. 1154] and (ii) the *Limited Objection of the U.S. Securities and Exchange Commission to Confirmation of the Debtors' Second Amended Joint Plan of Reorganization* (the "**SEC Objection**") [D.I. 1150], which are deemed fully incorporated herein by reference as if fully

set forth herein. (The US Trustee Objection and SEC Objection shall be collectively referred to as the "**Filed Objections**" ).

15.     In addition to the arguments raised in the Filed Objections, Clerkenwell also states the following in further support of its argument that the non-consensual releases which the Debtors seek to impose on the creditors and parties in interest in this case, are impermissible and improper.

16.     Non-consensual third-party releases may only be approved when a debtor puts forth specific factual evidence establishing that the releases are fair and necessary. *See In re Millennium Lab Holdings II, LLC.,* 945 F.3d 126, 139 (3d Cir 2019). ("The hallmarks of permissible non-consensual releases [are] fairness, the necessity to the reorganization, and specific factual findings to support these conclusions." (quoting *Gillman v. Cont'l Airlines (In re Cont'l Airlines*), 203 F.3d 203, 214 (3d Cir. 2000)). In addition to having to be fair and necessary, non-consensual third-party releases are only appropriate when cases present "exceptional facts". *Id*. at 129. In the Third Circuit, section 105(a) of the Bankruptcy Code provides courts with the power to order non-consensual third-party releases only when the fairness and necessity standards are met and when exceptional facts exist. *See In re Glob. Indus. Tech., Inc*., 645 F.3d 201, 205 (3d Cir. 2011); *In re Millennium Lab Holdings II, LLC.,* 591 B.R. 559, 584 (D. Del 2018*), aff'd* 945 F.3d 126 (3d Cir. 2019).

17.     A non-consensual third-party release is considered fair and reasonable if consideration is given in exchange for the release. *See United Artist Theater Co. v. Walton,* 315 F.3d 217, 227 (3d Cir. 2000) (citing *Cont'l*, 203 F.3d at 214-15); *In re Genesis Health Ventures, Inc.,* 266 B.R. 591, 607-08 (Bankr. D. Del. 2001). In this case, there is no way for creditors to assess whether fair consideration is being provided.

18.     The Plan and Disclosure Statement contain no meaningful information about the estate claims and causes of action being released, or the results of the multiple investigations being conducted. The Debtors have produced a report which has not been disclosed to any party other than the Creditors' Committee and an "independent director." Without the disclosure of the contents of these reports, the process lacks the appearance of integrity and openness. Additionally, upon information and belief, the investigations are ongoing. It makes no sense for creditors and parties in interest to be required to make a decision about whether to release claims against third parties, when they have no idea what claims they are releasing, and the value of these claims. Stakeholders, at a minimum, must have an understanding of the claims, their strengths and weaknesses and potential recoveries. *In re Oneida Motor Freight, Inc*., 848 F.2d 414, 417 (3d Cir. 1988) ("The importance of full disclosure is underlay by reliance placed upon the disclosure statement by creditors and the court. Given this reliance, we cannot over emphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of 'adequate information.'"); *In re Lower Bucks Hosp*., 488 B.R. 303, 321 (Bankr. E.D. Pa. 2013), *aff'd* 571 Fed App'x 139 (3d Cir. 2014) (denying approval of disclosure statement because it "did not provide… information about the merits or value of potential claims… Or the class action they would be relinquishing.")

19.     Additionally, the Plan and Disclosure Statement do not specifically identify who is receiving a Third-Party Release and how much each release party is contributing to the reorganization. The Debtors do provide a list that goes well beyond Foris and the DIP Lender (who are the only entities providing any consideration), but the list only sets forth categories of parties and does not specify any individuals. Moreover, there is no explanation why releases are necessary to the reorganization and who made the decision to authorize them. Without more information,

stakeholders should not be forced to make a decision as to whether to support the proposed Plan or to opt out.

20.　　Similar to the Plan's impermissible nonconsensual third-party releases, the Plan also provides exculpation that is impermissibly broad. At page 72, the Plan states:

> Except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpted Party shall have or incur liability for, and each Exculpated Party shall be released and exculpated from any claims and Causes of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, **the formulation, preparation, dissemination, negotiation, filing, or termination of prepetition transactions (including with respect to the Debt Documents)**, the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility Documents, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the DIP Facility, the Plan, the Plan Supplement, the Exit First Lien Facility, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence, except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

(Emphasis Added). The above exculpation provision not only exculpates the Exculpted Parties from acts during the Bankruptcy Cases, but exculpates the Exculpated Parties for acts performed prior to the filing of these bankruptcy cases. Clerkenwell submits that the Exculpated Parties are only entitled to be exculpated for acts performed during the Bankruptcy Case and the Debtors attempt to obtain broader exculpation is improper.

21.     Likewise, the Plan Injunction provision contained on page 67 and page 68, and the Direct

Claims Injunction provision on page 68 of the Plan are also impermissibly overbroad. The Plan Injunction

provision states:

> Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, and separate and apart from the Direct Claims Injunction, **all Entities who have held, hold, or may hold the Released Claims** are permanently enjoined from and after the Effective Date, from taking any of the following actions against, as applicable, **the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties**: (a) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any Released Claims; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any Released Claims; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the Estates of such Entities on account of or in connection with or with respect to any Released Claims; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the Estates of such Entities on account of or in connection with or with respect to any Released Claims unless such Entity has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims released or settled pursuant to the Plan.
>
> Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. **Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX.F hereof.**

(Emphasis added).

22.     The Direct Claims Injunction provision at page 68 of the Plan states:

The Confirmation Order shall provide that, as of the Effective Date, and irrespective of whether any such holder has agreed to be bound by the Plan, all holders of Direct Claims and their respective Related Parties will be permanently and forever stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Direct Claim against the Direct Claims Injunction Parties, including all of the following actions (collectively, the "Direct Claims Injunction"):

a. commencing or continuing in any manner, any actions or other proceedings of any kind with respect to any Direct Claims against any of the Direct Claims Injunction Parties or against the property of any of the Direct Claims Injunction Parties;

b. enforcing, levying, attaching, collecting, or otherwise recovering, by any manner or means, from any of the Direct Claims Injunction Parties, or the property of the Direct Claims Injunction Parties, any judgment, award, decree, or order with respect to any Direct Claim against any of the Direct Claims Injunction Parties, or any other person;

c. creating, perfecting, or enforcing any lien of any kind relating to any Direct Claim against any of the Direct Claims Injunction Parties, or the property of the Direct Claims Injunction Parties; and
d. taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, with respect to any such Direct Claim.

2. Standing of Direct Claim Injunction Parties.

Each of the Direct Claims Injunction Parties shall have standing to seek relief from the Bankruptcy Court or any court of competent jurisdiction for purposes of enforcement of the Direct Claims Injunction or other Injunction or releases under the Plan to the extent that any act occurs or is taken that is contrary to the provisions of, or would interfere with, restrict, defeat, nullify, violate or otherwise limit the protections afforded the Direct Claims Injunction Party through the Direct Claims Injunction.

23.     Clerkenwell submits that the above Plan Injunction and Direct Claim Injunction provisions may provide injunctive protection to various parties enumerated in those provisions, far beyond what the Bankruptcy Code otherwise provides.  Most concerning to Clerkenwell is that these provisions, contrary to established law, may be construed to provide an injunction against Clerkenwell's post confirmation enforcement of the Guarantee that Amyris provided to Clerkenwell. Cases in this district and in other districts have found a guarantee to be a non-executory contract which is not capable of rejection. *See, In re Furniture Brands Intl., Inc.*, 2013 Bankr. LEXIS 5162, at *15 (Bankr. D. Del. Nov. 7, 2013).  As such, a non-executory guarantee that is not enforced during the pendency of a bankruptcy case, would "ride through" the bankruptcy case, and the holder of the guarantee could enforce the guarantee post confirmation. *See*, *Schlundt*, 646 B.R at 487. Any provision of the Plan that provides greater protections than the bankruptcy code envisions should not be permitted, and as such, the Plan should not be confirmed.

III.    **The Debtors Attempt to Effect Substantive Consolidation of the Bankruptcy Cases Without Seeking this Extraordinary Relief.**

24.     In the Plan, the Debtors attempt to accomplish the effect of a substantive consolidation through what they call an "Administrative Consolidation". They do this because they are well aware they do not meet the stringent requirements for substantive consolidation.

> Substantive consolidation must not be confused with the related procedure of joint administration. Joint administration [which is sometimes referred to as administrative consolidation] is a procedure by which courts hear two or more related cases of entities that have filed bankruptcy petitions as a single case. The purpose of joint administration is to make case administration easier and less costly. The process has been called a "creature of procedural convenience," because it avoids the duplication of effort that would result if cases involving related debtors were to proceed separately. The most significant difference between joint administration and substantive consolidation is that joint administration requires the estate of each debtor to be kept separate and distinct. Joint administration does not affect the substantive rights of creditors and

other interested parties. Thus, administrative efficiency is achieved without sacrificing the parties' substantive rights. Conversely, substantive consolidation affects a merger of the consolidated debtors' estates, which creates a single estate that is recognized throughout the remaining bankruptcy process.

Other significant differences between joint administration and substantive consolidation exist. Because only a single estate remains after consolidation, interentity [sic] accounts and interentity [sic] claims are eliminated. Creditors of specific entities no longer can look only to the assets of the debtor which they bargained for satisfaction of their claims. Rather, creditors of the separated entities must look to the assets of the consolidated estate and become creditors of the consolidated entity. In joint administration, however, the debtors' estates are separate and interentity [sic] claims survive. Further, the creditor of each jointly administered entity may look only to the assets of the debtor with which they bargained for satisfaction of their claims.

J. Stephen Gilbert, *Substantive Consolidation in Bankruptcy: A Primer*, 43 Vand. L. Rev. 212-13

(1990) (internal citations omitted).

25.     In the Plan, the Debtors attempt a merger of the consolidated estates without

seeking substantive consolidation. Section C of the Plan at page 37 states:

> *Administrative Consolidation for Voting and Distribution Purposes Only.*
>
> On the Effective Date, and solely for voting and administrative purposes to facilitate distributions from the Creditor Trust on account of Class 8 General Unsecured Claims: (a) **all General Unsecured Claims shall be deemed merged and treated as liabilities of the Debtors on a consolidated basis; (b) each General Unsecured Claim will be deemed a single Claim and a single obligation of the Debtors; and (c) all General Unsecured Claims based on joint and several liability or a guaranty by a Debtor of the obligations of any other Debtor shall be deemed eliminated and extinguished.** For the avoidance of doubt, for the purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors shall be treated as separate Entities. Such administrative consolidation is solely for the purpose of facilitating distributions to Holders of Allowed General Unsecured Claims under this Plan and shall not affect the legal and corporate structures of the Reorganized Debtors or the General

Unsecured Claims. Moreover, such administrative consolidation shall not affect any subordination provisions set forth in any agreement relating to any General Unsecured Claim subordinated in accordance with section 510(b) of the Bankruptcy Code, any contractual rights, or any equitable principles.

(Emphasis Added.) Such merger of the estates of the various Debtors without this Court approving substantive consolidation, is clearly improper.

26. In this Circuit the requirements for substantive consolidation have been clearly articulated by the Court of Appeals.

In our Court what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

Proponents of substantive consolidation have the burden of showing one or the other rationale for consolidation.

*In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005).

27. Here, the Debtors have not even attempted to meet their burden for substantive consolidation. Instead of seeking to make the requisite showings, they instead attempt to improperly merge the estates through "Administrative Consolidation". Indeed, the creditors have been adversely affected by this improper merger of estates. If a creditor has a claim with a Debtor with more assets than other Debtors, they will be injured by this improper consolidation. Similarly, if a creditor has a claim against more than one Debtor, the creditor will be injured by losing his additional claims. A Debtor which would otherwise be well capitalized after confirmation, may find itself undercapitalized because its assets have been used to pay creditors of a totally different

Debtor. Clearly, the Debtors have not met their burden of proof and should not be permitted to merge their estates to the potential detriment of creditors.

## IV.  **Miscellaneous**

28.     In deciding whether to confirm this Plan, there are certain other issues which this Court should consider:

A.     Bankruptcy Code §1129(a)(5)(A)(i) requires that the plan proponent identify all individuals proposed to serve as officers or directors after confirmation. As previously mentioned, the Debtors have not identified any officers, and have only identified the directors "to the extent known". They have not made a good faith effort to identify officers and directors, and accordingly have failed to meet the requirements of Bankruptcy Code §1129(a)(5)(A)(i) and cannot confirm the Plan.

B.     The Plan currently provides that if a distribution from the Creditors Trust is undeliverable, either because of a wrong address or it is too small, the distribution reverts to the Reorganized Debtor. This is inappropriate because the amount reverting to the Reorganized Debtor is an asset of the Creditors Trust, and not an asset of the Reorganized Debtors. The undeliverable amount should revert to the Creditors Trust for redistribution among the beneficiaries of the Trust.

C.     It is the essence of the Bankruptcy Code that similarly situated creditors be treated alike. *See, e.g.,* 11 U.S.C. §§1123(a)(4). Furthermore, since certain classes in the Plan are deemed to have rejected the Plan, the Plan will need to be confirmed pursuant to Bankruptcy Code §1129(b), which requires that the Plan not discriminate unfairly. Nonetheless, the Plan fails to treat all administrative claimants equally. As already demonstrated above, there is a real concern whether there will be sufficient funds to pay all administrative claims. Yet administrative claimants who hold claims for professional fees get an advantage by having the funds for their claims

escrowed on the Effective Date, even though, they have been paid 80% of their fees regularly during the case. All other administrative claimants, who are still owed 100% of their Claims, are left to hope that there will be enough money to pay their claims. This is unfair discrimination.

D.    Many statements in the Plan are confusing, and some may even be untrue. For example, the exact same treatment is provided for the DIP Claims as is provided for the Foris Prepetition Secured Claims. Either group can elect to be paid by getting "100% of the New Common Stock". It is difficult to see how one group can get 100% of the New Common Stock at the same time as a different group is getting 100% of the New Common Stock for their Claims. While there certainly is overlap between the DIP Lenders and the Foris Prepetition Secured Lenders, there has been no representation that such groups are identical, nor should the consideration for one class of Claims constitute the consideration for another class of Claims, even if a Claimant holds Claims in both classes. Similarly, as already pointed out, the organization chart incorporated into the Plan shows that MG is a subsidiary of the Debtor. This is not true, as MG has been sold. The Plan should not be confirmed with so many confusing, opaque, and incorrect statements.

E.    No specific record date for distributions is specified in the Plan, nor are the Distribution Dates. This leaves creditors with a great deal of uncertainty as to whether and when they will be paid. These dates should be specified before the Plan is confirmed.

V. Conclusion

29.    For all the above reasons, Clerkenwell urges this Court not to confirm the Plan in its current form.

Dated: January 18, 2024
        Wilmington, Delaware

**BALLARD SPAHR LLP**

*/s/ Nicholas J. Brannick*
Nicholas J. Brannick (No. 5721)
919 N. Market St., 11th Floor
Wilmington, DE 19801-3034
Telephone: 302.252.4465
E-mail: brannickn@ballardspahr.com

           -and-

**MAYERSON & HARTHEIMER, PLLC**
Sandra E. Mayerson (admitted *pro hac vice*)
David H. Hartheimer (admitted *pro hac vice*)
845 3rd Ave., 11th floor
New York, NY 10022
Tel.: 646-778-4381
Fax: 646-778-4384
sandy@mhlaw-ny.com
david@mhlaw-ny.com

*Counsel for 10-11 Clerkenwell Green Limited*

**CERTIFICATE OF SERVICE**

Nicholas J. Brannick certifies that on January 18, 2024, he caused the *Objection of 10-11 Clerkenwell Green Limited to Confirmation of Second Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors, as Modified* to be served: (i) electronically on all CM/ECF participants registered in this case through the Court's CM/ECF system at their respective email addresses registered with the Court in accordance with Del. Bankr. L.R. 5005-4, and (ii) by electronic mail on the notice parties set forth in the *Notice of (A) Hearing to Consider Confirmation of Debtors' Chapter 11 Plan; (B) Deadline for Voting to Accept or Rjeect Plan; (C) Debtor's Releases and Third-Party Release; (D) Deadlines Regarding Third-Party Release Opt Out Election; and (E) Related Matters* [D.I. 946].

/s/ Nicholas J. Brannick
Nicholas J. Brannick (No. 5721)