IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC, *et al.*, | Case No. 23-11131 (TMH) |
| Debtors.[1] | (Jointly Administered) |
| | Hearing Date: January 24, 2024 at 10:00 a.m. (ET) |
| | Related Docket No. 892 |

### GIVAUDAN SA'S OBJECTION TO THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF AMYRIS, INC. AND ITS AFFILIATED DEBTORS, AS MODIFIED

Givaudan SA (together with its direct and indirect subsidiaries, "Givaudan") hereby files this objection (this "Objection") to the *Second Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors, As Modified* [Docket No. 892] (the "Plan").[2] In support of the Objection, Givaudan respectfully states as follows:

### PRELIMINARY STATEMENT

1. Since the beginning of the Debtors' chapter 11 cases, Givaudan, a significant contract counterparty of the Debtors, has been in discussions with the Debtors regarding potential amendments to the Givaudan Contracts and the go-forward relationship of the parties. Despite the parties' efforts to date, no agreement has been reached on the terms of any amendment. Givaudan intends to continue to work collaboratively with the Debtors in advance of confirmation and is hopeful that a consensual agreement can be reached, but files this Objection to confirmation

---

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

[2] Capitalized terms not defined herein shall have the meanings given in the Plan.

of the Plan to protect and preserve its rights in the event that no consensual resolution is reached prior to the confirmation hearing. To that end, Givaudan files this Objection to raise four issues.

2. *First*, the Plan contains an impermissible broad third-party release that the Debtors are seeking approval of on a *non-consensual* basis. Givaudan does not currently consent to the Third-Party Releases contained in the Plan, and wishes to opt out of such a release. These Third-Party Releases seek to release substantial claims against several non-Debtor parties, including claims that are owned by Givaudan against the DSM, without complying with the requirements set forth by the Third Circuit and bankruptcy courts in this jurisdiction. Givaudan has a direct relationship with DSM, as DSM was assigned from Amyris certain contracts and obligations thereunder to supply certain ingredients to Givaudan. Specifically, the Third-Party Releases fail *each* of the requirements of non-consensual releases in the Third Circuit: the releases are not (a) necessary to the success of the reorganization, (b) provided in exchange for critical financial contribution to the plan, or (c) fair to the non-consenting creditors. Moreover, the Debtors have failed to demonstrate the "extraordinary" circumstances required for non-consensual third-party releases.

3. *Second*, in accordance with the Court's previously entered Escrow Order, the Debtors must execute the Amended Givaudan Escrow Agreement. While the parties have agreed to extend the deadline by which this amendment must be effective, the Plan should contain a condition precedent to the Effective Date that the Amended Givaudan Escrow Agreement is effective.

4. *Third*, as things currently stand, the Givaudan Contracts will be rejected by the Debtors. In that event, the Plan cannot infringe upon Givaudan's right to retain its rights under the Givaudan Contracts pursuant to Bankruptcy Code section 365(n), and the Confirmation Order

should include a provision that states that the Givaudan Contracts are entitled to the protections of 365(n) of the Bankruptcy Code and nothing in the Plan or Confirmation Order modifies or limits Givaudan's rights under section 365(n) of the Bankruptcy Code, including any rights that arise in the event of a breach.

5.  *Fourth*, if the Givaudan Contracts are to be assumed by the Debtors, they cannot be modified without Givaudan's consent, and similarly to the extent Givaudan licenses any intellectual property to Amyris, such licenses may not be assumed without Givaudan's consent consistent with applicable law in this district.

## BACKGROUND

### A.    The Chapter 11 Cases

6.  On August 9 and August 21, 2023 (as applicable, the "Petition Date"), each above-captioned debtor and debtor-in-possession (the "Debtors" or "Amyris") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code," and such cases, the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases.  On August 27, 2023, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors.

7.  The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 1015-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

B.     **The Givaudan Contracts**

8.     Givaudan is an international manufacturer of fragrances, flavors, and cosmetics ingredients headquartered in Vernier, Switzerland, and a material contract counterparty of the Debtors, as described in the *Declaration of Han Kieftenbeld in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 18].

9.     Givaudan is party to certain agreements with the Debtors, including but not limited to: (a) the *Asset Purchase Agreement*, dated February 21, 2023, by and among Givaudan, Aprinnova, LLC, and Amyris; (b) the *License Agreement*, dated April 3, 2023, by and among Amyris, Aprinnova, LLC, and Givaudan; (c) the *Supply Agreement*, dated September 1, 2018, between Givaudan and Amyris and the *Agreement of Amendment to the (Bisabolol) Supply Agreement*, dated March 30, 2021, by and among Amyris, DSM Nutritional Products AG (together with its affiliates, "DSM"), and Givaudan; (d) the *Framework Supply Agreement*, dated January 1, 2019, as amended, between Givaudan and Amyris and the *Agreement of Amendment to the Framework Supply Agreement*, dated March 30, 2021, by and among Amyris, DSM, and Givaudan; (e) the *Collaboration Agreement*, as amended and restated March 30, 2021, between Amyris and Givaudan; (f) the *R&D Framework Agreement*, dated April 3, 2023, by and between Amyris and Givaudan; (g) the *Strain Escrow Agreement*, dated September 29, 2018 by and among Amyris, Givaudan, and SciSafe Inc. (the "Givaudan Escrow Agreement") ; and (h) the *Farnesene Supply Agreement*, dated October 28, 2015, as amended, between Amyris and Givaudan (collectively, the "Givaudan Contracts").

10.    Pursuant to the Givaudan Contracts, the Debtors granted Givaudan a license to intellectual property owned by the Debtors for certain ingredients. Additionally, Givaudan licenses, on a non-exclusive basis, certain intellectual property that it owns to the Debtors pursuant to the Givaudan Contracts.

11. The proposed Plan contemplates that the Givaudan Contracts shall be either (a) amended and assumed as amended, or (b) rejected, with any rejection damages to be treated as General Unsecured Claims in Class 8. (Plan Art. III.B.10(b)). Because the Givaudan Contracts can neither be assumed nor amended without Givaudan's consent, Givaudan expects that the Givaudan Contracts will be rejected under the Plan absent a consensual agreement with the Debtors regarding the amendments thereto.

C. **Amendment of the Givaudan Escrow Agreement**

12. On October 4, 2023, DSM filed the *Motion of DSM-Firmenich to Compel Debtors' Compliance with Section 365(n)(4) of the Bankruptcy Code* [Docket No. 465] (the "DSM 365(n)(4) Motion") seeking an order compelling the Debtors to perform under certain contracts between the Debtors and DSM pursuant to section 365(n)(4) of the Bankruptcy Code. Givaudan understands that in March 2021, (a) the Debtors and DSM entered into asset purchase, license, and supply agreements, pursuant to which DSM acquired exclusive production rights to specified ingredients, (b) the Debtors granted DSM exclusive production licenses covering specific intellectual property of the Debtors and assigned the Debtors' rights and obligations under third-party exclusive ingredients supply agreements to DSM, and (c) the Debtors entered into a fifteen-year agreement to manufacture certain flavors and fragrances ingredients for DSM for supply to third parties. In particular, DSM now performs certain obligations that the Debtors had previously performed for Givaudan.

13. On October 18, 2023, the Bankruptcy Court entered a consensual *Stipulation Resolving Motion of DSM-Firmenich to Compel Debtors' Compliance with Section 365(n)(4) of the Bankruptcy Code* [Docket No. 591] (the "Escrow Order") between the Debtors, DSM, and Givaudan resolving the DSM 365(n)(4) Motion. Pursuant to the Escrow Order, the

parties were required to execute an amendment to the Givaudan Escrow Agreement on or before October 27, 2023, which date has been extend with the consent of the parties. (Escrow Order ¶ 6.)

### D. The Plan's Non-Consensual Third-Party Releases

14. The Plan contains broad non-consensual third-party releases (the "Third-Party Releases") by all Holders of Claims against certain parties, including DSM.[3] Specifically, Article IX.D of the Plan provides in that each Releasing Party shall be "deemed to forever release and waive, as against each and all of the Released Parties, any and all Direct Claims, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or hereafter arising, in law, equity, or otherwise that are or may be based in whole or in part upon any act, omission, transaction, event, or other occurrence taking place or existing on or prior to the Effective Date." (Plan Art. IX.D). Article I.A.175. of the Plan defines "Releasing Parties" as "collectively, and in each case in its capacity as such: (a) the Foris Prepetition Secured Lenders; (b) the Creditors' Committee; (c) the Consenting Convertible Noteholders; (d) the Consenting Contract Counterparties; *(e) all Holders of Claims against the Debtors that are bound by the Third-Party Release Settlement;* and (f) all persons who hold Interests in Amyris that are bound by the Third-Party Release Settlement." (Plan Art. I.A.175 (emphasis added)). The definition of Releasing Parties does not contain any carve-out for parties that opt out of or express their objection to the releases.

---

[3] Article I.A.174. of the Plan defines "Released Parties" as "collectively, and in each case, solely in their capacities as such: (a) the Debtors; (b) the Reorganized Debtors; (c); the DIP Lenders and the DIP Agent; (d) the Foris Prepetition Secured Lenders; (e) the Creditors' Committee; (f) the Consenting Convertible Noteholders, (g) the Ad Hoc Group Professionals; *(h) the Consenting Contract Counterparties;* and (i) with respect to each of the foregoing Entities in clauses (a) through (e), all Related Parties." (Plan Art. I.A.174 (emphasis added)). Article I.A.35. of the Plan defines "Consenting Contract Counterparties" as "each of DSM and Givaudan, provided said party executes the Plan Support Agreement." (Plan Art. I.A.35). Givaudan believes that DSM will be considered a "Consenting Contract Counterparty" under the Plan, as Givaudan understands that DSM and the Debtors have reached an agreement regarding the amendment and assumption of the DSM Contracts. *See Notice of Filing Plan Supplement for the Second Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors, As Modified*. Exhibit E – Amended DSM Contracts [Docket No. 1112, Ex. E].

15. The Plan acknowledges that the Third-Party Releases set forth in the plan are non-consensual. (*See* Plan Art. IV.A.3 ("the Releasing Parties are subject to the Third-Party Release (***either non-consensually or consensually***) as provided for under the Plan") (emphasis added)). Pursuant to the Plan, Holders that grant the releases shall receive the consideration set forth in the definition of "Third-Party Release Settlement Amounts," which expressly contemplates a larger pool of cash be set aside for certain Holders of Claims and Interests if the Third-Party Releases are "approved on a non-consensual basis." (Plan Art. IV.A.198 (definition of Third-Party Release Settlement Amounts)).

## OBJECTION

### A. Givaudan Does Not Consent to The Third-Party Releases and The Third-Party Releases Cannot Be Approved on a Non-Consensual Basis

16. The Third Circuit and the bankruptcy courts in this jurisdiction require that debtors seeking non-consensual releases demonstrate that each release: (a) is necessary to the success of the debtors' reorganization, (b) is provided in exchange for a "critical financial contribution" to the debtors' plan, and (c) is fair to the non-consenting creditors providing such release, who must receive reasonable consideration. *Gillman* v. *Continental Airlines (In re Continental Airlines)*, 203 F.3d 214, 214 (3d Cir. 2000); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 607 (Bankr. D. Del. 2001); *see also U.S. Bank N.A.* v. *Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (applying the *Genesis* factors and rejecting the non-consensual releases not supported by a "critical financial contribution"). Even where the above factors are met, non-consensual third-party releases "should not be considered absent a showing of *exceptional circumstances*." *Continental*, 203 F.3d at 213, n.9 (quoting *AccordGreenblatt* v. *Richard Potasky Jeweler, Inc. (In re Richard Potasky Jeweler, Inc)*, 222 B.R. 816, 826-828 (S.D. Ohio 1998)) (emphasis added). The Third Circuit's precedents "set forth

exacting standards that must be satisfied if such releases and injunctions are to be permitted." *Millennium Health*, 945 F.3d at 139; *see also In re Tribune Co.*, 464 B.R. 126, 178 (Bankr. D. Del. 2011) (interpreting *Continental* to allow non-consensual releases only in "extraordinary cases.").

17. Here, Givaudan wishes to opt out of the Third-Party Releases and does not consent. Additionally, the Third-Party Releases cannot be approved as they fail to meet the "exacting standards" required by the Third Circuit's precedents. *Millennium Health*, 945 F.3d at 139.

        **i.**    **The Third-Party Releases Are Not Necessary to the Debtors' Reorganization**

18. The "necessity" requirement requires a showing that the success of the debtors' reorganization bears a relationship to the non-consensual release of the non-debtor parties. *Genesis*, 266 B.R. at 607. As with the rejected releases in *Genesis*, nothing suggests that the Debtors' reorganization hinges on the provision of the non-consensual Third-Party Releases by each of the Releasing Parties, including Givaudan. *Genesis*, 266 B.R. at 608. Nor have the Debtors attempted to establish that it is necessary for each of the Releasing Parties to provide a broad non-consensual release of any and all claims arising from, related to, or connected with, directly or indirectly, in any manner whatsoever, the Debtors to all of the Released Parties.

19. To the contrary, the Debtors have structured the Plan to proceed without them. Articles IV.A.3 and I.A.196 of the Plan together provide that if the Third-Party Releases are approved on a non-consensual basis, Holders of Convertible Notes, General Unsecured Claims, and Interests, will receive $6.9 million, $2 million, and $2.5 million, respectively. However, the Court rejects the Third-Party Releases on a non-consensual basis, the payouts are simply reduced to $3.45 million, $1 million, and $0, respectively, and limited to Holders of Claims and Interests who do not opt out of the Third-Party Releases. Thus, if the non-consensual Third-Party Releases

are not approved, the only impact on the Plan is to the distribution to certain creditors — the Debtors would nonetheless seek to confirm this Plan as-is. While the Debtors and certain Released Parties may *prefer* to receive releases from all parties — consensually or otherwise, approval of the Third-Party Releases is certainly not *necessary* to the Plan. The Plan can readily be confirmed and effectuated without non-consensual third-party releases, and the very incorporation of alternate recoveries in the event of consensual releases shows that the Debtors' reorganization does not depend on the provision of such releases.

        ii.        **Certain Released Parties Are Not Providing Critical Financial Contributions to the Debtors' Reorganization**

        20.        The Debtors must establish that *each* of the non-debtor Released Parties has made a critical financial contribution to the Debtors' plan, not in aggregate. *See, e.g.*, *Genesis*, 266 B.R. at 607-608 (examining the validity of the releases as to specific groups of released parties and non-consenting releasing parties). Moreover, financial contribution is considered "critical" if, without the contribution, the debtors' plan would be infeasible. *Genesis*, 266 B.R. at 607. While some of the Released Parties, such as the DIP Lenders and the Foris Prepetition Secured Lenders, may be making a financial contribution to the Debtors' estates in furtherance of confirmation, many, including DSM, certainly have not. These other Released Parties cannot receive the releases under the Plan without the consent of the Releasing Parties. The Debtors do not make any attempt to specify exactly what "critical financial contributions" have been made by DSM, among others, in exchange for these broad releases. That is because DSM has not made any financial contribution to the Debtors' estates, let alone a "critical" contribution without which the Debtors' plan would be infeasible. *Genesis*, 266 B.R. at 607 (describing a "critical" contribution as one without which the Debtors' plan would be infeasible). If the Releases are approved on a non-consensual basis, the additional distribution required to the relevant claimants will be provided by the Foris

Prepetition Secured Lenders. Under the Plan, DSM and others are providing nothing to the Debtors' estates in exchange for their releases. These parties are not providing the sort of "critical financial contribution" to the Debtors' estates necessary to justify such releases. *Id*.

      **iii.**    **The Debtors Have Not Demonstrated that the Consideration to Non-Consenting Releasing Parties Is Fair**

21.    The Debtors have also failed to establish as to each non-consenting Releasing Party, what fair consideration is being provided to such non-consenting Releasing Party in exchange for the Releases. Beyond outlining the differences in consideration to be provided to certain classes of claimants if the Third-Party Releases are not approved on a non-consensual basis, there is no attempt by the Debtors to demonstrate that such consideration is fair and capable of supporting the Third-Party Releases.

      **iv.**    **The Debtors Have Not Demonstrated Extraordinary Circumstances Necessary to Support Non-Consensual Third-Party Releases**

22.    Finally, non-consensual third-party releases are only appropriate under extraordinary circumstances. *Continental*, 203 F.3d at 213, n.9. The facts of this case do not establish exceptional circumstances to support non-consensual third-party releases. The Debtors acknowledge as much, by structuring the Plan so that it could readily be confirmed without the provision of non-consensual third-party releases.

23.    Because the non-consensual releases of third parties in the Plan do not meet the exacting standards set forth in *Continental* and its progeny, the Third-Party Releases in the Plan cannot be approved on a non-consensual basis.

**B.**    **The Debtors Must Execute the Amended Givaudan Escrow Agreement in Accordance with the Escrow Order Prior to Confirmation**

24.    Three months ago, the Bankruptcy Court entered the Escrow Order requiring the Debtors to perform under certain intellectual property licenses pursuant to

Bankruptcy Code section 365(n)(4) and to execute an amendment to the Givaudan Escrow Agreement (as amended in accordance with the Escrow Order, the "Amended Givaudan Escrow Agreement") on or before October 27, 2023. Since that date, Givaudan has worked in good faith with both the Debtors and DSM to negotiate the terms of such amendment. However, the amendment has yet to be executed and the parties have mutually agreed to extend the deadline to amend the Givaudan Escrow Agreement as discussions progress between Givaudan and the Debtors regarding their go-forward relationship.

25. The amendment to the Givaudan Escrow Agreement is intended to clarify the rights of Givaudan to the release of certain intellectual property from escrow upon the occurrence of certain events, including the rejection of the Givaudan Contracts in a bankruptcy proceeding, an amendment that is required by the existing Givaudan Contracts. Thus, in the event that Debtors and Givaudan cannot reach a mutual agreement to amend the Givaudan Contracts prior to confirmation and the Givaudan Contracts are rejected, the amendment to the Givaudan Escrow Agreement must be executed prior to the Effective Date so that Givaudan gains access to the requisite intellectual property through the escrow to effectively exercise its rights under section 365(n) of the Bankruptcy Code and minimize disruption to its operations.

  C.  **Rejection of the Givaudan Contracts Must Be Subject to Givaudan's Rights under Section 365(n) of the Bankruptcy Code**

26. As discussed above, Givaudan is hopeful that it can reach a consensual agreement with Amyris prior to confirmation regarding amendments to the terms of the Givaudan Contracts. However, if such agreement cannot be reached, Givaudan expects that the Givaudan Contracts will be rejected. Bankruptcy Code section 365(n)(1) provides that upon rejection, a licensee of intellectual property may (a) treat such contract as terminated, or (b) retain its rights thereunder and any rights under any agreement supplementary to the contract. 11 U.S.C.

§ 365(n)(1). Bankruptcy Code section 365(n)(3) further provides that if the licensee chooses to retain its rights upon rejection, the debtor must provide the intellectual property (including any embodiment thereof) to the licensee, to the extent provided in the contract or any agreement supplementary thereto. 11 U.S.C. § 365(n)(3).

27. As the licensee of certain of the Debtors' intellectual property under the Givaudan Contracts, Givaudan is entitled to retain its rights under the Givaudan Contracts (and any agreements supplementary thereto) in the event that the Givaudan Contracts are rejected, and it anticipates exercising such rights in the event of a rejection. As such, Givaudan objects to the Plan to the extent that it modifies or limits Givaudan's rights under 365(n) in the event of a rejection, and requests the inclusion of language in the Confirmation Order stating that the Givaudan Contracts are entitled to the protections of 365(n) of the Bankruptcy Code and that notwithstanding anything to the contrary in the Plan or Confirmation Order, the Plan and Confirmation Order do not limit or modify the rights of any intellectual property licensees, including any rights and licenses that are deemed granted upon a material breach, under Bankruptcy Code section 365(n).

**D.    The Plan Cannot Assume or Modify the Givaudan Contracts without Givaudan's Consent**

28. Because Givaudan is the licensor of certain intellectual property to Amyris under the Givaudan Contracts and the Third Circuit follows the "hypothetical test" in determining whether a debtor may assume a contract under Bankruptcy Code section 365(c)(1), the Givaudan Contracts cannot be assumed without Givaudan's consent. Under applicable federal law, licenses for patents cannot be assigned without the consent of the licensor (here, Givaudan). *See Institut Pasteur* v. *Cambridge Biotech Corp.*, 104 F.3d 489, 493 (1st Cir. 1997) (stating that federal common law does not allow for assignment of patents without the consent of the patent holder, but

allowing assumption of the patent by the debtor due to application of the "actual test" rather than the "hypothetical test" in the First Circuit). Furthermore, the Debtors cannot amend the Givaudan Contracts, as is proposed in the Plan, without Givaudan's consent. *See In re Fleming Companies, Inc.*, 499 F.3d 300, 308 (3d Cir. 2007) ("Section 365(f) requires a debtor to assume a contract subject to the benefits and burdens thereunder. . . . If [the debtor] accepts the contract he accepts it *cum onere*. If he receives the benefits he must adopt the burdens.") (quotations and citations omitted).

29. Givaudan does not currently consent to the amendment of the Givaudan Contracts. Givaudan will continue to work diligently with the Debtors to negotiate the terms of an amendment, but until such agreement is reached, the Givaudan Contracts cannot be assumed under the Plan or otherwise.

## RESERVATION OF RIGHTS

30. Givaudan reserves the right to (a) amend or supplement this Objection and otherwise take any additional or further action with respect to the Plan or the matters addressed therein, and (b) be heard before the Bankruptcy Court with respect to the Plan.

## CONCLUSION

31. For all the foregoing reasons, the Court should deny confirmation of the Plan or, alternatively, direct the Debtors to revise the Plan so as to comprehensively address the concerns raised herein.

[*Remainder of page intentionally left blank.*]

| | | |
|---|---|---|
| Dated: | January 21, 2024<br>Wilmington, Delaware | Respectfully submitted,<br><br>*/s/ Kevin S. Mann*<br>**CROSS & SIMON, LLC**<br>Christopher P. Simon (No. 3697)<br>Kevin Mann (No. 4576)<br>1105 North Market Street, Suite 901<br>Wilmington, Delaware 19801<br>(302) 777-4200<br>csimon@crosslaw.com<br>kmann@crosslaw.com<br><br>- and -<br><br>**PAUL, WEISS, RIFKIND,<br>WHARTON & GARRISON LLP**<br>John T. Weber (admitted *pro hac vice*)<br>Sean A. Mitchell (admitted *pro hac vice*)<br>Lara Luo (admitted *pro hac vice*)<br>1285 Avenue of the Americas<br>New York, New York 10019<br>Tel:    (212) 373-3000<br>Fax:   (212) 757-3990<br>Email: jweber@paulweiss.com<br>          smitchell@paulweiss.com<br>          lluo@paulweiss.com<br><br>- and -<br><br>**NIXON PEABODY LLP**<br>Richard C. Pedone (admitted *pro hac vice*)<br>53 State Street<br>Boston, MA 02109<br>Tel:    (617) 345-1305<br>Fax:   (866) 947-1890<br>Email: rpedone@nixonpeabody.com<br><br>- and-<br><br>Christopher J. Fong (admitted *pro hac vice*)<br>Tower 46, 55 West 46th Street<br>New York, New York 10036-4120<br>Tel:    (212) 940-3724<br>Fax:   (855) 900-8613<br>Email: cfong@nixonpeabody.com<br><br>*Co-Counsel to Givaudan* |