**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC., *et al.*, | Case No. 23-11131 (TMH) |
| Debtors. [1] | (Jointly Administered) |

**BRIEF OF EUAGORE, LLC
AND THE FORIS PREPETITION SECURED LENDERS IN SUPPORT
OF CONFIRMATION OF PLAN OF REORGANIZATION OF AMYRIS, INC. AND
ITS AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Euagore, LLC, as DIP Lender and DIP Agent (the "DIP Secured Parties"), and the Foris

Prepetition Secured Lenders[2] (together with the DIP Secured Parties, the "Foris Lenders"), by and

through their undersigned counsel, submit this memorandum in support of confirmation of the

*Third Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and its Affiliated Debtors*

(the "Plan")[3] of Amyris, Inc. and its debtor affiliates (collectively, the "Debtors"). The Foris

Lenders hereby: (i) join in and adopt by reference the arguments made in the *Debtors'*

*Memorandum of Law in Support of Confirmation of Plan of Reorganization of Amyris, Inc. and its*

*Affiliated Debtors Under Chapter 11 of the Bankruptcy Code, and Omnibus Reply to Objections*

and the *Omnibus Reply in Support Confirmation of Plan of Reorganization of Amyris, Inc. and its*

*Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* (collectively, the "Debtors'

Confirmation Brief"), which were filed contemporaneously herewith, and other filings in support

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/Amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

[2] The Foris Prepetition Secured Lenders include Foris Ventures, LLC ("Foris"), Perrara Ventures, LLC ("Perrara"), Anesma Group, LLC ("Anesma"), Anjo Ventures, LLC ("Anjo"), and Muirisc, LLC ("Muirisc").

[3] All terms used herein that are not defined herein shall have the meanings given to them in the Plan.

of Plan confirmation; and (ii) separately write in support of approval of the Third-Party Release

and Direct Claims Injunction.

## PRELIMINARY STATEMENT

1.    The Debtors' senior secured obligations to the Foris Lenders exceed $509 million.

The DIP Facility Claims eclipse $197 million,[4] while the Foris Prepetition Secured Claims exceed

$312 million.[5]   The Debtors cannot pay these senior secured claims, as the sale of the Consumer

Brands Businesses yielded less than $30 million of gross proceeds,[6] and the Debtors' remaining

business continues to hemorrhage cash.[7]   The Debtors' continuing liquidity crisis would, without

additional life support, unquestionably herald the end of the Debtors' decades-long pursuit of

clean, sustainable, synthetic molecular creation through patented and proprietary bio-

fermentation.[8]   The DIP Lenders initially extended a lifeline to provide an opportunity for the

---

[4] *See Final Order (I) Authorizing the Debtors (A) To Obtain Postpetition Financing and (B) To Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Dkt. No. 558] (the "Final DIP Order"); *Notice of Amendment No. 1 to the Senior Secured Super Priority Debtor In Possession Loan Agreement* [Dkt. No. 263]; *Notice of Amendment No. 2 to the Senior Secured Super Priority Debtor In Possession Loan Agreement* [Dkt. No. 398]; *Notice of Filing (I) Revised Proposed Final Order (I) Authorizing the Debtors (A) To Obtain Postpetition Financing and (B) To Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief; and (II) Notice of Amendment No. 3 to the Senior Secured Super Priority Debtor In Possession Loan Agreement* [Dkt. No. 443]; *Notice of Amendment No. 4 to the Senior Secured Super Priority Debtor In Possession Loan Agreement* [Dkt. No. 517]; *Notice of Amendment No. 5 to the Senior Secured Super Priority Debtor In Possession Loan Agreement* [Dkt. No. 900]; *Notice of Amendment No. 6 to the Senior Secured Super Priority Debtor In Possession Loan Agreement* [Dkt. No. 1076]; *Disclosure Statement with Respect to Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors* [Dkt. No. 524] (the "Disclosure Statement").

[5] *See* Proofs of Claim Nos. 562, 569, 573, 598, 583, 600, 626, 578, 575, 568, 672, 576, 580, 603, 628, 629, 640, 582, 577, 621 (the "Foris Prepetition Secured Lenders' Claims") and the Disclosure Statement.

[6] *See Order (A) Approving the Sale of Substantially All of the Debtors' Assets Relating to Rose, Inc. Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Approving Assumption and Assignment of Certain Unexpired Leases and Executory Contracts; and (C) Granting Related Relief* [Dkt. No. 985]; *Notice of Closing of the Sale of MenoLabs Brand Assets* [Dkt. No. 1063]; *Notice of Closing of the Sale of Biossance Brand Assets* [Dkt. No. 1023]; *Notice of Closing of the Sale of JVN Brand Assets* [Dkt. No. 1118]; and *Notice of Closing of the Sale of Pipette Brand Assets* [Dkt. No. 1119].

[7] Disclosure Statement, Ex. E.

[8]  *See* H'rg Tr., dated October 4, 2023 ("Final DIP Evidentiary Hearing"), at 137:20-139:15 [Dkt. No. 491].

167565944v1

Debtors to reorganize.  Now, the Foris Lenders, through their support of the Plan (including the Exit First Lien Facility), continue to extend that lifeline to enable the various negotiated settlements that are the foundation of the Plan.

2.     To provide for a consensual confirmation, as opposed to liquidation and protracted litigation, the Debtors and the Foris Lenders negotiated a comprehensive series of settlements with the Creditors' Committee,[9] the Ad Hoc Group,[10] and the Ad Hoc Cross-Holder Group, Lavvan, and DSM.  The settlements provide the only mechanism available for the Debtors' stakeholders to recover, given the Debtors' dire financial condition, and for the Debtors to reorganize.  The core of the settlements is a voluntary reallocation of value to junior stakeholders that would otherwise go to the Foris Lenders on account of their senior secured claims, including:

    i.    Approximately $27,850,000 made available to fund Allowed Administrative Claims;

    ii.    $17,000,000 (and the release of liens on the Retained Causes of Action) is made available to provide a recovery to holders of Allowed Claims in Class 7 and Class 8, and to fund the Creditor Trust;

    iii.    an additional up to $21,400,000 million is made available to provide a recovery to the Debtors' stakeholders bound by the Third-Party Release; and

    iv.    $15,140,000 is made available to provide a recovery to Lavvan on account of the Allowed Lavvan Secured Claim.

---

[9] *See The Official Committee of Unsecured Creditors' Joinder and Statement in Support of the Debtors' Disclosure Statement Motion And Confirmation Scheduling Motion* [Dkt. No. 881] (the "Creditors' Committee DS Statement"); *The Official Committee of Unsecured Creditors' Statement in Support of the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization* (filed contemporaneously herewith) (the "Creditors' Committee Plan Statement"); *Declaration of Elizabeth Hu in Support of the Official Committee of Unsecured Creditors' Statement in Support of the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization* (filed contemporaneously herewith) (the "Hu Declaration"); *Declaration of Frank Merola in Support of the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization* (filed contemporaneously herewith) (the "Merola Declaration").

[10] *See Joinder of the Ad Hoc Noteholder Group to Debtors' Omnibus Reply in Support of the Disclosure Statement Motion* [Dkt. No. 882].

3.      This aggregate sum of approximately $81,390,000 million (and the release of liens on the Retained Causes of Action) is being provided by the Foris Lenders in exchange for repose, without which there would be no settlements, no funding for the Plan,  no recovery for the Debtors' stakeholders, and no reorganization, thus driving a stake in the Debtors' almost two-decades' long effort to change the world, one molecule at a time.  The wisdom, fairness and propriety of the settlements is well documented in the uncontroverted evidence.  More so, the Debtors' creditors overwhelmingly support it.  All voting classes except for Class 10 (Givaudan Contract Claims) have accepted the Plan, and the Direct Claims Threshold was substantially hurdled for holders of Claims in Class 7 (Convertible Note Claims) and Class 8 (General Unsecured Claims) and for holders of Interests in Class 14 (Amyris Equity Interests).[11]

## ARGUMENT

I.      **The Third Circuit Test For Granting A Non-Consensual Third-Party Release is Satisfied**

A.      **This Court Has Subject-Matter Jurisdiction to Confirm a Plan that Contains the Third-Party Release**

4.      Under sections 157 and 1334 of title 28 of the United States Code, the Court has subject matter jurisdiction over three types of matters:  (a) "proceedings arising under title 11," (b) "proceedings arising in a case under title 11," and (c) "proceedings related to a case under title."[12] A proceeding "aris[es] under title 11" when the Bankruptcy Code itself creates the cause of action

---

[11] *See Voting Tabulation Affidavit of Jamilla Dennis of Stretto Regarding the Second Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and its Affiliated Debtors, as Modified*, Ex. A (filed contemporaneously herewith) ("the "Voting Declaration").

[12] 28 U.S.C. § 157.  *See Mullarkey v. Tamboer (In re Mullarkey)*, 536 F.3d 215, 220 (3d Cir. 2008) ("A bankruptcy court has subject matter jurisdiction over 'all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 . . . .'"); *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) (stating that "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate.").

167565944v1

or provides the substantive right invoked,[13] while a proceeding "aris[es] in" a chapter 11 case where the claims, "by their nature, not their particular factual circumstance, could only arise in the context of a bankruptcy case."[14]   A proceeding is "related to" a bankruptcy case where "*the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy*," meaning that "the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."[15]

5.     Here, the Court has jurisdiction under its "arising under," "arising in," and "related to" subject matter jurisdiction prongs to grant the Third-Party Release and to enjoin the assertion of Direct Claims against the Foris Lenders and their Related Parties.

6.     As an initial matter, the Court's ability to confirm a plan that contains a third-party release falls comfortably within its "arising under" or "arising in" jurisdiction.[16]   The broad-based jurisdictional grant in 28 U.S.C. § 157, coupled with the statutory authority granted in sections 105 and 1123 of the Bankruptcy Code, establish a unique federal law framework for granting third-party releases.[17]   Moreover, the Foris Lenders' funding of approximately $81,390,000 of

---

[13] *Stoe v. Flaherty*, 436 F.3d 209, 217 (3d Cir. 2006).

[14] *Id.* at 218 (citing *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999) (proceeding is "core" "if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case")).

[15] *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (emphasis in original); *see also In re Combustion Eng'g, Inc.*, 391 F.3d 190, 226 (3d Cir. 2004) ("Proceedings 'related to' a title 11 case include causes of action owned by the debtor that become property of the bankruptcy estate under 11 U.S.C. § 541(a), as well as suits between third parties that conceivably may have an effect on the bankruptcy estate.") (citing *Celotex*, 514 U.S. at 308 n. 5).

[16] *See In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 261 (Bankr. D. Del. 2017), *aff'd*, 591 B.R. 559 (D. Del. 2018), *aff'd sub nom. In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126 (3d Cir. 2019) (holding that confirmation of a plan that contains a third-party release is a proceeding "arising in and arising under title 11" and thus a core proceeding that the Court has jurisdiction over).

[17] The law of the Third Circuit is clear: bankruptcy courts have both "constitutional and statutory" authority to approve plans with a non-consensual third-party release.  *See Millennium*, 945 F.3d at 137 (finding that the Bankruptcy Court indisputably had "core" statutory authority to confirm the plan containing non-consensual third party releases and considering whether "that exercise of authority comports with the Constitution" by determining whether the matter is "integral to the restructuring of the debtor-creditor relationship").

settlement consideration (and the release of liens on the Retained Causes of Action) would not be available to stakeholders unless the Third-Party Release was available.   And without the consideration, there would be no Plan for the Debtors' emergence from their Chapter 11 Cases.[18]

7.      The Court's "related to" jurisdiction provides a separate basis for the non-consensual Third-Party Release by Holders of Direct Claims because the Direct Claims could conceivably impact the Debtors' Estates.   Any Direct Claims asserted against the Released Parties would ultimately result in such party asserting claims against the Debtors' Estates or the Reorganized Debtor for the cost of defending such claims and for indemnification of losses.   The Debtors' current and former directors have rights of indemnification and reimbursement against the Debtors and Reorganized Amyris pursuant to Amended and Restated Bylaws, dated November 17, 2022 (the "Bylaws"), a separate Indemnification Agreement between the current and former directors and the Debtors,[19] and state law contribution claims.[20]   In addition to indemnification claims, the litigation of Direct Claims against any of the Foris Lenders and their Related Parties

---

[18] *Millennium*, 945 F.3d at 137 (holding that the bankruptcy court has constitutional authority to confirm a plan granting Third-Party Release when such releases are "integral to the restructuring of the debtor-creditor relationship."); *In re Boy Scouts of Am. & Delaware BSA, LLC*, 642 B.R. 504, 594 (Bankr. D. Del. 2022) ("The Third Circuit reiterated that conclusion in *Millennium* . . . it did conclude that a bankruptcy court is constitutionally authorized to confirm a plan containing non-consensual third-party releases if it concludes that the releases are integral to the debtor-creditor relationship. While I hesitate to read further into the Court's conclusion, the ruling suggests an implicit recognition that the granting of third-party release is still permissible as part of the confirmation process.") (subsequent history omitted).

[19] *See Declaration of Oksana Wright in Support of Confirmation of Third Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code*, ¶ 2 (referencing https://www.sec.gov/Archives/edgar/data/1365916/000136591622000150/a112222xex31amendedandrest.htm and https://www.sec.gov/Archives/edgar/data/1365916/000119312510144333/dex1001.htm (filed contemporaneously herewith) (the "Wright Declaration"); *See Declaration of Philip J. Gund in Support of Confirmation of Third Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code*, ¶ 30 (filed contemporaneously herewith) (the "Gund Declaration").

[20] While a "right to contribution in Delaware is created by statute," *Commonwealth Land Title Ins. Co. v. Funk,* No. CV N14C-04-199 PRW, 2015 WL 1870287, at *4 (Del. Super. Ct. Apr. 22, 2015), other jurisdictions recognize a common-law contribution claim, *see e.g.*, *Foremost Contracting & Bldg., LLC v. Go Cat Go, LLC*, No. 155049/2016, 2018 WL 4599922, at *2 (N.Y. Sup. Ct. Sep. 25, 2018).

could also lead to contract indemnity claims[21] and contribution claims under state law against the Debtors.

8.      Further, as evidenced by the Independent Director's, Creditors' Committee's, Ad Hoc Group's, and others' respective claims investigations undertaken in these Chapter 11 Cases,[22] if the Direct Claims are pursued, the Reorganized Debtors will be subject to extensive discovery and related litigation costs, delay and distraction.

9.      Thus, this Court has jurisdiction to approve the releases by holders of Direct Claims and the Direct Claims Injunction established under the Plan.

**B.      The Extraordinary Circumstances of this Case Warrant the Non-Consensual Third-Party Release**

10.     Under Third Circuit precedent, the Court may approve a non-consensual third-party release and related channeling injunctions when (a) the release and/or channeling injunction satisfy the hallmarks of fairness and necessity to the chapter 11 plan and are given in exchange for fair consideration; and (b) there are exceptional circumstances warranting such relief.[23]

11.     In analyzing whether the *Continental* hallmarks are satisfied, courts within the Third Circuit have considered the following factors articulated in *Master Mortgage*:

> i.      an identity of interest between the debtor and the third-party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;
>
> ii.     substantial contribution by the non-debtor of assets to the reorganization;

---

[21] *See* Wright Declaration, ¶ 3, Ex. A-1-A-6.

[22] The Creditors' Committee's and Ad Hoc Group's investigations are described in their respective filings in support of confirmation.  *See* Creditors' Committee Plan Statement, ¶¶ 12-15; Hu Declaration, ¶¶ 10-19; Merola Declaration, ¶¶ 8-11; *see also* Gund Declaration, ¶¶ 10-20 (discussing the investigations conducted by the Creditors' Committee, the Ad Hoc Group, and M. Freddie Reiss (the independent director)).

[23] *Gillman v. Cont'l Airlines (In re Cont'l Airlines)*, 203 F.3d 203, 217 (3d Cir. 2000) ("<u>Continental</u>") (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 937 n.9 (Bankr. W.D. Mo. 1994) ("<u>Master Mortgage</u>")); *Millennium*, 945 F.3d at 139.

iii.    the essential nature of the injunction to the reorganization to the extent that, without the injunction, there is little likelihood of success;

iv.    an agreement by a substantial majority of creditors to support the injunction, specifically if the impacted class or classes "overwhelmingly" votes to accept the plan; and

v.    provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the injunction.[24]

12.    "[T]he *Master Mortgage* factors, while helpful guideposts, are not controlling; also, they are not 'an exclusive list of considerations, nor are they a list of conjunctive requirements.'"[25] To this end, it is a well-accepted principle in the Third Circuit that no one factor is dispositive when applying a multi-factor test.[26]

13.    The evidence will demonstrate that the non-consensual Third-Party Release and Direct Claims Injunction satisfy the fair and necessary, fair consideration and exceptional circumstances requirements under *Continental*, as guided by the *Master Mortgage* factors, and thus, should be approved.

    a.    <u>There is an Identity of Interest Between Foris Lenders and Their Related Parties and the Debtors' Estates</u>

14.    Courts in this Circuit have found an identity of interest between a debtor and non-debtor on various grounds, including when:  (a) claims asserted against a non-debtor would be

---

[24] *In re Zenith Elec. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *Master Mortg.*, 168 B.R. at 937).

[25] *In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 584 (D. Del. 2018); *see also In re Mallinckrodt plc*, 639 B.R. 837, 875 n. 103 (Bankr. D. Del. 2022) (concluding that it is unnecessary to consider the *Master Mortgage* factors, but, in any event, the factors are satisfied); *In re 710 Long Ridge Road Operating Co., II, LLC*, 2014 WL 886433 at *14 (Bankr. D.N.J. Mar. 5, 2014) (holding *Master Mortgage* guideposts are "not considered requirements for the approval of third-party releases, but . . . maybe instructive to the court").

[26] *See, e.g.*, *Adlife Mktg. & Commc'n Co, Inc. v. Karns Prime & Fancy Food, Ltd.*, 2023 U.S. App. LEXIS 832, *6-7 (3d Cir. Jan. 13, 2023) (explaining that "no single factor is dispositive" when applying the six-factor test for an involuntary dismissal under Fed. R. Civ. P. 41); *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 179-180 (3d Cir. 2001) (noting courts have applied the multi-factor test for antitrust standing by "weighing the enumerated factors without giving any one factor determinative weight"); *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 234 (3d Cir. 2000) (noting that "no one factor is dispositive" when applying the multi-factor test for reverse confusion in a trademark infringement action).

167565944v1

paid from the proceeds of a debtor's insurance policy, (b) the debtors are obligated to indemnify, reimburse, or otherwise advance funds pursuant to a contractual arrangement with the non-debtor party, or (c) the debtor and non-debtor share a common goal of confirming the Plan and implementing a global settlement.[27]  All three factors are present here to establish an identity of interest among the Debtors and the Released Parties.

15.    **First**, the Debtors carry directors and officers insurance which is a potential source of recovery for Direct Claims.[28]  Courts have uniformly held that the existence of a debtor's insurance policy that can be accessed in connection with third-party claims is a basis for finding an identity of interest to support "related to" subject matter jurisdiction.[29]

16.    In *In re Quigley Co., Inc.*, the Second Circuit explained the rationale for this rule of law:

> A suit against a third-party alleging liability not derivative of the debtor's conduct but that nevertheless poses the specter of direct impact on the *res* of the bankrupt estate may just as surely impair the bankruptcy court's ability to make a fair distribution of the bankrupt's assets as a third-party suit alleging derivative liability. Accordingly, we conclude that where litigation of [the claimant's] suits against [the third-party] would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy

---

[27] *See In re Tribune Co.*, 464 B.R. 126, 187 (Bankr. D. Del. 2011) (finding that debtors and releasees "share the common goal" of confirming a plan dependent on settlement of complex multi-party litigation resulted in an "identity of interest" for purposes of the *Master Mortgage* factors); *In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004) ("identity of interest" factor supported where releasees and debtor "share a common goal of achieving a reorganization of the Debtors"); *Zenith*, 241 B.R. at 110 ("identity of interest" found where releasees "instrumental in formulating the plan" shared with the debtor the goal of "seeing that the Plan succeed and the company reorganize").

[28] *See* Gund Declaration, ¶ 30 ("Notably, the Debtors carry director and officers' insurance under wasting policies (*i.e.*, defense/litigation costs are paid out of the policy limits), with a maximum coverage of $35 million, which is a potential source of recovery for certain Direct Claims.").

[29] *See In re Quigley Co., Inc.*, 676 F.3d 45, 57 (2d Cir. 2012) (holding third-party claims' effects on insurance policy shared by debtor and released nondebtor sufficed to create "related to" jurisdiction); *In re W.R. Grace & Co.*, Case No. 01-01139 (KG), 2016 WL 6137275, at *12 (Bankr. D. Del. Oct. 17, 2016) (holding that the bankruptcy court had jurisdiction over third-party claim against insurance company because such claim could "affect the *res* of the Debtors' estate.").

167565944v1

estate … the exercise of bankruptcy jurisdiction to enjoin these suits was appropriate.[30]

17.      **Second**, former and current officers and directors benefit from contractual indemnities by the Debtors under the Debtors' corporate documents.  For example, the Bylaws provide for the indemnification of all officers and directors to the fullest extent permitted by law and provided for Amyris's payment of expenses related thereto:

  i. **Section 6.1: Indemnification of Officers and Directors**.  "Each person who was or is made a party to, or is threatened to be made a party to, or is involved in any action, suit or proceeding, whether civil, criminal, administrative, or investigative (a "Proceeding"), by reason of the fact that such person (or a person of whom such person is the legal representative), is or was a member of the Board or officer of the Corporation or a Reincorporated Predecessor (as defined below in this Section) or is or was serving at the request of the Corporation or a Reincorporated Predecessor as a member of the board of directors, officer, or trustee of another corporation, or of a partnership, joint venture, trust, or other enterprise, including service with respect to employee benefit plans (for purposes of this Article VI, an "Indemnitee"), shall be indemnified and held harmless by the Corporation to the fullest extent permitted by the DGCL as the same exists or may hereafter be amended. . . ."

  ii. **Section 6.2: Advance of Expenses**.  "The Corporation shall pay all expenses (including reasonable attorneys' fees) incurred by such an Indemnitee in defending any such Proceeding as they are incurred in advance of its final disposition. . . ."[31]

---

[30] *In re Quigley Co., Inc.*, 676 F.3d 45, 58 (2d Cir. 2012).

[31] *See* Wright Declaration, ¶ 2 (referencing https://www.sec.gov/Archives/edgar/data/1365916/000136591622000150/a112222xex31amendedandrest.htm).

18.     Moreover, the Indemnity Agreement executed by certain directors, officers and key employees[32] and Amyris provided additional indemnification rights in favor of such directors, officers and key employees:

    i.    **Section 3(a) Agreement to Indemnify**.  "In the event Indemnitee is a person who was or is a party to or witness in or is threatened to be made a party to or witness in any Proceeding by reason of an Indemnifiable Event, the Company shall indemnify Indemnitee from and against any and all Expenses and Other Liabilities incurred by Indemnitee in connection with (including in preparation for) such Proceeding to the fullest extent not prohibited by the provisions of the Company's Bylaws and the Delaware General Corporation Law ("GCL"), as the same may be amended from time to time (but only to the extent that such amendment permits the Company to provide broader indemnification rights than the Bylaws or the GCL permitted prior to the adoption of such amendment)."

    ii.    **Section 3(c) Company Obligations Primary**.  The Company hereby acknowledges that Indemnitee may have rights to indemnification for Expenses and Other Liabilities provided by a third-party ("Other Indemnitor"). The Company agrees with Indemnitee that the Company is the indemnitor of first resort of Indemnitee with respect to matters for which indemnification is provided under this Agreement and that the Company will be obligated to make all payments due to or for the benefit of Indemnitee under this Agreement without regard to any rights that Indemnitee may have against the Other Indemnitor. The Company hereby waives any equitable rights to contribution or indemnification from the Other Indemnitor in respect of any amounts paid to Indemnitee hereunder. The Company further agrees that no reimbursement of Other Liabilities or payment of Expenses by the Other Indemnitor to or for the benefit of Indemnitee shall affect the obligations of the Company hereunder, and that the Company shall be obligated to repay the Other Indemnitor for all amounts so paid or reimbursed to the extent that the Company has an obligation to indemnify Indemnitee for such Expenses or Other Liabilities hereunder.

    iii.    **Section 6(a) Advancement**.  "If requested by Indemnitee, the Company shall advance prior to the final disposition of the Proceeding all Expenses reasonably incurred by Indemnitee in connection with

---

[32] *Id*. ("the Debtors enter into an Indemnification Agreement with each new director and officer during the onboarding process and the Debtors' records reflect that the Debtors have entered into Indemnification Agreements with each of the Debtors' current directors (Geoffrey Duyk, Steven Mills, John Doerr, Julie Washington, Ryan Panchadsaram, Ana Dutra, Lisa Qi, James McCann, Frank Kung, M. Freddie Reiss, and Scott White) and current and former officers (including Han Kieftenbeld, John Melo, Eduardo Alvarez, Nicole Kelsey, and Elizabeth Dreyer).").

11

(including in preparation for) a Proceeding related to an Indemnifiable Event. Indemnitee hereby undertakes to repay such amounts advanced if, and only if and to the extent that, it shall ultimately be determined that Indemnitee is not entitled to be indemnified by the Company under the provisions of this Agreement, the Company's Bylaws or the GCL. The advances to be made hereunder shall be paid by the Company to Indemnitee or directly to a third-party designated by Indemnitee within thirty (30) days following delivery of a written request therefor by Indemnitee to the Company. Indemnitee's undertaking to repay any Expenses advanced to Indemnitee hereunder shall be unsecured and shall not be subject to the accrual or payment of any interest thereon."[33]

19.     Thus, if any of the Released Parties covered by contractual indemnity provisions being assumed under the Plan are sued on account of Direct Claims, they will have the ability to assert claims against the Debtors (as Reorganized Amyris).[34]

20.     Similarly, the Foris Lenders, and their affiliates, have indemnity rights under their respective loan agreements.[35]

21.     In light of the critical contributions provided by these parties in the negotiation and implementation of the Plan, the Plan provides that these indemnity claims continue after the Effective Date.[36]  If the Direct Claims are not released and are pursued,[37] the resulting indemnity obligations will directly impact the Estates and the reorganization efforts, as the resulting litigation will necessarily require the expenditure of time and funds by the Reorganized Debtors.  That such

---

[33] *Id.*

[34] *See* Gund Declaration, ¶ 30.

[35] *See* Wright Declaration, ¶ 3.

[36] *See* Plan at Section VI.B; Amended Plan Supplement, Exit Facility at Ex. H. (filed contemporaneously herewith), Section 6.3.

[37] The potential for such claims being pursued is not a subject of speculation.  The Ad Hoc Cross-Holder Group and Lavvan both threatened such claims *See, e.g., Challenge Period Adversary Complaint to Challenge Enforceability, Priority, and Extent of Security Interests and Liens, and For Other Relief* [Dkt. No. 1] Case No. 23-50751] and related filings; *Motion of Ad Hoc Cross-Holder Group For Appointment of Examiner Pursuant to 11 U.S.C. § 1104(C)* [Dkt. No. 651] and related filings.  The Creditors' Committee undertook an investigation of such claims and, before the Estate Claims Settlement and the Third-Party Release Settlement, such claims were asserted by such constituent.  *See* Creditors' Committee Plan Statement*, ¶¶ 12-15; Hu Declaration, ¶¶ 10-19.

167565944v1

costs, delay and distraction would be significant is evidenced by the costs, delay and distractions resulting from the investigation of such claims during the Chapter 11 Cases.[38]  Under longstanding case law, such indemnity claims establish an "identity of interest" among the Debtors and the Released Parties that triggers "related to" subject matter jurisdiction.[39]

22.    **Third**, all of the Released Parties share a unified interest in seeking approval of the Plan[40] and foundational settlements upon which it sits in lieu of pursuing costly, risky, and uncertain litigation that would negatively impact the reorganization efforts.  By jointly negotiating and supporting the Plan, the current officers and directors, the Debtors, the Foris Lenders, the Creditors' Committee, the Ad Hoc Group, the Ad Hoc Cross-Holder Group, Lavvan and DSM, collectively support the reorganization–as opposed to the liquidation–of the Debtors.  Why?  A reorganization not only provides continued employment for hundreds of employees, and a source of business for customers and vendors, but it also allows the Debtors' science team to continue the

---

[38] Gund Declaration, ¶¶ 10-20.

[39] *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release."); *Boy Scouts*, 642 B.R. at 598-99 ("BSA's Representatives also share an identity of interest with Debtors. . . . BSA's Representatives have both indemnification and advancement rights against Debtors such that a suit against them is, in essence, a suit against Debtors and/or will deplete BSA's assets."); *Millennium Lab Holdings II*, Hr'g Tr., dated December 15, 2015, at 18:6-15 [Case No. 15-12284-LSS] ("*Millennium Bench Ruling*") ("I find that there is an identity of interest between the debtors and the third parties . . . because of the indemnifications and advancement obligations discussed above.  Any litigation claims brought against the released parties will result in claims being brought for indemnification and advancements, or certainly conceivably could.  While such claims will not reduce the recoveries of those creditors receiving 100 cents on the dollar, such claims will reduce recoveries for Class 2."); *In re TK Holdings Inc.*, Hr'g Tr., dated Feb. 16, 2018, at 174:10-20 [Case No. 17-11375- BLS] [Dkt. 2109] ("There are indemnification obligations that are running in every possible direction; in addition, many, if not all of the release parties, including officer and directors of the debtor entities, are parties that would have meaningful indemnification rights . . . So, the fact of the matter is . . . litigation against the debtor is often litigation against multiple parties . . . I am satisfied that the identity of interest prong has been satisfied.").

[40] *See* Gund Declaration, ¶ 29 ("There is an identity of interest between the Debtors and the Foris Secured Parties.  The Direct Claims to be released are limited to claims held by a Releasing Party that arose from or are related to the Debtors, including, without limitation, the Debtors' assets, liabilities, operations, financings and contracts; and further, the Debtors and the Foris Secured Parties share the common goal of confirming the Plan, implementing a restructuring, and maximizing recoveries for creditors.  As discussed further herein, the Debtors and the Foris Secured Parties share the common goal of restructuring the Debtors' affairs in order for the Debtors to emerge post-Effective Date a stronger, less debt-burdened, more focused business.").

work of synthetic bio-fermentation.  As a result, all stakeholders share the common goal of implementing a mutually beneficial restructuring.  Such a shared objective has long been recognized in the case law as a basis for finding an identity of interest.

23.     Because the Debtors and the Released Parties share an identity of interest with respect to the Plan and the Third-Party Release and Direct Claims Injunction, this first *Master Mortgage* factor weighs in favor of granting the non-consensual Third-Party Release and Direct Claims Injunction.

> b.     <u>The Foris Lenders Are Making Substantial Contributions to the Debtors' Reorganization</u>

24.     The case law provides examples of what constitutes a "substantial contribution" to support a non-consensual third-party release.  These examples do not define a minimum quantum of consideration, nor require that the reorganization "hinges" on the consideration.[41]  Rather, the focus is on the consideration being "valuable and material,[42] material services being provided without compensation,[43] and the waiver of claims being critical to the reorganization effort.[44]

25.     Judge Drain's explanation of substantial contribution provides useful guidance:

> Without the settlement payments, I find that the plan would unravel, including the complex interrelated settlements that depend upon the

---

[41] The dictionary definition of substantial is straight forward: "1 a: consisting or relating to substance, b: not imaginary or illusory: real, true, c: important, essential."  *See* Substantial Definition & Meaning - Merriam-Webster, https://www.merriam-webster.com/dictionary/substantial (last visited Jan. 21, 2024).  As used in Section 1127(b) "substantial consummation" means that means that "all or substantially all of the property proposed by the plan to be transferred has been transferred," "the debtor or any successor to the debtor under the plan has assumed operation of the debtor's business or assumed possession of all or substantially all of the property dealt with by the plan" and "distributions under the plan have commenced."  *See* 11 U.S.C. § 1101(2).

[42] *In re rue21, Inc.*, 575 B.R. 314, 326 (Bankr. W.D. Pa. 2017) (finding a substantial contribution where there was valuable and material contribution to the estate though the success of the plan of reorganization was not contingent on the release at issue).

[43] *Indianapolis Downs*, 486 B.R. at 303-04 (finding substantial contribution from senior management and holders of equity and debt instruments of the debtors where post-petition services were performed for the debtors without compensation).

[44] *Am. Family Enters.*, 256 B.R. 377, 406-08 (Bankr. D.N.J. 2000) (finding substantial contribution where the parties contributed over $70 million to consummate the plan).

14

payments being supplied under the settlement in addition to the non-monetary consideration under it.

\* \* \*

It is also clear that the amount being paid under the settlement is substantial. As I noted earlier, not only is it substantial in dollar terms, I believe that it is the largest amount that shareholders have ever paid in such a context of these types of third-party claims and closely related claims for piercing the corporate veil, alter ego, and breach of fiduciary duty/failure to supervise. Moreover, the non-monetary consideration under the settlement also is substantial, including the agreement to allocation by charities to opioid abatement valued at least at $175 million, resolution of naming rights, and the public document depository.

\* \* \*

On the other hand, neither a defendant's wealth nor the amount of claims asserted against it should dictate the fairness of a settlement without considering the claims' merits, the costs and delay of continued litigation, and risks relating to the collectability of any eventual judgments.

More relevant than the prospect of full payment, therefore, is the Third Circuit's focus on the fairness of the settlement to the third-party claimants. That issue can be assessed in two ways: first, the Court's analysis, based on the evidence, of the factors for and against the settlement and, second, based on the process leading to the settlement –- that is, whether it was conducted at arms-length by well-informed and well represented parties whose interests were aligned with the third parties whose claims would be released, as well as whether those parties and the overwhelming number of parties affected by the settlement, support it.[45]

Here, the measure of the Foris Lenders' contribution is not their balance sheet, or the percentage recovery for creditors, but rather whether the consideration provided is fair given all of the relevant factors, including the merits of the claims asserted, the process that resulted in the settlement, and the support of creditors. Viewed in this light, the Third-Party Settlement Amount (in addition to

---

[45] *In re Purdue Pharma L.P.*, 633 B.R. 53, 107-108 (Bankr. S.D.N.Y. 2021), *vacated sub nom. In re Purdue Pharma, L.P.*, 635 B.R. 26 (S.D.N.Y. 2021), *rev'd and remanded sub nom. In re Purdue Pharma L.P.*, 69 F.4th 45 (2d Cir. 2023), and *aff'd sub nom. In re Purdue Pharma L.P.*, 69 F.4th 45 (2d Cir. 2023).

167565944v1

all of the other contributions and concessions made by the Foris Lenders) is demonstrably fair, and thus, a substantial contribution.[46]

26.   It "is within the bankruptcy court's discretion to determine whether the nature and size of the consideration rises to the level of a 'substantial' contribution."[47]   The bankruptcy court's determination is fact specific based upon a variety of factors focused on whether the value of the contributions to the specific estate constitutes a substantial contribution.[48]   Courts in the Third Circuit have found that non-debtors have made substantial contributions to a Plan when they have contributed, among other things, cash, capital to cover operating shortfalls after a plan's effective date, rights assigned to a trust, and/or released claims against the debtor.[49]

27.   It is unquestionable that the Foris Lenders are making substantial contributions to the Debtors' reorganization.   Confirmation of the Plan and, more importantly, the funding of distributions under the Plan, indisputably depend on a variety of material contributions from, or on behalf of, the Foris Lenders, which include commitments to:

i.   fund up to approximately $27,850,000 for payment of Allowed Administrative Expenses of the Debtors' Estates for the period November 20, 2023 through and including February 15, 2024;

ii.   fund $17,000,000 as Estate Claims Settlement Cash Consideration, which shall be distributed, in accordance with the Plan, to Class 7 and Class 8 (whether or not Class 7 or Class 8 votes to accept the Plan) and shall be used to fund the expenses of the Creditor Trust;

iii.   fund up to $21,400,000 as consideration for the Third-Party Release Settlement;

---

[46] "A well-funded trust need not pay claimants in full for the contribution to be substantial." *Boy Scouts*, 642 B.R. at 602 n. 455 (citing *Purdue Pharma*, 633 B.R. at 107).

[47] *In re rue21*, 575 B.R. at 326.

[48] *See Indianapolis Downs*, 486 B.R. at 303 (noting the factors are "neither exclusive nor are they a list of conjunctive requirements" and instead are "helpful in weighing the equities of the particular case after a fact-specific review").

[49] *Am. Family Enters.*, 256 B.R. at 406-08 (finding that a third party's contribution of more than $70 million to fund, in part, consumer fraud victim's fund, was a substantial contribution supporting protection under channeling injunction).

16

iv.     fund $15,140,000 to provide a recovery to Lavvan on account of the Allowed Lavvan Secured Claim;

v.      provide a commitment for a $160,000,000 exit facility as set forth in the Plan and the Plan Supplement; and

vi.     forego any cash distribution on account of least $197 million in DIP Facility Claims and a cash distribution on account of least $312 million in Foris Prepetition Secured Claims.

Without these substantial contributions and concessions from or on behalf of the Foris Lenders, the Debtors would not be able to confirm the Plan, let alone make any cash distributions to creditors.[50]  The Foris Lenders are the source of tens of millions of dollars of consideration that would ensure confirmability of the Plan and the continued existence of the Debtors post-confirmation.  There can be no doubt that the second of the *Master Mortgage* factors is satisfied.

c.      <u>The Releases and Injunction in Favor of the Foris Lenders are Essential to the Debtors' Reorganization</u>

28.     Courts in the Third Circuit recognize that a third-party release is appropriate where the parties receiving the third-party release are making contributions that "are absolutely essential to the reorganization."[51]  The facts and history of these Chapter 11 Cases are clear—the contributions from the Foris Lenders are the only source of recovery for stakeholders, without which litigation and liquidation would ensue.  In short, without the comprehensive settlements negotiated, which include the non-consensual Third-Party Release as a component, there would be no reorganization of the Debtors.

---

[50] *See* Gund Declaration,¶ 28 ("The significant contributions and concessions, contingent upon the Released Parties receiving a release and the benefit of the Direct Claims Injunction, have enabled the Debtors to propose a viable Plan. Without the Third-Party Releases and Direct Claims Injunction, the Debtors could not reorganize.  As discussed further herein, if this Plan fails, the vast majority of the Debtors' creditors will not recover anywhere close to the recoveries made available to creditors under the Plan.").

[51] *Millennium Bench Ruling*, at 25:3; *see also Cont'l Airlines*, 203 F.3d at 215.

29.     The non-consensual Third-Party Release and the Direct Claims Injunction were negotiated as a component of the underlying settlements and are embodied in the Plan (*i.e.*, the Estate Claims Settlement and the Third-Party Release Settlement) as a predicate to the global settlements therein, certainty of recovery, the avoidance of ongoing litigation, and a platform for the Debtors' reorganization.  The Foris Lenders are willing to make the substantial contributions and concessions, support the Plan, and fund creditors' recoveries, because the non-consensual Third-Party Release and Direct Claim Injunction provide the Foris Lenders (and their Related Parties), and the other Released Parties, finality and protection from the threat of litigation, and the foundation for the Debtors to reorganize.

30.     The importance of certainty and finality is not limited to the Foris Lenders and its Related Parties.  It extends to the Released Parties as well.  If the Released Parties are not released, that simply provides a backdoor for litigation.  This reality, and the propriety of plan releases extending to cover all parties who have an identity of interest, whether or not each party, itself, contributes to the consideration provided, has long been established.

31.     As aptly noted by Judge Drain in *Purdue Pharma*:

> Not every shareholder released party is necessarily going to make a specific payment under the plan, but the Sackler family members are obligated to cause the payments to be made, and the relationships among the shareholder released parties are sufficiently close to lead to the conclusion that the aggregate settlement payment hinges on each being released. Understandably the shareholder released parties are not going to agree to provide the consideration under the settlement without receiving the shareholder release in return.[52]

32.     Similarly, in *Millennium*, Judge Silverstein approved a non-consensual third-party release of claims against the "related parties" of the parties that provided direct contributions in support of the plan.  Judge Silverstein held:

---

[52] *Purdue Pharma*, 633 B.R. at 107.

As to TA and MLH, I find that this contribution is substantial and real. I also find, on the facts of this case, that the contribution made by TA and MLH and each individual shareholder, which settles claims against them, based on the 2014 recapitalization transaction, is made on behalf of themselves and their 'related parties,' as that term is used in the plan. ***Each of these corporate families must be protected, in order for TA and MLH to buy peace in this litigation***.[53]

33.     Without the repose provided by the Third-Party Release and Direct Claim Injunction, the Reorganized Debtors will need to expend resources defending such litigation claims and in the process will be diverted away from the task of implementing the Reorganized Debtors' turnaround.  The Foris Lenders do not want to pay tens of millions of dollars and forego any cash recovery to settle and resolve claims, only to have some subset of the Debtors' stakeholders turn around and initiate litigation that would undermine the reorganization effort.[54]

34.     Because of the various indemnification and contribution rights, any such post-confirmation litigation would necessarily impact the Reorganized Debtors.  As the experience in connection with the pre-settlement discovery, and the discovery undertaken in connection with the Plan, evidences, litigation involving the Debtors' historical operations, financing, assets, liabilities and governance imposes significant burdens on the Debtors' personnel, distracts from the effort to implement the business plan and the Debtors' operational reorganization, and requires the

---

[53] *See Millennium Bench Ruling* at 19:16-23 (emphasis added); *see also Mallinckrodt*, 639 B.R. at 877-881, 910 (confirming plan and approving non-consensual third party releases where directors and officers had not contributed to the trust directly but where opioid claimants receive consideration in the form of a well-funded settlement trust).

[54] *See In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014) ("Second, the Court wil[l] permit Third Party Releases for claims that ***would trigger indemnification or contribution claims against the Debtors*** and thus impact the Debtors' reorganization. … Indeed, the Debtors represented that certain pre-petition credit agreements as well as bylaws covering the directors and officer, which, if respected, ***would eradicate many of the benefits of the Plan***.") (emphasis added).

expenditure of considerable funds.[55]  Avoiding the material, adverse impact on the Reorganized

Debtors that would flow from unfettered post-confirmation litigation is essential to the

Reorganized Debtors' ability to achieve their restructuring goals.

35.     Moreover, the Debtors' alternative to the Plan is liquidation.  The Debtors'

Consumer Brands Businesses sold for less than $30,000,000, while the ***Debtors received no***

***qualifying offers*** for their Other Assets.[56]  The Debtors have no alternative source for funding a

reorganization—including funding unpaid administrative expenses.  Without the Foris Lenders'

contributions, the Debtors could not fund a plan of reorganization and would likely need to turn to

chapter 7, which would cause a swift and severe destruction of the value of these Estates and loss

of countless jobs.  It is not speculative to predict that failure of this Plan would result in the

Debtors' liquidation, send all parties directly into full-scale litigation, and result in a worse

recovery (and no recovery at all for certain stakeholders).[57]

36.     As demonstrated by the Plan Support Agreement and negotiation of and

overwhelming support for the Plan and the settlements embodied therein, it is clear that the

Debtors, the Foris Lenders, and the primary creditor constituents prefer the certainty of the

substantial recoveries provided for under the Plan's restructuring scenario and the opportunity for

the Debtors to continue their mission.  As demonstrated in the Voting Declaration, all Voting

Classes except for Class 10 (Givaudan Contract Claims) overwhelmingly accepted the Plan, and

---

[55] *See* Gund Declaration, ¶31 ("Further, as the recent expensive and protracted experience in connection with the pre-settlement discovery and the Plan related discovery . . . illustrate, litigation involving the Debtors' historical operations, financing, assets, liabilities and governance, and other Direct Claims that could be potentially asserted, will in all likelihood impose significant burdens on Reorganized Amyris' personnel, distract from the efforts to implement the business plan and operational reorganization of Reorganized Amyris, and require the expenditure of considerable funds.  Avoiding the material, adverse, impact on Reorganized Amyris that would flow from post-confirmation litigation is essential to Reorganized Amyris' ability to achieve its restructuring goals.").

[56] *Notice of Cancellation of Auction for the Debtors' Lab-to-Market Assets* [Dkt. No. 1151].

[57] Disclosure Statement, Ex. D.

there were nominal opt outs cast by holders of Class 8 Claims and holders of Interests. Thus, there is overwhelming support for the Third-Party Release and Direct Claims Injunction and the consideration provided in exchange. In this context, the non-consensual Third-Party Release is a necessary and important building block of both the Plan and the Debtors' reorganization.

37. In *Millennium*, Judge Silverstein found the non-consensual third-party releases were a necessary component of the plan as they were required to obtain the funding for the plan and induced creditor groups to execute the restructuring support agreement. Based on the evidence presented, absent the settlement containing third-party releases, the debtor would have been forced to "liquidate and all going concern [would have been] lost."[58] Judge Silverstein held "it is clear that the releases are necessary to both obtaining the funding and consummating a plan. *In these cases, the funding does not merely enhance creditor recoveries; it is necessary for the debtor to confirm the plan*."[59]

38. Akin to the factual predicates in *Millennium*, the record of this case and the evidence submitted in support of confirmation of the Plan demonstrates that without the non-consensual Third-Party Release and the settlements that are tied to it, the Debtors would be faced with a liquidation and speculative and unknowable recoveries from a multi-front litigation war in a chapter 7 liquidation. More importantly, numerous jobs will be lost and the Debtors' technological breakthroughs will be put in jeopardy.

---

[58] *Millennium Bench Ruling* at 23:3-4.

[59] *Id.* at 23:5-8 (emphasis added).

(i)     *The Consensual Third-Party Release Alternative Does Not Render The Non-Consensual Third-Party Release Unimportant or Unnecessary to the Success of the Reorganization.*

39.     The Office of the United States Trustee (the "U.S. Trustee"), the U.S. Securities and Exchange Commission (the "SEC"), and Givaudan SA (together with its direct and indirect subsidiaries, "Givaudan") object to the Plan's non-consensual Third-Party Release primarily arguing that the non-consensual Third-Party Release should not be approved because the Plan contains a consensual Third-Party Release as a backstop, and, therefore, the non-consensual Third-Party Release is not necessary to confirm the Plan.  The U.S. Trustee argues:  "The non-consensual releases, therefore, are not necessary to reorganization here because the Plan provides expressly that it can be confirmed *without* approval of the non-consensual releases."[60]  The SEC argues: "Here, the Debtors have contradicted themselves by simultaneously asserting that the nonconsensual releases are essential to the reorganization and that that [sic] an opt-out release would also suffice to confirm the Plan."[61]  Givaudan argues:  "The Plan can readily be confirmed and effectuated without non-consensual third-party releases, and the very incorporation of alternate recoveries in the event of consensual releases shows that the Debtors' reorganization does not depend on the provision of such releases."[62]

40.     The U.S. Trustee's, SEC's, and Givaudan's "but for" test for necessity of a third-party release fails for several reasons.  **First**, as noted above, the applicable test for approval of a

---

[60] *See Objection of the United States Trustee to Confirmation of Second Amended Joint Chapter 11 Plan or Reorganization* [Dkt. No. 1154], ¶¶ 1, 30 (the "U.S. Trustee Objection") ("Because the Plan provides expressly that it can be confirmed without approval of the non-consensual releases, *ipso facto* the non-consensual releases are not necessary.")

[61] *Limited Objection of the U.S. Securities and Exchange Commission to Confirmation of the Debtors' Second Amended Joint Plan of Reorganization* [Dkt. No. 1150] at 6 (the "SEC Objection").

[62] *Givaudan SA's Objection to the Second Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors, as Modified* [Dkt. No. 1168], ¶ 19 (the "Givaudan Objection").

167565944v1

non-consensual third-party release does not turn on any one element of the test. The test requires a wholistic analysis of all of the relevant facts and circumstances.[63]

41.    **Second**, the applicable test is not whether the proposed non-consensual third-party release is a condition precedent to confirmation or the effectiveness of the plan of reorganization. No case requires that the releases are a condition precedent to confirming a plan of reorganization. Indeed, no objecting party cites any case law to support this proposition. Rather, the case law is clear that equating "necessary" or "essential" with a condition precedent to confirmation or the plan going effective would be an impermissible bootstrap that would "set the law on its head."[64]

42.    The caselaw cited by both the U.S. Trustee, the SEC, and Givaudan supports the principle that the focus of the necessity/essential inquiry is on the *success of the reorganization*. For example, the U.S. Trustee, SEC, and Givaudan each cite the Third Circuit's decision in *Continental*, which describes the test as "*necessity to the reorganization*."[65]  Similarly, the SEC cites to Second Circuit's decision in *In re Purdue Pharma L.P.* for the proposition that "the bankruptcy court had statutory authority to impose nonconsensual third-part releases only if the bankruptcy court found that the releases met a variety of factors including whether the *nonconsensual releases are necessary for the reorganization*, the non-debtor contributed substantial assets to the reorganization and whether the plan provides for the fair payment of enjoined claims."[66]

---

[63] *See supra* at n. 25.

[64] *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 269 (Bankr. S.D.N.Y. 2007) ("It would set the law on its head if parties could get around it by making a third party release a *sine qua non* of their deal, to establish a foundation for an argument that the injunction is essential to the reorganization, or even 'an important part' of the reorganization."); *see also In re Chemtura Corp.*, 439 B.R. 561, 611 (Bankr. S.D.N.Y. 2010) (finding that the court could not approve third-party releases on the same grounds as in *Adelphia*); *Millennium*, 945 F.3d at 139 (warning against third-party release gamesmanship by plan sponsors).

[65] U.S. Trustee Obj., ¶ 25; SEC Obj. at 5; Givaudan Obj., ¶ 18.

[66] SEC Obj. at 5.

23

43.     The U.S. Trustee and Givaudan each cite to *In re Genesis Health Ventures, Inc.* arguing that the non-consensual Third-Party Release should be rejected because the Debtors' reorganization does not hinge on the non-consensual Third-Party Releases.[67]  In *Genesis*, the court observed that post-emergence litigation was unlikely and, therefore, would have no impact on the success of the debtors' reorganization.[68]  To the contrary, pre-settlement litigation and discovery in these Chapter 11 Cases evidences that post-emergence litigation against the Released Parties is likely to be costly and impose significant burdens on the Debtors' personnel distracting them from implementing the business plan and the reorganization contemplated by the Plan.[69]  Moreover, in *Genesis*, the court criticized the parties' financial contribution to the debtors as "marginal" and noted that the court was "uncertain" if a feasible plan could have been presented without the parties' financial contribution.[70]  Here, the record of these Chapter 11 Cases and the Gund Declaration[71] reflect the undeniable truth that Debtors' reorganization absolutely depends on a variety of material contributions and concessions from, or on behalf of, the Foris Lenders (as summarized in Paragraph 27 hereof).

---

[67] U.S. Trustee Obj., ¶ 27-28; Givaudan Obj., ¶ 16.

[68] *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 608 (Bankr. D. Del. 2001).

[69] *See* Gund Declaration,¶ 31.

[70] *Genesis*, 266 B.R. at 608.

[71] *See* Gund Declaration,¶ 28.

167565944v1

44.     **Third**, as is clear from the case law, the necessity and essential formulations focus on the success of the reorganization itself.[72]   That is, the reorganization of the debtors' business and its post-confirmation operations.   The Foris Lenders have made substantial contributions and concessions in order to facilitate and support the reorganization of the Debtors' business in exchange for repose and finality enabled by the non-consensual Third-Party Release.   Neither the U.S. Trustee nor the SEC have argued or presented any evidence in support of the position that the Debtors can reorganize their business without the substantial contributions and concessions made by the Foris Lenders.

45.     **Fourth,** section 362(d)(2)(B) of the Bankruptcy Code provides an apt analogy to provide the analytical framework for applying the *Continental* "necessity" factor and the "essential" *Master Mortgage* factor.   Section 362(d)(2)(B) sets forth the following standard for relief from stay against property: "(2) with respect to a stay or an act against property under subsection (a) of this section, if (A) the debtor does not have equity in such property; and (B) such property is not necessary to an effective reorganization."[73]   In other words, even if a debtor does not have equity in property, relief from stay will not be granted if the property is "necessary to an effective reorganization."   In considering what it means for property to be "necessary" to an effective reorganization, the Supreme Court has instructed that the focus of the test is not merely the property itself (*i.e.*, that the "property will be needed"), but rather "that the property is essential

---

[72] *See, e.g.*, *Millennium*, 945 F.3d at 137 (on appeal noting the bankruptcy court had considered the release provisions thoroughly and concluded these provisions were critical to success of the debtor's plan)*; see also In re Long Ridge Road Operating Co. II LLC*, 2014 WL 886433, at *15 (Bankr. D.N.J. Mar. 5, 2014) (finding necessary factor satisfied where "contributions by [releasees were] absolutely necessary to a successful reorganization"); *In re W.R. Grace & Co.*, 446 B.R. 96, 138–39 (Bankr. D. Del. 2011) (finding that substantial contributions were critical for debtor's reorganization and would not be made absent non-consensual third-party release; therefore, releases were necessary under *Continental*).

[73] 11 U.S.C. § 362(d)(2).

for an effective reorganization *that is in prospect*."[74]  In order words, "there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'"[75]

46.     As such, even where the property in question is the debtor's only asset, that is not sufficient in and of itself for a debtor to meet its burden under section 362(d)(2)(B).  The debtor must also show the property is essential for a reorganization that is in prospect.[76]

47.     That the inquiry under section 362(d)(2)(B) is directed at the debtor's ability to reorganize, as distinguished from the composition of the debtor's assets and the specific property that is subject of the stay, has been echoed by the Third Circuit.  In *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, the Third Circuit observed: "[t]he 'effective reorganization' requirement enunciated by the Supreme Court … require[s] a showing by a debtor …that a proposed or contemplated plan is not patently unconfirmable and has a realistic chance of being confirmed."[77]  Following *Timbers*, courts in the Third Circuit do not begin the analysis with the relative necessity of the property in question, but rather"[i]f no reorganization of the debtor is

---

[74] *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375-76 (1988) (emphasis in original).

[75] *Id.*

[76] *See e.g., Nantucket Investors II v. California Fed. Bank (In re Indian Palms Assocs.)*, 61 F.3d 197, 209 (3rd Cir. 1995) ("In a single-asset bankruptcy case like this one, the property will almost always be necessary for reorganization for the very reason that it is the debtor's sole asset, and relief under 362(d)(2)(B) will be available only if the bankruptcy court concludes that reorganization within a reasonable time is not feasible."); *Timbers*, 484 U.S. at 376 (noting that the requirement that the property be "necessary to an effective reorganization" requires a showing that there is a "reasonable possibility of a successful reorganization within a reasonable time"); *In re Mount Moriah Baptist Church, Inc.*, 2010 Bankr. LEXIS 1611 at *13 (Bankr. S.D.N.Y. 2010) (where property at issue was essentially the debtor's only property, debtor "has not provided this Court with any tangible proof to indicate that a reorganization is possible, let alone likely."); *In re Jer/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 308 (Bankr. D. Del. 2011) (relief from stay granted even though property in question was debtor's only asset where "there are no purchase offers, settlement funds, net operating losses or other assets available to fund a reorganization" ).

[77] 987 F.2d 154, 157 (3d Cir. 1993) (internal citation omitted).

26

feasible, then no property of the debtor can be necessary for that end."[78]  Case law within this Circuit highlights application of this principle.[79]

48.    As the foregoing demonstrates, it is a debtor's reorganization prospects that are  the touchstone for analysis under section 362(d)(2)(B) and not merely the debtor's property that is protected by the stay.  In the same manner that "necessary to an effective reorganization" as used in section 362(d)(2)(B) requires analysis of the reasonable likelihood of a debtor's reorganization, so too here, it is the Debtors' reorganization prospects that provide the context for whether the non-consensual Third-Party Release are "necessary" or "essential."  Just as it is insufficient for a debtor to argue that its only property is *per se* necessary for an effective reorganization, it is insufficient for the U.S. Trustee and the SEC to argue that the non-consensual Third-Party Release cannot be necessary if a plan that does not contain such releases would also be confirmable.  In each case, the argument seeks to prove too much—here by suggesting a "but for" or "per se" rule that if the Debtors could reorganize without the non-consensual Third-Party Release, it is by definition not necessary or essential.  However, what *Timbers* teaches is that such "but for," or "per se" rules are not the gravamen of the meaning of "necessary" or "essential."  Rather it is the debtor's ability to successfully reorganize that drives the "necessary" analysis.  Here, as the evidence amply demonstrates, providing the Reorganized Debtors certainty and repose of litigation

---

[78] *In re Dublin Properties*, 12 B.R. 77, 80 (Bankr. E.D. Pa. 1981).

[79] *Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland Dev. Group)*, 16 F.3d 552, 568 (3rd Cir. 1994) (where debtor could not obtain post-petition financing, and unsecured deficiency claim precluded unsecured creditor class acceptance, "an effective reorganization of Swedeland is not realistically possible"); *PNL Newco II, LLC v. Hershey Office, L.P. (In re Hershey Office, L.P.)*, No. 1:13-BK-04745MDF, 2013 WL 6834799, at *5 (Bankr. M.D. Pa. Dec. 20, 2013) ("No evidence was presented that Debtor's plans for reorganizing its affairs is anything more than a pipe dream.  Accordingly, I also conclude that PNL is entitled to relief from stay under §362(d)(2)"); *In re Ripley*, 412 B.R. 690, 702 (Bankr. E.D. Pa. 2008) (relief from stay denied even though debtor lacked equity in the property at issue: "Given the extensive amount of planning work that has already been done with regard to the Property, and the fact that the cost of approvals will be paid by a prospective developer, the Court concludes that the Debtor's Plan to market and sell the Property within a year—despite the fact that he currently has no equity in the Property—is in fact feasible.").

to support its reorganization (and avoidance of the negative consequences of not having such certainty and repose) hurdles the threshold to establish the "necessity" and "essential" nexus between the Third-Party Release and the Debtors' reorganization.

        d.    An Overwhelming Majority of Creditors Support the Plan and the Releases

49.    The strong support of relevant parties in interest, both on a global and individualized basis, weighs heavily in favor of approval of the non-consensual Third-Party Release and Direct Claim Injunction. As set forth in the Debtors' Confirmation Brief and Voting Declaration, 100% of holders of Claims in Class 7 (Convertible Note Claims) and 96.3% of holders of Claims in Class 8 (General Unsecured Claims) voted in favor the Plan.[80] Likewise, holders of Claims in Class 4 (RealSweet Secured Claims), Class 5 (DSM Other Secured Claims), Class 6 (Lavvan Secured Claims), and Class 9 (DSM Contract Claims) voted in favor the Plan.[81]

50.    More wholistically, over 97% in both number of claimants and percentage of amount have voted in favor of the Plan and thus, the non-consensual Third-Party Release and Direct Claim Injunction. Additionally, the Creditors' Committee, the Ad Hoc Group, and the Ad Hoc Cross-Holder Group, among other creditors and other additional stakeholders, support the Plan—including the non-consensual Third-Party Release and Direct Claim Injunction.

51.    The non-consensual Third-Party Release and Direct Claim Injunction, as ultimately embodied in the Plan, were the product of intense, good-faith, and arm's-length negotiations between the Debtors and these constituencies that were aimed at ensuring that affected claimants received fair treatment.

---

[80] Voting Declaration, Ex. A.

[81] *Id*.

167565944v1

52.     Accordingly, the non-consensual Third-Party Release and Direct Claim Injunction clearly satisfy the requirements of the fourth *Master Mortgage* factor.

e.     The Plan Fairly Treats the Third-Party Releasing Parties

53.     As set forth above, the Foris Lenders are making substantial financial contributions and other concessions in connection with the Plan in exchange for the requested non-consensual Third-Party Release and Direct Claim Injunction.  These contributions are necessary to fund the Effective Date Funding Amount, facilitate recoveries to creditors through the Estate Claims Settlement, the Third-Party Release Settlement, and the Lavvan Settlement, which recoveries would not otherwise be available to creditors, enable the funding of the Creditor Trust, and enable the Debtors to emerge from chapter 11 with a viable go-forward business.  None of this could happen without funding provided by the Foris Lenders.

54.     That creditors are paid in full is not the test of fairness.  Rather, the test is one of overall fairness.[82]  As such, to measure fairness, courts focus on the recovery to creditors relative to alternative outcomes.

55.     For example, in *W.R. Grace*, the Court approved a non-consensual third-party release that provided certain and significant recoveries where, absent the release and settlement, substantial expenses would be incurred by the estate and creditors' recoveries after litigation were uncertain.[83]  Similarly, in *In re PNG Ventures, Inc.*, the court approved a non-consensual third-

---

[82] *See In re Exide Holdings*, 2021 WL 3145612 at *13 (noting "to grant non-consensual releases, a court must assess fairness" and holding that the releases parties' contributions and third parties releases were "necessary to the process"); *Boy Scouts*, 642 B.R. at 607; *Millennium*, 591 B.R. at 586 (finding "payment in full" factor satisfied where recoveries to affected creditors dwarf recoveries in a liquidation); *710 Long Ridge Road*, 2014 WL 886433 (approving third-party releases where class rejected plan, but receiving at least a 33% recovery of contingent and unliquidated claims, well in excess of liquidation value); *see also Purdue Pharma*, 633 B.R. at 107 ("More relevant than the prospect of full payment, therefore, is the Third Circuit's focus on the fairness of the settlement to the third-party claimants") (citing *Exide Holdings*, 2021 WL 3145612 at *13).

[83] *W.R. Grace*, 446 B.R. at 138–39.

party release where, absent such release and settlement, unsecured creditors would otherwise be "out of the money" and would receive no distribution under the plan.[84]

56.     The non-consensual Third-Party Release and the Direct Claims Injunction are fair because based upon the facts presented:

> i.     The value of the Debtors is substantially less than the $509 million in secured obligations owed to the Foris Lenders.[85]
>
> ii.     To recover on the Estates' claims and Causes of Action to be released, creditors would have to recover in excess of $509 million (the amount owed on account of the DIP Facility Claims and Foris Prepetition Secured Claims).[86]
>
> iii.     Without the global settlements embodied in the Plan, and the funding provided by the Foris Lenders, the Debtors would not be able to pay accrued Administrative Claims and would be forced to liquidate under Chapter 7.[87]
>
> iv.     There is a substantial overlap, if not identical, overlap between the Estates' claims and Causes of Action and the Direct Claims that could be asserted against the Foris Lenders and their Related Parties, as such claims are predicated upon substantially the same operative facts.[88]
>
> v.     The record demonstrates that the Amyris' Board of Directors engaged in independent and thorough decision making,[89] specifically, there were no payments made to any of the Released Parties that could be clawed back as preferences or fraudulent

---

[84] Case No. 09-13162 (Bankr. D. Del. Mar. 5, 2010) [Dkt. No. 368]; *see also Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1079-1081 (11th Cir. 2015) (noting that the proposed "plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction" and finding that "[t]his factor weighs heavily in favor of the releases") (internal citations omitted).

[85] *See supra*, n. 4-5; Disclosure Statement, Ex. E.

[86] *See* Final DIP Order, §§3(a), F(i)(b); Foris Prepetition Secured Lenders' Claims.

[87] *See* Final DIP Order, Ex. A-1 (Plan Budget) and A-2 (Sale Budget); the Plan, Art. II; Gund Declaration, ¶ 28.

[88] *See* Disclosure Statement, Art. 4F; *Debtors' Objection to the Motion of the Ad Hoc Cross-Holder Group for Appointment of Examiner Pursuant To 11 U.S.C. § 1104(C)*, ¶¶ 24-34 [Dkt. No. 827]; Gund Declaration, ¶ 30; Creditors' Committee Statement, ¶ 6.

[89] *See Debtors' Objection to the Motion of the Ad Hoc Cross-Holder Group for Appointment of Examiner Pursuant To 11 U.S.C. § 1104(C)*, ¶ 17 [Dkt. No. 827]; *Declaration of Steven W. Golden in Support of Debtors' Objection to the Motion of the Ad Hoc Cross-Holder Group for Appointment of Examiner Pursuant To 11 U.S.C. § 1104(C)* [Dkt. No. 829].

conveyances[90] and the terms and conditions of the loans made by the Foris Lenders were fair and appropriate and not out of the ordinary.[91]

57.    Accordingly, the non-consensual Third-Party Release and Direct Claim Injunction satisfies the fifth *Master Mortgage* factor as well.  "Regardless, payment in full is only one of the five *Master Mortgage* factors and is not necessary to meet the *Continental* hallmarks."[92]

## II.    Alternatively, The Third-Party Release Is Appropriate as a Consensual Release

58.    If this Court declines to grant the non-consensual Third-Party Release and Direct Claim Injunction, the consensual Third-Party Release and the Direct Claims Injunction are appropriate under applicable law in the Third Circuit as to those holders of Claims and holders of Interests that received notice of the Third-Party Release and were eligible to opt out of granting the Third-Party Release and failed to do so.

59.    The U.S. Trustee and the SEC argue that for the Third-Party Release to be consensual, affirmative consent is required.[93]  The U.S. Trustee also takes the position that the opt out process for Third-Party Release is only appropriate in mass tort cases.[94]  But this is not the law

---

[90] *Schedules of Assets and Liabilities and Statements of Financial Affairs* [Dkt. No. 5, Case No. 23-11132], *Schedules of Assets and Liabilities and Statements of Financial Affairs* [Dkt. No. 5, Case No. 23-11138], *Schedules of Assets and Liabilities and Statements of Financial Affairs* [Dkt, No. 5, Case No. 23-11134], *Schedules of Assets and Liabilities and Statements of Financial Affairs* [Dkt. No. Case No. 23-11136], *Schedules of Assets and Liabilities and Statements of Financial Affairs* [Dkt. No. 335, Case No. 23-11131], *Schedules of Assets and Liabilities and Statements of Financial Affairs* [Dkt. No. 5, Case No. 23-11131], *Schedules of Assets and Liabilities and Statements of Financial Affairs* [Dkt. No. 5, Case No. 23-11137], *Schedules of Assets and Liabilities and Statements of Financial Affairs* [Dkt. No. 4 Case No. 23-11226], *Schedules of Assets and Liabilities and Statements of Financial Affairs* [Dkt. No. 4 Case No. 23-11225], *Schedules of Assets and Liabilities and Statements of Financial Affairs* [Dkt. No. 4 Case No. 23-11224], *Schedules of Assets and Liabilities and Statements of Financial Affairs* [Dkt. No. 5 Case No. 23-11139].

[91] *See* Final DIP Evidentiary Hearing, at 224-225.

[92] *Boy Scouts*, 642 B.R. at 607.

[93] U.S. Trustee Obj., ¶¶ 33-44; SEC Obj. at 7-9.

[94] U.S. Trustee Obj., ¶ 37.

of the Third Circuit.  Indeed, this Court rejected similar arguments[95] as recently as October 5, 2023,[96] and it should do so again here.  As set forth below, the consensual Third-Party Release is appropriate under the specific facts and circumstances of these Chapter 11 Cases and entirely consistent with precedent in this jurisdiction, and should be approved.

60.     In accordance with the Solicitations Procedures Order, the Debtors sent solicitation packages to holders of claims and interests against the Debtors containing, as applicable, Non-Voting Class Notices (as defined in the Solicitation Procedures Order) and Opt Out Election Forms (as defined in the Solicitation Procedures Order) that enabled relevant holders to opt out of the Third-Party Release.  As discussed in more detail above below, these solicitation packages included the proposed Third-Party Release, prominent instructions on how to opt out of them, and conspicuous disclaimers that these releases will be binding on all such holders if they did not timely opt out of them.  Moreover, to facilitate the voting and opt out process, the holders were permitted to submit Ballots and Opt Out Election Forms electronically using the Solicitation Agent's on-line electronic ballot portal.

61.     The Debtors provided clear notice of the Third-Party Release and the ability to opt out in bolded text directly on the Voting Class Notice of Confirmation Hearing, Ballots, the Non-Voting Class Notices, and the Opt Out Election Form.  Likewise, the Debtors specifically annexed the release language from the Plan to the Voting Class Notice of Confirmation Hearing and the Non-Voting Class Notices.

62.     For example, on each Ballot, the text reads as follows:

---

[95] *See Objection of the United States Trustee to Confirmation [sic] of the Second Amended of Tritek International Inc. and its Affiliated Debtors* [Case No. 23-10520 (TMH) Dkt. No. 474] (the U.S. Trustee argued that affirmative consent to the third-party release is required in order for such release to be consensual in a non-mass tort chapter 11 case).

[96] *See In re Tritek International, Inc. et al.*, Hr'g Tr., dated October 5, 2023 at 63:22-64:8 [Case No. 23-10520 (TMH)] [Dkt. No. 512] ("*Tritek*").

**Item 2.  Releases.**  The undersigned, the holder of a Claim as indicated in Item 1, above, hereby elects to opt out of granting the Third-Party Release set forth in the Plan, **the relevant provisions of which are attached as Annex A to the enclosed Confirmation Hearing Notice and more fully described in the Solicitation Materials**. (Check if applicable):

☐  Opt Out of granting the Third-Party Release

**If you vote to accept the Plan, you shall be deemed to have consented to granting the Third-Party Release in the Plan.  If you fail to check the box or leave this Item blank, you will be deemed to have consented to granting the Third-Party Release and you will be deemed a Releasing Party.  Even if you check the box, the Court may deem your acceptance of the Plan on a non-consensual basis as consent to granting the Third-Party Release and that you are bound by such release.**

63.    And, each Opt Out Election Form for a holder of a Claim in a Non-Voting Class provided:

**Release Opt Out**: The undersigned, the Holder of a Claim in a Non-Voting Class, hereby elects to opt out of granting the Third-Party Release set forth in the Plan, **the relevant provisions of which are attached as Annex A to the enclosed Non-Voting Class Notice**. [Check box]

☐  Opt Out of the granting the Third-Party Release

64.    And, each Opt Out Election Form for a Holder of an Interest in a Non-Voting Class provided:

**Release Opt Out**: The undersigned, the Holder of an Interest in a Non-Voting Class, hereby elects to opt out of granting the Third-Party Release set forth in the Plan, **the relevant provisions of which are attached as Annex A to the enclosed Non-Voting Class Notice**. [Check box]

☐  Opt Out of granting the Release Provisions

65.    The Voting Class Notice of Confirmation Hearing and the Non-Voting Class Notices contained the following disclaimer:

**PLEASE TAKE NOTICE: ARTICLE IX OF THE PLAN CONTAINS CERTAIN RELEASES, EXCULPATION PROVISIONS AND INJUNCTIONS, INCLUDING THIRD-PARTY RELEASES**

**THESE PROVISIONS ARE SET FORTH IN THE ATTACHED ANNEX A**

33

66.     Moreover, the Non-Voting Class Notices explained that the holders of Interests or Claim, as applicable, will be subject to the Third-Party Release unless they complete the Opt Out Election Form and return it to the Solicitation Agent:

Notice of Confirmation Hearing and Related Matters (Non-Voting Classes/Holders of Interests)

**You are the Holder of an Interest in a Non-Voting Class.**

***Non-Consensual Third-Party Release***

**The Debtors will seek approval of the Third-Party Release based upon the standard for approval of non-consensual third-party release. All Holders of Claims or Interests in Voting and Non-Voting Classes will be deemed to have consented to the Third-Party Release set forth in Article IX.D of the Plan (as set forth in full in the attached Annex A).**

***Opt Out Election***

**In the event the Bankruptcy Court does not approve the Third-Party Release on a non-consensual basis, the Third-Party Release will be deemed a settlement offer to the holders of Direct Claims, and each Holder of an Interest in a Non-Voting Class that is a holder of a Direct Claim may voluntarily elect to receive its pro rata portion of the Third-Party Release Settlement Amounts to which it is entitled, provided the Direct Claims Threshold is satisfied. <u>If you do not want to consent to granting the Third-Party Release set forth in Article IX.D of the Plan, you must complete the attached Opt Out Election Form and return it to the Solicitation Agent in the manner indicated by January 16, 2024, at 5:00 p.m.</u> A failure to make and submit the Opt Out Election Form will be deemed consent to granting the Third-Party Release.**

Notice of Confirmation Hearing and Related Matters (Non-Voting Classes/Holders of Claims)

**You are the Holder of a Claim in a Non-Voting Class.**

***<u>Non-Consensual Third-Party Release</u>***

**The Debtors will seek approval of the Third-Party Release based upon the standard for approval of non-consensual third-party release. All Holders of Claims or Interests in Voting and Non-Voting Classes will be deemed to have consented to the Third-Party Release set forth in Article IX.D of the Plan (as set forth in full in the attached Annex A).**

***<u>Opt Out Election</u>***

**In the event the Bankruptcy Court does not approve the Third-Party Release on a non-consensual basis, the Third-Party Release will be deemed a settlement offer to the holders of Direct Claims, and each Holder of Claims in a Non-Voting Class that is a holder of a Direct**

**Claim may voluntarily elect to receive its pro rata portion of the Third-Party Release Settlement Amounts to which it is entitled, provided the Direct Claims Threshold is satisfied. If you do not want to consent to granting the Third-Party Release set forth in Article IX.D of the Plan, you must complete the attached Opt Out Election Form and return it to the Solicitation Agent in the manner indicated by January 16, 2024, at 5:00 p.m.  A failure to complete and submit the Opt Out Election Form will be deemed consent to granting the Third-Party Release.**

67.     The Voting Class Notice of Confirmation Hearing and the Ballots provide sufficient notice of and an opportunity for holders of claims in voting classes to opt out of granting the Third-Party Release contained in the Plan.  The detailed disclosures and instructions provided on how to opt out are consistent with the precedent cases in which the releasing parties included impaired parties that declined to opt out of the Plan.[97]

68.     The Non-Voting Class Notices and the Opt Out Election Form provide sufficient notice of, and an opportunity for holders of claims or interests in the non-voting classes to opt out of granting the Third-Party Release contained in the Plan.  Courts in this District and others have held that third-party releases may appropriately be deemed consensual even where affected claimants or interest holders are impaired and/or in classes that are deemed to accept or reject the plan where they are given an opportunity to opt out of such releases.[98]

---

[97] *See Indianapolis Downs*, 486 B.R. at 306 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the third-party release may be properly characterized as consensual and will be approved.").

[98] *See, e.g.*, *In re Insys Therapeutics, Inc.*, No. 19-11292 (KG) (Bankr. D. Del. Jan. 16, 2020) [Dkt. No. 1121] (approving Third-Party Release in which holders of claims or interests in classes deemed to reject where there was clear notice of the opt-out requirement); *In re Hexion Holdings LLC*, No. 19-10684 (KG) (Bankr. D. Del. June, 25, 2019) [Dkt. No. 920] (confirming a plan with a third-party release that included as releasing parties all holders in classes deemed to reject that did not file a timely objection to confirmation of the plan with respect to the releases); *In re EV Energy Partners, L.P.*, No. 18-10814 (CSS) (Bankr. D. Del. May 17, 2018) [Dkt. No. 238] (confirming a plan where holders in deemed rejecting classes had to affirmatively opt out of a third-party release); *In re Castex Energy Partners, L.P.*, No. 17-35835 (Bankr. S.D. Tex. Feb. 27, 2018) [Dkt. No. 448] (confirming plan and approving Third-Party Release where releasing creditors included holders of claims or equity interests in classes in presumed to reject the Plan who did not opt out of the releases); *In re GenOn Energy, Inc.*, No. 17-33695 (Bankr. S.D. Tex. Dec. 12, 2017) [Dkt. No. 1250] (confirming plan and approving a third-party release where the releasing parties included all holders of claims and interests, including those in classes deemed to reject, who did no opt out of or object to the releases).

69.     Notably, the Releasing Parties here either (i) voted to accept the Plan; (ii) abstained from voting on the Plan or voted to reject the Plan, but in either case were afforded the opportunity to opt out of granting the Third-Party Release and did not opt out; (iii) are unimpaired by the Plan and therefore presumed to accept the Plan, were afforded the opportunity to opt out of granting the Third-Party Release, and did not opt out; or (iv) are holders of impaired non-voting claims or interests and therefore deemed to reject the Plan, were afforded the opportunity to opt out of granting the Third-Party Release, and did not opt out.

70.     The fact that several parties took action to opt out of the Third-Party Release demonstrates the effectiveness of the opt out process.  As stated above, there was clear notice to non-voting and voting parties regarding the non-consensual Third-Party Release and the option to opt out.  Because the non-consensual Third-Party Release was conspicuously stated in multiple places and parties were notified about the consequences of failing to opt out, they provided their support for the non-consensual Third-Party Release.

71.     Courts in the Third Circuit "have consistently held that a plan may provide for a release of third-party claims against a non-debtor upon consent of the party affected."[99]  The Third-Party Release should be approved as "consensual" due to the opt-out mechanism in the Ballots, approved by this Court in the Solicitation Procedures Order.  The U.S. Trustee and the SEC ignore that courts in this jurisdiction routinely exercise their authority to approve third-party release

---

[99] *Indianapolis Downs*, 486 B.R. at 305 (collecting cases approving "a release of third party claims against a non-debtor upon consent of the party affected").

provisions similar in scope and structure to the Third-Party Release at hand as consensual for those who do not avail themselves of the opportunity to opt out.[100]

72.      Courts in this District have been flexible in recognizing the level of voluntary affirmation needed to establish a creditor's consent, and have found that releases may be "deemed consensual" even for creditors who receive adequate notice, abstain from voting, and do not otherwise challenge the Third-Party Release.[101]

73.      The majority view in Delaware is that a party's failure to opt out of the proposed Third-Party Release reflects that party's consent to the Third-Party Release.[102]  Courts have even gone so far as to state that section 1141 of the Bankruptcy Code requires creditors to "speak up and object to release provisions, like they need to [for] other provisions."[103]

---

[100] *See, e.g.*, *Tritek*; *Indianapolis Downs*, 486 B.R. at 304–05 (approving third-party release provision that applied to unimpaired holders of claims deemed to accept the plan as consensual); *In re Spansion*, 426 B.R. 144 (Bankr. D. Del. 2010) (same);  *In re Zenith Elecs. Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (approving non-debtor releases for creditors that voted in favor of the plan); ); *In re Colt Holding Co.*, No. 15-11296 (LSS) (Bankr. D. Del. Dec. 16, 2015) [Dkt. No. 813] (approving release as consensual where creditor fails to vote or opt-out of release); *In re EV Energy Partners, L.P.*, No. 18-10814 (CSS) (Bankr. D. Del. 2018) [Dkt. No. 238] (approving a third-party release with objection "opt-out" mechanic); *In re PES Holdings, LLC*, No. 18-10122 (KG) [Dkt. No. 357] (Bankr. D. Del. Apr. 2, 2018) (same); *In re SFP Franchise Corp.*, Case No. 20-10134 (JTD) (Bankr. D. Del. Aug. 24, 2020) [Dkt. No. 616] (approving a third-party release as consensual because unimpaired creditors could have objected to plan confirmation).

[101] *See, e.g., Boy Scouts*, 642 B.R. at 675 (finding releases consensual when claimants "were well aware of the opportunity and need to opt-out or object to the Third-Party Release in the Plan."); *Mallinckrodt*, 639 B.R. at 860-861 (same).

[102] *See, e.g., In re Colt Holding Co.*, Case No. 15-11296 (LSS) (Bankr. D. Del. Dec. 16, 2015) [Dkt. No. 813] (Judge Silverstein approving release as consensual where creditor fails to vote or opt-out of release); *Mallinckrodt*, 639 B.R. at 877-881 (Judge Dorsey approving Third-Party Release as consensual where parties were given the opportunity to opt-out); *In re EV Energy Partners, L.P.*, Case No. 18-10814 (CSS) (Bankr. D. Del. 2018) [Dkt. No. 238] (Judge Sontchi approving Third-Party Release with objection "opt-out" mechanic); *In re First Guaranty Mort. Corp.*, No. 22-10584 (CTG) (Bankr. D. Del. Nov. 11, 2022) [Dkt. No. 671] (Judge Goldblatt confirming a chapter 11 plan with opt-out procedures for parties deemed to reject); *In re Carestream Health, Inc.*, No. 22-10778 (JKS) (Bankr. D. Del. Sept. 28, 2022) [Dkt. No. 185] (Judge Stickles confirming a chapter 11 plan with opt-out procedures for parties deemed to reject); *In re WCI Cmtys., Inc.*, Case No. 09-52250 (KJC), 2012 WL 1981713 (Bankr. D. Del. June 1, 2012) (former Judge Carey permitting third-party release as consensual where creditor fails to vote and opt-out of release); *In re PES Holdings, LLC*, Case No. 18-10122 (KG) (Bankr. D. Del. Apr. 2, 2018) [Dkt. No. 357] (Former Judge Gross approving Third-Party Release with objection "opt-out" mechanic).

[103] *In re Melinta Therapeutics Inc.*, Case No. 19-12748 (LSS), Hr'g Tr. 120:1-14 (Bankr. D. Del. Apr. 2, 2020) [Dkt. No. 502].

74.    In *Indianapolis Downs*, Judge Shannon addressed objections to third-party releases on the basis that they were non-consensual despite the inclusion of an opt-out provision on the ballots.[104]  Judge Shannon found that because the unimpaired parties were being paid in full, they were receiving consideration for the releases, and that the impaired creditors who failed to opt out had consented to the third-party releases because they "were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots."[105]

75.    Judge Goldblatt in *Arsenal Intermediate Holdings*, *LLC*, found that the right to opt out was sufficient to establish consent. [106]   Even if the failure to opt out was the result of either carelessness, inattention or mistake, the failure to return a ballot was at the creditor's own risk.[107]

76.    In *Tritek*, this Court approved a third-party release with a similar opt out structure to that at-hand.  At the confirmation hearing, this Court held that if a party receives notice of a proposed release and does not object then that party has consented to the release.  *Tritek*, at 63:22-64:3.  This Court specially noted at the confirmation hearing:

> As in many other respects, when it comes to bankruptcy, parties are required to be vigilant and defend their rights, and such is the case here. In this case, I find that the opt out, it was conspicuous and some creditors did opt out, which evidences to me that the procedures were effective.[108]

77.    As is true here, in *Tritek*, unimpaired creditors received notice identifying the release provisions, directing them how to receive copies of the full plan if they wished, and

---

[104] *Indianapolis Downs*, 486 B.R. at 304.

[105] *Id*. at 306.

[106] 2023 WL 2655592, at *3-8 (Bankr. D. Del. Mar. 27, 2023).

[107] *See id*. at *19-20 ("[I]n this jurisdiction, a creditor may not safely assume that a plan relates only to its dealings with the debtor and not third parties. The creditor that discards the plan and disclosure statement accordingly does run the risk that its rights against third parties – though only with respect to claims related to the debtor – may be prejudiced.").

[108] *Id*. at 64:3-8.

identifying procedures for objecting to being a releasing party.  This Court found this to be adequate and noted that any unimpaired creditors who received such notice and did not object consequently consented to the release.[109]

78.     Here, notice of the Plan, along with Ballots and/Opt Out Election Forms, was served on approximately 1,085 holders of Claims.[110]  Only 9 holders of Claims returned a valid Opt Out Election Form, totaling less than 1% of creditor opt-outs from the Third-Party Release.[111] Furthermore, notice of the Plan, along with Ballots and/Opt Out Election Forms, was served on approximately 16,580 holders of Interests.[112]  Only 452 holders of Interests returned an Opt Out Election Form, totaling less than 3% of Interest opt-outs from the Third-Party Release.[113]

79.     Accordingly, in light of all of the circumstances, the Plan's consensual Third-Party Release satisfies the applicable standards, is fair to the Releasing Parties, and is otherwise appropriate.  For all of these reasons, the Plan's consensual Third-Party Release should therefore be approved.

## **CONCLUSION**

80.     For all of the reasons set forth herein, in the record in these proceedings, and as will be further shown at the Confirmation Hearing, the Foris Lenders respectfully request that the Court confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the proposed Confirmation Order, overruling any remaining objections, and granting such other and further relief as is just and proper.

---

[109] *Id*. at 64:24-65:1.

[110] Voting Declaration, ¶12, Ex. A.

[111] *Id*.

[112] *Id*.

[113] *Id*.

167565944v1

Dated: January 22, 2024
Wilmington, Delaware

_/s/ Kenneth A. Listwak_
David M. Fournier (DE No. 2812)
Kenneth A. Listwak (DE No. 6300)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Hercules Plaza, Suite 5100
1313 N. Market Street, P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Facsimile: (302) 421-8390
E-mail:  david.fournier@troutman.com
           ken.listwak@troutman.com

-and-

Michael H. Goldstein (admitted _pro hac vice_)
Alexander J. Nicas (admitted _pro hac vice_)
Debora A. Hoehne (admitted _pro hac vice_)
Artem Skorostensky (admitted _pro hac vice_)
**GOODWIN PROCTER LLP**
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 813-8800
Email:  mgoldstein@goodwinlaw.com
           anicas@goodwinlaw.com
           dhoehne@goodwinlaw.com
           askorostensky@goodwinlaw.com

_Counsel to the Foris Prepetition Secured Lenders and the DIP Secured Parties_

167565944v1