## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC., | Case No. 23-11131 (TMH) |
| Debtors.[1] | (Jointly Administered) |
| | **Docket Ref. No. 1170** |

### DECLARATION OF PHILIP J. GUND IN SUPPORT OF CONFIRMATION OF THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF AMYRIS, INC. AND ITS AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

I, Philip J. Gund, pursuant to section 1726 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer of the above-captioned debtors and debtors in possession (the "Debtors"), effective as of the Petition Date (as defined below). I am also a Senior Managing Director with Ankura Consulting Group, LLC ("Ankura"), a financial advisory services firm with numerous offices throughout the United States, which has been providing services to the Debtors since August 2023. On September 14, 2023, the Court entered an order [D.I. 281] granting the *Debtors' Application for Entry of an Order (I) Authorizing the Debtors to Employ and Retain Ankura Consulting Group, LLC to Provide the Debtors a Chief Restructuring Officer, (II) Designate Philip J. Gund as Chief Restructuring Officer for the Debtors Effective as of the Petition Date, and (III) Granting Related Relief* [Docket No. 141].

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https:\cases.stretto.com\amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

2.      I have more than 30 years of experience advising the boards of directors and senior management of troubled companies and creditor constituencies in both operational and financial restructurings, providing interim management services to both non-distressed and distressed companies and acting as liquidating trustee for liquidation trusts.  I have worked in a wide variety of industries including marine transportation, marine construction, automotive parts, healthcare, hotel development and management, retail, co-op purchasing and distribution, daily publications, printing, import/export, real estate and construction, specialty chemicals, coke and electrode production, alternative energy development, construction and management, telecommunications, golf courses and practice facilities, family entertainment centers, and manufacturing and wholesale distribution.

3.      I became the Debtors' CRO effective as of the Petition Date, and in such capacity, I am familiar with the Debtors' businesses, financial affairs, and operations.  I submit this Declaration in support of confirmation of the *Third Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* (as modified, amended, or supplemented from time to time, the "Plan").[2]

4.      Except as otherwise noted, I have personal knowledge of the matters set forth herein. All facts set forth in the Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management and Ankura's CRO team, my review of relevant documents, and/or my opinion based on my experience and knowledge of the Debtors' operations and financial condition. In making the Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit

---

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or in the Memorandum, as applicable.

in preparing the Declaration.  If I were called to testify as a witness in this matter, I could and would testify competently to the facts set forth herein.

## **BACKGROUND**

5.     For the reasons discussed herein, I believe that the Debtors' Plan presents a viable, efficient, and advantageous way forward for the Company to emerge from bankruptcy with a substantially de-levered capital structure, while ensuring that all allowed administrative and priority claims are paid or otherwise satisfied as required under the Bankruptcy Code and general unsecured creditors receive substantial, meaningful recoveries, notwithstanding that the senior secured lenders -the Foris Secured Parties- are significantly undersecured.  Given the Foris Secured Parties' senior position and the lack of any other workable restructuring alternative, and in light of the disappointing results of the approved and consummated asset sales to date, the heavily-negotiated Plan, which importantly has the support of the Debtors' key creditor constituencies, is the only path for a successful reorganization.

6.     After extensive negotiations undertaken at arms' length and in good faith by the parties, the Debtors, Foris and the other Foris Prepetition Secured Lenders, the DIP Secured Parties, the Ad Hoc Group (composed of certain Convertibles Notes holders), and the Creditors' Committee (the "Committee")  (all parties to the postpetition Plan Support Agreement) have reached a global settlement set forth in and composing the Plan.  The Debtors are pleased to present the proposed amended Plan of reorganization which provides for, among other things, a cash recovery to unsecured creditors (along with the assignment of certain estate claims to a Creditor Trust) in exchange for their support of a release of certain estate claims and causes of action, as well as additional consideration in connection with third-party releases.

4873-1215-9903.2 03703.004

7.       The Plan provides for the satisfaction of Administrative Claims, the treatment of secured claims in accordance with the Bankruptcy Code or as agreed by the holders of such claims, and the continuation of the Debtors' operations for the benefit of employees, vendors, contract counterparties and customers.  The Plan restructures the Debtors' balance sheet and operations by facilitating the Debtors' exit from and sale of their Consumer Brands Businesses, a potential sale of the Other Assets, and a distribution to certain stakeholders through the Plan.  The Plan gives the DIP Secured Parties and holders of the Foris Prepetition Secured Claims discretion to satisfy such claims not paid from the Debtors' operations through an allocation of certain net sale proceeds, a rollup into the Exit Facility, and the new equity interests of Reorganized Amyris.

8.       Further, under the Plan, the Debtors seek a Direct Claims Injunction that bars all holders of Direct Claims from pursuing such claims against the Released Parties.   In consideration for such releases, holders of Direct Claims will receive distributions from the Third-Party Release Settlement. Following the issuance of the Direct Claims Injunction in accordance with the Confirmation Order, any and all holders of Direct Claims will be permanently enjoined from seeking satisfaction of their Direct Claims against the Released Parties or any other Direct Claims Injunction Party or the property of any such Direct Claims Injunction Party.  Alternatively under the Plan, if the Third-Party Release Settlement is not approved on a non-consensual basis by the Court and instead, the Third Party Releases are approved as consensual releases (provided the required Direct Claims Threshold (of a majority or more)  is satisfied), the Third-Party Release Settlement Amounts will be reduced and only will be payable to creditors who do not opt out of the releases under the Plan.

9.       Upon the Effective Date, the Plan will establish a Creditor Trust for the benefit of Holders of Class 7 Convertible Notes Claims and Class 8 General Unsecured Claims that will be

4873-1215-9903.2 03703.004

funded with $2 million in Creditor Trust Funding, plus $15 million in Estate Claims Settlement Consideration and other Cash assets pursuant to the terms of the Plan and certain causes of action and preferences, the proceeds of which will be distributed according to the Plan, after payment of all direct out-of-pocket administrative, personnel, legal costs and expenses incurred after the Effective Date in administering the Creditor Trust, and making distributions from the Creditor Trust as provided for under the Plan. Separate and apart from the treatment of Classes 7 and 8, respectively, Holders of Allowed Claims in such Classes who are also Releasing Parties will also receive, in exchange for their granting Third-Party Releases, pro rata distributions of the applicable Third-Party Release Settlement Amounts as set forth in Section I.A.198 of the Plan, and from the Estate Claims Settlement. Under the Plan, Holders of Claims in Classes 7 and 8 are eligible to receive estimated aggregate recoveries of $51.95 to $66.4 million.

## INVESTIGATIONS OF CLAIMS AND ACTIONS

10. ***The Independent Director Investigation of Claims Against Directors and Officers***: Ancillary to its restructuring, Amyris recognized that there had been allegations regarding accounting irregularities from the third quarter of 2021 through the fourth quarter of 2022 and that there may have been other conduct or misconduct – by commission or omission – that contributed to Amyris's financial distress. To address these issues, effective on the Petition Date, the Board delegated to M. Freddie Reiss (the "Independent Director") the exclusive power and authority of the Board to investigate the conduct of the Debtors' directors and officers ("D&Os") and the D&Os' affiliates to determine whether any of the Debtors have claims against any current or former D&Os or any of the D&Os' affiliates.

11. The Independent Director began an investigation (the "Independent Director Investigation") upon his appointment on the Petition Date and promptly selected KTBS Law LLP

5

("KTBS") as special counsel for the Debtors to lead the examination and to report its findings to the Independent Director (the "Independent Director Report"). The Independent Director Report has not been provided to the full Board.  The Independent Director Report was shared with the Committee pursuant to a common interest agreement between the Debtors and the Committee, and with the other recently-appointed independent director (Mr. White).

12.     The Independent Director focused the Independent Director Investigation on the three-year period preceding the Petition Date and investigated potential claims and estate causes of action against D&Os and affiliates of D&Os for transactions, acts, and omissions.

13.     During the Independent Investigation, KTBS conducted numerous formal interviews of the Debtors' current and former directors, officers, and employees, in addition to numerous informal discussions with Steven Fleming of PwC and the Debtors' current internal counsel.  KTBS reviewed many thousands of documents and emails, including documents protected by the Debtors' attorney-client privilege.

14.     On October 20, 2023, the Independent Director and KTBS finalized the Independent Director Report, comprising 61 pages, supplemented by 455 pages of appendices, summarizing the Independent Investigation to date and the results thereof.  The Independent Director Report comprises 61 pages, supplemented by 455 pages of appendices. The Independent Director Investigation  has concluded.

15.     ***The Committee's Investigation:***  On August 29, 2023, the day after the Committee retained counsel, the Debtors provided the Committee's counsel and advisors with access to a comprehensive data room containing hundreds of documents, including prepetition debt documents, corporate governance documents, insurance policies, major commercial contracts, operative deal documents with respect to major transactions, and information regarding the

4873-1215-9903.2 03703.004

Debtors' intellectual property.  I am informed and understand that the Committee conducted a wide-ranging investigation of the facts and circumstances leading to the Chapter 11 Cases and potential causes of action against the DIP Lender and Foris Prepetition Secured Lenders, their principals, and the Debtors and their officers and directors.

16.    The Committee's investigative efforts included, commencing in September 2023, numerous document requests and interrogatories propounded on the Debtors and meet and confer sessions and other discussions.  The Debtors worked diligently and cooperatively to produce all information requested by the Committee, including at least 22 document productions totaling well over 100,000 pages and answering interrogatories.

17.    The  Committee prepared a motion to seek derivative standing and a proposed adversary complaint.  But I am informed and understand that the  Committee determined that the Plan Settlements with the Debtors and Foris would likely provide better value to the  Committee and its constituency than any claims that the  Committee had developed through its investigation.

18.    ***The Ad Hoc Noteholders' Group Investigation:***  Starting in mid-August 2023, the Debtors provided certain professionals of the Ad Hoc Group with access to a comprehensive data room (the "Noteholder VDR") that was substantively identical to the Committee VDR.  I understand that the Ad Hoc Group conducted an investigation focused on four principal matters: (i) "whether the Board and the officers considered selling the same brands that are going to be sold as part of the plan earlier;" (ii) "whether the Board and the officers improperly delayed implementing cost cutting measures;" (iii) "whether the Board and officers improperly approved prepetition loans to the Foris lenders;" and (iv) "whether the representations to the investors about the Fit to Win strategy were, in fact, false."  (Disclosure Statement, at p. 28, quoting Transcript of November 6, 2023 Hearing in *In re Amyris, Inc*., at 5:9–23.)

19.     Specifically, I understand that the Ad Hoc Group investigated potential causes of action against the Debtors, their officers, directors, employees, and professionals, including, without limitation, claims for: (i) breach of fiduciary duty or aiding and abetting breach of fiduciary duty; (ii) recharacterization; (iii) equitable subordination; (iv) fraudulent transfer, including under federal and state law; and (v) common-law fraud.  On October 18, 2023, in connection with its investigation, the Ad Hoc Group served thirty requests for production of documents on the Debtors pursuant to Bankruptcy Rule 2004 (the "Noteholder 2004 Requests").  The Debtors met and conferred with the Ad Hoc Group on October 20, 2023, and agreed to produce all nonprivileged documents and communications that had already been (or would in the future be) produced to the Committee in response to the  Committee's Rule 2004 requests. In addition, the Debtors agreed to conduct a limited search of email communications responsive to one Noteholder 2004 Requests for a fourth Agreed Custodian. On November 2, 2023, the Debtors agreed to run additional Agreed Search Terms at the Ad Hoc Group's and Committee's joint request. The Ad Hoc Group attended and coordinated with the  Committee with respect to their participation in each of the depositions. To investigate the factual basis for these claims, the Ad Hoc Group also reviewed materials produced in these cases pursuant to prior stakeholders' document requests and interrogatories, as well as publicly available information. Disputes over certain document requests served by the Ad Hoc Group required the Ad Hoc Group to serve a motion to compel discovery from Foris pursuant to Bankruptcy Rule 2004, which the Court granted in part in November 2023.  Further, in the course of its factual investigation, the Ad Hoc Group deposed certain officers and directors of the Debtors in November 2023.  The topics covered by the Ad Hoc Group's investigation included, without limitation, (i) the management of the Company; (ii) the board of directors' oversight of the Debtors' management; (iii) financing transactions entered into, proposed, or considered by the

Debtors, including, without limitation, prepetition financing to the Debtors provided by Foris; (iv) potential prepetition strategic transactions considered or available to the Debtors, including, without limitation, the potential sale of consumer brands owned by the Debtors; and (v) statements made to investors and the public in connection with certain cost-cutting measures entered into by the Debtors.

20.     The Ad Hoc Group also extensively coordinated with the Committee to pursue discovery, analyze potential causes of action, and avoid duplication of effort.   After extensive discussion with its members, its professional advisors, and the  Committee, I understand that the Ad Hoc Group concluded that the settlement with the Debtors and the Foris Prepetition Secured Lenders (including the retention of certain litigation claims to be prosecuted by a litigation trust for the benefit of unsecured creditors) likely provided better value than the potential causes of action that the Ad Hoc Group had investigated.

### PLAN SETTLEMENTS, RELEASES AND RELATED PROVISIONS

21.     ***Plan Settlements:***  The Plan Settlements, including the Debtor Release of the Foris Secured Parties, which compromises embodied in the Plan are supported by the key creditor groups,  the  Committee and the Ad Hoc Group.  The Independent Director investigation, the Committee investigation, and the Ad Hoc Group's investigation have not resulted in the commencement and prosecution of any claims and actions against the Foris Secured Parties or any other parties to the Plan Settlements.  The Debtors (through the Independent Director), the Committee, and the Ad Hoc Group have all undertaken extensive and sophisticated investigations and analyses and have concluded that, taking into account the prospects of prevailing in litigation, the complexities, risks, costs and delays thereof, the Plan Settlements embodied in the Plan are fair, reasonable and appropriate under all of the circumstances.  As discussed in the Fleming

4873-1215-9903.2 03703.004

Declaration and in the Debtors' Liquidation Analysis, in chapter 7 proceedings, only the DIP Lenders would receive a limited, partial recovery, and no junior creditors would receive any recovery at all.  In other words, without the Plan Settlements, the Debtors would not be emerging as a reorganized business and there would be no recoveries for most creditors.

22.    ***Exculpation:***  In addition, I believe that the exculpation provisions in Article IX.E of the Plan (the "Exculpation") are essential to the Plan, and further believe that the Exculpation is appropriate and vital because it provides protection to those estate fiduciaries and other key parties who served to further the Debtors' Chapter 11 Cases.  The Exculpation represents an integral piece of the overall terms of the Plan and was formulated following extensive, good faith, arm's-length negotiations with key constituents.  I believe it is appropriately limited in scope to achieve the overall purpose of the Plan. I believe each Exculpated Party made significant contributions to the Chapter 11 Cases, including, as applicable, with respect to the negotiation and implementation of the transactions embodied in the Plan and the continued operation of the Debtors and administration of the Chapter 11 Cases.

23.    Although certain of the Exculpated Parties are not fiduciaries of the Debtors or Estates (such as the Foris Secured Parties, Consenting Convertible Noteholders, and Ad Hoc Group Professionals), such third parties were critical in the negotiation and formulation of (i) the Plan Support Agreement, which set forth the basic key terms of the Plan, and (ii) the Plan, which, if confirmed, will provide for the restructuring of the Debtors' balance sheet and business and the payment of administrative and priority claims and material recoveries for unsecured creditors.  The protections afforded by the Exculpation are reasonable and appropriate.

24.    It is my understanding that all of the Debtors' key stakeholders, including the Committee, support the Exculpation.

25.    ***Debtor Release:***  Article IX.C of the Plan contains a release by the Debtors and the Estates of the Released Parties (the "<u>Debtor Release</u>").  The Released Parties are (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Lenders and the DIP Agent; (d) the Foris Prepetition Secured Lenders; (e) the  Committee; (f) the Consenting Convertible Noteholders, (g) the Ad Hoc Group Professionals; (h) the Consenting Contract Counterparties; and (i) with respect to each of the foregoing Entities in clauses (a) through (e), all Related Parties.

26.    The Debtor Releases in the Plan are fair and reasonable, supported by creditors, and in the best interests of the Estates.  The Debtor Releases are based upon a substantial contribution to the Plan (including its negotiation and formulation) and the Debtors' chapter 11 cases, by the Released Parties.  Without the Released Parties' involvement and assistance, there would be no comprehensive settlement that serves as the foundation for the Plan.  Without the Plan, most creditors, including unsecured creditors, would be substantially worse off than under another plan.  Indeed, as provided and discussed in the Debtors' Liquidation Analysis (Exhibit D to the Disclosure Statement), in chapter 7 proceedings, generally only the DIP Lenders  would receive a limited, partial recovery on account of their DIP Facility Claims, and essentially no junior creditors, including Holders of Other Priority Claims and general unsecured creditors, would receive any recovery.  In short, without the concessions and consideration being provided by the DIP Lenders and the Foris Secured Parties under the Plan, together with the involvement, supportive efforts and substantial contributions of other Released Parties relating to the negotiation and formulation of the Plan, I understand that there would be no meaningful recoveries for other junior creditors.

27.    ***Mandatory Third-Party Releases:***  Under the Plan, there will be a Direct Claims Injunction (Plan Art. IX.G) that bars all holders of Direct Claims from pursuing such claims against

the Released Parties.   In consideration for such mandatory releases, holders of Direct Claims will receive distributions from the Third-Party Release Settlement (Plan, Art. IX.D). Following the issuance of the Direct Claims Injunction in accordance with the Confirmation Order, any and all holders of Direct Claims will be permanently enjoined from seeking satisfaction of their Direct Claims against the Released Parties or any other Direct Claims Injunction Party or the property of any such Direct Claims Injunction Party.

28.    For the reasons and circumstances I discuss above, I believe that these Chapter 11 Cases present the extraordinary circumstances that warrant approval of the nonconsensual Third-Party Releases and the Direct Claims Injunction.  The Debtors have undertaken enormous efforts to secure substantial support for the Plan and substantial monetary contributions from the Foris Secured Parties.  The significant contributions and concessions, contingent upon the Released Parties receiving a release and the benefit of the Direct Claims Injunction, have enabled the Debtors to propose a viable Plan.  Without the Third-Party Releases and Direct Claims Injunction, the Debtors could not reorganize.  As discussed further herein, if this Plan fails, the vast majority of the Debtors' creditors will not recover anywhere close to the recoveries made available to creditors under the Plan.

29.    There is an identity of interest between the Debtors and the Foris Secured Parties. The Direct Claims to be released are limited to claims held by a Releasing Party that arose from or are related to the Debtors, including, without limitation, the Debtors' assets, liabilities, operations, financings and contracts; and further, the Debtors and the Foris Secured Parties share the common goal of confirming the Plan, implementing a restructuring, and maximizing recoveries for creditors.   As discussed further herein, the Debtors and the Foris Secured Parties share the

12

common goal of restructuring the Debtors' affairs in order for the Debtors to emerge post-Effective Date a stronger, less debt-burdened, more focused business.

30.     I am informed and understand that some Direct Claims against the Released Parties, to be released by virtue of the nonconsensual Third-Party Release, could cause such Released Parties (including Foris) to seek to collect them from the Estates or their property through indemnification and similar rights and remedies.  I understand that numerous Direct Claims that could be asserted potentially overlap substantially with Estate Claims as such claims are based upon substantially the same or similar or related operative facts, and in all or most cases would likely be time consuming and expensive to litigate.  Notably, the Debtors carry director and officers' insurance under wasting policies (*i.e.*, defense/litigation costs are paid out of the policy limits), with a maximum coverage of $35 million, which is a potential source of recovery for certain Direct Claims.

31.     Further, as the recent expensive and protracted experience in connection with the pre-settlement discovery and the Plan related discovery (discussed in paragraphs 10-20 above) illustrate, litigation involving the Debtors' historical operations, financing, assets, liabilities and governance, and other Direct Claims that could be potentially asserted, will in all likelihood impose significant burdens on Reorganized Amyris' personnel, distract from the efforts to implement the business plan and operational reorganization of Reorganized Amyris, and require the expenditure of considerable funds.  Avoiding the material, adverse, impact on Reorganized Amyris that would flow form post-confirmation litigation is essential to Reorganized Amyris' ability to achieve its restructuring goals.

32.     ***Consensual Third-Party Releases:***  In the event that the Court does not approve of the Third-Party Releases on a nonconsensual basis as the Debtors request in the first instance, the

13

Debtors seek approval of the Third-Party Releases as consensual releases by the applicable creditors under Art. IV.A.3 of the Plan ("Consensual Third-Party Releases"). The Consensual Third-Party Releases are integral to the Plan and were heavily negotiated by sophisticated parties during these Chapter 11 Cases. The Third-Party Releases are a key inducement to Foris to agree to make the substantial contributions set forth in the Plan. Put simply, the Foris Secured Parties are unwilling to agree to and support the Plan and make the applicable valuable contributions and concessions, without the assurance through the Third-Party Releases that the Foris Secured Parties would not be subject to post-emergence litigation or other disputes related to the Debtors.

33.     In addition to the above, the Released Parties: (a) made substantial and valuable contributions to the Debtors' Chapter 11 Cases and the Estates, including, as applicable, through extensive negotiations and communications with various stakeholders, and ensured and facilitated the operation and effective administration of the Debtors' business and financial affairs; (b) attended and, in certain instances, participated in Court hearings and case related meetings; (c) attended board meetings related to the Chapter 11 Cases and oversaw the negotiations that led to the Plan; and/or (d) invested significant time and effort in the preparation of the Plan, all supporting analyses, and the numerous other pleadings filed in the Chapter 11 Cases, thereby ensuring the smooth administration of the Chapter 11 Cases.

34.     Further, I believe that the injunction provisions in Articles IX.F and G of the Plan (the "Injunctions") are essential to the Plan because the Injunctions enforce the Debtor Release, the Third-Party Releases, and the Exculpation, which are centrally important to the Plan. To the extent that the Court finds that the Debtor Release, the Third-Party Release, and the Exculpation are appropriate, I believe that the Injunctions also would be appropriate for the same reasons.

4873-1215-9903.2 03703.004

**Lavvan Settlement**

35.     The Lavvan Settlement and the Lavvan Settlement Agreement are each an essential element of the Plan, necessary for Consummation, and critical to the overall success of the Reorganized Debtors and the feasibility of the Plan.

36.     Entry into the Lavvan Settlement Agreement is in the best interests of the Debtors and their Estates.  I believe that the Debtors have exercised reasonable business judgment in determining to enter into the Lavvan Settlement Agreement which will avoid the delay, risk and expense of protracted litigation.  I understand that the disputes between Lavvan have historically been, and continue to be complex, involving interpretation of intellectual property licenses and related agreements, interpretation of financing documents and the application of federal patent and trade secrets laws, among other things.   Taking into account the complex issues between the parties that have already resulted in protracted litigation, I believe that the terms and conditions are fair and reasonable and were negotiated in good faith and at arm's length. The provisions of the Plan, including the Lavvan Settlement Agreement, filed as part of the Plan Supplement, incorporate and reflect a compromise and settlement by and among the Debtors, the Foris Secured Parties, and Lavvan.  In consideration for the distribution and other benefits provided pursuant to the Plan, I believe that the Lavvan Settlement Agreement constitutes a good faith compromise of Claims and controversies related to the Lavvan Claims, the Lavvan Proofs of Claim, the Lavvan Documents, the Lavvan Challenge-Period Adversary Proceeding, the Arbitration Award, the Lavvan Estimation Motion, the Lavvan Estimation and Claim Objection Discovery, the Lavvan Confirmation Discovery, the Lavvan 3018(a) Motion, and the DIP Order Appeal.

4873-1215-9903.2 03703.004

## DSM Settlement

37.     The DSM Term Sheet, the DSM Joinder, the Amended DSM Contracts, and the Debtors' entry into the DSM Plan Promissory Note and DSM Plan Pledge Agreement are in the best interests of the Debtors and their Estates.  The Debtors have exercised reasonable business judgment in determining to enter into the foregoing settlement with DSM.  Among other things, the restructuring of the DSM secured loans and the modified commercial terms of the Amended DSM contracts are beneficial to the Debtors and the Reorganized Debtors. Accordingly, I believe that the terms and conditions are fair and reasonable and were negotiated in good faith and at arm's length.   I believe that the Debtors' agreement among the Debtors and DSM, constitutes a good faith compromise of Claims and controversies related to DSM.

## OTHER PLAN CONFIRMATION ELEMENTS

38.     I believe that the Debtors, together with their officers, directors, managers, employees, members, agents, advisors, accountants, attorneys, and representatives, have acted in good faith in connection with all their respective activities relating to the formulation, preparation, dissemination, negotiation, and/or filing of the Disclosure Statement, the Plan, the Plan Supplement, or any transactions related to the restructuring, any contract, instrument, or other document created or entered into during the Chapter 11 Cases in connection with the Chapter 11 Cases, the pursuit of Consummation, and/or the administration and implementation of the Plan.

39.     The Plan was proposed in good faith, with the legitimate and honest purposes of reorganizing the Debtors' affairs and providing for meaningful distributions to creditors. Moreover, the Plan is the product of extensive arm's-length negotiations among various constituencies, including the  Committee.

### GOOD CAUSE EXISTS TO WAIVE THE STAY OF THE CONFIRMATION ORDER

40.     I understand that certain Bankruptcy Rules provide for the stay of an order confirming a plan, but that such stay may be waived upon court order after a showing of good cause.

41.     I believe that there is good cause for the proposed Confirmation Order to be effective immediately upon its entry.  Based on the circumstances of this case discussed above (including the global settlement among the key constituencies reflected therein), it is reasonable and amply justified for the Debtors and interested parties to expeditiously proceed with implementing the Plan and to provide, as promptly as possible, distributions to the Debtors' creditors.  Expeditious implementation of this settlement Plan favored by the key creditor constituencies is in the best interests of all creditors and stakeholders, to avoid any further delays in the reorganization of the Debtors' business and Distributions.  I believe that good cause exists to waive any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

4873-1215-9903.2 03703.004

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 22, 2024                    */s/  Philp J. Gund*
_____
                                           Philip J. Gund
                                           Chief Restructuring Officer of Amyris, Inc. and Its
                                           Affiliated Debtors

4873-1215-9903.2 03703.004