IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: <br><br> AMYRIS, INC., <br><br> Debtors.[1] | Chapter 11 <br><br> Case No. 23-11131 (TMH) <br><br> (Jointly Administered) <br><br> Related Docket No. 1170 |

**DECLARATION OF BRADLEY M. ORELOWITZ IN SUPPORT OF CONFIRMATION OF THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF AMYRIS, INC. AND ITS AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

I, Bradley M. Orelowitz, pursuant to section 1726 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

**Background and Qualifications**

1. I am a Managing Director of Back Bay Management Corporation and its division, The Michel-Shaked Group ("MSG"). MSG's professionals have extensive experience in the analysis of solvency, capital surplus, and valuation of public and privately-held businesses, including businesses that are complex, international organizations. Experts at MSG have been engaged in numerous cases, including: *Adelphia Communications, Air Transport International, Belle Casinos, Bennett Funding Group, Bike Athletic, Boston Chicken, Caesars Entertainment, Caldor Corporation, Carleton Woolen Mills, Cascade International, Chesapeake Energy, Chinos Holdings (J. Crew), Congoleum, Dade Behring Holdings, Diet Center, Duro Industries, Enron, Enstar Group, Flintkote, FoxMeyer Corporation, Halliburton, Hayes Lemmerz International, Hechinger Company, Home Insurance, Jones Trucking Lines, Lady Luck Gaming, Laminate Kingdom, Lernout & Hauspie, Loyalty*

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https:\cases.stretto.com\amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

*Ventures, M4 Environmental, Medley, Merry-Go-Round, MGM/UA Communications, Mirant, Mortgages Limited, Munford Inc. (d/b/a Majik Market), Neiman Marcus, NetFax, Nine West, North Manchester Foundry, OneStar Long Distance, Payless ShoeSource* (2017 and 2019), *Quadrax, Quigly, Raytech Corporation, Refco, Safety-Kleen, Shoebuy.com, Specialty Retail Shops Holding Corp. (d/b/a ShopKo), Smurfit-Stone Container, Solar Cosmetic Labs, Stone & Webster, Styling Technology Corporation, Tailored Brands, Telecom Argentina, The Limited, Tribune Company, United Companies Financials, Vencor,* and *Vetta Sports*.

2. For over 30 years, I have provided business consulting services to boards of directors, investors, shareholders, law firms and governmental agencies nationwide, including more than 20 years with MSG. Prior to joining MSG, I was the Chief Financial Officer of a retail business, and an Audit Manager for a public accounting firm. My practice at MSG focuses on valuation, bankruptcy, damages, accounting, securities, capital markets, employment, and pensions and retirement plan issues.

3. I have performed valuations, solvency and damages analyses in numerous industries including cable, drug distribution, education, energy, financial services, health care, industrial, insurance, leisure, manufacturing, media, medical, pharmaceuticals, real estate, retail, software, sports franchises, technology, telecommunications, tire & rubber and tobacco. Some of the engagements I have been retained on include the largest bankruptcies, securities fraud, and pension litigation cases in U.S. history. A significant number of my assignments involved financial distress, restructuring, solvency and other bankruptcy-related consulting.

4. I have written on topics such as valuation, bankruptcy, pension and ERISA issues. I am a Member of the American Institute of Certified Public Accountants (AICPA) and the American Bankruptcy Institute (ABI) and have contributed several articles on valuation and bankruptcy to the ABI Journal, a monthly publication to the over 12,000 members of the ABI.

2

I have also spoken on various panels at industry conferences, delivered seminars to law firms and have taught, as a guest lecturer, business school classes on valuation.

5.  I have a Bachelor of Commerce with Accounting and Auditing majors and a Bachelor of Accounting Science – Honors from the University of South Africa. I also have a Master of Business Administration (High Honors) from Boston University and am a Certified Public Accountant, registered in the Commonwealth of Massachusetts. A copy of my curriculum vitae is attached hereto as <u>Exhibit 1</u>.

6.  On December 7, 2023, the Court entered its *Order Authorizing the Retention and Employment of Back Bay Management Corporation and Its Division, The Michel-Shaked Group, as Expert Consultant, Effective as of October 31, 2023* [Docket No. 844] (the "<u>MSG Retention Order</u>"). In connection with its retention in this matter, MSG has conducted an enterprise valuation of Amyris, Inc. and its affiliated debtors ("<u>Amyris</u>") on a going concern basis, as well as a valuation of Amyris' intellectual property assets.

7.  I submit this Declaration in support of confirmation of the *Third Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* (as modified, amended, or supplemented from time to time, the "<u>Plan</u>").[2]

8.  Neither MSG nor I is being specifically compensated for this testimony, other than compensation to MSG as a professional services firm retained by Amyris pursuant to the MSG Retention Order. In accordance with recognized professional ethics, my professional fees, or those of personnel working under my direction at MSG for this testimony are not contingent upon the

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or in *Debtors' Memorandum of Law in Support of Confirmation of Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code, and Omnibus Reply to Objections*, as applicable.

3

opinions expressed herein, and MSG does not have a present or intended financial interest in the outcome of this matter.

9. The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have received from Amyris' employees or advisors, or employees of MSG working directly with me or under my supervision, direction, or control. If called to testify, I could and would testify as to the facts and opinions set forth herein.

## Summary of Expert Opinions

10. It is my opinion that, as of August 9, 2023, the date that Amyris filed for bankruptcy, Amyris' enterprise value was $134.4 million. For Amyris' go-forward business, I utilized the Discounted Cash Flow ("DCF") valuation methodology to arrive at a value of $105.2 million. The DCF calculation is based on Amyris' financial projections for fiscal years 2024 – 2028 that reflect "Amyris 2.0," which represent the reorganized company (the "Disclosure Statement Financial Projections").[3] To this value I added the proceeds expected to be received by Amyris from the sale of its consumer brands businesses in the amount of $29.2 million, for a total of $134.4 million.

11. It is my opinion that, as of August 9, 2023, the value of certain of Amyris' patents, trade secrets, know how, brands, and trademarks that were in place as of March 5, 2019 (the "Amyris IP")[4] was $27.1 million. It is further my expert opinion that, as of August 9, 2023, the

---

[3] "Amyris 2.0" is described on page 19 of the Amended Disclosure Statement filed December 12, 2023 [Docket No. 893]. The Disclosure Statement Projections are set forth in the Amended Disclosure Statement, Exhibit E, p. 4 [Docket No. 893-5] and the supporting financial model "Phoenix-BP Model_10.10.23.xls." The Disclosure Statement Projections do not incorporate the restructuring costs incurred by Amyris from its bankruptcy filing to December 31, 2023.

[4] Exhibit 2 to this Declaration sets forth an overview description of the Amyris IP (which includes the following: IP Generating Ingredients Revenue, IP Generating Licensing Revenue, Previously Licensed IP Generating Ingredients Revenue, Previously Licensed IP Not Generating Ingredients Revenue, and Brand Names and Trademarks). As set forth on Exhibit 2, Amyris generates value through the use of its patents in manufacturing ingredients made with

4

intellectual property relating to technology that has been licensed to third-parties pursuant to research and collaboration agreements and/or in perpetuity for the fields of use that are contemplated in the Disclosure Statement Projections ("Previously Licensed IP Generating Ingredients Revenue") have no value to Amyris.

12. It is my opinion that, as of August 9, 2023, the value of certain of the Amyris consumer brands business trademarks, brand names and service marks (the "Consumer Brands IP")[5] was $9.4 million.

13. It is my expert opinion that, based on the Disclosure Statement Projections,[6] from the petition date (August 9, 2023) to Amyris' expected emergence from bankruptcy (February 9, 2024), Amyris' enterprise value, the value of the Amyris IP, the value of Previously Licensed IP Generating Ingredients Revenue, and the value of the Consumer Brands IP will not be materially different.

## Enterprise Valuation

14. As shown in the table below, I determined that the enterprise value of Amyris as of August 9, 2023 is $134.4 million. It is my opinion that from August 9, 2023 to February 9, 2024, Amyris' enterprise value will not be materially different.[7]

---

synthetic biology, it does not rely on its brand names and trademarks to create value. Therefore, the value of its brand name and trademarks is *de minimis*. Exhibit 3 to this Declaration lists the Amyris patents included in the Amyris IP.

[5] Exhibit 4 to this Declaration lists the trademarks and service marks included in the Consumer Brands IP.

[6] The Disclosure Statement Projections do not incorporate the restructuring costs incurred by the company from its bankruptcy filing to December 31, 2023.

[7] (1) Amyris – Consumer Brands Proceeds.xlsx.

5

| ($ millions) | Enterprise Value as of August 9, 2023 |
|---|---:|
| Amyris Inc. | |
|    Amyris' Go-Forward Business | $ 105.2 |
|    Expected Proceeds from Sale of Consumer Brands (1) | 29.2 |
| **Concluded Enterprise Value of Amyris Inc.** | **$ 134.4** |

15. My enterprise value calculation is based on the fair market value standard, which is defined as: "The price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts."[8]

16. The enterprise value for Amyris' go-forward business was calculated utilizing the DCF methodology. The DCF methodology is a standard framework used by financial professionals for valuing a business. The DCF process estimates a stream of cash flows over a projection period and then discounts the stream by a discount rate back to the valuation date. A terminal value, which accounts for the value of a business for the periods extending beyond the projection period, is also included. Together, the present value of the stream of cash flows and terminal value derive a total enterprise value of the subject company.[9]

17. The DCF calculation is based on the Disclosure Statement Projections for fiscal years 2024 – 2028 that reflect "Amyris 2.0." To perform a DCF analysis, I determined Amyris' projected unlevered free cash flows ("UFCF") as set forth in the Disclosure Statement Projections as of January 1, 2024, and discount these projections back to August 9, 2023.

---

[8] IRS Revenue Ruling 59-60.

[9] I also considered the Comparable Publicly Traded Company ("CompCo") and Comparable Transaction ("CompM&A") methodologies. I ultimately rejected the CompCo method for a lack of meaningful financial metrics to conduct the analysis and rejected the CompM&A method for a lack of comparable transactions and a lack of meaningful financial metrics to conduct the analysis.

18. Since these projected cash flows are "unlevered," or prior to the deduction of interest expense and debt principal repayments, the appropriate discount rate to apply to Amyris' UFCF is its weighted average cost of capital ("WACC"). A company's WACC represents its cost of financing and is calculated by multiplying its cost of equity by its percentage of capitalization that is equity, and adding to that the product of the after-tax cost of debt multiplied by the percentage of its capitalization that is debt.

19. The table below summarizes the present value of Amyris' projected cash flows set forth in the Disclosure Statement Projections from FY2024 to FY2028, discounted at a WACC of 17.3%. As of August 9, 2023, Amyris' go-forward enterprise value using the DCF method is $105 million.[10]

---

[10] (1) The Disclosure Statement Projections reflect "Amyris 2.0", which represents the reorganized company. These projections do not incorporate the restructuring costs incurred by the company from its bankruptcy filing to December 31, 2023.
(2) Projected a second stage step-down between the Disclosure Statement Projections and the normalized terminal year to gradually step-down the free cash flow growth rate of 31.2% in FY2028 to 3.0% in the terminal year.
(3) As of December 31, 2022, Amyris had a federal NOL balance of $1.2 billion and a state NOL balance of $291 million. I have assumed that Amyris will be able to carry this NOL forward post-emergence. Amyris is not projected to generate sufficient taxable income to utilize this NOL balance, therefore, I have assumed a tax rate of 0%. Source: Form 10-K, Amyris Inc., for the fiscal year ended December 31, 2022, p. 101.
(4) Calculated using the Gordon Growth Model. Terminal Value = (Normalized Terminal UFCF*(1+PGR))/(WACC-PGR). I selected a perpetual growth rate ("PGR") of 3.0% to reflect the midpoint between expected long-term inflation and nominal growth expectations.
(5) In preparation of this Declaration, I identified an error in my previous beta calculation for Amyris that was reflected in my expert report dated January 11, 2024. After correcting for this error, Amyris' WACC decreased from 17.7% to 17.3%. This recalculation of the beta and the WACC resulted in an increase in the go-forward enterprise value of Amyris from $97 million to $105 million.

7

| ($ millions) | For the Fiscal Year | | | | | MSG's Extended Projections (2) | | | | | Terminal Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2024E | 2025E | 2026E | 2027E | 2028E | 2029E | 2030E | 2031E | 2032E | 2033E | |
| Revenue | $ 163 | $ 247 | $ 299 | $ 316 | $ 332 | | | | | | |
| *Revenue Growth* | *90.4%* | *51.1%* | *21.4%* | *5.6%* | *5.1%* | | | | | | |
| EBITDA | $ (66) | $ (10) | $ 28 | $ 42 | $ 51 | | | | | | |
| Less: Depreciation and Amortization | (19) | (22) | (24) | (25) | (28) | | | | | | |
| EBIT | (85) | (32) | 4 | 16 | 23 | | | | | | |
| Unlevered Cash Taxes @ 0.0% (3) | - | - | - | - | - | | | | | | |
| Net Operating Profit After Tax | (85) | (32) | 4 | 16 | 23 | | | | | | |
| Add: Depreciation and Amortization | 19 | 22 | 24 | 25 | 28 | | | | | | |
| Less: Capital Expenditures | (42) | (24) | (27) | (24) | (19) | | | | | | |
| Add/(less): Change in Net Working Capital | 7 | 2 | (2) | 5 | (0) | | | | | | |
| Add: Ingredion Capital Call | 13 | 5 | 6 | 5 | 4 | | | | | | |
| Less: Ingredion Profit Share | - | - | (3) | (5) | (5) | | | | | | |
| Unlevered Free Cash Flows | $ (88) | $ (26) | $ 2 | $ 23 | $ 30 | $ 38 | $ 47 | $ 55 | $ 62 | $ 66 | $ 66 |
| Terminal Value (4) | | | | | | | | | | | $ 478 |
| Discount Period | 0.89 | 1.89 | 2.89 | 3.89 | 4.89 | 5.89 | 6.89 | 7.89 | 8.89 | 9.89 | 9.89 |
| Discount Factor @ 17.3% WACC (5) | 0.87 | 0.74 | 0.63 | 0.54 | 0.46 | 0.39 | 0.33 | 0.28 | 0.24 | 0.21 | 0.21 |
| Discounted Free Cash Flows | $ (76) | $ (20) | $ 1 | $ 12 | $ 14 | $ 15 | $ 16 | $ 16 | $ 15 | $ 14 | $ 99 |

| | | | | | | |
|---|---|---|---|---|---|---|
| PV of Cash Flows | 6 | | | | | |
| PV of Terminal Value | 99 | **FY27 - FY28 Growth** | **MSG's Step-Down Unlevered Free Cash Flow Growth** | | | **PGR** |
| **Concluded DCF Enterprise Value** | **$ 105** | **31.2%** | **26.5%   21.8%   17.1%   12.4%   7.7%** | | | **3.0%** |

## Valuation of the Amyris IP

20.     It is my opinion that, based on the Relief from Royalty ("RFR") methodology (utilized in the valuation of IP Generating Ingredients Revenue) and the DCF methodology (utilized in the valuation of the IP Generating Licensing Revenue), the value of the Amyris IP is $27.1 million as of August 9, 2023.  It is my opinion that from August 9, 2023 to February 9, 2024, the value of the Amyris IP will not be materially different.

| ($ millions) Ingredient IP | Royalty Rate | Valuation Methodology Used | IP Value |
|---|---|---|---|
| **IP Generating Ingredients Revenue** | | | |
| Ectoine | 2.50% | RFR | $ 1.3 |
| HDF | 2.50% | RFR | 2.4 |
| Squalene adjuvant | 2.50% | RFR | 2.2 |
| Cholesterol (vaccine excipient) | 1.75% | RFR | 2.0 |
| Cholesterol (cosmetic ingredient) | 1.75% | RFR | 1.4 |
| **IP Generating Licensing Revenue** | | | |
| Licensing Revenue | N/A | DCF | 17.9 |
| **Previously Licensed IP Generating Ingredients Revenue** | | | |
| Various Ingredients | N/A | N/A | - |
| **Previously Licensed IP Not Generating Ingredients Revenue** | | | |
| Cannabinoids | N/A | N/A | - |
| **Total Value of Amyris IP** | | | **$ 27.1** |

8

LA:4861-3170-6783.1 03703.004

21. Generally, there are three methodologies for valuing intellectual property, and specifically a patent: the income approach, the market approach and the cost approach.[11] I utilized the income approach as the appropriate methodology to value the Amyris IP. The income approach estimates the future cash flows generated from a specific piece of intellectual property. When valuing a patent using this methodology, there are several variables required to perform the analysis. These include, but are not limited to: (a) projected income stream associated with the product sales or licensing of the patent; (b) an estimated duration of the patent's useful life; (c) consideration of patent specific risk factors; and (d) a discount rate.

22. There are several methodologies used to value intellectual property utilizing the income approach. These include, but are not limited to the DCF and the RFR.[12]

23. The DCF method estimates the value of intellectual property by calculating the present value of the cash flows specifically attributable to the subject intellectual property, over the estimated life of the intellectual property. This methodology is very similar to how the enterprise value of a company would be determined using a DCF. The projected cash flows attributable to the subject intellectual property are forecasted for the useful life of the patent and discounted back at the company's discount rate, which assumes that the subject company's business risk is equivalent to the risk associated with the patent being valued. I utilized the DCF methodology, based on the Disclosure Statement Projections, as extended until December 31, 2033 consistent

---

[11] In this case, I rejected the market approach for valuing patents because, by definition, patents are unique and there are no patents that are directly comparable to the Amyris IP. I also rejected the cost approach because there is insufficient information to apply the historical cost, replication cost or replacement cost methodologies.

[12] I rejected the use of the Venture Capital Method in this case as it does not properly reflect the specific risks associated with a given patent.

9

LA:4861-3170-6783.1 03703.004

with the DCF enterprise valuation of Amyris (utilizing a WACC of 17.3%, a PGR of 3% and Amyris' UFCF margin), to value the IP Generating Licensing Revenue at $17.9 million.[13]

24. The RFR methodology is a standard framework used by financial professionals for valuing intangible assets. The RFR method estimates implied royalties over a projection period that the owner of the IP is "relieved" from paying due to owning the intangible asset, and then discounts those royalties by a discount rate back to the valuation date. In other words, the RFR method determines how much the subject company would have to pay to rent the IP from a third-party if it did not own it. While by definition a patent is unique, it is my opinion that the RFR method is a reasonable approach to value certain of the Amyris IP because comparable royalty rates are applied to Amyris-specific revenue. I utilized the RFR methodology to value the IP Generating Ingredients Revenue (Amyris' IP relating to ectoine ($1.3 million), HDF ($2.4 million), squalene adjuvant ($2.2 million), cholesterol (vaccine excipient) ($2.0 million), and cholesterol (cosmetic ingredient) ($1.4 million)).

25. Previously Licensed IP Generating Ingredients Revenue includes licenses relating to technology that has been licensed to third-parties pursuant to research and collaboration agreements and/or that have been granted in perpetuity to third-parties for the fields of use that are contemplated in the Disclosure Statement Projections (Bisabolol, GAA, Hemisqualane, Manool, Pachouli, RebM, Retinol, Sandalwood, Sclareol, Squalane and Vanillin). It is my opinion that, because the Previously Licensed IP Generating Ingredients Revenue have been perpetually licensed to third-parties and/or the Disclosure Statement Projections do not contain projected revenue from such research and collaboration agreements, it has no value to Amyris.

---

[13] Due to the change in the WACC (from 17.7% in my expert report dated January 11, 2024 to 17.3% utilized here), the value of the IP Generating Licensing Revenue increased from $16.8 million to $17.9 million.

**Valuation of the Consumer Brands IP**

26.     It is my opinion that, as of August 9, 2023, the value of the Consumer Brands IP is $9.4 million, as set forth in the below chart.  It is my opinion that from August 9, 2023 to February 9, 2024, the value of the Consumer Brands IP will not be materially different.

| ($ millions) Brand | Concluded Value |
|---|---|
| Biossance | $ 6.6 |
| JVN | 0.5 |
| Rose Inc | 0.6 |
| Pipette | 0.6 |
| MenoLabs | 0.8 |
| Stripes | 0.2 |
| 4U by Tia | 0.2 |
| **Total Consumer Brand Value** | **$ 9.4** |

27.     To determine the value of the Consumer Brands IP, I first reviewed and analyzed the purchase price paid by third-parties to buy each consumer brand business. Next, utilizing comparable transactions I identified through the Markables database,[14] I determined the proportion of the purchase price that was attributable to the brand IP.

28.     According to the *Motion for an Order Approving Bid Procedures* filed on September 18, 2023, at that time there were already 300 potential buyers, 200 of whom were active, 85 of whom had signed non-disclosure agreements to be given access to the data room, and more than a dozen had submitted non-binding indications of interest.[15] The large number of parties that expressed interest in buying Amyris' consumer brands business supports the notion that the

---

[14] Per its website, Markables database is a 24/7 web-based data vendor which caters to the needs of valuation professionals all over the world.  For more information, see https://www.markables.net/.

[15] *Motion for an Order Approving Bid Procedures*, filed September 18, 2023, p. 7, ¶ 15. [Docket No. 316].

purchase price of the various consumer brands business was based on an arm's length transaction and therefore is representative of the fair market value of the consumer brands businesses acquired.

29. As a test of reasonableness of my concluded value for the Consumer Brands IP, I compared the difference between the enterprise value/purchase price and the brand value for each brand to the book value of the assets acquired in each asset purchase agreement. In each case, inventory was acquired by the purchaser and in 3 of the 7 transactions (Biossance, Rose Inc. and 4U by Tia), accounts receivable was acquired. Various other assets including marketing materials, accounting records, contracts, warranties, permits, and office equipment were also acquired. Conservatively, I placed no value on these other assets acquired.

30. In total, my valuation of the Consumer Brands IP implies that the other assets acquired were acquired at approximately one-third of their book values. This confirms the reasonableness of my brand value.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 22, 2024         */s/  Bradley M. Orelowitz*
                                Bradley M. Orelowitz
                                Managing Director
                                Back Bay Management Corporation and its division,
                                The Michel-Shaked Group