**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>AMYRIS, INC.,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 23-11131 (TMH)<br><br>(Jointly Administered)<br><br>Related Docket No. 1170 |

**DECLARATION OF STEVEN J. FLEMING IN SUPPORT OF
CONFIRMATION OF THIRD AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF AMYRIS, INC. AND ITS AFFILIATED DEBTORS
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

I, Steven J. Fleming, pursuant to section 1726 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am a Principal of PwC US Business Advisory LLP ("PwC"), an experienced, leading, full-service financial services, consulting, and accounting firm with over 79 offices and more than 50,000 employees in the United States, which serves as the Debtors' financial advisor pursuant to an order entered on September 20, 2023 [Docket No. 329].

2. I am the leader of PwC's US Business Recovery Services Practice, a position that I have held since 2016, after being a senior member in the group for seven years. Prior to these positions, I held a senior position in PwC's Transaction Services practice in Dubai, UAE, where I was responsible for expanding the firm's Corporate Finance and Valuation practices across the Middle East and North Africa. I have been employed by PwC (and its predecessor entities) since August 1998, and have held other senior positions, both domestically and abroad.

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https:\cases.stretto.com\amyris. The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

3. I received a Bachelor of Science in Finance from Lehigh University in 1998 and a Master of Business Administration from Columbia Business School in 2004. I am a Certified Insolvency and Restructuring Advisor (CIRA) and hold a Certification in Distressed Business Valuation (CDBV), both of which are designations issued by the Association of Insolvency and Restructuring Advisors. I am also a Certified Turnaround Professional (CTP), a designation issued by the Turnaround Management Association. During the course of my career, I have served as a chief restructuring officer and have testified in numerous chapter 11 cases on matters relating to financing, valuation, cash forecasting, liquidation analyses, and sale processes. I have been qualified as an expert witness with respect to valuation, cash forecasting, and section 363 sale processes.

4. As discussed in more detail in the *Declaration of Han Kieftenbeld in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), as part of the Company's "Fit-to-Win" restructuring strategy, the Company retained PwC in April 2023 to work with management to accelerate improvements and further the Company's "Fit-to-Win" efficiency and cost reduction program. Since PwC was retained, I have worked hand-in-hand with the Company's management, directors and other professionals to develop a restructuring strategy, consulted on the preparation and filing of these Chapter 11 Cases and assisted the Company's management with the development of the postpetition budgets. In connection with the foregoing, I have also worked extensively with, and participated in negotiations with, the Foris Secured Parties and their professionals and advisors.

5. In my capacity at PwC, I am familiar with the Debtors' businesses, financial affairs, and operations. I submit this Declaration in support of confirmation of the *Third Amended Joint*

*Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* (as modified, amended, or supplemented from time to time, the "Plan").[2]

6. Except as otherwise noted, I have personal knowledge of the matters set forth herein. All facts set forth in the Declaration are based on my personal knowledge; my discussions with the Debtors' senior management, employees, and counsel and other advisors, and with other PwC personnel; my review of relevant documents and information; and/or my opinion based on my experience and knowledge of the Debtors' operations and financial condition. In making the Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors and other PwC personnel have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing the Declaration. If I were called to testify as a witness in this matter, I could and would testify competently to the facts set forth herein.

## Financial Projections/Feasibility of the Plan

7. With my advice and assistance and that of other PwC personnel and other advisors, the Debtors prepared financial projections for the calendar years 2024 - 2028 (together with and subject to the notes regarding assumptions and other matters included as part thereof, the "Financial Projections"), attached as Exhibit E to the Disclosure Statement [Docket No. 893].

8. In connection with the Debtors' restructuring efforts, with PwC's advice and assistance, the Debtors, led by their Interim CEO and CFO, undertook a comprehensive business and financial planning exercise that encompassed all aspects of the business. This process was supported by key functional leaders in the Company, including but not limited to the Company's

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or in *Debtors' Memorandum of Law in Support of Confirmation of Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code, and Omnibus Reply to Objections*, as applicable.

COO, SVP Corporate Finance, Chief People Officer, SVP Manufacturing leader, SVP R&D, SVP Process Development Chief Strategy and Product Development Officer, Senior Director of Strategic Partnerships and members of their respective teams. The Company was supported by its outside advisors, including but not limited to PwC, Intrepid Financial Partners and Ankura Consulting, LLC.

9. As a result, the Company discontinued its entire Consumer portfolio (brands and services) through a combination of sale transactions and shutdowns resulting in a significant downsizing and simplification of its global operating footprint, workforce and cost structure. Going forward, the Company's strategy and business plan is focused on its core Lab-to-Market™ competencies of research and development of sustainable ingredients, commercial scale-up and manufacturing, and business-to-business commercial partnerships.

10. The Company's five year go-forward business plan, referred to as "Amyris 2.0," was developed on both a top down and bottoms up basis, and went through many iterations analyzing multiple possible scenarios in order to assess, among other things, the capital requirements and cash flows under each scenario. Costs were analyzed on a bottom up basis, by cost center, by person. Ingredients revenue was forecasted by customer, by ingredient based on volume and pricing assumptions provided by the Company's key commercial partners. A comprehensive capital expenditure (CAPEX) budget was developed to support the growth and maintenance contemplated in the plan. The financial planning processes included the development of a financial model that underpins the forecasted income statement, balance sheet and statement of cash flows.

11. I worked directly with the Debtors' senior management team, functional leaders and other advisors in the development and preparation of the Financial Projections and the

4

assumptions on which they are based. The Financial Projections were reviewed and endorsed by management and reviewed with and ultimately approved by the Debtors' board of directors. I am familiar with the methods used, and the conclusions reached, in the preparation of the Financial Projections. I have reviewed the material assumptions included in the Financial Projections, and I believe that the assumptions embodied therein were prepared in good faith and are rooted in the experience of the Debtors' management team, reflect the best information available at the time the Financial Projections were developed incorporating material considerations pertaining to the business plan, the current industry environment and the Debtors' historical operating performance and operating costs and provide a foundation for the Financial Projections and the Plan (although such assumptions are inherently subject to uncertainties and risk given the nature of the Debtors' business).

12.    The Plan effectuates a re-start of the Debtors' business operations. The Debtors have adequate funding for their Plan obligations and for their near term operations. The Reorganized Debtors expect to operate their business and service their ordinary course operational obligations with operating cash flow and the Exit First Lien Facility, which provides for up to $160 million principal amount, subject to the assumptions and limitations set forth in the Financial Projections.

13.    With the Debtors and their other advisors, I directly worked on preparing, with other PwC personnel, the Plan Effective Date Funding Schedule filed with the Court on December 13, 2023 [Docket No. 900] (the "<u>Funding Schedule</u>"). An updated Funding Schedule is attached hereto as **Exhibit A**. As set forth therein, the Debtors have sufficient funds to make all payments required to be made on the Effective Date of the Plan. Pursuant to the Plan, Administrative Creditors will either be paid on the Effective Date if their claims are Allowed on that date or within

30 days of allowance by the Court. If an Administrative Claim is Allowed post-Effective Date, it will be paid by the Reorganized Debtors. The Creditor Trust will be funded with the Creditor Trust Assets on the Effective Date. At emergence, the total estimated Administrative Claims are approximately $26 million (net of the $30 million consumer brand sale proceeds which will be used to pay Allowed Administrative Claims). Other payments due on the Effective Date total approximately $54 million. The Plan provides that the Third-Party Release Settlement Amount, Estate Claims Settlement Cash Consideration, and the Lavvan Settlement Consideration will be funded by the DIP Lenders, the Foris Prepetition Secured Lenders or from an advance under the $160 million Exit First Lien Facility. Thus, the Plan provides that either the $160 million Exit First Lien Facility or funds from the Foris Secured Parties will be used to fund all payments required to be made on the Effective Date.

14. The Debtors' restructuring pursuant to the Plan will substantially deleverage the Debtors' balance sheet by approximately $1 billion (or nearly 80%). For the reasons discussed herein and in Exhibit D to the Disclosure Statement, I believe that this deleveraging and the additional liquidity from the Exit First Lien Facility equip the Reorganized Debtors for their near term post-emergence operations.

15. The estimates set forth in the attached Funding Schedule for the Administrative/Priority Claims and other payments remain reasonable estimates, or within a reasonable range of estimates, for purposes of estimating the total cash needs of the Debtors on and shortly after the Effective Date (with reasonable cushions for disputed Administrative/Priority Claims as they may become Allowed, disallowed or otherwise resolved). In addition to the approximately $30.8 million in net sales and other asset proceeds set forth in the Funding Schedule, the Debtors have access to and will draw in part upon, as necessary, the $160 million Exit First

Lien Facility on and after the Effective Date, to pay for all Allowed Administrative Claims and other allowed priority claims as provided in the Plan.

### Clerkenwell Objection

16.  10-11 Clerkenwell Green Limited ("Clerkenwell") has filed an objection to the Plan, alleging, among other things, that the Plan is not feasible because the Debtors have not shown that they have sufficient resources to fund the Plan and to pay Allowed Administrative Claims in full.  As set forth above, these allegations are incorrect.

17.  Clerkenwell alleges it is a $2.9 million administrative creditor of the Debtor Amyris, Inc. ("Amyris") pursuant to a prepetition guaranty of Amyris[3] of that certain lease entitled *Counterpart Lease Related to Uniform Works 10-11 Clerkenwell Green, London, EC1R ODP*, dated February 15, 2022 (the "Lease") between Clerkenwell and MG Empower Limited ("Tenant"), a non-debtor entity unaffiliated with the Debtors.[4]  Clerkenwell has also filed a $15,722,174.00 general unsecured proof of claim against the Debtors [POC No. 522, as amended by POC No. 531] based on the Lease.  Clerkenwell holds an undrawn £1.4 million (approximately $1.8 million) cash-collateralized letter of credit as collateral for any obligations owed under the Lease by Tenant.

18.  Clerkenwell has only two possible Claims under the Plan.  Either Clerkenwell has a $2.9 million Administrative Claim which will be paid in full if its Claim is Allowed or Clerkenwell has a Class 8 General Unsecured Claim which will be handled by the Creditor Trust.

19.  If Clerkenwell's alleged Administrative Claim is Allowed prior to the Effective Date, it will be paid on the Effective Date.  To the extent an Allowed Administrative Claim is not

---

[3] The Debtors dispute that any claims of Clerkenwell are entitled to administrative status.
[4] Tenant had been an affiliated entity of Amyris but was sold pursuant to a stock transaction on August 4, 2023, prior to the Petition Date.  The buyer was supposed to replace the Amyris guaranty of the Lease but failed to do so.  The Reorganized Debtors have retained its causes of action against the buyer.

4889-5119-7343.7 03703.004

paid on the Effective Date, the Reorganized Debtors will utilize available cash or the Exit First Lien Facility to fund such Allowed Administrative Claims, including any Allowed Administrative Claim of Clerkenwell. If Clerkenwell has an Allowed General Unsecured Claim it will be paid through the Creditor Trust which will have been funded on the Effective Date. Thus, regardless of whether Clerkenwell has an Administrative Claim or a General Unsecured Claim, the funds needed to pay such claim will be available. Even if the estimates set out in the Funding Schedule do not include Clerkenwell's alleged $2.9 million Administrative Claim, the Debtors or Reorganized Debtors, as applicable to the timing of the allowance of any Clerkenwell Administrative Claim, will have sufficient availability under the Exit Facility or from revenues from which such Claim can be paid.

**Successful Reorganization/Best Interest of Creditors Test**

20. The Plan effectuates a re-start of the Debtors' business operations. The reorganization contemplated by the Plan is more likely to be successful if the officers and directors of the Reorganized Debtors are able to focus on the operations of the business and the Reorganized Debtors are not distracted by or forced to bear the costs of protracted litigation brought by those opting out of the Third Party Release.

21. I understand that the best interests of creditors test can be satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan. I believe that the best interests of creditors test is satisfied in this case. As discussed in the Disclosure Statement and herein, the Plan is expected to provide a substantially greater recovery than would a chapter 7 liquidation for unsecured creditors, because of the Foris Plan Contributions.

8

22.     The Debtors prepared a Debtor-by-Debtor liquidation analysis attached as Exhibit D to the Disclosure Statement and estimates of the potential recoveries of the Classes under the Plan in Section 1.D of the Plan (the "Plan Recovery/Liquidation Analysis"), and based on the assumptions and other information provided therein, I believe that the Plan Recovery/Liquidation Analysis is reasonable and well-supported as of the dates such analysis was prepared.

23.     Based on the Plan Recovery/Liquidation Analysis, and as further supported by the *Declaration of Bradley M. Orelowitz in Support of Confirmation of Third Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* being filed concurrently herewith, the Debtors believe that the value of their assets are insufficient to satisfy the DIP Facility Claim and Administrative Claims. Accordingly, Holders of General Unsecured Claims and Convertible Notes Claims, as well as any other junior creditors, would not receive any distributions or recovery, absent the transactions and settlements contemplated in the Plan, including the Foris Plan Contributions. As set forth in the Plan Recovery/Liquidation Analysis (after deducting the costs of liquidation and satisfying the DSM RealSweet Secured Claim), the estate would hold only between $26.1 million and $79.6 million, amounts insufficient to satisfy the more than $200 million Superpriority DIP Facility Claim.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 22, 2024            */s/ Steven J. Fleming*
                                    Steven J. Fleming
                                    Principal
                                    PwC US Business Advisory LLP