## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC., *et al.*,[1] | Case No. 23-11131 (TMH) |
| Debtors. | (Jointly Administered) |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF PLAN OF REORGANIZATION OF AMYRIS, INC. AND ITS AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Richard M. Pachulski, (admitted *pro hac vice*)
Debra I. Grassgreen, (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
Jason H. Rosell, (admitted *pro hac vice*)
Steven W. Golden (DE Bar No. 6807)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Tel:  302-652-4100
Fax: 302-652-4400
rpachulski@pszjlaw.com
dgrassgreen@pszjlaw.com
joneill@pszjlaw.com
jrosell@pszjlaw.com
sgolden@pszjlaw.com

*Counsel to the Debtors and Debtors in Possession*

---

[1] A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://cases.stretto.com/amyris.  The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ........................................................................................ 2

II. BACKGROUND ............................................................................................................ 7

III. SUMMARY OF THE PLAN ....................................................................................... 8

IV. THE PLAN SATISFIES EACH OF THE REQUIREMENTS FOR CONFIRMATION
UNDER THE BANKRUPTCY CODE ............................................................................ 15

    A. The Plan Satisfies Section 1129(a)(1) of the Bankruptcy Code .......................... 15

        i.   The Plan Meets the Requirements of Section 1122 of the Bankruptcy Code ............. 16

        ii.  The Plan Meets the Requirements of Section 1123(a) of the Bankruptcy Code ........ 17

    B. The Plan Complies With the Discretionary Provisions of Section 1123(b) of the
Bankruptcy Code ..................................................................................................... 19

        i.   Rule 9019 Settlements ........................................................................... 21

        ii.  The Exculpation, Third-Party Release, Direct Claims Injunction and Related
Provisions Are Appropriate and Justified. ................................................... 28

    C. The Debtors Have Satisfied Section 1129(a)(2) of the Bankruptcy Code ........................ 29

        i.   The Debtors Have Complied With the Requirements of Section 1125 of the
Bankruptcy Code ................................................................................... 29

        ii.  The Debtors Have Complied With the Requirements of Bankruptcy Rules 3017(d)
and 3018(c) ......................................................................................... 30

        iii. The Vote Tabulation Satisfied Section 1126(c) and Bankruptcy Rule 3018(a) ......... 32

    D. The Plan Has Been Proposed in Good Faith (Section 1129(a)(3)) .................................. 34

    E. Payments for Services and Expenses (Section 1129(a)(4)) ............................................ 35

    F. Directors and Officers (Section 1129(a)(5)) ................................................................. 36

    G. Rate Changes (Section 1129(a)(6)) ............................................................................. 36

    H. The Plan Satisfies the "Best Interests" Test (Section 1129(a)(7)) .................................. 36

    I. Acceptance by Impaired Classes (Section 1129(a)(8)) .................................................. 38

J.   Treatment of Priority Claims (Section 1129(a)(9)) ...........................................................39

K.   Acceptance by at Least One Impaired Class (Section 1129(a)(10)).................................40

L.   The Plan Is Feasible (Section 1129 (a)(11)) ......................................................................40

M.   Payment of Certain Fees (Section 1129(a)(12)) ...............................................................43

N.   Continuation of the Debtors' Obligations to Pay Retiree Benefits (Section 1129 (a)(13))....................................................................................................................................44

O.   The Plan Satisfies the "Cramdown" Requirements of Section 1129(b)(1)......................44

   i.    The Plan Does Not Unfairly Discriminate Against the Deemed Rejecting Classes... 44

   ii.   The Plan Is Fair and Equitable as to the Deemed Rejecting Classes.........................46

P.   The Plan's Purpose is Consistent with  the Bankruptcy Code (Section 1129(d)) ............46

**V. MODIFICATIONS TO THE PLAN DO NOT ADVERSELY AFFECT HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN AND DO NOT REQUIRE RESOLICITATION ..........................................................................................................47**

**VI. WAIVER OF THE STAY OF THE CONFIRMATION ORDER ...................................48**

**VII. CONCLUSION ...................................................................................................................48**

# TABLE OF AUTHORITIES

**Pages**

<u>**Cases**</u>

*Aetna Cas. & Sur. Co. v. Clerk of the U.S. Bankr. Ct. (In re Chateaugay Corp.)*
  89 F.3d 942 (2d Cir. 1996) ................................................................. 16

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*
  526 U.S. 434 (1999) ............................................................... 37, 46

*Clarkson v. Cooke Sale & Serv. Co. (In re Clarkson)*
  767 F.2d 417 (8th Cir. 1985) ................................................................. 41

*Enron Corp. v. New Power Co. (In re New Power Co.),*
  438 F.3d 1113 (11th Cir. 2006) ................................................................. 47

*Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*
  10 F.3d 944 (2d Cir. 1993) ................................................................. 16

*In re 203 N. LaSalle St. P'ship*
  190 B.R. 567 (Bankr. N.D. Ill. 1995) ................................................................. 45

*In re 222 Liberty Assoc.*
  108 B.R. 971 (Bankr. E.D. Pa. 1990) ................................................................. 45

*In re Abbotts Dairies,*
  788 F.2d 143 (3d Cir. 1986) ................................................................. 34

*In re Adelphia Commc'n Corp.*
  368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................................................. 16

*In re Adelphia Commc'ns Corp.*
  368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................................................. 37

*In re Aztec Co.*
  107 B.R. 585 (Bankr. M.D. Tenn. 1989) ................................................................. 45

*In re Freymiller Trucking, Inc.*
  190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................. 45

*In re Idearc Inc.*
  423 B.R. 138 (Bankr. N.D. Tex. 2009) ................................................................. 45

*In re J T Thorpe Co.*
  308 B.R. 782 (Bankr. S.D. Tex. 2003) ................................................................. 15

*In re Jersey City Med. Ctr.,*
  817 F.2d 1055 (3d Cir. 1987) ................................................................. 16

*In re Lakeside Glob. II, Ltd.*
  116 B.R. 499 (Bankr. S.D. Tex. 1989) ................................................................. 41

*In re Landing Assocs.*
  157 B.R. 791 (Bankr. W.D. Tex. 1993) ................................................................. 36

*In re Lapworth*
   No. 97-34529, 1998 Bankr. LEXIS 1383 (Bankr. E.D. Pa. Nov. 2, 1998) ............................. 29

*In re Lason, Inc.*
   300 B.R. 227 (Bankr. D. Del. 2003) ...................................................................................... 37

*In re Lernout & Hauspie Speech Prods.*,
   301 B.R. 651 (Bankr. D. Del. 2003) ...................................................................................... 45

*In re NH Holdings, Inc.*,
   288 B.R. 356 (Bankr. D. Del. 2002) ...................................................................................... 35

*In re Orlando Investors, L.P.*
   103 B.R. 593 (Bankr. E.D. Pa. 1989) .................................................................................... 41

*In re Prussia Assocs.*
   322 B.R. 572 (Bankr. E.D. Pa. 2005) .................................................................................... 41

*In re Resorts Int'l, Inc.*,
   145 B.R. 412 (Bankr. D.N.J. 1990) ....................................................................................... 35

*In re Sea Garden Motel & Apartments*,
   195 B.R. 294 (D.N.J. 1996) ................................................................................................... 41

*In re Sound Radio, Inc.*
   93 B.R. 849 (Bankr. D.N.J. 1988) ......................................................................................... 34

*In re Texaco Inc.*
   84 B.R. 893 (Bankr. S.D.N.Y. 1988) ..................................................................................... 29

*In re W.R. Grace & Co.*
   729 F.3d 311 (3d Cir. 2013) .................................................................................................. 18

*In re Washington Mutual Inc.*
   442 B.R. 314 (Bankr. D. Del. 2011) ...................................................................................... 18

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*
   843 F.2d 636 (2d Cir. 1988) ........................................................................................... 15, 41

*Official Comm. v. Michelson (In re Michelson)*
   141 B.R. 715 (Bankr. E.D. Cal. 1992) ................................................................................... 29

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*,
   800 F.2d 581 (6th Cir. 1986) ................................................................................................. 16

## State Cases

H.R. Rep. No. 595, 95th Cong. 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5962, 6368
   (1977) ..................................................................................................................................... 15

S. Rep. No. 989, 95th Cong. 2d Sess. 126 (1978),
   *reprinted in* 1978 U.S.C.C.A.N. 5787, 5913 (1978) ....................................................... 15, 29

## Statutes

11 U.S.C. § 1107(a) ................................................................................................................... 7

11 U.S.C. § 1108 ....................................................................................................................... 7

11 U.S.C. § 1114 .......................................................................................................... 44

11 U.S.C. § 1123(a)(1) ................................................................................................. 17

11 U.S.C. § 1123(a)(4) ................................................................................................. 18

11 U.S.C. § 1125(b) ..................................................................................................... 29

11 U.S.C. § 1126(d) ..................................................................................................... 39

11 U.S.C. § 1126(f) ................................................................................................. 32, 39

11 U.S.C. § 1126(g) ..................................................................................................... 32

11 U.S.C. § 1127(a) ..................................................................................................... 47

11 U.S.C. § 1129(a) ..................................................................................................... 44

11 U.S.C. § 1129(a)(10) ............................................................................................... 40

11 U.S.C. § 1129(a)(12) ............................................................................................... 43

11 U.S.C. § 1129(a)(13) ............................................................................................... 44

11 U.S.C. § 1129(a)(14) ............................................................................................... 44

11 U.S.C. § 1129(a)(15) ............................................................................................... 44

11 U.S.C. § 1129(a)(16) ............................................................................................... 44

11 U.S.C. § 1129(a)(9) ....................................................................................... 17, 39, 40

11 U.S.C. § 1129(a)(9)(A) ............................................................................................ 39

11 U.S.C. § 1129(a)(9)(B) ............................................................................................ 39

11 U.S.C. § 1129(a)(9)(C) ............................................................................................ 39

11 U.S.C. § 1129(b)(1) ................................................................................................. 44

11 U.S.C. § 507(a) ....................................................................................................... 17

11 U.S.C. § 507(a)(1) ................................................................................................... 39

11 U.S.C. § 507(a)(3) ................................................................................................... 39

11 U.S.C. § 507(a)(7) ................................................................................................... 39

11 U.S.C. § 507(a)(8) ................................................................................................... 39

28 U.S.C. § 1334 .......................................................................................................... 15

28 U.S.C. § 1408 .......................................................................................................... 15

28 U.S.C. § 1409 .......................................................................................................... 15

28 U.S.C. § 157(b) ....................................................................................................... 15

28 U.S.C. § 1930 .......................................................................................................... 43

**Rules**

Fed. R. Bankr. P. 2002(b) ............................................................................................ 30

Fed. R. Bankr. P. 3002(c) ............................................................................................ 38

Fed. R. Bankr. P. 3017 ............................................................................................... 6, 30, 31

Fed. R. Bankr. P. 3017(d) ...................................................................................... 30, 31, 34

Fed. R. Bankr. P. 3017(f) ................................................................................................. 30

Fed. R. Bankr. P. 3018 ................................................................................................. 6, 30

Fed. R. Bankr. P. 3018(a) ................................................................................................ 34

Fed. R. Bankr. P. 3018(c) ........................................................................................... 31, 34

Fed. R. Bankr. P. 3018(e) ................................................................................................ 34

Fed. R. Bankr. P. 3019 .................................................................................................... 47

Fed. R. Bankr. P. 3020 .................................................................................................... 48

Fed. R. Bankr. P. 3020(e) ................................................................................................ 48

Fed. R. Bankr. P. 6004 .................................................................................................... 48

Fed. R. Bankr. P. 6004(h) ................................................................................................ 48

Fed. R. Bankr. P. 6006 .................................................................................................... 48

Fed. R. Bankr. P. 6006(d) ................................................................................................ 48

Amyris, Inc. and the other above-captioned debtors and debtors in possession (the "Debtors" or the "Company") submit this memorandum of law (the "Memorandum") in support of confirmation of the Plan (as defined below).[2]  Attached hereto is the Debtors' proposed order confirming the Plan as modified (the "Proposed Confirmation Order").

This Memorandum, confirmation of the Plan as modified, and entry of the Proposed Confirmation Order are supported by, *inter alia*:

1) *Third Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors* [D.I. 1170] (including all exhibits thereto and as amended, supplemented, or otherwise modified from time to time, the "Plan"), filed on January 22, 2024;

2) *Disclosure Statement With Respect to Second Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors, as Modified* [D.I. 893] (including all exhibits thereto, the "Disclosure Statement"), filed on December 12, 2023;

3) *Order (I) Approving the Disclosure Statement; (II) Scheduling Confirmation Hearing; (III) Approving Form and Manner of Notice of Confirmation Hearing; (IV) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject Plan, Including (A) Approving Form and Content of Solicitation Materials; (B) Establishing Record Date and Approving Procedures for Distribution of Solicitation Materials; (C) Approving Forms of Ballots; (D) Establishing Voting Deadline for Receipt of Ballots and (E) Approving Procedures for Vote Tabulations; (V) Approving Form and Manner of Notice of Plan Releases; (VI) Establishing Deadline and Procedures for Filing Objections to Confirmation of the Plan; and (VII) Granting Related Relief* [D.I. 897] (the "Solicitation Procedures Order"), entered on December 13, 2023; and

4) The following documents that have been filed or are being filed substantially contemporaneously herewith:

    a. *Omnibus Reply in Support of Confirmation of Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* (the "Omnibus Reply")'

    b. *Declaration of Philip J. Gund in Support of Confirmation of Third Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* (the "Gund Declaration");

---

[2]    Capitalized terms not defined herein shall have the meanings ascribed in the Plan.

c.   *Declaration of Han Kieftenbeld in Support of Confirmation of Third Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* (the "Kieftenbeld Declaration");

d.   *Declaration of Bradley M. Orelowitz in Support of Confirmation of Third Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* (the "Orelowitz Declaration");

e.   *Declaration of Steven J. Fleming in Support of Confirmation of Third Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors Under Chapter 11 of the Bankruptcy Code* (the "Fleming Declaration" and together with the Gund Declaration, the Kieftenbeld Declaration, and the Orelowitz Declaration, the "Plan Declaration(s)");

f.   *Voting Tabulation Affidavit of Jamilla Dennis of Stretto Regarding the Second Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors, As Modified* (the "Voting Declaration");

g.   *Notice of Filing of Plan Supplement for the Second Amended Joint Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors, As Modified* [D.I. 1112] (the "First Plan Supplement");

h.   *Notice of Filing of Amended Plan Supplement for the Third Amended Joint Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors, As Modified* (together with the "First Plan Supplement", the "Plan Supplement"); and

i.   The affidavits or other proofs of service of notices with respect to the Plan, Confirmation Hearing and solicitation of voting on the Plan (including, without limitation, all of the Docket Nos. referenced in the Voting Declaration) (the "Solicitation Service Filings").

## I.

## PRELIMINARY STATEMENT

1.     The Debtors' proposed Plan presents a viable, efficient, and advantageous way forward for the Company to emerge from bankruptcy with a sustainable capital structure, while ensuring that all Allowed Administrative  Claims and Priority Claims are paid or otherwise satisfied as required under the Bankruptcy Code and general unsecured creditors receive substantial, meaningful recoveries, notwithstanding that the senior secured lenders—the Foris Secured Parties—will not recover in full on their senior claims.  Indeed, given the Foris Secured

Parties' senior position and the lack of any other workable restructuring alternative, and in light of the disappointing results of the approved and consummated asset sales to date, the heavily-negotiated and broadly supported Plan, which importantly has the support of the Debtors' key creditor constituencies (including the Creditors' Committee), is the only path for a successful reorganization. As discussed below, the Plan enjoys broad and extensive support among key constituencies based on the Plan voting results.

2.      _Negotiation/Formulation of the Global Settlement and Plan_:    After extensive negotiations undertaken in good faith by the parties, the Debtors, Foris and the other Foris Prepetition Secured Lenders, the DIP Secured Parties, the Ad Hoc Group, and the Creditors' Committee (all parties to the postpetition Plan Support Agreement) have reached a global settlement set forth in and composing the Plan. The Debtors are pleased to present the proposed amended Plan of reorganization which provides for, among other things, a cash recovery to unsecured creditors (along with the assignment of certain estate claims to a Creditor Trust) in exchange for their support of a release of certain estate claims and Causes of Action, as well as additional consideration in connection with third-party releases.

3.      The Plan provides for the satisfaction of Administrative Claims, the treatment of Secured Claims in accordance with the Bankruptcy Code or as agreed by the Holders of such Claims, and the continuation of the Debtors' operations for the benefit of employees, vendors, contract counterparties, and customers. The Plan restructures the Debtors' balance sheet and operations by facilitating the Debtors' exit from and sale of their Consumer Brands Businesses, a potential sale of the Other Assets, and a distribution to certain stakeholders through the Plan. The Plan gives the DIP Secured Parties and Holders of the Foris Prepetition Secured Claims discretion to satisfy such claims not paid from the Debtors' operations through an allocation of certain net

sale proceeds, a rollup (or assumption) into the Exit Facility (providing up to $160 million), and the new equity interests of Reorganized Amyris.  The restructuring pursuant to the Plan will substantially deleverage the Debtors' balance sheet by approximately $1 billion (or nearly 80%).

4.      Further, under the Plan, the Debtors seek a Direct Claims Injunction that bars all holders of Direct Claims from pursuing such claims against the Released Parties.[3]  In consideration for such releases, holders of Direct Claims will receive distributions from the Third-Party Release Settlement. Following the issuance of the Direct Claims Injunction in accordance with the Confirmation Order, any and all holders of Direct Claims will be permanently enjoined from seeking satisfaction of their Direct Claims against the Released Parties or any other Direct Claims Injunction Party or the property of any such Direct Claims Injunction Party.  Alternatively, if the Third-Party Release Settlement is not approved on a non-consensual basis and the Direct Claims Threshold[4] is satisfied, the Third-Party Release Settlement Amounts will be reduced and only will be payable to creditors who do not validly opt out of the releases under the Plan.[5]

---

[3]  "Direct Claims" means any claim or Cause of Action held by a Releasing Party against any of the Released Parties (excluding the Debtors) and their respective Related Parties, but only to the extent such claims arise from, relate to, or are connected with, directly or indirectly, in any manner whatsoever, the Debtors, including their respective assets, liabilities, operations, financings, contractual agreements, licenses, and including the governance thereof, and existing on or prior to the Effective Date (including prior to the Petition Date).

[4]  "Direct Claims Threshold" means (a) with respect to holders of Direct Claims who are creditors of the Debtors, determined separately with respect to such creditors classified in Class 7 and Class 8, respectively, creditors who hold at least a majority in amount of the Claims asserted against the Debtors (such Claims measured as of the Record Date (as defined in the Solicitation Materials) on the same basis as such Claims are Allowed for voting purposes) do not elect to opt out of granting the Third-Party Release; and (b) with respect to holders of Direct Claims who are Holders of any Interests consisting of issued and outstanding shares of common stock of Parent, such Holders who hold at least a majority of the outstanding common stock of Parent (excluding for purposes of such calculation, any outstanding common stock of Parent held by any of the Direct Claims Injunction Parties) (such outstanding common stock of Parent measured as of the Distribution Record Date) do not elect to opt out of granting the Third-Party Release.

[5]  The Debtors have separately filed the Omnibus Reply addressing more specifically the Direct Claims Injunction, the Third-Party Releases and related matters and responding to the Objections/Statements (as defined below) referenced herein.  The Omnibus Reply is incorporated herein by reference.

5.      Upon the Effective Date, the Plan will establish a Creditor Trust for the benefit of Holders of Class 7 Convertible Notes Claims and Class 8 General Unsecured Claims that will be funded with $2 million in Creditor Trust Funding, plus $15 million in Estate Claims Settlement Consideration and other assets pursuant to the terms of the Plan, and certain Causes of Action and preferences, the proceeds of which will be distributed according to the Plan.  Separate and apart from the treatment of Classes 7 and 8, respectively, Holders of Allowed Claims in such Classes who are also Releasing Parties will also receive, in exchange for their granting Third-Party Releases, pro rata distributions of the applicable Third-Party Release Settlement Amounts as set forth in Article I.A.198 of the Plan, and from the Estate Claims Settlement.  Under the Plan, Holders of Claims in Classes 7 and 8 are eligible to receive estimated aggregate recoveries of $51.95 to $66.4 million.

6.      The sales of the Debtors' Consumer Brands Business were anticipated to generate substantial revenue to fund Administrative Claims and satisfy obligations under the DIP Facility. Unfortunately, the Consumer Brands Business sales proceeds fell far short of the amount needed to repay the DIP Facility and the outstanding Administrative Claims -- estimated in the aggregate amount of over $240 million -- which impacts the recoveries to unsecured creditors. Under the Plan, however, because of Foris' contributions and concessions, unsecured creditors will receive a meaningful recovery within a reasonable time period plus the proceeds of litigation claims that the Creditor Trust will pursue.

7.      The Plan should be confirmed for the following reasons:

8.      **_First_**, the Plan provides creditors with the best return that can be achieved under the circumstances of these Chapter 11 Cases.  Absent the substantial contributions of the Foris

Secured Parties in particular, all creditors junior to the Foris Secured Parties would receive no value under a chapter 11 liquidating plan or a chapter 7 proceeding.

9.      ***Second***, the Plan implements the heavily-negotiated global settlement by and among the Debtors, the Foris Secured Parties, the Creditors' Committee, the DIP Lender, and the Consenting Convertible Noteholders.  The global settlement will resolve the myriad disputes between the parties on the terms set forth in the Plan, which will lead to the prompt successful resolution of these cases for the benefit of the Estates and all stakeholders.  Extensive creditor support for this settlement Plan is evidenced by the voting results set forth in the Voting Declaration, indicating broad support for the Plan.

10.     ***Finally***, the Plan complies with all applicable provisions of title 11 of the United States Code (as amended, the "Bankruptcy Code") and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  As discussed below, the Plan satisfies all of the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code and Bankruptcy Rules 3017 and 3018.

11.     The following objections, statements or reservation of rights were filed with respect to the Plan (collectively, the "Objections/Statements"): (i) the *Limited Objection* [D.I. 1150] filed by the U.S. Securities and Exchange Commission (the "SEC"), which only objects to the proposed nonconsensual Third-Party Releases; (ii) the *Objection* [D.I. 1152] of Andrew E. Roth ("Roth"), an Amyris shareholder; (iii) the *Objection* [D.I. 1154] of the United States Trustee to the nonconsensual Third-Party Releases; (iv) the *Response and Reservation of Rights* [D.I. 1155] of Disruptional Ltd. and Vest Beauty Labs LP ("Disruptional/Vest Beauty"); (v) the *Objection* [D.I. 1156] of 10-11 Clerkenwell Green Limited ("Clerkenwell"); and (vi) the *Objection* [D.I. 1168] of Givaudan SA ("Givaudan").  Informal comments to the Plan were provided by the Texas Comptroller of Public Accounts, Revenue Accounting Division ("Texas Comptroller"), Cigna

Health and Life Insurance Company, The Broad Institute, the SEC, and counsel to John Melo,[6] which comments the Debtors believe have been resolved through proposed language in the Plan and/or Confirmation Order. The Debtors will file herewith the Omnibus Reply which specifically addresses and responds to the unresolved Objections/Statements.

12.    Together, this Memorandum, the Omnibus Reply, the Combined Disclosure Statement and Plan, the Plan Declarations, the Voting Declaration, the Plan Supplement, and the Solicitation Service Filings, along with the files and records in these Chapter 11 Cases, reflect that the Plan complies with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, and provide the legal and evidentiary bases necessary for this Court to confirm the Plan.

## II.

## BACKGROUND

13.    On August 9, 2023 (the "Original Petition Date"), Amyris, Inc., and the other Original Debtors filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Debtors Clean Beauty Collaborative, Inc., Clean Beauty 4U Holdings, LLC, and Clean Beauty 4U LLC filed their respective chapter 11 petitions on August 21, 2023 (the "Supplemental Petition Date"; the applicable petition date for each Debtor, either the Original Petition Date or the Supplemental Petition Date, is referred to herein as the "Petition Date"). The Debtors are managing their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

---

[6]    Mr. Melo also filed a *Preliminary Limited Objection* [Docket No. 1158], noting the parties' ongoing discussions. As noted, the Debtors believe that these informal discussions have been resolved.

14.     On August 27, 2023, the Office of the United States Trustee (the "UST") formed the Committee [D.I. 152].

15.     The factual background regarding the Debtors is set forth in detail in the *Declaration of Han Kieftenbeld in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [D.I. 18] and is fully incorporated herein by reference.

16.     On December 12, 2023, the Debtors filed the Disclosure Statement With Respect to Second Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors, as Modified [D.I. 893].   On December 13, 2023, the Court entered the Solicitation Procedures Order [D.I. 897].   The Debtors solicited the solicitation version of the Combined Disclosure Statement and Plan in accordance with the Solicitation Procedures Order.  See Voting Decl.

17.     On January 22, 2024, the Debtors filed the *Third Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors*, which includes non-material modifications or modifications that benefit affected creditors and do not require any resolicitation of votes on the Plan.

### III.

### SUMMARY OF THE PLAN[7]

18.     Under the Plan, certain Claims are not classified and are entitled under the Bankruptcy Code (and the Plan) to a full recovery (*i.e.*, Administrative Claims and Priority Tax Claims).  As discussed further below, the Plan designates twelve classes of Claims and two classes of equity interests:[8]

---

[7]     To the extent that there is any inconsistency between this Summary and the Plan itself, the Plan controls.

[8]     The Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein and in the Plan will apply separately to each of the Debtors, except as expressly set forth in the Plan.

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 2 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| 3 | Foris Prepetition Secured Claims | Impaired | Yes |
| 4 | DSM RealSweet Secured Claims | Impaired | Yes |
| 5 | DSM Other Secured Claims | Impaired | Yes |
| 6 | Lavvan Secured Claim | Impaired | Yes[9] |
| 7 | Convertible Note Claims | Impaired | Yes |
| 8 | General Unsecured Claims | Impaired | Yes |
| 9 | DSM Contract Claims | Impaired | Yes |
| 10 | Givaudan Contract Claims | Impaired | Yes |
| 11 | Intercompany Claims | Impaired | No (consented to treatment) |
| 12 | Section 510(b) Claims | Impaired | No (deemed to reject) |
| 13 | Intercompany Interests | Unimpaired | No (deemed to accept) |
| 14 | Amyris Equity Interests | Impaired | No (deemed to reject) |

19.     The Debtors' reorganization Plan provides for the satisfaction of Administrative Claims (except as otherwise may be agreed), the treatment of Secured Claims in accordance with the Bankruptcy Code, and the continuation of the Debtors' remaining operations and businesses, on and after the Effective Date, redounding to the substantial benefit of employees, vendors, suppliers, contract counterparties, and customers. The Plan restructures the Debtors' balance sheet and operations by facilitating the Debtors' exit from and sale of their Consumer Brands Businesses, a potential sale of the Other Assets, and a distribution to certain stakeholders through the Plan. The Plan gives the DIP Secured Parties and Holders of the Foris Prepetition Secured Claims

---

[9]   Under the Third Amended Plan, the Lavvan Secured Claim is impaired and entitled to vote on the Plan.

discretion to satisfy such Claims not paid from the Debtors' operations through an allocation of certain net sale proceeds, a rollup (or assumption by the Reorganized Debtors) into the Exit Facility, and the new equity interests (the New Common Stock) of Reorganized Amyris.[10]

20.    Under the Plan, Net Proceeds to which the DIP Lender and the Foris Secured Parties are otherwise entitled will be re-allocated for the benefit of Holders of Allowed Claims that are not classified and Holders of Allowed Claims classified in Classes 1, 2, 6, 7 and 8, will be used to fund Cash payments required to be made under the Plan on or after the Effective Date: (a) to satisfy Allowed Administrative Claims (except as otherwise may be agreed), Allowed Professional Fees, Allowed Priority Tax Claims and U.S. Trustee Fees (subject to the Plan Effective Date Funding); (b) on account of the treatment of Classes 1, 2, 6, 7 and 8, (c) to provide the funding of the Ad Hoc Cross-Holder Group Restructuring Expenses, (d) to provide the funding of the Ad Hoc Group Restructuring Expenses, (e) to provide the funding of the Estate Claims Settlement Cash Consideration, and (f) to fund amounts payable to DSM pursuant to the DSM Term Sheet and/or

---

[10]    On the Effective Date, in full and complete satisfaction of the DIP Facility Claims, the DIP Lender will receive, at the option of the DIP Lender, in its sole discretion, the Net Proceeds remaining after funding the payments required under the Plan (i) to satisfy Allowed Administrative Claims, Allowed Professional Fees, Allowed Priority Tax Claims and U.S. Trustee Fees (subject to the Plan Effective Date funding), (ii) on account of the treatment of Classes 1, 2, 6, 7, & 8, (iii) to provide the funding of the Estate Claims Settlement Cash Consideration, (iv) to provide the funding of the Third-Party Release Settlement Amounts, (v) to provide the funding of the Lavvan Settlement Consideration, and the remaining DIP Facility Claims after such application of Net Proceeds shall, at the option of the DIP Lender, in its sole discretion, be rolled up (or assumed by the Reorganized Debtors), converted, exchanged, refinanced or amended and restated, into: (x) the Exit First Lien Facility and/or (y) 100% of New Common Stock. Any remaining DIP Facility Claims not rolled up (or assumed by the Reorganized Debtors), converted, exchanged, refinanced or amended and restated, into: (x) the Exit First Lien Facility and/or (y) 100% of New Common Stock shall neither receive nor retain any property under the Plan. The DIP Lender may allocate ownership of the New Common Stock among its Affiliates in its sole discretion.  Except as otherwise expressly provided in the DIP Facility Loan Agreement or the DIP Orders or the Exit First Lien Facility, upon the indefeasible payment or satisfaction in full of all Allowed DIP Facility Claims, all commitments under the DIP Facility Loan Agreement shall terminate and all Liens and security interests granted to secure the DIP Facility Claims shall be automatically terminated and of no further force and effect, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

DSM AP Stipulation.[11]    In addition, Net Proceeds to which the DIP Lender and the Foris Prepetition Secured Lenders are otherwise entitled will be re-allocated to fund the Third-Party Release Settlement Amounts.  To the extent the Net Proceeds are insufficient to fund the Third-Party Release Settlement Amounts, Estate Claims Settlement Cash Consideration, and the Lavvan Settlement Consideration, then the Third-Party Release Settlement Amounts, Estate Claims Settlement Cash Consideration, and the Lavvan Settlement Consideration will be funded by the DIP Lenders, the Foris Prepetition Secured Lenders, and/or from an advance under the Exit First Lien Facility.  On the Effective Date, or before the Effective Date, or as soon as reasonably practicable thereafter, the applicable Debtors or the Reorganized Debtors, with the consent of the Foris Secured Parties, will consummate the Restructuring Transactions.

21.    As discussed above, upon the Effective Date, the Plan will establish a Creditor Trust for the benefit of Holders of Class 7 Convertible Notes Claims and Class 8 General Unsecured Claims that will be funded with $2 million and provided with certain Cash assets pursuant to the terms of the Plan and certain Causes of Action and preferences, the proceeds of which will be distributed according to the Plan after payment of all direct out-of-pocket administrative, personnel, legal costs and expenses incurred after the Effective Date in administering the Creditor Trust, and making distributions from the Creditor Trust as provided for under the Plan.  Separate and apart from the treatment of Classes 7 and 8, respectively, Holders of Allowed Claims in such Classes who are also Releasing Parties also will receive, in exchange for their granting Third-Party Releases, pro rata distributions of the applicable Third-Party Release Settlement Amounts as set

---

[11]    The sales of the Debtors' Consumer Brands Business were anticipated to generate substantial revenue to fund Administrative Claims and satisfy obligations under the DIP Facility. However, the Consumer Brands Business sales proceeds fell well short of the amount needed to repay the DIP Facility and the outstanding Administrative Claims.

forth in Article I.A.211. of the Plan,[12] and from the Estate Claims Settlement. Under the Plan, Holders of Claims in Classes 7 and 8 are eligible to receive estimated aggregate recoveries of $51.95 to $66.4 million.

22.     As discussed above, on the Effective Date, the Creditor Trust (the trustee of which has been selected by the Committee and the Ad Hoc Group) will be established pursuant to the Plan and the Creditor Trust Agreement for the purpose of liquidating the Creditor Trust Assets, and distributing the proceeds of the Creditor Trust Assets to the Creditor Trust Beneficiaries in accordance with the terms of the Plan and the Creditor Trust Agreement.[13]

---

[12]   The Third-Party Settlement Release Settlement Amounts are: "(A) (i) $12,714,000, consisting of that portion of the Third-Party Release Settlement Amounts to be distributed to the Holders of Convertible Notes, if the Third-Party Release Settlement is approved on a non-consensual basis; or (ii) $9,264,000, consisting of that portion of the Third-Party Release Settlement Amounts to be distributed to the Holders of Convertible Notes if the Third-Party Release Settlement is not approved on a non-consensual basis and the Direct Claims Threshold is satisfied as to holders of Direct Claims who are creditors (but only as to holders of Allowed Convertible Notes Claims who do not opt out of the Third-Party Release Settlement); (B) (i) $3,686,000, consisting of that portion of the Third-Party Release Settlement Amounts distributed to the Holders of General Unsecured Claims, if the Third-Party Release Settlement is approved on a non-consensual basis; or (ii) $2,686,000 consisting of that portion of the Third-Party Release Settlement Amounts distributed to the Holders of General Unsecured Claims if the Third-Party Release Settlement is not approved on a non-consensual basis and the Direct Claims Threshold is satisfied as to holders of Direct Claims who are creditors (but only as to Holders of Allowed General Unsecured Claims who do not opt out of the Third-Party Release Settlement); (C) (i) $5,000,000 consisting of that portion of the Third-Party Release Settlement Amounts distributed to the Holders of Interests as of the Voting Record Date, if the Third-Party Release Settlement is approved on a non-consensual basis; or (ii) $2,500,000 consisting of that portion of the Third-Party Release Settlement Amounts distributed to the Holders of Interests as of the Voting Record Date if the Third-Party Release Settlement is not approved on a non-consensual basis and the Direct Claims Threshold is satisfied as to holders of Direct Claims who are holders of any Interests (but only as to Holders of Interests who do not opt out of the Third-Party Release Settlement)." With respect to A(ii), B(ii), and C(ii) of Article I.A.211 of the Plan, the DIP Lenders and Foris Prepetition Secured Lenders, as applicable, will only allocate from the Net Proceeds, other assets of the Estates, or the Exit First Lien Facility (payable to the Creditor Trust or Plan Administrator, as applicable under the Plan), that portion necessary to pay the aggregate amount to be distributed to Holders of Allowed Convertible Notes Claims, Allowed General Unsecured Claims, and Interests, respectively, who do not opt out of the Third-Party Release Settlement; provided, however, that in no event will such amounts allocated exceed the amounts referenced in A(ii), B(ii), and C(ii) of Article I.A.211 of the Plan.

[13]   "Creditor Trust Assets" means the assets to be held in the Creditor Trust composed of (i) the Creditor Trust Funding; (ii) the Estate Claims Settlement Consideration (including, without limitation, the Retained Estate Causes of Action); (iii) the Third-Party Release Settlement Amounts specified for distribution to qualifying holders of Allowed Claims in Classes 7 and 8; and (iv) any net proceeds of (i) – (ii) above; *provided, however*, that (a) Causes of Action of the Debtors and their Estates against any Released Parties and (b) any Designated Preference Actions shall not be Creditor Trust Assets.

23.     Under the Plan, secured creditor DSM will receive on account of the Class 4 DSM RealSweet Secured Claim and Class 5 DSM Other Secured Claims the DSM Plan Promissory Note issued by Reorganized Amyris and secured by the DSM Plan Promissory Note Pledge Agreement under sections III.B.4 and 5 of the Plan.  Class 6 Lavvan Secured Claims, Class 9 DSM Contract Claims, Class 10 Givaudan Contract Claims, Class 11 Intercompany Claims, and Class 12 Section 510(b) Claims are impaired, and the respective Holders of such Claims will receive the treatment set forth in, as applicable, sections III.B.6, 9, 10, 11 and 12 of the Plan.  Class 13 Intercompany Interests will not be impaired by the Plan.  Lastly, Class 14 Amyris Equity Interests will be extinguished, and the Holders thereof will not receive any distribution on account of such Equity Interests.

24.     The Reorganized Debtors' emergence from chapter 11 will be supported by a $160 million Exit First Lien Facility, which certain of the DIP Lenders/Foris Prepetition Secured Lenders have agreed to provide.

25.     The Plan also includes certain releases: a Debtors' release provision (Article IX.C), a mandatory nonconsensual third-party release provision or, if not approved, in the alternative, a voluntary third-party release provision (Article IX.D), an exculpation provision (Article IX.E.), and a Plan injunction provision (Article IX.F).  Article IX.G of the Plan provides for a Direct Claims Injunction that bars all holders of Direct Claims from pursuing such claims against the Released Parties. In consideration for such releases, holders of Direct Claims will receive distributions from the Third-Party Release Settlement, as provided for in the Plan.  Following the issuance of the Direct Claims Injunction in accordance with the Confirmation Order, any and all holders of Direct Claims will be permanently enjoined from seeking satisfaction of their Direct

Claims against the Released Parties or any other Direct Claims Injunction Party or the property of any such Direct Claims Injunction Party.

26.     Under the Plan, if the nonconsensual Third-Party Release is not approved by the Bankruptcy Court, each holder of a Direct Claim may voluntarily elect to receive its portion of the Third-Party Release Settlement Amounts to which it is entitled by electing to grant the Third-Party Releases, through the following methods: (x) for (i) Holders of Claims who are entitled to submit a ballot to vote on the Plan and vote to accept the Plan, (ii) Holders of Claims who are entitled to submit a ballot to vote on the Plan and (a) vote to reject the Plan or (b) abstain from voting on the Plan and, in either case, do not elect to exercise their right to opt out of granting the Third-Party Release, and (y) for Holders of Claims and Interests who are deemed to accept or reject the Plan and are provided with a notice of non-voting status providing them with the right to opt out of granting the Third-Party Release and do not elect to exercise such right; *provided, that,* as applicable, the Direct Claims Threshold is satisfied.

27.     Approval of the Direct Claims Injunction, as well as the Third-Party Releases, Exculpation and Injunction, is a condition to Confirmation of the Plan (Article X.B), and thus, these provisions are critical and necessary for the Plan to proceed as discussed herein and in the Omnibus Reply.

28.     As discussed herein and in the Omnibus Reply, all such provisions are appropriate and consistent with applicable provisions of chapter 11 and Third Circuit law and are the product of good-faith, arm's length negotiations among the Debtors, the Foris Secured Parties, the Creditors' Committee, and the Ad Hoc Group.

**IV.**
**THE PLAN SATISFIES EACH OF THE REQUIREMENTS**
**FOR CONFIRMATION UNDER THE BANKRUPTCY CODE**

29.     Jurisdiction over this matter is proper pursuant to 28 U.S.C. § 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b) and the Bankruptcy Court may enter a final order consistent with Article III of the United States Constitution.

30.     The Plan complies with all relevant sections of the Bankruptcy Code and the Bankruptcy Rules relating to confirmation.  The Debtors must show by a preponderance of the evidence that the Plan satisfies section 1129 of the Bankruptcy Code in order to confirm the Plan.[14] In particular, the Plan complies with the requirements of sections 1123 and 1129 of the Bankruptcy Code.  This Memorandum addresses each requirement below.

**A.     The Plan Satisfies Section 1129(a)(1) of the Bankruptcy Code**

31.     Section 1129(a)(1) of the Bankruptcy Code provides that a plan may be confirmed only if "[t]he plan complies with the applicable provisions of this title."  11 U.S.C. § 1129(a)(1). The legislative history of section 1129(a)(1) indicates that the primary focus of this requirement is to ensure that the plan complies with sections 1122 and 1123 of the Bankruptcy Code, which govern classification of claims and interests and the contents of a plan, respectively.[15]  The Plan complies with these provisions in all respects.

---

[14]     *See, e.g., Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1165 (5th Cir.1993) ("The . . . preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown.").

[15]     *See* S. Rep. No. 989, 95th Cong. 2d Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5913 (1978) ("Senate Report"); H.R. Rep. No. 595, 95th Cong. 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5962, 6368 (1977) ("House Report"); *see also Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 648–49 (2d Cir. 1988).

### i.    The Plan Meets the Requirements of Section 1122 of the Bankruptcy Code

32.    The classification requirements of section 1122(a) of the Bankruptcy Code provide, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.[16]

33.    Section 1122(a) does not require that similar claims be classified together, only that claims grouped together in a class should be similar. *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581, 585 (6th Cir. 1986). The Third Circuit has recognized that debtors have significant flexibility in placing similar claims into different classes under section 1122, provided there is a rational basis to do so and it is not done to gerrymander a consenting impaired class.[17]

34.    The classification of Claims and Interests under the Plan is proper under the Bankruptcy Code. There are twelve classes of Claims and two classes of Interests: (1) Class 1 Other Secured Claims (all remaining secured prepetition claims, to the extent any exist, other than the specified secured claims in Classes 3, 4, 5 and 6)); (2) Class 2 Other Priority Claims (the only class of priority claims subject to classification); (3) Class 3 Foris Prepetition Secured Claims; (4) Class 4 DSM RealSweet Secured Claims; (5) Class 5 DSM Other Secured Claims; (6) Class 6

---

[16]    11 U.S.C. § 1122(a).

[17]    *See In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060–61 (3d Cir. 1987) (observing that separate classes of claims must be reasonable, and allowing a debtor to group similar claims in different classes); *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 956–57 (2d Cir. 1993) (finding separate classification appropriate because a classification scheme had a rational basis where separate classification was based on a bankruptcy court-approved settlement); *Aetna Cas. & Sur. Co. v. Clerk of the U.S. Bankr. Ct. (In re Chateaugay Corp.)*, 89 F.3d 942, 950 (2d Cir. 1996) (finding that classification was proper since the plan did not classify similar claims separately to gerrymander an impaired assenting class); *In re Adelphia Commc'n Corp.*, 368 B.R. 140, 246–47 (Bankr. S.D.N.Y. 2007) ("When considering assertions of gerrymandering, courts in the Second Circuit have inquired whether a debtor has classified substantially similar claims in separate classes for the sole purpose of obtaining at least one impaired assenting class.").

Lavvan Secured Claim; (7) Class 7 Convertible Note Claims; (8) Class 8 Unsecured Claims (all nonpriority unsecured prepetition claims); (9) Class 9 DSM Contract Claims; (10) Class 10 Givaudan Contract Claims; (11) Class 11 Intercompany Claims; (12) Class 12 Section 510(b) Claims; (13) Class 13 Intercompany Interests (all intercompany interests other than the Amyris Equity Interest); and (14) Class 14 Amyris Equity Interests (all Interests in the Parent, Amyris, Inc.).  As the foregoing descriptions of the classes reflect, valid reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan and, accordingly, the classification of Claims and Interests under the Plan satisfies the requirements of section 1122 of the Bankruptcy Code.

> ii.    **The Plan Meets the Requirements of Section 1123(a) of the Bankruptcy Code**

35.     Section 1123(a) of the Bankruptcy Code sets forth seven requirements with which every chapter 11 plan must comply.  The Plan complies fully with each requirement.

36.     First, paragraph (1) of section 1123(a) requires that a plan designate classes of claims, other than claims with the priority specified in subparagraphs 1, 2, and 8 of section 507(a) of the Bankruptcy Code.  Section III.A of the Plan designates Classes of Claims and Interests and does not classify Administrative Claims or Priority Tax Claims because they must receive the treatment specified in the Bankruptcy Code and cannot otherwise be Impaired.  *See* 11 U.S.C. §§ 1123(a)(1) and 1129(a)(9).

37.     Second, paragraph (2) of section 1123(a) of the Bankruptcy Code requires that a plan specify those classes or interests that are not Impaired.  Section III.A of the Plan specifies that Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), and Class 13 (Intercompany Interests) are Unimpaired.

38.     Third, paragraph (3) of section 1123(a) of the Bankruptcy Code requires that a plan specify those classes of claims or interests that are Impaired.  Section III.A of the Plan specifies that Class 3 (Foris Prepetition Secured Claims), Class 4 (DSM RealSweet Secured Claims), Class 5 (DSM Other Secured Claims), Class 6 (Lavvan Secured Claim), Class 7 (Convertible Note Claims), Class 8 (General Unsecured Claims), Class 9 (DSM Contract Claims), Class 10 (Givaudan Contract Claims), Class 11 (Intercompany Claims), Class 12 (Section 510(b) Claims), and Class 14 (Amyris Equity Interests) are Impaired.

39.     Fourth, paragraph (4) of section 1123(a) of the Bankruptcy Code requires that a plan provide the same treatment for each claim in a particular class unless the holder of a claim in that class agrees to less favorable treatment for such claim.  All of the Holders of Claims or Interests within each Class, as set forth in Section III.B of the Plan, are treated identically under the Plan as required by section 1123(a)(4) of the Bankruptcy Code.[18]

40.     Fifth, paragraph (5) of section 1123(a) of the Bankruptcy Code requires that a plan provide adequate means for its implementation.  Here, Article IV (Means for Implementation of This Plan), Article V (Creditor Trust), Article VI (Treatment of Executory Contracts and Unexpired Leases), and Article X (Conditions Precedent to Consummation of This Plan), among other provisions of the Plan, set forth the means for the Plan's implementation.

41.     Sixth, paragraph (6) of section 1123(a) of the Bankruptcy Code requires that a plan impose certain restrictions on a corporate debtor's equity securities.  Consistent with section 1123(a)(6), the Plan provides in Section IV.M:  "The New Organizational Documents will (a) authorize the issuance of the New Common Stock and (b) prohibit the issuance of non-voting

---

[18]   Provided that each claimant within a class has the "same opportunity to receive equal treatment," there is no violation of section 1123(a)(4). *See In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013); *In re Washington Mutual Inc.*, 442 B.R. 314, 356 (Bankr. D. Del. 2011).

equity Securities to the extent required under section 1123(a)(6) of the Bankruptcy Code." Thus, section 1123(a)(6) is satisfied.

42.     Finally, paragraph (7) of section 1123(a) of the Bankruptcy Code requires that a plan contain only provisions that are consistent with the interests of creditors, equity security holders, and public policy with respect to the manner of selection of any officer, director, or trustee under a plan and any successor thereto.  The Plan satisfies this requirement.  Section IV.N (Managers and Officers of the Reorganized Debtors) provides that the members of the New Board of Reorganized Amyris will be identified in the Plan Supplement, as was done, disclosing that John Doerr, Ryan Panchadsaram, and Han Kieftenbeld will be the initial members of the New Board as of the Effective Date.  The Plan Supplement also identifies Han Kieftenbeld (Interim CEO, CFO and Treasurer) and Doris Choi (Secretary and General Counsel) as officers of the Reorganized Debtors.  Section V.E (Creditor Trustee) of the Plan describes the manner of selection of the Creditor Trustee.  The identity of the Creditor Trustee has been disclosed in the Plan Supplement.  Alexandre Zyngier will be appointed the Creditor Trustee.  The appointment of the members of the New Board and the Creditor Trustee is consistent with the interests of Holders of Claims and Interests and with public policy and so satisfy section 1123(a)(7) of the Bankruptcy Code.

**B.      The Plan Complies With the Discretionary
         Provisions of Section 1123(b) of the Bankruptcy Code**

43.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may:  (a) impair or leave unimpaired any class of claims or interests, (b) provide for the assumption or rejection of executory contracts and unexpired leases, (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the

estate, and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.  11 U.S.C. § 1123(b)(1).

44.     The Plan is consistent with section 1123(b) of the Bankruptcy Code.  Specifically, under section III.A of the Plan, Classes 1, 2, and 13 are Unimpaired because the Plan provides the Holders of such Claims or Interests with the treatment required under the Bankruptcy Code or otherwise does not alter the Holders' rights.  On the other hand, Classes 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 14 are Impaired because the Plan modifies the rights of the Holders of Claims or Interests within such Classes.

45.     In addition, pursuant to section 1123(b)(2) of the Bankruptcy Code, section VI.A of the Plan provides for the rejection of all executory contracts and unexpired leases under section 365 of the Bankruptcy Code other than those that (a) are identified on the Schedule of Assumed Executory Contracts and Unexpired Leases; (b) have previously expired or terminated pursuant to their own terms or agreement of the parties thereto; (c) have been previously assumed or rejected by the Debtors pursuant to a Final Order; or (d) are, as of the Effective Date, the subject of (i) a motion to assume that is pending or (ii) an order of the Bankruptcy Court that is not yet a Final Order.[19]

46.     The Plan's discretionary provisions also include the Plan Settlements (defined and discussed below), a Debtors' release provision, a nonconsensual third-party release provision, alternatively a voluntary third-party release provision, an exculpation provision, and injunction provisions.  These provisions are appropriate and consistent with the applicable provisions of

---

[19]    For the avoidance of doubt, the Debtors intend to file a final Schedule of Assumed Executory Contracts and Unexpired Leases concurrent with providing notice of the occurrence of the Effective Date, which schedule shall control.

chapter 11 because, among other things, they are the product of good-faith, arm's length negotiations and are critically necessary to be able to confirm the Plan.

        **i.**        **Rule 9019 Settlements**

47.    Article IV.A.1 of the Plan provides:

As discussed in further detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, Causes of Action, Direct Claims and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, Causes of Action, Direct Claims and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, within the range of reasonableness and in the best interests of the Debtors, their Estates, and Holders of Claims and Equity Interests and holders of Direct Claims. Subject to Article VII of the Plan all distributions made to Holders of Allowed Claims and Allowed Interests, as applicable, in any Class are intended to be, and shall be, final.

48. All of the settlements embodied in the Plan (collectively, the "Plan Settlements")[20] – which are supported by the Creditors' Committee, the Ad Hoc Noteholder Group, and the Ad Hoc Cross-Holder Group – are reasonable compromises satisfying the standards of Bankruptcy Rule 9019.

49. Section 105(a) of the Bankruptcy Code provides in relevant part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105(a) has been interpreted to expressly empower bankruptcy courts with broad equitable powers to "craft flexible remedies that, while not expressly authorized by the Code, effect the result the Code was designed to obtain." *Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 568 (3d Cir. 2003) (*en banc*). Bankruptcy Rule 9019 governs the procedural prerequisites to approve a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

50. Settlements in bankruptcy are favored as a means of minimizing litigation, expediting the administration of the bankruptcy estate, and providing for the efficient resolution of bankruptcy cases. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). In deciding whether to approve a settlement pursuant to Bankruptcy Rule 9019, the court should determine

---

[20] The Plan Settlements include, without limitation, the Debtor Release, which is discussed further separately herein and in the Omnibus Reply.

whether the compromise is fair, reasonable, and in the interests of the estates. *In re Marvel Entertainment Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998). The decision whether to accept or reject a compromise lies within the sound discretion of the court. *In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986).

51.     In making this determination, the United States Court of Appeals for the Third Circuit has provided four criteria that a bankruptcy court should consider: (a) the probability of success in litigation; (b) the likely difficulties in collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors. *Martin*, 91 F.3d at 393. Courts generally defer to a trustee's business judgment when there is a legitimate business justification for the trustee's decision. *Id*. at 395.

52.     When applying the *Martin* factors to a particular settlement, "the court is not supposed to have a 'mini-trial' on the merits, but should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness." *Aetna Casualty & Surety Co. v. Jasmine, Ltd (In re Jasmine, Ltd)*, 258 B.R. 119, 123 (D.N.J. 2000) (internal quotations omitted); *see also In re TSIC, Inc.*, 393 B.R. 71, 79 (Bankr. D. Del. 2008); *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006). Although approval of a compromise is within the "sound discretion" of the bankruptcy court (*World Health*, 344 B.R. at 296), the court should not substitute its judgment for that of a trustee or debtor in possession. *In re Parkview Hosp.-Osteopathic Med. Ctr.*, 211 B.R. 603, 610 (Bankr. N.D. Ohio 1996). The ultimate inquiry is whether the compromise is "fair, reasonable, and in the interests of the estate." *TSIC*, 393 B.R. at 78. A court need not be convinced that a proposed settlement is the best possible settlement, but "must conclude that it is within the reasonable range of litigation possibilities." *World Health*, 344 B.R. at 296 (internal citations omitted).

53.     Aside from the standards under Bankruptcy Rule 9019, a settlement of an estate's claims and causes of action against third parties constitutes a use of property of the estate.  *See e.g. Northview Motors, Inc. v. Chrysler Motors Corp.*, 186 F.3d 346, 350-51 (3d Cir. 1999).   If a settlement is outside of the ordinary course of business of the debtor, it requires approval of the bankruptcy court pursuant to section 363(b) of the Bankruptcy Code.  *See id.; see also Martin*, 91 F.3d at 395 n.2 ("Section 363 of the Code is the substantive provision requiring a hearing and court approval; Bankruptcy Rule 9019 sets forth the procedure for approving an agreement to settle or compromise a controversy.").   Courts normally defer to the trustee's business judgment so long as there is a legitimate business justification.  *See id.; see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999) (trustee need only have a "sound business purpose" to justify use of estate property pursuant to section 363(b)).

54.     Here, the Plan Settlements are within the range of reasonableness and are an exercise of sound business judgment.  The Plan Settlements, which drive the Plan resulting in creditors junior to the Foris Secured Parties receiving meaningful recoveries (in contrast to receiving no recoveries in a chapter 7 proceeding), have been negotiated extensively at arms-length between counsel for each of the primary creditor constituencies, based on their own investigations and analyses of alleged claims against Released Parties and potential challenges to the liens and claims of the Foris Secured Parties.

(a)     The Independent Director Investigation of Claims Against Directors and Officers

55.     Ancillary to its restructuring, Amyris recognized that there had been allegations of irregularities that may have resulted in accounting irregularities from the third quarter of 2021

through the fourth quarter of 2022 and that there may have been other conduct or misconduct – by commission or omission – that contributed to Amyris's financial distress.  To address these issues, effective on the Petition Date, the Board delegated to M. Freddie Reiss (the "<u>Independent Director</u>") the exclusive power and authority of the Board to investigate the conduct of the Debtors' directors and officers ("<u>D&Os</u>") and the D&Os' affiliates to determine whether any of the Debtors have claims against any current or former D&Os or any of the D&Os' affiliates.  *See* Gund Declaration at 10.

56.    The Independent Director began an investigation (the "<u>Independent Director Investigation</u>") upon his appointment on the Petition Date and promptly selected KTBS Law LLP ("<u>KTBS</u>") as special counsel for the Debtors to lead the examination and to report its findings to the Independent Director (the "<u>Independent Director Report</u>"). The Independent Director Report has not been provided to the full Board.  The Independent Director Report has been shared with the Committee, pursuant to a common interest agreement between the Debtors and the Committee, and with the other recently-appointed independent director (Mr. J. Scott White).  *Id.* At 5-6.

57.    The Independent Director focused the Independent Director Investigation on the three-year period preceding the Petition Date and investigated potential claims and estate causes of action against D&Os and affiliates of D&Os for transactions, acts, and omissions for transactions, acts, and omissions during the relevant period.  *Id.* at 6.  The selection of the time period to be examined was driven by Delaware law, which applies a three-year statute of limitations to breach of fiduciary duty and fraud claims.   The statute of limitations effectively ceases to run for two years following a bankruptcy filing by virtue of section 108(a) of the Bankruptcy Code.

58.     During the Independent Investigation, KTBS conducted numerous formal interviews of the Debtors' current and former directors, officers, and employees, in addition to numerous informal discussions with Steven Fleming of PwC and the Debtors' current internal counsel.   KTBS reviewed many thousands of documents and emails, including documents protected by the Debtors' attorney-client privilege.  *Id.* at 6.

59.     On October 20, 2023, the Independent Director and KTBS finalized the Independent Director Report, comprising 61 pages, supplemented by 455 pages of appendices, summarizing the Independent Investigation to date and the results thereof.   The Independent Director Report comprises 61 pages, supplemented by 455 pages of appendices. The Independent Director Report has been shared with the Creditors' Committee.  *Id.*

(b)     The Committee's Investigation

60.     On August 29, 2023, the day after the Committee retained counsel, the Debtors provided the Committee's advisors with access to a comprehensive data room containing hundreds of documents, including prepetition debt documents, corporate governance documents, insurance policies, major commercial contracts, operative deal documents with respect to major transactions, and information regarding the Debtors' intellectual property.  *Id.* at 6-7.

61.     As a statutory fiduciary, the Committee conducted a wide-ranging investigation of the facts and circumstances leading to the Chapter 11 Cases and potential causes of action against the DIP Lender and Foris Prepetition Secured Lenders, their principals, and the Debtors and their officers and directors.

62.     The Committee's investigative efforts included, commencing in September 2023, numerous document requests and interrogatories propounded on the Debtors and meet and confer sessions and other discussions.  The Debtors worked diligently and cooperatively to produce all

information requested by the Committee, including at least twenty-two (22) document productions totaling well over 100,000 pages and answering interrogatories.[21] *Id.* at 7.

63.     Based on its extensive review and analysis, the Creditors' Committee prepared a motion to seek derivative standing and a proposed adversary complaint. But after substantial discussion among the Creditors' Committee members and the Creditors' Committee's advisors, the Creditors' Committee determined that the Plan Settlements with the Debtors and Foris would likely provide better value to the Creditors' Committee and its constituency than any claims that the Creditors' Committee had developed through its investigation.[22] *Id.*

64.     The foregoing circumstances and factors strongly militate in favor of approving the Plan Settlements, including the Debtor Release of the Foris Secured Parties, which compromises embodied in the Plan are supported by the key creditor groups, the Creditors' Committee, the Ad Hoc Noteholder Group, and the Ad Hoc Cross-Holder Group.  Most telling, the Independent Director investigation, the Creditors' Committee investigation, as well as the Ad Hoc Group Investigation (discussed in the Disclosure Statement and in the Gund Declaration), have not resulted in the commencement and prosecution of any claims and actions against the Foris Secured Parties or any other parties to the Plan Settlements.  The Debtors (through the Independent Director), the Creditors' Committee, and the Ad Hoc Group have all undertaken extensive and sophisticated investigations and analyses and have concluded that, taking into account the prospects of prevailing in litigation, the complexities, risks, costs and delays thereof, the Plan Settlements embodied in the Plan are fair, reasonable and appropriate under all of the

---

[21]   The Committee's, Debtors' and Ad Hoc Group's investigative efforts are further discussed in the Disclosure Statement, pp. 24-29.

[22]   The separate investigation conducted by the Ad Hoc Group of certain Convertible Notes holders (the "Ad Hoc Group Investigation") is described as set forth in the Gund Declaration and in the *Declaration of Frank Merola in Support of the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization*, filed substantially contemporaneously herewith.

circumstances. Indeed, as provided in the Debtors' Liquidation Analysis, in chapter 7 proceedings, only the DIP Lenders would receive a limited, partial recovery, and no junior creditors would receive any recovery at all. In other words, without the Plan Settlements, the Debtors would not be emerging as a reorganized business and there would be no recoveries for most creditors.[23]

65.     The Debtors and the other settling Plan parties including the Creditors' Committee have each applied, in essence, the four Rule 9019 factors in one form or another, and have determined the Plan Settlements and the Plan present the best option forward, given the uncertain prospects of success in litigation over the myriad claims being settled and compromised; the substantial risks, delays and difficulties in collecting upon such claims; the various complex claims and complex litigation at issue and the attendant significant costs, delays and risks; and the overall paramount interest of creditors receiving meaningful recoveries notwithstanding the extremely undersecured position of the Foris Secured Parties,

66.     Accordingly, the Plan Settlements should be approved under Bankruptcy Rule 9019.

### ii.     The Exculpation, Third-Party Release, Direct Claims Injunction and Related Provisions Are Appropriate and Justified.

67.     Section IX.C of the Plan (a release by the Debtors and the Estates of the Released Parties (the "Debtor Release")), Section IX.D (Third-Party Releases), Section IX.E (Exculpation),

---

[23] With particular respect to the Foris Secured Parties, as discussed herein, these Plan Settlement parties will be providing substantial consideration and concessions in favor of junior creditors, including, without limitation, not receiving full payment prior to junior creditors receiving a distribution and funding via the Exit First Lien Facility and other contribuitions/advances required under the Plan (i) to satisfy Allowed Administrative Claims, Allowed Professional Fees, Allowed Priority Tax Claims and U.S. Trustee Fees (subject to the Plan Effective Date funding), (ii) on account of the treatment of Classes 1, 2, 6 (the Lavvan Settlement), 7, and 8, (iii) to provide the funding of the Ad Hoc Cross-Holder Group Restructuring Expenses, the Ad Hoc Group Restructuring Expenses, and the Estate Claims Settlement Cash Consideration, and (iv) the funding of the Third-Party Release Settlement Amounts (the preceding items (i) – (iv), collectively, the "Foris Plan Contributions").

Section IX.F (Plan Injunction), and Section IX.G (Direct Claims Injunction) are appropriate and justified under the exceptional circumstances at hand, as set forth in the Omnibus Reply.

## C.      The Debtors Have Satisfied Section 1129(a)(2) of the Bankruptcy Code

68.      Section 1129(a)(2) of the Bankruptcy Code requires the proponent of a plan to comply with "applicable provisions of the Bankruptcy Code."  11 U.S.C. § 1129(a)(2).  The principal purpose of section 1129(a)(2) of Bankruptcy Code is to ensure that a debtor has complied with the disclosure and solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code.[24]

### i.      The Debtors Have Complied With the Requirements of Section 1125 of the Bankruptcy Code

69.      Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a chapter 11 plan from holders of claims or interests "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved . . . by the court as containing adequate information."  11 U.S.C. § 1125(b).  In this case, the Court entered the Solicitation Procedures Order, approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.

---

[24]    *See In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000) (stating that section 1129(a)(2) requires debtors to comply with the adequate disclosure requirements of section 1125); *see also In re Lapworth*, No. 97-34529, 1998 Bankr. LEXIS 1383, at *10 (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *Official Comm. v. Michelson (In re Michelson)*, 141 B.R. 715, 719 (Bankr. E.D. Cal. 1992) ("Compliance with the disclosure and solicitation requirements is the paradigmatic example of what the Congress had in mind when it enacted section 1129(a)(2)."); *In re Texaco Inc.*, 84 B.R. 893, 906–07 (Bankr. S.D.N.Y. 1988) (stating that the "principal purpose of Section 1129(a)(2) is to assure that the proponents have complied with the requirements of section 1125 in the solicitation of acceptances to the plan"); Senate Report at 126 ("Paragraph (2) of [section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure.").

70.     Pursuant to the Solicitation Procedures Order, the Debtors—through their claims, noticing, balloting, and solicitation agent, Stretto—transmitted the approved Solicitation Package notices in accordance with the instructions of the Court in the Solicitation Procedures Order.  *See* Voting Decl.  In addition, in compliance with the Solicitation Procedures Order, copies of the Solicitation Procedures Order, the Plan, and the Disclosure Statement have been available upon request from the Debtors' counsel and free of charge at https://cases.stretto.com/amyris/court-docket/court-docket-category/1689-plan-solicitation/.  Finally, in compliance with the Solicitation Procedures Order, notice of the Confirmation Hearing was published in *The Wall Street Journal*, *SP Official Gazette*, and *Jornal o Dia*.  *See* Docket No. 1048.

71.     The Solicitation Package was served in accordance with the requirements of Bankruptcy Rules 2002(b) and 3017(d)–(f) and the Solicitation Procedures Order, as set forth in the Voting Declaration.

### ii.     The Debtors Have Complied With the Requirements of Bankruptcy Rules 3017(d) and 3018(c)

72.     Bankruptcy Rules 3017 and 3018 require, in relevant part, that a debtor transmit its plan and disclosure statement to all affected creditors and equity security holders, that it adopt effective procedures for the transmission of its plan and disclosure statement to beneficial owners of securities, and that it afford creditors and equity security holders a reasonable period of time in which to accept or reject the proposed plan.  Fed. R. Bankr. P. 3017, 3018.  The Debtors respectfully submit that they have met all such requirements.

73.     Bankruptcy Rule 3017(d) requires that, unless a court orders otherwise, a debtor must transmit to all creditors, equity security holders, and the United States Trustee:  the plan (or a court-approved summary of the plan), the disclosure statement approved by the court, notice of the time within which acceptances and rejections of such plan may be filed, and such other

information as the court may direct, including any opinion of the court approving the disclosure statement or a court approved summary of the opinion.

74.    Bankruptcy Rule 3017 also requires that the debtor give notice of the time fixed for filing objections to the proposed disclosure statement and for the hearing on confirmation to all creditors and equity security holders, and that a debtor mail a ballot to each creditor and equity security holder entitled to vote on the plan.

75.    Bankruptcy Rule 3018(c) governs the form of ballot for accepting or rejecting a plan, providing in relevant part that an "acceptance or rejection shall be in writing, identify the plan or plans accepted or rejected, be signed by the creditor or equity security holder or an authorized agent and conform to the appropriate Official Form." Fed. R. Bankr. P. 3018(c).

76.    Stretto completed solicitation of the Plan by December 18, 2023, by causing the Solicitation Package (as defined and described in the Solicitation Procedures Order) to be transmitted to all known holders of claims in the applicable Voting Classes as of the Voting Record Date. The nonvoting parties were served with the Confirmation Hearing Notice and the applicable Notice of Non-Voting Status.

77.    As required by Bankruptcy Rule 3017(d), the Solicitation Package included, *inter alia*, the Disclosure Statement and Plan. In addition, each Solicitation Package included the appropriate Ballot with voting instructions, the Confirmation Hearing Notice, and a pre-addressed return envelope each in the form approved by the Court in the Solicitation Procedures Order. The Disclosure Statement, Ballots, and Confirmation Hearing Notice provided clear notice of the voting deadline to submit the Ballots, which the Court established as January 18, 2024, at 5:00 p.m. (Eastern Time).

78.     The Debtors and their professionals and agents followed the procedures set forth in the Solicitation Procedures Order for soliciting acceptances of the Plan as evidenced by the Voting Declaration and the certificates of service for the Solicitation Packages filed of record with the Court.   In addition, the Debtors served the Confirmation Hearing Notice on the U.S. Trustee, counsel for the Committee, all creditors on the list of creditors maintained by the Debtors' Claims Agent, and those parties that requested notice pursuant to Bankruptcy Rule 2002.  The Debtors did not solicit acceptances or rejection of the Plan from any creditor or equity interest holder before the approval of the Disclosure Statement by this Court.

### iii.     The Vote Tabulation Satisfied Section 1126(c) and Bankruptcy Rule 3018(a)

79.     The Debtors submit that the voting and tabulation procedures followed by Stretto are in accordance with the Solicitation Procedures Order, Bankruptcy Code section 1126(c), and Bankruptcy Rule 3018(a).  Bankruptcy Code section 1126(c) provides:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c).  Section 1126 of the Bankruptcy Code provides in part that only holders of allowed claims and interests in impaired classes that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject a plan.  11 U.S.C. §§ 1126(f)– (g).  Classes 1 and 3 are unimpaired under the Plan.  Accordingly, Classes 1, 2, 11, and 13 are deemed to have accepted the Plan and are not entitled to vote on the Plan.  Classes 3, 4, 5, 6, 7, 8, 9, and 10 are impaired and entitled to vote on the Plan (the "Voting Classes").  Classes 12 and 14 are deemed to have rejected the Plan and not entitled to vote on the Plan.

80.    As set forth in the Voting Summary, in accordance with section 1126 of the Bankruptcy Code and the Solicitation Procedures Order, the Debtors solicited acceptances and rejections of the Plan from the holders of Claims in the Voting Classes.  Every validly cast Ballot was counted and considered when tabulating votes for the acceptance or rejection of the Plan.[25] The voting results are set forth in Exhibit "A" to the Voting Declaration and are as follows:

**Class 3**
Accepting:  1 ballot (100% in number) representing $312,000,000.00 (100% in amount)
Rejecting:  0 ballots (0% in number) representing $0.00 (0% in amount)

**Class 4**
Accepting:  1 ballot (100% in number) representing $29,518,925.00 (100% in amount)
Rejecting:  0 ballots (0% in number) representing $0.00 (0% in amount)

**Class 5**
Accepting:  1 ballot (100% in number) representing $45,450,000.00 (100% in amount)
Rejecting:  0 ballots (0% in number) representing $0.00 (0% in amount)

**Class 6**
Accepting:  1 ballot (100% in number) representing $15,140,000.00 (100% in amount)
Rejecting:  0 ballots (0% in number) representing $0.00 (0% in amount)

**Class 7**
Accepting:  80 ballots (100% in number) representing $592,216,967.00 (100% in amount)
Rejecting:  0 ballots (0% in number) representing $0.00 (0% in amount)

**Class 8**
Accepting:  181 ballots (96.3% in number) representing $58,618,927.72 (96.1% in amount)
Rejecting:  7 ballots (3.7% in number) representing $2,354,880.52 (3.9% in amount)

**Class 9**
Accepting:  1 ballot (100% in number) representing $3,871,495.06 (100% in amount)
Rejecting:  0 ballots (0% in number) representing $0.00 (0% in amount)

**Class 10**
Accepting:  0 ballots (0% in number) representing $0.00 (0% in amount)
Rejecting:  1 ballot (100% in number) representing $13,003,848.00 (100% in amount)

---

[25]    *See* Voting Declaration and exhibits thereto.

81.    Based on the facts and arguments set forth above, the Debtors submit that the Plan-related solicitation efforts satisfied the requirements of Bankruptcy Code sections 1125 and 1126 and Bankruptcy Rules 3017(d), 3018(a), 3018(c), and 3018(e).

82.    Additionally, given the clear evidence of good faith on the part of the parties involved in the solicitation and the Debtors' compliance with Bankruptcy Code section 1125, the Debtors request that the Court grant the parties the protections provided under Bankruptcy Code section 1125(e).

### D.    The Plan Has Been Proposed in Good Faith (Section 1129(a)(3))

83.    Section 1129(a)(3) of the Bankruptcy Code requires that a plan be proposed in good faith and not by any means forbidden by law.  11 U.S.C. § 1129(a)(3).  Although the term "good faith" is not defined in the Bankruptcy Code, courts have determined that "'[f]or purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives of the Bankruptcy Code." *In re PWS Holding Corp.*, 228 F.3d at 242 (quoting *In re Abbotts Dairies*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)).  The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the proposal of a chapter 11 plan.  *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012).  In determining whether the plan will succeed and accomplish goals consistent with the Bankruptcy Code, courts look to the terms of the plan itself.[26]

84.    The Plan has been proposed in good faith, achieves a restructuring of the Debtors, and provides for meaningful distributions to creditors.  The Plan contains only provisions that are

---

[26]    *See In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr. D.N.J. 1988) (concluding that the good-faith test provides courts with significant flexibility and is focused on examination of the plan itself, rather than external factors), *aff'd in part and remanded in part on other grounds*, 103 B.R. 521 (D.N.J. 1989), *aff'd*, 908 F.2d 964 (3d Cir. 1990).

consistent with the Bankruptcy Code.  In light of the foregoing, the Plan complies with section 1129(a)(3) of the Bankruptcy Code.

**E.     Payments for Services and Expenses (Section 1129(a)(4))**

85.     Section 1129(a)(4) of the Bankruptcy Code requires that the Debtors not make any payment for services, costs, or expenses in connection with this case unless such payments are disclosed and subject to bankruptcy court approval as reasonable.  Courts have construed this section as requiring the bankruptcy court's review and approval of the reasonableness of all professional fee payments made from estate assets.  Courts have construed this section as requiring the bankruptcy court's review and approval of the reasonableness of all professional fee payments made from estate assets.  *See In re NH Holdings, Inc.*, 288 B.R. 356, 362–63 (Bankr. D. Del. 2002) (finding in a confirmation order that the plan complied with section 1129(a)(4) of the Bankruptcy Code where all final fees and expenses payable to professionals remained subject to final review by the court); *In re Resorts Int'l*, 145 B.R. 412, 475 (Bankr. D.N.J. 1990).

86.     No payment for services or costs and expenses in connection with the Debtors' Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been or will be made, other than payments that have been authorized by an order of the Court.  The Court has previously authorized the interim payment of the fees and expenses incurred by estate professionals.  Pursuant to section II.C of the Plan, professionals shall file and serve applications for allowance of final compensation and reimbursement of expenses no later than 45 days after the Effective Date.  Such applications will be subject to review and approval by the Court.  Accordingly, the Plan complies with the requirements of section 1129(a)(4) of the Bankruptcy Code.

F.     **Directors and Officers (Section 1129(a)(5))**

87.     Section 1129(a)(5) of the Bankruptcy Code requires that the identity and affiliations of the individuals proposed to serve after confirmation as a director or officer, and the identity and nature of any insider compensation, be disclosed.[27]   The Debtors have complied with section 1129(a)(5) by providing in the Plan Supplement the respective identity of the Plan Administrator and the Creditor Trustee who are not insiders of the Debtors and the initial members of the New Board.   The Debtors believe that the appointment of these representatives is "consistent with the interests of creditors and equity security holders and with public policy," and no party in interest has objected to the Plan on these grounds.   Therefore, the requirements of section 1129(a)(5) are satisfied.

G.     **Rate Changes (Section 1129(a)(6))**

88.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.   Section 1129(a)(6) of the Bankruptcy Code is inapplicable in this case.

H.     **The Plan Satisfies the "Best Interests" Test (Section 1129(a)(7))**

89.     The "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each individual holder of a claim or interest has either accepted the plan or will receive or retain under the plan property having a present value, as of the effective date of the plan, of not less than what such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time.   The

---

[27]   *See In re Landing Assocs.,* 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("In order to lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice the creditors.").

best-interests-of-creditors test is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan.[28]

90.    Under section 1129(a)(7), the best-interests-of-creditors test applies only to non-accepting holders of impaired claims or interests.[29]  For the reasons discussed in Exhibit "D" to the Disclosure Statement and the Fleming Declaration, the best-interests-of-creditors test is satisfied in these cases.  The Debtors prepared a Debtor-by-Debtor liquidation analysis attached as Exhibit D to the Disclosure Statement and estimates of the potential recoveries of the Classes under the Plan in Section 1.D of the Plan (the "Plan Recovery/Liquidation Analysis").  As discussed in the Disclosure Statement, the Plan Recovery/Liquidation Analysis and herein, the Plan is expected to provide a substantially greater recovery than would a chapter 7 liquidation for unsecured creditors, because of the Foris Plan Contributions.

91.    Based on the Plan Recovery/Liquidation Analysis, and as further supported by the Orelowitz Declaration, the Debtors believe that the value of their assets are insufficient to satisfy the DIP Facility Claim and Administrative Claims.  Accordingly, Holders of General Unsecured Claims and Convertible Notes Claims, as well as any other junior creditors, would not receive any distributions or recovery, absent the transactions and settlements contemplated in the Plan, including the Foris Plan Contributions. As set forth in the Plan Recovery/Liquidation Analysis (after deducting the costs of liquidation and satisfying the DSM RealSweet Secured Claim), the

---

[28]   *See In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) (citations omitted) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'"); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 251 (Bankr. S.D.N.Y. 2007) (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[29]   *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.").

estate would hold only between $26.1 million and $79.6 million, amounts insufficient to satisfy the more than $200 million DIP Facility Claim.  See Fleming Declaration at 22.

92.     Lastly, in chapter 7 proceedings, the value available for satisfaction of Claims and Interests in the Debtors would be reduced by the costs, fees, and expenses of the liquidation under chapter 7, which would include disposition expenses, the sliding scale fees and compensation of a chapter 7 trustee, the fees of the trustee's counsel and other professionals, and certain other costs arising from conversion of the chapter 11 case to a case under chapter 7.  The monetization of the Debtors' assets and distributions to creditors likely would suffer additional delays while the chapter 7 trustee and the trustee's professionals take time to get up to speed on the myriad relevant, many complex, matters to complete the administration of the Estates.  Furthermore, a chapter 7 liquidation could further delay payments being made to creditors because, in addition to the reasons described above, Bankruptcy Rule 3002(c) provides that conversion of a chapter 11 case to chapter 7 will trigger a new bar date for filing claims against the Estates.  Not only could a chapter 7 liquidation delay distribution to creditors, but it is possible that additional claims that were not asserted in the chapter 11 cases or that were filed late could be filed against the Estates.

93.     Accordingly, the Plan provides an equal or better potential recovery for creditors and interest holders as compared to a liquidation under chapter 7 of the Bankruptcy Code. Therefore, the Plan satisfies the "best interests" of creditors test under section 1129(a)(7) of the Bankruptcy Code.

I.     **Acceptance by Impaired Classes (Section 1129(a)(8))**

94.     A plan is accepted by the holders of the allowed claims of each class that voted if (i) at least two-thirds in dollar amount (the "Amount Requirement") and (ii) more than one-half in number (the "Creditor-Numerosity Requirement") have voted to accept the plan.  *See* 11 U.S.C.

§ 1126(c).  A class of interests accepts the plan if the plan is accepted by holders of interests that hold at least two-thirds in amount of the allowed interests in the class that actually vote on a plan (together with the Creditor-Numerosity Requirement, the "Numerosity Requirement").  *See* 11 U.S.C. § 1126(d).

95.    As discussed above, whether a class has accepted the plan is determined by reference to section 1126 of the Bankruptcy Code.  Under section 1126(f), any unimpaired class is conclusively presumed to have accepted the plan.

96.    Classes 1, 2, 11, and 13 are Unimpaired under the Plan and are deemed to have accepted the Plan.  Classes 3, 4, 5, 6, 7, 8, 9, and 10 are Impaired and entitled to vote on the Plan. All Voting Classes have voted in favor of the Plan except Class 10, which has rejected the Plan. Classes 12 and 14 are deemed to have rejected the Plan and not entitled to vote on the Plan. As discussed herein, the Debtors seek Confirmation of the Plan under the cramdown provisions of section 1129(b).

**J.      Treatment of Priority Claims (Section 1129(a)(9))**

97.    Section 1129(a)(9) of the Bankruptcy Code contains a number of requirements concerning the payment of priority claims.  11 U.S.C. § 1129(a)(9).  First, section 1129(a)(9)(A) requires that claims of a kind specified in section 507(a)(1), which gives first priority to certain administrative expenses, be paid in full in cash on the effective date of a plan.  Second, section 1129(a)(9)(B) requires that claims of a kind specified in subsections 507(a)(3) through 507(a)(7) receive deferred cash payments equal to the allowed amount of such claims on the effective date.  Finally, section 1129(a)(9)(C) requires that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—priority tax claims—must receive regular

installment payments in cash of the total value equal to the allowed amount of such claim over a period ending not later than five years after the petition date.

98.    The Plan satisfies these requirements.  Under section II.A of the Plan, Holders of Allowed Administrative Claims will receive payment in full.  Under section II.D of the Plan, each Holder of an Allowed Priority Tax Claim will, as elected by the Debtors or Reorganized Debtors, receive payment in full or receive such other treatment consistent with section 1129(a)(9).

99.    Thus, the treatment of priority claims under the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

**K.    Acceptance by at Least One Impaired Class (Section 1129(a)(10))**

100.    Section 1129(a)(10) of the Bankruptcy Code requires as a condition of confirmation that if a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.  *See* 11 U.S.C. § 1129(a)(10).  The voting members of Classes 3 through 9 are Impaired and have voted in favor of the Plan.  Therefore, the requirement of section 1129(a)(10) is satisfied.

**L.    The Plan Is Feasible (Section 1129 (a)(11))**

101.    Section 1129(a)(11) of the Bankruptcy Code provides that a plan may be confirmed only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtors or any successor to the debtors under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).

102.    Courts generally have held that the determination of the feasibility requirement contemplates "'the probability of actual performance of the provisions of the plan.'"[30]  Only a reasonable assurance of success is required.[31]  Further, "a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility."[32]

103.    Courts have identified the following nonexclusive factors as probative with respect to the feasibility of a plan:

(a)     the adequacy of the capital structure;

(b)     the earning power of the business;

(c)     economic conditions;

(d)     the ability of management;

(e)     the probability of the continuation of the same management;

(f)     the provisions for adequate working capital; and

(g)     any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

---

[30]   *Clarkson v. Cooke Sale & Serv. Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985) (quoting *Chase Manhattan Mortg. & Realty Tr. v. Bergman (In re Bergman)*, 585 F.2d 1171, 1179 (2d Cir. 1978)).  "The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts."  *Id.*; *see also In re Orlando Investors, L.P.*, 103 B.R. 593, 600 (Bankr. E.D. Pa. 1989) ("Feasibility does not require that substantial consummation of the plan be guaranteed; rather the plan proponent must demonstrate that there be a reasonable assurance of compliance with plan terms.").

[31]   *In re T-H New Orleans Ltd P'ship*, 116 F.3d 790, 801 (5th Cir. 1997) (citations omitted) ("[T]he [bankruptcy] court need not require a guarantee of success . . . , [o]nly a reasonable assurance of commercial viability is required.");  *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989) (noting that the feasibility standard "has been slightly broadened and contemplates whether the debtor can realistically carry out its plan").

[32]   *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005); *Tribune*, 464 B.R. at 185.

104.    For purposes of determining whether the Plan satisfies the above-described feasibility standards, the Debtors have analyzed their ability to fulfill their obligations under the Plan and have taken into consideration their estimated costs of administration. As part of this analysis, the Debtors, with the assistance of their financial and other advisors, have prepared financial projections for the Debtors for fiscal years 2024 - 2026 (the "Financial Projections"). These projections, and the assumptions on which they are based, are included in the Financial Projections annexed as **Exhibit E** to the Disclosure Statement.  The Financial Projections are further discussed in the Fleming Declaration and the Kieftenbeld Declaration.

105.    The Plan effectuates a re-start of the Debtors' business operations . The Debtors have adequate funding for their Plan obligations and for future operations in light of the type of business they operate. The Reorganized Debtors expect to operate their business and service their ordinary course operational obligations with operating cash flow and funds from the Exit First Lien Facility (as modified, to provide up to $160 million principal amount), subject to the assumptions and limitations set forth in the Financial Projections.

106.    As set out in the Fleming Declaration, at emergence, the total estimated Administrative Claims are approximately $25 million (net of the $30 million consumer brand sale proceeds which will be used to pay Allowed Administrative Claims).[33]  Other payments due on the Effective Date total approximately $48 million.[34]  The Plan provides that the Third-Party Release Settlement Amount, Estate Claims Settlement Cash Consideration, and the Lavvan Settlement Consideration will  be funded by the DIP Lenders, the Foris Prepetition Secured Lenders, or from an advance under the $160 million Exit First Lien Facility.  Thus, the Plan

---

[33] Fleming Declaration at ¶ 13.

[34] *Id.*

provides that either the $160 million Exit Facility or funds from the Foris Secured Parties will be used to fund these payments on the Effective Date.

107.    Based on all of the circumstances, the Financial Projections provide reasonable assurances that all distributions and payments required pursuant to the Plan to be made by the Reorganized Debtors will be made.  The Debtors' restructuring pursuant to the Plan will substantially deleverage the Debtors' balance sheet by as much as $800 million (or nearly 80%). For the reasons discussed herein and in Exhibit D to the Disclosure Statement, this deleveraging and the additional liquidity from the Exit First Lien Facility equip the Reorganized Debtors for their post-emergence operations.

108.    Accordingly, the Plan is feasible and has more than a reasonable likelihood of success, and so satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

**M.      Payment of Certain Fees (Section 1129(a)(12))**

109.    Section 1129(a)(12) of the Bankruptcy Code requires that certain fees listed in 28 U.S.C. § 1930, determined by the Court at the hearing on confirmation of a plan, be paid or that provision be made for their payment.  *See* 11 U.S.C. § 1129(a)(12).  All outstanding fees payable to the Office of the United States Trustee under 28 U.S.C. § 1930 that have not been paid as of the Effective Date will be paid by the Debtors on the Effective Date (or when otherwise due in the ordinary course).  *See* Plan § II.E.  Consequently, section 1129(a)(12) of the Bankruptcy Code is satisfied.

**N.    Continuation of the Debtors' Obligations to
Pay Retiree Benefits (Section 1129 (a)(13))**[35]

110.    Section 1129(a)(13) of the Bankruptcy Code requires that a plan provide for the

continuation of retiree benefits at levels established by agreement or by court order pursuant to

section  1114 of the Bankruptcy Code, for the duration of the period that the debtor has obligated

itself to provide such benefits.  *See* 11 U.S.C. § 1129(a)(13).  The Debtors have no retiree benefit

plans within the meaning of section 1129(a)(13) of the Bankruptcy Code.

**O.    The Plan Satisfies the "Cramdown" Requirements of Section 1129(b)(1)**

111.    Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable

requirements of section 1129(a) are met other than section 1129(a)(8), a plan may be confirmed

so long as the requirements set forth in section 1129(b) are satisfied.  To confirm a plan that has

not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the

Bankruptcy Code), the debtor must show that the plan does not "discriminate unfairly" and is "fair

and equitable" with respect to the nonaccepting impaired classes (the "Rejecting Classes").[36]

112.    As discussed herein, Class 10 (Givaudan Contract Claims) has voted to reject the

Plan.  And Classes 12 and 14 are not entitled to any recovery and thus are deemed to have rejected

the Plan.  To confirm the Plan, the Debtors must satisfy the Bankruptcy Code's "cramdown"

requirements as to Classes 10, 12 and 14 (the "Deemed Rejecting Classes").

**i.    The Plan Does Not Unfairly Discriminate Against the Deemed
Rejecting Classes**

---

[35]    The remaining elements of section 1129(a)—namely, subsections (a)(14) (domestic obligations), (15) (individual debtors), and (16) (nonprofit entities)—are inapplicable to the Debtors and will not be discussed.  *See* 11 U.S.C. § 1129(a)(14), (a)(15), and (a)(16).

[36]    11 U.S.C. § 1129(b); *see also John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993); *Zenith*, 241 B.R. at 105 (explaining that "[w]here a class of creditors or shareholders has not accepted a plan of reorganization, the court shall nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable.'").

113.    The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists.[37]   Rather, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists.[38]   In general, courts have held that a plan unfairly discriminates in violation of section 1129(b)(1) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.[39]   A threshold inquiry to assessing whether a proposed plan of reorganization unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.[40]

114.    The Court should find that the Plan does not unfairly discriminate against the Rejecting Classes and Deemed Rejecting Classes. There are no equally situated classes that are receiving more favorable treatment under the Plan, and consequently there is no discrimination against the Rejecting Classes and Deemed Rejecting Classes.

---

[37]    *See In re 203 N. LaSalle St. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established"), *rev'd on other grounds*, 526 U.S. 434 (1999).

[38]    *See Genesis Health Ventures,*.266 B.R. at 611 ("The hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination."); *see also In re 222 Liberty Assoc.*, 108 B.R. 971, 990-991 (Bankr. E.D. Pa. 1990); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) ("The language and legislative history of the statute provides little guidance in applying the 'unfair discrimination' standard . . . ."), *aff'd*, 843 F.2d 636 (2d Cir. 1988); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances"); *In re Aztec Co.*, 107 B.R. 585, 589 (Bankr. M.D. Tenn. 1989) (noting that courts "have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination").

[39]    *See In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661–62 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination), *aff'd*, 308 B.R. 672 (D. Del. 2004); *In re Idearc Inc.*, 423 B.R. 138, 171 (Bankr. N.D. Tex. 2009) ("[T]he unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so.").

[40]    *See In re Aleris Int'l*, No. 09-10478 (BLS), 2010 Bankr. LEXIS 2997, at *94–96 (Bankr. D. Del. May 13, 2010) (citing *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006)).

###### ii.    The Plan Is Fair and Equitable as to the Deemed Rejecting Classes

115.    A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[41]  This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.[42]

116.    No class junior to the Rejecting Classes or Deemed Rejecting Classes is entitled to any distributions under the Plan.  Further, as noted above, there is no other class equally situated to the Rejecting Classes or Deemed Rejecting Classes that will receive more favorable treatment under the Plan.  The foregoing treatment conforms to the absolute priority rule and is therefore fair and equitable within the meaning of section 1129(b).

117.    Accordingly, the Plan satisfies the cramdown requirements of section 1129(b) of the Bankruptcy Code and may be confirmed notwithstanding the rejection of the Plan by the Rejecting Classes and Deemed Rejecting Classes.

### P.    The Plan's Purpose is Consistent with the Bankruptcy Code (Section 1129(d))

118.    Section 1129(d) of the Bankruptcy Code provides that a court may not confirm a plan if the principal purpose of the plan is to avoid taxes or the application of section 5 of the Securities Act of 1933.  11 U.S.C. § 1129(d).  The Plan is a plan of reorganization and its purpose

---

[41]    *Bank of Am. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441–42 (1999) ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, or, in the alternative,  if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property.'  That latter condition is the core of what is known as the 'absolute priority rule.'" (quoting 11 U.S.C. § 1129(b)(1), (b)(2)(B)).

[42]    *Id.*

is not avoidance of taxes or avoidance of the requirements of section 5 of the Securities Act of 1933, and there has been no filing by any governmental agency asserting such avoidance.

## V.

## MODIFICATIONS TO THE PLAN DO NOT ADVERSELY AFFECT HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN AND DO NOT REQUIRE RESOLICITATION

119.   The Debtors have made certain modifications to the Plan to address certain concerns and issues raised by the Objections/Statements and certain informal comments and to conform to the settlements reached with DSM and Lavvan.  These modifications do not adversely affect any creditors, and certain modifications (such as the increase of the Exit First Lien Facility from $145 million to $160 million) inure to the collective benefit of creditors.

120.   Section 11 U.S.C. § 1127(a) of the Bankruptcy Code provides a plan proponent with the right to modify the plan "at any time" before confirmation.  Section 1127(d) of the Bankruptcy Code provides that all stakeholders that previously accepted the plan also are deemed to have accepted the modified plan if such modifications are found to not adversely change the treatment of the claims in the Voting Classes.  11 U.S.C. § 1127(d); Fed. R. Bankr. P. 3019.  Courts routinely allow plan proponents to make non-prejudicial changes to a plan without requiring the proponent to re-solicit the plan for acceptances.  *See, e.g.*, *Enron Corp. v. New Power Co. (In re New Power Co.)*, 438 F.3d 1113, 1117-18 (11th Cir. 2006).  The Debtors  submit that all of the modifications to the Plan, as reflected in the Third Amended Plan, do not adversely affect the recoveries of the Debtor's creditors.

121.     In light of these modifications, the Debtors are not required to re-solicit the Plan and all creditors that previously voted to accept the Second Amended Plan should be deemed to accept the Third Amended Plan.

## VI.

## **WAIVER OF THE STAY OF THE CONFIRMATION ORDER**

122.     Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."  Fed. R. Bankr. P. 3020(e).   Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

123.     The Debtors submit that good cause exists for waiving and eliminating any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the Confirmation Order will be effective immediately upon its entry.  The Debtors submit that, based on the circumstances of these cases discussed above (including the global settlement among the key constituencies reflected therein), it is reasonable and amply justified for the Debtors and interested parties to proceed with implementing the Plan, to minimize the significant ongoing chapter 11 administrative costs, and to provide, as promptly as possible, distributions to the Debtors' creditors.

## VII.

## **CONCLUSION**

**WHEREFORE**, for the reasons set forth in this Memorandum and the Omnibus Reply, the Debtors respectfully submit that the Plan fully satisfies all applicable requirements of the

Bankruptcy Code and requests that the Court enter an order confirming the Plan substantially in the form attached hereto.

[*Remainder of Page Intentionally Left Blank*]

Dated:  January 22, 2024

PACHULSKI STANG ZIEHL & JONES LLP

/s/Jaime O'Neill
Richard M. Pachulski, *(admitted pro hac vice)*
Debra I. Grassgreen, *(admitted pro hac vice)*
James E. O'Neill (DE Bar No. 4042)
Jason H. Rosell, *(admitted pro hac vice)*
Steven W. Golden (DE Bar No. 6807)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Tel:  302-652-4100
Fax: 302-652-4400
rpachulski@pszjlaw.com
dgrassgreen@pszjlaw.com
joneill@pszjlaw.com
jrosell@pszjlaw.com
sgolden@pszjlaw.com

*Counsel for Debtors and Debtors in Possession*