## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMYRIS, INC., *et al.*,[1] | Case No. 23-11131 (TMH) |
| Debtors. | (Jointly Administered) |

## OMNIBUS REPLY IN SUPPORT OF CONFIRMATION OF PLAN OF REORGANIZATION OF AMYRIS, INC. AND ITS AFFILIATED DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Dated:  January 22, 2024

PACHULSKI STANG ZIEHL & JONES LLP
Richard M. Pachulski, *(admitted pro hac vice)*
Debra I. Grassgreen, *(admitted pro hac vice)*
James E. O'Neill (DE Bar No. 4042)
Jason H. Rosell, *(admitted pro hac vice)*
Steven W. Golden (DE Bar No. 6807)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Tel:  302-652-4100
Fax: 302-652-4400
Email:  rpachulski@pszjlaw.com
        dgrassgreen@pszjlaw.com
        joneill@pszjlaw.com
        jrosell@pszjlaw.com
        sgolden@pszjlaw.com

*Counsel to the Debtors and Debtors in Possession*

---

[1]  A complete list of each of the Debtors in these Chapter 11 Cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.stretto.com/amyris.  The location of Debtor Amyris Inc.'s principal place of business and the Debtors' service address in these Chapter 11 Cases is 5885 Hollis Street, Suite 100, Emeryville, CA 94608.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ............................................................................................................. 2

OMNIBUS REPLY RELATING TO RELEASE/EXCULPATION PROVISIONS ..................... 6

   A.   Summary of Plan Release Provisions ................................................................ 6

   B.   The Third-Party Release and Direct Claims Injunction Are Permissible and Warranted Under the Circumstances and Should Be Approved ............................................. 7

         1.     Identity of Interests .................................................................... 12

         2.     Substantial Contribution ............................................................. 14

         3.     Essential to the Reorganization .................................................... 17

         4.     Significant Creditor Support ........................................................ 19

         5.     The Plan Provides a Mechanism for Substantial Recoveries for Affected Creditors ........................................................................ 19

   C.   Alternatively, the Third-Party Release Under the Plan Should Be Approved as a Consensual Release ...................................................................................... 21

   D.   This Court Has Jurisdiction to Confirm a Plan that Contains the Mandatory Third-Party Release and Direct Claims Injunction ............................................................ 27

   E.   The Scope of the Released Parties and Exculpated Parties Is Appropriate Under  the Circumstances ............................................................................................ 28

   F.   The Plan Injunction Provision Is Appropriate and Complies With the Bankruptcy Code. .......................................................................................... 31

REPLY TO REMAINING MISCELLANEOUS OBJECTIONS ............................................. 33

CONCLUSION ............................................................................................................. 46

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**<u>Cases</u>**

*Bourne v. Northwood Props., LLC (In re Northwood Props., LLC)*
   509 F.3d 15 (1ˢᵗ Cir. 2007)................................................................................. 42

*Cal. Dep't of Toxic Substances Control v. Exide Holdings, Inc. (In re Exide Holdings, Inc.)*
   2021 U.S. Dist. LEXIS 138478 (D. Del. July 26, 2021) ........................................ 15

*Celotex Corp. v. Edwards*
   514 U.S. 300 (1995)........................................................................................... 27

*Donoghue v. Bulldog Investors Gen. P'ship*
   696 F.3d 170 (2d Cir. 2012)................................................................................ 34

*Gibbons v. Morgan*
   2017 U.S. Dist. LEXIS 144032 (S.D.N.Y. Sep. 6, 2017) ...................................... 34

*Gillman v. Continental Airlines (In re Continental Airlines)*
   203 F.3d 203 (3d Cir. 2000)........................................................................ 8, 12, 18

*In re 710 Long Ridge Rd. Operating Co. II*
   Bankr. Case No. 13-3653 (DHS), 2014 Bankr. LEXIS 863 (Bankr. D.N.J. Mar. 5, 2014)...... 20

*In re AAC Holdings*
   No. 20-11648 (CTG) (Bankr. D. Del. June 20, 2020) ........................................... 26

*In re AeroCentury Corp.*
   No. 21-10636 (JTD) (Bankr. D. Del. Aug. 31, 2021)............................................ 25

*In re American Family Enters.*
   256 B.R. 377 (D.N.J. 2000) ................................................................................ 15

*In re Cred Inc.*
   No. 20-12836 (Bankr. D. Del. March 10, 2021)................................................... 25

*In re Episode USA*
   202 B.R. 691 (Bankr. S.D.N.Y. 1996)................................................................. 35

*In re Extraction Oil & Gas*
   No. 20-11548 (CSS) (Bankr. D. Del. Oct 22, 2020)............................................. 26

*In re First Capital Holdings Corp.*
   146 B.R. 7 (Bankr. C.D. Cal. 1992)..................................................................... 34

*In re Freedom Rings, LLC*
   No. 05-14268 (Bankr. D. Del. May 9, 2006) ....................................................... 28

*In re G-I Holdings, Inc.*
   313 B.R. 612 (Bankr. D. N.J. 2004) .................................................................... 34

*In re Global Indus. Techs., Inc.*
   645 F.3d 201 (3d Cir 2011)................................................................................. 12

*In re Indianapolis Downs, LLC*
   486 B.R. 286 (Bankr. D. Del. 2013) ...................................................... 9, 14, 24, 39

*In re Kalos Capital*
   2023 Bankr. LEXIS 2646 (Bankr. N.D. Ga. Oct. 31, 2023).................................. 12

*In re Mallinckrodt PLC*
   No. 20-12522 (JTD) (D. Del. 2020) .................................................................... 27

*In re Master Mortgage Investment Fund, Inc.*
   168 B.R. 930 (Bankr. W.D. Mo. 1994)........................................................... passim

*In re Millennium Lab Holdings II, LLC*
543 B.R. 703, 711 (Bankr. D. Del. 2016) ........................................................ 9

*In re Millennium Lab Holdings II, LLC,*
562 B.R. 614 (Bankr. D. Del. 2016) ............................................................. 27

*In re Millennium Lab Holdings II, LLC*
575 B.R. 252 (Bankr. D. Del. 2017) ...................................................... 9, 15, 28

*In re Millennium Lab Holdings II, LLC,*
591 B.R. 559 (D. Del. 2018) ....................................................................... 20

*In re Millennium Lab Holdings II, LLC*
945 F.3d 126 (3d Cir. 2019) ................................................................... passim

*In re National Forge Co.*
326 B.R. 532 (W.D. Pa. 2005) .................................................................... 34

*In re Orchard Acquisition Co.*
No. 17-12914 (KG)  (Bankr. D. Del. Dec. 12, 2017) ..................................... 26

*In re Phila. Newspapers, LLC,*
690 F.3d 161, 172-173 (3d Cir. 2012) ......................................................... 35

*In re PQ New York*
No. 20-11266 (Bankr. D. Del. Sept. 25, 2020) ............................................. 25

*In re PWS Holding Corp.*
228 F.3d 224 (3d Cir. 2000) ................................................................ 30, 31

*In re RTI Holding Co.*
No. 20-12456 (JTD) (Bankr. D. Del. Feb. 10, 2021) ...................................... 25

*In re rue21, Inc.*
575 B.R. 314 (Bankr. W.D. Pa. 2017) .......................................................... 14

*In re Spansion*
426 B.R. 114 (Bankr. D. Del. 2010) ......................................................... 9, 24

*In re T-H New Orleans Ltd. P'Ship*
116 F.3d 790 (5th Cir. 1997) ...................................................................... 39

*In re Tribune Co.*
464 B.R. 126 (Bankr. D. Del. 2011) ............................................................ 12

*In re Tribune Co.*
464 B.R. 126 (Bankr. D. Del. 2011) ............................................................. 9

*In re U.S. Fidelis, Inc.*
481 B.R. 503 (Bankr. E.D. Mo. 2012) ..................................................... 20, 21

*In re W.R. Grace & Co.*
475 B.R. 34, 115 (D. Del. 2012) ................................................................ 39

*In re Washington Mutual Inc.*
442 B.R. 314 (Bankr. D. Del. 2011) ............................................................ 30

*In re Washington Mutual Inc.,*
442 B.R. 314 (Bankr. D. Del. 2011) ............................................................ 14

*In re Zenith Electronics Corp.*
241 B.R. 92 (D. Del. 1999) ....................................................................... 24

*Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC)*
591 B.R. 559 (D. Del. 2018) .................................................................. 9, 20

*Rosenberg v. XO Communs., Inc. (In re XO Communs., Inc.)*
330 B.R. 394 (Bankr. S.D.N.Y. 2005) .......................................................... 34

*Statesboro Mall, LLC v. Green (In re Green)*
    504 B.R. 675 (Bankr. S.D. Ga. 2014) ................................................................................ 35
*Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*
    845 A.2d 1031 (Del. 2004) ................................................................................................ 34
*Tritek Int'l Inc.*,
    No. 23-10520 (TMH) (Bankr. D. Del. Oct. 6, 2023) ..................................... 10, 23, 24, 25, 27

**Statutes**

11 U.S.C. § 105 ........................................................................................................................ 12
11 U.S.C. § 105(a) ..................................................................................................................... 8
11 U.S.C. § 157 ........................................................................................................................ 28
11 U.S.C. § 365(n) .................................................................................................................... 47
11 U.S.C. § 1123(b)(6) ............................................................................................................. 12
11 U.S.C. § 1129(a)(3) ............................................................................................................. 31
11 U.S.C. § 1129(a)(9)(A) ........................................................................................................ 37
11 U.S.C. § 1129(a)(11) ....................................................................................................... 39, 40
11 U.S.C. § 1334 ...................................................................................................................... 28

**Rules**

Fed. R. Bankr. P 9019 .............................................................................................................. 36

Amyris, Inc. ("Amyris") and the other above-captioned debtors and debtors in possession (the "Debtors" or the "Company") submit this omnibus reply in support of confirmation of the *Third Amended Joint Chapter 11 Plan of Reorganization of Amyris, Inc. and Its Affiliated Debtors* (including all exhibits thereto and as amended, supplemented, or otherwise modified from time to time, the "Plan"), filed on January 22, 2024.[2]  The following objections, statements or reservation of rights have been filed with respect to the Plan (collectively, the "Objections/Responses"):

(i) the limited objection of the U.S. Securities and Exchange Commission (the "SEC") [Dkt. No. 1150];

(ii) the objection of Andrew E. Roth ("Roth"), a holder of Amyris, Inc. common stock [Dkt. No. 1152];

(iii) the objection of Andrew R. Vara, United States Trustee for Regions 3 and 9 (the "U.S. Trustee") [Dkt. No. 1154];

(iv) the response and reservation of rights of Disruptional Ltd. & Vest Beauty Labs LP, and their respective divisions and subsidiaries (collectively "Disruptional") [Dkt. No. 1155];

(v) the objection of 10-11 Clerkenwell Green Limited ("Clerkenwell"), as the alleged holder of certain claims against Amyris, Inc. [Dkt. No. 1156];

(vi) the objection and reservation of rights of Lexon Insurance Company ("Lexon") [Dkt. No. 1157];

(vii) the preliminary limited objection of John Melo ("Melo") [Dkt. No. 1158]; and

---

[2]  Dkt. No. 1170.  Capitalized terms not defined herein shall have the meanings ascribed in the Plan.

(viii) the objection of Givaudan SA (together with its direct and indirect subsidiaries, "Givaudan") [Dkt. No. 1168].

Attached hereto as **Exhibit A** is a summary chart of the key points of the Objections/Responses and the Debtors' responses thereto.  The Debtors also received additional informal comments to the Plan, which have been addressed to the best of the Debtors' knowledge in the amended Plan and/or proposed Confirmation Order.

## **INTRODUCTION**

1.      The Court should confirm the Plan notwithstanding the limited objections that have been asserted primarily by non-economic parties in interest.  The Plan accomplishes the rehabilitative goals of chapter 11 by right-sizing the Debtors' capital structure, streamlining the Debtors' operations, and adjusting key contracts.  The Plan preserves Amyris's cutting-edge science and technology for future generations allowing it to continue as a leading manufacturer of sustainable ingredients, making people and the planet healthier.  In doing so, the Plan preserves jobs both in the U.S. and Brazil, ends years of protracted litigation, and provides a meaningful recovery for Holders of General Unsecured Claims, notwithstanding that the senior secured lenders - the Foris Secured Parties - are significantly under-secured.

2.      Aside from Givaudan, every Impaired Class entitled to vote has overwhelmingly accepted the Plan.  For the Debtors' largest creditor constituency – Holders of Convertible Notes in Class 7 - there was ***not a single no vote.***  Holders of General Unsecured Claims in Class 8 accepted the Plan by over 96% in both number and amount.  ***Notably, when one***

*considers the amount of Claims collectively for the two Classes of General Unsecured Claims,*

*there is more than 99% acceptance with less than 1% of opt-outs from the Third-Party Release.*[3]

3.      The Objections/Responses filed by the SEC, Roth, the U.S. Trustee, Clerkenwell and Givaudan challenge the proposed Third-Party Release in the Plan and do not justify denial of Confirmation of the Plan.  The Third-Party Release is a critical part of the global settlement incorporated into the Plan by and among the Debtors, the Foris Secured Parties, the Creditors' Committee, all Consenting Convertible Noteholders, the Ad Hoc Group, the Ad Hoc Cross-Holder Group, and now Lavvan, and otherwise satisfy the requirements in this Circuit for approval of such releases.  The U.S. Trustee also challenges the exculpation provisions in the Plan, which as set forth below have been substantially narrowed in the amended Plan in an effort to address the U.S. Trustee's concerns.

4.      As to the Third-Party Release, the SEC, the U.S. Trustee, and Givaudan principally argue that the consideration provided for such release is inadequate and there is an alternative provided under the Plan that contemplates opt-out releases, which therefore means that the Third-Party Release is not necessary.  In addition, the SEC and U.S. Trustee take the position that even the consensual releases under the Plan are not really consensual because they do not require an affirmative opt-in by each creditor or equity holder.

5.      The Court should reject these arguments.  With respect to the adequacy of consideration for the releases under the Plan, the SEC, the U.S. Trustee, and Givaudan seek to supplant the business judgment of the Debtors and their creditors, who are highly sophisticated

---

[3]  More than half of the $2.4 million of rejections in Class 8 is on account of the disputed $1.4 million claim of Excluded Party – John Melo.

and well-represented parties owed hundreds of millions of dollars and who painstakingly negotiated the terms of the Plan, which now has the voting support of the vast majority of the creditor body. And as is set forth below, the nonconsensual Third-Party Release is unreservedly necessary for creditors, and even equity holders, to maximize recoveries under the Plan and the Debtors to effectuate a successful reorganization.

6.      The objectors argue that the non-consensual Third-Party Release is not necessary because the Plan includes the option for a consensual release and therefore the Plan can be confirmed without the non-consensual releases. The test is not whether ***any*** Plan can be confirmed. The test is whether there can be a ***successful reorganization***. If parties are permitted to opt-out of the Third-Party Release and sue the Debtors' officers and directors, that will undoubtedly impair a successful reorganization because the Reorganized Debtors will be incurring the expense and distraction of defending those claims pursuant to the assumed indemnity obligations. The Plan provides substantial benefits to all parties in interest and satisfies the exacting standards for approval of nonconsensual third party releases. The objections to the Third-Party Release should be overruled.

7.      The other objecting parties to the Plan, Roth, Disruptional and Clerkenwell, assert claims that are disputed by the Debtors and, even if ultimately Allowed, are relatively *de minimis* in the grand scheme of these cases. Lexon's objection is effectively a reservation of rights with respect to certain surety bonds and related collateral, which will be addressed with an insert to the Confirmation Order. Melo's objection is a single paragraph reservation of rights. The response filed by Disruptional is focused on the size of its asserted General Unsecured Claim for

reserve purposes, which is an issue that will be addressed by the Creditors' Committee and, in any case, is not relevant for purposes of Plan confirmation.

8.      Givaudan and the Debtors have business and contractual disputes that are the subject of ongoing negotiations.  Givaudan's objections to the Plan also focus on the Third-Party Release and Givaudan's individual contract issues, which are either addressed by appropriate language inserts to the Plan or the Confirmation Order or should be overruled for the reasons set forth below.

9.      Clerkenwell also challenges the feasibility of the Plan and the transparency of the Debtors' financial disclosures.  As is set forth in more detail below, the required Effective Date payments are adequately funded from either the Foris Secured Parties or the $160 million Exit First Lien Facility.  Under the Plan, no creditor's Plan distribution will be impacted by long term feasibility.  Pursuant to the Plan, Administrative Claims will either be paid in full on the Effective Date if their Claims are Allowed on that date or within 30 days of allowance by the Court.  The Creditor Trust will be funded with the Creditor Trust Assets on the Effective Date. Either direct funding by Foris or the $160 million Exit First Lien Facility will be used to fund these payments on the Effective Date, including the funding of the Creditor Trust.  The Plan is feasible.

10.      Considering the overwhelming creditor support for the Plan and the undisputed evidence that demonstrates that the Plan satisfies all of the requirements for Confirmation, the Court should overrule the Objections/Responses and enter the Confirmation Order.

## OMNIBUS REPLY RELATING TO RELEASE/EXCULPATION PROVISIONS

### A.    Summary of Plan Release Provisions

11.    The releases in the Plan include the following:

- the Debtors' release (Article IX.C)

- a nonconsensual Third-Party Release by the Releasing Parties[4] of the Released Parties or, if not approved, in the alternative, a voluntary third-party release (Article IX.D),

- an exculpation provision (Article IX.E.),

- a Plan Injunction provision (Article IX.F), and

- a Direct Claims Injunction that bars all holders of Direct Claims from pursuing such claims against the Released Parties[5] (Article IX.G of the Plan)

12.    In consideration for the Third-Party Release, holders of Direct Claims[6] will receive distributions from the Third-Party Release Settlement and will be permanently enjoined from seeking satisfaction of their Direct Claims against the Released Parties or any other Direct Claims Injunction Party or the property of any such Direct Claims Injunction Party.

13.    If the nonconsensual Third-Party Release is not approved by this Court, each holder of a Direct Claim may voluntarily elect to receive its portion of the Third-Party Release

---

[4] "Releasing Parties" means collectively, and in each case in its capacity as such: (a) the Foris Prepetition Secured Lenders; (b) the Creditors' Committee; (c) the Consenting Convertible Noteholders; (d) the Consenting Contract Counterparties; (e) Lavvan; (f) all Holders of Claims against the Debtors that are bound by the Third-Party Release Settlement; and (g) all persons who hold Interests in Parent that are bound by the Third-Party Release Settlement. The latest amended Plan added Lavvan as a Releasing Party pursuant to a recent settlement with that party.

[5] "Released Parties" means collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the DIP Lenders and the DIP Agent; (d) the Foris Prepetition Secured Lenders; (e) the Committee; (f) Lavvan; (g) the Consenting Convertible Noteholders, (h) the Ad Hoc Group Professionals; (i) the Consenting Contract Counterparties; (j) the Consenting Convertible Noteholders; and (k) with respect to each of the foregoing Entities in clauses (a) through (f), all Related Parties. The latest amended Plan added Lavvan as a Released Party pursuant to a recent settlement with that party, along with an added reference to the Consenting Convertible Noteholders.

[6] "Direct Claims" means any claim or Cause of Action held by a Releasing Party against any of the Released Parties (excluding the Debtors) and their respective Related Parties, but only to the extent such claims arise from, relate to, or are connected with, directly or indirectly, in any manner whatsoever, the Debtors, including their respective assets, liabilities, operations, financings, contractual agreements, licenses, and including the governance thereof, and existing on or prior to the Effective Date (including prior to the Petition Date).

Settlement Amounts to which it is entitled by electing to grant the Third-Party Release, through the following methods: (x) for (i) holders of Claims who are entitled to submit a ballot to vote on the Plan and vote to accept the Plan, (ii) holders of Claims who are entitled to submit a ballot to vote on the Plan and (a) vote to reject the Plan or (b) abstain from voting on the Plan and, in either case, do not elect to exercise their right to opt out of granting the Third-Party Release, and (y) for holders of Claims and Interests who are deemed to accept or reject the Plan and are provided with a notice of non-voting status providing them with the right to opt out of granting the Third-Party Release and do not elect to exercise such right; provided, that, as applicable, the Direct Claims Threshold is satisfied.

14.     Any undistributed Third-Party Release Settlement Amounts that would have otherwise been distributed to holders of Direct Claims that opted out of granting the Third-Party Release will be paid to the Foris Prepetition Secured Lenders and applied to obligations owing under the Exit First Lien Facility attributable to the Foris Prepetition Secured Loans that are included in the Exit First Lien Facility.

**B.     The Third-Party Release and Direct Claims Injunction Are Permissible and Warranted Under the Circumstances and Should Be Approved**

15.     The SEC, the U.S. Trustee, Clerkenwell, and Givaudan challenge the nonconsensual Third-Party Release under the Plan.  They assert that the Debtors cannot meet the high standard for approval of such releases and that such releases are not necessary in this case given that there is an alternative approach embedded in the Plan.  The objecting parties' blanket objections to the releases fail to take into account the complexity of the global settlement incorporated into the Plan or the overwhelming support for the Plan from all key creditor

constituents, each of whom acts as a fiduciary for hundreds of millions of dollars in creditor claims and negotiated the terms of the Plan through sophisticated counsel.  And to be clear, the nonconsensual Third-Party Release is absolutely necessary for creditors, and even equity holders, to maximize recoveries under the Plan and for the Debtors to effectuate the most successful reorganization possible.  The attention of the Reorganized Debtors' officers and directors should be focused on the operation of the business, not protracted litigation brought by persons opting out of the Third-Party Release, the costs of which will be borne by the Reorganized Debtors.  As addressed further below, the terms of the Plan provide substantial benefits to all parties in interest and satisfy the exacting standards for approval of nonconsensual third party releases.

16.     The Third Circuit has well-developed precedent regarding nonconsensual third party releases.  A court should approve non-debtor releases and related injunctions when (a) the non-debtor release and/or injunction satisfy the hallmarks of fairness and necessity to the chapter 11 plan and are given in exchange for fair consideration[7] and (b) there are exceptional circumstances warranting such relief.[8]

17.     While this Court need go no further in approving the nonconsensual Third-Party Release and Direct Claims Injunction than to apply the "fair and necessary" standard articulated in *Continental* and subsequent Third Circuit authority, courts in this Circuit have often

[7] 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); *Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203, 214 (3d Cir. 2000) ((holding that a third-party injunction would only be proper under section 105(a) of the Bankruptcy Code if the proponents of the injunction demonstrated with specificity that such an injunction was both necessary to the reorganization and fair).

[8] *Continental*, 203 F.3d at 217 (citing *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 139 (3d Cir. 2019).

considered the following *Master Mortgage* factors as "helpful guideposts" to determine whether

the "fairness and necessary" *Continental* standard has been met:[9]

> (a)   whether there is an identity of interest between the debtor and the third party such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate;
>
> (b)   whether the non-debtor made a substantial contribution of assets to the reorganization;
>
> (c)   the essential nature of the injunction to the reorganization to the extent that there is little likelihood of success without the injunction;
>
> (d)   whether a substantial majority of creditors agree to such injunction, specifically if the impacted class or classes "overwhelmingly" voted to accept the plan; and
>
> (e)   whether the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.[10]

18.   The SEC, the U.S. Trustee, and Givaudan do not attempt to address each of

the factors above, and neither does Clerkenwell which joins in the SEC's and the U.S. Trustee's

objections.  Rather than separately identifying specific issues with each of the relevant factors, the

objecting parties simply assert blanket objections to the nonconsensual Third-Party Release.  Their

arguments can be reduced to two basic points: (a) the consideration provided for the Third-Party

---

[9] It is most common for bankruptcy courts to apply the *Master Mortgage* factors when considering approval of a debtor's release of third parties.  *See, e.g., In re Indianapolis Downs, LLC*, 486 B.R. 286, 303-04 (Bankr. D. Del. 2013) (citing *Master Mortgage*); *In re Spansion*, 426 B.R. 114, 142-43 (Bankr. D. Del. 2010) (same).  In *Millennium Lab*, the court applied *Master Mortgage* to determine whether third-party releases should be approved in a plan. *In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 272 (Bankr. D. Del. 2017) ("The Master Mortgage factors, like the Dow factors (or any other standard in circuits that permit third party releases), are a federal, judicially-created yardstick against which a [third-party] release is measured.").  *See also Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC)*, 591 B.R. 559, 584 (D. Del. 2018) (referring to the *Master Mortgage* factors as "helpful guideposts"); *In re Millennium Lab Holdings II, LLC*, 543 B.R. 703, 711 (Bankr. D. Del. 2016) ("In making that determination, I considered the factors articulated in *In re Master Mortgage*. . . but ultimately returned to the *Continental* hallmarks.").

[10] *In re Tribune Co.*, 464 B.R. 126, 186 (Bankr. D. Del. 2011) (stating that "these factors are neither exclusive nor conjunctive requirements" and they simply provide guidance in this Court's determination of fairness).

Release is inadequate and (b) there is an alternative provided under the Plan that contemplates opt-out releases, which therefore means that the nonconsensual Third-Party Release are not necessary. As addressed below, the SEC and U.S. Trustee go one step further to take the position that even the consensual releases under the Plan are not really consensual because they do not require an affirmative opt-in by each creditor or equity holder.  In the SEC's and the U.S. Trustee's view, notwithstanding extensive precedent to the contrary in this District and this Court's recent ruling in the *Tritek* case (see **Exhibit B** hereto), the only time that one can have a valid third party release under a chapter 11 plan is when the affected counterparty affirmatively grants such release.  That is not the law.

19.    When it comes to the adequacy of consideration for the Third-Party Release under the Plan, the SEC, the U.S. Trustee, and Givaudan seek to supplant the business judgment of the Debtors and their creditors, who are highly sophisticated and well-represented parties owed hundreds of millions of dollars and who painstakingly negotiated the terms of the Plan, which now has the voting support of the vast majority of the creditor body.  The U.S. Trustee's objection to the Plan (at ¶31) goes so far as to characterize the additional consideration provided under the Plan if the nonconsensual Third-Party Release is approved as "*de minimis*".  Two non-economic actors, the SEC and the U.S. Trustee, who are owed no money in these cases, have challenged the consideration that creditors have negotiated with the Debtors and the Foris Secured Parties and overwhelmingly voted to receive under the Plan.  The Court should give no weight to such a challenge in light of the overwhelming support of parties whose economic interests are impacted by the Plan.

20.     Clerkenwell is a landlord on a lease between Clerkenwell and an entity unrelated to the Debtors that Amyris guaranteed.  The lease has allegedly gone into default and the landlord is aggressively asserting a disputed Administrative and General Unsecured Claim against Amyris.  The validity of these Claims can be addressed separately and are not relevant to confirmation of the Plan.

21.     The objecting parties also read the necessity requirement for nonconsensual third party releases too narrowly.  The test is not whether ***any*** Plan can be confirmed.   The test is whether there can be a ***successful reorganization***.  If parties are permitted to opt-out of the Third-Party Release and sue the Debtors' officers and directors, such litigation will undoubtedly impair a successful reorganization because the Debtor will be incurring the expense and distraction of defending those claims pursuant to the assumed indemnity obligations.  The existence of an alternative under the Plan does not mean that non-consensual Third-Party Release can never be approved under any circumstances.  There is no precedent to that effect.  The Debtors are focused on achieving the best possible restructuring for all constituents, and they have negotiated releases that provide that option to creditors.  Given the overwhelming vote in favor of the Plan, the few opt-outs from such releases, and the limited number of objections to the Plan in general, it is obvious that creditors view the terms of the Plan, including the nonconsensual Third-Party Release that gets them the highest possible return, as definitely necessary for a successful reorganization.

22.     As set forth below, the Third-Party Release and the Direct Claims Injunction under the Plan satisfy the fair and necessary hallmarks under *Continental*, as guided by

the *Master Mortgage* factors, and thus should be approved.[11]  The factual support for the releases and exculpations under the Plan are set forth in the *Declaration of Philip J. Gund* filed in support of the Plan.

### 1.   <u>Identity of Interests</u>

23.    Courts in this Circuit and elsewhere have found that there is an identity of interest between a debtor and non-debtor on various grounds, including when the debtor and non-debtor share a common goal of confirming the Plan, implementing a restructuring, and maximizing recoveries for creditors.[12]

24.    There is a clear identity of interests among the Debtors and the Released Parties in this case.  The Debtors and the Released Parties, which include the major creditor constituents in these cases, share the common goal of maximizing recoveries, resolving disputes, and restructuring the Debtors' affairs in order for the Debtors to emerge as a stronger, less debt-burdened, and more focused business.  The voting results clearly reflect massive creditor support for the terms of the Plan as drafted, including the nonconsensual Third-Party Release.

25.    Further, certain Direct Claims, if asserted against the Released Parties rather than released, could cause such Released Parties to seek indemnification from the Estates or other

---

[11]  *See Continental*, 203 F.3d at 214 ("The hallmarks of permissible non-consensual releases [are] fairness, necessity to the reorganization, and specific factual findings to support these conclusions[.]"); *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir 2011) (explaining that the injunction must be "both necessary to the reorganization and fair"); *In re Millennium Lab Holdings II, LLC*, 945 F.3d at 139 (same) (citing *Continental* and *Global Indus.*).

[12]  *See, e.g., In re Tribune Co.*, 464 B.R. 126, 187 (Bankr. D. Del. 2011) (finding that debtors and releasees "share the common goal" of confirming a plan dependent on settlement of complex multi-party litigation resulted in an "identity of interest" for purposes of the *Master Mortgage* factors); *In re Kalos Capital*, 2023 Bankr. LEXIS 2646, at *25-*27 (Bankr. N.D. Ga. Oct. 31, 2023) (under plan, debtor's principals would contribute $1.3 million to be distributed to creditors (which would increase the funds available for distribution to creditors 162%) in exchange for third party releases releasing any causes of action arising from or in connection with debtor's business or chapter 11 case; court finding it had statutory authority under 11 U.S.C. §§ 105 and 1123(b)(6) and that through plan related notices, releasing creditors got due process; "Courts have also found an identity of interests between debtors and released non-debtors when they 'share a common goal' of confirming the debtor's plan and implementing a plan settlement).

contractual rights and remedies. Such Direct Claims likely would be based upon substantially the same or similar operative facts as Estate claims that are being released under the Plan and certainly would be time-consuming and expensive to litigate. Specifically, in addition to any common law or statutory contribution claims they may have, the Debtors' current and former directors have rights of indemnification and reimbursement against the Debtors and Reorganized Amyris pursuant to Article VI of the Amended and Restated Bylaws, dated November 17, 2022 (the "Bylaws") and any separate indemnification agreement (an "Indemnification Agreement") between such current and former directors and the Debtors. A copy of the Bylaws and form Indemnification Agreement may be found at the links referenced in the *Declaration of Oksana Wright* (the "Wright Declaration") filed in support of the Plan.

26.     Pursuant to Section 6.3 of each of the Foris Loan Agreements, the parties thereto have contractual indemnity rights against the Debtors. The "Foris Loan Agreements" are, collectively, the (i) Amended and Restated Loan and Security Agreement dated as of October 28, 2019; (ii) Foris Amended and Restated Loan and Security Agreement dated as of September 27, 2022; (iii) Loan and Security Agreement, dated as of March 10, 2023; (iv) Loan and Security Agreement dated as of June 5, 2023; (v) Loan and Security Agreement dated as of June 29, 2023; and (vi) Muirisc Loan and Security Agreement dated August 2, 2023. True and correct copies of each of the Foris Loan Agreements are attached as exhibits to the Wright Declaration.

27.     The Debtors carry directors' and officers' insurance under wasting policies (*i.e.*, defense/litigation costs are paid out of the policy limits), with a maximum coverage of $35 million, which is a potential source of recovery for certain Direct Claims.

28.     Finally, as the recent expensive and protracted experience in connection with the pre-settlement discovery and the Plan related discovery illustrate, litigation involving the Debtors' historical operations, financing, assets, liabilities and governance, and other Direct Claims that could potentially be asserted would impose significant burdens on the Reorganized Debtors' personnel, distract from the efforts to implement the business plan and operational reorganization of the Reorganized Debtors, and require the expenditure of considerable funds. Avoiding the material, adverse, impact on the Reorganized Debtors that would flow form post-confirmation litigation is essential to the Reorganized Debtors' ability to achieve its restructuring goals.

### 2.     Substantial Contribution

99.     Confirmation of the Plan depends on significant monetary contributions by the Released Parties.  "It is within the bankruptcy court's discretion to determine whether the nature and size of the consideration rises to the level of a 'substantial' contribution."[13]  A bankruptcy court will consider the value of the contributions to the specific estate when determining whether the consideration provided constitutes a substantial contribution.[14]  Courts in the Third Circuit have found that non-debtors have made substantial contributions to a Plan when they have

---

[13]  *In re rue21, Inc.*, 575 B.R. 314, 326 (Bankr. W.D. Pa. 2017) (finding a substantial contribution where there was valuable and material contribution to the estate though the success of the plan of reorganization was not contingent on the release at issue).

[14]  *In re Washington Mutual Inc.*, 442 B.R. 314, 348 (Bankr. D. Del. 2011); *In re Indianapolis Downs, LLC*, 486 B.R. at 304 (finding substantial contribution from senior management and holders of equity and debt instruments of the debtors where post-petition services were performed for the debtors without compensation).

contributed, among other things, cash, capital to cover operating shortfalls after a plan's effective date, rights assigned to a trust, and/or released claims against the debtor.[15]

29.    As is critical here, courts have considered nonconsensual third-party releases and related injunctions to be essential to a reorganization and fair when the success of a debtor's plan hinges on the third-party contributors receiving a release in exchange for their substantial contributions that make the Plan feasible.[16]

30.    With the exception of Givaudan, other than generalities, the objecting parties offer no specific challenge to the adequacy of the consideration under the Plan. They ignore the protracted and arms' length negotiations between all major constituencies to reach agreement on the terms of the Plan. The Released Parties: (a) made substantial and valuable contributions to the Debtors' Chapter 11 Cases and the Estates, including, as applicable, through extensive negotiations and communications with various stakeholders, and ensured and facilitated the operation and effective administration of the Debtors' business and financial affairs; (b) attended and, in certain instances, participated in Court hearings and case related meetings; (c) attended board meetings related to the Chapter 11 Cases and oversaw the negotiations that led to the Plan;

---

[15]  *See, e.g., Millennium Lab*, 575 B.R. at 261 (finding that certain non-debtor parties' $325 million contribution in exchange for third-party releases constituted substantial contribution in satisfaction of the *Master Mortgage* factors); *In re American Family Enters.*, 256 B.R. 377, 406-08 (D.N.J. 2000) (finding that a third party's contribution of more than $70 million to fund, in part, consumer fraud victim's fund, was a substantial contribution supporting protection under channeling injunction); *In re Blitz U.S.A., Inc.*, Case No. 11-13603 (PJW) (confirmation order [D.I. 2152]; approving third party nonconsensual release and channeling injunction for protected parties, including, among others, (a) Walmart, which contributed more than $24 million to the personal injury trust and waived various claims and (b) certain insurers, who contributed more than $137 million to the personal injury trust); *Cal. Dep't of Toxic Substances Control v. Exide Holdings, Inc. (In re Exide Holdings, Inc.)*, 2021 U.S. Dist. LEXIS 138478, at *44 (D. Del. July 26, 2021) (affirming bankruptcy court as to nonconsensual third party releases; "The finding that the Consenting Creditors and Transferred Entities—who will receive the protections afforded by the non-consensual third-party releases—made critical and substantial contributions to the plan is supported by the record . . . .  Those contributions included: (a) funding $18.5 million in settlement payments; (b) consenting to the use of cash collateral; (c) contributing a significant portion of the debtor-in-possession financing capital; . . . .").

[16]  *In re Millennium Lab Holdings II, LLC*, 945 F.3d at 137.

and/or (d) invested significant time and effort in the preparation of the Plan, all supporting analyses, and the numerous other pleadings filed in the Chapter 11 Cases, thereby ensuring the smooth administration of the Chapter 11 Cases.

31. Givaudan focuses specifically on the release of its direct competitor, DSM-Firmenich, and argues that the Debtors do not make any attempt to specify exactly what "critical financial contributions" have been made by DSM-Firmenich, among others, in exchange for such release. What Givaudan fails to take into account is the fact that DSM-Firmenich (i) is a critical contract counterparty that has made significant economic concessions in its amended agreements, (ii) executed a joinder to the Plan Support Agreement, and (iii) is waiving an approximately $45 million deficiency claim against the Debtors' estates.

32. Notably, the Direct Claims to be released are limited to claims held by a Releasing Party that arose from or are related to the Debtors, including, without limitation, the Debtors' assets, liabilities, operations, financings and contracts. There are also parties excluded from the scope of the releases, like former insiders John Melo and Eduardo Alvarez. Further, the Third-Party Release does not apply to: (i) any Estate Causes of Action or liabilities arising out of actual fraud, willful misconduct, or gross negligence of any such Released Party as determined by a Final Order; (ii) any Causes of Action transferred to the Creditor Trust, which Causes of Action are preserved notwithstanding anything to the contrary in the Plan; (iii) any Excluded Party Direct Claims; (iv) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any other document, instrument, or agreement (including those set forth in the Plan Supplement) executed

to implement the Plan or the Restructuring Transactions, including the Exit First Lien Facility Documents; (v) the rights of any Holder of Allowed Claims or Allowed Interests to receive distributions under the Plan; and (vi) any obligations arising under business or commercial agreements or arrangements among the Released Parties and any non-Debtor Entity.  *See* Plan at Art. IX.D.

33.     The objecting parties also fail to take into account the extent of the multiple investigations that have taken place in this case, consisting of the Independent Director investigation, the Committee investigation, and the Ad Hoc Group's investigation.  None of these investigations has resulted in the commencement and prosecution of any claims and actions against the Foris Secured Parties or any other parties to the Plan Settlements.  The Committee and the Ad Hoc Group have all undertaken extensive and sophisticated investigations and analyses and have concluded that, taking into account the prospects of prevailing in litigation, as well as the complexities, risks, costs and delays thereof, the Plan Settlements embodied in the Plan are fair, reasonable and appropriate under all of the circumstances.

34.     In sum, the Debtors have undertaken enormous efforts to secure substantial support for the Plan and the largest possible monetary contributions from the Foris Secured Parties and key concessions from DSM-Firmenich and other constituents.  The significant contributions and concessions, contingent upon the Released Parties receiving a release and the benefit of the Direct Claims Injunction, have enabled the Debtors to propose the Plan that will maximize recoveries by all stakeholders.

### 3.      Essential to the Reorganization

35.     The SEC, the U.S. Trustee, and Givaudan focus their objections to the Plan on this factor of necessity to a successful reorganization.  They myopically focus on the fact that the Plan has a back-up approach in the event that the nonconsensual Third-Party Release is not approved and that such back-up somehow constitutes an admission that the releases are not critical to the reorganization.  This is an unsupported and overly restrictive view of the law.

36.     Courts in this Circuit recognize that third party releases are essential where the releases are "critical to the success of the [p]lan" such that the plan depends on the non-debtor released parties making contributions to the plan in exchange for the releases.[17]

37.     The focus is on the "success" of the Plan.  Here, recoveries to creditors will be maximized and the reorganization of the Debtors will be most successful if the nonconsensual Third-Party Release is approved.   The Plan effectuates a re-start of the Debtors' business operations.  The reorganization contemplated by the Plan is more likely to be successful if the officers and directors of the Reorganized Debtors are able to focus on the operations of the business and the Reorganized Debtors are not distracted by or forced to bear the costs of protracted litigation brought by those opting out of the Third-Party Release.  Yes, there is an alternative approach encompassed in the Plan that will yield lower recoveries to creditors, and no recoveries at all to equity holders.  But that approach will not yield the highest and best recoveries to parties in interest or the biggest contribution from the Foris Secured Parties.  Creditors have spoken on this point. They overwhelmingly support the Plan as drafted, with few opt-outs from the releases or objections to the Plan.

---

[17] *In re Millennium Lab Holdings II, LLC*, 945 F.3d at 137; *see also Continental*, 203 F.3d at 215.

38.     In short, the nonconsensual Third-Party Release is absolutely essential in order to maximize recoveries for all parties in interest in these cases and achieve the most successful restructuring possible under the circumstances.

**4.     Significant Creditor Support**

39.     The objecting parties ignore the overwhelming support for the Plan, including the Direct Claims Injunction and Third-Party Release, by creditors and key constituents in these cases, such as the Creditors' Committee, all Consenting Convertible Noteholders, and the Ad Hoc Group (composed of certain holders of Convertible Notes).  As set forth in the *Declaration of Jamilla Davis*, Notice of the Plan, along with ballots or opt-out forms, was served on  17,776 potential creditors and other stakeholders.  Only 485 parties returned opt-outs from the releases under the Plan totaling less than 1% of the parties entitled to opt-out.  Furthermore, other than Givaudan, all voting Classes voted to accept the Plan and the vote of such Classes was overwhelmingly in favor.  There can be no question that the Plan has the overwhelming support of the vast body of creditors and other parties in interest in these cases.

**5.     The Plan Provides a Mechanism for Substantial Recoveries for Affected Creditors**

40.     Although the U.S. Trustee may brusquely characterize the distributions to creditors under the Plan with the nonconsensual Third-Party Release as *de minimis* compared to the distributions without such releases, it is readily apparent that the estates' creditors disagree. The settlements encompassed in the Plan were the result of extensive, hard-fought, and arms' length good faith negotiations among each of the key constituents in these cases and took place after extensive investigations into potential claims.  While the SEC and the U.S. Trustee give short

shrift to the outcome of these negotiations, it is clear that the creditors with an actual economic stake in these cases strongly support realizing the highest possible return on account of their claims. The Plan provides a definitive mechanism for achieving that goal of maximizing creditor recoveries.

41.    Courts have applied various standards to determine whether a plan containing a nonconsensual third party release and related injunction satisfies the fifth *Master Mortgage* factor, with many such courts comparing what claimants will receive under the plan as compared to what they could otherwise receive.[18]  For example, this Court in *Millennium Lab* considered whether the dissenting claimant "received reasonable or fair compensation in exchange for the release," finding that the payments and distributions under the plan "dwarfed any recoveries for [such] claims in a wipeout liquidation."[19]

42.    Another Third Circuit court found the fifth *Master Mortgage* factor was established where the plan provided "at least a 33% recovery" to the affected class of claims, noting that such claims are "contingent, unliquidated, and will not be determined for several years, and it is therefore unclear what amount of their claims, if any, will be paid."[20]  Further supporting this finding was that, absent the third-party release, those claims' recovery would drop from 33% to 11%.[21]

---

[18] *See, e.g., Opt-Out Lenders v. Millennium Lab Holdings II, LLC (In re Millennium Lab Holdings II, LLC)*, 591 B.R. 559, 586 (D. Del. 2018); *In re 710 Long Ridge Rd. Operating Co. II*, Bankr. Case No. 13-3653 (DHS), 2014 Bankr. LEXIS 863, at *52 (Bankr. D.N.J. Mar. 5, 2014); *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 520 (Bankr. E.D. Mo. 2012).
[19] *In re Millennium Lab Holdings II, LLC*, 591 B.R. 559 at 586 (D. Del. 2018).
[20] *In re 710 Long Ridge Rd. Operating Co. II*, Bankr. Case No. 13-3653 (DHS), 2014 Bankr. LEXIS 863, at *52 (Bankr. D.N.J. Mar. 5, 2014).
[21] *Id.* at *50-51.

43.     Another court took a similarly pragmatic view of the fifth *Master Mortgage* factor, noting that absent the plan's third party releases, "there is no Plan. And no other plan will be presented. Instead, the Case eventually would be dismissed or converted to chapter 7."[22]   The court observed that, absent a plan, creditors would preserve the possibility of tort litigation, but noted that "it is unlikely that the [affected] creditors would receive a distribution anywhere close to that offered through the plan, if they obtain one at all," and that the plan provided for recovery without the risk, time, expense, and fees of tort litigation.[23]   The court concluded that the plan should be confirmed because, "despite the incredibly complex nature of the claims and the interests among the major parties in the case, a unique and singular opportunity has presented itself [the fund] offers a rare opportunity to actually serve the truly injured."[24]

44.     Here, stated simply, the Plan and the nonconsensual Third-Party Release incorporated therein provide the mechanism for all parties in interest to realize the highest possible recovery.

**C.     Alternatively, the Third-Party Release Under the Plan Should Be Approved as a Consensual Release**

45.     In the event that the Court does not approve of the Third-Party Release on a nonconsensual basis as the Debtors request in the first instance, the Debtors seek approval of such release as a consensual release by the applicable parties.

46.     Section IV.A.3 of the Plan provides, in part:

> If the Third-Party Releases are not approved by the Bankruptcy Court, each holder of a Direct Claim may voluntarily elect to receive its portion of the Third-Party Release Settlement Amounts to which

---

[22] *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 520 (Bankr. E.D. Mo. 2012).

[23] *Id.* at 520-21.

[24] *Id.* at 521.

it is entitled by electing to grant the Third-Party Releases, through the following methods: (x) for (i) holders of Claims who are entitled to submit a ballot to vote on the Plan and vote to accept the Plan, (ii) holders of Claims who are entitled to submit a ballot to vote on the Plan and (a) vote to reject the Plan or (b) abstain from voting on the Plan and, in either case, do not elect to exercise their right to opt out of granting the Third-Party Releases, and (y) for holders of Claims and Interests who are deemed to accept or reject the Plan and are provided with a notice of non-voting status providing them with the right to opt out of granting the Third-Party Releases and do not elect to exercise such right; provided, that, as applicable, the Direct Claims Threshold is satisfied. Any undistributed Third-Party Release Settlement Amounts that would have otherwise been distributed to holders of Direct Claims that opted out of granting the Third-Party Release shall be paid to the Foris Prepetition Secured Lenders and applied to obligations owing under the Exit First Lien Facility attributable to the Foris Prepetition Secured Loans that are included in the Exit First Lien Facility.

47.     The foregoing consensual Third-Party Releases is reasonably tailored and only applicable to certain parties (*i.e.*, voting creditors who vote to accept the Plan; creditors entitled to vote who vote to reject the Plan or do not vote, but do not opt out of the releases; and creditors and Interest holders who are deemed to accept or reject the Plan, who do not opt out of the releases). The procedures for opting out of the Third Party Release were approved by this Court in connection with approval of the Disclosure Statement. The ability to opt out of the Third Party Release was highlighted in the Disclosure Statement, the applicable ballots, and the related confirmation hearing notices, in order to alert creditors and Interest holders of the Third-Party Release and option to opt out of the Consensual Third Party Release. The Debtors' voting declaration sets forth the creditors and Interest holders who made the opt out election.

48.     The SEC, the U.S. Trustee and Clerkenwell assert that the consensual Third-Party Release is not really consensual because parties need to affirmatively opt out of any releases.

They argue that deemed consent does not constitute affirmative consent. This is not the weight of

the law in this District. Indeed, this Court recently reached the conclusion that opt out releases are

appropriate by approving the third party releases contained in and confirming the plan in *Tritek*

*International, Inc*., over the U.S. Trustee's objection.

> THE COURT: Okay, I'm prepared to rule on the 11 plan. I want to start by noting that I appreciate the work of the parties and the cooperation that went into it to narrow the issues and come to resolutions on many important issues. And I note that when the plan was solicited, the committee had a statement that said that they urged the creditors to vote against the plan. And I think it's really significant that the committee is here today supporting the plan. And through the work of the parties, the projected recovers to unsecured creditors have increased meaningfully. The projections have increased meaningfully. So, I appreciate that.
>
> I'm going to grant final approval of the disclosure statement, and I am going to confirm the fourth-amended plan. The opt out versus opt in issue and the question of what constitutes consent are questions that, as we know, are not uncontroversial. But, in my view, if a party receives notice of proposed releases and doesn't object, that party has consented to the releases. As in many other respects, when it comes to bankruptcy, parties are required to be vigilant and defend their rights, and such is the case here. In this case, I find that the opt out, it was conspicuous and some creditors did opt out, which evidences to me that the procedures were effective.
>
> The UST raises a number of concerns that I take very seriously and I'm grateful for the outstanding argument from the UST and appreciate the positions that the office takes. The UST raises concerns about the possibility of mail errors preventing parties from receiving notice. But I note that the federal rules of bankruptcy procedure and civil procedure call for mail notice, and there is a rebuttal presumption of receipt when a piece of mail is sent to an addressee. And I think it's the system that we have and it's the one that we have to live with.
>
> As for unimpaired creditors, the evidence before me shows that they received notice identifying the release provisions of the plan, directing them on how to receive copies of the full plan if they wished, free of cost, and identified procedures for objecting to being a releasing party. And I find this to be adequate and also find that

any unimpaired creditor who received such notice and did not object has consented to the release that they are granting.

I find the scope of the third party releases to generally be appropriate but I raise an issue about third party releases only extending to unknown claims, and I believe it should extend to known claims as well.

Also, to the extent there are parties receiving releases that are, in effect, illusory because they already benefit from exculpation, or in the case of a liquidating trustee, there can be no pre-effective date claims to release, the drafting may be overzealous. And I won't fault anybody for that, but there is no harm.

So, on those grounds, I am confirming the plan.

*In re Tritek Int'l Inc.*, No. 23-10520 (TMH), Transcript of Hearing dated Oct. 6, 2023 (attached hereto as **Exhibit B**, at pp. 63-65.

49.    The consensual Third-Party Release in the Plan is also consistent with governing Third Circuit law.  "Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected." *Indianapolis Downs*, 486 B.R. at 305 (citing *In re Zenith Electronics Corp.*, 241 B.R. 92 at 111 (D. Del. 1999) and *Spansion*, 426 B.R. at 144).  The Third-Party Release is narrowly tailored and only applicable to certain creditors, as discussed above.  The opt out provision was conspicuously and prominently highlighted in the form of Ballots, in the Disclosure Statement, and in the applicable Plan-related Court-approved Notices, in order to clearly notify creditors and Interest holders as to this option.  Based on the foregoing, in line with applicable precedent and decisions in this District, the Consensual Third-Party Release should be approved.  *See, e.g., Tritek Int'l Inc.*, No. 23-10520 (TMH) (Bankr. D. Del. Oct. 6, 2023) (confirmation order [D.I. 506], at p. 10, approving consensual third party releases which allowed creditors to opt out through opt-out

procedures); *In re AeroCentury Corp.*, No. 21-10636 (JTD) (*Findings of Fact, Conclusions of Law and Order* [D.I. 296], ¶ O (Bankr. D. Del. Aug. 31, 2021)) ("The releases . . . are consensual as they pertain to the Releasing Parties because they are given and made after due notice and an opportunity to object and be heard with respect thereto, as the Combined Disclosure Statement and Plan, the Confirmation Hearing Notice, and the Ballots each unambiguously state that (a) the Plan contains such releases, (b) affected parties may object to such releases, and (c) the Release Opt-Election may be exercised as provided for in the Plan."); *In re RTI Holding Co.*, No. 20-12456 (JTD) (*Debtors' Second Amended Chapter 11 Plan* [D.I. 1093], ¶ 163 (Bankr. D. Del. Feb. 10, 2021)) ("For the avoidance of doubt, a Holder of a Claim shall constitute a Releasing Party unless it affirmatively opts out of granting the releases by indicating on and returning its ballot."); *In re PQ New York*, No. 20-11266 (*Findings of Fact and Conclusions of Law* [D.I. 597], ¶ OO at 17 (Bankr. D. Del. Sept. 25, 2020)) ("The releases . . . are binding on all (a) Creditors who are unimpaired, (b) Creditors who returned a Ballot and did not check the opt-out box on the Ballot, and (c) Creditors who were sent a solicitation package but did not vote and did not return a Ballot with the opt-out box checked . . . ."); *In re Cred Inc.*, No. 20-12836 (Modified First Amended Combined Joint Plan of Liquidation [D.I. 619], ¶ 18.2 (Bankr. D. Del. March 10, 2021)) ("[A]ll Holders of Claims or Equity Interests, who (1) vote in favor of the Combined Plan and Disclosure Statement or (2) (A) abstain from voting, are not entitled to vote, or vote to reject the Combined Plan and Disclosure Statement and (B) do not opt out of the this release on a timely submitted Ballot or the Opt-Out Election Form shall be deemed to have released and discharged each Released Party from any and all claims and Causes of Action . . . ."); *In re Extraction Oil & Gas*,

No. 20-11548 (CSS) (*Sixth Amended Joint Plan of Reorganization* [D.I. 883], ¶ 186 (Bankr. D. Del. Oct 22, 2020)) ("'Releasing Parties' means . . . (b) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan; (c) the holders of all Claims or Interests who vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth therein; (d) the holders of all Claims and Interests who were given notice of the opportunity to opt out of granting the releases set forth therein but did not opt out . . . ."); *In re AAC Holdings*, No. 20-11648 (CTG) (*Order Confirming Second Amended Joint Chapter 11 Plan* [D.I. 695], ¶ 36 (Bankr. D. Del. June 20, 2020)) ("[E]ach Releasing Party was given due and adequate notice that they would be granting the Third Party Release by voting to accept the Plan, failing to opt out of the Third Party Release if voting against the Plan or abstaining from voting on the Plan, failing to object to the Third Party Release prior to the deadline to object to Confirmation of the Plan or as otherwise described in the Plan."); *In re Orchard Acquisition Co.*, No. 17-12914 (KG) (*Joint Pre-Packaged Plan of Reorganization* [D.I. 9], ¶ 1.114 (Bankr. D. Del. Dec. 12, 2017)) ("'Releasing Parties" means . . . "Holders of Claims or Equity Interests (i) who vote to accept the Plan, (ii) who are Unimpaired under the Plan and do not timely object to the releases provided herein, (iii) whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan and do not opt out of granting the releases herein, or (iv) who vote to reject the Plan but do not opt out of granting the releases herein.").

50.     Based on the above overwhelming precedent and this Court's own recent decision in *Tritek*, the SEC's and the U.S. Trustee's position that opt out releases do not constitute deemed consent under any circumstances should be rejected.  Creditors and parties in interest can

look out for their own interests in deciding whether they need to exercise their opt out rights under the Plan.

**D.     This Court Has Jurisdiction to Confirm a Plan that Contains the Mandatory Third-Party Release and Direct Claims Injunction**

51.     At the conclusion of the SEC's objection to the Plan, the SEC (and no one else) takes the position that this Court lacks jurisdiction to approve the nonconsensual Third-Party Release.  The SEC argues that constitutional authority only exists if the Court finds that the releases are integral to the Debtors' restructuring, but that the Debtors have not provided any such evidence.  This is incorrect for all the reasons noted herein.

52.     First, there is plenty of precedent from this District confirming that bankruptcy courts have both constitutional and statutory authority to approve plans with nonconsensual third party releases.[25]  Under sections 157 and 1334 of title 28 of the United States Code, the Court has subject matter jurisdiction over three types of matters: (a) "proceedings arising under title 11," (b) "proceedings arising in a case under title 11," and (c) "proceedings related to a case under title 11."[26]  All three bases of jurisdiction apply here.  Confirmation of a plan that contains third party releases plainly falls within this Court's "arising under" or "arising in" jurisdiction.  Moreover, the Direct Claims against non-Debtors released under the Plan fall within

---

[25]  *See In re Millennium Lab Holdings II, LLC*, 945 F.3d at 135, 137 (finding that the Bankruptcy Court indisputably had 'core' statutory authority to confirm the plan" containing nonconsensual third party releases and considering whether "that exercise of authority comports with the Constitution" by determining whether the matter is "integral to the debtor-creditor relationship"); *In re Mallinckrodt PLC*, No. 20-12522 (JTD), Opinion [D.I. 6347] at 30 n. 69 (D. Del. 2020) ("I am applying the law of the Third Circuit which has recognized that bankruptcy courts do have statutory and constitutional authority to approve a plan of reorganization that contains non-consensual third-party release, albeit, only in extraordinary cases.").

[26]  *See In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 621 (Bankr. D. Del. 2016); *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995)) (stating that "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate.").

this Court's "related to" jurisdiction, as the Direct Claims and the release thereof will affect the assets of the Estates.[27]

53.     Second, as addressed, the proposed nonconsensual Third-Party Release is critical to the restructuring under the Plan that maximizes creditor returns.  Without approval of the Third-Party Release, creditors who overwhelmingly support the Plan would not have the benefit of the full consideration offered to them under the Plan.  The Plan would no longer maximize value or lead to the most successful reorganization possible.

54.     Hence, even under the SEC's unsupported and narrow interpretation of the scope of this Court's jurisdiction, there is nothing preventing this Court from entering a confirmation order approving the nonconsensual Third-Party Release under the Plan.

## E.    The Scope of the Released Parties and Exculpated Parties Is Appropriate Under the Circumstances

55.     Both the SEC and the U.S. Trustee object to the "Related Parties" who are included within the meaning of Released Parties under the Plan.  They assert that the definition of Related Parties is too broad.  The U.S. Trustee (but not the SEC) also objects to the scope of the Exculpated Parties and argues that such parties must be limited solely to estate fiduciaries.

56.     As reflected in the latest amended Plan, the Debtors and the other supporting creditor constituents have agreed to modify the definition of Related Party as follows to further narrow the term:

---

[27] *See In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 261 (Bankr. D. Del. 2017), *aff'd*, 591 B.R. 559 (D. Del. 2018), *aff'd sub nom. In re Millennium Lab Holdings II, LLC*, 945 F.3d 126 (3d Cir. 2019) (holding that confirmation of a plan that contains third-party releases is a proceeding "arising in and arising under title 11" and thus a core proceeding that the Court has jurisdiction over); *In re Freedom Rings, LLC*, No. 05-14268 (Bankr. D. Del. May 9, 2006) [D.I. 385] (CSS) ("[T]here is a jurisdictional nexus between the proposed release to non-Debtor third parties and the Debtor. The entire Plan hinges on the releases, and the evidence is uncontroverted that without the releases, there is little prospect of confirming a Plan.").

"*Related Party*" means, collectively, with respect to any Entity, in each case in its capacity as such wit respect to such Entity, such Entity's **(a)** current and former directors, managers, officers, shareholders, investment committee members, special committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles **controlled by such Entity**, predecessors, participants, successors, assigns (whether by operation of Law or otherwise), **controlled** subsidiaries, current, former~~, and future associated entities~~, managed or advised entities, accounts, or funds, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, fiduciaries, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, other representatives, restructuring advisors, and other professionals and advisors, **solely to the extent such persons or entities acted on behalf of the Released Parties or Exculpated Parties in connection with the matters as to which exculpation or releases are provided in the Plan** and **(b)** any person's or Entity's respective predecessors, successors, assigns, heirs, executors, estates, and nominees.

57.    With the foregoing modification, the Debtors submit that the scope of the Related Parties is appropriate and consistent with standard practice. As addressed previously, the Plan implements a global settlement among a broad range of settling parties. Such releases are meant to be broad-ranging and mutual in nature in that all of the parties are receiving substantial benefits under the Plan in consideration for their releases. It is entirely customary under such circumstances to include releases (and exculpations) of the officers, managers, representatives and agents of each of the Released Parties within the scope of the releases, solely to the extent such parties acted in on behalf of the Released Parties in connection with the matters being released.

58.    The definition of Exculpated Parties, as reflected in the latest amended Plan, is now limited to estate fiduciaries, as set forth below:

"*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; ~~(b) the Foris Secured Parties; (c) all Consenting Convertible Noteholders; (d) the Ad Hoc~~

~~Group Professionals; (b)~~ the Creditors' Committee; and (c) the Related Parties of each of the foregoing parties **who acted on their behalf in connection with the matters as to which exculpation is provided herein.**

59.     The Debtors submit that the foregoing exculpation provision, as revised, should be approved.

60.     As recognized in *Washington Mutual*, the Third Circuit has held that "a creditors' committee, its members, and estate professionals may be exculpated under a plan for their actions in the bankruptcy case except for willful misconduct or gross negligence."  *In re Washington Mutual Inc.*, 442 B.R. 314, 350 (Bankr. D. Del. 2011) (citing *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000)).  Courts have approved exculpations to prevent future collateral attacks against parties that have contributed in good faith to a debtor's reorganization in large chapter 11 cases based on the particular circumstances of a case.

61.     An exculpation provision does not affect the liability of third parties *per se*, but rather sets forth a standard of liability under the Bankruptcy Code.[28]  A bankruptcy court has the power to approve an exculpation provision in a chapter 11 plan because a bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan has been proposed in good faith.[29]  Once the court makes its good faith finding, it is appropriate, as in these cases, to set the standard of care of the parties involved in the formulation of that chapter 11 plan.[30]

---

[28]   *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code.").

[29]   *See* 11 U.S.C. § 1129(a)(3).

[30]   *See PWS*, 228 F.3d at 246-47 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . .").

62.     Here, the proposed exculpation provision is appropriate and vital because it provides protection to those estate fiduciaries who served to further the Debtors' case and the resolution of issues embodied in the Plan.  The exculpation follows along with the releases in the Plan and represents an integral piece of the overall terms of the Plan and was formulated following extensive, good faith, arm's-length negotiations with key constituents, and it is appropriately limited in scope to achieve the overall purpose of the Plan consistent with applicable law.  Each Exculpated Party made significant contributions to this case, including the negotiation and implementation of the transactions and resolutions embodied in the Plan and the continued operation of the Debtors.  The Exculpated Parties have participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

63.     Further, the exculpation provision in the Plan is narrowly tailored to exclude acts of actual fraud, willful misconduct, and gross negligence, and it relates only to acts or omissions in connection with or arising out of the Debtors' Chapter 11 Cases.

64.     Based on the foregoing, the scope of the Released Parties, Related Parties, and Exculpated Parties under the Plan should be approved.

## F.     The Plan Injunction Provision Is Appropriate and Complies With the Bankruptcy Code.

65.     Clerkenwell takes issue with the breadth of the injunctions in the Plan.  As is standard, these provisions do nothing more than implement the release and exculpation

provisions of the Plan. Specifically, Plan injunction provisions (separate from the Direct Claims Injunction) set forth in Article IX.F of the Plan[31] facilitates the implementation of the Plan and its specified treatment of Claims and Interests by permanently enjoining all entities from commencing or maintaining any action and taking other similar or related acts against, *inter alia*, the Debtors, the Released Parties, and the Exculpated Parties. The Plan injunction provisions are key terms of the Plan in that they provide a mechanism to enforce the terms of the Plan and to prevent third parties from commencing litigation against the protected parties by launching a collateral attack

---

[31] Article IX.F provides:

> Except as otherwise expressly provided in the Plan or the Confirmation Order or for obligations or distributions issued or required to be paid pursuant to the Plan or the Confirmation Order, and separate and apart from the Direct Claims Injunction, all Entities who have held, hold, or may hold the Released Claims are permanently enjoined from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action, suit, or other proceeding of any kind on account of or in connection with or with respect to any Released Claims; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any Released Claims; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the Estates of such Entities on account of or in connection with or with respect to any Released Claims; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or the Estates of such Entities on account of or in connection with or with respect to any Released Claims unless such Entity has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable Law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Released Claims released or settled pursuant to the Plan.

> Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, managers, principals, and direct and indirect Affiliates, in their capacities as such, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article IX.F hereof.

on the Plan in another forum.  As such, to the extent the Court finds that the Plan's release and exculpation provisions are appropriate, the Court should approve the Plan injunction provisions that merely implement those terms.

## REPLY TO REMAINING MISCELLANEOUS OBJECTIONS

66.    **Objection of Roth**.  Roth, the plaintiff in a derivative[32] action (the "Roth Action") brought against Foris, Vallejo Ventures Trust U/T/A 2/12/96, L. John Doerr, Ann Doerr, and Barbara Hager (collectively, the "Foris Defendants"), naming Amyris as a nominal defendant, argues that the Plan cannot be confirmed for two reasons: (1) the Plan cannot release the Roth Action; and (2) the Plan fails to compensate Roth's counsel through an Allowed Administrative Claim.  Whether Roth's counsel is entitled to a substantial contribution claim (which they are not)—is not a confirmation issue and can be resolved on an expedited basis after notice and a hearing.

67.    Because, by Roth's own admission, the Roth Action "*is a valuable asset of the Debtor*"[33] and only Amyris would receive the benefit of any recovery realized from the Roth Action,[34] it is subject to Bankruptcy Rule 9019 and may be released pursuant to the Estate Claims

---

[32]  The Roth Complaint describes the Roth Action as being "brought derivatively on behalf of Amyris."  *Roth Complaint* at ¶ 7.  Similarly, even Mr. Ostrager of OCFB, in correspondence to the Committee, described the Roth Action as a "derivative action on behalf of Amyris."  *See* Exhibit 2 to *Declaration of Glenn F. Ostrager in Support of the Objection of Andrew E. Roth, an Amyris Shareholder, to Confirmation of the Debtors' Second Amended Joint Plan of Reorganization* [Dkt. No. 1153].

[33]  Roth Objection at ¶ 39.

[34]  Roth Objection at ¶¶ 2, 33.

Settlement.[35]  The "widely accepted"[36] test to determine whether an action is derivative (meaning that it can be settled or released by a debtor in possession) or direct "turn[s] *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[37]  Here, by Roth's admission, the harm alleged in the Roth Action was suffered by Amyris and the benefit of any recovery would be received only by Amyris and, accordingly, is appropriately released by the heavily-negotiated Estate Claims Settlement.[38]

---

[35]  Citing to three published cases from outside this District, Roth claims that "the Debtors have a conflict of interest that disqualifies it from prosecuting or releasing claims in the Roth Action on behalf of the bankruptcy estate." *Roth Objection* at ¶ 6.  Those three cases do not stand for the proposition for which they are cited.  Each of *In re National Forge Co.*, 326 B.R. 532, 545 (W.D. Pa. 2005); *In re G-I Holdings, Inc.*, 313 B.R. 612 (Bankr. D. N.J. 2004); and *In re First Capital Holdings Corp.*, 146 B.R. 7 (Bankr. C.D. Cal. 1992), evaluated when a creditors' committee is entitled to be granted derivative standing to pursue claims on behalf of a debtor.  In none of those three cases was the concept of a debtor being "disqualified" by a court from "prosecuting or releasing claims" discussed.

[36]  *Gibbons v. Morgan*, 2017 U.S. Dist. LEXIS 144032, at *10 (S.D.N.Y. Sep. 6, 2017) (quoting *Donoghue v. Bulldog Investors Gen. P'ship*, 696 F.3d 170, 176 (2d Cir. 2012)).

[37]  *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004) (emphasis in original).

[38]  The Debtors recognize that *Rosenberg v. XO Communs., Inc.* (*In re XO Communs., Inc.*), 330 B.R. 394 (Bankr. S.D.N.Y. 2005) held that a claim brought under Section 16(b) was not derivative such that the debtors had the right to release such a claim in their plan of reorganization.  *See* 330 B.R. at 430-31.  In addition to being factually distinguishable (among other things, the defendants in the Section 16(b) action provided zero consideration under the plan and the reorganized debtors actually *supported* the Section 16(b) action being pursued), *XO Communs.* appears to elevate form over substance.  While it is true that a Section 16(b) claim is a creation of statute and thus intended to vindicate a specific policy objective—as contrasted with the more familiar derivative claims that emanate from common law interests of a corporation—their effect is the same.  Even the Second Circuit agrees—where "a shareholder plaintiff pursues a § 16(b) claim on behalf of an issuer, the claim is derivative in the sense that the corporation is the instrument for the effectuation of the statutory policy." *Donoghue v. Bulldog Investors Gen. P'ship*, 696 F.3d 170, 175 (2d Cir. 2012) (cleaned up).  As Roth concedes, if the Roth Action is successful, he will not be entitled to a penny—only the Debtors will.  That a Section 16(b) claim has been described as an "enforcement right," derives from statute and not common law, or vindicates a public interest (which are all reasons that have been given to characterize a Section 16(b) claim as something other than a derivative claim for the purpose of bankruptcy) does not change the fact that a Section 16(b) claim is derivative in effect.

But even *XO Communs.* suggests that a stay or plan injunction could be applied to a Section 16(b) claim on account of the debtor's status as a nominal defendant, the debtor's interest in the proceeds of such a claim, and the impact that such a claim may have on the administration of the estate.  *See* 330 B.R. at 431.  The *XO Communs.* court only declined to rule on that issue because there, the debtors did not raise the issue and further supported the continued prosecution of the Section 16(b) claim.

68.     To the extent the Roth Action cannot be released by the Estate Claims Settlement, it can and should be released through the Third-Party Release, as set forth more fully above.[39]  And, if the Roth Action cannot be released by either the Estate Claims Settlement or the Third-Party Release, it should be transferred to the Creditor Trust, which can determine whether to pursue the non-meritorious claim.

69.     **Objection and Reservation of Rights of Disruptional**.  The response filed by Disruptional relates to the asserted need for a reserve with respect to its asserted General Unsecured Claim.  This is an issue that will be addressed by the Creditors' Committee and, in any case, is not relevant for purposes of Plan confirmation.

70.     **Objection of Clerkenwell**.  Clerkenwell alleges it is a $2.9 million administrative creditor of Debtor Amyris pursuant to a prepetition guaranty of Amyris (the "Guaranty") of that certain lease entitled *Counterpart Lease Related to Uniform Works 10-11 Clerkenwell Green, London, EC1R 0DP*, dated February 15, 2022 (the "Lease")[40] between Clerkenwell and MG Empower Limited ("Tenant"), a non-debtor entity unaffiliated with the

---

[39] Specific to the Roth Action, the propriety of the Third-Party Release is even more acute.  Unlike in *XO Communs.*, Foris has provided substantial consideration to the Debtors' estates and the Creditor Trust in exchange for the release of all claims or causes of action that could inure to the benefit of the Debtors' estates, including the Roth Action.

[40] The Debtors dispute the validity of any alleged Administrative Claim asserted by Clerkenwell because lease guaranty claims are prepetition general unsecured claims, and even if the debt is deemed to have accrued post-petition, the Debtors' estates received no benefit from the Guaranty.  *See, e.g. In re Phila. Newspapers, LLC*, 690 F.3d 161, 172-173 (3d Cir. 2012) (claimant asserting administrative expense status has burden of proof that debt was "beneficial to the debtor-in-possession in the operation of the business.") (cites omitted); *Statesboro Mall, LLC v. Green (In re Green)*, 504 B.R. 675, 680 (Bankr. S.D. Ga. 2014) (landlord under a tenant's lease guaranteed by a debtor was not entitled to an administrative expense claim for post-petition rent because the debtor's liability to the landlord was premised on the guaranty rather than the lease, and thus neither the debtor nor the bankruptcy estate received any benefit from the use or possession of the leased property); *In re Episode USA*, 202 B.R. 691, 696 (Bankr. S.D.N.Y. 1996) (landlord not entitled to administrative claim where lease guarantor debtor never occupied premises and received no benefit from lease).  As Debtor Amyris has neither occupied the leased premises nor received a benefit from the Lease between Clerkenwell and Tenant, Clerkenwell would not be entitled to an administrative claim in Amyris's chapter 11 case.

Debtors.[41]  Clerkenwell has also filed a $15,722,174 general unsecured proof of claim against Amyris [POC No. 522, as amended by POC No. 531] based on the Guaranty of the Lease.[42]

71.    Therefore, Clerkenwell has *only* two possible Claims in this case.  Either Clerkenwell has a $2.9 million Administrative Claim which will be paid in full *if* its claim is Allowed or Clerkenwell has a Class 8 General Unsecured Claim which will be handled by the Creditor Trust.  Under no scenario does Clerkenwell have any interest in the post-Effective Date Reorganized Debtor.  Thus, despite Clerkenwell's blustery objections to the Plan, Clerkenwell's *only* vested interest is to ensure that the Debtors have sufficient funds to pay Allowed Administrative Claims and sufficient funds to fund the Creditor Trust on the Effective Date.

72.    Notwithstanding this limited interest, Clerkenwell objects to Confirmation of the Debtors' Plan on the following grounds: (i) the Plan allegedly is not feasible because Clerkenwell cannot determine how creditors will be paid and from what funds; (ii) the Plan allegedly does not comply with section 1129(a)(9)(A) of the Bankruptcy Code because it asserts that there are insufficient funds to pay Allowed Administrative Claims in full, and as a result, the Plan unfairly discriminates against certain administrative claimants who might not get paid in full while others (specifically, case professionals) may get paid in full; (iii) the Plan allegedly contains impermissible non-debtor third party releases; (iv) the Plan allegedly effectuates impermissible

---

[41]  Tenant had been an Amyris affiliated entity but was sold on August 4, 2023, pursuant to a stock sale transaction that closed prior to the Petition Date.  The sale transaction required the buyer to replace the Guaranty of the Lease but to date, the buyer has failed to do so.  Prior to the sale of Tenant's stock, the leased premises were utilized by two non-debtor subsidiaries of Amyris – Amyris UK Trading Limited and Beauty Labs International Limited.  These entities, who are now in UK administration proceedings, did not operate on the premises post-sale, and as acknowledged by Clerkenwell, Tenant had paid rent on the premises through December 29, 2023.

[42]  Clerkenwell fails to disclose in either its Plan objections or in the demand letter it sent to the Debtors demanding *immediate payment* of its alleged Administrative Claim the fact that Clerkenwell also holds an undrawn £1.4 million (approximately $1.8 million) cash-collateralized letter of credit as collateral for any obligations owed under the Lease by Tenant.

substantive consolidation; (v) the Plan fails to identify post-effective date officers and directors of the Reorganized Debtors; (vi) the Plan provides that non-deliverable Class 8 distributions will be returned to the Reorganized Debtors rather than the Creditor Trust; (vii) the treatment of the DIP Claims and the Foris Prepetition Claims is confusing; and (viii) no exact Distribution Record Date or Distribution Date is established so that creditors will know when they will be paid.[43]

73.    Clerkenwell's objections to feasibility and substantive consolidation, as well as its miscellaneous objections, will be addressed in this section. The Debtors' consolidated response to objections to non-debtor third party releases is set forth above. Clerkenwell's objections should be overruled in their entirety. Taken as a whole and in context, Clerkenwell's objections are nothing more than a blatant attempt to extort immediate payment of a contrived and legally unsupportable Administrative Claim.

74.    The Plan is Feasible and Sufficient Funds Exist to Pay the Alleged Administrative Claim of Clerkenwell in Full Upon Allowance. Clerkenwell's feasibility objection should be overruled. As set forth in detail in the *Declaration of Steven J. Fleming* (the "Fleming Declaration"), the Plan is feasible and adequately describes the sources of funds to be utilized to pay the Allowed Claims of the various Classes of creditors contained in the Plan. The Debtors' financial projections for fiscal years 2024 - 2028 (together with and subject to the notes regarding assumptions and other matters included as part thereof, the "Financial Projections"), are attached

---

[43] Clerkenwell also alleges it was not served with Notice of the Plan or Confirmation Hearing and did not receive a Ballot. This allegation is incorrect. Stretto, the Debtors' solicitation agent, served the Notice of the Confirmation Hearing on Clerkenwell at the two addresses listed on its proof of claim via first-class mail on December 13, 2023: (i) 10-11 Clerkenwell Green Limited, c/o Mayerson & Hartheimer, PLLC, Attn: David H. Hartheimer, 845 Third Avenue, 11th Floor, New York, NY 10022, and (ii) 10-11 Clerkenwell Green Limited, Attn: Carl Vincent Grebelius, Pentland Farley Heath, Albury, Guildford, Surrey, GU5 9EW, England. Clerkenwell's Class 8 ballot was sent to the New York address of Clerkenwell's counsel. *See Stretto Affidavit of Service* [Docket No. 1017] at Exhibit E (Class 8 Ballot) and Exhibit R (Notice of Confirmation Hearing).

as Exhibit E to the Debtors' Disclosure Statement [Dkt. No. 893].[44]  The Debtors' restructuring pursuant to the Plan will substantially deleverage the Debtors' balance sheet by approximately $1 billion (or approximately 80%).[45]  As discussed in the Fleming Declaration, the Plan effectuates a re-start of the Debtors' business operations.[46]  As required by section 1129(a)(11) of the Bankruptcy Code, the Debtors have adequate funding for their Plan obligations and for future operations of the Reorganized Debtor in light of the type of business it is.

75.     But the post-Effective Date operations of the Debtors are of no concern to Clerkenwell.  As set forth above, Clerkenwell, to the extent it has an Allowed Administrative Claim, will be paid in Cash in full upon Allowance of its Claim from either the $160 million Exit First Lien Facility or other funds of the Reorganized Debtors.[47]  As set out in the Fleming Declaration, at emergence, the total estimated Administrative Claims are approximately $26 million (net of the $30 million consumer brand sale proceeds which will be used to pay Allowed Administrative Claims).[48]  Other payments due on the Effective Date total approximately $54 million.[49]  The Plan provides that the Third-Party Release Settlement Amount, Estate Claims Settlement Cash Consideration, and the Lavvan Settlement Consideration will be funded by the DIP Lenders, the Foris Prepetition Secured Lenders or from an advance under the $160 million Exit First Lien Facility.[50]  Thus, the Plan provides that either the $160 million Exit First Lien

---

[44] Fleming Declaration at ¶ 7.

[45] Fleming Declaration at ¶ 14.

[46] Fleming Declaration at ¶ 12.

[47] The Plan expressly provides that Administrative Claims will be paid in Cash on the Effective Date of the Plan if already Allowed on such date or within 30 days of final allowance by the Court.  If an Administrative Claim is Allowed post-Effective Date it will be paid by the Reorganized Debtors.  This type of provision for payment of administrative claims is customary in most plans of reorganization.

[48] Fleming Declaration at ¶ 13.

[49] *Id.*

[50] *Id.*

Facility or funds from the Foris Secured Parties will be used to fund these payments on the Effective Date, including the funding of the Creditor Trust – which is the ***only*** other source of payment of Clerkenwell's Claim to the extent the Court deems such Claim to be unsecured rather than administrative.[51]   Even if the estimates set out in the Funding Schedule do not include Clerkenwell's alleged $2.9 million Administrative Claim, the Debtors or Reorganized Debtors, as applicable to the timing of the allowance of any Clerkenwell Administrative Claim, will have sufficient availability under the Exit First Lien Facility or from revenues from which such Claim can be paid.[52]

76.     Section 1129(a)(11) of the Bankruptcy Code requires a court to determine that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan . . . ." 11 U.S.C. § 1129(a)(11).  Section 1129(a)(11) does not require a guarantee of the plan's success; only a "reasonable assurance" of success.  *In re Indianapolis Downs*, 486 B.R. 286, 298 (Bankr. D. Del. 2013); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 115 (D. Del. 2012) ("In making this finding, the bankruptcy court need not require a guarantee of success, but rather only must find that 'the plan present[s] a workable scheme of organization and operation from which there may be reasonable expectation of success.'") (citations omitted).  The court must find, based on the evidence presented, that the projections and financial analysis is reasonable and credible after balancing all the evidence presented.  *In re T-H New Orleans Ltd. P'Ship*, 116 F.3d 790, 802 (5th Cir. 1997).

---

[51]  *Id.*
[52]  Fleming Declaration at ¶ 19 and Ex. A thereto.

77.    The Debtors have presented sufficient evidence to enable the Court to make a feasibility determination and find that the Debtors have sufficient funds to pay any Administrative Claim of Clerkenwell in full if and when such claim is Allowed.  No contrary admissible evidence has been provided.  As the Debtors have sufficient funds to pay any potential Administrative Claim of Clerkenwell in full, Clerkenwell's unfair discrimination objection must fail as well because all Allowed Administrative Claims will receive the same treatment – payment in Cash in full.  Clerkenwell's objections to the feasibility of the Plan should be overruled.

78.    <u>The Plan does not Substantively Consolidate the Debtors</u>.  Clerkenwell alleges the Debtors are attempting to effectuate an impermissible substantive consolidation of the Debtors.  This is patently incorrect.  The Plan expressly provides: "The Plan constitutes a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors, except as expressly set forth herein."  Plan, Art. III.A at 26.  Section IV.C of the Plan expressly states that the administrative consolidation is for voting and distribution purposes only to facilitate the Creditor Trust distributions to Class 8 General Unsecured Claims.

79.    The reason for this Class 8 administrative consolidation is patently clear from a review of the Liquidation Analysis attached to the Debtors' Disclosure Statement as Exhibit D.[53]  The Liquidation Analysis is a Debtor-by-Debtor review of the assets and liabilities of each Debtor.  This analysis clearly show that no Debtor has any assets in excess of the obligations owed to the DIP Lenders and Foris Prepetition Lenders.  The distributions being provided to general

---

[53] Disclosure Statement, Ex. D; s*ee also* Fleming Declaration at ¶ 21.

unsecured creditors through the Creditor Trust pursuant to the global settlement encompassed in the Plan benefits all holders of General Unsecured Claims equally and is in the best interests of all unsecured creditors.

80.    Clerkenwell's unsubstantiated allegation that creditors of certain Debtors may be prejudiced by the Plan's administrative consolidation for Class 8 distribution purposes[54] is pure fantasy.  Clerkenwell has not and cannot provide any evidence that it or any other creditor is being harmed by the administrative consolidation of Class 8 General Unsecured Claims for distribution purposes.  To the extent Clerkenwell has *any* allowable claim in these Chapter 11 Cases, it has a General Unsecured Claim against one Debtor – Amyris – and but for the global settlement set forth in the Plan, Clerkenwell would receive no recovery on such claim.  The "improper substantive consolidation" objection should be overruled.

81.    <u>Clerkenwell's Miscellaneous Objections</u>.  As set forth in detail in the amended Plan Supplement, the Debtors have now identified all officers and directors of the Reorganized Debtors and have modified the Plan to provide that any non-deliverable Class 8 distributions (other than on account of the Third-Party Release Settlement Consideration) will be returned to the Creditor Trust and that the Distribution Record Date shall be the Solicitation Record Date (as opposed to the Confirmation Date) as set out in the *Disclosure Statement Approval Order* [Dkt No. 897], or such other date as selected by the Debtors.

82.    Clerkenwell also objects to confirmation on the ground that the treatment option provided to the DIP Lenders and Foris Prepetition Lenders (who are all related entities as

---

[54]  Objection at ¶ 27.

has been disclosed in connection with the Debtors' DIP Financing Motions) is confusing.[55]  The only parties impacted by this Plan provision – the DIP Lenders and Foris Prepetition Lenders – are provided flexibility with respect to which debt to leave in place, waive or convert.  Clerkenwell neglects to explain how it is in any way affected, let alone prejudiced, by this provision.  The treatment of the DIP Lenders and Foris Prepetition Lenders has no impact on Clerkenwell, who will be paid in full if it has an Allowed Administrative Claim or paid through the Creditor Trust if it has an Allowed Class 8 General Unsecured Claim.  Thus, Clerkenwell's confusion as to how the option works is not a valid confirmation objection.[56]

83.    Clerkenwell also objects that the actual Distribution Date for creditor recoveries cannot be determined.[57]  "Distribution Date" is defined in the Plan, and will be determined, as applicable, by the entity making the distribution to the applicable Class of Claims.  *See* Plan, Art. I.A.80.  Thus, Clerkenwell's Administrative Claim (if Allowed) will be paid within 30 days of allowance.  *See* Plan, Art. II.A.1.  Clerkenwell's Class 8 General Unsecured Claim (if Allowed) will be paid by the Creditor Trust on such date as determined by the Creditor Trust for distributions to its beneficiaries.  The fact that no exact date is set for such distribution is not remotely unusual.  Plans customarily do not contain an exact date for distributions to creditor trust beneficiaries as distributions are contingent on a variety of post-effective date factors such as the claims allowance process, the resolution of litigation and assets sales.  Nothing in the Bankruptcy Code requires the establishment of an exact distribution date as a prerequisite to confirmation.  The

---

[55]  Objection at ¶ 28.D.
[56]  *See Bourne v. Northwood Props., LLC (In re Northwood Props., LLC)*, 509 F.3d 15, 25 1st Cir. 2007) (creditor whose interests are fully protected has no legitimate grounds for objecting to reorganization plan.)
[57]  Objection at ¶ 28.E.

Distribution Date, as defined in the Plan, is sufficient, and Clerkenwell's objection should be overruled.

84.    **Objection and Reservation of Rights of Lexon**.  The Debtors have been in conversations with Lexon, the provider of certain of the Debtors' now-terminated customs bonds, regarding language that would consensually resolve Lexon's objection to confirmation of the Plan.  The Debtors expect to include such language, when finalized, in the Confirmation Order to be submitted to the Court.[58]

85.    **Preliminary Limited Objection of John Melo**.  The Debtors' former CEO – who is also an Excluded Party – filed a preliminary objection that did not raise any specified issue.   In informal discussions with counsel for both Excluded Parties, the Debtors shared the following proposed modification to the Plan related to indemnification obligations:

> All indemnification provisions, consistent with applicable Law, in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, ~~other than with respect to any Excluded Party,~~ shall be Reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Plan on the same terms that existed prior to the Effective Date; *provided* that nothing herein shall expand any of the Debtors' indemnification obligations in place as of the Petition Date.
>
> ~~Notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of~~ the ~~Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing~~

---

[58]  For the avoidance of doubt, the Debtors reserve all rights with respect to Lexon's objection in the event agreement on such language cannot be reached.

~~assumption of each of the unexpired D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors~~ under the Plan as to which no Proof of Claim need be Filed.

~~In addition, after~~**Upon** the Effective Date, ~~none of~~**the Debtors' existing D&O Liability Insurance Policy expires and the Endorsement #94: "Run off Endorsement" will be in place and shall not be altered, amended or modified by the Plan. For the avoidance of doubt,** the Reorganized Debtors ~~shall terminate or otherwise reduce the coverage~~**do not assume any indemnification obligation for any insured** under ~~any~~**the Debtors'** D&O Liability Insurance Policies ~~in effect on or after the Petition Date, with respect to conduct occurring prior thereto, and all directors, managers, and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors, managers, and officers remain in such positions after the Effective Date~~**, including, but not limited to, any Excluded Party who is an** insured under the Debtors' D&O Liability Insurance Policies**, and no insured, including any Excluded Party, shall have any recourse to the Reorganized Debtors with respect to any such indemnification obligation under such policies.**

86.     The Debtors are unaware of any continuing objection to the foregoing language.

87.     **Objection of Givaudan**.  Givaudan's primary opposition to the Plan concerns the imposition of the non-consensual Third-Party Release, which opposition is addressed above.  In addition, Givaudan asserts that (1) the Plan should contain a condition precedent to the Effective Date that the Amended Givaudan Escrow Agreement is effective, (2) the Confirmation Order should include a provision that states that the Givaudan Contracts are entitled to the

protections of section 365(n) of the Bankruptcy Code, and (3) the Debtors cannot assume inbound intellectual property licenses from Givaudan without Givaudan's consent.

88.     First, the Debtors have complied with all aspects of the *Stipulation Resolving Motion of DSM-Firmenich to Compel Debtors' Compliance With Section 365(n)(4) of the Bankruptcy Code* [Dkt. No. 591-1] ("Givaudan Stipulation").  For example, the Debtors timely deposited all materials into escrow in accordance with the Givaudan Stipulation.  In addition, since the entry of the Givaudan Stipulation, the parties have exchanged multiple drafts of an amended and restated Givaudan Escrow Agreement that adds DSM Nutritional as a party pursuant to Section 3.5 of the LDRA (as defined in the Stipulation).  However, for the past approximately two (2) months, Givaudan and the Debtors have been focused on negotiating a global resolution that would render the amended and restated Givaudan Escrow Agreement unnecessary.  Since those negotiations have not been successful, the Debtors (and presumably Givaudan) are refocusing their efforts to amend and restate the Givaudan Escrow Agreement – and the Debtors remain committed to continuing these negotiations post-confirmation in good faith.  However, if an agreement cannot be reached, paragraph 7 of the Stipulation directs the parties to "bring the matter to the Court seeking expedited consideration of any remaining disputes."  Accordingly, if there is an impasse with respect to the amendment, Givaudan should be directed to follow the procedure previously agreed to and bring it to the Court for consideration on an expedited basis – but this does not and cannot prevent the Plan from going effective.  For the avoidance of doubt, nothing in the Plan or the Confirmation Order alters the terms or conditions of the Givaudan Stipulation.

89.     Second, nothing in the Plan or the proposed Confirmation Order alters a contract counterparty's rights under section 365(n) of the Bankruptcy Code.  If the agreements between Givaudan and the Debtors are ultimately rejected, Givaudan will retain its rights under section 365(n) of the Bankruptcy Code.  In order to clarify any potential ambiguity, the Debtors have modified the Plan to provide that "nothing in this [Plan] shall prejudice any rights under 11 U.S.C. § 365(n), if any, held by a counterparty to a rejected contract."

90.     Finally, absent a global agreement with Givaudan, the Debtors are not intending to assume any licenses or agreements with Givaudan, including in-bound licenses that Givaudan asserts are not capable of assumption.

91.     Based on the foregoing, Givaudan's objection should be overruled in its entirety.

## CONCLUSION

92.     Based on the above and the evidence submitted in support hereof, the Debtors urge the Court to overrule any Objections/Responses that have not been resolved and confirm the Plan as amended.

Dated:  January 22, 2024

PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*

Richard M. Pachulski, *(*admitted *pro hac vice)*
Debra I. Grassgreen, *(*admitted *pro hac vice)*
James E. O'Neill (DE Bar No. 4042)
Jason H. Rosell, *(*admitted *pro hac vice)*
Steven W. Golden (DE Bar No. 6807)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Tel:  302-652-4100
Fax: 302-652-4400
Email:  rpachulski@pszjlaw.com
          dgrassgreen@pszjlaw.com
          joneill@pszjlaw.com
          jrosell@pszjlaw.com
          sgolden@pszjlaw.com

*Counsel to the Debtors and Debtors in Possession*