RECEIVED
2024 DEC 10 AM 11:29
CLERK
U.S. BANKRUPTCY COURT

Jasmina Samardzic

5728 N Campbell Ave

Chicago, IL 60659

E: jasmina686@outlook.com

Ph: 773-759-1880

12/05/2024


United States Bankruptcy Court

District of Delaware

824 North Market Street, 3rd Floor

Wilmington, DE 19801


RE: Response to Reorganized Debtors' Eighth Omnibus Objection (Case No. 23-11131), Claim No. 552


Dear Honorable Judge Horan and Interested Parties,


I am writing regarding the Reorganized Debtors' Eighth Omnibus Objection to certain claims, specifically to address any impact on my claim as a former employee of Amyris, Inc. I respectfully request that my case not be expunged as no liability and that it be given full and fair consideration.


When I accepted my position with Amyris, Inc., I was still managing lingering symptoms from COVID-19, which I contracted in 2021. Due to temporary housing arrangements, I delayed moving my car until I secured employment with Amyris, which led me to travel to Chicago in April. Unfortunately, during this time, I encountered a series of urgent medical crises involving my parent, who contracted COVID-19 and faced repeated hospitalizations.

Balancing these family health emergencies, my own ongoing health struggles, and work responsibilities was profoundly challenging.

While employed at Amyris, I experienced significant mistreatment from members of the executive team, including HR Director, being told I did not deserve to be paid. These actions led to a further decline in my health, requiring hospitalization two times (May of 2022 and September of 2022). My primary doctor subsequently recommended remote work as a reasonable accommodation to help stabilize my condition and as such would not impact my productivity or job performance. I completed all required paperwork and submitted it to Amyris's HR team. However, instead of honoring this reasonable accommodation request, Amyris terminated my employment on August 3, 2022. Unfortunately, I was later laid off due to a medical disability. This separation from the company caused financial and emotional hardship during an already challenging period of recovery. I filed a claim with EEOC and by the time it was supposed to be solved the Amyris Inc filed for bankruptcy.

In light of these events, I assert that Amyris owes me severance pay, equity compensation, and payment for unused vacation time, punitive damages due to employment termination for not honoring my medical disability. I believe my claim is valid and should not be expunged.

I kindly request that my claim be reviewed comprehensively and considered as part of these proceedings. If further documentation or evidence is required, I am prepared to provide it. Please let me know the necessary steps to ensure my claim receives proper attention.

Thank you for your time and understanding of the challenges I have faced in this situation.

Sincerely,

Jasmina Samardzic

Enclosed: all necessary documentation to support my case

## REQUEST FOR MEDICAL STATUS EVALUATION

The information below is treated confidentially, is not maintained in the employee's main personnel file, and will be used only by authorized individuals with a direct need to know and/or evaluate the information. Please return the form to:

**Briant Mitchell, Senior People Partner, Amyris, Inc.**

**Phone number: (314) 384-9744**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**THIS SECTION TO BE COMPLETED BY HEALTH CARE PROVIDER:**

Important Notice to Health Care Provider: This form is for the use of the patient's employer for the purpose of assessing certain employment-related circumstances. Please answer the following questions accurately and fully, but **DO NOT IDENTIFY THE PATIENT'S SPECIFIC MEDICAL CONDITION AND DO NOT PROVIDE THE DETAILS OF YOUR DIAGNOSIS OF THE PATIENT.**

The Genetic Information Nondiscrimination Act of 2008 (GINA) and the California Genetic Nondiscrimination Act of 2011 (CalGINA) prohibit employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic Information" as defined by GINA and CalGINA, includes an individual's family medical history, information about or the results of an individual's or family member's genetic tests, information regarding the manifestation of a disease or disorder in a family member of the individual, the fact that an individual or an individual's family member sought or received genetic services and information from genetic services or participation in clinical research that includes genetic service by an individual or an individual's family member, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services. Genetic Information does not include information about an individual's sex or age.

| Employee Patient Name |
|---|
| Jasmina Samardzic |

| Name of Health Care Provider | Degree Specialty Type of Practice |
|---|---|
| Mileyko Lazarevic, MD | MD, INTENL MEDICINE |
| Office Address City, State, Zip | Office Phone |
| 5067 N Lincoln Ave CHICAGO, IL 60625 | 773-878-6550 |

1.  Does this employee have any of the following?   ☑ Yes   ☐ No

   a)  *A physical impairment?* "Physical impairment" means any physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as:

   |   |   |   |   |
   |---|---|---|---|
   | a) | neurological | h) | genitourinary |
   | b) | musculoskeletal | i) | immune |
   | c) | special sense organs | j) | circulatory |
   | d) | respiratory (including speech organs) | k) | hemic |
   | e) | cardiovascular | l) | lymphatic |
   | f) | reproductive | m) | skin |

   - 1 -

g)    digestive                    n)    endocrine

The term "impairment" does not include physical characteristics such as left-handedness or height, weight or muscle tone that are within "normal" range and are not the result of a physiological disorder

--or--

b)    *A mental impairment?* "Mental impairment" means any mental or psychological disorder, such as an intellectual disability, organic brain syndrome, emotional or mental illness or specific learning disabilities' Common personality traits, such as poor judgement or a quick temper that are not symptoms of a mental or psychological disorder are not impairments.

--or--

c)    *A condition that is chronic, episodic and/or in remission, even if the condition is not currently in an active phase?* Examples include but are not limited to  HIV, AIDS, hepatitis, epilepsy, hypertension, asthma, seizure disorder, diabetes, major depressive disorder, clinical depression, bipolar disorder, schizophrenia, post-traumatic stress disorder, cancer, multiple sclerosis, and heart disease

**If the answer to 1 is "No," no further information is required.**

**If the answer to 1 is "Yes," please answer the following:**

2
a)    When did the symptoms first appear?  _Symptoms started December of 2021_

b)    Are the symptoms objectively verifiable?  _Yes_

c)    What is the expected probable duration of the impairment(s)? [For conditions that are chronic, episodic or in remission, please include both "active" and "inactive" phases in explaining duration, e.g., active phase equals 10 uninterrupted days a month, 2 months per year ]

_Duration of impairment could last for the next several months on the patient is currently under my medical care._

**Questions to help determine whether an accommodation is needed**

3
**Does this employee have an impairment that limits one or more major life activities (defined below)?** "Limits" means that the impairment makes the achievement of a major life activity "difficult." The term "major life activities" is broadly construed and includes physical maneuvering and physical activities and working Whether a condition limits a major life activity shall be determined without regard to any mitigating measure, unless the mitigating measure itself limits a major life activity  For impairments that are chronic, episodic or in remission, please answer this question with respect to whether an impairment would limit a major life activity when active

☐ Yes        ☑ No

*If yes*, please check the major life activities that are limited, which include but are not limited to

| | | |
|---|---|---|
| ☐ sitting | ☐ breathing | ☐ reaching |
| ☐ standing | ☐ seeing | ☐ caring for one-self |
| ☐ walking | ☐ hearing | ☐ lifting |
| ☐ eating | ☐ reading | ☐ bending |
| ☐ speaking | ☐ learning | ☐ performing manual tasks |
| ☐ communicating | ☐ thinking | ☐ working |
| ☐ sleeping | ☐ concentrating | ☐ interacting with others |

☐ The operation of a major bodily function (including the functions of the systems listed in Question 1.1 above, brain, bowel, bladder and normal cell growth functions, and the operation of an individual organ within a body system.)

☑ other (please describe) *fear of operating any moving vehicles while experiencing uncontrolled episodes of seizures and high blood pressure.*

*If yes, please explain in detail the **limitation(s)/restriction(s)*** (attach additional sheets of paper, if necessary)

*Sudden uncontrollable seizures occur at any time of the day, where medical intervention is sometime required.*

4.    Please review the attached job description. Based on the job description, can the employee perform the essential functions of the position without an accommodation?

☐ Yes          ☑ No

*If no, what essential job function(s) is the employee having trouble performing because of the impairment(s)?* (attach additional sheets of paper, if necessary)?

*The patient is able to perform basic job functions with accommodation when she is in safe and secured environment*

5.    How does the employee's impairment(s) interfere with his/her ability to perform the essential job functions? (attach additional sheets of paper, if necessary)?    *Patient is able to perform essential job functions with a proper accommodation*

6.    Can the employee perform the essential functions of his/her position and other duties without a direct threat to his/her own health and safety and/or the health and safety of others in the workplace?

☑ Yes          ☐ No

*If no, please explain the basis for your response, including _____ (attach additional sheets of paper, if necessary)?*

**Questions to help determine effective accommodation options.**

7.    **_Is there a reasonable accommodation_** that would enable the employee to perform the essential functions of the job as described? Examples of potential accommodation include job restructuring to eliminate non-essential functions, modified work schedules, modification of work tools or equipment, reassignment, telecommuting, modification of Company policies and leave of absence, among other things.   (Please note that the employer retains the discretion to determine whether an accommodation is reasonable.)

☑ Yes          ☐ No

If yes, please suggest any and all reasonable accommodation(s) (attach additional sheets of paper, if necessary)

*Patient is able to perform essential job functions with proper accommodation which is telecommuting.*

8    How long do you estimate the accommodation(s) will be needed?

*The accommodation will be needed until the patient gets medical clearance from her provider.*

9    If your proposed accommodation is a leave of absence, when will the employee be able to return to work?

*No leave of absence is necessary with current telecommuting*

10   If the accommodation requested is to telecommute from home, please specify

The time period during which the employee will need to telecommute, including beginning and ending dates.

*Not applicable currently due to patients medical condition. Additional info will be provided upon final review*

The number of days a week/month the employee will need to telecommute.

*Patient will need to telecommute 5 days a week.*

The days of the week that the employee will need to work from home and if the employee will need to telecommute on a particular schedule.

*Patient will have to work from home five days a week until medical clearance is approved from provider.*

Any other scheduling restrictions related to telecommuting.

11   **If your answer to Question No. 6 is "No," please identify any other reasonable accommodations that would reduce the threat of harm to an acceptable level that would enable the individual to perform**

12   What is the purpose of the accommodation sought? Check as many as apply.

- ☑ To enable the employee to perform the essential function of his/her position
- ☐ To enable the employee to perform the essential functions of his/her position without being a direct threat to his/her health or safety
- ☐ To enable the employee to perform the essential functions of his/her position without being a direct threat to the health or safety of others in the workplace.
- ☑ Other (describe) *restriction of operating any moving vehicles due to sudden seizures*

- 4 -

13    How will the accommodation sought further these purposes? For example, if your proposed accommodation is a leave of absence, please explain how the specific accommodation requested will enable the employee to return to work and perform the essential functions of his/her position

*Work from home is the only Best accommodation for patient that will enable her to perform essential functions of her position.*

14    Please provide any further information you feel would be useful to the Company in evaluating the employee's situation, but DO NOT IDENTIFY THE EMPLOYEE'S SPECIFIC MEDICAL CONDITION AND DO NOT PROVIDE THE DETAILS OF YOUR DIAGNOSIS OF THE EMPLOYEE

*Patient has long-lasting Covid symptoms. Based on her medical history such symptoms an occasional seizures occur (which can't be controlled) disable her and restrict her from operating any vehicles.*

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

_SIGNATURE OF HEALTH CARE PROVIDER_
(Please do not use signature stamp or designee signature)

07/26/2022
DATE

- 5 -

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Tampa Field Office**
501 East Polk St, Suite 1000
Tampa, FL 33602
(800) 669-4000
Website:  www.eeoc.gov

## <u>DETERMINATION AND NOTICE OF RIGHTS</u>
### (This Notice replaces EEOC FORMS 161, 161-A & 161-B)

**To:** Jasmina Samardzic
7009 Interbay Blvd.
Tampa, FL 33616
Charge No: 511-2023-00449

EEOC Representative and email:    SURANNY GOMEZ
Equal Opportunity Investigator
suranny.gomez@eeoc.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 511-2023-00449.

On behalf of the Commission,

*Tamra S Schweiberger*
Digitally signed by Tamra
Schweiberger
Date: 2023.08.23 16:22:10 -04'00'

Tamra Schweiberger

Director

**Cc:**
Oksana Wright
5885 HOLLIS ST STE 100
Emeryville, CA 94608

Chad Justice
1205 N. Franklin Street, Suite 326
Tampa, FL 33602

Please retain this notice for your records.

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to: https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request

identifying your request as a "FOIA Request" for Charge Number 511-2023-00449 to the District Director at Evangeline Hawthorne, 100 SE 2nd St Suite 1500

Miami, FL 33131.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 511-2023-00449 to the District Director at Evangeline Hawthorne, 100 SE 2nd St Suite 1500

Miami, FL 33131.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.

- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system**.

- ✓ **Only one** major life activity need be substantially limited.

✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications) **are not considered** in determining if the impairment substantially limits a major life activity.

✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.

✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.

✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.

✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability".

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability. For moreinformation, consult the amended regulations and appendix, as well as explanatory publications, available at* http://www.eeoc.gov/laws/types/disability_regulations.cfm.

JLA | JUSTICE LITIGATION ASSOCIATES
L E G A L   A D V O C A T E S

**Justice Litigation Associates PLLC**
*Attorneys at Law*

1205 North Franklin Street, Suite 326
Tampa, FL 33602
Telephone: 813-566-0550
www.justicelitigation.law

September 14, 2023

**VIA EMAIL ONLY**: jasmina686@outlook.com

Jasmina Samardzic
7009 Interbay Blvd
Tampa 33616

*Re: Closing File; Termination of Representation [Samardzic-Jasmina/22-08-00299]*

Dear Jasmina:

Thank you for the trust placed in us to represent you in your employment case. We hope you are satisfied with our legal representation and the customer service we provided. Because the Pre-litigation process has exhausted without a resolution, and our litigation counsel has declined to file suit because Amyris has declared bankruptcy, we cannot move forward. As we discussed, we are ending representation and it is your responsibility to seek counsel if you want to proceed with any claims. We advise you to contact a bankruptcy attorney to state your claim against Amyris.

*Please be mindful that all cases are subject to strict statute of limitations, meaning that the law provides you a certain amount of time before you are unable to file a lawsuit.*
*I have attached your right-to-sue issued on August 23, 2023. You have 90 days from the issuance date to file suit or your claim may be forever barred.*

You **do not** owe this firm for any fees or costs expended on your matter.

Since you provided our office your supporting documents and records exclusively through electronic communication, you should be in possession of all records and supporting documents. We will keep them on file in accordance with the Florida Bar Rules.

Please keep us in mind for future referrals in any of these practice areas if the need were to arise for you, family, friend or colleague.

Sincerely,

Chad A. Justice, Esq.

# DISCHARGE INSTRUCTIONS

**Swedish Hospital**
Part of **✚NorthShore**

**Jasmina Samardzic** MRN: 100056480

📍 Swedish Hospital Emergency Room   📍 SWEDISH HOSPITAL   📞 773-878-8200

## Your Next Steps

👍 Do

☐ Follow up with Erie Family Health Center After Emergency Department

ERIE MEDICAL RECORDS
Please call for nearest location
and first available physician
847-666-3494

## ED Disposition

| ED Disposition | Condition | Comment |
| --- | --- | --- |
| Discharge - good condition | | |

You were seen by: **Bashiti, Samer Mohammad, DO**

## Diagnosis

| Diagnosis | Comment |
| --- | --- |
| **Postural dizziness with presyncope** | |

## Discharge References/Attachments

**Lightheadedness or Faintness (English)**

## Contact information for other follow-up providers:

Follow up with Erie Family Health Center After Emergency Department

ERIE MEDICAL RECORDS
Please call for nearest location
and first available physician
847-666-3494

## These are your medications prescribed today:

You have not been prescribed any medications.

We strive to provide excellent care to every patient we see in the Emergency Department.  Before you leave, please be sure to:

- <u>Review your discharge instructions</u> with the ED staff to be sure that you are clear on how to care for yourself at home.
- <u>Ask any questions you may have;</u> let us know if you would like to reconnect with a member of your care team on any issues or concerns.
- <u>Inform your ED care team if there is anything you may need</u> prior to going home.

**VERBALIZED UNDERSTANDING OF DISCHARGE INSTRUCTIONS AND COPY GIVEN.**

## NorthShoreConnect

You can view the details of your hospitalization, test results and schedule future NorthShore appointments by going to www.northshoreconnect.org. If you don't have a NorthShoreConnect account, please go to **www.northshoreconnect.org,** click 'SIGN UP NOW' and fill out the required information in order to activate your NorthShoreConnect account.

Need Help? Contact our NorthShoreConnect Support Line at 847.425.3900

Do you want a caregiver or loved one to help manage your care? With Family Access, they can review your discharge instructions, email your physicians, schedule appointments and tests, renewing prescriptions, and more. To get more information go to http://www.northshore.org/connect

**Would you share your experience with us?  Your perceptions and suggestions help us to continuously improve care at NorthShore.  If you receive a survey by email or mail, please take a moment to share your thoughts - we read, and value your feedback!**

## Lightheadedness or Faintness: Care Instructions

## Your Care Instructions

Lightheadedness is a feeling that you are about to faint or "pass out." You do not feel as if you or your surroundings are moving. It is different from vertigo, which is the feeling that you or things around you are spinning or tilting.

Lightheadedness usually goes away or gets better when you lie down. If lightheadedness gets worse, it can lead to a fainting spell.

It is common to feel lightheaded from time to time. Lightheadedness usually is not caused by a serious problem. It often is caused by a short-lasting drop in blood pressure and blood flow to your head that occurs when you get up too quickly from a seated or lying position.

**Follow-up care is a key part of your treatment and safety.** Be sure to make and go to all appointments, and call your doctor if you are having problems. It's also a good idea to know your test results and keep a list of the medicines you take.

## How can you care for yourself at home?

- Lie down for 1 or 2 minutes when you feel lightheaded. After lying down, sit up slowly and remain sitting for 1 to 2 minutes before slowly standing up.
- Avoid movements, positions, or activities that have made you lightheaded in the past.
- Get plenty of rest, especially if you have a cold or flu, which can cause lightheadedness.
- Make sure you drink plenty of fluids, especially if you have a fever or have been sweating.
- Do not drive or put yourself and others in danger while you feel lightheaded.

## When should you call for help?



**Call 911** anytime you think you may need emergency care. For example, call if:

- You have symptoms of a stroke. These may include:
  - Sudden numbness, tingling, weakness, or loss of movement in your face, arm, or leg, especially on only one side of your body.
  - Sudden vision changes.
  - Sudden trouble speaking.
  - Sudden confusion or trouble understanding simple statements.
  - Sudden problems with walking or balance.
  - A sudden, severe headache that is different from past headaches.
- You have symptoms of a heart attack. These may include:
  - Chest pain or pressure, or a strange feeling in the chest.
  - Sweating.
  - Shortness of breath.
  - Nausea or vomiting.
  - Pain, pressure, or a strange feeling in the back, neck, jaw, or upper belly or in one or both shoulders or arms.
  - Lightheadedness or sudden weakness.
  - A fast or irregular heartbeat.

After you call **911**, the operator may tell you to chew 1 adult-strength or 2 to 4 low-dose aspirin. Wait for an ambulance. Do not try to drive yourself.

Watch closely for changes in your health, and be sure to contact your doctor if:

- Your lightheadedness gets worse or does not get better with home care.

## Where can you learn more?

Go to **https://www.northshore.org**  and use the search button or log into your NorthShore*Connect* account, go to "Resources" icon then "Search Medical Library".

Enter **X578** in the search box to learn more about "**Lightheadedness or Faintness: Care Instructions**."

Current as of: July 1, 2021          Content Version: 13.2

© 2006-2022 Healthwise, Incorporated.

Care instructions adapted under license by NorthShore University Health System. If you have questions about a medical condition or this instruction, always ask your healthcare professional. Healthwise, Incorporated disclaims any warranty or liability for your use of this information.

## NorthShore Lab Locations

Laboratory appointments are now required at Highland Park and Skokie ACC Outpatient Laboratories Visit NorthShoreConnect.org to make your next appointment.

Check northshore.org/lab to confirm address and hours of operation at all locations prior to arriving.

©2020 Epic Systems Corporation  Page 5 of 5

# amyris

August 3, 2022

**VIA EMAIL/U.S. MAIL**

Jasmina Samardzic

Dear Jasmina:

This letter sets forth the substance of the separation agreement (the "Agreement") which Amyris, Inc. (the "Company") is offering to you to assist in your employment transition.

    **1.**    **Separation Date**.  Your last day of employment with the Company will be August 3, 2022 (the "Separation Date").

    **2.**    **Final Pay**.  On the Separation Date, the Company will pay you all accrued wages earned through the Separation Date, including any accrued but unused vacation, subject to standard payroll deductions and withholdings.  You are entitled to this payment regardless of whether you sign this Agreement.

    **3.**    **Separation Payment.**  The Company will pay you, as separation pay, an amount equivalent to 3 weeks of your base salary in effect as of the Separation Date, which amount shall be Four Thousand Forty-Six Dollars and Eighty Cents ($4,546.80), subject to all required payroll deductions and tax withholding (the "Separation Payment").  To be eligible to receive the Separation Payment, you must timely sign this Agreement, allow it to become effective, and you must abide by the terms of this Agreement.  The Company will pay you the Separation Payment in a single lump sum amount  within the next two regular Amyris pay periods after the Effective Date (as defined in Paragraph 10(c) below), provided that you have returned all Company property as specified in Paragraph 8 below.

Additionally, Amyris will provide you with a lump sum net payment in the amount of $847.07 (after taxes) payable on the timing described below to cover COBRA premiums to continue your coverage through September 30, 2022. Please note you are responsible for electing coverage under COBRA or enrolling in an individual plan through any applicable state or federal health insurance exchange.

    **4.**    **Health Insurance.**  Your health insurance benefits coverage will end on August 31, 2022. After your Company-provided health insurance benefits end, to the extent provided by the federal Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") or, if

Jasmina Samardzic
August 3, 2022
Page 2

applicable, state insurance laws, and by the Company's current group health insurance policies, you will be eligible to continue your group health insurance benefits at your own expense. Later, you may be able to convert to an individual policy through the provider of the Company's health insurance, if you wish. You may also be eligible for health insurance through one of the state marketplaces implementing the federal Patient Protection and Affordable Care Act. You will receive COBRA election materials from the Company's administrator after your Company-provided health insurance benefits terminate. These materials will also contain information about your options under the Patient Protection and Affordable Care Act. The materials will inform you of the time limits for you to waive or elect coverage under both options.

5. **Amyris Equity Awards.** Your Amyris options and, if applicable, restricted stock units (collectively "Equity Awards"), will cease vesting on the Separation Date, after which you will have three (3) months in which to exercise any portion of your stock options vested through the Separation Date. All unvested portions of the Amyris Equity Awards (options and restricted stock units) issued to you will be canceled effective as of the Separation Date.

6. **Other Compensation or Benefits.** You acknowledge that, except as expressly provided in this Agreement, you have not earned and will not receive, in connection with your employment relationship with the Company, any additional compensation, separation pay or benefits after the Separation Date, with the exception of any vested right you may have under the express terms of a written ERISA-qualified benefit plan (e.g., 401(k) account). In particular, but without limitation, you agree that you are not owed any bonus, incentive compensation, or commissions.

7. **Expense Reimbursements.** You agree that, within thirty (30) days after the Separation Date, you will submit your final documented expense reimbursement statement reflecting all business expenses you incurred through the Separation Date, if any, for which you seek reimbursement. The Company will process your reimbursement request pursuant to its regular business practice.

8. **Return Of Company Property**. You agree that you will immediately return to the Company all Company documents (and all copies thereof) and other Company property in your possession or control, including, but not limited to: Company files, notes, memoranda, correspondence, agreements, draft documents, notebooks, logs, drawings, records, plans, proposals, reports, forecasts, financial information, sales and marketing information, training information, research and development information, personnel information, computer-recorded information, tangible property and equipment, including but not limited to laptops, PCs, cell phones, PDAs, credit cards, entry cards, identification badges and keys, and any materials of any kind that contain or embody any proprietary or confidential information of the Company (and all reproductions thereof in whole or in part). You agree that you will make a diligent search to locate any such documents, property and information on or before the Separation Date. In addition, if you have used any non-Company computer, server, or e-mail system to receive, store, review, prepare or transmit any Company confidential or proprietary data, materials or information, you agree to provide the Company with a computer-useable copy of such information and then permanently delete and expunge such Company confidential or proprietary information from those systems. You further agree to provide the Company access to such systems as requested to verify that the necessary copying and/or deletion is completed. You agree that, after the Separation Date,

Jasmina Samardzic
August 3, 2022
Page 3

you will neither use nor possess Company property. **Your compliance with the terms of this Paragraph is a condition precedent to your eligibility to receive the Separation Payment described above.**

     **9. Confidential Information Obligations**.    You acknowledge your continuing obligations under your Employee Proprietary Information and Inventions Agreement ("PIIA") (a copy of which is attached to this Agreement as Exhibit A), which obligations shall continue after the Separation Date, including, without limitation, your obligation to refrain from any unauthorized use or disclosure of the Company's proprietary information or materials. Nothing in this Agreement or the PIIA is intended to interfere with or discourage a good faith disclosure to any governmental entity related to a suspected violation of the law.   Pursuant to 18 USC Section 1833(b), you cannot and will not be held criminally or civilly liable under any federal or state trade secret law for disclosing otherwise protected trade secrets and/or confidential or proprietary information as long as the disclosure is made in (i) confidence to a federal, state, or local government official, directly or indirectly, or to an attorney and solely for the purpose of reporting or investigating a suspected violation of law; or (ii) a complaint or other document filed in a lawsuit or other proceeding, as long as such filing is made under seal.

     **10.    Release of Claims**.

         **(a)    General Release.** In exchange for the consideration provided to you under this Agreement to which you would not otherwise be entitled, you hereby generally and completely release the Company, and its affiliated, related, parent and subsidiary entities,  and its and their current and former directors, officers, employees, shareholders, partners, agents, attorneys, predecessors, successors, insurers, affiliates, and assigns (collectively, the "**Released Parties**") from any and all claims, liabilities and obligations, both known and unknown, that arise out of or are in any way related to events, acts, conduct, or omissions occurring prior to or on the date you sign this Agreement (collectively, the "**Released Claims**").

         **(b)    Scope of Release.** The Released Claims include, but are not limited to:  (i) all claims arising out of or in any way related to your employment with the Company, or the termination of that employment; (ii) all claims related to your compensation or benefits from the Company, including without limitation bona fide disputes regarding wages, salary, bonuses, commissions, vacation, paid time off, expense reimbursements, severance pay, fringe benefits, stock, stock options, or any other ownership, equity, or profits interests in the Company; (iii) all claims for breach of contract, wrongful termination, and breach of the implied covenant of good faith and fair dealing; (iv) all tort claims, including claims for fraud, defamation, emotional distress, and discharge in violation of public policy; and (v) all federal, state, and local statutory claims, including (without limitation) claims for discrimination, harassment, retaliation, attorneys' fees, and other claims arising under Title VII of the federal Civil Rights Act of 1964 (as amended), the federal Americans with Disabilities Act of 1990 (as amended), the federal Age Discrimination in Employment Act of 1967 (as amended), the Older Workers Benefit Protection Act of 1990 (as amended), the federal Family and Medical Leave Act of 1993 (as amended), the federal Employee Retirement Income Security Act of 1974 (as amended), the federal WARN Act, the Sarbanes-Oxley Act of 2002, the Florida Civil Rights Act (as amended), the California Family Rights Act (as amended), the California Fair Employment and Housing Act (as amended), and claims arising

Jasmina Samardzic
August 3, 2022
Page 4

under any other federal, state or local statute, regulation or common law. The parties intend for this release to be enforced to the fullest extent permitted by law.

   **(c)**  **ADEA Waiver.** You acknowledge that you are knowingly and voluntarily waiving and releasing any rights you may have under the federal Age Discrimination in Employment Act (the "ADEA"). You also acknowledge that the consideration given for the waiver and release in the preceding paragraph hereof is in addition to anything of value to which you were already entitled. You further acknowledge that you have been advised by this writing, as required by the ADEA, that: (a) your waiver and release do not apply to any rights or claims that may arise after the execution date of this Agreement; (b) you have been advised hereby that you have the right to consult with an attorney prior to executing this Agreement; (c) you have up to twenty-one (21) calendar days after the Separation Date within which to consider this Agreement (although you may choose to voluntarily execute this Agreement earlier); (d) you have seven (7) calendar days following the date you sign this Agreement to revoke the Agreement (the "Revocation Period"); and (e) this Agreement will not be effective until the date upon which the revocation period has expired, which will be the eighth calendar day after this Agreement is signed by you (the "Effective Date"). If you choose to revoke this Agreement, you must deliver notice of such revocation in writing, by personal delivery, email or mail, to Patricia East, VP, Head of People at Amyris, Inc. 5885 Hollis St Emeryville, CA 94609 or east@amyris.com. If mailed, the revocation must be properly addressed to the above addressee and postmarked no later than the last day of the Revocation Period.

   **(d)**  **Waiver of Unknown Claims.** In giving the releases set forth in this Agreement, which include claims which may be unknown to you at present, you acknowledge that you have read and understand Section 1542 of the California Civil Code, which reads as follows: **"A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."** You hereby expressly waive and relinquish all rights and benefits under that section and any law or legal principle of similar effect in Florida or any other jurisdiction with respect to your release of claims herein, including but not limited to the release of unknown and unsuspected claims.

   **(e)**  **Excluded Claims.** Notwithstanding the foregoing, the following are not included in the Released Claims (the "**Excluded Claims**"): (i) any rights or claims for indemnification you may have pursuant to any written indemnification agreement with the Company to which you are a party, the bylaws or operating agreements of the Company, or under applicable law; (ii) any rights or claims which are not waivable as a matter of law; (iii) any rights you have to file or pursue a claim for workers' compensation or unemployment insurance; and (iv) any claims for breach of this Agreement. In addition, nothing in this Agreement prevents you from filing a charge or complaint with the Equal Employment Opportunity Commission (the "EEOC"), the National Labor Relations Board, the Occupational Safety and Health Administration, the Securities and Exchange Commission (the "SEC") or any other federal, state or local governmental agency or commission (collectively, the "**Government Agencies**"). This Agreement does not limit your ability to communicate with any Government Agencies or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency, including providing documents or other information, without notice to the

Jasmina Samardzic
August 3, 2022
Page 5

Company.  While this Agreement does not limit your right to receive an award for information provided to any Government Agency, you understand and agree that, to the maximum extent permitted by law, you are otherwise waiving any and all rights you may have to individual relief, including monetary recovery, from Government Agencies or otherwise based on any claims that you have released and the rights you have waived by signing this Agreement.  You represent and warrant that, other than the Excluded Claims, you are not aware of any claims you have or might have against any of the Released Parties that are not included in the Released Claims.

     **11.**    **Other Agreements.**  You also acknowledge and agree that:

     **(a)**    You are entering into this Agreement knowingly, voluntarily, and with full knowledge that it shall become a binding and enforceable contract affecting your legal rights.  You have not been coerced, threatened, or intimidated into signing the Agreement;

     **(b)**    You have a right to consult an attorney regarding this Agreement and have been provided with the opportunity to consult with an attorney during the 21-day consideration period under this Agreement;

     **(c)**    In the event that you sign this Agreement prior to the end of your 21-day consideration period, your decision to shorten your consideration period is knowing and voluntary and is not induced by the Company through fraud, misrepresentation, or a threat to withdraw or alter the offer prior to the expiration of the consideration period, or by offering more favorable terms for signing the Agreement prior to the expiration of the consideration period;

     **(d)**    You have read this Agreement in its entirety and you understand and accept the terms and conditions of the Agreement;

     **(e)**    You understand that you may hereafter discover facts different from or in addition to those you now believe to be true and that the release herein shall remain in effect as a complete and general release, notwithstanding any such different or additional facts; and

     **(f)**    You understand that this Agreement includes the compromise of any disputed claims.

     **12.**    **No Pending Actions or Lawsuits**.  You represent that you have no lawsuits, claims or actions pending in your name, or on behalf of yourself or any other person or entity, against any of the Released Parties.

     **13.**    **Acknowledgments and Representations.**  You acknowledge and represent that you have not suffered any discrimination or harassment by any of the Released Parties on account of race, gender, national origin, age, religion, marital or registered domestic partner status, sexual orientation, gender identity, gender expression, disability, genetic information, military or veteran status, medical condition or any other characteristic protected by law.  You acknowledge and represent that you have not been denied any leave, benefits or rights to which you may have been entitled under any federal, state or local law, and that you have not suffered any job-related wrongs or injuries for which you have not already filed a claim.  You further acknowledge and represent that you have not been promised, explicitly or implicitly, employment for any specified period of

Jasmina Samardzic
August 3, 2022
Page 6

time. You represent and warrant that all of the factual representations made herein, all of which induce the Company to enter into this agreement, are true in all material respects.

**14.   Job References**. You should direct any job reference inquiries to HR at HR@amyris.com. Pursuant to Company policy, in response to any such inquiries, the Company will disclose only the position you held and the dates of employment. The Company will confirm your salary in response to any such inquiry only if you submit a signed request to the Company to disclose such information.

**15.   Unemployment Benefits.** You may be eligible to receive unemployment benefits after the Separation Date. Whether you receive benefits will be determined by the State of Florida.

**16.   Nondisparagement.** Subject to Paragraph 18 below, you agree not to disparage any of the Released Parties in any manner likely to be harmful to any of them or their business, business reputation or personal reputation, provided that you may respond accurately and fully to any question, inquiry or request for information when required by legal process. For purposes of this Agreement, "disparage" shall mean to make, publish or communicate any negative, belittling or derogatory statement, whether oral or written. You agree that the obligations under this Paragraph include (without limitation) refraining from publishing any disparaging remark on any blog, online social network or any other website (including, but not limited to, www.glassdoor.com), whether or not such comments are made anonymously. Notwithstanding the foregoing, you may respond accurately and fully to any question, inquiry or request for information when required by legal process.

**17.   Confidentiality.** Subject to Paragraph 18 below, the provisions of this Agreement will be held in strictest confidence by you and will not be publicized or disclosed in any manner whatsoever; *provided, however,* that: (a) you may disclose this Agreement to your immediate family; (b) you may disclose this Agreement in confidence to your attorneys, accountants, auditors, tax preparers, and financial advisors; and (c) you may disclose this Agreement insofar as such disclosure may be necessary to enforce its terms or as otherwise required by law. In particular, and without limitation, you agree not to disclose the terms of this Agreement to any current or former Company employee, consultant, or independent contractor.

**18.   Permitted Communications.** You acknowledge that nothing in this Agreement prohibits or restricts you from initiating communications directly with, responding to any inquiry from, or providing information to or testimony before the Securities and Exchange Commission ("SEC"), the Equal Employment Opportunity Commission ("EEOC"), the Department of Justice, or any other Government Agency or self-regulatory organization, about actual or potential violations of laws or regulations. You further acknowledge that you are not required to obtain the Company's prior authorization before engaging in such communications nor are you required to inform the Company about such communications. You understand that any such communications will not be considered a breach of your obligations under this Agreement.

**19.   No Admission of Liability.** This Agreement is not and shall not be construed or contended by you to be an admission or evidence of any wrongdoing or liability on the part of any of the Released Parties, their representatives, heirs, executors, attorneys, agents, partners,

Jasmina Samardzic
August 3, 2022
Page 7

members, officers, shareholders, directors, employees, subsidiaries, affiliates, divisions, successors, insurers or assigns.

**20.     IRS Code 409A.**     To the extent applicable, this Agreement shall be interpreted and applied consistent and in accordance with Section 409A of the Code and Department of Treasury regulations and other interpretive guidance issued thereunder.  Notwithstanding any provision of this Agreement to the contrary, to the extent that the Company, in its sole discretion, determines that any payments or benefits under this Agreement may not be either compliant with or exempt from Section 409A of the Code and related Department of Treasury guidance, you and the Company shall work together to adopt such amendments to this Agreement or take such other actions that the Company determines are necessary or appropriate to (i) exempt the compensation and benefits payable under this Agreement from Section 409A of the Code and/or preserve the intended tax treatment of such compensation and benefits, or (ii) comply with the requirements of Section 409A of the Code and related Department of Treasury guidance; provided, however, that this paragraph shall not create any obligation on the part of the Company to adopt any such amendment or take any other action, nor shall the Company have any liability for failing to do so..

**21.     Arbitration.**  You acknowledge your continuing obligations under your Mutual Agreement to Binding Arbitration (the "Arbitration Agreement") (a copy of which is attached to this Agreement as Exhibit B). Any controversy or any claim arising out of or relating to the interpretation, enforceability or breach of this Agreement shall be settled by arbitration in accordance with the arbitration provision of the Arbitration Agreement. If for any reason the arbitration procedure set forth in the Arbitration Agreement is unavailable, you agree to arbitration under the employment arbitration rules of the American Arbitration Association or any successor hereto. The parties further agree that the arbitrator shall not be empowered to add to, subtract from, or modify, alter or amend the terms of this Agreement. Any applicable arbitration rules or policies shall be interpreted in a manner so as to ensure their enforceability under applicable state or federal law.

**22.     Miscellaneous**.  This Agreement, including Exhibits A and B, constitutes the complete, final and exclusive embodiment of the entire agreement between you and the Company with regard to its subject matter.  It is entered into without reliance on any promise or representation, written or oral, other than those expressly contained herein, and it supersedes any other such promises, warranties, or representations.  This Agreement may not be modified or amended except in a writing signed by both you and the Company's Head of HR.  This Agreement will bind the heirs, personal representatives, successors and assigns of both you and the Company, and inure to the benefit of both you and the Company, and your and its heirs, successors and assigns. Any waiver of a breach of this Agreement shall be in writing and shall not be deemed to be a waiver of any successive breach. For purposes of construing this Agreement, any ambiguities shall not be construed against either party as the drafter.  If any provision of this Agreement is determined to be invalid or unenforceable, in whole or in part, this determination will not affect any other provision of this Agreement and the provision in question will be modified so as to be rendered enforceable in a manner consistent with the intent of the parties insofar as possible.  This Agreement will be deemed to have been entered into and will be construed and enforced in accordance with the laws of the State of Florida as applied to contracts made and to be performed entirely within Florida.  This agreement may be executed in counterparts which shall be deemed to be part of one original, and facsimile signatures shall be equivalent to original signatures.

Jasmina Samardzic
August 3, 2022
Page 8

**23.**     **Effective Date**. If you wish to accept this Agreement, you must sign and return this Agreement to the Company on or within twenty-one (21) calendar days after the Separation Date. The "**Effective Date**" of this Agreement shall be the eighth calendar day after you sign this Agreement, provided that you do not revoke this Agreement during the Revocation Period, as described in Paragraph 10(c) above.

If this Agreement is acceptable to you, please sign below and return the original to me.

Jasmina, we wish you the best in your future endeavors.

Sincerely,

**AMRYIS, INC.**

By: _____

Christine Ofori
Chief People Officer


Exhibit A:     Proprietary Information and Inventions Agreement
Exhibit B:     Mutual Agreement to Binding Arbitration


**I HAVE CAREFULLY REVIEWED AND CONSIDERED THE TERMS OF THIS AGREEMENT; I FULLY UNDERSTAND ALL OF ITS TERMS AND VOLUNTARILY AGREE TO EACH OF THEM; AND I INTEND TO BE LEGALLY BOUND BY THIS AGREEMENT:**


_____     DATE: _____
            **Jasmina Samardzic**

Jasmina Samardzic
August 3, 2022
Page 9

## EXHIBIT A

### PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

**ATTACHED**

Jasmina Samardzic
August 3, 2022
Page 10

## EXHIBIT B

### Mutual Agreement to Binding Arbitration

**ATTACHED**

# amyris

## STATEMENT REGARDING EMPLOYEE PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

Attached to this statement is your Employee Proprietary Information and Inventions Agreement (the "*Agreement*").

Please take the time to review the Agreement carefully. It contains material restrictions on your right to disclose or use, during or after your employment, certain information and technology learned by you during your employment.

The Company considers this Agreement to be very important to the protection of its business. It intends to enforce the terms of the Agreement and to pursue, appropriate, injunctions, restraining orders, and money damages, should you violate the Agreement.

If you have any questions concerning this Agreement, you may wish to consult an attorney. The employees and agents of the Company are not authorized to, and will not, give you legal advice concerning this Agreement.

If you have read and understand the Agreement, and if you agree to its terms and conditions, please return a fully executed copy of it to the Company, retaining one copy for yourself.

## EMPLOYEE PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT (INCLUDING NON-COMPETITION)

In consideration of my employment by Amyris, Inc. (the "*Company*"), and the compensation I receive from the Company, I agree to certain restrictions placed by the Company on my use of information belonging to the Company. I understand that, during the course of my work as an employee of the Company, I have had and will have access to Proprietary Information (a term which is defined below) concerning the Company, its employees, its operations, its vendors and its customers. I acknowledge that the Company has developed, compiled, and otherwise obtained, often at great expense, this information and that this information has great value to the Company's business. I agree to hold in strict confidence all Proprietary Information and will not disclose any Proprietary Information to anyone outside of the Company, as defined more fully below.

## I.    DEFINITIONS

### A.  The "*Company*"

As used in this Agreement, the "*Company*" refers to Amyris, Inc. and each of its subsidiaries or affiliated companies. I recognize and agree that my obligations under this Agreement and all terms of this Agreement apply to me regardless of whether I am employed by or work for Company or any of its subsidiaries or affiliates.

### B.  "*Proprietary Information*": Definition and Ownership

I understand that the Company possesses and will possess Proprietary Information which is important to its business. For purposes of this Agreement, "*Proprietary Information*" is information that

# amyris

was or will be developed, created, or discovered by or on behalf of the Company, or which became or will become known by, or was or is conveyed by a third party to the Company, which has commercial value in the Company's business or the business of a third party disclosing such information.

"*Proprietary Information*" includes, but is not limited to, the following (whether or not patentable, copyrightable, or registrable under any intellectual property laws or industrial property laws in the United States or elsewhere):  information about software programs and subroutines, source and object code, databases, database criteria, user profiles, scripts, algorithms, processes, trade secrets, designs, methodologies, technology, know-how, processes, data, ideas, techniques, inventions, modules, features and modes of operation, internal documentation, works of authorship, technical, business, financial, client, marketing, and product development plans, forecasts, other employees' positions, skill levels, duties, compensation and all other terms of their employment (unless disclosure is permitted by law), client and supplier lists, contacts at or knowledge of clients or prospective clients of the Company, and other information concerning the Company's or its clients' actual or anticipated products or services, business, research or development, or any information which is received in confidence by or for the Company from any other person unless (i) the information is or becomes publicly known through lawful means; (ii) the information was rightfully in my possession or part of my general knowledge prior to my employment by the Company as specifically identified and disclosed by me in Exhibit "A"; or (iii) the information is disclosed to me without confidential or proprietary restriction by a third party who rightfully possesses the information (without confidential or proprietary restriction).  I understand that my employment creates a relationship of confidence and trust between me and the Company with respect to Proprietary Information.

All Proprietary Information and all title, patents, patent rights, copyrights, trade secret rights, trademarks, trademark rights, and other intellectual property and rights anywhere in the world (collectively "Rights") in connection therewith shall be the sole property of the Company.  I hereby assign to the Company any Rights I may have or acquire in Proprietary Information.

C. "*Company Materials*"

I understand that the Company possesses or will possess "Company Materials" which are important to its business.  For purposes of this Agreement, "*Company Materials*" are documents or other media or tangible items that contain or embody Proprietary Information or any other information concerning the business, operations or plans of the Company, whether such documents, media or items have been prepared by me or by others.

"*Company Materials*" include, but are not limited to, blueprints, drawings, photographs, charts, graphs, notebooks, customer lists, computer disks, tapes or printouts, sound recordings and other printed, typewritten or handwritten documents, sample products, prototypes and models.

## II.    OBLIGATIONS TO PROTECT PROPRIETARY INFORMATION

I represent and warrant that from the time of my first contact or communication with the Company, I have held in strict confidence all Proprietary Information and have not disclosed any Proprietary Information to anyone outside of the Company, or used, copied, published, or summarized any Proprietary Information except to the extent necessary to carry out my responsibilities as an employee of the Company.

# amyris

At all times, both during my employment by the Company and after its termination, I will (a) keep in confidence and trust and will not disclose any Proprietary Information except to other Company employees, agents and representatives who need to know, or to third parties who are bound by written confidentiality agreements to the extent necessary to carry out my responsibilities as an employee of the Company and in a manner consistent with any such third party confidentiality agreements, and (b) use Proprietary Information only for the benefit of the Company.

## III.    MAINTENANCE AND RETURN OF COMPANY MATERIALS

All Company Materials are and shall be the sole property of the Company.  I agree that during my employment by the Company, I will not remove any Company Materials from the business premises of the Company or deliver any Company Materials to any person or entity outside the Company, except as I am required to do in connection with performing the duties of my employment.  I further agree that, immediately upon the termination of my employment by me or by the Company for any reason, or during my employment if so requested by the Company, I will return all Company Materials, apparatus, equipment and other physical property, or any reproduction of such property, excepting only (i) my personal copies of records relating to my compensation; (ii) my personal copies of any materials previously distributed generally to stockholders of the Company; and (iii) my copy of this Agreement.

## IV.    DISCLOSURE OF INVENTIONS TO THE COMPANY

As used in this Agreement, "*Inventions*" mean any work of authorship, discovery, improvement, invention, design, graphic, source, HTML and other code, trade secret, technology, algorithms, computer program or software, audio, video or other files or content, idea, design, process, technique, formula or composition, know-how and data, whether or not patentable or copyrightable.  I agree to maintain adequate and current written records and promptly disclose in writing to my immediate supervisor or as otherwise designated by the Company, all Inventions, made, discovered, conceived, reduced to practice or developed by me, either alone or jointly with others, during the term of my employment.

I will also disclose to the President of the Company all Inventions made, discovered, conceived, reduced to practice, or developed by me, either alone or jointly with others, within six (6) months after the termination of my employment with the Company which resulted, in whole or in part, from my prior employment by the Company.  Such disclosures shall be received by the Company in confidence (to the extent such Inventions are not assigned to the Company pursuant to Section V below) and do not extend the assignment made in Section V below.  I will not disclose Inventions covered by this Section IV to any person outside the Company unless I am requested to do so by management personnel of the Company.

## V.    OWNERSHIP OF INVENTIONS

A.  Generally

I agree that all Inventions which I make, conceive, reduce to practice or develop (in whole or in part, either alone or jointly with others) during my employment shall be the sole property of the Company to the maximum extent permitted by Section 2870 of the California Labor Code, a copy of which is attached, and I hereby assign such Inventions and all Rights therein to the Company.   No assignment in this Agreement shall extend to inventions, the assignment of which is prohibited by Labor Code Section 2870.  The Company shall be the sole owner of all Rights in connection therewith.

# amyris

B.   Works Made for Hire

The Company shall be the sole owner of all Rights, title and interest in Inventions.   I further acknowledge and agree that such Inventions, including, without limitation, any computer programs, programming documentation, and other works of authorship, are "works made for hire" for purposes of the Company's rights under copyright laws.   To the extent that any Inventions may not be considered a "work made for hire", I hereby assign to the Company such Inventions and all Rights therein, except those Inventions, if any, the assignment of which is prohibited under California Labor Code Section 2870, a copy of which is attached.

C.   License

If any Inventions assigned hereunder are based on, or incorporated, or are improvements or derivatives of, or cannot be reasonably made, used, reproduced and distributed without using or violating technology or rights owned or licensed by me and not assigned hereunder, I hereby grant the company a perpetual, worldwide, royalty-free, non-exclusive and sub-licensable right and license to exploit and exercise all such technology and rights in support of the Company's exercise or exploitation of any assigned Inventions (including any modifications, improvements and derivatives thereof).

D.   List of Inventions

I have attached hereto a complete list of all existing Inventions to which I claim ownership as of the date of this Agreement and that I desire to specifically clarify are not subject to this Agreement, and I acknowledge and agree that such list is complete.   If no such list is attached to this Agreement, I represent that I have no such Inventions at the time of signing this Agreement.

E.   Cooperation

I agree to perform, during and after my employment, all acts deemed necessary or desirable by the Company to permit and assist it in further evidencing and perfecting the assignments made to the Company under this Agreement and in obtaining, maintaining, defending and enforcing Rights in connection with such Inventions and improvements thereto in any and all countries.   Such acts may include, but are not limited to, execution of documents and assistance or cooperation in legal proceedings. To the extent such acts are required after the termination of my employment, the Company shall pay me a reasonable and customary consultancy fee and reimburse reasonable costs and expenses.   I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents, as my agents and attorney-in-fact to act for and on my behalf and instead of me, to execute and file any documents, applications or related findings and to do all other lawfully permitted acts to further the purposes set forth above in this Subsection E, including, without limitation, the perfection of assignment and the prosecution and issuance of patents, patent applications, copyright applications and registrations, trademark applications and registrations or other rights in connection with such Inventions and improvements thereto with the same legal force and effect as if executed by me.

F.   Assignment or Waiver of Moral Rights

Any assignment of copyright hereunder (and any ownership of a copyright as a work made for hire) includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights" (collectively "*Moral Rights*").   To the extent such Moral Rights

# amyris

cannot be assigned under applicable law and to the extent the following is allowed by the laws in the various countries where Moral Rights exist, I hereby waive such Moral Rights and consent to any action of the Company that would violate such Moral Rights in the absence of such consent.

## VI.    NON-SOLICITATION

During the term of my employment and for one (1) year thereafter, I will not (i) encourage any employee, consultant, or person who was employed by the Company on the date of termination of my employment (or at any time during the six (6) month period prior to termination of my employment) to leave the company for any reason, nor will I solicit their services; (ii) assist any other person or entity in such encouragement or solicitation; or (iii) hire or assist in hiring or retaining any such employee or consultant.

## VII.    NON-COMPETITION

I agree that during my employment with the Company I will not engage in any employment, business, or activity that is in any way competitive with the business or proposed business of the Company, and I will not assist any other person or organization in competing with the Company or in preparing to engage in competition with the business or proposed business of the Company. The provisions of this paragraph shall apply both during normal working hours and at all other times including, without limitation, nights, weekends and vacation time, while I am employed with the Company.

## VIII.    COMPANY AUTHORIZATION FOR PUBLICATION

Prior to my submitting or disclosing for possible publication or general dissemination outside the Company (such as through public speaking engagements or literature), any material prepared by me that incorporates information that concerns the Company's business or anticipated research, I agree to deliver a copy of such material to an officer of the Company for his or her review.  Within twenty (20) days following such submission, the Company agrees to notify me in writing whether the Company believes such material contains any Proprietary Information or Inventions, and I agree to make such deletions and revisions as are reasonably requested by the Company to protect its Proprietary Information and Inventions.  I further agree to obtain the written consent of the Company prior to any review of such material by persons outside the Company.

## IX.    FORMER EMPLOYER INFORMATION

I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me in confidence or in trust prior to my employment by the Company, and I will not disclose to the Company or induce the Company to use any confidential or proprietary information or material belonging to any previous employers or others.  I have not entered into and I agree I will not enter into any agreement, either written or oral, in conflict herewith or in conflict with my employment with the Company.  I further agree to conform to the rules and regulations of the Company.

# amyris

## X. AT-WILL EMPLOYMENT

I agree and understand that employment with the Company is "*at-will*," meaning that it is not for any specified period of time and can be terminated by me or by the Company at any time, with or without advance notice, and for any or no particular reason or cause. I agree and understand that it also means that job duties, title and responsibility and reporting level, compensation and benefits, as well as the Company's personnel policies and procedures, may be changed at any time at-will by the Company. I understand and agree that nothing about the fact or the content of this Agreement is intended to, nor should be construed to, alter the at-will nature of my employment with the Company.

## XI. SEVERABILITY

If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provisions shall be modified to the minimum extent necessary to comply with applicable law and the intent of the parties. If any provision of this Agreement, or application of it to any person, place, or circumstances, shall be held by a court of competent jurisdiction to be invalid, unenforceable, or void, the remainder of this Agreement and such provisions as applied to other persons, places, and circumstances shall remain in full force and effect.

## XII. AUTHORIZATION TO NOTIFY NEW EMPLOYER

I hereby authorize the Company to notify my new employer about my rights and obligations under this Agreement following the termination of my employment with the Company.

## XIII. ENTIRE AGREEMENT

This Agreement, the Agreement to Arbitrate Employment Issues, and the offer letter dated set[s] forth the entire agreement and understanding between the Company and me relating to the subject matter herein and supersedes all prior discussions and/or agreements between us. I understand and acknowledge that (i) no other representation or inducement has been made to me, (ii) I have relied on my own judgment and investigation in accepting my employment with the Company, and (iii) I have not relied on any representation or inducement made by any officer, employee or representative of the Company. No modification of or amendment to this Agreement nor any waiver of any rights under this Agreement will be effective unless in a writing signed by the President of the Company and me. I understand and agree that any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

## XIV. EFFECTIVE DATE AND BINDING UPON SUCCESSORS

This Agreement shall be effective as of the first day of my employment with the Company and shall be binding upon me, my heirs, executors, and administrators and shall inure to the benefit of the Company, its subsidiaries, successors and assigns.

## XV. GOVERNING LAW

Although I may work for the Company outside of California or the United States, I understand and agree that this Agreement shall be interpreted and enforced in accordance with the laws of the State

# amyris

of California without regard to the conflict of laws provisions thereof.  I hereby submit to the exclusive jurisdiction and venue of the federal and state courts located in San Francisco County, California.

## XVI.   REMEDIES

I recognize that nothing in this Agreement is intended to limit any remedy of the Company under the California Uniform Trade Secrets Act.  I recognize that my violation of this Agreement could cause the Company irreparable harm, the amount of which may be extremely difficult to estimate, making any remedy at law or in damages inadequate.  Thus, I agree that the Company shall have the right to apply to any court of competent jurisdiction for an order restraining any breach or threatened breach of this Agreement and for any other relief the Company deems appropriate.  This right shall be in addition to any other remedy available to the Company.

## XVII.   APPLICATION OF THIS AGREEMENT

I agree that my obligation set forth in this Agreement, along with the Agreement's definitions of Proprietary Information shall be equally applicable to Proprietary Information related to any work performed by me for the Company prior to the execution of this Agreement.

I HAVE READ THIS AGREEMENT CAREFULLY AND I UNDERSTAND ITS TERMS.  I ACCEPT THE OBLIGATIONS WHICH IT IMPOSES UPON ME WITHOUT RESERVATION.  NO PROMISES OR REPRESENTATIONS HAVE BEEN MADE TO ME TO INDUCE ME TO SIGN THIS AGREEMENT.   I SIGN THIS AGREEMENT VOLUNTARILY AND FREELY.   I HAVE COMPLETELY NOTED ON EXHIBIT A TO THIS AGREEMENT ANY PROPRIETARY INFORMATION THAT I DESIRE TO EXCLUDE FROM THIS AGREEMENT.

Date: 3/17/2022 | 2:51 PM PDT

Employee Signature: _____
8E79B0585719405

Employee Name: Jasmina Samardzic

# amyris

**EXHIBIT A**

1.      The following is a complete list of all Inventions relevant to the subject matter of my employment with the Company that have been made, discovered, conceived, first reduced to practice or developed by me or jointly with others prior to my employment by the Company that I desire to remove from the operation of the Employee Proprietary Information and Inventions Agreement:

__X__      No Inventions.

_____      See below:  Any and all Inventions regarding:

_____      Additional sheets attached.


2.      I propose to bring to my employment the following materials and documents of a former employer:

__X__      No materials or documents

_____      See below:


Date:__3/17/2022 | 2:51 PM PDT__          Employee Signature:_____

                                          Employee Name:  __Jasmina Samardzic_____

# amyris

**ATTACHMENT B**

Section 2870.  Application of provision providing that employee shall assign or offer to assign rights in invention to employer.

(a)      Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1)      Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or

(2)      Result from any work performed by the employee for the employer.

(b)      To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.

# amyris

## MUTUAL AGREEMENT TO BINDING ARBITRATION

In consideration of the employment relationship between _____Jasmina Samardzic_____ ("Employee") and Amyris, Inc. their subsidiaries, affiliates, successors, or assigns, ("Employer" or "Company"), and the benefits to be received by each as a result of the relationship, this *Mutual Agreement to Binding Arbitration* ("Agreement") is entered into as of the date signed by Employee.

1.       **MUTUAL AGREEMENT TO ARBITRATE CERTAIN DISPUTES AND CLAIMS**

1.1       Employee and Employer (together, the "Parties") agree to arbitrate any and all disputes, demands, claims, or controversies (collectively, "claim" or claims") we may have against each other (and in the case of Employee, including claims against current or former agents, owners, officers, directors or employees of the Employer), arising from the employment relationship between Employee and Employer, whether in tort, contract, or pursuant to a statute, regulation, or ordinance now in existence or which may in the future be enacted or amended or recognized at common law.  The Parties understand and agree that arbitration shall be the sole and exclusive method of resolving any and all existing and future claims, subject to this Agreement, that arise out of Employee's recruitment, hiring, or employment with the Employer or the termination of that employment. To the extent permitted by applicable law, the Parties agree that each may bring claims against the other only in their individual capacities, and not as a plaintiff or class member in any purported class, representative or collective proceeding (collectively referred to as a "Class Action" for purposes of this Agreement).  In addition, neither party can join any Class Action or participate as a member of a Class Action instituted by someone else in court or in arbitration in order to pursue any claim covered by this Agreement. The Parties further agree that the arbitrator may not consolidate the claims of more than one person or entity and may not preside over any form of Class Action.

1.2.       By way of example only, such claims subject to this Agreement include, but are not limited to:

1.2.1.       Claims for fraud, promissory estoppel, fraudulent inducement of contract or breach of contract or contractual obligation, whether such alleged contract or obligation be oral, written, or express or implied by fact or law;

1.2.2.       claims for wrongful termination of employment, violation of public policy and constructive discharge, infliction of emotional distress, misrepresentation, interference with contract or prospective economic advantage, defamation, unfair business practices, and any other tort or tort-like causes of action relating to or arising from the employment relationship or the formation or termination thereof;

1.2.3.       claims for discrimination, harassment, or retaliation under any and all federal, state, or municipal statutes, regulations, or ordinances that prohibit discrimination, harassment, or retaliation in employment, as well as claims for violation of any other federal, state, or municipal statute, regulation, or ordinance, except as set forth herein;

130

      1.2.4.    claims for non-payment or incorrect payment of wages, commissions, bonuses, severance, employee/fringe benefits not subject to the Employee Retirement Income Securities Act ("ERISA"), and the like, whether such claims be pursuant to alleged express or implied contract or obligation, equity, the California Labor Code, the Fair Labor Standards Act, the and any other federal, state or municipal laws governing wages, compensation or employee/fringe benefits (except those subject to ERISA); and

      1.2.5.    claims arising out of or relating to the granting, vesting, exercise or purchase and/or issuance of equity in the Company or options to purchase equity in the Company.

      1.3.    Notwithstanding the foregoing, claims for workers' compensation benefits, state disability benefits, or unemployment benefits, or any other claims not subject to arbitration as a matter of controlling law are not subject to this Agreement. Moreover, this Agreement does not prohibit the Parties from filing claims with the National Labor Relations Board, the Equal Employment Opportunity Commission, the U.S. Department of Labor or any other federal, state or local government office or agency to the extent applicable law permits such filings notwithstanding an agreement to arbitrate; nor does this Agreement prohibit Employee from filing a representative action in court under the California Labor Code Private Attorneys General Act ("PAGA") to the extent that the PAGA claim is deemed non-waivable under applicable law. If any non-arbitrable claim brought in court arises out of or relates to an underlying dispute that is subject to arbitration under this Agreement, the judicial action will be stayed pending completion of the arbitration. For example, if a court adjudicating a case involving Employee and the Company were to determine that there is a non-waivable right to bring a representative PAGA action, any such action shall be brought only in court, not in arbitration, and the PAGA claim shall not be litigated until the arbitration of any related claims is completed.

      1.4    The Parties agree that nothing in this Agreement precludes Employee from filing an administrative charge or complaint with, or from participating in, an administrative investigation of a charge or complaint before any government agency; or relieves either Employee or Employer from any obligation either may have to exhaust administrative remedies before arbitrating any claim under this Agreement.

**2.**    **ARBITRATION PROCEDURES**

      2.1.    **Place of Arbitration.**  The Parties agree that arbitration shall be conducted in San Francisco, California.

      2.2.    **Arbitration.**  The Parties agree that arbitration shall be conducted in accordance with the national rules for the resolution of employment disputes of the American Arbitration Association ("AAA Rules") then in effect, which may be accessed at the AAA website, www.adr.org, and a printed copy will be provided by the Company upon request.  However, the Parties shall be allowed discovery authorized by applicable law in arbitration proceedings.  To the extent permitted by applicable law, the arbitrator shall have the power to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement.

      2.3.    **Arbitrator**.  The Parties agree that arbitration shall be conducted before a single, neutral arbitrator selected by mutual agreement of the parties, but who need not be a panel member of the American Arbitration Association ("AAA").  However, if the parties cannot agree to such arbitrator, arbitration shall be conducted before a single, neutral arbitrator selected from AAA panel members in accordance with AAA National Rules for the Resolution of Employment Disputes.

2.4.    **Arbitrator's Powers.**  The arbitrator shall have the power to decide any motions brought by any party to the arbitration, including (without limitation) motions for summary judgment and/or adjudication, and motions to dismiss and demurrers, prior to any arbitration hearing. The arbitrator shall permit discovery essential to allow each side to adequately arbitrate their claims, including access to essential documents and witnesses. The arbitrator shall have the power to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement.  Notwithstanding the foregoing, the arbitrator shall not have the authority to amend, modify or delete any provision of this Agreement or **Employer's** policies, unless violative of applicable law.

2.5    **Arbitrator's Award.**  The Parties agree that the arbitrator shall issue a written award that sets forth the essential findings and conclusions on which the award is based.  The arbitrator shall have the authority to award any relief authorized by law in connection with the asserted claims or defenses, and the arbitrator's award shall be subject to correction, confirmation, or vacation, as provided by any applicable law setting forth the standard of judicial review of arbitration awards.  To the extent permitted by applicable law, the Parties agree that there is no right to have claims covered by this Agreement heard or arbitrated on a class action basis, and the arbitrator may not preside over any class.

2.6.    **Costs of Arbitration**.  The Company will pay all costs unique to arbitration, including the arbitrator's fees, that the Employee would not be required to pay if the claim was in court.

2.7.    **Attorneys' Fees.**  The Parties agree that they shall pay their own respective attorneys' fees and costs (exclusive of the costs of arbitration referenced above), incurred in connection with the arbitration, and the arbitrator will not have authority to award attorneys' fees and costs, including the costs of arbitration referenced above, unless a statute or contract at issue in the claim authorizes the award of attorneys' fees as required or permitted by law.  If there is a dispute as to whether Employer or Employee is the prevailing party in the arbitration, the arbitrator will decide that issue.

2.8.    **Applicable Law Governs.**  This Agreement is governed by the Federal Arbitration Act ("FAA") and, to the extent not inconsistent with the FAA, the law of the state of California.  To the extent that any provision of the AAA National Rules for the Resolution of Employment Disputes or this Section 2 conflicts with any arbitration procedures required by applicable law, the arbitration procedures required by applicable law shall govern.

**3.**    FINAL AND BINDING ARBITRATION.  The Parties understand and agree that arbitration of claims under this Agreement shall be instead of a trial before a court or jury.  We further understand and agree that, by signing this Agreement, we are expressly waiving any and all rights to a trial before a court or a jury regarding any claims subject to this Agreement that either now has against the other or that either may in the future have against the other.  This Agreement shall bind Employee and all heirs and representatives of Employee, and shall bind Employer and all successors to the Employer.

**4.**    GOVERNING LAW.  The Parties understand and agree that this Agreement and its validity, construction and performance, as well as disputes and/or claims arising under this Agreement, shall be governed by the Federal Arbitration Act and the laws of the State of California.

**5.**    SEVERABILITY.  The Parties understand and agree that if any term or portion of this Agreement shall, for any reason, be held to be invalid or unenforceable or to be contrary to public policy or any law, then the remainder of this Agreement shall not be affected by such invalidity or unenforceability but shall remain in full force and effect, as if the invalid or unenforceable term or portion thereof had not existed within this Agreement.

6.      **KNOWING AND VOLUNTARY AGREEMENT.** The Parties understand and agree that each has been advised to consult with an attorney of their own respective choosing before signing this Agreement, and each has had an opportunity to do so.  We each agree that we have read this Agreement carefully and understand that by signing it, we are waiving all rights to a trial or hearing before a court or jury of any of the claims subject to this Agreement. We each also agree that, in signing this Agreement, we are not relying on any representation or agreement that is not expressly set forth in this Agreement.

7.      **COMPLETE AGREEMENT.** The Parties understand and agree that:

        7.1     this Agreement contains the complete agreement between Employer and Employee regarding the subjects covered in it;

        7.2     this Agreement cancels and replaces any and all prior representations and agreements between them, if any regarding the subjects covered in it; and

        7.3     this Agreement may be modified only in a writing, expressly referencing this Agreement and Employee by full name, that has been signed by the General Counsel on behalf of the Employer and by Employee.

**The Parties agree that each has read this Agreement carefully and understands that by signing it, THE PARTIES ARE VOLUNTARILY WAIVING ALL RIGHTS TO A TRIAL OR HEARING BEFORE A COURT OR JURY OF ANY AND ALL DISPUTES AND CLAIMS SUBJECT TO ARBITRATION UNDER THIS AGREEMENT AND ARE WAIVING THE RIGHT TO PURSUE SUCH CLAIMS ON A CLASS ACTION OR REPRESENTATIVE BASIS TO THE FULLEST EXTENT PERMITTED BY LAW.**

Dated:  3/17/2022 | 2:51 PM PDT          Jasmina Samardzic
        _____                 _____

                                         Employee Signature


                                         Amyris, Inc.

Dated:  _____                 By: _____
                                             Patricia Cohello East

                                         Its: _____
                                              Vice President, Head of People

133

# amyris

**California Consumer Privacy Act of 2018 ("CCPA")**

Under the California Consumer Privacy Act of 2018 ("CCPA"), Amyris is required to inform California residents who are current, temporary or former employees of Amyris ("Employees") about the personal information we collect about you in connection with your employment with Amyris.

As a future Employee, pursuant to the CCPA you have the right to know and understand the categories of personal information we collect about you, the purposes for which the categories of personal information shall be used.

By signing below, you agree you have reviewed the complete Privacy Notice for Employees, Independent Contractors and Job Applicants.

If you have any questions regarding this information, please contact Amyris at privacy@amyris.com

Employee Name:

Date: 3/17/2022 | 2:51 PM PDT

# DISCHARGE INSTRUCTIONS

**Swedish Hospital**
Part of ✚NorthShore

**Jasmina Samardzic** MRN: 100056480

📍 Swedish Hospital Emergency Room   📍 SWEDISH HOSPITAL   📞 773-878-8200

## Your Next Steps

👍 Do

☐ Pick up these medications from any pharmacy with your printed prescription
- Ondansetron ODT

☐ Follow up with No Pcp Physician, MD in 3 day(s)
   As needed

## ED Disposition

| ED Disposition | Condition | Comment |
|---|---|---|
| **Discharge - good condition** | -- | -- |

You were seen by: **Hapeman, Brett J., DO**

## Diagnoses

| Diagnosis | Comment |
|---|---|
| **Postural dizziness with presyncope** | |
| **Nausea, vomiting and diarrhea** | |

## Discharge References/Attachments

**Nausea and Vomiting (English)**
**Lightheadedness or Faintness (English)**

Contact information for other follow-up providers:
   Follow up with No Pcp Physician, MD in 3 day(s)

These are your medications prescribed today:

| | | Sig | Dispense | Auth. Provider |
|---|---|---|---|---|
| **START** | Ondansetron ODT 4 MG TABLET DISPERSIBLE<br>Commonly known as: ZOFRAN ODT | Place 1 Tab in cheek three times per day as needed for For Nausea/Vomiting. Place tablet on tongue and allow to dissolve. | 8 Tab | Brett J. Hapeman, DO |

Where to pick up your medications

Pick up these medications from any pharmacy with your printed prescription
Ondansetron ODT

We strive to provide excellent care to every patient we see in the Emergency Department.  Before you leave, please be sure to:

- <u>Review your discharge instructions</u> with the ED staff to be sure that you are clear on how to care for yourself at home.
- <u>Ask any questions you may have;</u> let us know if you would like to reconnect with a member of your care team on any issues or concerns.
- <u>Inform your ED care team if there is anything you may need</u> prior to going home.

**VERBALIZED UNDERSTANDING OF DISCHARGE INSTRUCTIONS AND COPY GIVEN.**

NorthShoreConnect

You can view the details of your hospitalization, test results and schedule future NorthShore appointments by going to www.northshoreconnect.org. If you don't have a NorthShoreConnect account, please go to **www.northshoreconnect.org,** click 'SIGN UP NOW' and fill out the required information in order to activate your NorthShoreConnect account.

Need Help? Contact our NorthShoreConnect Support Line at 847.425.3900

Do you want a caregiver or loved one to help manage your care? With Family Access, they can review your discharge instructions, email your physicians, schedule appointments and tests, renewing prescriptions, and more. To get more information go to http://www.northshore.org/connect

**Would you share your experience with us?  Your perceptions and suggestions help us to continuously improve care at NorthShore.  If you receive a survey by email or mail, please take a moment to share your thoughts - we read, and value your feedback!**

## Nausea and Vomiting: Care Instructions

### Overview

 

© Healthwise, Incorporated

When you are nauseated, you may feel weak and sweaty and notice a lot of saliva in your mouth. Nausea often leads to vomiting. Most of the time you do not need to worry about nausea and vomiting, but they can be signs of other illnesses.

Two common causes of nausea and vomiting are a stomach infection and food poisoning. Nausea and vomiting from a viral stomach infection will usually start to improve within 24 hours. Nausea and vomiting from food poisoning may last from 12 to 48 hours.

The doctor has checked you carefully, but problems can develop later. If you notice any problems or new symptoms, **get medical treatment right away**.

**Follow-up care is a key part of your treatment and safety.** Be sure to make and go to all appointments, and call your doctor if you are having problems. It's also a good idea to know your test results and keep a list of the medicines you take.

## How can you care for yourself at home?

- To prevent dehydration, drink plenty of fluids. Choose water and other clear liquids until you feel better. If you have kidney, heart, or liver disease and have to limit fluids, talk with your doctor before you increase the amount of fluids you drink.
- Rest in bed until you feel better.
- When you are able to eat, try clear soups, mild foods, and liquids until all symptoms are gone for 12 to 48 hours. Other good choices include dry toast, crackers, cooked cereal, and gelatin dessert, such as Jell-O.

## When should you call for help?



**Call 911** anytime you think you may need emergency care. For example, call if:

- You passed out (lost consciousness).

**Call your doctor now** or seek immediate medical care if:

- You have symptoms of dehydration, such as:
  - Dry eyes and a dry mouth.
  - Passing only a little urine.
  - Feeling thirstier than usual.
- You have new or worsening belly pain.
- You have a new or higher fever.
- You vomit blood or what looks like coffee grounds.

Watch closely for changes in your health, and be sure to contact your doctor if:

- You have ongoing nausea and vomiting.
- Your vomiting is getting worse.
- Your vomiting lasts longer than 2 days.
- You are not getting better as expected.

## Where can you learn more?

Go to **https://www.northshore.org**  and use the search button or log into your NorthShore*Connect* account, go to "Resources" icon then "Search Medical Library".

Enter **H591** in the search box to learn more about "**Nausea and Vomiting: Care Instructions.**"

Current as of: June 6, 2022          Content Version: 13.4

© 2006-2022 Healthwise, Incorporated.

Care instructions adapted under license by NorthShore University Health System. If you have questions about a medical condition or this instruction, always ask your healthcare professional. Healthwise, Incorporated disclaims any warranty or liability for your use of this information.

# Lightheadedness or Faintness: Care Instructions

## Your Care Instructions

Lightheadedness is a feeling that you are about to faint or "pass out." You do not feel as if you or your surroundings are moving. It is different from vertigo, which is the feeling that you or things around you are spinning ortilting.

Lightheadedness usually goes away or gets better when you lie down. Iflightheadedness gets worse, it can lead to a fainting spell.

It is common to feel lightheaded from time to time. Lightheadedness usually is not caused by a serious problem. It often is caused by a short-lasting drop in blood pressure and blood flow to your head that occurs when you get up tooquickly from a seated or lying position.

**Follow-up care is a key part of your treatment and safety.** Be sure to make and go to all appointments, and call your doctor if you are having problems. It's also a good idea to know your test results and keep alist of the medicines you take.

## How can you care for yourself at home?

- Lie down for 1 or 2 minutes when you feel lightheaded. After lying down, sit up slowly and remain sitting for 1 to 2 minutes before slowly standing up.
- Avoid movements, positions, or activities that have made you lightheaded in the past.
- Get plenty of rest, especially if you have a cold or flu, which can cause lightheadedness.
- Make sure you drink plenty of fluids, especially if you have a fever or have been sweating.
- Do not drive or put yourself and others in danger while you feel lightheaded.

## When should you call for help?



**Call 911** anytime you think you may need emergency care. For example, call if:

- You have symptoms of a stroke. These may include:
  - Sudden numbness, tingling, weakness, or loss of movement in your face, arm, or leg, especially on only one side of your body.
  - Sudden vision changes.
  - Sudden trouble speaking.
  - Sudden confusion or trouble understanding simple statements.
  - Sudden problems with walking or balance.
  - A sudden, severe headache that is different from past headaches.
- You have symptoms of a heart attack. These may include:
  - Chest pain or pressure, or a strange feeling in the chest.
  - Sweating.
  - Shortness of breath.
  - Nausea or vomiting.
  - Pain, pressure, or a strange feeling in the back, neck, jaw, or upper belly or in one or both shoulders or arms.
  - Lightheadedness or sudden weakness.
  - A fast or irregular heartbeat.

After you call **911**, the operator may tell you to chew 1 adult-strength or 2 to 4 low-dose aspirin. Wait for an ambulance. Do not try to drive yourself.

Watch closely for changes in your health, and be sure to contact your doctor if:

- Your lightheadedness gets worse or does not get better with home care.

## Where can you learn more?

Go to **https://www.northshore.org** and use the search button or log into your NorthShore*Connect* account, go to "Resources" icon then "Search Medical Library".

Enter **X578** in the search box to learn more about "**Lightheadedness or Faintness: Care Instructions**."

Current as of: January 10, 2022          Content Version: 13.4

© 2006-2022 Healthwise, Incorporated.

Care instructions adapted under license by NorthShore University Health System. If you have questions about a medical condition or this instruction, always ask your healthcare professional. Healthwise, Incorporated disclaims any warranty or liability for your use of this information.

©2022 Epic Systems Corporation  Page 7 of 7